No. 23-3166

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

PENNSYLVANIA CONFERENCE OF THE NAACP, *et al.*,

v.

SECRETARY COMMONWEALTH OF PENNSYLVANIA, *et al.*

RICHARD MARINO; REPUBLICAN NATIONAL COMMITTEE;
NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE;
THE REPUBLICAN PARTY OF PENNSYLVANIA,

*Appellants.*

———————————

**On Appeal from the United States District Court for the
Western District of Pennsylvania, Case No. 1:22-cv-00339**

———————————

**APPELLANTS' OPENING BRIEF**

———————————

Kathleen A. Gallagher
THE GALLAGHER FIRM, LLC
436 Seventh Ave., 31st Floor
Pittsburgh, PA 15219
(412) 717-1900
kag@gallagherlawllc.com

Thomas W. King, III
Thomas E. Breth
DILLON, MCCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
(724) 283-2200
tking@dmkcg.com
tbreth@gmkcg.com

John M. Gore
(D.C. Bar No. 502057)
  *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
Ryan M. Proctor
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com
rproctor@jonesday.com

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Appellants disclose that they have no parent corporations and that no publicly held corporations hold 10% or more of their stock. Further, no publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding.

Dated:  December 27, 2023    /s/ John M. Gore
                                        John M. Gore
                                        *Counsel for Appellants*

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF CONTENTS .................................................................. ii

TABLE OF AUTHORITIES ............................................................. v

INTRODUCTION ......................................................................... 1

STATEMENT OF THE ISSUES ........................................................ 5

STATEMENT OF RELATED CASES .................................................. 6

STATEMENT OF THE CASE ........................................................... 6

    A.    Congress Enacts The Materiality Provision To Target Discriminatory Voter-Registration Practices. ...................... 6

    B.    The Pennsylvania Supreme Court Upholds The Date Requirement In 2022. ........................................................ 9

    C.    The District Court Invalidates The Date Requirement In 12 Counties. .................................................................. 11

    D.    Election Officials Belatedly Flip The Apparent Result Of A 2023 Race. ................................................................. 13

    E.    Marino Intervenes And Appellants Obtain A Stay. ............. 14

SUMMARY OF ARGUMENT .......................................................... 14

STANDARD OF REVIEW .............................................................. 16

ARGUMENT .............................................................................. 17

I.    THE DATE REQUIREMENT DOES NOT VIOLATE THE MATERIALITY PROVISION. ..................................................... 17

    A.    The Date Requirement Does Not Implicate The Materiality Provision. ........................................................ 19

        1.    The Date Requirement Does Not Apply To A "Record Or Paper" Related To An "Application, Registration, Or Other Act Requisite To Voting." ...... 19

2.  The Date Requirement Is Not Used "In Determining" Any Individual's Qualifications To Vote. 23

3.  The Date Requirement Does Not "Deny The Right Of Any Individual To Vote."........................................ 25

4.  The Federalism Canon Bars Application Of The Materiality Provision to the Date Requirement......... 30

5.  Constitutional Avoidance Bars Application Of The Materiality Provision To The Date Requirement................................................ 35

B.  The District Court's Reasoning Is Flawed........................... 40

C.  Plaintiffs' And The Secretary's Attempts To Rehabilitate The District Court's Construction Fail........... 45

II.  PLAINTIFFS HAVE NO RIGHT OF ACTION. ........................... 49

A.  The Materiality Provision Creates No Applicable Private Right Of Action..................................................... 50

B.  Section 1983 Creates No Applicable Private Right Of Action................................................................................ 51

III.  REGARDLESS OF THE MERITS AND ANY PRIVATE RIGHT OF ACTION, THE DISTRICT COURT'S REMEDY IS UNLAWFUL. .......................................................... 53

A.  The District Court's Judgment Violates Equal Protection. .......................................................... 54

B.  At Minimum, The District Court's Judgment Cannot Apply To The 2023 Elections. ............................. 57

IV.  THE MONTGOMERY COUNTY BOARD'S CERTIFICATION OF THE 2023 ELECTION DOES NOT AFFECT THIS COURT'S JURISDICTION. ............................... 60

A.  This Court Has Jurisdiction Over The Live Case Or Controversy Regarding Future Elections........................... 60

B.    This Court Has Jurisdiction Over The Live Case Or
Controversy Regarding The 2023 Election............................ 66

CONCLUSION ........................................................................................ 67

# TABLE OF AUTHORITIES

**Page**

**C**ASES

*Ala. Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021).................................................................... 30, 34

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)....................................................................... 50, 51

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ............................................................................ 31

*Baker v. Carr,*
    369 U.S. 186 (1962)............................................................................. 26

*Ball v. Chapman,*
    284 A.3d 1189 (Pa. 2022) ........................................... 1, 11, 56

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023) .............................................. *passim*

*Blunt v. Lower Merion Sch. Dist.,*
    767 F.3d 247 (3d Cir. 2014) ....................................... 62, 65

*Brnovich v. DNC,*
    141 S. Ct. 2321 (2021)....................................................................... 26

*Broyles v. Texas,*
    618 F. Supp. 2d 661 (S.D. Tex. 2009) .......................... 40

*Bush v. Gore,*
    531 U.S. 98 (2000)..................................................... *passim*

*Castro v. Scanlan,*
    86 F.4th 947 (1st Cir. 2023)............................................ 63

*Circuit City Stores v. Adams*,
    532 U.S. 105 (2001).............................................................21

*City of Boerne v. Flores*,
    521 U.S. 507 (1997).....................................................36, 37

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005).............................................................51

*Clingman v. Beaver*,
    544 U.S. 581 (2005).............................................................31

*Condon v. Reno*,
    913 F. Supp. 946 (D.S.C. 1995)...........................................9

*Crawford v. Marion Cnty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007)..............................................29

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008).............................................................29

*DNC v. Wis. State Legislature*,
    141 S. Ct. 28 (2020).............................................................29

*Fla. State Conf. of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008).......................................9, 22

*Freeman v. Quicken Loans, Inc.*,
    566 U.S. 624 (2012).............................................................21

*Friedman v. Snipes*,
    345 F. Supp. 2d 1356 (S.D. Fla. 2004)......................8, 18, 32

*Green Party of Tenn. v. Hargett*,
    767 F.3d 533 (6th Cir. 2014)..............................................63

*Harrison v. PPG Indus.*,
    446 U.S. 578 (1980).............................................................21

*In re 2003 Gen. Election for Off. of Prothonotary*,
  849 A.2d 230 (Pa. 2004) ....................................................... 66

*In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020*
  *Gen. Election*,
  241 A.3d 1058 (Pa. 2020) ....................................... 31, 46, 47

*In re Contest of Nov. 7, 2023 Election of Towamencin Twp.*
  *Supervisor*,
  No. 1482 CD 2023 (Pa. Comm. Ct. filed Dec. 12, 2023) .................... 13

*In re Ga. Senate Bill 202*,
  No. 1:21-cv-01284-JPB, 2023 WL 5334582 (N.D. Ga. Aug.
  18, 2023) ..................................................................... 32

*In re Revel AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015) ................................................. 14

*In re Sinclair*,
  870 F.2d 1340 (7th Cir. 1989) ............................................... 20

*Ind. Democratic Party v. Rokita*,
  458 Supp. 2d 775 (S.D. Ind. 2006) .......................................... 40

*Ingram v. Experian Info. Sols., Inc.*,
  83 F.4th 231 (3d Cir. 2023) ................................................. 16

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ......................................................... 35

*Kupau v. Yamamoto*,
  622 F.2d 449 (9th Cir. 1980) ............................................... 67

*L.A. Cnty. v. Davis*,
  440 U.S. 625 (1979) ......................................................... 43

*Lassiter v. Northampton Cnty. Bd. of Elections*,
  360 U.S. 45 (1959) .......................................................... 24

*LUPE v. Abbott*,
   No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov.
   29, 2023) ................................................................................ 32

*McDonald v. Bd. of Election Comm'rs*,
   394 U.S. 802 (1969) ....................................................... 27, 28

*Mecinas v. Hobbs*,
   30 F.4th 890 (9th Cir. 2022) ......................................... 62, 63

*Merrill v. Milligan*,
   142 S. Ct. 879 (2022) ............................................... 57, 58, 59

*Migliori v. Cohen*,
   36 F.4th 153. (3d Cir. 2022) ............................. 10, 43, 44, 53

*Moore v. Harper*,
   600 U.S. 1 (2023) ...................................................... 61, 66, 67

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) .................................................................. 26

*Ne. Ohio Coal. for the Homeless v. Husted*,
   837 F.3d 612 (6th Cir. 2016) ......................................... 50, 53

*Nelson v. Warner*,
   12 F.4th 376 (4th Cir. 2021) .............................................. 63

*NFIB v. OSHA*,
   595 U.S. 109 (2022) .............................................................. 35

*Pavek v. Donald J. Trump for President, Inc.*,
   967 F.3d 905 (8th Cir. 2020) ............................................... 63

*Poe v. Gerstein*,
   417 U.S. 281 (1974) ....................................................... 56, 59

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ....................................................................... 4, 58

*Republican Party of Pa. v. Degraffenreid*,
    141 S. Ct. 732 (2021) ..................................................................... 58

*Reynolds v. Sims*,
    377 U.S. 533 (1964) .............................................................. 42, 64, 65

*Ritter v. Migliori*,
    142 S. Ct. 1824 (2022) ........................................................... *passim*

*Ritter v. Migliori*,
    143 S. Ct. 297 (2022) ..................................................................... 10

*RNC v. DNC*,
    140 S. Ct. 1205 (2020) ............................................................... 57, 59

*RNC v. Schmidt*,
    No. 447 M.D. 2022 (Pa. Commw. Ct. Mar. 23, 2023) ...................... 12

*Rosario v. Rockefeller*,
    410 U.S. 752 (1973) .......................................................... 28, 30, 42, 43

*Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*,
    410 U.S. 719 (1973) ....................................................................... 49

*Sandusky Cnty. Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) .......................................................... 62

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ......................................... 9, 22, 30, 53

*Shays v. FEC*,
    414 F.3d 76 (D.C. Cir. 2005) .......................................................... 63

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013) .................................................................. 37, 39

*Smiley v. Holm,*
   285 U.S. 355 (1932) ................................................................ 31, 38

*Smith v. Boyle,*
   144 F.3d 1060 (7th Cir. 1998) ............................................. 63

*Tennessee v. Lane,*
   541 U.S. 509 (2004) .................................................................. 36

*Tex. Democratic Party v. Benkiser,*
   459 F.3d 582 (5th Cir. 2006) .............................................. 62

*Thrasher v. Ill. Republican Party,*
   No. 4:12-cv-4071-SLD-JAG, 2013 WL 442832 (C.D. Ill.
   Feb. 5, 2013) ............................................................................... 9

*Timmons v. Twin Cities Area New Party,*
   520 U.S. 351 (1997) ............................................................. 17, 48

*Trump v. Wis. Elections Comm'n,*
   983 F.3d 919 (7th Cir. 2020) ............................................... 58

*United States v. Mississippi,*
   380 U.S. 128 (1965) .................................................................. 37

*United States v. Mosley,*
   238 U.S. 383 (1915) ....................................................... 28, 42, 43

*United States v. Paxton,*
   No. 23-50885, ECF 80-1 (5th Cir. Dec. 15, 2023) .............. 6, 26, 32, 40

*Viera v. Life Ins. Co. of N. Am.,*
   642 F.3d 407 (3d Cir. 2011) .............................................. 17

*Vote.Org v. Callanen,*
   __ F.4th __, No. 22-50536, 2023 WL 8664636 (5th Cir. Dec.
   15, 2023) ......................................................................... *passim*

*Vote.Org v. Callanen*,
  39 F.4th 297 (5th Cir. 2022) ........................................................ 18, 19

*Vote.Org v. Ga. State Election Bd.*,
  No. 1:22-CV-01734-JPB, 2023 WL 2432011 (N.D. Ga.
  Mar. 9, 2023) ...................................................................................... 32

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022)................................................................ 35, 61

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)............................................................................ 35

*Wilton v. Seven Falls Co.*,
  515 U.S. 277 (1995)............................................................................ 59

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amendment XV, § 1 ............................................................ 36

U.S. Const. Amendment XV, § 2 ............................................................ 36

## STATUTES

### *Federal*

28 U.S.C. § 1291 ....................................................................................... 5

28 U.S.C. § 1331 ....................................................................................... 5

42 U.S.C. § 1983 .............................................................. 16, 51, 52, 53

52 U.S.C. § 10101(a) ...................................................... 23, 24, 25, 43

52 U.S.C. § 10101(a)(2)......................................................................... 20

52 U.S.C. § 10101(a)(2)(A)................................................................. 7, 24

52 U.S.C. § 10101(a)(2)(B)............................................................. *passim*

xi

52 U.S.C. § 10101(a)(2)(C) ................................................................ 7, 24

52 U.S.C. § 10101(a)(3)(A) .................................................................... 40

52 U.S.C. § 10101(b) .............................................................................. 25

52 U.S.C. § 10101(c) ........................................................................ 50, 52

52 U.S.C. § 10101(e) .................................................................. 24, 40, 52

52 U.S.C. § 10501 ................................................................................... 24

Civil Rights Act of 1964, Pub. L. No. 88-352, § 101(a), 78
  Stat. 241, 241 ..................................................................................... 7

*Pennsylvania*

25 P.S. § 1301(a) .................................................................................... 45

25 P.S. § 1301(b) .................................................................................... 25

25 P.S. § 2642 ........................................................................................ 12

25 P.S. § 3050 ........................................................................................ 34

25 P.S. § 3058 ........................................................................................ 34

25 P.S. § 3063(a) .................................................................................... 34

25 P.S. § 3146.4 ..................................................................................... 34

25 P.S. § 3146.6(a) ................................................................ 9, 33, 46, 55

25 P.S. § 3146.6(b)(3) .............................................................................. 9

25 P.S. § 3150.11(a) ................................................................................. 9

25 P.S. § 3150.16(a) ............................................................... 9, 33, 46, 55

25 P.S. § 3150.16(b)(3) ............................................................................ 9

25 P.S. § 3291 .................................................................... 66

25 P.S. § 3431 .................................................................... 66

25 P.S. § 3456 .................................................................... 66

Act of Mar. 9, 1945, P.L. 29, No. 17, 1945 Pa. Laws 29 ............................. 9

Act of Oct. 31, 2019, P.L. 552, No. 77 ..................................... 9

*Other States*

Ala. Code § 11-46-50 ........................................................ 34

Ala. Code § 17-11-7 .......................................................... 33

Ala. Code § 17-11-9 .......................................................... 34

Ariz. Rev. Stat. § 16-542 .................................................. 33

Ariz. Rev. Stat. § 16-547(A), (D) .................................... 33

Ariz. Rev. Stat. § 16-611 .................................................. 34

Ark. Code § 7-5-404(a)(1) ............................................... 33

Ark. Code § 7-5-405(a)(3)(A) .......................................... 33

Cal. Elec. Code § 3011(a)(2) ........................................... 33

Cal. Elec. Code § 3011(a)(9) ........................................... 34

Colo. Rev. Stat. § 1-10-1007 ........................................... 33

Colo. Rev. Stat. § 31-10-1002(1) .................................... 33

Conn. Gen. Stat. 145 § 9-137 ......................................... 33

Conn. Gen. Stat. § 9139(b) ............................................. 33

15 Del. Code § 4972(b)(6) ............................................... 34

15 Del. Code § 5503(k) ............................................................... 33

Fla. Stat. § 101.23 ...................................................................... 34

Fla. Stat. § 101.051(4) ............................................................... 34

Fla. Stat. § 101.64 ...................................................................... 34

Fla. Stat. § 101.65(3) ................................................................. 34

Fla. Stat. § 101.65(7) ................................................................. 33

Fla. Stat. § 101.657(4)(a) ........................................................... 33

Ga. Code Ann. § 21-2-384(b) ..................................................... 34

10 ILCS § 5/17-4 ........................................................................ 34

10 ILCS § 5/19-3 ........................................................................ 33

10 ILCS § 5/19-5 ........................................................................ 33

10 ILCS § 5/19-6 ........................................................................ 34

10 ILCS § 5/19A-40, 45 .............................................................. 33

Ind. Code 3 § 3-11-10-29 ............................................................ 33

Ind. Code § 3-11-10-24(d) .......................................................... 34

Ind. Code § 3-11.5-4-13 .............................................................. 34

Ky. Rev. Stat. § 117.076 ............................................................. 34

Ky. Rev. Stat. § 117.085(2) ......................................................... 33

Ky. Rev. Stat. § 117.085(3) ......................................................... 34

Ky. Rev. Stat. § 117.085(7) ......................................................... 33

Ky. Rev. Stat. § 117.0863 ........................................................... 34

La. Stat. Ann. § 18: 1306E.(1)(f) ...................................................... 33

La. Stat. Ann. § 562.C ...................................................................... 34

La. Stat. § 18:1306E.(2)(a) ................................................................ 33

La. Stat. § 18:1307A .......................................................................... 33

Mass. Gen. Laws Chapter 54 § 25(B)(a)(10) .................................... 34

Mass. Gen. Laws Chapter 54 § 25B(a)(2) .......................................... 33

Mass. Gen. Laws Chapter 54 § 25B(a)(3) .......................................... 34

Mass. Gen. Laws Chapter 54 § 25B(a)(9-10) ..................................... 33

Mass. Gen. Laws Chapter 54 § 25B(a)(14) .................................. 33, 34

Mass. Gen. Laws Chapter 54 § 25B(b)(8) ........................................... 33

Mass. Gen. Laws Chapter 54 § 25B(c)(5) ............................................ 33

Mass. Gen. Laws § 25B(b)(7) .............................................................. 34

Md. Code, Elec. Law § 9-308 .............................................................. 34

Md. Code § 9-305(a)(3)(i) ................................................................... 33

Minn. Stat. § 203B.07 ......................................................................... 34

Minn. Stat. § 203B.07(3) .................................................................... 33

Mont. Code Ann. § 13-19-301(b) ....................................................... 34

N.J. Stat. § 19:62-11(c) ...................................................................... 33

N.J. Stat. § 19:63-12 .......................................................................... 34

N.M. Stat. Ann. § 1-6-8 ..................................................................... 34

26 Okla. Stat. § 26-14-107(A)(1)........................................................ 34

S.C. Code Ann. § 7-15-370 ........................................................ 34

Tenn. Code 2-7-112(a)(2)(A) .................................................... 34

Tenn. Code § 2-6-202(a)(3) ...................................................... 33

Tenn. Code § 2-6-202(e) ........................................................... 33

Tenn. Code § 2-7-116 ............................................................... 34

Tex. Elec. Code § 63.003 ........................................................... 34

Va. Code § 24.2-611 ................................................................. 34

Va. Code § 24.2-643(B) ............................................................ 34

Va. Code § 24.2-649(A) ............................................................ 34

Vt. Stat. 17 § 2542(a) ................................................................ 33

Vt. Stat. § 2542(a) ................................................................... 33

Wash. Rev. Code § 29A.40.091(1) ............................................. 33

**REGULATIONS**

Ga. Comp. R. & Regs. § 183-1-14 ............................................. 33

Ga. Comp. R. & Regs. § 183-1-14.02(11) .................................. 33

Ga Comp. R. & Regs. § 183-1-14.05(c), (i) ................................ 33

**LEGISLATIVE HISTORY MATERIALS**

H.R. Rep. 88-914 (1963) ................................................... *passim*

**OTHER AUTHORITIES**

*National Voter Registration Application Form for U.S.
    Citizens*, U.S. Election Assistance Comm'n,
    https://perma.cc/GEU2-9SNN (last visited Dec. 26, 2023) ............... 20

*Oxford English Dictionary* (3d ed. 2021, rev. online Mar. 2023)...................................................................23

Pa. Dep't of State, *Election Results*, https://perma.cc/B9SZ-ZKEX (last visited Dec. 26, 2023).......................................... 63, 64, 65

Pa. Dep't of State, *Official Returns* (Nov. 3, 2020), https://perma.cc/M6DG-LRL4 ............................................64

Pa. Dep't of State, *Official Returns* (Nov. 8, 2022), https://perma.cc/N34U-HUQP...........................................63

U.S. Election Assistance Comm'n, *Voter FAQs*, https://perma.cc/FNQ3-SLC4 (last visited Dec. 4, 2023) ..................18

*Voter Registration Application*, D.C. Bd. of Elections, https://perma.cc/B8GX-K4E7 (last visited Dec. 8, 2023) ..................20

*Voter Registration*, Md. State Bd. of Elections ("Voter Registration Application"), https://perma.cc/FXC6-QKUD (last visited Dec. 8, 2023)...................................................20

Warren M. Christopher, *The Constitutionality of the Voting Rights Act of 1965*, 18 Stan. L. Rev. 1, 7 (1965)..................................8

*Webster's Third New International Dictionary* (1961)............................46

**INTRODUCTION**

In 2019, the Pennsylvania General Assembly enacted bipartisan legislation making voting by mail available to all registered voters. As part of this historic compromise, the General Assembly preserved Pennsylvania's longstanding requirement that voters sign and date the outer envelope of their mail ballots.

In 2022, the Pennsylvania Supreme Court rejected a state-law challenge to the date requirement, upheld it against a challenge under an obscure provision of the Civil Rights Act called the Materiality Provision, and prohibited all 67 county boards of elections from counting ballots that fail to comply with it. *See Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022); *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023). That decision came shortly after three Justices of the United States Supreme Court stated the date requirement "very likely" comports with the Materiality Provision. *Ritter v. Migliori*, 142 S. Ct. 1824, 1824 (2022) (Alito, J., dissental).

Dissatisfied with the General Assembly's enactment and *Ball*, private plaintiffs challenged the date requirement in federal court. They argued that it violates the Materiality Provision—and had done so,

1

unknown to anyone, *for nearly sixty years*. In fact, under Plaintiffs' construction, *all* paper-based requirements for voting by mail—including *all* such measures to protect against voter fraud, no matter how necessary or effective—have been outlawed by Congress since 1964, because they are not used to determine voter qualifications.

This is nonsense. The Materiality Provision serves an important, but properly focused, role in protecting the right to vote against discriminatory state efforts to prevent qualified individuals from registering to vote. In line with this purpose, the Materiality Provision regulates only voter-qualification determinations made during the voter-registration process. The Provision applies only to "registration" and "other" analogous acts. 52 U.S.C. § 10101(a)(2)(B). It is implicated only "in determining" voters' qualifications. *Id.* And it prohibits only outright "den[ials]" of "the right ... to vote" by deeming a would-be voter ineligible based on "not material" errors or omissions on registration-related paperwork. *Id.* The Materiality Provision simply does not address ballot-casting rules, like the date requirement, that govern how qualified voters cast a ballot. *See id.*

Plaintiffs' contrary view, adopted by the District Court, also has no support in the Civil Rights Act's legislative purpose or—until *very* recently—caselaw.  It conflicts with the views of three Supreme Court justices in *Ritter*, three Pennsylvania Supreme Court justices in *Ball*, and the Fifth Circuit.  It offends federalism by inferring from vague language a transformative shift in power from state legislatures to federal courts.  And it risks rendering the Materiality Provision unconstitutional by unmooring it from the Congressional findings supporting it.  This Court should put this sweeping and destructive interpretation to rest for good.

The District Court's misconstruction of the Materiality Provision was not its only reversible error.  Its order requiring election officials to count ballots that do not comply with the date requirement applies to only 12 of Pennsylvania's 67 county boards of elections.  The other 55 county boards remain subject to the Pennsylvania Supreme Court's order *not* to count such noncompliant ballots.  The District Court's order thus mandates "varying standards to determine what [is] a legal vote" from "county to county" in violation of the Equal Protection Clause.  *Bush v. Gore*, 531 U.S. 98, 106-07 (2000).

Finally, the District Court's order violates the *Purcell* principle.  *See*

*Purcell v. Gonzalez*, 549 U.S. 1 (2006). Under that principle, federal courts may not change the rules even shortly *before* an election. The District Court here did something even worse by changing the rules *after* an election. For weeks after Election Day 2023, the voters of Towamencin Township believed that Appellant Richard Marino had won reelection to the Board of Supervisors. That is because he had: when election officials counted all ballots under the rules in effect on Election Day, Mr. Marino was the winner. But wielding the District Court's order, the Montgomery County Board of Elections belatedly counted ballots that do not comply with the date requirement, flipped the apparent result of Marino's election, and declared his opponent the winner. This happened only because the Montgomery County Board is one of the 12 county boards subject to the District Court's order, not one of the 55 still bound by *Ball*.

The Court should put an end to the District Court's misreading of the Materiality Provision and unleashing of electoral chaos on the Commonwealth of Pennsylvania and its citizens in 2023, 2024, and beyond. The Court should reverse.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because Appellants timely appealed, App.1, from the District Court's final judgment, App.8-12.

The District Court had original jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claim arises under a federal statute.

## STATEMENT OF THE ISSUES

1.    Whether Pennsylvania's date requirement violates the Materiality Provision. *See* App.73-85, 95-107, 120-129.

2.    Whether private individuals have a right of action to enforce the Materiality Provision. *See* App.63-66, 94-95, 120.

3.    Whether the District Court violated the Equal Protection Clause by creating conflicting standards for determining the validity of ballots across Pennsylvania counties. App.5-6, 49-50, 140-41.

4.    Whether the District Court violated the *Purcell* principle by altering the rules governing an already completed election. App.6, 88-89, 138-40.

5.    Whether the Montgomery County Board of Elections'
certification of the 2023 election has any effect on the Court's jurisdiction.
*See* Stay Pending Appeal Order, ECF 43 at 3.

## STATEMENT OF RELATED CASES

This case has not previously come before this Court.  The issue of
the Materiality Provision's applicability to state ballot-casting rules is
currently before the Fifth Circuit, in which that court recently stayed a
district court decision invalidating a Texas law requiring voters to
include identification numbers on mail ballot applications and ballots.
*See* Order Granting Stay Pending Appeal, *United States v. Paxton*, No.
23-50885, ECF 80-1 (5th Cir. Dec. 15, 2023) ("*Paxton* Stay Order").

## STATEMENT OF THE CASE

### A.    *Congress Enacts The Materiality Provision To Target Discriminatory Voter-Registration Practices.*

Almost a century after the Fifteenth Amendment gave African
Americans the right to vote on paper, many African Americans still had
been prevented from registering to vote.  At the end of 1963, in "over 250
counties … less than 15 percent of the voting-age [African-Americans
were] registered to vote."  H.R. Rep. 88-914, pt. 2, at 2 (1963).  Congress
laid the blame for this on efforts by local "voting officials to defeat

[African-American] registration." *Id.* at 5. Among other problems, "registrars will overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting [an African-American] application for the same or more trivial reasons." *Id.*

Congress addressed these problems in Section 101(a) of the Civil Rights Act of 1964, which consists of three provisions addressed to "State registration officials," *id.*, and "designed to insure nondiscriminatory practices in the registration of voters," *id.*, pt. 1, at 19; *see* Civil Rights Act of 1964, Pub. L. No. 88-352, § 101(a), 78 Stat. 241, 241 (codified at 52 U.S.C. § 10101(a)(2)).

The first requires state officials to apply uniform standards "in determining whether any individual is qualified" to vote. 52 U.S.C. § 10101(a)(2)(A). The second, the Materiality Provision, prohibits "deny[ing] the right … to vote" based on certain errors or omissions that are "not material in determining whether [an] individual is qualified under State law to vote." *Id.* § 10101(a)(2)(B). The third narrowed the permissible uses of a "literacy test as a qualification for voting." *Id.* § 10101(a)(2)(C).

The House Report consistently described the Materiality Provision, like the other two provisions of Section 101(a), as a regulation of the voter-registration process. *See* H.R. Rep. 88-914, pt. 1, at 19 (Provision bars "registration officials" from "disqualifying an applicant for immaterial errors or omissions"); *id.* (Provision "prohibit[s] the disqualification of an individual because of immaterial errors or omissions"); *id.*, pt. 2, at 5 (under the Provision, "State registration officials must … disregard minor errors or omissions if they are not material in determining whether an individual is qualified to vote"). Observers at the time read it similarly. *E.g.*, Warren M. Christopher, *The Constitutionality of the Voting Rights Act of 1965*, 18 Stan. L. Rev. 1, 7 (1965) (Provision prohibits "[d]enial of the right to vote in any federal election because of immaterial omissions or errors in registration forms").

This understanding also prevailed in the courts for the next half century. In 2004, a court observed it had found no "case law in [any] jurisdiction … indicat[ing] that section [10101](a)(2)(B) was intended to apply to the counting of ballots by individuals *already deemed qualified to vote*." *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004). Other decisions agreed that the Materiality Provision targets "the

practice of disqualifying potential voters for their failure to provide information irrelevant to determining their eligibility to vote." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); *see Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008); *Thrasher v. Ill. Republican Party*, No. 4:12-cv-4071-SLD-JAG, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013); *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995).

**B.    *The Pennsylvania Supreme Court Upholds The Date Requirement In 2022.***

In 2019, a bipartisan majority of the Pennsylvania General Assembly adopted universal mail-in voting for the first time in history. Act of Oct. 31, 2019, P.L. 552, No. 77, sec. 8 ("Act 77"); *see* 25 P.S. § 3150.11(a). As part of that compromise, the General Assembly required that mail-in voters "fill out, date and sign the declaration" on the ballot return envelope.   Act 77, sec. 6, 8; *see* 25 P.S. §§ 3146.6(a), (b)(3), 3150.16(a), (b)(3).  The declaration includes the statement that the voter is "a qualified registered elector."  25 P.S. §§ 3146.6(b)(3), 3150.16(b)(3). This was nothing new: Pennsylvania has required residents voting by mail to date their ballots since 1945.  *See* Act of Mar. 9, 1945, P.L. 29, No. 17, 1945 Pa. Laws 29, 37.

9

Various groups of plaintiffs responded to Pennsylvania's historic expansion of mail-in voting with challenges to the nearly 80-year-old date requirement. After several failed state-court challenges, individuals filed a federal lawsuit claiming that the requirement violates the Materiality Provision.

This Court agreed and held that the Provision applies to all paper-based voting requirements, including ballot-casting rules, not just to registration-related rules. *Migliori v. Cohen*, 36 F.4th 153, 162 n.56 (3d Cir. 2022). It further held that a requirement is not material unless it "goes to determining" an individual's qualifications. *Id.* at 163. Since the date requirement is not used to determine qualifications under Pennsylvania law (age, citizenship, residency, or imprisonment for a felony), the Court declared it unlawful, "[e]ven if [it] is true" that the requirement "'serves a significant fraud-deterrent function' and 'prevents the tabulation of potentially fraudulent back-dated votes.'" *Id.*

The Supreme Court vacated *Migliori* after the case became moot, depriving it of precedential effect. *Ritter v. Migliori*, 143 S. Ct. 297 (2022). When addressing a stay request on the emergency docket, three Justices opined that this Court's now-vacated holding was "very likely

wrong." *Ritter*, 142 S. Ct. at 1824 (Alito, J., dissental).  According to those Justices, *Migliori* conflated "the forfeiture of the right to vote" due to "failure to follow" ballot-casting rules with "the denial of 'the right to vote.'"  *Id.* at 1825.  Further, they found it "absurd to judge the validity of" "the rules for casting a vote" "based on whether they are material to eligibility."  *Id.*

The Pennsylvania Supreme Court also declined to follow *Migliori*. In 2022, it affirmed that mail-in ballots that fail to comply with the date requirement are invalid and ruled, by an equally divided vote, that the requirement does not violate the Materiality Provision.  *Ball*, 284 A.3d at 1192.  It therefore prohibited all 67 county boards from counting such noncompliant ballots.  *Ball*, 289 A.3d 1.

## C.   *The District Court Invalidates The Date Requirement In 12 Counties.*

Shortly after the Pennsylvania Supreme Court decided *Ball*, Plaintiffs filed this lawsuit against all 67 county boards of elections and the Secretary of the Commonwealth.  App.16.  Appellants Republican National Committee, National Republican Congressional Committee, and Pennsylvania Republican Party (collectively, "Republican Party Appellants") intervened as defendants.  App.51-52.

11

At summary judgment, the District Court concluded that Plaintiffs had standing to bring their Materiality Provision claim against the Secretary and 12 county boards, but not against the remaining 55 county boards, which it dismissed. App.46. On the merits, it relied on *Migliori* to hold that the date requirement violates the Materiality Provision and entered a "declaratory judgment" against the 12 boards and the Secretary. App.6, 73-85.

The "declaratory judgment" does not run against the 55 dismissed county boards. Nor does the District Court's injunction against the Secretary, *see* App.7, change the obligations of any county board. The Secretary "does not have control over the County Boards' administration of elections, as the General Assembly conferred such authority solely upon the County Boards." *RNC v. Schmidt*, No. 447 M.D. 2022 (Pa. Commw. Ct. Mar. 23, 2023) (slip op. at 19-20); *see also* 25 P.S. § 2642. The 55 dismissed boards therefore remain subject to the Pennsylvania Supreme Court's order to enforce the date requirement by not counting any noncompliant ballot. *See Ball*, 289 A.3d 1.

The Republican Party Appellants filed a notice of appeal on December 6, 2023. App.1-2.

**D.    *Election Officials Belatedly Flip The Apparent Result Of A 2023 Race.***

Mr. Marino is the vice chairman of the Towamencin Township Board of Supervisors and ran for reelection in the November 7, 2023 election.  App.143 ¶¶ 3, 6.  Under the rules in effect on Election Day— and under which Towamencin Township citizens voted—Marino prevailed by 4 votes.  *Id.* ¶ 7.

The District Court's order issued two weeks later.  The Montgomery County Board of Elections then invoked the order to flip the apparent result of Marino's race.  *See* App.143-44 ¶¶ 8-16.  It did so by counting 6 noncompliant ballots, declaring the race a tie, and, on November 30, declaring Marino's opponent, Kofi Osei, the winner through a casting of lots.  *See id.* ¶¶ 9-12.

On December 4, Towamencin Township voters filed a contest to the Montgomery County Board's certification of Osei as the winner.  *See* Petition, *In Re: Contest of Nov. 7, 2023 Election of Towamencin Twp Supervisor*, No. 2023-26306 (Ct. Comm. Pls. of Mont. Cty.), App.151. Three days later, the Pennsylvania Court of Common Pleas denied the petition on the merits, citing the District Court's opinion as the "basis" for its ruling.  App.197.  The voters have appealed.  *In re Contest of Nov.*

13

*7, 2023 Election of Towamencin Twp. Supervisor*, No. 1482 CD 2023 (Pa. Comm. Ct. filed Dec. 12, 2023).

### E.    *Marino Intervenes And Appellants Obtain A Stay.*

On December 7, 2023, Marino moved to intervene in this Court, ECF 8, and the Republican Party Appellants and Marino jointly filed a motion for stay pending appeal, ECF 9. This Court granted both motions on December 13. ECF 43. The motions panel noted it was not deciding whether Appellants were "more likely than not" to prevail. *Id.* at 3. But it did cite *In re Revel AC, Inc.*, 802 F.3d 558, 568-69 (3d Cir. 2015), indicating it believed Appellants had "a reasonable chance, or probability, of winning," *id.*

## SUMMARY OF ARGUMENT

**I.    A.**    The date requirement cannot violate the Materiality Provision for three reasons. *First*, a ballot envelope is not an "application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). *Second*, the date requirement is not used "in determining" a voter's eligibility to vote. *Id. Third*, the requirement does not "deny" anyone "the right … to vote," because a voter who fails to comply with it remains

eligible to vote in any election on equal terms with all other eligible voters. *Id.*

**B.** The District Court's contrary reading is untenable. It would disable states from pursuing *any* interest other than determining voter eligibility through paper-based regulations. That would invalidate a host of state ballot-casting rules, such as signature requirements, long thought to be permissible. Under the federalism canon, such a dramatic withdrawal of states' authority requires a clear statement absent from the Provision. Further, the District Court's reading would also render the Provision unconstitutional under the Fifteenth Amendment, because it would unmoor the Provision's reach from the enacting Congress's findings, which were limited to registration.

**C.** Alternatively, if Plaintiffs are right to say, in the teeth of the District Court's decision, that a signature requirement is material, then so is the date requirement, since it serves similar interests.

**II.** Plaintiffs' claims independently fail because they have no right of action. **A.** There is no textual basis for inferring a private right of action from the Materiality Provision itself. **B.** Moreover, the

availability of a more limited private right of action in § 10101 forecloses reliance on § 1983.

**III.** Regardless of the merits, the District Court must be reversed. **A.** The District Court's judgment requires disparate treatment of similarly situated ballots in different counties, in violation of the Equal Protection Clause. **B.** At minimum, application of the District Court's judgment to an election that had already occurred violated the *Purcell* principle.

**IV.** The Montgomery County Board's certification of the 2023 election does not affect this Court's jurisdiction. **A.** That certification has no effect on the Court's jurisdiction to resolve the live controversy regarding the rules for future elections in 2024 and beyond. **B.** This Court also has jurisdiction to resolve the live controversy regarding the 2023 election. The District Court's order is the main impediment to Marino being rightfully declared the winner of that election through the pending state-court contest.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment, as well as questions of statutory interpretation, *de novo*. *Ingram v. Experian Info.*

*Sols., Inc.*, 83 F.4th 231, 236 (3d Cir. 2023); *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011).

## ARGUMENT

The Court should reverse the District Court for three independent reasons. *First*, the date requirement does not even implicate, let alone violate, the Materiality Provision. *Second*, Plaintiffs have no right of action to enforce the Provision. *Third*, regardless of the date requirement's lawfulness and any private right to enforce the Provision, the District Court's remedy runs afoul of the Equal Protection Clause and the *Purcell* principle. The Montgomery County Board of Elections' certification of the 2023 election is no obstacle to reversal, since it does not affect this Court's jurisdiction.

## I. THE DATE REQUIREMENT DOES NOT VIOLATE THE MATERIALITY PROVISION.

"States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Yet according to the District Court, the Materiality Provision prohibits states from adopting *any* mandatory paper-based election

rule—including any ballot-casting rule—unless it is used to determine voter eligibility.  *See* App.78.

That makes no sense: "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" the Materiality Provision. *Vote.Org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022) ("*Vote.Org I*"); *see also Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental).  Almost every state, including Pennsylvania, determines voter eligibility during a voter-registration process.  *See, e.g.*, U.S. Election Assistance Comm'n, *Voter FAQs*, https://perma.cc/FNQ3-SLC4  (last visited Dec. 4, 2023) (noting 49 states require voters "to be registered to vote to participate in an election").  The Materiality Provision governs only qualification determinations during *that* process, not "the counting of ballots by individuals *already deemed qualified to vote*." *Friedman*, 345 F. Supp. 2d at 1371; *see Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental); *Vote.Org I*, 39 F.4th at 305 n.6.  The date requirement thus does not even *implicate*, let alone violate, the Materiality Provision because it is a ballot-casting rule inapplicable to qualification determinations and voter registration.

## A.    *The Date Requirement Does Not Implicate The Materiality Provision.*

The Materiality Provision forbids state actors to:

> deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

In at least three ways, the Materiality Provision's plain text confirms that the date requirement cannot violate it.  And to the extent any doubt remains, the federalism and constitutional avoidance canons require this conclusion.

### 1.    The Date Requirement Does Not Apply To A "Record Or Paper" Related To An "Application, Registration, Or Other Act Requisite To Voting."

The Materiality Provision applies only to a "record or paper" related to an "application, registration, or other act requisite to voting."  *Id.* These terms refer to documents used in "only voter registration specifically."  *Vote.Org I*, 39 F.4th at 305 n.6; *see Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental); *see also Vote.Org v. Callanen*, __ F.4th __, No. 22-50536, 2023 WL 8664636, at *12 n.7 (5th Cir. Dec. 15, 2023) ("*Vote.Org II*") (noting that applying the Provision to rules regulating "vote

counting" rather than voter registration is "possibly overbroad"). Indeed, the House Report notes that § 10101(a)(2), including the Materiality Provision, "is designed to insure nondiscriminatory practices in the registration of voters." H.R. Rep. No. 88-914, pt. 2, at 19.

The relevant legislative history also shows Congress used "application" and "registration" interchangeably to refer to voter registration. H.R. Rep. 88-914, pt. 1, at 19 (Provision bars "registration officials" from "disqualifying an applicant for immaterial errors or omissions"); *id.* at 77 (referring to "application to register"); *id.*, pt. 2, at 5 (referring to efforts to "defeat [African-American] registration" by "rejecting [African-American] applications" to vote); *id.* (faulting "registrars" for "rejecting [African-American] application[s]" in registration process); *cf. In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989) (Easterbrook, J.) (recognizing that legislative history is an "invaluable" aid when used to "reconstruct the legal and political culture" in which the text was enacted). And states still do so today.[1]

---

[1] *E.g.*, *Voter Registration*, Md. State Bd. of Elections ("Voter Registration Application"), https://perma.cc/FXC6-QKUD (last visited Dec. 8, 2023); *Voter Registration Application*, D.C. Bd. of Elections, https://perma.cc/B8GX-K4E7 (last visited Dec. 8, 2023); *National Voter*

The catch-all phrase "other act requisite to voting" likewise refers only to voter registration. 52 U.S.C. § 10101(a)(2)(B). "[W]here general words follow an enumeration of specific items, [they] are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Indus.*, 446 U.S. 578, 588 (1980). Thus, the catch-all phrase must be "controlled and defined by reference to the enumerated categories," *Circuit City Stores v. Adams*, 532 U.S. 105, 115 (2001), of "application" and "registration," 52 U.S.C. § 10101(a)(2)(B); *see Ball*, 289 A.3d at 38 n.11 (opinion of Brobson, J.).

Application of *ejusdem generis* is the only way to give meaning to the entire phrase "application, registration, or other act requisite to voting." If the canon did not limit the catch-all phrase, the words "registration" and "application" would become superfluous—an outcome courts must "avoid[]." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012). In contrast, with the canon applied, the catch-all still has plenty to do. It helps prevent state and local election officials from circumventing the Materiality Provision based on labeling: Referring to

---

*Registration Application Form for U.S. Citizens*, U.S. Election Assistance Comm'n, https://perma.cc/GEU2-9SNN (last visited Dec. 26, 2023).

a qualification-determining practice as something other than a voter
"application" or "registration" does not permit disqualifying voters for
immaterial paperwork "error[s] or omission[s]." 52 U.S.C.
§ 10101(a)(2)(B). And it may cover any forms citizens must submit to
remain registered to vote besides initial applications and registrations,
such as a declaration by a released felon that he has paid all outstanding
fines or by an inactive voter that she continues to reside at her registered
address.

Moreover, only the application of *ejusdem generis* harmonizes the
Materiality Provision's reach with precedent and Congress's statutory
aim: preventing states from "defeat[ing] [African-American voter]
registration" by denying their registration applications based on "minor
misspelling errors or mistakes in age or length of residence." H.R. Rep.
No. 88-914, pt. 2, at 5; *see Fla. State Conf. of NAACP*, 522 F.3d at 1173;
*Schwier*, 340 F.3d at 1294; *supra* 6-8, 19-20.

The date requirement is not applied during Pennsylvania's voter-
registration process. It governs the casting of mail ballots and, as the
District Court explained, applies only to voters who "ha[ve] previously

been determined to be eligible and qualified to vote." App.61.  It therefore does not implicate, let alone violate, the Materiality Provision.

### 2.    The Date Requirement Is Not Used "In Determining" Any Individual's Qualifications To Vote.

The Materiality Provision also requires that the paper or record be used "in determining" whether an individual is "qualified" to vote. § 10101(a)(2)(B).    When used with a "verbal noun[]"—here, "determining"—the word "in" is typically "equivalent in sense to a temporal clause introduced by *when*, *while*, *if*."  *In*, prep., def. 21(b), *Oxford English Dictionary* (3d ed. 2021, rev. online Mar. 2023).   The Provision thus applies only to actions taken *when determining* a voter's eligibility.  *Ball*, 289 A.3d at 38 (opinion of Brobson, J.); *see also Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental).

The structure of § 10101 underscores this point.  The immediately preceding provision of § 10101(a)—subsection (a)(2)(A)—requires "uniform standards *for voter qualifications*" within the same political subdivision of a state.  52 U.S.C. § 10101(a) (subsection title) (emphasis added).  It also uses a substantially identical phrase—"in determining whether any individual is qualified under State law or laws to vote in any

election"—to make clear that it is limited to voter-qualification determinations. *Id.* § 10101(a)(2)(A). And the subparagraph following the Materiality Provision, subsection (a)(2)(C), which bans literacy tests formerly used in southern states during voter registration, *e.g.*, *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 46 (1959), is likewise limited to "qualification" determinations, 52 U.S.C. § 10101(a)(2)(C).[2]

Subsection (e) of § 10101 further reinforces the qualification-and-registration focus of § 10101(a). That subsection empowers courts to address systemic violations of "*any* right or privilege secured by subsection (a)," including the Materiality Provision. *Id.* § 10101(e) (emphasis added). Yet the only remedy it authorizes is "an order declaring [an applicant] qualified to vote." *Id.* Subsection (e) thus confirms that the "right" secured by § 10101(a) and the Materiality Provision is the right of qualified individuals to register to vote. Indeed, if the Materiality Provision extended beyond voter-qualification determinations during the voter-registration process, subsection (e)'s

---

[2] Congress reinforced that § 10101(a) is limited to qualification determinations when it later enacted a separate provision banning literacy tests at all other steps of the election process. *See* 52 U.S.C. § 10501.

24

remedy would not enable courts to redress the violation of "*any* right" secured by it. *Id.* (emphasis added).

In contrast, when Congress wanted to prohibit intimidation in the *act* of voting, it sensibly set that topic apart in its own subsection, subsection (b), rather than stuff it between provisions about voter registration and qualifications. *See id.* § 10101(b) (prohibiting intimidation in the act of voting).

Pennsylvania, like virtually every state, determines whether an "individual is qualified to vote," 52 U.S.C. § 10101(a)(2)(B), during the voter-registration process, *see* 25 P.S. § 1301(b). As a regulation of mail-in voting, the date requirement has nothing to do with determining a voter's *qualifications* but, instead, is used to determine a ballot's *validity* applies only after election officials have *already* found the voter qualified through the voter-registration process. *See* App.79. Thus, the Materiality Provision does not regulate, much less invalidate, the date requirement.

### 3. The Date Requirement Does Not "Deny The Right Of Any Individual To Vote."

The Materiality Provision prohibits only "deny[ing] the right of any individual to vote," not imposing mandatory ballot-casting rules like the

25

date requirement.  52 U.S.C. § 10101(a)(2)(B); *see also Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental).  For at least two reasons, this clause confirms that the date requirement does not even implicate, let alone violate, the Materiality Provision.

In the first place, the "right to vote" does not encompass mail-in voting, so mail-in voting rules do not deny any individual that right.  *See, e.g.*, *Paxton* Stay Order at 5 (mail-in voting rules "do not deny anyone the right to vote" under "the Materiality Provision" "because they only affect the ability of some individuals to vote by mail").  By the mid-1960s, the "right … to vote" was a well-established concept with a well-established meaning.  *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 247 (1962) (Douglas, J., concurring) (the "right to vote" was "protected by the judiciary long before that right received the explicit protection" in civil-rights statutes).  The Materiality Provision thus "codified a *pre-existing* right," not a "novel principle," so its contours must be discerned with reference to "history." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022); *cf. Brnovich v. DNC*, 141 S. Ct. 2321, 2338-39 (2021) (looking to "standard practice" at the time "when § 2 [of the Voting Rights Act] was amended"

to determine what "furnish[es] an equal 'opportunity' to vote in the sense meant by § 2").

At the time the Materiality Provision was enacted, the "right to vote" meant the right to register to vote and to cast a ballot on equal terms with other registered voters. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969). It was not understood to entail a right to vote by mail, since mail-in voting was limited to a small number of situations. *See, e.g.*, *id.* at 804 (discussing Illinois statute permitting mail-in voting only for voters "absent from the county" and those otherwise "unable to appear at the polls because of physical incapacity, religious holidays, or election duties"). And just a few years after the Provision became law, the Supreme Court unanimously held that "the right to vote" does not encompass the "right to receive absentee ballots." *Id.* at 807. Thus, applying a neutral paper-based rule to decline to count a mail ballot does not deny an individual of the "right to vote" under the Materiality Provision.

In the second place, more generally, mandatory ballot-casting rules do not deny anyone "the right to vote" under the Materiality Provision. *See, e.g.*, *Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental). At the time of

the Provision's enactment, the "right to vote" entailed a right to require election officials to count a ballot so long as it is "lawful and regular" and thus "entitled to be counted" under state law. *United States v. Mosley*, 238 U.S. 383, 385-86 (1915). It did not contemplate a right to be *free* from neutral, generally applicable state laws governing the act of casting a ballot. *See, e.g.*, *id.*

*McDonald*, for instance, recognized that restrictions on mail-in voting may make casting a ballot "extremely difficult, if not practically impossible," for some individuals. 394 U.S. at 810. But because such restrictions do not formally "deny [anyone] the exercise of the franchise," they do not implicate "the right to vote." *Id.* at 807-08.

Likewise, *Rosario v. Rockefeller* recognized that laws that "totally den[y] the electoral franchise to a particular class of residents" by deeming them not "eligible to vote" deny "the right to vote." 410 U.S. 752, 756-57 (1973). But laws regulating the voting process, such as "a time deadline," do not "disenfranchise" anyone. *Id.* at 757.

This distinction between laws that disenfranchise by depriving eligible individuals of the opportunity to vote on equal terms and laws that regulate the casting of ballots persists to this day. *See, e.g.*, *Ritter*,

142 S. Ct. at 1825 (Alito, J., dissental) ("Even the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right."); *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral) ("[A] State's election [rule] does not disenfranchise voters who are capable of [following it] but fail to do so."); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007) (Posner, J.) (distinguishing denials of the right to vote from regulations that cause some "eligible voters to disenfranchise themselves"), *aff'd*, 553 U.S. 181 (2008).  And that distinction informs the scope of the Materiality Provision.  Only rules that deprive eligible individuals of the opportunity to vote on equal terms for immaterial errors or omissions on registration-related paperwork violate the Provision; rules that regulate *how* eligible individuals receive and cast their ballots do not.  *See, e.g.*, *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental); *Ball*, 289 A.3d at 38-39 (opinion of Brobson, J.).

For this reason as well, the date requirement cannot, and does not, "deny" the "right to vote" under the Materiality Provision.  Election officials enforcing the date requirement do not "disqualify potential

voters," remove them from the voter-registration list, or prevent future voting. *Schwier*, 340 F.3d at 1294. Instead, they do not count noncompliant ballots "because [individuals] did not follow the rules for casting [them]." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). Such individuals remain qualified and eligible to vote in any election on equal terms with—and subject to the same rules as—all other qualified individuals. Their right to vote has not been denied. *See, e.g.*, *id.*; *Rosario*, 410 U.S. at 757-58; *Schwier*, 340 F.3d at 1294.

### 4. The Federalism Canon Bars Application Of The Materiality Provision to the Date Requirement.

A broader interpretation extending the Materiality Provision beyond qualification determinations during the voter-registration process, such as the District Court's interpretation, would jeopardize many longstanding ballot-casting rules nationwide long assumed to be legitimate. Since the Materiality Provision at least does not clearly require this result, the federalism canon bars it.

Under the federalism canon, courts must not read a statute "to significantly alter the balance between federal and state power" absent "exceedingly clear language." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). Courts thus must avoid interpreting statutes to

"hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes."  *Clingman v. Beaver*, 544 U.S. 581, 593 (2005).

Indeed, states must provide a "complete code for [] elections," regulating not only voter qualifications, but also "supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns," among others.  *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (distinguishing between state laws that "govern[] the registration and qualifications of voters" and those regulating "the voting process itself"); *Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental).  And unsurprisingly, states have often enacted such regulations through paper-based requirements.

The date requirement is one such example.  It regulates the casting of ballots, not qualification or registration of voters.  It therefore serves legitimate purposes besides determining eligibility—*i.e.*, "preventi[ng] fraud" and facilitating the "counting of votes."  *Smiley*, 285 U.S. at 366; *see In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen.*

*Election*, 241 A.3d 1058, 1090-91 (Pa. 2020) (opinion of Dougherty, J., joined by Saylor, C.J., and Mundy, J.) (discussing date requirement's purposes).   In 2022, for instance, the date requirement helped prove a ballot was fraudulently cast after a citizen's death.   *See* App.109-10 ¶¶ 48-55.

From 1964 until 2022, when *Migliori* was decided, the Materiality Provision and paper-based ballot-casting rules coexisted without conflict, because of the widespread understanding that the Provision did not cover "the counting of ballots by individuals *already deemed qualified to vote*." *Friedman*, 345 F. Supp. 2d at 1371; *supra* 8.

But in the year-and-a-half following *Migliori*'s much more expansive reading of the Materiality Provision, courts around the country have followed its lead, holding unlawful important state laws regulating mail-in voting.   *E.g.*, *LUPE v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, at *14 (W.D. Tex. Nov. 29, 2023) (Texas requirement to list identification number on mail ballot), *stayed pending appeal by Paxton* Stay Order; *In re Ga. Senate Bill 202*, No. 1:21-cv-01284-JPB, 2023 WL 5334582, at *8 (N.D. Ga. Aug. 18, 2023) (Georgia requirement to list birthdate on ballot); *Vote.Org v. Ga. State Election Bd.*, No. 1:22-CV-

01734-JPB, 2023 WL 2432011, at *1 (N.D. Ga. Mar. 9, 2023) (Georgia requirement to sign absentee ballot application).

This is only the beginning. Under *Migliori*'s and the District Court's logic, many other widespread, commonsense paper-based regulations are now federal civil-rights violations, because they further interests besides determining eligibility. These include:

- Mail-ballot signature requirements, *e.g.* 25 P.S. §§ 3146.6(a), 3150.16(a); N.J. Stat. § 19:62-11(c); Ariz. Rev. Stat. § 16-547(A), (D); Ark. Code § 7-5-405(a)(3)(A); Colo. Rev. Stat. § 1-10-1007; 10 ILCS § 5/19-5; Ky. Rev. Stat. § 117.085(2); Tenn. Code § 2-6-202(e); 17 Vt. Stat. § 2542(a); Cal. Elec. Code § 3011(a)(2); Conn. Gen. Stat. 145 § 9-137; La. Stat. § 18: 1306E.(1)(f); Ga Comp. R. & Regs. § 183-1-14.05(c), (i); Fla. Stat. § 101.65(7); Wash. Rev. Code § 29A.40.091(1); Mass. Gen. Laws ch. 54 § 25B(a)(9-10), (14);

- Mail-ballot application signature requirements, *e.g.*, Ark. Code § 7-5-404(a)(1); Conn. Gen. Stat. § 9139(b); 15 Del. Code § 5503(k); Ky. Rev. Stat. § 117.085(2); Md. Code § 9-305(a)(3)(i); Mass. Gen. Laws ch. 54 § 25B(a)(2); Tenn. Code § 2-6-202(a)(3); 10 ILCS § 5/19-3; Ga. Comp. R. & Regs. § 183-1-14; Ariz. Rev. Stat. § 16-542; Colo. Rev. Stat. § 31-10-1002(1);

- Requirements to have a witness sign an absentee ballot or ballot application, *e.g.*, Ala. Code § 17-11-7; Ind. Code 3 § 3-11-10-29; Minn. Stat. § 203B.07(3); Vt. Stat. 17 § 2542(a); Colo. Rev. Stat. § 31-10-1002(1); La. Stat. §§ 18:1306E.(2)(a), 18:1307A; Ky. Rev. Stat. § 117.085(7);

- Requirements to sign early-voting certificate, *e.g.*, Fla. Stat. § 101.657(4)(a); 10 ILCS § 5/19A-40, 45; Ga. Comp. R. & Regs. § 183-1-14.02(11); Mass. Gen. Laws ch. 54 § 25B(b)(8), (c)(5);

- Prohibitions on voting for more candidates than there are offices, *e.g.*, P.S. § 3063(a); Ariz. Rev. Stat. § 16-611; 15 Del. Code § 4972(b)(6); Fla. Stat. § 101.65(3);

- Requirements to maintain pollbooks, *e.g.*, 25 P.S. § 3050; Va. Code § 24.2-611; Tex. Elec. Code § 63.003; Fla. Stat § 101.23; 10 ILCS § 5/17-4; Va. Code § 24.2-643(B); Mass. Gen. Laws § 25B(b)(7);

- Secrecy envelope requirements, 25 P.S. § 3146.4; Ala. Code § 17-11-9; Ga. Code § 21-2-384(b); Ky. Rev. Stat. § 117.085(3);  Mass. Gen. Laws ch. 54 § 25(B)(a)(10); N.J. Stat. § 19:63-12; Mont. Code § 13-19-301(b); S.C. Code § 7-15-370; Fla. Stat. §  101.64; Minn. Stat. § 203B.07; N.M. Stat. § 1-6-8; 26 Okla. Stat. § 26-14-107(A)(1);

- Requirements to sign poll lists, *e.g.*, Tenn. Code 2-7-112(a)(2)(A); La. Stat. Ann. § 562.C; Ala. Code § 11-46-50; Ky. Rev. Stat. § 117.076;

- Voter assistance forms, *e.g.*, 25 P.S. § 3058; Ind. Code § 3-11.5-4-13; Fla. Stat. § 101.051(4); Ky. Rev. Stat. 117.0863; Md. Code, Elec. Law § 9-308; Mass. Gen. Laws ch. 54 § 25B(a)(3), (14); Va. Code § 24.2-649(A); Tenn. Code § 2-7-116; and

- Laws requiring the signature of person returning the mail ballot, *e.g.*, Cal. Elec. Code § 3011(a)(9); 10 ILCS § 5/19-6; Ind. Code § 3-11-10-24(d).

*See Ball*, 289 A.3d at 38-39 (opinion of Brobson, J.).

The federalism canon forbids this extreme result.  As the textual arguments discussed above show, there at least is not "exceedingly clear language" establishing Congress meant for the Materiality Provision to reach beyond qualification determinations and voter registration.  *Ala. Realtors*, 141 S. Ct. at 2489.  And the "lack of historical precedent" for this "broad" reading is a particularly "'telling 'indication' that [it] extends

beyond the [Provision's] legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022). It is simply not plausible that so many commonplace rules would stand unchallenged for generations if, in fact, the Materiality Provision outlawed them *all* nearly sixty years ago. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."). Congress did not "hide [this] elephant[]" in the Materiality Provision's obscure "mousehole[]." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

### 5. Constitutional Avoidance Bars Application Of The Materiality Provision To The Date Requirement.

Finally, the canon of constitutional avoidance requires limiting the Materiality Provision to voter-eligibility determinations in the registration process. Courts must avoid constructions of statutes that create "serious doubt" about their "constitutionality" when another "plausible" construction is available. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). Appellants' reading of the Materiality Provision is at

least plausible, whereas the District Court's would render it unconstitutional.

Under the Fifteenth Amendment, states may not deny or abridge the right to vote "on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Congress has the power to "enforce" that prohibition "by appropriate legislation." *Id.*, § 2.

Using this enforcement power, Congress may pass laws "to remedy … violation[s] of rights" guaranteed by the Fifteenth Amendment and "enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). But Congress *lacks* power to redefine "the substance" of the Fifteenth Amendment's guarantee. *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). Thus, there "must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Id.* at 530. To assess congruence and proportionality, courts look to the "record" compiled by

the enacting Congress. *Id.* at 531-32; *accord Shelby Cnty. v. Holder*, 570 U.S. 529, 553-55 (2013).

Congress enacted the Materiality Provision pursuant to its Fifteenth Amendment enforcement authority. *United States v. Mississippi*, 380 U.S. 128, 138 (1965). There is no dispute that the date requirement is constitutional under the Fifteenth Amendment, so the Materiality Provision must be justified as prophylactic legislation. And when properly limited to registration, it is a reasonably tailored prophylactic measure. The enacting Congress identified Fifteenth Amendment violations in efforts by state "registrars" to "defeat [African-American] registration" based on "minor misspelling errors or mistakes in age or length of residence" in their applications for registration. H.R. Rep. 88-914, pt. 2, at 2; *supra* 6-8, 19-20. Congress thus found widespread evidence of unscrupulous officials discriminating during in-person voter registration, which was common in the 1960s and during which officials could observe the voter's race. *See supra* 6-8, 19-20. The remedy—forbidding registrars to deny applications based on immaterial mistakes—fits the violation. And its invasion of state prerogatives is minimal. The Provision entirely respects states' role in defining voter

eligibility. It simply keeps registrars honest by forbidding them from relying on irrelevant considerations when determining eligibility.

In contrast, the District Court's reading unmoors the Materiality Provision from any remedying of Fifteenth Amendment violations. The Congressional record reveals no consideration of discriminatory voting practices outside the registration process, including during the application of ballot-casting rules when officials cannot observe the voter's race. *Id.* Even if it did, extending the Materiality Provision outside of registration would be an "absurd" way to combat discrimination. *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). States have a host of legitimate reasons to regulate the electoral process, including casting of ballots, besides ensuring eligibility. *Supra* 30-31. Perhaps, on a proper record, Congress could require state officials to apply ballot-casting rules based only on considerations material to *those* interests. But it neither compiled such a record nor enacted such a requirement.

Indeed, deeming illegitimate a host of interests long thought "necessary" for states to pursue, *Smiley*, 285 U.S. at 366, would certainly be "an uncommon exercise of congressional power" that could only "be

justified by 'exceptional conditions,'" *Shelby Cnty.*, 570 U.S. at 545. The Congressional record contains no suggestion of such exceptional conditions calling for that drastic measure. There is no discussion, for instance, that, to combat discrimination, states can no longer concern themselves with preventing fraud or ensuring ballots are timely cast.

The Congressional record's silence is particularly telling because the House Report responded to an objection that the Act's voting provisions exceeded Congress's enforcement power. It replied that "wide-ranging evidence has been produced before Congress" that "State voter-qualification standards and procedures have been regularly use by some States to deny people the right to vote because of their race," and "Congress has the authority to eliminate such denials through legislative means." H.R. Rep. 88-914, pt. 2, at 6. The Report, however, did not even hint at any findings to support a reach for those provisions beyond qualification determinations during voter registration. *See id.*

Other courts have recognized the constitutional issues with expansive readings like the District Court's. A stay panel of the Fifth Circuit has proposed reading the Materiality Provision to cover "only racially motivated deprivations of rights" to square it with Congress's

enforcement power. *Paxton* Stay Order at 5-6;[3] *accord Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009); *Ind. Democratic Party v. Rokita*, 458 Supp. 2d 775, 839 (S.D. Ind. 2006). And although that approach would solve the constitutional issue, this Court need not go so far. The Provision can be kept properly rooted in the enacting Congress's findings—and thus Congress's enforcement power—simply by limiting its reach to qualification determinations during the voter-registration process.

## B. *The District Court's Reasoning Is Flawed.*

The District Court gave two reasons for rejecting Appellants' construction of the Materiality Provision. Both are unpersuasive.

*First*, the District Court justified its decoupling of the Materiality Provision from voter registration by relying on the statutory definition of "vote," which includes "having [one's] ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(a)(3)(A), (e); *see*

---

[3] The Fifth Circuit has since held—in a case involving registration requirements—that the Materiality Provision does not require a showing of discrimination and is within Congress's enforcement power. *Vote.Org II*, 2023 WL 8664636, at *18. The court did not consider whether the Provision would still be constitutional if applied to "vote counting" rules. *Id.* at *12 n.7.

App.77.   The District Court thought this definition "expansive" and suggested it broadens the Provision beyond the contemporaneous understanding of "the right to vote." *Id.*; *compare supra* 25-30.  Thus, the District Court reasoned that the Provision is not limited to "registering or qualifying to vote" but instead "prohibits rules or regulations which add immaterial requirements to the **act of voting**," including "the actual casting of a vote."  App.77-78 (emphasis original).

This reasoning is multiply flawed.  To begin, even if the District Court were correct about the meaning of "right to vote," the Materiality Provision still applies only to paperwork used in the registration process, *supra* 19-23, and to determinations of voter eligibility*, supra* 23-25, neither of which the date requirement implicates.

Further, the District Court's emphasis on "vote" overlooks the key statutory terms "right" and "deny."  However broad "vote" is, it remains the case that, at the time of the Provision's enactment and now, the "*right* to vote" does not cover voting by mail and is not "denied" by election officials declining to count a ballot due to noncompliance with ballot-casting rules.  *Supra* 25-30.

41

Indeed, the District Court's reading proves too much: it would prohibit states from adopting paper-based rules regulating the "**act of voting**" and "ballot count[ing]" that are different from the rules regulating, and not "material" to determining, qualifications to vote. App.77-78. But "[t]here is no reason why the requirements that must be met in order to register (and thus be 'qualified') to vote should be the same as the requirements that must be met in order to count a ballot that will be counted." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). In fact, *every* state in the country has *different* rules for qualifying to vote and for casting ballots—and the District Court's construction of the Materiality Provision is incompatible with this reality.

In any event, the District Court is mistaken that the definition of "vote" changes or expands the meaning of "vote" in the phrase "right to vote." In 1964, it was well established that the "right to vote" included "the right to have one's vote counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (quoting *Mosley*, 238 U.S. at 386). But then, as now, this right to have one's vote counted abides only so long as the individual complies with applicable ballot-casting rules. *See, e.g.*, *Mosley*, 238 U.S. at 386; *Rosario*, 410 U.S. at 757-58; *supra* 27-30. Accordingly, nothing in the

42

definition of "vote" in the Materiality Provision entitles an individual to *greater* protection than "the right to vote," as ordinarily understood. *See Mosley*, 238 U.S. at 386; *Rosario*, 410 U.S. at 757-58; *Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental).

Moreover, the District Court's reading is incompatible with the plain statutory text. The same definition of "vote" applies to the entirety of § 10101(a), 52 U.S.C. § 10101(a)(3)(A), but § 10101(a)(2)(A) and (C) apply only to voter-eligibility determinations during the voter-registration process, *see supra* 23-24. Accordingly, that definition does not require extending § 10101(a)(2)(B) beyond such registration-related eligibility determinations either.

*Second*, the District Court relied on thin and unpersuasive authority to support its ruling. Its primary authority was this Court's vacated opinion in *Migliori*, but vacatur "[o]f necessity ... deprive[d] [*Migliori*] of precedential effect." *L.A. Cnty. v. Davis*, 440 U.S. 625, 634 n.6 (1979).

Nor is *Migliori* persuasive. This Court considered *Migliori* on an "expedited" basis, 36 F.4th at 156, and underdeveloped briefing that one panel member faulted for overlooking important arguments, *see id.* at

43

165-66 (Matey, J., concurring in the judgment). Indeed, the *Migliori* briefing did not make most of Appellants' current arguments and barely developed the rest.

Thus, it is perhaps unsurprising that the panel devoted only half a footnote to the key interpretive question—whether the Materiality Provision applies outside voter registration. *Id.* at 162 n.56 (majority opinion). The panel held it did not because the Provision covers "other act[s] requisite to voting." *Id.* But it did not consider, much less reject, the possibility that *ejusdem generis* limited the reach of that catchall phrase. *See id.* Nor did it consider the import of the phrases "in determining whether such voter is qualified" or "deny the right … to vote." *See id.* at 162-63. Much less did it address the federalism canon or the unconstitutionality of its broader interpretation. *See id.*

Presented with new information, this Court should adopt the reasoning of three Justices of the Supreme Court, the Pennsylvania Supreme Court, and the Fifth Circuit. Reinstating *Migliori* would only exacerbate intrastate division and create a circuit split, necessitating Supreme Court review.

44

### C.  *Plaintiffs' And The Secretary's Attempts To Rehabilitate The District Court's Construction Fail.*

Perhaps recognizing the absurd results required by *Migliori* and the District Court, Plaintiffs and the Secretary offer two arguments in an attempt to buttress the District Court's opinion.  Both fail.

*First*, Plaintiffs attempt to craft a definition of "material" that would invalidate the date requirement they oppose but not other non-registration rules they favor.  They insist, for instance, that the requirement to sign the outer envelope of a mail ballot "*is* material to determining [whether an individual is] qualified to vote," because a signature helps to establish identity.  App.133.  This suggestion is incompatible with Plaintiffs' position that the Materiality Provision invalidates all paper-based rules that are not "used … to determine an individual's qualification to vote." App.113.  After all, signing one's ballot is not a qualification for voting in Pennsylvania.  *See* 25 P.S. § 1301(a) (defining age, citizenship, residency, and non-felon status as the qualifications).

Nor is it an especially surefire way to establish identity.  Fraudsters can easily forge signatures undetected, and honest voters can simply forget to sign.  Still, a signature is "material" to establishing identity in

the sense of being "relevant." *Material*, *Webster's Third New International Dictionary* (1961).

This, however, only *proves* Appellants' point and *disproves* Plaintiffs' position because the date requirement satisfies this definition of "material" no less than Pennsylvania's signature requirement. In fact, both requirements appear in the *same statutory phrase* in the Pennsylvania Election Code. *See* 25 P.S. § 3146.6(a) (the voter "shall then fill out, *date and sign* the declaration printed on" the outer envelope (emphasis added)); *id.* § 3150.16(a) (same).

In any event, like the signature requirement, the date requirement can be "relevant" and "more than tenuously connected to" confirming an individual's identity. *Vote.Org II*, 2023 WL 8664636, at *19-20. The date "establishes a point in time against which to measure the elector's eligibility to cast the ballot," *In re Canvass*, 241 A.3d at 1090 (opinion of Dougherty, J.), as when the requirement helped establish that a ballot was fraudulently submitted after the voter in question had died, *supra* 32. And like a signature, it performs a ritual function. Important documents are generally signed *and dated*; these formalities help encourage voters to take the process seriously and be truthful about their

declaration that they are eligible voters. *See, e.g.*, *Vote.Org II*, 2023 WL 8664636, at \*20 (upholding a wet signature requirement for voter-registration forms because "applying an original signature to a voter registration form carries 'solemn weight'" and "has some prospect of getting the attention of many applicants and dissuading false statements").

There is simply no way to draw a principled line that keeps signature requirements *lawful*, but date requirements *unlawful*, under the Materiality Provision. If Appellants' reading is rejected, all paper-based voting rules must strictly relate to qualifications—in which case both signature and date requirements violate the Materiality Provision— or rules must simply have some relevance to determining identity, in which case both signature and date requirements are lawful. The Pennsylvania General Assembly judged both requirements to be important, which is why it made clear that ballots without signatures *or* dates cannot be counted. *Ball*, 289 A.3d 1; *In re Canvass*, 241 A.3d 1058. And as the Fifth Circuit recently explained when upholding a wet-signature requirement on voter-registration forms against a Materiality Provision challenge, state legislatures must be accorded substantial

deference when they determine which rules are material in registering voters. *See Vote.Org II*, 2023 WL 8664636, at *15-21.

Such deference is equally appropriate, if not more so, when state legislatures exercise their prerogative to regulate the act of voting. *See Timmons*, 520 U.S. at 358. Plaintiffs instead essentially want this Court to second-guess the General Assembly's judgment that the date requirement is really worth the cost. But that is just too much to squeeze out of the single vague term "material" in the Materiality Provision.

*Second*, as part of the stay briefing in this Court, the Secretary suggests that the Materiality Provision's use of the term "such election" indicates that it is not limited to "the function of voter registration." Sec'y Opp., ECF 35 at 22. The Secretary thus overlooks that the full statutory phrase encompassing "such election" is expressly tied to qualification determinations: "in determining whether such individual is *qualified* under State law to vote in *such election.*" 52 U.S.C. § 10101(a)(2)(B) (emphases added). Moreover, "such election" refers back to the antecedent "any election" in § 10101(a)(2)(B). Thus, because the Secretary admits that "any election" addresses "determining if a voter is

qualified to vote generally in elections—the process of voter registration," Sec'y Opp. 22, so too does the term "such election."

The term "such election" also recognizes that states may adopt different qualifications for different types of elections. *See, e.g.*, *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 734-35 (1973) (upholding property requirement for local water-district election). The Materiality Provision thus applies to voter-qualification determinations for "any election," permits states to apply their specific qualifications to any "such election," and prohibits voter disqualification based on paper-based errors or omissions "immaterial" to determining the applicable qualifications in any "such election." 52 U.S.C. § 10101(a)(2)(B). The term "such election" therefore underscores the correctness of Appellants' reading and the incorrectness of the District Court's contrary reading. The Court should reverse.

## II.    PLAINTIFFS HAVE NO RIGHT OF ACTION.

Plaintiffs' challenge to the date requirement independently fails because they have no right of action to enforce the Materiality Provision.

A.    *The Materiality Provision Creates No Applicable Private Right Of Action.*

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Absent Congressional "intent to create … a private remedy[,] … a cause of action does not exist and courts may not create one." *Id.* at 286-87. And "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* at 290.

Here, as the District Court recognized, § 10101 "itself does not expressly create a private right action" authorizing Plaintiffs' suit. App.64. But it does explicitly provide for enforcement by the Attorney General. 52 U.S.C. § 10101(c). The necessary "implication of [this] provision for enforcement by the Attorney General is that the statute does not permit private rights of action." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016).

The District Court applied a three-factor test to determine whether § 10101 "contains rights-creating language." App.65. Finding those factors satisfied, it concluded "an implied right of action exists within the Materiality Provision." App.66. But the District Court had to "determine

whether [the Materiality Provision] displays an intent to create not just a private right *but also a private remedy*." *Sandoval*, 532 U.S. at 286 (emphasis added). It found no indication of such an intent, and none exists.

## B. *Section 1983 Creates No Applicable Private Right Of Action.*

Plaintiffs' claim of a private right of action from 42 U.S.C. § 1983 fares no better. If the plaintiff "demonstrate[s] that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs," there is "a rebuttable presumption that the right is enforceable under § 1983." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005). This presumption may be defeated "by demonstrating that Congress did not intend that remedy for a newly created right." *Id*. Such an intent can be "inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id*. In particular, "the existence of a more restrictive private remedy for statutory violations has been the dividing line" between finding an intent to rule out individual enforcement and finding no such intent. *Id*. at 121.

Section 10101 establishes an elaborate enforcement scheme that includes a more restrictive private cause of action. It authorizes "the Attorney General" to institute "a civil action or other proper proceeding for preventive relief" to stop "any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b)," which includes the Materiality Provision. 52 U.S.C. § 10101(c). In such a proceeding, if the court finds that a violation occurred "on account of race or color," the Attorney General may request "a finding [that] such deprivation was or is pursuant to a pattern or practice." *Id.* § 10101(e). If the court makes that finding, "any person of such race or color resident within the affected area shall, for one year and thereafter until the court subsequently finds that such pattern or practice has ceased, be entitled, upon his application therefor, to an order declaring him qualified to vote," provided he can show he was wrongly deemed not qualified. *Id.*

In other words, the statute gives individual citizens a right of action, but only if the court makes certain antecedent findings in a proceeding brought by the Attorney General and only for a limited period of time. If § 1983 were available, however, any individual could seek a declaration that she was denied the right to vote in violation of the

Materiality Provision at any time.  That would make meaningless the careful limits set forth in § 10101(e), which help ensure that federal courts seize control over voter registration from the states only when genuinely necessary.  The only reasonable inference is that Congress meant to foreclose private suits under § 1983.

Although the Sixth Circuit has reached the same conclusion, *Husted*, 837 F.3d at 630, the Fifth and Eleventh Circuits, as well as this Court's vacated decision in *Migliori*, reached the opposite, *Vote.Org II*, 2023 WL 8664636, at *6-10; *Schwier*, 340 F.3d at 1295-97; *Migliori*, 36 F.4th at 159.  All these decisions are unpersuasive, however, because they rest on the incorrect premise that "Section 10101 lacks any specific 'private judicial right of action.'"  *Vote.Org II*, 2023 WL 8664636, at *9.  Because these decisions simply missed an outcome-determinative consideration, this Court should have no trouble joining the Sixth Circuit in holding that the Materiality Provision is not enforceable under § 1983.

## III.  REGARDLESS OF THE MERITS AND ANY PRIVATE RIGHT OF ACTION, THE DISTRICT COURT'S REMEDY IS UNLAWFUL.

Because they involve unelected judges determining the rules under which the democratic process will take place, election-law cases have a

unique potential to cause disruption and undermine public confidence in our system of government. In light of that reality, federal courts in such cases must be particularly sensitive to questions of remedy; even when a violation can be proved, it does not automatically follow that a plaintiff is entitled to the all the relief she seeks. Here, regardless of the merits of Plaintiffs' claims or the existence of any private right of action, the District Court's remedy was doubly flawed. It created disuniformity in the application of the date requirement across Pennsylvania, in violation of the Equal Protection principles articulated in *Bush v. Gore*. And by letting its remedy take immediate effect, thereby disrupting the results of the already-transpired 2023 elections, it violated the *Purcell* principle. Each of these errors warrants reversal.

### A. *The District Court's Judgment Violates Equal Protection.*

Under fundamental Equal Protection principles, "the State may not, by [] arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05. Accordingly, at least where a "statewide" rule purportedly governs, there must be "adequate statewide standards for determining what is a legal vote, and practicable procedures to implement them." *Id.* at 109-10. Different "counties

us[ing] varying standards to determine what [constitutes] a legal vote" is arbitrary and unconstitutional. *Id.* at 107.

*Bush* reversed the Florida Supreme Court's judgment ordering a post-election recount under a new legal standard for ascertaining the validity of votes cast on a ballot. *Id.* at 111. Importantly, *Bush* did not "decide whether the Florida Supreme Court had the authority under [state law] to define what a legal vote is and to mandate a manual recount implementing that definition." *Id.* at 105. That is, the U.S. Supreme Court assumed the state court otherwise had the authority to find a legal violation and order a remedy for it. But the U.S. Supreme Court concluded that the court-ordered remedy violated the Equal Protection Clause because it caused local officials to "appl[y] different standards in defining a legal vote" and "accepting or rejecting … ballots." *Id.* at 106. Accordingly, the U.S. Supreme Court halted the recount and ordered that the original final count remain in place and determine the winner. *Id.* at 111.

Here, the District Court's order created the same kind of intrastate disuniformity—and the same kind of Equal Protection violation. The date requirement applies statewide. 25 P.S. §§ 3146.6(a), 3150.16(a).

Under the District Court's order, 12 county boards of elections must *count* ballots that do not comply with the date requirement. App.6, 10-11; *see also Poe v. Gerstein*, 417 U.S. 281 (1974) (government actors are presumed to comply with declaratory judgments absent evidence to the contrary). But the Pennsylvania Supreme Court's order in *Ball* continues to govern the other 55 county boards, so they must *reject* ballots that do not comply with the date requirement. *See Ball*, 284 A.3d at 1192.

This scenario is an even worse violation of Equal Protection than *Bush*. There, "the *absence* of specific standards" opened the door to disparate application of a single standard across counties. 531 U.S. at 106 (emphasis added). Here, by contrast, the District Court's order *gives* specific guidance that compels application of different standards to similarly situated ballots in different counties.

The only solution is reversal of the District Court's judgment, as in *Bush*. The Court in *Bush* determined that it would not be feasible for the Florida Supreme Court to order a recount under constitutionally compliant standards in time. *Id.* at 110. That meant its only choice was to reverse, despite the uncontested state law violation the state court had found. *Id.* So too here. Because Plaintiffs do not have standing to obtain

relief against the other 55 county boards, the District Court cannot direct all boards in the Commonwealth to comply with its interpretation of the Materiality Provision. The only remedy for the Equal Protection violation is to reverse the District Court's judgment.[4]

### B. At Minimum, The District Court's Judgment Cannot Apply To The 2023 Elections.

At minimum, the District Court's judgment must be reversed to the extent it applies to the 2023 election cycle. Regardless of the merits, it was not appropriate for the District Court to change the rules *weeks after* Election Day—and in particular to flip the apparent result of the Towamencin Township Board of Supervisors election.

As the Supreme Court "has repeatedly emphasized[,] … lower federal courts should ordinarily not alter the election rules on the eve of an election." *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020). This rule, "known as the *Purcell* principle," is "a bedrock tenet of election law." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurral).

---

[4] Of course, properly cabining the Materiality Provision to voter-qualification determinations during the voter-registration process, *see supra* 19-25, eliminates any risk of an unconstitutional judicial remedy requiring "counties [to] use[] varying standards" to "accept[] or reject[] … ballots" or "to determine what [is] a legal vote." *Bush*, 531 U.S. at 106, 107.

"Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Id.* at 881; *see Purcell*, 549 U.S. at 4. Accordingly, the appropriate disposition of a challenge close in time to an impending election is to leave the existing rules in place while expressing "no opinion" on the merits. *Purcell*, 549 U.S. at 5.

The *Purcell* principle applies "with much more force on the back end of elections." *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 925 (7th Cir. 2020). "Changing the rules in the middle of the game is bad enough," but changing the rules during the post-game tally risks "severely damag[ing] the electoral system on which our self-governance so heavily depends." *Republican Party of Pa. v. Degraffenreid*, 141 S. Ct. 732, 735 (2021) (Thomas, J., dissental). Orders before election day are made behind the veil of ignorance; neither the court nor the public can know what effect, if any, the order will have on the outcome. That is not the case for orders "after election day," giving rise to suspicions that federal courts are picking winners and losers in partisan elections—particularly where, as here, such orders *do* flip the result of an election. *See id.* To avoid these harms, the District Court should have at least limited its

judgment to future elections. And because the District Court failed to do so, its judgment must be reversed, at least to that extent. *See Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurral) (collecting cases).

It makes no difference that this case involves a declaratory judgment rather than an injunction. After all, courts possess "broad statutory discretion to decline declaratory relief," requiring them to take *Purcell* into account in that posture. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995). Moreover, government officials are presumed to comply with declaratory judgments, and injunctions swiftly follow where they fail to do so. *See Poe*, 417 U.S. 281. The *Purcell* principle rests not on the form of judicial relief, but instead on concerns about federal courts untimely "alter[ing] the election rules" in any form. *RNC*, 140 S. Ct. at 1207. Were the law were otherwise, federal courts could circumvent the *Purcell* principle through artful labeling of their remedial orders. The Court should reverse any application of the District Court's judgment to Pennsylvania's 2023 elections.

## IV. THE MONTGOMERY COUNTY BOARD'S CERTIFICATION OF THE 2023 ELECTION DOES NOT AFFECT THIS COURT'S JURISDICTION.

The Montgomery County Board's certification of Mr. Marino's opponent as the winner of the November 2023 Towamencin Township election has no effect on this Court's jurisdiction. *See* ECF 43 at 3 (directing parties to address this question in merits briefing). Regardless of that certification, the Court has jurisdiction to adjudicate the live controversy regarding future Pennsylvania elections in 2024 and beyond. Moreover, because the District Court's order is the principal impediment to Marino being declared the winner through the pending state-court contest, the Court has jurisdiction to resolve the live case or controversy regarding the 2023 election as well.

### A. *This Court Has Jurisdiction Over The Live Case Or Controversy Regarding Future Elections.*

The District Court's order declares the date requirement inapplicable in 12 Pennsylvania counties in future elections in 2024 and beyond. *See* App.46, 85. Appellants seek reversal of that order and any application of it in any future election on various grounds. *See supra* 17-59. The Court's jurisdiction over *that* live case and controversy is unaffected by the Montgomery County Board's certification of the result

of the 2023 election. Indeed, no party has suggested otherwise at any stage of this case.

After all, certification of the 2023 election results, without more, cannot moot a case or controversy regarding future elections that have not even happened yet. *See, e.g.*, *Moore v. Harper*, 600 U.S. 1, 14-15 (2023). Because this appeal may affect the validity of the date requirement in future elections, Appellants "continue to have a 'personal stake in the ultimate disposition of the lawsuit'" sufficient to satisfy Article III. *Id.* at 15-16.

At minimum, the Republican Party Appellants have standing to appeal the District Court's judgment as applied to future elections. To establish appellate standing, a party must show (1) "an injury" (2) that is "fairly traceable to the judgment below" and (3) likely to be "redress[ed]" by a "'favorable ruling' from the appellate court." *West Virginia*, 142 S. Ct. at 2606 (emphasis omitted). When the appellant is an organization, it can establish standing where "(1) the organization itself has suffered injury to the rights and/or immunities it enjoys; or (2) where it is asserting claims on behalf of its members and those individual members

have standing to bring those claims themselves." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014).

Here, Appellant the Republican Party of Pennsylvania's "members include all registered Republican voters, candidates, and officeholders in Pennsylvania." App.145 ¶ 7. As a result, in addition to direct organizational injury, it can assert associational standing on behalf of its candidates, *e.g.*, *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006), and voters, *e.g.*, *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

For at least four reasons, Republican Party Appellants have standing to appeal—and that standing is unaffected by the Montgomery County Board's certification of the results of the 2023 election. *First*, the District Court's judgment imposes a competitive injury on Appellants and their candidates. Courts "in a variety of different contexts" have found "being forced to participate in an illegally structured competitive environment" to be a concrete "injury" giving rise to standing. *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (cleaned up) (collecting cases). Accordingly, "[i]f an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party

than it would otherwise be if the regulation were declared unlawful, those injured parties have the requisite concrete, non-generalized harm to confer standing." *Id.*; *see, e.g.*, *Nelson v. Warner*, 12 F.4th 376, 384 (4th Cir. 2021); *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014); *Shays v. FEC*, 414 F.3d 76, 84-85 (D.C. Cir. 2005); *Smith v. Boyle*, 144 F.3d 1060, 1062-63 (7th Cir. 1998).

Nor can there be any doubt that the changes brought on by the District Court's order tilts the scale against Republican Party Appellants. Courts generally defer to "a candidate's"—or political party's— "reasonable assessment of his own campaign" when assessing standing; otherwise, they would "assum[e] the guises of campaign consultants or political pundits." *Castro v. Scanlan*, 86 F.4th 947, 958 (1st Cir. 2023) (cleaned up). And in any event, in recent elections, mail ballots in Pennsylvania—as in the country at large—have skewed Democrat:

- In the 2023 elections, 587,436 Democrats voted by mail, compared to 168,965 Republicans. *See* Pa. Dep't of State, *Election Results*, https://perma.cc/B9SZ-ZKEX ("*2023 Results*") (last visited Dec. 26, 2023) (on live page, click button labeled "Daily Mail Ballot Report").

- In the 2022 Senate race, 960,405 mail ballots were cast for Democrat John Fetterman and only 234,371 for Republican Mehmet Oz. *See* Pa. Dep't of State, *Official Returns* (Nov. 8, 2022),

https://perma.cc/N34U-HUQP.

- In the 2020 Presidential election, 1,995,691 mail ballots were cast for Biden, and only 595,538 for Trump. *See* Pa. Dep't of State, *Official Returns* (Nov. 3, 2020), https://perma.cc/M6DG-LRL4.

A change in election rules that increases the number of mail ballots counted will therefore tend to advantage Democrats and disadvantage Republicans. This is not speculative. The outcomes of three Pennsylvania elections since 2020 (including Mr. Marino's) have flipped as a result of counting mail ballots that did not comply with the date requirement. App.149 ¶ 34. In all three elections, the change in outcome resulted in a Democrat being declared the winner and a Republican the loser. *Id.* Reversal of the District Court's judgment would remedy Appellants' injury by restoring the preexisting competitive environment.

*Second*, the District Court's judgment dilutes the votes of Appellants' voters, and subjects them to unequal treatment. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. The counties subject to the District Court's judgment include 10 of the Commonwealth's most populous counties, where mail ballots skew heavily Democratic. *See 2023*

*Results*, *supra*.  In contrast, nearly all counties where most mail ballots are from Republicans remain subject to the date requirement.  *See id.* This dilutes the votes of Republican voters and exacerbates the competitive harm Appellants suffer.  Reversal would end this dilution.

*Third*, regardless of the partisan skew of subject and non-subject counties, the judgment below imposes an Equal Protection harm. Appellants' voters in the 55 non-subject counties have a cognizable interest in their vote being "value[d]" the same as "another['s]."  *Bush*, 531 U.S. at 104-05.  This interest is harmed when voters in the 12 subject counties enjoy more lenient mail-in voting rules.  *Supra* 54-57.  That harm can only be redressed by a ruling restoring evenhanded application of the date requirement across the Commonwealth.

*Fourth*, the District Court's judgment imposes a direct organizational harm on Appellants.  An organization suffers a direct harm when it must expend "resources to identify and counteract" the allegedly unlawful action at the expense of "its mission."  *Lower Merion Sch. Dist.*, 767 F.3d at 285.  Here, the judgment below requires the Republican Party of Pennsylvania to modify its materials for Election Day Operations, its training materials for poll watchers, and its voter

education materials to reflect the change in voting rules. App.146-48 ¶¶ 9-28. Those modifications will require the Republican Party of Pennsylvania to divert resources away from its intended mission of nominating, promoting, and assisting Republican in Pennsylvania and of educating, mobilizing, assisting, and turning out voters in Pennsylvania. *Id.* ¶ 28. Reversal would make this diversion unnecessary.

**B.** ***This Court Has Jurisdiction Over The Live Case Or Controversy Regarding The 2023 Election.***

The Montgomery County Board of Elections relied solely upon the District Court's order to change the apparent outcome of Mr. Marino's election. *See supra* 13. That certification does not affect this Court's jurisdiction to adjudicate the live case or controversy regarding the 2023 election because Appellants "continue to have a 'personal stake in the ultimate disposition of th[is] lawsuit.'" *Moore*, 143 S. Ct. at 15-16.

Certification of the election result does not finally place Marino's opponent in office. Rather, under Pennsylvania law, "the results of an election" may "be changed" even after they "have been certified" through the filing of an election contest petition in state court. *In re 2003 Gen. Election for Off. of Prothonotary*, 849 A.2d 230, 235 (Pa. 2004); *see also* 25 P.S. §§ 3291, 3431, 3456 (authorizing post-certification election contests).

A group of Towamencin Township voters have done just that, filing a petition on December 4, 2023, seeking certification of the election in Marino's favor. App.151-62. Three days later, the Pennsylvania Court of Common Pleas denied the petition on the merits, citing the District Court's decision below as the "basis" for its ruling. App.197. The voters' appeal of that ruling remains pending in the Pennsylvania Commonwealth Court. *Supra* 13-14.

Thus, the District Court's order is the main impediment to the voters prevailing in their state-court contest and Marino properly being certified as the winner. Appellants therefore continue to have a "personal stake" in securing reversal of the order. *Moore*, 143 S. Ct. at 14; *see also Kupau v. Yamamoto*, 622 F.2d 449, 457 (9th Cir. 1980) ("den[ial]" of "the opportunity to serve" in office gives candidate a personal stake in lawsuit challenging that denial).

## CONCLUSION

This District Court's judgment should be reversed.

Dated:  December 27, 2023

Kathleen A. Gallagher
THE GALLAGHER FIRM, LLC
436 Seventh Ave., 31st Floor
Pittsburgh, PA 15219
(412) 717-1900
kag@gallagherlawllc.com

Thomas W. King, III
Thomas E. Breth
DILLON, MCCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
(724) 283-2200
tking@dmkcg.com
tbreth@gmkcg.com

Respectfully submitted,

*/s/* John M. Gore
John M. Gore
(D.C. Bar No. 502057)
 *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
Ryan M. Proctor
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com
rproctor@jonesday.com

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I hereby certify the following:

1.     I am  a member in good standing of the Bar of this Court.

2.     This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,999 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3,     This Brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced 14-point font (namely, Century Schoolbook Standard) in the text and the footnotes.

4.     The text of the electronic Brief is identical to the text in the paper copies.

5.     The electronic file containing the Brief was scanned for viruses using the most recent version of a commercial virus scanning program, and no virus was detected.


Dated: December 27, 2023          */s/* John M. Gore
                                  John M. Gore
                                  *Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2023, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system. Service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.

Dated: December 27, 2023              */s/* John M. Gore
                                      John M. Gore
                                      *Counsel for Appellants*