No. 23-3166

# United States Court of Appeals
# for the Third Circuit

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,

*Plaintiffs–Appellees,*

v.

SECRETARY COMMONWEALTH OF PENNSYLVANIA, *et al.*,

*Defendants–Appellees,*

RICHARD MARINO; REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN
CONGRESSIONAL COMMITTEE; THE REPUBLICAN PARTY OF PENNSYLVANIA,

*Intervenor-Defendants–Appellants.*

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 1:22-cv-339 (Baxter, J.)

## BRIEF OF *AMICUS CURIAE*
## RESTORING INTEGRITY AND TRUST IN ELECTIONS, INC.
## IN SUPPORT OF APPELLANTS

Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

DECEMBER 30, 2023                    *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1, Amicus discloses that it has no parent corporations and that no publicly held corporations hold 10% or more of its stock. Further, no publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding.

Dated: December 30, 2023                    */s/ Gilbert C. Dickey*
                                            Gilbert C. Dickey
                                            *Counsel for Amicus*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ ii

TABLE OF AUTHORITIES ................................................................. iv

INTEREST OF AMICUS CURIAE ......................................................... 1

INTRODUCTION ........................................................................... 2

ARGUMENT ................................................................................ 3

I.   The history of the materiality provision confirms that it never applied to the ordinary rules for casting an absentee ballot. ......................................... 3

    A.   Congress passed the materiality provision to combat racial discrimination in voter registration. .................................................... 3

    B.   Courts and lawyers have applied the materiality provision to racial discrimination in determining voter qualifications. ...................................... 6

II.  The plaintiffs' overreading of the materiality provision is undermining state laws and electoral confidence across the country. ....................................... 9

III. This Court should not follow its now-vacated decision in *Migliori*. ................ 15

    A.   The materiality provision applies to determinations of a voter's qualifications, not to the validity of ballots. ................................................ 16

    B.   Plaintiffs lack a private right of action to enforce the materiality provision. ..................................................................................... 17

    C.   The materiality provision requires proof of racial discrimination. ........... 18

    D.   The materiality provision applies only to ad hoc actions by state officials. ...................................................................................... 20

    E.   The date requirement doesn't deny anyone the right to vote. .................. 21

CONCLUSION ............................................................................. 22

COMBINED CERTIFICATIONS ........................................................ 23

CERTIFICATE OF SERVICE ............................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................................................17

*Appeal of Orsatti*,
  598 A.2d 1341 (Pa. Commw. Ct. 1991) .......................................................14

*Ball v. Chapman*,
  289 A.3d 1 (Pa. 2023) ................................................................................ 10, 16

*Bausch v. Lehigh Cnty. Bd. of Elections*,
  No. 5:22-cv-2111 (E.D. Pa. May 31, 2022) .............................................11

*Broyles v. Texas*,
  618 F.Supp.2d 661 (S.D. Tex. 2009) ...........................................................19

*Bush v. Gore*,
  531 U.S. 98 (2000) ............................................................................................ 7

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ..........................................................................................19

*Clark v. Marengo Cnty.*,
  469 F.Supp. 1150 (S.D. Ala. 1979) ...............................................................19

*Cochran v. Grubbs*,
  913 So.2d 446 (Ala. 2005) ............................................................................. 8

*Condon v. Reno*,
  913 F.Supp. 946 (D.S.C. 1995) ................................................................6, 20

*Democratic Cong. Campaign Comm. v. Kosinski*,
  614 F.Supp.3d 20 (S.D.N.Y. 2022) ...............................................................13

*Democratic Party of Va. v. Brink*,
  599 F.Supp.3d 346 (E.D. Va. 2022) .............................................................13

*Friedman v. Snipes*,
  345 F.Supp.2d 1356 (S.D. Fla. 2004) ........................................................... 7

*Gilmore v. Amityville Union Free Sch. Dist.*,
305 F.Supp.2d 271 (E.D.N.Y. 2004) ..................................................................17

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) .........................................................................................17

*Griffin v. Roupas*,
385 F.3d 1128 (7th Cir. 2004) .........................................................................14

*Hunter v. Hamilton Cnty. Bd. of Elections*,
635 F.3d 219 (6th Cir. 2011) .............................................................................9

*In re Contest of Gen. Election Held on Nov. 4, 2008*,
767 N.W.2d 453 (Minn. 2009) ...........................................................................8

*In re Ctr. T'ship Democratic Party Supervisor Primary Election*,
4 Pa. D. & C.4th 555 (Pa. Com. Pl. 1989) .......................................................14

*In re Election for Sch. Comm. Representative for Dist. 3 in City of Portland*,
No. CIV.A. CV-04-695, 2004 WL 3196881 (Me. Super. Dec. 3, 2004)......................8

*In re Ga. S.B. 202*,
No. 1:21-cv-1259, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ................................12

*In re Pet. to Contest the Gen. Election for Dist. Just. in Jud. Dist. 36-3-03 Nunc Pro Tunc.*,
695 A.2d 476 (Pa. Commw. Ct. 1997) .................................................................8

*Ind. Democratic Party v. Rokita*,
458 F.Supp.2d 775 (S.D. Ind. 2006) ..................................................................18

*League of Women Voters of Ark. v. Thurston*,
No. 5:20-cv-5174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) .............................12

*Liebert v. Wis. Elections Comm.*,
No. 3:23-cv-672 (W.D. Wis. Oct. 2, 2023) .......................................................13

*Malinou v. Bd. of Elections*,
271 A.2d 798 (R.I. 1970) ...................................................................................6

*Marks v. Stinson*,
19 F.3d 873 (3d Cir. 1994) ...............................................................................14

*McKay v. Altobello*,
No. 1:96-cv-3458, 1996 WL 635987 (E.D. La. 1996)................................................6, 17

*McKay v. Thompson,*
    226 F.3d 752 (6th Cir. 2000) ................................................................... 17

*Migliori v. Cohen,*
    36 F.4th 153 (3d Cir. 2022) ............................................................. passim

*Miller v. Treadwell,*
    245 P.3d 867 (Alaska 2010) ...................................................................... 8

*Org. for Black Struggle v. Ashcroft,*
    No. 2:20-cv-4184, 2021 WL 1318011 (W.D. Mo. Mar. 9, 2021) ............... 13

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ..................................................................................... 13

*Ritter v. Migliori,*
    142 S. Ct. 1824 (2022) ................................................................. 2, 16, 21

*Ritter v. Migliori,*
    143 S. Ct. 297 (2022) ................................................................................. 2

*Roe v. Ala. Ex rel. Evans,*
    43 F.3d 574 (11th Cir. 1995) ..................................................................... 9

*Schilling v. Washburne,*
    592 F.Supp.3d 492 (W.D. Va. 2022) ....................................................... 17

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003) ............................................................ 7, 16

*Schwier v. Cox,*
    412 F.Supp.2d 1266 (N.D. Ga. 2005) ..................................................... 20

*Shelby Cnty. v. Holder,*
    570 U.S. 529 (2013) ........................................................................... 18, 20

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ................................................................... 21

*United States v. Mississippi,*
    380 U.S. 128 (1965) ................................................................................ 18

*United States v. Ross,*
    456 U.S. 798 (1982) .................................................................................. 9

*Vote.org v. Byrd,*
  No. 4:23-cv-111, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023) .................................. 13

*Vote.Org v. Callanen,*
  39 F.4th 297 (5th Cir. 2022) ......................................................................... 21

*Vote.Org v. Callanen,*
  No. 22-50536, __ F.4th __, 2023 WL 8664636 (5th Cir. Dec. 15, 2023) ..... 12, 19, 21

*Vote.org v. Ga. State Election Bd.,*
  No. 1:22-cv-1734, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023) .................................. 12

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ......................................................................................... 11

*Wichelmann v. City of Glencoe,*
  273 N.W. 638 (1937) ......................................................................................... 8

## STATUTES

25 Pa. Stat. §3150.16 ............................................................................................ 12

52 U.S.C. §10101 ......................................................................................... passim

52 U.S.C. §10307 ............................................................................................... 14

52 U.S.C. §21081 ............................................................................................... 15

An Act to Enforce the Constitutional Right to Vote,
  Pub. L. 88-352, 78 Stat. 241 (July 2, 1964) ...................................................... 4

## OTHER AUTHORITIES

1 Federal Civil Rights Acts §2:86 (3d ed.) ............................................................ 19

Christopher Dornblaser*, Quakertown Woman Gets County Jail Sentence for Mail-In Ballot Fraud,* Courier Times (July 18, 2022), https://perma.cc/JYF8-E4D9 ...................... 18

H.R. Rep. No. 88-914 (Nov. 20, 1963),
  *as reprinted in* 1964 U.S.C.C.A.N. 2391 ....................................................... 5, 6

Joshua A. Douglas, *Procedural Fairness in Election Contests,*
  88 Ind. L.J. 1 (2013) ...................................................................................... 10

Misc. Proposals Regarding the C.R. of Persons Within the Jurisdiction of the U.S.:
Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary,
88 Cong. (May 8, 1963) ...............................................................................5, 6

N.D. Sec'y of State, Voting Basics for North Dakota,
https://perma.cc/5YHF-T497 ................................................................... 7

*Pennsylvania v. Mihaliak*, CP-36-CR-3315-2022 (Ct. of Com. Pl. of Lancaster Cnty. Aug.
27, 2022), https://perma.cc/FQD7-P8QG ...............................................18

Pew Research Center, *Two Years After Election Turmoil, GOP Voters Remain Skeptical on
Elections, Vote Counts*, at 19-20 (Oct. 31, 2022), https://perma.cc/SKN5-JSRF......16

*Voting: 1961 Commission on Civil Rights Report* (1961),
https://perma.cc/WA4A-QEYK........................................................... 3, 4, 5

## CONSTITUTIONAL PROVISIONS

La. Const. of 1921, art. VIII, §1 ............................................................... 4

**INTEREST OF AMICUS CURIAE**

Restoring Integrity and Trust in Elections, Inc. (RITE) is a 501(c)(4) non-profit organization whose mission is to protect the rule of law in elections throughout the United States. RITE supports laws and policies that promote secure elections and enhance voter confidence in the electoral process. It also files briefs in state and federal courts across the country on important issues regarding the qualifications for voting, the administration of elections, and the tabulation of ballots.

This case raises several legal issues that threaten to disrupt the 2024 elections nationwide if left uncorrected. Federal courts across the country are enjoining state election safeguards based on a novel, confused interpretation of the 1964 Civil Rights Act. RITE has filed amicus briefs in some of these cases, including in the district court in this case. RITE's expertise and national perspective on voting rights, election law, and election administration will assist the Court in reaching a decision consistent with the rule of law. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amicus curiae and their counsel, made any monetary contribution toward the preparation or submission of this brief.

## INTRODUCTION

When this Court confronted 52 U.S.C. §10101 last year, its "interpretation broke new ground." *Ritter v. Migliori*, 142 S. Ct. 1824, 1824 (2022) (Alito, J., dissental). The panel accepted a novel theory of the materiality provision from plaintiffs who sought to overturn a local Pennsylvania election. As a result, the GOP candidate David Ritter was stripped of his win, and his opponent was "re-elected" as the Judge of the Common Pleas of Lehigh County. But the Third Circuit's opinion didn't stand—the Supreme Court vacated it and instructed this Court to dismiss the case as moot. *Ritter v. Migliori*, 143 S. Ct. 297, 298 (2022).

Now, the issue returns with higher stakes. Again, the district court's ruling flips an election. And again, it errs by adopting a novel interpretation of a decades-old statute. But this time, the consequences are more severe. Courts have largely failed to heed— or even address—Justice Alito's concerns about this Court's interpretation. And Justice Alito anticipated that this issue "could well affect the outcome of the fall elections." *Ritter*, 142 S. Ct. at 1824. Since that prediction, litigation on this issue has exploded. Federal courts are enjoining state election laws based on poor interpretation, bad history, and novel theories. Those orders—including the injunction in this case— undermine state election laws and voter confidence in advance of the 2024 elections.

This Court should reverse the district court for at least three reasons. First, the district court's reasoning contravenes the history of the materiality provision. Second, the district court's erroneous interpretation threatens to disrupt election administration and voter confidence across the country if left uncorrected. Third, the district court applied the erroneous and now-vacated decision in *Migliori v. Cohen*.

## ARGUMENT

**I.    The history of the materiality provision confirms that it never applied to the ordinary rules for casting an absentee ballot.**

The text of the materiality provision refutes the district court's reading. As the Appellants' brief explains, the statutory language applies to discriminatory application of registration requirements, not to ordinary rules for casting a ballot. Doc. 97-1 at 19-30. But this more limited reach is found not only in the text. The history of that statute confirms it, too.

**A.    Congress passed the materiality provision to combat racial discrimination in voter registration.**

The Civil Rights Act of 1957 created the U.S. Commission on Civil Rights to investigate national civil rights issues and recommend legislation. In 1961, the Commission published an in-depth report. *See* Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights Report* (1961), https://perma.cc/WA4A-QEYK. In a section on voting, the Commission detailed registration difficulties faced by minorities in southern States. *Id.* at 21. "[D]iscriminatory practices on the part of registrars" were "aimed at reducing Negro registration." *Id.* at 43. In Louisiana, for example, registrars would arbitrarily refuse witnesses or valid government documents as identification. *Id.* at 50-53. They would reject applications for errors such as misspelling "the words 'October' and 'Democratic.'" *Id.* at 54. Sometimes, registrars wouldn't tell the applicant what the error was, or that they had even denied the application. *Id.* at 54, 57. They would force applicants to calculate their age in exact number of days, *id.*, even though the Louisiana Constitution required only that the applicant provide "the essential facts necessary to show that he" is "not less than twenty-one years of age," La. Const. of

1921, art. VIII, §1. Worse still, in calculating an applicants' age, "some [registrars] would exclude, others include, the day on which the application is filed." *Commission on Civil Rights Report, supra* at 56. They would quiz applicants on "a reasonable interpretation of [a] specific clause of the constitution," and the registrars would use their "own discretion in determining whether or not the applicant meets the constitutional test." *Id.* at 58. And "[i]n most cases," the "arbitrary practices [were] largely, or even exclusively, directed against Negroes." *Id.* at 66. The result was single-digit registration rates among black citizens in the South. *Id.* at 71-72, 101-11.

Based on these findings, the Commission concluded that "substantial numbers" of black citizens had been "denied the right to vote on grounds of race or color." *Id.* at 135. "Some denials of the right to vote occur[red] by reason of discriminatory application of laws setting qualifications for voters," and others "result[ed] from arbitrary and discriminatory procedures for the registration of voters." *Id.* at 135-36. In short, the Commission focused on discrimination by election officials in assessing voter qualifications: discrimination "against would-be voters on racial grounds" based on "the discriminatory application of legal qualifications for voters." *Id.* at 137.

Relying on the Commission's findings, Congress passed the Civil Rights Act of 1964. *See* An Act to Enforce the Constitutional Right to Vote, Pub. L. 88-352, §101, 78 Stat. 241, 241-42 (July 2, 1964). The House Report found that the "crux of the problem" addressed the materiality provision was that "registrars [would] overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting a Negro application for the same or more trivial reasons." H.R. Rep. No. 88-914 (Nov. 20, 1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2491. Relying on the

Commission's findings regarding "the arbitrary or discriminatory application of various registration procedures," one of the bill's sponsors explained that it was "quite clear that this statute would not infringe on the rights of the States to establish voter qualifications." Misc. Proposals Regarding the C.R. of Persons Within the Jurisdiction of the U.S.: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 88 Cong. 915 (May 8, 1963) (statement of Rep. Peter W. Rodino, Jr.).

President Kennedy likewise supported the amendments because they would address "the various forms of racial discrimination practiced by local registrars." *Id.* at 928 (message from the President). Like Congress, the President sought to solve the suppressed registration rates among black voters in southern States. *See id.* at 927. In this context, securing the "right to vote" meant ensuring that those who were qualified to vote would be registered to vote: "No one can rightfully contend that any voting registrar should be permitted to deny the vote to any qualified citizen, anywhere in this country, through discriminatory administration of qualifying tests, or upon the basis of minor errors in filling out a complicated form which seeks only information." *Id.*

"It is for these reasons" that Congress passed the materiality provision. 1964 U.S.C.C.A.N. at 2491. "Formerly, registrars applied stringent standards to Negroes and lax standards to whites; the new bill explicitly forbids such practices. The 'errors or omissions' paragraph closes the door to a common excuse given by registrars in denying registration to Negro applicants who are otherwise qualified." 88 Cong. at 1824. Everyone understood that the materiality provision targeted discrimination in voter registration, not rules governing how to vote—and certainly not to rules governing absentee voting. As summarized by the National Lawyers Guild, the materiality

provision was a "ban on refusing to register a person for Federal elections based on immaterial errors or omissions in his application." *Id.*

## B.  Courts and lawyers have applied the materiality provision to racial discrimination in determining voter qualifications.

The judiciary likewise understood that the materiality provision was a safeguard against discriminatory registration requirements.[1] Early on, courts recognized that the provision "is aimed at any state law which has the effect of denying citizens their right to vote because of their race." *Malinou v. Bd. of Elections*, 271 A.2d 798, 803 (R.I. 1970). Courts thus found that it banned discriminatory enforcement practices like "disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon v. Reno*, 913 F.Supp. 946, 950 (D.S.C. 1995). Decades later, courts observed that "the jurisprudence appears to demonstrate that [§10101] is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through *arbitrary enforcement* of registration requirements." *McKay v. Altobello*, No. 1:96-cv-3458, 1996 WL 635987, at *1 (E.D. La. 1996) (emphasis added); *see also Condon*, 913 F.Supp. at 950 (noting Congress enacted the materiality provision "to sweep away such

---

[1] In nearly every State, voter registration is the process to determine whether a voter is qualified to vote. Legislators, courts, and lawyers thus spoke in shorthand that the materiality provision applies to "voter registration." That shorthand might not work so well in a State like North Dakota that does not use voter registration. *See* N.D. Sec'y of State, Voting Basics for North Dakota, https://perma.cc/5YHF-T497. How and when a voter is determined "qualified under State law to vote" might be a more difficult question in that State. 52 U.S.C. §10101(a)(2)(B). And there might be marginal situations in which a voter's qualifications are put at issue after he is registered, which is why Congress defined "vote" to cover more than registration. *Id.* §10101(e). But the touchstone is a voter's qualifications to vote, which as a practical matter is synonymous with voter registration in nearly every State, including Pennsylvania.

tactics as disqualifying an applicant who failed to list the exact number of months and days in his age"). The materiality provision was "designed to eliminate practices that could encumber an individual's ability to *register* to vote." *Friedman v. Snipes*, 345 F.Supp.2d 1356, 1371 (S.D. Fla. 2004) (citing *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003)). Indeed, for most its history, "[n]othing in … the case law … indicate[d] that [the materiality provision] was intended to apply to the counting of ballots by individuals already deemed qualified to vote." *Id.* at 1373. Courts thus rejected claims that the materiality provision preempted rules governing the casting of ballots. *Id.* at 1373 (ruling that rejecting absentee ballots for invalid postmarks did not violate the materiality provision "[b]ecause the error and omission … did not occur in relationship to a determination of the Plaintiffs' eligibility to vote").

Litigation history tells the same story. For example, if the plaintiffs were correct, *Bush v. Gore* would have been a very different case. 531 U.S. 98 (2000). Florida, like every State, requires voters to follow rules when filling out their ballots. Undervoted ballots with too few votes, and overvoted ballots with too many votes, violated Florida's one-vote rule. *Id.* at 107-08. *Bush v. Gore* concerned a court-ordered recount of ballots that were undervoted or overvoted. *Id.* Under the plaintiffs' interpretation, the materiality provision would have required courts to count those ballots, irrespective of what state law said. An overvote is an "error," an undervote an "omission," and the ballot a "paper." 52 U.S.C. §10101(a)(2)(B). Because the one-vote requirement is immaterial to a voter's qualifications, those votes should have been counted. But until recently no one even advanced that novel understanding of the materiality provision, which is why no one raised it in *Bush v. Gore*.

The problem goes far beyond *Bush v. Gore*. Under the plaintiffs' theory, virtually every election contest in the history of this country has violated the materiality provision. Every year, state courts hear post-election challenges in which they must determine whether certain ballots should be counted or rejected. And they routinely hold that "a vote is properly rejected if the voter fails to comply with the law." *In re Contest of Gen. Election Held on Nov. 4, 2008*, 767 N.W.2d 453, 462 (Minn. 2009). The arguments are innumerable: ballots must be set aside because they showed evidence of tampering;[2] because they were not accompanied by the required affidavit;[3] because the voter misspelled a write-in candidate's name;[4] because the voter failed to submit a "verified application" with an absentee ballot;[5] because the voter underlined names or made other marks instead of following the instructions to "fill in an oval to the left of the candidates of their choice."[6] These and other election contests are so common and varied "that it is virtually impossible to create standards for every conceivable election failure." Joshua A. Douglas, *Procedural Fairness in Election Contests*, 88 Ind. L.J. 1, 49 (2013). Some of these arguments prevail, others do not. But the answer turns on state law, not the materiality provision.

As a result, state courts are familiar with election contests. Federal courts are not. That's because, "[g]enerally, federal courts do not involve themselves in 'garden variety'

---

[2] *In re Pet. to Contest the Gen. Election for Dist. Just. in Jud. Dist. 36-3-03 Nunc Pro Tunc.*, 695 A.2d 476, 478-79 (Pa. Commw. Ct. 1997).

[3] *Cochran v. Grubbs*, 913 So.2d 446, 449 (Ala. 2005).

[4] *Miller v. Treadwell*, 245 P.3d 867, 869-70 (Alaska 2010).

[5] *Wichelmann v. City of Glencoe*, 273 N.W. 638, 640 (1937).

[6] *In re Election for Sch. Comm. Representative for Dist. 3 in City of Portland*, No. CIV.A. CV-04-695, 2004 WL 3196881, at *2-3 (Me. Super. Dec. 3, 2004).

election disputes," and they intervene only when "the election process *itself* reaches the point of patent and fundamental unfairness [that] a violation of the due process clause may be indicated." *Roe v. Ala. Ex rel. Evans*, 43 F.3d 574, 580 (11th Cir. 1995) (citations omitted) (emphasis added). On the rare occasions federal courts insert themselves into election contests, it is to examine whether the *process* comports with the Equal Protection and Due Process Clauses. *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234-44 (6th Cir. 2011).

But on the plaintiffs' theory, the materiality provision preempts these election contests, an argument everyone has overlooked for decades. After all, these contests determine whether to count ballots because they contained "errors" on "paper." And most, if not all, of those errors aren't relevant to a voter's qualifications, which were likely established at the registration stage. Under the plaintiffs' reading, States *must* count ballots regardless of whether the ballot is overvoted, undervoted, improperly marked, signed, mailed, postmarked—the list goes on. "The fact that no such argument was even made" in these innumerable election-contest cases "illuminates the profession's understanding of the scope of" the materiality provision. *United States v. Ross*, 456 U.S. 798, 819 (1982). Perhaps every member of the bench and bar since 1964 has overlooked that Congress preempted State election contests with a single line in the Civil Rights Act. More likely, the plaintiffs are wrong.

## II.    The plaintiffs' overreading of the materiality provision is undermining state laws and electoral confidence across the country.

Recently, courts have misread the materiality provision to strike down ordinary election regulations. Even courts that have reached the correct conclusions often do so

for confused reasons. This Court has the opportunity to provide clarity before the 2024 elections by rejecting the plaintiffs' maximalist interpretation. Failing to provide that guidance risks throwing out a host of ordinary state election laws that provide essential security and electoral confidence; it invites last-minute emergency lawsuits on the plaintiffs' novel theories; and it threatens to throw election administration into disarray. These ill effects are not predictions—they are already occurring.

In Pennsylvania alone, this is the second attempt to undermine the absentee-ballot date requirement in federal court. The first resulted in this Court ordering election officials to count undated ballots for the election for Judge of the Common Pleas of Lehigh County. *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir. 2022). David Ritter won that election. But counting the noncompliant ballots flipped the result, and Mr. Ritter lost his seat.

The Pennsylvania Supreme Court took a pass at this issue, too. After the Supreme Court vacated *Migliori*, petitioners filed an action in the Pennsylvania Supreme Court, arguing that state law requires Pennsylvania to reject undated mail-in ballots, and that the materiality provision does not apply. *Ball v. Chapman*, 289 A.3d 1, 1 (Pa. 2023). The court equally split on the materiality provision, with Justice Brobson explaining that the provision does not apply to election rules that merely "set forth requirements on how a qualified elector may cast a valid absentee or mail-in ballot," as those rules do not "determine whether the elector, in fact and law, is qualified" to vote. *Id.* at 39 (Brobson, J., dissenting). Any other reading would invalidate scores of ordinary voting rules such as secrecy envelopes, signatures, and declarations. *Id.*

Justice Brobson's fears had already materialized, as litigants sued to halt the certification of the May 2022 Pennsylvania primary in two counties. *Bausch v. Lehigh Cnty. Bd. of Elections*, Doc. 1, No. 5:22-cv-2111 (E.D. Pa. May 31, 2022). They represented Democratic voters whose mail-in ballots were rejected because they had failed to place the ballot in the secrecy envelope, or because their ballot had arrived after the election-day deadline. *Id.* at 2-3. The plaintiffs argued that the secrecy envelope and ballot-receipt deadline violated the materiality provision. *Id.* at 3-4. The county defendants settled, agreeing to take various steps to reduce the possibility of voter errors. *See id.*, Docs. 43 & 49.

Congress did not engineer the destruction of mail-in voting in the 1964 Civil Rights Act. It does, after all, not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). But under the plaintiffs' theory, all absentee-voting steps that require the voter to touch a piece of paper are "immaterial" unless they have something to do with establishing voter qualifications. And since most States establish a voter's qualifications at the registration stage, that means nearly all post-registration voting steps would be unlawful. Pennsylvania, for example, directs absentee voters "to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen"; "fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot'"; place that envelope in a "second" envelope, "on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector"; "fill out, date and sign the declaration printed on such envelope"; and ensure the envelope is "securely sealed" and

sent "by mail, postage prepaid … or deliver it in person to said county board of election." 25 Pa. Stat. §3150.16(a). The plaintiffs' theory puts all of these election-administration and election-security measures at risk.

The plaintiffs' theory reaches far beyond Pennsylvania, striking down all kinds of ordinary election laws. Plaintiffs have filed these cases across the country, jeopardizing countless election measures long thought to be uncontroversial. One of the more recent lawsuits attacked original signatures on Texas' voter registration forms, though the Fifth Circuit ultimately held that the original signatures are material to a voter's qualifications. *Vote.Org v. Callanen*, No. 22-50536, __ F.4th __, 2023 WL 8664636, at *1 (5th Cir. Dec. 15, 2023). Plaintiffs also bombarded Georgia with lawsuits, resulting in a preliminary injunction that prevents Georgia from requiring voters to print their date of birth on the outer envelope of an absentee ballot. *See In re Ga. S.B. 202*, No. 1:21-cv-1259, 2023 WL 5334582, at *1 (N.D. Ga. Aug. 18, 2023). That order is now on appeal, *see* No. 23-13085 (11th Cir.).

These cases just scratch the surface. Plaintiffs are challenging Georgia's law that requires those applying to vote absentee to sign an oath in "pen and ink" affirming "that the elector is a qualified Georgia elector" and that "the facts presented on the application are true." *Vote.org v. Ga. State Election Bd.*, No. 1:22-cv-1734, 2023 WL 2432011, at *1 (N.D. Ga. Mar. 9, 2023). They're challenging an Arkansas law that forbids counting an absentee ballot if the voter's information does not match the voter's absentee ballot application.[7] They're challenging Missouri's rules for applying for and

---

[7] *League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-5174, 2023 WL 6446015, at *1 (W.D. Ark. Sept. 29, 2023).

casting an absentee ballot, such as the affirmation that the information on the ballot is correct.[8] New York's rejection of ballots cast at the wrong polling place.[9] Florida's original-signature requirement.[10] Virginia's social-security-number requirement.[11] Wisconsin's witness requirement.[12] All of these lawsuits—and many others— undermine valid state laws that protect election integrity, public trust, and electoral confidence. Many should fail for the simple reasons described in this brief: the laws challenged aren't used to determine whether the voter is "qualified" to vote. The materiality provision simply doesn't apply.

By jeopardizing countless state election rules, these lawsuits undermine confidence in elections across the country. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Confidence in absentee voting is particularly fragile,[13] and many of the materiality-provision lawsuits target absentee-voting safeguards. Court orders enjoining those safeguards often "result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4-5. And the "election draws closer, that risk will increase." *Id.* at 5.

---

[8] *Org. for Black Struggle v. Ashcroft*, No. 2:20-cv-4184, 2021 WL 1318011, at *1, 4 (W.D. Mo. Mar. 9, 2021).

[9] *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F.Supp.3d 20, 55-56 (S.D.N.Y. 2022).

[10] *Vote.org v. Byrd*, No. 4:23-cv-111, 2023 WL 7169095, at *1 (N.D. Fla. Oct. 30, 2023).

[11] *Democratic Party of Va. v. Brink*, 599 F.Supp.3d 346, 356-57 (E.D. Va. 2022).

[12] *Liebert v. Wis. Elections Comm.*, Doc. 1, No. 3:23-cv-672 (W.D. Wis. Oct. 2, 2023).

[13] *See* Pew Research Center, *Two Years After Election Turmoil, GOP Voters Remain Skeptical on Elections, Vote Counts*, at 19-20 (Oct. 31, 2022), https://perma.cc/SKN5-JSRF (detailing the declining voter confidence in absentee voting).

Absentee-voting rules like Pennsylvania's also protect against voter fraud. States have a "compelling interest in preventing voter fraud," *id.* at 4, which is "a serious problem in U.S. elections generally" and "is facilitated by absentee voting," *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004). Pennsylvania has caught its fair share of absentee-ballot fraud. *See Marks v. Stinson*, 19 F.3d 873, 875 (3d Cir. 1994) (election officials conspired with a candidate to cast illegally obtained absentee ballots, and four-hundred absentee ballots were rejected because they were from unregistered voters); *Appeal of Orsatti*, 598 A.2d 1341, 1342-43 (Pa. Commw. Ct. 1991) (signatures on absentee ballots did not match those on applications for the absentee ballots, and independent voters were improperly given partisan ballots); *In re Ctr. T'ship Democratic Party Supervisor Primary Election*, 4 Pa. D. & C.4th 555, 556-60 (Pa. Com. Pl. 1989) (nomination voided after absentee applications and ballots were submitted for fifteen fictitious persons, and the margin of victory was fourteen votes).[14] "[T]he striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment," *Griffin*, 385 F.3d at 1131, and Congress did not strip that judgment from state legislatures when it enacted the materiality provision.

Finally, the plaintiffs' overbroad reading of the materiality provision is not necessary to protect voting rights. Federal law already provides extensive protections against the mischief plaintiffs fear. For example, the plaintiffs' expansive theory is not

---

[14] *See also, e.g.*, Christopher Dornblaser, *Quakertown Woman Gets County Jail Sentence for Mail-In Ballot Fraud*, Courier Times (July 18, 2022), https://perma.cc/JYF8-E4D9; *Pennsylvania v. Mihaliak*, CP-36-CR-3315-2022 (Ct. of Com. Pl. of Lancaster Cnty. Aug. 27, 2022) (pleading guilty to "Forging And Destroying Ballots"), https://perma.cc/FQD7-P8QG.

necessary to protect against arbitrary rejections of ballots cast by qualified voters—federal law already does that. 52 U.S.C. §10307(a) ("No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote … or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote."). Their theory is also not necessary to protect against discriminatory voting standards—federal law does that, too. *Id.* §21081(a)(6) ("Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State."). Nor is it needed to protect against arbitrary voter-qualification standards. Those and many other laws are readily captured by the *Anderson-Burdick* test, which "is the default 'all-purpose' test" that invalidates state laws that unduly burden the right to vote. 1 Federal Civil Rights Acts §2:86 (3d ed.). The Fourteenth and Fifteenth Amendments, plus numerous provisions in the Voting Rights Act and the Civil Rights Act, provide myriad other safeguards. These overlapping protections counsel strongly against expanding the materiality provision far beyond what it has meant for the last half-century.

## III.    This Court should not follow its now-vacated decision in *Migliori*.

This Court confronted the materiality provision in *Migliori v. Cohen*, holding that Pennsylvania's date requirement for absentee ballots violated federal law. The panel erred in that case in part because of "the lack of genuine disagreement on key questions." *Migliori*, 36 F.4th at 164 (Matey, J., concurring in the judgment). Those concessions led the panel to commit several errors that this panel should avoid.

**A.    The materiality provision applies to determinations of a voter's qualifications, not to the validity of ballots.**

The *Migliori* panel erred by applying the materiality provision to rules for casting absentee ballots. The plain text of the provision applies to determinations about "whether [a voter] is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). And "the requirements that must be met in order to cast a ballot that will be counted"—like whether it is submitted in a properly signed and dated envelope—have nothing to do with whether a voter is *qualified*—they're determinations about whether a ballot is *valid*. *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). Determining that a ballot is invalid does not mean that the person who submitted the invalid ballot was not a qualified voter. In Pennsylvania, determining whether a voter is qualified to vote happens at the registration stage. Election rules that merely "set forth requirements on how a qualified elector may cast a valid absentee or mail-in ballot … do not fall within the scope of the [materiality provision]," because those rules do not "determine whether the elector, in fact and law, is qualified" to vote. They determine only whether a qualified voter has in fact submitted a valid ballot. *Ball*, 289 A.3d at 39 (Brobson, J., dissenting); *see also Schwier*, 340 F.3d at 1287 (remanding to determine whether requiring social security numbers on Georgia's voter registration form violated the materiality provision). Likewise, laws that ensure ballot security, promote efficient processing, and facilitate election administration do not "determine" whether the elector is qualified to vote, and thus don't trigger the materiality provision. *See supra* Section II. The *Migliori* panel dismissed this argument in a footnote without engaging the text, context, or history of the statute. *See Migliori*, 36 F.4th at 162 n.56 (maj. op.).

**B.      Plaintiffs lack a private right of action to enforce the materiality provision.**

The panel also erred by holding that plaintiffs have a private right of action to enforce the materiality provision. The statute permits "the Attorney General" to bring "a civil action or other proper proceeding for preventive relief." 52 U.S.C. §10101(c). It does not provide for private civil actions. *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) ("Section [10101] is enforceable by the Attorney General, not by private citizens."); *McKay*, 1996 WL 635987, at *2 (Section 10101 "is ... enforceable only by the Attorney General, not impliedly, by private persons."); *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F.Supp.2d 271, 279 (E.D.N.Y. 2004) ("[The] provisions [of §10101] are only enforceable by the United States of America in an action brought by the Attorney General and may not be enforced by private citizens.").

The *Migliori* panel allowed plaintiffs to invoke 42 U.S.C. §1983 as a vehicle for their §10101 claims. *Migliori*, 36 F.4th at 1659-62. But to prevail under §1983, plaintiffs must show both that "Congress *intended to create a federal right*" and that "the statute manifests an intent 'to create not just a private right but also a private remedy.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-84 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). In *Migliori*, "the Appellees did not challenge the argument that §10101(a)(2)(B) creates an individual federal right," so the Court had little left to decide. *Migliori*, 36 F.4th at 165 (Matey, J., concurring in the judgment). But the Supreme Court has "reject[ed] the notion" that "anything short of an unambiguously conferred right" can "support a cause of action" under §1983. *Gonzaga Univ.*, 536 U.S. at 283. And §10101 does not directly confer any individual right to enforce the materiality provision. *See Schilling v. Washburne*, 592 F.Supp.3d 492, 498 (W.D. Va. 2022) (reasoning that "the

17

'[n]o person ... shall' language" in the Voting Rights Act "is directed to the regulated party, not the party to be protected," which "clearly prohibits voter intimidation" but "does not, under the Supreme Court's precedents, confer any new right on voters").

Moreover, to the extent Congress created any right in §10101, that right is limited to filing an "application" for "an order declaring him qualified to vote," after the *Attorney General* has obtained a judicial finding that the statute was violated. 52 U.S.C. §10101(3). As the Appellants' brief explains, this elaborate enforcement mechanism demonstrates that Congress did not intend that right to be enforceable through §1983. *See* Doc. 97-1 at 51-53.

### C.    The materiality provision requires proof of racial discrimination.

Next, the panel erred by holding that the provision does not require a showing of discrimination. Congress enacted the 1964 Civil Rights Act under "the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." *Ind. Democratic Party v. Rokita*, 458 F.Supp.2d 775, 839 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008); *see also United States v. Mississippi*, 380 U.S. 128, 138 (1965). Text and context indicate that a "pattern or practice of discrimination" is an element of §10101 violations, and state action is illegitimate only if used to "qualif[] persons" of one "race or color" but disqualify persons of other "race[s] or color[s]." 52 U.S.C. §10101(e). Holding otherwise raises serious constitutional problems, since Congress must justify applications beyond racial discrimination with "current data reflecting current needs." *Shelby Cnty. v. Holder*, 570 U.S. 529, 553 (2013). But the historical evidence unambiguously shows that Congress targeted racial discrimination in voter registration.

*See supra* Section I. That evidence could not support extending the materiality provision beyond instances of racial discrimination in 1964, much less today.

Construing the statute to require racial discrimination as an element—as courts have for decades—avoids this constitutional problem. *E.g.*, *Clark v. Marengo Cnty.*, 469 F.Supp. 1150, 1176 (S.D. Ala. 1979) (concluding, after "exhaustively consider[ing]" the text "and the legislative history behind the adoption of the statute," that the section is "a statutory embodiment of the Fifteenth Amendment intended only to preclude denials by persons acting under color of state law of the right to vote to other persons where such denial is based upon race, color, or previous condition of servitude"). Courts have thus held that §10101 claims "fail as a matter of law" when they "do not allege that the actions by [election] officials were racially motivated." *Broyles v. Texas*, 618 F.Supp.2d 661, 697 (S.D. Tex. 2009). But the *Migliori* panel's footnote ignored this text, context, history, and precedent, holding merely that the "plain meaning" of the statute does not require discrimination. *Migliori*, 36 F.4th at 162 n.56 (maj. op.).

The Fifth Circuit said more, but not much more. In *Vote.org v. Callanen*, the Fifth Circuit reasoned that because Congress could "prohibit all literacy tests under the Fifteenth Amendment," it could expand the materiality provision beyond racial discrimination. *Vote.Org*, 2023 WL 8664636, at *19 (citing *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)). But the Fifth Circuit never examined the "congruence and proportionality" of applying the materiality provision beyond instances of racial discrimination, as is required. *Boerne*, 521 U.S. at 520. That was error, because courts must examine the "particular type of voting qualification" and the specific "provision" at issue. *Id.* at 533. Compounding that error, the Fifth Circuit never examined whether

applying the materiality provision beyond racial discrimination *today* is justified by "current data reflecting current needs." *Shelby Cnty.*, 570 U.S. at 553.

### D.   The materiality provision applies only to ad hoc actions by state officials.

The *Migliori* panel again erred by holding that the provision preempts state law. Even if the materiality provision reached non-discriminatory executive actions, it still applies only to "person[s] acting under color of law." 52 U.S.C. §10101(a)(2). And the provision asks whether the error or omission is material "under State law." *Id.* The text does not apply to errors or omissions that state law determines are material, although other federal provisions may prevent the enforcement of such laws.

Thus, a plaintiff claiming a violation of the materiality provision must show that the state official went beyond state law. *See, e.g.*, *Schwier v. Cox*, 412 F.Supp.2d 1266, 1276 (N.D. Ga. 2005) (ruling that requiring social security numbers from prospective voters "is not material in determining whether one is qualified to vote under Georgia law" because Georgia law did not require social security numbers). Again, the history of the provision is helpful. State law often requires voters to prove their age through some form of identification to be qualified to vote. But registrars in the South were *adding steps* to those age-verification requirements, rejecting "applicant[s] who failed to list the exact number of months and days in his age." *Condon*, 913 F.Supp. at 950. Because Pennsylvania law requires voters to date their absentee ballots, the date requirements is material "under State law." 52 U.S.C. §10101(a)(2).

### E.    The date requirement doesn't deny anyone the right to vote.

Finally, the *Migliori* panel erred by holding that the date requirement "den[ies] the right of any individual to vote." *Id.* §10101(b). Pennsylvania's date requirement doesn't deny anyone the right to vote for at least two reasons. First, the date requirement applies only to absentee ballots. But voting by mail is a privilege that can be limited without infringing the right to vote. *See, e.g.*, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 403-05 (5th Cir. 2020) (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-11 (1969)). Second, even voters who aren't able to cure their ballots can vote provisionally. *See* Pa. Dep't of State, *Voting by Provisional Ballot*, https://perma.cc/75X8-MNG3. When applicants can cure defects, "it is hard to conceive" how a voting rule "deprives anyone of the right to vote." *Vote.Org v. Callanen*, 39 F.4th 297, 306 (5th Cir. 2022); *cf. Vote.Org*, 2023 WL 8664636, at *19 (setting aside "that holding" but leaving the issue "open for a later case"). That is doubly true when the voters whose ballots are rejected can still vote by provisional ballot. At most, only the plaintiffs who proved they did not receive notice of a cure and were prohibited from voting provisionally could prevail. The cure and provisional-ballot opportunities defeat their facial challenge.

*    *    *

This panel need not correct all these errors. But each one is good reason not to follow the *Migliori* panel. The simplest holding, and the one that "weighs [most] heavily" against the plaintiffs' theory, is that the materiality provision applies to determinations of voter qualifications, not to rules governing the casting of ballots. *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). That is reason enough to reverse the district court.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court.

Respectfully submitted,

*/s/ Gilbert C. Dickey*

Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

DECEMBER 30, 2023                *Counsel for Amicus Curiae*

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I certify the following:

1. I am a member in good standing of the Bar of this Court.

2. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,457 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in 14-point Garamond.

4. The text of the electronic brief is identical to the text in the paper copies.

5. The electronic file containing the brief was scanned for viruses using the most recent version of a commercial virus scanning program, and no virus was detected.

Dated: December 30, 2023          */s/ Gilbert C. Dickey*
                                   Gilbert C. Dickey
                                   *Counsel for Amicus*

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2023, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system, which will provide notice and service on counsel for all parties.

Dated: December 30, 2023                    */s/ Gilbert C. Dickey*
                                            Gilbert C. Dickey
                                            *Counsel for Amicus*