No. 23-3166

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

PENNSYLVANIA STATE CONFERENCE OF NAACP BRANCHES, et al.,

*Plaintiffs-Appellees,*

DEMOCRATIC NATIONAL COMMITTEE, et al.,

*Intervenors-Appellees,*

*v.*

SECRETARY COMMONWEALTH OF PENNSYLVANIA, et al.,

*Defendants-Appellees,*

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Intervenors-Appellants.*

On Appeal from the United States District Court
for the Western District of Pennsylvania
Case No. 1:22-cv-00339 (Hon. Susan Paradise Baxter)

## BRIEF OF INTERVENORS-APPELLEES DEMOCRATIC
## NATIONAL COMMITTEE, DSCC, AND DCCC

Seth P. Waxman
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com

*Counsel for the Democratic
National Committee*

Uzoma N. Nkwonta
 *Counsel of Record*
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
(202) 968-4490
unkwonta@elias.law

*Counsel for DSCC and DCCC*

*(additional counsel on following page)*

Clifford B. Levine
DENTONS COHEN & GRIGSBY P.C.
625 Liberty Avenue
Pittsburgh, Pennsylvania 15222
(412) 297-4998
clifford.levine@dentons.com

*Counsel for the Democratic
National Committee*

Justin M. Baxenberg
Daniel J. Cohen
Omeed Alerasool
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
(202) 968-4490
jbaxenberg@elias.law
dcohen@elias.law
oalerasool@elias.law

Jonathan P. Hawley
ELIAS LAW GROUP LLP
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
(206) 656-0179
jhawley@elias.law

*Counsel for DSCC and DCCC*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 3d Cir. L.A.R. 26.1.1, Intervenors-Appellees Democratic National Committee, DSCC, and DCCC (the "Democratic Committees") disclose that they have no parent corporations and that no publicly held corporations hold 10% or more of their stock. No publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding. *See* Doc Nos. 93–94, 96.

Dated: January 10, 2024       *s/ Uzoma N. Nkwonta*
                                      Uzoma N. Nkwonta

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................... iii

TABLE OF AUTHORITIES ....................................................................vi

INTRODUCTION .................................................................................. 1

STATEMENT OF THE ISSUES .............................................................5

STATEMENT OF RELATED CASES ......................................................6

STATEMENT OF THE CASE ................................................................ 6

SUMMARY OF THE ARGUMENT ........................................................9

STANDARD OF REVIEW....................................................................11

ARGUMENT ........................................................................................11

    I.    Enforcement of the date requirement violates the
Materiality Provision. ............................................................ 12

        A.    Rejecting mail ballots for noncompliance with the date
requirement constitutes denial of the right to vote. ... 13

        B.    Noncompliance with the date requirement is an error
or omission on a paper relating to an act requisite to
voting. ................................................................................ 18

        C.    The handwritten date on the outer envelope of a mail
ballot is immaterial to determining voting
qualifications or administering elections generally. ... 24

    II.    The District Court's ruling is consistent with federalism
principles and raises no constitutional concerns. ................. 28

        A.    The District Court's application of the Materiality
Provision does not violate federalism principles. ........ 28

        B.    The District Court's decision is fully consistent with
the U.S. Constitution. .................................................... 31

    III.    Plaintiffs-Appellees have a private right of action under
§ 1983. .................................................................................... 36

    IV.    Appellants' arguments regarding the relief the District
Court provided fail. ............................................................... 41

A.    The District Court's order does not violate the Equal Protection Clause. ........................................ 43

B.    The District Court's order does not violate *Purcell*. ..... 46

V.    Any challenge regarding the 2023 elections is moot. ........... 50

CONCLUSION ................................................................. 53

COMBINED CERTIFICATIONS ........................................... 55

CERTIFICATE OF SERVICE ............................................. 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan,*
    599 U.S. 1 (2023) ...................................................................... 42

*Ball v. Chapman,*
    284 A.3d 1189 (Pa. 2022) ........................................... 8, 45, 46

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023) ............................................... 18, 30, 45

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ...................................... 12, 20, 24, 28

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ................................................................ 42

*Bush v. Gore,*
    531 U.S. 98 (2000) ...................................................... 44, 45, 46

*C.A.C. v. United States,*
    449 F. App'x 194 (3d Cir. 2011) ........................................ 53

*In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020*
    *Gen. Election,*
    241 A.3d 1058 (Pa. 2020) ................................................... 25

*Chafin v. Chafin,*
    568 U.S. 165 (2013) ............................................................... 50

*Chapman v. Berks Cnty. Bd. of Elections,*
    No. 355 M.D. 2022, 2022 WL 4100998
    (Pa. Commw. Ct. Aug. 19, 2022)........................................ 7

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ...................................................... 32, 33

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113, 116 (2005) ....................................................... 38

*In re Contest of 2003 Gen. Election for Off. of Prothonotary*,
    849 A.2d 230 (Pa. 2004) ................................................... 51, 52

*In re Contest of Nov. 7, 2023 Election of Towamencin Twp.*,
    No. 1482 C.D. 2023, slip opinion
    (Pa. Commw. Ct. Dec. 29, 2023) ..................................... 51, 52

*Eakin v. Adams Cnty. Bd. of Elections*,
    No. 1:22-CV-340 (W.D. Pa. Nov. 21, 2023) ..................... 6, 46

*In re Energy Future Holdings Corp*,
    949 F.3d 806 (3d Cir. 2020) ................................................. 50

*Ford v. Tenn. Senate*,
    No. 06-2031 D V, 2006 WL 8435145
    (W.D. Tenn. Feb. 1, 2006) ................................................... 29

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966) .............................................................. 42

*Harrison v. PPG Indus., Inc.*,
    446 U.S. 578 (1980) ................................................. 18, 19, 23

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
    599 U.S. 166 (2023) ....................................................... 36, 38

*Heckler v. Mathews*,
    465 U.S. 728 (1984) .............................................................. 46

*Johnson v. Arteaga-Martinez*,
    596 U.S. 573 (2022) .............................................................. 31

*Kimel v. Fla. Bd. of Regents*,
    528 U.S. 62 (2000) ................................................................ 35

*La Unión del Pueblo Entero v. Abbott*,
    No. 5:21-CV-0844-XR, 2023 WL 8263348
    (W.D. Tex. Nov. 29, 2023) ................................................... 13

*League of Women Voters of Ark. v. Thurston,*
   No. 5:20-CV-05174, 2021 WL 5312640
   (W.D. Ark. Nov. 15, 2021) ....................................................... 29

*Martin v. Crittenden,*
   347 F. Supp. 3d 1302 (N.D. Ga. 2018) ................................. 29

*McCormick for U.S. Senate v. Chapman,*
   No. 286 M.D. 2022, 2022 WL 2900112
   (Pa. Commw. Ct. June 2, 2022) ............................................. 7

*McDonald v. Bd. of Election Comm'rs,*
   394 U.S. 802 (1969) ................................................. 15, 16, 17

*McKay v. Thompson,*
   226 F.3d 752 (6th Cir. 2000) ................................................ 41

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,*
   453 U.S. 1 (1981) ................................................................. 39

*Migliori v. Cohen,*
   36 F.4th 153 (3d Cir.) ................................................. passim

*Nev. Dep't of Hum. Res. v. Hibbs,*
   538 U.S. 721 (2003) .............................................................. 33

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
   597 U.S. 1 (2022) ................................................................. 17

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ................................................................. 17

*Ne. Ohio Coal. for Homeless v. Husted,*
   837 F.3d 612, 630 (6th Cir. 2016) ........................................ 40

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
   557 U.S. 193 (2009) .............................................................. 33

*O'Brien v. Skinner,*
   414 U.S. 524 (1974) .............................................................. 15

*Purcell v. Gonzalez,*
   549 U.S. 1 (2006) ........................................................ passim

*Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.,*
   867 F.3d 338 (3d Cir. 2017) ................................................................ 14

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
   140 S. Ct. 1205 (2020).......................................................................... 46

*Republican Party of Pa. v. Degraffenreid,*
   141 S. Ct. 732 (2021)............................................................................ 49

*Reynolds v. Sims,*
   377 U.S. 533 (1964).............................................................................. 16

*Ritter v. Migliori,*
   143 S. Ct. 297 (2022)................................................................... 6, 7, 17

*Rosen v. Pub. Serv. Elec. & Gas Co.,*
   477 F.2d 90 (3d Cir. 1973) ................................................................. 21

*Schwier v. Cox,*
   439 F.3d 1285 (11th Cir. 2006)..................................................... 40, 41

*Shelby County v. Holder,*
   570 U.S. 529 (2013)............................................................................... 33

*Simmons v. Himmelreich,*
   578 U.S. 621 (2016)......................................................................... 23, 31

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp,*
   574 F. Supp. 3d 1260 (N.D. Ga. 2021).............................................. 29

*Slagle v. County of Clarion,*
   435 F.3d 262 (3d Cir. 2006) ............................................................... 21

*Smith v. Robinson,*
   468 U.S. 992 (1984)............................................................................... 38

*South Carolina v. Katzenbach,*
   383 U.S. 301 (1966)......................................................................... 32, 33

*Students for Fair Admissions, Inc. v. President &*
   *Fellows of Harvard Coll.,*
   600 U.S. 181 (2023)............................................................................... 21

*Sw. Airlines Co. v. Saxon,*
   596 U.S. 450 (2022) ............................................................... 19

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ............................................................... 43

*Trump v. Wis. Elections Comm'n,*
   983 F.3d 919 (7th Cir. 2020) ......................................... 48, 49

*United States v. Classic,*
   313 U.S. 299 (1941) ............................................................... 14

*United States v. Munsingwear, Inc.,*
   340 U.S. 36 (1950) ................................................................... 7

*United States v. Oakland Cannabis Buyers' Coop.,*
   532 U.S. 483 (2001) ............................................................... 31

*United States v. Paxton,*
   No. 23-50885, slip op. (5th Cir. Dec. 15, 2023) ................... 15

*United States v. Stevens,*
   70 F.4th 653 (3d Cir. 2023) ................................................. 20

*Vote.org v. Byrd,*
   No. 4:23-cv-111-AW-MAF, 2023 WL 7169095
   (N.D. Fla. Oct. 30, 2023) ............................................... 32, 36

*Vote.org v. Callanen,*
   No. 22-50536, 2023 WL 8664636
   (5th Cir. Dec. 15, 2023) ................................................. passim

*Wesberry v. Sanders,*
   376 U.S. 1 (1964) ................................................................... 42

*In re World Imps. Ltd.,*
   820 F.3d 576 (3d Cir. 2016) ................................................. 51

**Statutes**

25 P.S. § 1301(a) ............................................................. 2, 24

25 P.S. § 3146.6(a) .............................................................. 6

25 P.S. § 3146.8(g)(3) ......................................................... 18

25 P.S. § 3150.16(a) ............................................................ 6

25 P.S. § 3456 ................................................................... 51

42 U.S.C. § 1983 ........................................................ passim

52 U.S.C. § 10101 ....................................................... passim

**Other Authorities**

Dan Sokil, *Sewer Sale Opponent Kosi Osei Takes Oath as
    Towamencin Township Supervisor*, North Penn Now
    (Jan. 4, 2024), https://northpennnow.com/sewer-sale-
    opponent-kofi-osei-takes-oath-as-towamencin-township-
    supervisor-p7914-103.htm .................................................. 50

H.R. Rep. No. 88-914 (1963),
    *reprinted in* 1964 U.S.C.C.A.N. 2391 ................................ 21, 22, 23, 34

## INTRODUCTION

In 2022, election officials across Pennsylvania denied thousands of eligible citizens their right to vote simply because they made minor errors on the envelopes enclosing their timely received mail ballots. The disenfranchised Pennsylvanians provided more than enough information to verify their identities and voting eligibility: They used ballot envelopes bearing unique barcodes and numeric designators, they listed their addresses, they printed and signed their names, and their ballots were timely received. But because these voters either made a mistake when writing the date or left the date field blank, their ballots were set aside and ultimately not counted.

Pennsylvania law and the undisputed evidence establish that the date written by a voter on their mail-ballot envelope has no role to play in determining the voter's eligibility, complying with any ballot-counting rule, or administering elections generally. A voter is qualified to vote under Pennsylvania law if they: will be at least 18 years old on election day; will have been a U.S. citizen and a resident of the district in which they intend to vote for at least 30 days prior to election day; and if they have not been imprisoned for a felony within five years of election day.

25 P.S. § 1301(a). As Appellants concede, the handwritten date "has nothing to do with" determining any of these qualifications. Appellants' Opening Br. ("Opening Br.") 25, Doc. No. 97-1. The law and the evidence further establish that the handwritten date serves no purpose with respect to determining the timeliness of the ballot; timeliness is established solely by scanning the unique barcode on each ballot envelope upon receipt at the county board of elections. Indeed, the District Court made a specific factual finding that the handwritten date serves no purpose whatsoever. Nevertheless , several Republican Party committees have demanded that election officials continue to enforce the date requirement. This would disenfranchise thousands of voters across Pennsylvania each election, due only to an inconsequential paperwork error.

Congress long ago forbade states from imposing such needless barriers to the franchise. The Materiality Provision of the Civil Rights Act of 1964 prohibits state and local officials from "deny[ing] the right of any individual to vote . . . because of an error or omission" that "is not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B). Rejecting the ballots of

otherwise-qualified voters simply because they misdated or forgot to date their ballot envelopes squarely violates the Materiality Provision, and the District Court properly enjoined this practice.

Courts around the country—including this Court—have similarly concluded that state laws like Pennsylvania's date requirement run afoul of the Materiality Provision. In 2022, this Court reviewed a Materiality Provision challenge to a Pennsylvania county's decision to reject undated ballots. Proponents of the date requirement made many of the same arguments Appellants make now, including that private plaintiffs have no private right of action to enforce the Materiality Provision and that mandating handwritten dates on mail-ballot envelopes does not violate that statute. This Court rejected each of those arguments and concluded that the date requirement could not be enforced because it was "exactly the type of disenfranchisement that Congress sought to prevent." *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir.), *vacated as moot sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022). Although that decision was later vacated as moot, the Court's reasoning remains sound.

Urging a different outcome this time, Appellants ignore the text of the Civil Rights Act, attempting to create confusion and ambiguity where

none exists. But no canon of statutory construction permits this Court to disregard the plain meaning of the Materiality Provision. Appellants suggest a parade of horribles will result from affirmance, with litigants wielding the Materiality Provision to strike down ballot-counting rules across the nation. But Appellants ignore the crucial fact that, in this case, the relevant ballot-counting rule—timely receipt—has been fully satisfied irrespective of the date requirement. The handwritten date serves no purpose whatsoever; there can be no more textbook example of an immaterial error.

Appellants' other kitchen-sink arguments similarly lack merit. This Court and others have held that Materiality Provision claims can be asserted by private litigants, and the ordered relief—which came in the post-election context and applies only to those counties that the District Court found Plaintiffs-Appellees had standing to sue—neither violates equal protection nor runs afoul of the *Purcell* principle. Finally, while standing exists here to appeal the District Court's ruling applied prospectively, any challenge regarding the application of the ruling to Appellant Richard Marino's 2023 race (which has been certified and for

which no timely election-contest petition was filed) is moot because there is no possibility of legal relief under Pennsylvania law.

In short, the District Court's summary-judgment order is consistent with the text and purpose of the Civil Rights Act, binding and persuasive precedent, and the U.S. Constitution. The Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether rejecting voters' mail ballots for failure to write an acceptable date on the ballot envelope violates the Materiality Provision.

2. Whether private individuals have a right of action to enforce the Materiality Provision.

3. Whether the District Court violated the Equal Protection Clause by enjoining 12 counties from rejecting undated or unacceptably dated ballots without likewise enjoining other counties over which the court concluded subject-matter jurisdiction was lacking.

4. Whether the District Court's injunction violated the *Purcell* principle.

5. Whether Appellants' challenge to the already certified 2023 election for Towamencin Township Supervisor is moot.

## STATEMENT OF RELATED CASES

This matter has not come before the Court, though the Court previously determined that Pennsylvania's date requirement violates the Materiality Provision in a decision subsequently vacated by the Supreme Court on mootness grounds. *See Migliori*, 36 F.4th at 153; *Ritter*, 143 S. Ct. at 298.

Intervenors-Appellees DSCC and DCCC are plaintiffs in a case before the same district judge that involves similar issues and recently concluded supplemental briefing "focus[ed] specifically on standing" in advance of a ruling on pending cross-motions for summary judgment. Briefing Order at 1, *Eakin v. Adams Cnty. Bd. of Elections*, No. 1:22-CV-340 (W.D. Pa. Nov. 21, 2023).

## STATEMENT OF THE CASE

Pennsylvania law requires that a voter who casts a ballot by mail or absentee sign and date a declaration printed on the outer envelope in order for the vote to be counted. 25 P.S. §§ 3146.6(a), 3150.16(a). The date component of this requirement has been extensively litigated in federal and state courts.

In May 2022, a unanimous panel of this Court held that the date requirement violates the Materiality Provision, concluding that a handwritten date was "superfluous and meaningless" because it was "not entered as the official date received in the SURE [Statewide Uniform Registry of Electors] system, nor used for any other purpose." *Migliori*, 36 F.4th at 164. In October 2022, after the disputed judicial election at issue in *Migliori* was certified, the U.S. Supreme Court vacated this Court's opinion as moot. *Ritter*, 143 S. Ct. at 298. That vacatur, however, did not call this Court's reasoning into question; it merely reflected the Supreme Court's "established practice" of "revers[ing] or vacat[ing] the judgment below" when a case becomes moot while on appeal. *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950).

During the summer of 2022, the Commonwealth Court of Pennsylvania found *Migliori*'s analysis persuasive, concluding in two separate cases that the date requirement violates the Materiality Provision. *See Chapman v. Berks Cnty. Bd. of Elections*, No. 355 M.D. 2022, 2022 WL 4100998, at *26–27 (Pa. Commw. Ct. Aug. 19, 2022) (explaining that the date requirement serves no purpose); *McCormick for U.S. Senate v. Chapman*, No. 286 M.D. 2022, 2022 WL 2900112, at *10–

7

11 (Pa. Commw. Ct. June 2, 2022) (same). However, on November 1, 2022, the Pennsylvania Supreme Court divided equally on whether the date requirement violates the Materiality Provision (and held that, as a matter of state law, the requirement mandates that county boards of elections "refrain from counting any absentee and mail-in ballots . . . that are contained in undated or incorrectly dated outer envelopes"). *Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022) (per curiam).

Following the Pennsylvania Supreme Court's ruling, county boards disenfranchised more than 10,000 Pennsylvanians in the 2022 general election solely because those voters failed to acceptably date the outer envelopes of their timely-received mail ballots. App.61 n.30.

On November 4, 2022, Plaintiffs-Appellees filed this action, asserting (as relevant here) that the date requirement violates the Materiality Provision. On November 21, 2023, the District Court granted summary judgment for Plaintiffs-Appellees. App.6–7. On December 4, 2023, the Montgomery County Board of Elections certified the results of its November elections after applying the District Court's ruling to count ballots that had been excluded solely for failure to comply with the date requirement.

# SUMMARY OF THE ARGUMENT

The District Court's summary-judgment order should be affirmed.

*First*, the District Court correctly concluded that the date requirement violates the plain terms of the Materiality Provision because it excludes the ballots of otherwise-qualified voters based solely on a failure to provide an acceptable handwritten date on the outer envelope of a mail ballot, thereby denying the right to vote. This is an error or omission on a paper relating to an act requisite to voting, and it is immaterial because the handwritten date is not used to determine a voter's identity, qualifications to vote, or any other election-administration function.

*Second*, the District Court's order is consistent with extensive federal caselaw applying the Materiality Provision to enjoin enforcement of state laws that reject ballots based solely on immaterial errors. It is also supported by a fully developed evidentiary record, establishing that the date requirement serves no purpose whatsoever, unlike the litany of election rules—which are not before the Court—that Appellants surmise will be swept into the Materiality Provision's reach. And applying the Materiality Provision in this context does not implicate federalism or

constitutional concerns because it is a rational means to prohibit racial discrimination in voting and a valid exercise of Congress's authority under the Fourteenth and Fifteenth Amendments.

*Third*, Plaintiffs-Appellees have a private right of action under Supreme Court precedent because the Materiality Provision confers individual rights, which are presumptively enforceable through 42 U.S.C. § 1983, and Congress has not created an exclusive statutory mechanism for individuals to protect that right.

*Fourth*, the District Court's injunction against 12 counties does not violate equal protection because the scope of the court's relief reflects its determination as to the limits of its jurisdiction, and there is no constitutional barrier to a district court fashioning relief tailored to the specific parties before it rather than on a statewide basis. Nor does the District Court's ruling violate the principle derived from *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), because it applied to county officials' post-election conduct in counting ballots and thus could not result in any voter confusion. That *Purcell* argument is, in any event, moot because the only affected election has been certified.

*Fifth*, the Montgomery County Board's certification of the 2023 election does not affect this Court's jurisdiction to consider the appeal of the District Court's ruling as applied prospectively to future elections. But Appellants' challenge to the District Court's ruling as applied to the 2023 Towamencin Township Supervisor election is moot because, as multiple Pennsylvania state courts have found, no timely election-contest petition was filed, so there is no basis under Pennsylvania law to overturn the certified election results. Indeed, Mr. Marino's opponent has already been sworn into office.

## STANDARD OF REVIEW

The Democratic Committees adopt Plaintiffs-Appellees' standard of review.

## ARGUMENT

The Court should affirm because the date requirement violates the unambiguous language of the Materiality Provision, which is privately enforceable through an action under 42 U.S.C. § 1983, and the District Court's ruling violates neither equal protection nor the *Purcell* principle.

**I.    Enforcement of the date requirement violates the Materiality Provision.**

Adjudicating a claim under the Materiality Provision requires three determinations: (1) whether the election regulation at issue results in the "den[ial of] the right of any individual to vote"; (2) whether that denial is caused by "an error or omission on any record or paper relating to any . . . act requisite to voting; and (3) whether that "error or omission" is "material in determining whether such individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). Each determination requires interpreting the Materiality Provision. Such statutory interpretation, of course, begins with the text, and where its "plain meaning is 'unambiguous, . . . the first step is also the last.'" *Migliori*, 36 F.4th at 162 n.56 (cleaned up) (quoting *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010)); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."). Applying that fundamental canon leaves no doubt that the date requirement violates the Materiality Provision.

**A.** **Rejecting mail ballots for noncompliance with the date requirement constitutes denial of the right to vote.**

The Materiality Provision applies to any regulation or rule that results in "den[ial of] the right of any individual to vote," 52 U.S.C. § 10101(a)(2)(B), and the Civil Rights Act defines "vote" to include "all action[s] necessary to make a vote effective including . . . having [a] ballot counted and included in the appropriate totals of votes cast," *id.* § 10101(e); *see also id.* § 10101(a)(3)(A) (incorporating this definition for purposes of the Materiality Provision's use of "vote").

Mail ballots set aside or rejected by county boards of elections for noncompliance with the date requirement are not "counted and included in the appropriate totals of votes cast," *id.* § 10101(e), resulting in a denial of the right to vote under the Materiality Provision's plain text, *see La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, at *18 (W.D. Tex. Nov. 29, 2023) ("If [the Materiality Provision] was intended only to protect qualified voters' right to *register* and be added to the voter rolls and not their right to actually cast a ballot and have it counted, Congress could have said so. It did just the opposite[.]" (citing 52 U.S.C. §§ 10101(a)(2)(B), (a)(3)(A))), *stayed pending appeal sub nom. United States v. Paxton*, No. 23-50885 (5th Cir. Dec. 15, 2023) (per

13

curiam); *cf. United States v. Classic*, 313 U.S. 299, 318 (1941) (the right to vote includes both the "right to cast a ballot" *and* "to have it counted").

This Court reached the same conclusion in *Migliori*, *see* 36 F.4th at 164, and should do so again. *Migliori* was vacated on grounds unrelated to the merits, and there is no reason "to conclude that [the] reasoning in that opinion was incorrect." *Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 n.18 (3d Cir. 2017); *see also id.* (finding an opinion vacated on grounds other than the merits still persuasive). To the contrary, subsequent briefing (both here and in *Migliori*), a comprehensive factual record in this matter, and the Materiality Provision's unambiguous terms confirm *Migliori*'s conclusion: Rejecting mail ballots due to "omissions of the date on their outside envelopes . . . violate[s] the Materiality Provision by denying Voters their right to vote." 36 F.4th at 164.

Appellants disagree, asserting that "the 'right to vote' does not encompass mail-in voting, so mail-in voting rules do not deny any individual that right." Opening Br. 26. But the text of the Materiality Provision does not draw any distinction between mail voting and in-person voting, and the sole authority Appellants cite is a stay opinion

from the Fifth Circuit, *United States v. Paxton*, No. 23-50885, slip op. at 5 (5th Cir. Dec. 15, 2023) (per curiam)—which is not binding even in *that* circuit, *see, e.g.*, *Vote.org v. Callanen*, No. 22-50536, 2023 WL 8664636, at *3, *19 (5th Cir. Dec. 15, 2023) (recognizing that a "motions panel decision does not bind . . . a merits panel" and setting aside a motions panel's holding). And the stay order's persuasive value is minimal given both the absence of analysis of the Materiality Provision's first inquiry— whether the regulation results in denial of the right to vote—and the order's exclusive reliance on *another* Fifth Circuit stay order. *See Paxton*, slip op. at 5 (citing *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 403–05 (5th Cir. 2020)).

Appellants' reliance on *McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969), to exempt mail voting from the Materiality Provision's scope, Opening Br. 26–27, is similarly misplaced. The Supreme Court has acknowledged that its "disposition of the claims in *McDonald* rested on failure of proof" that the challenged statute prohibited the plaintiffs from voting, *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974), not on any sweeping exemption of mail voting from the protections of federal law. Here, there is such "proof," as the record leaves

no doubt that a voter whose mail ballot is rejected under the date requirement is left with virtually no other option to cast an effective ballot.

Moreover, in trying to apply *McDonald* to the dispute here over vote *counting*, Appellants not only disregard the Civil Rights Act's unambiguous definition of "vote," 52 U.S.C. § 10101(e), but also ignore a critical distinction between the millions of Pennsylvanians who rely on mail ballots to exercise the franchise and the unsentenced inmates in *McDonald* who were never authorized under state law to vote absentee to begin with, 394 U.S. at 803–04. As *McDonald* explained, the plaintiffs there effectively claimed a "right to *receive*" absentee ballots, which Illinois law generally did not permit. *Id*. at 807 (emphasis added). But the Court also recognized that once a State grants a voting-related privilege, the privilege must be administered in accordance with federal law. *Id*. Here, Pennsylvania has authorized all eligible citizens to vote by mail. Having done so, its counting of mail ballots (like other ballots) must comply with federal law. Neither *McDonald* nor any other authority Appellants cite supports the theory that refusing to *count* a mail ballot does not implicate the right to vote. *Contra Reynolds v. Sims*, 377 U.S.

533, 554 (1964) (recognizing that the right to vote includes "the right to have one's vote counted").

Finally, Appellants rely heavily on Justice Alito's dissent (joined only by Justices Thomas and Gorsuch) from the denial of a stay application in *Migliori*. That dissent has little persuasive value. Even Justice Alito conceded that his opinion was "based on the review that [he] ha[d] been able to conduct in the time allowed," and said he would not "rule out the possibility that" his "current view" would prove "unfounded" after full briefing. *Ritter*, 142 S. Ct. at 1824 (Alito, J., dissenting).[1]

In short, Appellants cannot rely on a Fifth Circuit motions panel, an emergency-docket dissent, *McDonald*, or any other authority to place mail voting outside the plain text of the Materiality Provision. Their attempts to obscure the statute's unambiguous language cast no doubt on this Court's conclusion in *Migliori*: Rejecting ballots for noncompliance with the date requirement constitutes denial of the right to vote.

---

[1] Appellants' reliance on *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), is similarly misplaced. The Materiality Provision did not "codif[y] a *pre-existing* right." *Id.* at 20. It created a *new protection* for the (pre-existing) right to vote, barring states from denying that right based on certain immaterial errors or omissions.

17

**B.    Noncompliance with the date requirement is an error or omission on a paper relating to an act requisite to voting.**

The second question under the Materiality Provision is whether a denial of the right to vote is caused by "an error or omission on any record or paper relating to any ... act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). A handwritten date on an outer ballot envelope deemed unacceptable or invalid is "an error," whereas a wholly missing date is an "omission." *Id.* And, as this Court has recognized, "the mail-in ballot squarely constitutes a paper relating to an act for voting." *Migliori*, 36 F.4th at 162 n.56. Because compliance with the date requirement is an "action necessary to make a vote effective," 52 U.S.C. § 10101(e)—county boards must deem handwritten dates compliant for mail ballots to be counted, *see* 25 P.S. § 3146.8(g)(3); *Ball v. Chapman*, 289 A.3d 1, 21–22 (Pa. 2023)—it is "an act ... requisite to voting," 52 U.S.C. § 10101(a)(2)(B). The Materiality Provision therefore applies.

Here, too, Appellants try to muddy the plain statutory text, this time with an inapposite canon of construction, *ejusdem generis*. Opening Br. 21–23. Their "reliance on the rule of *ejusdem generis* is ... misplaced in two respects." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980).

*First*, this canon "is only an instrumentality for ascertaining the correct meaning of words *when there is uncertainty*." *Id.* (emphasis added) (quoting *United States v. Powell*, 423 U.S. 87, 91 (1975)). The Materiality Provision's language is unambiguous: "other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B), is statutorily defined as "all action necessary to make a vote effective including, but not limited to, . . . having such ballot counted and included in the appropriate totals of votes cast," *id.* § 10101(e). There is thus no uncertainty in the statutory text to resolve.

*Second*, the Supreme Court has rejected the way Appellants propose to apply *ejusdem generis*, explaining that "[t]he use of 'other' in [a] catchall provision" confirms congressional categorization of the previous terms within the catchall provision. *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 459 (2022). Specifically, the Court has held that "*[e]jusdem generis* neither demands nor permits that we limit a broadly worded catchall phrase based on an attribute that inheres in only one of the list's preceding specific terms." *Id.* at 462. Accordingly, "act[s] requisite to voting" *include* applications and registrations; these enumerated acts do not somehow limit "other act[s] requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The Materiality Provision's plain text covers each and

every stage of the voting process, from registering to vote to casting a mail ballot to counting ballots timely cast.

Next, Appellants recount a selective "legislative history" to assert that the Materiality Provision is limited "to documents used in 'only voter registration specifically.'" Opening Br. 19–20 (quoting *Vote.org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022) (motions panel)). But, as with *ejusdem generis*, "the Court only looks to legislative history, if at all, 'when interpreting *ambiguous* statutory language.'" *United States v. Stevens*, 70 F.4th 653, 657 (3d Cir. 2023) (quoting *Bostock*, 140 S. Ct. at 1749). "Legislative history," in other words, "is meant to clear up ambiguity, not create it." *Bostock*, 140 S. Ct. at 1749 (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)). Again, since the Materiality Provision's "plain terms" are unambiguous, "that should be the end of the analysis." *Id.* at 1743 (cleaned up).

Even if the Materiality Provision were ambiguous, the relevant legislative history supports an expansive scope consistent with the District Court's decision. As a concomitant House report stated, the Civil Rights Act sought to provide broad and sweeping protections for "the civil rights of persons within the jurisdiction of the United States" and was

20

written to be "general in application and national in scope" precisely in order to "provide means of expediting the vindication of th[e] right" to vote. H.R. Rep. No. 88-914, pt. 1, at 16, 18 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2391, 2393. To this end, "Title I [wa]s designed to meet problems encountered in the operation and enforcement of the Civil Rights Acts of 1957 and 1960, by which the Congress took steps to guarantee to all citizens the right to vote without discrimination as to race or color." *Id.* at 19, *reprinted in* 1964 U.S.C.C.A.N. at 2394. This intent informs any interpretation of the law's provisions: As remedial civil-rights legislation, the Materiality Provision "must be interpreted liberally." *Slagle v. County of Clarion*, 435 F.3d 262, 267 (3d Cir. 2006); *cf. Rosen v. Pub. Serv. Elec. & Gas Co.*, 477 F.2d 90, 94 (3d Cir. 1973) (recognizing that "[s]tanding for purposes of the Civil Rights Act of 1964 was intended by Congress to be defined as broadly as is permitted by Article III of the Constitution"). Put another way, "the Civil Rights Act of 1964 stands as . . . one of the Nation's great triumphs. [Courts] have no right to make a blank sheet of any of its provisions." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 310 (2023) (Gorsuch, J., concurring).

Ignoring this historical context and explicitly broad remedial purpose, Appellants argue that, because part of the House report mentioned contemporary discriminatory voter-registration practices, the Materiality Provision is *limited* to voter-registration procedures. Opening Br. 8, 19–20. But the House report also noted that the Materiality Provision would help apply "uniform standards, practices, and procedures to all persons seeking to vote in Federal elections [] by prohibiting the disqualification of an individual because of immaterial errors or omissions in papers or acts relating to such voting," and that Title I would help address issues such as "lengthy and often unwarranted delays . . . in the course of judicial proceedings." H.R. Rep. No. 88-914, pt. 1, at 19, *reprinted in* 1964 U.S.C.C.A.N. at 2394. This language is not specifically cabined to voter-registration procedures, so Appellants' artificial limitation of the statute would have to be rejected even if the legislative history could be considered.

Moreover, Appellants ignore other legislative history that supports a broad reading of the Materiality Provision. For example, the House minority report recognized the statute's expansive scope in voicing opposition to Title I's "extension of Federal control to *all material steps*

in Federal, State, and local elections," *id.* at 78 (emphasis added), *reprinted in* 1964 U.S.C.C.A.N. at 2447. The House report also included legislators' statements that their "chief concern" was to "correct *any* unjust discriminatory practices against any group or class," *id.* at 61 (emphasis added), *reprinted in* 1964 U.S.C.C.A.N. at 2430, and that they "believe and are certain that our view is shared by all Americans that the right to vote is meaningless unless one's vote is properly counted. They are interrelated and are both civil rights," *id.*, pt. 2, at 24, *reprinted in* 1964 U.S.C.C.A.N. at 2510.

Simply put, there is "nothing in the legislative history to support the conclusion that the [statutory text] . . . means anything other than what it says." *Harrison*, 446 U.S. at 589. If Congress had not intended the Materiality Provision to broadly cover every stage of the voting process, it would have "persuasive[ly] indicat[ed] to the contrary." *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016). And even if the Materiality Provision's text "reaches beyond the principal evil legislators may have intended or expected to address," that does not constitute ambiguity. "[I]t is ultimately the provisions of those legislative

commands rather than the principal concerns of our legislators by which we are governed." *Bostock*, 140 S. Ct. at 1749 (cleaned up).

### C.    The handwritten date on the outer envelope of a mail ballot is immaterial to determining voting qualifications or administering elections generally.

The Materiality Provision applies when an error or omission is "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). A missing or unacceptable handwritten date on the outer envelope of a mail ballot is such an error or omission.

Under Pennsylvania law, qualified voters must satisfy four qualifications: (1) being at least 18 years old on election day; (2) being a U.S. citizen for at least one month prior to the election; (3) residing in the relevant election district for at least 30 days; and (4) not being imprisoned for a felony during the previous five years. 25 P.S. § 1301(a). As Appellants concede, the handwritten date "has nothing to do with" determining any of these qualifications. Opening Br. 25. It is therefore immaterial for purposes of the Materiality Provision.

In fact, the record shows that a handwritten date is not used for *any* purpose. As the District Court explained:

> [T]he date on the outside envelope was not used by any of the county boards to determine when a voter's mail ballot was received in the November 2022 election. . . . Whether a mail ballot is timely, and therefore counted, is not determined by the date indicated by the voter on the outer return envelope, but instead by the time stamp and the SURE [State Uniform Registry of Elections] system scan indicating the date of its receipt by the county board.

App.80. Ignoring this, Appellants cite the separate opinion of a Pennsylvania Supreme Court justice suggesting that the date requirement serves a timing role. Opening Br. 46 (citing *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1090 (Pa. 2020) (Dougherty, J., concurring in part and dissenting in part)). But that suggestion has no basis in Pennsylvania's election laws (or in the record here about county boards' practices), and in the same case a majority of the court recognized "some persuasive force" to the argument that the date requirement "could lead to a violation of federal law by asking the state to deny the right to vote for immaterial reasons." *In re Canvass*, 241 A.3d at 1074 n.5 (majority opinion).

The District Court also expressly rejected the argument that the date requirement is useful to detect fraud. While Appellants claimed below that, in one instance, the handwritten date "helped prove a ballot was fraudulently cast after a citizen's death," that story unraveled when

25

"the county board's own Rule 30(b)(6) designee testified that the fraudulent ballot was first detected by way of the SURE system and Department of Health records, rather than by using the date on the return envelope." App.79 n.39. Appellants ignore these undisputed facts in reprising their debunked tale here. *See* Opening Br. 31–32. They also speculate that the date requirement "help[s] encourage voters to take the process seriously and be truthful" when claiming that they are eligible voters. *Id.* at 46–47. They cite no evidence for this speculation, however, nor explain how such abstract interests could render a handwritten date material to determining a voter's qualifications.

Appellants also attempt once more to twist the statutory text to exempt the casting and counting of votes from the Materiality Provision's scope. Opening Br. 23–25. Specifically, they cite a nearby provision authorizing courts to issue "order[s] declaring [voters] *qualified* to vote" "in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by subsection (a)," the subsection in which the Materiality Provision is found. 52 U.S.C. § 10101(e) (emphasis added). Based on this purportedly limited remedial provision (authorizing courts to declare people *eligible*),

Appellants argue that the Materiality Provision (subsection (a)) protects only the right to register to vote. But they ignore that subsection (e) *also* both provides that "an applicant so declared qualified to vote shall be permitted to vote in any such election" and proscribes a "refusal by any . . . officer . . . to permit any person so declared qualified to vote to vote at an appropriate election"—provisions that plainly protect the right to cast votes, not just the right to register. *Id.* § 10101(e). They likewise ignore that subsection (c) provides for injunctive relief against "*any act or practice* which would deprive any other person of *any right or privilege* secured by subsection (a)." *Id.* § 10101(c) (emphases added).

In any event, there is no need to look to neighboring provisions to ascertain which rights subsection (a) protects: The Materiality Provision by its plain terms prohibits the unlawful denial of "the right of any individual to vote in any election." *Id.* § 10101(a)(2)(B). And it applies to all stages of the voting process, including "casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast."

*Id.* § 10101(e). Appellants' proposed cabining of the Materiality Provision conflicts with the statute's expansive definition of what it protects.[2]

## II. The District Court's ruling is consistent with federalism principles and raises no constitutional concerns.

### A. The District Court's application of the Materiality Provision does not violate federalism principles.

Appellants claim that the District Court's decision violates federalism principles by hampering states' ability to administer elections without "exceedingly clear language" authorizing the court to do so. Opening Br. 30–35 (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021)). But, as discussed, the Materiality Provision *is* "exceedingly clear." As federal courts have consistently concluded, the statute prohibits enforcement of state laws that, like the date requirement, require election officials to reject ballots

---

[2] An amicus brief proffers another unjustifiably circumscribed interpretation of the Materiality Provision's scope: that it applies not to state laws but only to ad hoc actions by state officials. *See* Br. of *Amicus Curiae* Restoring Integrity & Trust in Elections, Inc. 20, Doc. No. 114. Not only does this interpretation impermissibly depart from the statute's "plain terms," *Bostock*, 140 S. Ct. at 1743, but it would also swallow the rule by exempting every state law from its reach, *see Vote.org*, 2023 WL 8664636, at *19 (rejecting the argument "that [s]tates may circumvent the Materiality Provision by defining all manner of restrictions, no matter how trivial, as being a qualification to vote").

because of immaterial paperwork errors. *See, e.g.*, *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1281–82 (N.D. Ga. 2021) (plaintiffs stated a plausible Materiality Provision claim in challenging a requirement that absentee voters write their birthdates on ballot envelopes); *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021) (plaintiffs stated a plausible Materiality Provision claim in challenging a requirement that absentee voters who already demonstrated their eligibility to vote provide similar evidence with their absentee ballots); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1309 (N.D. Ga. 2018) (enjoining a county, based on the Materiality Provision, from rejecting absentee ballots due to voters' failures to write their correct birth years on envelopes); *Ford v. Tenn. Senate*, No. 06-2031 D V, 2006 WL 8435145, at *11 (W.D. Tenn. Feb. 1, 2006) (Materiality Provision prohibits rejecting ballots because of voters' failure to sign ballots and poll books), *appeal dismissed sub nom. Ford v. Wilder*, 469 F.3d 500 (6th Cir. 2006). These cases are all consistent with the exceedingly clear text of the Materiality Provision. And Appellants cite no contrary authority.

Instead, they claim that the District Court's decision would hinder states' ability to administer elections, because the Materiality Provision could be applied to strike down many ballot-counting rules. Opening Br. 33–34. But that ignores the facts of this specific case. The district court found that the date requirement serves no purpose whatsoever. In other words, the relevant ballot-counting rule (timely receipt of ballots) has been fully satisfied; the date requirement is not a ballot-counting rule but rather an empty requirement. Appellants' predictions about the fate of other paper-based regulations in other states—such as signature requirements, rules against overvoting, secrecy-envelope requirements, or voter-assistance forms—are thus unwarranted. Such rules and regulations are distinct from Pennsylvania's date requirement because the undisputed evidence establishes that the date requirement is immaterial to determining a voter's qualifications and serves no election-administration function. There is no similar finding regarding any of the other regulations Appellants mention.[3]

---

[3] For the same reason, Justice Brobson's separate opinion in *Ball, see* 289 A.3d at 38–39 (Brobson, J., concurring in part and dissenting in part), does not remotely support Appellants' speculation about mass invalidation of unrelated laws in other states, like "[p]rohibitions on voting for more candidates than there are offices," Opening Br. 33–34.

30

Finally, even if other requirements *would* be invalid under the Materiality Provision, that would not empower this Court to rewrite the Civil Rights Act's straightforward language. As the Supreme Court has instructed time and again, courts must "presume Congress says what it means and means what it says." *Simmons*, 578 U.S. at 627. As explained, what Congress said in the Materiality Provision invalidates Pennsylvania's date requirement. That is the end of the matter.

## B. The District Court's decision is fully consistent with the U.S. Constitution.

Appellants wrongly suggest that application of the Materiality Provision to the date requirement exceeds Congress's enforcement powers under the Fifteenth Amendment, thus requiring reversal to avoid an unconstitutional result. Opening Br. 35–40.

To begin, the Supreme Court has recognized that the constitutional-avoidance canon "has no application in the absence of statutory ambiguity," *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001)—meaning it applies "only . . . where a statute has 'more than one plausible construction,'" *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 581 (2022) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)). As discussed, the Materiality Provision's plain text

unambiguously applies to all stages of the voting process; limiting it to voter-eligibility determinations is simply not a plausible construction of the statutory text. The constitutional-avoidance canon thus has no application here. *Cf. Vote.org v. Byrd*, No. 4:23-cv-111-AW-MAF, 2023 WL 7169095, at *6 (N.D. Fla. Oct. 30, 2023) (rejecting a constitutional-avoidance challenge to the Materiality Provision because "limiting [its] reach . . . would require rewriting the provision—not just interpreting it"), *appeal docketed sub nom. Disability Rts. Fla. v. Sec'y*, No. 23-13727 (11th Cir. Nov. 13, 2023).

In any event, there is no constitutional problem to avoid here; the Materiality Provision easily falls with Congress's constitutional power. Appellants' contrary view rests on their mistaken understanding that the congruence-and-proportionality test applies to Congress's Fifteenth Amendment authority. Opening Br. 36. While that test applies to congressional action under the *Fourteenth* Amendment, *see City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997), legislation under the *Fifteenth* Amendment is subject to the same "basic test . . . as in all cases concerning the express powers of Congress with relation to the reserved powers of the States," *South Carolina v. Katzenbach*, 383 U.S. 301, 326–

27 (1966) (citing *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819)); *but see Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (noting that the parties disagreed on the applicable Fifteenth Amendment standard and declining to resolve the issue). Under that test, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *Katzenbach*, 383 U.S. at 324; *see also Shelby County v. Holder*, 570 U.S. 529, 554–56 (2013) (striking down the Voting Right Act's preclearance requirement based on the "irrationality of continued reliance on the § 4 coverage formula").

Given that "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct," *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727-28 (2003)—including voting-related limitations that "unduly lend themselves to discriminatory application, either conscious or unconscious," *City of Boerne*, 521 U.S. at 526 (quoting *Oregon v. Mitchell*, 400 U.S. 112, 311 (1970) (Harlan, J., concurring in part and dissenting in part))—it is a wholly rational exercise of congressional power to "prohibit those acting under color of law from using immaterial omissions, which were historically used to prevent racial minorities from

voting, from blocking any individual's ability to vote," *Vote.org*, 2023 WL 8664636, at *19. The District Court's application of the Materiality Provision is therefore consistent with Congress's enforcement powers under the Fifteenth Amendment.

Even if Appellants' preferred standard applies, affirmance would still be warranted. As the Fifth Circuit has concluded, the Materiality Provision is "a congruent and proportional exercise of congressional power." *Vote.org*, 2023 WL 8664636, at *18–19 & n.11. Contrary to Appellants' argument, this conclusion is supported by the relevant congressional record, which tied Black Americans' "ability . . . to obtain material benefits and social and political advancement" to "the right to vote" generally, not solely to the ability of Black Americans to register. H.R. Rep. No. 88-914, pt. 2, at 2, *reprinted in* 1964 U.S.C.C.A.N. at 2488; *see also id.* at 2–6 (referring generally to importance of "[t]he secret ballot," "vote denial," "voter discrimination," and "[en]franchising" Black Americans), *reprinted in* 1964 U.S.C.C.A.N. at 2488–93. Given that Congress made findings linking "the burdens of a race under the traces of servitude" to "the right to vote," *id.* at 2, *reprinted in* 1964 U.S.C.C.A.N. at 2488—and that "Congress' power to enforce the [Fourteenth]

Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text," *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000) (cleaned up)—the District Court's application of the Materiality Provision is consistent with the constitutional exercise of Congress's Fourteenth Amendment enforcement powers.

Finally, the argument in one amicus brief that the Materiality Provision requires proof of racial discrimination, *see* Br. of *Amicus Curiae* Restoring Integrity & Trust in Elections, Inc. 18–20, Doc. No. 114, fails. As courts have noted, "[n]o suggestion of a requirement of racial discrimination exists in any of [the Materiality Provision's] language," and thus the provision "is not textually limited to protecting only one race of voters in order to more effectively reach subtle forms of racial discrimination." *Vote.org*, 2023 WL 8664636, at *18 (citing Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83, 148–49 (2012)). Put another way, "[t]hat Congress enacted the Materiality Provision to tackle racial discrimination does not . . . mean the provision applies only to racially

discriminatory practices." *Byrd*, 2023 WL 7169095, at *5 (citing *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008); *Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006)).

## III. Plaintiffs-Appellees have a private right of action under § 1983.

Supreme Court precedent compels the conclusion that Plaintiffs-Appellees have a private right of action to enforce the Materiality Provision, and every circuit to seriously consider the question (including this Court) has embraced that conclusion.

The Supreme Court has held that "§ 1983 can presumptively be used to enforce unambiguously conferred federal individual rights, unless a private right of action under § 1983 would thwart any enforcement mechanism that the rights-creating statute contains for protection of the rights it has created." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 172 (2023). Appellants do not seriously dispute the District Court's conclusion that the Materiality Provision confers individual rights; the statute provides that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election" for immaterial errors or omissions, 52 U.S.C. § 10101(a)(2), language that "'clearly imparts an individual entitlement with an

unmistakable focus on the benefitted class;' namely, the right of voters to vote, unimpeded by unnecessary and/or immaterial requirements." App.65 (quoting *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 526 (3d Cir. 2009)); *see also Migliori*, 36 F.4th at 159 (the Materiality Provision "unambiguously confers a personal right because it places all citizens qualified to vote at the center of its import and provides that they shall be entitled and allowed to vote" (cleaned up)).

Appellants instead argue that 52 U.S.C. § 10101 "includes a more restrictive private cause of action"—one that manifests only if the Attorney General first brings a civil action demonstrating a pattern or practice of racially discriminatory Materiality Provision violations—and that this restrictive cause of action precludes enforcement through § 1983 save in that circumstance. Opening Br. 52. But this argument ignores the Supreme Court's most recent analysis of the scope of § 1983, which explains that "[t]he crucial consideration is whether Congress intended a statute's remedial scheme to be *the exclusive avenue* through which a plaintiff may assert his claims," and that the "presumption is that § 1983 can play its textually prescribed role as a vehicle for enforcing [unambiguously conferred] rights, even alongside a detailed enforcement

regime that also protects those interests, so long as § 1983 enforcement is not incompatible with Congress's handiwork." *Talevski*, 599 U.S. at 187–89 (cleaned up).

Appellants offer nothing to overcome this presumption, and nothing demonstrating that the streamlined relief potentially available to *some* individuals affected by systemic civil-rights violations evinces congressional intent to prohibit enforcement of the Materiality Provision through § 1983.

For example, in *City of Rancho Palos Verdes v. Abrams*, which Appellants cite for the proposition that § 1983 relief is not available where there is a "comprehensive enforcement scheme," Opening Br. 51, Congress had expressly provided another mechanism for private parties to seek redress. *See* 544 U.S. 113, 116 (2005) (the Telecommunications Act allows "[a]ny person adversely affected" by violation to "commence an action in any court of competent jurisdiction" within 30 days (quoting 47 U.S.C. § 332(c)(7)(B)(v)). The same is true of the other two cases in which the Supreme Court has determined that Congress intended to preclude enforcement of private rights through § 1983. *See Smith v. Robinson*, 468 U.S. 992, 1010–11 (1984) (the Education of the Handicapped Act

"establishes an elaborate procedural mechanism to protect the rights of handicapped children" that "includes ongoing parental involvement, detailed procedural safeguards, and a right to judicial review"); *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14 (1981) (the Federal Water Pollution Control Act includes "express citizen-suit provisions . . . [that] authorize private persons to sue for injunction to enforce these statutes" subject to "specified procedures," including "60 days' prior notice to potential defendants"). No such alternative processes exist here. Unlike in those cases, therefore, Appellants' interpretation would prevent the meaningful enforcement of the statutory right Congress created, leaving voters entirely reliant on the Attorney General first initiating an action and then requesting a pattern-or-practice finding. And even then, relief would be available only if voters were subsequently deprived of their right to vote. *See* 52 U.S.C. § 10101(e). There is no sound basis for such a sharp curtailment on enforcement of a core protection of the fundamental right to vote.

Every appellate court to meaningfully address the issue has agreed, concluding that the Materiality Provision is privately enforceable through § 1983. Most recently, the Fifth Circuit rejected the same

39

argument made by Appellants, recognizing that there was "no evidence in the text of the statute to rebut the presumption nor a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Vote.org*, 2023 WL 8664636, at *10 (quoting *Migliori*, 36 F.4th. at 160). The Eleventh Circuit similarly "conclude[d] that neither [§ 10101's] provision for enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in [§ 10101] require[s] the conclusion that Congress did not intend such a right to exist." *Schwier*, 340 F.3d at 1296 (emphasis omitted). And this Court in *Migliori*, after paragraphs of analysis, likewise recognized that § 10101 "does not establish a cause of action for private individuals" and that, "[w]hen Congress added a provision for civil enforcement by the Attorney General, it acknowledged that private individuals had enforced the substantive rights in § 10101(a) via § 1983 for nearly a century." 36 F.4th at 161–62.

The only contrary authority Appellants cite is *Northeast Ohio Coalition for Homeless v. Husted*, in which the Sixth Circuit held without meaningful analysis that it was bound by a previous decision to hold that the Materiality Provision was not privately enforceable. *See* 837 F.3d

612, 630 (6th Cir. 2016). The earlier decision—which predates much of the Supreme Court's relevant § 1983 precedent—stated in a single conclusory sentence that § 10101 "is enforceable by the Attorney General, not by private citizens." *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000). And as both the Fifth and Eleventh Circuits have noted, *McKay* in turn relied on a 1978 district-court case that "was not even about the Materiality Provision." *Vote.org*, 2023 WL 8664636, at *10; *see also Schwier*, 340 F.3d at 1294. Far from relying on an "incorrect premise" or "simply miss[ing] an outcome-determinative consideration," as Appellants contend, Opening Br. 53, the decisions of the Fifth and Eleventh Circuits—as well as this Court—thoroughly considered and rejected Appellants' arguments. This Court should reaffirm its *Migliori* analysis and decline Appellants' invitation to join the Sixth Circuit's cursory and unreasoned determination.

## IV.  Appellants' arguments regarding the relief the District Court provided fail.

Appellants contend that the District Court's remedy violates the Equal Protection Clause and the principle set out in *Purcell*. Opening Br. 53–59. Neither argument has merit.

41

As an initial matter, Appellants begin their remedy arguments by suggesting that federal courts must generally exercise unusual restraint in crafting remedies in election-law cases. *See id.* at 53–54. But they cite no authority to support that suggestion—and, to the Democratic Committees' knowledge, there is none. What caselaw *does* hold is that voting is a "fundamental right." *Allen v. Milligan*, 599 U.S. 1, 36 (2023). Indeed, the Supreme Court has long made clear that the right to vote is "preservative of other basic civil and political rights," *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds*, 377 U.S. at 562), and that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws," *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Put more simply, "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). These cases foreclose Appellants' claim that some rule (the contours of which they never articulate) requires courts to be more hesitant about remedying violations of the right to vote than of other rights. If anything, the

42

foundational importance of the right to vote counsels in favor of ensuring that infringements are effectively remedied.

## A.    The District Court's order does not violate the Equal Protection Clause.

Appellants argue that the District Court's order violates equal protection because it directly binds only the Secretary of the Commonwealth and the 12 county boards (of 67 total) that the District Court held Plaintiffs-Appellees have standing to sue, thus creating "intrastate disuniformity." Opening Br. 55. Their conclusion is incorrect.

The limited reach of the order below is an unremarkable consequence of Article III's limitations on federal judicial power. A federal court can resolve only concrete disputes between adverse litigants properly before it. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). That frequently means that a certain rule of law—like the one the District Court's remedy implements—will be applied directly to some individuals and groups sooner than others. Such disparities (almost always temporary) do not violate the Equal Protection Clause.

Embracing Appellants' contrary position would render district courts powerless to address even properly presented challenges to clear violations of the right to vote. For example, say that a state law

43

administered at the county level required voters to attest to their religious faith and recite passages of scripture to receive a ballot, and aggrieved individuals sued their county to enjoin its enforcement. It cannot be that a federal court would have to turn the plaintiffs away on the theory that if a single district court cannot *simultaneously* redress the constitutional violation across the state, it cannot do justice for the parties properly before it.

*Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), is not to the contrary. There, the Florida Supreme Court had ordered a statewide recount but provided such vague and variable rules for implementing it that the U.S. Supreme Court held that the recount process violated the Equal Protection Clause. *Id.* at 105–10. "The problem," the Court explained, "inhere[d] in the absence of specific standards" to determine how voters' intent would be discerned, leaving each Florida county free to set its own standards. *Id.* at 106. Here, by contrast, Appellants agree that the District Court's order provides "specific guidance" regarding the standard for counting votes. Opening Br. 56. Moreover, whereas the *Bush* Court emphasized that it faced a "situation where a state court *with the power to assure uniformity*" statewide had failed to do so, 531 U.S. at 109

(emphasis added), the District Court here determined that it lacked that power under Article III given its standing analysis. Each of these differences renders *Bush* inapposite; as the Court there noted, its decision was "limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities." *Id.*

Appellants, moreover, cite no evidence to support their assumption that the 55 county boards not directly subject to the District Court's order will adopt arbitrary standards in processing ballots that fail to comply with the date requirement. The only basis Appellants *do* offer is that "the Pennsylvania Supreme Court's order in *Ball* continues to govern the other 55 county boards, so they must *reject* ballots that do not comply with the date requirement." Opening Br. 56. But *Ball* forbade the counting of undated or misdated ballots *only* "for the November 8, 2022 general election." 284 A.3d at 1192. And it did so—at a time when there was no federal-court ruling on whether the Materiality Provision required the counting of such ballots—because the justices were equally divided on that question. *See id.* at 1192. By its own terms, *Ball*'s

prohibition on counting did not apply to future elections—and there is now a court ruling on the federal issue *Ball* could not resolve.

If this Court affirms the District Court's ruling and county boards still do not comply with it voluntarily, they will undoubtedly be ordered to comply in very short order, through further litigation (brought by plaintiffs with standing against every county board) to enforce this Court's decision.[4] Either way, this Court's decision would do what the *Bush* Court held was impossible given the extreme time urgency there, *see* 531 U.S. at 110–11: quickly eliminate any intrastate variation (and hence any conceivable equal-protection problem) by "exten[ding]" the "benefits" of the District Court's order to the "excluded class," *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)—namely, voters living in the 55 dismissed counties.

### B.    The District Court's order does not violate *Purcell*.

Appellants' reliance on *Purcell* likewise fails. That case holds "that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*,

---

[4] In the related *Eakin* case, Intervenors-Appellees DSCC and DCCC have asserted standing to seek relief against all 67 of Pennsylvania's county boards of elections. *See supra* at 6.

140 S. Ct. 1205, 1207 (2020) (per curiam). It rests on the concern that changes shortly before an election may "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. That concern is not implicated here because the District Court's order was issued "*weeks after* Election Day," Opening Br. 57. Given that, the order could not have engendered any voter confusion or dissuaded anyone from going to the polls in the 2023 elections. Indeed, by resolving the issue when it did, the District Court properly avoided *Purcell* concerns for 2024.

Appellants, however, ask this Court to extend *Purcell* to the post-election context, *see* Opening Br. 58–59. But that contention is moot, as the only affected election has been certified, as explained below. In other words, even if this Court were to hold that the District Court erred in applying its ruling to the 2023 election, it would and could redress no injury. As a practical matter, given the certification of the only affected election, the decision below will only apply prospectively to the 2024 election and beyond. There is thus no Article III basis for this Court to consider extending *Purcell* to the post-election context.

In any event, Appellants' reliance on *Trump v. Wisconsin Elections Commission*, 983 F.3d 919 (7th Cir. 2020), is misplaced. As Appellants note, the *Trump* court reasoned that the "same imperative of timing and the exercise of judicial review" underlying *Purcell* "applies with much more force on the back end of elections." *Id.* at 925. But, in the very next sentence, the court explained what it meant by that: "Before a court can contemplate entering a judgment that would void election results, it *must* consider whether the plaintiffs filed a timely pre-election request for relief." *Id.* (cleaned up). In particular, the court explained that the party seeking relief in that case (former President Donald Trump) "had a full opportunity *before* the election to press the very challenges to Wisconsin law underlying his present claims," and held that, "[h]aving foregone that opportunity, he cannot now—after the election results have been certified as final—seek to bring those challenges." *Id.* at 926 (emphasis added). That was "especially so," the court added, "given that the [Wisconsin Elections] Commission announced well in advance of the election the guidance he now challenges." *Id.*

*Trump* thus stands for the proposition that a party cannot wait until after an election to bring a challenge that was unquestionably

available "well in advance of the election." *Id.* That does not help Appellants here, because Plaintiffs-Appellees filed suit a *year* before the 2023 elections. Even under *Trump*, then, *Purcell* would not have provided any bar to the District Court's order.

Nor does Justice Thomas's dissent from the denials of certiorari in *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021), assist Appellants. The certiorari petitions in *Degraffenried* did not even concern *post*-election orders. *See id.* at 733–34 (Thomas, J., dissenting). And while Justice Thomas expressed concern about a different case where an order issued "after election day" altered an election result, *id.* at 735, his solo opinion on *Purcell* issues is not the law. Federal courts should not be prohibited from enforcing federal law after an election so as to prevent infringements of voting rights merely because there is a chance that doing so could affect the outcome of the election—again, certainly not where a plaintiff filed suit well before that election. Given the amount of time inherent in conducting most litigation, a contrary rule would make it exceedingly difficult for federal courts to safeguard the fundamental right to vote.

**V.    Any challenge regarding the 2023 elections is moot.**

This Court directed the parties to "address the effect, if any, of certification on the jurisdiction of this court." Doc. No. 43 at 3. The Democratic Committees do not agree with every theory of standing Appellants advance. *See* Opening Br. 62–66. But they do not dispute that at least one defendant (which is all that is needed, *see In re Energy Future Holdings Corp*, 949 F.3d 806, 815 n.4 (3d Cir. 2020)), has standing to appeal the District Court's ruling as applied prospectively—for example, because enjoining the date requirement may result in the Republican Party entities that intervened below diverting resources in response.

Any challenge regarding the application of the District Court's ruling to Mr. Marino's 2023 race, however, is moot. The results of that race have been certified, and Mr. Marino's opponent has been sworn in.[5] It would therefore be "impossible for a court to grant any effectual relief whatever" to Mr. Marino if he prevailed here. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. SEIU*, 567 U.S. 298, 307 (2012)); *accord,*

---

[5] *See* Dan Sokil, *Sewer Sale Opponent Kosi Osei Takes Oath as Towamencin Township Supervisor*, North Penn Now (Jan. 4, 2024), https://northpennnow.com/sewer-sale-opponent-kofi-osei-takes-oath-as-towamencin-township-supervisor-p7914-103.htm.

*e.g.*, *In re World Imps. Ltd.*, 820 F.3d 576, 582 (3d Cir. 2016). The appeal as to that election is therefore moot.

Appellants dispute this solely with the argument that "under Pennsylvania law, the results of an election may be changed even after they have been certified through the filing of an election contest petition in state court." Opening Br. 66 (cleaned up). But in the lone case they cite for support, the Pennsylvania Supreme Court stated that "once the results of an election have been certified they may only be changed on the basis of a *timely* filed election contest petition." *In re Contest of 2003 Gen. Election for Off. of Prothonotary*, 849 A.2d 230, 235 (Pa. 2004) (emphasis added). Although Appellants do not say so, the petition challenging the results in Mr. Marino's election was *not* timely: The petition was due on November 27, 20 days after the November 7 election, *see* 25 P.S. § 3456, but was not filed until December 4, *see In re Contest of Nov. 7, 2023 Election of Towamencin Twp.*, No. 1482 C.D. 2023, slip op. at 16 (Pa. Commw. Ct. Dec. 29, 2023) (attached as Exhibit A). The Court of Common Pleas rejected the petition on that ground (as "untimely filed") as well as on alternative grounds, including Mr. Marino's separate failure to timely appeal the board of elections' decision to count the undated

51

ballots. *Id.* at 9. (Appellants claim that the court "denied the petition on the merits," Opening Br. 13, 67, but they cite the court's short December 7 order rather than its December 20 opinion providing its full reasoning—including untimeliness, *see In re Contest of Nov. 7, 2023 Election*, slip op. at 8–9.) Moreover, after Appellants filed their brief here, the Pennsylvania Commonwealth Court denied Mr. Marino's application for relief in his appeal from the Court of Common Pleas' ruling, again on several grounds—including the petition's untimeliness. *Id.* at 15–21. Because no timely petition was filed, there is no basis under Pennsylvania law to change the certified election results. *See In re Contest of 2003 Gen. Election*, 849 A.2d at 235. Even if there were, Appellants provide no basis to conclude that Pennsylvania law authorizes a court to oust a sworn-in official, as would be required now that Mr. Marino's opponent has taken office. There is simply no relief available at this juncture to Mr. Marino, making this appeal moot as to his election.

Finally, Appellants do not argue that the voluntary-cessation or capable-of-repetition-yet-evading-review exception to mootness applies, and thus have waived any such argument. (Defects in subject-matter

jurisdiction cannot be waived, but arguments establishing jurisdiction can be. *See, e.g., C.A.C. v. United States*, 449 F. App'x 194, 197–98 (3d Cir. 2011).) In any event, neither exception applies: There was no cessation of relevant conduct, and although the challenge regarding Mr. Marino's election is moot, the *issue* in the case will not evade review here, *see supra* at 50, and this Court's ruling on that issue will apply to any future election in which Mr. Marino runs.

## CONCLUSION

This Court should affirm the District Court's summary-judgment ruling.

Dated: January 10, 2024

Seth P. Waxman
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com

Clifford B. Levine
DENTONS COHEN & GRIGSBY P.C.
625 Liberty Avenue
Pittsburgh, Pennsylvania 15222
(412) 297-4998
clifford.levine@dentons.com

*Counsel for the Democratic
National Committee*

Respectfully submitted,

*s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta
Justin M. Baxenberg
Daniel J. Cohen
Omeed Alerasool
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
(202) 968-4490
unkwonta@elias.law
jbaxenberg@elias.law
dcohen@elias.law
oalerasool@elias.law

Jonathan P. Hawley
ELIAS LAW GROUP LLP
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
(206) 656-0179
jhawley@elias.law

*Counsel for DSCC and DCCC*

# COMBINED CERTIFICATIONS

1.    Pursuant to 3d Cir. L.A.R. 28.3(d), at least one of the attorneys whose names appear on this motion, including the undersigned, is a member in good standing of the bar of this Court.

2.    This brief complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 10,638 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced 14-point serif font (Century Schoolbook) using Microsoft Word.

3.    Pursuant to 3d Cir. L.A.R. 31.1(c), Sophos Endpoint version 3.4.530.0 has been run on this electronic file and no virus was detected.


Dated: January 10, 2024            *s/ Uzoma N. Nkwonta*
                                      Uzoma N. Nkwonta

## CERTIFICATE OF SERVICE

I hereby certify that, on January 10, 2024, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system.

Dated: January 10, 2024                    *s/ Uzoma N. Nkwonta*
                                           Uzoma N. Nkwonta

# EXHIBIT A

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Contest of November 7, 2023 | : | |
| Election of Towamencin Township | : | |
| | : | |
| Appeal of: Shannon L. Main, Holly A. | : | |
| Bechtel, Nancy J. Becker, David Allen | : | |
| Brady, Richard D. Costlow, George | : | |
| H. Frisch, Earl G. Godshall, Marilyn | : | |
| Godshall, Alyson Horcher, Leo F. | : | No. 1482 C.D. 2023 |
| Horcher III, Kris A. Kazmar, Michael E. | : | Heard: December 28, 2023 |
| Main, Cynthia M. Manero, Bruce C. | : | |
| Marger, Bruce R. Marger III, Kathryn J. | : | |
| Marger, Margrit D. Marino, Joseph F. | : | |
| Meehan, Richard Mullen, Karen L. | : | |
| Nuss, Thomas A. Nuss III, Beth | : | |
| Pickford,  Scott E. Pickford, Delyne | : | |
| D. Rogiani, Kevin Rossi, Nicole M. | : | |
| Rossi, Janella J. Santiago, Kelly L. | : | |
| Secoda, Michael Secoda and Kristin | : | |
| R. Warner | : | |

**BEFORE:      HONORABLE RENÉE COHN JUBELIRER, PRESIDENT JUDGE**

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**                    **FILED:** December 29, 2023

By order dated December 29, 2023, the Court disposed of Appellants'[1]

"Application for Relief in the Nature of a Motion for Summary Judgment/Relief or,

---

[1] The appellants in this appeal include:  Shannon L. Main, Holly A. Bechtel, Nancy J. Becker, David Allen Brady, Richard D. Costlow, George H. Frisch, Earl G. Godshall, Marilyn Godshall, Alyson Horcher, Leo F. Horcher III, Kris A. Kazmar, Michael E. Main, Cynthia M. Manero, Bruce C. Marger, Bruce R. Marger III, Kathryn J. Marger, Margrit D. Marino, Joseph F. Meehan, Richard Mullen, Karen L. Nuss, Thomas A. Nuss III, Beth Pickford, Scott E. Pickford, Delyne D. Rogiani, Kevin Rossi, Nicole M. Rossi, Janella J. Santiago, Kelly L. Secoda, Michael Secoda, and Kristin R. Warner (collectively, Appellants).

*In the Alternative*, Application for Relief in the Nature of a Request for an Emergency Preliminary Injunction" (Application), filed "pursuant to Pa.[]R.A.P. 123, Pa.R.A.P. 1501(a)(2), and Pa.R.C[iv.]P. 1035.1[,]"[2] and Appellees Kofi Osei's (Osei) and the Montgomery County Board of Elections' (Board or Montgomery Board) respective Answers in opposition thereto.  This opinion sets forth the reasons for that disposition.

The Application was filed ancillary to an appeal from the Court of Common Pleas of Montgomery County's (Common Pleas) December 7, 2023 order (Common Pleas' Order), which denied Appellants' "Petition for Election Contest **Or in the alternative**, Petition for Election Contest *Nunc Pro Tunc*" (Petition), relying on the reasoning set forth in the United States District Court for the Western District of Pennsylvania's (District Court) November 21, 2023 Order (District Court Order) in *Pennsylvania State Conference of the NAACP v. Schmidt*, Civil Action No. 1:22-CV-

---

[2] Initially, the Court notes that this is an appeal from a trial court order in a matter arising under the Pennsylvania Election Code (Code), Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591, and, as such, it is governed by Chapter 9 of the Pennsylvania Rules of Appellate Procedure (Appellate Rules).  *See* Pa.R.A.P. 901 (providing that Chapter 9 "applies to all appeals from a trial court to an appellate court[,]" with certain exceptions not applicable herein), 903(c)(ii) (providing that "[a]n appeal from . . . [a]n order in any matter arising under the . . . Code" "shall be taken within ten days after the entry of the order from which the appeal is taken").  To clarify, this is not an appeal governed by Chapter 15 of the Appellate Rules, as Appellants contend.  *See* Pa.R.A.P. 1501(b)(1) (providing that Chapter 15 of the Appellate Rules "does not apply to any appeal within the scope of . . . Chapter 9").

Additionally, because this is an appeal under Chapter 9 of the Appellate Rules, the Pennsylvania Rules of Civil Procedure (Civil Rules) are inapplicable.  *See* Pa.R.A.P. 103 (providing that the Appellate Rules "govern practice and procedure in . . . Commonwealth Court, including procedure in appeals to such courts from lower courts . . ."); *see also* Pa.R.A.P. 106 (providing that the general rules applicable to practice and procedure in the courts of common pleas, i.e., the Civil Rules, apply to matters brought before an appellate court in its **original jurisdiction**, unless otherwise prescribed by the Appellate Rules).  Therefore, to the extent Appellants' Application sought relief in the form of summary judgment in their favor, such relief is not available in this Chapter 9 proceeding, as will be discussed *infra*.

00339, 2023 WL 8091601 (W.D. Pa. 2023 Nov. 21. 2023), and dismissed the case.

The Application initially requested summary judgment/relief for Appellants directing the Board (1) to certify Richard Marino (Marino), who is not a party to this action, as the winner of the November 7, 2023 General Municipal Election (Municipal Election) for Towamencin Township Supervisor (Township Supervisor), and (2) to decertify Osei as the winner for the office of Township Supervisor. The Application sought injunctive relief in the alternative. However, as discussed *infra*, summary relief is not available in this proceeding, and Appellants later withdrew that request and modified the relief they proposed.[3]

As their requested relief is presently constituted, Appellants seek temporary emergency injunctive relief pending final determination in this matter in the form of an order enjoining Osei from assuming office as Township Supervisor. Because the Court finds that Appellants failed to satisfy the stringent requirements for a stay and/or injunction pending appeal under Pa.R.A.P. 1732(b), the Court issued an order on the morning of December 29, 2023, denying the Application with opinion to follow (Order). In the Order, the Court considered the prior request for summary judgment/relief to have been withdrawn; however, to the extent the request for summary judgment/relief was not so withdrawn, the Court dismissed it as improvidently filed.

---

[3] During the December 28, 2023 proceeding on the Application, Appellants clarified that they no longer seek relief compelling the Board to decertify Osei and certify Marino; instead, Appellants sought only injunctive relief that would prevent any candidate from taking office until their appeal is resolved. In response to the Court's inquiry as to whether the Court could enjoin the Township from administering the oath of office of Osei (as Appellants had initially requested), given that the Township is not a party to this litigation, Appellants essentially withdrew their requested relief in the nature of summary judgment/relief, and reframed the Application as seeking an injunction against Osei himself "prohibiting [him] from **taking** the oath of office." (Appellants' Br. at 5 (emphasis added)); *accord id.* (proposed order).

3

## I.    BACKGROUND & PROCEDURAL HISTORY

This matter involves a close race between Osei and Marino for the office of Township Supervisor and the recurring issue of whether undated and/or misdated[4] declarations on the outer return envelopes of mail-in ballots that are timely received should be counted in this Commonwealth.  Before explaining the background and procedural history of this matter, the Court initially observes that this case touches upon important constitutional principles that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  Article I, section 5 of the Pennsylvania Constitution, PA. CONST. art. I, § 5.  In considering election-related matters, the Court notes that it is "[t]he longstanding and overriding policy in this Commonwealth to protect the elective franchise[,]" and that "[o]ur goal must be to enfranchise and not to disenfranchise."  *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 360-61 (Pa. 2020) (citing *Shambach v. Bickhart*, 845 A.2d 793, 798 (Pa. 2004), and *In re Luzerne Cnty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972)).  Further, the courts have long held that the Pennsylvania Election Code (Code) must be construed liberally "so as not to deprive . . . voters of their right to elect a candidate of their choice."  *In Re Masino*, 293 A.3d 752, 760 (Pa. Cmwlth. 2023) (single-Judge op.) (Cohn Jubelirer, P.J.).  With those overarching principles in mind, and for purposes of clarity in this unique case, the Court will first explain the procedural history of the matter and the relevant facts, which are largely not in dispute, followed by the averments of the Application,

---

[4] This matter involves ballots returned in envelopes that were either "undated [or] improperly dated."  (Joint Stipulation (Stip.) Ex. C at 1.).  It is somewhat imprecise, however, to refer to the envelopes as "undated" because counties time-stamp the outer envelopes as they receive them, *Ball v. Chapman*, 289 A.3d 1, 16 n.77 (Pa. 2023), and the envelopes may also be postmarked if sent by postal mail.  More precisely, the issue is "the lack of a **handwritten** date" *Id.* at 10 (emphasis added).

the arguments presented,[5] and the Court's reasoning for its December 29, 2023 Order.

On December 12, 2023, Appellants timely appealed Common Pleas' Order to this Court. Eleven days later, Appellants filed the instant Application. By Order dated December 26, 2023, this Court directed expedited answers to the Application, scheduled a hearing on the Application for Thursday, December 28, 2023, at 10:00 a.m. in Harrisburg, Pennsylvania, further directed the parties to consult in good faith and file any stipulations, if possible, prior to the hearing, and permitted briefs in support of and/or in opposition to the Application to be filed no later than 4:00 p.m. on the date of the hearing. On December 26, 2023, the parties filed a "Joint Application for Relief in the Nature of a Motion to Appear via Video Conference[,]" which this Court granted by Order dated December 27, 2023, given the parties' representations in that application and the time-sensitive nature of this election matter, thus permitting the December 28 proceeding to be held via WebEx. Osei and the Board filed their respective answers and briefs in opposition to the Application on December 27, 2023, as directed, as well as a "Joint Stipulation of Facts and Evidence Not in Dispute" (Joint Stipulation). Per agreement of the parties in the Joint Stipulation, and as gleaned from the record in this case, the facts are as follows.

---

[5] In addition to the arguments presented by the parties in their filings, before disposing of the Application, the Court considered the arguments presented in the "Brief for *Amicus Curiae* Secretary of the Commonwealth Al Schmidt [(Secretary)] and the Pennsylvania Department of State" (Secretary's Brief) filed on December 28, 2023. The Court notes that the Secretary did not seek leave of court before filing or within the Secretary's Brief itself, as is required. *See* Pa.R.A.P. 531(b) ("An *amicus curiae* may file a brief (i) during merits briefing; (ii) [regarding] a petition for allowance of appeal, . . . or (iii) by leave of court.") However, given the Secretary's obvious interest in election administration, which are highly salient here, the Court fully considered the Secretary's arguments.

5

On November 7, 2023, the Municipal Election was held for, *inter alia*, Township Supervisor, for which both Marino and Osei were candidates. (Joint Stipulation (Stip.) ¶¶ 1-2.) The unofficial results of the Municipal Election, as of November 14, 2023, initially showed Marino as the winner of the Township Supervisor race by four votes over Osei. (Stip. ¶ 3.) The Board initially completed the canvassing and computation of all ballots on November 14, 2023. (Stip. ¶ 4.) Pursuant to Section 1404(f) of the Code, 25 P.S. § 3154(f), the Board was required to submit the unofficial results to the Secretary of the Commonwealth (Secretary) no later than 5:00 p.m. on November 14, 2023. (Stip. ¶ 5.) The Board complied with Section 1404(f) and submitted the unofficial results of the Municipal Election to the Secretary. (Stip. ¶ 6.) No petitions for recount or recanvass were filed in relation to the Municipal Election. (Stip. ¶ 7.) The Board thereafter scheduled its certification vote for November 22, 2023. (Stip. ¶ 8.)

On November 21, 2023, the District Court issued the District Court Order in *Pennsylvania State Conference of the NAACP v. Schmidt*, Civil Action No. 1:22-CV-00339, 2023 WL 8091601 (W.D. Pa. 2023 Nov. 21. 2023), dismissing 55 county boards of election from the action for lack of standing, but retaining the Montgomery Board as a defendant in the action. (Stip. ¶ 9 & Exhibit (Ex.) B, at 3-4.) The District Court Order also granted in part the plaintiffs' motion for summary judgment to the extent it requested, *inter alia*, that two mail-in ballots from Montgomery County be counted for the November 2022 general election, and entered declaratory judgment in the plaintiffs' favor declaring that the rejection of timely submitted mail-in ballots based solely on the voter's failure to include a date on the outer return envelope, or a correct date thereon, violates the Materiality Provision of the Civil Rights Act of

1964, 52 U.S.C. § 10101(a)(2)(B) (Materiality Provision).[6] (Stip., Ex. B, at 4.) The District Court Order further permanently enjoined the Secretary from directing any county board of elections to segregate, reject, exclude, or in any way not count timely received mail-in ballots based on such error or omission regarding the date on the voter's declaration, dismissed the plaintiffs' equal protection claim, and granted in part and denied in part other relief requested by other parties in the case. (Stip., Ex. B, at 5.)

Pursuant to the District Court Order, on November 22, 2023, the Board issued a public statement postponing its certification to canvass six mail-in and absentee ballots it had previously determined to be defective and void for lack of a date or an incorrect date. (Stip. ¶ 10 & Ex. C.) The ballots were opened on November 27, 2023, in the presence of candidates or their designated representatives, and, as a

---

[6] Section 10101(a)(2)(B) of the Civil Rights Act of 1964 provides, in relevant part, as follows:

**(a) Race, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers; literacy tests; agreements between Attorney General and State or local authorities; definitions**
. . . .

**(2)** No person acting under color of law shall--
. . . .

**(B)** deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B) (emphasis in the original).

7

result, Marino and Osei each received 3,035 votes.[7]  (Stip. ¶ 11.)  The Board announced these new unofficial results on November 28, 2023, and, on November 30, 2023, Marino and Osei drew lots pursuant to Section 1418 of the Code, 25 P.S. § 3168, which resulted in Osei being declared the winner of the Municipal Election for Township Supervisor.  (Stip. ¶¶ 12-13.)  The Board thereafter certified the results on December 4, 2023, and Appellants filed their Petition on that same date.  (Stip. ¶¶ 14-15.)

On December 5, 2023, Osei filed an "Unopposed Petition to Intervene" and a "Demurrer and Application to Quash" in Common Pleas, alleging that Appellants' Petition was both time-barred and substantively deficient, and that the Board correctly complied with the District Court Order.  (Stip. ¶ 16; Original Record (O.R.) at 54-56, 57-72.)  By order dated December 5, 2023, Common Pleas granted Osei intervention, observed that the "Demurrer and Application to Quash" was filed of record, and noted that the court only addressed intervention and not the merits of the matter at issue.  (*See* O.R. at 73.)

On December 7, 2023, Common Pleas' Order was issued, denying Appellants' Petition, dismissing the case, and adopting by reference the reasoning of the District Court Order.  (Stip. ¶ 17 & Ex. D.)  Appellants filed their notice of appeal to this Court on December 12, 2023.  (Stip. ¶ 18.)

Common Pleas thereafter issued an Opinion on December 20, 2023, explaining its reasoning for its December 7, 2023 Order.  (Stip. ¶ 17 & Ex. E.)  Noting the above facts, Common Pleas opined that Appellants' appeal should be

---

[7] This matter, arising in part from a tie vote, joins a long line of cases demonstrating that "elections can be decided by a very small number of votes."  *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1204 (9th Cir. 2021) (Tashima, J., dissenting) (collecting cases and examples).  As may be true of any election, this is literally "an election where every vote matters."  *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 356 (M.D. Pa. 2020).

denied because no appeal was filed within the two-day period set forth in Section 1407(a) of the Code, 25 P.S. § 3157(a); no recount or recanvas of the results of the election for Township Supervisor was requested within the time period allowed under the Code, *see* Sections 1701-1703 of the Code, 25 P.S. §§ 3261-3263; the Petition was untimely filed; and no application to appeal nunc pro tunc was granted. (Common Pleas' Opinion (Op.) at 1-2.)  Common Pleas further observed that its decision to uphold the counting of the 349 ballots at issue complied with applicable federal law on the subject, namely, the District Court Order.  (*Id.* at 2; *see also* Stip., Ex. C.)  Relying on that decision and the United States Court of Appeals for the Third Circuit's (Third Circuit) recent decision in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *petition for writ of certiorari granted, judgment vacated*, *Ritter v. Migliori*, 143 S. Ct. 297 (2022),[8] both of which held that failure to comply with the dating provisions of Sections 1306(a) and 1306-D(a) of the Code, 25 P.S. §§ 3146.6(a) and 3150.16(a), is not a material defect under the Materiality Provision and thus could not prevent the counting of those ballots, and the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2, Common Pleas explained that it found the Board properly counted the mail-in ballots at issue in this case pursuant to the District Court Order.  (Common Pleas' Op. at 3.)  Common Pleas therefore opined that it properly dismissed Appellants' Petition.  (Common Pleas' Op. at 3.)

Following Appellants' appeal to this Court, proceedings continued in the federal courts.  On December 13, 2023, the Third Circuit entered an order granting

---

[8] In *Ritter v. Migliori*, 143 S. Ct. 297 (2022), the Supreme Court granted, *inter alia*, the petition for writ of certiorari, vacated the Third Circuit's decision, and remanded the case to the Third Circuit with instructions to dismiss the case as moot, citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).

Marino intervention and staying the District Court Order.  (Stip. ¶ 19 & Ex. F.)  On December 14, 2023, the Third Circuit entered another order expediting merits briefing and the appeal of the District Court Order.  (Stip. ¶ 20 & Ex. G.). On December 27, 2023, the Third Circuit ordered that oral argument would be held on March 4, 2024.

## II.    APPELLANTS' ARGUMENTS

In support of their request for emergency injunctive relief, Appellants argue they satisfy each of the six factors required for a preliminary injunction.  *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mountain, Inc.*, 828 A.2d 995, 1001 (Pa. 2003).  With respect to irreparable harm, they assert that in the absence of an injunction, the electors of the Township will be "depriv[ed] of the candidate of their choice" and "subject[] . . . to the governance [of] an unelected official." (Appellants' Memorandum of Law in Support of Their Application (Appellants' Br.) at 11.)  In their view, greater harm would result from refusing to grant, than from granting, the injunction.  They focus on the fact they do not ask to have a particular candidate seated, but rather to have the Township "refrain from seating anyone[,]" which would also serve to preserve the status quo.  (*Id.* at 12.)

Appellants emphasize that demonstrating a clear right to relief does not require them to "prove the merits of the underlying claim," but rather requires that they "only demonstrate that substantial legal questions must be resolved to determine the rights of the parties." (Appellants' Br. at 12 (quoting *SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 590-91 (Pa. 2014)).)  They support their clear right to relief argument with two main points.  First, the Board lacked authority under the Code to postpone certification of Marino; they specifically assert that the Board's failure to certify Marino as the winner ran afoul of Section 1404(f) of the Code, 25

10

P.S. § 3154(f).  In support of this argument, they cite *Petition to Open Ballot Box of Oneida District in East Union Township*, 103 A.2d 652 (Pa. 1954).  Second, they assert that it is unclear whether the District Court Order "even authorized the [Board] to canvass and count" the ballots at issue.  (Appellants' Br. at 14.)  Because that determination presents a "substantial legal question[,]" and because the District Court Order has been stayed, they argue their right to relief is clear.  (Appellants' Br. at 12 (citing *SEIU Healthcare*, 104 A.3d at 591).)  Further, they argue the District Court Order is in conflict with the Pennsylvania Supreme Court's pronouncement in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023).

Appellants also explain that they should have been allowed to proceed nunc pro tunc in Common Pleas, citing *Appeal of Koch*, 41 A.2d 657 (Pa. 1945).[9]  They emphasize that they are members of the public who did not learn "that the winning candidate had now somehow lost" until November 30, 2023.  (Appellants' Br. at 7.)  Appellants further argue that they are not guilty of laches because there is nothing in the record to suggest that Osei was prejudiced by the delay, given that "[p]rior to the statutory deadline, [he] had no reason to believe that the election was settled in his favor."  (Appellants' Br. at 8.)  They argue the harm they seek to correct can be traced back to November 28, suggesting that "[t]o deny the Petition as untimely would mean that the [Board's] clear violation of the [] Code is unchallengeable merely because [it] ran out [Appellants'] clock before altering the results of an election[.]"  (Appellants' Br. at 9.)

Next, they argue that a preliminary injunction is reasonably suited to abate the offending activity, as preventing "an individual who lost the [Municipal] Election"

---

[9] Although Appellants do not specifically place the nunc pro tunc issue under the "Injunctive Relief" section of their Brief, the Court notes that the nunc pro tunc issue falls squarely within the clear right to relief prerequisite it must consider.

11

from being seated avoids violations of the Code and "preserve[s] the will of the electorate." (Appellants' Br. at 14.) Finally, they assert, citing *Oliviero v. Diven*, 902 A.2d 933 (Pa. Cmwlth. 2006), that granting their requeuested relief is not contrary to the public interest, but rather consistent with the public interest, because it would "prevent an individual who lost the [Municipal] Election . . . from assuming office during the pendency of the litigation." (Appellants' Br. at 15.)

## III.   <u>DISCUSSION</u>

### A.   *Standard for Injunctive Relief Pending Appeal*

Although Appellants' Application initially requested summary judgment and injunctive relief under "Pa.[]R.A.P. 123, Pa.R.A.P. 1501(a)(2), and Pa.R.C[iv.]P. 1035.1[,]" (*see* Application at 1), there is no basis for this Court to issue the requested summary judgment in favor of Appellants under those rules in this **appeal** invoking the Court's **appellate** jurisdiction. *See* RONALD G. DARLINGTON ET AL., 20A PENNSYLVANIA APPELLATE PRACTICE § 1732:1 (2023-2024 ed.) (PA. APPELLATE PRAC.) (enumerating the four species of ancillary relief available incident to an appeal, among which is not summary relief). Therefore, after argument, Appellants essentially withdrew that request, and seek only an injunction pending appeal, which the Court considered based on the standards governing such relief under Pa.R.A.P. 1732.[10]

---

[10] Appellate Rule 1732(a) provides that generally, a party seeking a stay or injunction pending appeal must first seek that relief in the trial court. Pa.R.A.P. 1732(a). Applications for injunctive relief pending appeal

> may be made to the appellate court or to a judge thereof, but the application shall show that application to the trial court for the relief sought is not practicable, or that the trial court has denied an application, or has failed to afford the relief which the applicant requested, with the reasons given by the trial court for its action. The application shall also show the reasons for the relief requested and the facts relied

An injunction pending appeal is an extraordinary remedy carrying a heavy burden of proof. *Tri-State Asphalt Corp. v. Dep't of Transp.*, 582 A.2d 55, 60 (Pa. Cmwlth. 1990); *see also* 20A PA. APPELLATE PRAC. § 1732:9 (describing such relief as "[t]he most esoteric form . . . available under [Appellate] Rule 1732 and explaining "the burden of obtaining an injunction pending appeal is extremely heavy"). This Court has held

> that where a party requests relief in the nature of an injunction pending review, the applicant must satisfy not only the standard announced by our Supreme Court in [*Pennsylvania Public Utility Commission v. Process Gas*] *Consumers Group*, 467 A.2d 805 (Pa. 1983)], but **also that the party satisfy the stringent requirements for a preliminary injunction**, particularly the requirements that greater injury would result by refusing the injunction than by granting it and that the plaintiff's right to relief is clear.

*Tri-State Asphalt*, 582 A.2d at 60 (emphasis added). Under *Process Gas*, 467 A.2d 805, an applicant must make a "strong showing" on all of the following criteria to warrant the grant of a stay:

1. The petitioner makes a strong showing that he is likely to prevail on

---

upon, and if the facts are subject to dispute the application shall be supported by sworn or verified statements or copies thereof. With the application shall be filed such parts of the record as are relevant. Where practicable, the application should be accompanied by the briefs, if any, used in the trial court. The application shall contain the certificate of compliance required by Pa.R.A.P. 127.

Pa.R.A.P. 1732(b). The Court notes that Appellants did not comply with Appellate Rule 1732(a) or (b) in filing their Application. However, given the time-sensitive nature of this election-related matter, the Court exercised its discretion under Appellate Rule 105 and disregarded Appellants' noncompliance with these requirements in disposing of the Application. *See* Pa.R.A.P. 105 (providing that the Appellate Rules "shall be liberally construed to secure the just, speedy, and inexpensive determination of every matter to which they are applicable" and that "[i]n the interest of expediting decision . . . , an appellate court may . . . disregard the requirements or provisions of any of these rules in a particular case . . . on its own motion and may order proceedings in accordance with its direction").

13

the merits.

2. The petitioner has shown that without the requested relief, he will suffer irreparable injury.

3. The issuance of a stay will not substantially harm other interested parties in the proceedings.

4. The issuance of a stay will not adversely affect the public interest.

*Id.* at 808-09.

To meet the standard for a preliminary injunction, the applicant must establish **each** of the following "essential prerequisites":

> (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and[] (6) the preliminary injunction will not adversely affect the public interest.

*SEIU Healthcare*, 104 A.3d at 502 (citing, *inter alia*, *Summit Towne Ctr., Inc.*, 828 A.2d at 1001). "For a preliminary injunction to issue, **every one** of these prerequisites must be established; if the petitioner fails to establish **any one** of them, there is no need to address the others." *County of Allegheny v. Commonwealth,* 544 A.2d 1305, 1307 (Pa. 1988) (emphasis added). As the Court noted during the proceeding on the Application, the *Process Gas* factors for a stay pending appeal are largely duplicative of the more stringent test for injunctive relief, and the Court principally focused on the latter.

After a proceeding during which both parties presented argument and stipulated facts, and a thorough review of the filings and the trial court record, this Court

concludes that Appellants fell short of satisfying the stringent requirements for the issuance of an injunction pending appeal.

### B.   Analysis

#### 1. Clear Right to Relief

##### a. Was the Petition Timely Filed in Common Pleas?

To determine whether Appellants have demonstrated a clear right to relief, the Court first turns to whether it is clear that the underlying Petition was timely filed, and if not, whether it is clear that nunc pro tunc relief is warranted. Compliance with any mandatory appeal or filing period would be a prerequisite to Common Pleas' ability to grant any relief to Appellants. *Appeal of Orsatti*, 598 A.2d 1341, 1342 (Pa. Cmwlth. 1991). *See also Pa. Dental Ass'n v. Ins. Dep't*, 516 A.2d 647, 654 (Pa. 1986) ("Periods of time set for filing appeals are jurisdictional."). "Compliance with statutorily imposed time limitations is especially important in election cases." *Appeal of Walko*, 325 A.2d 303, 307 (Pa. 1974); *see also In re James*, 944 A.2d 69, 73 (Pa. 2008) (holding statutory period for filing objection petitions under the Code is mandatory). Thus, Common Pleas considered whether the Petition was timely filed, concluding that it could have properly dismissed Appellants' Petition on the basis of untimeliness alone. (*See* Common Pleas' Op. at 2.) This Court will ultimately be reviewing that issue on a plenary basis on appeal. *See Narberth Borough v. Lower Merion Twp.*, 915 A.2d 626, 634 (Pa. 2007) (timeliness presents a question of law; our standard of review is de novo, and our scope of review is plenary); *Brown v. Levy*, 993 A.2d 364, 365 n.1 (Pa. Cmwlth. 2010) (whether trial court erred in declining to grant nunc pro tunc relief is a question of law for which our standard of review is de novo, and our scope of review is plenary). Accordingly, whether the Petition was timely filed below significantly affects the likelihood that

15

Appellants will prevail on the merits of their appeal, the fourth factor.

The parties dispute the proper characterization of the Petition. Appellants styled the Petition as a "Petition for Election Contest *Or in the alternative*, Petition for Election Contest *Nunc Pro Tunc*." (O.R., Item No. 0, at 1.) They argue it was filed pursuant to Section 1756 of the Code, which requires that any petition to commence an election contest of the fifth class[11] "shall be made and filed, as herein required, **within twenty days after the day of the primary or election**, as the case may be." 25 P.S. § 3456 (emphasis added). The parties do not dispute that the Municipal Election occurred on November 7, 2023, such that a petition under Section 1756 of the Code was required to be filed no later than November 27, 2023. Appellants filed the Petition on December 4, 2023, so it was not timely filed as a contest petition under Section 1756.

Common Pleas and Appellees take the position that the Petition did not, in substance, seek to initiate a contest of the election, but rather sought to appeal the Board's decision to recompute or recanvass returns pursuant to the District Court Order. Such a challenge is authorized by Section 1407(a) of the Code, which provides in relevant part:

> Any person aggrieved by any order or decision of any county board regarding computation or canvassing of the returns of any . . . election, or regarding any recount or recanvass thereof under [S]ections 1701, 1702 and 1703 of [the Code[12]], may appeal therefrom **within two days after such order or decision shall have been made**, whether then reduced to writing or not, to the court specified in this subsection . . . .

25 P.S. § 3157(a) (emphasis added). Appeals under this section from decisions such

---

[11] Under Section 1711 of the Code, the election at issue here would be subject to a Class V contest, i.e., a contest of the election of an officer "elected by the qualified voters of . . . [a] township[]." 25 P.S. § 3291.

[12] 25 P.S. §§ 3261, 3262, 3263.

16

as the one at issue here (i.e., decisions which do not result from a recount or recanvass ordered by the Secretary under Section 1404(g) of the Code, 25 P.S. § 3154(g)) are properly filed in the courts of common pleas. *Id.*  The parties do not dispute that, on November 22, 2023, the Board issued a public statement announcing its decision that it would comply with the District Court Order by recavassing all 349 disputed ballots on November 27, 2023.  (Stip. ¶ 10 & Ex. C.)  The Board's decision at a public meeting, which included scheduling a specific future date for the recanvass, could be the relevant "decision of [the B]oard" for purposes of commencing the two-day appeal period under Section 1407(a), 25 P.S. § 3157(a). Alternatively, the actual recanvassing, which occured on November 27, 2023, could also be the start of the appeal period. *See Perles v. Cnty. Return Bd. of Northumberland Cnty.*, 202 A.2d 538, 539 & 540 n.5 (Pa. 1964) (holding that "[t]he **counting** of . . . absentee ballots" constituted the board of elections' "order" for purposes of the Section 1407(a) appeal period) (emphasis added).  The December 4, 2023 filing of the Petition occurred 12 days after the Board's public statement that it would recanvass the disputed ballots, and 7 days after the actual counting occurred, and, thus, the Petition could be untimely under Section 1407(a), which would generally be grounds for Common Pleas to dismiss the Petition. *See Perles*, 202 A.2d at 540 n.5.

Appellants argue, alternatively, that Common Pleas should have accepted the Petition nunc pro tunc.  To support the timing of their filing, Appellants argue that "the impermissible re[]canvass took place **after** the permitted statutory period for filing a timely election contest petition."  (Application ¶ 31 (emphasis added).) Further, they contend that "it was not until the [Board] completed its re[]canvass that [Appellants] sustain[ed] the harm they seek to remedy."  (*Id.* ¶ 32.)

Our Supreme Court has explained that "where a petitioner does not learn of a problem with the election until the filing period has expired and his ignorance is not due to any fault or dereliction on his part . . . the petitioner [may] seek relief nunc pro tunc." *Appeal of Zupsic*, 670 A.2d 629, 635-36 (Pa. 1996). Further, in determining whether nunc pro tunc relief is warranted, the court will consider whether the petitioner is guilty of laches, which requires "lack of due diligence in pursuing a cause of action and resulting prejudice to the other party." *Id.* at 636. Finally, nunc pro tunc relief is generally only warranted where a petitioner can point to fraud or a breakdown in the administrative process on the part of the court or the election board. *Appeal of Orsatti*, 598 A.2d 1341, 1342 (Pa. Cmwlth. 1991).

Appellants rely on *Appeal of Koch*, 41 A.2d 657 (Pa. 1945), to support their position that Common Pleas erred in denying nunc pro tunc relief. There, the appellant had received a majority of the votes, and the return sheets posted outside the precincts reflected that. However, a clerical error (that the board of elections declined to correct) resulted in the candidate who won fewer votes being erroneously certified as the winner; the board of elections issued a certificate of elections to that losing candidate. All appeal or contest periods under the Code had run by the time the appellant learned of the board's error. The court of common pleas denied nunc pro tunc relief, reasoning that the appellant was guilty of laches for having "made no effort to acquire knowledge of the board's action until after the expiration of the statutory period[.]" *Id.* at 658. On appeal, the appellant argued that the board's negligence rose to the level of fraud, in that "the general returns posted outside the polling places showed his election; that the election board failed to publicly announce the result of the election . . . thus prevented him from receiving notice of the discrepancy in time to correct it." *Id.*

18

Embracing the appellant's argument, the Supreme Court focused on the board's negligence in failing to carry out its statutory duties to compare sealed and unsealed returns with tally sheets to discover discrepancies, along with its failure to publicly announce the final result of the election. It noted that had the board complied with those statutory requirements, the appellant would have discovered the issue before the statute of limitations ran. *Id.* at 659. Noting that "those seeking . . . nunc pro tunc [relief] in an election matter must be held to a **stricter rule** than those in a controversy between individuals[,]" the Court was satisfied that the appellant was not guilty of laches where the board's failure to perform its duties completely deprived the appellant of his only means of correcting the mistake. *Id.* at 660 (emphasis added).

Appellants characterize *Koch* to say "the common pleas court erred in not allowing an appeal nunc pro tunc from the action of the election board after the Board clearly violated the [] Code." (Application ¶ 29.) It is not clear that this characterization fully captures the meaning of *Koch*, as the Court was arguably concerned about the violations of the Code **insofar as they deprived the appellant of the opportunity to learn in the first instance** that there had been a mistake. The board in *Koch* did not publicly post the results in violation of the Code, thereby depriving the appellant of the ability to file a timely challenge. It does not appear that here the Board did anything to prevent Appellants from discovering the alleged error (canvassing the ballots in accordance with the District Court Order); rather, it issued a press release publicly explaining the reason for delay of the certification, and its intent to canvass the votes in accordance with the District Court Order on November 22 following a public meeting. (Stip. ¶ 10 & Ex. C.) Arguably, *Koch* reflects the type of paradigmatic **breakdown** in a board of elections' operations that

would generally justify nunc pro tunc relief.  In *Koch*, a clerical error the board refused to correct—and of which the appellant had no notice—thwarted his ability to learn of the issue to appeal within the appropriate timeframe.  In this matter, it was not a clerical error, but an order entered by a federal court, to which the Board was a party, that caused the alleged problem with the election which Appellants raise.

Appellants also argue that nunc pro tunc relief is justified because the period to file an election contest petition expired on November 27, and the Board's announcement of the tie occurred a day later.  It is not clear that the relevant inquiry for nunc pro tunc relief is whether a breakdown thwarted Appellants' timely learning of when the "harm" was sustained or whether the focus is on their timely learning of a problem with the election.

For example, in *In re Election of Tax Collector, Horsham Township*, 51 A.2d 692 (Pa. 1947), a day after the election, the appellant heard a rumor that there was a possible issue with the count.  Instead of immediately going to court, she "awaited the ascertainment of the results of the ballot box opening, and then sought to file her appeal nunc pro tunc."  *Id.* at 693.  The Supreme Court distinguished *Koch*, emphasizing that the appellant there "who in fact was elected, and the public, were . . . deceived." *Id.* at 695.  The *Horsham Township* appellant waited for the **results** of a recount—instead of immediately bringing an election contest petition—and was found not to have timely filed the petition and was not entitled to nunc pro tunc relief.  Based on that case, there is an argument that Appellants, who awaited the recanvassing and did not file their Petition until their candidate was not successful, would also not have timely filed their Petition or be entitled to nunc pro tunc relief.

Finally, it is unclear that the Board could render any "clear violation of the []

Code . . . unchallengeable" by waiting until the day after the 20-day contest period runs, as Appellants argue. (Appellants' Br. at 9.) The Code states that "[a]ny person aggrieved by any order or decision of any county board regarding the computation or canvasing of the returns . . . may appeal therefrom within two days after such order or decision shall have been made," irrespective of whether that order or decision falls outside of the 20-day contest period. 25 P.S. § 3157(a).

Taking the record as a whole, the Court cannot say that Appellants' explanation for the time of their filing establishes that they had a clear right to nunc pro tunc relief. First, it is likely the relevant question here is not when the Board actually recanvassed the votes, but when Appellants learned of the problem. If they "learn[ed] of a problem with the election [after] the filing period ha[d] expired and [their] ignorance [wa]s not due to any 'fault or dereliction' on [their] part[,]" then an appeal nunc pro tunc is warranted. *Zupsic*, 670 A.2d at 635. Here, there is a strong argument that Appellants were on notice as soon as the Board publicly announced the delayed certification and the reasons for that delay on November 22. (Stip. ¶ 10 & Ex. C.)

In sum, it is not clear that Appellants would be found to have timely filed their Petition under either the provision Appellants themselves claim to have relied upon (a Section 1756 petition for election contest, to be filed within 20 days of the Municipal Election), or under the 2-day period for appeal to Common Pleas (under Section 1407(a)). Further, Appellants have not made a compelling showing that they were entitled to nunc pro tunc relief in Common Pleas. Given this, Appellants have not carried their heavy burden to show that they have a clear right to relief and are likely to prevail in their appeal here.

21

b. <u>Clear Right to Relief as to Lawfullness of Board's Action</u>

The merits issues raised on appeal in the Petition really involve two interrelated questions. First, as a matter of state law under the Code, Appellants argue the Board acted unlawfully in certifying the election, both because it did so after the time period prescribed by the Code, and also because the Code, as interpreted by the Pennsylvania Supreme Court's precedent, requires that the disputed ballots not be counted. Second, the Board's action implicates a question of federal law (i.e., the Materiality Provision) and its effect on how the Board is obligated to canvass ballots, and which ballots must be counted. Both of those questions bear on whether the Board acted properly, in interpreting the District Court Order and, in reliance thereon, recanvassing the disputed ballots as and when it did. Because these issues are intertwined, and given the state of the law on the federal question, Appellants cannot show a clear right to relief.

Specifically, The Pennsylvania Supreme Court has held the date requirement is unambiguous and mandatory, and that undated ballots shall not be counted. *Ball*, 289 A.3d at 20. The Court also observed that "county boards of elections retain authority to evaluate the ballots that they receive in future elections—including those that fall within the date ranges derived from statutes indicating when it is possible to send out mail-in and absentee ballots—for compliance with the Election Code." *Ball*, 289 A.3d at 23. However, the Court was evenly divided on whether the disqualification of undated or incorrectly dated ballots would offend the Materiality Provision. In addition, the District Court Order resolved the issue of the Materiality Provision and granted relief on that basis, which the Board interpreted as requring that it count the disputed ballots in this case. However, the District Court Order is currently on appeal before the Third Circuit and has now been stayed

22

pending that appeal. Because it is unclear how the federal courts will resolve the federal question,[13] and because that federal question underlies the merits of Appellants' appeal, the Court cannot say that Appellants have established a clear right to relief regarding whether the Board acted unlawfully. Appellants recognize that the ultimate resolution of this issue may lie before the United States Supreme Court. (*See* Appellants' Br. at 5.)

### 2. Balancing of Harms

In addition to a clear right to relief, injunctive relief demands a strong showing on a second, particularly important factor: that "greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings." *SEIU Healthcare*, 104 A.3d at 502. This factor requires the Court to balance potential harm to the parties, and in so doing "the harm to the public must also be considered." *Valley Forge Hist. Soc. v. Washington Mem'l Chapel*, 426 A.2d 1123, 1129 (Pa. 1981); *accord Commonwealth ex rel. Corbett v. Snyder*, 977 A.2d 28, 42 (Pa. Cmwlth. 2009), *appeal denied*, 999 A.2d 1247 (Pa. 2010).

Appellants' argument—that denial of the injunction here would undermine public confidence in the election process by effectively placing into office a candidate who lost the election—raises a profound concern. The Court is mindful that public confidence in elections, and especially the reality and public perception of fairness in elections, is of paramount importance. Relatedly, the Court takes seriously its duty to construe and apply the Code so as to maximize the franchise. *Pa. Democratic Party*, 238 A.3d at 360-61. The prospect of an unelected, or potentially unelected, person assuming public office, even temporarily, risks

---

[13] As noted *supra*, the Third Circuit already once resolved this issue in *Migliori*, 36 F.4th at 153, and the United States Supreme Court vacated that decision, 143 S. Ct. at 297.

upsetting these critical public interests, and an injunction preventing any candidate from taking office could abate the risk of that harm. Weighing against that important concern, however, is the harm of seating no candidate at all. This harm has at least two aspects: it deprives the candidate who has been certified and provided with a certificate of election of the opportunity to hold office, and it deprives the public of an officer to serve on their behalf.

The Court appreciates the gravity of the concerns expressed by Appellants in this case regarding the need for public confidence in this Commonwealth's free and equal elections. *See* PA. CONST. art. I, § 5. The importance of that interest cannot be overstated. But the finality of elections is also critical, and to that end, the General Assembly has structured the appeal and contest provisions of the Code to raise and resolve disputes as early as possible, so the boards of elections can perform their functions under the Code lawfully and with confidence. Despite those procedures, the Court did not receive the request for injunctive relief here until December 23, 2023. The timeframe on which the Court must consider that request, so close to the time that the certified candidate is set to take office, makes holding the seat open the only practical remedy for the harm Appellants allege. In light of the balancing of harms the Court must undertake, the harm that would be created by an **indefinite vacancy** pending this appeal[14] also constrains the Court to deny the Application. This result underscores the importance of bringing challenges pursuant to the Code as early as possible.

---

[14] Although the relief technically before the Court is an injunction pending **this** appeal, Appellants essentially request a stay pending not only this appeal but also "until the final determination of the subject appeal and the appeal of the related federal case through the United States Court of Appeals in the Third Circuit and any proceedings in the United States Supreme Court." (Appellants' Br. at 5.) Given the Third Circuit's stay of the District Court Order through potential review by the United States Supreme Court in that matter, it could be a substantial time before the federal question is finally resolved, which could further prolong any vacancy.

24

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Appellants have not demonstrated a clear right to relief on the merits of their appeal, and have not shown that greater injury would result from denying the requested injunctive relief than from granting it.  Because they have not satisfied all of the factors, *County of Allegheny*, 544 A.2d at 1307, the Court denied the Application.

As a final note, the Court pauses to commend all counsel of record in this matter for the impressive level of professionalism they have displayed throughout this proceeding, much of which occurred on extremely short timelines between two major holidays.


**RENEE COHN JUBELIRER,** President Judge

Order Exit
12/29/2023