No. 23-3166

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

PENNSYLVANIA CONFERENCE OF THE NAACP, *et al.*,

*Plaintiffs-Appellees,*

v.

SECRETARY OF THE COMMONWEALTH, *et al.*,

*Defendants-Appellees,*

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

*Intervenors-Appellants.*

On Appeal from the United States District Court for the Western District of Pennsylvania, Case No. 1:22-cv-339

**Response Brief of the Secretary of the Commonwealth and Philadelphia, Allegheny, Bucks, Delaware, and Montgomery County Boards of Elections**

Robert A. Wiygul
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933

Sean A. Kirkpatrick
Elizabeth Lester-Abdalla
OFFICE OF ATTORNEY GENERAL
15th Floor, Strawberry Square
Harrisburg, PA 17120

Michael J. Fischer
Jacob B. Boyer
GOVERNOR'S OFFICE OF GENERAL
COUNSEL
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Secretary of the
Commonwealth Al Schmidt*

*[Counsel Information Continued On Next Page]*

Ilana H. Eisenstein
Brian H. Benjet
Ben C. Fabens-Lassen
M. David Josefovits
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
(215) 656-3300
ilana.eisenstein@us.dlapiper.com
brian.benjet@us.dlapiper.com
ben.fabens-lassen@us.dlapiper.com
david.josefovits@us.dlapiper.com

Benjamin H. Field
Aimee D. Thomson
Alison L. Stohr
PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
benjaim.field@phila.gov
aimee.thomson@phila.gov
alison.stohr@phila.gov

*Counsel for the Philadelphia
County Board of Elections*

Amy M. Fitzpatrick
Tyler B. Burns
BUCKS COUNTY LAW
DEPARTMENT
55 E. Court Street, 5th Floor
Doylestown, PA 18901
(215) 348-6464
amfitzpatrick@buckscounty.org
tbburns@buckscounty.org

*Counsel for the Bucks County
Board of Elections*

Allan J. Opsitnick
Lisa G. Michel
ALLEGHENY COUNTY LAW DEPARTMENT
445 Fort Pitt Boulevard
Fort Pitt Commons Suite 300
Pittsburgh, PA 15129
(412) 350-1120
opsitnick@opsitnickslaw.com
lisa.michel@alleghenycounty.us

*Counsel for the Allegheny County Board
of Elections*

J. Manly Parks
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
(215) 979-1342
jmparks@duanemorris.com

*Counsel for the Delaware County Board
of Elections*

John A. Marlatt
Maureen E. Calder
MONTGOMERY COUNTY SOLICITOR'S
OFFICE
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-3033
john.marlatt@montgomerycountypa.gov
maureen.calder@montgomerycountypa.gov

*Counsel for the Montgomery County
Board of Elections*

# TABLE OF CONTENTS

Table of Authorities.................................................................... iii

Introduction ............................................................................... 1

Statement of the Issues............................................................. 4

Statement of Related Cases ...................................................... 4

Statement of the Case ............................................................... 4

  I.  Voting in Pennsylvania................................................... 4

      A.  The Relevant History of Mail Voting.....................5

      B.  Counties Do Not Use a Declaration Date for Any
          Purpose..................................................................6

  II.  Litigation Over Pennsylvania's Declaration Date ..........9

      A.  2020 General Election: The Pennsylvania
          Supreme Court Orders the Counting of Ballots
          Missing a Declaration Date .....................................9

      B.  2021 Municipal Election & 2022 Primary: This
          Court and Pennsylvania Courts Rule that
          Counties May Not Reject Ballots Because of a
          Missing Declaration Date ......................................10

      C.  2022 General Election: The RNC Initiates
          Litigation that Disrupts Uniform Rules
          Immediately Before the 2022 General Election ....11

  III. Disenfranchised Elderly Voters and Non-Partisan
      Organizations Bring this Action ...................................16

Summary of the Argument .....................................................20

Argument..................................................................................24

  I.  Section 10101 Prohibits Rejecting Mail Ballots Due to
     an Error on the Return-Envelope Declaration ..............24

      A.  Section 10101's Plain Text Requires Affirming the
          District Court ........................................................24

          1.  The Handwritten Date Is Not Material.........25

i

2.  Failing to Properly Fill Out the Return-Envelope Declaration Is an Error or Omission on a Record Related to an Act Requisite to Voting ........................... 29

    a.  Completing the Declaration is an Act Requisite to Voting ............................... 30

    b.  Nothing Else in § 10101(a)(2)(B) Limits Its Reach to the Review of Registration Materials .. 37

    c.  Constitutional Avoidance and Federalism Considerations Are Inapplicable ........................ 41

3.  Refusing to Count a Legal Vote Denies the Right to Vote ..................................................................... 47

B.  Congress Sought to Protect the Right to Vote, Not the "Right to Register" .......................................... 50

C.  The RNC Grossly Exaggerates the Consequences of the District Court's Decision .............................. 54

II.  The District Court's Remedy Was Lawful and Appropriate ........................................................... 56

III. Certification of Mr. Marino's Election Has No Effect on this Court's Jurisdiction ................................. 61

Conclusion ......................................................................... 62

# TABLE OF AUTHORITIES

## Cases

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008)..........................31, 34

*All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226 (5th Cir. 2023)............................................................................................42

*Arizona v. Inter-Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)......................................................................................45, 46

*Ball v. Chapman*, 284 A.3d 1189 (Pa. 2022)....................................12, 58

*Ball v. Chapman*, 289 A.3d 1 (Pa. 2023)...............................*passim*

*Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020)...............................................................................................60

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020)....................................31

*Brnovich v. Democratic Nat'l Comm.* 141 S.Ct. 2321 (2021)................48

*Bush v. Gore*, 531 U.S. 98 (2000) ............................................................56

*Chapman v. Berks Cnty. Bd. of Elections*, No. 355 MD 2022, 2022 WL 4100998 (Pa. Cmwlth. Ct. Aug. 19, 2022) ....................11, 27

*Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142 (2012)...............................................................................................35

*Clingman v. Beaver*, 544 U.S. 581 (2005) .............................................46

*Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1998)...................................37

*Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020)...............................................................................60

*Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008)....................................................................................*passim*

*Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004)...................37

*In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020) ............................ 9, 10, 27, 28

*In re Georgia Senate Bill 202*, No. 21-cv-1259, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ...................................... 36

*In re Rowe*, 750 F.3d 392 (4th Cir. 2014) ................................ 39

*In re Salgado-Nava*, 473 B.R. 911 (9th Cir. BAP 2012) ....................... 39

*In re: Contest of November 7, 2023 Election of Towamencin Township*, Docket No. 23-26306, (Mont. Cnty. C.C.P. Dec. 20, 2023) ............................................................... 19

*In re: Contest of November 7, 2023 Election of Towamencin Township*, No. 1482 CD 2023 (Pa. Cmwlth. Ct. Dec. 28, 2023) .................................................................. 19

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ........................... 45

*La Union del Pueblo Entero v. Abbott*, No. 21-cv-844, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023) ............................. 35

*League of Women Voters of Ark. v. Thurston*, No. 20-CV-5174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) .......................... 36

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) ................ 36

*McCormick v. Chapman*, No. 286 MD 2022, 2022 WL 2900112 (Pa. Cmwlth. Ct. June 2, 2022) ..................................... 11, 27

*McDonald v. Board of Election Com'rs of Chicago*, 394 U.S. 802 (1969) ....................................................... 48

*Migliori v. Lehigh Cnty. Bd. of Elections*, 36 F.4th 153 (3d Cir. 2022) ................................................. *passim*

*Mixon v. Commonwealth*, 759 A.2d 442 (Pa. Cmwlth. Ct. 2000) ......................................................... 4

*Nat'l Assn. of Mfrs. v. Dep't of Def.*, 583 U.S. 109 (2018) ........................ 29

*Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998)............... 42, 50

*Polselli v. Internal Revenue Service*, 598 U.S. 432 (2023) ..................... 32

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 7 (2020) ............................................................... 60

*Ritter v. Migliori*, 142 S.Ct. 1824 (2022) ................................................ 56

*Ritter v. Migliori*, 143 S. Ct. 297 (2022) ................................................. 11

*Russell Motor Car Co. v. United States*, 261 U.S. 514 (1923) ............... 31

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ................................... 36

*Thrasher v. Ill. Rep. Party*, No. 12-cv-4071, 2013 WL 442832 (C.D. Ill. Feb. 5, 2013)........................................................... 36

*Toth v. Chapman*, No. 22-208, 2022 WL 821175 (M.D. Pa. Mar. 16, 2022) ...................................................................... 60

*United States v. Mosley*, 238 U.S. 383 (1915) ....................................... 51

*United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)........................ 11

*United States v. Palomar-Santiago*, 593 U.S. 321 (2021) ..................... 42

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ............... 40

*Vote.Org v. Callanen*, – F.4th –, No. 22-50536, 2023 WL 8664636 (5th Cir. 2023) ................................................... 45, 49

*Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) ....................... 60

*Woods v. Cloyd W. Miller Co.*, 333 U.S. 138 (1948) .............................. 42

*Yates v. United States*, 574 U.S. 528 (2015)..................................... 31, 32

## Constitutional Provisions

Pa. Const. art. VII, § 1.............................................................................. 4

U.S. Const. amend. XV.............................................................................. 43

U.S. Const. amend. XXVI ........................................................ 5

U.S. Const. art. I, § 4 ............................................................ 42

**Statutes**

18 U.S.C. § 1115 .................................................................. 32

18 U.S.C. § 1715 .................................................................. 32

21 U.S.C. § 331 .................................................................... 32

25 P.S. § 2811 ................................................................. 4, 27

25 P.S. § 3050 ..................................................................... 61

25 P.S. § 3146.1 .................................................................... 6

25 P.S. § 3146.2 .................................................................... 7

25 P.S. § 3146.2b ................................................................... 7

25 P.S. § 3146.4 ............................................................... 7, 33

25 P.S. § 3146.6 .................................................................... 8

25 P.S. § 3146.8 .................................................................... 8

25 P.S. § 3146.9 .................................................................... 8

25 P.S. § 3150.11 ................................................................... 6

25 P.S. § 3150.12 ................................................................... 7

25 P.S. § 3150.12b .................................................................. 7

25 P.S. § 3150.14 ............................................................. 7, 33

25 P.S. § 3150.16 ................................................................... 8

25 P.S. § 3150.17 ................................................................... 8

25 P.S. § 3154 .................................................................... 18

25 P.S. § 3157 ...................................................................... 18, 61

25 P.S. § 3261 ............................................................................ 18

25 P.S. § 3457 ............................................................................ 18

25 Pa.C.S. § 1301 ................................................................... 4, 27

25 Pa.C.S. § 1327 ...................................................................... 33

25 Pa.C.S. § 1328 ........................................................................ 5

52 U.S.C. § 10101(a)(2)(A) ................................................... 39, 40

52 U.S.C. § 10101(a)(2)(B) ............................................... *passim*

52 U.S.C. § 10101(a)(2)(C) ................................................... 40, 41

52 U.S.C. § 10101(a)(3)(A) ........................................... 20, 34, 47

52 U.S.C. § 10101(e) ......................................................... *passim*

8 U.S.C. § 1253 ........................................................................ 32

Act of Aug. 1, 1941, P.L. 672, No. 273 ...................................... 5

Act of Dec. 11, 1968, P.L. 1183, No. 375 .................................. 6

Act of June 3, 1937, P.L. 1333, No. 320 .................................... 5

Act of Mar. 9, 1945, P.L. 29, No. 17 ......................................... 5

**Legislative Materials**

110 Cong. Rec. 1519 (1964) ..................................................... 44

110 Cong. Rec. 1593 (1964) ..................................................... 52

110 Cong. Rec. 1600 (1964) ..................................................... 44

110 Cong. Rec. 1605 (1964) ..................................................... 53

110 Cong. Rec. 1691 (1964) ..................................................... 53

110 Cong. Rec. 2732 (1964) ....................................................... 51

110 Cong. Rec. 6647 (1964) ....................................................... 44

110 Cong. Rec. 6723 (1964) ................................................. 44, 52

110 Cong. Reg. 6650 (1964) ...................................................... 52

H.R. Rep. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N
    2391 ..................................................................................... *passim*

## Other Authorities

1957 U.S. Comm'n on Civil Rights............................................. 52

1961 U.S. Comm'n on Civil Rights, Part 1: Voting................................ 52

1972 Op. Atty. Gen. No. 121 ........................................................ 4

*Requisite*, adj. & noun, *Oxford English Dictionary* ................................ 30

## INTRODUCTION

Appellants, including the Republican National Committee (collectively the "RNC"), seek to disenfranchise thousands of indisputably qualified voters across Pennsylvania for failing to properly write a date that has no function in the administration of Pennsylvania's elections.

Federal law prohibits this result. *See* 52 U.S.C. § 10101(a)(2)(B). That statute forbids denying the right to vote based on paperwork errors that, as those at issue here, are not material in determining whether an individual is qualified to vote under state law.

The RNC does not meaningfully dispute that the straightforward application of the statute's plain text requires affirming the District Court's judgment. Rather, it implores the Court to interpret § 10101(a)(2)(B) based not on what it says, but on snippets of legislative history and a collection of interpretive canons that it wields to avoid the manifest meaning of the law Congress passed. But each successive attempt to overcome the statute's clear words fails, as the canons and other extra-textual techniques the RNC employs all depend on textual ambiguity not present here, and considerations such as legislative

history and structure merely confirm that the District Court's plain-text interpretation of the statute is the correct one.

A unanimous panel of this Court has already resolved the central question in this case, concluding, just as the District Court did below, that § 10101(a)(2)(B) prohibits rejecting the sorts of ballots at issue here because that statute "ensures qualified voters are not disenfranchised by meaningless requirements that prevent eligible voters from casting their ballots but have nothing to do with determining one's qualifications to vote." *Migliori v. Lehigh Cnty. Bd. of Elections*, 36 F.4th 153, 164 (3d Cir. 2022), *vacated as moot by Ritter v. Migliori*, 143 S. Ct. 297 (2022) (cleaned up); *id.* at 164-66 (Matey, J., concurring).

The RNC warns that affirming the District Court, and reaffirming *Migliori*, will yield electoral chaos, but that warning ignores limitations in § 10101(a)(2)(B)'s text that put out of reach the laws the RNC claims are in jeopardy. Affirming the District Court will do no more than reiterate that a federal law—one squarely within Congress's powers to regulate elections—does not allow states to impose immaterial paperwork requirements and then deny the right to vote for failing to comply. Important election regulations will remain undisturbed.

Affirming the District Court will restore the uniformity in Pennsylvania's elections lost after the RNC initiated *Ball v. Chapman*—an action leading to the Pennsylvania Supreme Court's decision that state law requires rejecting mail ballots returned with a declaration date error (but explicitly leaving unresolved the federal question raised here). 289 A.3d 1, 28 (Pa. 2023). As the record here shows, since *Ball*, counties have followed inconsistent practices when deciding which ballots to reject.

Words mean what they say. Application of the relevant words here is not complicated. The District Court correctly concluded, as this Court has before, that § 10101(a)(2)(B)'s plain meaning forbids rejecting ballots because the voter failed to correctly write an immaterial date on their ballot-return envelope. State-Appellees, comprising Pennsylvania's chief election official and the election boards of the Commonwealth's five largest counties, have a strong interest in seeing that legal voters have their votes counted, while ensuring that important voting regulations are protected so that elections are administered smoothly and securely. The District Court's correct application of § 10101(a)(2)(B) furthers these goals, and its judgment should be affirmed.

## STATEMENT OF THE ISSUES

1.   Does federal law forbid rejecting timely returned mail ballots submitted by indisputably qualified voters merely because the voter neglected to handwrite a date that has no function in Pennsylvania's elections? App. 73-85.

2.   Does certification of an election never implicated by this appeal have any effect on this Court's jurisdiction? Dkt. 43.[1]

## STATEMENT OF RELATED CASES

The issue presented in this appeal was before this Court in *Migliori v. Lehigh County Board of Elections*, No. 21-1499.

## STATEMENT OF THE CASE

## I.   Voting in Pennsylvania

Pennsylvanians are qualified to vote if they: (1) are at least 18 years old on the day of the election; (2) have been a U.S. citizen for at least one month prior to the election; (3) have lived in Pennsylvania and in their election district for at least 30 days prior to the election; and (4) are not imprisoned for a felony conviction. Pa. Const. art. VII, § 1; 25 P.S. § 2811; 25 Pa.C.S. § 1301(a).[2] Each county board first assesses compliance with

---

[1] "Dkt. #" are references to docket entries in this appeal.

[2] *See also Mixon v. Commonwealth*, 759 A.2d 442, 451 (Pa. Cmwlth. Ct. 2000), *aff'd*, 783 A.2d 763 (2001) (holding that individuals with felony convictions, other than those currently incarcerated, may register to vote); 1972 Op. Atty. Gen. No. 121 (concluding that *Dunn v. Blumstein*,

these conditions when an individual applies to register to vote. 25 Pa.C.S. § 1328. Qualified, registered voters may vote in person or by mail.

## A.    The Relevant History of Mail Voting

When the Election Code was enacted in 1937, absentee voters (limited to select active military members) were required to complete their ballots before Election Day, but those ballots could be counted even if they arrived after Election Day. Act of June 3, 1937, P.L. 1333, No. 320, §§ 1317, 1323-1330, Pa. App. 6-7, 10.

In 1945, the General Assembly added an instruction that absentee voters write a date on their ballot's return envelope. Act of Mar. 9, 1945, P.L. 29, No. 17, sec. 10, § 1306, Pa. App. 36-37. The General Assembly also added a direction that counties "set aside" mail ballots with return envelopes bearing "a date later than the date of the election." *Id.* That language replaced an earlier requirement that county boards "set aside" any ballot with a return envelope bearing a postmark later than Election Day. Act of Aug. 1, 1941, P.L. 672, No. 273, sec. 4, § 1307, Pa. App. 19.

_____

405 U.S. 330 (1972), prohibits the enforcement of certain durational residency requirements longer than 30 days); U.S. Const. amend. XXVI (prohibiting denial of right to vote to citizens 18 years of age or older on account of age).

In 1968, the General Assembly, for the first time, set a single deadline for a voter to complete a mail ballot, and for a county board to receive it. Act of Dec. 11, 1968, P.L. 1183, No. 375, sec. 8, §§ 1306(a), 1308(a), Pa. App. 43, 47.

The General Assembly then *removed* the requirement that counties set aside ballots based on the date written on the ballot-return envelope. *Id.* § 1308(c), Pa. App. 47. Doing so reflected that, with a single, common deadline for completion and receipt of a mail ballot, the handwritten declaration date no longer served its purpose.

## B.    Counties Do Not Use a Declaration Date for Any Purpose

From 1968 to 2019, mail voting provisions were materially unchanged.

In 2019, Pennsylvania made mail voting available to all registered eligible voters. *See* 25 P.S. § 3150.11. Pennsylvania voters may accordingly cast their vote in person or, alternatively, submit: (i) an absentee ballot, which is available to certain voters, *id.* § 3146.1; or (ii) a mail-in ballot, which is available to all voters, *id.* § 3150.11. In relevant form and function, these two types of ballots (collectively, "mail ballots") are identical.

6

To vote by mail ballot, a registered voter must apply to their county board and provide, among other things, their name, address, date of birth, proof of identification, and the amount of time they have resided in their election district. *Id.* §§ 3146.2, 3150.12. County boards review applications, verify the applicant's proof of identification, and compare the voter's information in the application with information the voter provided during registration. *Id.* §§ 3146.2b, 3150.12b. The registration information is housed in county-specific voter rolls within the Statewide Uniform Registry of Electors ("SURE") system. App. 56. Through this process, county boards reaffirm that the applicant meets the qualifications to vote in Pennsylvania.

County boards send approved voters a package with a mail ballot, a "secrecy envelope," and a larger pre-addressed return envelope. 25 P.S. §§ 3146.4, 3150.14. Each return envelope has printed on it a declaration that the voter is qualified to vote in the election and has not already voted. *Id.* §§ 3146.4, 3150.14. It also had printed a SURE system barcode unique both to the voter requesting the mail ballot and the election. App. 57.

After receiving the package, voters complete their ballot, place it into the secrecy envelope, and then place the secrecy envelope into the return envelope. 25 P.S. §§ 3146.6(a), 3150.16(a). The Election Code directs that voters "shall then fill out, date and sign the [return-envelope] declaration. *Id.* §§ 3146.6(a), 3150.16(a).

Voters must complete and return their ballot before 8:00 p.m. on Election Day. *Id.* §§ 3146.6(a), 3150.16(a). During canvassing, county boards must set aside and not count mail ballots received after that same time. *Id.* § 3146.8(g)(1)(ii). For this reason, upon receipt, county boards stamp or mark each return envelope with the date and time the ballot was received. App. 58. Counties also scan the barcode on the return envelope using the SURE system, which creates an electronic record of the date and time the ballot was received. *Id.* During the canvassing process, county boards use these independent means of verifying a mail ballot was received by the statutory deadline. App. 80.

Counties must maintain records of when each mail ballot was received. 25 P.S. §§ 3146.9(b)(5), 3150.17(b)(5).

## II.    Litigation Over Pennsylvania's Declaration Date

Before 2020, county boards routinely counted mail ballots returned with a missing handwritten declaration date. Only after the General Assembly expanded the availability of mail-in voting did anyone seek to force counties to exclude these ballots. As a result, there has been litigation about this issue in almost all subsequent elections.

### A.    <u>2020 General Election</u>: The Pennsylvania Supreme Court Orders the Counting of Ballots Missing a Declaration Date

The Pennsylvania Supreme Court first addressed declaration dates shortly after the 2020 General Election, when it considered challenges to the decisions of the Allegheny and Philadelphia election boards to count mail ballots returned without a handwritten date on the return-envelope declaration. *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020).

Five days after taking the case, the Supreme Court issued a 3-3-1 decision that the ballots should be counted in 2020. Three Justices concluded that the Election Code did not require counties to reject ballots lacking a handwritten date. *Id.* at 1076-78 (announcing judgment). A fourth Justice disagreed with that conclusion but agreed that omitting a date should not disqualify voters under the facts of the case. *Id.* at 1085-

89 (Wecht, J., concurring). Three other Justices would have rejected the ballot of any voter that omitted a date. *Id.* at 1090-91 (Dougherty, J., dissenting).

A majority acknowledged that there was "persuasive force" to the argument that rejecting mail ballots for date errors would violate federal law. *Id.* at 1074 n.5 (announcing judgment); *id.* at 1089 n.54 (Wecht, J., concurring). The Court, however, did not resolve that issue.

**B.    2021 Municipal Election & 2022 Primary: This Court and Pennsylvania Courts Rule that Counties May Not Reject Ballots Because of a Missing Declaration Date**

Declaration dates next arose during the 2021 Municipal Election, after the Lehigh County board of election set aside mail ballots where voters failed to handwrite a date on the return-envelope declaration. A unanimous panel of this Court held that rejecting those ballots violated 52 U.S.C. § 10101(a)(2)(B). *Migliori v. Lehigh Cnty. Bd. of Elections*, 36 F.4th 153, 164 (3d Cir. 2022), *vacated as moot by Ritter v. Migliori*, 143 S. Ct. 297 (2022); *see also id.* at 164-66 (Matey, J., concurring). This Court concluded that because omitting the handwritten date on the return envelope was not "material in determining whether [a voter] is qualified

10

to vote under Pennsylvania law," rejecting ballots based on that omission violated federal law. *Id.* at 162-63; *id.* at 165 (Matey, J., concurring).[3]

After *Migliori*, in two cases relating to the 2022 Primary, the Commonwealth Court of Pennsylvania held that rejecting ballots because of missing dates violates or likely violates Pennsylvania and federal law. *Chapman v. Berks Cnty. Bd. of Elections*, No. 355 MD 2022, 2022 WL 4100998, at *25, 29 (Pa. Cmwlth. Ct. Aug. 19, 2022); *McCormick v. Chapman*, No. 286 MD 2022, 2022 WL 2900112, at *9-14 (Pa. Cmwlth. Ct. June 2, 2022) (granting preliminary injunction).

As a result, virtually all Pennsylvania's counties accepted ballots returned with a declaration date error in the 2022 Primary.

**C.    2022 General Election: The RNC Initiates Litigation that Disrupts Uniform Rules Immediately Before the 2022 General Election**

Consistent with the three decisions issued between May and August 2022, the Secretary of the Commonwealth advised counties in the run-up to the 2022 General Election to count otherwise timely received

---

[3] In a non-merits, short-form order, the U.S. Supreme Court later vacated this Court's decision as moot under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), because certification of the disputed election ended any controversy between the parties. *Ritter v. Migliori*, 143 S. Ct. 297 (2022).

mail ballots from qualified voters even where the voter did not handwrite a date on the return envelope. Pa. App. 243-246, 247. But on October 16, 2022, after almost 300,000 voters had returned mail ballots, *see*, Dkt. 35, Ramachandran Decl. ¶ 3, the RNC filed a case in the Pennsylvania Supreme Court's original jurisdiction, asking that court to order counties to invalidate mail ballots that lacked a correctly handwritten date on the return envelope, Pa. App. 248-281.

On November 1, by which point almost 1,000,000 mail ballots had already been returned for the 2022 General Election, *see* Dkt. 35, Ramachandran Decl. ¶ 3, the Pennsylvania Supreme Court issued an order that county boards must "refrain from counting any absentee and mail-in ballots received for the November 8, 2022 general election that are contained in undated or incorrectly dated outer envelopes," *Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022). The order added that "[t]he Court is evenly divided on the issue of whether failing to count such ballots violates 52 U.S.C. § 10101(a)(2)(B)" and that counties must "segregate and preserve" them. *Id.*[4]

---

[4] Chief Justice Max Baer died a few days before *Ball* was filed, so the Court had six members at that time.

The *Ball* order did not explain how election officials were to determine if a declaration was "incorrectly dated." This omission led to widespread confusion among election officials.[5] Four days later, the Supreme Court issued a supplemental order, directing that, for the 2022 election, dates (1) before September 19, 2022 (which was around the time counties began sending mail-ballot packages for that election) or (2) after Election Day were "incorrect." Order, *Ball v. Chapman*, No. 102 MM 2022 (Pa. Nov. 5, 2022), Pa. App. 282-283.

Several months later, the Supreme Court issued opinions in *Ball*, explaining that *In re Canvass* constituted binding precedent requiring counties to set aside ballots returned with a missing or incorrect handwritten date on the declaration. *Ball v. Chapman*, 289 A.3d 1, 20-23 (Pa. 2023) (opinion of the court). How counties figure out if a date is "correct" was a question "beyond [the court's] purview." *Id.* at 23 (opinion of the court).

As to the federal law raised here, three Justices concluded that rejecting ballots for date errors violated § 10101(a)(2)(B). *Id.* at 28

---

[5] *E.g.*, Bethanie Rodgers, *'Utter chaos': Pa. counties hustle after Supreme Court order on mail-in ballots*, GoErie.com (Nov. 5, 2022).

(Wecht., J, announcing judgment). Two Justices concluded it did not. *Id.* at 37 (Brobson J., dissenting). The final Justice wrote that the deadlock made it improper to opine at all. *Id.* at 34 (Dougherty J., concurring). For this reason, the court stressed that "having divided evenly on the question of the federal materiality provision, we issued no order on that basis." *Id.* at 28 (opinion of the court).

Following *Ball*, more than 10,000 mail ballots were rejected in the 2022 General Election solely because the voter failed to correctly handwrite a date on the return-envelope declaration. App. 60-61. Each ballot was submitted by a voter previously determined to be eligible and qualified to vote in the election by their county board. App. 61. And each ballot was timely received based on its stamp, as well its entry into the SURE system. App. 80, 83.

For some of these voters, it was painfully obvious that they tried to comply with the requirement. Some wrote their birthdate, Pa. App. 284-288, some put the date on a different portion of the envelope, Pa. App. 289, and some mistakenly wrote the wrong year (*e.g,* "2023" or "2002" instead of "2022"), Pa. App. 290-291.

Further, the record in this case shows that county boards adopted different ways to determine whether the date on the return envelope was "correct." App. 82-84. During the 2022 General Election, for example, some county boards determined that the date was correct only if it followed the American dating convention of month, day, year. App. 84. Other counties also accounted for the European dating convention of day, month, year. *Id.* Still others, but not all, considered a date correct if it listed the month and year but not the day, or the day and month but not year. App. 84 n.44; *see also* Pa. App. 292-296. And some rejected those ballots returned with proper dates if the voter had written, but then crossed out, an incorrect date. App. 84; Pa. App. 297-298.

Rejecting ballots because of date errors significantly impacted voters above the age of 65 during the 2022 General Election. In Philadelphia County, for example, voters 65-years old or older were disproportionately overrepresented in the number of mail ballots rejected merely because an eligible voter failed to correctly handwrite an immaterial date. Pa. App. 893-894.

## III. Disenfranchised Elderly Voters and Non-Partisan Organizations Bring this Action

*The Parties*. Five elderly voters whose mail ballots were not counted in the 2022 General Election for neglecting to handwrite a date and six organizations involved in voter education sued the Secretary and the sixty-seven county boards of elections. Plaintiffs sought an order that their votes be included in the results of the 2022 election and a declaratory judgment that rejecting ballots for date errors violates § 10101(a)(2)(B). Pa. App. 87-88. The RNC and other political committees associated with the Republican Party intervened as defendants. App. 51-52. After completing discovery, the parties cross-moved for summary judgment. *Id.*

*District Court Proceedings and the 2023 Municipal Elections*. On November 7, the county boards administered the 2023 Municipal Elections. As of that date, the District Court had not yet resolved the pending cross-motions for summary judgment and county boards were segregating mail ballots returned in envelopes with a date error.

On November 21, the District Court resolved the cross-summary judgment motions. App. 5-7. The court dismissed fifty-five county boards from the case, concluding that the voters and voting groups lacked

16

standing to bring claims against those boards. App. 5-6. The District
Court also issued a declaratory judgment that rejecting timely returned
mail ballots based solely on voters' failure to handwrite a correct date on
the outer return envelope violates § 10101(a)(2)(B). App. 6. And the
District Court ordered certain counties to include Plaintiffs' ballots in
their 2022 results, App. 6, and permanently enjoined the Secretary from
"directing all county boards of elections of the Commonwealth to … not
count timely received mail ballots based on a voter's error or omission in
relation to the date" on the return envelope, App. 7.

After the District Court issued its opinion, many counties, including
ones dismissed from this case, canvassed and counted mail ballots
returned with a declaration date error and then certified the results for
at least some of the 2023 elections to include those ballots. *See* Dkt. 34 at
6-7; Dkt. 35, Ramachandran Decl. ¶ 8; Dkt. 38 at 2.[6]

*The 2023 Towamencin Township Supervisor Election.* On
November 22, after the District Court's opinion, Montgomery County

---

[6] Based on available information, the Secretary believes that these
15 counties did so: Adams, Allegheny, Beaver, Berks, Bucks, Chester,
Dauphin, Delaware, Lancaster, Lebanon, Lehigh, Luzerne, Montgomery,
Philadelphia, and York.

postponed certification of its election results to count ballots in undated or incorrectly dated return envelopes. *See* App. 178-79. Among those ballots were six from Towamencin Township, which had a close race for Township Supervisor between incumbent Richard Marino and challenger Kofi Osei.

Mr. Marino, the intervenor here, did not challenge Montgomery County's decision to count the six mail ballots, as permitted under 25 P.S. § 3157. Nor did Mr. Marino or any other interested party seek a recount in the race. *See Id.* §§ 3261-3263, 3154(f).

Following the counting of these six ballots, the race was tied, with each candidate receiving 3,035 votes. App. 144. After a tiebreaker, Montgomery County declared Mr. Osei the winner. The race was certified on December 4, 2023. *Id.*

A week after the statutory deadline to do so, some voters in Towamencin Township filed an election contest—a procedure available when an election is "illegal," 25 P.S. § 3457—challenging the result. App. 151-196. The Court of Common Pleas dismissed the contest because "the Petition at issue was untimely filed," and because it was not illegal for Montgomery County to follow the District Court's order. *See In re: Contest*

*of November 7, 2023 Election of Towamencin Township*, Docket No. 23-26306, (Mont. Cnty. C.C.P. Dec. 20, 2023), Pa. App. 1052-1053.

After the dismissal was appealed, the Commonwealth Court denied the voters' motion to enjoin Mr. Osei from taking office during their appeal. Order, *In re: Contest of November 7, 2023 Election of Towamencin Township*, No. 1482 CD 2023 (Pa. Cmwlth. Ct. Dec. 28, 2023), Pa. App. 1055-1056. As that court explained, the voters were not likely to succeed because the Court of Common Pleas had correctly concluded that they inexcusably had missed the filing deadline. *In re: Contest of November 7, 2023 Election of Towamencin Township*, No. 1482 CD 2023, slip op. at 15-21 (Pa. Cmwlth. Ct. Dec. 28, 2023), Pa. App. 1071-1077.

Mr. Osei was sworn into office on January 2. Pa. App. 1082.

*This Appeal*. On December 6, 2023, the RNC filed this appeal, Mr. Marino moved to intervene, and both filed a motion for a stay pending appeal. Dkt. 8 & 9. This Court granted both motions on December 13. Dkt. 43. The motions panel expressly stated it was not deciding whether the RNC is "more likely than not" to prevail. *Id.* at 3.

## SUMMARY OF THE ARGUMENT

In 1964, Congress passed a law forbidding states from using trivial paperwork requirements to deny the right to vote. *See* 52 U.S.C. § 10101(a)(2)(B). The law Congress enacted uses clear, unambiguous language:

> No person acting under color of law shall … [1] deny the right of any individual to vote in any election because [2] of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, [3] if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

For purposes of this statute, Congress specifically defined "vote" to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals." *Id.* § 10101(e); *see also id.* § 10101(a)(3)(A).

The District Court correctly held that rejecting ballots because a voter neglected to properly write a date on the ballot's return-envelope declaration easily fits within the plain meaning of the statute. First, that date has no function in Pennsylvania's elections and so "is not material in determining" whether anyone is qualified to vote. Second, failing to correctly date the required declaration is "an error or omission on any

20

record or paper relating to any application, registration, or other act requisite to voting." Third, rejecting a qualified voter's timely received ballot "den[ies] the right … to vote."

Although the statute, by its plain terms, applies to errors on papers relating to "any application, registration, or other act requisite to voting," the RNC insists that it governs only voter registration. RNC Br. at 21. To reach that counter-textual conclusion, the RNC asks this Court to eschew the clear meaning of "other act requisite to voting" in favor of the RNC's flawed application of the *ejusdem generis* canon of construction. That canon applies only to ambiguous language, a condition not met here. And the RNC's application of it would make the general term "other act requisite to voting" superfluous.

Further, the RNC maintains that § 10101(a)(2)(B) applies only when a mistake is made on a "paper or record [] used 'in determining' whether an individual is qualified to vote." RNC Br. at 23. That, however, completely rewrites the text. The statute's first clause directs that it applies to denials of the right to vote due to errors made on a "record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The statute's second clause limits the

first clause's application to when the "error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *Id.* So, contrary to the RNC's description, there is no requirement that the records and papers be used in determining someone's qualifications.

Next, the RNC invokes two more canons—constitutional avoidance and federalism considerations—as reason for this Court to write its own limits into the text. Those canons are inapplicable for overlapping reasons: (1) they require statutory ambiguity; (2) Congress had power under both Article I's Elections Clause and the Fifteenth Amendment to pass the law it did; and (3) there are no federalism concerns when Congress properly and intentionally regulates state elections.

Legislative history also supports State-Appellees. Before 1964, most arbitrary denials of the right to vote happened during registration, but the record communicates that Congress was motivated to prevent arbitrary denials of the right to vote—not only of a right to register. Compliance with registration requirements is no more consequential to exercising the right to vote than is compliance with any other procedural predicate to voting. And history had shown the states were willing to

avoid more targeted federal laws protecting the right to vote, making Congress's response a reasonable prophylaxis.

The RNC's warning that keeping to the statute's unambiguous meaning will produce a federal takeover of state elections is terribly overstated. Section 10101(a)(2)(B) has meaningful limits—such as that the error must occur on a record or paper, that record or paper must relate to registration or an act requisite to voting, and the error must not be material to a voter's qualification. The RNC does not identify a law other than Pennsylvania's date requirement that flunks this test.

Affirming the District Court's resolution of what federal law requires will restore uniformity to Pennsylvania elections. *Contra* RNC Br. at 54-57. As the record here shows, disuniformity resulted from the Pennsylvania Supreme Court decision in *Ball v. Chapman*, holding that, under state law, ballots must be rejected if the voter failed to correctly date the return envelope. But the decision in *Ball* explicitly did not rule on the federal law issue central to this appeal and does not impose a conflicting obligation on any county. Affirming the District Court's decision here will resolve that issue and result in uniform practices across Pennsylvania.

Finally, Mr. Marino has no stake in this appeal, and never did. He failed to challenge his loss in state court, and no decision of this Court could have helped him. But the certification of his loss in the 2023 election, and the subsequent swearing in of his opponent, have no bearing on this Court's jurisdiction, because this appeal was never going to affect the 2023 Municipal Elections, all of which are over. For the same reason, the *Purcell* principle has no relevance to this case.

## ARGUMENT

## I.    Section 10101 Prohibits Rejecting Mail Ballots Due to an Error on the Return-Envelope Declaration

Statutory text, structure, and history all point to one conclusion in this case: Pennsylvanians may not have their ballots set aside for failing to correctly write a date on the declaration returned with a mail ballot. Applying § 10101(a)(2)(B) to facts easily within its scope, as the District Court did here, will not prevent states or counties from enforcing necessary rules regulating elections.

### A.    Section 10101's Plain Text Requires Affirming the District Court

State actors may not "deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such

error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Congress defined "vote" as used in this section to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." *Id.* § 10101(e).

Application of this language here is uncomplicated. First, a voter's handwritten date on a return-envelope declaration has no function in Pennsylvania's elections and so "is not material in determining" whether anyone is qualified to vote. Second, failing to correctly date the required declaration is "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." Third, rejecting a qualified voter's timely received ballot "den[ies] the right … to vote."

### 1.    The Handwritten Date Is Not Material

The District Court correctly found that a voter's handwritten date on a return envelope is not "material in determining whether such individual is qualified under State law to vote" because "the undisputed evidence shows that … county boards of elections did not use the

handwritten date on the return envelope for any purpose related to determining a voter's age, citizenship, county or duration of residence, or felony status." App. 81. Consistent with this conclusion, the RNC itself admits that "the date requirement has nothing to do with determining a voter's qualifications." RNC Br. at 25.

The District Court's finding, and the RNC's admission, are correct because under Pennsylvania law the date serves no function. The history of the Election Code demonstrates that the handwritten date once confirmed that a ballot had been completed before Election Day. *Supra* at 5-6. But ever since the General Assembly established a single deadline to complete and return the ballot, the declaration date has ceased serving that (or any other) function. If a ballot is timely received by a county board, it necessarily was timely completed by the voter. And the date written by the voter does not assist county boards in determining whether they received the ballot before that deadline. Rather, county boards independently track timeliness based on when the county board in fact received each mail ballot. App. 58.

Five of the six Justices of the Supreme Court of Pennsylvania in *Ball* expressly recognized that there is no connection between the

handwritten date on the return envelope and a voter's qualifications, and the sixth did not address the subject. 289 A.3d at 24 (Wecht, J., announcing judgment); *see also id.* at 39 (Brobson, J., dissenting) (observing that the declaration date would not "have any bearing on determining voter qualification at all."). That conclusion aligns with this Court's decision in *Migliori* that the omission of the date on the return envelope was immaterial. 36 F.4th at 164.

Nor is it true that the date "establishes a point in time against which to measure the elector's eligibility to cast the ballot." RNC Br. at 46 (quoting *In re Canvass*, 241 A.3d at 1090 (Dougherty, J., dissenting)). Election Day—not the day the voter dated the return envelope—is the date against which a voter's qualifications are measured. *See* 25 P.S. § 2811; 25 Pa.C.S. § 1301. As subsequent decisions have explained, Justice Dougherty was mistaken. *See Berks County*, 2022 WL 4100998 at *19 ("The date as of which an elector's qualifications are determined is election day."); *McCormick*, 2022 WL 2900112, at *13 (rejecting conclusion that the handwritten date served weighty interests). Indeed, Justice Dougherty did not repeat this claim in *Ball*.

Because the handwritten date does not identify any meaningful point in time, it also does not prevent fraud. *Contra* RNC Br. at 31-32 (citing *In re Canvass*, 241 A.3d at 1090 (Dougherty, J., dissenting)).[7] Justice Dougherty's concern that the date "prevents the counting of potentially fraudulent back-dated votes," *id.* at 1091 (Dougherty, J., dissenting) had the issue backwards. There is no point in "fraudulently back-dat[ing]" a ballot envelope if the date is not used to determine whether the ballot was timely received. It is only where the date affects whether the ballot will be counted that a motivation to alter it could possibly exist.

Thousands of voters, especially the elderly, have already been disenfranchised because of a mere paperwork technicality. Thousands more will be if this Court sanctions that practice. Section 10101(a)(2)(B) was intended for a situation like this where a paperwork requirement

---

[7] The RNC's claim that in 2022 the date "helped" prove a ballot was fraudulently cast is demonstrably wrong. RNC Br. at 32. A Lancaster County Commissioner testifying about the incident agreed that the date "did not affect whether [we] counted that ballot." Pa. App. 653-654. Lancaster's election director similarly testified that it was correct that "regardless of the date written on the envelope, that vote would not have counted." Pa. App. 228.

"serve[s] no purpose other than as a means to inducing voter-generated errors that could be used to justify" denying the right to vote. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008).

### 2. Failing to Properly Fill Out the Return-Envelope Declaration Is an Error or Omission on a Record Related to an Act Requisite to Voting

Forgetting to date, or incorrectly dating, the return envelope is "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). This conclusion follows directly from the statute's text.

While the RNC does not dispute that neglecting to date the return-envelope declaration is "an error or omission," it advances a host of arguments that require disregarding (or, in one case, rearranging) the plain text of the statute to argue that errors or omissions in the handwritten date are not within the scope of this section. But where a statute is unambiguous, determining its meaning "begins with the statutory text, and ends there as well." *Nat'l Assn. of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018) (cleaned up).

> a.  *Completing the Declaration is an Act Requisite to Voting*

Under the Election Code, anyone who votes by mail "shall ... fill out, date and sign the declaration" printed on the ballot return envelope. 25 P.S. §§ 3146.6(a), 3150.16(a). This language makes completing the declaration a mandatory part of the mail voting process—or, in other words, "an act requisite to voting." *See Requisite*, adj. & noun, *Oxford English Dictionary* ("Required by circumstances or regulations; appropriate; necessary for a purpose, indispensable."). So, failing to date a declaration is an error or omission on a paper relating to an act requisite to voting.

The RNC does not dispute that, under Pennsylvania law, filling out the return-envelope declaration is an "act requisite to voting" using those terms' ordinary definitions. In fact, it does not engage with the meaning of the words at all. Instead, it argues that "act requisite to voting" as used in § 10101(a)(2)(B) means something else entirely—that it "refers only to voter registration." RNC Br. at 21.

**1.** Tellingly, the RNC's analysis begins not with text, but with legislative history. RNC Br. at 19-20. While the legislative history confirms State-Appellees' interpretation, *see infra* at 50-54, statutory

30

text, not history, is the law, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020).

When the RNC turns to interpreting the text, it bypasses the meaning of the words themselves to start with the *ejusdem generis* canon. *See* RNC Br. at 21-22. But that canon resolves ambiguity; it does not create it. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (rejecting reliance on *ejusdem generis* to create ambiguity); *see also Yates v. United States*, 574 U.S. 528, 564 (2015) (Kagan, J., dissenting) ("[T]his Court uses *noscitur a sociis* and *ejusdem generis* to resolve ambiguity, not create it."); *Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923) (rejecting invocation of *noscitur a sociis* to interpret words that have clear meaning). The meaning of "other act requisite to voting" is not ambiguous and the RNC does not suggest that it is.

The RNC also misconstrues the *ejusdem generis* canon, which advises that "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali*, 552 U.S. at 223. The RNC's interpretation does not seek similarity between the specific and general terms, but for

the specific terms to fully subsume the general.[8] The canon, however, teaches that specific terms anchor the general term's independent reach. *Yates*, 574 U.S. at 545. The RNC's flawed application of the *ejusdem generis* canon would deprive of meaning both "other act requisite to voting" and every other portion of the statute expressly extending it beyond registration, such as the broad definition of "vote." Statutes are not read that way. *E.g.*, *Polselli v. Internal Revenue Service*, 598 U.S. 432, 441 (2023) ("We ordinarily aim to give effect to every clause and word of a statute.").

The RNC strains to find some independent meaning that "other act requisite to voting" could have under its view that the phrase refers only to registration. RNC Br. at 21-21. But all its examples involve registration-related documents already covered under the text's use of "related to … registration."

---

[8] The RNC claims its interpretation is necessary to avoid making specific terms in a list meaningless, RNC Br. at 21, but if that assertion is true here, it is true of all lists ending in catch-all terms, a common legislative drafting technique. *E.g.*, 8 U.S.C. § 1253(a)(1)(C); 18 U.S.C. § 1115; 18 U.S.C. § 1715; 21 U.S.C. § 331(k).

State-Appellees' interpretation, on the other hand, gives effect to all statutory language. Congress sought to ensure that states could not creatively avoid the statute, as had happened with prior voting laws. *See* H.R. Rep. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N 2391, 2394 (describing Title I of the Civil Rights Act of 1964 as "designed to meet problems encountered in the operation and enforcement of the Civil Rights Acts of 1957 and 1960"); *NAACP*, 522 F.3d at 1173 (referencing prior laws' ineffectiveness). Including "other act requisite to voting" guards against creative "labeling," *see* RNC Br. at 21, that would merely shift the devices used to thwart applications to register to later, similar acts required during the voting process.

Finally, using *ejusdem generis* supports State-Appellees' view because a voter's completion of the declaration is akin to the completion of a registration application. Each requires submitting a document to a county board on which the individual swears that they are qualified to vote. *Compare* 25 Pa.C.S. § 1327(b) (registration) *with* 25 P.S. §§ 3146.4, 3150.14(b) (declaration). Registration is how a voter attests (under penalty of perjury) to their eligibility generally, while the declaration is

how a voter attests (under penalty of perjury) to their eligibility to vote in the specific election.

2.    If the unquestioned meaning of the operative words were not enough, Congress repeatedly signaled that the statute covers all instances of failing to properly comply with immaterial paperwork requirements resulting in the denial of the right to vote.

Both "record or paper" and "application, registration, or other act requisite to voting" are introduced by "any." And "read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Ali*, 552 U.S. at 219. So, here, the text directs that a record or paper "of whatever kind" is within the statute's sweep if it must be completed as a predicate to voting.

Moreover, Congress incorporated into § 10101(a)(2)(B) the definition of "vote" found in § 10101(e). *See* 52 U.S.C. § 10101(a)(3)(A). That definitions states, "[T]he word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast … ." *Id.* § 10101(e). Not only does the definition list all steps of the

electoral process, but the list is "introduced with the verb 'includes' instead of 'means,'" a choice further communicating expansiveness. *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 162 (2012).

Explicitly incorporating each stage of the voting process into § 10101(a)(2)(B)'s definition of vote makes sense only if the statute reaches records or papers necessary to having a vote counted, but not necessary for registration (or earlier stages in the voting process), as is the case here. Through that definition, Congress instructed "courts to look not only for individuals being stripped of their ability to exercise the right to vote generally, but for individuals who are denied the right to have their ballots counted and included in the tallies for an individual election." *Ball*, 289 A.3d at 25 (Wecht, J., announcing judgment).

**3.** Courts, including this one, *see Migliori*, 36 F.4th at 162 n.56, have easily reached the conclusion that §10101(a)(2)(B) extends beyond registration and applies to immaterial errors made on other records or papers requisite to voting:

-   *La Union del Pueblo Entero v. Abbott*, No. 21-844, 2023 WL
    8263348, at *18-22 (W.D. Tex. Nov. 29, 2023), *stayed pending
    appeal, United States v. Paxton*, No. 23-50885, (5th Cir. Dec.
    15, 2023), ruled that Texas cannot reject mail ballots merely
    because a voter failed to write on their balloting materials the
    ID number associated with their registration record. The

decision of a Fifth Circuit motions panel staying the decision did not suggest that § 10101(a)(2)(B) is limited to registration.

- *League of Women Voters of Ark. v. Thurston*, No. 20-5174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021), denied a motion to dismiss in a case challenging Arkansas's requirement that absentee voters complete a voter statement with information that duplicates what was submitted when applying to vote absentee.

- Both *In re Georgia Senate Bill 202*, No. 21-1259, 2023 WL 5334582, at *11 (N.D. Ga. Aug. 18, 2023) and *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) enjoined Georgia counties from rejecting absentee ballots merely because a voter failed to write her birthday on the return envelope.

The RNC claims 50 years of countervailing practice are consistent with its narrow reading of the statute, RNC Br. at 8-9, 32, but none of the cases it cites supports its claim:

- *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003), ruled that § 10101(a)(2)(B) can be enforced by private right of action and remanded to the district court for consideration of the merits.

- *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153, 1172-75 (11th Cir. 2008), concerned what information Florida could require during registration but had no need (and did not) address when else the statute might apply.

- *Thrasher v. Ill. Rep. Party*, No. 12-4071, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013), rejected that § 10101(a)(2)(B) had any application to "the inner workings and negotiations of a state political party convention" because that was "a domain far outside the statute's purview."

- *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1372-73 (S.D. Fla. 2004), ruled that § 10101(a)(2)(B) did not require counting untimely mail ballots because even if Congress was "concerned about denials of the right to vote at all stages and components of the voting process—from application to registration to casting to counting," returning a ballot after the deadline was not an error on a record.

- *Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1998), was about the National Voter Registration Act.

There is no basis for the Court to depart from the common understanding of "act requisite to voting," its ruling in *Migliori*, or what other courts to consider this issue have held.

> **b.** *Nothing Else in § 10101(a)(2)(B) Limits Its Reach to the Review of Registration Materials*

The RNC's next atextual argument is that § 10101(a)(2)(B) "requires that the paper or record be used 'in determining' whether an individual is 'qualified' to vote." RNC Br. at 23. But the statute says no such thing.

Section 10101(a)(2)(B) consists of two clauses that act in tandem:

No person acting under color of law shall…

[1] deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting,

[2] if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

The first clause defines *when* the statute applies: any time the right to vote is denied for an error "on any record or paper relating to any application, registration, or other act requisite to voting." The second limits *which errors or omissions* are covered under the first clause: only an error or omission that "is not material in determining whether such individual is qualified under State law to vote in such election."

The RNC turns the structure of § 10101(a)(2)(B) on its head, reading the phrase "in determining" from the second clause to act as a limitation on how the records or paper must be used. But the effect of the second clause is to exclude from the statute's reach those errors or omissions where the information the voter is asked to provide is material to whether they are qualified to vote in such election. It says nothing about which records or paper are covered.

As the Eleventh Circuit has explained, the second clause's core inquiry requires asking "whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant." *NAACP*, 522 F.3d at 1175. If it is not, then an error or omission may not be used to deny the right to vote. The inquiry focuses on "the nature of the underlying information" that the

38

voter has failed to provide. *Id.* This conclusion is consistent with the fact that the subject of the second clause, where "in determining" appears, is not "paper or record"—as the RNC falsely claims, *see* RNC Br. at 23—but "error or omission."

A comparison of § 10101(a)(2)(B) and the provisions immediately before and after it confirms this interpretation. The phrase "in determining whether any individual is qualified under State law" appears at the *beginning* of § 10101(a)(2)(A), and thus defines a process to which that provision applies. *See In re Salgado-Nava*, 473 B.R. 911, 916 (9th Cir. BAP 2012) (interpreting "in determining" as used to introduce 11 U.S.C. § 330(a)(7)); *see also In re Rowe*, 750 F.3d 392, 396 (4th Cir. 2014) (same). Congress did not repeat the same structure in § 10101(a)(2)(B), instead using "in determining" in connection with the relevance of the "errors or omissions."

Thus, contrary to the RNC's claim, RNC Br. at 23-24, the structure of § 10101(a)(2) offers further reason to reject its interpretation. That § 10101(a)(2)(A) is written the way the RNC would prefer § 10101(a)(2)(B) were written does not allow it to ignore the differences between the two provisions. Rather, it reflects that Congress made a

deliberate choice, which must be respected. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices.").

Moreover, § 10101(a)(2)(A) uses "in determining whether any individual is qualified under State law or laws to vote in *any* election." The use of "any" communicates a concern with determining if a voter is qualified to vote generally in elections of any kind—the function of registration. But § 10101(a)(2)(B) uses "in determining whether such individual is qualified under State law to vote in *such* election." The use of "such" connotes concern with determining a voter's qualifications for a specific election. *Migliori*, 36 F.4th at 163. That is not the exclusive role of voter registration.

The subsequent section, § 10101(a)(2)(C), prohibits "employ[ing] any literacy test as a qualification for voting in any election," subject to certain exceptions not relevant here. The RNC makes the astonishing claim that this prohibition only bars the use of literacy tests in voter registration. *See* RNC Br. at 24. But any requirement that a voter must pass a literacy test to vote can impose a "qualification" on voting regardless of whether the test is required as a precondition of registration

40

or is given at a later stage in the process. Like § 10101(a)(2)(B), § 10101(a)(2)(C) is concerned with protecting the right to *vote*, which "includes all action necessary to make a vote effective." *Id.* § 10101(e).

Finally, § 10101(b) covers a completely different subject matter (threats) and different actors (both private and public actors) than § 10101(a)(2), and so does not aid the RNC's position. *Contra* RNC Br. at 25. Nor do the remedies under § 10101(e), *contra id.* at 24, inform the meaning of § 10101(a)(2)(B). Those remedies are available after a finding of a pattern or practice of denying the right to vote "on account of race or color of any right or privilege secured by subsection (a)." When this remedial language was enacted as part of the Civil Rights Act of 1960, the only part of subsection (a) that existed was the provision now codified at § 10101(a)(1), which is the focus of this language.

### c.   *Constitutional Avoidance and Federalism Considerations Are Inapplicable*

Neither constitutional avoidance nor federalism considerations permits reading "error or omission on any record or paper relating to any application, registration, or other act requisite to voting," as meaning something other than what it says. *Contra* RNC Br. at 30-35, 35-40.

Both canons are useful only to make sense of ambiguous statutory language. *United States v. Palomar-Santiago*, 593 U.S. 321, 329 (2021) (explaining that the constitutional avoidance canon "has no application in the absence of statutory ambiguity."); *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 209 (1998) (explaining that federalism canon is inapplicable where a statute "plainly covers" the issue); *All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226, 255 (5th Cir. 2023) (holding that federalism canon "only applies when a statute is ambiguous"). The language here is not ambiguous, and the RNC does argue otherwise. Even if it were, neither canon supports the RNC's interpretation.

***Constitutional Avoidance***: For federal elections, Title I of the Civil Rights Act of 1964, which enacted what is now codified at § 10101(a)(2)(B), is a valid exercise of Congress's authority to "make or alter" regulations of "The Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4; *see* H.R. Rep. 88-914, at *2492 (Rep. McCulloch, *et al.*) (identifying Article I, § 4 as authorizing Title I); *see also Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to

42

exercise.").[9] The RNC's constitutional avoidance arguments never mention this clear font of congressional authority.

Instead, the RNC claims that adopting its "registration-only" interpretation is necessary for Title I to be proper under Congress's Fifteenth Amendment power to enact "appropriate legislation" to prohibit citizens' right to vote from being "denied or abridged" "on account of race." U.S. Const. amend. XV. It maintains that a record replete with evidence of repeated, persistent denials of the right to vote cannot justify a remedy that would prohibit such arbitrary denials at any stage in the voting process, because Congress had no reason to believe that those who sought to prevent the registration of Black voters would try to thwart them at other stages in the process as well. RNC Br. at 27. And it makes this claim in the context of discussing Congress's power to enforce a constitutional amendment that protects "[t]he right of citizens of the United States *to vote*." To state this argument is to refute it.

As the legislative record reflects, the constitutional injury Title I responded to was states' use of immaterial paperwork requirements to

---

[9] Here, the individual plaintiffs challenged failures to count their ballots in the 2022 federal election.

deny Black voters their right to vote. *E.g.,* H.R. Rep. 88-914, at *2491-92 (Rep. McCulloch, *et al.*); 110 Cong. Rec. 1519, 1522 (1964) (Rep. Celler); 110 Cong. Rec. 1600 (1964) (Rep. Daniels); 110 Cong. Rec. 6647 (1964) (Sen. McIntyre); 110 Cong. Rec. 6723 (1964) (Sens. Ervin and Keating). The evidence before Congress showed that "among the devices most commonly employed" to prevent Black voters from registering was "rejecting Black applicants for minor errors or omissions." H.R. Rep. 88-914 at *2491. "Testimony show[ed] that … registrars" would "overlook minor misspelling errors or mistakes in age or length of residence of white applicants," but deny Black applicants "for the same or more trivial reasons." *Id.*

This crisis necessitated forbidding immaterial errors or omissions from being used to deny the right to vote at any point in the voting process, not just during registration. A statute limited to registration could easily be circumvented by shifting the same demands once used largely at registration to any later time. Concerns about circumvention were especially real because Congress's previous legislative attempts had not achieved their objectives. *NAACP*, 522 F.3d at 1173 (explaining statutes "enacted in 1870, 1871, 1957, and 1960" had not prevented

burdening Black voters' right to vote); H.R. Rep. 88-914 at *2394 (describing Title I as "designed to meet problems encountered in the operation and enforcement of the Civil Rights Acts of 1957 and 1960").

Thus, § 10101(a)(2)(B) is a congruent and proportional remedy (and certainly a rational one) for states' use of immaterial errors and omissions to reject Black voters while overlooking the same for white voters. *Vote.Org v. Callanen*, – F.4th –, No. 22-50536, 2023 WL 8664636, *18-19 & n.11 (5th Cir. 2023) (concluding that § 10101(a)(2)(B) survives either the "congruent and proportional" or "rational means" standard).

The RNC has not substantiated that its interpretation is needed to avoid calling the constitutionality of § 10101(a)(2)(B) into "serious doubt." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

***Federalism***: Because Title I expressly (and permissibly) regulates states' management of elections, the federalism canon is of no use here. That canon "rests on an assumption about congressional intent: that 'Congress does not exercise lightly' the 'extraordinary power' to legislate in areas traditionally regulated by the States.'" *Arizona v. Inter-Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13 (2013) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). That assumption does not apply when

45

Congress acts under constitutional provisions that expressly empower it to regulate elections. *Id.* at 13-14.[10]

Similarly, this case is not about a statute that would "authoriz[e] an agency to exercise powers of vast economic and political significance." *See Ala. Assoc. of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (nationwide eviction moratorium); *see also U.S. Forest Serv. v. Cowpasture River Preservation Assn.,* 140 S.Ct. 1837, 1850 (2020) (transformation of privately owned and state-owned land into federal land). Nor would applying § 10101(a)(2)(B) here "significantly alter the balance between federal and state power." *See Cowpasture River Preservation Assn.,* 140 S.Ct. at 1850; *see also All. for Fair Bd. Recruitment*, 85 F.4th at 255 (rejecting invocation of doctrine where the at-issue legislation "does not alter the state-federal balance").[11] Rather,

---

[10] The RNC cites to *Clingman v. Beaver*, 544 U.S. 581, 593 (2005), to say that the federalism canon directs courts to "avoid interpreting statutes to 'hamper the ability of States to run efficient and equitable elections.'" RNC Br. at 29. But this misrepresents *Clingman*, which did not involve statutory interpretation or the federalism canon at all. It certainly did not involve § 10101(a)(2)(B) or the Civil Rights Act of 1964 more generally.

[11] The RNC hangs much of its federalism argument on a parade of horribles that simply will not follow from affirming the District Court's decision. *Infra* at 54-56.

as even the RNC's interpretation of § 10101(a)(2)(B) recognizes, Congress passed Title I expressly to regulate states' administration of elections.

### 3. Refusing to Count a Legal Vote Denies the Right to Vote

Finally, rejecting a qualified voter's timely received mail ballot such that it will not be counted "den[ies] the right … to vote." 52 U.S.C. § 10101(a)(2)(B). This conclusion comes directly from the definition of "vote" that Congress specifically adopted for this provision. As used in § 10101(a)(2)(B), "'vote' includes *all action necessary to make a vote effective* including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, *and having such ballot counted* and included in the appropriate totals of votes cast with respect to candidates for public office." *Id.* § 10101(e) (emphasis added); *see also id.* § 10101(a)(3)(A).

Nowhere in the RNC's explanation of why rejecting ballots does *not* deny the right to vote does it acknowledge the statute's definition of the word "vote." *See* RNC Br. at 25-30. Rather, the RNC once more points to everything but the statute's text.

It first suggests that § 10101(a)(2)(B) does not shield voters from arbitrary mail ballot rejections because there is no constitutional right to

vote by mail. RNC Br. at 26-27, 41. That claim is beside the point. This case does not implicate the right to vote by mail, or the right to vote by any specific method. Unlike *McDonald v. Board of Election Com'rs of Chicago*, *see* RNC Br. at 27, no party in this case claims the "right to receive absentee ballots." 394 U.S. 802, 807 (1969). Rather, because Pennsylvania gives voters the option to vote by mail, the procedures to do so must comply with § 10101(a)(2)(B).

The RNC then proceeds to invent a dichotomy between denial of the right to vote and voters' own failures to comply with "laws regulating the voting process." RNC Br. at 27-30. But the RNC never explains what statutory language creates an exemption for "laws regulating the voting process," something the statute's text does not remotely contemplate.

Each step in the voting process "requires compliance with certain rules." *Brnovich v. Democratic Nat'l Comm.* 141 S.Ct. 2321, 2338 (2021). But § 10101(a)(2)(B) creates a federal-law standard that generally applicable state-law rules must satisfy. The RNC's argument is an exercise in question-begging: it simply assumes that there are entire categories of election-related rules that are exempt from § 10101(a)(2)(B), and then asserts that the dating requirement must be one of them.

Indeed, § 10101(a)(2)(B) applies only in cases involving an "error or omission." The statute's underlying premise is that the voter will have not followed some generally applicable requirement regulating the voting process. *Every* case in which § 10101(a)(2)(B) applies will involve a voter who "did not follow the rules." So, it swallows the statute to say that it does not apply where the voter "did not follow the rules." RNC Br. at 30 (quoting *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting)). If the RNC is right, the statute "would never be violated, because every 'error or omission' would constitute an elector's accidental forfeiture of his or her vote by failing to follow the rules for voting, rather than a denial of the 'right to vote' for which a state actor would be responsible." *Ball*, 289 A.3d at 25 (Wecht, J.). Faulting voters any time they fail to comply with procedural rules merely circumvents the statute's operation. *Vote.Org*, 2023 WL 8664636, *19.

This Court should reject the RNC's attempt to render the statute null.

## B.    Congress Sought to Protect the Right to Vote, Not the "Right to Register"

The undercurrent beneath the RNC's insistence that § 10101(a)(2)(B) protects only the right to register is the assumption that Congress meant to do something other than what it said. Regardless of what the legislative record contains, "the text of the resulting statute, and not the historically motivating examples is [] the appropriate starting point of inquiry in discerning congressional intent." *NAACP*, 522 F.3d at 1173. If the text captures "situations not expressly anticipated by Congress," it "does not demonstrate ambiguity. It demonstrates breadth." *Yeskey*, 524 U.S. at 212.

As discussed at length, the text of § 10101(a)(2)(B) applies to Pennsylvania's handwritten date requirement. The legislative record is perfectly consistent with State-Appellees' plain text reading because it reflects legislators acting to defend the right to vote, not a "right to register."

Congress passed Title I "to counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African Americans" because some states historically made trivial demands for information that "served no

50

purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants." *NAACP*, 522 F.3d at 1173. Before 1964, registration was the foremost point at which demands for trivial information were used to deny the right to vote. But Congress's evident concern was protecting the *right to vote* from arbitrary denials.

As the House reported, Title I was intended to "provide specific protections to the right to vote and would reduce opportunities for discriminatory application of voting standards." H.R. Rep. 88-914 at *2394. Those protections for the right to vote were needed because reports published by the congressionally created Civil Rights Commission had "dramatically demonstrated the inadequacy of present law to protect the most basic of all rights—the right to vote. … [A]ll or most Negroes in hundreds of communities are still denied *the right to register and vote* for those who will govern them." 110 Cong. Rec. 2732 (1964) (Rep. Dawson) (emphasis added). Supporters of the bill emphasized that it was the "right to vote" that was "essential to citizenship," and it was equalizing access to that right that informed the Civil Right Act's voting reforms. H.R. Rep. 88-914, at *2488 (Rep. McCulloch, *et al.*).

By 1964, it was settled that the right to vote could be implicated at any point in the electoral process. *See United States v. Mosley*, 238 U.S. 383, 386 (1915) ("We regard it as equally unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box."); *see also* 1957 U.S. Comm'n on Civil Rights 57-66 (giving examples of the denials of the right to vote occurring to already registered voters); 1961 U.S. Comm'n on Civil Rights, Part 1: Voting 17 (explaining that whatever protections exist for the right to vote must apply "to the whole electoral process including primaries, with respect to all public officials whether local, State, or national").

Title I's protections of the right to vote were thus broadly meant to end "the use of onerous procedural requirements which handicap the exercise of the franchise." H.R. Rep. 88-914 at *2492 (cleaned up); *see also* 110 Cong. Rec. 1593 (1964) (Rep. Farbstein) (supporting Title I because it confronts "wholesale denials of the right to vote"); 110 Cong. Reg. 6650 (1964) (Sen. Javits) (citing "outright and outrageous deprivation[s] of voting rights" as reason for Title I); 110 Cong. Rec. 6723 (1964) (Sen. Keating) ("Abundant proof exists to establish that people have been

denied the right to vote because of immaterial errors in their applications.").

Opponents of the bill well understood that a law forbidding certain denials of the right to vote would apply at any stage of the electoral process. One decried that Title I would allow the Attorney General to bring actions for "arbitrary acts or inaction in the area of registration, voting, or counting of votes in any Federal election." 110 Cong. Rec. 1605 (1964) (Rep. Huddelston). Another recognized that the bill would apply to poll tax receipts, but questioned who would decide if such a receipt was material. 110 Cong. Rec. 1691 (1964) (Rep. Harris).

Nothing in the legislative record substantiates the RNC's irrational view that Congress meant to allow—or at least was completely ambivalent about—arbitrary denials of the right to vote so long as they happened after registration. Registration itself is not sacrosanct and any statute protecting the right to vote entirely by protecting registration could be easily circumvented with "labeling." RNC Br. at 21. History taught that circumventing federal civil rights legislation was a real and persistent risk. H.R. Rep. 88-914 at *2394 (describing Title I as "designed to meet problems encountered in the operation and enforcement of the

Civil Rights Acts of 1957 and 1960"); *see also NAACP*, 522 F.3d at 117 (noting that statutes enacted in 1870, 1871, 1957, and 1960 had not adequately protected the right to vote). The statute's text lays bare that Congress did not make the senseless decision that the RNC claims it did.

At bottom, § 10101(a)(2)(B) was a prudent response to a history of disenfranchising voters through demands for immaterial information. Its text is consistent with the reality that "Congress in combating specific evils might choose a broader remedy." *NAACP*, 522 F.3d at 1175.

## C.    The RNC Grossly Exaggerates the Consequences of the District Court's Decision

Section 10101(a)(2)(B) has a narrow but definitive purpose: to stop the imposition of immaterial paperwork requirements that deny qualified voters the opportunity to successfully participate in the electoral process. Nothing about applying the statute to facts squarely within its reach, as those here, would stop states from imposing important election rules.

For example, there is no reason to equate the immaterial *date* requirement in this case with *signature* requirements. RNC Br. at 33-34. Signing the declaration is a solemn act that requires voters, under penalty of perjury, to complete a "statement of the electors

qualifications." 25 P.S. §§ 3146.4, 3150.14(b). Under Pennsylvania law, *by signing the declaration alone*, voters attest that they are the person qualified to return the mail ballot and subject themselves to criminal penalty if the statement that they are qualified is knowingly false. *Id.* § 3553. The history of the Election Code similarly shows that the declaration serves its purpose once a voter has signed it, even if the declaration is undated. *Supra* at 5-6. Writing a date does not carry similar weight or purpose.

The Secretary has consistently stated that, in Pennsylvania, signatures, such as the one on the return-envelope declaration, are "material." As a factual matter, counties do not count mail ballots returned without a declaration signature. Further, the Fifth Circuit's recent decision that under Texas law a wet signature on voter registration forms is "material" undermines the RNC's catastrophist arguments. *Vote.Org*, 2023 WL 8664636, at *20-21.

The rest of the RNC's parade of horribles is equally unconvincing. Ballot rules (such as not counting overvotes or undervotes) are not implicated. *Contra* RNC Br. at 34. Completing a ballot, unlike a declaration, is the act of voting. It is not an "act requisite to voting."

Failure to use a secrecy envelope, RNC Br. at 34, is not "an error or
omission *on* any record or paper." It is an omission *of* a record or paper.
Nor is going "to the polling place on the wrong day," going "after the polls
have closed" or delivering your ballot to the wrong place an error *on* a
record or paper. *Contra Ritter v. Migliori*, 142 S.Ct. 1824, 1825 (2022)
(Alito, J., dissenting).

All in all, the RNC has not supported the view that scores of election
regulations would fall under State-Appellees' plain text reading.

## II.    The District Court's Remedy Was Lawful and Appropriate

The RNC asserts that the remedy entered by the District Court was
unlawful under *Bush v. Gore*, 531 U.S. 98 (2000), and *Purcell v. Gonzalez*,
549 U.S. 1 (2006). Neither claim has merit.

***Bush v. Gore***: The Equal Protection concerns reflected in *Bush v.
Gore* provide no basis for reversing the District Court's judgment. Rather,
they support affirming, which would ensure that a consistent rule is
applied in the future in every county in Pennsylvania.

*Bush* reversed a decision requiring election officials to comply with
state law and consider "the intent of the voter" in determining the
validity of a ballot. *Bush*, 531 U.S. at 105, 110. The Supreme Court found

that the use of different standards to determine the voter's intent in different counties would lead to the unequal evaluation of ballots. *Id.* at 108. Accordingly, *Bush* held that counting votes in compliance with that state law would violate equal protection. *Id.* at 110. The Court stressed, however, that its "consideration [was] limited to the present circumstances," *id.* at 109, which likely explains why the RNC cannot cite a single subsequent case applying the decision in any context.

Affirming the District Court here will not "compel application of different standards" across counties. *Contra* RNC Br. at 56. All counties must follow federal law. A precedential decision from this Court affirming the District Court's judgment will be controlling as to the meaning of federal law in this Circuit.

Therefore, affirming the District Court's judgment would establish a uniform rule for ballots returned with declaration date errors.

Doing so would prevent a return to the inconsistent treatment of ballots that followed inevitably from *Ball's* order requiring counties to reject ballots that were "incorrectly dated." As the District Court observed, "the record is replete with evidence that the county boards' application of the *Ball* order in the November 2022 general election

created inconsistencies across the Commonwealth in the way 'correctly dated' and 'incorrectly dated' ballots were rejected or counted by different counties." App. 82; *see also* App. 82-83 (providing examples of disuniformity across counties).

Contrary to the RNC's repeated assertions, *e.g.*, RNC Br. at 56, the Pennsylvania Supreme Court's order in *Ball* would not justify any county's refusing to follow a precedential decision from this Court and thus affirming here would not create disparate rules throughout Pennsylvania.[12] *Ball* was based on state law and explicitly left unresolved the federal question at issue here. 289 A.3d at 28. And the *order* entered in that case applied only to the 2022 general election. *Ball*, 284 at 1192. So while that decision remains controlling *precedent* on the state-law question, state law must yield to federal law.

While its argument sounds in concerns about uniformity, the RNC actually seeks to maintain the inconsistency that followed *Ball*. The Court should reject this request.

---

[12] Information available to the Secretary suggests at least seven counties dismissed from this action counted ballots in the 2023 Municipal Election that were returned with a date error.

***Purcell v. Gonzalez***: The RNC next argues, based on the "*Purcell* Principle*," that "the District Court's judgment must be reversed to the extent it applies to the 2023 election cycle." RNC Br. at 57.   But no decision by this Court could have any effect on the 2023 election.

The District Court's order in this case specifically required three counties to count certain ballots from the 2022 election, and declared that failing to count ballots based on dating errors violated § 10101(a)(2)(B). App. 6. But it did not order any county to take any specific action with respect to the 2023 election. When the District Court issued its order, some counties had completed certification of that election while others had not. Of the latter, some—including some that had been dismissed from this case—counted mail ballots that were returned without a date error.

Thus, which ballots were counted for 2023 was a result of each board's decision. No one argues that those boards that chose to count ballots with date errors *violated federal law*. And the way to challenge those counties' decisions on the basis that they *violated state law* under 25 P.S. § 3157.

Further, even if a decision from this Court could affect the 2023 election, *Purcell* still would have no application.[13]

*Purcell* embodies an equitable interest in pre-election judicial restraint to avoid disrupting the efforts of election administrators or imposing hardship or confusion on voters. *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 30-32 (2020) (Kavanaugh, J., concurring); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020).

The District Court's decision here did not change pre-election rules. It imposed no new obligations on voters, but simply allowed for the counting of votes cast by legal voters. Voters who dated the return-envelope declaration, like all other voters, were not harmed by the counting of ballots returned by qualified voters. *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 356-60 (3d Cir. 2020), *vacated as moot by Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020); *Toth v.*

---

[13] Nor can the RNC's invocation of the equitable principles behind *Purcell* be taken seriously in this context given the timing of its *Ball* action. *Supra* at 11-14.

*Chapman*, No. 22-208, 2022 WL 821175, at *7 (M.D. Pa. Mar. 16, 2022) (three-judge court).

Decisions about whether certain ballots are counted is a normal post-election occurrence that happens after every election and is expressly contemplated by the Election Code. *See* 25 P.S. §§ 3050(a.4)(4)(v), 3157. In fact, counties were already segregating ballots with declaration date errors and were prepared to implement instructions about how to handle such ballots. *Purcell* simply has no relevance to this case.

## III.   Certification of Mr. Marino's Election Has No Effect on this Court's Jurisdiction

Finally, Montgomery County's certification of the results of Mr. Marino's race has no bearing on this Court's jurisdiction, because this appeal never had anything to do with Mr. Marino's election.

Montgomery County was among the counties that had not certified its 2023 election results when the District Court issued its decision and that subsequently counted ballots with date errors on the return envelope. For reasons described in the preceding section, no resolution of this appeal can reverse Montgomery County's decision.

61

Mr. Marino's opportunity to challenge Montgomery County's decision lay in state court, under the procedures set forth in the Election Code. *See* 25 P.S. § 3157. He did not avail himself of this option.

The untimely election contest filed by supporters of Mr. Marino was dismissed. *Supra* at 18-19.[14] On appeal of that decision, the Commonwealth Court denied a motion to enjoin Mr. Marino's opponent from taking office, finding that the petitioning voters had inexcusably missed the filing deadline and thus were not likely to prevail in their appeal. *Supra* at 19. As a result, Mr. Marino's opponent, like other victorious candidates in the 2023 election, was sworn into office on January 2. *Id.*

## CONCLUSION

The facts of this case are comfortably captured by the plain meaning of 52 U.S.C. § 10101(a)(2)(B). The Court should not indulge any of the various reasons the RNC furnishes for ignoring what the statute says. Accordingly, the District Court should be affirmed.

---

[14] Although the RNC claims the District Court's decision was the basis for dismissing the election contest, RNC Br. at 67, a week before the RNC filed its brief here, the Court of Common Pleas issued an opinion explaining that the contest was dismissed as untimely.

January 10, 2024

/s/ *Ilana H. Eisenstein*

Ilana H. Eisenstein (No. 94907)
Brian H. Benjet
Ben C. Fabens-Lassen
M. David Josefovits
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
(215) 656-3300
ilana.eisenstein@us.dlapiper.com
brian.benjet@us.dlapiper.com
ben.fabens-lassen@us.dlapiper.com
david.josefovits@us.dlapiper.com

Benjamin H. Field
Aimee D. Thomson
Alison L. Stohr
PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
benjaim.field@phila.gov
aimee.thomson@phila.gov
alison.stohr@phila.gov

*Counsel for Philadelphia County Board of Elections*

Respectfully submitted,

Michael J. Fischer
Executive Deputy General Counsel

/s/ *Jacob B. Boyer*

Jacob B. Boyer (No. 324396)
Deputy General Counsel
GOVERNOR OFFICE OF GENERAL COUNSEL
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

Robert A. Wiygul
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHULLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933

Sean A. Kirkpatrick
Elizabeth Lester-Abdalla
OFFICE OF ATTORNEY GENERAL
15th Floor, Strawberry Square
Harrisburg, PA 17120

*Counsel for Secretary of the Commonwealth Al Schmidt*

/s/ *Allan J. Opsitnick*

Allan J. Opsitnick (No. 28126)
Lisa G. Michel
ALLEGHENY COUNTY LAW
DEPARTMENT
445 Fort Pitt Boulevard
Fort Pitt Commons Suite 300
Pittsburgh, PA 15129
(412) 350-1120
opsitnick@opsitnickslaw.com
lisa.michel@alleghenycounty.us

*Counsel for the Allegheny County Board of Elections*

Amy M. Fitzpatrick

/s/ *Tyler B. Burns*

Tyler B. Burns (No. 325660)
BUCKS COUNTY LAW DEPARTMENT
55 E. Court Street, 5th Floor
Doylestown, PA 18901
(215) 348-6464
amfitzpatrick@buckscounty.org
tbburns@buckscounty.org

*Counsel for the Bucks County Board of Election*

/s/ *J. Manly Parks*

J. Manly Parks (No. 74647)
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
(215) 979-1342
jmparks@duanemorris.com

*Counsel for the Delaware County Board of Elections*

/s/ *John A. Marlatt*

John A. Marlatt (No. 210141)
Maureen E. Calder (No. 68055)
MONTGOMERY COUNTY SOLICITOR'S
OFFICE
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-3033
john.marlatt@montgomerycountypa.gov
maureen.calder@montgomerycountypa.gov

*Counsel for the Montgomery County Board of Elections*

# CERTIFICATES

I, Jacob B. Boyer, certify that:

1.  I am a member of the bar of this Court in good standing;

2.  Malwarebytes Premium was run on this file and no virus
    was detected;

3.  The text of this brief is identical to the text in paper copies
    that will be filed with the Court; and

4.  This response contains 12,602 words and therefore complies
    with Federal Rule of Appellate Procedure 32(a)(7)(b)(i). In
    making this certificate, I have relied on the word count of
    the word-processing system used to prepare the brief.


January 10, 2024                    /s/ *Jacob B. Boyer*
                                    Jacob B. Boyer
                                    *Counsel for Secretary of the*
                                    *Commonwealth Al Schmidt*

# CERTIFICATE OF SERVICE

I, Jacob B. Boyer, hereby certify that a copy of this response has

been served on all counsel of record using the Court's CM/ECF system.


January 10, 2024                    /s/ *Jacob B. Boyer*
                                    Jacob B. Boyer
                                    *Counsel for Secretary of the*
                                    *Commonwealth Al Schmidt*