No. 23-3166

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

PENNSYLVANIA CONFERENCE OF THE NAACP, *et al.*,

*Plaintiffs-Appellees,*

v.

SECRETARY OF THE COMMONWEALTH, *et al.*,

*Defendants-Appellees*,

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

*Intervenors-Appellants*.

On Appeal from the United States District Court for the Western District of Pennsylvania, Case No. 1:22-cv-339

**Supplemental Appendix, Pa. App. 1-1082, of the Secretary of the Commonwealth and Philadelphia, Allegheny, Bucks, Delaware, and Montgomery County Boards of Elections**

Robert A. Wiygul
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933

Sean A. Kirkpatrick
Elizabeth Lester-Abdalla
OFFICE OF ATTORNEY GENERAL
15th Floor, Strawberry Square
Harrisburg, PA 17120

Michael J. Fischer
Jacob B. Boyer
GOVERNOR'S OFFICE OF GENERAL COUNSEL
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Secretary of the Commonwealth Al Schmidt*

[*Counsel Information Continued On Next Page*]

Ilana H. Eisenstein
Brian H. Benjet
Ben C. Fabens-Lassen
M. David Josefovits
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
(215) 656-3300
ilana.eisenstein@us.dlapiper.com
brian.benjet@us.dlapiper.com
ben.fabens-lassen@us.dlapiper.com
david.josefovits@us.dlapiper.com

Benjamin H. Field
Aimee D. Thomson
Alison L. Stohr
PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
benjaim.field@phila.gov
aimee.thomson@phila.gov
alison.stohr@phila.gov

*Counsel for the Philadelphia
County Board of Elections*

Amy M. Fitzpatrick
Tyler B. Burns
BUCKS COUNTY LAW
DEPARTMENT
55 E. Court Street, 5th Floor
Doylestown, PA 18901
(215) 348-6464
amfitzpatrick@buckcounty.org
tbburns@buckscounty.org

*Counsel for the Bucks County
Board of Elections*

Allan J. Opsitnick
Lisa G. Michel
ALLEGHENY COUNTY LAW DEPARTMENT
445 Fort Pitt Boulevard
Fort Pitt Commons Suite 300
Pittsburgh, PA 15129
(412) 350-1120
opsitnick@opsitnickslaw.com
lisa.michel@alleghenycounty.us

*Counsel for the Allegheny County Board
of Elections*

J. Manly Parks
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
(215) 979-1342
jmparks@duanemorris.com

*Counsel for the Delaware County Board
of Elections*

John A. Marlatt
Maureen E. Calder
MONTGOMERY COUNTY SOLICITOR'S
OFFICE
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-3033
john.marlatt@montgomerycountypa.gov
maureen.calder@montgomerycountypa.gov

*Counsel for the Montgomery County
Board of Elections*

# TABLE OF CONTENTS

Act of June 3, 1937, P.L. 1333, No. 320 .................................... Pa. App. 1

Act of August 1, 1941, P.L. 672, No. 273 ................................ Pa. App. 12

Act of March 9, 1945, P.L. 29, No. 17 ..................................... Pa. App. 20

Act of December 11, 1968, P.L. 1183, No. 375 ......................... Pa. App. 31

Amended Complaint (ECF No. 121) ..................................... Pa. App. 51

Plaintiffs' Statement of Material Facts (ECF No. 276) .......... Pa. App. 90

Excerpts from Volume III of Appendix to Plaintiffs' Statement of Material Facts (ECF No 279)

Department of State Guidance (Nov. 3, 2022)........... Pa. App. 184

Excerpts from Deposition of Crista Miller, Lancaster County Election Director............ ......................................... Pa. App. 186

Criminal Complaint, *Commonwealth v. Mihaliak* (June 3, 2022)...................................................................... Pa. App. 235

Excerpts from Volume V of Appendix to Plaintiffs' Statement of Material Facts (ECF No 281)

Department of State Guidance (Sept. 26, 2022) ......... Pa. App. 243

Email from Jonathan Marks (Oct. 11, 2022) ............. Pa. App. 247

Petition, *Ball v. Chapman* (Oct. 16, 2022) ................. Pa. App. 248

Supplemental Order, *Ball v. Chapman* (Nov. 5, 2022) Pa. App. 282

Excerpts from Volume VI of Appendix to Plaintiffs' Statement of Material Facts (ECF No. 282)

Images of Rejected Ballot Envelopes .................................. Pa. App. 284

Department of State's Response to RNC's Statement of Material Facts (ECF No. 299) .................................................................... Pa. App. 299

Department of State's Response to Plaintiffs' Statement of Material Facts (ECF No. 300) ........................................................... Pa. App. 377

Department of State's Appendix to Responses to Statements of Material Facts (ECF No. 301)........................................................... Pa. App. 506

Excerpts from Lancaster County's Response to Plaintiffs' Statement of Material Facts (ECF No. 302)............................................ Pa. App. 884

Counties' Response to RNC's Statement of Material Facts (ECF No. 311) .............................................................................................. Pa. App. 889

Counties' Appendix to Response to RNC's Statement of Material Facts (ECF No. 312) ..................................................................... Pa. App. 942

Opinion, *In re: Contest of November 7, 2023 Election*, No. 23-26306 (Mont. Cnty. C.C.P. Dec. 20, 2023) ..................................... Pa. App. 1052

Order, *In re: Contest of November 7, 2023 Election*, No. 1482 CD 2023 (Pa. Cmwlth. Ct. Dec. 28, 2023).......................................... Pa. App. 1055

Opinion, *In re: Contest of November 7, 2023 Election*, No. 1482 CD 2023 (Pa. Cmwlth. Ct. Dec. 28, 2023).......................................... Pa. App. 1057

Agenda, Towamencin Township Board of Supervisors, Reorganization Meeting (Jan. 2, 2024)........................................................ Pa. App. 1082

Case: 23-3166 Document: 146 Page: 5 Date Filed: 01/10/2024

been defective, all such bonds, securities, and obligations, sold under defective publication of the notices of such sale, are hereby made valid and binding obligations of every such county, city, borough, township, school district, or other municipality or incorporated district: Provided, That all the other requirements of law concerning such procedure, election, and issue of bonds have been complied with.

Section 2. The provisions of this act shall become effective immediately upon its final enactment.

When effective.

APPROVED—The 3d day of June, A. D. 1937.

GEORGE H. EARLE

No. 320

AN ACT

Concerning elections, including general, municipal, special and primary elections, the nomination of candidates, primary and election expenses and election contests; creating and defining membership of county boards of elections; imposing duties upon the Secretary of the Commonwealth, courts, county boards of elections, county commissioners; imposing penalties for violation of the act, and codifying, revising and consolidating the laws relating thereto; and repealing certain acts and parts of acts relating to elections.

CONTENTS

| | | |
|---|---|---|
| ARTICLE | I. | Preliminary Provisions. |
| ARTICLE | II. | The Secretary of the Commonwealth. |
| ARTICLE | III. | County Boards of Elections. |
| ARTICLE | IV. | District Election Officers. |
| ARTICLE | V. | Election Districts and Polling Places. |
| ARTICLE | VI. | Dates of Elections and Primaries and Special Elections. |
| ARTICLE | VII. | Qualifications of Electors. |
| ARTICLE | VIII. | Party Organization. |
| ARTICLE | IX. | Nomination of Candidates. |
| ARTICLE | X. | Ballots. |
| ARTICLE | XI. | Voting Machines. |
| ARTICLE | XII. | Preparation for and Conduct of Primaries and Elections. |
| ARTICLE | XIII. | Voting by Persons in Actual Military Service. |
| ARTICLE | XIV. | Returns of Primaries and Elections. |
| ARTICLE | XV. | Electoral College. |
| ARTICLE | XVI. | Primary and Election Expenses. |
| ARTICLE | XVII. | Recounts and Contests. |
| ARTICLE | XVIII. | Penalties. |
| ARTICLE | XIX. | Repeals. |

Section 1. Be it enacted, &c., That the laws relating to general, municipal, special and primary elections, the nomination of candidates, primary and election expenses and election contests are hereby codified, revised and consolidated as follows:

## Article I

## Preliminary Provisions

Section 101. Short Title.—This act shall be known, and may be cited, as the "Pennsylvania Election Code."

Section 102. Definitions.—The following words, when used in this act, shall have the following meanings, unless otherwise clearly apparent from the context:

(a) The word "candidate" shall, unless the context otherwise requires, include both candidates for nomination and election.

(b) The word "county" shall mean any county of this Commonwealth.

(c) The words "county board" or "board" shall mean the county board of elections of any county herein provided for.

(d) The words "district election board" or "election board" shall mean the election officers required to conduct primaries and elections in any election district in accordance with the provisions of this act.

(e) The words "district register" shall mean the cards containing all or any part of the registry list of qualified electors of the same election district, as prepared by the registration commissions.

(f) The word "election" shall mean any general, municipal, special or primary election, unless otherwise specified.

(g) The words "election district" shall mean a district, division or precinct, established in accordance with the provisions of this act, within which all qualified electors vote at one polling place.

(h) The words "general election" shall mean the election which the Constitution of this Commonwealth requires to be held in even-numbered years.

(i) The words "independent nomination" shall mean the selection by an independent political body, in accordance with the provisions of this act, of a candidate for a public office authorized to be voted for at an election.

(j) The words "municipal election" shall mean the election which the Constitution of this Commonwealth requires to be held in odd-numbered years.

(k) The word "nomination" shall mean the selection, in accordance with the provisions of this act, of a candidate for a public office authorized to be voted for at an election.

## Article XIII

### Voting by Persons in Actual Military Service

Section 1301. Qualified Electors in Actual Military Service.—Whenever any of the qualified electors of this Commonwealth shall be in any actual military service, under a requisition from the President of the United States or by the authority of this Commonwealth, and as such, absent from their place of residence on the days appointed by law for holding the general or municipal elections within this State, or on the days for holding special elections to fill vacancies, such electors shall be entitled, at such times, to exercise the right of suffrage, as fully as if they were present at their usual places of election, in the manner prescribed in this article and, whether at the time of voting, such electors shall be within the limits of this State or not; and the right of voting shall not be affected by reason of the failure of any elector to have been registered in his place of residence.

Section 1302. Polls to Be Opened in Each Military Unit; Detached Electors.—A poll shall be opened in each military or naval unit, composed in whole or in part of Pennsylvania soldiers, at the quarters of the captain or other officer thereof, and all electors belonging to such unit who shall be within one mile of such quarters, on the day of election, and not prevented by orders of their commanders, or proximity of the enemy, from returning to their unit quarters, shall vote at such poll and at no other place; officers, other than those of a unit, and other electors detached and absent from their units, or in any military or naval hospital, or in any vessel or navy yard, may vote at such other polls as may be most convenient for them; and when there shall be ten or more electors at any place, who shall be unable to attend any unit poll, or their proper place of election as aforesaid, the electors present may open a poll, at such place as they may select, and certify in the poll-book, which shall be a record of the proceedings at said election, substantially in manner and form as hereinafter directed.

Section 1303. Time of Opening and Closing Polls.—The polls shall be opened as early as practicable on said day and remain open at least three hours, and if necessary in the opinion of the election officers, in order to receive the votes of all the electors, they may keep the polls open until seven o'clock P. M. of said day; proclamation thereof shall be made at or before the opening of the polls and one hour before closing them.

Section 1304. Election Officers.—Before opening the poll on the day of election, the electors present at each of the places aforesaid, shall elect viva voce three persons, present at the time, and having the qualifications

of electors, for judge and inspectors of said election, and the inspectors so elected shall then appoint two of the persons present, who shall be qualified, to act as clerks of said election; and the judge shall prepare boxes or other suitable receptacles for the ballots.

Section 1305. Oaths of Election Officers.—Before any votes shall be received, said judge, inspectors and clerks shall each take an oath or affirmation that he will perform the duties of judge, inspector or clerk, as the case may be, of said election, according to law, and to the best of his abilities, and that he will studiously endeavor to prevent fraud, deceit or abuse in conducting the same, which oath or affirmation any of the said judges, inspectors or clerks so elected or appointed may administer to each other; and the same shall be in writing, or partly written and partly printed, and signed by said judge, inspectors and clerks, and certified to by the party administering the same, and attached to or entered upon the poll-book, and there signed and certified as aforesaid.

Section 1306. Manner of Election; Challenges.—All elections under this article shall be by official ballots provided in the manner herein prescribed, and the judge and inspectors of elections may, and upon challenge of any elector shall, examine under oath or affirmation the applicant to vote (which oath or affirmation any of said judges or inspectors may administer), in respect to his right to vote, and his qualifications to vote in the particular election district, ward, precinct, city, borough, township or county of this State, in which he claims residence; and before issuing a ballot to any applicant to vote, the judge and inspectors, or majority of them, shall be satisfied that such applicant is a qualified elector of such place. The judge of election shall arrange one or more voting compartments, suitably curtained in which the electors may mark their ballots.

Section 1307. Poll-Books.—Separate poll-books shall be kept, and separate returns made, for the electors of each county; the poll-books shall name the unit and organization and the place, post or hospital, in which said election is held; the county and township, city, borough, ward or election district of each elector shall be indorsed opposite his name on the poll-books, so that there may be a double list of voters.

Section 1308. Ballots.—Ballots for use by persons in military service under the provisions of this article shall be prepared sufficiently in advance by the Secretary of the Commonwealth, and shall be by him distributed through the commissioners hereinafter provided, or in such other manner as he may think proper, to the various military or naval units containing Pennsylvania soldiers entitled to vote at any election. Such ballots

shall be in substantially the form prescribed by Article X of this act for ballots to be used at the same elections within this Commonwealth, but in cases where it is, in the opinion of the Secretary of the Commonwealth, not feasible to print on said ballots the names of the various candidates for district, county and local offices, the ballots shall contain blank spaces only under the titles of such offices in which the voters may insert the names of the candidates for whom they desire to vote, and in such cases the Secretary of the Commonwealth shall furnish to the judge of election a sufficient number of printed lists containing the names of all the candidates who have been regularly nominated under the provisions of this act for the use of the electors in preparing their ballots.

Section 1309.  Casting of Ballot.—The judge or one of the inspectors shall, upon the application of an elector to vote, pronounce his name audibly, and if no objection is made to him, and the judge and inspectors are satisfied that said elector is a citizen of the United States, and legally entitled, according to the Constitution and laws of this State, to vote at said election, shall issue a ballot to such elector first folding it so that the words printed on the back shall be the only words visible. The elector, after receiving his ballot, shall retire to one of the voting compartments and draw the curtain and shall there prepare his ballot.  He shall then fold his ballot without displaying the markings in the same way it was folded when received by him, and he shall then leave the voting compartment and deposit the ballot thus folded in the ballot box or other receptacle therefor, and the clerks shall enter the name of the elector in the poll-book of his county, together with the ward, election district, city, borough, township and county of his residence.

Section 1310.  Counting of Votes.—At the close of the polls, the number of voters who have voted shall be counted and set down at the foot of the list of voters, and certified and signed by the judge and inspectors and attested by the clerks.

Section 1311.  Manner of Counting Ballots.—After the poll-books are signed, the ballot box shall be opened and the ballots therein contained shall be taken out, one at a time, by the judge, who shall read distinctly while the ballot remains in his hand, the names of the candidates voted for therein for the several offices voted for, and then deliver it to one of the inspectors, who shall examine the same and pass it to the other inspector, who shall place the same in an envelope prepared for the ballots of such count, and carefully preserve the same; the same method shall be pursued as to each ballot taken out, until all the votes are counted.

Section 1312. Rejection of Ballots.—No ballot which is so marked as to be capable of identification shall be counted, and if a ballot is marked for more candidates for any office than the number an elector is entitled to vote for for such office, the same shall not be counted for that office, but shall be counted for all other candidates properly marked.

Section 1313. Tally Lists.—As a check in counting, each clerk shall keep a tally list for each county from which votes shall have been received, which tally list shall constitute a part of the poll-books.

Section 1314. Enumeration of Votes.—After the examination of the ballots shall be completed, the number of votes for each person in the county poll-books, as aforesaid, shall be enumerated under the inspection of the judge and inspectors, and set down in the poll-books.

Section 1315. Form of Poll-Book and Returns.—The form of the poll-books to be used at such elections shall be determined by the Secretary of the Commonwealth, who shall also prescribe the form of return to be made by the election officers in each poll-book of the ballots cast by the electors of the county for which such poll-book is kept.

Section 1316. Disposition of Poll-Books and Returns.—After canvassing the votes in manner aforesaid, the judge shall put in an envelope, one of the poll-books with its tally list and return of each county, together with the ballots of such county, and transmit the same, properly sealed up and directed, through the nearest post office, or by express, as soon as possible thereafter, to the county board of elections of the county in which such electors would have voted if not in the military service aforesaid (being the county for which the poll-book was kept); and the other poll-book of said county, enclosed in an envelope and sealed as aforesaid, and properly directed, shall be delivered to one of the commissioners hereinafter provided for, if such commissioner calls for the same in ten days, and if not so called for, the same shall be transmitted by mail or by express, as* soon as possible thereafter, to the Secretary of the Commonwealth, who shall carefully preserve the same, and on demand of the proper county board, deliver to said county board, under his hand and official seal, a certified copy of the return of votes, so transmitted to and received by him, for said county.

Section 1317. Duties of County Boards.—In the case of any election at which votes are cast by persons in military service, under the provisions of this article, it shall be the duty of each county board of elections to withhold the completion of the computation of the returns of the county until the third Friday after such election, within which period all returns of votes cast

* "so" in the original.

by electors of the county in military service, as provided in this article, shall be added to and included in its computation of the returns of such election.

Section 1318. Returns of Federal and State Offices.—In all general elections for Federal and State offices at which votes are cast by persons in the military service, under the provisions of this article, it shall be the duty of the Secretary of the Commonwealth before finally computing and certifying the returns of such elections, to add to the returns received by him from the various county boards of election any returns of the votes cast by persons in the military service received by him under the provisions of this act, which, upon an examination of the returns received from the county boards, clearly appear not to have been added to and included in such returns by the respective county boards.

Section 1319. Contested Elections.—All said elections shall be subject to contest in the manner provided by Article XVII of this act; and in all cases of contested elections, all legal returns which shall have been bona fide forwarded by said judge and inspectors, in the manner hereinbefore prescribed, shall be counted, although the same may not have arrived or been received by the proper officers to be counted in the manner hereinbefore directed, before issuing the certificates of election to the persons appearing to have a majority of the votes then received, and the said returns shall be subject to all such objections, as other returns are liable to when received in due time.

Section 1320. Duties of Secretary of the Commonwealth.—The Secretary of the Commonwealth shall cause to be printed a sufficient number of copies of this article, with such extracts from the other portions of this act, as shall be deemed important to accompany the same, and blank forms of poll-books, together with ballots, tally lists, returns and envelopes, as prescribed in this article, which, with the necessary postage stamps, to defray expenses and postage on returns, shall in sufficient time before any such election, be forwarded by said secretary, at the expense of the Commonwealth, by commissioners or otherwise, as shall be deemed most certain to insure delivery thereof, to the captain or commanding officer of each unit, or in case of detached voters, to the officer having charge of the post or hospital, who shall retain the same until the day of election, and then deliver the same to the judge elected as provided in this article. No election shall be invalidated by reason of the neglect or failure of the said secretary to cause the delivery of said poll-books, ballots and other supplies to the proper persons as aforesaid.

Section 1321. Appointment of Commissioners; Oath.—For the purpose of more effectually carrying out the

provisions of this article, the Governor may appoint and commission, under the great seal of the Commonwealth, such number of commissioners, having the qualifications of an elector in this State, as he shall deem necessary, not exceeding one to each regiment or equivalent organization of Pennsylvania soldiers in the service of this State, or of the United States, and shall apportion the work among the commissioners and supply such vacancies as may occur in their number. Such commissioners, before they act, shall take and subscribe an oath or affirmation and cause the same to be filed with the Secretary of the Commonwealth, to the following effect:

"I, ................ appointed commissioner, under Article XIII of the Election Law regulating elections by persons in actual military service, do solemnly swear (or affirm), that I will support the Constitution of the United States, and the Commonwealth of Pennsylvania, and impartially, fully, and without reference to political preference or results, perform, to the best of my knowledge and ability, the duties imposed on me by the said act; and that I will studiously endeavor to prevent fraud, deceit and abuse, not only in the elections to be held under the same, but in the returns thereof."

Section 1322. Duties of the Commissioners.—Such commissioners shall deliver, as far as practicable, at least four of the copies of this article, and other extracts from this act and the rules and regulations issued hereunder, published as hereinbefore directed, and at least two blank forms of poll-books, tally lists and returns entrusted to them, together with a suitable number of ballots, and other supplies, to the commanding officers of every unit, or part thereof, of Pennsylvania soldiers in the actual military or naval service of the United States, or of this State; and make suitable arrangements and provision for the opening of polls under this article. The said commissioners, as soon as practicable after the day of election, shall call upon the judge of the election, and procure one poll-book, containing the returns of the election, and safely preserve and deliver the same, without delay, to the Secretary of the Commonwealth.

Section 1323. Compensation of Commissioners.—Said commissioners shall receive, in full compensation for their services under this article, ten cents (.10) per mile in going to and returning from their respective organizations, estimating the distance of travel by the usually traveled route; and the accounts therefor shall be audited and paid out of the State Treasury in the same manner as other claims are now audited and paid. All commanding and other officers shall be required to aid the commissioners herein appointed, and to give

46

them all proper facilities to enable them to carry out the design and intention of this article.

Section 1324. Informalities Not to Invalidate Elections.—No mere informality in the manner of carrying out or executing any of the provisions of this article, shall invalidate any election held under the same, or authorize the returns thereof to be rejected or set aside; nor shall any failure on the part of the commissioners to reach or visit any unit or organization, or the failure of any unit, or part thereof, to vote, invalidate any election which may be held under this article.

Section 1325. Powers of Election Officers.—The several officers authorized to conduct such election, shall have the like powers, and they, as well as other persons who may attend, vote, or offer to vote at such election, shall be subject to the like penalties and restrictions as are declared or provided in the case of elections by the citizens at their usual places of election; and all of the provisions of this act, so far as applicable and not inconsistent with the provisions of this article, nor supplied thereby, shall apply to all elections held under this article.

Section 1326. No Compensation for Election Officers.—No compensation shall be allowed to any judge, inspector or clerk under this article.

Section 1327. Rights of Detached Electors.—When any of the electors mentioned in section 1301, less than ten (10) in number, shall be members of companies of another state or territory or for any sufficient and legal cause shall be separated from their proper unit or shall be in a hospital, navy yard, vessel or on recruiting, provost, or any other duty, whether within or without this State, under such circumstances as shall render it probable that they will be unable to rejoin their proper unit or to be present at their proper place of election on or before the day of any election, said electors shall have the right to vote in the following manner.

Section 1328. Ballots and Envelopes for Detached Electors.—The Secretary of the Commonwealth shall prepare and distribute to the said detached electors through the commissioners provided for by this article or in such manner as he may think proper, additional official ballots to be known as detached soldier's ballots. Such ballots shall be prepared and printed in the same form as the ballots provided for by section 1308 of this act, but shall have in addition printed thereon the words "Detached Soldier's Ballot." The Secretary of the Commonwealth shall also provide and distribute as aforesaid, three envelopes for each detached soldier's ballot of such size and shape that will permit the placing of one within the other. On the first shall be printed only the words "Detached Soldier's Ballot."

On the second shall be printed the affidavit of the detached elector, together with the jurat of the officer in whose presence the ballot is marked and before whom the affidavit is made, such affidavit and jurat to be in form prescribed by the Secretary of the Commonwealth. On the third shall be placed the name and address of the county board of elections of the proper county.

Section 1329.  Voting by Detached Electors.—Any such detached elector may make application prior to the day of any election to one of the commissioners appointed under the provisions of this article or to the Secretary of the Commonwealth for a "Detached Soldier's Ballot."  At any time after receiving such detached soldier's ballot, but on or before the day of the election, such elector may appear before any commissioned officer of the military or naval forces, either within or without the Commonwealth, and mark such ballot under the scrutiny of such officer in the following manner.  The voter shall first display the ballot to such officer as evidence that the same is unmarked, and shall then proceed to mark the ballot in the presence of such officer, but in such manner that such officer is unable to see how the same is marked, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed "Detached Soldier's Ballot."  This envelope shall then be placed in the one on which is printed the affidavit of the elector and the jurat of the officer before whom the elector appears, and such envelope sealed in like manner by the elector. The elector shall then make out, subscribe and swear to the affidavit printed on the face of such envelope and the jurat shall be subscribed by the officer before whom the affidavit was taken.  Such ballot and envelope shall then be securely sealed in the third envelope which the elector shall send by registered mail to the county board of elections of the proper county.

Section 1330.    Receipt and Counting of Detached Soldiers' Ballots.—The county board of elections upon receipt of such registered letter shall safely keep the same in their office until they meet to canvass the vote of such election under the provisions of this act, at which time they shall open such registered letter and after examining the affidavit and jurat, shall compare the signature of such absent voter with his signature upon any register or other record in their possession. If the county board is satisfied that the signatures correspond and that the affidavit and jurat are sufficient, they shall announce the name of the elector and shall give any person present an opportunity to challenge the same in like manner and for the same causes as such elector could have been challenged had he presented himself in his own district to cast his vote.  If

there are no challenges, they shall open the second envelope in such manner as not to destroy the affidavit and jurat printed thereon, which envelope shall be kept in their office for a period of one year thereafter. All envelopes on which are printed the words "Detached Soldier's Ballot" and containing the ballots, shall be put into one depository at one time and said depository well shaken, and the envelopes containing the ballots mixed before any ballot is taken therefrom. The county board shall then break the seals of such envelopes and record the said ballots in the same manner as district election officers are required to record votes under the provisions of this act. In like manner all detached soldier's ballots received, prior to completion of the computation of the returns of the county, shall be counted and recorded and upon the completion of the computation of the returns of the county the votes cast upon the detached soldier's ballots shall then be added to the votes cast within the county, city, borough, township, ward or election district, as designated on each ballot. Detached soldier's ballots shall be safely kept by the county board of elections for a period of one year.

## Article XIV

## Returns of Primaries and Elections

Section 1401. Offices of County Boards to Remain Open During Primaries and Elections and Until Completion of Count; Reports and Returns to Be Made Public.—Each county board of elections shall cause its office to remain open, in charge of one or more members of the board, during the entire duration of each primary and election, and after the close of the polls, until all the ballot boxes and returns have been received in the office of the county elections board, or received in such other place as has been designated by the board.

Section 1402. Returns to Be Open to Public Inspection; Exceptions.—The general returns from the various districts which have been returned unsealed shall be open to public inspection at the office of the county board as soon as they are received from the judges of election. None of the envelopes sealed by election officers and entrusted to the judge of election for delivery to the county board shall be opened by any person, except by the order of the return board, or of the court of common pleas.

Section 1403. Place of Meeting for Computation of Votes; Notice; Papers to Be Prepared; Assistants to Be Sworn.—

(a) The county board of elections shall arrange for the computation and canvassing of the returns of votes cast at each primary and election at its office or at some other convenient public place at the county seat

Cancellation of registration of persons in military service

expiration of the time specified in such notice, cancel the registration of such person unless he personally appears and proves his qualifications as an elector: *Provided, however, That the registration of any person in military service shall not be cancelled by reason of the failure of such person to reside at the address appearing upon the district register, if such person did reside at such address on the date of entering military service.*

Said act, section 36, amended by adding new subsection (h).

Section 7. Section thirty-six of the said act is hereby amended by adding thereto subsection (h) to read as follows:

Right of persons in military service to vote

*(h) Persons in military service shall be entitled to vote, if duly registered in a manner provided by this act. Persons in military service, and by reason thereof absent from their places of residence on the day of any election, shall be entitled to vote in such manner as may now or hereafter be provided by law, unaffected by the provisions of this section in so far as they relate to the manner of voting.*

Act effective immediately.

Section 8. This act shall become effective immediately upon final enactment.

APPROVED—The 1st day of August, A. D. 1941.

ARTHUR H. JAMES

---

## No. 273

## AN ACT

To amend the act, approved the third day of June, one thousand nine hundred and thirty-seven (Pamphlet Laws, one thousand three hundred thirty-three), entitled, "An act concerning elections, including general, municipal, special and primary elections, the nomination of candidates, primary and election expenses and election contests; creating and defining membership of county boards of elections; imposing duties upon the Secretary of the Commonwealth, courts, county boards of elections, county commissioners; imposing penalties for violation of the act, and codifying, revising and consolidating the laws relating thereto; and repealing certain acts and parts of acts relating to elections", by changing the procedure for, and regulating voting in elections by, persons in actual military service; conferring powers and imposing duties upon the Secretary of the Commonwealth, courts, county boards of elections and county commissioners; providing for reimbursement of counties for actual expenses incurred for canvassing the vote of electors in actual military service.

Elections.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

Pennsylvania Election Code.

Act of June 3, 1937, P. L. 1333, section 102, amended.

Section 1. Section one hundred two of the act, approved the third day of June, one thousand nine hundred and thirty-seven (Pamphlet Laws, one thousand three hundred thirty-three), entitled, "An act concerning elections, including general, municipal, special and primary elections, the nomination of candidates, primary and election expenses and election contests; creating and defining membership of county boards of elections;

imposing duties upon the Secretary of the Commonwealth, courts, county boards of elections, county commissioners; imposing penalties for violation of the act, and codifying, revising and consolidating the laws relating thereto; and repealing certain acts and parts of acts relating to elections", is hereby amended to read as follows:

Section 102. Definitions.—The following words, when used in this act, shall have the following meanings, unless otherwise clearly apparent from the context:

(a) The word "candidate" shall, unless the context otherwise requires, include both candidates for nomination and election.

(b) The word "county" shall mean any county of this Commonwealth.

(c) The words "county board" or "board" shall mean the county board of elections of any county herein provided for.

(d) The words "district election board" or "election board" shall mean the election officers required to conduct primaries and elections in any election district in accordance with the provisions of this act.

(e) The words "district register" shall mean the cards containing all or any part of the registry list of qualified electors of the same election district, as prepared by the registration commissions.

(f) The word "election" shall mean any general, municipal, special or primary election, unless otherwise specified.

(g) The words "election district" shall mean a district, division or precinct, established in accordance with the provisions of this act, within which all qualified electors vote at one polling place.

(h) The words "general election" shall mean the election which the Constitution of this Commonwealth requires to be held in even-numbered years.

(i) The words "independent nomination" shall mean the selection by an independent political body, in accordance with the provisions of this act, of a candidate for a public office authorized to be voted for at an election.

(j) The words "municipal election" shall mean the election which the Constitution of this Commonwealth requires to be held in odd-numbered years.

(k) The word "nomination" shall mean the selection, in accordance with the provisions of this act, of a candidate for a public office authorized to be voted for at an election.

(l) The words "November election" shall mean either the general or municipal election, or both, according to the context.

(m) The word "oath" shall include affirmation and the word "swear" shall include affirm.

(n) The word "party" shall mean a political party, as defined in section 801 of this act.

(o) The words "party nomination" shall mean the selection by a political party, in accordance with the

provisions of this act, of a candidate for a public office authorized to be voted for at an election.

(p) The words "political body" shall mean an independent body of electors, as defined in section 801 of this act.

(q) The words "polling place" shall mean the room provided in each election district for voting at a primary or election.

(r) The words "primary" or "primary election" shall mean any election held for the purpose of electing party officers and nominating candidates for public offices to be voted for at an election.

(s) The words "public office" shall include every public office to which persons can be elected by a vote of the electors under the laws of this State.

(t) The words "qualified elector" shall mean any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election.

(u) The words "registered and enrolled member of a political party" shall mean any qualified elector who shall be registered according to political designation, in accordance with the provisions of the registration acts.

(v) The words "special election" shall mean any election other than a regular general, municipal or primary election.

"Electors in actual military service", defined.

*(w) "Electors in actual military service" shall mean qualified electors of this Commonwealth who are or may be by enlistment, enrollment or draft in the military or naval service of the United States, or any branch or unit thereof, or in the military service of the Commonwealth.*

Said act, section 305, amended.

Section 2. Section three hundred and five of said act is hereby amended to read as follows:

Section 305. Expenses of County Boards and of Primaries and Elections to Be Paid by County; Expenses of Special Elections; Boards to Be Provided with Offices.—

(a) The county commissioners or other appropriating authorities of the county shall appropriate annually, and from time to time, to the county board of elections of such county, the funds that shall be necessary for the maintenance and operation of the board and for the conduct of primaries and elections in such county, including the payment of the compensation of the employes of the board, custodians, election officers, and other assistants and employes herein provided for, and the fees of witnesses as herein provided; for the purchase or printing, under contracts made by the board, of all ballots and other primary and election supplies required by this act, or which the board shall consider necessary to carry out the provisions of this act; for the purchase, under contracts made by the board, and maintenance, of voting machines, when adopted as herein provided, and of all other primary and

election equipment required by this act, or which the board shall consider necessary to carry out the provisions of this act; for the publication of notices authorized by this act, under contracts made by the board, and for all other necessary expenses hereunder: Provided, however, That bonds or other evidences of indebtedness, payable not later than ten years from their dates of issuance, may be issued by the county commissioners or other appropriating authorities of the county in accordance with the provisions of law relating to the increase of indebtedness of such county, to meet all or any part of the cost of voting machines.

1. The county shall be liable for the expenses of holding special elections for any city, borough, township, school district or other municipality or incorporated district contained therein, which is held on the day of any general, municipal or primary election, and on any special question which is required by law to be, or which is, at the discretion of the county board, as hereinafter provided, printed on the regular ballot after the list of the candidates, or on the same voting machine as the list of candidates.

2. Any city, borough, township, school district or other municipality or incorporated district contained in any county, holding a special election, as authorized by law, on the question of increase of indebtedness or any other question to be voted on by the electors of such subdivision, which special election is held on the day of any general, municipal or primary election and which is required by law to be conducted or at the discretion of the county board, as hereinafter provided, is conducted by special ballots for such question, shall be liable to the county for the expenses necessarily incurred in the printing of such special ballots.

3. If any other day than the day of any general, municipal or primary election be fixed by the corporate authorities of any municipality, school district or incorporated district for the holding of a special election on the question of increase of indebtedness or any other question, as authorized by law, such municipality, school district or incorporated district shall be liable for and pay the entire expense of holding such election, including the cost of printing ballots and supplies, pay of election officers, the rental of polling places, and the cost of canvassing and computing the votes cast.

(b) The county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, properly furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide such branch offices for the board in cities other than the county seat, as may be necessary.

Reimbursement of counties by Commonwealth for expense of canvassing military vote.

*(c) The Commonwealth shall reimburse each county for election expenses incurred at every election for the preparation, handling and mailing of ballots for electors in actual military service, in the sum of forty-three cents for each ballot mailed to an elector in actual military service in such manner as is now or may hereafter be provided by law.*

Statement of number of ballots to be filed with Department of State.

*Each county board of elections shall file in the Department of State, not later than thirty days after every election, on a form prescribed by the Department of State, a statement of the number of ballots mailed in such manner as is now or may hereafter be provided by law to electors in actual military service upon the written application of each such elector. Such applications shall be preserved by each county board of elections until reimbursement is made as herein provided, subject to inspection or production in the Department of State, if demanded by the Department of State.*

Department of State to determine and requisition payment of amount due.

*The Department of State shall ascertain and fix the amount due, as herein provided, to each county for election expenses incurred for the preparation, handling and mailing of ballots to electors in actual military service, and by requisition in the usual course shall provide for payment of such amounts so found due from moneys appropriated to the Department of State for such purpose, or shall prorate the moneys so appropriated among the several counties to be reimbursed, if the amount so appropriated shall not be sufficient for the payment in full to each county of the amount found to be due.*

Said act, Article XIII, repealed absolutely.

Section 3. Article thirteen of said act is hereby repealed absolutely.

Said act amended by adding new Article XIII.

Section 4. Said act is hereby amended by adding* thereto a new article thirteen to read as follows:

*ARTICLE XIII*

*VOTING BY PERSONS IN ACTUAL MILITARY SERVICE*

Electors in actual military service to have right of suffrage at any election.

*Section 1301. Qualified Electors in Actual Military Service.—Whenever any of the qualified electors of this Commonwealth shall be in any actual military service and as such absent from their place of residence on the days appointed by law for holding any election within this State, or on the days for holding special elections to fill vacancies, such electors shall be entitled at such times to exercise the right of suffrage as fully as if they were present at their usual places of election in the manner prescribed in this article, and whether at the time of voting such electors shall be within the limits of this State or not.*

Preparation and distribution of ballots for use of persons in military service.

*Section 1302. Ballots.—Ballots for use by electors in actual military service under the provisions of this article shall be prepared sufficiently in advance by the county boards of election and shall be by such boards distributed as hereinafter provided to the electors in actual military service entitled to vote at any election. Such ballots shall be in substantially the form prescribed by article ten of this act for*

*"adding" repeated in original.

*ballots to be used at the same elections within this Commonwealth, but in cases where there is not time in the opinion of the county boards of elections to print on said ballots the names of the various candidates for district, county and local offices, the ballots shall contain blank spaces only under the titles of such offices, in which the voters may insert the names of the candidates for whom they desire to vote, and in such cases the county boards of elections shall furnish to the elector in actual military service a sufficient number of printed lists containing the names of all the candidates who have been regularly nominated under the provisions of this act for the use of the elector in preparing his ballot.*

*Section 1303. Duties of County Boards.—In the case of any election at which votes are cast by electors in actual military service under the provisions of this article, it shall be the duty of each county board of elections to withhold the completion of the computation of the returns of the county until the second Friday after such election, within which period all votes cast by electors of the county in actual military service as provided in this article shall be added to and included in its computation of the returns of such election, but not afterwards.*

County boards to include military vote in computation of returns of any election.

*Section 1304. Manner of Voting by Electors in Actual Military Service.—Electors mentioned in section one thousand three hundred and one shall have the right to apply, not less than thirty (30) days, and not more than fifty (50) days, before any election for a "military ballot". The application shall be in writing signed by the applicant in his own hand and addressed to the county board of elections of the county wherein the applicant is registered to vote and shall state the county and the city, borough or township, and the precise ward or election district in, or the street and number at, which the applicant is registered to vote. If the application is for a ballot for a primary election, it shall also state the political party in which the applicant is enrolled.*

Application for ballot by person in military service.

*Section 1305. Ballots and Envelopes for Electors in Actual Military Service.—The county boards of elections shall prepare, and, upon request, deliver to the said electors in actual military service a ballot by registered mail, with return receipt required, in an envelope addressed to each such elector at the address furnished by the elector in his application for a military ballot. Such ballots shall be prepared and printed in the same form as the ballots provided for by section one thousand three hundred and two of this act, but shall have in addition printed, stamped or endorsed thereon the words "Military Ballot". The county boards of elections shall also provide and deliver, as aforesaid, three envelopes for each military ballot of such size and shape that will permit the placing of one within the other. On the first shall be printed, stamped or endorsed only the words "Military Ballot". On the second shall be printed the affidavit of the elector, together with the jurat of the officer in whose presence the ballot is marked and before whom the affidavit is made, such affidavit and jurat to be in*

Method of preparing and distributing ballots for use by persons in military service.

*form prescribed by the Secretary of the Commonwealth. On the third shall be placed the name and address of the county board of elections of the proper county. All military ballots and envelopes shall be mailed at least fifteen (15) days before the election involved to the electors requesting them.*

**List of applicants for ballots for use by electors in military service to be posted.**

*Each county board of elections shall print and post in a conspicuous public place at its office a list, setting forth the name, present location, the local voting district or ward of every elector to whom a military ballot has been sent. This list shall be posted at least ten (10) days before the primary or election involved and shall also set forth the total number of military ballots prepared by the county board of elections. Copies of such list shall be furnished upon request to the county chairman of each political party and political body.*

**Manner of marking and handling ballot by person in military service.**

*Section 1306. Voting by Electors in Actual Military Service.—Any such elector may make application within the time prescribed by section one thousand three hundred and four to the county boards of elections for a "Military Ballot". At any time after receiving such military ballot, but on or before the day of the election, such elector in actual military service may appear before any commissioned officer of the military or naval forces, either within or without the Commonwealth, or before any officer of this or* any other state or territory of the United States authorized to administer oaths, and mark such ballot under the scrutiny of such officer in the following manner. The voter shall first display the ballot to such officer as evidence that the same is unmarked, and shall then proceed to mark the ballot in the presence of such officer, but in such manner that such officer is unable to see how the same is marked, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Military Ballot". This envelope shall then be placed in the one on which is printed the affidavit of the elector and the jurat of the officer before whom the elector appears, and such envelope sealed in like manner by the elector. The elector shall then make out, subscribe and swear to the affidavit printed on the face of such envelope, and the jurat shall be subscribed by the officer before whom the affidavit was taken. Such ballot and envelope shall then be securely sealed in the third envelope which the elector shall send by mail to the county board of elections of the proper county with postage prepaid.*

**Receipt and counting of military ballots by county boards.**

*Section 1307. Receipt and Counting of Military Ballots.—The county board of elections upon receipt of such third envelope shall safely keep the same in their office until they meet to canvass the vote of such election under the provisions of this act.*

*At such time the members of the county board of elections may in person dispose of military ballots in the manner hereinafter set forth, or they may designate a sufficient number of clerks to perform such duties. When it is determined that clerks shall be appointed, the total number shall*

*"or" repeated in original.

*in every case be in multiples of three; each member of the county board of elections shall appoint an equal number thereof.*

Watchers.

*Watchers appointed in the manner prescribed by, and subject to the restrictions imposed by section four hundred and seventeen of this act, in so far as applicable, shall be permitted to be present whenever any of the envelopes containing military ballots are opened* and whenever any such ballots are counted and recorded.*

Disposal of ballots and envelopes.

*In disposing of military ballots the county board of elections, or the clerks designated as aforesaid, shall first examine the third envelope and set aside unopened all such envelopes which bear a postmark later than the date of the particular election day involved. The envelopes thus set aside shall be retained for a period of one year and then destroyed unopened.*

*They shall then open the third envelopes not thus set aside, and after examining the affidavit and jurat, shall compare the signature of such absent voter with his signature upon any register or other record in their possession. If the county board is satisfied that the signatures correspond, that the affidavit and jurat are sufficient and that the voter has been duly registered as provided by law, they shall announce the name of the elector and shall give any person present an opportunity to challenge the same in like manner and for the same causes as such elector could have been challenged had he presented himself in his own district to cast his vote. If there are no challenges, they shall open the second envelope in such manner as not to destroy the affidavit and jurat printed thereon, which envelope shall be kept in their office for a period of one year thereafter. All envelopes on which are printed, stamped or endorsed the words "Military Ballot", and containing the ballots, shall be put into one depository at one time and said depository well shaken, and the envelopes containing the ballots mixed before any ballot is taken therefrom. The county board shall then break the seals of such envelopes and record the said ballots in the same manner as district election officers are required to record votes under the provisions of this act. In like manner all military ballots received prior to completion of the computation of the returns of the county shall be counted and recorded, and, upon completion of the computation of the returns of the county, the votes cast upon the military ballots shall then be added to the votes cast within the county, city, borough, incorporated town, township, ward or election district as designated on each ballot. Military ballots shall be safely kept by the county board of elections for a period of one year.*

Act effective immediately.

**Section 5. This act shall become effective immediately upon final enactment.

APPROVED—The 1st day of August, A. D. 1941.

ARTHUR H. JAMES

*"*opended*" in original.
**All of Section 5 italicized in original.

## No. 17

## AN ACT

To further amend the act, approved the third day of June, one thousand nine hundred thirty-seven (Pamphlet Laws, one thousand three hundred thirty-three), entitled "An act concerning elections, including general, municipal, special and primary elections, the nomination of candidates, primary and election expenses and election contests; creating and defining membership of county boards of elections; imposing duties upon the Secretary of the Commonwealth, courts, county boards of elections, county commissioners; imposing penalties for violation of the act, and codifying, revising and consolidating the laws relating thereto; and repealing certain acts and parts of acts relating to elections," by further regulating elections during the time of the present war and for six months thereafter; authorizing and providing a procedure for the voting of qualified electors in actual military service as herein defined, who are absent from their place of residence while in, attached to, or serving with the armed forces of the United States; imposing additional duties upon the various county boards of elections and election officers; chairmen of political parties or committees, and officers and employes of certain political subdivisions; placing costs upon the Commonwealth; authorizing appropriations by cities of the first class and counties; further regulating the last day for filing nomination petitions and nomination papers; the withdrawal of nominated candidates; the payment of fees by persons nominated at primary elections; the filing of substitute nomination certificates to fill vacancies caused by the withdrawal of candidates, and further regulating the date of the primary election.

Elections.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

Section 102 (w), act of June 3, 1937, P. L. 1333, as amended by act of August 1, 1941, P. L. 672, further amended.

Section 1. Section one hundred two (w) of the act, approved the third day of June, one thousand nine hundred thirty-seven (Pamphlet Laws, one thousand three hundred thirty-three), entitled "An act concerning elections, including general, municipal, special and primary elections, the nomination of candidates, primary and election expenses and election contests; creating and defining membership of county boards of elections; imposing duties upon the Secretary of the Commonwealth, courts, county boards of elections, county commissioners; imposing penalties for violation of the act, and codifying, revising and consolidating the laws relating thereto; and repealing certain acts and parts of acts relating to elections," is hereby amended to read as follows:

"Qualified elector in actual military service" defined.

Section 102. (w) ["Electors in actual military service" shall mean qualified electors of this Commonwealth, who are or may be by enlistment, enrollment, or draft in the military or naval service of the United

States, or any branch or unit thereof, or in the military service of the Commonwealth.] *The term "qualified elector in actual military service" shall mean a qualified elector of this Commonwealth, who is or may be in the military or naval service of the United States or any branch or unit thereof, or in the Merchant Marine of the United States, or serving in the American Red Cross, the Society of Friends, the Women's Auxiliary Service Pilots, the American Field Service or the United Service Organizations attached to and serving with the armed forces of the United States, and regardless of whether such person is registered or enrolled in accordance with law.*

Section 305 (c), act of June 3, 1937, P. L. 1333, as amended by act of August 1, 1941, P. L. 672, further amended.

Section 2. Section three hundred five (c) of said act is hereby amended to read as follows:

Section 305. (c) [The Commonwealth shall reimburse each county for election expenses incurred at every election for the preparation, handling and mailing of ballots for electors in actual military service, in the sum of forty-three cents for each ballot mailed to an elector in actual military service in such manner as is now or may hereafter be provided by law.] *The Commonwealth shall reimburse each city of the first class and county for the actual expenses incurred in and incidental to preparing, handling, mailing, delivering, counting and storing official military ballots as herein provided in a sum not to exceed forty cents (40¢) for each such ballot mailed or delivered.*

Cities of the first class and counties shall be reimbursed by Commonwealth in sum not to exceed 40¢ for each ballot mailed or delivered.

Each county board of elections shall file in the Department of State, not later than thirty days after every election, on a form prescribed by the Department of State, a statement of the number of ballots mailed *or delivered* in such manner as is now or may hereafter be provided by law to electors in actual military service. [upon the written application of each elector. Such applications shall be preserved by each county board of elections until reimbursement is made as herein provided, subject to inspection or production in the Department of State, if demanded by the Department of State.]

County boards of election to file statement of number of ballots mailed or delivered with Secretary of Commonwealth.

The Department of State shall ascertain and fix the amount due, as herein provided, to each [county] *city of the first class and county* for *actual* election expenses incurred [for the preparation, handling and mailing of ballots to electors in actual military service], and by requisition in the usual course shall provide for payment of such amounts so found due from moneys appropriated to the Department of State for such purpose, or shall prorate the moneys so appropriated among the several [counties] *cities of the first class and counties* to be reimbursed, if the amount so appropriated shall

Department of State shall fix amount due and provide for payment.

not be sufficient for the payment in full to each [county] *city of the first class and county* of the amount found to be due.

Section 3. Section six hundred four of said act is hereby amended to read as follows:

**Section 604, act of June 3, 1937, P. L. 1333, amended.**

Section 604. [Fall] *Summer* Primary; Officers to Be Nominated.—There shall be a [Fall] *Summer* primary preceding each municipal election which shall be held on the [second] *third* Tuesday of [September] *June* in all odd-numbered years. Candidates for all offices to be filled at the ensuing municipal election shall be nominated at the [Fall] *Summer* primary.

**Primary date in odd-numbered years changed.**

Section 4. Sections nine hundred four, nine hundred five, nine hundred six and subsection (d) of section nine hundred thirteen of said act are hereby amended to read as follows:

**Sections 904, 905 and 906 and subsection (d) of 913, act of June 3, 1937, P. L. 1333, amended.**

Section 904. Municipal Clerks and Party Chairmen to Furnish Information as to Offices to Be Filled.—To assist the respective county boards in ascertaining the offices to be filled, it shall be the duty of the clerks or secretaries of the various cities, boroughs, towns, townships, school districts and poor districts, with the advice of their respective solicitors, on or before the [tenth] *thirteenth* Tuesday preceding the [Fall] *Summer* primary, to send to the county boards of their respective counties a written notice setting forth all city, borough, town, township, school district and poor district offices to be filled in their respective subdivisions at the ensuing municipal election, and for which candidates are to be nominated at the ensuing primary. It shall also be the duty of the chairman of the State committee of each political party to forward to the Secretary of the Commonwealth and to the respective county boards, on or before the [tenth] *thirteenth* Tuesday preceding the Spring primary, a written notice setting forth the number of delegates and alternate delegates to the National convention of such party who are to be elected in the State at large at the ensuing primary, and the number of such delegates and alternate delegates who are to be elected at said primary in such county, or in any district within such county, or of which it forms a part. The said notice shall also set forth the number of members of the National committee, if any, who, under the national party rules, are to be elected at the said primary in the State at large, and the number of members of the State committee to be elected at the said primary in such county, or in any district, or part of a district within such county. It shall also be the duty of the chairman of the county committee and, in cases where a city is coextensive with a county, the chairman of the city committee of each party, on or before the [tenth]

**Time for municipal clerks and party chairmen to furnish information changed.**

*thirteenth* Tuesday preceding the Spring primary, to send to the county board of such county a written notice setting forth all party offices to be filled in the county at the ensuing primary.

Time for Secretary of Commonwealth to notify county boards of vacancies changed.

Section 905. Secretary of the Commonwealth to Notify County Board of Certain Nominations to Be Made.—On or before the [tenth] *thirteenth* Tuesday preceding each primary, the Secretary of the Commonwealth shall send to the county board of each county a written notice designating all the offices for which candidates are to be nominated therein, or in any district of which such county forms a part, or in the State at large, at the ensuing primary, and for the nomination to which candidates are required to file nomination petitions in the office of the Secretary of the Commonwealth, including that of President of the United States; and shall also in said notice set forth the number of presidential electors, United States Senators, Representatives in Congress and State officers, including senators, representatives and judges of courts of record, to be elected at the succeeding November election by a vote of the electors of the State at large, or by a vote of the electors of the county, or of any district therein, or of any district of which such county forms a part.

Time for publication of notice of vacancies changed.

Section 906. Publication of Notice of Officers to Be Nominated and Elected.—Beginning not earlier than [nine] *twelve* weeks, nor later than [eight] *eleven* weeks before any regular Spring or [Fall] *Summer* primary, the county board of each county shall publish in newspapers, as provided by section 106 of this act, a notice setting forth the number of delegates and alternate delegates to the National convention of each party who are to be elected in the State at large at the ensuing primary, and the number of delegates and alternate delegates who are to be elected at the said primary in said county, or in any district of which said county or part thereof forms a part, and also setting forth the names of all public offices for which nominations are to be made, and the names of all party offices, including that of members of the National committee, if any, and State committee, for which candidates are to be elected at said primary in said county, or in any district of which such county or part thereof forms a part, or in the State at large. Said notice shall contain the date of the primary, and shall be published once each week for two successive weeks.

Filing of nomination petitions 71 days before primary.

Section 913. (d) All nomination petitions shall be filed at least [fifty (50)] *seventy-one (71)* days prior to the primary.

Section 953 (c), act of June 3, 1937, P. L. 1333, amended.

Filing of nomination papers 41 days before primary.

Section 5. Section nine hundred fifty-three (c) of said act is hereby amended to read as follows:

Section 953. (c) All nomination papers must be filed at least [twenty (20)] *forty-one (41)* days prior to the date of the primary election.

Section 978, act of June 3, 1937, P. L. 1333, as amended by Act No. 3 of May 5, 1944, further amended.

Withdrawals filed 105 days previous to November election.

Section 6. Section nine hundred seventy-eight of said act is hereby amended to read as follows:

Section 978. Withdrawal of Nominated Candidates.—Any person who has been nominated by any political party or political body, in accordance with the provisions of this act, as a candidate for the office of presidential elector, United States Senator, Representative in Congress or for any State office, including that of senator, representative and judge of court of record, may withdraw his name from nomination by request in writing, signed by him and acknowledged before an officer qualified to take acknowledgment of deeds, and filed in the office of the Secretary of the Commonwealth. Any person who has been similarly nominated as a candidate for any other office may withdraw his name from nomination by similar request, filed with the county board of elections of the proper county. Such written withdrawals shall be filed with the Secretary of the Commonwealth or the county board of elections, as the case may be, at least one hundred five days previous to the day of the general *or municipal* election [and at least twenty-five days previous to the day of the municipal election]. Such withdrawals to be effective must be received in the office of the Secretary of the Commonwealth not later than five (5) o'clock P. M. on the last day for filing same, and in the office of any county board of elections not later than the ordinary closing hour of said office on the last day for filing same. No name so withdrawn shall be printed upon the ballot or ballot labels. No candidate may withdraw any withdrawal notice already received and filed, and thereby reinstate his nomination.

Section 978.1, act of June 3, 1937, P. L. 1333, added by act of May 27, 1943, P. L. 747, as amended by Act No. 3 of May 5, 1944, further amended.

Nominees who have not paid filing fee shall pay same 105 days previous to November election.

Section 7. Section nine hundred seventy-eight and one-tenth* of said act, added by the act, approved the twenty-seventh day of May, one thousand nine hundred forty-three (Pamphlet Laws, seven hundred forty-seven), is hereby amended to read as follows:

Section 978.1. Vacancy in Party Nomination by Failure to Pay Filing Fee.—Every person nominated at any primary election as the candidate of any political party for any office, who has not paid the filing fee required by section nine hundred thirteen of this act, as amended, for the filing of a nomination petition for such office, shall pay the amount of such fee to the [State Treasurer] *Secretary of the Commonwealth,* or to the [county treasurer] *county board of elections* as the case

* "one-tenths" in original.

may be, at least one hundred five days previous to the day of the general *or municipal* election [or at least twenty-five days previous to the day of the municipal election] at which such candidate's name would appear on the ballot. Failure to pay such fee within the time herein prescribed shall result in a vacancy in such party nomination. Such vacancy shall be filled in the manner hereinafter provided for the filling of such vacancies happening by reason of the death or withdrawal of any candidate.

**Section 981 (a), act of June 3, 1937, P. L. 1333, amended by Act No. 8 of May 5, 1944, further amended.**

Section 8. Section nine hundred eighty-one (a) of said act is hereby amended to read as follows:

Section 981. Time for Filing Substituted Nomination Certificates.—

**Substituted nomination certificates to fill vacancies filed 95 days prior to November election.**

(a) Substituted nomination certificates to fill vacancies caused by the withdrawal of candidates nominated at primaries or by nomination papers shall be filed with the Secretary of the Commonwealth or proper county board of elections, as the case may be, at least ninety-five days before the day of the general *or municipal* election [and at least twenty days before the day of the municipal election].

**Article XIII of act of June 3, 1937, P. L. 1333, as amended, repealed.**

Section 9. Article Thirteen of said act as amended is hereby repealed absolutely.

**New Article XIII added to act of June 3, 1937, P. L. 1333.**

Section 10. Said act is hereby amended by adding thereto a new Article Thirteen to read as follows:

## *ARTICLE XIII*
## *VOTING BY PERSONS IN ACTUAL MILITARY SERVICE*

**Absentee qualified electors in actual military service entitled to vote.**

*Section 1301. Qualified Electors in Actual Military Service.—Whenever any qualified elector in actual military service is absent from his place of residence on any day appointed by law for holding a general, municipal or primary election within this Commonwealth, such elector shall be entitled to exercise the right of suffrage as fully as if he were present at his place of election, in the manner prescribed in this act, whether at the time of voting such elector shall be within the limits of this Commonwealth or not, and regardless of whether such elector is registered or enrolled.*

**Applications for official military ballots.**

*Section 1302. Applications for Official Military Ballots.—Any qualified elector in actual military service may apply at any time before any election for an official military ballot on Form USWBC Form No. 1 or any other form supplied by the Federal Government, or by post card, letter or other writing, addressed to the Secretary of the Commonwealth of Pennsylvania or the county board of election of the county wherein the voting residence of the elector is located.*

*The application shall contain the following information: Residence, length of time a citizen, length of residence in Pennsylvania, date of birth, length of time a resident of voting district, voting district, party choice in case of primary, name, rank or grade, military address, branch of service and serial number. When such application is received by the Secretary of the Commonwealth it shall be forwarded to the proper county board of election.*

Contents of application.

*The application for a military ballot in any November election may be made or information supplied over the signature of any person who is familiar with the voting qualifications of the military elector, as required in the preceding paragraph.*

Applications for November election.

*The various county boards of election, upon receipt of any application, shall ascertain from the information on such applications, district register or from any other source that such applicant possessed all the qualifications of a qualified elector other than being registered or enrolled.*

Duty of county boards of election when application received.

*Section 1303. Official Military Ballots.—Ballots for use by such military electors under the provisions of this act shall be prepared sufficiently in advance by the county boards of election and shall be distributed by such boards as hereinafter provided. Such ballots shall be marked "Official Military Ballot" but shall not be numbered and shall otherwise be in substantially the form for ballots required by article ten of this act, which form shall be determined and prescribed by the Secretary of the Commonwealth.*

Form, preparation and distribution of official military ballots.

*In cases where there is not time, in the opinion of the county boards of election, to print on said ballots the names of the various candidates for district, county and local offices, the ballots shall contain blank spaces only under the titles of such offices in which electors may insert the names of the candidates for whom they desire to vote, and in such cases the county boards of election shall furnish to electors lists containing the names of all the candidates who have been regularly nominated under the provisions of this act, for the use of such electors in preparing their ballots.*

Candidate's name need not appear on ballot for local offices.

*Section 1304. Envelopes for Official Military Ballots. —The county boards of election shall provide two additional envelopes for each official military ballot, of such size and shape as shall be prescribed by the Secretary of the Commonwealth, in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed, stamped or endorsed the words "Official Military Ballot," and nothing else. On the larger of the two envelopes, to be*

Form of envelopes prescribed by Secretary of Commonwealth.

*enclosed within the mailing envelope, shall be printed the affidavit of the elector, together with the jurat of the person in whose presence the ballot is marked and before whom the affidavit is made, and the name and address of the county board of election of the proper county. Said affidavit, jurat and envelope shall be in the form prescribed by the Secretary of the Commonwealth and shall contain among other things a statement of elector's qualifications. The mailing envelope addressed to the elector shall contain the two envelopes, the official military ballot, lists of candidates, when authorized by section 1303 of this act, the uniform instructions in form and substance as prescribed by the Secretary of the Commonwealth and nothing else.*

Time for mailing military ballots.

*Section 1305. Duties of County Boards.—The county boards of election shall at least thirty-eight days prior to the election deliver or mail official military ballots to all electors whose names and addresses have been ascertained; as additional names and addresses of electors are ascertained, the board shall deliver or mail official military ballots to such additional electors within forty-eight hours after ascertaining their names and addresses.*

Posting of military file.

*Each county board of election shall post in a conspicuous public place at its office a master list, arranged alphabetically by election districts, setting forth the name, residence and the local voting district or ward of every elector to whom an official military ballot has been sent. This posted list shall not contain the elector's military address or military organization. This list shall be known as the "Military File" and shall be posted at least five days before the election day involved, and shall also set forth the total number of such ballots prepared for use in such election. Copies of such military files shall be furnished upon request to the county chairman of each political party and political body, and shall also be furnished to registration commissions.*

Method of absentee military voting.

*Section 1306. Voting by Electors in Actual Military Service.—At any time after receiving an official military ballot, but on or before the day of the election, the elector, for the purpose of voting, may appear before any commissioned or noncommissioned officer, not below the rank of sergeant or petty officer third class, of the military or naval forces or any member of the Merchant Marine of the United States designated for the purpose by the Administrator of the War Shipping Administration. Such persons are hereby authorized and empowered to administer oaths as required herein. Such elector may also appear before any person of this or any other state or territory of the United States authorized to administer oaths. The elector shall first display the ballot to such person as evidence that the same is un-*

*marked, and then shall proceed to mark the ballot with pencil, crayon, indelible pencil or ink, in the presence of such person, but in such manner that the person administering the oath is unable to see how the same is marked, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Military Ballot". This envelope shall then be placed in the second one, on which is printed the affidavit of the elector, the jurat of the person before whom the elector appears, and the address of the elector's county board of election. The elector shall then fill out, subscribe and swear to the affidavit printed on such envelope, and the jurat shall be subscribed and dated by the person before whom the affidavit was taken. Such envelope shall then be securely sealed and the elector shall send same by mail to said county board of election.*

Time and method of canvassing military ballots.

*Section 1307. Canvassing of Official Military Ballots. --The county boards of election, upon receipt of such envelopes, shall safely keep the same until they meet to canvass official military ballots, which canvass shall begin immediately following the official civilian canvass for all primary elections. After the November election, the canvass of official military ballots shall begin at ten o'clock A. M., Eastern Standard Time, on the second Friday following the election. No such ballots shall be counted which are received in their offices later than ten o'clock A. M., Eastern Standard Time, of the first Tuesday following the primary election, and ten A. M., Eastern Standard Time, of said second Friday following the November election. At such time the members of the return boards or the county boards of election shall in person dispose of official military ballots in the manner hereinafter* set forth. The county boards of election may designate a sufficient number of clerks to perform such duties. When it is determined that clerks shall be appointed, the total number shall in every case be in multiples of three, and each member of a county board of election shall appoint an equal number thereof.*

Watchers.

*Each candidate for nomination or election shall be entitled to appoint one watcher and each political party or body which has nominated candidates shall be entitled to appoint three watchers. Watchers shall be permitted to be present when the envelopes** containing official military ballots are opened and when *** such ballots are counted and recorded.*

Disposition of official military ballots.

*In disposing of an official military ballot the county return board or the county board of election shall examine the affidavit and jurat and if the jurat bears a*

* "herinafter" in original.
** "envelope" in original.
*** "then" in original.

*date later than the date of the election, the envelope shall be set aside unopened.*

Challenges and recordation of votes.

*The board shall then further examine the affidavit and jurat of each envelope not so set aside and shall compare the informatio. thereon with that contained in the military file. If the board is satisfied that the affidavit and jurat are sufficient and that the elector has qualified, and the board has utilized the information contained in the military file to verify his right to vote, the board shall announce the name of the elector and shall give any person present an opportunity to challenge in like manner and for the same cause, except failure to register or enroll, as the elector could have been challenged had he presented himself in his own district to vote other than by official military ballot. If no challenges are sustained, the board shall open the envelope in such manner as not to destroy the affidavit and jurat printed thereon. All envelopes on which are printed, stamped or endorsed the words "Official Military Ballot" shall be placed in one or more depositories at one time and said depository or depositories well shaken, and the envelopes mixed before any envelope is taken therefrom. The board shall then break the seals of such envelopes, remove the ballots and record the votes in the same manner as district election officers are required to record votes. Upon completion of the computation of the returns of the county, the votes cast upon the official military ballots shall be added to the other votes cast within the county.*

Military ballots, etc., declared public records.

*Section 1308. Public Records.—All official military ballots, military files, applications for such ballots and envelopes on which the jurats and affidavits appear, and all information and lists are hereby designated and declared to be public records and shall be safely kept for a period of two years, except that no information shall be made public which is expressly forbidden by the War Department because of military security.*

Cities of first class empowered to appropriate money.

Section 11. Cities of the first class and counties are hereby authorized and empowered to appropriate the moneys necessary to carry out the provisions of this amendment.

Purpose of act and liberal construction.

Section 12. The purpose of this amendment is to enable every qualified elector of this Commonwealth in actual military service, as herein defined, during the continuance of the present war and for six months thereafter, to vote, notwithstanding the fact that such elector may be absent on election day from the election district in which he resides, whether su h person is within or without this Commonwealth or within or without the United States, and regardless of whether such person is

registered or enrolled as a qualified elector, and this amendment shall be liberally construed to effectuate such purpose.

Acts repealed.

Section 13. The following supplements, acts or parts of acts are hereby repealed absolutely.

Supplement No. 1 of May 5, 1944, repealed.

Supplement No. 1, approved the fifth day of May, one thousand nine hundred and forty-four supplementing the act, approved the third day of June, one thousand nine hundred and thirty-seven (Pamphlet Laws, one thousand three hundred thirty-three), known as the "Pennsylvania Election Code".

Act No. 4 of May 5, 1944, repealed.

Act No. 4, approved the fifth day of May, one thousand nine hundred and forty-four, entitled "An act relating to voting by official military ballot; conferring powers and imposing duties upon the State Council of Defense, local and district councils of defense, county boards of election, election officers and the Secretary of the Commonwealth; providing for the promulgation of rules, regulations and orders; and providing penalties".

Effective for present war and 6 months thereafter.

Section 14. This act shall remain in effect until the termination of hostilities in the present war, and for six months thereafter. The termination of hostilities in the present war shall be the time proclaimed as such by the President of the United States, or the date specified as such in a concurrent resolution of the two houses of Congress.

Act effective immediately.

Section 15. The provisions of this act shall become effective immediately upon final enactment.

APPROVED—The 9th day of March, A. D. 1945.

EDWARD MARTIN

---

No. 18

AN ACT

To amend sections three hundred ten and three hundred eleven of Article III of the act, approved the third day of June, one thousand nine hundred and thirty-seven (Pamphlet Laws, one thousand two hundred twenty-five), entitled "An act concerning game and other wild birds and wild animals; and amending, revising, consolidating, and changing the law relating thereto," by providing for monthly returns and payments by certain issuing agents and requiring that amount of bond of issuing agents shall be fixed by Secretary of Revenue.

Wild birds and animals.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

Article III, sections 310 and 311, act of June 3, 1937, P. L. 1225, amended.

Section 1. Sections three hundred ten and three hundred eleven of Article III of the act, approved the third day of June, one thousand nine hundred and thirty-seven (Pamphlet Laws, one thousand two hundred twenty-five), entitled "An act concerning game and

monwealth, subject to the limitations provided in any current capital budget, money not exceeding in the aggregate the sum of [twenty-four million one hundred seventy thousand dollars ($24,170,000)] twenty-four million two hundred eighty-three thousand six hundred ninety dollars ($24,283,690) as may be found necessary to carry out the acquisition and construction of transportation assistance projects heretofore specifically itemized in a capital budget.

Section 2. This act shall take effect immediately.

APPROVED—The 11th day of December, A. D. 1968.

RAYMOND P. SHAFER.

---

No. 375

AN ACT

HB 1908

Amending the act of June 3, 1937 (P. L. 1333), entitled "An act concerning elections, including general, municipal, special and primary elections, the nomination of candidates, primary and election expenses and election contests; creating and defining membership of county boards of elections; imposing duties upon the Secretary of the Commonwealth, courts, county boards of elections, county commissioners; imposing penalties for violation of the act, and codifying, revising and consolidating the laws relating thereto; and repealing certain acts and parts of acts relating to elections," revising provisions relating to absentee voting and providing penalties.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

Section 1. Subclauses (9) and (10) of clause (w) of section 102, act of June 3, 1937 (P. L. 1333), known as the "Pennsylvania Election Code," added or amended August 13, 1963 (P. L. 707), are amended, and section 102 is amended by adding after clause (a), [1] and clause (r) [2] respectively [3] new clauses, to read:

Section 102. Definitions.—The following words, when used in this act, shall have the following meanings, unless otherwise clearly apparent from the context:

* * *

(a. 1) "Canvass" includes gathering the ballots after the election and counting, computing and tallying the votes.

---

[1] "and" not in original.
[2] "respectively" not in original.
[3] "and clause (z-2)" in original.

* * *

(r. 1) "Public institution" means institutions primarily maintained by the Federal, State or local governments and includes but is not limited to veterans' hospitals and homes, State hospitals, poorhouses and county homes.

* * *

(w) The words "qualified absentee elector" shall mean:

* * *

(9) Any qualified war veteran elector who is bedridden or hospitalized due to illnes or physical disability if he is [unavoidably] absent from the Commonwealth or county of his residence and unable to attend his polling place because of such illness or physical disability regardless of whether he is registered and enrolled; or

(10) Any qualified, registered and enrolled elector who expects to be or is [unavoidably] absent from the Commonwealth or county of his residence because his duties, occupation or business require him to be elsewhere during the entire period the polls are open for voting on the day of any primary or election; or

* * *

Section 2. Clause (z-2) of section 102 of the act is repealed.

Section 3. Section 102 of the act, amended August 13, 1963 (P. L. 707), is amended by adding at the end thereof, a new clause to read:

[1] Section 102. Definitions—The following words, when used in this act, shall have the following meanings, unless otherwise clearly apparent from the context:

* * *

(z-3) The words "duties, occupation or business" shall include leaves of absence for teaching or education, vacations, sabbatical leaves, and all other absences associated with the elector's duties, occupation or business, and also include an elector's spouse who accompanies the elector.

Section 4. Subsections (i) and (j) of section 1301 of the act, amended August 13, 1963 (P. L. 707), are amended to read:

Section 1301. Qualified Absentee Electors.—The following persons shall be entitled to vote by an official absentee ballot in any primary or election held in this Commonwealth in the manner hereinafter provided:

[1] "Section 102. Definitions.—The following words, when used in this act, shall have the following meanings, unless otherwise clearly apparent from the context:" not in original.

* * *

(i) Any qualified war veteran elector who is bedridden or hospitalized due to illness or physical disability if he is [unavoidably] absent from the Commonwealth or county of his residence and unable to attend his polling place because of such illness or physical disability regardless of whether he is registered and enrolled; or

(j) Any qualified registered and enrolled elector who expects to be or is [unavoidably] absent from the Commonwealth or county of his residence because his duties, occupation or business require him to be elsewhere during the entire period the polls are open for voting on the day of any primary or election; or

* * *

Section 5. Subsections (a), (b), (c) and (e) of section 1802 of the act, amended August 13, 1963 (P. L. 707), are amended to read:

Section 1802. Applications for Official Absentee Ballots.—(a) Any qualified elector defined in preceding section 1801, subsections (a) to (h), inclusive, may apply at any time before any primary or election for any official absentee ballot in person, on [post card application or] any [other] form supplied by the Federal Government, or [by post card, letter or other writing,] on any official county board of election form addressed to the Secretary of the Commonwealth of Pennsylvania or the county board of election of the county in which his voting residence is located. An application shall be issued only to an elector who appears in person at the office of the county board of election and signs for the application, or who, by mail, requests an application with a written and signed communication. No more than one application for an absentee ballot shall be issued to any elector. A copy of the request for the application shall be kept on record at the office of the county board of election.

(b) The application shall contain the following information: Home residence at the time of entrance into actual military service or Federal employment, length of time a citizen, length of residence in Pennsylvania, date of birth, length of time a resident of voting district, voting district if known, party choice in case of primary, name and, for a military elector, his [rank or grade,] stateside military address, [branch of service] FPO or APO number and serial number. Any elector other than a military elector shall in addition specify the nature of his employment, the address to which ballot is to be sent, relationship where necessary, and such other information as may be

determined and prescribed by the Secretary of the Commonwealth. When such application is received by the Secretary of the Commonwealth it shall be forwarded to the proper county board of election.

(c) The application of any qualified military elector, as defined in preceding section 1301 subsection (a), for an official absentee ballot in any primary or election may not be made [or information supplied] over the signature of any person [who is familiar with the voting qualifications of the elector], other than the qualified elector or an adult member of his immediate family, as required in the preceding subsection.

* * *

(e) Any qualified bedridden or hospitalized veteran [unavoidably] absent from the State or county of his residence and unable to attend his polling place because of such illness or physical disability, regardless of whether he is registered or enrolled, may apply at any time before any primary or election for an official absentee ballot [by post card, letter or other writing,] on any official county board of election form addressed to the Secretary of the Commonwealth of Pennsylvania or the county board of elections of the county in which his voting residence is located. The request for an application shall be in writing, signed and transmitted by mail.

The application shall contain the following information: Residence at the time of becoming bedridden or hospitalized, length of time a citizen, length of residence in Pennsylvania, date of birth, length of time a resident in voting district, voting district if known, party choice in case of primary, name and address of present residence or hospital at which hospitalized. When such application is received by the Secretary of the Commonwealth, it shall be forwarded to the proper county board of elections.

The application for an official absentee ballot for any primary or election [may] shall be made [or] on information supplied over the signature [of any person who is familiar with the voting qualifications] of the bedridden or hospitalized veteran as required in the preceding subsection [(f)]. Any qualified registered elector, including a spouse or dependent referred to in subsection [1](l) of section 1301, who expects to be or is [unavoidably] absent from the Commonwealth or county of his residence because his duties, occupation or business require him to be elsewhere on the day of any primary or election and any qualified registered elector who is unable to attend his polling place on the day of any primary or election because of illness or

[1] "(1)" in original.

physical disability and any qualified registered bedridden or hospitalised veteran in the county of residence, may apply to the county board of elections of the county in which his voting residence is located for an Official Absentee Ballot. Such application [or request may] shall be made upon an official application form supplied by the county board of elections. Such official application form shall be determined and prescribed by the Secretary of the Commonwealth of Pennsylvania. An application shall be issued only to an elector who appears in person at the office of the county board of election and signs for the application, or who, by mail, requests an application with a written and signed communication. A copy of the request for the application shall be kept on record at the office of the county board of elections.

(1) The application of any qualified registered elector, including spouse or dependent referred to in subsection [1](l) of section 1301, who expects to be or is [unavoidably] absent from the Commonwealth or county of his residence because his duties, occupation or business require him to be elsewhere on the day of any primary or election, shall be signed by the applicant and shall include the surname and christian name or names of the applicant, his occupation, date of birth, length of time a resident in voting district, voting district if known, place of residence, post office address to which ballot is to be mailed, the reason for [2] his absence, and such other information as shall make clear to the county board of elections the applicant's right to an official absentee ballot.

(2) The application of any qualified registered elector who is unable to attend his polling place on the day of any primary or election because of illness or physical disability and the application of any qualified registered bedridden or hospitalised veteran in the county of residence shall be signed by the applicant and shall include surname and christian name or names of the applicant, his occupation, date of birth, residence at the time of becoming bedridden or hospitalized, length of time a resident in voting district, voting district if known, place of residence, post office address to which ballot is to be mailed, and such other information as shall make clear to the county board of elections the applicant's right to an official ballot. In addition, the application of such electors shall include a declaration stating the nature of their disability or illness, and the name of their attending physician, if any, together with a supporting dec-

[1] "(1)" in original.
[2] "this" in original.

laration signed by such attending physician, or, if none, by a registered elector unrelated by blood or marriage of the election district of the residence of the applicant: Provided, however, That in the event any elector entitled to an absentee ballot under this subsection be unable to sign his application because of illness or physical disability, he shall be excused from signing upon making a statement which shall be witnessed by one adult person in substantially the following form: I hereby state that I am unable to sign my application for an absentee ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or have received assistance in making my mark in lieu of my signature.

............................ ..................... (Mark)
(Date)

............................ ............................
(Complete Address of Witness) (Signature of Witness)

No more than one application for an absentee ballot shall be issued to any elector. A copy of the request for the application shall be kept on record at the office of the county board of election.

Section 6. Section 1302 of the act is amended by adding after subsection (e), three new subsections to read:

Section 1302. Applications for Official Absentee [1] Ballots.—* * *

(f) The county chairman of each political party or the head of each political body shall designate one representative from his respective political party or body for each public institution. The representatives so appointed shall, at the same time on a date fixed by the county board of election visit every public institution situate in the county for the purpose of obtaining the names and addresses of public institution residents who desire to receive applications for absentee ballots and to act as an election board as provided in subsection (g) of this section. The list of names and addresses thus obtained shall then be submitted by said representatives to the board which shall furnish applications individually to those appearing in the written request. If the chairman or head of a political party or body fails to appoint a representative within fifteen days from written

[1] "Ballot" in original.

notice from the county board of election, the county board of election shall appoint a representative from the political party or body.

(g) The county board of election shall appoint teams of three members for each public institution that shall go to the public institutions and hold the election on the first Friday prior to election day. Each member of the board shall appoint one member on every team. After the votes are cast, the teams shall collect the ballots and return them to the county board of election where they shall be placed unopened in a secure, safe and sealed container in the custody of the board until they shall be distributed to the respective absentee voters' election district as provided in section 1308 of this act where they shall be counted with the other absentee ballots, if any.

(h) The county board of election shall number, in chronological order, the applications for an official absentee ballot, which number shall likewise appear on the official absentee ballot for the qualified elector. The numbers shall appear legibly and in a conspicuous place but before the ballots are distributed the number on the ballot shall be torn off by the county board of election. This number information shall be appropriately inserted and become a part of the Registered Absentee Voters File and the Military, Veterans and Emergency Civilian Absentee Voters File provided in section 1302.3 of this act.

Section 7. Sections 1302.1, 1302.2 and 1302.3 of the act, added August 13, 1963 (P. L. 707), are amended to read:

Section 1302.1. Date of Application for Absentee Ballot.—
Applications for absentee ballots unless otherwise specified shall be received in the office of the county board of elections not earlier than fifty (50) days before the primary or election and not later than five o'clock P. M. of the first Tuesday prior to the day of any primary or election: Provided, however, That in the event any elector otherwise qualified who is so physically disabled or ill on or before the first Tuesday prior to any primary or election that he is unable to file his application or who becomes physically disabled or ill after the first Tuesday prior to any primary or election and is unable to appear at his polling place or any elector otherwise qualified who because of the conduct of his business, duties or occupation will necessarily be absent from the State or county of his residence on the day of the primary or election, which fact was not and could not

reasonably be known to said elector on or before the first Tuesday prior to any primary or election, shall be entitled to an absentee ballot at any time prior to five o'clock P. M. on the [day] first Friday preceding any primary or election upon execution of an Emergency Application in such form prescribed by the Secretary of the Commonwealth.

In the case of an elector who is physically disabled or ill on or before the first Tuesday prior to a primary or election or becomes physically disabled or ill after the first Tuesday prior to a primary or election, such Emergency Application shall contain a supporting affidavit from his attending physician stating that due to physical disability or illness said elector was unable to apply for an absentee ballot on or before the first Tuesday prior to the primary or election or became physically disabled or ill after that period.

In the case of an elector who is necessarily absent because of the conduct of his business, duties or occupation under the unforeseen circumstances specified in this subsection, such Emergency Application shall contain a supporting affidavit from such elector stating that because of the conduct of his business, duties or occupation said elector will necessarily be absent from the State or county of his residence on the day of the primary or election which fact was not and could not reasonably be known to said elector on or before the first Tuesday prior to the primary or election.

Section 1302.2. Approval of Application for Absentee Ballot.—

(a) The county board of elections, upon receipt of any application filed by a qualified elector not required to be registered under preceding section 1301, shall ascertain from the information on such application, district register or from any other source that such applicant possesses all the qualifications of a qualified elector other than being registered or enrolled. If the board is satisfied that the applicant is qualified to receive an official absentee ballot, the application shall be marked approved such approval decision shall be final and binding except that challenges may be made only on the ground that the applicant did not possess qualifications of an absentee elector. Such challenges must be made to the county board of elections prior to 5:00 o'clock P. M. on the first Friday prior to the election. When so approved, the county board of elections shall cause the applicant's name and residence (and at a primary, the party enrollment) to be inserted in the Military, Veterans and Emergency Civilians Absentee Voters File as provided in section 1302.3, subsection (b): Providing, however, That no application of any qualified elector in military service shall be rejected for failure to include on his application any information if such information may be ascertained within a reasonable time by the county board of elections.

(b) The county board of elections, upon receipt of any application filed by a qualified elector who is entitled, under the provisions of the Permanent Registration Law as now or hereinafter enacted by the General Assembly, to absentee registration prior to or concurrently with the time of voting as provided under preceding section 1301, shall ascertain from the information on such application or from any other source that such applicant possesses all the qualifications of a qualified elector. If the board is satisfied that the applicant is entitled, under the provisions of the Permanent Registration Law as now or hereinafter enacted by the General Assembly, to absentee registration prior to or concurrently with the time of voting and that the applicant is qualified to receive an official absentee ballot, the application shall be marked "approved." Such approval decision shall be final and binding except that challenges may be made only on the ground that the applicant did not possess the qualifications of an absentee elector prior to or concurrently with the time of voting. Such challenges must be made to the county board of elections prior to 5:00 o'clock P. M. on the first Friday prior to the election. When so approved, the county board of elections shall cause the applicant's name and residence (and [1] at a primary, the party enrollment) to be inserted in the Military, Veterans and Emergency Civilian Absentee Voters File as provided in section 1302.3 subsection (b).

(c) The county board of elections, upon receipt of any application of a qualified elector required to be registered under the provisions of preceding section 1301, shall determine the qualifications of such applicant by comparing the information set forth on such application with the information contained on the applicant's permanent registration card. If the board is satisfied that the applicant is qualified to receive an official absentee ballot, the application shall be marked "approved." Such approval decision shall be final and binding, except that challenges may be made only on the ground that the applicant did not possess the qualifications of an absentee elector. Such challenges must be made to the county board of elections prior to 5:00 o'clock P. M. on the first Friday prior to the election. When so approved, the registration commission shall cause [the applicant's permanent registration card to be removed from the district register and the county board of elections shall cause same to be inserted in the Registered Absentee Voters File as provided in section 1302.3 subsection (a):] an absentee voter's temporary registration card to be inserted in the district register on top of and along with the

[1] "at" not in original.

permanent registration card. The absentee voter's temporary registration card shall be in the color and form prescribed in subsection (e) of this section:

Provided, however, That the duties of the county boards of elections and the registration commissions with respect to the [removal] insertion of the [original] absentee voter's temporary registration card of any elector from the district register as set forth in section [1305] 1302.2 shall include only such applications and emergency applications as are received on or before the first Tuesday prior to the primary or election. In all cases where applications are received after the first Tuesday prior to the primary or election and before five o'clock P. M. on the [day] first Friday prior to the primary or election, the county board of elections shall determine the qualifications of such applicant by comparing the information set forth on such application with the information contained on the applicant's duplicate registration card on file in the General Register (also referred to as the Master File) in the office of the Registration Commission and shall cause the name and residence (and at primaries, the party enrollment) to be inserted in the Military, Veterans and Emergency Civilian Absentee Voters File as provided in section 1302.3, subsection (b). In addition, the [county] local district boards of elections shall, upon canvassing the official absentee ballots under section 1308, examine the voting check list of the election district of said elector's residence and satisfy itself that such elector did not cast any ballot other than the one properly issued to him under his absentee ballot application. In all cases where the examination of the [county] local district board of elections discloses that an elector did vote a ballot other than the one properly issued to him under the absentee ballot application, the [county] local district board of elections shall thereupon cancel said absentee ballot and said elector shall be subject to the penalties as hereinafter set forth.

(d) In the event that any application for an official absentee ballot is not approved by the county board of elections, the elector shall be notified immediately to that effect with a statement by the county board of the reasons for the disapproval.

(e) The absentee voter's temporary registration card shall be in duplicate and the same size as the permanent registration card, in a different and contrasting color to the permanent registration card and shall contain the absentee voter's name and address and shall conspicuously contain the words "Absentee Voter." Such card shall

also contain the affidavit required by subsection (b) of section 1306.

Section 1302.3. Absentee Electors Files and Lists.—(a) The county board of elections shall maintain at its office a file containing the [original] duplicate absentee voter's temporary registration cards of every registered elector to whom an absentee ballot has been sent. Such [original] duplicate absentee voter's temporary registration cards shall be filed by election districts and within each election district in exact alphabetical order and indexed. The registration cards so filed shall constitute the Registered Absentee Voters File for the Primary or Election of (date of primary or election) and shall be kept on file for a period commencing the [Thursday] Tuesday prior to the day of the primary or election until the [third Monday] day following the primary or election or the day the county board of elections certifies the returns of the primary or election, whichever date is later. Such file shall be open to public inspection at all times subject to reasonable safeguards, rules and regulations.

(b) The county board of elections shall post in a conspicuous public place at its office a master list arranged in alphabetical order by election districts setting forth the name and residence, and at primaries, the party enrollment, of (1) every military elector to whom an absentee ballot is being sent, each such name to be prefixed with an "M"; (2) every bedridden or hospitalized veteran outside the county of his residence who is not registered and to whom an absentee ballot is being sent, each such name to be prefixed with a "V"; and (3) every registered elector who has filed his application for an absentee ballot too late for the extraction of his original registration card and to whom a ballot is being sent and every qualified elector who has filed his application for an absentee ballot and is entitled, under provisions of the Permanent Registration Law as now or hereinafter enacted by the General Assembly, to absentee registration prior to or concurrently with the time of voting, each such name to be prefixed with a "C." This list shall be known as the Military, Veterans and Emergency Civilians Absentee Voters File for the Primary or Election of (date of primary or election) and shall be posted for a period commencing the Tuesday prior to the day of the primary or election until the [third Monday] day following the primary or election or the day on which the county board of elections certifies the returns of the primary or election, whichever date is later. Such file shall be open to public inspection at all times subject to reasonable safeguards, rules and regulations. This posted list shall not contain any military address or references to any military organization. Upon written request, the county board shall furnish a copy of such list to any candidate or party county chairman.

(c) Not less than five days preceding the election, the chief clerk shall prepare a list for each election district showing the names and post office addresses of all voting residents thereof to whom official absentee ballots shall have been issued. Each such list shall be prepared in duplicate, shall be headed "Persons in (give identity of election district) to whom absentee ballots have been issued for the election of (date of election)," and shall be signed by him not less than four days preceding the election. He shall post the original of each such list in a conspicuous place in the office of the county election board and see that it is kept so posted until the close of the polls on election day. He shall cause the duplicate of each such list to be delivered to the judge of election in the election district in the same manner and at the same time as are provided in this act for the delivery of other election supplies, and it shall be the duty of such judge of election to post such duplicate list in a conspicuous place within the polling place of his district and see that it is kept so posted throughout the time that the polls are open. Upon written request, he shall furnish a copy of such list to any candidate or party county chairman.

Section 8.  Sections 1304 and 1306, subsection (b) of section 1307 and section 1308 of the act, amended August 13, 1963 (P. L. 707), are amended to read:

Section 1304.  Envelopes for Official Absentee Ballots.—
The county boards of election shall provide two additional envelopes for each official absentee ballot of such size and shape as shall be prescribed by the Secretary of the Commonwealth, in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed, stamped or endorsed the words "Official Absentee Ballot," and nothing else. On the larger of the two envelopes, to be enclosed within the mailing envelope, shall be printed the form of the declaration of the elector, and the name and address of the county board of election of the proper county. The larger envelope shall also contain information indicating the local election district of the absentee voter. Said form of declaration and envelope shall be as prescribed by the Secretary of the Commonwealth

and shall contain among other things a statement of the elector's qualifications, together with a statement that such elector has not already voted in such primary or election. The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, lists of candidates when authorized by section 1303 subsection (b) of this act, the uniform instructions in form and substance as prescribed by the Secretary of the Commonwealth and nothing else: Provided, however, That envelopes for electors qualified under preceding section 1301, subsections (a) to (h), inclusive, shall have printed across the face of each transmittal or return envelope two parallel horizontal red bars, each one-quarter inch wide, extending from one side of the envelope to the other side, with an intervening space of one-quarter inch, the top bar to be one and one-quarter inches from the top of the envelope and with the words "Official Election Balloting Material via Air Mail" between the bars; that there be printed, in the upper right corner of each such envelope in a box, the words "Free of U. S. Postage, Including Air Mail;" that all printing on the face of each such envelope be in red, and that there be printed in red, in the upper left corner of each such envelope, the name and address of the county board of elections of the proper county or blank lines for return address of the sender:

Provided further, That the aforesaid envelope addressed to the elector may contain absentee registration forms [and instructions] where required, and shall contain detailed instructions on the procedures to be observed in casting an absentee ballot as prescribed by the Secretary of the Commonwealth, together with return envelope upon which is printed the name and address of the registration commission of the proper county, which envelope shall have printed across the face two parallel horizontal red bars, each one-quarter inch wide, extending from one side of the envelope to the other side, with an intervening space of one-quarter inch, the top bar to be one and one-quarter inches from the top of the envelope and with the words "Official Election Balloting Material via Air Mail" between the bars; that there be printed in the upper right corner of each such envelope in a box the words "Free of U. S. Postage, Including Air Mail," and, in the upper left corner of each such envelope, blank lines for return address of the sender; that all printing on the face of each such envelope be in red.

Section 1306. Voting by Absentee Electors.—(a) At any time after receiving an official absentee ballot, but on or before [the day of] five o'clock P. M. on the Friday prior to the primary or election, the elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is

printed, stamped or endorsed "Official Absentee Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person [or by representative] to said county board of election:

Provided, however, That any elector, spouse of the elector or dependent of the elector, qualified in accordance with the provisions of section 1301, subsections (e), (f), (g) and (h) to vote by absentee ballot as herein provided, shall be required to include on the form of declaration a supporting declaration in form prescribed by the Secretary of the Commonwealth, to be signed by the head of the department or chief of division or bureau in which the elector is employed, setting forth the identity of the elector, spouse of the elector or dependent of the elector:

Provided further, That any elector who has filed his application in accordance with section 1302 [, subsection (f)] subsection (e) (2), and is unable to sign his declaration because of illness or physical disability, shall be excused from signing upon making a declaration which shall be witnessed by one adult person in substantially the following form: I hereby declare that I am unable to sign my declaration for voting my absentee ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

......................(Mark)

.................................
(Date)

.................................
(Signature of Witness)

.................................
(Complete Address of Witness)

(b) In the event that any such elector, excepting an elector in military service or any elector unable to go to his polling place because of illness or physical disability, entitled to vote an official absentee ballot shall be in the county of his residence on the day for holding the primary or election for which the ballot was issued, or in the event any such elector shall have recovered from his

illness or physical disability sufficiently to permit him to present himself at the proper polling place for the purpose of casting his ballot, such absentee ballot cast by such elector shall, [upon challenge properly sustained,] be declared void.

[However, any] Any such elector referred to in this subsection, who is within the county of his residence must present himself at his polling place and, shall be permitted to vote upon presenting himself at his regular polling place in the same manner as he could have voted had he not received an absentee ballot: Provided, That such elector has first presented himself [before the court of common pleas of his county between the hours of seven o'clock A. M. and five o'clock P. M. on the day of any primary or election and has procured an "Emergency Voting Form" signed by the court, which form entitles the elector to vote at his regular polling place upon the signing of a voter's certificate: Provided, however, That the court may require the surrender of said elector's absentee ballot where he has not already voted, which shall thereupon be marked "cancelled" by said court and transmitted to the county board of elections. In the event such elector has already voted, then the court shall direct the county board of elections to set such ballot aside unopened.] to the judge of elections in his local election district and shall have signed the affidavit on the absentee voter's temporary registration card, which affidavit shall be in substantially the following form:

I hereby swear that I am a qualified registered elector who has obtained an absentee ballot, however, I am present in the county of my residence and physically able to present myself at my polling place and therefore request that my absentee ballot be voided.

..................................

(Date) (Signature of Elector)

..................................

(Local Judge of Elections)

An elector who has received an absentee ballot under the emergency application provisions of section 1302.1, and for whom, therefore, no temporary absentee voter's registration card is in the district register, shall sign the aforementioned affidavit in any

case, which the local judge of elections shall then cause to be inserted in the district register with the elector's permanent registration card.

Section 1307.    Certain Electors Voting in Districts of Residence.—
* * *

(b) Each such application shall be in the form and shall contain the information required by this act together with a statement by the applicant that he has not already voted in the election.

The county board of elections shall ascertain from the information on such application or from any other source that such applicant possesses all the qualifications of a qualified elector other than being registered or enrolled.    If the board is satisfied that the applicant is qualified to receive an official absentee ballot, the application shall be marked "Approved," subject to the limitations set out in section 1302.2 of this act.    When so approved, the county board of elections shall cause the applicant's name and residence (and at primaries, the party enrollment) to be inserted in the "Military, Veterans and Emergency Civilian Absentee Voters File" as provided in section 1302.3 subsection (b).
* * *

Section 1308.    Canvassing of Official Absentee Ballots.—
(a) The county boards of election, upon receipt of official absentee ballots in such envelopes, shall safely keep the same in sealed or locked containers until they [meet to canvass official absentee ballots, which canvass shall begin immediately following the official civilian canvass for the primary or November election or the second Friday following the primary or November election, whichever date is later. Said canvass to commence at ten o'clock A. M., Eastern Standard Time.    No such ballots shall be counted which are received in their offices later than ten o'clock A. M., Eastern Standard Time, of the second Friday following the primary election or the November election.    At such time the members of the return boards or the county boards of election shall in person dispose of official absentee ballots in the manner hereinafter set forth.    The county boards of election may designate a sufficient number of clerks to perform such duties.    When it is determined that clerks shall be appointed, the total number shall in every case be in multiples of three, and each member of a county board of elections shall appoint an equal number thereof.] distribute same to the appropriate local election districts in a manner prescribed by the Secretary of the Commonwealth.

The county board of elections shall then distribute the absentee ballots, unopened, to the absentee voter's respective election dis-

trict concurrently with the distribution of the other election supplies. Absentee ballots shall be canvassed immediately and continuously without interruption until completed after the close of the polls on the day of the election in each election district. The results of the [1] canvass of the absentee ballots shall then be included in and returned to the county board with the returns of that district. No absentee ballot shall be counted which is received in the office of the county board of election later than five o'clock P. M. on the Friday immediately preceding the primary or November election.

(b) [Each candidate for nomination or election shall be entitled to appoint one watcher and each political party or body which has nominated candidates shall be entitled to appoint three watchers.] Watchers shall be permitted to be present when the envelopes containing official absentee ballots are opened and when such ballots are counted and recorded.

[(c) In disposing of an official absentee ballot the county return board or the county board of election shall examine the declaration and if the same bears a date later than the date of such primary or election, the envelope shall be set aside unopened.]

(d) Whenever it shall appear by due proof that any absentee elector who has returned his ballot in accordance with the provisions of this act has died prior to the opening of the polls on the day of the primary or election, the ballot of such deceased elector shall be rejected by the canvassers but the counting of the ballot of an elector thus deceased shall not of itself invalidate any nomination or election.

(e) [The] At such time the local election board shall then further examine the declaration on each envelope not so set aside and shall compare the information thereon with that contained in the "Registered Absentee Voters File," the absentee voters' list and the "Military Veterans and Emergency Civilians Absentee Voters File." If the local election board is satisfied that the declaration is sufficient [and that the elector has qualified,] and [the board has utilized] the information contained in the "Registered Absentee Voters File," the absentee voters' list and the "Military Veterans and Emergency Civilians Absentee Voters File" [to verify] verifies his right to vote, the local election board shall announce

[1] "canvas" in original.

the name of the elector and shall give any watcher present an opportunity to challenge [in like manner and for the same cause, except the failure of qualified electors set forth in preceding section 1301, subsections (a) to (i), inclusive, to register or enroll, as the elector could have been challenged had he presented himself in his own district to vote other than by official absentee ballot: Provided further, That any watcher may challenge] any absentee elector upon the ground or grounds (1) that the absentee elector is not a qualified [absentee] elector; [as defined in this act;] or (2) that the absentee elector was within the county of his residence on the day of the primary or election during the period the polls were open, except where he was in military service or except in the case where his ballot was obtained for the reason that he was unable to appear personally at the polling place because of illness or physical disability; or (3) that the absentee elector was able to appear personally at the polling place on the day of the primary or election during the period the polls were open in the case his ballot was obtained for the reason that he was unable to appear personally at the polling place because of illness or physical disability.  Upon challenge of any absentee elector, as set forth herein the local election board shall mark "challenged" on the envelope together with the reason or reasons therefor, and the same shall be set aside for return to the county board unopened pending decision by the county board and shall not be counted. All absentee ballots not challenged for any of the reasons provided herein shall be counted and included with the general return of paper ballots or voting machines, as the case may be as follows. Thereupon, the local election board shall open the envelope of every unchallenged absentee elector in such manner as not to destroy the declaration executed thereon.  All of such envelopes on which are printed, stamped or endorsed the words "Official Absentee Ballot" shall be placed in one or more depositories at one time and said depository or depositories well shaken and the envelopes mixed before any envelope is taken therefrom.  If any of these envelopes shall contain any extraneous marks or identifying symbols other than the words "Official Absentee Ballot," the envelopes and the ballots contained therein shall be set aside and declared void.  The local election board shall then break the seals of such envelopes, remove the ballots and record the votes in the same manner as district election officers are required to record votes.  With respect to the challenged ballots, [the board] they shall be returned

to the county board with the returns of the local election district where they shall be placed unopened in a secure, safe and sealed container in the custody of the county board until it shall fix a time and place for a formal hearing of all such challenges and notice shall be given where possible to all absentee electors thus challenged and to every attorney, watcher or candidate who made such challenge. The time for the hearing shall not be later than [ten (10)] seven (7) days after the date of said challenge. On the day fixed for said hearing, the county board shall proceed without delay to hear said [1] challenges and, in hearing the testimony, the county board shall not be bound by technical rules of evidence. The testimony presented shall be stenographically recorded and made part of the record of the hearing. The decision of the county board in upholding or dismissing any [2] challenge may be reviewed by the court of common pleas of the county upon a petition filed by any person aggrieved by the decision of the county board. Such appeal shall be taken, within two (2) days after such decision shall have been made, whether reduced to writing or not, to the court of common pleas setting forth the objections to the county board's decision and praying for an order reversing same. Pending the final determination of all appeals, the county board shall suspend any action in canvassing and computing all challenged ballots irrespective of whether or not appeal was taken from the county board's decision. Upon completion of the computation of the returns of the county, the votes cast upon the challenged official absentee ballots shall be added to the other votes cast within the county.

(f) Any person challenging an application for an absentee ballot or an absentee ballot for any of the reasons provided in this act shall deposit the sum of ten dollars ($10.00) in cash with the local election board, in cases of challenges made to the local election board and with the county board in cases of challenges made to the county board for which he shall be issued a receipt for each challenge made, which sum shall only be refunded if the challenge is sustained or if the challenge is withdrawn within five

---

[1] "challenge" in original.
[2] "challenges" in original.

(5) days after the primary or election. If the challenge is dismissed by any lawful order then the deposit shall be forfeited. All deposit money received by the local election board shall be turned over to the county board simultaneously with the return of the challenged ballots. The county board shall deposit all deposit money in the general fund of the county.

Notice of the requirements of subsection (b) of section 1306 shall be printed on the envelope for the absentee ballot.

Section 9. The act is amended by adding after section 1330, a new section to read:

Section 1331. Violation of Provisions Relating to Absentee Voting.—Any person who shall violate any of the provisions of this act relating to absentee voting shall, unless otherwise provided, be subject to the penalties provided for in section 1850 of this act.

Section 10. This act shall take effect immediately.

APPROVED—The 11th day of December, A. D. 1968.

RAYMOND P. SHAFER.

---

## No. 376

## AN ACT

**SB 1086**

Prohibiting the interception and interference of certain police and fire radio broadcasts; regulating the manufacture, conversion, sale, possession and use of certain equipment adaptable for such purpose and prescribing penalties.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

Section 1. Police and Fire Radio Broadcasts.—(a) Police or fire radio broadcasts as used herein shall mean broadcasts on frequencies from one hundred fifty-four to one hundred fifty-six megacycles and four hundred fifty-three to four hundred fifty-nine megacycles only.

(b) No unauthorized person shall interfere with or broadcast on any police or fire radio broadcast. No person shall intercept any such broadcast for the purpose of aiding himself or others in the perpetra-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, PHILADELPHIANS ORGANIZED TO WITNESS, EMPOWER AND REBUILD, COMMON CAUSE PENNSYLVANIA, BLACK POLITICAL EMPOWERMENT PROJECT, MAKE THE ROAD PENNSYLVANIA, JEAN TERRIZZI, BARRY M. SEASTEAD, MARJORIE BOYLE, MARLENE G. GUTIERREZ, DEBORAH DIEHL, AYNNE MARGARET PLEBAN POLINSKI, JOEL BENCAN, and LAURENCE M. SMITH,

*Plaintiffs*,

v.

LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth, ADAMS COUNTY BOARD OF ELECTIONS, ALLEGHENY COUNTY BOARD OF ELECTIONS, ARMSTRONG COUNTY BOARD OF ELECTIONS, BEAVER COUNTY BOARD OF ELECTIONS, BEDFORD COUNTY BOARD OF ELECTIONS, BERKS COUNTY BOARD OF ELECTIONS, BLAIR COUNTY BOARD OF ELECTIONS, BRADFORD COUNTY BOARD OF ELECTIONS, BUCKS COUNTY BOARD OF ELECTIONS, BUTLER COUNTY BOARD OF ELECTIONS, CAMBRIA COUNTY BOARD OF ELECTIONS, CAMERON COUNTY BOARD OF ELECTIONS, CARBON COUNTY BOARD OF ELECTIONS, CENTRE COUNTY BOARD OF ELECTIONS, CHESTER COUNTY BOARD OF ELECTIONS, CLARION COUNTY BOARD OF ELECTIONS, CLEARFIELD COUNTY BOARD OF ELECTIONS, CLINTON COUNTY BOARD OF ELECTIONS, COLUMBIA COUNTY BOARD OF ELECTIONS, CRAWFORD COUNTY BOARD OF ELECTIONS, CUMBERLAND COUNTY BOARD OF ELECTIONS, DAUPHIN COUNTY BOARD OF ELECTIONS, DELAWARE COUNTY BOARD OF ELECTIONS, ELK COUNTY BOARD OF ELECTIONS, ERIE

Civ. No. 22-339

COUNTY BOARD OF ELECTIONS, FAYETTE COUNTY BOARD OF ELECTIONS, FOREST COUNTY BOARD OF ELECTIONS, FRANKLIN COUNTY BOARD OF ELECTIONS, FULTON COUNTY BOARD OF ELECTIONS, GREENE COUNTY BOARD OF ELECTIONS, HUNTINGDON COUNTY BOARD OF ELECTIONS, INDIANA COUNTY BOARD OF ELECTIONS, JEFFERSON COUNTY BOARD OF ELECTIONS, JUNIATA COUNTY BOARD OF ELECTIONS, LACKAWANNA COUNTY BOARD OF ELECTIONS, LANCASTER COUNTY BOARD OF ELECTIONS, LAWRENCE COUNTY BOARD OF ELECTIONS, LEBANON COUNTY BOARD OF ELECTIONS, LEHIGH COUNTY BOARD OF ELECTIONS, LUZERNE COUNTY BOARD OF ELECTIONS, LYCOMING COUNTY BOARD OF ELECTIONS, MCKEAN COUNTY BOARD OF ELECTIONS, MERCER COUNTY BOARD OF ELECTIONS, MIFFLIN COUNTY BOARD OF ELECTIONS, MONROE COUNTY BOARD OF ELECTIONS, MONTGOMERY COUNTY BOARD OF ELECTIONS, MONTOUR COUNTY BOARD OF ELECTIONS, NORTHAMPTON COUNTY BOARD OF ELECTIONS, NORTHUMBERLAND COUNTY BOARD OF ELECTIONS, PERRY COUNTY BOARD OF ELECTIONS, PHILADELPHIA COUNTY BOARD OF ELECTIONS, PIKE COUNTY BOARD OF ELECTIONS, POTTER COUNTY BOARD OF ELECTIONS, SCHUYLKILL COUNTY BOARD OF ELECTIONS, SNYDER COUNTY BOARD OF ELECTIONS, SOMERSET COUNTY BOARD OF ELECTIONS, SULLIVAN COUNTY BOARD OF ELECTIONS, SUSQUEHANNA COUNTY BOARD OF ELECTIONS, TIOGA COUNTY BOARD OF ELECTIONS, UNION COUNTY BOARD OF ELECTIONS, VENANGO COUNTY BOARD OF ELECTIONS, WARREN COUNTY BOARD OF ELECTIONS, WASHINGTON COUNTY BOARD OF ELECTIONS, WAYNE COUNTY BOARD OF ELECTIONS, WESTMORELAND COUNTY BOARD OF ELECTIONS, WYOMING COUNTY BOARD OF

ELECTIONS, and YORK COUNTY BOARD OF ELECTIONS,

*Defendants*.

**AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. Plaintiffs—nonpartisan organizations dedicated to promoting American democracy and the participation of Pennsylvania voters in our shared civic enterprise, and a bipartisan group of Pennsylvania voters, ages 64 through 95, all of whom cast mail ballots in the 2022 election—bring this Complaint for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 52 U.S.C. § 10101 to ensure that qualified Pennsylvania voters are not disenfranchised based on an immaterial paperwork error.

2. Defendants, Pennsylvania's Acting Secretary of the Commonwealth and the 67 Pennsylvania county boards of elections, will not count thousands of timely-received mail ballots submitted for the November 2022 election and future elections by otherwise qualified voters based on a meaningless technicality—that the ballots are missing a handwritten date next to their signature on the return envelope, or because the handwritten date is somehow "wrong." This refusal to count timely mail ballots submitted by otherwise eligible voters because of a trivial paperwork error violates the Materiality Provision of the Civil Rights Act, which makes it unlawful to deny the right to vote based on an "error or omission" on a voting-related "record or paper" that is "not material in determining whether [a voter] is qualified under State

Case 1:22-cv-00339-SPB Document 121 Filed 01/30/23 Page 4 of 39

law to vote in [the] election." 52 U.S.C. § 10101(a)(2)(B). Because mail ballots in Pennsylvania may, under state law, be completed at "any time," and because their timeliness is determined by when a local county board of elections receives and date-stamps the ballot, the presence or absence of a handwritten date on the envelope is utterly immaterial to determining whether the ballot was timely received, much less to assessing a voter's qualifications. *See Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir.), *vacated as moot*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022).

3. In addition to the Materiality Provision, Defendants' refusal to count timely-received mail ballots based on an immaterial paperwork error also violates the Equal Protection Clause of the Fourteenth Amendment because it imposes arbitrary distinctions between different mail ballot voters that are unsupported by any legitimate government interest (let alone a compelling one).

4. The Plaintiff organizations represent the interests of their combined thousands of members. Many of the Plaintiff organizations' members are qualified and registered Pennsylvania voters who timely voted by mail-in ballot, some of whom were or will be directly affected by Defendants' enforcement of the immaterial envelope-date rule in 2022 as well as future elections. The Plaintiff organizations' expansive get-out-the-vote and voter education efforts are also burdened, even undermined, by hyper-technical rules that disenfranchise thousands of Pennsylvania voters based on an inconsequential paperwork error.

5. As for the individual voter Plaintiffs, they seek to vindicate their fundamental right to vote, which includes having their votes for federal, state, and

local offices counted. The individual Plaintiffs, all of whom were disenfranchised by Defendants' actions, care deeply about their right to vote for numerous reasons, including ensuring representation for themselves and their families, and making themselves heard on the issues that matter to them.

6. Absent declaratory and injunctive relief from this court, the individual voter plaintiffs and the organizational plaintiffs and their members will suffer irreparable harm.

**JURISDICTION AND VENUE**

7. Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 to enforce the rights guaranteed by 52 U.S.C. § 10101 and the Fourteenth Amendment. Alternatively, Plaintiffs bring suit directly under Section 10101 via the implied right of action contained within 52 U.S.C. § 10101.

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights cases).

9. Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

10. Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district and several Defendants conduct business in this district. And venue in the Erie Division is appropriate because the Defendants include the boards of elections in Crawford, Elk, Erie, Forest, McKean, Venango, and Warren Counties, and the Plaintiffs include

organizations with members in those counties as well as individual voters who vote in Crawford and Warren counties. *See* W.D. Pa. LCvR 3.

**PARTIES**

11. The Pennsylvania State Conference of the NAACP ("the State Conference") is a non-profit, non-partisan organization that works to improve the political, educational, social, and economic status of African-Americans and other racial and ethnic minorities, to eliminate racial prejudice, and to take lawful action to secure the elimination of racial discrimination, among other objectives. The State Conference has thousands of members who live and/or work in Pennsylvania, many of whom are registered to vote in Pennsylvania and are at risk of disenfranchisement if Defendants fail to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope.

12. The State Conference advocates for civil rights, including voting rights, for Black Americans, both nationally and in Pennsylvania. Every election cycle, the State Conference engages in efforts to get out the vote, including by educating Black voters in Pennsylvania on different methods of voting, providing educational guides on local candidates to increase voter engagement, and focusing on strategies to eliminate Black voter suppression both nationally and in Pennsylvania.

13. Defendants' failure to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope will disenfranchise potentially thousands of voters, directly affecting the State Conference's members and interfering with its ability to carry out its mission of increasing voter turnout and

participation. Defendants' failure to count such ballots also has caused and will cause the State Conference to divert resources in this and future elections from its existing voter education and mobilization efforts towards investigating and educating voters about any available cure processes or to advocate that new processes be developed to ensure that voters who are eligible and registered and who submitted their ballots on time are not disenfranchised by a trivial paperwork mistake.

14.     The League of Women Voters of Pennsylvania ("the League") is a nonpartisan statewide non-profit formed in 1920. The League and its members are dedicated to helping the people of Pennsylvania exercise their right to vote, as protected by the law. The League has 2,500 members across Pennsylvania, including in Crawford, Elk, Erie, Forest, McKean, Venango, and Warren Counties. Members of the League are registered voters in Pennsylvania who regularly vote in state and federal elections, including by mail or absentee ballot. The League's members are at risk of disenfranchisement if Defendants fail to count ballots based solely on a missing or incorrect handwritten date on the return envelope.

15.     The League's mission includes voter registration, education, and get-out-the-vote drives. The League conducts voter-registration drives, staffs nonpartisan voter-registration tables, educates incarcerated and formerly incarcerated individuals about their voting rights, and works with local high schools to register new 18-year-old voters. It also maintains an online database called VOTE411, a nonpartisan and free digital voter resource with information available in both

English and Spanish, including voter guides, candidate information, polling rules and locations, and more.

16.    Defendants' failure to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope will disenfranchise potentially thousands of voters, thus directly affecting the League's members and interfering with the League's ability to carry out its mission of increasing voter turnout and participation. And both now and especially in future elections, the Defendants' enforcement of the immaterial envelope-date rule has caused and will cause the League to divert resources from its existing voter-mobilization and education efforts towards identifying voters who neglected to write the date on the return envelope, educating voters about any available cure processes, and advocating for new cure processes to be developed in real time at the county level. For future elections, the League will be forced to dedicate resources to educating voters about strict compliance with hyper-technical rules of Pennsylvania election law so that voters are not disenfranchised over trivial and immaterial paperwork errors.

17.    Philadelphians Organized to Witness, Empower and Rebuild ("POWER") is a Pennsylvania nonprofit founded in 2011 to advance concrete policy changes to transform and strengthen communities. POWER is an organization of more than 100 congregations of various faith traditions, cultures and neighborhoods committed to racial and economic justice on a livable planet. One of its five priority areas is civic engagement and organizing communities so that the voices of all faiths, races and income levels are counted and have a say in government.

18.     POWER engages directly with people who live in the communities that its member congregations serve. Its civic engagement efforts include voter education programs, voter registration drives, information about applying for mail ballots, completing them properly and returning them on time, and "Souls to the Polls" efforts to encourage congregants to vote. In the 2020 election cycle, POWER contacted more than 700,000 voters and plans to reach a similar number in 2022.

19.     In the three weeks leading up to this November's election, POWER launched a three-week bus tour to promote a vision for building a community in Pennsylvania rooted in inclusivity, diversity and justice. The bus tour scheduled numerous events, including voter registration canvasses and voter education programs that provide information on mail voting.

20.     Because of Defendants' failure to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope, POWER must divert its limited resources to re-contacting voters to make sure they dated their ballots. Refusing to count votes based on immaterial paperwork errors has a suppressive effect on the communities POWER serves by erecting yet another roadblock preventing them from voting and having their votes counted. In this, as well as future elections, the Defendants' enforcement of the immaterial envelope-date rule has caused and will cause POWER to divert resources from its existing voter-mobilization and education efforts towards counteracting the disenfranchising effects of the strict enforcement of the envelope-date requirement.

21.     Common Cause Pennsylvania ("Common Cause") is a non-profit political advocacy organization and a chapter of the national Common Cause organization. Common Cause has approximately 36,000 members and supporters in Pennsylvania. These members live in all 67 counties of Pennsylvania, and many members are registered voters in Pennsylvania who are at risk of disenfranchisement if Defendants fail to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope.

22.     Common Cause seeks to increase the level of voter registration and voter participation in Pennsylvania elections, especially in communities that are historically underserved and whose populations have a low propensity for voting. Many of these communities are communities of color.

23.     In preparation for the statewide election, Common Cause mobilizes hundreds of volunteers to help fellow Pennsylvanians navigate the voting process and cast their votes without obstruction, confusion, or intimidation. Common Cause leads the nonpartisan Election Protection volunteer program, which aims to ensure voters have access to the ballot box, provide voters with necessary voting information and answer their questions, quickly identify and correct any problems at polling places, and gather information to identify potential barriers to voting. Because of Defendants' refusal to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope, in this and future elections Common Cause was required and will be required to divert resources from its existing efforts towards educating voters about the drastic consequences of failing to comply with a

trivial paperwork requirement that was previously understood (including by a panel of federal judges) to be superfluous, and about any available cure processes to prevent the disenfranchisement of its members and other Pennsylvania voters.

24. Black Political Empowerment Project ("B-PEP") is a non-profit, non-partisan organization that has worked since 1986 to ensure that the Pittsburgh African-American community votes in every election. B-PEP has numerous supporters, of various ages and races, throughout the Pittsburgh Region, working with numerous community organizations to empower Black and brown communities.

25. During every election cycle, B-PEP's work includes voter registration drives, get-out-the-vote activities, education and outreach about the voting process, and election-protection work. B-PEP focuses these activities in predominantly Black neighborhoods in Allegheny County, with some efforts in Westmoreland and Washington Counties. In preparation for the November 8, 2022, election, B-PEP's work has included educating its members and voters in predominantly Black communities about the importance of voting, and about how to vote, either in person or by mail. B-PEP's members include many older voters, who are at particularly high risk of having their ballots disqualified for minor errors, such as omitting the date on the mail-in-ballot-return envelope. B-PEP has an interest in preventing the disenfranchisement of eligible voters who seek to have their votes counted.

26. Make the Road Pennsylvania ("Make the Road PA") is a not-for-profit, member-led organization formed in 2014 that builds the power of the working-class in Latino and other communities to achieve dignity and justice through organizing,

policy innovation, and education services. Make the Road PA's more than 10,000 members are primarily working-class residents of Pennsylvania, many in underserved communities. Many members of Make the Road PA are registered voters in Pennsylvania and are at risk of disenfranchisement if Defendants fail to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope.

27.     Make the Road PA's work includes voter protection, voter advocacy and voter education on, for example, how to register to vote, how to apply for mail-in/absentee ballots, how to return mail-in/absentee ballots, and where to vote. Make the Road PA has run active programs to register voters in historically underserved communities of color, especially in Berks, Bucks, Lehigh, Northampton and Philadelphia Counties.

28.     Defendants' failure to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope will disenfranchise potentially thousands of voters, thus directly affecting Make the Road PA's members and interfering with Make the Road's ability to carry out its mission of increasing voter turnout and participation. Indeed, because Make the Road PA's efforts are focused on communities where some voters are not native English speakers, the risk that some voters may make a minor paperwork mistake in filling out various forms related to mail or absentee ballot voting is heightened. For example, if a voter followed the date sequencing convention used by many other countries, they may have transposed the day before the month in dating their outer return envelope—

and, on information and belief, that would constitute an "incorrect" date under Defendants' standards. Defendants' failure to count timely-submitted mail-in ballots based solely on a missing or incorrect date on the return envelope in this and future elections also has caused and will cause Make the Road PA to divert resources from its existing efforts towards focusing voters on trivial, technical mail ballot rules and towards investigating and educating voters about any available cure processes that might be available for the thousands who will invariably be disenfranchised by a trivial paperwork mistake under Defendants' current policy.

29. Jean Terrizzi is a Philadelphia voter facing disenfranchisement by Defendants solely because her timely-received mail ballot purportedly lacks a date next to the signature on the outer return envelope. Jean Terrizzi is 95 years old and has lived on the same block in Philadelphia for her entire life. She is qualified to vote in Pennsylvania, has been voting regularly in Philadelphia for decades, and has been voting by mail for the past few years. For the November 8, 2022 election, Terrizzi properly requested a mail-in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. Terrizzi believed she had followed all of the instructions and returned her mail ballot weeks before Election Day. She does not have an email address and did not receive any notification from Defendants that there was any problem with her ballot. She learned on the Sunday before Election Day, after being contacted by a reporter, that her ballot would not be counted. She is physically immobile and was not able to attempt to cure by voting provisionally in person. Voting is important to Terrizzi

because she wants to elect leaders who will support her children, grandchildren, and great-grandchildren living in the Philadelphia area, and she wants her vote for federal and state offices to count in this election. A true and correct copy of Terrizzi's declaration is attached as Ex. A.

30. Barry M. Seastead is a Warren County voter facing disenfranchisement by Defendants solely because his timely-received mail ballot has a purportedly-incorrect date next to the signature on the outer return envelope. Seastead is a 68-year-old retired welder. He has been a registered voter in Warren County for decades, ever since he was legally eligible to vote. He votes regularly, and has been voting by mail for the past few years. For the November 8, 2022 election, Seastead properly requested a mail-in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the declaration. Seastead also believes he wrote the date on which he filled out the ballot, and he is unaware of why the Warren County Board of Elections rejected the date he wrote as "incorrect." Because Warren County did not provide him with any notice of its determination that the date he wrote was incorrect, he had no opportunity to cure any defect regarding the date on his outer return envelope prior to Election Day and only learned after Election Day that his vote was not counted. Voting is important to Seastead because he is the grandson of an immigrant and believes that voting is the foundation of this country, and he wants his vote for federal and state offices to count in this election. A true and correct copy of Seastead's declaration is attached as Ex. B.

31.     Marjorie Boyle is a Crawford County voter facing disenfranchisement by Defendants solely because her timely-received mail ballot has a missing or purportedly-incorrect date next to the signature on the outer return envelope. Boyle is 76 years old. Before her retirement, she performed clerical work assisting with subsidized housing applications. Boyle is a qualified voter who has been registered to vote in Crawford County since moving there in 2006. For the November 8, 2022 election, Boyle properly requested a mail-in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. She read all the instructions and recalls writing a date while completing her ballot, and she believed she had completed all of the requisite steps. Because Crawford County did not provide her with any notice of the missing date, she had no opportunity to cure any defect regarding the date on her outer return envelope prior to Election Day and only learned after Election Day that her vote was not counted. Voting is important to Boyle because she believes voting allows her to stand up for her rights and issues that are important to her, and she wants her vote for federal and state offices to count in this election. A true and correct copy of Boyle's declaration is attached as Ex. C.

32.     Marlene G. Gutierrez is a York County voter facing disenfranchisement by Defendants solely because her timely-received mail ballot lacks a date next to the signature on the outer return envelope. Gutierrez is 64 years old. She works as a corporate travel agent. She first registered to vote in York County when she was 18 years old, and after residing elsewhere for several years, she most recently registered

to vote in York County when she moved back in September 2020. She has been regularly voting by mail for at least twenty years. For the November 8, 2022 election, Gutierrez properly requested a mail-in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. Gutierrez believed she had followed all of the instructions but learned on Election Day that her ballot would not be counted, and she did not have time to cure her ballot. Voting is important to Gutierrez because she wants her preferred political party to represent her, and she wants her vote for federal and state offices to count in this election. A true and correct copy of Gutierrez's declaration is attached as Ex. D.

33.     Deborah Diehl is a York County voter facing disenfranchisement by Defendants solely because her timely-received mail ballot has a missing or purportedly-incorrect date next to the signature on the outer return envelope. Diehl is 67 years old. She is a retired nurse. Diehl is a qualified voter who participates regularly in elections: she has been registered to vote in York County for 23 years, and has been a registered Pennsylvania voter since she was 18 years old. She has been voting by mail since 2018 because of a disability. For the November 8, 2022 election, Diehl properly requested a mail-in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. Because York County did not provide her with any notice of the missing date, she had no opportunity to cure any defect regarding the date on her outer return envelope prior to Election Day and only learned after Election Day that her vote was

not counted. Voting is important to Diehl because she strongly believes in exercising her constitutional right to vote and she wants her vote for federal and state offices to count in this election. A true and correct copy of Diehl's declaration is attached as Ex. E.

34.     Aynne Margaret Pleban Polinski is a York County voter who is facing disenfranchisement by Defendants solely because her timely-received mail ballot lacks a date next to the signature on the outer return envelope. Polinski is 71 years old. She is a retired art educator, art therapist, and professional artist. Polinski is a qualified voter who participates regularly in elections: she has been a registered voter in York County since 2016 and a registered voter in the Commonwealth of Pennsylvania since she was 18 years old. Polinski has been voting by mail since the June 2020 presidential primary because of the COVID-19 pandemic. For the November 8, 2022 election, Polinski properly requested a mail-in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. Because York County did not provide her with any notice of the missing date, she had no opportunity to cure any defect regarding the date on her outer return envelope prior to Election Day and only learned after Election Day that her vote was not counted. Voting is important to Polinski because she believes everyone has a right to support their preferred candidate and policies, and she wants her vote for federal and state offices to count in this election. A true and correct copy of Polinski's declaration is attached as Ex. F.

35. Joel Bencan is a Montgomery County voter facing disenfranchisement by Defendants solely because his timely-received mail ballot has a purportedly-incorrect date next to the signature on the outer return envelope. Bencan is 71 years old. He is a retired pharmacist. He has been a registered voter for decades and has participated regularly in elections since the Nixon Administration. Bencan began voting by mail in 2020 because of the COVID-19 pandemic and has continued since then to vote by mail. For the November 8, 2022 election, Bencan properly requested a mail-in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the declaration. Bencan also recalls writing the date on which he filled out the ballot, and he is unaware of why the Montgomery County Board of Elections rejected the date he wrote as "incorrect." Because Montgomery County did not provide him with any notice of its determination that the date he wrote was incorrect, he had no opportunity to cure any defect regarding the date on his outer return envelope prior to Election Day. Voting is important to Bencan because he believes each individual vote can make a difference, and he wants his vote for federal and state offices to count in this election. A true and correct copy of Bencan's declaration is attached as Ex. G.

36. Laurence M. Smith is a Montgomery County voter who is facing disenfranchisement by Defendants solely because his timely-received mail ballot has a missing or purportedly-incorrect date next to the signature on the outer return envelope. Smith is 78 years old. Before his retirement, he worked as an entrepreneur in the medical services industry. He has been a registered voter for decades, and he

has been voting regularly in Montgomery County since moving there in 1991, including voting by mail since 2020. For the November 8, 2022 election, Smith properly requested a mail-in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the declaration. Smith believed he had followed all of the necessary steps to complete the declaration, and he is unaware of what the Montgomery County Board of Elections concluded was wrong with the date form. Because Montgomery County did not provide him with any notice of its determination about the date form on his outer return envelope, he had no opportunity to cure any defect prior to Election Day. Voting is important to Smith because Smith is concerned with the increasing polarization across the country, and he wants his vote for federal and state offices to count in this election. A true and correct copy of Smith's declaration is attached as Ex. H.

37. Defendant Acting Secretary Leigh Chapman has the duty "[t]o receive from county boards of elections the returns of primaries and elections, to canvass and compute the votes cast for candidates and upon [ballot] questions as required by the provisions of this act; to proclaim the results of such primaries and elections, and to issue certificates of election to the successful candidates at such elections." 25 Pa. Stat. § 2621(f). Defendant Acting Secretary Chapman has issued guidance to county boards of elections that timely-submitted mail-in ballots that are determined to have a missing or incorrect date on the return envelope must be segregated and excluded from tabulation for the 2022 election.

38. Defendant County Boards of Elections are county-level executive agencies established under the Pennsylvania Election Code with jurisdiction over the conduct of primaries and elections in each of their respective counties. *See* 25 Pa. Stat. Ann. § 2641. Each elections board Defendant manages all aspects of elections in its respective county. *Id.* Their authority includes canvassing and computing the votes cast in each county's election districts and then certifying the results of each race to Pennsylvania's Secretary of the Commonwealth. *See* 25 Pa. Stat. Ann. § 2642.

## FACTS

### A. Pennsylvania's Mail Ballot Rules

39. Pennsylvania has long provided absentee-ballot options for voters who cannot attend a polling place on election day. *See* 25 P.S. § 3146.1–3146.9. In 2019, Pennsylvania enacted new mail-in voting provisions, which allow all registered, eligible voters to vote by mail. Act of Oct. 31, 2019, P.L. 552, No. 77, § 8.

40. A voter seeking to vote by mail must complete an application and have their identity and qualifications verified. The voter must provide their name, address, and proof of identification to their county board of elections. 25 P.S. §§ 3146.2, 3150.12. Such proof of identification may include, among other things, a Pennsylvania driver's license number or the last four digits of the voter's social security number. 25 P.S. § 2602(z.5)(3). As part of the application process, voters provide all the information necessary for county boards of elections to verify that they are qualified to vote in Pennsylvania—namely, that they are at least 18 years old, have been a U.S. citizen for at least one month, have resided in the election district

for at least 30 days, and are not incarcerated on a felony conviction. 25 Pa. C.S. § 1301.

41. After the application is submitted, the county board of elections confirms applicants' qualifications by verifying their proof of identification and comparing the information on the application with information contained in a voter's record. 25 P.S. §§ 3146.2b, 3150.12b; *see also id.* § 3146.8(g)(4).[1] The county board's determinations on that score are conclusive as to voter eligibility unless challenged prior to Election Day. *Id.* Once the county board verifies the voter's identity and eligibility, it sends a mail-ballot package that contains a ballot, a "secrecy envelope" marked with the words "Official Election Ballot," and the pre-addressed outer return envelope, on which a voter declaration form is printed (the "Return Envelope"). *Id.* §§ 3146.6(a), 3150.16(a). Poll books kept by the county show which voters have requested mail ballots and which have returned them. *Id.* §§ 3146.6(b)(3), 3150.16(b)(3).

42. At "any time" after receiving their mail-ballot package, the voter marks their ballot, puts it inside the secrecy envelope, and places the secrecy envelope in the Return Envelope. 25 P.S. §§ 3146.6(a), 3150.16(a). The voter delivers the ballot, in the requisite envelopes, by mail or in person to their county board of elections. To be considered timely, a county board of elections must receive a ballot by 8 p.m. on Election Day. *Id.* §§ 3146.6(c), 3150.16(c). Upon receipt of a mail ballot, county boards

[1] *See also* Pa. Dep't of State, *Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes* at 2 (Sept. 11, 2020), https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/Examination%20of%20Absentee%20and%20Mail-In%20Ballot%20Return%20Envelopes.pdf.

of elections stamp the Return Envelope with the date of receipt to confirm its timeliness and log it in the Statewide Uniform Registry of Electors ("SURE") system, the voter registration system used to generate poll books.[2]

43. Timely absentee and mail-in ballots that county boards of elections have verified consistent with the procedures set forth in § 3146.8(g)(3), that have not been challenged, and for which there is no proof that the voter died prior to Election Day are counted and included with the election results. *Id.* § 3146.8(d), (g)(4).

44. Pennsylvania's adoption of mail voting has been a boon for voter participation in the Commonwealth. For example, in 2020, 2.7 million Pennsylvanians voted by absentee or mail ballot.[3]

45. In Pennsylvania's 2022 general election, approximately 1.4 million mail ballots were requested.

**B. Litigation Over the Envelope-Date Requirement**

46. This case involves the instructions regarding the Return Envelope in which a voter places their mail ballot, in particular the direction that a voter "shall . . . fill out, date and sign the declaration printed on such envelope." *See* 25 P.S. §§ 3146.6(a), 3150.16(a). The issue is whether a qualified, registered voter who (1) applies for and obtains a mail ballot, (2) fills it out, places it in the secrecy envelope

---

[2] *See, e.g.,* Pa. Dep't of State, *Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes* at 2–3 (Sept. 11, 2020).

[3] Pa. Dep't of State, *Report on the 2020 General Election* at 9 (May 14, 2021), https://www.dos.pa.gov/VotingElections/Documents/2020-General-Election-Report.pdf. For ease of reference, the term "mail ballots" is used herein to encompass both absentee and mail ballots. The relevant rules governing the treatment of absentee and mail ballots are identical.

and the Return Envelope, and signs the declaration on the Return Envelope, and then (3) timely returns the envelope to their local board of elections by 8 p.m. on Election Day as confirmed by an official date stamp, may nevertheless have their vote invalidated because they did not add a superfluous handwritten date next to their signature on the Return Envelope, or because the date they wrote was deemed "incorrect" by a county board of elections.

47. The envelope-dating provision has been the subject of repeated litigation and guidance from the Department of State, including a unanimous Third Circuit panel decision (which was later vacated as moot) that refusing to count ballots on that basis violates federal law.

**i. *In re Canvass***

48. In 2020, the Supreme Court of Pennsylvania, in the context of a fast-moving post-election lawsuit, concluded 3-1-3 that otherwise valid mail ballots contained in signed but undated Return Envelopes would be counted in that election. *In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1062 (Pa. 2020).

49. The decision from the Supreme Court of Pennsylvania primarily concerned the construction of state law and did not produce a single majority opinion. But a majority of the Court suggested (albeit without deciding) that invalidating votes for failure to comply with the envelope-dating provision "could lead to a violation of federal law by asking the state to deny the right to vote for immaterial reasons," contrary to the Materiality Provision. *In re Canvass*, 241 A.3d 1058 at 1074

n.5 (opinion announcing the judgment for three Justices); *id*. at 1089 n.54 (Wecht, J., concurring and dissenting) (expressing similar concern). Indeed, Justice Wecht was so concerned that he urged the Pennsylvania General Assembly to review the Election Code with "[the Materiality Provision] in mind." *Id*.

**ii. *Migliori***

50. Earlier this year, a unanimous panel of the Third Circuit concluded that disenfranchising voters based on the envelope-dating provision would violate the Materiality Provision. *Migliori*, 36 F.4th at 162–64; *id.* at 164–66 (Matey, J., concurring).[4]

51. In the 2021 Lehigh County elections, 257 timely-received mail ballots (1% of all mail ballots) were initially excluded based on mail-ballot voters' inadvertent failure to handwrite a date on the Return Envelope. Three-quarters of the affected voters were over 65 years old, and fifteen of them were older than 90.[5]

52. Consistent with the then-current guidance from the Secretary of the Commonwealth, the Lehigh County Board of Elections counted ballots where the Return Envelopes had "wrong" dates on them, *e.g.*, a voter wrote their own birthdate instead of the date they signed the envelope. As the county clerk explained, he did so because state law "doesn't say what date."

[4] The undersigned counsel represented the plaintiff voters at all stages of the *Migliori* litigation.

[5] These and other facts from the *Migliori* record are drawn from Joint App'x, *Migliori v. Cohen,* No. 22-1499 (3d Cir.), Dkt.33-2.

53.     The Lehigh County Board of Elections ultimately voted to count the 257 mail ballots without a date on the outer envelope, explaining, among other reasons, that the voters had made a "technical error," that there was no question that the ballots were "received on time," that "the signatures [on the Return Envelopes] match the poll book," and that the directive on the Return Envelope to include a date was in small print and could have been made "much more visible to the voters."

54.     However, a candidate for County Court of Common Pleas, who was then leading the vote count by less than 257 votes, challenged the county board's decision in state court. A divided panel of the Commonwealth Court eventually ruled in his favor in an unpublished decision that briefly mentioned, but did not resolve, the Materiality Provision issue. *See Ritter v. Lehigh Cnty. Bd. of Elections*, No. 1322 C.D. 2021, 272 A.3d 989 (Tbl.), 2022 WL 16577 (Pa. Commw. Ct. Jan. 3, 2022), *appeal denied*, 271 A.3d 1285 (Pa. 2022).

55.     A bipartisan group of voters then sued in federal court. After a district judge dismissed their case on procedural grounds, a unanimous three-judge panel of the U.S. Court of Appeals for the Third Circuit reversed, upholding plaintiffs' right to have their votes counted under federal law. *See Migliori*, 36 F.4th at 162–64; *see also id.* 164–66 (Matey, J., concurring). The court concluded that because omitting the handwritten date on the Return Envelope was not "material in determining whether [a voter] is qualified to vote under Pennsylvania law," disenfranchising voters based on that omission violated federal law, namely, the Materiality Provision. *Id.* at 162–63. Judge Matey concurred that the defendants had offered "no evidence,

and little argument, that the date requirement for voter declarations under the Pennsylvania Election Code … is material as defined in § 10101(a)(2)(B).” *Migliori*, 36 F.4th at 165 (Matey, J., concurring). The court ordered Lehigh County to count the 257 mail ballots in undated envelopes.

56. The Court of Common Pleas candidate pressing the appeal, David Ritter, then sought a stay from the U.S. Supreme Court.

57. The Supreme Court denied the stay, with three justices dissenting, thus allowing (indeed, requiring) Lehigh County to count the 257 mail ballots. *See Ritter v. Migliori*, 142 S. Ct. 1824 (2022) (mem.). The 2021 election was then certified with all the ballots counted, which the parties agreed mooted the controversy. The Supreme Court later granted Ritter’s request to vacate the Third Circuit’s decision as moot, pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), which the Court did in a short-form order that did not question the correctness of the Third Circuit’s decision, *see Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022). Vacatur for mootness is not a merits determination and decisions that have been vacated as moot are still “persuasive” authority. *See Polychrome Int’l Corp. v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993).

**iii. *McCormick and Berks County***

58. After the Third Circuit’s *Migliori* decision, the Commonwealth Court of Pennsylvania twice held that such mail ballots must be counted as a matter of both state and federal law in suits arising out of the 2022 primary. *Chapman v. Berks Cnty. Bd. of Elections*, No. 355 M.D. 2022, 2022 WL 4100998, at *12–*29 (Pa. Commw.

Ct. Aug. 19, 2022); *McCormick for U.S. Senate v. Chapman*, No. 286 M.D. 2022, 2022 WL 2900112, at *9–*15 (Pa. Commw. Ct. June 2, 2022). These decisions agreed with the *Migliori* panel that the federal Materiality Provision required that result. *See, e.g.*, *Berks Cnty.*, 2022 WL 4100998, at *12–*29 (concluding that "the failure of an elector to handwrite a date on the declaration on the return envelope does not relate to the timeliness of the ballot or the qualification of the elector").

59. Consistent with those decisions, the Secretary of the Commonwealth advised counties in the months leading up to the 2022 election to count otherwise valid and timely-received mail ballots even where voters omitted a handwritten date, or wrote a plainly wrong date like a birthdate, on the Return Envelope.[6] The Secretary reaffirmed that guidance after the U.S. Supreme Court vacated on mootness grounds the Third Circuit's *Migliori* decision.[7]

**iv. *Ball v. Chapman***

60. On October 16, 2022, less than a week after the vacatur of the *Migliori* decision, and with voting in the 2022 election already underway, a group of partisan petitioners brought a King's Bench petition in the Supreme Court of Pennsylvania

[6] *See* Pa. Dep't of State, *Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes* (Sept. 26, 2022), https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/2022-09-26-Examination-Absentee-Mail-In-Ballot-Return-Envelopes-3.0.pdf (advising county boards of elections to "include[] in the canvass and pre-canvass ... [a]ny ballot-return envelope that is undated or dated with an incorrect date but has been timely received").

[7] *See* Pennsylvania Pressroom, *Acting Secretary of State Issues Statement on SCOTUS Order on Undated Mail Ballots* (Oct. 11, 2022), https://www.media.pa.gov/Pages/State-details.aspx?newsid=536.

seeking to invalidate mail ballots with no handwritten date on the Return Envelope or with an "incorrect" handwritten date on the Return Envelope.

61. On November 1, 2022, the Supreme Court of Pennsylvania issued an order directing that the mail ballots at issue should be segregated and not counted, but indicating that the Court, which currently has only six justices, was deadlocked on whether the federal Materiality Provision prohibited disenfranchising voters on that basis.

62. Following that decision, on November 1, 2022, the Department of State's Deputy Secretary for Elections and Commissions, Jonathan Marks, sent an email to counties advising elections officials of the Supreme Court of Pennsylvania's order to "refrain from counting any absentee and mail-in ballots received for the November 8, 2022 general election that are contained in undated or incorrectly dated outer envelopes," and to "**segregate** and **preserve** any ballots contained in undated or incorrectly dated outer envelopes." Deputy Secretary Marks instructed that the elections officials "**must remember to do two things** as [they] pre-canvass and canvass absentee and mail-in ballots: Segregate AND preserve these undated and incorrectly dated ballots; and Do not count the votes cast on ballots with undated or incorrectly dated ballots." A true and correct copy of the email is attached as Ex. I (all emphasis in original email).

63. On November 3, Acting Secretary Chapman issued new guidance, instructing counties that "ballots which are administratively determined to be undated or incorrectly dated" should be coded as "CANC – NO SIGNATURE within

the SURE system" (*i.e.*, should be cancelled and not accepted) and "segregated from other ballots." A true and correct copy of the guidance is attached as Ex. J.

64. On November 5, 2022, the Supreme Court of Pennsylvania issued a supplemental order stating that "incorrectly dated outer envelopes" include "(1) mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022 through November 8, 2022; and (2) absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022 through November 8, 2022." A true and correct copy of that supplemental order is attached as Ex. K.

**C. Pennsylvania's 2022 Election**

65. On information and belief, as of November 15, 2022, the Defendant county boards of elections had recorded their receipt of 1,244,072 mail ballots in the Statewide Uniform Registry of Electors.

66. In the 2022 midterm election, which involved elections for the U.S. Senate, U.S. House of Representatives, and Pennsylvania House and Senate offices, the Defendant county boards of elections segregated thousands of mail-in ballots based on missing or incorrect dates on their outer return envelopes. For example, on information and belief:

a. As of November 16, 2022, Philadelphia had segregated 2,143 ballots with no dates on their return envelopes and 460 ballots that listed purportedly-incorrect dates on their return envelopes.

b. As of November 7, 2022, Allegheny County had segregated 369 ballots with no dates on their return envelopes and 551 ballots that listed purportedly-incorrect dates on their return envelopes.

c. As of November 18, 2022, Lehigh County had segregated a total of 223 ballots because there were no dates or purportedly-incorrect dates on their return envelopes.

d. As of November 5, 2022, Lackawanna County reported that it had segregated 186 ballots with no dates on their return envelopes.

e. As of November 22, 2022, Erie County had segregated 122 ballots with no dates on their return envelopes and 49 ballots that listed purportedly-incorrect dates on their return envelopes.

f. As of November 7, 2022, Beaver County had segregated 159 ballots with missing or purportedly-incorrect dates on their return envelopes.

g. As of November 7, 2022, Butler County had segregated 64 ballots with no dates on their return envelopes.

h. As of November 21, 2022, Blair County had segregated 26 ballots with no dates on their return envelopes and 28 ballots that listed purportedly-incorrect dates on their return envelopes.

i. As of November 18, 2022, Crawford County had segregated a total of 51 ballots because there were no dates or purportedly-incorrect dates on their return envelopes.

j. As of November 7, 2022, Forest County had segregated 39 ballots with missing or incorrect dates on their return envelopes.

k. As of November 7, 2022, Perry County had segregated 25 ballots with no dates on their return envelopes and 4 ballots that listed purportedly-incorrect dates on their return envelopes.

l. As of November 10, 2022, Bucks County had segregated 19 ballots with no dates on their return envelopes and 7 ballots that listed purportedly-incorrect dates on their return envelopes.

m. As of November 14, 2022, Warren County had segregated 10 ballots with no dates on their return envelopes and 8 ballots that listed purportedly-incorrect dates on their return envelopes.

n. As of November 7, 2022, Mifflin County had segregated 7 ballots with no dates on their return envelopes.

o. As of November 7, 2022, Cameron County had segregated 5 ballots with no dates on their return envelopes.

p. As of November 5, 2022, Union County had segregated 5 ballots with no dates on their return envelopes.

67.    The above represents only a fraction of the total number of voters affected by this issue, as Plaintiffs have not yet been able to gather data for many of the counties not listed above. In Erie County, for instance, 26,170 voters submitted mail or absentee ballots, meaning the 171 segregated ballots represent approximately .7% of all such ballots cast in that county. And in Forest County, the 39 segregated ballots represent more than 9% of the 412 total mail ballots submitted in that county. Well over a million people voted by mail ballot in 2022. Across the Commonwealth, .7% of all mail ballot voters would represent more than 8,129 votes, and 9% of mail ballot voters would represent more than 117,764 votes.

68.    On information and belief, at least 20 counties provided no advance notice to voters that their ballots would not be counted due to the envelope-date rule and/or forbade voters who had their ballot set aside due to the immaterial envelope-date rule from voting provisionally to cure the problem. Many voters, including Plaintiffs Seastead, Boyle, Diehl, Polinski, Bencan, and Smith, accordingly had no opportunity to cure any purported defect involving their date because their county boards of elections failed to provide them with any such notice before Election Day.

69.    Moreover, some voters who did receive notice, including Plaintiffs Terrizzi and Gutierrez, were often unable to vote in person on Election Day given their health circumstances and/or because they were not afforded sufficient time to cure their mistake.

70. Voters—including individual Plaintiffs and organizational Plaintiffs' members—will be disenfranchised if Defendants refuse to count their ballots based on missing or purportedly-incorrect dates on the outer return envelopes.

71. Litigation over the past year has demonstrated that it is Pennsylvania voters who will lose unless this Court enjoins Defendants from disqualifying timely submitted ballots from eligible voters simply because they omitted a meaningless date, or wrote the wrong date, on the Return Envelope. For example, the plaintiffs in *Migliori* were senior citizens who had voted in Lehigh County for decades. They were Republicans and Democrats alike. Like the individual voter Plaintiffs here, and like thousands of the organizational Plaintiffs' members, they were regular people—a foundry blaster, a teacher, a business owner—who vote in almost every election. They filled out their mail ballots, sent them in on time, and signed the declaration on the Return Envelope, but made a mistake on the Return Envelope by omitting a handwritten date.

72. Moreover, here as in *Migliori*, the affected voters are significantly older than both other Pennsylvanians who voted by mail and all registered Pennsylvania voters. Philadelphia provides a compelling example: There, on information and belief, almost 50% of the affected voters are 65 or older, while only 36% of other Philadelphians who voted by mail are 65 or older and only 20% of all registered Philadelphia voters are 65 or older. And around 23% of the affected voters are 75 or older, while only 15% of other Philadelphians who voted by mail are 75 or older and only 8% of all registered Philadelphia voters are 75 or older.

73. The challenged envelope-date rule disenfranchises even voters who reasonably believed they were complying with all of the proper requirements to cast their ballot. For example, on information and belief, if a voter who was raised in or spent time living overseas followed the date sequencing convention used by many other countries (*i.e.*, day, then month, then year) in dating their outer return envelope, those voters could have their ballots invalidated based on an "incorrect" date.

74. The Materiality Provision of the Civil Rights Act and the Fourteenth Amendment of the United States Constitution requires that the ballots at issue here be counted. The disenfranchisement of the affected voters in 2022 and future elections constitutes irreparable harm for which there is no adequate remedy at law and for which this Court's intervention is required.

## CLAIM FOR RELIEF

### Count I: Rejection of Ballots for Immaterial Paperwork Errors or Omissions in Violation of the Materiality Provision of the Civil Rights Act (52 U.S.C. § 10101(a)(2)(B), 42 U.S.C. § 1983)

75. Plaintiffs rely upon all the paragraphs of this Complaint, which are incorporated into this Count I as if fully restated here.

76. The Materiality Provision of the Civil Rights Act prohibits disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (formerly codified at 42 U.S.C. § 1971).

77. The Civil Rights Act directs that "vote" in this context means "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election." *Id.* § 10101(a)(3)(A), (e).

78. The challenged conduct here tracks exactly what the statute forbids: denying voters the right to have their ballot "counted and included in the appropriate totals of votes cast" based on an immaterial paperwork error on a form made requisite to voting. Specifically, Defendants are poised to invalidate voters' mail ballots:

(1) based on an "omission" (namely, leaving off the handwritten date) or an "error" (namely, writing a purportedly incorrect date);

(2) on a "record or paper" that is "made requisite to voting" (namely, the form declaration printed on the outer Return Envelope);

(3) that is immaterial to whether the voter "is qualified under State law to vote in [the] election," or for that matter on whether the mail ballot was timely received (namely, because the handwritten date on the envelope has no bearing on whether a voter meets the age, residency, or citizenship and felony status requirements of state law, or whether the county received the ballot on time.

52 U.S.C. § 10101(a)(2)(B), (e).

Case 1:22-cv-00339-SPB Document 121 Filed 11/30/22 Page 35 of 49

79. In Pennsylvania, state law establishes the only "qualifications" needed to "be entitled to vote at all elections." *See* Pa. Const. art. VII, § 1. In particular, a voter must be at least 18 years old, have been a U.S. citizen for at least one month, have resided in the election district for at least 30 days, and is not presently incarcerated on a felony conviction. 25 Pa. C.S. § 1301.

80. A voter's failure to handwrite the date next to their signature on the ballot return envelope is not material to determining their qualification to vote. Indeed, as set forth *supra*, Pennsylvania law requires each mail-in voter to demonstrate eligibility and qualification to vote before the voter is even issued a mail-in ballot in the first place. *See* 25 P.S. §§ 3146.2, 3150.12.

81. The date on which a voter signed their return envelope is also immaterial to determining the timeliness of the voter's ballot. Because a ballot's timeliness under Pennsylvania law is determined by when it was received and stamped by the county board of elections, 25 P.S. §§ 3146.6(c), 3150.16(c), the date and time at which mail ballots are returned is objectively verifiable—regardless of what, if any, date the voter wrote on the return envelope. *Accord Migliori*, 36 F.4th at 164 ("Upon receipt, the [Board] timestamped the ballots, rendering whatever date was written on the ballot superfluous and meaningless.").

82. The rejection of otherwise-valid ballots for immaterial errors or omissions on voting-related paperwork is contrary to the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), and will result in the disenfranchisement

of Pennsylvania voters who submitted timely mail-in ballots in the 2022 election and all future elections, unless and until enjoined by this Court.

**Count II: Rejection of Certain Ballots for Immaterial Paperwork Errors or Omissions in Violation of the Fourteenth Amendment of the United States Constitution (42 U.S.C. § 1983)**

83. Plaintiffs rely upon all the paragraphs of this Complaint, which are incorporated into this Count II as if fully restated here.

84. The Equal Protection Clause of the Fourteenth Amendment commands that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

85. "[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966). And when an equal protection claim involves differential treatment of the right to vote, the Supreme Court has required the application of strict scrutiny because of "the significance of the franchise as the guardian of all other rights." *Plyler v. Doe*, 457 U.S. 202, 217 n.15 (1982) (collecting cases).

86. Defendants' interpretation of Pennsylvania law creates differential treatment of the right to vote. Under their interpretation, the Pennsylvania Election Code requires invalidating the ballots of voters who write no date or a purportedly-incorrect date on the outer return envelope in which they submit their mail ballot to the board of elections. 25 P.S. §§ 3146.6(a), 3150.16(a). Yet state law applies a different rule to military and overseas voters who vote by mail, stating that a "voter's

mistake or omission in the completion of a document" shall *not* invalidate their ballot "as long as the mistake or omission does not prevent determining whether a covered voter is eligible to vote." 25 Pa. C.S. § 3515(a).

87. Defendants have no legitimate interest, let alone a compelling one, to invalidate the mail ballots of otherwise-qualified domestic voters based on trivial paperwork errors while counting the mail ballots of military and overseas voters who make the same immaterial mistake. Nor could the chosen means of advancing such an interest—disenfranchising qualified, registered domestic voters—be narrowly tailored to achieving any interest the Commonwealth might proffer.

88. Disqualifying some, but not all, voters based on a missing or incorrect date on the return envelope of a mail ballot is especially pernicious because that date has "no relation to voting qualifications." *Harper*, 383 U.S. at 670. "[T]he right to vote is too precious, too fundamental to be so burdened or conditioned" on such basis. *Id.*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and provide the following relief:

1. A declaration that rejecting timely submitted mail-in ballots based solely on a missing or incorrect date next to the voter's signature on the return envelope violates the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), and the Fourteenth Amendment of the United States Constitution;

2. Injunctive relief preliminarily and permanently enjoining Defendants and all persons acting on their behalf from:

    a. Rejecting and/or not counting otherwise-valid mail-in ballots timely submitted by 8:00 p.m. on Election Day, in 2022 and future elections, based solely on a missing or incorrect date on the outer return envelope;

    b. Certifying any future election in the Commonwealth of Pennsylvania or any Pennsylvania county or locality without counting such mail-in ballots; and

    c. Refusing to include these ballots when reporting the 2022 election totals on Commonwealth and County websites, voter files, record books, and any other public tallies or recordings;

3.    Nominal damages to Plaintiffs Terrizzi, Seastead, Boyle, Gutierrez, Diehl, Polinski, Bencan, and Smith for the completed violation of their legal right to vote under both the Materiality Provision and the Fourteenth Amendment;

4.    An award of costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5.    Any such other relief as this Court deems just and appropriate.

Dated: November 30, 2022

Respectfully submitted,

/s/ Witold J. Walczak
Witold J. Walczak (PA 62976)
Richard T. Ting (PA 200438)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
vwalczak@aclupa.org
rting@aclupa.org

Ari J. Savitzky
Megan C. Keenan
Sophia Lin Lakin
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
mkeenan@aclu.org
slakin@aclu.org
acepedaderieux@aclu.org

Marian K. Schneider (PA 50337)
Stephen Loney (PA 202535)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
mschneider@aclupa.org
sloney@aclupa.org

David Newmann (PA 82401)
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4610
david.newmann@hoganlovells.com

*Counsel for the Pennsylvania State Conference of the NAACP, League of Women Voters of Pennsylvania, Philadelphians Organized to Witness, Empower and Rebuild, Common Cause Pennsylvania, Black Political Empowerment Project, Make the Road Pennsylvania, Jean Terrizzi, Barry M. Seastead, Marjorie Boyle, Marlene G. Gutierrez, Deborah Diehl, Aynne Margaret Pleban Polinski, Joel Bencan, and Laurence M. Smith*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>AL SCHMIDT, in his official capacity as Acting Secretary of the Commonwealth, *et al.*,<br><br>*Defendants*. | Case No. 1:22-cv-00339-SPB |

**PLAINTIFFS' LOCAL CIVIL RULE 56(B)(1) STATEMENT**

Pursuant to Local Civil Rule 56(B)(1), Plaintiffs submit the following concise statement setting forth the undisputed and material facts essential for the Court to decide the motion for summary judgment.

## I. BACKGROUND

### A. History and Practice of Mail Ballot Voting in Pennsylvania

1. Pennsylvania has long provided absentee-ballot options for voters who cannot attend a polling place on Election Day. APP_00954 (Marks Dep.); 25 P.S. § 3146.1–3146.9.

2. In 2019, Pennsylvania enacted new mail-in voting provisions, which allow all registered, eligible voters to vote by mail. APP_00954 (Marks Dep.); APP_01180 (Greenburg Report); Act of Oct 31, 2019, P.L. 552, No. 77, § 8.

3. More than 2.6 million Pennsylvanians voted by absentee or mail ballot in the November 2020 general election, and more than 1.2 million Pennsylvanians

voted by absentee or mail ballot in the November 2022 general election. APP_01181

(Greenburg Report); *see also* APP_00981-982 (Marks Dep.).

4.  A voter seeking to vote by mail must complete an application and have

their identity and qualifications verified before receiving a mail ballot. Voters provide

all the information necessary for county boards of elections to verify that they are

qualified to vote in Pennsylvania—namely, that on the day of the next election, they

will have been a U.S. citizen for at least one month, will be at least 18 years old, will

have resided in the election district for at least 30 days, and have not been confined

in a penal institution for a conviction of a felony within the last five years—at the

time of registration, at which time the county board of elections first determines their

eligibility to vote. 25 Pa. C.S. §§ 1301, 1327(b); *see also* APP_00893 (Lancaster Dep.);

APP_00995-997 (Marks Dep.).

5.  To apply to receive a mail ballot, voters must submit an application that

contains information relevant to their qualifications—including their date of birth,

address, and length of time as a resident of the voting district—as well as proof of

identification (a Pennsylvania driver's license number or, if the voter does not have

one, the last four digits of the voter's social security number). APP_01036-1037 (mail

ballot application); 25 P.S. §§ 3150.12, 2602(z.5)(3).

6.  After the application is submitted, county boards of elections verify the

voter's proof of identification and compare the information in the mail ballot

application to the information provided at the time of registration, using the data

housed in the Statewide Uniform Registry of Electors ("SURE") system. 25 P.S.

§ 3150.12b; *see also* APP_01136 (Pa. Dep't of State Guidance); APP_00894 (Lancaster Dep.); APP_00916-917 (Westmoreland Dep.); APP_00957-961 (Marks Dep.); APP_01182 (Greenburg Report); APP_001015, APP_001020-1025 (Greenburg Dep.).

7.    County boards of elections issue mail ballot packages to voters only after verifying their qualifications to vote, based on the information provided in their voter registration records and mail ballot applications. 25 P.S. § 3150.12b; *see also* APP_00917 (Westmoreland Dep.).

8.    The county board's determination that an individual is qualified to vote is conclusive unless the voter's eligibility is challenged prior to Election Day. 25 P.S. §§ 3150.12b, 3146.8(g)(3)-(4); *see also* APP_01182 (Greenburg Report); APP_01136 (Pa. Dep't of State Guidance).

9.    Once the county board verifies the voter's identity and eligibility, it sends a mail-ballot package that contains a ballot, a "secrecy envelope" marked with the words "Official Election Ballot," and the pre-addressed outer return envelope, on which a voter declaration form is printed (the "Return Envelope"). 25 P.S. §§ 3146.6(a), 3150.16(a); *see also* APP_00965-966 (Marks Dep.); APP_01182-1183 (Greenburg Report).

10.    A voter can mark their ballot, put it inside the secrecy envelope, and place the secrecy envelope in the Return Envelope, and complete the form declaration on the return envelope at "any time" between receiving their mail-ballot package from the county board of elections and 8:00 P.M. on Election Day. 25 P.S. §§ 3146.6(a),

3150.16(a); *see also* APP_00977 (Marks Dep.); APP_01183, APP_01189-1190 (Greenburg Report).

11. The voter must then deliver their ballot, in the requisite envelopes, by mail or in person to their county board of elections. To be considered timely under the Election Code, a county board of elections must receive a voter's mail ballot by 8:00 P.M. on Election Day. 25 P.S. §§ 3146.6(c), 3150.16(c); *see also* APP_00974-76 (Marks Dep.); APP_01183 (Greenburg Report).

12. Upon receipt of a mail ballot, county boards of elections stamp or otherwise mark the Return Envelope with the date of receipt to confirm its timeliness and log it in the SURE system. APP_01183, APP_01189 (Greenburg Report); APP_01136-1137 (Pa. Dep't of State Guidance); APP_00977-978 (Marks Dep.), 70:5–8; APP_00834 (Berks Dep.).

**B. Previous Litigation over the Date Requirement**

13. The Election Code provides that a voter "shall … fill out, date and sign the declaration printed on" the mail ballot Return Envelope. *See* 25 P.S. §§ 3146.6(a), 3150.16(a). The voter declaration forms that accompany paper mail and absentee ballots include a line for the voter to sign and date the declaration.[1] *See, e.g.*, APP_01290 (Berks mail ballot envelope); APP_01291 (Bucks military ballot envelope).

[1] UOCAVA voters have the option to submit their absentee ballots electronically, or they can return a paper ballot by mail. *See* APP_00998-00999 (Marks Dep.). This case focuses solely on the treatment of *paper* mail and absentee ballots.

14. This envelope-dating provision has been the subject of repeated litigation. APP_00824 (Berks Dep.).

15. In the months leading up to the 2022 election, the Secretary of the Commonwealth advised counties to count otherwise valid and timely-received mail ballots even where voters omitted a handwritten date, or wrote a plainly wrong date like a birthdate, on the Return Envelope. APP_01139-1142 (Sept. 26, 2022 Pa. Dep't of State Guidance); APP_00824a-824c (Berks Dep.); APP_00869-870 (Lancaster Dep.); APP_00920-921 (Westmoreland Dep.); APP_00986-989, APP_00991-992 (Marks Dep.).

16. The Secretary reaffirmed that guidance after the U.S. Supreme Court vacated on mootness grounds the Third Circuit's *Migliori v. Cohen* decision regarding the envelope-date rule. APP_01143 (Oct. 11, 2022 Pa. Dep't of State email).

17. On October 16, 2022, a group of petitioners including political party entities brought a King's Bench petition in the Supreme Court of Pennsylvania seeking to invalidate mail ballots based on voter errors or omissions with respect to the envelope date on the Return Envelope. APP_01202.

18. On November 1, 2022, the Supreme Court of Pennsylvania issued an order directing that the mail ballots at issue should be segregated and not counted. APP_01147-1148.

19. Following that decision, on November 1, 2022, the Department of State's Deputy Secretary for Elections and Commissions, Jonathan Marks, sent an email to counties advising elections officials of the Supreme Court of Pennsylvania's order to

"refrain from counting any absentee and mail-in ballots received for the November 8, 2022 general election that are contained in undated or incorrectly dated outer envelopes," and to "**segregate** and **preserve** any ballots contained in undated or incorrectly dated outer envelopes." Deputy Secretary Marks instructed that the elections officials "**must remember to do two things** as [they] pre-canvass and canvass absentee and mail-in ballots: Segregate AND preserve these undated and incorrectly dated ballots; and Do not count the votes cast on ballots with undated or incorrectly dated ballots." APP_01149 (all emphasis in original email).

20. On November 3, Acting Secretary Chapman issued new guidance, instructing counties that "ballots which are administratively determined to be undated or incorrectly dated" should be coded as "CANC – NO SIGNATURE within the SURE system" (*i.e.*, should be cancelled and not accepted) and "segregated from other ballots." APP_01006-1007.

21. On November 5, 2022, the Supreme Court of Pennsylvania issued a supplemental order stating that "incorrectly dated outer envelopes" include "(1) mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022 through November 8, 2022; and (2) absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022 through November 8, 2022." APP_01150-1151.

## II. PLAINTIFFS

22. Laurence Smith is a Montgomery County voter who sought to vote in the November 2022 election. *See* APP_01047-1051 (Smith Decl.); APP_01392 (Montgomery voter list).

    a. Smith is 78 years old. Before his retirement, he worked as an entrepreneur in the medical services industry. APP_01047.

    b. He has been a registered voter for decades, and he has been voting regularly in Montgomery County since moving there in 1991, including voting by mail since 2020. APP_01047.

    c. For the November 8, 2022 election, Smith properly requested a mail-in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the declaration. APP_01048; APP_01392.

    d. The Montgomery County Board of Elections did not count Smith's ballot on the basis of a missing date. APP_01392.

    e. Smith believed he had followed all of the necessary steps to complete the declaration, and he was unaware of what the Montgomery County Board of Elections concluded was wrong with the date form. APP_01048-1049.

    f. Mr. Smith was not notified of any opportunity to cure any defect prior to Election Day. APP_01049.

23.    Joel Bencan is a Montgomery County voter who sought to vote in the November 2022 election. *See* APP_01052-1056 (Bencan Decl.); APP_01392 (Montgomery voter list).

    a. Bencan is 71 years old and is a retired pharmacist. APP_01052.

    b. He has been a registered voter for decades and has participated regularly in elections since the Nixon Administration. Bencan began

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 8 of 94

voting by mail in 2020 because of the COVID-19 pandemic and has continued since then to vote by mail. APP_01052.

c. For the November 8, 2022 election, Bencan properly requested a mail-in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the declaration. APP_01052; APP_01392.

d. The Montgomery County Board of Elections did not count Bencan's ballot on the basis of a missing date. APP_01392.

e. Bencan believed he had followed all of the necessary steps to complete the declaration, and he was unaware of why the Montgomery County Board of Elections rejected the date he wrote as "incorrect." APP_01052-1053.

f. Bencan was not notified of any opportunity to cure any defect prior to Election Day. APP_01053.

24. Aynne Pleban Polinski is a York County voter who sought to vote in the November 2022 election. *See* APP_01057-1058 (Polinski Decl.); APP_01400 (York voter list).

a. Polinski is 71 years old and is a retired art educator, art therapist, and professional artist. APP_01057.

b. Polinski is a qualified voter who participates regularly in elections: she has been a registered voter in York County since 2016 and a registered voter in the Commonwealth of Pennsylvania since she was 18 years old.

Polinski has been voting by mail since the June 2020 presidential primary because of the COVID-19 pandemic. APP_01057.

c. For the November 8, 2022 election, Polinski properly requested a mail-in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. APP_01057-1058; APP_01400.

d. The York County Board of Elections has confirmed that it did not count Polinski's ballot on the basis of a missing date. APP_01400.

e. Polinski was not notified of any opportunity to cure any defect prior to Election Day and only learned after Election Day that her vote was not counted. APP_01058.

25. Marlene Gutierrez is a York County voter who sought to vote in the November 2022 election. APP_01059-1061 (Gutierrez Decl.); APP_01400 (York voter list).

a. Gutierrez is 64 years old and works as a corporate travel agent. APP_01059.

b. She first registered to vote in York County when she was 18 years old, and after residing elsewhere for several years, she most recently registered to vote in York County when she moved back in September 2020. She has been regularly voting by mail for at least twenty years. APP_01059.

c. For the November 8, 2022 election, Gutierrez properly requested a mail-in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. APP_01059-1060.

d. Gutierrez believed she had followed all of the instructions but learned on Election Day that her ballot would not be counted, and she did not have time to cure her ballot. APP_01060.

e. The York County Board of Elections has confirmed that it did not count Gutierrez's ballot on the basis of a missing date. APP_01400.

f. Gutierrez was not notified of any opportunity to cure any defect prior to Election Day. APP_01060.

26. Barry Seastead is a Warren County voter who sought to vote in the November 2022 election. *See* APP_01062-1064 (Seastead Decl.); APP_01394 (Warren voter list).

a. Seastead is a 68-year-old retired welder. APP_01062.

b. He has been a registered voter in Warren County for decades, ever since he was legally eligible to vote. He votes regularly, and has been voting by mail for the past few years. APP_01062.

c. For the November 8, 2022 election, Seastead properly requested a mail-in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the declaration. APP_01063.

d. The Warren County Board of Elections has confirmed that it did not count Seastead's ballot on the basis of an "invalid" date. APP_01394.

e. Seastead believed he wrote the date on which he filled out the ballot, and he is unaware of why the Warren County Board of Elections rejected the date he wrote as "incorrect." APP_01063.

f. Mr. Seastead was not notified of any opportunity to cure any defect prior to Election Day. APP_01063; APP_01394.

g. Because Warren County did not provide him with any notice of its determination that the date he wrote was incorrect, he had no opportunity to cure any defect regarding the date on his outer return envelope prior to Election Day and only learned after Election Day that his vote was not counted. APP_01063.

27.    The Pennsylvania State Conference of the NAACP (the "State Conference") is a non-profit, non-partisan organization that works to improve the political, educational, social, and economic status of African-Americans and other racial and ethnic minorities, to eliminate racial prejudice, and to take lawful action to secure the elimination of racial discrimination, among other objectives. APP_01065-1081 (State Conf. Decl.).

a. The State Conference has thousands of members who live and/or work in Pennsylvania, many of whom are registered to vote in Pennsylvania. APP_01065.

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 12 of 24

b. Every election cycle, the State Conference engages in efforts to get out the vote, including by educating voters in Pennsylvania on different methods of voting, providing educational guides on local candidates to increase voter engagement, and focusing on strategies to encourage new voters to participate in elections in Pennsylvania. For example, in the 2022 election cycle, the State Conference coordinated Souls to the Polls efforts, solicited poll monitor volunteers, and organized phone- and text-banking to generate voter engagement and remind voters of the importance of the election. APP_01065-1066.

c. During the 2022 election, the State Conference reassigned volunteers and staff from its existing voter education and mobilization efforts towards contacting and educating voters who had already submitted their mail ballots about how to fix problems with the mail ballot envelope date and avoid having their vote set aside. APP_01066-1067.

d. For example, the time and attention of the State Conference's Philadelphia branch field director, as well as volunteers (including approximately 17 volunteer law students from Howard University) were all diverted from their intended mission—conducting election protection at the polls on Election Day in Philadelphia—toward coordinating and manning the phone lines in order to contact and/or assist mail ballot voters affected by the envelope-date rule. APP_01067-1068.

e.  In the days leading up to the election in November 2022, multiple local branches of the State Conference also created and shared social media posts alerting the public, and especially those who had already submitted mail ballots, that "thousands of voters" had "accidentally left off or wrote the incorrect date on the outside of their absentee/mail-in ballots," and that "those ballots CAN be cured, and the votes counted" if the affected voters took urgent action. APP_01078-1081. The time and attention of each of these branches that was spent on those efforts in the last few days before the election would otherwise have been used to engage and educate people who had not already voted. APP_01068-1069.

f.  The State Conference anticipates that, in future elections, it will similarly need to divert its staff and volunteer resources from their intended mission—engaging, educating, and mobilizing new voters—toward addressing the risk that voters who have already submitted their mail ballots may have their ballot set aside due to an error or omission of the handwritten date on the mail ballot return envelope. APP_01069.

28.  The League of Women Voters of Pennsylvania ("the League") is a non-partisan statewide non-profit formed in 1920. APP_01082-1106.

a.  The League encourages informed and active participation in government, works to increase understanding of major public policy issues, and seeks to influence public policy through education and advocacy. APP_01082.

b. The League is a predominantly volunteer organization and has 31 member chapters and one Inter-League Organization operating in 29 counties around the Commonwealth. LWVPA has more than 2,500 individual members, many of whom who are registered voters and regularly vote in state and federal elections using, among other methods, absentee and mail ballots. APP_01082.

c. During every election cycle, the League conducts voter-registration drives, staffs nonpartisan voter-registration tables, educates incarcerated and formerly incarcerated individuals about their voting rights, and works with local high schools and universities to register young voters. The League maintains voter information resources on its website in English and Spanish. APP_01082-1083.

d. During the November 2022 election, the League reassigned its members' and volunteers' time and efforts from these core activities towards contacting and educating voters who had already submitted their mail ballots about how to fix problems with the mail ballot envelope date and avoid having their ballot set aside. APP_01083.

e. Three staff members and approximately 30 volunteers spent time scouring publicly available lists of affected voters and contacting

hundreds of Pennsylvania voters to provide them with information to help them cure their ballot or vote provisionally. In particular, the Lower Merion & Narberth league directly emailed more than 250 members with explicit instructions on how to vote if their mail ballots were cancelled. APP_01083-1087.

f. The League (and many of its local leagues) shared information on social media channels and the League's websites to alert voters of the risk that their vote would not be counted and instruct voters about how to correct their mail ballot envelopes. The League also attended county board of elections meetings, especially in Montgomery, Allegheny, and Lancaster Counties, to advocate for notice and cure opportunities for voters whose ballots were set aside due to an error or omission of the handwritten date on the mail ballot return envelope. APP_01084-1087.

g. The Lower Merion and Narberth League also worked in coalition with civic and community groups to spread the word about correcting errors on mail ballot envelopes and participated in an event with the Bethel AME Church in Ardmore to help congregants check their mail ballot status and instruct them on how to correct paperwork errors. APP_01086-1087.

h. The League anticipates that, in future elections, it will similarly need to divert staff, member and volunteer resources from their

core activities toward addressing the risk that voters who have already submitted their mail ballots may have their ballot set aside due to an error or omission of the handwritten date on the mail ballot return envelope. For example, in advance of the 2023 municipal primary, the League has developed a webinar featuring mail voting and how to apply and correctly submit a mail ballot. Similarly, its social media posts, website content and public statements will need to focus on helping voters avoid disenfranchisement for errors on mail ballot envelopes. APP_01087-1088.

29. Philadelphians Organized to Witness, Empower and Rebuild ("POWER") is a Pennsylvania non-profit organization of more than 100 congregations of various faith traditions, cultures and neighborhoods committed to civic engagement and organizing communities so that the voices of all faiths, races and income levels are counted and have a say in government. APP_01107-1110 (POWER Decl.).

    a. POWER's civic engagement efforts include civic engagement efforts include voter education programs, voter registration drives, and "Souls to the Polls" efforts to encourage congregants to vote. In the weeks leading up to the November 2022 election, POWER launched a bus tour focused on engaging voters who were not already participating in the political process. APP_01107-1108.

b. During the 2022 election, POWER reassigned volunteers and staff from its existing voter education and mobilization efforts towards contacting and educating voters who had already submitted their mail ballots about how to fix problems with the mail ballot envelope date and avoid having their vote set aside. APP_01108-1109.

c. For example, when Philadelphia published a list of over 3,000 voters who were at risk of having their November 2022 general election ballots thrown out over technical errors, including a missing or incorrect date on the return envelope, POWER's members and volunteers made more than 1,200 manual calls and sent more than 2,900 texts to the voters whose names appeared on Philadelphia's at-risk list to provide them with information to help them cure their ballot or vote provisionally. POWER also stationed volunteers at City Hall to ensure voters returning their mail ballots to that location had correctly dated their return envelopes. APP_01108-1109.

d. The time and attention that POWER devoted to ensuring voters who had already submitted their mail ballots would have their votes counted would otherwise have been used to engage and educate people who had not already attempted to vote. APP_01109.

e. POWER anticipates that, in future elections, it will similarly need to divert its member and volunteer resources from their intended mission—engaging, educating, and mobilizing new voters—toward

addressing the risk that voters who have already submitted their mail ballots may have their ballot set aside due to an error or omission of the handwritten date on the mail ballot return envelope. APP_01109.

30. Common Cause Pennsylvania ("Common Cause PA") is a non-profit, non-partisan organization, and a chapter of the national Common Cause organization. APP_01111-1124 (Common Cause PA Decl.).

   a. Common Cause PA is a non-partisan good government organization with approximately 36,000 members and supporters who live in all 67 counties of Pennsylvania. One of Common Cause PA's core functions is to increase the level of voter registration and voter participation in Pennsylvania elections, especially in communities that are historically underserved and whose populations have a low propensity for voting. APP_01111.

   b. In preparation for every election cycle, and most significantly in even-year elections, Common Cause PA leads the Election Protection Coalition field program which recruits and trains volunteers to visit polling places and assist voters. As part of its Election Protection Coalition work, Common Cause PA disseminates accurate information about voting and instructions for navigating the voting process on its website, on social media, and through outreach to traditional media. APP_01112.

c. During the 2022 election, Common Cause PA reassigned its volunteers' time and efforts from Common Cause PA's existing efforts toward contacting and educating voters who had already submitted their mail ballots about how to fix problems with the mail ballot envelope date and avoid having their vote set aside. APP_01113.

d. When defendants announced that they would segregate and not count ballots with an incorrect or missing date, Common Cause PA ensured that accurate information was available for voters. Additionally, Common Cause PA organized a press briefing with Make the Road PA, All Voting is Local PA and Pennsylvania Voice to remind voters to date their mail ballot envelopes and to alert them that their ballot would not count if the date was missing. Common Cause PA issued the press advisory, held the press briefing and issued a press statement within the span of 24 hours, with the goal of alerting as many voters as possible as quickly as possible. APP_01113-1114.

e. To protect voters from having their ballot set aside due to an error or omission of the handwritten date on their mail ballot return envelope, Common Cause PA also created and sent an email to all of its members and supporters immediately after the November 2022 election advising them that, if they cast a provisional ballot, to check and make sure the ballot was counted. APP_01114.

f. Common Cause PA anticipates that, in future elections, it will continue to divert its volunteer resources from its intended mission—educating and mobilizing voters—toward addressing the risk that voters who have already submitted their mail ballots may have their ballot set aside due to an error or omission of the handwritten date on the mail ballot return envelope. For example, in advance of the 2023 municipal primary, Common Cause PA is developing a new webinar on mail voting, specifically focusing on the impact of the enforcement of the date requirement. This webinar is part of a series, but it diverts resources away from providing other important voter education information. APP_01114-1115.

31. Black Political Empowerment Project ("B-PEP") is a non-profit, non-partisan organization that has worked since 1986 to ensure that the Pittsburgh African-American community votes in every election. APP_01125.

a. B-PEP has numerous supporters, of various ages and races, throughout the Pittsburgh Region, working with numerous community organizations to empower Black and brown communities. APP_01125.

b. During every election cycle, B-PEP's work includes voter registration drives, get-out-the-vote activities, education and outreach about the voting process, and election-protection work. B-PEP focuses these activities in predominantly Black

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 21 of 94

neighborhoods in Allegheny County, with some efforts in Westmoreland and Washington Counties. For the November 2022 election, B-PEP conducted outreach to members and constituent communities about the importance of voting in person or by mail. APP_01125-1126.

c. When it was announced that county boards of elections would not count timely-submitted mail ballots based solely on missing or supposedly incorrect dates on return envelopes, many B-PEP members and others served by its mission had already submitted mail ballots. This abrupt change in voting rules just before Election Day caused B-PEP to redirect its limited resources, including staff and volunteer time, to efforts to inform voters of this change and educate them as to how to avoid disenfranchisement. APP_01126.

d. Specifically, in the days leading up to the election in November 2022, B-PEP's staff and volunteers also expended time and money developing, printing and distributing hundreds of flyers and other educational materials to dozens of churches for the purpose of informing prospective voters of the envelope dating issues generated by the Ball decision. APP_01126, APP_01129-1131.

e. B-PEP staff and volunteers also spent valuable time in discussion with county election directors seeking clarity and guidance about

their handling of mail ballots, and then working with other voting rights and community organizations to maximize voters' understanding of the county election boards' procedures. APP_01126.

f.  B-PEP's time and resources dedicated by B-PEP staff and volunteers would otherwise have been available for the organization's other "get out the vote" efforts and other initiatives serving BPEP's mission, including its Greater Pittsburgh Coalition Against Violence. APP_01126-1127.

g.  B-PEP anticipates that, in future elections, it will similarly need to divert its staff and volunteer resources from voter engagement and community initiatives toward preventing the disenfranchisement of voters who have already submitted their ballots. APP_01127.

32.    Make the Road Pennsylvania ("Make the Road PA") is a not-for-profit, member-led organization formed in 2014 that builds the power of the working class in Latino and other communities to achieve dignity and justice through organizing, policy innovation, and education services. APP_01132.

a.  Make the Road PA's more than 10,000 members are primarily working-class residents of Pennsylvania, many in underserved communities. Many members of Make the Road PA are registered voters in Pennsylvania. APP_01132.

b.  Make the Road PA's work includes substantial field work aimed at voter protection, voter advocacy and voter education on, for example, how to register to vote, how to apply for mail-in/absentee ballots, how to return mail-in/absentee ballots, and where to vote. Its get-out-the-vote efforts in the 2022 General Election alone included knocking on over 300,000 doors and speaking directly with over 29,000 people in Berks, Bucks, Lehigh, Northampton and Philadelphia Counties. APP_01132-1133.

c.  When defendants announced that they would not count timely-submitted mail ballots based solely on missing or supposedly incorrect dates on return envelopes, many Make the Road PA members and others served by its mission had already submitted mail ballots. This abrupt change in voting rules just before Election Day caused Make the Road PA to redirect its limited resources, including staff and volunteer time, to efforts to inform voters of this change and educate them as to how to avoid disenfranchisement. Moreover, because Make the Road's efforts are focused on communities where many voters are not native English speakers, the risk that some voters may make a minor paperwork mistake in filling out various forms related to mail or absentee ballot voting is heightened. Accordingly, Make the Road PA's staff and volunteers directed time and resources in the

critical time before Election Day to contacting county election officials to determine how, if at all, they would inform non-English speakers of any problems with the dating of their mail ballot envelopes. APP_01133.

d. Make the Road PA's staff and volunteers conducted extensive phone and text message outreach, on an emergency basis, to its members informing prospective voters of the envelope dating issues generated. APP_01133. Make the Road PA contacted thousands of Pennsylvania voters to provide them with information to help them cure their ballot or vote provisionally to prevent the counties' actions from disenfranchising them. Make the Road PA's staff and volunteers also spent valuable time in discussion with county election directors seeking clarity and guidance about their handling of mail ballots. But for application of the rule at issue in this case, such time and resources dedicated by Make the Road PA staff and volunteers would have been available for the organization's other "get out the vote" efforts and other initiatives serving Make the Road PA's mission, including its Immigrant Rights, Education Justice, Housing Justice, Climate Justice and Worker Rights initiative. APP_01134.

e. Make the Road PA anticipates that, in future elections, it will similarly need to divert its staff and volunteer resources from

voter engagement and community initiatives toward preventing the disenfranchisement of voters who have already submitted their ballots. APP_01134.

## III.   THE 2022 ELECTION

33.   The November 2022 general election involved elections for the U.S. Senate, U.S. House of Representatives, Pennsylvania Governor, and Pennsylvania House and Senate offices. APP_01194**.**

34.   For the November 2022 election, different counties sent out their mail-ballot packages at different times:

    a.  Adams County began sending mail ballot packages to voters on September 28, 2022. APP_00005 (Adams Interrog. Resp.).

    b.  Allegheny County began sending mail ballot packages to voters on September 30, 2022. APP_00027 (Allegheny Interrog. Resp.).

    c.  Armstrong County began sending mail ballot packages to voters on October 10, 2022. APP_00041 (Armstrong Interrog. Resp.).

    d.  Beaver County began sending mail ballot packages to voters on September 26, 2022. APP_00062 (Beaver Interrog. Resp.).

    e.  Berks County began sending mail ballot packages to voters on October 7, 2022. APP_00078 (Berks Interrog. Resp.).

    f.  Blair County began sending mail ballot packages to voters on October 14, 2022. APP_00097 (Blair Interrog. Resp.).

    g.  Bradford County began sending mail ballot packages to voters on September 27th, 2022. APP_00108 (Bradford Interrog. Resp.).

h. Bucks County began sending mail ballot packages to voters on October 5, 2022 and military/overseas ballots on September 22, 2022. APP_00117 (Bucks Interrog. Resp.).

i. Butler County began sending mail ballot packages to voters on October 12, 2022. APP_00131 (Butler Interrog. Resp.).

j. Cambria County began sending mail ballot packages to voters on October 6, 2022. APP_00140 (Cambria Interrog. Resp.).

k. Cameron County began sending mail ballot packages to voters on October 12, 2022. APP_00150 (Cameron Interrog. Resp.).

l. Chester County began sending mail ballot packages to voters on October 10, 2022. APP_00169 (Chester Interrog. Resp.).

m. Clarion County began sending mail ballot packages to voters on October 4, 2022. APP_00185 (Clarion Interrog. Resp.).

n. Clearfield County began sending mail ballot packages to voters on October 3, 2022. APP_00294 (Clearfield Interrog. Resp.).

o. Clinton County began sending mail ballot packages to voters on September 30, 2022. APP_00216 (Clinton Interrog. Resp.).

p. Crawford County began sending mail ballot packages to voters on September 26, 2022. APP_00233 (Crawford Interrog. Resp.).

q. Cumberland County began sending mail ballot packages to voters on October 3, 2022. APP_00252 (Cumberland Interrog. Resp.).

r.  Delaware County began sending mail ballot packages to voters on October 8, 2022. APP_00267 (Delaware Interrog. Resp.).

s.  Elk County began sending mail ballot packages to voters on September 16, 2022. APP_00279 (Elk Interrog. Resp.).

t.  Erie County began sending mail ballot packages to voters on October 6, 2022. APP_00292 (Erie Interrog. Resp.).

u.  Fayette County began sending mail ballot packages to voters on October 11, 2022. APP_00309 (Fayette Interrog. Resp.).

v.  Forest County began sending mail ballot packages to voters on October 6, 2022. APP_00321 (Forest Interrog. Resp.).

w.  Franklin County began sending mail ballot packages to voters on October 3, 2022. APP_00336 (Franklin Interrog. Resp.).

x.  Fulton County began sending mail ballot packages to voters on October 21, 2022. APP_00347 (Fulton Interrog. Resp.).

y.  Greene County began sending mail ballot packages to voters on September 30, 2022. APP_00355 (Greene Interrog. Resp.).

z.  Juniata County began sending mail ballot packages to voters on September 27, 2022. APP_00363 (Juniata Interrog. Resp.).

aa. Lackawanna County began sending mail ballot packages to voters on October 3, 2022. APP_00373 (Lackawanna Interrog. Resp.).

bb. Lancaster County began sending mail ballot packages to voters on September 26, 2022. APP_00389 (Lancaster Interrog. Resp.).

cc. Lehigh County began sending mail ballot packages to voters on September 23, 2022. APP_00401 (Lehigh Interrog. Resp.).

dd. Luzerne County began sending mail ballot packages to voters on October 13, 2022. APP_00417 (Luzerne Interrog. Resp.).

ee. Lycoming County began sending mail ballot packages to voters on September 22, 2022. APP_00439 (Lycoming Interrog. Resp.).

ff. McKean County began sending mail ballot packages to voters on September 30, 2022. APP_00453 (McKean Interrog. Resp.).

gg. Mercer County began sending mail ballot packages to voters on October 7, 2022. APP_00461 (Mercer Interrog. Resp.).

hh. Mifflin County began sending mail ballot packages to voters on October 10, 2022. APP_00468 (Mifflin Interrog. Resp.).

ii. Montgomery County began sending mail ballot packages to voters on October 6, 2022. APP_00481 (Montgomery Interrog. Resp.).

jj. Northampton County began sending mail ballot packages to voters on October 3, 2022. APP_00495 (Northampton Interrog. Resp.).

kk. Perry County began sending mail ballot packages to voters on October 3, 2022. APP_00511 (Perry Interrog. Resp.).

ll. Philadelphia County began sending mail ballot packages to voters on October 10, 2022. APP_00530 (Philadelphia Interrog. Resp.).

mm. Pike County began sending mail ballot packages to voters on October 3, 2022. APP_00541 (Pike Interrog. Resp.).

nn. Potter County began sending mail ballot packages to voters on September 26, 2022. APP_00575 (Potter Interrog. Resp.).

oo. Schuylkill County began sending mail ballot packages to voters on October 13, 2022. APP_00587 (Schuylkill Interrog. Resp.).

pp. Somerset County began sending mail ballot packages to voters on October 5, 2022. APP_00599 (Somerset Interrog. Resp.).

qq. Sullivan County began sending mail ballot packages to voters on October 4, 2022. APP_00609 (Sullivan Interrog. Resp.).

rr. Susquehanna County began sending mail ballot packages to voters on October 19, 2022. APP_00619 (Susquehanna Interrog. Resp.).

ss. Tioga County began sending mail ballot packages to voters on September 21, 2022. APP_00629 (Tioga Interrog. Resp.).

tt. Union County began sending mail ballot packages to voters on September 23, 2022. APP_00635 (Union Interrog. Resp.).

uu. Warren County began sending mail ballot packages to voters on October 5, 2022. APP_00646 (Warren Interrog. Resp.).

vv. Washington County began sending military overseas ballots on September 23, 2022 and mail ballot packages to voters on October 4, 2022. APP_00667 (Washington Interrog. Resp.).

ww.    Wayne County began sending mail ballot packages to voters on August 23, 2022. APP_00691 (Wayne Interrog. Resp.).

xx. Westmoreland County began sending mail ballot packages to voters on October 5, 2022. APP_00706 (Westmoreland Interrog. Resp.).

yy. Wyoming County began sending mail ballot packages to voters on September 19, 2022. APP_00714. (Wyoming Interrog. Resp.).

zz. Bedford County began sending mail ballot packages to voters on October 7, 2022. APP_00732 (Bedford Interrog. Resp.).

aaa.    Carbon County began sending mail ballot packages to voters on September 27, 2022. APP_00733 (Carbon Interrog. Resp.).

bbb.    Centre County began sending mail ballot packages to voters on September 27, 2022. APP_00733 (Centre Interrog. Resp.).

ccc.    Columbia County began sending mail ballot packages to voters on September 27, 2022. APP_00733 (Columbia Interrog. Resp.).

ddd.    Dauphin County began sending mail ballot packages to voters on September 2, 2022. APP_00733 (Dauphin Interrog. Resp.).

eee.    Jefferson County began sending mail ballot packages to voters on September 12, 2022. APP_00733 (Jefferson Interrog. Resp.).

fff. Huntington County began sending mail ballot packages to voters on October 4, 2022. APP_00733 (Huntingdon Interrog. Resp.).

ggg.    Indiana County began sending mail ballot packages to voters on October 3, 2022. APP_00733 (Indiana Interrog. Resp.).

hhh.    Lawrence County began sending mail ballot packages to voters on September 26, 2022. APP_00733 (Lawrence Interrog. Resp.).

iii. Lebanon County began sending mail ballot packages to voters on October 7, 2022. APP_00733 (Lebanon Interrog. Resp.).

jjj. Monroe County began sending mail ballot packages to voters on October 7, 2022. APP_00733 (Monroe Interrog. Resp.).

kkk.    Montour County began sending mail ballot packages to voters on September 23, 2022. APP_00733 (Montour Interrog. Resp.).

lll. Northumberland County began sending mail ballot packages to voters on September 21, 2022. APP_00733 (Northumberland Interrog. Resp.).

mmm.    Snyder County began sending mail ballot packages to voters on September 23, 2022. APP_00733 (Snyder Interrog. Resp.).

nnn.    Venango County began sending mail ballot packages to voters on September 27, 2022. APP_00733 (Venango Interrog. Resp.).

ooo.    York County began sending mail ballot packages to voters on September 28, 2022. APP_00733 (York Interrog. Resp.).

35.    The county boards of elections reported receiving 1,238,522 mail and absentee ballots in the November 2022 election. APP_00005 (Adams Interrog. Resp.); APP_00035 (Allegheny Interrog. Resp.); APP_00040 (Armstrong Interrog. Resp.); APP_00060 (Beaver Interrog. Resp.); APP_00077 (Berks Interrog. Resp.); APP_00096 (Blair Interrog. Resp.); APP_00107 (Bradford Interrog. Resp.); APP_00116 (Bucks Interrog. Resp.); APP_00130 (Butler Interrog. Resp.); APP_00140 (Cambria Interrog. Resp.); APP_00149 (Cameron Interrog. Resp.); APP_00168 (Chester Interrog. Resp.); APP_00185 (Clarion Interrog. Resp.); APP_00209 (Clearfield Interrog. Resp.); APP_00215 (Clinton Interrog. Resp.); APP_00232 (Crawford Interrog. Resp.); APP_00251 (Cumberland Interrog. Resp.); APP_00266 (Delaware Interrog. Resp.); APP_00278 (Elk Interrog. Resp.); APP_00291 (Erie Interrog. Resp.); APP_00308 (Fayette Interrog. Resp.); APP_00320 (Forest Interrog. Resp.); APP_00335 (Franklin Interrog. Resp.); APP_00347 (Fulton Interrog. Resp.); APP_00354 (Greene Interrog. Resp.); APP_00363 (Juniata Interrog. Resp.); APP_00371 (Lackawanna Interrog.

Resp.); APP_00388 (Lancaster Interrog. Resp.); APP_00400 (Lehigh Interrog. Resp.); APP_00416 (Luzerne Interrog. Resp.); APP_00438 (Lycoming Interrog. Resp.); APP_00452 (McKean Interrog. Resp.); APP_00461 (Mercer Interrog. Resp.); APP_00468 (Mifflin Interrog. Resp.); APP_00481 (Montgomery Interrog. Resp.); APP_00494 (Northampton Interrog. Resp.); APP_00510 (Perry Interrog. Resp.); APP_00529 (Philadelphia Interrog. Resp.); APP_00541 (Pike Interrog. Resp.); APP_00573 (Potter Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.); APP_00598 (Somerset Interrog. Resp.); APP_00609 (Sullivan Interrog. Resp.); APP_00619 (Susquehanna Interrog. Resp.); APP_00629 (Tioga Interrog. Resp.); APP_00634 (Union Interrog. Resp.); APP_00645 (Warren Interrog. Resp.); APP_00666 (Washington Interrog. Resp.); APP_00690 (Wayne Interrog. Resp.); APP_00705 (Westmoreland Interrog. Resp.); APP_00714 (Wyoming Interrog. Resp.); APP_00729-30 (Babst Calland[2] Interrog. Resp.).

36. In the November 2022 general election, the county boards of elections segregated at least 10,506 mail ballots solely based on missing or incorrect dates on their outer return envelopes:

a. Adams County segregated 4 ballots with undated return envelopes and 0 ballots with misdated envelopes. APP_00005-6 (Adams Interrog. Resp.).

[2] Cites to the "Babst Calland" Responses to Requests for Admissions and Interrogatories refer to the collective responses filed by the Bedford, Carbon, Centre, Columbia, Dauphin, Huntingdon, Indiana, Jefferson, Lawrence, Lebanon, Monroe, Montour, Northumberland, Snyder, Venango, and York County Boards of Elections. *See generally* APP_00723-775.

b. Allegheny County segregated 1,009 ballots with undated or misdated return envelopes. APP_00026-27 (Allegheny Interrog. Resp.).

c. Armstrong County segregated 15 ballots with undated or misdated return envelopes. APP_00040 (Armstrong Interrog. Resp.).

d. Beaver County segregated 182 ballots with undated or misdated return envelopes. APP_00060 (Beaver Interrog. Resp.).

e. Berks County segregated 782 ballots with undated or misdated return envelopes. APP_00078 (Berks Interrog. Resp.).

f. Blair County segregated 55 ballots with undated or misdated return envelopes. APP_00096 (Blair Interrog. Resp.).

g. Bradford County segregated 22 ballots with undated return envelopes and 1 ballot with misdated envelopes. APP_00107-108 (Bradford Interrog. Resp.).

h. Bucks County segregated 357 ballots with undated or misdated return envelopes. APP_00116 (Bucks Interrog. Resp.).

i. Butler County segregated 66 ballots with undated or misdated return envelopes. APP_00130 (Butler Interrog. Resp.).

j. Cambria County segregated 38 ballots with undated or misdated return envelopes. APP_00140 (Cambria Interrog. Resp.).

k.  Cameron County segregated 5 ballots with undated return envelopes and 0 ballots with misdated envelopes. APP_00150 (Cameron Interrog. Resp.).

l.  Chester County segregated 67 ballots with undated return envelopes and 68 ballots with misdated envelopes. APP_00168 (Chester Interrog. Resp.).

m.  Clarion County segregated 9 ballots with undated return envelopes and 3 ballots with misdated envelopes. APP_00185 (Clarion Interrog. Resp.).

n.  Clearfield County segregated 12 ballots with undated or misdated return envelopes. APP_00204 (Clearfield Interrog. Resp.).

o.  Clinton County segregated 20 ballots with undated or misdated return envelopes. APP_00216 (Clinton Interrog. Resp.).

p.  Crawford County segregated 51 ballots with undated or misdated return envelopes. APP_00233 (Crawford Interrog. Resp.).

q.  Cumberland County segregated 100 ballots with undated or misdated return envelopes. APP_00252 (Cumberland Interrog. Resp.).

r.  Delaware County segregated 49 ballots with undated return envelopes and 65 ballots with misdated envelopes. APP_00267 (Delaware Interrog. Resp.).

s. Elk County segregated 10 ballots with undated or misdated return envelopes. APP_00278 (Elk Interrog. Resp.).

t. Erie County segregated 168 ballots with undated return envelopes and 51 ballots with misdated envelopes. APP_00292 (Erie Interrog. Resp.).

u. Fayette County segregated 137 ballots with undated or misdated return envelopes. APP_00309 (Fayette Interrog. Resp.).

v. Forest County segregated 38 ballots with undated or misdated return envelopes. APP_00320 (Forest Interrog. Resp.).

w. Franklin County segregated 114 ballots with undated or misdated return envelopes. APP_00336 (Franklin Interrog. Resp.).

x. Fulton County segregated 5 ballots with undated or misdated return envelopes. APP_00347 (Fulton Interrog. Resp.).

y. Greene County segregated 11 ballots with undated or misdated return envelopes. APP_00354 (Greene Interrog. Resp.).

z. Juniata County segregated 5 ballots with undated or misdated return envelopes. APP_00363 (Juniata Interrog. Resp.).

aa. Lackawanna County segregated 160 ballots with undated or misdated return envelopes. APP_00372 (Lackawanna Interrog. Resp.).

bb. Lancaster County segregated 232 ballots with undated or misdated return envelopes. APP_00388 (Lancaster Interrog. Resp.).

cc. Lehigh County segregated 176 ballots with undated return envelopes and 237 ballots with misdated envelopes. APP_00400 (Lehigh Interrog. Resp.).

dd. Luzerne County segregated 166 ballots with undated or misdated return envelopes. APP_00416 (Luzerne Interrog. Resp.).

ee. Lycoming County segregated 36 ballots with undated or misdated return envelopes. APP_00438 (Lycoming Interrog. Resp.).

ff. McKean County segregated 35 ballots with undated or misdated return envelopes. APP_00453 (McKean Interrog. Resp.).

gg. Mercer County segregated 63 ballots with undated or misdated return envelopes. APP_00461 (Mercer Interrog. Resp.).

hh. Mifflin County segregated 10 ballots with undated or misdated return envelopes. APP_00468 (Mifflin Interrog. Resp.).

ii. Montgomery County segregated 460 ballots with undated or misdated return envelopes. APP_00481 (Montgomery Interrog. Resp.).

jj. Northampton County segregated 230 ballots with undated return envelopes and 50 ballots with misdated envelopes. APP_00495 (Northampton Interrog. Resp.).

kk. Perry County segregated 27 ballots with undated return envelopes and 8 ballots with misdated envelopes. APP_00511 (Perry Interrog. Resp.).

ll. Philadelphia County segregated 2,617 ballots with undated or misdated return envelopes. APP_00529 (Philadelphia Interrog. Resp.).

mm.    Pike County segregated 55 ballots with undated or misdated return envelopes. APP_00541 (Pike Interrog. Resp.).

nn. Potter County segregated 14 ballots with undated return envelopes and 0 ballots with misdated envelopes. APP_00574 (Potter Interrog. Resp.).

oo. Schuylkill County segregated 59 ballots with undated or misdated return envelopes. APP_00587 (Schuylkill Interrog. Resp.).

pp. Somerset County segregated 63 ballots with undated or misdated return envelopes. APP_00598 (Somerset Interrog. Resp.).

qq. Sullivan County segregated 4 ballots with undated or misdated return envelopes. APP_00609 (Sullivan Interrog. Resp.).

rr. Susquehanna County segregated 0 ballots with undated or misdated return envelopes. APP_00619 (Susquehanna Interrog. Resp.).

ss. Tioga County segregated 4 ballots with undated or misdated return envelopes. APP_00629 (Tioga Interrog. Resp.).

tt. Union County segregated 23 ballots with undated or misdated return envelopes. APP_00634 (Union Interrog. Resp.).

uu. Warren County segregated 10 ballots with undated return envelopes and 8 ballots with misdated envelopes. APP_00646 (Warren Interrog. Resp.).

vv. Washington County segregated 66 ballots with undated or misdated return envelopes. APP_00666 (Washington Interrog. Resp.).

ww. Wayne County segregated 40 ballots with undated return envelopes and 15 ballots with misdated envelopes. APP_00691 (Wayne Interrog. Resp.).

xx. Westmoreland County segregated 95 ballots with undated or misdated return envelopes. APP_00705 (Westmoreland Interrog. Resp.).

yy. Wyoming County segregated 17 ballots with undated return envelopes and 0 ballots with misdated envelopes. APP_00714. (Wyoming Interrog. Resp.).

zz. Bedford County segregated 0 ballots with undated or misdated return envelopes. APP_00731 (Bedford Interrog. Resp.).

aaa.     Carbon County segregated 27 ballots with undated or misdated return envelopes. APP_00731 (Carbon Interrog. Resp.).

bbb.     Centre County segregated 115 ballots with undated or misdated return envelopes. APP_00731 (Centre Interrog. Resp.).

ccc.     Columbia County segregated 29 ballots with undated or misdated return envelopes. APP_00731 (Columbia Interrog. Resp.).

ddd.     Dauphin County segregated 95 ballots with undated or misdated return envelopes. APP_00731 (Dauphin Interrog. Resp.).

eee.     Jefferson County segregated 23 ballots with undated or misdated return envelopes. APP_00731 (Jefferson Interrog. Resp.).

fff. Huntingdon County segregated 34 ballots with undated or misdated return envelopes. APP_00731 (Huntingdon Interrog. Resp.).

ggg.     Indiana County segregated 107 ballots with undated or misdated return envelopes. APP_00731 (Indiana Interrog. Resp.).

hhh.     Lawrence County segregated 15 ballots with undated or misdated return envelopes. APP_00731 (Lawrence Interrog. Resp.).

iii. Lebanon County segregated 24 ballots with undated or misdated return envelopes. APP_00731 (Lebanon Interrog. Resp.).

jjj. Monroe County segregated 462 ballots with undated or misdated return envelopes. APP_00731 (Monroe Interrog. Resp.).

kkk. Montour County segregated 8 ballots with undated or misdated return envelopes. APP_00731 (Montour Interrog. Resp.).

lll. Northumberland County segregated 14 ballots with undated or misdated return envelopes. APP_00731 (Northumberland Interrog. Resp.).

mmm. Snyder County segregated 9 ballots with undated or misdated return envelopes. APP_00732 (Snyder Interrog. Resp.).

nnn. Venango County segregated 42 ballots with undated or misdated return envelopes. APP_00732 (Venango Interrog. Resp.).

ooo. York County segregated 1,061 ballots with undated or misdated return envelopes. APP_00732 (York Interrog. Resp.).

37. In administering the November 2022 general election, the county boards of elections did not count mail ballots that were timely received and submitted in signed envelopes but without a handwritten date on the outer return envelope. APP_00004 (Adams RFA Resp.); APP_00021 (Allegheny RFA Resp.); APP_00038 (Armstrong RFA Resp.); APP_0050 (Beaver RFA Resp.); APP_00073 (Berks RFA

Resp.); APP_00091 (Blair RFA Resp.); APP_00106 (Bradford RFA Resp.); APP_00114 (Bucks RFA Resp.); APP_00126 (Butler RFA Resp.); APP_00137 (Cambria RFA Resp.); APP_00160 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp); APP_00194 (Clearfield RFA Resp.); APP_00212 (Clinton RFA Resp.); APP_00226 (Crawford RFA Resp.); APP_00247 (Cumberland RFA Resp.); APP_00262 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00282 (Erie RFA Resp.); APP_00303 (Fayette RFA Resp.); APP_00318 (Forest RFA Resp.); APP_00330 (Franklin RFA Resp.); APP_00348 (Fulton RFA Resp.); APP_00352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00368 (Lackawanna RFA Resp.); APP_00383 (Lancaster RFA Resp.); APP_00397 (Lehigh RFA Resp.); APP_00411 (Luzerne RFA Resp.); APP_00431 (Lycoming RFA Resp.); APP_00450 (McKean RFA Resp.); APP_00466 (Mifflin RFA Resp.); APP_00476 (Montgomery RFA Resp.); APP_00489, APP_00490 (Northampton RFA Resp.); APP_00505 (Perry RFA Resp.); APP_00524 (Philadelphia RFA Resp.); APP_00544 (Pike RFA Resp.); APP_00550 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00593 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00642 (Warren RFA Resp.); APP_00655 (Washington RFA Resp.); APP_00681 (Wayne RFA Resp.); APP_00698 (Westmoreland RFA Resp.); APP_00719 (Wyoming RFA Resp.); *see also* APP_00822-823 (Berks Dep.); APP_00867-868 (Lancaster Dep.); APP_00918-919 (Westmoreland Dep.).

38.    Thousands of ballots were set aside and not counted solely based on a missing handwritten date on the return envelope in the November 2022 election. *See*

APP_01494-1496, APP_01572 (Tetro Decl.) (summarizing manual review of certain counties' ballot envelopes); APP_01162a (Philadelphia meeting minutes stating 2,143 ballots were excluded based on a missing handwritten date on the return envelope in Philadelphia alone).

    a. For example, Clearfield County set aside the ballot of a voter who omitted the handwritten date on their return envelope, even though the stamp on the envelope indicates the ballot was received by the county board of elections on "OCT 11 2022." An election official wrote a note on this envelope that says "can't come in disabled." APP_01433.

    b. Clearfield County also set aside the ballot of another voter who omitted the handwritten date on their return envelope, even though the stamp on the envelope indicates the ballot was received by the county board of elections on "OCT 24 2022." An election official wrote a note on that envelope that says "can not fix[,] in Florida." APP_01434.

    c. Cumberland County set aside the ballot of a voter who omitted the handwritten date on the "Today's Date (Required)" line of the voter declaration form of their return envelope, even though the date "30 OCT 2022" appears in another signed and dated portion of the envelope that was completed by a witness, who assisted the

voter because the voter was unable to sign their declaration because of illness or physical disability. APP_01435.

39.     In administering the November 2022 general election, the county boards of elections did not count mail ballots that were timely received and submitted in signed envelopes, but had a handwritten date on the outer return envelope that appeared to pre-date September 19, 2022, or to post-date November 8, 2022. APP_00022 (Allegheny RFA Resp.); APP_00038 (Armstrong RFA Resp.); APP_00051 (Beaver RFA Resp.); APP_00074 (Berks RFA Resp.); APP_00091 (Blair RFA Resp.); APP_00106 (Bradford RFA Resp.); APP_00114 (Bucks RFA Resp.); APP_00126 (Butler RFA Resp.); APP_00137 (Cambria RFA Resp.); APP_00161 (Chester RFA Resp.); 00182 (Clarion RFA Resp.); APP_00194 (Clearfield RFA Resp.); APP_00212 (Clinton RFA Resp.); APP_00226 (Crawford RFA Resp.); APP_00262 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00282 (Erie RFA Resp.); APP_00304, APP_00305 (Fayette RFA Resp.); APP_00318 (Forest RFA Resp.); APP_00330 (Franklin RFA Resp.); APP_00348 (Fulton RFA Resp.); APP_00352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00369 (Lackawanna RFA Resp.); APP_00384 (Lancaster RFA Resp.); APP_00398 (Lehigh RFA Resp.); APP_00412 (Luzerne RFA Resp.); APP_00431 (Lycoming RFA Resp.); APP_00450 (McKean RFA Resp.); APP_00466 (Mifflin RFA Resp.); APP_00477 (Montgomery RFA Resp.); APP_00490 (Northampton RFA Resp.); APP_00505 (Perry RFA Resp.); APP_00525 (Philadelphia RFA Resp.); APP_00544 (Pike RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00593 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.);

APP_00642 (Warren RFA Resp.); APP_00681 (Wayne RFA Resp.); APP_00699 (Westmoreland RFA Resp.); APP_00719 (Wyoming RFA Resp.); APP_00727 (Babst Calland RFA Resp.); *see also* APP_00822-823 (Berks Dep.); APP_00868 (Lancaster Dep.); APP_00918-919 (Westmoreland Dep.).[3]

40. At least 21 counties admitted that they provided voters with no notice that their ballot had been set aside because of a missing or incorrect date on the outer return envelope. APP_00043 (Armstrong Interrog. Resp.); APP_00100 (Blair Interrog. Resp.); APP_00109 (Bradford Interrog. Resp.); APP_00152 (Cameron Interrog. Resp.); APP_00187 (Clarion Interrog. Resp.); APP_00219 (Clinton Interrog. Resp.); APP_00255 (Cumberland Interrog. Resp.); APP_00323 (Forest Interrog. Resp.); APP_00356 (Greene Interrog. Resp.); APP_00375 (Lackawanna Interrog.

[3] The only counties that did not admit this are those that did not report receiving any mail ballots in incorrectly dated envelopes. APP_00004 (Adams RFA Resp.) ("Adams did not receive any such ballots and therefore no admission is made."); APP_00248 (Cumberland RFA Resp.) ("The Cumberland BOE did not receive any mail ballots in connection with the 2022 General Election that were timely received in signed envelopes that showed a date on the outer return envelope predating September 19, 2022, or post-dating November 8, 2022."); APP_00562 (Potter Suppl. RFA Resp.) ("As understood the request is DENIED as all ballots set aside by Defendant regarding date issues were ballots which had a blank date on the outer envelope. SUPPLEMENTAL ANSWER: As an additional response the request is DENIED because no ballots were received with dates pre or post the dates mentioned."); APP_00146 (Cameron RFA Resp.) ("No such mail ballots were received in connection with the 2022 General Election."); APP_00616 (Susquehanna RFA Resp.) ("Defendant denies the first clause of the preceding statement insofar as no such ballots had been received"); APP_00626 (Tioga RFA. Resp.) ("Defendant objects to the preceding request as it assumes events contrary to fact. Subject to this objection, no envelopes bearing dates were uncounted.); APP_00655 (Washington RFA Resp.) ("Upon reasonable review of information in Defendant's possession and control, Defendant is without sufficient knowledge and/or information to admit or deny this Request.").

Resp.); APP_00391 (Lancaster Interrog. Resp.); APP_00456 (McKean Interrog. Resp.); APP_00513 (Perry Interrog. Resp.); APP_00611 (Sullivan Interrog. Resp.); APP_00621 (Susquehanna Interrog. Resp.); APP_00636 (Union Interrog. Resp.); APP_00648 (Warren Interrog. Resp.); APP_00671 (Washington Interrog. Resp.); APP_00692 (Wayne Interrog. Resp.); APP_00708 (Westmoreland Interrog. Resp.); APP_00716 (Wyoming Interrog. Resp.); *see also* APP_00870-871 (Lancaster Dep.); APP_00921 (Westmoreland Dep.); APP_00980 (Marks Dep.).

41.     At least 20 additional counties admitted that they provided voters with no notice that their ballot had been set aside because of a missing or incorrect date on the outer return envelope, except that they uploaded that information into the SURE system, which sends an automatic notification to voters who provided the county with their email address. APP_00738-739 (Bedford Interrog. Resp.); APP_00132 (Butler Interrog. Resp.); APP_00738-739 (Carbon Interrog. Resp.); APP_00738-739 (Centre Interrog. Resp.); APP_00738-739 (Columbia Interrog. Resp.); APP_00738-739 (Dauphin Interrog. Resp.); APP_00738-739 (Jefferson Interrog. Resp.); APP_00364 (Juniata Interrog. Resp.); APP_00738-739 (Huntingdon Interrog. Resp.); APP_00738-739 (Indiana Interrog. Resp.); APP_00738-739 (Lebanon Interrog. Resp.); APP_00462 (Mercer Interrog. Resp.); APP_00738-739 (Montour Interrog. Resp.); APP_00738-739 (Northumberland Interrog. Resp.); APP_00542 (Pike Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.); APP_00738-739 (Snyder Interrog. Resp.); APP_00601 (Somerset Interrog. Resp.); APP_00738-739 (Venango Interrog. Resp.); APP_00738-739 (York Interrog. Resp.).

42. All of the voters whose ballots were set aside in the November 2022 election solely because of a missing or incorrect handwritten date on the outer return envelope had previously been determined to be eligible and qualified to vote in the election by their county board of elections. APP_00008 (Adams Interrog. Resp.); APP_00029 (Allegheny Interrog. Resp.); APP_00042 (Armstrong Interrog. Resp.); APP_00064-65 (Beaver Interrog. Resp.); APP_00080 (Berks Interrog. Resp.); APP_00099 (Blair Interrog. Resp.); APP_00109 (Bradford Interrog. Resp.); APP_00118 (Bucks Interrog. Resp.); APP_00132 (Butler Interrog. Resp.); APP_00141 (Cambria Interrog. Resp.); APP_00152 (Cameron Interrog. Resp.); APP_00171 (Chester Interrog. Resp.); APP_00186 (Clarion Interrog. Resp.); APP_00205 (Clearfield Interrog. Resp.); APP_00219 (Clinton Interrog. Resp.); APP_00238 (Crawford Interrog. Resp.); APP_00255 (Cumberland Interrog. Resp); APP_00269 (Delaware Interrog. Resp.); APP_00279 (Elk Interrog. Resp.); APP_00294 (Erie Interrog. Resp.); APP_00311 (Fayette Interrog. Resp.); APP_0032 (Forest Interrog. Resp.); APP_00338 (Franklin Interrog. Resp.); APP_00347 (Fulton Interrog. Resp.); APP_00356 (Greene Interrog. Resp.); APP_00363 (Juniata Interrog. Resp.); APP_00375 (Lackawanna Interrog. Resp.); APP_00391 (Lancaster Interrog. Resp.); APP_00419 (Luzerne Interrog. Resp.); APP_00440 (Lycoming Interrog. Resp.); APP_00455 (McKean Interrog. Resp.); APP_00462 (Mercer Interrog. Resp.); APP_00470 (Mifflin Interrog. Resp.); APP_00482 (Montgomery Interrog. Resp.); APP_00497 (Northampton Interrog. Resp.); APP_00513 (Perry Interrog. Resp.); APP_00533 (Philadelphia Interrog. Resp.); APP_00542 (Pike Interrog. Resp.);

APP_00577 (Potter Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.); APP_00600 (Somerset Interrog. Resp.); APP_00611 (Sullivan Interrog. Resp.); APP_00620 (Susquehanna Interrog. Resp.); APP_00630 (Tioga Interrog. Resp.); APP_00636 (Union Interrog. Resp.); APP_00647 (Warren Interrog. Resp.); APP_00670 (Washington Interrog. Resp.); APP_00692 (Wayne Interrog. Resp.); APP_00708 (Westmoreland Interrog. Resp.); APP_00715 (Wyoming Interrog. Resp.); APP_00736-737 (Babst Calland Interrog. Resp.); *see also* APP_01165-1168 (Philadelphia meeting minutes).

43.     The county boards of elections did not identify or raise any fraud concerns with respect to any November 2022 general election mail ballot that was signed and timely received but set aside because of a missing or incorrect handwritten date on the outer return envelope. APP_00009 (Adams Interrog. Resp.); APP_00029 (Allegheny Interrog. Resp.); APP_00043 (Armstrong Interrog. Resp.); APP_00064 (Beaver Interrog. Resp.); APP_00080 (Berks Interrog. Resp.); APP_00099 (Blair Interrog. Resp.); APP_00109 (Bradford Interrog. Resp.); APP_00118 (Bucks Interrog. Resp.); APP_00132 (Butler Interrog. Resp.); APP_00141 (Cambria Interrog. Resp.); APP_00152 (Cameron Interrog. Resp.); APP_00172 (Chester Interrog. Resp.); APP_00187 (Clarion Interrog. Resp.); APP_00205 (Clearfield Interrog. Resp.); APP_00219 (Clinton Interrog. Resp.); APP_00239 (Crawford Interrog. Resp.); APP_00255 (Cumberland Interrog. Resp.); APP_00270 (Delaware Interrog. Resp.); APP_00279 (Elk Interrog. Resp.); APP_00294 (Erie Interrog. Resp.); APP_00311 (Fayette Interrog. Resp.); APP_0323 (Forest Interrog. Resp.); APP_00338 (Franklin

Interrog. Resp.); APP_00347 (Fulton Interrog. Resp.); APP_00356 (Greene Interrog. Resp.); APP_00364 (Juniata Interrog. Resp.); APP_00375 (Lackawanna Interrog. Resp.); APP_00391 (Lancaster Interrog. Resp.); APP_00403 (Lehigh Interrog. Resp.); APP_00417 (Luzerne Interrog. Resp.); APP_00440 (Lycoming Interrog. Resp.); APP_00455 (McKean Interrog. Resp.); APP_00462 (Mercer Interrog. Resp.); APP_00471 (Mifflin Interrog. Resp.); APP_00482 (Montgomery Interrog. Resp.); APP_00497 (Northampton Interrog. Resp.); APP_00513 (Perry Interrog. Resp.); APP_00542 (Pike Interrog. Resp.); APP_00533 (Philadelphia Interrog. Resp.); APP_00578 (Potter Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.); APP_00601 (Somerset Interrog. Resp.); APP_00611 (Sullivan Interrog. Resp.); APP_00647 (Warren Interrog. Resp.); APP_00620 (Susquehanna Interrog. Resp.); APP_00630 (Tioga Interrog. Resp.); APP_00636 (Union Interrog. Resp.); APP_00670 (Washington Interrog. Resp.); APP_00692 (Wayne Interrog. Resp.); APP_00708 (Westmoreland Interrog. Resp.); APP_00716 (Wyoming Interrog. Resp.); APP_00737 (Babst Calland Interrog. Resp.); APP_00929r (Westmoreland Dep.); Phila Bd. Transcript at 14-15.

44.     The voters whose ballots were set aside based on a missing or incorrect handwritten date include voters who identify as Democrats, Republicans, and Independents, as well as unaffiliated voters. APP_01292-1400 (Beaver, Berks, Blair, Butler, Centre, Erie, Franklin, Indiana, Lancaster, Lawrence, Luzerne, Venango, Wayne, and Westmoreland voter lists).

45. The voters whose ballots were set aside based on a missing or incorrect handwritten date ranged in age from 18 to at least 101 years old, and the date requirement had a significant impact on voters who were 65 or older. APP_01292-1400. For example:

  a. In Beaver County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 96. Approximately 70 percent of the affected voters in Beaver County were at least 65 years old, and approximately 30 percent of the affected voters were at least 80 years old. APP_01292-01296.

  b. In Berks County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 101. Approximately 43 percent of the affected voters in Berks County were at least 65 years old, and 16 percent of the affected voters were at least 80 years old. APP_01298-01353.

  c. In Blair County, the youngest voter affected by the date requirement was 25, and the oldest voter affected by the date requirement was 95. Approximately 69 percent of the affected voters in Blair County were at least 65 years old, and 18 percent of the affected voters were at least 80 years old. APP_01357-01358.

d. In Butler County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 96. Approximately 48 percent of the affected voters in Butler County were at least 65 years old, and 16 percent of the affected voters were at least 80 years old. APP_01359-01360.

e. In Centre County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 100. Approximately 56 percent of the affected voters in Centre County were at least 65 years old, and 24 percent of the affected voters were at least 80 years old. APP_01361-01364.

f. In Erie County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 92. Approximately 66 percent of the affected voters in Erie County were at least 65 years old, and 25 percent of the affected voters were at least 80 years old. APP_01367-01372.

g. In Franklin County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 96. Approximately 60 percent of the affected voters in Franklin County were at least 65 years old, and 30

percent of the affected voters were at least 80 years old. APP_01373-01375.

h. In Indiana County, the youngest voter affected by the date requirement was 20, and the oldest voter affected by the date requirement was 94. Approximately 42 percent of the affected voters in Indiana County were at least 65 years old, and 10 percent of the affected voters were at least 80 years old. APP_01376-01379.

i. In Lancaster County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 99. Approximately 61 percent of the affected voters in Lancaster County were at least 65 years old, and 22 percent of the affected voters were at least 80 years old. APP_01380-01386.

j. In Lawrence County, the youngest voter affected by the date requirement was 19, and the oldest voter affected by the date requirement was 92. Approximately 66 percent of the affected voters in Lawrence County were at least 65 years old, and 26 percent of the affected voters were at least 80 years old. APP_01387.

k. In Luzerne County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date

requirement was 97. Approximately 61 percent of the affected voters in Luzerne County were at least 65 years old, and 15 percent of the affected voters were at least 80 years old. APP_01388-01391.

l. In Venango County, the youngest voter affected by the date requirement was 24, and the oldest voter affected by the date requirement was 97. Approximately 77 percent of the affected voters in Venango County were at least 65 years old, and 30 percent of the affected voters were at least 80 years old. APP_01393.

m. In Wayne County, the youngest voter affected by the date requirement was 19, and the oldest voter affected by the date requirement was 97. Approximately 59 percent of the affected voters in Wayne County were at least 65 years old, and 25 percent of the affected voters were at least 80 years old. APP_01395-01396.

n. In Westmoreland County, the youngest voter affected by the date requirement was 19, and the oldest voter affected by the date requirement was 94. Approximately 67 percent of the affected voters in Westmoreland County were at least 65 years old, and 28 percent of the affected voters were at least 80 years old. APP_01397-01398.

o. In Philadelphia County, one of the commissioners reported: "the median age of voters who submitted undated ballots is 64 years old and the median age of voters who submitted misdated ballots is 66 years old. By comparison, the median age of registered voters in Philadelphia is 43. Looked at more closely, 74.5% of undated ballots were submitted by voters age 50 or older and 77.2% of misdated ballots were submitted by voters age 50 or older. At age 60 or older, those numbers are 60.9% for undated ballots and 64.1% for misdated ballots. Over a third of the undated and misdated ballots were submitted by voters over 70 years of age. 37.5% for the undated, and 40.9% for the misdated. 14.1% of the undated ballots were submitted by voters 80 years or older and 13.9% of the misdated ballots were submitted by voters in this age group. Voters age 90 or older submitted 57 undated ballots and 15 misdated ballots. Importantly, these percentages all are significantly higher than the percentage of Philadelphia's registered voters that these age groups represent.... In addition, the Board has reviewed the distribution of these ballots across Philadelphia and that analysis suggests that the issue disproportionately impacts certain Philadelphia communities. These include areas with higher poverty rates,

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 55 of 94

lower rates of educational attainment, and minority communities." APP_01163-1164 (Philadelphia meeting minutes).

## IV. THE DATE REQUIREMENT

46. The voter declaration forms that accompany paper mail and absentee ballots include a line for the voter to sign and date the declaration. *See, e.g.*, APP_01298 (Berks mail envelope); APP_01299 (Bucks military envelope). The exact phrasing of the label under the date line varies by county—for example, some counties employ the label "Today's date (required) / Fecha de hoy (obligatorio)," while others use "Today's date (MM/DD/YYYY (required)." APP_01298 (Berks envelope); APP_01486 (Lancaster envelope).

47. In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail or absentee ballot for any purpose related to determining or confirming the mail ballot voter's age. APP_00003 (Adams RFA Resp.); APP_00019-20 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00072-73 (Berks RFA Resp.); APP_00088-90 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113 (Bucks RFA Resp.); APP_00124, APP_00125 (Butler RFA Resp.); APP_00136-137 (Cambria RFA Resp.)[4]; APP_00145-

[4] Cambria County responded to this request (and others) with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to determine or confirm the mail ballot voter's age. Cambria County consistently responded to Plaintiffs' interrogatory requests that it does not contend the handwritten date on Return Envelope is "material in determining whether a mail ballot voter is qualified to vote" (Interrogatory No. 14) and agreed not to oppose Plaintiffs' requested relief in this action (ECF No. 157).

146 (Cameron RFA Resp.); APP_00158-159 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-194 (Clearfield RFA Resp.); APP_0211-212 (Clinton RFA Resp.); APP_00225-226 (Crawford RFA Resp.); APP_00245-246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-282 (Erie RFA Resp.); APP_00301-303 (Fayette RFA Resp.); APP_00317-318 (Forest RFA Resp.); APP_00328-329 (Franklin RFA Resp.); APP_00351-352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00367-368 (Lackawanna RFA Resp.); APP_00396-397 (Lehigh RFA Resp.); APP_00410-411 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00448-449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00475-476 (Montgomery RFA Resp.); APP_00488-489 (Northampton RFA Resp.); APP_00503-504 (Perry RFA Resp.); APP_00523-524 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00548-549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-642 (Warren RFA Resp.); APP_00653-654 (Washington RFA Resp.); APP_00680-681 (Wayne RFA Resp.); APP_00697-698 (Westmoreland RFA Resp.); APP_00718-719 (Wyoming RFA Resp.); APP_00725-726 (Babst Calland RFA Resp.); *see also* APP_00814-816 (Berks Dep.); APP_00861-862, APP_00866 (Lancaster Dep.); APP_00906-910 (Westmoreland Dep.); APP_00983-984, APP_00995-997 (Marks Dep.); APP_01190-1191 (Greenburg Report).

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 57 of 94

48. In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail or absentee ballot for any purpose related to determining or confirming the mail ballot voter's citizenship. APP_00003 (Adams RFA Resp.); APP_00019-20 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00072-73 (Berks RFA Resp.); APP_00088-90 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113 (Bucks RFA Resp.); APP_00124-125 (Butler RFA Resp.); APP_00136-137 (Cambria RFA Resp.); APP_00145-146 (Cameron RFA Resp.)[5]; APP_00158-159 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-194 (Clearfield RFA Resp.); APP_00211-212 (Clinton RFA Resp.); APP_00225-226 (Crawford RFA Resp.); APP_00245-246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-282 (Erie RFA Resp.); APP_00301, APP_00303 (Fayette RFA Resp.); APP_00317-318 (Forest RFA Resp.); APP_00328-329 (Franklin RFA Resp.); APP_00351-352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00367-368 (Lackawanna RFA Resp.); APP_00396-397 (Lehigh RFA Resp.); APP_00410-411 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00448-449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00475-476 (Montgomery RFA Resp.); APP_00488-489 (Northampton RFA Resp.);

---

[5] Cambria County responded to this request with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to determine or confirm the mail ballot voter's citizenship. *See supra* n.4.

APP_00503-504 (Perry RFA Resp.); APP_00523-524 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00548-549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-642 (Warren RFA Resp.); APP_00653-654 (Washington RFA Resp.); APP_00680-681 (Wayne RFA Resp.); APP_00697-698 (Westmoreland RFA Resp.); APP_00718-719 (Wyoming RFA Resp.); APP_00725-726 (Babst Calland RFA Resp.); *see also* APP_00814-816 (Berks Dep.); APP_00861-862, APP_00866 (Lancaster Dep.); APP_00906-910 (Westmoreland Dep.); APP_00983-984, APP_00995-997 (Marks Dep.); APP_01190-1191 (Greenburg Report).

49. In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail or absentee ballot for any purpose related to determining or confirming the mail ballot voter's county or duration of residence. APP_00003 (Adams RFA Resp.); APP_00019-20 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00072-73 (Berks RFA Resp.); APP_00088-90 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113 (Bucks RFA Resp.); APP_00124-125 (Butler RFA Resp.); APP_00136-137 (Cambria RFA Resp.)[6]; APP_00145-146 (Cameron RFA Resp.); APP_00158-159 (Chester RFA Resp.);

[6] Cambria County responded to this request with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to determine or confirm the mail ballot voter's county or duration of residence. *See supra* n.4.

APP_00181 (Clarion RFA Resp.); APP_00193-194 (Clearfield RFA Resp.); APP_00211-212 (Clinton RFA Resp.); APP_00225-226 (Crawford RFA Resp.); APP_00245-246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-282 (Erie RFA Resp.); APP_00301, APP_00303 (Fayette RFA Resp.); APP_00317-318 (Forest RFA Resp.); APP_00328-329 (Franklin RFA Resp.); APP_00351-352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00367-368 (Lackawanna RFA Resp.); APP_00396-397 (Lehigh RFA Resp.); APP_00410-411 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00448-449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00475-476 (Montgomery RFA Resp.); APP_00488-489 (Northampton RFA Resp.); APP_00503-504 (Perry RFA Resp.); APP_00523-524 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00548-549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-642 (Warren RFA Resp.); APP_00653-654 (Washington RFA Resp.); APP_00680-681 (Wayne RFA Resp.); APP_00697-698 (Westmoreland RFA Resp.); APP_00718-719 (Wyoming RFA Resp.); APP_00725-726 (Babst Calland RFA Resp.); *see also* APP_00814-816 (Berks Dep.); APP_00861-862, APP_00866 (Lancaster Dep.); APP_00906-910 (Westmoreland Dep.); APP_00983-984, APP_00995-997 (Marks Dep.); APP_01190-1191 (Greenburg Report).

50.    In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing

a mail or absentee ballot for any purpose related to determining or confirming the mail ballot voter's felony status. APP_00003 (Adams RFA Resp.); APP_00019-20 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00072-73 (Berks RFA Resp.); APP_00088-90 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113 (Bucks RFA Resp.); APP_00124-125 (Butler RFA Resp.); APP_00136-137 (Cambria RFA Resp.)[7]; APP_00145-146 (Cameron RFA Resp.); APP_00158-159 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-194 (Clearfield RFA Resp.); APP_00211-212 (Clinton RFA Resp.); APP_00225-226 (Crawford RFA Resp.); APP_00245-246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-282 (Erie RFA Resp.); APP_00301, APP_00303 (Fayette RFA Resp.); APP_00317-318 (Forest RFA Resp.); APP_00328-329 (Franklin RFA Resp.); APP_00351-352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00367-368 (Lackawanna RFA Resp.); APP_00396-397 (Lehigh RFA Resp.); APP_00410-411 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00448-449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00475-476 (Montgomery RFA Resp.); APP_00488-489 (Northampton RFA Resp.); APP_00503-504 (Perry RFA Resp.); APP_00523-524 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00548-549 (Potter RFA Resp.); APP_00584

---

[7] Cambria County responded to this request with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to determine or confirm the mail ballot voter's county or duration of residence. *See supra* n.4.

(Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-642 (Warren RFA Resp.); APP_00653-654 (Washington RFA Resp.); APP_00680-681 (Wayne RFA Resp.); APP_00697-698 (Westmoreland RFA Resp.); APP_00718-719 (Wyoming RFA Resp.); APP_00725-726 (Babst Calland RFA Resp.); *see also* APP_00814-816 (Berks Dep.); APP_00861-862, APP_00866 (Lancaster Dep.); APP_00906-910 (Westmoreland Dep.); APP_00983-984, APP_00995-997 (Marks Dep.); APP_01190-1191 (Greenburg Report).

51. In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail ballot to establish whether they received the ballot by 8:00 P.M. on November 8, 2022. APP_00003 (Adams RFA Resp.); APP_00020 (Allegheny RFA Resp.); APP_00037 (Armstrong RFA Resp.); APP_00049 (Beaver RFA Resp.); APP_00073 (Berks RFA Resp.); APP_00090 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_0013 (Bucks RFA Resp.); APP_00125 (Butler RFA Resp.); APP_00136 (Cambria RFA Resp.)[8]; APP_00145 (Cameron RFA Resp.); APP_00158 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193 (Clearfield RFA Resp.); APP_00211 (Clinton RFA Resp.); APP_00225 (Crawford RFA Resp.); APP_00246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.);

[8] Cambria County responded to this request with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to establish whether they received the ballot by the applicable deadline. *See supra* n.4.

APP_00281 (Erie RFA Resp.); APP_00302 (Fayette RFA Resp.); APP_00317 (Forest RFA Resp.); APP_00329 (Franklin RFA); APP_00351 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00368 (Lackawanna RFA Resp.); APP_00396 (Lehigh RFA Resp.); APP_00410 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00476 (Montgomery RFA Resp.); APP_00488 (Northampton RFA Resp.); APP_0504 (Perry RFA Resp.); APP_00523 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp); APP_00641 (Warren RFA Resp.); APP_00653 (Washington RFA Resp.); APP_00680 (Wayne RFA Resp.); APP_00697 (Westmoreland RFA Resp.); APP_00718 (Wyoming RFA Resp.); APP_00725 (Babst Calland RFA Resp.); *see also* APP_00886-887 (Lancaster Dep.); APP_00993-995, APP_01001 (Marks Dep.); APP_01165-1166 (Philadelphia meeting minutes).

52.     Setting aside military-overseas ballots, in administering the November 2022 general election, the county boards of elections did not use or refer to the date handwritten on the outer return envelope containing an absentee ballot to establish whether they received the ballot by the applicable deadline. APP_00003 (Adams RFA Resp.); APP_00020-21 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00073 (Berks RFA Resp.); APP_00091 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113-14

(Bucks RFA Resp.); APP_00125-26 (Butler RFA Resp.); APP_00136 (Cambria RFA Resp.)[9]; APP_00145-46 (Cameron RFA Resp.); APP_00158-59 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-94 (Clearfield RFA Resp.); APP_00211-12 (Clinton RFA Resp.); APP_00225-26 (Crawford RFA Resp.); APP_00247 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-82 (Erie RFA Resp.); APP_00302-03 (Fayette RFA Resp.); APP_00317-18 (Forest RFA Resp.); APP_00329 (Franklin RFA Resp.); APP_00351-52 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00368 (Lackawanna RFA Resp.); APP_00396-97 (Lehigh RFA Resp.); APP_00410-11 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00449 (McKean RFA Resp.); APP_00465-66 (Mifflin RFA Resp.); APP_00476 (Montgomery RFA Resp.); APP_00488-89 (Northampton RFA Resp.); APP_00504 (Perry RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00549-50 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-42 (Warren RFA Resp.); APP_00653-54 (Washington RFA Resp.); APP_00680-81 (Wayne RFA Resp.); APP_00697-98 (Westmoreland RFA Resp.); APP_00718-19 (Wyoming RFA Resp.); APP_00725-26 (Babst Calland RFA Resp.); *see also* APP_00886-887 (Lancaster Dep.); APP_00993-995, APP_01001 (Marks Dep.); APP_01165 (Philadelphia meeting minutes).

---

[9] *See supra* n.8.

53.     A voter could not have signed the voter declaration form on the 2022 general election mail ballot outer return envelope on any date before their county board of elections sent the mail ballot materials for the 2022 election to voters, because the voter would not yet have the mail ballot materials in their possession. For example, if a county board of elections did not send mail ballots to voters until October 1, 2022, then a voter in that county could not have filled out their mail ballot before October 1, 2022, regardless of what if any date the voter wrote on the outer return envelope. APP_00827, APP00831-832, APP_00840-41 (Berks Dep.); APP_00876-877, APP_00880-881 (Lancaster Dep.); APP_00928-929 (Westmoreland Dep.); APP_01000, APP_01002-1003 (Marks Dep.); APP_01189-1190 (Greenburg Report).

54.     If a county board of elections received and date-stamped a 2022 general election mail ballot before 8:00 P.M. on Election Day (November 8, 2022), then that ballot was timely received under the Election Code. 25 P.S. §§ 3146.6(c), 3150.16(c); *see also, e.g.*, APP_00834 (Berks Dep.); APP_01189 (Greenburg Report).

55.     If a county board of elections received a 2022 general election mail ballot by 8:00 P.M. on Election Day (November 8, 2022), then the voter who submitted that ballot could not have filled out that ballot *after* 8:00 P.M. on Election Day, regardless of what if any date the voter wrote on the outer return envelope. APP_00830 (Berks Dep.); APP_00874-875 (Lancaster Dep.); APP_00925-926 (Westmoreland Dep.); APP_01000 (Marks Dep.).

56.     If a county board of elections received a 2022 general election mail ballot *after* 8:00 P.M. on Election Day (November 8, 2022), then the board of elections did not count that ballot, regardless of what if any date the voter wrote on the outer return envelope. APP_00830a (Berks Dep.); APP_00875-876 (Lancaster Dep.); APP_00926-927 (Westmoreland Dep.); APP_01000-1001 (Marks Dep.).

57.     More than 20 county boards of elections have stated that they do not contend that the handwritten date is material in determining whether a mail ballot voter is qualified to vote in the election in which they have cast a ballot. APP_00010 (Adams Interrog. Resp.); APP_00031-32 (Allegheny Interrog. Resp.); APP_00100 (Blair Interrog. Resp.); APP_00118 (Bucks Interrog. Resp.); APP_00142 (Cambria Interrog. Resp.); APP_00174 (Chester Interrog. Resp.); APP_00220 (Clinton Interrog. Resp.); APP_00271 (Delaware Interrog. Resp.); APP_00295 (Erie Interrog. Resp.); APP_00312 (Fayette Interrog. Resp.); APP_00324 (Forest Interrog. Resp.); APP_00364 (Juniata Interrog. Resp.); APP_00392 (Lancaster Interrog. Resp.); APP_00404 (Lehigh Interrog. Resp.); APP_00456 (McKean Interrog. Resp.); APP_00483 (Montgomery Interrog. Resp.); APP_00535 (Philadelphia Interrog. Resp.); APP_00602 (Somerset Interrog. Resp.); APP_00612 (Sullivan Interrog. Resp.); APP_00637 (Union Interrog. Resp.).

58.     An additional ten counties have taken no position on this contention. APP_00043 (Armstrong Interrog. Resp.); APP_00066 (Beaver Interrog. Resp.); APP_00187 (Clarion Interrog. Resp.); APP_00240 (Crawford Interrog. Resp.); APP_00256 (Cumberland Interrog. Resp.); APP_00357 (Greene Interrog. Resp.);

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 66 of 94

APP_00462 (Mercer Interrog. Resp.); APP_00472 (Mifflin Interrog. Resp.); APP_00631 (Tioga Interrog. Resp.); APP_00716 (Wyoming Interrog. Resp.).

59. Of those county boards of elections that identified any purported use for the voter-written date in their discovery responses, 30 counties identified that the only reason for looking at this date was to ensure compliance with the Election Code and the Supreme Court of Pennsylvania's Ball decision. APP_00080 (Berks Interrog. Resp.); APP_00110 (Bradford Interrog. Resp.); APP_00153 (Cameron Interrog. Resp.); APP_00339 (Franklin Interrog. Resp.); APP_00348 (Fulton Interrog. Resp.), APP_00376 (Lackawanna Interrog. Resp.); APP_00418 (Luzerne Interrog. Resp.); APP_00499 (Northampton Interrog. Resp.); APP_00514 (Perry Interrog. Resp.); APP_00579 (Potter Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.); APP_00672 (Washington Interrog. Resp.); APP_00693 (Wayne Interrog. Resp.); APP_00709 (Westmoreland Interrog. Resp.); APP_00740 (Babst Calland Interrog. Resp.); *see also* APP_00817, APP_00820-821 (Berks Dep.); APP_00863-865 (Lancaster Dep.); APP_00914-916 (Westmoreland Dep.).

60. The only other purported use for the voter-written date identified in discovery by any county is that considering the date written on a voter declaration might aid in prosecution of voter fraud relating to deceased voters. No county mentioned this use of the voter-written date in their interrogatory responses, but both Lancaster County and Westmoreland County addressed it when deposed. APP_00910-915 (Westmoreland Dep.); APP_00888-892 (Lancaster Dep.).

61.     If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the board of elections removes the deceased person from the voter rolls. 25 P.S. § 3146.8(d); APP_01191 (Greenburg Report); APP_01016-1019, APP_01026-1029 (Greenburg Dep.); APP_00888-892, APP_00895-896 (Lancaster Dep.).

62.     County boards of elections determine whether a voter died before 8:00 P.M. on Election Day by reviewing Department of Health records, local obituaries, and/or death certificates. APP_00895-896 (Lancaster Dep.); APP_00911-912 (Westmoreland Dep.); APP_01032 (Greenburg Dep.).

63.     If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the county board of elections will not count that person's vote, even if the vote was timely submitted before the voter's death. APP_00818 (Berks Dep.); APP_00890-891 (Lancaster Dep.); APP_00911-914 (Westmoreland Dep.); APP_01016-1019, APP_01026-1029 (Greenburg Dep.).

64.     If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the county board of elections will not count that person's vote, regardless of what if any handwritten date appears on the outer return envelope of the deceased voter's ballot. 25 P.S. § 3146.8(d); APP_00819 (Berks Dep.); APP_00890-891 (Lancaster Dep.); APP_00914 (Westmoreland Dep.); APP_01016-1019, APP_01026-1029 (Greenburg Dep.).

          a. For example, the Beaver County Board of Elections set aside the ballot of a deceased voter who also happened to write the date on

the wrong line of their return envelope. On the return envelope, an elections official wrote "Voter passed away[,] DOH notification 11/3/22[,] moot on date." APP_01485.

## V. Defendants' Arbitrary and Inconsistent Applications of the Date Requirement

### A. Missing or incorrect year

65. A voter whose mail ballot was timely received by their county board of elections could only have signed the voter declaration form in the year 2022, because the county boards of elections did not begin sending the relevant mail ballot materials to voters until August 2022 or later (*see supra* ¶ TK), and the ballots must have been received by November 8, 2022 to be considered timely. APP_00835-81 (Berks Dep.); APP_00878-879, APP_00884-885 (Lancaster Dep.); APP_00923-924, APP_00929g, APP_00929l-929q (Westmoreland Dep.).

#### *i. Past year*

66. At least 530 voters' ballots were set aside because their handwritten date included a year earlier than 2022. APP_01494-1496, APP_01572 (Tetro Decl.).

67. Of those voters whose ballots were set aside for writing a past year, at least 474 voters wrote a day and month within the Supreme Court of Pennsylvania's date range, but wrote a past year (*e.g.*, 2020 or 2021). APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "October 15, 2020" on the date line. A stamp on the envelope indicates the

ballot was processed by the county board of elections on "10/17/22." APP_01466.

b. Another voter whose ballot was set aside wrote "10/31/21" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/02/22." APP_01467.

c. Another voter whose ballot was set aside wrote "11-06-2021" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "NOV 08 2022." APP_01468.

d. Another voter whose ballot was set aside wrote "10/7/1922" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 12." APP_01469.

e. Another voter whose ballot was set aside wrote "Oct. 18, 2012" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 20." APP_01470.

f. Another voter whose ballot was set aside wrote "10-26-2002" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "2022 OCT 31." APP_01471.

g. Another voter whose ballot was set aside wrote "October 26, 2002" on the date line. APP_01472.

h. Another voter whose ballot was set aside wrote "11-2-2002" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/27/22." APP_01473.

68. Of those voters whose ballots were set aside for writing a past year, at least 50 voters wrote their birth date instead of the date they signed the declaration. APP_01494-1496, APP_01572 (Tetro Decl.).[10] *See, e.g.,* APP_01474-1484 (11 envelopes with examples of this pattern).

a. For example, one voter whose ballot was set aside wrote "9/25/22" on the date line—the date five days before the ballot was date stamped by the county board of elections on "09/30/2022"—but then crossed out that date ("~~9/25/22~~") and wrote his date of birth beneath it. APP_01474; APP_01365 (Dauphin voter list).

69. Conversely, at least one county board of elections—Montgomery—ultimately decided to count ballots if they determined the voter had written their birth date instead of the date they signed the declaration on the outer return envelope. APP_01286-1289.

[10] This total reflects only those birth dates that Plaintiffs could confirm via the lists of voter date of birth that certain counties produced. Additional ballots in other counties looked like possible birth dates, but those counties did not produce complete dates of birth against which Plaintiffs could compare the envelopes. APP_01494-1496, APP_01572 (Tetro Decl.).

***ii. Future year***

70. At least 228 voters' ballots were set aside because their handwritten date included a year later than 2022 (*e.g.*, "2023" or "2202"). APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "11/3/2023" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/07/22." APP_01423.

b. Another voter whose ballot was set aside wrote "November 7 2023" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/08/22." APP_01424.

c. Another voter whose ballot was set aside wrote "11/03/2023" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "2022 NOV 04." APP_01425.

d. Another voter whose ballot was set aside wrote "10/12/2222" on the date line. APP_01426.

e. Another voter whose ballot was set aside wrote "10/22/2122" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/25/22." APP_01427.

f.  Another voter whose ballot was set aside wrote "10-17-2200" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/29/22." APP_01428.

g.  Another voter whose ballot was set aside wrote "10/21/31" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/27/22." APP_01429.

h.  Another voter whose ballot was set aside wrote "10-20-2202" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/23/22." APP_01430.

i.  Another voter whose ballot was set aside wrote "10/24/2024" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/25/22." APP_01431.

j.  Another voter whose ballot was set aside wrote "10-23-2033" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 25." APP_01432.

### *iii. Omitted year*

71. At least 60 voters' ballots were set aside because they wrote a handwritten date that was between September 19 and November 8, but omitted the year. APP_01494-1496, APP_01572 (Tetro Decl.); *see also* APP_01153 (meeting minutes reflecting that Luzerne Board voted to reject ballots dated "10/26" and "Oct 2nd").

a. For example, one voter whose ballot was set aside wrote "October 8" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/13/22." APP_01446.

b. Another voter whose ballot was set aside wrote "Wednesday Oct. 26" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/31/22." APP_01447.

c. Another voter whose ballot was set aside wrote "11/2" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/04/22." APP_01448.

d. Another voter whose ballot was set aside wrote "Thu. Oct. 6" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/11/22." APP_01449.

e. Another voter whose ballot was set aside wrote "Thursday October 6" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/11/22." APP_01450.

f. Another voter whose ballot was set aside wrote "Oct. 25" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/31/22." APP_01451.

g. Another voter whose ballot was set aside wrote "Nov. 2nd" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/03/22." APP_01452.

h. Another voter whose ballot was set aside wrote "10/15" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/18/22." APP_01453.

i. Another voter whose ballot was set aside wrote "10/04" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 7." APP_01454.

72. Conversely, at least three county boards of elections—Blair, Fayette, and Montgomery—ultimately decided to count ballots with "partial dates" if the

"information in the date line [wa]s sufficient to determine that the ballot was returned within the appropriate date range." APP_01286-1289 (Montgomery County voted to count ballots with "partial dates" if the "information in the date line [wa]s sufficient to determine that the ballot was returned within the appropriate date range"); *see also* APP_01177 (Blair County's "canvassing board instructions" includes a list of "VALID DATING FORMATS," which includes month and day without a year); APP_01161 (meeting minutes reflecting that Fayette Board voted to count ballots dated "Friday November 4th, no year" and "November 3rd, no year").

**B. Missing or incorrect month**

73. A voter whose mail ballot was timely received by 8:00 P.M. on November 8, 2022 could only have signed the voter declaration form in the time period between the date that their county boards of elections sent mail ballot packages to voters and Election Day. APP_00878-879 (Lancaster Dep.); APP_00929g-929j, APP_00929o-929p (Westmoreland Dep.).

74. At least 605 voters' timely-received ballots were set aside because their handwritten date included an incorrect month that indicated that they signed their ballot earlier than September 19, 2022. APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "9/13/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/14/22." APP_01455.

b. Another voter whose ballot was set aside wrote "9-17-2022" on the date line. A stamp on the envelope indicates the ballot was

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 76 of 94

processed by the county board of elections on "10/18/22." APP_01456.

c. Another voter whose ballot was set aside wrote "09/14/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/17/22." APP_01457.

d. Another voter whose ballot was set aside wrote "9/14/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/16/22." APP_01458.

e. Another voter whose ballot was set aside wrote "9-13-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/20/22." APP_01459.

f. Another voter whose ballot was set aside wrote "9/14/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/16/22." APP_01460.

g. Another voter whose ballot was set aside wrote "Sept 12, 2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10 16 22." APP_01461.

h. Another voter whose ballot was set aside wrote "9/11/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/16/22." APP_01462.

i. Another voter whose ballot was set aside wrote "9/17/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/18/22." APP_01463.

j. Another voter whose ballot was set aside wrote "Sept. 10, 2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/14/22." APP_01464.

k. Another voter whose ballot was set aside wrote "9-6-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/07/22." APP_01465.

75. At least 427 voters' ballots were set aside because their handwritten date included an incorrect month that indicated that they signed their ballot after November 8, 2022 (e.g., "11/28/22"). APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "11/23/2022" on the date line. A stamp on the envelope indicates

the ballot was processed by the county board of elections on "10/25/22." APP_01414.

b.  Another voter whose ballot was set aside wrote "11/27/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/31/22." APP_01415.

c.  Another voter whose ballot was set aside wrote "11/12/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/15/22." APP_01416.

d.  Another voter whose ballot was set aside wrote "11/19/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/24/22." APP_01417.

e.  Another voter whose ballot was set aside wrote "11-13-2022" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 13." APP_01418.

f.  Another voter whose ballot was set aside wrote "11-23-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/26/22." APP_01419.

g. Another voter whose ballot was set aside wrote "11/14/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10-17." APP_01420.

h. Another voter whose ballot was set aside wrote "11-25-22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/27/2022." APP_01421.

i. Another voter whose ballot was set aside wrote "11-17-2022" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 20." APP_01422.

76. At least three voters' ballots were set aside because their handwritten date omitted the month. APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "Friday 7 2022" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 12." APP_01443.

b. Another voter whose ballot was set aside wrote "20/2022" on the date line. APP_01444.

c. Another voter whose ballot was set aside wrote "14/2022" on the date line. APP_01445.

### C. Missing or incorrect day

77. At least four voters' ballots were set aside because their handwritten date included a day that does not exist. APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "10/111/22" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 13." APP_01486.

b. Another voter whose ballot was set aside wrote "11/0/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/02/22." APP_01487.

c. Another voter whose ballot was set aside wrote "09/31/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/06/22." APP_01488.

78. Conversely, Luzerne County voted to *count* a ballot dated "09/31/22." APP_01153 (Luzerne meeting minutes).

79. A voter could not have signed the voter declaration form on the outer return envelope on a date that does not exist.

80. At least 40 voters' ballots with a handwritten date that omitted the day were set aside. APP_01494-1496, APP_01572 (Tetro Decl.).

a. The majority of these 29 ballots indicated "10," "Oct," or "October" for the month, with the remaining indicating "11," "Nov," or

November" for the month. APP_01494-1496, APP_01572 (Tetro Decl.).

b.   All 29 of these ballots indicated 2022 for the year. APP_01494-1496, APP_01572 (Tetro Decl.).

c.   For example, one voter whose ballot was set aside wrote "10-  -22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "OCT 28 2022." APP_01436.

d.   Another voter whose ballot was set aside wrote "10-  -2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/28/2022." APP_01437.

e.   Another voter whose ballot was set aside wrote "10-  -2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/19/2022." APP_01438.

f.   Another voter whose ballot was set aside wrote "10/  /2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/11/22." APP_01439.

g.   Another voter whose ballot was set aside wrote "10-  -2022" on the date line. A stamp on the envelope indicates the ballot was

processed by the county board of elections on "OCT 11 2022." An election official wrote a note on the envelope that reads: "Left message 11/3/22. . . can't come in to fix 11/4/22." APP_01440.

h. Another voter whose ballot was set aside wrote "10/ /2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/31/22." APP_01441.

i. Another voter whose ballot was set aside wrote "10- -22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/11/22." APP_01442.

81. Conversely, at least two county board of elections—Bucks and Fayette—voted unanimously to count a mail ballot "dated October 2022 with no day listed," because the board was "able to ascertain what day the ballot was mailed and what day it was received," and the "entire month of October is included in the date range in the [Pennsylvania Supreme] Court's Order." APP_01157 (Bucks meeting minutes); *see also* APP_01161 (Fayette Board voted to count ballot dated "10-no day -2022").

82. Any day within October 2022 would have been within the range provided by the Supreme Court's supplemental order in *Ball v. Chapman*. APP_01150-1151.

**D. Wrong line**

83. At least twelve ballots were set aside for having a missing or incorrect date on the voter declaration form, even though the voter had written a date that was

within the Supreme Court of Pennsylvania's date range elsewhere on the outer return envelope. APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "Nov 4, 2022" *underneath* the date line instead of on it. APP_01489.

b. Another voter whose ballot was set aside wrote their name on the "Today's Date (Required)" line of the voter declaration, and wrote "10-24-2022" on a different "Today's Date" line intended for voters who were unable to sign their declaration because of illness or physical disability. APP_01490.

c. Another voter whose ballot was set aside wrote "10-15-22" in a box beneath the date line that is intended for county election use only, rather than on the date line. APP_01491.

**E. "Election Day" as "Today's Date"**

84. At least 16 ballots were set aside because the voter wrote November 8, 2022 (Election Day) as "Today's Date" instead of writing the (earlier-in-time) date that they signed the voter declaration form. APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "10-12-22" on the date line—the same date the ballot was date stamped "2022 OCT 12" by the county board of elections—but then crossed out that date ("~~10-12-22~~") and wrote "11-8-22" beneath it, accompanied by their initials. APP_01407.

85. Election Day was within the Supreme Court of Pennsylvania's date range. APP_01150-1151.

**F. International dating convention**

86. 18 county boards of elections determined whether the date written on the outer envelope was within the "correct" date range based on only the American dating convention of writing the month, then day, then year (MM/DD/YYYY), and set aside ballots if the voter used a European dating convention of writing the day, then month, then year (*e.g.*, if a voter wrote 1/11/2022 to indicate November 1, 2022). APP_00039 (Armstrong RFA Resp.); APP_00051 (Beaver RFA Resp.); APP_00213 (Clinton RFA Resp.); APP_00106 (Bradford RFA Resp.); APP_00277 (Elk RFA Resp.); APP_00283 (Erie RFA Resp.); APP_00319 (Forest RFA Resp.); APP_00331 (Franklin RFA Resp.); APP_00353 (Greene RFA Resp.); APP_00369 (Lackawanna RFA Resp.); APP_00412 (Luzerne RFA Resp.); APP_00451 (McKean RFA Resp.); APP_00467 (Mifflin RFA Resp.); APP_00506 (Perry RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00594 (Somerset RFA Resp.); APP_00682 (Wayne RFA Resp.); *see also* APP_00877a, APP_00882-883 (Lancaster Dep.).

87. Conversely, at least 31 other counties tried to account for both the American and International dating conventions in determining whether the outer return envelope had been correctly dated. APP_00023, APP_00024 (Allegheny RFA Resp.); APP_00074 (Berks RFA Resp.); APP_00114 (Bucks RFA Resp.); APP_00127, APP_00128 (Butler RFA Resp.); APP_00195 (Clearfield RFA Resp.); APP_00227 (Crawford RFA Resp.); APP_00249 (Cumberland RFA Resp.); APP_00263 (Delaware RFA Resp.); APP_00305 (Fayette RFA Resp.); APP_00348 (Fulton RFA Resp.);

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 85 of 94

APP_00398, APP_00399 (Lehigh RFA Resp.); APP_00432 (Lycoming RFA Resp.); APP_00492 (Northampton RFA Resp.); APP_00700 (Westmoreland RFA Resp.); APP_00728-729 (Babst Calland RFA Resp.); *see also* APP_01146 (citizen comment at Oct. 20, 2022 Berks Board meeting, asking "whether the Election office is checking dates on ballots that may be flipped citing that some people's country of origin may write a date differently"); APP_01177 (Blair County's "canvassing board instructions" includes a list of "VALID DATING FORMATS," which includes day-month-year).

88. At least 34 ballots were set aside for having "incorrect" dates, even though the handwritten date on the outer return envelope could be read as within the Supreme Court of Pennsylvania's date range, assuming the voter used the International dating convention (DD-MM-YYYY, rather than MM-DD-YYYY APP_01494-1496, APP_01572 (Tetro Decl.); APP_00841-843 (Berks Dep.); APP_00929k-n (Westmoreland Dep.).

a. For example, one voter whose ballot was set aside wrote "1/11/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/02/22." APP_01408.

b. Another voter whose ballot was set aside wrote "3-10-2022" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 5." APP_01409.

c. Another voter whose ballot was set aside wrote "4-10-22" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT-6." APP_01410.

d. Another voter whose ballot was set aside wrote "06/10/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/13/22." APP_01411.

e. Another voter whose ballot was set aside wrote "06-10-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/07/22." APP_01412.

f. Another voter whose ballot was set aside wrote "5/11/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/06/22." APP_01413.

**G. Adherence to date range in *Ball* supplemental order**

89. The Supreme Court of Pennsylvania's supplemental order in *Ball v. Chapman* defined "incorrectly dated outer envelopes" to mean "mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022, through November 8, 2022," and "absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022, through November 8, 2022." APP_01150-1151.

90.     At least 17 counties set aside and did not count mail-in or absentee ballot envelopes that bore a handwritten date *within* the court's prescribed date range (September 19–November 8) if that handwritten date was before the county started sending out mail ballots. For example, because Westmoreland County did not begin sending mail ballots to voters until September 30, 2022, it would not have counted mail ballots that were dated within the *Ball* date range if the handwritten date on the outer return envelope was between September 19 and September 29, 2022. APP_921a-921c (Westmoreland Dep.). *See also* APP_00141 (Cambria Interrog. Resp.); APP_00150 (Cameron Interrog. Resp.); APP_00185 (Clarion Interrog. Resp.); APP_00234 (Crawford Interrog. Resp.); APP_00321 (Forest Interrog. Resp.); APP_00336 (Franklin Interrog. Resp.); APP_00347 (Fulton Interrog. Resp.); APP_00363 (Juniata Interrog. Resp.); APP_00454 (McKean Interrog. Resp.); APP_00469 (Mifflin Interrog. Resp.); APP_00575 (Potter Interrog. Resp.); APP_00610 (Sullivan Interrog. Resp.); APP_00619-620 (Susquehanna Interrog. Resp.); APP_00629-630 (Tioga Interrog. Resp.); APP_00635 (Union Interrog. Resp.); APP_00646 (Warren Interrog. Resp.); APP_00706 (Westmoreland Interrog. Resp.).

91.     At least 25 other counties followed the date range in the Supreme Court of Pennsylvania's supplemental order in *Ball v. Chapman*, even where the handwritten date on the mail-in or absentee ballot envelope was "incorrect" inasmuch as it occurred before the counties sent 2022 general election mail ballot materials to voters, or after the date that the voter's ballot was received by their county board of elections. APP_00826-828 (Berks Dep.); APP_00872-873 (Lancaster Dep.);

APP_00027-28 (Allegheny Interrog. Resp.); APP_00062 (Beaver Interrog. Resp.); APP_00078 (Berks Interrog. Resp.); APP_00097 (Blair Interrog. Resp.); APP_00204 (Clearfield Interrog. Resp.); APP_00268 (Delaware Interrog. Resp.); APP_00292, APP_00293 (Erie Interrog. Resp); APP_00417 (Luzerne Interrog. Resp.); APP_00530-531 (Philadelphia Interrog. Resp.); APP_00733-34 (Babst Calland Resp.); *see also* APP_01159 (Fayette meeting minutes).

92.     For example, Berks County counted ballots if the handwritten date on the outer return envelope was September 20, 2022, even though it did not begin sending mail ballots to voters until October 7, 2022. APP_00826-829, APP_00831 (Berks Dep.).

93.     Likewise, Lancaster County counted ballots if the handwritten date on the outer return envelope was September 20, 2022, even though it did not begin sending mail ballots to voters until September 26, 2022. APP_00872-873 (Lancaster Dep.).

94.     At least one county—Fayette—counted ballots where the voter had written an envelope date that was after the date that the board of elections had already received and time-stamped the package. APP_01159 (Fayette Board voted to count all ballots that fell within the Supreme Court of Pennsylvania's date range, including "incorrectly dated ballots within the date range of September 19, 2022, through November 8, 2022").

95.     Other counties did not count ballots where the voter had written an envelope date that was after the date that the board of elections had already received

and time-stamped the package, even if the voter's handwritten date was within the Supreme Court of Pennsylvania's date range. **Appears Correct at TK**.

96. At least two counties took different approaches to mail-in and absentee ballots. The county boards of elections in both Elk and Somerset County counted absentee ballots if the outer return envelope contained any date within the full *Ball* date range (*i.e.*, even before the board had sent the ballot materials to voters), but counted mail-in ballots only if the handwritten date was *after* the date on which the board had sent out the ballot materials. APP_00279 (Elk Interrog. Resp.); APP_00599 (Somerset Interrog. Resp.).

**H. Date appears correct**

97. At least 47 ballots were set aside for having "incorrect" dates, even though the voter included a handwritten date on the outer return envelope that appeared correct and was within the Supreme Court of Pennsylvania's date range. APP_01494-1496, APP_01572 (Tetro Decl.); **Appears Correct TK**; *see also, e.g.*, APP_00844 (Berks Dep.)**.**

a. For example, one voter whose ballot was set aside wrote "10/17/2020" on the date line, then crossed out the year ("~~2020~~"), and wrote the year "2022" beneath it. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 19." APP_01402.

b. Another voter whose ballot was set aside wrote "10/23/2023" on the date line, then crossed out the last digit of the year and wrote a 2 next to it on the date line ("202~~3~~2"), and wrote their initials

beneath the crossed-out digit. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/26/22." APP_01403.

**c.** Another voter whose ballot was set aside wrote the date "9-8-22," then crossed out that date ("~~9-8-22~~") and wrote "10-8-22" next to it. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 13." APP_01404.

d. Another voter whose ballot was set aside wrote "10/14/2023" on the date line, then crossed that date out ("~~10/14/2023~~"), and wrote the date "10/14/2022" next to it on the date line. The postmark on that ballot reads: "14 OCT 2022." APP_01405.

e. Another voter whose ballot was set aside wrote "10/4/21" on the date line, then crossed out the year ("~~21~~"), and wrote the year "22" next to it on the date line, along with their initials. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 5." APP_01406.

## VI. UNEQUAL TREATMENT AS COMPARED TO MILITARY/OVERSEAS BALLOTS

98. The Secretary of State provides envelope templates that prescribe the form of the envelopes that county boards of elections must use for mail and absentee ballots. APP_00963-964 (Marks Dep.).

Case 1:22-cv-00339-SPB Document 276 Filed 04/21/23 Page 91 of 94

99. The templates for both the mail ballot and the absentee ballot include a voter declaration form that the voter must sign and date on the return envelope that contains the voter's secrecy envelope and ballot. APP_00966-973 (Marks Dep.).

100. The county boards of elections vary the form and layout of the return envelopes that they submit to voters, but each county's mail ballot materials include an outer return envelope (inside which the voter places their secrecy envelope and, in turn, their ballot) bearing a voter declaration that voters are instructed to sign and date. APP_00966-973 (Marks Dep.); *see, e.g.*, APP_01290 (Berks mail ballot envelope).

101. Each county's absentee ballot materials also include a voter declaration that voters are instructed to sign and date. APP_00966-973 (Marks Dep.); APP_00933-936 (Westmoreland Dep.). When UOCAVA voters request a paper ballot from their county board of elections (rather than opting to submit their ballot electronically), that declaration appears on the envelope containing the voter's secrecy envelope and ballot. APP_00933-936 (Westmoreland Dep.); *see, e.g.*, APP_01291 (Bucks military-overseas ballot envelope).

102. The instructions that Berks County provided to domestic voters submitting mail ballots in the November 2022 general election told the voters to "Sign and date the pre-addressed return envelope," and told voters that "YOUR BALLOT WILL NOT COUNT IF IT IS NOT SIGNED AND DATED." APP_01170.

103. The instructions that Berks County provided to UOCAVA voters submitting absentee ballots in the November 2022 general election told the voters to ""Fill out the absentee elector's declaration on the back of this envelope with your

name and address. Be sure to sign where indicated. Your ballot will not be counted without a signature," but did not indicate that the ballot would not be counted if the declaration on the return envelope lacked a handwritten date. APP_01169.

104.    Berks County did not set aside any absentee ballots submitted by UOCAVA voters in the November 2022 general election on the basis of a missing or incorrect handwritten date on the ballot's return envelope. APP_00103 (Berks Dep.); Berks ROG Resp. at 6.

105.    The envelopes that Westmoreland County provided to domestic voters submitting mail ballots in the November 2022 general election instructed voters that "YOUR BALLOT WILL NOT BE COUNTED UNLESS: You sign and date the voter's declaration in your own handwriting[.]" APP_01401.

106.    The envelopes that Westmoreland County provided to UOCAVA voters did not instruct those voters that their ballots would not be counted if the voter failed to date the voter's declaration. APP_01201.

107.    Westmoreland County did not set aside any absentee ballots submitted by UOCAVA voters in the November 2022 general election on the basis of a missing or incorrect handwritten date on the ballot's return envelope. APP_00936-937 (Westmoreland Dep.); Westmoreland ROG Resp. at 7.

108.    At least three county boards of elections—Bucks, Philadelphia, and Tioga—counted timely-received military-overseas ballots in the November 2022 general election if the voter failed to date their voter declaration or included a date that the county deemed to be incorrect. APP_00118-119 (Bucks Interrog. Resp., Bucks

counted 11 ballots with reflecting that undated or misdated declarations); APP_00535-536 (Philadelphia Interrog. Resp., reflecting that Philadelphia counted 13 ballots with undated or misdated declarations); APP_00632 (Tioga Interrog. Resp., reflecting that Tioga counted 10 ballots with undated or misdated declarations).

109. At least one additional county board of elections—Lehigh—did not check the date on the voter declaration for timely-received military-overseas ballots in the November 2022 general election. APP_00405 (Lehigh Interrog. Resp.).

110. At least five additional county boards of elections did not segregate or set aside any timely-received military-overseas ballots in the November 2022 general election based on a missing or incorrect date on the voter declaration. APP_00579 (Potter Interrog. Resp.); APP_00716 (Wyoming Interrog. Resp.); APP_00673 (Washington Interrog. Resp.); APP_00484 (Montgomery Interrog. Resp.); APP_00499 (Northampton Interrog. Resp.).

111. Over half of the county boards of elections—37 in total—indicated that they did not receive any military-overseas ballots in the November 2022 general election that had a missing or incorrect date on the voter declaration, and so they did not have to determine whether to set aside or count such ballots. APP_00010 (Adams Interrog. Resp.); APP_00031 (Allegheny Interrog. Resp.); APP_00044 (Armstrong Interrog. Resp.); APP_00066 (Beaver Interrog. Resp.); APP_00082 (Berks Interrog. Resp.); APP_00101 (Blair Interrog. Resp.); APP_00110 (Bradford Interrog. Resp.); APP_00133 (Butler Interrog. Resp.); APP_00142 (Cambria Interrog. Resp.); APP_00153-54 (Cameron Interrog. Resp.); APP_00206 (Clearfield Interrog. Resp.);

APP_00220 (Clinton Interrog. Resp); APP_00240-41 (Crawford Interrog. Resp.);

APP_00256 (Cumberland Interrog. Resp.); APP_00271 (Delaware Interrog. Resp.);

APP_00279 (Elk Interrog. Resp.); APP_00296 (Erie Interrog. Resp.); APP_00313

(Fayette Interrog. Resp.); APP_00324 (Forest Interrog. Resp.); APP_00339 (Franklin

Interrog. Resp.); APP_00348 (Fulton Interrog. Resp.); APP_00357 (Greene Interrog.

Resp.); APP_00377 (Lackawanna Interrog. Resp.); APP_00421 (Luzerne Interrog.

Resp.); APP_00442 (Lycoming Interrog. Resp.); APP_00462 (Mercer Interrog. Resp.);

APP_00472 (Mifflin Interrog. Resp.); APP_00542 (Pike Interrog. Resp.); APP_00587

(Schuylkill Interrog. Resp.); APP_00602 (Somerset Interrog. Resp.); APP_00612

(Sullivan Interrog. Resp.); APP_00621 (Susquehanna Interrog. Resp.); APP_00637

(Union Interrog. Resp.); APP_00649 (Warren Interrog. Resp.); APP_00692 (Wayne

Interrog. Resp.); APP_00709 (Westmoreland Interrog. Resp.).

## VII. RELIEF

112. County boards of elections are responsible for creating and retaining official records of election results, including a copy of the returns that must be available for public inspection at the county election board's office. APP_01183 (Greenburg Report); 25 P.S. § 3152.

113. County boards of elections maintain digital and paper records of the total number of votes received by each candidate in past elections. APP_00846 (Berks Dep.); APP_00930-931 (Westmoreland Dep.); APP_01183 (Greenburg Report).

114. County boards of elections are capable of updating records of the total number of votes received by each candidate in past elections if ordered to do so by a court. APP_01183-1184 (Greenburg Report); APP_00931-932 (Westmoreland Dep.).

# Guidance on Undated and Incorrectly Dated Mail-in and Absentee Ballot Envelopes Based on the Pennsylvania Supreme Court's Order in *Ball v. Chapman,* issued November 1, 2022

Date: November 3, 2022
Version: 1.0



**Guidance on Undated and Incorrectly Dated Mail-in and Absentee Ballot Envelopes Based on the Pennsylvania Supreme Court's Order in *Ball v. Chapman,* issued November 1, 2022**

On November 1, 2022, the Pennsylvania Supreme Court issued an Order regarding undated and incorrectly dated outer envelopes containing mail-in and absentee ballots. A copy of that Order is attached. This email follows an initial communication from Deputy Secretary Jonathan Marks on the evening of November 1, 2022 and provides additional guidance to counties regarding the Court's Order.

In light of the Court's Order, the Department's September 26, 2022 Guidance Concerning Examination of Absentee and Mail-In Return Envelopes ("Envelope Guidance") and Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures as it relates to undated and incorrectly dated outer envelopes is modified as stated below and counties are directed as follows:

- Returned ballots should be scanned into the SURE system immediately upon receipt. County election offices should ensure that previously received mail-in and absentee ballots have been scanned into SURE.
  - As a reminder, election offices should date-stamp return envelopes for all mail-in and absentee ballots immediately upon receipt.
- Examine all mail-in and absentee ballots received to determine if the return envelopes for those ballots are signed and dated.
- For ballots which are administratively determined to be undated or incorrectly dated, code that ballot as CANC – NO SIGNATURE within the SURE system.
- Further, for those ballots that have been administratively determined to be undated or incorrectly dated, the ballots must be segregated from other ballots. Counties may prefer to keep segregated undated and incorrectly dated ballots organized by precinct, and alphabetically by last name within each precinct.
  - The department strongly recommends that counties also segregate into separate groups undated ballots versus incorrectly dated ballots.
- For voters returning their ballots in person to election offices, office personnel should remind voters to confirm that they signed and correctly dated their ballots, and to provide them an opportunity to do so prior to submission.

###

| Version | Date | Description |
|---|---|---|
| **1.0** | 11/3/22 | Original issue |
| | | |

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

-----------------------------------------

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, et al.,

Plaintiffs,

v.

LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth, et al.,

Defendants.

Case No. 1:22-cv-00339-SPB

-- and --

BETTY EAKIN, et al.

Plaintiffs,

v.

ADAMS COUNTY BOARD OF ELECTIONS, et al.

Defendants.

Case No. 1:22-cv-340

-----------------------------------------

Remote Deposition of Crista Miller

Monday, February 13, 2023

11:00 a.m.

Recorded Stenographically by:
Jennifer Miller, RMR, CRR, CCR
Job No.:222617

A P P E A R A N C E S

Counsel for Plaintiffs:
ACLU of Pennsylvania
Hogan Lovells US LLP
Stephen Loney, Jr., Esq.
1735 Market Street
Philadelphia, PA 19103

Counsel for Plaintiff Eakin:
Daniel Cohen, Esq.
Litigation Associate
Elias Law Group
10 G Street NE
Washington DC 20002

Counsel for Plaintiffs:
Ari Savitzky, Esq.
American Civil Liberties Union
125 Broad Street
New York, NY 10004

Counsel for Plaintiff:
Witold Walczak, Esq.
American Civil Liberties
Union of Pennsylvania
P.O. Box 23058
Pittsburgh, PA 15222

Appearances Cont'd

Counsel for Plaintiff in the 1:22-cv-339 matter:
Megan Keenan, Esq.
Luis Manuel Rico Román, Esq.
American Civil Liberties Union
125 Broad Street
New York, NY 10004

Counsel on behalf of Acting Secretary of the Commonwealth Leigh Chapman:
Elizabeth Lester-Abdalla, Esq.
Honors Deputy Attorney General
Pennsylvania Office of Attorney General
1600 Arch Street
Philadelphia, PA 19103

Counsel for behalf of the Lancaster County Board of Elections and the Deponent:
Walter Zimolong, Esq.
James Fitzpatrick, Esq.
Zimolong Law, LLC
353 West Lancaster Avenue
Wayne, PA 19087

Counsel for Allegheny County BOE:
Lisa Michel, Esq.
Allegheny County Law Department
Fort Pitt Commons
445 Fort Pitt Boulevard
Pittsburgh, PA 15219

Appearances Cont'd

Counsel for Westmoreland County Board of Elections:
Melissa Guiddy, Esquire
Office of County Solicitor
Westmoreland County
2 North Main Street
Greensburg, PA 15601

Counsel on behalf of Chester County Board of Elections:
Faith Mattox-Baldini, Esq.
County of Chester Solicitor’s Office
313 W. Market Street, Suite 6702
West Chester, PA 19380

Counsel for Defendant, Bucks County:
Amy Fitzpatrick, Esq.
First Assistant County Solicitor
Law Department - County of Bucks
55 E. Court Street
Doylestown, PA 18901

Counsel for Acting Secretary of the Commonwealth Al Schmidt:
Robert Wiygul, Esq.
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
Philadelphia, PA 19103

Case 1:22-cv-00339-SPB Document 279 Filed 04/21/23 Page 14 of 292

Appearances Cont'd

Counsel for Luzerne County Board of Elections and Registration:
Joseph Cosgrove, Esq.
Selingo Guagliardo LLC
345 Market Street
Kingston, PA 18704

Counsel for Berks County Board of Elections:
Cody Kauffman, Esq.
First Assistant County Solicitor
Berks County Solicitor's Office
633 Court Street
Reading, PA 19601

Counsel on behalf of the Defendants Bedford County, Carbon County Centre County, Columbia County, Dauphin County, Huntingdon County, Indiana County, Jefferson County, Lawrence County, Lebanon County, Monroe County, Montour County, Northumberland County, Snyder County, Venango County, and York County Board of Elections:
Jessica Barnes, Esq.
Two Gateway Center
Pittsburgh, PA 15222

Counsel on behalf of Defendant Philadelphia Board of Elections:
Aimee Thomson, Esq.
City of Philadelphia Law Department
1515 Arch Street
Philadelphia, PA 19102

Case 1:22-cv-00339-SPB Document 279 Filed 04/21/23 Page 7 of 292

Appearances Cont'd

Counsel on behalf of defendant, the Delaware County Board of Elections:
J. Manly Parks, Esq.
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Counsel on behalf of the Defendant Butler County Board of Elections:
H. William White, III, Esq.
Solicitor for the County of Butler
Butler County Commissioners' Office
124 West Diamond Street
P.O. Box 1208
Butler, PA 16003

Counsel for Intervenor-Defendants, the Republican National Committee, National Republican Congressional Committee, and Republican Party of Pennsylvania:
John Gore, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

Counsel for Berks County Board of Elections:
Jeffrey Bukowski, Esq.
Smith Bukowski
14133 Kutztown Road
Fleetwood, PA 19522

Case 1:22-cv-00339-SPB Document 279 Filed 04/21/23 Page 7 of 242

I N D E X

| WITNESS | PAGE |
|---|---|
| BY MR. LONEY | 10 |
| BY MR. OSHER | 98 |

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 17 |
| Exhibit 2 | Answers of Defendant Lancaster County Board of Elections to Plaintiffs' First Set of Requests for Admission | 20 |
| Exhibit 3 | Answers and Objections of Defendant Lancaster County Board of Elections to Plaintiffs' First Set of Interrogatories | 21 |
| Exhibit 4 | Answers and Objections of Defendant Lancaster County Board of Elections to Plaintiffs' First Set of Requests for Production of Documents | 23 |
| Exhibit 5 | Ball order granting in part and denying in part injunction | 48 |
| Exhibit 6 | Chapman supplemental order | 49 |
| Exhibit 7 | Document Bates-stamped DAUPHIN000001 | 66 |
| Exhibit 8 | Document Bates-stamped DAUPHIN000001_2 | 73 |
| Exhibit 9 | Document Bates-stamped DAUPHIN000001_3 | 75 |

Exhibits Cont'd

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 10 | Document Bates-stamped DAUPHIN000001_5 | 78 |
| Exhibit 11 | Document Bates-stamped DAUPHIN000001_7 | 80 |
| Exhibit 12 | Mihaliak police report | 90 |
| Exhibit 13 | Answers and Objections of Defendant Lancaster County Board of Elections to Plaintiffs' First Set of Requests for Productions of Documents | 109 |

C. Miller

P R O C E E D I N G S

CHRISTA MILLER, after having been first duly sworn, was examined and testified as follows:

MR. OSHER: Before Mr. Loney begins his questioning, I'd like to put on the record an agreement that was reached before we went on the record here, which is that we are here appearing in two different cases, the NAACP case, which is the 22-cv-339 case; and the Eakin case, which is 22-cv-340.

The parties have agreed that the questioning that is elicited by the plaintiffs in the 339 case will be usable in the 340 case and vice versa. And the Eakin plaintiffs have agreed that the time used by the 339 plaintiffs will count against their seven hours under the rules.

Mr. Zimolong, is that sufficient for you?

MR. ZIMOLONG: That's accurate. Thank you.

MR. OSHER: And, Mr. Loney, is

C. Miller

that good for you?

MR. LONEY: Yeah. That works for plaintiffs in 339.

Thanks for putting that on the record.

MR. OSHER: Okay. And my understanding is that there's no objection from any other party, but they should speak up now if that is the case.

Thanks, all.

\- - -

E X A M I N A T I O N

\- - -

BY MR. LONEY:

Q. Okay. Good morning, Ms. Miller. Thank you for taking the time today.

Just for the record, my name is Steve Loney. I'm an attorney with the ACLU of Pennsylvania, and I represent the plaintiffs in the 339 case. That's the Pennsylvania State Conference of the NAACP and all of the other plaintiffs in that case.

Have you been deposed before?

A. I have not.

my questioning.

MR. ZIMOLONG: Well, you have misrepresented it, but I'll let you -- I'll let you continue.

MR. LONEY: Okay. So I'm going to take the document production responses off the screen and go back to the interrogatory responses, which are Exhibit Lancaster 3.

BY MR. LONEY:

Q. And I have jumped here, Ms. Miller, to Interrogatory Number 14.

Do you see that on your -- on your screen?

A. I do.

Q. And, again, if you feel the need to flip through this and look at anything else to contextualize your answer, let me know. But, otherwise, I'm just going to ask about Question Number 14 for a moment.

So plaintiffs' interrogatory reads: "Do you contend that the handwritten date is material in determining whether a ballot" -- "a mail ballot voter is qualified to

C. Miller

vote in the election in which they have cast a ballot?" If so, what is the basis for that contention?"

Did I read that correctly?

A. You did.

Q. And can you take a moment to read over the Lancaster board's response?

A. Yeah, I will.

Q. Let me know when you're finished reading.

A. Okay.

Q. So the response that you just read, you reviewed that and approved it before it was served in this case, right?

A. Yes.

Q. And so you agree, in the first instance, looking at the first line of the response, that the dates written on envelopes are not material to the question of whether a person is qualified to vote?

The date written on the envelope, for example, doesn't tell you whether the person is over 18 years old, right?

A. Correct.

C. Miller

Q. And the date written on the envelope doesn't tell you whether the voter is or has been a U.S. citizen for at least a month, right?

A. Correct.

Q. And the date written on the envelope doesn't tell you whether the voter has resided in Lancaster County for at least 30 days, does it?

A. Correct.

Q. And it also doesn't tell you whether the person voting is incarcerated on a felony conviction, right?

A. Correct.

Q. For all of those other things I just went through -- citizenship, age, residence in the county, whether the person is incarcerated -- the Lancaster board has other methods of confirming all of those things that are relevant to qualification, right? You don't need the -- the -- the date on the envelope?

MR. ZIMOLONG: Objection to form.

C. Miller

You can answer.

THE WITNESS: That is correct.

BY MR. LONEY:

Q. But it's the Lancaster board's position that -- and looking again at Interrogatory Number 14 -- that the date is, nevertheless, material in determining whether the ballot was cast in compliance with the election code; is that right?

A. That is correct.

Q. Okay. So can you help me understand how that is?

Is it because the voter who didn't write the correct date next to their signature didn't comply with the election code and its requirement to sign and date the outer envelope?

A. Correct. The election code says that it must be dated, and so we are looking to see if there is a date or not to determine whether we can open to count the ballot or not.

Q. Okay. So you've used the date or the absence of a date to determine whether the voter complied with the dating requirements.

C. Miller

Do I have that right?

A. Correct.

Q. And that's the only way a voter-written date is relevant to whether the vote is counted, right, to determine if the voter complied with that requirement to date and sign?

MR. ZIMOLONG: Objection to form.

You can answer.

THE WITNESS: We use that date. We follow the court order, if there is one, for that election to give us the date range and if there is a date there at all.

BY MR. LONEY:

Q. Right. If they don't include the date, it's a noncompliant vote, based on the most recent court order. And if they did provide a date within a particular range, it's a compliant vote.

Do I have that right?

A. That is correct.

Q. And that's -- that's the end of the analysis of the date, from the Lancaster

C. Miller

board's perspective; is that right?

A. Correct.

Q. Okay. So I'm going to flip back to Exhibit Lancaster 2, which is the requests for admission.

Do you have that on your screen now?

A. I do.

Q. And I'm going to focus on the first one, Request for Admission Number 1, on that first page.

The request is -- or the statement that we've asked the counties to admit is: "You have never used or referred to the date handwritten on the outer envelope containing a mail ballot for any purpose related to determining or confirming the mail ballot voter's eligibility (that is, their age, citizenship, county, and duration of residence and felony status)."

Did I read that correctly?

A. Yes.

Q. And the Lancaster board replied to that with one word, simply saying "Denied."

C. Miller

Can you help me square that with the first sentence from the interrogatory response we just saw that said the handwritten date is not material to determining whether a mail ballots voter is qualified to vote?

MR. ZIMOLONG: Objection to form.

You can answer.

THE WITNESS: We have not used it to determine someone's eligibility.

BY MR. LONEY:

Q. Okay. So the board's only basis for denying this request is -- this overlaps with Interrogatory 14.

Am I right that Interrogatory 14 tells us how the Lancaster board uses the date on the envelopes?

A. Correct.

MR. ZIMOLONG: Go ahead.

THE WITNESS: Correct.

BY MR. LONEY:

Q. Is there anything else -- any other way in which the date is relevant to the board's decision whether to open and canvas the

C. Miller

we would have to follow it.

BY MR. LONEY:

Q. And if there's a requirement in the election code, and the Court says follow it, that says every voter has to draw a self-portrait on their return envelope on their mail ballot, would drawing the self-portrait be material as to whether the ballot is eligible to be counted?

MR. ZIMOLONG: Objection. Calls for improper opinion testimony. Also beyond the scope of the Rule 30(b)(6) notice.

BY MR. LONEY:

Q. You can answer.

A. If there was a court order that we were to follow that said it, we would have to follow it.

Q. So I'll get back to the facts in this case.

So you agree that, if a voter returns a ballot or returned a ballot in connection with the November 2022 election without a handwritten date on it at all on the

                         C. Miller

outer envelope, then Lancaster County did not count their ballot.

Is that -- do I understand that correctly?

A. That is correct.

Q. And if a voter returned a ballot with a handwritten date that was outside of the range defined by the Pennsylvania Supreme Court, again, Lancaster board did not count that ballot?

A. That is correct.

Q. I'm going to put back up the interrogatories, which is Exhibit Lancaster 3. And I'm going to jump to page 3 and the answer to Interrogatory Number 2.

Do you see that Interrogatory Number 2 on your screen?

A. I do.

Q. So in response to Interrogatory Number 2, the Lancaster board offered some objections and then, after that, stated that the Lancaster board "set aside 232 mail ballots under the orders of the Supreme Court of Pennsylvania dated November 1st and

C. Miller

- - -

(Whereupon, Exhibit 6 was marked for identification.)

- - -

MR. LONEY: I'll share that now.

BY MR. LONEY:

Q. Ms. Miller, do you see on your screen another Supreme Court of Pennsylvania document with a caption starting "David Ball"?

A. I do.

Q. So this document on your screen is being marked as Exhibit Lancaster 6. It is a November 5th, 2022, supplemental order of the Pennsylvania Supreme Court in Ball versus Chapman, same case number as Exhibit 5.

Is this the November 5th order you referenced in response to Interrogatory Number 2?

A. Yes.

Q. Prior to these orders from the Pennsylvania Supreme Court, the secretary of state had instructed county boards to open and canvass ballots received in envelopes without a handwritten date on them, right?

C. Miller

A. Correct.

Q. And the Lancaster board was going to follow that guidance had the Supreme Court not weighed in in November; is that right?

A. That is correct.

Q. In other words, had these orders not come in the week before the election, Lancaster board would have canvassed and opened the mail ballot envelopes received without a handwritten date on them?

A. Correct.

Q. And when these orders came out, did the Lancaster board give anyone the opportunity to -- strike that.

When the orders came out, did the Lancaster board notify Lancaster County voters of this change in approach?

A. We did not.

Q. Did the Lancaster board give anybody the opportunity to correct any problems with the missing or incorrect dates on their mail ballot envelopes?

A. No.

Q. Did the Lancaster board notify

C. Miller

anybody that their ballot was going to be set aside on this basis?

A. No.

Q. If anybody had separately learned, you know, by reading the news or following the secretary of state's website, if they had separately learned that this issue had come up, could they have come in and cast a provisional ballot on Election Day if they chose to do so?

MR. ZIMOLONG: Objection. Asks the witness to guess.

BY MR. LONEY:

Q. Do you know whether that was an option?

A. Any voter could vote a provisional ballot on Election Day at their precinct.

\- - -

(Stenographer clarification.)

\- - -

BY MR. LONEY:

Q. Do you know if anybody, in fact, cast a provisional ballot who also had their prior attempt at voting by mail set aside based on the Supreme Court's orders in Ball?

C. Miller

A. No, not that I can remember.

Q. No, you don't know one way or the other? Or, no, that didn't happen?

A. I am not sure.

Q. Okay. So I'm going to turn back to Exhibit Lancaster 6, the November 5th order.

Spanning the first and second page, the Supreme Court stated that for the purposes of the November 8th, 2022, general election, incorrectly dated ballots or -- strike that -- incorrectly dated outer envelopes are those with dates that fall outside the date range of September 19th, 2022, through November 8th, 2022.

Did I read that correctly?

A. Yes, for mail ballots.

Q. So if somebody -- strike that.

And is this the instruction that the Lancaster board followed in connection with mail ballots submitted in the 2022 election?

A. Yes.

Q. So if somebody wrote a date on their mail ballot envelope that preceded November 19th, 2022, you would have set it

C. Miller

aside?

A. Correct.

Q. And if somebody wrote September 20th, 2022, and everything else appeared in order, that would have been in compliance with the election code, as interpreted by the Pennsylvania Supreme Court, and so the Lancaster board would have opened that envelope and canvassed the ballot?

A. If the date was withinside what the order gave us, yes, we would have counted it.

Q. Including September 20th, in particular?

A. I believe the order was from the 19th through the 8th. So the 20th would have been included.

Q. So am I correct, though, that Lancaster County did not even start issuing mail ballot packets until September 26th?

A. Correct.

Q. So nobody could have actually been signing that envelope as early as September 20th?

A. Correct.

C. Miller

else appeared to be in order, the Lancaster board would have counted it, period, full stop, right? There's no further evaluation as to whether or not the person signed it on November 8th?

MR. ZIMOLONG: Objection to form.

THE WITNESS: As long as it was received by 8:00 p.m. on Election Day.

BY MR. LONEY:

Q. And because that's what the Supreme Court instructed, not because you're using the voter-written date to make a determination as to when the voter actually signed their envelope, right?

A. Correct. We would not know that.

Q. Let's talk a bit about dates falling after November 8th, and I'm going to limit these questions to domestic mail-in ballots, right. So leaving aside the military ballots that might have come in by the 15th.

If you receive an envelope by 8:00 p.m. on Election Day, you know for a fact that the voter didn't fill out their ballot

after November 8th, regardless of what they wrote on the envelope, right?

A. Correct.

Q. But pursuant to the court order, you still would have set aside any envelope where the voter wrote a date that falls after November 8th, 2022, even if it was received by 8:00 p.m. on Election Day, right?

A. Correct.

Q. And that's because you're following -- strictly following the court order, not because you're using the voter-written date to determine when the voter actually filled out the ballot, right?

A. Correct.

Q. What about envelopes received after Election Day?

Leaving aside for a second the date issue on what's written on the envelope, what does the Lancaster board do with mail ballots received after Election Day?

A. They are time-stamped in to show when we received them, and then they are set aside and not -- and not counted.

C. Miller

Q. And they're set aside and not counted regardless of the date the voter writes on them, right?

A. Correct.

Q. So if the voter doesn't get their mail ballot to the board by 8:00p.m. on Election Day, they couldn't possibly get their late vote counted by backdating the signature on the envelope, right?

A. Correct.

Q. So whether or not you receive a ballot before 8:00 p.m. on Election Day has nothing to do with whether the voter wrote "November 8th, 2022," or some earlier date on the envelope?

A. Correct.

Q. Now, going to the other end of the timeline, envelopes dated before September 19th, 2022. Again, I'll focus on domestic mail ballots, leaving aside the military ballots.

There is no way anybody in Lancaster County could have actually filled out the 2022 general election paperwork before

C. Miller

September 19th, right?

A. Correct.

Q. So even if somebody wrote "9/1/2022" on their envelope, you knew for a fact they could not have actually tried to vote using this paperwork on 9/1/2022?

A. Correct.

Q. But you would have set aside that envelope anyway because that's what the Supreme Court instructed, right?

A. For mail ballots, yes. Absentees had a different date range.

Q. Do you know what the date range was for absentee?

A. August 30th through November 8th.

Q. And so I can put up the document again, but I just read it. And good memory; that's exactly what the document said in the next part. It wasn't intended to be a memory test.

But it said August 30th, 2022, through November 8th, 2022, and did not set forth a different deadline for military ballots, right?

C. Miller

So, for example, some people who wish to indicate November 4th might write 4/11 instead of 11/4?

MR. ZIMOLONG: Objection to form.

You can answer.

BY MR. LONEY:

Q. Is that something you're aware of people doing out in the world?

MR. ZIMOLONG: Calls for speculation as to what people out in the world do.

THE WITNESS: If somebody did, we -- yes. I mean, I'm sure that happened. But that would be seen as month, date, year in our office.

BY MR. LONEY:

Q. So your office would not have done anything to evaluate whether flipping the day and the month in the order would have actually cured a problem? You just did not count it if it didn't hit the range, assuming everybody is writing month then day then year?

A. Correct.

C. Miller

If the stamp on the envelope indicates the mail ballot was received in time, right -- so the stamp is on or before November 8th, right?

A. Yes.

Q. And you know that nobody voted before September 26th, 2022, because nobody could have gotten the mail ballot forms before that, right, in Lancaster County?

A. Correct.

Q. And so you know everybody who submitted one of these envelopes between the time you issued the mail ballot packages and the November 8th stamp voted -- actually filled out their envelope during that window, right?

MR. ZIMOLONG: Objection to form. Calls for speculation.

THE WITNESS: One would have to assume that.

BY MR. LONEY:

Q. I mean, there's no way they could have voted before September 26th, right?

A. Correct.

Q. And there's no way they could have

voted after November 8th if you stamped the envelope "received" on or before November 8th, right?

A. Correct.

Q. So in those situations, does any of that matter once you see that somebody mistakenly put "2012" instead of "2022" on their envelope?

A. For this election, it did not because the Supreme Court order gave us date ranges to use.

MR. LONEY: I'm going to ask the Court Reporter to mark the next exhibit, which is Tab 8, as Lancaster 8.

\- - -

(Whereupon, Exhibit 8 was marked for identification.)

\- - -

MR. LONEY: Share that on my screen.

BY MR. LONEY:

Q. This is another example from Dauphin County.

Do you have another mail ballot

C. Miller

envelope sample up on your screen?

A. I do.

Q. And there's also a stamp on this example near the top, similar to the date stamps that the Lancaster board applied when it received incoming mail ballots, right?

A. Correct.

Q. And there's also a handwritten date on this envelope that reads "1/1/22," right?

A. Correct.

Q. And just like the last example, we know nobody filled out a mail-in ballot for the November '22 election as early as New Year's Day 2022, right?

A. Correct.

Q. But if the person had just put an extra 1 in front of the 1 that's currently there for the month so that it would read 11/1/22 instead of 1/1/22, that would have been in compliance with the dating rule, right?

A. If it said 11/1, yes.

Q. Right. So if the Lancaster board didn't inquire as to whether that was a simple mistake, that somebody wrote 1 instead of 11,

C. Miller

they would have set this aside based on what appears on the face of the envelope, right?

MR. ZIMOLONG: Objection to form.

You can answer.

THE WITNESS: Yes. We take the date that is written by the voter.

BY MR. LONEY:

Q. And that's, again, because that's what the Supreme Court instructed you to do, not because you would look at a January date and think that the person actually tried to vote in January, right?

A. Correct.

MR. LONEY: I'm going to ask the Court Reporter to mark the next one, which is Tab 9, as Exhibit Lancaster 9.

- - -

(Whereupon, Exhibit 9 was marked for identification.)

- - -

MR. LONEY: I'll share that up on my screen now.

C. Miller

BY MR. LONEY:

Q. Do you have another mail ballot envelope sample up on your screen?

A. I do.

Q. And, again, this envelope has a handwritten date on it that reads "8/11/22," right?

A. Correct.

Q. Now, this could be an example, could it not, of what we were talking about before? If somebody switched month and day, they wrote day/month, then they were actually writing Election Day on this envelope, right?

MR. ZIMOLONG: Objection to form. Calls for speculation.

THE WITNESS: It's not up to our office to assume what someone is writing. We can only look at exactly what's in front of us and what is submitted.

BY MR. LONEY:

Q. But you did assume that everybody wrote month/day/year, and that was their intent, right?

A. Again, I would have to look at our

C. Miller

envelope to see if that is actually on our envelope.

Q. And we would also have to look at your envelopes to see if they are actually on your envelope, right?

A. Correct.

Q. But in any event, if somebody wrote a date that -- assuming it's month/day/year and that didn't fall within the range ordered by the Supreme Court, the Lancaster board didn't inquire as to whether it could have been someone intending to write day/month/year?

A. We did not.

Q. And this example up on the screen, this is one that you would have set aside without further inquiry, right?

A. Correct.

MR. LONEY: I'll ask the Court Reporter to mark the next one, which is Tab 11, as Exhibit Lancaster 10, if that makes sense.

\- - -

(Whereupon, Exhibit 10 was marked for identification.)

C. Miller

were voting?

A. We did not go back to look at that. We took just what the date was written.

Q. So in this example, you would have set it aside because the date that's not crossed out is from 1944, which is obviously outside of the date range ordered by the Supreme Court, right?

A. I would be speculating on that, without seeing this unredacted, to see what else was on this envelope and why there were two dates.

Q. Ah. So you're saying -- so there are a couple of things redacted here, not just the signature.

Are you saying that you might -- if somebody wrote some sort of explanation underneath, that might have weighed into your thinking?

A. Again, I would just need to see it unredacted to know what we would have done.

Q. Now, if the Lancaster board had seen an envelope or if you had seen an envelope submitted with just "3/6/1944" in the date line

C. Miller

and nothing else other than the signature, you would have set that aside, right?

A. Correct.

Q. And not because you thought somebody had actually filled out a ballot in 1944 and saved it until 2022, right? It's just because you were following the Supreme Court's order as -- as written, right?

A. Correct.

Q. Now, does this indicate to you, if somebody wrote a date long in the past, that the voter was engaging in any sort of voter fraud?

A. No.

Q. And did the Lancaster board initiate any investigations of any voters who wrote dates from the 1900s on their outer envelopes to see if they were committing voter fraud?

A. No.

Q. Did you refer anybody to the police from the November 2022 general election for putting dates long in the past in the 1900s?

A. No.

MR. LONEY: Is anybody else as

C. Miller

So with that understanding, can you help me understand why this statement is denied?

MR. ZIMOLONG: Objection.

BY MR. LONEY:

Q. It doesn't sound like, from our prior conversation -- like the Lancaster board actually uses the date written to determine the date received.

MR. ZIMOLONG: Objection to form.

BY MR. LONEY:

Q. Is that right?

A. We don't use -- can you rephrase that. I'm sorry.

Q. Sure. I'll just ask it separate from the request for admission.

The Lancaster board doesn't actually use the date written on the envelope to establish when the ballot is received by the board, does it?

A. No.

Q. I mean, it stamps the date received on the envelope.

C. Miller

It doesn't adjust the date on the stamp according to the date written by the voter, right?

A. Correct.

Q. So if we had written this statement more cleanly to say that -- to say exactly that, that the Lancaster board does not use the date written by the voter to determine whether the envelope was received by Election Day, it shouldn't be a denial, right? That should be admitted?

MR. ZIMOLONG: Objection to form.

You can answer.

THE WITNESS: I would be speculating what the board would agree to for that answer. But for my own self, I would say correct.

BY MR. LONEY:

Q. So I asked a second ago about whether anybody was referred to the police or investigated for fraud.

Of the 232 voters whose mail ballots were set aside in the 2022 general

                    C. Miller

A. Yes.

MR. LONEY: I'm going to ask the Court Reporter to mark as Exhibit Lancaster 12 the document that we previously emailed over as Tab 13.

- - -

(Whereupon, Exhibit 12 was marked for identification.)

- - -

MR. LONEY: I'll share my screen.

BY MR. LONEY:

Q. Do you have the police criminal complaint up on your screen?

A. I do.

Q. And is this -- I'm going to scroll through it. Tell me to slow down if I need to.

My first question, as I scroll through, is: Is the document on your screen, Exhibit Lancaster 12, the criminal complaint against Cheryl Mihaliak --

A. Yes.

Q. -- that we were just talking about?

A. Yes, it is.

C. Miller

Q. And on the affidavit of probable cause -- do you see where I am?

A. Yep.

Q. It appears to be written by Detective Larry Martin.

Do you know who Larry Martin is?

A. I do.

Q. And did you provide a report of what you knew about Ms. Mihaliak and her alleged voter fraud to Detective Martin?

A. I did.

Q. Okay. In the second paragraph, it says the ballot for the Democrat primary was received on April 28th, 2022, by your office, right?

A. Correct.

Q. And the mother, Teresa Mihaliak, had been deceased since April 14th, right?

A. Correct.

Q. Now, the criminal complaint here does not indicate what date, if any, was written on Ms. Mihaliak's mail-in vote, right?

A. It was dated April -- it says it. It says it was dated April 26th, 2022.

C. Miller

Q. Ah. Thank you very much.

It also says that Teresa Mihaliak was removed from the voter roles on April 25th, 2022, right?

A. Correct.

Q. And that was before you received any mail-in ballot for her?

A. Yes, the day before -- or three days before.

Q. Got it.

So Lancaster -- the Lancaster board has some mechanism for removing people who die before Election Day from the voter rolls, right?

A. Correct.

Q. And you would have done that in this case for Teresa Mihaliak before any mail-in ballot had been submitted on her behalf, right?

A. Correct.

Q. So as soon as you or the system saw that Teresa Mihaliak had submitted a mail-in vote after she had been removed from the voters rolls because she had died, you knew that this was an invalid vote, right?

C. Miller

A. Yes.

Q. You didn't need to look at the date written on the envelope to determine that this was an invalid vote?

A. We did.

Q. You did need to look at the envelope to determine if this was an invalid vote?

A. Yes, because of when -- because of how the dates lined up for all of it to have happened.

She could have received -- she did -- she would have received a ballot before she died as well as the request. However, once it was returned, she had already been deceased for, I believe, almost two weeks.

Q. Right. And dying two weeks before the ballot comes in makes the vote invalid as a matter of course, right?

A. Oh, yes. It would have been invalidated it either way.

Q. Right. So regardless of the date written on the envelope, that vote would not have counted?

A. Correct.

C. Miller

Q. Because you had already caught that Teresa Mihaliak had died and removed her from the voter rolls before Election Day?

A. Yes.

Q. And I understand that the police are interested in how the dates line up because they're, presumably, going for a fraud case against Cheryl Mihaliak.

But just focusing on whether this was a valid vote, the date written on the envelope didn't matter one way or the other?

A. Correct. When we received it back, as we had already removed her, that ballot would have been set to the side.

MR. LONEY: We can put this aside for a second. I want to get back for a moment to military and overseas ballots.

And I'd like to go back to Exhibit Lancaster 3, the interrogatory responses.

If everybody would just bear with me for a second while I'm chopping things out of my outline to get us out of

C. Miller

Board of Elections?

A. The Board of Elections directly oversees my position at our office.

Q. Understood. Okay.

So in terms of when the board actually determines when a person is eligible to vote, when does that occur in the process of a person -- let's say a person moves to Pennsylvania, wants to register to vote and participate in Pennsylvania's elections.

When does the Board of Elections determine that that person is eligible to cast a ballot in one of their elections?

A. When we are registering them to vote.

Q. Okay. After that point, let's say that the person successfully registers to vote, does the board determine whether that voter is eligible to cast the ballot at any point in the future?

A. There are many voter roll maintenance programs that we do throughout every single year, so yes.

Q. When a person submits a mail ballot application -- and when I say "mail ballot," I

C. Miller

mean both mail-in ballots and absentee ballots -- does the board make a determination of whether that person is eligible to participate in the election?

A. I'm not sure I understand.

Q. Sure. So you said -- in response to my question of after the person successfully registers to vote, I asked you does the board make any future determinations about that person's eligibility to participate in elections, and you said the board does roll maintenance.

And so my question was: When a person submits an application to vote by mail, whether mail-in or absentee, does the board make a determination again as to whether that voter is eligible to vote?

A. Yes. The first thing we do is to make sure that that person is actually a registered voter first before we process any mail ballot applications.

Q. Okay. And -- okay. That answered my question. Thank you.

So does the Board of Elections

C. Miller

use the date that is written on the mail ballot return envelope to determine that person's eligibility to vote?

A. In a way, yes. Because sometimes, when they come back, if it's a deceased voter, then we have to remove it.

Q. Okay. And when is that person's eligibility to vote determined?

Is it based on when they submitted the ballot? Is it based on Election Day?

What is the date by which you determine that person's eligibility to vote in a particular election?

A. We pull deceased voter ballots up through Election Day.

Q. So if a person passes away before the election, you say you pull the ballot.

What does that mean?

A. If we received their ballot -- their voted ballot already, we would then pull that from those received ballots and set aside.

Q. And how do you determine whether a person has passed away?

C. Miller

A. We receive Department of Health records, as all counties do. And we also use local obituaries or if someone has a death certificate that they have submitted to us.

Q. So if a person passes away before Election Day and they -- and their ballot is received for a particular election, that person's ballot will not be counted?

A. Correct.

Q. And that is regardless of whether there's a date on their return envelope, whether the date is incorrect?

A. If there is not a date on the envelope, we would have already pulled it for it being no date. But, yes, otherwise, looking at the date, yes, we still would pull it at that point.

Q. So in response to Mr. Loney's questions, you said that before the Pennsylvania Supreme Court's order in November of 2022 the Board of Elections was prepared to count ballots regardless of whether they contained a date on the envelope or whether that date was correct; is that right?

C. Miller

CERTIFICATE

I HEREBY CERTIFY that the proceedings, evidence and objections are contained fully and accurately in the stenographic notes taken by me upon the deposition of Crista Miller, taken on February 13, 2023 and that this is a true and correct transcript of same.

Date, February 23, 2023

Jennifer Billstein-Miller

Jennifer Miller, RMR, CCR, CRR
and Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

**COMMONWEALTH OF PENNSYLVANIA**
**COUNTY OF: Lancaster**

# POLICE CRIMINAL COMPLAINT

## COMMONWEALTH OF PENNSYLVANIA VS.

Magisterial District Number: 02-2-02

MDJ: Hon. BRUCE A. ROTH, ESQ

Address: 150 NORTH QUEEN STREET SUITE 120 LANCASTER, PA 17603

Telephone: 717-295-2000

DEFENDANT: *(NAME and ADDRESS):*

| First Name | Middle Name | Last Name | Gen |
|---|---|---|---|
| CHERYL | | MIHALIAK | |

831 3RD ST
LANCASTER PA 17603

**NCIC Extradition Code Type**

- ☐ 1-Felony Full
- ☐ 2-Felony Ltd.
- ☐ 3-Felony Surrounding States
- ☐ 4-Felony No Ext
- ☐ 5-Felony Pend.
- ☐ 6-Felony Pend. Extradition Determ.
- ☐ A-Misdemeanor Full
- ☒ B-Misdemeanor Limited
- ☐ C-Misdemeanor Surrounding States
- ☐ D-Misdemeanor No Extradition
- ☐ E-Misdemeanor Pending
- ☐ F-Misdemeanor Pending Extradition Determ.
- ☐ Distance:

**DEFENDANT IDENTIFICATION INFORMATION**

| Docket Number | Date Filed | OTN/LiveScan Number | Complaint | Incident Number | Request Lab Services? |
|---|---|---|---|---|---|
| CR-126-22 | 06/03/22 | R 300522-5 | 150 | DA-22-0138 | ☐ YES ☒ NO |

GENDER: ☐ Male ☒ Female

DOB 6/13/1961 POB Add'l DOB Co-Defendant(s) ☐

AKA: First Name / Middle Name / Last Name / Gen.

RACE: ☒ White ☐ Asian ☐ Black ☐ Native American ☐ Unknown

ETHNICITY: ☐ Hispanic ☒ Non-Hispanic ☐ Unknown

HAIR COLOR: ☒ GRY (Gray) ☐ RED (Red/Aubn.) ☐ SDY (Sandy) ☐ BLU (Blue) ☐ PLE (Purple) ☐ BRO (Brown) ☐ BLK (Black) ☐ ONG (Orange) ☐ WHI (White) ☐ XXX (Unk/Bald) ☐ GRN (Green) ☐ PNK (Pink) ☐ BLN (Blonde /Strawberry)

EYE COLOR: ☐ BLK (Black) ☒ BLU (Blue) ☐ BRO (Brown) ☐ GRN (Green) ☐ GRY (Gray) ☐ HAZ (Hazel) ☐ MAR (Maroon) ☐ PNK (Pink) ☐ MUL (Multicolored) ☐ XXX (Unknown)

DNA ☐ YES ☒ NO DNA Location

WEIGHT (lbs.) 160

FBI Number 688907JA3 MNU Number

Defendant Fingerprinted? ☐ YES ☐ NO

Fingerprint Classification:

HEIGHT Ft. 5 In. 11

**DEFENDANT VEHICLE INFORMATION**

| Plate # | State | Hazmat ☐ | Registration Sticker (MM/YY) | Comm'l Veh. Ind. ☐ | School Veh. ☐ | Oth. NCIC Veh. Code | Reg. same as Def. ☐ |
|---|---|---|---|---|---|---|---|
| VIN | Year | Make | Model | Style | Color | | |

Office of the attorney for the Commonwealth ☒ Approved ☐ Disapproved Because:

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. See Pa.R.Crim.P.507.)

Andrew J. Gonzalez [signature] 6/3/22
(Name of the attorney for the Commonwealth) (Signature of the attorney for the Commonwealth) (Date)

I, MARTIN, LARRY (Name of the Affiant) 10158 (PSP/MPOETC-Assigned Affiant ID Number and Badge #)

of LANCASTER CO DETECTIVES (Identify Department or Agency Represented and Political Subdivision) PA036013A (Police Agency ORI Number)

do hereby state: (check appropriate box)

1. ☒ I accuse the above named defendant who lives at the address set forth above

   ☐ I accuse the defendant whose name is unknown to me but who is described as

   ☐ I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have therefore designated as John Doe or Jane Doe

with violating the penal laws of the Commonwealth of Pennsylvania at [ 301 ] (Subdivision Code) Lancaster City (Place-Political Subdivision)

150 N QUEEN ST LANCASTER, PA 17603

in Lancaster County [ 36 ] (County Code) on or about Between 04/26/2022 0001 and 04/26/2022 2359 (Offense Date)



# POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 06/03/2022 | OTN/LiveScan Number | | Complaint 150 | Incident Number DA-22-0138 |
|---|---|---|---|---|---|
| Defendant Name | First: CHERYL | Middle: | | Last: MIHALIAK | |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered 1 through 4.

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing of confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.
**(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

June 3, 2022 (Date) [signature] (Signature of Affiant)

AND NOW, on this date ____________ I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

02-2-02
(Magisterial District Court Number)

[signature]
(Issuing Authority)

COMMONWEALTH OF PENNSYLVANIA LANCASTER COUNTY SEAL MAGISTERIAL DISTRICT JUDGE DISTRICT 02-2-02

# POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: | OTN/LiveScan Number | Complaint | Incident Number |
|---|---|---|---|---|
| | 06/03/2022 | | 150 | DA-22-0138 |

| Defendant Name | First: | Middle: | Last: |
|---|---|---|---|
| | CHERYL | | MIHALIAK |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

**(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.**

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Over ____ |
|---|---|---|---|---|

| Lead? | Offense # | Section | Subsection | of the | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|
| ☒ | 1 | 4101 | (a)(3) | of the | PA Crimes Code | 1 | M1 | | 250 |

| PennDOT Data (if Applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (Include the name of the statute or ordinance):
**FORGERY-UTTER FORGED WRIT**

Acts of the accused associated with this Offense:

**PACC 4101(a)3 Forgery**

WP AB 7/25/22

**IN THAT, on or about April 26, 2022, THE DEFENDANT did unlawfully utter a writing, namely, a commercial instrument or other document evidencing, creating, transferring, altering, terminating, or otherwise affecting legal relations, which said actor knew to be forged, with intent to defraud or injure TO WIT: Cheryl Mihaliak completed a mail in voter ballot for her deceased mother and signed her mother's name to the ballot. It was returned to the Lancaster County Board of Elections.**

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Over ____ |
|---|---|---|---|---|

| Lead? | Offense # | Section | Subsection | of the | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | 2 | 3517 | - | of the | 25 | 1 | M2 | | |

| PennDOT Data (if Applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (Include the name of the statute or ordinance):

Acts of the accused associated with this Offense:

**Any person who shall forge or falsely make the official endorsement on any ballot or wilfully destroy or deface any ballot or willfully delay the delivery of ant ballot. TO WIT: Cheryl Mihaliak completed a mail in voter ballot for her deceased mother and signed her mother's name to the ballot.**



# Police Criminal Complaint

| Docket Number: | Date Filed: 06/03/2022 | OTN/LiveScan Number | | Complaint 150 | Incident Number DA-22-0138 |
|---|---|---|---|---|---|
| Defendant Name | First: CHERYL | | Middle: | Last: MIHALIAK | |

## AFFIDAVIT OF PROBABLE CAUSE

1) On April 28, 2022, I (Detective Larry R. Martin) was assigned to investigate an alleged voter fraud incident. I received information from Christa Miller Chief Clerk/ Chief Registrar of the Lancaster County Board of Elections and Registration Commission.

2) Christa Miller stated she received a mail in ballot from Teresa J. Mihaliak signed and dated April 26, 2022. The ballot for the democrat primary was received on April 28, 2022, by her office. However, Christa Miller reported that Teresa J. Mihaliak was deceased on April 14, 2022. Christa Miller said this was confirmed by an obituary and records from the Department of Health. She said Teresa J. Mihaliak was removed from the voter rolls on April 25, 2022.

3) Christa Miller stated that Teresa J. Mihaliak's ballot was requested by Cheryl Mihaliak on March 17, 2022, Cheryl Mihaliak requested her own ballot on March 17, 2022. Christa Miller reported both Teresa Mihaliak and Cheryl Mihaliak's ballots were returned on April 28, 2022.

4) On May 5, 2022, at 1641 hours I spoke with Cheryl Mihaliak. During that conversation Cheryl Mihaliak told me that she did vote for her mother and signed her ballot after her mother died. Cheryl Mihaliak said that she knew who her mother was going to vote for and decided to vote for her after she died. Cheryl Mihaliak said she filled out her mother Teresa J. Mihaliak ballot and signed her ballot.

5) Due to the above information, I request that a summons be issued for defendant Cheryl Mihaliak.

I, LARRY MARTIN, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA THAT REQUIRE FILING OF CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NO-CONFIDENTIAL INFORMATION AND DOCUMENTS.

_______________________________
(Signature of Affiant)

Sworn to me and subscribed before me this ______day of ______________________, __________.

______________ Date ______________________________, Magisterial District Judge

My commission expires first Monday of January,

SEAL

AOPC 412A - Rev. 12/21

# Magisterial District Judge 02-2-02

## DOCKET TRANSCRIPT

Docket Number: MJ-02202-CR-0000126-2022

**Criminal Docket**

Commonwealth of Pennsylvania
v.
Cheryl Mihaliak

## CASE INFORMATION

| | | | |
|---|---|---|---|
| Judge Assigned: | Magisterial District Judge Bruce A. Roth | Issue Date: | 06/03/2022 |
| OTN: | R 300522-5 | File Date: | 06/03/2022 |
| Arresting Agency: | Lancaster County, District Attorney | Arrest Date: | |
| Complaint No.: | DA-22-0138 | Incident No.: | DA-22-0138 |
| Disposition: | Waived for Court | Disposition Date: | 07/25/2022 |
| County: | Lancaster | Township: | Lancaster City |
| Case Status: | Closed | | |

## STATUS INFORMATION

| Case Status | Status Date | Processing Status |
|---|---|---|
| Closed | 07/25/2022 | Completed |
| | 06/03/2022 | Awaiting Preliminary Hearing |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Preliminary Hearing | 06/29/2022 | 2:00 pm | | Magisterial District Judge Bruce A. Roth | Continued |
| *Continuance Reason:* | *Defendant Attorney Request* | | | | |
| *Requested By:* | *Attorney Michael Todd Winters* | | | | |
| Preliminary Hearing | 07/25/2022 | 2:00 pm | | Magisterial District Judge Bruce A. Roth | Scheduled |
| Formal Arraignment | 08/26/2022 | 9:00 am | Courtroom A | | Scheduled |

## DEFENDANT INFORMATION

| | | | |
|---|---|---|---|
| Name: | Mihaliak, Cheryl | Sex: | Female |
| Date of Birth: | 06/13/1961 | Race: | |

Address(es):

**Other**

831 Third Street
Lancaster, PA 17603

| | |
|---|---|
| Advised of His Right to Apply for Assignment of Counsel? | Yes |
| Public Defender Requested by the Defendant? | No |
| Application Provided for Appointment of Public Defender? | No |
| Has the Defendant Been Fingerprinted? | No |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on these docket sheets. Docket sheet information should not be used in place of a criminal history background check, which can only be provided by the Pennsylvania State Police. Employers who do not comply with the provisions of the Criminal History Record Information Act (18 Pa.C.S. Section 9101 et seq.) may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# Magisterial District Judge 02-2-02

## DOCKET TRANSCRIPT

Docket Number: MJ-02202-CR-0000126-2022

**Criminal Docket**

Commonwealth of Pennsylvania
v.
Cheryl Mihaliak

## CASE PARTICIPANTS

| Participant Type | Participant Name | OTN/LOTN | Docket Number | Was Sworn In? | Has Testified? |
|---|---|---|---|---|---|
| Prosecution | Commonwealth of Pennsylvania | | | | |
| Arresting Officer | Martin, Larry R. | | | | |
| Defendant | Mihaliak, Cheryl | | | | |
| Witness for the Commonwealth | Miller, Christa | | | | |

## BAIL

**Bail Set:** **Nebbia Status: None**

| Bail Action Type | Bail Action Date | Bail Type | Percentage | Amount |
|---|---|---|---|---|
| Set | 07/25/2022 | Unsecured | | $2,500.00 |

## CHARGES

| # | Charge | Grade | Description | Offense Dt. | Disposition |
|---|---|---|---|---|---|
| 1 | 18 § 4101 §§ A3 | M1 | Forgery - Utters Forged Writing | 04/26/2022 | Withdrawn |
| 2 | 25 § 3517 | M2 | Forging And Destroying Ballots | 04/26/2022 | Waived for Court |

## DISPOSITION / SENTENCING DETAILS

| Case Disposition | Disposition Date | Was Defendant Present? |
|---|---|---|
| **Waived for Court** | 07/25/2022 | Yes |

| Offense Seq./Description | Offense Disposition |
|---|---|
| 1 Forgery - Utters Forged Writing | Withdrawn |
| 2 Forging And Destroying Ballots | Waived for Court |

## ATTORNEY INFORMATION

**Private**

Name: Michael Todd Winters, Esq.
Representing: Mihaliak, Cheryl
Counsel Status: Active
Supreme Court No.: 077976
Phone No.: 717-584-1895
Address: 53 N Duke St
Ste 318
Lancaster, PA 17602

**Assistant District Attorney**

Name: Jennifer Lauren Ponessa, Esq.
Representing: Commonwealth of Pennsylvania
Counsel Status: Active
Supreme Court No.: 319222
Phone No.: 717-299-8100
Address: Lancaster County Da's Office
50 N Duke St
Lancaster, PA 17602-2805

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on these docket sheets. Docket sheet information should not be used in place of a criminal history background check, which can only be provided by the Pennsylvania State Police. Employers who do not comply with the provisions of the Criminal History Record Information Act (18 Pa.C.S. Section 9101 et seq.) may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# Magisterial District Judge 02-2-02

DOCKET TRANSCRIPT

Docket Number: MJ-02202-CR-0000126-2022

## Criminal Docket

Commonwealth of Pennsylvania
v.
Cheryl Mihaliak

DOCKET ENTRY INFORMATION

| Filed Date | Entry | Filer | Applies To |
|---|---|---|---|
| 07/25/2022 | Bail Set | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 07/25/2022 | Formal Arraignment Scheduled | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 07/25/2022 | Waiver of Preliminary Hearing | Cheryl Mihaliak | Cheryl Mihaliak, Defendant |
| 07/25/2022 | Waived for Court | Magisterial District Judge Bruce A. Roth | Cheryl Mihaliak, Defendant |
| 07/25/2022 | Docket Transcript Printed | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 07/22/2022 | Attorney Active | Jennifer Lauren Ponessa, Esq. | Commonwealth of Pennsylvania, Prosecution |
| 06/24/2022 | First Class Summons Accepted | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/13/2022 | Subpoena Issued | Magisterial District Court 02-2-02 | Christa Miller, Witness for the Commonwealth |
| | *Event:* | *Preliminary Hearing-07/25/2022 2:00PM- 2:05PM* | |
| | *Testify On Behalf Of:* | *Commonwealth of Pennsylvania* | |
| 06/13/2022 | First Class Subpoena Issued | Magisterial District Court 02-2-02 | Christa Miller, Witness for the Commonwealth |
| 06/13/2022 | Preliminary Hearing Scheduled | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/13/2022 | Preliminary Hearing Continued | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/09/2022 | Attorney Active | Michael Todd Winters, Esq. | Cheryl Mihaliak, Defendant |
| 06/06/2022 | Certified Summons Accepted | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/06/2022 | Certified Fingerprint Order Accepted | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/03/2022 | Summons Issued | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/03/2022 | Subpoena Issued | Magisterial District Court 02-2-02 | Christa Miller, Witness for the Commonwealth |
| | *Event:* | *Preliminary Hearing-06/29/2022 2:00PM- 2:15PM* | |
| | *Testify On Behalf Of:* | *Commonwealth of Pennsylvania* | |
| 06/03/2022 | First Class Subpoena Issued | Magisterial District Court 02-2-02 | Christa Miller, Witness for the Commonwealth |
| 06/03/2022 | Certified Summons Issued | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/03/2022 | First Class Fingerprint Order Issued | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/03/2022 | Fingerprint Order Issued | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| | *Report to Agency:* | *Lancaster Police Dept* | |
| | *Authority:* | *Roth, Bruce A.* | |
| | *Report From:* | *6/3/2022 12:00:00 AM* | |
| | *Report To:* | *6/29/2022 12:00:00 AM* | |
| 06/03/2022 | Certified Fingerprint Order Issued | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/03/2022 | Preliminary Hearing Scheduled | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |
| 06/03/2022 | Criminal Complaint Filed | Magisterial District Court 02-2-02 | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on these docket sheets. Docket sheet information should not be used in place of a criminal history background check, which can only be provided by the Pennsylvania State Police. Employers who do not comply with the provisions of the Criminal History Record Information Act (18 Pa.C.S. Section 9101 et seq.) may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# Magisterial District Judge 02-2-02

DOCKET TRANSCRIPT

Docket Number: MJ-02202-CR-0000126-2022

**Criminal Docket**

Commonwealth of Pennsylvania
v.
Cheryl Mihaliak

DOCKET ENTRY INFORMATION

| Filed Date | Entry | Filer | Applies To |
|---|---|---|---|
| 06/03/2022 | First Class Summons Issued | Magisterial District Court 02-2-02 | Cheryl Mihaliak, Defendant |

July 25, 2022
Date

Magisterial District Judge Bruce A. Roth

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on these docket sheets. Docket sheet information should not be used in place of a criminal history background check, which can only be provided by the Pennsylvania State Police. Employers who do not comply with the provisions of the Criminal History Record Information Act (18 Pa.C.S. Section 9101 et seq.) may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

TLP: WHITE



# GUIDANCE CONCERNING EXAMINATION OF ABSENTEE AND MAIL-IN BALLOT RETURN ENVELOPES

**Updated: September 26, 2022**

**Version: 3.0**

EXAMINATION OF ABSENTEE AND MAIL-IN BALLOT RETURN ENVELOPES

## 1 BACKGROUND:

The Pennsylvania Election Code describes processes that a qualified voter follows to apply for, receive, complete and timely return an absentee or mail-in ballot to their county board of election. These processes include multiple secure methods used by the voter's county board of election to verify that the qualified voter's absentee or mail-in application is complete and that the statutory requirements are satisfied. These include voter identification verification confirmed by either a valid driver's license number, the last four digits of the voter's social security number or other valid photo identification, and unique information on the application including the voter's residence and date of birth. Before sending the ballot to the applicant, the county board of elections confirms the qualifications of the applicant by verifying the proof of identification and comparing the information provided on the application with the information contained in the voter record. If the county is satisfied that the applicant is qualified, the application must be approved. This approval shall be final and binding, except that challenges may be made only on the grounds that the applicant was not a qualified voter, and those challenges must be made to the county prior to five o'clock p.m. on the Friday prior to the election.

Once the qualified voter's absentee or mail-in application is approved, the voter is mailed a ballot with instructions and two envelopes. The outer envelope includes both a unique correspondence ID barcode that links the envelope to the qualified voter's application and a pre-printed Voter's Declaration that the voter must sign representing that the voter is qualified to vote the enclosed ballot and has not already voted. This Guidance addresses the examination of the Voter's Declaration on the ballot return envelope. This Guidance assumes that the voter has satisfactorily completed the steps described above as to application for, receipt and return of an absentee or mail-in ballot.

## 2 RECORDING THE DATE, RETURN METHOD AND BALLOT STATUS FOR RETURNED BALLOTS:

County boards of elections should have processes in place to record the date, return method, and ballot status for all voted ballots received. County boards of elections must store and maintain returned ballots in a secure location until the ballots are to be pre-canvassed or canvassed.

The county board of elections should stamp the date of receipt on the ballot-return. County boards of elections should record the receipt of absentee and mail ballots daily in the SURE system. To record a ballot as returned, the staff should scan the                                

correspondence ID barcode on the outside of the envelope. The correspondence ID on the envelope is unique to each absentee or mail-in voter and each issuance of a ballot to a voter. Once a correspondence ID has been recorded as returned in the SURE system, it cannot be recorded again. Further, if a ballot issuance record is cancelled by the county board of elections (e.g. voided to reissue a replacement ballot) in the SURE system, the correspondence ID on the cancelled ballot will become invalid. If the same barcode is subsequently scanned, the SURE system will not allow the returned ballot to be marked as being approved for counting.

The county boards of elections should record the date the ballot is received (not the date that the returned ballot is processed). In the event a county board of elections is entering the ballot on a date other than the date the ballot was received, the county personnel should ensure that the SURE record reflects the date of receipt, rather than the date of entry, since by default, SURE will automatically populate both the 'Date Received' and 'Vote Recorded' fields with the current date and time unless users manually correct the date to reflect the date received.

## 3    EXAMINATION OF DECLARATION ON BALLOT RETURN ENVELOPES:

The county board of elections is responsible for approving ballots to be counted during pre-canvassing and canvassing.

To promote consistency across the 67 counties, the county boards of elections should follow the following steps when processing returned absentee and mail-in ballots.

After setting aside ballots of electors who died prior to the opening of the polls, the county board of elections shall examine the Voter's Declaration on the outer envelope of each returned ballot and compare the information on the outer envelope, i.e., the voter's name and address, with the information contained on the list of absentee and mail-in voters.

If the Voter's Declaration on the return envelope is not signed, that ballot return envelope must be set aside and not counted. If the board determines that a ballot should not be counted, the final ballot disposition should be noted in SURE. The ballot return status (Resp Type) should be noted using the appropriate drop-down selection.

If the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for the pre-canvass or canvass unless the application was challenged in accordance with the Pennsylvania Election Code.

Any ballot-return envelope that is undated or dated with an incorrect date but that has been timely received by the county shall be included in the pre-canvass and canvass.

The Pennsylvania Election Code does not authorize the county board of elections to set

aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections.

| Version | Date | Description | Author |
|---|---|---|---|
| 1.0 | 9.11.2020 | Initial document release | Bureau of Elections |
| 2.0 | 5.24.2022 | Updates related to court decisions | Bureau of Elections |
| 3.0 | 9.26.2022 | Updates related to court decisions | Bureau of Elections |

Clarion County

#1

**Cindy Callihan**

**From:** Marks, Jonathan <jmarks@pa.gov>
**Sent:** Tuesday, October 11, 2022 4:49 PM
**To:** Marks, Jonathan
**Subject:** DOS Email: Guidance on Undated Ballots Unchanged

**Importance:** High

**Warning: This email originated outside of Clarion County's Network.
DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.** *Clarion County IT Department*

Dear county election official,

As you may know, the U.S. Supreme Court issued an order this morning regarding the Third Circuit's decision in the *Migliori* case. Please be advised that the Court took this action because the election at issue in *Migliori* had concluded, and the case was thus moot. The Court did not rule on the merits of the issues, and did not change the status quo. The Pennsylvania Commonwealth Court's decision on this issue held that both Pennsylvania *and* federal law prohibit excluding legal votes because the voter omitted an irrelevant date on the ballot return envelope, and that decision remains good law. Every county is expected to include undated ballots in their official returns for the Nov. 8 election, consistent with the Department of State's guidance.

Today's order vacating the Third Circuit's judgment on mootness grounds does not affect the prior decision of Commonwealth Court in any way. It provides no justification for counties to exclude ballots based on a minor omission, and we expect that counties will continue to comply with their obligation to count all legal votes.

Warmest regards,

**Jonathan Marks** | Deputy Secretary for Elections and Commissions *(he, him, his)*
Office of the Secretary
302 North Office Building, Harrisburg, PA 17120
Office: 717.787.6458 Direct: 717.783.2035
dos.pa.gov | vote.pa.gov | Facebook | Twitter

Received 10/16/2022 10:53:53 PM Supreme Court Middle District

Filed 10/16/2022 10:53:00 PM Supreme Court Middle District
102 MM 2022

**IN THE SUPREME COURT OF PENNSYLVANIA**

---

**No. ____ MM 2022**

---

David Ball, James D. Bee, Jesse D. Daniel, Gwendolyn Mae DeLuca, Ross M. Farber, Lynn Marie Kalcevic, Vallerie Siciliano-Biancaniello, S. Michael Streib, Republican National Committee, National Republican Congressional Committee, and Republican Party of Pennsylvania,

Petitioners,

v.

Leigh M. Chapman, in her official capacity as Acting Secretary of the Commonwealth, and All 67 County Boards of Elections (See back of cover for list of County Respondents),

Respondents.

---

**PETITIONERS' APPLICATION FOR THE EXERCISE OF KING'S BENCH POWER OR EXTRAORDINARY JURISDICTION**

---

Kathleen A. Gallagher
(PA #37950)
Russell D. Giancola
(PA #200058)
GALLAGHER GIANCOLA LLC
436 7th Avenue, 31st Fl.
Pittsburgh, PA 15219
412.717.1900 (Phone)

John M. Gore *
E. Stewart Crosland
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
202.879.3939 (Phone)

* *Pro hac vice motion forthcoming*

Thomas W. King, III *
(PA #21580)
Thomas E. Breth
(PA #66350)
DILLON, MCCANDLESS, KING, COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
724.283.2200 (Phone)

***** *General Counsel, Republican Party of Pennsylvania*

*Counsel for Petitioners*

Adams County Board of Elections; Allegheny County Board of Elections;
Armstrong County Board of Elections; Beaver County Board of Elections;
Bedford County Board of Elections; Berks County Board of Elections;
Blair County Board of Elections; Bradford County Board of Elections;
Bucks County Board of Elections; Butler County Board of Elections;
Cambria County Board of Elections; Cameron County Board of Elections;
Carbon County Board of Elections; Centre County Board of Elections;
Chester County Board of Elections; Clarion County Board of Elections;
Clearfield County Board of Elections; Clinton County Board of Elections;
Columbia County Board of Elections; Crawford County Board of Elections;
Cumberland County Board of Elections; Dauphin County Board of Elections;
Delaware County Board of Elections; Elk County Board of Elections;
Erie County Board of Elections; Fayette County Board of Elections;
Forest County Board of Elections; Franklin County Board of Elections;
Fulton County Board of Elections; Greene County Board of Elections;
Huntingdon County Board of Elections; Indiana County Board of Elections;
Jefferson County Board of Elections; Juniata County Board of Elections;
Lackawanna County Board of Elections; Lancaster County Board of Elections;
Lawrence County Board of Elections; Lebanon County Board of Elections;
Lehigh County Board of Elections; Luzerne County Board of Elections;
Lycoming County Board of Elections; McKean County Board of Elections;
Mercer County Board of Elections; Mifflin County Board of Elections;
Monroe County Board of Elections; Montgomery County Board of Elections;
Montour County Board of Elections; Northampton County Board of Elections;
Northumberland County Board of Elections; Perry County Board of Elections;
Philadelphia County Board of Elections; Pike County Board of Elections;
Potter County Board of Elections; Schuylkill County Board of Elections;
Snyder County Board of Elections; Somerset County Board of Elections;
Sullivan County Board of Elections; Susquehanna County Board of Elections;
Tioga County Board of Elections; Union County Board of Elections;
Venango County Board of Elections; Warren County Board of Elections;
Washington County Board of Elections; Wayne County Board of Elections;
Westmoreland County Board of Elections; Wyoming County Board of Elections;
and York County Board of Elections,

     Respondents/Appellants.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

PARTIES ..... 5

I. Petitioners ..... 5

A. Voter Petitioners ..... 5

B. Republican Committees ..... 7

II. Respondents ..... 9

STATEMENT OF THE CASE ..... 10

BASIS FOR EXERCISE OF KING'S BENCH POWER OR EXTRAORDINARY JURISDICTION ..... 11

ARGUMENT ..... 13

I. A Majority Of This Court Has Already Upheld The Mandatory Date Requirement Under State Law ..... 13

II. Federal Law Does Not Preempt the Date Requirement ..... 19

III. The Acting Secretary's Guidance Directly Contradicts the General Assembly's Date Requirement ..... 23

IV. The Court Should Immediately Order County Boards of Elections to Segregate Any Absentee or Mail-In Ballots That Do Not Comply With the Date Requirement ..... 24

RELIEF REQUESTED ..... 26

## TABLE OF AUTHORITIES

**Cases** **Page**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .......... 14

*Bd. of Revisions of Taxes, City of Philadelphia v. City of Philadelphia*, 4 A.3d 610 (Pa. 2010) .......... 11

*Brnovich v. DNC*, 141 S. Ct. 2321 (2021) .......... 21

*Chapman v. Berks County Bd. of Elecs.*, 2022 WL 4100998, *13-*25 (Pa. Commw. Aug. 19, 2022) .......... 4

*Commonwealth v. Williams*, 129 A.3d 1199 (Pa. 2015) .......... 12

*Cook v. Gralike*, 531 U.S. 510 (2010) .......... 18

*County of Fulton v. Sec.*, 276 A.3d 846 (Pa. Commw. 2022) .......... 23

*DNC v. Wisconsin State Leg.*, 141 S. Ct. 28 (Mem.) (Oct. 26, 2020) .......... 21

*Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020) .......... 12, 13

*Hamilton v. Johnson*, 141 A. 846 (Pa. 1928) .......... 23

*Hawke v. Smith*, 253 U.S. 221 (1920) .......... 19

*In re Bruno*, 101 A.3d 635 (Pa. 2014) .......... 12

*In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election*, 241 A.3d 1058 (2020) .......... passim

*In re Canvass of Absentee Ballots of Nov. 4, 2003 General Election*, 843 A.2d 1223 (Pa. 2004) .......... 14

*In re Election in Region 4 for Downington Sch. Bd. Precinct Uwchlan 1*, 272 A.3d 993 (Pa. Commw. Ct. 2022) .......... 10, 16

*League of Women Voters v. Commonwealth*, 178 A.2d 737 (Pa. 2018) .................12

*McCormick for U.S. Senate v. Chapman*,
2022 WL 2900112 (Pa. Commw. Ct. June 2, 2022) ..................................passim

*Migliori v. Cohen*, No. 22-1499 (3d Cir. May 27, 2022) .............................1, 10, 11

*Moore v. Harper*, 142 S. Ct. 1089 (2022)..................................................18, 19, 24

*Perzel v. Cortes*, 870 A.2d 759 (Pa. 2005) .............................................................23

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .......................................................5, 13, 26

*Republican Party of Pa. v. Degraffenreid*,
No. 20A84, Order (Nov. 6, 2020)......................................................................24

*Republican Party of Pa. v. Degraffenreid*, 141 S. Ct. 732 (2021) .............18, 19, 24

*Ritter v. Lehigh Cnty. Bd. of Elecs.*, 272 A.3d 989 (Pa. Commw. 2022)..........10, 16

*Ritter v. Migliori*,
No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) .....................................1, 10

*Ritter v. Migliori*, 142 S. Ct. 1824 (2022).......................................................passim

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) .........................................................20

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) .....................................................21

*Smiley v. Holm*, 285 U.S. 355 (Pa. 1932) ....................................................18, 19, 23

*Storer v. Brown*, 415 U.S. 724 (1974) ......................................................................14

*Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*,
828 A.2d 995 (Pa. 2003)...............................................................................24, 25

*Timmons v. Twin City Area New Party*, 520 U.S. 351 (1997)...........................14, 21

*Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022)...............................................21

**Statutes**

42 Pa. C.S. § 502 .......... 11

25 P.S. § 1301 .......... 22

25 P.S. § 2621 .......... 9, 23

25 P.S. § 2641 .......... 9

25 P.S. § 2642 .......... 9, 23

25 P.S. § 2831 .......... 8

25 P.S. § 2834 .......... 8

25 P.S. § 3146.6 .......... 1, 13, 23, 26

25 P.S. § 3146.8 .......... 12

25 P.S. § 3150.16 .......... 1, 13, 23, 26

25 P.S. § 3159 .......... 9

52 U.S.C. § 10101 .......... 1, 20, 21, 22

52 U.S.C. § 30101 .......... 7, 8

**Constitutional Provisions**

PA. CONST. art. I, § 5 .......... 16

U.S. CONST. art. I, § 4, cl. 1 .......... 18, 19, 23

**INTRODUCTION**

The General Assembly has mandated that a voter who uses an absentee or mail-in ballot "shall . . . fill out, date and sign the declaration" printed on the outer envelope of the ballot. 25 P.S. §§ 3146.6(a), 3150.16(a). A majority of this Court has already held that any absentee or mail-in ballot that does not comply with the General Assembly's date requirement is invalid and cannot be counted in any election after the 2020 general election. *See In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election*, 241 A.3d 1058, 1079-80 (2020) (Opinion of Justice Wecht); *id.* at 1090-91 (Opinion of Justices Dougherty, Saylor, and Mundy) ("*In re 2020 Canvass*"). Thereafter, a panel of the Third Circuit held that the federal materiality statute—which touches on election officials' determination of whether an "individual is qualified under State law to vote," 52 U.S.C. § 10101(2)(B)—somehow preempts the date requirement. The U.S. Supreme Court vacated that holding last week. *See Migliori v. Cohen*, No. 22-1499 (3d Cir. May 27, 2022), *cert. granted and judgment vacated*, *Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (Mem.). And when addressing a request for a stay earlier in that case, three Justices even opined that the Third Circuit's holding is "very likely wrong" on the merits because it rests upon a misconstruction of federal law. *Ritter v. Migliori*, 142 S. Ct. 1824, 1824 (2022) (Mem.) (Alito, J., dissenting from the denial of the application for stay).

Nonetheless, following the Supreme Court's vacatur order, the Acting Secretary of the Commonwealth has doubled down on guidance that purports to direct county boards of elections to "include[] in the canvass and pre-canvass . . . [a]ny ballot-return envelope that is undated or dated with an incorrect date but has been timely received." *See* Pa. Dep't of State, *Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes* (Sept. 26, 2022), a copy of which is attached as Ex. A. The Acting Secretary premised that statement on an unpublished, non-precedential decision of the Commonwealth Court adopting the Third Circuit's now-vacated reasoning that the date requirement is invalid. *See Acting Secretary of State Issues Statement on SCOTUS Order on Undated Mail Ballots* (Oct. 11, 2022), a copy of which is attached as Ex. B.

At the same time, the Acting Secretary's own website advises the public that "[i]f you do not complete the declaration on the return envelope" of an absentee or mail-in ballot, "your ballot will not be counted." *See* Mail-In and Absentee Voting, https://www.vote.pa.gov/Voting-in-PA/Pages/Mail-and-Absentee-Ballot.aspx. County boards of elections have likewise informed voters that their ballots "will not be counted" if they do not comply with the date requirement. *See, e.g.*, Philadelphia County Voter Declaration ("YOUR BALLOT WILL NOT BE COUNTED UNLESS . . . [y]ou sign and date the voter's declaration in your own handwriting"), a copy of which is attached as Ex. C.

Petitioners are Pennsylvania voters and political party committees that support and seek to uphold free and fair elections on behalf of all Pennsylvanians. Petitioners therefore ask the Court to exercise its King's Bench power or extraordinary jurisdiction to uphold the General Assembly's date requirement for the imminent 2022 general election and beyond. In particular, Petitioners ask the Court to issue a declaration that the date requirement is valid and mandatory, and that the Acting Secretary's contrary guidance is invalid. Moreover, to preserve the rights of all voters and candidates, the Court should immediately issue an order directing county boards of elections to segregate any undated or incorrectly dated ballots received for the 2022 general election, as the Speaker and Majority Leader of the House of Representatives have requested. *See* Letter from B. Cutler & K. Benninghoff to Leigh Chapman (Oct. 13, 2022), attached as Ex. D.

The time for the Court to act is now. The validity of undated absentee and mail-in ballots already led to one costly and unnecessary election challenge earlier this year. *See McCormick for U.S. Senate v. Chapman*, 2022 WL 2900112 (Pa. Commw. June 2, 2022) (unpublished). Moreover, the issue "could well affect the outcome of the fall elections" in which Petitioners seek to exercise their constitutional rights to vote and to participate. *Ritter*, 142 S. Ct. at 1824 (Alito, J., dissenting from the denial of the application for stay). And while a few counties have indicated that they intend to segregate any undated absentee or mail-in ballots

in the imminent general election, others have provided no such indication. *See* "Pa. House GOP:  Segregate undated ballots," Pittsburgh Post-Gazette (Oct. 14, 2022), attached as Ex. E.

Thus, while the General Assembly has made the date requirement clear and explicit in the Election Code, the actions of other courts, the Acting Secretary, and some county boards of elections have generated a lack of clarity and transparency. Those actions may also result in unequal treatment of otherwise identical ballots based upon the county in which the voter resides.  In particular, some county boards of elections may follow the plain statutory text, the Acting Secretary's website, and their own instructions to voters and decline to count an undated or incorrectly dated absentee or mail-in ballot.  In fact, even though the Acting Secretary sued to force all county boards to count such ballots for the 2022 primary election, at least one county, Butler County, declined to do so.  *See Chapman v. Berks County Bd. of Elecs.*, 2022 WL 4100998, at *6 (Pa. Commw. Aug. 19, 2022) (unpublished).  On the other hand, other county boards may choose to follow the Acting Secretary's guidance and to count any undated or incorrectly dated ballot.  Any counting of ballots that the General Assembly has declared invalid—and the lack of statewide uniformity in the treatment of undated or incorrectly dated ballots—are eroding public trust and confidence in the integrity of Pennsylvania's elections at a vital moment in the Nation's and the Commonwealth's history.

The Court therefore should take immediate action to uphold the General Assembly's date requirement and to set aside the Secretary's invalid guidance. Such action will promote "[c]onfidence in the integrity of our electoral process," facilitate "the functioning of our participatory democracy," and eliminate the "consequent incentive to remain away from the polls" that the current state of affairs creates. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). The Court should grant the Application.

## PARTIES

### I. Petitioners

#### A. Voter Petitioners

Petitioner David Ball resides in Washington County, Pennsylvania and is a registered Pennsylvania elector who consistently votes in each election.

Petitioner James D. Bee resides in Cambria County, Pennsylvania and is a registered Pennsylvania elector who consistently votes in each election.

Petitioner Jesse D. Daniel resides in Indiana County, Pennsylvania and is a registered Pennsylvania elector who consistently votes in each election.

Petitioner Gwendolyn Mae Deluca resides in Beaver County, Pennsylvania and is a registered Pennsylvania elector who consistently votes in each election.

Petitioner Ross M. Farber resides in Westmoreland County, Pennsylvania and is a registered Pennsylvania elector who consistently votes in each election.

Petitioner Lynn Marie Kalcevic resides in Beaver County, Pennsylvania and is a registered Pennsylvania elector who consistently votes in each election.

Petitioner Vallerie Siciliano-Biancaniello resides in Delaware County, Pennsylvania and is a registered Pennsylvania elector who consistently votes in each election.

Petitioner S. Michael Streib resides in Butler County, Pennsylvania and is a registered Pennsylvania elector who consistently votes in each election.

Each of the Voter Petitioners regularly votes in both primary and general elections and intends to vote for candidates in all races on their respective ballots in the 2022 general election, including but not limited to the races for United States Senate, United States House of Representatives, Pennsylvania Senate, and Pennsylvania House of Representatives. Voter Petitioners, each of whom has the right to vote via mail-in ballot, have a particularized interest in knowing the exact requirements for such mail-in ballots to be counted.

Moreover, the counting of undated or incorrectly dated ballots by some or all county boards of elections in violation of the Election Code has interfered, and threatens to interfere, with Voter Petitioners' right to free and equal elections. In particular, the votes validly cast by Voter Petitioners have been and will be canceled out and diluted by the counting of undated or incorrectly dated ballots.

This substantial harm is only exacerbated by the current lack of statewide uniformity among county boards of elections on whether to segregate any absentee or mail-in ballots that do not comply with the General Assembly's date requirement. Indeed, even if the Court reiterates that the date requirement is mandatory, it will not be able to grant effectual relief in any county where the board of elections has failed to segregate undated and incorrectly dated ballots and, thus, cannot exclude such invalid ballots from its final certified results.

**B. Republican Committees**

The Republican National Committee (the "RNC") is the national committee of the Republican Party as defined by 52 U.S.C. § 30101(14). The RNC manages the Republican Party's business at the national level, including development and promotion of the Party's national platform and fundraising and election strategies; supports Republican candidates for public office at all levels across the country, including those on the ballot in Pennsylvania; and assists state parties throughout the country, including the Republican Party of Pennsylvania, to educate, mobilize, assist, and turnout voters.

The National Republican Congressional Committee (the "NRCC") is the national congressional committee of the Republican Party as defined by 52 U.S.C. § 30101(14). The NRCC's mission is to elect Republican candidates to the U.S. House of Representatives from across the United States, including from

Pennsylvania's eighteen congressional districts. The NRCC works to accomplish its mission in Pennsylvania by, among other things, providing direct and indirect financial contributions and support to candidates and other Republican Party organizations; providing technical and research assistance to Republican candidates and Party organizations; engaging in voter registration, voter education and voter turnout programs; and other Republican party-building activities.

Petitioner Republican Party of Pennsylvania ("RPP") is a major political party, 25 P.S. § 2831(a), and the "State committee" for the Republican Party in Pennsylvania, 25 P.S. § 2834, as well as a federally registered "State Committee" of the Republican Party as defined by 52 U.S.C. § 30101(15). RPP, on behalf of itself and its members nominates, promotes, and assists Republican candidates seeking election or appointment to federal, state, and local office in Pennsylvania.

The RNC, NRCC, and RPP (collectively, "Committee Petitioners") each have made significant contributions and expenditures in support of Republican candidates up and down the ballot and in mobilizing and educating voters in Pennsylvania in past election cycles and is doing so again in 2022. These efforts include devoting substantial time and resources toward monitoring of the voting and vote counting process in Pennsylvania and to ensure it is conducted lawfully. Committee Petitioners make expenditures to ensure they and their voters understand the rules governing the elections process, including applicable dates, deadlines, and

requirements for voting by mail or absentee. These efforts require a uniform application of the law and a clear and transparent understanding of mail voting requirements, including any allowances for notice and opportunity to cure procedures. Committee Petitioners have a substantial and particularized interest in ensuring that Pennsylvania administers free and fair elections.

## II.    Respondents

Respondent Leigh M. Chapman is the Acting Secretary of the Commonwealth and is sued in her official capacity only. In that capacity, Acting Secretary Chapman must "receive from county boards of elections the returns of primaries and elections," "canvass and compute the votes cast for candidates," "proclaim the results of such primaries and elections," and "issue certificates of election to the successful candidates at such elections." *See* 25 P.S. § 2621(f); *see also* 25 P.S. § 3159.

Each of the 67 County Boards of Elections in Pennsylvania are also named as Respondents. Boards of Elections "have jurisdiction over the conduct of primaries and elections in such count[ies]." *Id.* at § 2641(a). The Boards of Elections' powers are set forth in the Election Code. *See* 25 P.S. § 2642.

## STATEMENT OF THE CASE

In the first two cases after *In re 2020 Canvass*, the Commonwealth Court adhered to the majority's construction of the date requirement and denied requests to count undated absentee or mail-in ballots. On both occasions, this Court allowed the Commonwealth Court's decisions to stand. *See In re Election in Region 4 for Downington Sch. Bd. Precinct Uwchlan 1*, 272 A.3d 993 (Pa. Commw. 2022), *appeal denied*, 273 A.3d 508 (Pa. 2022); *Ritter v. Lehigh Cnty. Bd. of Elecs.*, 272 A.3d 989 (Pa. Commw. 2022), *appeal denied* 271 A.3d 1285 (Pa. 2022).

Four days after *Ritter* was resolved by this Court, individual voters filed a new lawsuit in federal court claiming that Pennsylvania's date requirement violated the federal materiality provision. The district court granted summary judgment against the plaintiffs. A panel of the Third Circuit reversed, holding that the federal materiality provision preempts the date requirement. The U.S. Supreme Court granted certiorari and vacated that holding on October 11, 2022. *See Migliori v. Cohen*, No. 22-1499 (3d Cir. May 27, 2022), *cert. granted and judgment vacated*, *Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (Mem.).

Meanwhile, the Commonwealth Court twice has departed from the General Assembly's date requirement and the majority's construction in unpublished, non-precedential cases arising out of the 2022 Republican primary election for U.S. Senate. *See McCormick*, 2022 WL 2900112 at *13-14; *Chapman*, 2022 WL

4100998. In those cases, the Commonwealth Court has held that treating the date requirement as mandatory violates state law and the federal materiality provision. The Commonwealth Court relied upon the Third Circuit's now-vacated *Migliori* decision in support of its federal holding in both cases. *See McCormick*, 2022 WL 2900112 at *10-14; *Chapman*, 2022 WL 4100998 at *13-*25.

Following the U.S. Supreme Court's vacatur of *Migliori*, the Acting Secretary reiterated her view that "[e]very county is expected to include undated ballots in their official returns for the Nov. 8 election, consistent with" the Department of State's prior guidance. *See* Ex. B. The Secretary's statement explicitly invoked the Commonwealth Court's two unpublished, non-precedential decisions from earlier this year. *See id.* The Secretary's guidance purports to direct that "[a]ny ballot-return envelope that is undated or dated with an incorrect date but that has been timely received by the county shall be included in the canvass and pre-canvass." Ex. A at 3.

**BASIS FOR EXERCISE OF KING'S BENCH POWER OR EXTRAORDINARY JURISDICTION**

This Court possesses authority to "exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722." 42 Pa. C.S. § 502. That authority includes the "power of general superintendency over inferior tribunals even when no matter is pending." *Bd. of*

*Revisions of Taxes, City of Philadelphia v. City of Philadelphia*, 4 A.3d 610, 620 (Pa. 2010); *see also Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 884 (Pa. 2020); *Commonwealth v. Williams*, 129 A.3d 1199, 1206 (Pa. 2015).

"King's Bench authority is generally invoked to review an issue of public importance that requires timely intervention by the court of last resort to avoid the deleterious effects arising from delays incident to the ordinary process of law." *Friends of Danny DeVito*, 227 A.3d at 884 (quoting *Williams*, 129 A.3d at 1206); *In re Bruno*, 101 A.3d 635, 670 (Pa. 2014). "[T]he power of King's Bench allow[s] the Court to innovate a swift process and remedy appropriate to exigencies of the event." *In re Bruno*, 101 A.3d at 672.

The Court should grant the Application and exercise its King's Bench authority here. The 2022 general election day is rapidly approaching on November 8, 2022. The pre-canvass and canvass of absentee and mail-in ballots begin as early as that date. *See* 25 P.S. § 3146.8. There is not sufficient time for the "ordinary processes of law" to resolve the issues presented before the pre-canvass and canvass begin—and it may be impossible to grant effectual relief after that time, particularly if county boards of elections do not segregate undated or incorrectly dated absentee and mail-in ballots. *Friends of Danny DeVito*, 227 A.3d at 884. Those issues are of vital importance: voting is among "the most central of democratic rights," *League of Women Voters v. Commonwealth*, 178 A.3d 737, 741 (Pa. 2018),

and Voter Petitioners face the threat of an irreparable dilution of their votes if—as the Acting Secretary has purported to direct—county boards of elections include invalid undated or incorrectly dated absentee or mail-in ballots in their official vote totals. Indeed, the application of the General Assembly's date requirement is an "issue of public importance," *Friends of Danny DeVito*, 227 A.3d at 884, bearing on "the integrity of our electoral process" in Pennsylvania, *Purcell*, 549 U.S. at 5. The Court should grant the Application and resolve it now.

## ARGUMENT

The General Assembly's straightforward mandate that any voter who uses an absentee or mail-in ballot "shall . . . fill out, date and sign the declaration," 25 P.S. §§ 3146.6(a), 3150.16(a), is valid under state and federal law. The Court should grant the Application and enter an order (i) declaring that county boards of elections may not count any undated or incorrectly dated absentee or mail-in ballot; (ii) declaring that the Acting Secretary's contrary guidance is invalid; and (iii) directing county boards of elections to segregate any undated or incorrectly dated absentee or mail-in ballots received in connection with the 2022 general election.

### I. A Majority Of This Court Has Already Upheld The Mandatory Date Requirement Under State Law.

A majority of this Court has already held that the General Assembly said what it meant and meant what it said: the date requirement is mandatory, and any ballot

that does not comply with it may not be counted in any election after the 2020 general election. *See In re 2020 Canvass*, 241 A.3d at 1079-80 (Opinion of Justice Wecht); *see also id.* at 1082 ("A court's only 'goal' should be to remain faithful to the terms of the statute that the General Assembly enacted, employing only one juridical presumption when faced with unambiguous language: that the legislature *meant what it said*."); *id.* at 1090-91 (Opinion of Justices Dougherty, Saylor, and Mundy). This holding makes perfect sense: "[t]he word 'shall,'" particularly when used in the Election Code, "carries an imperative or mandatory meaning." *In re Canvass of Absentee Ballots of Nov. 4, 2003 General Election*, 843 A.2d 1223, 1231 (Pa. 2004).

Moreover, "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin City Area New Party*, 520 U.S. 351, 358 (1997). "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). In Pennsylvania, the decision whether to impose a date requirement for absentee and mail-in ballots is entrusted to the General Assembly—and it has clearly spoken. *See In re 2020 Canvass*, 241 A.3d at 1079-

80, 1082 (Opinion of Justice Wecht); *id.* at 1090-91 (Opinion of Justices Dougherty, Saylor, and Mundy).

That alone is sufficient to mandate upholding the commonsense and evenhanded date requirement. But if more were somehow needed, Justices of this Court have recognized that the General Assembly's date requirement serves "an unquestionable purpose." *Id.* at 1090 (Opinion of Justices Dougherty, Saylor, and Mundy). In particular, the date on the ballot envelope "provides proof of when the elector actually executed the ballot in full, ensuring their desire to cast it in lieu of appearing in person at the polling place." *Id.* "The presence of the date also establishes a point in time against which to measure the elector's eligibility to cast the ballot." *Id.* And the date "ensures the elector completed the ballot within the proper time frame and prevents tabulation of potentially fraudulent back-dated votes." *Id.* at 1091.

These are no mere theoretical interests. Earlier this year, officials in Lancaster County discovered that an individual had cast a fraudulent ballot in her deceased mother's name. The evidence? The date provided on the outer envelope was April 26, 2022, twelve days *after* the mother had passed away. *See* Affidavit of Probable Cause ¶ 2, Police Criminal Complaint, *Com. v. Mihaliak*, No. CR-126-22 (June 3, 2002), a copy of which is attached as Ex. F.

This Court's declaration that the General Assembly's date requirement is mandatory should have been the end of the matter in Pennsylvania courts. For a while, it was. *See, e.g.*, *In re Election in Region 4 for Downington Sch. Bd. Precinct Uwchlan 1*, 272 A.3d 993 (Pa. Commw. 2022), *appeal denied*, 273 A.3d 508 (Pa. 2022); *Ritter v. Lehigh Cnty. Bd. of Elecs.*, 272 A.3d 989 (Pa. Commw. 2022), *appeal denied* 271 A.3d 1285 (Pa. 2022). But earlier this year, the Commonwealth Court issued two unpublished, non-precedential opinions that departed from the Election Code's plain text and the majority's reasoning. The Commonwealth Court rested this departure on two strands of reasoning, neither of which is persuasive.

*First*, the Commonwealth Court pointed to the Free and Equal Elections Clause, PA. Const. art. I, § 5, for the proposition that "the Election Code should be liberally construed so as not to deprive electors of their right to elect the candidate of their choice." *McCormick*, 2022 WL 2900112 at *13-14; *see also Chapman*, 2022 WL 4100998 at *13-25. But, of course, the Free and Equal Elections Clause and any rules of construction it requires were before this Court in 2020, when the majority concluded that the date requirement is mandatory such that non-compliant ballots may not be counted. *See In re 2020 Canvass*, 241 A.3d at 1079-80 (Opinion of Justice Wecht); *id.* at 1090-91 (Opinion of Justices Dougherty, Saylor, and Mundy). Moreover, as Justice Wecht reasoned, the Free and Equal Elections Clause does not support, much less require, liberal construction of the date requirement. To

the contrary, "[a] court's only 'goal' should be to remain faithful to the terms of the statute that the General Assembly enacted, employing only one juridical presumption when faced with unambiguous language: that the legislature *meant what it said*." *Id.* at 1082 (Opinion of Justice Wecht) (emphasis original).

*Second*, the Commonwealth Court noted that the majority in *In re 2020 Canvass* did not expressly address a case where "ballots that had exterior envelopes with incorrect dates were counted and included in the election totals." *McCormick*, 2022 WL 2900112, at *14; *see also Chapman*, 2022 WL 4100998, *24. The Commonwealth Court, however, nowhere explains how the fact that a *different* category of incorrectly dated ballots was *not* raised somehow erodes the General Assembly's clear mandate and the majority's reading of the date requirement. *See McCormick*, 2022 WL 2900112, at *14; *see also Chapman*, 2022 WL 4100998, *24. Nor could it, since the majority's reading broadly supports the General Assembly's date requirement in *all* applications, not merely as applied to some scenarios. *See In re 2020 Canvass*, 241 A.3d at 1079-80 (Opinion of Justice Wecht); *id.* at 1090-91 (Opinion of Justices Dougherty, Saylor, and Mundy). And, in all events, that putative distinction is irrelevant here, where Petitioners seek a declaration that any undated or incorrectly dated ballot is invalid and may not be counted.

Finally, any state judicial construction—such as the construction adopted by the Commonwealth Court this year—that fails to uphold the date requirement's plain

Case 1:22-cv-00339-SPB Document 281 Filed 04/21/23 Page 107 of 171

and mandatory meaning for federal elections violates the Elections Clause of the U.S. Constitution. The Elections Clause directs: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. CONST. art. I, § 4, cl. 1. "It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections," including related to "counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (Pa. 1932).

Thus, the Clause "delegate[s] to" state *legislatures*—but not any other organ of state government—the "authority to regulate election to" federal offices created by the Constitution. *Cook v. Gralike*, 531 U.S. 510, 522 (2010); *see also Republican Party of Pa. v. Degraffenreid*, 141 S. Ct. 732, 733 (2021) (Thomas, J., dissenting from the denial of certiorari) ("the Federal Constitution, not state constitutions, gives state legislatures authority to regulate federal elections[.]") (emphasis added). As Justice Alito observed, the "Clause could have said that these rules are to be prescribed 'by each State,' which would have left it up to each State to decide which branch, component, or officer of the state government should exercise that power, as States are generally free to allocate state power as they choose." *Moore v. Harper*, 142 S. Ct. 1089, 1090 (2022) (Alito, J., dissenting from the denial of application for stay). "But that is not what the Elections Clause says. Its language specifies a

particular organ of a state government, and we must take that language seriously." *Id.*; *see also Hawke v. Smith*, 253 U.S. 221, 227 (1920) (affirming that "legislature" means the "representative body which made the laws of the people"); *Smiley*, 285 U.S. at 365 (same).

Accordingly, state courts wield no authority to regulate federal elections and may not deploy broad and amorphous state constitutional provisions to rewrite state laws governing those elections. *See, e.g.*, U.S. CONST. art. I, § 4, cl. 1; *Smiley*, 285 U.S. at 366; *Republican Party of Pa.*, 141 S. Ct. at 733 (Thomas, J., dissenting from the denial of certiorari); *Moore*, 142 S. Ct. at 1090 (Alito, J., dissenting from the denial of application for stay). Thus, neither the Commonwealth Court nor this Court may erode, much less set aside, the General Assembly's mandatory date requirement as applied to federal elections. The Court should grant the Application and uphold the date requirement.

## II. Federal Law Does Not Preempt The Date Requirement.

As three Justices of the U.S. Supreme Court already have concluded, the notion that the federal materiality provision preempts the General Assembly's date requirement is "very likely wrong." *Ritter*, 142 S. Ct. at 1824 (Mem.) (Alito, J., dissenting from the denial of the application for stay). The materiality provision states:

> No person acting under color of law shall … deny the right of any individual to vote in any election because of an error or omission on

> any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

This provision does not preempt the General Assembly's express date requirement for at least three reasons. *First*, the materiality provision prohibits only "deny[ing] the right of any individual to vote," not imposing mandatory rules on the act of completing and casting a ballot. *Id.* The materiality provision therefore has no application to the date requirement because "[w]hen a mail-in ballot is not counted because it was not filled out correctly, the voter is not denied 'the right to vote.'" *Ritter*, 142 S. Ct. at 1825 (Mem.) (Alito, J., dissenting from the denial of the application for stay) (quoting 52 U.S.C. § 10101(a)(2)(B)). Rather, "that individual's vote is not counted because he or she did not follow the rules for casting a ballot." *Id.* An individual "may be unable to cast a vote for any number of reasons," such as showing up to the polls after Election Day, failing to use a secrecy envelope for an absentee or mail-in ballot, returning the ballot to the wrong location, or arriving at the wrong polling place. *Id.* Application of these rules does not deny the right to vote; nor does application of the date requirement. *See id.* at 1825 ("Even the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right."); *see also Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973) (application of

neutral state-law voting requirement does not "disenfranchise" voters); *Timmons*, 520 U.S. at 358 ("States may, and inevitably must, enact reasonable regulations" for effectuating votes); *Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021) ("Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules."); *DNC v. Wisconsin State Leg.*, 141 S. Ct. 28, 35 (Mem.) (Oct. 26, 2020) (Kavanaugh, J., concurring) ("In other words, reasonable election deadlines do not 'disenfranchise' anyone under any legitimate understanding of that term."). As the Fifth Circuit has reasoned in a precedential, non-vacated decision, "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" the federal materiality provision. *Vote.Org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022).

*Second*, the materiality provision requires that the error or omission be "material in determining whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B). It therefore regulates determinations of whether an individual is *qualified* to vote, not "requirements that must be met in order to cast a ballot that will be counted." *Ritter*, 142 S. Ct. at 1825 (Mem.) (Alito, J., dissenting from the denial of the application for stay); *see also Vote.Org*, 39 F.4th at 305 n.6; *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003) ("This provision was intended to address the practice of requiring unnecessary information *for voter registration*

with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify voters.") (emphasis added).   The date requirement has nothing to do with whether the individual satisfies the four qualifications to vote in Pennsylvania: being at least 18 years of age on the date of the election, having been a citizen of Pennsylvania for at least one month, having lived in the relevant election district for at least 30 days, and not being imprisoned for a felony.  *See* 25 P.S. § 1301.  It therefore falls outside the narrow sweep of the federal materiality provision for this reason as well.  *Ritter*, 142 S. Ct. at 1825-26 (Mem.) (Alito, J., dissenting from the denial of the application for stay).

*Third*, the materiality provision demands that the "record or paper" be related to an "application, registration, or other act requisite to voting."   52 U.S.C. § 10101(a)(2)(B).  To be sure, an absentee or mail-in ballot is a "record or paper." *Id.*  But casting a ballot constitutes the *act* of voting, not an application, registration, or other act *requisite* to voting.  *Ritter*, 142 S. Ct. at 1826 n.2 (Mem.) (Alito, J., dissenting from the denial of the application for stay).  It therefore would be an "awkward" statutory construction at best to extend the materiality provision to absentee and mail-in ballots and the date requirement.  *Id.*  Voting is voting; it is not an act requisite to voting.  The Court should grant the Application and uphold the General Assembly's date requirement.

## III. The Acting Secretary's Guidance Directly Contradicts The General Assembly's Date Requirement.

The Acting Secretary's guidance documents are not binding on the county boards of elections. *See* 25 P.S. §§ 2621, 2642; *Perzel v. Cortes*, 870 A.2d 759, 764 (Pa. 2005); *Hamilton v. Johnson*, 141 A. 846, 847 (Pa. 1928). Nor may the Acting Secretary act—or direct others to act—in contravention of law. *See also County of Fulton v. Sec.*, 276 A.3d 846 (Pa. Commw. 2022). The Acting Secretary's guidance nonetheless purports to direct county boards of elections to "include[] in the canvass and pre-canvass . . . [a]ny ballot-return envelope that is undated or dated with an incorrect date but has been timely received," Ex. A, in direct contravention of the General Assembly's date requirement. The conflict is obvious: the Acting Secretary's guidance instructs county boards of elections to count ballots that the General Assembly has mandated may not be counted. The guidance is therefore unlawful for that reason alone. *See* 25 P.S. §§ 3146.6(a), 3150.16(a); *see In re 2020 Canvass*, 241 A.3d at 1079-80 (Opinion of Justice Wecht); *id.* at 1090-91 (Opinion of Justices Dougherty, Saylor, and Mundy).

The Acting Secretary's guidance is unlawful for another reason as well. To the extent the Secretary attempts to "regulate"—and vitiate the General Assembly's date requirement as applied to—federal elections, the guidance violates the Elections Clause of the U.S. Constitution. *See, e.g.*, U.S. CONST. art. I, § 4, cl. 1; *Smiley*, 285 U.S. at 366; *Republican Party of Pa.*, 141 S. Ct. at 733 (Thomas, J., dissenting from

the denial of certiorari); *Moore*, 142 S. Ct. at 1090 (Alito, J., dissenting from the denial of application for stay). The Court should grant the Application and set aside the Acting Secretary's guidance.

**IV. The Court Should Immediately Order County Boards Of Elections To Segregate Any Absentee Or Mail-In Ballots That Do Not Comply With The Date Requirement.**

At a minimum, Petitioners have established a likelihood of success on the merits of their claim that the General Assembly's date requirement is mandatory and valid under state and federal law. *See supra* Parts I-III; *Summit Towne Center, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1001 (Pa. 2003). The Court therefore should immediately order all county boards of elections to segregate any absentee or mail-in ballots received for the 2022 general election that do not comply with the date requirement, including because they are undated or incorrectly dated. *See, e.g.*, *Republican Party of Pa. v. Degraffenreid*, No. 20A84, Order (Nov. 6, 2020) (Alito, J.) (ordering segregation of ballots pending result of dispute regarding Election Day received-by deadline); *McCormick*, 2022 WL 2900112, at *16 (ordering county boards of elections "to segregate the ballots that lack a dated exterior envelope" pending resolution of validity of such ballots).

This commonsense relief will protect the interests of the parties and promote judicial economy. The issue of whether the date requirement is mandatory "could well affect the outcome of the fall elections" in Pennsylvania. *Ritter*, 142 S. Ct. at

1824 (Alito, J., dissenting from the denial of the application for stay). Ordering county boards of elections to segregate ballots is therefore "necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages." *Summit Towne Center*, 828 A.2d at 1001. Absent this relief, a county board of elections that counts undated or incorrectly dated ballots cannot remove non-compliant ballots from its certified election results if this Court upholds the General Assembly's date requirement. The resulting dilution of Voter Petitioners' votes—and harm to the Republican Committees' voters and candidates—cannot be compensated through an award of damages.

Ordering segregation of non-compliant ballots thus will prevent the "greater injury" of vote dilution that "would result from refusing the injunction" and, by protecting all interested parties' rights pending any final resolution of the date requirement's validity, "will not substantially harm other interested parties." *Id.* Such an order will also "properly restore the parties to their status as it existed" under the plain statutory terms of the General Assembly's date requirement and the majority's reasoning in 2020. *Id.*

Moreover, an order requiring segregation of non-compliant ballots "is reasonably suited to abate the offending activity" of diluting Voter Petitioners' votes by counting invalid ballots. *Id.* And the order will advance the "public interest." *Id.* After all, such an order will promote "[c]onfidence in the integrity of our

electoral process," facilitate "the functioning of our participatory democracy," and eliminate the "consequent incentive to remain away from the polls" occasioned by the Commonwealth Court's and the Acting Secretary's refusal to adhere to the General Assembly's date requirement and the majority's reasoning. *Purcell*, 549 U.S. 1, 4–5 (2006). The Court should grant the Application.

**RELIEF REQUESTED**

Petitioners respectfully request that this Honorable Court:

a. Grant this application for the Court to exercise its King's Bench power or extraordinary jurisdiction;

b. Immediately order county boards of elections to segregate all absentee or mail-in ballots received for the 2022 general election that do not comply with the date requirement because they are undated or incorrectly dated;

c. Set a schedule for the expeditious resolution of this matter in advance of the November 8, 2022 commencement of the pre-canvass and canvass;

d. Declare that absentee and mail-in ballots that are undated or incorrectly dated cannot be included in the pre-canvass or canvass under the Election Code, 25 P.S. §§ 3146.6(a), 3150.16(a);

e. Direct the Acting Secretary to withdraw any and all guidance that purports to direct, require, or encourage county boards of elections to include undated or incorrectly dated absentee or mail-in ballots in the pre-canvass or canvass; and

f. Grant any other relief this Court deems necessary and appropriate.

Respectfully submitted,

Dated: October 16, 2022

*<u>/s/ Kathleen A. Gallagher</u>*
Kathleen A. Gallagher
PA I.D. #37950
Russell D. Giancola
PA. I.D. #200058
GALLAGHER GIANCOLA LLC
436 Seventh Avenue, 31st Floor
Pittsburgh, PA 15219
Phone: (412) 717-1900
kag@glawfirm.com
rdg@glawfirm.com

John M. Gore *
E. Stewart Crosland
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com
msowardsnewton@jonesday.com
scrosland@jonesday.com

* *Pro hac vice application forthcoming*

Case 1:22-cv-00339-SPB Document 281 Filed 04/21/23 Page 117 of 171

Thomas W. King, III *
Thomas E. Breth
DILLON, McCANDLESS, KING,
COULTER & GRAHAM, LLP
128 W. Cunningham St.
Butler, PA 16001
Phone: (724) 283.2200
tking@dmkcg.com
tbreth@dmkcg.com

* *General Counsel, Republican Party of Pennsylvania*

*Counsel for Petitioners*

**[J-85-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| DAVID BALL, JAMES D. BEE, JESSE D. DANIEL, GWENDOLYN MAE DELUCA, ROSS M. FARBER, LYNN MARIE KALCEVIC, VALLERIE SICILIANO-BIANCANIELLO, S. MICHAEL STREIB, REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, AND REPUBLICAN PARTY OF PENNSYLVANIA, | : | No. 102 MM 2022 |
| Petitioners | : | |
| v. | : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS ACTING SECRETARY OF THE COMMONWEALTH, AND ALL 67 COUNTY BOARDS OF ELECTIONS, | : | |
| Respondents | : | |

**SUPPLEMENTAL ORDER**

**PER CURIAM**

**AND NOW**, this 5th day of November, 2022, the Court hereby supplements its per curiam order dated November 1, 2022, wherein we directed, in part, that "[t]he Pennsylvania county boards of elections are hereby ORDERED to refrain from counting any absentee and mail-in ballots received for the November 8, 2022 general election that are contained in undated *or incorrectly* dated outer envelopes." (Emphasis added.) For purposes of the November 8, 2022 general election, "incorrectly dated outer envelopes" are as follows: (1) mail-in ballot outer envelopes with dates that fall outside the date range

of September 19, 2022, through November 8, 2022; and (2) absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022, through November 8, 2022. *See* 25 P.S. §§ 3150.12a, 3150.15, 3146.2a(a), 3146.5(a).

A True Copy Amy Dreibelbis, Esquire
As Of 11/05/2022

Attest: Amy J. Dreibelbis
Deputy Prothonotary
Supreme Court of Pennsylvania

G2022

**YOUR BALLOT WILL NOT BE COUNTED UNLESS:**

- ☐ You sign and date the voter's declaration in your own handwriting
- ☐ You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here

09/30/2022 11:06 AM

**Voter's declaration**

I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

REDACTED

9/25/22 RE DA

Today's Date (Required)

REDACTED

3-6-1944

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:**

I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

REDACTED

**Voter, mark here**

✖

DAU

**Today's Date**

**Witness, address (street)**

**Witness, address (city, zip code)**

**Witness, sign here**

# Voter's Declaration

**Voter's declaration:** I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Voter, sign or mark here (REQUIRED)**

REDACTED

04/21/1937

Date of signing (MM/DD/YYYY) **(REQUIRED)**

**IF you DO NOT follow the instructions your ballot may not be counted! Contact the Election office for assistance.**

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:** I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

X

Date of signing (MM/DD/YYYY)

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

REDACTED

002798

M

DID YOU...

- ☐ **SIGN & DATE** the voter's declaration in your own handwriting?
- ☐ **SEAL** your ballot inside the secrecy envelope labeled "Official Election Ballot" and place it in here?

IF, your ballot is not in the secrecy envelope **PLEASE** contact 814-355-6703 to be corrected.

# Voter's Declaration

**Voter's declaration:** I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Voter, sign or mark here (REQUIRED)**

REDACTED

12/6/1935

Date of signing (MM/DD/YYYY) (REQUIRED)

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:** I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

X

Date of signing (MM/DD/YYYY)

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

REDACTED
010733
M

**IF you DO NOT follow the instructions your ballot may not be counted! Contact the Election office for assistance.**

**DID YOU...**

- ☐ **SIGN & DATE the voter's declaration in your own handwriting?**
- ☐ **SEAL your ballot inside the secrecy envelope labeled "Official Election Ballot" and place it in here?**

IF, your ballot is not in the secrecy envelope, **PLEASE** contact 814-355-6703 to be corrected.

# Voter's Declaration

**Voter's declaration:** I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Voter, sign or mark here (REQUIRED)**

REDACTED

08/05/1935

Date of signing (MM/DD/YYYY) **(REQUIRED)**

**IF you DO NOT follow the instructions your ballot may not be counted! Contact the Election office for assistance.**

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:** I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

X

Date of signing (MM/DD/YYYY)

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

REDACTED

010569

M

DID YOU...

- ☐ **SIGN & DATE** the voter's declaration in your own handwriting?
- ☐ **SEAL** your ballot inside the secrecy envelope labeled "Official Election Ballot" and place it in here?

IF your ballot is not in the secrecy envelope **PLEASE** contact 814-355-6703 to be corrected.

# Voter's Declaration

**Voter's declaration:** I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Voter, sign or mark here (REQUIRED)**

REDACTED

11/21/1942

Date of signing (MM/DD/YYYY) **(REQUIRED)**

**IF you DO NOT follow the instructions your ballot may not be counted! Contact the Election office for assistance.**

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:** I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

X

Date of signing (MM/DD/YYYY)

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

REDACTED

011789

M

**DID YOU...**

- ☐ **SIGN & DATE** the voter's declaration in your own handwriting?
- ☐ **SEAL** your ballot inside the secrecy envelope labeled "Official Election Ballot" and place it in here?

IF, your ballot is not in the secrecy envelope **PLEASE** contact 814-355-6703 to be corrected.





CONFIDENTIAL

### Voter's declaration

I hereby declare that I am qualified to vote in this election; that I have not already voted in this electio and I further declare that I marked my ballot in secre I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to b voided, to the judge of elections at my polling place

Voter, sign or mark here (Required)

Today's Date (Required)

Nov 4, 2022

'05439405-26 50010-1

YOUR BALLOT WILL NOT BE COUNTED UNLESS:

☐ You sign and date the voter's declaration in your own handwriting

☐ You seal your ballot inside the white secrecy envelope ("Official Election Ballot") and place it in here

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:**

I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reas of my illness or physical disability. I have made c received assistance in making my mark in lieu of my signature.

Voter, mark here

Today's Date

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

COUNTY OF BERKS
633 COURT ST FL 1C
READING PA 19601-9956

238245882

ADAM SCOTT CHERNOW
M440002-1
FLEETWOOD BORO - 2ND PRECINCT

BC010003000835

OFFICIAL ELECTION MAIL

BUSINESS REPLY MAIL
FIRST-CLASS MAIL PERMIT NO 2093 READING PA

POSTAGE WILL BE PAID BY ADDRESSEE

COUNTY OF BERKS
633 COURT ST FL 1C
READING PA 19601-9956

NO POSTAGE NECESSARY IF MAILED IN THE UNITED STATES

FLEETWOOD PA 19522 NOV - 3 2022

BERKS COUNTY, PA
2022 NOV -4 PM 3:01
ELECTION SERVICES

**Your ballot must have the following to be counted:**
- ☐ You sign and date the voter's declaration in your own handwriting
- ☐ You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here

**Su papeleta electoral debe incluir todo lo siguiente para que se cuente:**
- ☐ Usted firma y pone la fecha en la declaración del votante de su puño y letra
- ☐ Usted selle el sobre de confidencialidad (que dice "papeleta electoral oficial") con su papeleta adentro y lo coloca aquí

**Voter's declaration**
- I hereby declare that
  - I am qualified to vote in this election;
  - I have not already voted in this election;
  - I marked my ballot in secret.
  - I am qualified to vote the enclosed ballot.
- I understand I am no longer eligible to vote at my polling place after I return my voted ballot.
- However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Declaración del votante**
- Por la presente afirmo que
  - reúno los requisitos para votar en estas elecciones;
  - no he votado aún en estas elecciones;
  - marqué mi papeleta de manera secreta.
  - reúno los requisitos para votar con la papeleta adjunta
- Comprendo que ya no seré elegible para votar en mi lugar de votación después de devolver mi papeleta con mi voto
- Sin embargo, si el condado no recibe mi papeleta, comprendo que solo podré votar con una papeleta provisional en mi lugar de votación, a menos que le entregue mis materiales de votación al juez de elecciones en mi lugar de votación para que los anule.

**Voter, sign or mark here (required) / Votante, firme o marque aquí (obligatorio)**

X [redacted]

11/03/2023

**Today's date (required) / Fecha de hoy (obligatorio)**

**For county election use only**

**Solo para uso del personal electoral del condado**

**To be completed by voter unable to sign their declaration because of illness or physical disability:**
I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**El votante que no pueda firmar su declaración debido a una enfermedad o discapacidad física debe completar lo siguiente:**
Por la presente declaro que no puedo firmar mi declaración para finalizar mi papeleta sin ayuda, ya que no puedo escribir debido a mi enfermedad o discapacidad física. He puesto mi marca o recibí ayuda para ponerla, en lugar de mi firma.

**Voter, mark here / Votante, marque aquí**

X

**Today's date (required) / Fecha de hoy (obligatorio)**

**Witness, address (street) / Testigo, dirección (calle)**

**Witness, address (city, zip code) / Testigo, dirección (ciudad, código postal)**

**Witness, sign here / Testigo, firme aquí**

Berks - 00051

CONFIDENTIAL
ATTORNEY EYES ONLY INFORMATION

**Your ballot WILL NOT be counted unless:**

- You sign and date the voter's declaration in your own handwriting.
- You seal your ballot inside the plain white secrecy envelope that reads "Official Election Ballot" and place it in here.

COUNTY OF LYCOMING
2022 OCT 31 A 11: 21
VOTER REG/BD OF ELECTION

**Voter's declaration**

I hereby declare that I am qualified to vote from the below stated address at this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Voter, sign or mark here (required)**

**Today's date (MM/DD/YYYY) (required)**

✖ 10-26-2002

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:**

I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

✖

**Today's date (MM/DD/YYYY) (required)**

✖

**Witness, address (street)**

**Witness, address (city, zip code)**

**Witness, sign here**

234083393

012400152-41 1400-0 M

LYC

**YOUR BALLOT WILL NOT BE COUNTED UNLESS:**

- ☐ You sign and date the voter's declaration in your own handwriting
- ☐ You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here

**Voter's declaration**

I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

10- -2022

Today's Date (Required)

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:**

I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

10/19/22 13:44:56

Voter, mark here

✕

Today's Date

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

**YOUR BALLOT WILL NOT BE COUNTED UNLESS:**

- ☐ You sign and date the voter's declaration in your own handwriting
- ☐ You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here

**Voter's declaration**

I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

10/ /2022

**Today's Date (Required)**

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:**

I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

10/ /2022

**Today's Date**

**Witness, address (street)**

**Witness, address (city, zip code)**

**Witness, sign here**

10/11/22 17:18:51

# Voter's Declaration

I hereby declare that I am qualified to vote in this election; that I have not already voted in this election and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

Voter, sign or mark here (REQUIRED)

10/ /2022

Today's Date (REQUIRED)

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:** I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

Today's Date (REQUIRED)

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

AC_001300

**IF you DO NOT follow the instructions your ballot may not be counted! Contact the Election office for assistance.**

10/31/22 10:55:28

001590

YOUR BALLOT WILL NOT BE COUNTED UNLESS:

- You sign and date the voter's declaration in your own handwriting
- You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here.

# Voter's Declaration

I hereby declare that I am qualified to vote in this election; that I have not already voted in this election and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Voter, sign or mark here (REQUIRED)**

Thu. OCT 6

Today's Date **(REQUIRED)**

**IF you DO NOT follow the instructions your ballot may not be counted! Contact the Election office for assistance.**

10/11/22 10:56:35

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:** I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

Today's Date **(REQUIRED)**

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

**YOUR BALLOT WILL NOT BE COUNTED UNLESS:**

- ■ **You sign and date the voter's declaration in your own handwriting**
- ☐ **You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here.**

AC_000451

# Voter's Declaration

I hereby declare that I am qualified to vote in this election; that I have not already voted in this election and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

Voter, sign or mark here (REQUIRED)

Wednesday Oct. 26

Today's Date (REQUIRED)

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:** I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

Today's Date (REQUIRED)

Witness, address (street)

Witness, address (city, zip code)

Witness, sign here

**IF you DO NOT follow the instructions your ballot may not be counted! Contact the Election office for assistance**

10/31/22 10:53:27

023048

YOUR BALLOT WILL NOT BE COUNTED UNLESS:

- You sign and date the voter's declaration in your own handwriting
- You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here.

A

**Voter's declaration**

I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Voter, sign or mark here (Required)**

~~10/14/2023~~ 10/14/2022

**Today's Date (Required)**

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:**

I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

X

**Today's Date**

**Witness, address (street)**

**Witness, address (city, zip code)**

**Witness, sign here**

**YOUR BALLOT WILL NOT BE COUNTED UNLESS:**

☑ You sign and date the voter's declaration in your own handwriting

☑ You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here

0013456498-04 3605-1 M
GILES, KAREN W
2109 RIDGE RD
MONACA, PA 15061
2318 14359

BUSINESS REPLY MAIL
FIRST-CLASS MAIL PERMIT NO. 170 BEAVER PA
POSTAGE WILL BE PAID BY ADDRESSEE

BOARD OF ELECTIONS
BEAVER COUNTY COURTHOUSE
810 3RD ST
BEAVER PA 15009-9903

PITTSBURGH PA 15
14 OCT 2022 PM 4 L








001375369-04 1004-1 M
TUSICK, KEVIN
124 SUNRAY DR
ALIQUIPPA PA 15001-1494
231824979

A

**Voter's declaration**

I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

**Voter, sign or mark here (Required)**

X [redacted]

10/23/2022 KT

**Today's Date (Required)**

OFFICIAL ELECTION MAIL

**BUSINESS REPLY MAIL**

FIRST-CLASS MAIL PERMIT NO. 170 BEAVER PA

POSTAGE WILL BE PAID BY ADDRESSEE

BOARD OF ELECTIONS
BEAVER COUNTY COURTHOUSE
810 3RD ST
BEAVER PA 15009-9903

Processed On:10/26/22 10:40:23-A

NO POSTAGE NECESSARY IF MAILED IN THE UNITED STATES

**To be Completed by Voter Unable to Sign their Declaration Because of Illness or Physical Disability:**

I hereby declare that I am unable to sign my declaration for voting my ballot without assistance because I am unable to write by reason of my illness or physical disability. I have made or received assistance in making my mark in lieu of my signature.

**Voter, mark here**

X

**Today's Date**

**Witness, address (street)**

**Witness, address (city, zip code)**

**Witness, sign here**

**YOUR BALLOT WILL NOT BE COUNTED UNLESS:**

1. You sign and date the voter's declaration in your own handwriting
2. You seal your ballot inside the secrecy envelope ("Official Election Ballot") and place it in here

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>AL SCHMIDT, *in his official capacity as Acting Secretary of the Commonwealth*, *et al.*,<br><br>Defendants. | No. 1:22-cv-339<br>Judge Susan Paradise Baxter |

**RESPONSE OF AL SCHMIDT TO INTERVENOR-DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS**

## I.     THE PARTIES

### A.     Plaintiffs

1.     Plaintiff the Pennsylvania State Conference of the NAACP is a "non-profit, nonpartisan organization" which "engages in efforts to get out the vote." Ex. 1, Am. Compl. ¶¶ 11-12 (Dkt. No. 121).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

2.     Plaintiff the League of Women Voters of Pennsylvania is a "nonpartisan statewide non-profit" whose "mission includes voter registration, education, and get-out-the-vote drives." *Id.* ¶¶ 14-15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

3.     Plaintiff Philadelphians Organized to Witness, Empower and Rebuild is "a Pennsylvania nonprofit" whose "civic engagement efforts include voter education programs, voter registration drives, information about applying for mail ballots, completing them properly and returning them on time, and 'Souls to the Polls' efforts to encourage congregants to vote." *Id.* ¶¶ 17-18.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

4. Plaintiff Common Cause Pennsylvania is "a non-profit political advocacy organization and a chapter of the national Common Cause organization," and "seeks to increase the level of voter registration and voter participation in Pennsylvania elections." *Id.* ¶¶ 21-22.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

5. Plaintiff Black Political Empowerment Project is "a non-profit, non-partisan organization" whose "work includes voter registration drives, get-out-the-vote activities, education and outreach about the voting process, and election-protection work." *Id.* ¶¶ 24-25.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

6. Plaintiff Make the Road Pennsylvania is "a not-for-profit, member-led organization" whose "work includes voter protection voter advocacy and voter education." *Id.* ¶¶ 26-27.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

7.      Plaintiffs Barry M. Seastead, Marlene G. Gutierrez, Aynne Margaret Pleban Polinski, Joel Bencan, and Laurence M. Smith plead that they are registered voters in Pennsylvania. *Id.* ¶¶ 30, 32, 34, 35, 36.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

**B.      Named Defendants**

8.      Defendant Al Schmidt is Acting Secretary of the Commonwealth. https://www.dos.pa.gov/about-us/Pages/Secretary-of-the-Commonwealth.aspx.

**Response**: Admitted.

9.      The Secretary of the Commonwealth has the duty "[t]o receive from county boards of elections the returns of primaries and elections, to canvass and compute the votes cast for candidates and upon questions as required by the provisions of this act." 25 P.S. § 2621(f).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead

comprises only statements or conclusions of law. Accordingly, no response is required thereto.

10. Defendant County Boards of Elections have "jurisdiction over the conduct of primaries and elections in [their respective] count[ies], in accordance with the provisions of this act." 25 P.S. § 2641(a).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

**C. Intervenor-Defendants**

11. The Republican National Committee is the national committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

12. The National Republican Congressional Committee is the national congressional committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

13. The Republican Party of Pennsylvania is a major political party, 25 P.S. § 2831(a), and the "State committee" for the Republican Party in Pennsylvania, 25 P.S. § 2834, as well as a federally registered "State Committee" of the Republican Party as defined by 52 U.S.C. § 30101(15).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

14. Any court order purporting to change the law and direct counting of undated or incorrectly dated mail-in or absentee ballots would inflict significant

harm on Intervenor-Defendants. *See* Ex. 2, Intervenor-Defendants' Resps. & Objs. To Plaintiffs' First Set of Interrogs. #1.

**Response**: This paragraph purports to set forth statements or conclusions of law to which no response is required. By way of further response, enforcement of the Materiality Provision of the Civil Rights Act does not "change the law," nor does it inflict any harm.

15. Unlawful counting of ballots undermines the integrity of elections, generates voter confusion, and erodes public confidence in elections. Therefore, unlawful counting of ballots can discourage voters, including Republican voters, from voting or otherwise participating in elections and, thus, change the outcome of election contests in Pennsylvania. *See id.* at 7-8; *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. By way of further response, enforcement of the Materiality Provision of the Civil Rights Act does not result in the "[u]nlawful counting of ballots," "generate[] voter confusion," "erode[] public confidence in elections," or "change the outcome of election contests in Pennsylvania."

16.     Intervenor-Defendants were the prevailing parties in the *Ball* litigation upholding the date requirement, so any court order invalidating the date requirement harms Intervenor-Defendants' rights secured in that litigation. *See* Ex. 2 at Interrog. #1.

**Response**: This paragraph purports to set forth statements or conclusions of law to which no response is required. Further, this paragraph purports to summarize the Supreme Court of Pennsylvania's decision in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), which is in writing and speaks for itself, and any characterization contrary to that writing is denied. By way of further response, the enforcement of the Materiality Provision of the Civil Rights Act does not inflict harm.

17.     As political parties, Intervenor-Defendants expend substantial resources toward educating, mobilizing, assisting, and turning out voters in Pennsylvania and supporting Republican candidates up and down the ballot. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

18.     These efforts include devoting time and resources toward training and education programs that ensure that Intervenor-Defendants and their voters understand the rules governing the election process, including applicable dates, deadlines, and requirements for voting by mail or absentee. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

19. The efforts also encompass training, education, and monitoring of the voting and vote counting process in Pennsylvania to ensure it is conducted lawfully. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

20. Any change in the laws governing Pennsylvania elections harms Intervenor-Defendants by rendering their training, voter education, and monitoring programs less effective, wasting the resources they have devoted to such programs, and requiring them to expend new resources to update those programs. *Id.*

**Response**: This paragraph purports to set forth conclusions of law to which no response is required. By way of further response, the enforcement of the Materiality Provision of the Civil Rights Act is not a "change in the laws governing Pennsylvania elections" and does not inflict any harm.

21. For instance, the Republican Party of Pennsylvania has statutory rights to appoint poll watchers to observe casting, counting, and canvassing of ballots at the polling place, 25 P.S. § 2687(a), and an "authorized representative" to "remain

in the room" at the county board of elections and observe the pre-canvass and canvass of "absentee ballots and mail-in ballots," *id.* §§ 3146.8(g)(1.1)-(2). See Ex. 2 at Interrog. #1.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph asserts that the Republican Party of Pennsylvania has certain "statutory rights" or characterizes those purported rights, it sets forth conclusions of law to which no response is required.

22.    The Republican Party of Pennsylvania has exercised these statutory rights in the past several election cycles and will do so again in future election cycles. *See id.*

**Response**: To the extent this paragraph comprises factual allegations, The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph asserts that the Republican Party of Pennsylvania has certain "statutory rights" or characterizes those purported rights, it sets forth conclusions of law to which no response is required.

23.    In conjunction with its Election Integrity Operations, the Republican Party of Pennsylvania devotes substantial time and resources toward the recruitment

and training of poll workers, poll watchers, and volunteers throughout the 67 counties of the Commonwealth to assist voters on election day, to observe the casting and counting of ballots at the polling place, and to observe the pre-canvass and canvass of absentee and mail-in ballots at the county board of elections. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

24. As part of its Election Integrity Operations, the Republican Party of Pennsylvania also devotes substantial time and resources toward the recruitment and training of a "ground team" of lawyers throughout the Commonwealth who stand ready on Election Day to assist poll workers, poll watchers, and volunteers should questions arise as to elections laws or the voting process within the Commonwealth. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

25. The Republican Party of Pennsylvania's Election Integrity Operations, training programs, and voter education programs include training and information regarding the requirements for voters to cast lawful and valid ballots, and the

governing rules delineating unlawful and invalid ballots and preventing election officials from pre-canvassing, canvassing, or counting such ballots. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

26. Any change in the laws governing Pennsylvania elections harms the Republican Party of Pennsylvania by rendering its Election Day Operations, training programs, and voter education programs less effective, wasting the resources they have devoted to such programs, and requiring them to expend new resources to update those programs. *Id.*

**Response**: This paragraph purports to set forth conclusions of law to which no response is required. By way of further response, enforcement of the Materiality Provision of the Civil Rights Act is not a "change in the laws governing Pennsylvania elections" and does not inflict any harm.

27. Any change in the laws governing Pennsylvania elections could affect the outcome of an election in which Intervenor-Defendants, their voters, and their supported candidates exercise their constitutional rights to vote and to participate. *Id.*

**Response**: It is admitted only that *some* changes in the laws governing Pennsylvania elections could potentially affect the outcome of an election. The

allegations that *any* change in those laws could affect an election outcome is overbroad and unsupported by the record. Further, to the extent this paragraph purports to set forth conclusions of law, no response is required thereto. By way of further response, enforcement of the Materiality Provision of the Civil Rights Act is not a "change in the laws governing Pennsylvania elections."

28. The Third Circuit's failure to enforce the date requirement in *Migliori v. Cohen* actually did change the outcome of an election in which a Republican candidate had prevailed. See Ex. 3, Cert. Pet. at 7-12, *Ritter v. Migliori*, No. 22-30 (U.S. July 7, 2022), https://www.supremecourt.gov/DocketPDF/22/22-30/229591/20220707140738344_Ritter%20Petition.pdf.

**Response**: Denied. This paragraph purports to set forth conclusions of law to which no response is required. Further, this paragraph purports to summarize the Third Circuit Court of Appeals' decision in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir.), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022), which is in writing and speaks for itself, and any characterization contrary to that writing is denied. Additionally, in *Migliori*, the court did not "fail" to enforce anything. Rather, the court applied the Materiality Provision of the Civil Rights Act and concluded that "the dating provisions in 25 Pa. Cons. Stat. §§ 3146.6(a) and 3150.16(a) are immaterial under § 10101(a)(2)(B)." *Id.* at 164. Further, the court's decision in *Migliori* did not "change" the outcome of an election. The court merely

enforced the Materiality Provision of the Civil Rights Act so as to count all ballots required to be counted under the controlling law. *See id.*

## II.     THE DATE REQUIREMENT

29.     Pennsylvania's election laws provide a date requirement for absentee and mail-in voting. 25 P.S. § 3146.6(a); § 3150.16(a).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

30.     In both provisions, the wording of the date requirement is the same: "The elector shall then fill out, date and sign the declaration printed on such envelope." 25 P.S. § 3146.6(a); § 3150.16(a).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

### A.     The Date Requirement Has Been A Part Of Pennsylvania's Election Code Since 1945.

31.    The first version of the Election Code permitted some active military members to vote by mail. Ex. 4, Act of June 3, 1937, P.L. 1333, No. 320, §§ 1327-1330, 1937 Pa. Laws 1333, 1442-44.

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

32.    In 1945, the mail ballot provision was amended to require that the jurat on the ballot-return envelope be dated. Ex. 5, Act of Mar. 9, 1945, P.L. 29, No. 17, sec. 10, § 1306, 1945 Pa. Laws 29, 37.

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

33.    Eighteen years later, the General Assembly enacted the date requirement in its current form, providing that "[t]he elector shall then fill out, date and sign the declaration printed on such envelope." Ex. 6, Act of Aug. 13, 1963, P.L. 707, No. 379, sec. 22, § 1304, 1963 Pa. Laws. 707, 736.

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

34. In 2019, the General Assembly passed Act 77, extending the option to vote by mail to all qualified voters, and adopting the date requirement for such ballots. Ex. 7, Act 77, P.L. 552, sec. 8 (Oct. 31, 2019).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto.

35. Act 77 also provides that section 8—containing the date requirement—is "nonseverable," and that "[i]f any provision of this act or its application to any person or circumstance is held invalid, the remaining provisions or applications of this act are void." Ex. 8, Act 77, P.L. 552, sec. 11 (Oct. 31, 2019).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead

comprises only statements or conclusions of law. Accordingly, no response is required thereto.

**B. The Date Requirement Has Been A Subject Of Multiple Recent Lawsuits.**

36. After seven cases in five courts over two years, the current state of the law is that the General Assembly's date requirement is mandatory and that any noncompliant absentee or mail-in ballot may not be counted.

**Response**: Denied. This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. Additionally, the Third Circuit Court of Appeal's decision in *Migliori* that "the dating provisions in 25 P.S. §§ 3146.6(a) and 3150.16(a) are immaterial under § 10101(a)(2)(B)," 36 F.4th at 164, was vacated solely on mootness grounds, pursuant to the *Munsingwear* doctrine, and is still persuasive authority. *See Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993). Since then, the Commonwealth Court of Pennsylvania has twice agreed with *Migliori*'s materiality analysis, *see McCormick for U.S. Senate v. Chapman*, No. 286 M.D. 2022, 2022 WL 2900112, at *10-12 (Pa. Commw. June 2, 2022); *Chapman v. Berks Cnty. Bd. of Elections*, No. 355 M.D. 2022, 2022 WL 4100998, at *26-29 (Pa. Commw. Aug. 19, 2022), and the Supreme Court of Pennsylvania did

not reverse those decisions, dividing evenly 3-3 on the question of whether the dating provisions of Pennsylvania Election Law are material under the Civil Rights Act, *see Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022).

37. In 2020, a majority of the Pennsylvania Supreme Court held that the date requirement is mandatory and that election officials may not count any noncompliant ballot in any election after the 2020 general election. *See In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1079–80 (2020) (Opinion of Justice Wecht); *id.* at 1090–91 (Opinion of Justice Dougherty, Chief Justice Saylor, and Justice Mundy).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. Further, this paragraph purports to summarize the Supreme Court of Pennsylvania's decision in *In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (2020), which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

38. In the first two cases following that ruling, the Pennsylvania Commonwealth Court upheld mandatory application of the date requirement. *See In re Election in Region 4 for Downington Sch. Bd. Precinct Uwchlan 1*, 272 A.3d 993

(Pa. Commw. 2022) (unpublished), *appeal denied*, 273 A.3d 508 (Pa. 2022); *Ritter v. Lehigh Cnty. Bd. of Elections*, 272 A.3d 989 (Pa. Commw. 2022) (unpublished), *appeal denied*, 271 A.3d 1285 (Pa. 2022).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. Further, this paragraph purports to summarize the Commonwealth Court of Pennsylvania's decisions in *In re Election in Region 4 for Downington Sch. Bd. Precinct Uwchlan 1*, 272 A.3d 993 (Pa. Commw. 2022) and *Ritter v. Lehigh Cnty. Bd. of Elections*, 272 A.3d 989 (Pa. Commw. 2022), which are in writing and speak for themselves, and any characterization contrary to those writings are denied.

39.    Four days after the Pennsylvania Supreme Court resolved *Ritter*, individual voters filed a new lawsuit in federal court claiming that the date requirement violates the federal materiality provision, 52 U.S.C. § 10101(a)(2)(B). See Ex. 9, Compl., *Migliori v. Lehigh County Bd. of Elections*, No. 5:22-cv-397 (E.D. Pa. Jan. 31, 2022), ECF No. 1.

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead

comprises only statements or conclusions of law. Accordingly, no response is required thereto. Further, this paragraph purports to summarize the complaint in *Migliori v. Lehigh County Bd. of Elections*, No. 22-cv-397 (E.D. Pa.), which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

40. The Third Circuit agreed with the plaintiffs, but the U.S. Supreme Court vacated that decision. *See Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *cert. granted and judgment vacated, Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (Mem.).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. Further, this paragraph purports to summarize the Third Circuit Court of Appeals' decision in *Migliori*, and the Supreme Court's subsequent order in *Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (Mem.), which are in writing and speak for themselves, and any characterization contrary to those writings are denied. By way of further response, the Supreme Court vacated *Migliori* solely on mootness grounds, pursuant to the *Munsingwear* doctrine, *see id.*,

Case 1:22-cv-00339-SPB Document 299 Filed 05/05/23 Page 21 of 78

and the opinion is still persuasive authority. *See Polychrome Int'l Corp. v. Krigger*, 5 F.3d at 1534.

41. When addressing a request for a stay at an earlier stage in that case, three Justices opined that the Third Circuit's now-vacated holding was "very likely wrong" on the merits because it rested upon a misconstruction of the materiality provision. *Ritter*, 142 S. Ct. at 1824 (Mem.) (Alito, J., dissenting from the denial of the application for stay).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. Further, this paragraph purports to summarize Justice Alito's dissent from denial of application for stay in *Ritter v. Migliori*, 142 S. Ct. 1824 (June 9, 2022) (Mem.) (Alito, J., dissenting from denial of stay), which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

42. The Commonwealth Court twice invoked the Third Circuit decision to depart from the General Assembly's date requirement in unpublished, non-precedential cases arising out of the 2022 primary election. *See McCormick for U.S. Senate v. Chapman*, 2022 WL 2900112 (Pa. Commw. June 2, 2022) (unpublished);

*Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 (Pa. Commw. Aug. 19, 2022) (unpublished).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. Further, this paragraph purports to summarize the Commonwealth Court of Pennsylvania's decisions in *McCormick for U.S. Senate v. Chapman*, 2022 WL 2900112 (Pa. Commw. June 2, 2022) and *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 (Pa. Commw. Aug. 19, 2022), which are in writing and speak for themselves, and any characterization contrary to those writings are denied.

43. Finally, in November 2022, the Pennsylvania Supreme Court exercised its original jurisdiction to reaffirm that the General Assembly's date requirement is mandatory. *Ball v. Chapman*, 284 A.3d 1189 (Pa. 2022).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. Further, this paragraph purports to summarize the Supreme Court

of Pennsylvania's Order in *Ball v. Chapman*, 284 A.3d 1189 (Pa. 2022), which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

44.     In that litigation, Acting Secretary Leigh M. Chapman agreed that the signature requirement is valid and mandatory and does not violate the federal materiality provision. Ex. 10, Acting Sec'y Ans. 15–23, *Ball v. Chapman*, No. 102 MM 2022 (Oct. 19, 2022).

**Response**: This paragraph purports to summarize the Acting Secretary's Answer to the Application to Exercise King's Bench Power or Extraordinary Jurisdiction in *Ball v. Chapman*, which is in writing and speaks for itself, and any characterization contrary to that writing is denied. By way of further response, the Acting Secretary states that the provisions of Pennsylvania election law directing voters to sign declarations in connection with their submission of absentee and mail-in ballots are material under the Civil Rights Act. The signed declaration affirms the "statement of the elector's qualifications," 25 P.S. §§ 3146.4, 3150.14, and attests that the person who completed the ballot is qualified to vote. Accordingly, omission of a voter's signature is material to determining whether the person who completed the ballot is "qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

45. The Acting Secretary also conceded in that litigation that the secrecy envelope does not violate the federal materiality provision. *Id.* at 39 n.15.

**Response**: This paragraph purports to summarize the Acting Secretary's Answer to the Application to Exercise King's Bench Power or Extraordinary Jurisdiction in *Ball v. Chapman*, which is in writing and speaks for itself, and any characterization contrary to that writing is denied. By way of further response, the secrecy envelope provisions of Pennsylvania election law concerning absentee and mail-in ballots do not implicate the Materiality Provision of the Civil Rights Act. Section 10101(a)(2)(B) applies only to errors or omissions "*on* any record or paper." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Failing to use a secrecy envelope is not an error or omission *on* any record or paper.

46. In an opinion that followed, the Pennsylvania Supreme Court held that the date requirement refers to the "day upon which an elector signs the declaration," and noted that "[t]o hold otherwise would be to require unnecessarily specific drafting on the part of the General Assembly." *Ball v. Chapman*, 289 A.3d 1, 23 (Pa. 2023).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is

required thereto. Further, this paragraph purports to summarize the Supreme Court of Pennsylvania's decision in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

47. The Pennsylvania Supreme Court was evenly divided on whether the federal materiality provision invalidates the date requirement. *Id.* at 9.

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is required thereto. Further, this paragraph purports to summarize the Supreme Court of Pennsylvania's decision in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

### C. *Commonwealth v. Mihaliak*

48. The date requirement has already been used to detect election fraud. *See* Ex. 11, Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022), at 100-116, 141-153.

**Response**: It is denied that Intervenor-Defendants' Exhibit 11 supports the allegations of this paragraph as stated.[1] In the hearing transcript in *Chapman* cited in this paragraph, Deputy Secretary for Elections and Commissions Jonathan Marks testified that the date on a ballot submission "hypothetically … might be relevant" in detecting fraud. Ex. A to Appendix of Acting Secretary Al Schmidt, Complete Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022) at p. 103. Deputy Secretary Marks did not testify that a declaration date had ever actually been instrumental in detecting election fraud. Additionally, as shown by the hearing transcript in *Chapman* cited in this paragraph, Lancaster County Commissioner Ray D'Agostino testified that the ballot at issue was first flagged as potentially fraudulent because, when it was scanned, "the SURE system popped up and said that the person was deceased," before any review of the date on the outer envelope of the ballot submission. *Id.* at p. 145. He further testified that the ballot would "not have counted regardless of the date," and thus the date had

[1] A complete copy of the hearing transcript in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022), is attached to the Appendix of Acting Secretary Schmidt as Exhibit A.

no bearing on Lancaster County's decision to reject the ballot. *Id.* at p. 148. By way of further response, Intervenor-Defendants' Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), and Exhibit A to Appendix of Acting Secretary Al Schmidt, Complete Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022) at pp. 145-148, show that the voter in whose name the ballot at issue was submitted had died—and was known to the county board of elections to have died—two weeks before the ballot was received by the county board. The handwritten declaration date was not the basis for the ballot's disqualification, and the ballot would likely have been the subject of a potential criminal investigation irrespective of the date, if any, printed on the declaration.

49. Last year, officials in Lancaster County discovered that an individual had cast a fraudulent ballot in her deceased mother's name in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022); *see* Ex. 12, Affidavit of Probable Cause ¶ 2, Police Criminal Complaint, *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022) ("Mihaliak Compl.").

**<u>Response</u>**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

50.     In Lancaster County, the only information a voter is required to supply on a ballot declaration is the date and a signature. *See* Ex. 13, Exemplar Ballot Declaration from Lancaster County Board; *see also* Ex. 77, Greenburg Dep. at 114:23-115:7.

**Response**: To the extent that this paragraph contains factual allegations regarding practices of the Lancaster County Board of Elections, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements regarding requirements of Pennsylvania law, this paragraph contains statements or conclusions of law to which no response is required.

51.     Under the Pennsylvania Supreme Court's current precedent, county boards of elections lack authority to conduct signature comparisons, so they may not check ballots for a non-matching signature, much less use any non-matching signature to detect fraud by a third party. *See In re November 3, 2020 General Election*, 240 A.3d 591 (Pa. 2020).

**Response**: This paragraph does not comply with Local Rule 56(B)(1), as it does not cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record in support of a factual allegation, and instead comprises only statements or conclusions of law. Accordingly, no response is

required thereto. Further, this paragraph purports to summarize the Supreme Court of Pennsylvania's decision in *In re November 3, 2020 General Election*, 240 A.3d 591 (Pa. 2020), which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

52. In *Mihaliak*, the only evidence on the face of the ballot declaration indicating that someone other than the decedent had completed the ballot was the handwritten date of April 26, 2022, which was twelve days after the decedent had passed away. *See* Ex. 12 ¶ 2.

**Response**: It is denied that Intervenor-Defendants' Exhibit 12 supports the allegations of this paragraph as stated. It is admitted only that Intervenor-Defendants' Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), states that "Christa Miller stated she received a mail in ballot from Teresa J. Mihaliak signed and dated April 26, 2022. The ballot for the democrat [sic] primary was received on April 28, 2022, by her office. However, Crista Miller reported that Teresa J. Mihaliak was deceased on April 14, 2022. Christa Miller said this was confirmed by an obituary and records from the Department of Health. She said Teresa J. Mihaliak was removed from the voter rolls on April 25, 2022." By way of further response, Intervenor-Defendants' Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), and Exhibit A to Appendix of Acting Secretary Al Schmidt,

Complete Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022) at pp. 142-148, show that the voter in whose name the ballot at issue was submitted had died—and was known to the county board of elections to have died—two weeks before the ballot was received by the county board and also that the county board time stamps the face of the return envelopes when they are received. The handwritten declaration date was not the basis for the ballot's disqualification, and the ballot would likely have been the subject of a potential criminal investigation irrespective of the date, if any, printed on the declaration.

53. The investigation into the election fraud committed in *Mihaliak* was predicated upon the date supplied on the ballot declaration. *See id.* ¶ 2.

**Response**: It is denied that Intervenor-Defendants' Exhibit 12 supports the allegations of this paragraph as stated. It is admitted only that Intervenor-Defendants' Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), states that "Christa Miller stated she received a mail in ballot from Teresa J. Mihaliak signed and dated April 26, 2022. The ballot for the democrat [sic] primary was received on April 28, 2022, by her office. However, Crista Miller reported that Teresa J. Mihaliak was deceased on April 14, 2022. Christa Miller said this was confirmed by an obituary and records from the Department of Health. She said Teresa J. Mihaliak was removed from the

voter rolls on April 25, 2022." By way of further response, Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), and Exhibit A to Appendix of Acting Secretary Al Schmidt, Complete Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022) at pp. 145-148, show that the voter in whose name the ballot at issue was submitted had died—and was known to the county board of elections to have died—two weeks before the ballot was received by the county board. The handwritten declaration date was not the basis for the ballot's disqualification, and the ballot would likely have been the subject of a potential criminal investigation irrespective of the date, if any, printed on the declaration.

54. Plaintiffs' putative expert agreed that the date supplied on the *Mihaliak* ballot declaration was the only piece of evidence of fraud on the face of the ballot. Ex. 77 at 114:15-118:2.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg. By way of further response, Intervenor-Defendants' Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), and Exhibit A to Appendix of Acting Secretary Al Schmidt, Complete Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022) at pp. 145-148, show that the voter in whose name the ballot at issue was submitted had died—and was known to the county board of elections to

have died—two weeks before the ballot was received by the county board. The handwritten declaration date was not the basis for the ballot's disqualification, and the ballot would likely have been the subject of a potential criminal investigation irrespective of the date, if any, printed on the declaration.

55.     Plaintiffs' putative expert agreed that the date on the ballot declaration helped to detect fraud in *Mihaliak*. *Id.* at 116:19-117:2.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg. By way of further response, Intervenor-Defendants' Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), and Exhibit A to Appendix of Acting Secretary Al Schmidt, Complete Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022) at pp. 145-148, show that the voter in whose name the ballot at issue was submitted had died—and was known to the county board of elections to have died—two weeks before the ballot was received by the county board. The handwritten declaration date was not the basis for the ballot's disqualification, and the ballot would likely have been the subject of a potential criminal investigation irrespective of the date, if any, printed on the declaration..

## III. THIS LITIGATION

56. Plaintiffs in this case filed suit on November 4, 2022, seeking to invalidate the General Assembly's date requirement. ECF No. 1.

**Response**: This paragraph purports to summarize the Amended Complaint, which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

57. Plaintiffs claim that the date requirement—which has been on the books in some form since 1945—violates a provision of the 1964 Civil Rights Act and the Equal Protection Clause of the U.S. Constitution. *Id.*

**Response**: This paragraph purports to summarize the Amended Complaint, which is in writing and speaks for itself, and any characterization contrary to that writing is denied.

### A. County Boards Of Elections' Responses To Discovery Requests Regarding The 2022 General Election.

58. Allegheny County Board of Elections responded as follows.

a. It received 161,575 mail ballots, of which 151 were military ballots. Ex. 14, Allegheny Cnty. Bd.'s Am. Ans. to Interrog. #1.

b. It set aside 1,009 mail ballots with undated or misdated ballot declarations. Ex. 15, Allegheny Cnty. Bd.'s Ans. to Interrog. #2.

c. It did not receive any undated or misdated military ballots. Id. at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

59. Beaver County Board of Elections responded as follows.

   a. It received 15,172 mail ballots, of which 48 were military-overseas ballots. Ex. 16, Beaver Cnty. Bd.'s Ans. to Interrog. #1.

   b. It received 182 mail ballots with undated or misdated ballot declarations, of which 41 were corrected or cured. *Id.* Of the non-cured mail ballots, 9 were also missing their inner/secrecy envelopes. *Id.* "One voter who had an error on their ballot also had a naked ballot," and though that voter "corrected the ballot envelope prior to [the board's] notice being published," "the ballot was not counted as the error on the ballot was not determined until the pre-canvassing began." *Id.*

   c. "No timely-received military-overseas ballots were missing a date or signature or were dated incorrectly." *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

60. Bedford County Board of Elections responded as follows.

    a. It received 2,868 mail ballots and 6 military-overseas ballots. Ex. 17, Bedford Cnty. Bd., et al. ("BCCZ") Ans. to Interrog. #1.

b. It did not set aside any mail ballots for a date issue. *Id.* at Interrog. #2

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

61. Berks Board of Elections responded as follows.

a. It received 28,829 mail ballots, including 146 military-overseas ballots. Ex. 18, Berks Cnty. Bd.'s Ans. to Interrog. #1.

b. It set aside 782 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

62. Blair County Board of Elections responded as follows.

a. It received 9,022 mail ballots, and 27 military-overseas ballots. Ex. 19, Blair Cnty. Bd.'s Ans. Interrogs. #1.

b. It set aside 55 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

    c. It did not receive any undated or misdated military ballots for which the declaration was on the outside of the return envelope. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

    63. Bradford County Board of Elections responded as follows.

    a. It received 2,787 mail ballots, and 16 military-overseas ballots. Ex. 20, Bradford Cnty. Bd.'s Ans. to Interrogs. #1.

    b. It set aside 20 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. An additional 3 undated/misdated ballots lacked a secrecy envelope. *Id.*

    c. It did not receive any undated or misdated military-overseas ballots. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

    64. Bucks County Board of Elections responded as follows.

    a. It received 87,321 mail ballots and 466 military-overseas ballots. Ex. 21, Bucks Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 357 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It received 11 military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

d. It counted military-overseas ballots with undated or misdated ballot declarations. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

65. Butler County Board of Elections responded as follows.

a. It received 18,212 mail ballots. Ex. 22, Butler Cnty. Bd.'s Ans. Interrogs. #1.

b. It set aside 66 mail ballots with undated or misdated ballot declarations. *Id.*

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

66. Cambria County Board of Elections responded as follows.

a. It received 9,848 mail and military-overseas ballots. Ex. 23, Cambria Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 38 mail-in/absentee ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

67. Cameron County Board of Elections responded as follows.

a. It received 410 mail ballots and 2 military-overseas ballots. Ex. 24, Cameron Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 5 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

68. Carbon County Board of Elections responded as follows.

     a. It received 4,823 mail ballots and 14 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 27 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

69. Centre County Board of Elections responded as follows.

a. It received 15,654 mail ballots and 126 military-overseas ballots. *Id.* at Interrog. #1.

b. It set aside 116 mail ballots with undated or misdated ballot declarations. Ex. 25, Centre County, Montour County and York County Bds.' Supp. Ans. to Interrogs. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

70. Chester County Board of Elections responded as follows.

a. It received 70,023 mail ballots and 638 military/overseas/federal absentee ballots. Ex. 26, Chester Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 116 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. An additional 19 mail ballots had no date and no signature. *Id.*

c. It set aside 12 military/overseas/federal absentee ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

71. Clarion County Board of Elections responded as follows.

a. It received 12 mail ballots. Ex. 27, Clarion Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 12 mail ballots with undated or misdated ballot declarations. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

72. Clearfield County Board of Elections responded as follows.

a. It received 4,564 mail ballots, including 8 military and civilian overseas ballots. Ex. 28, Clearfield Cnty. Bd.'s Ans. to Interrogs. #1 & Ex. "Clfd. 1."

    b. It set aside 12 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

73. Clinton County Board of Elections responded as follows.

a. It received 2,248 mail ballots and 14 military-overseas ballots. Ex. 29, Clinton Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 20 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

74. Columbia County Board of Elections responded as follows.

a. It received 4,168 mail ballots and 11 military-overseas ballots. Ex. 17 at Interrog. #7.

b. It set aside 29 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

75.     Crawford County Board of Elections responded as follows.

a. It received 5,917 mail ballots and 22 military-overseas ballots. Ex. 30, Crawford Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 49 mail ballots with undated or misdated ballot declarations. *Id.* at Interrogs. #2, 8. It set aside an additional 2 mail ballots with undated or misdated ballot declarations that also lacked a signature. *Id.* at Interrog. #8.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

76.     Cumberland County Board of Elections responded as follows.

a. It received 26,298 mail ballots and 113 military-overseas ballots. Ex. 31, Cumberland Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 100 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

77. Dauphin County Board of Elections responded as follows.

a. It received 25,839 mail ballots and 154 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 95 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

78. Delaware County Board of Elections responded as follows.

a. It received 60,154 mail ballots. Ex. 32, Delaware Cnty. Bd.'s Ans. To Interrogs. #1.

b. It set aside 114 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

79.　Elk County Board of Elections responded as follows.

a. It received 2,012 absentee/mail-in ballots and 19 military-overseas ballots. Ex. 33, Elk Cnty. Bd.'s Ans. to Interrogs. #1.

b. It received 10 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Of those, 7 voters either corrected the error or filed a provisional ballot. *Id.* at Interrog. #13.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

80.　Erie County Board of Elections responded as follows.

a. It received 26,766 mail-in ballots and 41 military-overseas ballots. Ex. 34, Erie Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 211 mail ballots with undated or misdated ballot declarations, including cured ballots. *Id.* at Interrog. #2. An additional 8 mail ballots with undated ballot declarations were also missing a signature. *Id.* at Interrog. #8. 113 of these ballots were cured. *Id.* at Interrog. #13.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

<u>**Response**</u>: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

81. Fayette County Board of Elections responded as follows.

a. It received 9,036 mail ballots and 33 military-overseas ballots. Ex. 35, Fayette Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 137 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Eleven of these "signed another voter's ballot return envelope. *Id.* at Interrog. #8. 93 "[v]oters whose timely received mail ballots were set aside and/or segregated by Fayette County because the signed outer return envelope was missing a date or showed a date the county determined to be incorrect" "came to the

Case 1:22-cv-00339-SPB Document 299 Filed 05/05/23 Page 46 of 73

Fayette County Election Bureau and cured their mail ballots." *Id.* at Interrog. #13.

c. It stated that it "did not timely receive any military-overseas ballots in the 2022 General Election on which the voter failed to date their voter declaration or included a date that the county deemed to be incorrect." *Id.* at Interrog. #15.

d. "Dates were not reviewed for military/overseas ballots that were timely received." Ex. 36, Fayette Cnty. Bd.'s Resps. to Requests for Prod. of Docs. #3.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

82. Forest County Board of Elections responded as follows.

a. It received 447 mail ballots and 0 military-overseas ballots. Ex. 37, Forest Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 38 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Of these, two mail ballots were signed by the incorrect person. *Id.* at Interrog. #8. Two ballots were cured. *Id.* at Interrog. #13.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

83. Franklin County Board of Elections responded as follows.

   a. It received 10,496 mail ballots and 68 military-overseas ballots. Ex. 38, Franklin Cnty. Bd.'s Ans. to Interrogs. #1.

   b. It set aside 114 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Seven of those were also missing a signature. *Id.* at Interrog. #8.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

84. Greene County Board of Elections responded as follows.

   a. It received 2,384 mail ballots and 7 military-overseas ballots. Ex. 39, Greene Cnty. Bd.'s Ans. to Interrogs. #1.

   b. It set aside 11 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

   c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

85. Huntingdon County Board of Elections responded as follows.

a. It received 2,452 mail ballots and 8 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 34 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

86. Indiana County Board of Elections responded as follows.

a. It received 2,452 mail ballots and 8 military-overseas ballots. *Id.* at Interrog. #1.

b. It set aside 107 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

87. Jefferson County Board of Elections responded as follows.

a. It received 2,278 mail ballots and 12 military-overseas ballots. *Id.* at Interrog. #1.

b. It set aside 23 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

88. Juniata County Board of Elections responded as follows.

a. It received 1,244 mail-in ballots and 7 military-overseas ballots. Ex. 40, Juniata Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside five mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Of those, two were also missing signatures. *Id.* at Interrog. #8. Two ballots were cured. *Id.*

c. In response to whether it counted "timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that [it] deemed to be incorrect," it responded: "No." *Id.* at Interrog. #15. It set aside one military-overseas ballot with an undated ballot declaration. *Id.* at Interrog. #16. It was also missing a signature. *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

89. Lackawanna County Board of Elections responded as follows.

a. It received 20,759 mail ballots, including 29 military ballots and 26 civilian overseas ballots. Ex. 41, Lackawanna Cnty. Bd.'s Ans. To Interrogs. #1.

b. It set aside 160 mail ballots with undated ballot declarations. *Id.* at Interrog. #2.

c. It did not deem any military-overseas ballots as incorrect. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

90. Lancaster County Board of Elections responded as follows.

a. It received 34,202 mail ballots and 188 military-overseas ballots. Ex. 42, Lancaster Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 232 mail ballots which had undated or misdated ballot declarations. *Id.* at Interrog. #2. Of those, 51 had additional defects. *Id.* at Interrog. #8.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15; Ex. 43, Miller Dep. 96:15-98:4.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

91. Lawrence County Board of Elections responded as follows.

a. It received 6,888 mail ballots and 33 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 107 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

92. Lebanon County Board of Elections responded as follows.

a. It received 10,771 mail ballots and 64 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 24 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

93. Lehigh County Board of Elections responded as follows.

a. It received 35,425 mail-in/absentee ballots and 101 military/overseas/civilian ballots. Ex. 44, Lehigh Cnty. Bd.'s Ans. To Interrogs. #1.

b. It set aside 390 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. An additional 23 mail ballots had no date and no signature on their ballot declarations. *Id.*

c. It did not review military-overseas ballots for dates. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

94. Luzerne County Board of Elections responded as follows.

a. It received 29,002 mail ballots. Ex. 45, Luzerne Cnty. Bd.'s Ans. To Interrogs. #1.

b. It set aside 166 mail ballots with undated or misdated ballot declarations. Ex. 46, Luzerne Cnty. Bd.'s Am. Ans. to Interrogs. 16 of these voters voted provisionally. Ex. 45 at Interrog. #7.

c. It "[d]o[es] not recall any" military-ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

95. Lycoming County Board of Elections responded as follows.

a. It received 6,474 mail ballots. Ex. 47, Lycoming Cnty. Bd.'s Ans. To Interrogs. #1.

b. It set aside 36 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Six of these voters cast provisional ballots. *Id.* at Interrog. #12.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

96. McKean County Board of Elections responded as follows.

a. It received 1,957 mail in ballots and 5 military-overseas ballots. Ex. 48, McKean Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 35 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It set aside 5 military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

97. Mercer County Board of Elections responded as follows.

a. It received 8,220 mail ballots. Ex. 49, Mercer Cnty. Bd.'s Ans. To Interrogs. #1.

b. It set aside 63 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. Though it received "12 mail ballots where the Declaration was unsigned," "[a]ny ballot that was both unsigned and missing a date were categorized as 'Unsigned' since this is a fatal defect outside the scope of current litigation." *Id.* at Interrog. #8.

d. In response to whether it counted "timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that [it] deemed to be incorrect," it responded: "This issue did not arise in 2022." *Id.* at Interrog. #15.

Case 1:22-cv-00339-SPB Document 299 Filed 05/05/23 Page 55 of 78

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

98. Mifflin County Board of Elections responded as follows.

a. It received 2,680 mail-in ballots and 8 military-overseas ballots. Ex. 50, Mifflin Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 13 mail-in/absentee ballots with undated ballot declarations, exclusive of ballots with other defects. Ex. 51, Mifflin Cnty. Bd.'s Resps. to Requests for Prod. of Docs. #2 & Ex. 1.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. Ex. 50 at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

99. Monroe County Board of Elections responded as follows.

a. It received 15,651 mail ballots and 56 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 462 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Of these, 191 were cured. *Id.* at Interrog. #13.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

100. Montgomery County Board of Elections responded as follows.

a. It received 118,224 mail-in/absentee ballots and 914 military-overseas ballots. Ex. 52, Montgomery Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 460 mail ballots with undated or misdated ballot declarations. *Id.* 44 of those ballots had other defects. *Id.* at Interrog. #2.

c. In Montgomery County, "[m]ilitary-overseas ballots were checked to make sure the declarations were complete. If the declarations were complete, the ballot was counted. No military-overseas ballots were set aside for having a missing or incorrect date." *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

101. Montour County Board of Elections responded as follows.

a. It received 1,718 mail ballots and 3 military-overseas ballots. Ex. 25 at Interrog. #1.

    b. It set aside 8 mail ballots with undated or misdated ballot declarations. Ex. 17 at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

102. Northampton County Board of Elections responded as follows.

a. It received 36,401 mail/absentee ballots, including 91 UMOVA ballots. Ex. 53, Northampton Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 280 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

103. Northumberland County Board of Elections responded as follows.

a. It received 4,835 mail ballots and 30 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 14 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

104. Perry County Board of Elections responded as follows.

a. It received 2,340 mail ballots and 4 military ballots. Ex. 54, Perry Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 35 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

105. Philadelphia County Board of Elections responded as follows.

a. It received 133,968 absentee and mail-in ballots, including military-overseas ballots. Ex. 55, Philadelphia Cnty. Bd.'s Ans. to Interrogs. #1. It counted 127,934 absentee and mail-in ballots and 1,014 military-overseas ballots. *Id.*

b. It set aside 2,617 mail-in and absentee ballots. *Id.* at Interrog. #2. 580 of these voters submitted provisional ballots. *Id.*

c. It counted 13 military-overseas ballots with undated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

106. Potter County Board of Elections responded as follows.

    a. It received 888 mail-in ballots, including 2 military-overseas ballots. Ex. 56, Potter Cnty. Bd.'s Ans. to Interrogs. #1.

    b. It set aside 11 mail ballots with undated or misdated ballot declarations, not including voters who submitted provisional ballots or ballots with other defects. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

107. Schuylkill County Board of Elections responded as follows.

    a. It received 8,657 mail ballots and 25 military-overseas ballots. Ex. 57, Schuylkill Cnty. Bd.'s Ans. to Interrogs. #1.

    b. It set aside 59 mail ballots with undated or misdated ballot declarations, including one ballot which also was missing a signature and another where the date was missing from the voter assistance declaration. Ex. 58, Ex. 2 to Schuylkill Resp. to Requests for Prod. of Docs.

    c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. Ex. 57 at Interrog. #1.

**<u>Response</u>**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

108. Snyder County Board of Elections responded as follows.

a. It received 2,286 mail ballots and 5 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 9 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**<u>Response</u>**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

109. Somerset County Board of Elections responded as follows.

a. It received 4,211 mail ballots, including 47 military-overseas ballots. Ex. 59, Somerset Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 63 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. Two also did not contain signatures. *Id.*

c. It did not receive any military-overseas ballots with an undated or misdated outer return envelope. *Id.* at Interrog. #15.

Case 1:22-cv-00339-SPB Document 280 Filed 05/05/23 Page 61 of 78

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

110. Sullivan County Board of Elections responded as follows.

a. It received 505 mail ballots and 4 military-overseas ballots. Ex. 60, Sullivan Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 4 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

111. Susquehanna County Board of Elections responded as follows.

a. It received 3,247 mail-in ballots and 16 military-overseas ballots. Ex. 61, Susquehanna Cnty. Bd.'s Ans. to Interrogs. #1.

b. It did not set aside any mail ballots for undated or misdated ballot declarations. *Id.* at Interrog. #2

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

112. Tioga Board of Elections responded as follows.

    a. It reported that "[o]ut of 2,363 total ballots, 10 were returned." Ex. 62, Tioga Cnty. Bd.'s Ans. to Interrogs. #1.

    b. It set aside four mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

    c. When asked if it "count[ed] timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that [it] deemed to be incorrect," it responded: "Ten such ballots were counted." *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

113. Union County Board of Elections responded as follows.

    a. It received 2,997 mail ballots, including 41 military-overseas ballots. Ex. 63, Union Cnty. Bd.'s Ans. to Interrogs. #1.

    b. It set aside 23 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

    c. It "believes it did not receive any military-overseas ballots that were not counted based on a missing and/or incorrect date on the elector's declaration on the return envelope." *Id.* at Interrog. #16.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

114. Venango County Board of Elections responded as follows.

a. It received 3,027 mail ballots and 35 military-overseas ballots. Ex. 17 at Interrog. #1.

b. It set aside 42 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

115. Warren County Board of Elections responded as follows.

a. It received 2,266 mail ballots and 8 military ballots. Ex. 64, Warren Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 18 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. One of these ballots also did not have a signature. *Id.* at Interrog. #8.

c. It did not receive any military-overseas ballots that were undated or misdated. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

116. Washington County Board of Elections responded as follows.

a. It received 19,569 mail ballots, including 51 military-overseas ballots. Ex. 65, Washington Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 66 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It reported that "none of the military-overseas ballots it received in the 2022 General Election were required to be set aside." *Id.* at Interrog. #155.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

117. Wayne County Board of Elections responded as follows.

a. It received 4,692 mail ballots. Ex. 66, Wayne Cnty. Bd.'s Ans. To Interrogs. #1.

b. It set aside 55 mail ballots with undated or misdated ballot declarations. *Id.* at 8. Fewer than 10 of these were cured. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

118. Westmoreland County Board of Elections responded as follows.

a. It received 34,599 mail ballots and 109 military-overseas ballots. Ex. 67, Westmoreland Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 95 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It "did not receive any military-overseas ballots that were not counted based on a missing and/or incorrect date on the elector's declaration on the return envelope." *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

119. Wyoming County Board of Elections responded as follows.

    a. It received 2,029 mail ballots and 7 military-overseas ballots. Ex. 68, Wyoming Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 17 mail ballots with undated ballot declarations. *Id.* One ballot also was missing a signature on the declaration. *Id.* at Interrog. #2.

c. It reported that "[n]o military-overseas ballot was set aside for incorrect or missing date." *Id.* at Interrog. #15.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

120. York County Board of Elections responded as follows.

a. It received 37,296 mail ballots and 185 military-overseas ballots. Ex. 25 at Interrog. #1.

b. It set aside 1,354 mail ballots with an undated or misdated ballot declaration. *Id.* at Interrog. #2.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

### B. Ballot Envelopes

121. Military/overseas voters were provided with ballot declarations to fill out. *See* Ex. 69, Montgomery County Declaration for Military-Overseas Ballot at 3; Ex. 70, Fayette County Declaration for Military-Overseas Ballot.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

122. Those ballot declarations had date fields, and instructed voters to "SIGN AND DATE HERE." *Id.*

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

123. The Federal Write-In Absentee Ballot (FWAB) also contains a date field. https://www.fvap.gov/uploads/FVAP/Forms/fwab.pdf (specifying "Today's date"). See Ex. 72, Federal Write-In Absentee Ballot.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

124. The fvap.gov website instructs voters to "[m]ake sure to follow your state instructions when filling out your FWAB."

https://www.fvap.gov/eo/overview/materials/forms. See Ex. 73, Federal Voting Assistance Program Guide.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

125. The fvap.gov website's Pennsylvania guide in its "Hardcopy Instructions" directs voters to "sign and date the 'Voter Information' page" "[o]nce your FWAB is complete." https://www.fvap.gov/guide/chapter2/pennsylvania. See Ex. 74, Federal Voting Assistance Guide Regarding Pennsylvania Elections.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

**C. Mr. Jeffrey Greenburg's Putative Expert Testimony**

126. Plaintiffs designated Mr. Jeffrey Greenburg to be an expert witness. *See* Ex. 75, Plaintiffs' Designation of Expert Witness.

**Response**: Admitted.

127. Mr. Greenburg served as the director of elections for the Mercer County Bureau of Voter Registration and Elections from 2007 until July 2020. *See* Ex. 76, Greenburg Decl. ¶ 3.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

128. Mr. Greenburg graduated from John Carroll University in 1982 with a bachelor of arts in History. Ex. 76 Ex. 1.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

129. Mr. Greenburg never took any courses in elections or election administration. Ex. 77, Greenburg Dep. at 18:10-13.

**Response**: It is denied that Intervenor-Defendants' Exhibit 77 supports the allegations of this paragraph as stated. By way of further response, Mr. Greenburg testified that only he did not take any courses in elections or election administration "as part of [his] *education*." Ex. 77, Greenburg Dep. at 18:10-13 (emphasis added).

130. Mr. Greenburg has never published any articles in a peer-reviewed journal or publication, and has never submitted any written works for peer review that were not published. *Id.* at 22:18-25.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

131.   Mr. Greenburg has never authored any studies about election administration. *Id.* at 23:2-4.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

132.   Mr. Greenburg's sole experience with statistical analysis of elections was to analyze the age of poll workers and to calculate the number of average voters registered in every county. *Id.* 23:8-24:4.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

133.   Mr. Greenburg's statistical analyses were never published anywhere. *Id.* at 24:5-7.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

134.   Mr. Greenburg has only ever administered elections in Mercer County, and has never administered a statewide election in Pennsylvania. *Id.* at 26:2-12.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

135.   Mr. Greenburg purports to offer the opinion that "older voters" (over age 65) "were disproportionately affected by the date requirement" in the November 2022 general election compared to voters under the age of 65. Ex. 76 ¶ 32.

**Response**: Admitted that Mr. Greenburg offers the opinion that "older voters were disproportionately affected by the date requirement in the 2022 general election" in Pennsylvania. Intervenor-Defendants' Ex. 76 ¶ 32

136. This opinion is multiply flawed. See Ex. 77 at 98:8-107:7.

**Response**: It is denied that Intervenor-Defendants' Exhibit 77 supports the allegation that Mr. Greenburg's opinion is "multiply flawed," which is an argumentative characterization rather than a statement of fact.

137. In the first place, Mr. Greenburg's opinion is limited to the discovery responses from 13 Pennsylvania counties and does not address any of the 54 other counties in Pennsylvania. See Ex. 76 ¶ 32; Ex. 77 at 105:25-107:7.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

138. Moreover, in the 13 counties Mr. Greenburg examined, he found a disproportionate effect by looking only at voters whose absentee or mail-in ballots were not counted due to the date requirement. See Ex. 76 ¶ 32; Ex. 77 at 98:15-99:11.

**Response**: It is denied that Intervenor-Defendants' Exhibit 77 supports the allegations of this paragraph as stated. Mr. Greenburg did not testify that he "only"

looked at "voters whose absentee or mail-in ballots were not counted due to the date requirement."

139. Mr. Greenburg calculated the "percentage of voters" from that pool who were over the age of 65 and who were under the age of 65. Ex. 77 at 98:18; see also Ex. 76 ¶ 32.

**Response**: It is denied that Intervenor-Defendants' Exhibit 77 supports the allegations of this paragraph as stated. Mr. Greenburg testified that he measured the disproportionate effect of the date requirement on older voters by reviewing "the number of ballots that were not counted because of the date requirement" and then calculating "the percentage of those ballots that were cast by senior citizens." Ex. 77 at 98:10-99:5.

140. Mr. Greenburg, however, did not know the total number of voters in each age category who submitted absentee or mail-in ballots. See Ex. 77 at 99:12-101:9.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

141. Mr. Greenburg did not calculate the rate at which voters over 65 or voters under 65 use absentee or mail-in voting. See Ex. 76 ¶ 32; Ex. 77 at 99:12-101:21.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

142. Mr. Greenburg also did not calculate the rate at which voters in either category fail to comply with the date requirement. See Ex. 77 at 103:9-105:19.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

143. Mr. Greenburg conceded that voters over age 65 may be less affected by the date requirement if they use absentee and mail-in voting at a higher rate—or make mistakes in completing the date field at a lower rate—than voters under age 65. See Ex. 77 at 101:18-105:19.

**Response**: It is denied that Intervenor-Defendants' Exhibit 77 supports the allegations of this paragraph as stated. The portions of Exhibit 77 cited in this paragraph refer to testimony given in response to hypothetical questions only.

144. Mr. Greenburg's "disproportionately affected" opinion relied on data provided by Plaintiffs. Ex. 76 at ¶ 28 n.4; ¶ 32 n.6.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

145. The data provided by Plaintiffs was incomplete; they provided age data for voters in only 13 counties. Ex. 76 at ¶ 32 n.6.

**Response**: It is denied that Intervenor-Defendants' Exhibit 76 supports the allegation that the data in the exhibit is "incomplete," which is an argumentative characterization rather than a statement of fact. The Acting Secretary is not aware of any facts in the record that contradict the remaining allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

146. The data provided by Plaintiffs was internally inconsistent.

a. Plaintiffs purported to exclude from their count ballots that failed some other requirement than the date requirement. Ex. 76 Ex. 2. But in Somerset, Franklin, Lancaster, Montgomery, Warren, Wyoming, and Crawford counties, Plaintiffs' table failed to exclude such ballots. *Id.*

b. Plaintiffs sometimes purported to exclude cured ballots from its count, but their table admits that those numbers are not consistently tracked. *Id.* Similarly, it does not take into account the list of ballots provided by Fayette County that specifies which ballots were cured. *See* Ex. 71, Fayette Cnty. Bd.'s List of Undated Ballots.

**Response**: It is denied that Intervenor-Defendants' Exhibit 76, Exhibit 2 supports the allegation that the data in the exhibit is "internally inconsistent" or "not consistently tracked," which are argumentative characterizations rather than statements of fact. The Acting Secretary is not aware of any facts in the record that

contradict the remaining allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

147. Mr. Greenburg testified that voters "are required to affirm that they meet the qualifications" to vote "on the voter registration application." Ex. 77 at 69:13-25.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

148. Mr. Greenburg testified that voters "provide the information necessary for the boards to verify they are qualified" on "their voter registrations." Ex. 77 at 69:13-17.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

149. Mr. Greenburg agreed that providing a signature is not a qualification to vote. Ex. 77, at 76:3-5.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

150. Mr. Greenburg's "definition of 'disenfranchised'" was, "in [his] opinion," "an eligible voter who, for one reason or another, their ballot was not counted." Ex. 76 at 90:8-14. He stated in his deposition:

> If a legally eligible voter's ballot is not counted, it's disenfranchisement. When you're interpreting the law correctly or not,

> the ability for them to cast that ballot is not happening because of something that either they did or they omitted.

Ex. 77 at 93:3-15.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

151. For purposes of his report, Mr. Greenburg classified such voters as "disenfranchise[d]" even if the "election official" "follow[ed] the law" in setting aside the voter's ballot. *Id.* at 93:9-19.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

152. Mr. Greenburg admitted that, in the *Mihaliak* case, the only piece of information on the face of the ballot indicating that a third party had attempted to vote someone else's ballot was the handwritten date. *Id.* at 115:8-20.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg. By way of further response, Intervenor-Defendants' Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), and Exhibit A to Appendix of Acting Secretary Al Schmidt, Complete Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022) at pp. 145-148, show that the voter in whose name the ballot at issue was submitted had died—and was known to the county board of elections to have died—two weeks before the ballot was received by the county board. The

handwritten declaration date was not the basis for the ballot's disqualification, and the ballot would likely have been the subject of a potential criminal investigation irrespective of the date, if any, printed on the declaration.

153.   Mr. Greenburg admitted that, in the *Mihaliak* case, the date requirement helped to identify fraud. *Id.* at 116:19-117:2.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg. By way of further response, Intervenor-Defendants' Exhibit 12, the Affidavit of Probable Cause in *Commonwealth v. Mihaliak*, No. CR-126-22 (June 3, 2022), and Exhibit A to Appendix of Acting Secretary Al Schmidt, Complete Tr. of Hearing in *Chapman v. Berks County Bd. of Elections*, No. 355 MD 2022 (Pa. Commw. July 28, 2022) at pp. 145-148, show that the voter in whose name the ballot at issue was submitted had died—and was known to the county board of elections to have died—two weeks before the ballot was received by the county board. The handwritten declaration date was not the basis for the ballot's disqualification, and the ballot would likely have been the subject of a potential criminal investigation irrespective of the date, if any, printed on the declaration.

154.   Mr. Greenburg agreed that fraud involving mail ballots is possible now and in the future in Pennsylvania. *Id.* at 61:3-9.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

155. Mr. Greenburg agreed that the date requirement applies to overseas voters. *Id.* at 84:2-4.

**Response**: The allegations of this paragraph fairly represent the testimony of Mr. Greenburg.

May 5, 2023

Respectfully submitted,

Michael J. Fischer (Bar. No. 322311)
Executive Deputy General Counsel

/s/ *Jacob Boyer*
Jacob Boyer (Bar. No. 324396)
Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

Robert A. Wiygul (Bar. No. 310760)
John B. Hill (Bar. No. 328340)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933

Elizabeth Lester-Abdalla (Bar. No. 327276)
Deputy Attorney General
OFFICE OF ATTORNEY GENERAL
1600 Arch Street, Suite 300
Philadelphia, PA 19103

*Counsel for Acting Secretary Al Schmidt*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>AL SCHMIDT, *in his official capacity as Acting Secretary of the Commonwealth*, *et al.*,<br><br>Defendants. | No. 1:22-cv-339<br>Judge Susan Paradise Baxter |

**RESPONSE OF AL SCHMIDT TO**
**PLAINTIFFS' LOCAL CIVIL RULE 56(B)(1) STATEMENT**

## I. BACKGROUND

### A. History and Practice of Mail Ballot Voting in Pennsylvania

1. Pennsylvania has long provided absentee-ballot options for voters who cannot attend a polling place on Election Day. APP_00954 (Marks Dep.); 25 P.S. § 3146.1–3146.9.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

2. In 2019, Pennsylvania enacted new mail-in voting provisions, which allow all registered, eligible voters to vote by mail. APP_00954 (Marks Dep.); APP_01180 (Greenburg Report); Act of Oct 31, 2019, P.L. 552, No. 77, § 8.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto. By way of further response, a complete copy of

the deposition transcript of Jonathan Marks is attached to the Appendix of Acting

Secretary Schmidt as Exhibit B.

3.      More than 2.6 million Pennsylvanians voted by absentee or mail ballot

in the November 2020 general election, and more than 1.2 million Pennsylvanians

voted by absentee or mail ballot in the November 2022 general election. APP_01181

(Greenburg Report); *see also* APP_00981-982 (Marks Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that

contradict the allegations of this paragraph and accordingly admits the allegations

for purposes of this litigation only. By way of further response, a complete copy of

the deposition transcript of Jonathan Marks is attached to the Appendix of Acting

Secretary Schmidt as Exhibit B.

4.      A voter seeking to vote by mail must complete an application and have

their identity and qualifications verified before receiving a mail ballot. Voters

provide all the information necessary for county boards of elections to verify that

they are qualified to vote in Pennsylvania—namely, that on the day of the next

election, they will have been a U.S. citizen for at least one month, will be at least 18

years old, will have resided in the election district for at least 30 days, and have not

been confined in a penal institution for a conviction of a felony within the last five

years—at the time of registration, at which time the county board of elections first

determines their eligibility to vote. 25 Pa. C.S. §§ 1301, 1327(b); *see also* APP_00893 (Lancaster Dep.); APP_00995-997 (Marks Dep.).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

5. To apply to receive a mail ballot, voters must submit an application that contains information relevant to their qualifications—including their date of birth, address, and length of time as a resident of the voting district—as well as proof of identification (a Pennsylvania driver's license number or, if the voter does not have one, the last four digits of the voter's social security number). APP_01036-1037 (mail ballot application); 25 P.S. §§ 3150.12, 2602(z.5)(3).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

6. After the application is submitted, county boards of elections verify the voter's proof of identification and compare the information in the mail ballot application to the information provided at the time of registration, using the data housed in the Statewide Uniform Registry of Electors ("SURE") system. 25 P.S.§ 3150.12b; *see also* APP_01136 (Pa. Dep't of State Guidance); APP_00894 (Lancaster Dep.); APP_00916-917 (Westmoreland Dep.); APP_00957-961 (Marks Dep.); APP_01182 (Greenburg Report); APP_001015, APP_001020-1025 (Greenburg Dep.).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

7. County boards of elections issue mail ballot packages to voters only after verifying their qualifications to vote, based on the information provided in their voter registration records and mail ballot applications. 25 P.S. § 3150.12b; *see also* APP_00917 (Westmoreland Dep.).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

8. The county board's determination that an individual is qualified to vote is conclusive unless the voter's eligibility is challenged prior to Election Day. 25 P.S. §§ 3150.12b, 3146.8(g)(3)-(4); *see also* APP_01182 (Greenburg Report); APP_01136 (Pa. Dep't of State Guidance).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

9. Once the county board verifies the voter's identity and eligibility, it sends a mail-ballot package that contains a ballot, a "secrecy envelope" marked with the words "Official Election Ballot," and the pre-addressed outer return envelope, on which a voter declaration form is printed (the "Return Envelope"). 25 P.S. §§ 3146.6(a), 3150.16(a); *see also* APP_00965-966 (Marks Dep.); APP_01182-1183 (Greenburg Report).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

10. A voter can mark their ballot, put it inside the secrecy envelope, and place the secrecy envelope in the Return Envelope, and complete the form declaration on the return envelope at "any time" between receiving their mail-ballot package from the county board of elections and 8:00 P.M. on Election Day. 25 P.S. §§ 3146.6(a), 3150.16(a); *see also* APP_00977 (Marks Dep.); APP_01183, APP_01189-1190 (Greenburg Report).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

11. The voter must then deliver their ballot, in the requisite envelopes, by mail or in person to their county board of elections. To be considered timely under the Election Code, a county board of elections must receive a voter's mail ballot by 8:00 P.M. on Election Day. 25 P.S. §§ 3146.6(c), 3150.16(c); *see also* APP_00974-76 (Marks Dep.); APP_01183 (Greenburg Report).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

12. Upon receipt of a mail ballot, county boards of elections stamp or otherwise mark the Return Envelope with the date of receipt to confirm its timeliness and log it in the SURE system. APP_01183, APP_01189 (Greenburg Report); APP_01136-1137 (Pa. Dep't of State Guidance); APP_00977-978 (Marks Dep.), 70:5– 8; APP_00834 (Berks Dep.).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this

litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

**B. Previous Litigation over the Date Requirement**

13. The Election Code provides that a voter "shall … fill out, date and sign the declaration printed on" the mail ballot Return Envelope. *See* 25 P.S. §§ 3146.6(a), 3150.16(a). The voter declaration forms that accompany paper mail and absentee ballots include a line for the voter to sign and date the declaration.[1] *See, e.g.*, APP_01290 (Berks mail ballot envelope); APP_01291 (Bucks military ballot envelope).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

14. This envelope-dating provision has been the subject of repeated litigation. APP_00824 (Berks Dep.).

[1] UOCAVA voters have the option to submit their absentee ballots electronically, or they can return a paper ballot by mail. *See* APP_00998-00999 (Marks Dep.). This case focuses solely on the treatment of *paper* mail and absentee ballots.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

15. In the months leading up to the 2022 election, the Secretary of the Commonwealth advised counties to count otherwise valid and timely-received mail ballots even where voters omitted a handwritten date, or wrote a plainly wrong date like a birthdate, on the Return Envelope. APP_01139-1142 (Sept. 26, 2022 Pa. Dep't of State Guidance); APP_00824a-824c (Berks Dep.); APP_00869-870 (Lancaster Dep.); APP_00920-921 (Westmoreland Dep.); APP_00986-989, APP_00991-992 (Marks Dep.).

**Response**: Admitted that in 2022, the Acting Secretary issued guidance consistent with judicial interpretations of state and federal election law. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

16. The Secretary reaffirmed that guidance after the U.S. Supreme Court vacated on mootness grounds the Third Circuit's *Migliori v. Cohen* decision regarding the envelope-date rule. APP_01143 (Oct. 11, 2022 Pa. Dep't of State email).

**Response**: Admitted that in 2022, the Acting Secretary issued guidance consistent with judicial interpretations of state and federal election law.

17.    On October 16, 2022, a group of petitioners including political party entities brought a King's Bench petition in the Supreme Court of Pennsylvania seeking to invalidate mail ballots based on voter errors or omissions with respect to the envelope date on the Return Envelope. APP_01202.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

18.    On November 1, 2022, the Supreme Court of Pennsylvania issued an order directing that the mail ballots at issue should be segregated and not counted. APP_01147-1148.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

19.    Following that decision, on November 1, 2022, the Department of State's Deputy Secretary for Elections and Commissions, Jonathan Marks, sent an email to counties advising elections officials of the Supreme Court of Pennsylvania's

order to "refrain from counting any absentee and mail-in ballots received for the November 8, 2022 general election that are contained in undated or incorrectly dated outer envelopes," and to "**segregate** and **preserve** any ballots contained in undated or incorrectly dated outer envelopes." Deputy Secretary Marks instructed that the elections officials "**must remember to do two things** as [they] pre-canvass and canvass absentee and mail-in ballots: Segregate AND preserve these undated and incorrectly dated ballots; and Do not count the votes cast on ballots with undated or incorrectly dated ballots." APP_01149 (all emphasis in original email).

**Response**: Admitted. By way of further answer, the Acting Secretary issued guidance consistent with judicial interpretations of state and federal election law.

20. On November 3, Acting Secretary Chapman issued new guidance, instructing counties that "ballots which are administratively determined to be undated or incorrectly dated" should be coded as "CANC – NO SIGNATURE within the SURE system" (*i.e.*, should be cancelled and not accepted) and "segregated from other ballots." APP_01006-1007.

**Response**: Admitted. By way of further answer, the Acting Secretary issued guidance consistent with judicial interpretations of state and federal election law.

21. On November 5, 2022, the Supreme Court of Pennsylvania issued a supplemental order stating that "incorrectly dated outer envelopes" include "(1) mail- in ballot outer envelopes with dates that fall outside the date range of

September 19, 2022 through November 8, 2022; and (2) absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022 through November 8, 2022." APP_01150-1151.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

## II.   PLAINTIFFS

22.    Laurence Smith is a Montgomery County voter who sought to vote in the November 2022 election. *See* APP_01047-1051 (Smith Decl.); APP_01392 (Montgomery voter list).

      a. Smith is 78 years old. Before his retirement, he worked as an entrepreneur in the medical services industry. APP_01047.

      b. He has been a registered voter for decades, and he has been voting regularly in Montgomery County since moving there in 1991, including voting by mail since 2020. APP_01047.

      c. For the November 8, 2022 election, Smith properly requested a mail-in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the

declaration. APP_01048; APP_01392.

d. The Montgomery County Board of Elections did not count Smith's ballot on the basis of a missing date. APP_01392.

e. Smith believed he had followed all of the necessary steps to complete the declaration, and he was unaware of what the Montgomery County Board of Elections concluded was wrong with the date form. APP_01048-1049.

f. Mr. Smith was not notified of any opportunity to cure any defect prior to Election Day. APP_01049

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

23. Joel Bencan is a Montgomery County voter who sought to vote in the November 2022 election. *See* APP_01052-1056 (Bencan Decl.); APP_01392 (Montgomery voter list).

a. Bencan is 71 years old and is a retired pharmacist. APP_01052.

b. He has been a registered voter for decades and has participated regularly in elections since the Nixon Administration. Bencan began voting by mail in 2020 because of the COVID-19

pandemic and has continued since then to vote by mail. APP_01052.

c. For the November 8, 2022 election, Bencan properly requested a mail-in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the declaration. APP_01052; APP_01392.

d. The Montgomery County Board of Elections did not count Bencan's ballot on the basis of a missing date. APP_01392.

e. Bencan believed he had followed all of the necessary steps to complete the declaration, and he was unaware of why the Montgomery County Board of Elections rejected the date he wrote as "incorrect." APP_01052- 1053.

f. Bencan was not notified of any opportunity to cure any defect prior to Election Day. APP_01053.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

24. Aynne Pleban Polinski is a York County voter who sought to vote in the November 2022 election. *See* APP_01057-1058 (Polinski Decl.); APP_01400 (York voter list).

a. Polinski is 71 years old and is a retired art educator, art therapist, and professional artist. APP_01057.

b. Polinski is a qualified voter who participates regularly in elections: she has been a registered voter in York County since 2016 and a registered voter in the Commonwealth of Pennsylvania since she was 18 years old. Polinski has been voting by mail since the June 2020 presidential primary because of the COVID-19 pandemic. APP_01057.

c. For the November 8, 2022 election, Polinski properly requested a mail- in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. APP_01057-1058; APP_01400.

d. The York County Board of Elections has confirmed that it did not count Polinski's ballot on the basis of a missing date. APP_01400.

e. Polinski was not notified of any opportunity to cure any defect prior to Election Day and only learned after Election Day that her vote was not counted. APP_01058

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

25.     Marlene Gutierrez is a York County voter who sought to vote in the November 2022 election. APP_01059-1061 (Gutierrez Decl.); APP_01400 (York voter list).

a.  Gutierrez is 64 years old and works as a corporate travel agent. APP_01059.

b.  She first registered to vote in York County when she was 18 years old, and after residing elsewhere for several years, she most recently registered to vote in York County when she moved back in September 2020. She has been regularly voting by mail for at least twenty years. APP_01059.

c.  For the November 8, 2022 election, Gutierrez properly requested a mail- in ballot, marked her ballot, and inserted it into the secrecy envelope and then into an outer envelope on which she signed the declaration. APP_01059-1060.

d.  Gutierrez believed she had followed all of the instructions but learned on Election Day that her ballot would not be counted, and she did not have time to cure her ballot. APP_01060.

e. The York County Board of Elections has confirmed that it did not count Gutierrez's ballot on the basis of a missing date. APP_01400.

f. Gutierrez was not notified of any opportunity to cure any defect prior to Election Day. APP_01060.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

26. Barry Seastead is a Warren County voter who sought to vote in the November 2022 election. *See* APP_01062-1064 (Seastead Decl.); APP_01394 (Warren voter list).

a. Seastead is a 68-year-old retired welder. APP_01062.

b. He has been a registered voter in Warren County for decades, ever since he was legally eligible to vote. He votes regularly, and has been voting by mail for the past few years. APP_01062.

c. For the November 8, 2022 election, Seastead properly requested a mail- in ballot, marked his ballot, and inserted it into the secrecy envelope and then into an outer envelope on which he signed the declaration. APP_01063.

d.  The Warren County Board of Elections has confirmed that it did not count Seastead's ballot on the basis of an "invalid" date. APP_01394.

e.  Seastead believed he wrote the date on which he filled out the ballot, and he is unaware of why the Warren County Board of Elections rejected the date he wrote as "incorrect." APP_01063.

f.  Mr. Seastead was not notified of any opportunity to cure any defect prior to Election Day. APP_01063; APP_01394.

g.  Because Warren County did not provide him with any notice of its determination that the date he wrote was incorrect, he had no opportunity to cure any defect regarding the date on his outer return envelope prior to Election Day and only learned after Election Day that his vote was not counted. APP_01063.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

27.  The Pennsylvania State Conference of the NAACP (the "State Conference") is a non-profit, non-partisan organization that works to improve the political, educational, social, and economic status of African-Americans and other racial and ethnic minorities, to eliminate racial prejudice, and to take lawful action

to secure the elimination of racial discrimination, among other objectives. APP_01065-1081 (State Conf. Decl.).

    a.  The State Conference has thousands of members who live and/or work in Pennsylvania, many of whom are registered to vote in Pennsylvania. APP_01065.

    b.  Every election cycle, the State Conference engages in efforts to get out the vote, including by educating voters in Pennsylvania on different methods of voting, providing educational guides on local candidates to increase voter engagement, and focusing on strategies to encourage new voters to participate in elections in Pennsylvania. For example, in the 2022 election cycle, the State Conference coordinated Souls to the Polls efforts, solicited poll monitor volunteers, and organized phone- and text- banking to generate voter engagement and remind voters of the importance of the election. APP_01065-1066.

    c.  During the 2022 election, the State Conference reassigned volunteers and staff from its existing voter education and mobilization efforts towards contacting and educating voters who had already submitted their mail ballots about how to fix

problems with the mail ballot envelope date and avoid having their vote set aside. APP_01066-1067.

d. For example, the time and attention of the State Conference's Philadelphia branch field director, as well as volunteers (including approximately 17 volunteer law students from Howard University) were all diverted from their intended mission—conducting election protection at the polls on Election Day in Philadelphia—toward coordinating and manning the phone lines in order to contact and/or assist mail ballot voters affected by the envelope-date rule. APP_01067-1068.

e. In the days leading up to the election in November 2022, multiple local branches of the State Conference also created and shared social media posts alerting the public, and especially those who had already submitted mail ballots, that "thousands of voters" had "accidentally left off or wrote the incorrect date on the outside of their absentee/mail-in ballots," and that "those ballots CAN be cured, and the votes counted" if the affected voters took urgent action. APP_01078-1081. The time and attention of each of these branches that was spent on those efforts in the last few days before the election would otherwise have been used to

engage and educate people who had not already voted. APP_01068-1069.

f.  The State Conference anticipates that, in future elections, it will similarly need to divert its staff and volunteer resources from their intended mission—engaging, educating, and mobilizing new voters— toward addressing the risk that voters who have already submitted their mail ballots may have their ballot set aside due to an error or omission of the handwritten date on the mail ballot return envelope. APP_01069.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

28.  The League of Women Voters of Pennsylvania ("the League") is a non-partisan statewide non-profit formed in 1920. APP_01082-1106.

a.  The League encourages informed and active participation in government, works to increase understanding of major public policy issues, and seeks to influence public policy through education and advocacy. APP_01082.

b.  The League is a predominantly volunteer organization and has

c. 31 member chapters and one Inter-League Organization operating in 29 counties around the Commonwealth. LWVPA has more than 2,500 individual members, many of whom who are registered voters and regularly vote in state and federal elections using, among other methods, absentee and mail ballots. APP_01082.

d. During every election cycle, the League conducts voter-registration drives, staffs nonpartisan voter-registration tables, educates incarcerated and formerly incarcerated individuals about their voting rights, and works with local high schools and universities to register young voters. The League maintains voter information resources on its website in English and Spanish. APP_01082-1083.

e. During the November 2022 election, the League reassigned its members' and volunteers' time and efforts from these core activities towards contacting and educating voters who had already submitted their mail ballots about how to fix problems with the mail ballot envelope date and avoid having their ballot set aside. APP_01083.

f. Three staff members and approximately 30 volunteers spent time scouring publicly available lists of affected voters and contacting hundreds of Pennsylvania voters to provide them with information to help them cure their ballot or vote provisionally. In particular, the Lower Merion & Narberth league directly emailed more than 250 members with explicit instructions on how to vote if their mail ballots were cancelled. APP_01083-1087.

g. The League (and many of its local leagues) shared information on social media channels and the League's websites to alert voters of the risk that their vote would not be counted and instruct voters about how to correct their mail ballot envelopes. The League also attended county board of elections meetings, especially in Montgomery, Allegheny, and Lancaster Counties, to advocate for notice and cure opportunities for voters whose ballots were set aside due to an error or omission of the handwritten date on the mail ballot return envelope. APP_01084-1087.

h. The Lower Merion and Narberth League also worked in coalition with civic and community groups to spread the word about

correcting errors on mail ballot envelopes and participated in an event with the Bethel AME Church in Ardmore to help congregants check their mail ballot status and instruct them on how to correct paperwork errors. APP_01086-1087.

i. The League anticipates that, in future elections, it will similarly need to divert staff, member and volunteer resources from their core activities toward addressing the risk that voters who have already submitted their mail ballots may have their ballot set aside due to an error or omission of the handwritten date on the mail ballot return envelope. For example, in advance of the 2023 municipal primary, the League has developed a webinar featuring mail voting and how to apply and correctly submit a mail ballot. Similarly, its social media posts, website content and public statements will need to focus on helping voters avoid disenfranchisement for errors on mail ballot envelopes. APP_01087-1088.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

29. Philadelphians Organized to Witness, Empower and Rebuild ("POWER") is a Pennsylvania non-profit organization of more than 100 congregations of various faith traditions, cultures and neighborhoods committed to civic engagement and organizing communities so that the voices of all faiths, races and income levels are counted and have a say in government. APP_01107-1110 (POWER Decl.).

a. POWER's civic engagement efforts include civic engagement efforts include voter education programs, voter registration drives, and "Souls to the Polls" efforts to encourage congregants to vote. In the weeks leading up to the November 2022 election, POWER launched a bus tour focused on engaging voters who were not already participating in the political process. APP_01107-1108.

b. During the 2022 election, POWER reassigned volunteers and staff from its existing voter education and mobilization efforts towards contacting and educating voters who had already submitted their mail ballots about how to fix problems with the mail ballot envelope date and avoid having their vote set aside. APP_01108-1109.

c. For example, when Philadelphia published a list of over 3,000 voters who were at risk of having their November 2022 general election ballots thrown out over technical errors, including a missing or incorrect date on the return envelope, POWER's members and volunteers made more than 1,200 manual calls and sent more than 2,900 texts to the voters whose names appeared on Philadelphia's at-risk list to provide them with information to help them cure their ballot or vote provisionally. POWER also stationed volunteers at City Hall to ensure voters returning their mail ballots to that location had correctly dated their return envelopes. APP_01108-1109.

d. The time and attention that POWER devoted to ensuring voters who had already submitted their mail ballots would have their votes counted would otherwise have been used to engage and educate people who had not already attempted to vote. APP_01109.

e. POWER anticipates that, in future elections, it will similarly need to divert its member and volunteer resources from their intended mission—engaging, educating, and mobilizing new voters—toward addressing the risk that voters who have already

submitted their mail ballots may have their ballot set aside due to an error or omission of the handwritten date on the mail ballot return envelope. APP_01109.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

30.    Common Cause Pennsylvania ("Common Cause PA") is a non-profit, non-partisan organization, and a chapter of the national Common Cause organization. APP_01111-1124 (Common Cause PA Decl.).

    a.  Common Cause PA is a non-partisan good government organization with approximately 36,000 members and supporters who live in all 67 counties of Pennsylvania. One of Common Cause PA's core functions is to increase the level of voter registration and voter participation in Pennsylvania elections, especially in communities that are historically underserved and whose populations have a low propensity for voting. APP_01111.

    b.  In preparation for every election cycle, and most significantly in even- year elections, Common Cause PA leads the Election Protection Coalition field program which recruits and trains

volunteers to visit polling places and assist voters. As part of its Election Protection Coalition work, Common Cause PA disseminates accurate information about voting and instructions for navigating the voting process on its website, on social media, and through outreach to traditional media. APP_01112.

c. During the 2022 election, Common Cause PA reassigned its volunteers' time and efforts from Common Cause PA's existing efforts toward contacting and educating voters who had already submitted their mail ballots about how to fix problems with the mail ballot envelope date and avoid having their vote set aside. APP_01113.

d. When defendants announced that they would segregate and not count ballots with an incorrect or missing date, Common Cause PA ensured that accurate information was available for voters. Additionally, Common Cause PA organized a press briefing with Make the Road PA, All Voting is Local PA and Pennsylvania Voice to remind voters to date their mail ballot envelopes and to alert them that their ballot would not count if the date was missing. Common Cause PA issued the press

advisory, held the press briefing and issued a press statement within the span of 24 hours, with the goal of alerting as many voters as possible as quickly as possible. APP_01113-1114.

e. To protect voters from having their ballot set aside due to an error or omission of the handwritten date on their mail ballot return envelope, Common Cause PA also created and sent an email to all of its members and supporters immediately after the November 2022 election advising them that, if they cast a provisional ballot, to check and make sure the ballot was counted. APP_01114.

f. Common Cause PA anticipates that, in future elections, it will continue to divert its volunteer resources from its intended mission—educating and mobilizing voters—toward addressing the risk that voters who have already submitted their mail ballots may have their ballot set aside due to an error or omission of the handwritten date on the mail ballot return envelope. For example, in advance of the 2023 municipal primary, Common Cause PA is developing a new webinar on mail voting, specifically focusing on the impact of the enforcement of the date requirement. This webinar is part of a series, but it diverts

resources away from providing other important voter education information. APP_01114-1115

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

31. Black Political Empowerment Project ("B-PEP") is a non-profit, non-partisan organization that has worked since 1986 to ensure that the Pittsburgh African-American community votes in every election. APP_01125.

a. B-PEP has numerous supporters, of various ages and races, throughout the Pittsburgh Region, working with numerous community organizations to empower Black and brown communities. APP_01125.

b. During every election cycle, B-PEP's work includes voter registration drives, get-out-the-vote activities, education and outreach about the voting process, and election-protection work. B-PEP focuses these activities in predominantly Black neighborhoods in Allegheny County, with some efforts in Westmoreland and Washington Counties. For the November 2022 election, B-PEP conducted outreach to members and

constituent communities about the importance of voting in person or by mail. APP_01125-1126.

c. When it was announced that county boards of elections would not count timely-submitted mail ballots based solely on missing or supposedly incorrect dates on return envelopes, many B-PEP members and others served by its mission had already submitted mail ballots. This abrupt change in voting rules just before Election Day caused B-PEP to redirect its limited resources, including staff and volunteer time, to efforts to inform voters of this change and educate them as to how to avoid disenfranchisement. APP_01126.

d. Specifically, in the days leading up to the election in November 2022, B-PEP's staff and volunteers also expended time and money developing, printing and distributing hundreds of flyers and other educational materials to dozens of churches for the purpose of informing prospective voters of the envelope dating issues generated by the Ball decision. APP_01126, APP_01129-1131.

e. B-PEP staff and volunteers also spent valuable time in discussion with county election directors seeking clarity and

guidance about their handling of mail ballots, and then working with other voting rights and community organizations to maximize voters' understanding of the county election boards' procedures. APP_01126.

f. B-PEP's time and resources dedicated by B-PEP staff and volunteers would otherwise have been available for the organization's other "get out the vote" efforts and other initiatives serving BPEP's mission, including its Greater Pittsburgh Coalition Against Violence. APP_01126-1127.

g. B-PEP anticipates that, in future elections, it will similarly need to divert its staff and volunteer resources from voter engagement and community initiatives toward preventing the disenfranchisement of voters who have already submitted their ballots. APP_01127.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

32. Make the Road Pennsylvania ("Make the Road PA") is a not-for-profit, member-led organization formed in 2014 that builds the power of the working class

in Latino and other communities to achieve dignity and justice through organizing, policy innovation, and education services. APP_01132.

    a. Make the Road PA's more than 10,000 members are primarily working-class residents of Pennsylvania, many in underserved communities. Many members of Make the Road PA are registered voters in Pennsylvania. APP_01132.

    b. Make the Road PA's work includes substantial field work aimed at voter protection, voter advocacy and voter education on, for example, how to register to vote, how to apply for mail-in/absentee ballots, how to return mail-in/absentee ballots, and where to vote. Its get-out-the-vote efforts in the 2022 General Election alone included knocking on over 300,000 doors and speaking directly with over 29,000 people in Berks, Bucks, Lehigh, Northampton and Philadelphia Counties. APP_01132-1133.

    c. When defendants announced that they would not count timely-submitted mail ballots based solely on missing or supposedly incorrect dates on return envelopes, many Make the Road PA members and others served by its mission had already submitted mail ballots. This abrupt change in voting rules just before

Election Day caused Make the Road PA to redirect its limited resources, including staff and volunteer time, to efforts to inform voters of this change and educate them as to how to avoid disenfranchisement. Moreover, because Make the Road's efforts are focused on communities where many voters are not native English speakers, the risk that some voters may make a minor paperwork mistake in filling out various forms related to mail or absentee ballot voting is heightened. Accordingly, Make the Road PA's staff and volunteers directed time and resources in the critical time before Election Day to contacting county election officials to determine how, if at all, they would inform non- English speakers of any problems with the dating of their mail ballot envelopes. APP_01133.

d. Make the Road PA's staff and volunteers conducted extensive phone and text message outreach, on an emergency basis, to its members informing prospective voters of the envelope dating issues generated. APP_01133. Make the Road PA contacted thousands of Pennsylvania voters to provide them with information to help them cure their ballot or vote provisionally to prevent the counties' actions from disenfranchising them.

Make the Road PA's staff and volunteers also spent valuable time in discussion with county election directors seeking clarity and guidance about their handling of mail ballots. But for application of the rule at issue in this case, such time and resources dedicated by Make the Road PA staff and volunteers would have been available for the organization's other "get out the vote" efforts and other initiatives serving Make the Road PA's mission, including its Immigrant Rights, Education Justice, Housing Justice, Climate Justice and Worker Rights initiative. APP_01134.

e. Make the Road PA anticipates that, in future elections, it will similarly need to divert its staff and volunteer resources from voter engagement and community initiatives toward preventing the disenfranchisement of voters who have already submitted their ballots. APP_01134.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

## III. THE 2022 ELECTION

33. The November 2022 general election involved elections for the U.S. Senate, U.S. House of Representatives, Pennsylvania Governor, and Pennsylvania House and Senate offices. APP_01194.

**Response**: Admitted.

34. For the November 2022 election, different counties sent out their mail-ballot packages at different times:

a. Adams County began sending mail ballot packages to voters on September 28, 2022. APP_00005 (Adams Interrog. Resp.).

b. Allegheny County began sending mail ballot packages to voters on September 30, 2022. APP_00027 (Allegheny Interrog. Resp.).

c. Armstrong County began sending mail ballot packages to voters on October 10, 2022. APP_00041 (Armstrong Interrog. Resp.).

d. Beaver County began sending mail ballot packages to voters on September 26, 2022. APP_00062 (Beaver Interrog. Resp.).

e. Berks County began sending mail ballot packages to voters on October 7, 2022. APP_00078 (Berks Interrog. Resp.).

f. Blair County began sending mail ballot packages to voters on

October 14, 2022. APP_00097 (Blair Interrog. Resp.).

g. Bradford County began sending mail ballot packages to voters on September 27th, 2022. APP_00108 (Bradford Interrog. Resp.).

h. Bucks County began sending mail ballot packages to voters on October 5, 2022 and military/overseas ballots on September 22, 2022. APP_00117 (Bucks Interrog. Resp.).

i. Butler County began sending mail ballot packages to voters on October 12, 2022. APP_00131 (Butler Interrog. Resp.).

j. Cambria County began sending mail ballot packages to voters on October 6, 2022. APP_00140 (Cambria Interrog. Resp.).

k. Cameron County began sending mail ballot packages to voters on October 12, 2022. APP_00150 (Cameron Interrog. Resp.).

l. Chester County began sending mail ballot packages to voters on October 10, 2022. APP_00169 (Chester Interrog. Resp.).

m. Clarion County began sending mail ballot packages to voters on October 4, 2022. APP_00185 (Clarion Interrog. Resp.).

n. Clearfield County began sending mail ballot packages to voters on October 3, 2022. APP_00294 (Clearfield Interrog. Resp.).

o. Clinton County began sending mail ballot packages to voters

on September 30, 2022. APP_00216 (Clinton Interrog. Resp.).

p. Crawford County began sending mail ballot packages to voters on September 26, 2022. APP_00233 (Crawford Interrog. Resp.).

q. Cumberland County began sending mail ballot packages to voters on October 3, 2022. APP_00252 (Cumberland Interrog. Resp.).

r. Delaware County began sending mail ballot packages to voters on October 8, 2022. APP_00267 (Delaware Interrog. Resp.).

s. Elk County began sending mail ballot packages to voters on September 16, 2022. APP_00279 (Elk Interrog. Resp.).

t. Erie County began sending mail ballot packages to voters on October 6, 2022. APP_00292 (Erie Interrog. Resp.).

u. Fayette County began sending mail ballot packages to voters on October 11, 2022. APP_00309 (Fayette Interrog. Resp.).

v. Forest County began sending mail ballot packages to voters on October 6, 2022. APP_00321 (Forest Interrog. Resp.).

w. Franklin County began sending mail ballot packages to voters on October 3, 2022. APP_00336 (Franklin Interrog. Resp.).

x. Fulton County began sending mail ballot packages to voters on

October 21, 2022. APP_00347 (Fulton Interrog. Resp.).

y. Greene County began sending mail ballot packages to voters on September 30, 2022. APP_00355 (Greene Interrog. Resp.).

z. Juniata County began sending mail ballot packages to voters on September 27, 2022. APP_00363 (Juniata Interrog. Resp.).

aa. Lackawanna County began sending mail ballot packages to voters on October 3, 2022. APP_00373 (Lackawanna Interrog. Resp.).

bb. Lancaster County began sending mail ballot packages to voters on September 26, 2022. APP_00389 (Lancaster Interrog. Resp.).

cc. Lehigh County began sending mail ballot packages to voters on September 23, 2022. APP_00401 (Lehigh Interrog. Resp.).

dd. Luzerne County began sending mail ballot packages to voters on October 13, 2022. APP_00417 (Luzerne Interrog. Resp.).

ee. Lycoming County began sending mail ballot packages to voters on September 22, 2022. APP_00439 (Lycoming Interrog. Resp.).

ff. McKean County began sending mail ballot packages to voters on September 30, 2022. APP_00453 (McKean Interrog. Resp.).

gg. Mercer County began sending mail ballot packages to voters on October 7, 2022. APP_00461 (Mercer Interrog. Resp.).

hh. Mifflin County began sending mail ballot packages to voters on October 10, 2022. APP_00468 (Mifflin Interrog. Resp.).

ii. Montgomery County began sending mail ballot packages to voters on October 6, 2022. APP_00481 (Montgomery Interrog. Resp.).

jj. Northampton County began sending mail ballot packages to voters on October 3, 2022. APP_00495 (Northampton Interrog. Resp.).

kk. Perry County began sending mail ballot packages to voters on October 3, 2022. APP_00511 (Perry Interrog. Resp.).

ll. Philadelphia County began sending mail ballot packages to voters on October 10, 2022. APP_00530 (Philadelphia Interrog. Resp.).

mm.     Pike County began sending mail ballot packages to voters on October 3, 2022. APP_00541 (Pike Interrog. Resp.).

nn. Potter County began sending mail ballot packages to voters on September 26, 2022. APP_00575 (Potter Interrog. Resp.).

oo. Schuylkill County began sending mail ballot packages to

voters on October 13, 2022. APP_00587 (Schuylkill Interrog. Resp.).

pp. Somerset County began sending mail ballot packages to voters on October 5, 2022. APP_00599 (Somerset Interrog. Resp.).

qq. Sullivan County began sending mail ballot packages to voters on October 4, 2022. APP_00609 (Sullivan Interrog. Resp.).

rr. Susquehanna County began sending mail ballot packages to voters on October 19, 2022. APP_00619 (Susquehanna Interrog. Resp.).

ss. Tioga County began sending mail ballot packages to voters on September 21, 2022. APP_00629 (Tioga Interrog. Resp.).

tt. Union County began sending mail ballot packages to voters on September 23, 2022. APP_00635 (Union Interrog. Resp.).

uu. Warren County began sending mail ballot packages to voters on October 5, 2022. APP_00646 (Warren Interrog. Resp.).

vv. Washington County began sending military overseas ballots on September 23, 2022 and mail ballot packages to voters on October 4, 2022. APP_00667 (Washington Interrog. Resp.).

ww. Wayne County began sending mail ballot packages to voters on August 23, 2022. APP_00691 (Wayne Interrog.

Resp.).

xx. Westmoreland County began sending mail ballot packages to voters on October 5, 2022. APP_00706 (Westmoreland Interrog. Resp.).

yy. Wyoming County began sending mail ballot packages to voters on September 19, 2022. APP_00714. (Wyoming Interrog. Resp.).

zz. Bedford County began sending mail ballot packages to voters on October 7, 2022. APP_00732 (Bedford Interrog. Resp.).

aaa. Carbon County began sending mail ballot packages to voters on September 27, 2022. APP_00733 (Carbon Interrog. Resp.).

bbb. Centre County began sending mail ballot packages to voters on September 27, 2022. APP_00733 (Centre Interrog. Resp.).

ccc. Columbia County began sending mail ballot packages to voters on September 27, 2022. APP_00733 (Columbia Interrog. Resp.).

ddd. Dauphin County began sending mail ballot packages to voters on September 2, 2022. APP_00733 (Dauphin Interrog.

Resp.).

eee.     Jefferson County began sending mail ballot packages to voters on September 12, 2022. APP_00733 (Jefferson Interrog. Resp.).

fff. Huntington County began sending mail ballot packages to voters on October 4, 2022. APP_00733 (Huntingdon Interrog. Resp.).

ggg.     Indiana County began sending mail ballot packages to voters on October 3, 2022. APP_00733 (Indiana Interrog. Resp.).

hhh.     Lawrence County began sending mail ballot packages to voters on September 26, 2022. APP_00733 (Lawrence Interrog. Resp.).

iii. Lebanon County began sending mail ballot packages to voters on October 7, 2022. APP_00733 (Lebanon Interrog. Resp.).

jjj. Monroe County began sending mail ballot packages to voters on October 7, 2022. APP_00733 (Monroe Interrog. Resp.).

kkk.     Montour County began sending mail ballot packages to voters on September 23, 2022. APP_00733 (Montour Interrog. Resp.).

lll. Northumberland County began sending mail ballot packages to voters on September 21, 2022. APP_00733 (Northumberland Interrog. Resp.).

mmm. Snyder County began sending mail ballot packages to voters on September 23, 2022. APP_00733 (Snyder Interrog. Resp.).

nnn. Venango County began sending mail ballot packages to voters on September 27, 2022. APP_00733 (Venango Interrog. Resp.).

ooo. York County began sending mail ballot packages to voters on September 28, 2022. APP_00733 (York Interrog. Resp.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

35. The county boards of elections reported receiving 1,238,522 mail and absentee ballots in the November 2022 election. APP_00005 (Adams Interrog. Resp.); APP_00035 (Allegheny Interrog. Resp.); APP_00040 (Armstrong Interrog. Resp.); APP_00060 (Beaver Interrog. Resp.); APP_00077 (Berks Interrog. Resp.); APP_00096 (Blair Interrog. Resp.); APP_00107 (Bradford Interrog. Resp.);

APP_00116 (Bucks Interrog. Resp.); APP_00130 (Butler Interrog. Resp.);

APP_00140 (Cambria Interrog. Resp.); APP_00149 (Cameron Interrog. Resp.);

APP_00168 (Chester Interrog. Resp.); APP_00185 (Clarion Interrog. Resp.);

APP_00209 (Clearfield Interrog. Resp.); APP_00215 (Clinton Interrog. Resp.);

APP_00232 (Crawford Interrog. Resp.); APP_00251 (Cumberland Interrog. Resp.);

APP_00266 (Delaware Interrog. Resp.); APP_00278 (Elk Interrog. Resp.);

APP_00291 (Erie Interrog. Resp.); APP_00308 (Fayette Interrog. Resp.);

APP_00320 (Forest Interrog. Resp.); APP_00335 (Franklin Interrog. Resp.);

APP_00347 (Fulton Interrog. Resp.); APP_00354 (Greene Interrog. Resp.);

APP_00363 (Juniata Interrog. Resp.); APP_00371 (Lackawanna Interrog. Resp.);

APP_00388 (Lancaster Interrog. Resp.); APP_00400 (Lehigh Interrog. Resp.);

APP_00416 (Luzerne Interrog. Resp.); APP_00438 (Lycoming Interrog. Resp.);

APP_00452 (McKean Interrog. Resp.); APP_00461 (Mercer Interrog. Resp.);

APP_00468 (Mifflin Interrog. Resp.); APP_00481 (Montgomery Interrog. Resp.);

APP_00494 (Northampton Interrog. Resp.); APP_00510 (Perry Interrog. Resp.);

APP_00529 (Philadelphia Interrog. Resp.); APP_00541 (Pike Interrog. Resp.);

APP_00573 (Potter Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.);

APP_00598 (Somerset Interrog. Resp.); APP_00609 (Sullivan Interrog. Resp.);

APP_00619 (Susquehanna Interrog. Resp.); APP_00629 (Tioga Interrog. Resp.);

APP_00634 (Union Interrog. Resp.); APP_00645 (Warren Interrog. Resp.);

APP_00666 (Washington Interrog. Resp.); APP_00690 (Wayne Interrog. Resp.); APP_00705 (Westmoreland Interrog. Resp.); APP_00714 (Wyoming Interrog. Resp.); APP_00729-30 (Babst Calland[2] Interrog. Resp.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

36. In the November 2022 general election, the county boards of elections segregated at least 10,506 mail ballots solely based on missing or incorrect dates on their outer return envelopes:

a. Adams County segregated 4 ballots with undated return envelopes and 0 ballots with misdated envelopes. APP_00005-6 (Adams Interrog. Resp.).

b. Allegheny County segregated 1,009 ballots with undated or misdated return envelopes. APP_00026-27 (Allegheny Interrog. Resp.).

c. Armstrong County segregated 15 ballots with undated or misdated return envelopes. APP_00040 (Armstrong Interrog.

[2] Cites to the "Babst Calland" Responses to Requests for Admissions and Interrogatories refer to the collective responses filed by the Bedford, Carbon, Centre, Columbia, Dauphin, Huntingdon, Indiana, Jefferson, Lawrence, Lebanon, Monroe, Montour, Northumberland, Snyder, Venango, and York County Boards of Elections. See generally APP_00723-775.

Resp.).

d. Beaver County segregated 182 ballots with undated or misdated return envelopes. APP_00060 (Beaver Interrog. Resp.).

e. Berks County segregated 782 ballots with undated or misdated return envelopes. APP_00078 (Berks Interrog. Resp.).

f. Blair County segregated 55 ballots with undated or misdated return envelopes. APP_00096 (Blair Interrog. Resp.).

g. Bradford County segregated 22 ballots with undated return envelopes and 1 ballot with misdated envelopes. APP_00107-108 (Bradford Interrog. Resp.).

h. Bucks County segregated 357 ballots with undated or misdated return envelopes. APP_00116 (Bucks Interrog. Resp.).

i. Butler County segregated 66 ballots with undated or misdated return envelopes. APP_00130 (Butler Interrog. Resp.).

j. Cambria County segregated 38 ballots with undated or misdated return envelopes. APP_00140 (Cambria Interrog. Resp.).

k. Cameron County segregated 5 ballots with undated return envelopes and 0 ballots with misdated envelopes. APP_00150 (Cameron Interrog. Resp.).

l.  Chester County segregated 67 ballots with undated return envelopes and 68 ballots with misdated envelopes. APP_00168 (Chester Interrog. Resp.).

m. Clarion County segregated 9 ballots with undated return envelopes and 3 ballots with misdated envelopes. APP_00185 (Clarion Interrog. Resp.).

n.  Clearfield County segregated 12 ballots with undated or misdated return envelopes. APP_00204 (Clearfield Interrog. Resp.).

o.  Clinton County segregated 20 ballots with undated or misdated return envelopes. APP_00216 (Clinton Interrog. Resp.).

p.  Crawford County segregated 51 ballots with undated or misdated return envelopes. APP_00233 (Crawford Interrog. Resp.).

q.  Cumberland County segregated 100 ballots with undated or misdated return envelopes. APP_00252 (Cumberland Interrog. Resp.).

r.  Delaware County segregated 49 ballots with undated return envelopes and 65 ballots with misdated envelopes. APP_00267 (Delaware Interrog. Resp.).

s. Elk County segregated 10 ballots with undated or misdated return envelopes. APP_00278 (Elk Interrog. Resp.).

t. Erie County segregated 168 ballots with undated return envelopes and 51 ballots with misdated envelopes. APP_00292 (Erie Interrog. Resp.).

u. Fayette County segregated 137 ballots with undated or misdated return envelopes. APP_00309 (Fayette Interrog. Resp.).

v. Forest County segregated 38 ballots with undated or misdated return envelopes. APP_00320 (Forest Interrog. Resp.).

w. Franklin County segregated 114 ballots with undated or misdated return envelopes. APP_00336 (Franklin Interrog. Resp.).

x. Fulton County segregated 5 ballots with undated or misdated return envelopes. APP_00347 (Fulton Interrog. Resp.).

y. Greene County segregated 11 ballots with undated or misdated return envelopes. APP_00354 (Greene Interrog. Resp.).

z. Juniata County segregated 5 ballots with undated or misdated return envelopes. APP_00363 (Juniata Interrog. Resp.).

Case 1:22-cv-00339-SPB Document 309 Filed 05/05/23 Page 51 of 229

aa. Lackawanna County segregated 160 ballots with undated or misdated return envelopes. APP_00372 (Lackawanna Interrog. Resp.).

bb. Lancaster County segregated 232 ballots with undated or misdated return envelopes. APP_00388 (Lancaster Interrog. Resp.).

cc. Lehigh County segregated 176 ballots with undated return envelopes and 237 ballots with misdated envelopes. APP_00400 (Lehigh Interrog. Resp.).

dd. Luzerne County segregated 166 ballots with undated or misdated return envelopes. APP_00416 (Luzerne Interrog. Resp.).

ee. Lycoming County segregated 36 ballots with undated or misdated return envelopes. APP_00438 (Lycoming Interrog. Resp.).

ff. McKean County segregated 35 ballots with undated or misdated return envelopes. APP_00453 (McKean Interrog. Resp.).

gg. Mercer County segregated 63 ballots with undated or misdated return envelopes. APP_00461 (Mercer Interrog. Resp.).

hh. Mifflin County segregated 10 ballots with undated or misdated return envelopes. APP_00468 (Mifflin Interrog. Resp.).

ii. Montgomery County segregated 460 ballots with undated or misdated return envelopes. APP_00481 (Montgomery Interrog. Resp.).

jj. Northampton County segregated 230 ballots with undated return envelopes and 50 ballots with misdated envelopes. APP_00495 (Northampton Interrog. Resp.).

kk. Perry County segregated 27 ballots with undated return envelopes and 8 ballots with misdated envelopes. APP_00511 (Perry Interrog. Resp.).

ll. Philadelphia County segregated 2,617 ballots with undated or misdated return envelopes. APP_00529 (Philadelphia Interrog. Resp.).

mm. Pike County segregated 55 ballots with undated or misdated return envelopes. APP_00541 (Pike Interrog. Resp.).

nn. Potter County segregated 14 ballots with undated return envelopes and 0 ballots with misdated envelopes. APP_00574 (Potter Interrog. Resp.).

oo. Schuylkill County segregated 59 ballots with undated or misdated return envelopes. APP_00587 (Schuylkill Interrog. Resp.).

pp. Somerset County segregated 63 ballots with undated or misdated return envelopes. APP_00598 (Somerset Interrog. Resp.).

qq. Sullivan County segregated 4 ballots with undated or misdated return envelopes. APP_00609 (Sullivan Interrog. Resp.).

rr. Susquehanna County segregated 0 ballots with undated or misdated return envelopes. APP_00619 (Susquehanna Interrog. Resp.).

ss. Tioga County segregated 4 ballots with undated or misdated return envelopes. APP_00629 (Tioga Interrog. Resp.).

tt. Union County segregated 23 ballots with undated or misdated return envelopes. APP_00634 (Union Interrog. Resp.).

uu. Warren County segregated 10 ballots with undated return envelopes and 8 ballots with misdated envelopes. APP_00646 (Warren Interrog. Resp.).

vv. Washington County segregated 66 ballots with undated or misdated return envelopes. APP_00666 (Washington Interrog. Resp.).

ww. Wayne County segregated 40 ballots with undated return envelopes and 15 ballots with misdated envelopes. APP_00691 (Wayne Interrog. Resp.).

xx. Westmoreland County segregated 95 ballots with undated or misdated return envelopes. APP_00705 (Westmoreland Interrog. Resp.).

yy. Wyoming County segregated 17 ballots with undated return envelopes and 0 ballots with misdated envelopes. APP_00714. (Wyoming Interrog. Resp.).

zz. Bedford County segregated 0 ballots with undated or misdated return envelopes. APP_00731 (Bedford Interrog. Resp.).

aaa. Carbon County segregated 27 ballots with undated or misdated return envelopes. APP_00731 (Carbon Interrog. Resp.).

bbb. Centre County segregated 115 ballots with undated or misdated return envelopes. APP_00731 (Centre Interrog. Resp.).

ccc. Columbia County segregated 29 ballots with undated or misdated return envelopes. APP_00731 (Columbia Interrog. Resp.).

ddd. Dauphin County segregated 95 ballots with undated or misdated return envelopes. APP_00731 (Dauphin Interrog. Resp.).

eee. Jefferson County segregated 23 ballots with undated or misdated return envelopes. APP_00731 (Jefferson Interrog. Resp.).

fff. Huntingdon County segregated 34 ballots with undated or misdated return envelopes. APP_00731 (Huntingdon Interrog. Resp.).

ggg. Indiana County segregated 107 ballots with undated or misdated return envelopes. APP_00731 (Indiana Interrog. Resp.).

hhh. Lawrence County segregated 15 ballots with undated or misdated return envelopes. APP_00731 (Lawrence Interrog. Resp.).

iii. Lebanon County segregated 24 ballots with undated or misdated return envelopes. APP_00731 (Lebanon Interrog. Resp.).

jjj. Monroe County segregated 462 ballots with undated or misdated return envelopes. APP_00731 (Monroe Interrog. Resp.).

kkk. Montour County segregated 8 ballots with undated or misdated return envelopes. APP_00731 (Montour Interrog. Resp.).

lll. Northumberland County segregated 14 ballots with undated or misdated return envelopes. APP_00731 (Northumberland Interrog. Resp.).

mmm. Snyder County segregated 9 ballots with undated or misdated return envelopes. APP_00732 (Snyder Interrog. Resp.).

nnn. Venango County segregated 42 ballots with undated or misdated return envelopes. APP_00732 (Venango Interrog. Resp.).

ooo. York County segregated 1,061 ballots with undated or misdated return envelopes. APP_00732 (York Interrog. Resp.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

37. In administering the November 2022 general election, the county boards of elections did not count mail ballots that were timely received and submitted in signed envelopes but without a handwritten date on the outer return envelope. APP_00004 (Adams RFA Resp.); APP_00021 (Allegheny RFA Resp.); APP_00038 (Armstrong RFA Resp.); APP_0050 (Beaver RFA Resp.); APP_00073 (Berks RFA Resp.); APP_00091 (Blair RFA Resp.); APP_00106 (Bradford RFA Resp.); APP_00114 (Bucks RFA Resp.); APP_00126 (Butler RFA Resp.);

Case 1:22-cv-00339-SPB Document 399 Filed 05/05/25 Page 57 of 129

APP_00137 (Cambria RFA Resp.); APP_00160 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp); APP_00194 (Clearfield RFA Resp.); APP_00212 (Clinton RFA Resp.); APP_00226 (Crawford RFA Resp.); APP_00247 (Cumberland RFA Resp.); APP_00262 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00282 (Erie RFA Resp.); APP_00303 (Fayette RFA Resp.); APP_00318 (Forest RFA Resp.); APP_00330 (Franklin RFA Resp.); APP_00348 (Fulton RFA Resp.); APP_00352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00368 (Lackawanna RFA Resp.); APP_00383 (Lancaster RFA Resp.); APP_00397 (Lehigh RFA Resp.); APP_00411 (Luzerne RFA Resp.); APP_00431 (Lycoming RFA Resp.); APP_00450 (McKean RFA Resp.); APP_00466 (Mifflin RFA Resp.); APP_00476 (Montgomery RFA Resp.); APP_00489, APP_00490 (Northampton RFA Resp.); APP_00505 (Perry RFA Resp.); APP_00524 (Philadelphia RFA Resp.); APP_00544 (Pike RFA Resp.); APP_00550 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00593 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00642 (Warren RFA Resp.); APP_00655 (Washington RFA Resp.); APP_00681 (Wayne RFA Resp.); APP_00698 (Westmoreland RFA Resp.); APP_00719 (Wyoming RFA Resp.); *see also* APP_00822-823 (Berks Dep.); APP_00867-868 (Lancaster Dep.); APP_00918-919 (Westmoreland Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

38. Thousands of ballots were set aside and not counted solely based on a missing handwritten date on the return envelope in the November 2022 election. *See* APP_01494-1496, APP_01572 (Tetro Decl.) (summarizing manual review of certain counties' ballot envelopes); APP_01162a (Philadelphia meeting minutes stating 2,143 ballots were excluded based on a missing handwritten date on the return envelope in Philadelphia alone).

a. For example, Clearfield County set aside the ballot of a voter who omitted the handwritten date on their return envelope, even though the stamp on the envelope indicates the ballot was received by the county board of elections on "OCT 11 2022." An election official wrote a note on this envelope that says "can't come in disabled." APP_01433.

b. Clearfield County also set aside the ballot of another voter who omitted the handwritten date on their return envelope, even though the stamp on the envelope indicates the ballot was received by the county board of elections on "OCT 24 2022." An election official wrote a note on that envelope that says "can

not fix[,] in Florida." APP_01434.

    c. Cumberland County set aside the ballot of a voter who omitted the handwritten date on the "Today's Date (Required)" line of the voter declaration form of their return envelope, even though the date "30 OCT 2022" appears in another signed and dated portion of the envelope that was completed by a witness, who assisted the voter because the voter was unable to sign their declaration because of illness or physical disability. APP_01435.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

39.    In administering the November 2022 general election, the county boards of elections did not count mail ballots that were timely received and submitted in signed envelopes, but had a handwritten date on the outer return envelope that appeared to pre-date September 19, 2022, or to post-date November 8, 2022. APP_00022 (Allegheny RFA Resp.); APP_00038 (Armstrong RFA Resp.); APP_00051 (Beaver RFA Resp.); APP_00074 (Berks RFA Resp.); APP_00091 (Blair RFA Resp.); APP_00106 (Bradford RFA Resp.); APP_00114 (Bucks RFA Resp.); APP_00126 (Butler RFA Resp.); APP_00137 (Cambria RFA Resp.); APP_00161 (Chester RFA Resp.); 00182 (Clarion RFA Resp.); APP_00194

(Clearfield RFA Resp.); APP_00212 (Clinton RFA Resp.); APP_00226 (Crawford RFA Resp.); APP_00262 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00282 (Erie RFA Resp.); APP_00304, APP_00305 (Fayette RFA Resp.); APP_00318 (Forest RFA Resp.); APP_00330 (Franklin RFA Resp.); APP_00348 (Fulton RFA Resp.); APP_00352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00369 (Lackawanna RFA Resp.); APP_00384 (Lancaster RFA Resp.); APP_00398 (Lehigh RFA Resp.); APP_00412 (Luzerne RFA Resp.); APP_00431 (Lycoming RFA Resp.); APP_00450 (McKean RFA Resp.); APP_00466 (Mifflin RFA Resp.); APP_00477 (Montgomery RFA Resp.); APP_00490 (Northampton RFA Resp.); APP_00505 (Perry RFA Resp.); APP_00525 (Philadelphia RFA Resp.); APP_00544 (Pike RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00593 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00642 (Warren RFA Resp.); APP_00681 (Wayne RFA Resp.); APP_00699 (Westmoreland RFA Resp.); APP_00719 (Wyoming RFA Resp.); APP_00727 (Babst Calland RFA Resp.); *see also* APP_00822-823 (Berks Dep.); APP_00868 (Lancaster Dep.); APP_00918-919 (Westmoreland Dep.).[3]

[3] The only counties that did not admit this are those that did not report receiving any mail ballots in incorrectly dated envelopes. APP_00004 (Adams RFA Resp.) ("Adams did not receive any such ballots and therefore no admission is made."); APP_00248 (Cumberland RFA Resp.) ("The Cumberland BOE did not receive any mail ballots in connection with the 2022 General Election that were timely received in signed envelopes that showed a date on the outer return envelope predating September 19, 2022, or post-dating November 8, 2022."); APP_00562 (Potter Suppl. RFA Resp.) ("As understood the request is DENIED as all ballots set aside by

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

40. At least 21 counties admitted that they provided voters with no notice that their ballot had been set aside because of a missing or incorrect date on the outer return envelope. APP_00043 (Armstrong Interrog. Resp.); APP_00100 (Blair Interrog. Resp.); APP_00109 (Bradford Interrog. Resp.); APP_00152 (Cameron Interrog. Resp.); APP_00187 (Clarion Interrog. Resp.); APP_00219 (Clinton Interrog. Resp.); APP_00255 (Cumberland Interrog. Resp.); APP_00323 (Forest Interrog. Resp.); APP_00356 (Greene Interrog. Resp.); APP_00375 (Lackawanna Interrog. Resp.); APP_00391 (Lancaster Interrog. Resp.); APP_00456 (McKean Interrog. Resp.); APP_00513 (Perry Interrog. Resp.); APP_00611 (Sullivan Interrog. Resp.); APP_00621 (Susquehanna Interrog. Resp.); APP_00636 (Union Interrog. Resp.); APP_00648 (Warren Interrog. Resp.); APP_00671 (Washington Interrog. Resp.); APP_00692 (Wayne Interrog. Resp.); APP_00708 (Westmoreland

---

Defendant regarding date issues were ballots which had a blank date on the outer envelope. SUPPLEMENTAL ANSWER: As an additional response the request is DENIED because no ballots were received with dates pre or post the dates mentioned."); APP_00146 (Cameron RFA Resp.) ("No such mail ballots were received in connection with the 2022 General Election."); APP_00616 (Susquehanna RFA Resp.) ("Defendant denies the first clause of the preceding statement insofar as no such ballots had been received"); APP_00626 (Tioga RFA. Resp.) ("Defendant objects to the preceding request as it assumes events contrary to fact. Subject to this objection, no envelopes bearing dates were uncounted.); APP_00655 (Washington RFA Resp.) ("Upon reasonable review of information in Defendant's possession and control, Defendant is without sufficient knowledge and/or information to admit or deny this Request.").

Interrog. Resp.); APP_00716 (Wyoming Interrog. Resp.); *see also* APP_00870-871 (Lancaster Dep.); APP_00921 (Westmoreland Dep.); APP_00980 (Marks Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

41.    At least 20 additional counties admitted that they provided voters with no notice that their ballot had been set aside because of a missing or incorrect date on the outer return envelope, except that they uploaded that information into the SURE system, which sends an automatic notification to voters who provided the county with their email address. APP_00738-739 (Bedford Interrog. Resp.); APP_00132 (Butler Interrog. Resp.); APP_00738-739 (Carbon Interrog. Resp.); APP_00738-739 (Centre Interrog. Resp.); APP_00738-739 (Columbia Interrog. Resp.); APP_00738-739 (Dauphin Interrog. Resp.); APP_00738-739 (Jefferson Interrog. Resp.); APP_00364 (Juniata Interrog. Resp.); APP_00738-739 (Huntingdon Interrog. Resp.); APP_00738-739 (Indiana Interrog. Resp.); APP_00738-739 (Lebanon Interrog. Resp.); APP_00462 (Mercer Interrog. Resp.); APP_00738-739 (Montour Interrog. Resp.); APP_00738-739 (Northumberland Interrog. Resp.); APP_00542 (Pike Interrog. Resp.); APP_00587 (Schuylkill

Interrog. Resp.); APP_00738-739 (Snyder Interrog. Resp.); APP_00601 (Somerset Interrog. Resp.); APP_00738-739 (Venango Interrog. Resp.); APP_00738-739 (York Interrog. Resp.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

42. All of the voters whose ballots were set aside in the November 2022 election solely because of a missing or incorrect handwritten date on the outer return envelope had previously been determined to be eligible and qualified to vote in the election by their county board of elections. APP_00008 (Adams Interrog. Resp.); APP_00029 (Allegheny Interrog. Resp.); APP_00042 (Armstrong Interrog. Resp.); APP_00064-65 (Beaver Interrog. Resp.); APP_00080 (Berks Interrog. Resp.); APP_00099 (Blair Interrog. Resp.); APP_00109 (Bradford Interrog. Resp.); APP_00118 (Bucks Interrog. Resp.); APP_00132 (Butler Interrog. Resp.); APP_00141 (Cambria Interrog. Resp.); APP_00152 (Cameron Interrog. Resp.); APP_00171 (Chester Interrog. Resp.); APP_00186 (Clarion Interrog. Resp.); APP_00205 (Clearfield Interrog. Resp.); APP_00219 (Clinton Interrog. Resp.); APP_00238 (Crawford Interrog. Resp.); APP_00255 (Cumberland Interrog. Resp); APP_00269 (Delaware Interrog. Resp.); APP_00279 (Elk Interrog. Resp.); APP_00294 (Erie Interrog. Resp.); APP_00311 (Fayette Interrog. Resp.);

APP_0032 (Forest Interrog. Resp.); APP_00338 (Franklin Interrog. Resp.);

APP_00347 (Fulton Interrog. Resp.); APP_00356 (Greene Interrog. Resp.);

APP_00363 (Juniata Interrog. Resp.); APP_00375 (Lackawanna Interrog. Resp.);

APP_00391 (Lancaster Interrog. Resp.); APP_00419 (Luzerne Interrog. Resp.);

APP_00440 (Lycoming Interrog. Resp.); APP_00455 (McKean Interrog. Resp.);

APP_00462 (Mercer Interrog. Resp.); APP_00470 (Mifflin Interrog. Resp.);

APP_00482 (Montgomery Interrog. Resp.); APP_00497 (Northampton Interrog.

Resp.); APP_00513 (Perry Interrog. Resp.); APP_00533 (Philadelphia Interrog.

Resp.); APP_00542 (Pike Interrog. Resp.); APP_00577 (Potter Interrog. Resp.);

APP_00587 (Schuylkill Interrog. Resp.); APP_00600 (Somerset Interrog. Resp.);

APP_00611 (Sullivan Interrog. Resp.); APP_00620 (Susquehanna Interrog. Resp.);

APP_00630 (Tioga Interrog. Resp.); APP_00636 (Union Interrog. Resp.);

APP_00647 (Warren Interrog. Resp.); APP_00670 (Washington Interrog. Resp.);

APP_00692 (Wayne Interrog. Resp.); APP_00708 (Westmoreland Interrog. Resp.);

APP_00715 (Wyoming Interrog. Resp.); APP_00736-737 (Babst Calland Interrog.

Resp.); see also APP_01165-1168 (Philadelphia meeting minutes).

**Response**: The Acting Secretary is not aware of any facts in the record that

contradict the allegations of this paragraph and accordingly admits the allegations

for purposes of this litigation only.

43. The county boards of elections did not identify or raise any fraud concerns with respect to any November 2022 general election mail ballot that was signed and timely received but set aside because of a missing or incorrect handwritten date on the outer return envelope. APP_00009 (Adams Interrog. Resp.); APP_00029 (Allegheny Interrog. Resp.); APP_00043 (Armstrong Interrog. Resp.); APP_00064 (Beaver Interrog. Resp.); APP_00080 (Berks Interrog. Resp.); APP_00099 (Blair Interrog. Resp.); APP_00109 (Bradford Interrog. Resp.); APP_00118 (Bucks Interrog. Resp.); APP_00132 (Butler Interrog. Resp.); APP_00141 (Cambria Interrog. Resp.); APP_00152 (Cameron Interrog. Resp.); APP_00172 (Chester Interrog. Resp.); APP_00187 (Clarion Interrog. Resp.); APP_00205 (Clearfield Interrog. Resp.); APP_00219 (Clinton Interrog. Resp.); APP_00239 (Crawford Interrog. Resp.); APP_00255 (Cumberland Interrog. Resp.); APP_00270 (Delaware Interrog. Resp.); APP_00279 (Elk Interrog. Resp.); APP_00294 (Erie Interrog. Resp.); APP_00311 (Fayette Interrog. Resp.); APP_0323 (Forest Interrog. Resp.); APP_00338 (Franklin Interrog. Resp.); APP_00347 (Fulton Interrog. Resp.); APP_00356 (Greene Interrog. Resp.); APP_00364 (Juniata Interrog. Resp.); APP_00375 (Lackawanna Interrog. Resp.); APP_00391 (Lancaster Interrog. Resp.); APP_00403 (Lehigh Interrog. Resp.); APP_00417 (Luzerne Interrog. Resp.); APP_00440 (Lycoming Interrog. Resp.); APP_00455 (McKean Interrog. Resp.); APP_00462 (Mercer Interrog. Resp.);

APP_00471 (Mifflin Interrog. Resp.); APP_00482 (Montgomery Interrog. Resp.);

APP_00497 (Northampton Interrog. Resp.); APP_00513 (Perry Interrog. Resp.);

APP_00542 (Pike Interrog. Resp.); APP_00533 (Philadelphia Interrog. Resp.);

APP_00578 (Potter Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.);

APP_00601 (Somerset Interrog. Resp.); APP_00611 (Sullivan Interrog. Resp.);

APP_00647 (Warren Interrog. Resp.); APP_00620 (Susquehanna Interrog. Resp.);

APP_00630 (Tioga Interrog. Resp.); APP_00636 (Union Interrog. Resp.);

APP_00670 (Washington Interrog. Resp.); APP_00692 (Wayne Interrog. Resp.);

APP_00708 (Westmoreland Interrog. Resp.); APP_00716 (Wyoming Interrog.

Resp.); APP_00737 (Babst Calland Interrog. Resp.); APP_00929r (Westmoreland

Dep.); Phila Bd. Transcript at 14-15.

**Response**: The Acting Secretary is not aware of any facts in the record that

contradict the allegations of this paragraph and accordingly admits the allegations

for purposes of this litigation only.

44.     The voters whose ballots were set aside based on a missing or incorrect

handwritten date include voters who identify as Democrats, Republicans, and

Independents, as well as unaffiliated voters. APP_01292-1400 (Beaver, Berks, Blair,

Butler, Centre, Erie, Franklin, Indiana, Lancaster, Lawrence, Luzerne, Venango,

Wayne, and Westmoreland voter lists).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

45.     The voters whose ballots were set aside based on a missing or incorrect handwritten date ranged in age from 18 to at least 101 years old, and the date requirement had a significant impact on voters who were 65 or older. APP_01292-1400. For example:

   a. In Beaver County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 96. Approximately 70 percent of the affected voters in Beaver County were at least 65 years old, and approximately 30 percent of the affected voters were at least 80 years old. APP_01292-01296.

   b. In Berks County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 101. Approximately 43 percent of the affected voters in Berks County were at least 65 years old, and 16 percent of the affected voters were at least 80 years old. APP_01298-01353.

   c. In Blair County, the youngest voter affected by the date

requirement was 25, and the oldest voter affected by the date requirement was 95. Approximately 69 percent of the affected voters in Blair County were at least 65 years old, and 18 percent of the affected voters were at least 80 years old. APP_01357-01358.

d.  In Butler County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 96. Approximately 48 percent of the affected voters in Butler County were at least 65 years old, and 16 percent of the affected voters were at least 80 years old. APP_01359-01360.

e.  In Centre County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 100. Approximately 56 percent of the affected voters in Centre County were at least 65 years old, and 24 percent of the affected voters were at least 80 years old. APP_01361-01364.

f.  In Erie County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 92. Approximately 66 percent of the affected

voters in Erie County were at least 65 years old, and 25 percent of the affected voters were at least 80 years old. APP_01367-01372.

g. In Franklin County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 96. Approximately 60 percent of the affected voters in Franklin County were at least 65 years old, and 30 percent of the affected voters were at least 80 years old. APP_01373-01375.

h. In Indiana County, the youngest voter affected by the date requirement was 20, and the oldest voter affected by the date requirement was 94. Approximately 42 percent of the affected voters in Indiana County were at least 65 years old, and 10 percent of the affected voters were at least 80 years old. APP_01376-01379.

i. In Lancaster County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 99. Approximately 61 percent of the affected voters in Lancaster County were at least 65 years old, and 22 percent of the affected voters were at least 80 years old.

APP_01380-01386.

j. In Lawrence County, the youngest voter affected by the date requirement was 19, and the oldest voter affected by the date requirement was 92. Approximately 66 percent of the affected voters in Lawrence County were at least 65 years old, and 26 percent of the affected voters were at least 80 years old. APP_01387.

k. In Luzerne County, the youngest voter affected by the date requirement was 18, and the oldest voter affected by the date requirement was 97. Approximately 61 percent of the affected voters in Luzerne County were at least 65 years old, and 15 percent of the affected voters were at least 80 years old. APP_01388-01391.

l. In Venango County, the youngest voter affected by the date requirement was 24, and the oldest voter affected by the date requirement was 97. Approximately 77 percent of the affected voters in Venango County were at least 65 years old, and 30 percent of the affected voters were at least 80 years old. APP_01393.

m. In Wayne County, the youngest voter affected by the date

requirement was 19, and the oldest voter affected by the date requirement was 97. Approximately 59 percent of the affected voters in Wayne County were at least 65 years old, and 25 percent of the affected voters were at least 80 years old. APP_01395- 01396.

n. In Westmoreland County, the youngest voter affected by the date requirement was 19, and the oldest voter affected by the date requirement was 94. Approximately 67 percent of the affected voters in Westmoreland County were at least 65 years old, and 28 percent of the affected voters were at least 80 years old. APP_01397-01398.

o. In Philadelphia County, one of the commissioners reported: "the median age of voters who submitted undated ballots is 64 years old and the median age of voters who submitted misdated ballots is 66 years old. By comparison, the median age of registered voters in Philadelphia is 43. Looked at more closely, 74.5% of undated ballots were submitted by voters age 50 or older and 77.2% of misdated ballots were submitted by voters age 50 or older. At age 60 or older, those numbers are 60.9% for undated ballots and 64.1% for misdated ballots. Over a third of the

undated and misdated ballots were submitted by voters over 70 years of age. 37.5% for the undated, and 40.9% for the misdated. 14.1% of the undated ballots were submitted by voters 80 years or older and 13.9% of the misdated ballots were submitted by voters in this age group. Voters age 90 or older submitted 57 undated ballots and 15 misdated ballots. Importantly, these percentages all are significantly higher than the percentage of Philadelphia's registered voters that these age groups represent. In addition, the Board has reviewed the distribution of these ballots across Philadelphia and that analysis suggests that the issue disproportionately impacts certain Philadelphia communities. These include areas with higher poverty rates lower rates of educational attainment, and minority communities." APP_01163-1164 (Philadelphia meeting minutes).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

## IV.    THE DATE REQUIREMENT

46. The voter declaration forms that accompany paper mail and absentee ballots include a line for the voter to sign and date the declaration. *See, e.g.*, APP_01298 (Berks mail envelope); APP_01299 (Bucks military envelope). The exact phrasing of the label under the date line varies by county—for example, some counties employ the label "Today's date (required) / Fecha de hoy (obligatorio)," while others use "Today's date (MM/DD/YYYY (required)." APP_01298 (Berks envelope); APP_01486 (Lancaster envelope).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

47. In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail or absentee ballot for any purpose related to determining or confirming the mail ballot voter's age. APP_00003 (Adams RFA Resp.); APP_00019-20 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00072-73 (Berks RFA Resp.); APP_00088-90 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113 (Bucks RFA Resp.); APP_00124, APP_00125 (Butler RFA Resp.); APP_00136-137

(Cambria RFA Resp.)[4]; APP_00145-146 (Cameron RFA Resp.); APP_00158-159 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-194 (Clearfield RFA Resp.); APP_0211-212 (Clinton RFA Resp.); APP_00225-226 (Crawford RFA Resp.); APP_00245-246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-282 (Erie RFA Resp.); APP_00301-303 (Fayette RFA Resp.); APP_00317-318 (Forest RFA Resp.); APP_00328-329 (Franklin RFA Resp.); APP_00351-352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00367-368 (Lackawanna RFA Resp.); APP_00396-397 (Lehigh RFA Resp.); APP_00410-411 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00448-449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00475-476 (Montgomery RFA Resp.); APP_00488-489 (Northampton RFA Resp.); APP_00503-504 (Perry RFA Resp.); APP_00523-524 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00548-549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-642

[4] Cambria County responded to this request (and others) with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to determine or confirm the mail ballot voter's age. Cambria County consistently responded to Plaintiffs' interrogatory requests that it does not contend the handwritten date on Return Envelope is "material in determining whether a mail ballot voter is qualified to vote" (Interrogatory No. 14) and agreed not to oppose Plaintiffs' requested relief in this action (ECF No. 157).

(Warren RFA Resp.); APP_00653-654 (Washington RFA Resp.); APP_00680-681 (Wayne RFA Resp.); APP_00697-698 (Westmoreland RFA Resp.); APP_00718-719 (Wyoming RFA Resp.); APP_00725-726 (Babst Calland RFA Resp.); *see also* APP_00814-816 (Berks Dep.); APP_00861-862, APP_00866 (Lancaster Dep.); APP_00906-910 (Westmoreland Dep.); APP_00983-984, APP_00995-997 (Marks Dep.); APP_01190-1191 (Greenburg Report).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

48.    In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail or absentee ballot for any purpose related to determining or confirming the mail ballot voter's citizenship. APP_00003 (Adams RFA Resp.); APP_00019-20 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00072-73 (Berks RFA Resp.); APP_00088-90 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113 (Bucks RFA Resp.); APP_00124-125 (Butler RFA Resp.); APP_00136-137

(Cambria RFA Resp.); APP_00145-146 (Cameron RFA Resp.)[5]; APP_00158-159 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-194 (Clearfield RFA Resp.); APP_00211-212 (Clinton RFA Resp.); APP_00225-226 (Crawford RFA Resp.); APP_00245-246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-282 (Erie RFA Resp.); APP_00301, APP_00303 (Fayette RFA Resp.); APP_00317-318 (Forest RFA Resp.); APP_00328- 329 (Franklin RFA Resp.); APP_00351-352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00367-368 (Lackawanna RFA Resp.); APP_00396-397 (Lehigh RFA Resp.); APP_00410-411 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00448-449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00475-476 (Montgomery RFA Resp.); APP_00488-48 (Northampton RFA Resp.); APP_00503-504 (Perry RFA Resp.); APP_00523-524 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00548-549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-642 (Warren RFA Resp.); APP_00653-654 (Washington RFA Resp.); APP_00680-681 (Wayne RFA Resp.); APP_00697-698 (Westmoreland RFA

[5] Cambria County responded to this request with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to determine or confirm the mail ballot voter's citizenship. *See supra* n.4.

Resp.); APP_00718-719 (Wyoming RFA Resp.); APP_00725-726 (Babst Calland RFA Resp.); *see also* APP_00814-816 (Berks Dep.); APP_00861-862, APP_00866 (Lancaster Dep.); APP_00906-910 (Westmoreland Dep.); APP_00983-984, APP_00995-997 (Marks Dep.); APP_01190-1191 (Greenburg Report).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

49. In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail or absentee ballot for any purpose related to determining or confirming the mail ballot voter's county or duration of residence. APP_00003 (Adams RFA Resp.); APP_00019-20 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00072-73 (Berks RFA Resp.); APP_00088- 90 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113 (Bucks RFA Resp.); APP_00124-125 (Butler RFA Resp.); APP_00136-137 (Cambria RFA Resp.)[6]; APP_00145-146 (Cameron RFA Resp.);

[6] Cambria County responded to this request with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to determine or confirm the mail ballot voter's county or duration of residence. *See supra* n.4.

APP_00158-159 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-194 (Clearfield RFA Resp.); APP_00211-212 (Clinton RFA Resp.); APP_00225-226 (Crawford RFA Resp.); APP_00245-246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-282 (Erie RFA Resp.); APP_00301, APP_00303 (Fayette RFA Resp.); APP_00317-318 (Forest RFA Resp.); APP_00328- 329 (Franklin RFA Resp.); APP_00351-352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00367-368 (Lackawanna RFA Resp.); APP_00396-397 (Lehigh RFA Resp.); APP_00410-411 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00448-449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00475- 476 (Montgomery RFA Resp.); APP_00488-489 (Northampton RFA Resp.); APP_00503-504 (Perry RFA Resp.); APP_00523-524 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00548-549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-642 (Warren RFA Resp.); APP_00653-654 (Washington RFA Resp.); APP_00680-681 (Wayne RFA Resp.); APP_00697-698 (Westmoreland RFA Resp.); APP_00718-719 (Wyoming RFA Resp.); APP_00725-726 (Babst Calland RFA Resp.); see also APP_00814-816 (Berks Dep.); APP_00861-862, APP_00866 (Lancaster Dep.); APP_00906-910 (Westmoreland

Dep.); APP_00983-984, APP_00995-997 (Marks Dep.); APP_01190-1191 (Greenburg Report).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

50. In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail or absentee ballot for any purpose related to determining or confirming the mail ballot voter's felony status. APP_00003 (Adams RFA Resp.); APP_00019-20 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00072-73 (Berks RFA Resp.); APP_00088-90 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113 (Bucks RFA Resp.); APP_00124-125 (Butler RFA Resp.); APP_00136-137 (Cambria RFA Resp.)[7]; APP_00145-146 (Cameron RFA Resp.); APP_00158-159 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-194 (Clearfield RFA Resp.); APP_00211-212 (Clinton RFA Resp.); APP_00225-226

[7] Cambria County responded to this request with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to determine or confirm the mail ballot voter's county or duration of residence. *See supra* n.4.

(Crawford RFA Resp.); APP_00245-246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-282 (Erie RFA Resp.); APP_00301, APP_00303 (Fayette RFA Resp.); APP_00317-318 (Forest RFA Resp.); APP_00328- 329 (Franklin RFA Resp.); APP_00351-352 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00367-368 (Lackawanna RFA Resp.); APP_00396-397 (Lehigh RFA Resp.); APP_00410-411 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00448-449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00475- 476 (Montgomery RFA Resp.); APP_00488-489 (Northampton RFA Resp.); APP_00503-504 (Perry RFA Resp.); APP_00523-524 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00548-549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-642 (Warren RFA Resp.); APP_00653-654 (Washington RFA Resp.); APP_00680-681 (Wayne RFA Resp.); APP_00697-698 (Westmoreland RFA Resp.); APP_00718-719 (Wyoming RFA Resp.); APP_00725-726 (Babst Calland RFA Resp.); see also APP_00814-816 (Berks Dep.); APP_00861-862, APP_00866 (Lancaster Dep.); APP_00906-910 (Westmoreland Dep.); APP_00983-984, APP_00995-997 (Marks Dep.); APP_01190-1191 (Greenburg Report).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

51. In administering the November 2022 general election, the county boards of elections did not use the handwritten date on the outer return envelope containing a mail ballot to establish whether they received the ballot by 8:00 P.M. on November 8, 2022. APP_00003 (Adams RFA Resp.); APP_00020 (Allegheny RFA Resp.); APP_00037 (Armstrong RFA Resp.); APP_00049 (Beaver RFA Resp.); APP_00073 (Berks RFA Resp.); APP_00090 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_0013 (Bucks RFA Resp.); APP_00125 (Butler RFA Resp.); APP_00136 (Cambria RFA Resp.)[8]; APP_00145 (Cameron RFA Resp.); APP_00158 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193 (Clearfield RFA Resp.); APP_00211 (Clinton RFA Resp.); APP_00225 (Crawford RFA Resp.); APP_00246 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.) APP_00281 (Erie RFA Resp.); APP_00302 (Fayette RFA Resp.); APP_00317 (Forest RFA Resp.);

[8] Cambria County responded to this request with a simple "No," which can only be interpreted to mean that this county, like all others, never used or referred to the handwritten date to establish whether they received the ballot by the applicable deadline. *See supra* n.4.

APP_00329 (Franklin RFA); APP_00351 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00368 (Lackawanna RFA Resp.); APP_00396 (Lehigh RFA Resp.); APP_00410 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00449 (McKean RFA Resp.); APP_00465 (Mifflin RFA Resp.); APP_00476 (Montgomery RFA Resp.); APP_00488 (Northampton RFA Resp.); APP_0504 (Perry RFA Resp.); APP_00523 (Philadelphia RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00549 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp); APP_00641 (Warren RFA Resp.); APP_00653 (Washington RFA Resp.); APP_00680 (Wayne RFA Resp.); APP_00697 (Westmoreland RFA Resp.); APP_00718 (Wyoming RFA Resp.); APP_00725 (Babst Calland RFA Resp.); see also APP_00886-887 (Lancaster Dep.); APP_00993-995, APP_01001 (Marks Dep.); APP_01165-1166 (Philadelphia meeting minutes).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

52. Setting aside military-overseas ballots, in administering the November 2022 general election, the county boards of elections did not use or refer to the date handwritten on the outer return envelope containing an absentee ballot to establish whether they received the ballot by the applicable deadline. APP_00003 (Adams RFA Resp.); APP_00020-21 (Allegheny RFA Resp.); APP_00037-38 (Armstrong RFA Resp.); APP_00049-50 (Beaver RFA Resp.); APP_00073 (Berks RFA Resp.); APP_00091 (Blair RFA Resp.); APP_00105 (Bradford RFA Resp.); APP_00113-14 (Bucks RFA Resp.); APP_00125-26 (Butler RFA Resp.); APP_00136 (Cambria RFA Resp.)[9]; APP_00145-46 (Cameron RFA Resp.); APP_00158-59 (Chester RFA Resp.); APP_00181 (Clarion RFA Resp.); APP_00193-94 (Clearfield RFA Resp.); APP_00211- 12 (Clinton RFA Resp.); APP_00225-26 (Crawford RFA Resp.); APP_00247 (Cumberland RFA Resp.); APP_00261 (Delaware RFA Resp.); APP_00276 (Elk RFA Resp.); APP_00281-82 (Erie RFA Resp.); APP_00302-03 (Fayette RFA Resp.); APP_00317-18 (Forest RFA Resp.); APP_00329 (Franklin RFA Resp.); APP_00351- 52 (Greene RFA Resp.); APP_00360 (Juniata RFA Resp.); APP_00368 (Lackawanna RFA Resp.); APP_00396-97 (Lehigh RFA Resp.); APP_00410-11 (Luzerne RFA Resp.); APP_00430 (Lycoming RFA Resp.); APP_00449 (McKean RFA Resp.); APP_00465-66 (Mifflin RFA Resp.); APP_00476 (Montgomery RFA Resp.); APP_00488-89 (Northampton RFA Resp.);

[9] *See supra* n.8.

APP_00504 (Perry RFA Resp.); APP_00543 (Pike RFA Resp.); APP_00549-50 (Potter RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00592 (Somerset RFA Resp.); APP_00607 (Sullivan RFA Resp.); APP_00615 (Susquehanna RFA Resp.); APP_00625 (Tioga RFA. Resp.); APP_00641-42 (Warren RFA Resp.); APP_00653-54 (Washington RFA Resp.); APP_00680-81 (Wayne RFA Resp.); APP_00697-98 (Westmoreland RFA Resp.); APP_00718-19 (Wyoming RFA Resp.); APP_00725-26 (Babst Calland RFA Resp.); see also APP_00886-887 (Lancaster Dep.); APP_00993-995, APP_01001 (Marks Dep.); APP_01165 (Philadelphia meeting minutes).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

53. A voter could not have signed the voter declaration form on the 2022 general election mail ballot outer return envelope on any date before their county board of elections sent the mail ballot materials for the 2022 election to voters, because the voter would not yet have the mail ballot materials in their possession. For example, if a county board of elections did not send mail ballots to voters until October 1, 2022, then a voter in that county could not have filled out their mail ballot

before October 1, 2022, regardless of what if any date the voter wrote on the outer return envelope. APP_00827, APP00831-832, APP_00840-41 (Berks Dep.); APP_00876-877, APP_00880-881 (Lancaster Dep.); APP_00928-929 (Westmoreland Dep.); APP_01000, APP_01002-1003 (Marks Dep.); APP_01189-1190 (Greenburg Report).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

54.     If a county board of elections received and date-stamped a 2022 general election mail ballot before 8:00 P.M. on Election Day (November 8, 2022), then that ballot was timely received under the Election Code. 25 P.S. §§ 3146.6(c), 3150.16(c); see also, e.g., APP_00834 (Berks Dep.); APP_01189 (Greenburg Report).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

55. If a county board of elections received a 2022 general election mail ballot by 8:00 P.M. on Election Day (November 8, 2022), then the voter who submitted that ballot could not have filled out that ballot after 8:00 P.M. on Election Day, regardless of what if any date the voter wrote on the outer return envelope. APP_00830 (Berks Dep.); APP_00874-875 (Lancaster Dep.); APP_00925-926 (Westmoreland Dep.); APP_01000 (Marks Dep.).

**Response**: Admitted. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

56. If a county board of elections received a 2022 general election mail ballot *after* 8:00 P.M. on Election Day (November 8, 2022), then the board of elections did not count that ballot, regardless of what if any date the voter wrote on the outer return envelope. APP_00830a (Berks Dep.); APP_00875-876 (Lancaster Dep.); APP_00926-927 (Westmoreland Dep.); APP_01000-1001 (Marks Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

57. More than 20 county boards of elections have stated that they do not contend that the handwritten date is material in determining whether a mail ballot voter is qualified to vote in the election in which they have cast a ballot. APP_00010 (Adams Interrog. Resp.); APP_00031-32 (Allegheny Interrog. Resp.); APP_00100 (Blair Interrog. Resp.); APP_00118 (Bucks Interrog. Resp.); APP_00142 (Cambria Interrog. Resp.); APP_00174 (Chester Interrog. Resp.); APP_00220 (Clinton Interrog. Resp.); APP_00271 (Delaware Interrog. Resp.); APP_00295 (Erie Interrog. Resp.); APP_00312 (Fayette Interrog. Resp.); APP_00324 (Forest Interrog. Resp.); APP_00364 (Juniata Interrog. Resp.); APP_00392 (Lancaster Interrog. Resp.); APP_00404 (Lehigh Interrog. Resp.); APP_00456 (McKean Interrog. Resp.); APP_00483 (Montgomery Interrog. Resp.); APP_00535 (Philadelphia Interrog. Resp.); APP_00602 (Somerset Interrog. Resp.); APP_00612 (Sullivan Interrog. Resp.); APP_00637 (Union Interrog. Resp.).

**<u>Response</u>**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

58. An additional ten counties have taken no position on this contention. APP_00043 (Armstrong Interrog. Resp.); APP_00066 (Beaver Interrog. Resp.); APP_00187 (Clarion Interrog. Resp.); APP_00240 (Crawford Interrog. Resp.); APP_00256 (Cumberland Interrog. Resp.); APP_00357 (Greene Interrog. Resp.);

APP_00462 (Mercer Interrog. Resp.); APP_00472 (Mifflin Interrog. Resp.); APP_00631 (Tioga Interrog. Resp.); APP_00716 (Wyoming Interrog. Resp.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

59. Of those county boards of elections that identified any purported use for the voter-written date in their discovery responses, 30 counties identified that the only reason for looking at this date was to ensure compliance with the Election Code and the Supreme Court of Pennsylvania's Ball decision. APP_00080 (Berks Interrog. Resp.); APP_00110 (Bradford Interrog. Resp.); APP_00153 (Cameron Interrog. Resp.); APP_00339 (Franklin Interrog. Resp.); APP_00348 (Fulton Interrog. Resp.), APP_00376 (Lackawanna Interrog. Resp.); APP_00418 (Luzerne Interrog. Resp.); APP_00499 (Northampton Interrog. Resp.); APP_00514 (Perry Interrog. Resp.); APP_00579 (Potter Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.); APP_00672 (Washington Interrog. Resp.); APP_00693 (Wayne Interrog. Resp.); APP_00709 (Westmoreland Interrog. Resp.); APP_00740 (Babst Calland Interrog. Resp.); *see also* APP_00817, APP_00820-821 (Berks Dep.); APP_00863-865 (Lancaster Dep.); APP_00914-916 (Westmoreland Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

60. The only other purported use for the voter-written date identified in discovery by any county is that considering the date written on a voter declaration might aid in prosecution of voter fraud relating to deceased voters. No county mentioned this use of the voter-written date in their interrogatory responses, but both Lancaster County and Westmoreland County addressed it when deposed. APP_00910-915 (Westmoreland Dep.); APP_00888-892 (Lancaster Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

61. If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the board of elections removes the deceased person from the voter rolls. 25 P.S. § 3146.8(d); APP_01191 (Greenburg Report); APP_01016-1019, APP_01026-1029 (Greenburg Dep.); APP_00888-892, APP_00895-896 (Lancaster Dep.).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this

litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

62. County boards of elections determine whether a voter died before 8:00 P.M. on Election Day by reviewing Department of Health records, local obituaries, and/or death certificates. APP_00895-896 (Lancaster Dep.); APP_00911-912 (Westmoreland Dep.); APP_01032 (Greenburg Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

63. If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the county board of elections will not count that person's vote, even if the vote was timely submitted before the voter's death. APP_00818 (Berks Dep.); APP_00890-891 (Lancaster Dep.); APP_00911-914 (Westmoreland Dep.); APP_01016-1019, APP_01026-1029 (Greenburg Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

64. If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the county board of elections will not count that person's vote, regardless of what if any handwritten date appears on the outer return envelope

of the deceased voter's ballot. 25 P.S. § 3146.8(d); APP_00819 (Berks Dep.); APP_00890-891 (Lancaster Dep.); APP_00914 (Westmoreland Dep.); APP_01016-1019, APP_01026-1029 (Greenburg Dep.).

      a. For example, the Beaver County Board of Elections set aside the ballot of a deceased voter who also happened to write the date on the wrong line of their return envelope. On the return envelope, an elections official wrote "Voter passed away[,] DOH notification 11/3/22[,] moot on date." APP_01485.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

## V. Defendants' Arbitrary and Inconsistent Applications of the Date Requirement

### A. Missing or incorrect year

65.     A voter whose mail ballot was timely received by their county board of elections could only have signed the voter declaration form in the year 2022, because the county boards of elections did not begin sending the relevant mail ballot materials to voters until August 2022 or later (*see supra* ¶ TK), and the ballots must have been received by November 8, 2022 to be considered timely. APP_00835-81

(Berks Dep.); APP_00878-879, APP_00884-885 (Lancaster Dep.); APP_00923-924, APP_00929g, APP_00929l-929q (Westmoreland Dep.).

**Response**: Admitted.

***i. Past year***

66. At least 530 voters' ballots were set aside because their handwritten date included a year earlier than 2022. APP_01494-1496, APP_01572 (Tetro Decl.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

67. Of those voters whose ballots were set aside for writing a past year, at least 474 voters wrote a day and month within the Supreme Court of Pennsylvania's date range, but wrote a past year (*e.g.*, 2020 or 2021). APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "October 15, 2020" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/17/22." APP_01466.

b. Another voter whose ballot was set aside wrote "10/31/21" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/02/22." APP_01467.

c. Another voter whose ballot was set aside wrote "11-06-2021" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "NOV 08 2022." APP_01468.

d. Another voter whose ballot was set aside wrote "10/7/1922" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 12." APP_01469.

e. Another voter whose ballot was set aside wrote "Oct. 18, 2012" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 20." APP_01470.

f. Another voter whose ballot was set aside wrote "10-26-2002" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "2022 OCT 31." APP_01471.

g. Another voter whose ballot was set aside wrote "October 26, 2002" on the date line. APP_01472.

h. Another voter whose ballot was set aside wrote "11-2-2002" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/27/22." APP_01473.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

68. Of those voters whose ballots were set aside for writing a past year, at least 50 voters wrote their birth date instead of the date they signed the declaration. APP_01494-1496, APP_01572 (Tetro Decl.).[10] *See*, *e.g.*, APP_01474-1484 (11 envelopes with examples of this pattern).

a. For example, one voter whose ballot was set aside wrote "9/25/22" on the date line—the date five days before the ballot was date stamped by the county board of elections on "09/30/2022"—but then crossed out that date ("~~9/25/22~~") and wrote his date of birth beneath it. APP_01474; APP_01365 (Dauphin voter list).

**<u>Response</u>**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

69. Conversely, at least one county board of elections—Montgomery—ultimately decided to count ballots if they determined the voter had written their birth date instead of the date they signed the declaration on the outer return envelope. APP_01286-1289.

[10] This total reflects only those birth dates that Plaintiffs could confirm via the lists of voter date of birth that certain counties produced. Additional ballots in other counties looked like possible birth dates, but those counties did not produce complete dates of birth against which Plaintiffs could compare the envelopes. APP_01494-1496, APP_01572 (Tetro Decl.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

***ii. Future year***

70. At least 228 voters' ballots were set aside because their handwritten date included a year later than 2022 (e.g., "2023" or "2202"). APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "11/3/2023" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/07/22." APP_01423.

b. Another voter whose ballot was set aside wrote "November 7 2023" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/08/22." APP_01424.

c. Another voter whose ballot was set aside wrote "11/03/2023" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "2022 NOV 04." APP_01425.

d. Another voter whose ballot was set aside wrote "10/12/2222" on the date line. APP_01426.

e. Another voter whose ballot was set aside wrote "10/22/2122" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/25/22." APP_01427.

f. Another voter whose ballot was set aside wrote "10-17-2200" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/29/22." APP_01428.

g. Another voter whose ballot was set aside wrote "10/21/31" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/27/22." APP_01429.

h. Another voter whose ballot was set aside wrote "10-20-2202" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/23/22." APP_01430.

i. Another voter whose ballot was set aside wrote "10/24/2024" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/25/22." APP_01431.

j. Another voter whose ballot was set aside wrote "10-23-2033" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 25." APP_01432.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

***iii. Omitted year***

71. At least 60 voters' ballots were set aside because they wrote a handwritten date that was between September 19 and November 8, but omitted the year. APP_01494-1496, APP_01572 (Tetro Decl.); see also APP_01153 (meeting minutes reflecting that Luzerne Board voted to reject ballots dated "10/26" and "Oct 2nd").

a. For example, one voter whose ballot was set aside wrote "October 8" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/13/22." APP_01446.

b. Another voter whose ballot was set aside wrote "Wednesday Oct. 26" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/31/22." APP_01447.

c. Another voter whose ballot was set aside wrote "11/2" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/04/22." APP_01448.

d. Another voter whose ballot was set aside wrote "Thu. Oct. 6" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/11/22." APP_01449.

e. Another voter whose ballot was set aside wrote "Thursday October 6" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/11/22." APP_01450.

f. Another voter whose ballot was set aside wrote "Oct. 25" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/31/22." APP_01451.

g. Another voter whose ballot was set aside wrote "Nov. 2nd" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/03/22." APP_01452.

h. Another voter whose ballot was set aside wrote "10/15" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/18/22." APP_01453.

i. Another voter whose ballot was set aside wrote "10/04" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 7." APP_01454.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

72. Conversely, at least three county boards of elections—Blair, Fayette, and Montgomery—ultimately decided to count ballots with "partial dates" if the "information in the date line [wa]s sufficient to determine that the ballot was returned within the appropriate date range." APP_01286-1289 (Montgomery County voted to count ballots with "partial dates" if the "information in the date line [wa]s sufficient to determine that the ballot was returned within the appropriate date range"); *see also* APP_01177 (Blair County's "canvassing board instructions" includes a list of "VALID DATING FORMATS," which includes month and day without a year); APP_01161 (meeting minutes reflecting that Fayette Board voted to count ballots dated "Friday November 4th, no year" and "November 3rd, no year").

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

**B. Missing or incorrect month**

73. A voter whose mail ballot was timely received by 8:00 P.M. on November 8, 2022 could only have signed the voter declaration form in the time

period between the date that their county boards of elections sent mail ballot packages to voters and Election Day. APP_00878-879 (Lancaster Dep.); APP_00929g-929j, APP_00929o929p (Westmoreland Dep.).

**Response**: Admitted.

74.    At least 605 voters' timely-received ballots were set aside because their handwritten date included an incorrect month that indicated that they signed their ballot earlier than September 19, 2022. APP_01494-1496, APP_01572 (Tetro Decl.).

     a.  For example, one voter whose ballot was set aside wrote "9/13/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/14/22." APP_01455.

     b.  Another voter whose ballot was set aside wrote "9-17-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/18/22." APP_01456.

     c.  Another voter whose ballot was set aside wrote "09/14/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/17/22." APP_01457.

     d.  Another voter whose ballot was set aside wrote "9/14/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/16/22." APP_01458.

Case 1:22-cv-00339-SPB Document 390 Filed 05/05/23 Page 101 of 129

e. Another voter whose ballot was set aside wrote "9-13-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/20/22." APP_01459.

f. Another voter whose ballot was set aside wrote "9/14/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/16/22." APP_01460.

g. Another voter whose ballot was set aside wrote "Sept 12, 2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10 16 22." APP_01461.

h. Another voter whose ballot was set aside wrote "9/11/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/16/22." APP_01462.

i. Another voter whose ballot was set aside wrote "9/17/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/18/22." APP_01463.

j. Another voter whose ballot was set aside wrote "Sept. 10, 2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/14/22." APP_01464.

    k. Another voter whose ballot was set aside wrote "9-6-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/07/22." APP_01465.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

75. At least 427 voters' ballots were set aside because their handwritten date included an incorrect month that indicated that they signed their ballot after November 8, 2022 (e.g., "11/28/22"). APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "11/23/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/25/22." APP_01414.

b. Another voter whose ballot was set aside wrote "11/27/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/31/22." APP_01415.

c. Another voter whose ballot was set aside wrote "11/12/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/15/22." APP_01416.

d. Another voter whose ballot was set aside wrote "11/19/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/24/22." APP_01417.

e. Another voter whose ballot was set aside wrote "11-13-2022" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 13." APP_01418.

f. Another voter whose ballot was set aside wrote "11-23-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/26/22." APP_01419.

g. Another voter whose ballot was set aside wrote "11/14/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10-17." APP_01420.

h. Another voter whose ballot was set aside wrote "11-25-22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/27/2022." APP_01421.

i. Another voter whose ballot was set aside wrote "11-17-2022" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 20." APP_01422.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

76. At least three voters' ballots were set aside because their handwritten date omitted the month. APP_01494-1496, APP_01572 (Tetro Decl.).

    a. For example, one voter whose ballot was set aside wrote "Friday 7 2022" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 12." APP_01443.

    b. Another voter whose ballot was set aside wrote "20/2022" on the date line. APP_01444.

    c. Another voter whose ballot was set aside wrote "14/2022" on the date line. APP_01445.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

### C. Missing or incorrect day

77. At least four voters' ballots were set aside because their handwritten date included a day that does not exist. APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "10/111/22" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 13." APP_01486.

b. Another voter whose ballot was set aside wrote "11/0/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/02/22." APP_01487.

c. Another voter whose ballot was set aside wrote "09/31/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/06/22." APP_01488.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

78. Conversely, Luzerne County voted to *count* a ballot dated "09/31/22." APP_01153 (Luzerne meeting minutes).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

79. A voter could not have signed the voter declaration form on the outer return envelope on a date that does not exist.

**Response**: Admitted.

80. At least 40 voters' ballots with a handwritten date that omitted the day were set aside. APP_01494-1496, APP_01572 (Tetro Decl.).

a. The majority of these 29 ballots indicated "10," "Oct," or "October" for the month, with the remaining indicating "11," "Nov," or November" for the month. APP_01494-1496, APP_01572 (Tetro Decl.).

b. All 29 of these ballots indicated 2022 for the year. APP_01494- 1496, APP_01572 (Tetro Decl.).

c. For example, one voter whose ballot was set aside wrote "10- -22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "OCT 28 2022." APP_01436.

d. Another voter whose ballot was set aside wrote "10- -2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/28/2022." APP_01437.

e. Another voter whose ballot was set aside wrote "10- -2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/19/2022." APP_01438.

f. Another voter whose ballot was set aside wrote "10/ /2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/11/22." APP_01439.

g. Another voter whose ballot was set aside wrote "10- -2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "OCT 11 2022." An election official wrote a note on the envelope that reads: "Left message 11/3/22. . . can't come in to fix 11/4/22." APP_01440.

h. . Another voter whose ballot was set aside wrote "10/ /2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/31/22." APP_01441.

i. Another voter whose ballot was set aside wrote "10- -22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/11/22." APP_01442.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

81. Conversely, at least two county board of elections—Bucks and Fayette— voted unanimously to count a mail ballot "dated October 2022 with no day listed," because the board was "able to ascertain what day the ballot was mailed

and what day it was received," and the "entire month of October is included in the date range in the [Pennsylvania Supreme] Court's Order." APP_01157 (Bucks meeting minutes); see also APP_01161 (Fayette Board voted to count ballot dated "10-no day -2022").

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

82. Any day within October 2022 would have been within the range provided by the Supreme Court's supplemental order in *Ball v. Chapman*. APP_01150-1151.

**Response**: Admitted.

**D. Wrong Line**

83. At least twelve ballots were set aside for having a missing or incorrect date on the voter declaration form, even though the voter had written a date that was within the Supreme Court of Pennsylvania's date range elsewhere on the outer return envelope. APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "Nov 4, 2022" underneath the date line instead of on it. APP_01489.

b. Another voter whose ballot was set aside wrote their name on the "Today's Date (Required)" line of the voter declaration, and wrote "10-

24-2022" on a different "Today's Date" line intended for voters who were unable to sign their declaration because of illness or physical disability. APP_01490.

c. Another voter whose ballot was set aside wrote "10-15-22" in a box beneath the date line that is intended for county election use only, rather than on the date line. APP_01491.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

**E. "Election Day" as "Today's Date"**

84. At least 16 ballots were set aside because the voter wrote November 8, 2022 (Election Day) as "Today's Date" instead of writing the (earlier-in-time) date that they signed the voter declaration form. APP_01494-1496, APP_01572 (Tetro Decl.).

a. For example, one voter whose ballot was set aside wrote "10-12- 22" on the date line—the same date the ballot was date stamped "2022 OCT 12" by the county board of elections—but then crossed out that date ("10-12-22") and wrote "11-8-22" beneath it, accompanied by their initials. APP_01407.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

85. Election Day was within the Supreme Court of Pennsylvania's date range. APP_01150-1151.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

**F. International dating convention**

86. 18 county boards of elections determined whether the date written on the outer envelope was within the "correct" date range based on only the American dating convention of writing the month, then day, then year (MM/DD/YYYY), and set aside ballots if the voter used a European dating convention of writing the day, then month, then year (e.g., if a voter wrote 1/11/2022 to indicate November 1, 2022). APP_00039 (Armstrong RFA Resp.); APP_00051 (Beaver RFA Resp.); APP_00213 (Clinton RFA Resp.); APP_00106 (Bradford RFA Resp.); APP_00277 (Elk RFA Resp.); APP_00283 (Erie RFA Resp.); APP_00319 (Forest RFA Resp.); APP_00331 (Franklin RFA Resp.); APP_00353 (Greene RFA Resp.); APP_00369

(Lackawanna RFA Resp.); APP_00412 (Luzerne RFA Resp.); APP_00451 (McKean RFA Resp.); APP_00467 (Mifflin RFA Resp.); APP_00506 (Perry RFA Resp.); APP_00584 (Schuylkill RFA Resp.); APP_00594 (Somerset RFA Resp.); APP_00682 (Wayne RFA Resp.); see also APP_00877a, APP_00882-883 (Lancaster Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

87. Conversely, at least 31 other counties tried to account for both the American and International dating conventions in determining whether the outer return envelope had been correctly dated. APP_00023, APP_00024 (Allegheny RFA Resp.); APP_00074 (Berks RFA Resp.); APP_00114 (Bucks RFA Resp.); APP_00127, APP_00128 (Butler RFA Resp.); APP_00195 (Clearfield RFA Resp.); APP_00227 (Crawford RFA Resp.); APP_00249 (Cumberland RFA Resp.); APP_00263 (Delaware RFA Resp.); APP_00305 (Fayette RFA Resp.); APP_00348 (Fulton RFA Resp.); APP_00398, APP_00399 (Lehigh RFA Resp.); APP_00432 (Lycoming RFA Resp.); APP_00492 (Northampton RFA Resp.); APP_00700 (Westmoreland RFA Resp.); APP_00728-729 (Babst Calland RFA Resp.); see also APP_01146 (citizen comment at Oct. 20, 2022 Berks Board meeting, asking "whether the Election office is checking dates on ballots that may be flipped citing

that some people's country of origin may write a date differently"); APP_01177 (Blair County's "canvassing board instructions" includes a list of "VALID DATING FORMATS," which includes day-month-year).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

88. At least 34 ballots were set aside for having "incorrect" dates, even though the handwritten date on the outer return envelope could be read as within the Supreme Court of Pennsylvania's date range, assuming the voter used the International dating convention (DD-MM-YYYY, rather than MM-DD-YYYY APP_01494-1496, APP_01572 (Tetro Decl.); APP_00841-843 (Berks Dep.); APP_00929k-n (Westmoreland Dep.).

    a.  For example, one voter whose ballot was set aside wrote "1/11/22" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/02/22." APP_01408.

    b.  Another voter whose ballot was set aside wrote "3-10-2022" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 5." APP_01409.

c. Another voter whose ballot was set aside wrote "4-10-22" on the date line. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT-6." APP_01410.

d. Another voter whose ballot was set aside wrote "06/10/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/13/22." APP_01411.

e. Another voter whose ballot was set aside wrote "06-10-2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/07/22." APP_01412.

f. Another voter whose ballot was set aside wrote "5/11/2022" on the date line. A stamp on the envelope indicates the ballot was processed by the county board of elections on "11/06/22." APP_01413.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

**G. Adherence to date range in *Ball* supplemental order**

89. The Supreme Court of Pennsylvania's supplemental order in *Ball v. Chapman* defined "incorrectly dated outer envelopes" to mean "mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022, through

November 8, 2022," and "absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022, through November 8, 2022." APP_01150-1151.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

90. At least 17 counties set aside and did not count mail-in or absentee ballot envelopes that bore a handwritten date within the court's prescribed date range (September 19–November 8) if that handwritten date was before the county started sending out mail ballots. For example, because Westmoreland County did not begin sending mail ballots to voters until September 30, 2022, it would not have counted mail ballots that were dated within the Ball date range if the handwritten date on the outer return envelope was between September 19 and September 29, 2022. APP_921a-921c (Westmoreland Dep.). See also APP_00141 (Cambria Interrog. Resp.); APP_00150 (Cameron Interrog. Resp.); APP_00185 (Clarion Interrog. Resp.); APP_00234 (Crawford Interrog. Resp.); APP_00321 (Forest Interrog. Resp.); APP_00336 (Franklin Interrog. Resp.); APP_00347 (Fulton Interrog. Resp.); APP_00363 (Juniata Interrog. Resp.); APP_00454 (McKean Interrog. Resp.); APP_00469 (Mifflin Interrog. Resp.); APP_00575 (Potter Interrog. Resp.);

APP_00610 (Sullivan Interrog. Resp.); APP_00619-620 (Susquehanna Interrog. Resp.); APP_00629-630 (Tioga Interrog. Resp.); APP_00635 (Union Interrog. Resp.); APP_00646 (Warren Interrog. Resp.); APP_00706 (Westmoreland Interrog. Resp.).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

91.     At least 25 other counties followed the date range in the Supreme Court of Pennsylvania's supplemental order in *Ball v. Chapman*, even where the handwritten date on the mail-in or absentee ballot envelope was "incorrect" inasmuch as it occurred before the counties sent 2022 general election mail ballot materials to voters, or after the date that the voter's ballot was received by their county board of elections. APP_00826-828 (Berks Dep.); APP_00872-873 (Lancaster Dep.); APP_00027-28 (Allegheny Interrog. Resp.); APP_00062 (Beaver Interrog. Resp.); APP_00078 (Berks Interrog. Resp.); APP_00097 (Blair Interrog. Resp.); APP_00204 (Clearfield Interrog. Resp.); APP_00268 (Delaware Interrog. Resp.); APP_00292, APP_00293 (Erie Interrog. Resp); APP_00417 (Luzerne

Interrog. Resp.); APP_00530- 531 (Philadelphia Interrog. Resp.); APP_00733-34 (Babst Calland Resp.); see also APP_01159 (Fayette meeting minutes).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

92.    For example, Berks County counted ballots if the handwritten date on the outer return envelope was September 20, 2022, even though it did not begin sending mail ballots to voters until October 7, 2022. APP_00826-829, APP_00831 (Berks Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

93.    Likewise, Lancaster County counted ballots if the handwritten date on the outer return envelope was September 20, 2022, even though it did not begin sending mail ballots to voters until September 26, 2022. APP_00872-873 (Lancaster Dep.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

94. At least one county—Fayette—counted ballots where the voter had written an envelope date that was after the date that the board of elections had already received and time-stamped the package. APP_01159 (Fayette Board voted to count all ballots that fell within the Supreme Court of Pennsylvania's date range, including "incorrectly dated ballots within the date range of September 19, 2022, through November 8, 2022").

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

95. Other counties did not count ballots where the voter had written an envelope date that was after the date that the board of elections had already received and time-stamped the package, even if the voter's handwritten date was within the Supreme Court of Pennsylvania's date range. Appears Correct at TK.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations

of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

96.     At least two counties took different approaches to mail-in and absentee ballots. The county boards of elections in both Elk and Somerset County counted absentee ballots if the outer return envelope contained any date within the full *Ball* date range (i.e., even before the board had sent the ballot materials to voters), but counted mail-in ballots only if the handwritten date was *after* the date on which the board had sent out the ballot materials. APP_00279 (Elk Interrog. Resp.); APP_00599 (Somerset Interrog. Resp.).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

97.     At least 47 ballots were set aside for having "incorrect" dates, even though the voter included a handwritten date on the outer return envelope that appeared correct and was within the Supreme Court of Pennsylvania's date range. APP_01494-1496, APP_01572 (Tetro Decl.); Appears Correct TK; see also, e.g., APP_00844 (Berks Dep.).

a.   For example, one voter whose ballot was set aside wrote "10/17/2020" on the date line, then crossed out the year ("2020"), and wrote the year "2022" beneath it. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 19." APP_01402.

b.   Another voter whose ballot was set aside wrote "10/23/2023" on the date line, then crossed out the last digit of the year and wrote a 2 next to it on the date line ("20232"), and wrote their initials beneath the crossed-out digit. A stamp on the envelope indicates the ballot was processed by the county board of elections on "10/26/22." APP_01403.

c.   Another voter whose ballot was set aside wrote the date "9-8-22," then crossed out that date ("9-8-22") and wrote "10-8-22" next to it. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 13." APP_01404. d.

d.   Another voter whose ballot was set aside wrote "10/14/2023" on the date line, then crossed that date out ("10/14/2023"), and wrote the date "10/14/2022" next to it on the date line. The postmark on that ballot reads: "14 OCT 2022." APP_01405.

e.   Another voter whose ballot was set aside wrote "10/4/21" on the date line, then crossed out the year ("21"), and wrote the year "22" next to

Case 1:22-cv-00339-SPB Document 300 Filed 05/05/23 Page 120 of 129

it on the date line, along with their initials. A stamp on the envelope indicates the ballot was received by the county board of elections on "2022 OCT 5." APP_01406.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph's reference to the "Supreme Court of Pennsylvania's date range" sets forth a statement or conclusion of law, no response is required thereto.

## VI. UNEQUAL TREATMENT AS COMPARED TO MILITARY/OVERSEAS BALLOTS

98. The Secretary of State provides envelope templates that prescribe the form of the envelopes that county boards of elections must use for mail and absentee ballots. APP_00963-964 (Marks Dep.).

**Response**: Admitted. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

99. The templates for both the mail ballot and the absentee ballot include a voter declaration form that the voter must sign and date on the return envelope that contains the voter's secrecy envelope and ballot. APP_00966-973 (Marks Dep.).

**Response**: Admitted that a voter declaration is printed on the exterior envelope of the templates for absentee and mail-in ballot submissions. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

100.   The county boards of elections vary the form and layout of the return envelopes that they submit to voters, but each county's mail ballot materials include an outer return envelope (inside which the voter places their secrecy envelope and, in turn, their ballot) bearing a voter declaration that voters are instructed to sign and date. APP_00966-973 (Marks Dep.); see, e.g., APP_01290 (Berks mail ballot envelope).

**Response**: Admitted. By way of further response, a complete copy of the deposition transcript of Jonathan Marks is attached to the Appendix of Acting Secretary Schmidt as Exhibit B.

101.   Each county's absentee ballot materials also include a voter declaration that voters are instructed to sign and date. APP_00966-973 (Marks Dep.); APP_00933-936 (Westmoreland Dep.). When UOCAVA voters request a paper ballot from their county board of elections (rather than opting to submit their ballot electronically), that declaration appears on the envelope containing the voter's secrecy envelope and ballot. APP_00933-936 (Westmoreland Dep.); *see*, *e.g.*, APP_01291 (Bucks military-overseas ballot envelope).

**Response**:  Admitted that each county's absentee ballot materials also include a voter declaration that voters are instructed to sign and date. For ballots sent to UOCAVA voters, although ballot submissions still include a declaration, that declaration is not necessarily printed on the submission's outer envelope. *See* Ex. B to Appendix of Acting Secretary Al Schmidt, Marks Dep. Tr. 146:2-147:23.

102.  The instructions that Berks County provided to domestic voters submitting mail ballots in the November 2022 general election told the voters to "Sign and date the pre-addressed return envelope," and told voters that "YOUR BALLOT WILL NOT COUNT IF IT IS NOT SIGNED AND DATED." APP_01170.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

103.  The instructions that Berks County provided to UOCAVA voters submitting absentee ballots in the November 2022 general election told the voters to ""Fill out the absentee elector's declaration on the back of this envelope with your name and address. Be sure to sign where indicated. Your ballot will not be counted without a signature," but did not indicate that the ballot would not be counted if the declaration on the return envelope lacked a handwritten date. APP_01169.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

104.  Berks County did not set aside any absentee ballots submitted by UOCAVA voters in the November 2022 general election on the basis of a missing or incorrect handwritten date on the ballot's return envelope. APP_00103 (Berks Dep.); Berks ROG Resp. at 6.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

105.  The envelopes that Westmoreland County provided to domestic voters submitting mail ballots in the November 2022 general election instructed voters that "YOUR BALLOT WILL NOT BE COUNTED UNLESS: You sign and date the voter's declaration in your own handwriting[.]" APP_01401.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

106.  The envelopes that Westmoreland County provided to UOCAVA voters did not instruct those voters that their ballots would not be counted if the voter failed to date the voter's declaration. APP_01201.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

107.   Westmoreland County did not set aside any absentee ballots submitted by UOCAVA voters in the November 2022 general election on the basis of a missing or incorrect handwritten date on the ballot's return envelope. APP_00936-937 (Westmoreland Dep.); Westmoreland ROG Resp. at 7.

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

108.   At least three county boards of elections—Bucks, Philadelphia, and Tioga—counted timely-received military-overseas ballots in the November 2022 general election if the voter failed to date their voter declaration or included a date that the county deemed to be incorrect. APP_00118-119 (Bucks Interrog. Resp., Bucks counted 11 ballots with reflecting that undated or misdated declarations); APP_00535-536 (Philadelphia Interrog. Resp., reflecting that Philadelphia counted 13 ballots with undated or misdated declarations); APP_00632 (Tioga Interrog. Resp., reflecting that Tioga counted 10 ballots with undated or misdated declarations).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

109. At least one additional county board of elections—Lehigh—did not check the date on the voter declaration for timely-received military-overseas ballots in the November 2022 general election. APP_00405 (Lehigh Interrog. Resp.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

110. At least five additional county boards of elections did not segregate or set aside any timely-received military-overseas ballots in the November 2022 general election based on a missing or incorrect date on the voter declaration. APP_00579 (Potter Interrog. Resp.); APP_00716 (Wyoming Interrog. Resp.); APP_00673 (Washington Interrog. Resp.); APP_00484 (Montgomery Interrog. Resp.); APP_00499 (Northampton Interrog. Resp.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

111. Over half of the county boards of elections—37 in total—indicated that they did not receive any military-overseas ballots in the November 2022 general

election that had a missing or incorrect date on the voter declaration, and so they did not have to determine whether to set aside or count such ballots. APP_00010 (Adams Interrog. Resp.); APP_00031 (Allegheny Interrog. Resp.); APP_00044 (Armstrong Interrog. Resp.); APP_00066 (Beaver Interrog. Resp.); APP_00082 (Berks Interrog. Resp.); APP_00101 (Blair Interrog. Resp.); APP_00110 (Bradford Interrog. Resp.); APP_00133 (Butler Interrog. Resp.); APP_00142 (Cambria Interrog. Resp.); APP_00153-54 (Cameron Interrog. Resp.); APP_00206 (Clearfield Interrog. Resp.); APP_00220 (Clinton Interrog. Resp); APP_00240-41 (Crawford Interrog. Resp.); APP_00256 (Cumberland Interrog. Resp.); APP_00271 (Delaware Interrog. Resp.); APP_00279 (Elk Interrog. Resp.); APP_00296 (Erie Interrog. Resp.); APP_00313 (Fayette Interrog. Resp.); APP_00324 (Forest Interrog. Resp.); APP_00339 (Franklin Interrog. Resp.); APP_00348 (Fulton Interrog. Resp.); APP_00357 (Greene Interrog. Resp.); APP_00377 (Lackawanna Interrog. Resp.); APP_00421 (Luzerne Interrog. Resp.); APP_00442 (Lycoming Interrog. Resp.); APP_00462 (Mercer Interrog. Resp.); APP_00472 (Mifflin Interrog. Resp.); APP_00542 (Pike Interrog. Resp.); APP_00587 (Schuylkill Interrog. Resp.); APP_00602 (Somerset Interrog. Resp.); APP_00612 (Sullivan Interrog. Resp.); APP_00621 (Susquehanna Interrog. Resp.); APP_00637 (Union Interrog. Resp.); APP_00649 (Warren Interrog. Resp.); APP_00692 (Wayne Interrog. Resp.); APP_00709 (Westmoreland Interrog. Resp.).

**Response**: The Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only.

## VII. RELIEF

112. County boards of elections are responsible for creating and retaining official records of election results, including a copy of the returns that must be available for public inspection at the county election board's office. APP_01183 (Greenburg Report); 25 P.S. § 3152.

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

113. County boards of elections maintain digital and paper records of the total number of votes received by each candidate in past elections. APP_00846 (Berks Dep.); APP_00930-931 (Westmoreland Dep.); APP_01183 (Greenburg Report).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this

litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

114. County boards of elections are capable of updating records of the total number of votes received by each candidate in past elections if ordered to do so by a court. APP_01183-1184 (Greenburg Report); APP_00931-932 (Westmoreland Dep.).

**Response**: To the extent this paragraph comprises factual allegations, the Acting Secretary is not aware of any facts in the record that contradict the allegations of this paragraph and accordingly admits the allegations for purposes of this litigation only. To the extent this paragraph sets forth statements or conclusions of law, no response is required thereto.

May 5, 2023

Respectfully submitted,

Robert A. Wiygul (Bar. No. 310760)
John B. Hill (Bar. No. 328340)
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933

Elizabeth Lester-Abdalla (Bar. No. 327276)
Deputy Attorney General
OFFICE OF ATTORNEY GENERAL
1600 Arch Street, Suite 300
Philadelphia, PA 19103

Michael J. Fischer (Bar. No. 322311)
Executive Deputy General Counsel

/s/ *Jacob Boyer*

Jacob Boyer (Bar. No. 324396)
Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Acting Secretary Al Schmidt*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>AL SCHMIDT, *in his official capacity as Acting Secretary of the Commonwealth*, *et al.*,<br><br>Defendants. | No. 1:22-cv-339<br>Judge Susan Paradise Baxter |

**APPENDIX OF AL SCHMIDT IN SUPPORT OF RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT**

Robert A. Wiygul (Bar. No. 310760)
John B. Hill (Bar. No. 328340)
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933

Michael J. Fischer (Bar No. 322311)
Executive Deputy General Counsel
Jacob B. Boyer (Bar. No. 324396)
Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

Elizabeth Lester-Abdalla (Bar. No. 327276)
Deputy Attorney General
OFFICE OF ATTORNEY GENERAL
1600 Arch Street, Suite 300
Philadelphia, PA 19103

*Counsel for Acting Secretary Al Schmidt*

**TABLE OF CONTENTS**

Complete Transcript of Hearing,
*Chapman v. Berks County Bd. of Elections*,
No. 355 MD 2022 (Pa. Commw. July 28, 2022) .................................. Exhibit A

Complete Deposition Transcript of Jonathan Marks .................................. Exhibit B

# Exhibit A

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

LEIGH M. CHAPMAN, Acting Secretary of the Commonwealth and the Pennsylvania Department of State,
Petitioners

v. NO. 355 M.D. 2022

BERKS COUNTY BOARD OF ELECTIONS, FAYETTE COUNTY Board of Elections, and LANCASTER COUNTY BOARD OF ELECTIONS,
Respondents

Pages 1 through 263

Courtroom 3001
PA Judicial Center
601 Commonwealth Avenue
Harrisburg, Pennsylvania

Thursday, July 28, 2022

Met, pursuant to notice, at 10:00 a.m.

BEFORE:

HON. RENÉE COHN JUBELIRER, President Judge

APPEARANCES:

MICHAEL J. FISCHER, Esquire
JACOB B. BOYER, Esquire
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, Pennsylvania 19103
(For the Petitioners)

JEFF BUKOWSKI, Esquire
Smith Bukowski
1050 Spring Street, Suite 1
Wyomissing, Pennsylvania 19610
(For Respondents, Berks County Board of of Elections and Lancaster County Board of Elections)

APPEARANCES (continued):

        THOMAS W. KING, III, Esquire
        THOMAS E. BRETH, Esquire
        Dillon McCandless King Coulter & Graham L.L.P.
        128 West Cunningham Street
        Butler, Pennsylvania  16001
           (For Respondent, Fayette County Board of
           Elections)

                    ***

C O N T E N T S

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jonathan Marks | | | | |
| (By Mr. Fischer) | 16 | -- | 111 | -- |
| (By Mr. Bukowski) | -- | 36 | -- | 120 |
| (By Mr. King) | -- | 61 | -- | 121 |
| Scott Dunn | | | | |
| (By Mr. Fischer) | 125 | -- | -- | -- |
| (By Mr. King) | -- | 138 | -- | -- |
| Ray D'Agostino | | | | |
| (By Mr. Fischer) | 141 | -- | 157 | -- |
| (By Mr. Bukowski) | -- | 150 | -- | 159 |
| (By Mr. King) | -- | 155 | -- | -- |
| Christian Leinbach | | | | |
| (By Mr. Boyer) | 160 | -- | 181 | -- |
| (By Mr. Bukowski) | -- | 167 | -- | 183 |
| (By Mr. King) | -- | 176 | -- | -- |

A R G U M E N T

| | Page |
|---|---|
| Oral Argument by Mr. Boyer | 186 |
| Oral Argument by Mr. Bukowski | 209 |
| Oral Argument by Mr. King | 236 |
| Rebuttal Argument by Mr. Boyer | 251 |

E X H I B I T S

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Joint | | |
| 1 (Declaration Envelope Template) | 19 | 109 |
| 2 (9/11/20 Department of State Guidance) | 42 | 109 |
| 3 (9/28/20 Department of State Guidance) | 42 | 109 |
| 4 (2022 Mail-in and Absentee Ballot Information) | 108 | 109 |
| 5 (5/24/22 Department of State Guidance) | 58 | 109 |
| 6 (6/17/22 Marks E-mails) | 24 | 109 |
| 7 (6/23/22 Riegner E-mail) | 55 | 109 |
| 8 (6/27/22 Kuznik E-mail) | 28 | 109 |
| 9 (6/27/22 Pfursich E-mail) | 30 | 109 |
| 10 (6/28/22 Leinbach E-mail) | 31 | 109 |
| 11 (6/29/22 Gates Letter) | 27 | 109 |
| 12 (7/1/22 Kauffman Letter) | 32 | 109 |
| 13 (July E-mail Chain Between Gates and Pfursich) | 33 | 109 |
| 14 (7/8/22 Gates E-mail) | 33 | 109 |
| Petitioner | | |
| 1 (6/2/22 Order of Judge Cohn Jubelirer in McCormick) | 108 | 109 |

E X H I B I T S

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 2 (6/10/22 Order of Judge Cohn Jubelirer in McCormick) | 108 | 109 |
| Berks - Lancaster | | |
| 1 (Third Circuit Docket in Migliori) | 108 | 109 |
| 2 (3/21/22 Amicus Brief of the Commonwealth of Pennsylvania in Migliori) | 108 | 109 |
| 3 (4/1/22 Amicus Brief of the Commonwealth of Pennsylvania in Migliori) | 108 | 109 |
| 4 (Why Are There Two Envelopes With My Mail-in Ballot) | 108 | 109 |
| 5 (Dissenting Opinion of Justice Alito in Migliori) | 108 | 109 |
| 6 (Complaint and Docket in Commonwealth of Pennsylvania v. Mihaliak at MJ-02202-CR-0000126-2022) (Maintained by Counsel) *RETAINED* | 157 | 157 |
| Fayette | | |
| A (6/1/21 Marks E-mail) | 108 | 109 |
| B (Petition for Writ of Certiorari in Ritter) | 108 | 109 |
| C (U.S. Supreme Court Docket in Ritter) | 108 | 109 |
| D (Memorandum of Law of the Commonwealth of Pennsylvania in Ziccarelli) | 83 | 109 |

E X H I B I T S

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| E (11/23/20 PA Supreme Court Decision in In Re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 Election) | 108 | 109 |

Any reproduction of this transcript is prohibited without authorization by the certifying reporter.

***

P R O C E E D I N G S

JUDGE COHN JUBELIRER: Good morning, everyone, and welcome to Commonwealth Court. We are here today in the matter of Leigh Chapman, Acting Secretary of the Commonwealth and the Pennsylvania Department of State, Petitioners, versus Berks County Board of Elections, Fayette County Board of Elections, and Lancaster County Board of Elections, Respondents. It is a hearing on Petitioners' Emergency Application for Peremptory Judgment and Summary Relief. So welcome.

We will begin. I understand that there are some witnesses that you anticipating calling. Would you each like to make a brief opening statement or would you prefer to jump right in?

MR. BUKOWSKI: I'm not sure, Your Honor, and the Court's preference is, you know, one of the issues we raised some threshold issues as to how we even get to an evidentiary hearing; and we'll defer to Your Honor on how you want to handle that, whether you want us to argue those first before calling witnesses.

We do think that how we got here is the Secretary's filing this action late to challenge the Board, the three County Boards of Elections' certified results in an untimely manner in which no voter challenge exists, no candidate challenge exists, and they're seeking to enforce

a directive by the Secretary to have the three counties recertify their results of their elections in accordance with the Acting Secretary's interpretation of a Third Circuit decision that wasn't even in effect as of the deadline and actual date of certification.

So we can argue those before the Court first before putting on witnesses, but we're prepared to proceed however the Court would prefer.

MR. KING: Good morning. Thomas W. King, III, for the Fayette County Board of Elections. With me is my partner, Thomas Breth, who has appeared before you previously.

I would echo what Mr. Bukowski said. There are preliminary matters that I'm certain that the Court has seen the papers in the case, but there are preliminary matters that call into question the jurisdiction with respect to hearing this matter because of the failure to comply with the statutory requirements. Also there is no case or controversy before you; and in addition to that, whatever is filed is completely untimely.

So I'm not sure that we shouldn't at least address those preliminary issues in some way. There are witnesses here. There are County Commissioners here. I have Commissioner Dunn and Commissioner Lohr from Fayette County made the trip here today, and I know that the Deputy

Secretary Mr. Marks is here who we would call on cross-examination.

We're prepared to go however Your Honor would see fit, but I think there are preliminary issues that we ought to at least address. I guess we're kind of addressing them now, but I think we ought to get to those. And I would think that the Court would most likely have, with all due respect, would most likely have questions for both sides about those issues.

JUDGE COHN JUBELIRER: And --

Yes?

MR. BUKOWSKI: And, Your Honor, I didn't introduce myself, so I apologize. Jeff Bukowski on behalf of both Berks and Lancaster County; and I do have Commissioner Christian Leinbach, Chairman of the Berks County Commissioners, here and Commissioner Ray D'Agostino from the Lancaster County Board of Commissioners here.

And I didn't intend to argue it first other than raise the issue so that if the Court preferred to go that way, maybe Mr. Boyer or Mr. Fischer would try and, you know, convince the Court why they should be here now and then we would argue why they shouldn't be.

JUDGE COHN JUBELIRER: And thank you very much. I appreciate and I understand that you haven't actually made your arguments. You've just presented what

you would like to, the method you would like to proceed with.

Counsel?

MR. BOYER: Good morning, Your Honor, Jacob Boyer --

JUDGE COHN JUBELIRER: Good morning.

MR. BOYER: -- from the Office of Attorney General on behalf of the Acting Secretary and the Department of State.

I think our view is we're prepared to proceed as Your Honor sees fit. Unless Your Honor's prepared to rule on the legal issues right now, I think it probably makes sense out of respect to the witnesses to proceed with the evidentiary hearing and then to argument.

I will say a couple of the comments that my colleagues on the other side made during their presentation reflects a basic --

JUDGE COHN JUBELIRER: And please, you know what, before we continue and this is just more of just a method of proceeding here, I have no objection if you wish to speak from your tables where you're sitting because you can have all your materials in front of you; and I also appreciate the respect accorded to the Court by your standing when you speak.

With the streaming of the proceedings so

that other people can watch this on YouTube without having to be in court, the volume of your voice is difficult to hear if you're not sitting or close to the microphone. So I will not take it amiss if you sit while you speak to the Court so that the microphone can catch what you're saying or, of course, you may stand at the podium. But I want to make sure that everybody can hear what you're saying.

So excuse the interruption but please --

(Mr. Boyer approached the podium.)

JUDGE COHN JUBELIRER: -- okay -- feel free to go wherever it's most suitable and convenient.

MR. BOYER: Thank you, Your Honor, and I appreciate the courtesy.

I will say we believe that these issues can be resolved on the paper much like they were in the McCormick matter. If Your Honor disagrees and believes there are relevant disputed facts, I think our view is that it makes sense out of courtesy to the witnesses to have them testify and then proceed to argument.

The threshold issues that my colleagues raised I think reflect a couple basic misunderstandings about the issues in this case. Number one, this is not a case to enforce guidance from the Secretary. This is a case to enforce an order of this Court, state law, and federal law.

And, number two, I think they refer to issues of timeliness. I believe that's a reference to Section 3157 of the Election Code which doesn't apply here since it doesn't apply to contests about certification which is a ministerial duty that it's supposed to follow the resolution of issues about computation and canvassing which are the only things that can be challenged under the statutes being alluded to. So I don't think that --

JUDGE COHN JUBELIRER: I think are you having trouble hearing?

THE REPORTER: Yes, and he needs to slow down.

JUDGE COHN JUBELIRER: And you need to speak a little slower, please.

MR. BOYER: I'm sorry.

JUDGE COHN JUBELIRER: Yes.

MR. BOYER: I apologize.

The threshold issues, Your Honor, in our view are actually quite easily resolved and don't apply in this matter. So unless Your Honor is in a position to rule ahead of an evidentiary hearing, I think we should proceed with that and then follow the evidentiary hearing with argument.

JUDGE COHN JUBELIRER: Okay. Thank you very much.

I am going to be taking all of these matters under consideration, so I don't intend to rule preliminarily on the issues that you've raised which are important and I think will benefit from considered thought and research.

So given the fact that you have witnesses here that may or may not want to remain through all of the arguments, if there is no objection I think we should begin with the testimony, allow the witnesses to be questioned, make the record, and then afterwards I do want to hear all of the arguments that you've raised.

Even though we're taking it a little out of order, given the situation I think that probably makes most sense although I appreciate your having brought the preliminary threshold issues to the fore.

MR. KING: Yes, Your Honor. That's fine with us. Thank you very much.

MR. BUKOWSKI: Thank you, Your Honor. We will proceed accordingly.

JUDGE COHN JUBELIRER: Thank you very much.

MR. BUKOWSKI: Thank you.

MR. BOYER: Thank you, Your Honor.

JUDGE COHN JUBELIRER: Okay. Given the way we're going to proceed, would you like to spend a few minutes before we begin with an opening statement or would

you prefer to wait and at the end do the conclusions?

MR. FISCHER: Your Honor, I think we're fine dispensing with opening statements.

JUDGE COHN JUBELIRER: Okay.

Would you?

MR. BUKOWSKI: We agree, Your Honor.

JUDGE COHN JUBELIRER: Okay.

MR. BUKOWSKI: And since the Court has directed that we'll get a full chance to argue, we agree that makes sense.

JUDGE COHN JUBELIRER: Absolutely and I will place no time limitations on your arguments because I know how important they are, and I want to make sure that everyone has the opportunity to make their best arguments and present their best case.

MR. KING: Thank you very much.

MR. BUKOWSKI: Very good, Your Honor. Thank you.

JUDGE COHN JUBELIRER: Thank you.

In that case I believe it is up to the Secretary to proceed. Since you are the moving party, you have the burden.

MR. FISCHER: Thank you very much, Your Honor. We'd like to call Jonathan Marks as our first witness.

MR. HOLLAND: Please raise your right hand.

Whereupon,

JONATHAN MARKS,

having been duly sworn, testified as follows:

MR. HOLLAND: Please be seated. Thank you.

MR. KING: Excuse me. May it please the Court. Your Honor, with respect to these witnesses, will the parties be bound by the declarations made to the Court in the form of a proffer that was included in the memorandum filed? So, for example, would the Commonwealth be bound by the proffer of what this witness is about to testify about?

JUDGE COHN JUBELIRER: Is there any objection to that?

MR. FISCHER: No objection, Your Honor. We've laid out in general terms what we'd like to ask this witness, but I don't intend to go much beyond that. If Mr. King on cross elicits other points, then we certainly reserve the right on redirect to respond.

MR. KING: That's fine, Your Honor. I just wanted to make sure what the rules were before we got into the game here.

JUDGE COHN JUBELIRER: Sure. Thank you very much.

MR. KING: Yes, ma'am. Thank you.

DIRECT EXAMINATION

BY MR. FISCHER:

Q. Good morning, Mr. Marks.

A. Good morning.

Q. What is your current position, sir?

A. Currently I am the Deputy Secretary for Elections and Commissions at the Pennsylvania Department of State.

Q. How long have you been employed by the Pennsylvania Department of State?

A. Employed by the Pennsylvania Department of State 27 years, 28 years. I started in the Corporation Bureau before I came to Elections.

Q. How long have you worked in the Elections Bureau?

A. I've worked in Elections in a variety of positions for over 18 years, since late 2003.

Q. And how long have you held your current position?

A. Since February of 2019.

Q. Thank you. I'd just like to ask you briefly about the administration of elections in Pennsylvania. What governmental entity or entities is responsible for administering elections on a day-to-day basis?

A Primarily the county Boards of Elections. They are statutorily given that duty to administer the day-to-day on election administration. Of course, the Department of State plays an important role as well in

election administration at the State level.

Q. Generally speaking, what are the responsibilities of the county boards?

A. Generally speaking, you know, it's to instruct poll workers, to procure and staff polling places throughout their county. It also includes receiving and tabulating both Election Day votes as well as votes cast by absentee or through the mail.

Q. And what are the responsibilities broadly speaking of the Department of State with respect to elections?

A. Our duties are primarily ministerial in nature. We do provide guidance to the counties; but as it relates to elections or a given election, you know, our responsibility primarily is to certify the results of the election upon receipt of the certified election returns from the various 67 county Boards of Elections.

Q. Now, you mentioned guidance issued by the Department of State. Is the Department of State's guidance binding on the counties?

A. Guidance, no, it is not binding on the counties. The Secretary of the Commonwealth does have the authority to issue directives in some cases. But when we use the term guidance, we're talking about something that is what the name implies. It's guidance that counties we expect

will follow but as we learned not always.

Q. Thank you. And who in Pennsylvania has the final say over disputed questions relating to the administration of elections?

A. The final say, I would think the final say would be the Court, you know, a competent Court, whatever that Court happens to be.

Q. Does the Department make an effort to see that its guidance is consistent with relevant decisions from the Courts?

A. We do, yes.

Q. So I'd like to ask you a little about the process of certifying elections which you mentioned and then specifically relating to the May, 2022 primary. First of all, can I ask a question? What does it mean to canvass the votes cast?

A. Canvass really means the entire process of, you know, the viewing and tabulating of the election returns. So canvass, the county Board of Elections comes together and they will review the returns submitted by the various precincts in their counties. It also includes adding those totals from absentee and mail-in balloting which are done centrally by the county Board of Elections.

So that precanvass that we have that begins on 7:00 a.m. on Election Day as well as the official canvass

that continues thereafter, all of that is part of the canvass. So it's not just the tabulation of votes. It's also everything that precedes that during the official canvassing.

Q. But it's fair to say that canvassing includes counting votes and tabulating votes?

A. It does, yes.

Q. Thank you. And what does certification of the election refer to?

A. Certification is essentially an act, a ministerial act that occurs once the canvass is completed and you've tallied up all the results. The county will then certify those results to the Secretary of the Commonwealth, and subsequently the Secretary will certify the final results after she compiles them.

Q. So both the counties and the Secretary certify results; is that correct?

A. Correct. Yes.

Q. Does the Secretary strive to make sure that her certification is accurate and complete?

A. She does, yes.

Q. Sir, I'd like to ask you specifically now about mail-in and absentee ballots, and I'm going to hand you what's been marked as Joint Exhibit 1.

(Whereupon, the document was marked as

Joint Exhibit Number 1 for
identification.)

THE WITNESS: Thank you.

BY MR. FISCHER:

Q. Sir, are you familiar with this document?

A. I am, yes.

Q. What is this document?

A. This is the declaration envelope template drafted by the Department of State. A declaration envelope meaning that outside envelope that the voter inserts their ballot inside the secrecy envelope and they sign the declaration.

Q. Could you just explain again? You mentioned two different envelopes. Could you just explain the function of the two envelopes?

A. Sure. So the secrecy envelope or I believe the statute identifies it as official ballot envelope is just a plain envelope with the wording official election ballot on it that the voter inserts their voted ballot into. The declaration envelope then is the envelope that that inner envelope, that secrecy envelope is inserted into, sealed, and then signed by the elector. And that is then returned to the county Board of Elections for canvassing.

Q. So what we're looking at as Joint Exhibit 1 appears on the outer envelope; is that your testimony?

A Correct. Yes.

Q. Now, there's a place for the voter to sign and mark, sign or mark and then a line below that for the date. Do you see that?
A. I do, yes.
Q. Could you explain under the Election Code when do mail-in and absentee ballots need to be returned to the counties?
A. A mail-in or absentee ballot must be returned to the county by 8:00 p.m. on Election Day.
Q. And was that true with respect to the May, 2022 primary?
A. It was, yes.
Q. And was this certification form in use for the May, 2022 primary?
A. It was, yes.
Q. Now, with respect to the November, 2020 general election, was the deadline 8:00 p.m. on Election Day?
A. No. The deadline was not 8:00 p.m. on Election Day November, 2020. Pursuant to the order of the Pennsylvania Supreme Court, that deadline for receipt was extended to Friday after election.
Q. How do counties determine whether mail-in and absentee ballots were submitted by the deadline?
A. Typically the counties will date-stamp or otherwise put some indicia on the outer envelope indicating

that it was timely received by the county Board of Elections.

Q. Do the counties use the date written by the voter on the outer envelope to determine timeliness?

A. Not that I'm aware of, no.

Q. Are you aware of any purpose for which the counties use the date as written on the outer envelope?

A. I cannot think of any administrative purpose.

Q. Do voters occasionally omit to write a date on the outer envelope?

A. Yes, they do.

Q. And if I refer to those ballots as undated ballots, do you understand what I'm referring to?

A. I do.

Q. And do voters sometimes write a date that is obviously incorrect?

A. Yes. Voters, anecdotally we've heard from counties where voters will, you know, either put their birth date on there as they misunderstand what's being requested or they'll put a date with the wrong year or the wrong month.

Q. Outside those situations where the date is obviously incorrect, do the counties have a mechanism of verifying whether the date is accurate?

A. No, they do not.

Q. Now, earlier you testified about guidance issued by the Department. Has the Department issued guidance relating to undated ballots or wrongly dated ballots as you describe them?

A. Yes. Since early June -- well, actually since May 20th I believe when the Third Circuit ruled in the Migliori case, we issued guidance to the counties at that point indicating that the counties should -- well, sorry. I want to make sure I get the timeline correct; but, yes, we've issued guidance prior to the primary. We obviously issued guidance subsequent to that in light of various Court rulings.

Q. So let me drill down a little bit on that. First of all, are you an attorney for the Department?

A. I am not, no.

Q. You had mentioned the Department issued guidance before and after. Let me ask you specifically about wrongly dated ballots. What is the Department's guidance as to wrongly dated ballots such as a ballot where the voter lists his or her birth date?

A. It has been our guidance since I believe September of 2020 that counties cannot and should not set aside ballots that are wrongly dated, meaning a ballot that has an incorrect date whether it's a birth date or some other error by the voter.

Q. And has the Department's guidance with respect to wrongly dated ballots only changed over that time?

A. It has not.

Q. Now, with respect to undated ballots, has the Department's guidance changed over time?

A. It has, yes.

Q. And what has prompted those changes?

A. Rulings by the Court, this Court as well as the Third Circuit.

Q. So leading up to the May, 2022 primary, what was the Department's guidance with respect to undated ballots?

A. It was the Department's guidance leading up to the May, 2022 primary that those ballots could not be counted and based on our analysis of the 2020 decision by the Pennsylvania Supreme Court.

Q. I'm going to hand you what's been marked as Joint Exhibit 6.

(Whereupon, the document was marked as Joint Exhibit Number 6 for identification.)

THE WITNESS: Thank you.

Your Honor, is my volume okay? I tried to --

JUDGE COHN JUBELIRER: I think so. Thank you.

Any problem?

THE REPORTER: No.

BY MR. FISCHER:

Q. Mr. Marks, do you recognize this exhibit?

A. I do, yes.

Q. Is this an e-mail that you sent?

A. It is, yes.

Q. Now, I notice you are the only individual listed in the recipient line. Did you only send this e-mail to yourself?

A. No. I blind copied several counties. I believe nine counties received this e-mail.

Q. Is that your typical practice when you're e-mailing multiple counties?

A. Yes. We typically blind copy everyone, and I'll send a copy to myself.

Q. Now, if I could direct you to the second page of the document, the top half of that page there's a list of dates.

A. Yes. I'm sorry. I want to correct one thing. I was confused on the dates. I believe I sent this e-mail to all county Boards of Elections, June 17th e-mail.

Q. Thank you for that clarification. What is the summary of events that you have here?

A. This was basically a summary of, you know,

relevant events, mostly, you know, rulings by the Court and other events in between that led to the Department's determination as to what counties were required to do.

Q. Now, I'd like to direct you to the bottom e-mail-in this exhibit dated June 17th, 2022, at 9:08 a.m. Do you see this e-mail?

A. I do, yes.

Q. And did you write and sign this e-mail?

A. I did, yes.

Q. And what were you trying to communicate to the counties in this e-mail?

A. We were trying to communicate -- I was trying to communicate that if counties had not already done so that they should canvass, tabulate, and certify votes from undated or wrongly dated ballots as the case may be. And, you know, it's our belief that that should be done in an open meeting if it had not already been done and that subsequently they should certify those totals to the Department of State.

Q. And what had prompted that change in the Department's guidance to counties?

A. Well, it was not only the decision of the Third Circuit but also the June 2nd opinion of this Court as well as I believe the last item on this list of events is an action by the U.S. Supreme Court denying an application for

stay in the Migliori case.

Q. Now, you mentioned the June 2nd decision of this Court. Did that involve litigation regarding the republican senate primary?

A It did, yes.

Q. And that was actually brought by Mr. McCormick, one of the candidates, correct?

A. Correct.

Q. Sir, I'm going to hand you what's been marked as Joint Exhibit 11.

(Whereupon, the document was marked as Joint Exhibit Number 11 for identification.)

BY MR. FISCHER:

Q. Have you seen this document before?

A. I have, yes.

Q. And what is the date on this letter?

A. This letter is dated June 29th of 2022.

Q. And who is it sent from?

A. It's sent by Chief Counsel of the Department of State, Timothy Gates.

Q. Now, the letter is directed to the Director of the Berks County Election Services. Do you recall if this letter was sent to any other county officials?

A. Yes. My recollection is this letter was sent to

I believe four counties, Berks, Bradford, Fayette, and Lancaster.

Q. And what was the purpose of this letter?

A. The purpose of this letter was to reiterate the Department's position that counties were required, in light of relevant rulings by the Courts, the counties were required to canvass, tabulate, and certify vote totals cast on undated or wrongly dated ballots as the case may be. And it outlines how the Department arrived at that conclusion, briefly summarizes it.

Q. And in between your June 17th e-mail and this June 29th letter, had you been in communication with any counties about those certifications?

A. Yes. I certainly received questions, had some phone conversations with various counties about the June 17th e-mail.

Q. I'm going to hand you what's been marked as Joint Exhibit 8 and also give you the next two to save time but I'll let you know when we're ready for those.

(Whereupon, the document was marked as Joint Exhibit Number 8 for identification.)

BY MR. FISCHER:

Q Do you recognize Joint 8?

A. I do, yes.

Q. And this is an e-mail sent to you from Marybeth Kuznik, am I saying that right?
A. Kuznik.
Q. Kuznik, with the Fayette County Election Bureau, correct?
A. Correct. Yes.
Q. Dated June 27th?
A. That's correct, yes.
Q. And what is Ms. Kuznik saying in her e-mail?
A. So Ms. Kuznik, I'm actually going to read it if that --
Q. Certainly.
A. -- pleases the Court. The Board of Elections of Fayette County has voted not to open or count the undated ballots from the May 17th, 2022 general primary. For this reason, I am unable to provide the information you requested in your e-mail below. Dated ballots with the wrong date were counted and were already included in Fayette's original certification of the primary and subsequent recount, referring to the recount, statewide recount for U.S. Senate.
Q. So now let's look at your e-mail that she was responding to which begins on the bottom of the first page and carries over into the second page. Do you recall sending this e-mail?

A. I do, yes. This was sort of my final reminder to the counties who at that point had not yet certified vote totals for undated and wrongly dated ballots.

Q. Did this go to all 67 counties?

A. It did not. This one went to nine counties including Bradford, Berks, Fayette, and Lancaster.

Q. How had you selected those nine counties to receive the e-mail?

A. They were selected based on whether we received from those counties a certification per my original request of June 17th.

Q. All right. Thank you. I'd like to now direct you to Joint Exhibit 9 which is the next document up there.

(Whereupon, the document was marked as Joint Exhibit Number 9 for identification.)

BY MR. FISCHER:

Q. This is another e-mail sent to you from Jacquelyn Pfursich. Am I saying that correctly?

A. I don't know. This is the first time I actually had any interaction with Jacquelyn, so I believe that's correct but don't quote me on that. I'm sure one of the Commissioners from Lancaster County can tell you the correct pronunciation.

MR. D'AGOSTINO: Pfursich.

MR. FISCHER: Pfursich, thank you.

BY MR. FISCHER:

Q. What is Ms. Pfursich's position?

A. I believe she is the Lancaster County Solicitor.

Q. And this e-mail is dated June 27th?

A. It is, yes.

Q. And I won't ask you to read the entire e-mail, but is it fair to say that in this e-mail Ms. Pfursich says that Lancaster County will not be including undated ballots in its certified totals?

A. Yes, that is correct.

Q. And now I'd like to go to Joint Exhibit 10.

(Whereupon, the document was marked as Joint Exhibit Number 10 for identification.)

BY MR. FISCHER:

Q. This is another e-mail sent to you from Christian Leinbach. Do you know who Mr. Leinbach is?

A. I do, yes. I believe he is the Chair of the Berks County Commissioners.

Q. And this is sent on June 28th, correct?

A. Correct. Yes.

Q. And in this e-mail Mr. Leinbach says please help me understand where the clear Court guidance is regarding certification on undated ballots. I do not see it. Do you

see that?
A. I do, yes.
Q. So is it fair to say that you understood this e-mail to be communicating that Mr. Leinbach did not agree with the Department's position?
A. Yes, I think that's a fair --
Q. I'm going to hand you the next three exhibits which are 12, 13, and 14. I want to direct you to Joint Exhibit 12 first.

(Whereupon, the document was marked as Joint Exhibit Number 12 for identification.)

BY MR. FISCHER:
Q. Now, this is the letter from the Berks County -- First Assistant Berks County Solicitor to Mr. Gates, correct?
A. Yes, that's correct.
Q. And dated July 1st?
A. Yes.
Q. And in this letter Mr. Kauffman, the Assistant County Solicitor, says in the second sentence, pursuant to a majority vote of the Berks County Board of Elections, the County of Berks will not be recertifying the results of the May 17th, 2022 primary election as requested in your correspondence?

A. Correct.
Q. And what correspondence is Mr. Kauffman referring to there?
A. He's referring to the June 29th letter from our Chief Counsel, from Mr. Gates to the Election Director in Berks County.
Q. I'd like to direct you to Joint Exhibit 13 and specifically the second e-mail in the chain which is from Ms. Pfursich to Mr. Gates.
(Whereupon, the document was marked as Joint Exhibit Number 13 for identification.)
BY MR. FISCHER:
Q. Have you seen this e-mail before?
A. Are you referring to the July 5th, 4:17 p.m.?
Q. Yes, that's correct.
A. I have, yes.
Q. And is it fair to say Ms. Pfursich is reiterating what she previously said to you which is that Lancaster County will not be including undated ballots in its total?
A. That is correct. Yes.
Q. Now, finally I'd like to direct you to Joint Exhibit 14.
(Whereupon, the document was marked as Joint Exhibit Number 14 for

identification.)

BY MR. FISCHER:

Q. This is an e-mail from Mr. Gates to Ms. Kuznik. What is the date on this e-mail?

A. This e-mail is -- are you referring to the one at the top of the chain --

Q. Yes.

A. -- which is July 8th, 2022, at 6:31 p.m.?

Q. Thank you. Can you just read what Mr. Gates says in this e-mail?

A. Following up again. Please advise on your response as requested. Fayette County is the only county that I have not yet heard from.

Q. And with respect to the subject that Fayette County did not report to Mr. Gates on, do you have an understanding of what that refers to?

A. Yes. Following all the way back to the beginning of this thread, it is follow-up from the June 29th e-mail from Mr. Gates where he attaches the letter, the June 29th letter, the one to the four counties regarding certification of undated ballot vote totals.

Q. And do you see the second e-mail in the chain dated July 5th, 2022?

A. I do, yes.

Q. Now, this is sent to two e-mail addresses, Ms.

Kuznik and jackpurcell146@gmail. Do you know who Mr. Purcell is?

A. I don't. I believe Mr. Purcell may be counsel for Fayette County or I'm really not sure.

Q. And in this e-mail Mr. Gates says, Jack, following up on my e-mail and letter last week. If you do not provide the requested information by 5:00 p.m. today, the Acting Secretary intends to pursue all necessary and appropriate legal action, Tim. Did I read that correctly?

A. You did, yes.

Q. Now, I believe earlier you mentioned that Mr. Gates' letter went to four counties; is that correct?

A. Yes, I believe that's correct.

Q. Did any of those counties ultimately comply with the Department's request to include undated ballots in their certified totals?

A. Yes, Bradford County.

Q. Bradford did. With respect to the other three, did they ultimately comply?

A. No.

Q. In the Department's view have those three counties complied with their obligation to certify the results of the May, 2022 primary?

A. No.

Q. Now, we've talked a little bit about undated

ballots and wrongly dated ballots earlier. Are you aware of any county that excluded wrongly dated ballots from its certified total?

A. I am not aware of any county other than these three that have excluded -- I'm sorry. You said wrongly dated ballots?

Q. Wrongly dated ballots.

A. No. I'm not aware of any county that excluded wrongly dated ballots.

Q. But in the submissions from these three counties, it is your understanding that undated ballots were not included?

A. That is correct. Yes.

Q. Thank you.

MR. FISCHER: Thank you. We have no further questions, Your Honor.

JUDGE COHN JUBELIRER: Thank you very much.

Which of you would prefer to go first?

MR. BUKOWSKI: I'll go first, Your Honor.

JUDGE COHN JUBELIRER: Okay. And if you can either come up here or --

MR. BUKOWSKI: I'll come up.

JUDGE COHN JUBELIRER: Okay.

CROSS-EXAMINATION

BY MR. BUKOWSKI:

 Q. Good morning, Mr. Marks.
A. Good morning.
Q. I introduced myself to the Court earlier. My name is Jeff Bukowski. I'm representing the Election Boards from Berks County and Lancaster County in this action. Thank you for being here this morning and giving your testimony.
Let's go back to -- you still have the exhibit binder in front of you?
A. I do.
Q. You were asked about Joint Exhibit 1 which is the form of the --
A. Yes.
Q. -- outer envelope?
A. I'm putting them in order. I have a pile of paper.
Q. Okay. Take your time.
A. I have it. You're referring to this (indicating) --
Q. Yes.
A. -- ballot envelope template?
Q. And that's the form of voter declaration on the outer envelope that's circulated by the Department to the Boards of Elections; is that right?
A. It is, yes.

Q. Okay. And on that form it's two pages. I'm not sure what the difference is. Maybe one's if it's different for an absentee or a mail-in ballot, but I did not discern a difference other than one has a nice blue line at the top. Are they the same?

A. The declaration is substantively the same, yes.

Q. Okay. And the notes, the bold lettering on the side running from the left side of the page, so if you turn it sideways, that says -- the first line in all caps and bold says your ballot will not be counted unless, correct?

A. That's correct. Yes.

Q. And then it has two bullet points or little blocks that have the two things that tell the voter what would result in their vote not being counted?

A. Correct. Yes.

Q. Okay. And the first block says you sign and date the voter's declaration in your own handwriting; is that right?

A. That is correct.

Q. So this form promulgated by the Secretary and the Department includes clear instructions to the voter that their vote on the ballot will not be counted unless the ballot is signed and dated, the voter's declaration is signed and dated in the voters's own handwriting; is that right?

A. That's correct.
Q. Okay. And now looking at the voter's declaration and the signature block, so turning it back right side up, the voter's declaration states I hereby declare that I am qualified to vote in this election, correct?
A. Correct.
Q. Then it goes on to say that I have not already voted in this election, correct?
A. That's correct.
Q. And I further declare that I marked my ballot in secret, correct?
A. Correct.
Q. And I am qualified to vote the enclosed ballot?
A. Correct.
Q. It further declares I understand I am no longer eligible to vote at my polling place after I returned my voted ballot?
A. Correct.
Q. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place unless I surrender my balloting materials to be voted to the Judge of Elections at my polling place; is that right?
A. To be voided to the Judge of Elections at my polling place.

Q. To be voided, I apologize. The last one is I understand I may only vote by provisional ballot at my polling place unless I surrender my balloting materials to be voided to the Judge of Elections at my polling place?
A. That's correct.
Q. And below that is a block with a big X that says voter sign or mark here, right?
A. Correct.
Q. And in parentheses in bold text it says required?
A. That's correct.
Q. And below that there's a blank, and below the line on that blank it says in bold text today's date?
A. Correct.
Q. And next to that it says in parentheses in bold text required?
A. Correct.
Q. Is there anything on this that would indicate to the voter that the date is not required on this?
A. No, nothing that would indicate to the voter that the date is not required.
Q. And there's nothing -- and the date in question says pretty plainly, you would agree, wouldn't you, it's today's date, the date you sign it?
A. I would. I'm one of those people that still puts the wrong year, though, on checks four months into the

following year, so I understand how it happens.
Q. It's a good thing we vote in the primary in May then?
A. Yes.
Q. Thank you. Now, the next exhibit -- well, before we get into the next exhibit, you had discussed guidance issued by the Department; is that right?
A. That is correct. Yes.
Q. And you conceded that that guidance is not binding on county boards of election?
A. Correct. Yes.
Q. And the guidance at issue -- well, the guidance that was promulgated by the Department prior to the May, 2022 general primary election were two pieces of guidance. There's one that's Joint Exhibit 2 which is guidance issued September 11th, 2020; is that right?
A. I don't have Joint Exhibit 2 in front of me, but the timeline sounds correct.
MR. BUKOWSKI: Do you have that?
MR. BOYER: These are all the exhibits.
(Documents handed to Mr. Bukowski.)
MR. BUKOWSKI: Here's a set of all 14 so I'll direct you. Here you go.
THE WITNESS: Thank you.
BY MR. BUKOWSKI:

Q. Do you have Joint Exhibit 2 now in front of you?
A. I do, yes.
Q. Okay. And Joint Exhibit 2 is guidance issued by the Department on September 11th, 2020?
A. That is correct. Yes.
(Whereupon, the document was marked as Joint Exhibit Number 2 for identification.)
BY MR. BUKOWSKI:
Q. Okay. And now would you turn to Joint Exhibit 3? That's similar guidance. It's guidance issued by the Department of State dated September 28th, 2020?
A. Correct, yes.
(Whereupon, the document was marked as Joint Exhibit Number 3 for identification.)
BY MR. BUKOWSKI:
Q. So a couple weeks after the prior guidance?
A. Right.
Q. And the title page of Joint Exhibit 3 says Guidance Concerning Civilian Absentee and Mail-in Ballot Procedures, correct?
A. Correct.
Q. And then if you turn to page 5 of Joint Exhibit 3, let me know when you're there.

A. I am there.
Q. Okay. In the middle of the page above the bullet points, the second set of bullet points, it says, with regard to the outer ballot return envelope. And then there are three bullet points; is that right?
A. That's correct. Yes.
Q. And the first bullet point says -- so I'll read the intro and then the bullet point says, with regard to the outer ballot return envelope, a ballot return envelope with a declaration that is filled out, dated, and signed by an elector who was approved to receive an absentee or a mail-in ballot is sufficient and counties should continue to precanvass and canvass these ballots, correct?
A. Correct.
Q. The next bullet says, a ballot return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void, and may not be counted. Ballot return envelopes must be opened in such a manner as not to destroy the declarations executed thereon; is that right?
A. That's correct.
Q. Now, the language in this, filled out, dated, and signed, that stems from the Election Code provision that requires absentee and mail-in voters to fill out, date, and sign their ballots, right?

A. Yes. I think that's fair.

Q. Okay. And the language in the second bullet, sufficient, a ballot return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside. That word sufficient comes from the language of the Election Code that directs Boards of Elections to determine if the voter's declaration is sufficient; isn't that right?

MR. FISCHER: Your Honor, I'm just going to object to the extent that there's a call for a legal conclusion here since Mr. Marks is not an attorney.

MR. BUKOWSKI: He's testified about how their guidance complies with the Election Code in cases interpreting the Election Code. I think he can at least answer his understanding of my question.

JUDGE COHN JUBELIRER: So I will, yes, kind of sustain in part that I recognize that he is not an attorney. He is not giving a legal conclusion; but if he has an opinion in his position, he can give that.

MR. FISCHER: Thank you.

THE WITNESS: I don't have the Election Code in front of me so I don't recall if that exact word is used, but I think certainly it implies that an envelope is insufficient if those items are not completed.

MR. BUKOWSKI: Okay. And we'll provide the

Court in our argument later with some of the specific language. So thank you.

BY MR. BUKOWSKI:

Q. Now, and this guidance, Joint Exhibit 3, I guess is guidance to the Boards of Elections on how they should canvass and count these absentee and mail-in ballots, correct?

A. Correct. Yes.

Q. Do you recognize and does the Department recognize that the canvassing and counting or canvassing and computing of absentee ballots is discretionary, is a discretionary act?

A. Well, I think certainly the mechanics of it certain are discretionary. Whether or not to count legally cast ballots I don't believe is discretionary. I think that's a duty.

Q. Let me rephrase my question. Determining whether a ballot is legally cast is an act of discretion by the county boards of election and subject to interpretation; isn't that right?

A. I think I would disagree with you there. I think the statute, you know, provides direction as to which ballots should be counted; and the statute in this case as interpreted by the Courts I believe that's ultimately the authority on which ballots should be counted and which ones

shouldn't.

Q. And when you say interpreted by the Courts, are you talking about the 2020 In Re: Canvass Pennsylvania Supreme Court decision?

A. Well, again you're getting a layman's interpretation here, but it would be that as well as recent decisions including the Third Circuit's decision in Migliori as well as the Commonwealth Court's decision on June 2nd.

Q. Okay. Let's limit it to decisions before Election Day 2022. Before May 17th, 2022, the only decision that the Department believes is relevant is In Re: Canvass by the Supreme Court in November of 2020, correct?

A. I believe that's fair, yes.

Q. Right. Because this Court's decision in McCormick was June 2nd, 2022, right?

A. Correct.

Q. And then the Migliori decision was -- and we'll argue about that -- but it was issued -- it came out May 20th --

A. Yes.

Q. -- and then was stayed and then became effective ultimately June 9th, 2022, when the Supreme Court vacated the decision?

A. Correct. I'll concede the timing is not perfect.

Q. Okay. So up through -- and is there any Departmental guidance between September 28th, 2020, and Election Day May 17th, 2022, regarding how to handle civilian absentee and mail-in ballots?

A. Generally perhaps but on the question of undated ballots if that's what you're asking, there was no change in our guidance during that period of time.

Q. So the guidance going into Election Day from the Department to the boards was if it's not signed and dated, those ballots should be set aside and not counted; is that fair?

A. Yes. That was certainly our guidance prior to the Third Circuit's ruling in Migliori.

Q. And the Department believes that that guidance is consistent with In Re: Canvass, the 2020 PA Supreme Court decision?

MR. FISCHER: Again, Your Honor, I'll object. It calls for a legal conclusion.

MR. BUKOWSKI: I'll withdraw the question.

JUDGE COHN JUBELIRER: Okay. Thank you.

BY MR. BUKOWSKI:

Q Now, going forward to your correspondence, so I think that might be in the binder if you had a binder. I think the first correspondence from --

A. It might be --

Q. -- from you, sir, is Joint Exhibit 6. Do you have that?
A. I do. This is the e-mail dated June 17th at 9:08 a.m.?
Q. Right. That's from you to the various county Boards of Elections, correct?
A. Correct.
Q. June 17th, 2022. Now, you did talk about later -- and I'll get to that -- but when you talked about the boards, these particular boards who are parties here, Berks, Lancaster, and Fayette, you had testified earlier that at least as of, you know, June 27th through July 1st of 2022 they had not certified final results and sent those to the Secretary, that that included votes from undated mail-in or absentee ballots; is that right?
A. Yes. I believe it was June 29th. It was counties that had not done it by June 29th was held against the date of the letter from our counsel.
Q. So the fact that they had not done that, that spurred Mr. Gates to send his letter?
A. Correct.
Q. Okay. But prior to that on June 6th, June 7th, and June 8th, respectively, each of these three counties had submitted final certified results to the Secretary; is that right?

A. I believe yes. My recollection is that each of these counties had submitted a certification of election results to the Secretary.

Q. Okay. And you had testified previously that the Secretary's role in the process is ministerial, correct?

A. Yes. That's correct.

Q. And her role is to take in the certified results from the 67 county Boards of Elections, right, and tabulate all those from the statewide votes and to tabulate those results and then certify the results of those statewide elections?

A. Correct.

Q. Okay. And has the Secretary done that for the 2022 primary?

A. The Secretary has done a partial certification pending resolution in these three counties.

Q. What's the partial certification that the Secretary has done?

A. The partial certification would be certifying results for all those offices that are not impacted by this litigation.

Q. Okay. So for example?

A. Some congressional districts, some senatorial, and state house districts for example.

Q. All right. And the statute tells, you know,

describes which elections she tabulates and certifies. So you're saying if it's a county that didn't involve any of these three counties and there's a congressional race, that result was certified?

A. Right. It's our position that these three counties have not completed certification; and, therefore, we've certified results for all those races in the other 64 counties.

Q. Okay. And so the Secretary has not certified a single race in which -- statewide race that she would otherwise be required to certify in which any voter in these three counties, Berks, Lancaster, and Fayette, has voted; is that right?

A. Correct.

Q. And her rationale is that her interpretation of what the Election Code requires differs from the interpretation of the independent county Boards of Elections of each of those three counties?

A. I don't think it's her interpretation of what the Election Code requires. I think it's the Court's interpretation of what the Election Code requires.

Q. Let's talk about the deadline and timing. The Election Code provides for deadlines for certification by county boards, doesn't it?

A. It does, yes.

Q. And would you agree that this year the deadline because there was a statewide recount ordered for the U.S. Senate race, that that deadline was June 8th, 2022?

A. That sounds correct. It's June 8th I believe is correct.

Q. And isn't it true that on June 6th Lancaster submitted its certified results?

A. I don't have a copy of that certification in front of me, but the timeline roughly sounds correct.

Q. And I'll rely on our stipulated facts, so I don't need to explore that with you.

MR. BUKOWSKI: But the stipulated facts, Your Honor, do say that Lancaster submitted certified results on June 6th, 2022. Berks did a partial certification on June 6th, 2022. It had another issue regarding provisional ballots. Berks later submitted certified results, updated certified results that included the provisional on June 8th, 2022. And Fayette was in between the two and submitted its certified results on June 7th, 2022.

BY MR. BUKOWSKI:

Q. So Berks was the last of those three to certify, and there's no issue of timeliness in this case. As of June 8th, 2022, you would agree the Third Circuit's order in Migliori was not in effect?

MR. FISCHER: Objection again to the extent there's a legal --

THE WITNESS: I'm not sure I'm best qualified to make that determination.

MR. BUKOWSKI: The order vacating the stay was issued June 9th. I think that's in the stipulated facts. If it's not we'll present it for argument, Your Honor.

THE WITNESS: It is in the timeline in my e-mail and that date is correct.

BY MR. BUKOWSKI:

Q. Okay. From Joint Exhibit 6 that's what your e-mail says?

A. Correct.

Q. Okay. So all of the -- your e-mail came June 17th which is, depending on which county, nine to 11 days after the Secretary had received their certified results; is that right?

A. Yes. That amount sounds correct.

Q. Okay. And the Secretary chose not to challenge in Court the certified results of those three counties that she had received on June 6th, 7th, and 8th; isn't that right, within two days?

A. Up until that point, no.

Q. Okay. Would you describe your e-mail to the

county boards a directive?

A. I don't know that I would describe it as a directive. Again, though, I believe that it is, you know, it was our determination, the Department's determination that, you know, based on the case law counties had a duty to certify results that included vote totals from undated ballots and that failing to do so essentially would in effect mean that the counties have not completed their statutory duty to certify vote totals from all legally cast ballots.

And it's my layman's, probably not the most articulate but that's --

Q. No, that's fine. And does the Department and the Acting Secretary leave room for any reasonable disagreement as to the state of the law on certification of undated ballots as of, you know, the deadline for this election?

A. No. Again I think our position is that without including those vote totals from undated ballots which this Court had previously asked counties to tabulate, segregate and tabulate, tabulate, that without including those that the certification was not complete, that all legally cast ballots in this case would not be counted, you know. So that's really our position that the certification is incomplete in light of the case law.

Q. And you're aware that the June 2nd, 2022 order

from this Court did not say certified ballots, correct?
A. It did not use the term certified, correct.
Q And, in fact, the order said I'm ordering you to do this, tabulate them, report the totals, and if and when a final decision on the merits is made, then we'll have the information and you can proceed quickly. Do you agree with that?
A. Yes. I believe generally that's the language used in this Court's ruling.
Q. Now, you got in response to your June 17th e-mail which was Joint Exhibit 6, you received responses from all three of these counties, Fayette, Lancaster, and Berks; isn't that right?
A. Yes.
Q. And I won't go through chapter and verse of their responses, but in essence all three of these counties said we disagree and we're not going to do that. We're not going to certify results that count undated ballots because we view that as not being required; is that fair?
A. Yes, I think it's fair.
Q. So the dates of their communications, you know, Joint Exhibit 7 is the Berks County Director's response. That was June 23rd, so less than a week after your e-mail, correct?
A. Correct.

(Whereupon, the document was marked as Joint Exhibit Number 7 for identification.)

BY MR. BUKOWSKI:

Q. And then Joint Exhibit 8 was the one from Ms. Kuznik in Fayette. That was June 27th 2022, correct?

A. Correct.

Q. And then Attorney Pfursich from Lancaster also responded in Joint Exhibit 9 on June 27th, 2022, correct?

A. That's correct.

Q. So by June 27th you knew all three of these counties had stated they were not going to do what you had requested in your e-mail, correct?

A. Correct.

Q. Now, I want to specifically point out Joint Exhibit 10 which is the e-mail you received in response from Christian Leinbach, the Chairman of the Berks County Commissioners. Do you have that?

A. I do, yes.

Q. That's the e-mail he sent in response to your June or June 17th e-mail, and his response is dated June 28th, 2022, at 12:32 p.m.?

A. Correct.

Q. And you had read into the record the part where he said please help me understand where there is clear

guidance. The last sentence of Mr. Leinbach's e-mail says I look forward to your response. Do you see that?

A. Yes.

Q. Did you respond to Mr. Leinbach's e-mail?

A. Well, ultimately the Department responded the next day when Mr. Gates sent the June 29th letter to the counties who had not yet certified.

Q. But you did not respond to Mr. Leinbach?

A. I did not personally respond. I consulted with our counsel, and it was my understanding that a letter would be going out to each of these counties within the next 24 to 48 hours.

Q. And you didn't respond saying stay tuned, our Chief Counsel is going to send you a letter?

A. I did not, no.

Q. Okay. And the letter, the one -- and I understand this is an example of the letter -- it's the one addressed to Berks County's Director of Election Services, that's Joint Exhibit 11. So if I understood your testimony, the response to Christian Leinbach's and the other county officials' e-mail responses was the letter from Attorney Gates?

A. Yeah. Certainly the counties that asked for clarification. As I testified earlier, the letter provides a summary of why the Department believed that that was the,

you know, the mandate from the Courts.

Q. Okay. And on July 1st Berks County's Assistant Solicitor, First Assistant County Solicitor Cody Kauffman, responded to Mr. Gates and reiterated Berks County's position?

A. Correct. Yes.

Q. Similarly Attorney Pfursich from Lancaster County reiterated Lancaster's prior response, and she did so by her response e-mail Joint Exhibit 13 which was July 5th?

A. You're referring to?

Q. Joint Exhibit 13 is Ms. Pfursich -- I'm sorry. Hers is, yeah, it's July 5th but it's Joint Exhibit 13 which starts with Mr. Gates' follow-up thanking her for clarifying or responding.

A. Sorry. I'm flipping through all this. Yes, July 5th, correct.

Q. Okay. And Attorney Kauffman's response, Joint Exhibit 12, I think I said was July 1st?

A. That's correct. Yes.

Q. Okay. So you knew I guess for the second time the Department was aware that Berks and Lancaster were not going to comply because they told Mr. Gates, Attorney Gates that in response to his letter they disagreed, and therefore they were sticking with the certifications that they had previously submitted; is that right?

A. Correct. Yes.
Q. Okay. You testified about Bradford County that they complied. Complied with what exactly?
A. They complied with our request for them to certify vote totals that included undated ballots.
Q. And I think the language is important. It was a request, wasn't it, to the boards to do?
A. Well, it was request based on, you know, what we believe was clear guidance from the Court as to what counties were required to certify.
Q. And the Department issued additional guidance after the May 17th, 2022 election which was issued May 24th; is that right? That's Joint Exhibit 6. You should have that, if not in your binder the one that I gave you.
A. Yes.
Q. Yeah. I'm sorry. It's --
A. Joint Exhibit 5.
Q. -- Joint Exhibit 5. Joint Exhibit 5?
A. Correct.
(Whereupon, the document was marked as Joint Exhibit Number 5 for identification.)
BY MR. BUKOWSKI:
Q. And at that point this Court had not issued its order in the McCormick case, correct?

A. That's correct. Yes.

Q. So the only thing that had happened before issuing that May 24th guidance was the issuance by the Third Circuit panel of its decision in the Migliori v. Cohen case; is that fair?

A. Yes.

Q. Okay. And this guidance, the guidance in Joint Exhibit 5 does a 180 on the instructions to the counties and says you must count undated ballots, absentee ballots, and mail-in ballots provided there are no other deficiencies, correct?

A. Correct.

Q. And that, you know, May 24th is the week after Election Day; is that right?

A. Yes. Again the timing not ideal.

Q. Now, were you aware of this Court's administrative order issued May 27th stating that because a statewide recount had been ordered that appeals from any of the decisions -- any of the certified results from the recount were to be filed in the Commonwealth Court as opposed to the courts of common pleas?

A. I am familiar with that. I don't have a copy in front of me, but I do recall that; and we circulated that order to the campaigns as well as the counties.

Q. Okay. And counsel for Petitioners asked you if

you were aware of any counties that had refused or not certified votes from absentee or mail-in ballots that included wrong or incorrect dates, and I think your testimony was you were not aware that any of the counties had excluded votes from those types of ballots; is that right?

A. Correct.

Q. Now, doing that is consistent with the guidance issued by the Department -- doing that -- let me strike that. Restart over. Certifying votes from incorrectly dated voter declarations is consistent with the Department's guidance; is that right?

A. It is, yes.

Q. Do you know whether there was any contest or challenge in any of the 67 counties but more specifically these three counties, Berks, Lancaster, and Fayette, as to the canvassing and counting of an absentee or mail-in ballot that included an incorrect date?

A. I'm not aware of any.

Q. Okay.

MR. BUKOWSKI: That's all I have for Mr. Marks at this time. Thank you very much, sir.

THE WITNESS: Thank you.

JUDGE COHN JUBELIRER: Thank you.

MR. KING: Thank you, Your Honor. May it

please the Court.

I'll wait until you're done with the water.

THE WITNESS: Sorry.

MR. KING: I once observed a witness pour water all over his shirt during cross-examination. It wasn't a good thing.

THE WITNESS: That would be something I'd be known to do, yes. Water is okay. I've poured coffee on myself frequently enough.

MR. KING: Thank you very much.

CROSS-EXAMINATION

BY MR. KING:

Q. Mr. Marks, my name is Thomas W. King, III, as you know and I want to thank you for your service to the Commonwealth. You've spent many, many years in the Bureau of Elections; am I correct?

A. I have. It's dating me now so --

Q. Do you know of anyone who spent more time in the Bureau of Elections than you have?

A. Actually we do have one employee I think who's been a year or two longer than I am.

Q. Let me go back just so the record is clear on this because we had this discussion about whether you're a lawyer or you're not a lawyer or you're, you know, seemingly whether you're an expert or not. You have

expertise with respect to the Pennsylvania Election Code, do you not?

A. I've been accused of being an expert on it, yes.

Q. Have you testified as an expert in cases involving the Pennsylvania Election Code?

A. I have testified in a multitude of Court cases regarding election matters over the years, yes.

Q. Have you ever been rejected as an expert in any case that you were called to testify in?

A. No, I don't believe so.

Q. And the Courts that you've testified in including you've testified all the way to the Lycoming County Court of Common Pleas where Mr. Breth examined you a couple weeks ago --

A. Yes.

Q. -- to the Commonwealth Court to the federal district courts, and your testimony has been accepted in the Supreme Court of Pennsylvania and your testimony has made its way to the United States Supreme Court at some point; is that true?

A. That's correct. Yes.

Q. All right.

MR. KING: Your Honor, I don't want to belabor this, but there is nobody that knows more about the Election Code. Ask any of the jurists in this

 Commonwealth, ask the lawyers, ask anybody. Mr. Marks is the person they all know.

So I'd like to ask him questions about the pleading and about the statute. He is the most knowledgeable person perhaps other than Mr. Tabas who I consider to be the foremost expert, but Mr. Marks would be -- if Tabas is number 1A, Marks is 1B. So I would like to examine him in those areas. So I'll go on and I guess somebody can object.

MR. FISCHER: Your Honor, we have no objection to Mr. Marks being asked about his understanding, but he is not the Department's attorney. He can't speak for the Department's legal position, and frankly the Department's legal positions are not at issue in what is a factual examination. Legal questions obviously are beyond the scope of this examination.

So I don't object to him again being asked about his understanding of things, but he's not the Department's lawyer. He's not speaking for the Department as to its legal positions.

MR. KING: I respectfully don't agree with any of that because first of all, Your Honor, Mr. Marks is the person who verified this complaint. He signed on and verified the complaint. I'll ask him that, but you can see it from the pleading.

Secondly, there is nothing involved here except statutes and regulations and that's what he does. That's what he communicates to these Commissioners who are sitting in your courtroom. That's what he communicates to the candidates. That's what he communicates to the public. That's what he communicates to the Courts. He knows these statutes. He knows whether there are statutes that would provide authority for certain things.

So that would be the nature of my inquiry. But I didn't want to get into this down the road. I wanted to say it up front, so --

MR. FISCHER: Your Honor, the statutes say what they say. You know, we're not disputing the language of the statutes, and I'm not sure what Mr. Marks --

MR. KING: I'll make that clear when I ask the questions.

JUDGE COHN JUBELIRER: I was just going to say why don't we allow for the questioning, and when you hear a question that you have an objection to you can raise that objection.

MR. FISCHER: Thank you.

JUDGE COHN JUBELIRER: Thank you.

MR. KING: Thank you, Your Honor. I didn't mean to get off track, but I did want to make it clear.

JUDGE COHN JUBELIRER: Thank you.

MR. KING: Thank you, Your Honor.

BY MR. KING:

Q. So, Mr. Marks, let's go back for a moment. What is your educational background beyond high school?

A. I have basically two years of college.

Q. From where?

A. From Ashford University.

Q. Okay. And after you got out of college, when did you begin to work for the Commonwealth of Pennsylvania, Department of State?

A. Actually I took those college courses while I was working for the Department of State.

Q. Oh, you did?

A. So prior to -- yes. Prior to that I was working for the Department with just a high school diploma.

Q. All right. And at some point you moved. Within the Department of State you moved into the elections arena, correct?

A. I did. I started back in the early 2000s as a legal assistant assigned to the Bureau of Elections, became the Chief of the Division of Elections, then the Chief of the Division of SURE, the Statewide Registry, then the Commissioner of the Bureau of Elections, and ultimately this position as Deputy Secretary.

Q. So literally there is no position within that

Department or in that Bureau that you haven't held in terms of the chain moving up to where you are; is that correct?
A. That's not entirely true; but, yes, I've worked in a lot of the positions --
Q. All right.
A. -- leadership positions related to elections, yes.
Q. Were you -- whenever litigation is filed in the Department, are you consulted? Are you involved in a general sense when litigation is indicated and commenced?
A. Litigation related to elections, yes.
Q. Is that -- are you -- do you oversee litigation within -- in that context within the Department?
A. I don't, no. The Office of Chief Counsel oversees litigation within the Department. I'm --
Q. Well, what would your role --
A. -- consulted as program area expert, yes.
Q. I apologize. I don't mean to interrupt you. What would your role be, for example, in the current litigation? This litigation is before Judge Jubelirer. What would your role be?
A. Well, you know, primarily my role is client. You know, the Department of State is client of our counsel; but, you know, we are -- the Acting Secretary of the Commonwealth is the chief election official in

Pennsylvania, and I work directly for the Acting Secretary. So that's why I signed those verifications for these various things that are filed with the Courts.

Q. Mr. Bukowski earlier said that language is important here. Language is important here in this arena; is that correct?

A. Yes. I believe language is always important. I believe communication is important.

Q. Okay. And were you involved in the Ziccarelli case?

A. I don't recall that I was involved directly in the Ziccarelli case, but I certainly was consulted. This I believe is a case out in Western Pennsylvania from 2020 if I recall.

Q. Well, Ziccarelli determined whether Nicole Ziccarelli was going to be the senator from Westmoreland and Allegheny --

A. Correct.

Q. -- or Senator Brewster was going to be the senator from Allegheny and Westmoreland; is that correct?

A. Correct. Yes.

Q. You remember that case?

A. I do, yes.

Q. And in that Ziccarelli case, the Secretary took certain positions. The Secretary was involved in that

case, correct?
A. Yes.
Q. And the Secretary had counsel in that case, the Aronchick firm in Philadelphia, correct?
A. That's my recollection, yes.
Q. And generally in many of the election cases, the Aronchick Hangley firm has been counsel to the Secretary; is that correct?
A. Yes. We've used outside counsel for various cases.
Q. Did you read the papers in this case? Did you read the briefs that we filed?
MR. FISCHER: I'm going to object just to the extent that this calls for the substance of discussions with counsel. Certainly that's protected by attorney-client privilege here. As Mr. Marks has testified, his role is that of client in these cases.
MR. KING: I didn't ask him that.
THE WITNESS: I reviewed the filings. I also reviewed other documents including the exhibits that we've been going through today.
BY MR. KING:
Q. All right. Did you see the quote that we put in our brief and in our papers from the Ziccarelli case where the Secretary took the position that in Ziccarelli, however

Westmoreland decided to count these ballots which were again undated ballots, however Westmoreland decided to count them and however Allegheny decided to count them, that that was none of the Secretary's business?

A. I think you're paraphrasing.

Q. I am paraphrasing.

A. It might be helpful to have a copy of it in front of me. I mean I know what quote you're talking about, but I don't have the exact wording in front of me.

Q. But you know that the result was that Westmoreland counted them one way and Allegheny counted them a different way, correct?

A. Yes, that is my understanding. Correct.

Q. And had the Secretary been able to force one of those two counties to count differently, the result may have been different. For example, if the Secretary had the ability to say to Westmoreland you have to count these undated ballots and Westmoreland counted them, Ziccarelli would be a senator today and not Brewster, correct?

A. Well, I'm not going to, you know.

Q. The possibility exists?

A. Certainly if, you know, the Courts had ruled differently, the possibility exists that the outcome would be different, but --

Q. You are the person. This is your signature I

take it.

MR. KING: May I approach, Your Honor?

JUDGE COHN JUBELIRER: Yes.

(Document shown to the witness.)

THE WITNESS: Yes. Sloppy as it is, that is my signature.

MR. KING: I was thinking it looked pretty good.

MR. FISCHER: May I just ask what document it is that was shown to him?

MR. KING: It's the verification to the complaint -- to the petition.

MR. FISCHER: Thank you.

BY MR. KING:

Q. So you're the person who verified the petition in this instance, correct?

A. Correct.

Q. So would you tell the Court the petition basically asks for two things, right? You want a mandamus. You understand the term mandamus?

A. I do, yes. We're basically trying to compel some action we believe is -- that the entity is duty-bound to do.

Q. Or mandate, correct?

A. Mandate, correct.

Q. You want to force these three counties that are here in the courtroom, you want to force them to do something, correct?
A. Again, I'm not counsel but my understanding of mandamus is that the person who brings the action believes that that entity has failed to do some duty that they're mandated to do and that's why they come before the Court.
Q. When is the last time that you're aware of that the Department brought an action to mandate any county Board of Elections?
A. It has been a very long time. I believe there was one occasion and do not ask me to tell you what the case was. I believe Allegheny County had to -- no. I'm sorry. I'm wrong about that actually. Allegheny County filed a mandamus against the Secretary asking that the Secretary at that time accept an amended certification of election results.
I don't recall at least in my tenure at the Department that the Department pursued a mandamus against a county.
Q. Well, let me ask you this. You want to order these folks, these Commissioners to do several things I suspect. You tell me if I'm wrong, please. You want them to go back home from here today, and you want them to have to advertise and hold a meeting of their Boards of

Elections; is that true?
A. To the extent that they did not already do that as part of the canvass and canvass the undated ballots, yes, I think that's fair.
Q. So you want Her Honor to, you want her to order them to go back and run an ad in the paper and hold a meeting, correct?
A. If it's necessary for them to do that to complete certification, then I believe that's fair, yes.
Q. Now, would you be kind enough to tell me where -- listen, you're familiar with this Election Code. You think about it every day, don't you?
A. I do.
Q. Every day, Sundays, too?
A. True, yes.
Q. So tell me the section and tell Her Honor where is it in the Election Code that says that the Secretary of the Commonwealth can order county commissioners who serve as Boards of Elections, who perform quasi-judicial functions according to the Supreme Court of Pennsylvania to go back home and have to schedule a new meeting when they've already certified the election in their counties. Where does it say that in the statute?
MR. FISCHER: Objection, Your Honor. This is a purely legal question.

MR. KING: Listen, Your Honor, if we can't get the answer to that from this gent -- I think we can. And I think Your Honor knows he is an expert. He's also the moving party here. He verified the complaint. And the threshold question here for Your Honor to answer is what authority in the world does the Secretary have to do this?

There's never been a case brought like this before that. Mr. Marks would know of it if there was one. There hasn't been one, and there hasn't been one for good reason. There's no authority to do this.

JUDGE COHN JUBELIRER: Well, the question of whether there is authority or is not authority is ultimately a question of law for the Court to decide.

MR. KING: Yes, ma'am.

JUDGE COHN JUBELIRER: So whether Mr. Marks is aware of the section or not aware of the section, his counsel will make arguments on behalf of his client and the Court will make the decision.

MR. KING: Yes, ma'am.

JUDGE COHN JUBELIRER: So if --

MR. KING: I just want to know if he knows.

JUDGE COHN JUBELIRER: If he is aware --

MR. KING: Yes, ma'am.

JUDGE COHN JUBELIRER: -- of a section.

Counsel, would you object to him giving his

opinion as well I guess based on his experience as to whether he's aware of a section or --

MR. FISCHER: If he just testifies as a fact witness about his awareness, I would be okay. I don't think he's giving opinion testimony frankly on anything.

JUDGE COHN JUBELIRER: Right. I don't think he was qualified as an expert, and that would anyway be a little questionable with regard to legal opinions. We don't typically have those offered as testimony.

MR. KING: I'm just asking, Your Honor, if he knows. I'm asking what -- we're here in front of Your Honor. We're taking up a lot of your time today. You followed a very difficult case we've all followed in the news yesterday. So we appreciate the fact that you're with us today.

But the question for him is what's the basis for this action? What is the basis? He's the person who signed the complaint. He's involved in these discussions. He said that. He's a truthful man. He'll answer it truthfully to us.

MR. FISCHER: Again, sorry. Mr. King is trying to ask him a legal question. I'm sorry. That is a purely a legal question.

JUDGE COHN JUBELIRER: Right, and we don't want a legal opinion. But I think as a fact witness if

he's aware of a section, he can answer that subject to the qualifications I've given.

MR. KING: Thank you very much, Your Honor.

BY MR. KING:

Q. Back to you, Mr. Marks.

A. Okay.

Q. Do you want me to repeat the question or do you know it?

A. No. I believe I understand your question to be am I aware of a provision in the Election Code --

Q. Yes.

A. -- that gives the Secretary the authority to do what she's doing in this case?

Q. Well, yeah. Yes.

A. I'm not aware of anything. You know, I'll qualify my answer. I'm clearly not an expert on civil law and civil procedure; but I'm not aware of anything in the Election Code that would enable the Secretary to, you know, mandate her discretion on the counties if that makes sense.

Q. All right. I think that's fair enough. So are you aware of Section 3159 of the Code, and if you're not let me --

MR. KING: If you don't mind, Your Honor, I'll hand it to him.

BY MR. KING:

Q. Are you aware of this section of the Code, 3159?

MR. KING: This is from our papers.

(Document shown to Mr. Fischer.)

MR. FISCHER: Yes.

BY MR. KING:

Q. So would you read 3159, please. It's at the top of the page.

A. Upon receiving the certified returns of any primary or election from the various county boards, the Secretary of the Commonwealth shall forthwith proceed to tabulate, compute, and canvass the votes cast for all candidates enumerated in Section 140 and upon all questions voted for by the electors of the state at large and shall thereupon certify and file in his office the tabulation thereof.

Q. Thank you. Now, Mr. Marks, you're familiar with that section. You were familiar before you read it; am I correct?

A. Yes.

Q. You live this section of the Code, don't you?

A. I hope I'm not that boring. I don't live the election.

Q. In a manner of speaking?

A. In a manner of speaking.

Q. All right. So this section says, upon receiving

the certified returns of any primary or election from the various county boards, the Secretary of the Commonwealth shall forthwith proceed to tabulate, compute, and canvass the votes cast for all candidates, correct? And then it goes on. That's the language you read.

So when the county boards submit their certifications to the Secretary, what does forthwith generally mean? How long does it generally take you to compute, tabulate, and forthwith certify these results?

MR. FISCHER: Objection. Again this is a purely legal question.

JUDGE COHN JUBELIRER: Yes. At this point you're making legal arguments which I think will be better suited for the legal arguments that will come later as to what the statute means. If you want to ask how the Secretary tabulates ballots --

MR. KING: Yes.

JUDGE COHN JUBELIRER: -- or other questions of fact regarding an issue, facts that would be relevant here, that's one thing; but I don't think that tying it to the statute is within the scope of appropriate questioning.

MR. KING: Yes, ma'am. I'll ask the question that the Court just posed.

BY MR. KING:

Q. So the question that the Court said I could ask I

think is --

JUDGE COHN JUBELIRER: Let's see. Unless there is an objection. I didn't mean to overstate. I was just wanting to create a factual question, and maybe I overstepped my discretion.

MR. KING: I don't mean to overstep my bounds either. So I'll withdraw that statement and I'll just --

JUDGE COHN JUBELIRER: Before you go further, is there an objection? I mean I'm not --

MR. FISCHER: No, Your Honor, not to the way the Court phrased the question.

JUDGE COHN JUBELIRER: Okay.

MR. KING: Now at least we're all on the same page.

BY MR. KING:

Q. So, Mr. Marks, let's say that the certifications come in from 67 counties in the primary election, any primary election. The 67 counties send you -- what do they send you, a form?

A. They do. They basically send a report that has the signatures and the seal, signatures of the Board of Elections, at least two of them.

Q. Are they uniform across the state?

A. The format of the attestation is uniform across

the state. Sometimes the reports may vary a little bit based on, you know, the county's voting system, etc.

Q. So it's up to the county board that you want the results, right?

A. We want the results, yes.

Q. And the form is up to them?

A. We do provide a form through our system; but if a county sends a slightly different form, as long as it is signed and certified by, you know, a majority of the members of the Board of Elections and it contains the election results for all the state-level offices, we will accept it.

Q. All right. So you get these forms in from the 67 counties. You look at them. You make sure they're legitimate. What do you do next?

A. Well and, you know, we're looking at them to make sure that they're -- you use the word legitimate. We're looking at them to make sure they're complete, that there are no obvious errors.

On the certification report there are occasions where a county will miss something or they'll put a vote total that, you know, based on our review against unofficial returns that we had received from the counties previously, you know, appears to be incorrect. You know, we'll reach out to the county before we finalize our

certification to make sure that they didn't make a clerical error when they certified.

But once we've gone through that process, then we'll compile results. How long it takes depends on the individual election. It depends on how many offices are up for election, how many write-in votes were cast for the various offices. But we will, you know, do that as soon as possible; and once we compile those results, we'll certify the final compiled official results.

Q. So basically if we were analogizing this to a hockey game -- which I'm prone to do -- you are the scorekeeper, not the referee?

MR. FISCHER: Your Honor, I'm going to object to that as vague and frankly beyond the scope.

MR. KING: It's the issue here. That's the whole issue.

JUDGE COHN JUBELIRER: Well, it's the legal issue --

MR. KING: Yes, ma'am.

JUDGE COHN JUBELIRER: -- which is before the Court.

MR. KING: Yes. All right. Can he answer the question?

JUDGE COHN JUBELIRER: You've objected.

MR. KING: I'll withdraw it, Your Honor. I

don't need to prolong.

JUDGE COHN JUBELIRER: Yes. Thank you.

MR. KING: I'll withdraw it but I do like the hockey analogy.

THE WITNESS: Are you wearing an orange and black tie because you're a Flyers fan or --

MR. KING: My son played professional hockey so I'm a big fan. No, I'm a Penguins fan.

BY MR. KING:

Q. So when you do certify the election, then what do you do with that?

A. In the case of a primary, you know, we don't certify it necessarily to any individual or body. It essentially -- you know, the Secretary will put her signature and seal on the official results and that becomes the, you know, official list of nominees for the November election.

In the case of a November election, once the Secretary certifies, there are documents that have to be certified to whether it's the Governor or the legislature, you know, those have to be certified to certain individuals or bodies so that they can swear in their members.

Q. All right. This Ziccarelli case, I want to go back to it because you're aware of the result from the Supreme Court of Pennsylvania with respect to that case,

are you not?

A. I am, yes.

Q. And you're aware that the Ziccarelli case likewise ended up in federal court in Pittsburgh, correct?

A. That's my recollection, yes.

Q. Were you involved in both of those matters, the state court and the federal court actions?

A. Yes. I would have been consulted, you know, at least during that period of time when the Secretary of the Commonwealth is involved in the litigation.

Q. I want to ask you to look at the brief filed by your office in the Ziccarelli case in federal court.

MR. KING: It's part of the papers that we filed in this matter, Your Honor.

BY MR. KING:

Q. I want you to read from your own brief. First I'd like you to look at it and tell me it is your own brief, your own being the Department, of course, not you. I'm going to ask you to look at this section, the second section right below the yellow line.

(Counsel approached the witness.)

MR. KING: Are you with me on this one? Do you gentlemen know where --

MR. FISCHER: Yes.

MR. KING: Thank you.

MR. FISCHER: Could you clarify, Mr. King, what page you're on?

MR. KING: Sure.

Can I see that for a minute, Mr. Marks?

THE WITNESS: Sure.

MR. KING: I'm at what's marked Exhibit D and it doesn't look like Mr. Wiygul -- yes, he did. It's page 5 of the Memorandum of Law in Support of the Motion of Secretary of the Commonwealth of Pennsylvania, Kathy Boockvar, to Dismiss the Amended Complaint or, in the Alternative, to Grant Summary Judgment. It's in the United States District Court, Your Honor, in Pittsburgh, in the Western District.

(Whereupon, the document was marked as Fayette Exhibit Number D for identification.)

BY MR. KING:

Q. Would you look at the second paragraph, second full paragraph of your brief?

A. The paragraph that begins with the Election Code also gives?

Q. Could you read that into the record for me, please.

A. Sure. The Election Code also gives the Secretary powers and duties including the duty to, in quotes, receive

from county Boards of Elections the returns of primaries and elections, to canvass and compute the votes cast, to proclaim the results of such primaries and elections, and to issue certificates of election to the successful candidates, end quotes, and then provides two citations to the statute, 25 P.S. Section 2621(f) as well as 25 P.S. Section 3159.

Do you want me to read the whole paragraph?

Q. Yes, I do.

A. Then there's a parenthetical and in quotes within that, upon receiving the certified returns of any primary or election from the various county boards, the Secretary shall forthwith proceed to tabulate, compute, and canvass the votes cast, end quote and end of the parenthetical.

The next sentence says, while the Secretary issues guidance to the county boards, nothing in the Election Code gives her the authority to refuse to accept returns or to decide which ballots are to be counted and which are not.

Then another quote, the Secretary has no authority to declare ballots null and void. Moreover, the Secretary has no authority to order the 67 county Boards of Elections take any particular action with respect to the receipt of ballots. And then it cites the November 3rd, 2020 case In Re: Canvass of Absentee and Mail-in Ballots of

November 3rd, 2020 General Election.

Q. Thank you. So what you just read was the brief filed by your own lawyers, correct?

A. That's correct. Yes.

Q. You're aware that the Secretary has no such powers, aren't you?

MR. FISCHER: Objection.

JUDGE COHN JUBELIRER: Yes, I think --

MR. KING: He's the affiant, Your Honor. He's the affiant to this complaint. The whole case depends on whether the Secretary has such powers. He's the person bringing this case.

JUDGE COHN JUBELIRER: Counsel?

MR. FISCHER: He is not the person bringing the case, and also he verified the facts. The law is for the Court to ultimately decide, and his opinion simply isn't relevant.

MR. KING: Your Honor?

JUDGE COHN JUBELIRER: Yes.

MR. KING: I'm sorry.

JUDGE COHN JUBELIRER: No, go ahead.

MR. KING: A person appearing before Your Honor needs to come in here and say whether they believe that the law provides for what they're telling the Court it ought to do. This gentleman --

JUDGE COHN JUBELIRER: And that's part of the question, too, is what they're asking the Court to do.

MR. KING: Yes.

JUDGE COHN JUBELIRER: And as I understood it, the mandamus is requesting the Court to issue the order. It's not that the individual who's requesting the relief has the authority to issue the order.

MR. KING: Yes.

JUDGE COHN JUBELIRER: So I want to make sure that we're all looking at all of the different legal issues and potential interpretation. So he's read the brief; and, you know, I tend to agree with counsel that what you're asking is for legal opinion from him.

MR. KING: I'll withdraw the question, Your Honor.

JUDGE COHN JUBELIRER: Thank you.

MR. KING: Yes, ma'am.

BY MR. KING:

Q. Mr. Marks, I want to ask you. This may be somewhat redundant but I want to make sure that I have it in the record as to Fayette County at least. As to Berks County, Lancaster County, or Fayette County, are you aware of any citizen who has filed within the statutory periods any challenge to the certification of this election in their county?

A. I am not, no.

Q. Is there a time limit set to file such a challenge under the Election Code?

A. There are time limits for, you know, for filing a request for recounts or contesting an election, yes.

Q. And what would those time limits be?

A. My recollection is that it's 20 days after the date of the primary election.

Q. So there's a two-day, I believe there's a two-day section in the Code and there's a 20-day section, correct?

MR. FISCHER: I'll object. That asks for a legal conclusion. I think Mr. Marks can testify about his understanding of the challenge process. I think that's fine, but he's not speaking authoritatively on the law here.

MR. KING: This is the case, Your Honor, so I'll abide by whatever the Court tells me to do.

JUDGE COHN JUBELIRER: With that qualification he can answer the question.

MR. KING: Thank you.

THE WITNESS: I believe the two-day that you're referencing is -- there is a provision wherein an individual who is aggrieved by a determination made by the Board of Elections can appeal that determination to the appropriate court of common pleas.

BY MR. KING:
Q. All right. So the two-day you're not aware of anybody having done that in these three counties?
A. I'm not aware of anyone doing that.
Q. Are you aware of anybody having done the 20-day challenge?
A. The election contest, no.
Q. All right. So June 6, 7, and 8 I think Mr. Bukowski asked you this but I want to make sure it's clear. June 6, 7, 8 these three counties, I don't know which order, but the three of them -- it's in the stipulated facts -- those three counties on three consecutive days in early June certified the elections in their counties and they sent them to you, correct?
A. Correct.
Q. That's what happened here?
A. Yes.
Q. All right. So when you got them, you got these three certified results. What did you do with the forms that came in? Physically what did you do?
A. Well, you know, as I said, ultimately we compile all the results and certify them once we compile them. So we put those -- a lot of what we're doing now we certainly have paper files, but a lot of files are now electronic. So we have a central repository where we store copies of

all of the documents submitted by the county Boards of Elections related to both unofficial and official returns. And then our staff begins to work on the compilation of the election results.

Q. So when these came in from Berks, Lancaster, and Fayette Counties, did somebody input them onto a spreadsheet or electronically?

A. So the counties actually -- the way our system works, we have a statewide election and campaign finance system. The vast majority of counties data enter them into that system directly, and then they print out the certification report. So if a county has done that and most counties do that, our staff it's a matter of just verifying that what's on the hard copy signed by the Board of Elections matches what was entered into the database.

Q. Okay. So is that what happened when these three results came in? Were they inputted into the system?

A. To the extent that the data was not already inputted into the system, yes, that's what would happen. That's what our staff would do.

Q. What you want to do here I think -- you tell me if I'm wrong -- is you want to ask the Court to ask, to tell these counties, to mandate these counties to recertify these elections because they've already certified them once, right?

A. I believe that's fair. I think we're asking the Court. We believe that these three counties have not completed certification. They have not completed, you know, their duty in terms of certifying the election; and we're asking that the Court mandate that they do so.
Q. But they have certified them. They've certified them to you on -- the stipulated facts say that. They were certified on the 6th, 7th, and 8th of June of 2022, correct?
A. I mean, respectfully, I think that's why we're in this courtroom today. We do not believe that these three counties have completed certification, and that's really the issue before the Court.
Q. I'd respectfully disagree and I'm going to ask you this. You say that they need to complete certification. Did you not receive certifications from each of these counties in hand?
A. We received certifications from each of the three counties. Our position is that if those counties do not include vote totals from the undated ballots that those certifications are incomplete, and that's really the crux of this argument.
Q. And so not a single voter, not a single candidate, no candidate filed any objection to this, did they?

A. I'm not aware of any candidate other than the case related to McCormick before this Court regarding undated ballots generally.

Q. All right. And that case was ultimately --

MR. KING: And Your Honor handled that case.

BY MR. KING:

Q. So that case was ultimately dismissed, correct?

A. I believe that was the outcome, yes.

Q. And but no candidate filed a challenge to the certification of these three counties' certificates of election?

A. I'm not aware of any candidate doing that, no.

Q. And you would be aware of that if it happened, wouldn't you?

A. I would think so, yes.

Q. If anybody would be aware, you would be aware, correct?

A. Yes.

Q. All right.

A. There are local party offices, so that's why I, you know, I don't want to say for absolutely. Those have not necessarily come to the Department of State.

Q. You mentioned guidance, and the stipulated facts here say that the guidance that you've issued in this case, the guidance that's referred to in this case and in your

pleading is not mandatory. It's not binding on the counties, correct?

A. Correct. When we use the term guidance, it is not mandatory.

Q. And there was never a directive issued in this case?

A. No, there was no directive issued by the Department.

Q. Are you familiar with the case of Fulton County Board of Elections decided by Judge Leavitt?

A. I am, yes.

Q. All right. And you're aware that with respect to these issues, that the Secretary has limited powers with respect to these matters?

MR. FISCHER: Objection, Your Honor. This is legal territory again, and it's simply not relevant to this case.

MR. KING: I'm just asking him if he's aware.

JUDGE COHN JUBELIRER: If he's aware of?

MR. KING: Of the limited powers. He's the Deputy Secretary so it's important that he knows. He knows what his powers are. I'm just asking him if he's aware that --

JUDGE COHN JUBELIRER: It's his

understanding.

MR. KING: Yes.

JUDGE COHN JUBELIRER: Clearly there's counsel for the Department as well that would --

MR. KING: Yes, ma'am. I'll ask it that way.

JUDGE COHN JUBELIRER: All right. But wait. Are you?

MR. FISCHER: I don't object. If the question is about his understanding, I think that's permissible. I also think we've covered this ground multiple times, and there's no dispute that the guidance issued by the Department isn't mandatory. That's not an issue in dispute here. So I'm not sure what the purpose of this is, but I don't object to the question about his understanding.

MR. KING: It was the subject of direct examination. This is cross-examination, Your Honor. May I ask a question?

JUDGE COHN JUBELIRER: Yes.

MR. KING: Thank you.

BY MR. KING:

Q. Mr. Marks, do you know the question at this point?

A. I do. I believe you're asking if there are

limits to the Secretary of the Commonwealth's power, and the answer is yes.

Q. All right. And isn't it true as is stated in your brief in Ziccarelli and what's been said by this Department on numerous occasions that in Pennsylvania 67 counties Boards of Elections have primacy with respect to the conduct of these elections, correct?

A. I believe that's correct within the confines of election law of course.

Q. In those Boards of Elections, you're familiar with numerous challenges I suspect? You tell me if I'm I wrong. You're familiar with numerous challenges over the years that have been made in those Boards of Elections, correct?

A. Correct. Yes.

Q. And there's a reference to the Boards of Elections as performing a quasi-judicial function. Do you understand what that means?

A. I do, yes. I mean they're engaging in, you know, a function where they're making determinations that could result in further judicial review. I mean it's almost like an administrative court if you will.

Q. Right. Thank you. That's your understanding. The Judge knows what --

A. That's my understanding.

Q. Among all people on Earth, this Judge knows what quasi-judicial means. But that's your understanding, right?
A. Yes.
Q. I think it's pretty appropriate.
A. Yeah. I mean, I would liken them to an administrative court where they're making administrative determinations then that could be reviewed by a court of law.
Q. So, for example -- and I don't want to get into too much minutiae -- but, for example, those county Boards of Elections, they will look at ballots that are challenged by candidates or voters or parties or people who live there or watchers. They'll determine whether a circle is completely filled in or if someone put an X instead of a circle. They decide issues like that, correct?
A. Yeah. I think where there's ambiguity it certainly is the power of the Board of Elections to make those determinations, and they're subject to judicial review.
Q. And that judicial review -- so you went through your knowledge of the two-day, the 20-day deadlines in the Election Code. So if someone -- and you tell me if you know this or not -- if someone wanted to challenge the decision of the Board of Elections, I think you just said

they would go to court, right?
A. Yes. They would go to the court of common pleas in that county.
Q. That would be 30 days from that date; is that correct?
MR. FISCHER: Objection again.
MR. KING: If he knows.
BY MR. KING:
Q. If you know.
A. I'm not sure. Again, there are a couple of different mechanisms, but yes --
Q. If you hypothetically assume that it's 30 days from the decision of a Board of Elections. So what was the date that the three certifications were made to you? That was June 6, 7, and 8, correct?
A. That's correct. Yes.
Q. What's the date of this lawsuit? What is the date that this lawsuit was filed?
A. I don't have it in front of me so I can't give you the exact date. It was --
Q. It's not a trick. Let me get it for you.
MR. KING: If I might, Your Honor?
THE WITNESS: -- certainly subsequent to the June 29th letter, early July.
MR. KING: You want to just stipulate the

date it was filed?

MR. FISCHER: Certainly. Yes, it is the complaint.

MR. KING: I believe it to be July 11th. We would stipulate with counsel that the filing of this complaint was July 11, 2022.

BY MR. KING:

Q. So July 11, 2022, is more than 30 days beyond the date of the certifications that were given to the Department here?

A. That's correct. Yes.

Q. Thank you. This election that we're talking about today, the Department has not currently certified the winners of the race for Governor of Pennsylvania; is that correct?

A. We have not certified the results of the primary for Governor or U.S. Senate or Lieutenant Governor for that matter, none of the statewide races.

Q. The winners of the gubernatorial primary, Mr. Shapiro, Mr. Mastriano, neither of them are certified as we stand hereby today?

A. That's correct. Yes.

Q. The winners of the United States Senate races, Dr. Oz and Mr. Fetterman, Lieutenant Governor Fetterman, they're not certified either?

A. Correct.

Q. And people running for Congress in any of those three counties, none of them are certified along with members of the Pennsylvania House and Senate. You haven't certified any of those elections in those counties?

A. Correct.

Q. You made a comment in response to somebody's question, I don't recall who, about these undated ballots and you said I think -- you correct me if I'm wrong and I'm paraphrasing -- but I think you said that you couldn't think of any good reason why they would be dated; is that correct?

A. I couldn't think of any administrative reason why the counties would need them to be dated --

Q. Why is that?

A. -- by the electors. Well, in determining whether they're legally cast and in determining whether they're timely, I don't know that the date inserted by the voter is relevant in making that determination. It's the date that the county receives the ballot from the voter that is relevant.

Q. You're familiar with Justice Dougherty in the Supreme Court of Pennsylvania suggesting that the dating does have merit with respect to preventing fraud; is that correct?

A. I believe that was -- again, you know, I have not read that opinion recently; but that was I believe that's the long and short of Dougherty's opinion, yes.

Q. You think what I said is a fair analysis of Mr. Justice Dougherty's comments?

MR. FISCHER: Objection. This is plainly outside the scope of --

MR. KING: Oh, I'm going to get to it.

JUDGE COHN JUBELIRER: I'm going to -- is there --

MR. KING: I'll be brief.

JUDGE COHN JUBELIRER: Okay. I'm going to allow him to answer this --

MR. KING: Yes, ma'am.

JUDGE COHN JUBELIRER: -- but the Court can read the opinion and know what it said, and I'm sure you'll be arguing about that as well.

MR. KING: I'll be brief. The only reason I ask is there was a gratuitous comment, and I don't mean that in a bad way. It was just a gratuitous comment about dating.

BY MR. KING:

Q. So with respect to the dating and I think you did say it the first time, too, you couldn't think of any good administrative reason for it, correct?

A. Correct.

Q. You can think of reasons why about it might need to -- these right mail-in ballots might need to be dated, though, whether administrative or otherwise. There are reasons why they would need to be dated, correct?

A. You know, I suppose there are reasons I guess. You know, whether or not there are reasons that are relevant to whether the ballots should be counted or not, that's where we probably would disagree.

Q. What reasons can you think of why they might need to be dated?

MR. FISCHER: Objection. This is calling for speculation. That has nothing --

MR. KING: He said he knows reasons why.

JUDGE COHN JUBELIRER: Yes. I'm going to allow him to answer if he can.

THE WITNESS: I'm conceding that there may be practical reasons. What I'm trying to say is that I'm not aware -- and I think this is the Third Circuit's assessment of the issue as well -- that I'm not aware of any reason regarding the validity of the ballot or the legality of the ballot that where the date inserted by the voter is relevant.

BY MR. KING:

Q. Are you aware of the cases -- and I believe that

at least one of these cases is in Lancaster County. Are you aware of the cases where someone has been accused of fraud with respect to a ballot that was cast by somebody who died, and there's a date on that envelope. There's a date on that particular envelope that says when this ballot was allegedly filled out and that date was instrumental with respect to whether or not the person that died on or before the date that the ballot was cast.

You're familiar with that case, aren't you?

MR. FISCHER: Objection. That was about six questions in one.

MR. KING: I'll rephrase it.

JUDGE COHN JUBELIRER: Thank you.

BY MR. KING:

Q. Do you know about any cases where somebody has cast a ballot and been accused of fraud with respect to these mail-in ballots and the date had any relevance?

A. Yeah. I mean there are certainly cases of fraud. I think, you know, the Election Code is clear on, you know, the situation where a voter is deceased before Election Day. Even if that voter legally cast a ballot, if the voter is deceased before Election Day, there's direction in the law to the county boards of election that they should not count that ballot.

I don't know that the date on the envelope,

though, is the relevant piece of information. It's the date when the person is deceased.

Q. Well, in McCormick --

A. It's the date of the election that is relevant.

Q. Yes. In the McCormick case, people argued to Judge Cohn Jubelirer about this whether it was important or not. So what you're talking about is you're going to know whether somebody died or not as of Election Day, right?

A. Yes.

Q. But you're not going to know when that person allegedly voted because we now have mail-in ballots that get mailed in and they come in at various times before the election. So in the case that I'm talking about out of Lancaster County -- and I believe there's another one if I'm not mistaken -- the date on the envelope was critically important to determine whether the person was alive at the time the ballot was cast. Not as of Election Day but when the ballot was cast the date was significant, correct?

MR. FISCHER: Objection. I don't think there's been any foundation established that this witness knows the details of these cases.

MR. KING: I think he said he did.

MR. FISCHER: He said he's familiar with it generally, but I don't think he said --

MR. KING: Well, that's what he said.

JUDGE COHN JUBELIRER: Okay. Well, if he can answer the question with specificity and based on his knowledge.

THE WITNESS: I'm not familiar with all the details of the case, but I can certainly understand why that piece of information may be relevant if you're a district attorney who's looking into an allegation of fraud.

BY MR. KING:

Q. Hypothetically, I'll ask you a hypothetical then. Hypothetically Mary Jones and her mother Sally Jones live in a house together, and Sally Jones cast a vote. And Sally Jones died on October the 28th, but the vote was cast on October the 29th or the 30th. Is that hypothetically evidence of fraud?

A. I don't like hypotheticals. I'll go off the line with that, but yes.

Q. I have to ask it that way because otherwise I'm going to get an objection.

A. Hypothetically the date inserted in that case might be relevant provided there isn't some other explanation for it.

Q. I get it. But that's an example of why -- of how the dating of the ballot would be significant with respect to fraud, correct?

A. I'll accept that argument that it may be relevant in that narrow circumstance.

Q. I want to ask you about a case called Parnell. Do you remember the Parnell case? It's a case in Allegheny County. It was in federal court in the Western District. It involved about I think 20-some thousand misprinted ballots; do you recall that?

A. I believe so. I don't have the details and I don't know if I'll be able to recall all the details, but this is related to a ballot printing error in Allegheny County that impacted roughly 20,000 ballots.

Q. We've had in Pennsylvania several counties -- because the counties get their own ballots printed, right, there's no uniform form? We may have a uniform setup of the offices, but there's no ballot form that you distribute or you print on a statewide basis, right?

A. Correct. It really would depend on the different voting systems. You know, the Election Code provides for, you know, instead of one statewide voting system a variety of voting systems. We have about a half a dozen different vendors that provide voting systems in Pennsylvania.

Q. Do you remember the Parnell case, Sean Parnell case involving the --

A. I do.

Q. -- thousands of misprinted ballots?

A. I recall it. You know, whether I can recall all the details or not, I don't know.

MR. FISCHER: Your Honor, I'm going to object. This is way outside the scope of the offer of proof that Mr. King offered. It's also way outside the scope of direct, and I don't see what this has to with --

MR. KING: It's not direct, Your Honor. It's cross-examination related to the witness's statement about the fact that he couldn't think of any good administrative reason for dating.

JUDGE COHN JUBELIRER: Okay. We are getting -- it's already after noon and --

MR. KING: Sorry about that.

JUDGE COHN JUBELIRER: No, that's okay. I want to make sure -- off the record.

(Brief discussion held off the record at 12:10 p.m.)

JUDGE COHN JUBELIRER: What I'd like to do is first find out how much longer you have for this witness?

MR. KING: I just have a few questions, and I'll try to condense those during the break.

JUDGE COHN JUBELIRER: Should we just complete it now or would you --

MR. KING: I would think if we take a break,

I'll try to condense this and get through it and not spend everyone's time.

JUDGE COHN JUBELIRER: I don't want to short-circuit, but I want to be mindful of everyone's comfort. Then we also have other witnesses that you want to present. Is there a sort of time frame that you have for how long your witnesses -- I believe this will be the end.

Will you have some redirect? You might have some redirect?

MR. FISCHER: Yes, Your Honor, we will have some redirect for this witness.

JUDGE COHN JUBELIRER: Okay. And then you have your own witnesses. About how long do you think those witnesses will last?

MR. FISCHER: Your Honor, it's actually our intention to call the county witnesses as on cross, and then obviously they will have redirect effectively.

MR. BUKOWSKI: And I think my understanding of what the Commonwealth intends to do with the county witnesses -- he can answer as to the direct -- I don't expect much of cross, and we would cover any additional topic so that they wouldn't need to be recalled in our case. So I would say we'll probably be limited to the cross and cover that. So I'm not sure.

JUDGE COHN JUBELIRER: Their offer of proof was, you know, relatively straightforward and condensed. I don't want to give him a time limit, but I'd suggest, you know, probably a half hour at the most for each of those witnesses.

JUDGE COHN JUBELIRER: Okay.

MR. FISCHER: Your Honor, I don't expect it will take that long. I mean it depends on the scope of cross again. I mean we can't --

JUDGE COHN JUBELIRER: Right.

MR. KING: This is one place I agree with Mr. Fischer. I don't think it'll take a half an hour. I think five minutes would be plenty, and I think we've already covered what they would be testifying about anyway.

JUDGE COHN JUBELIRER: Okay. So you think maybe with the three of them no more than an hour or hour and a half or hour and a half to two hours?

MR. FISCHER: That would be our goal, Your Honor.

JUDGE COHN JUBELIRER: Okay. And then we'll have the legal arguments which I think will be substantial.

MR. KING: Yes, ma'am, hopefully.

JUDGE COHN JUBELIRER: So it's 12:15. Should we take a lunch break now and then come back?

MR. KING: That makes sense.

JUDGE COHN JUBELIRER: And then we'll have

45 minutes. Let's be back at one o'clock and see if we can proceed apace. Okay. Thank you very much.

(Whereupon, a recess taken from 12:15 p.m. to 1:00 p.m.)

JUDGE COHN JUBELIRER: So we are back and, counsel, you were --

MR. KING: Yes, ma'am.

JUDGE COHN JUBELIRER: -- going to finish your cross-examination.

MR. KING: Yes, Your Honor, and I think I can report at this point, too, that counsel would all agree that the exhibits that were submitted in this case should be admitted with the Court's permission without objection from any of the parties.

MR. FISCHER: No objection.

JUDGE COHN JUBELIRER: Then hearing no objections, then all of the exhibits are admitted into evidence.

(Whereupon, the documents were marked as Joint Exhibit Number 4, Petitioner's Exhibits Numbers 1 and 2, Berks - Lancaster's Exhibits Numbers 1 through 5, and Fayette's Exhibits Numbers A, B, C, and E for identification; and Joint Exhibits Numbers 1 through 14,

Petitioner's Exhibits Numbers 1 and 2, Berks - Lancaster's Exhibits Numbers 1 through 5, and Fayette's Exhibits Numbers A through E were received in evidence.)

MR. KING: Thank you very much. Your Honor, I have three questions. I'll try to shorten this up.

JUDGE COHN JUBELIRER: Give me one second. I dropped a --

MR. KING: Certainly.

JUDGE COHN JUBELIRER: Okay.

MR. KING: That's usually what I'm doing.

JUDGE COHN JUBELIRER: Proceed.

BY MR. KING:

Q. Mr. Marks, you're still under examination and under oath, so I'm going to ask you three things, generally three things. So the first thing I want to ask you about, as the Deputy Secretary, are you aware of whether any of these undated ballots -- you know the totals from the three counties generally speaking. I'm not going to ask you the numbers, but --

A. Generally speaking, yes,

Q. -- they're in the record here. There's a few hundred in one place, and there's as few as six republican undated ballots in Fayette County. Could you tell the

Court whether you're aware of whether any of these undated ballots if counted or uncounted make any difference whatsoever in any election that you're aware of?

A. Not that I'm aware of, certainly not in any state-level election. Those elections certified to the Secretary.

Q. So it's not going to affect Oz or McCormick. It's not going to make a difference in the Oz-McCormick or the Shapiro-Mastriano elections, right?

A. I'm not aware of any state-level race where these ballots will affect the outcome.

Q. Okay. Even the State House, State Senate, nothing like that?

A. Correct.

Q. Thank you. Also you spoke earlier about something called partial certification and also incomplete certification. Are those two terms to your knowledge contained -- is there such a definition, is there a definition of, quote, partial certification within the, end of quote, within the Election Code?

A. There is not.

Q. Is there a definition of something that you mentioned which was, quote, incomplete certification, end of quote?

A. It's not defined in the Election Code. I think

it's a term of art that I would use when a certification is not complete.

Q. It's a vernacular. It's not something that's in the statute, right?

A. Correct.

Q. All right. I want to lastly ask you whether you're aware as the Deputy Secretary and based on all your credentials which are extensive, are you aware of any provision in the Election Code that specifically or expressly authorizes the Secretary of the Commonwealth to reject a county's certification of election results? Is there some section that says that?

A. I'm not aware of anything that gives the Secretary of the Commonwealth unilateral authority to reject the certification from a county.

MR. KING: Thank you very much, Mr. Marks. Appreciate it.

I'm finished, Your Honor. Thank you.

JUDGE COHN JUBELIRER: Thank you very much, counsel.

MR. FISCHER: Thank you, Your Honor.

JUDGE COHN JUBELIRER: Redirect.

REDIRECT EXAMINATION

BY MR. FISCHER:

Q. Mr. Marks, has the Department tried to

unilaterally force these three counties to include undated ballots in their certified totals?
A. No, I don't believe so.
Q. The Department, in fact, has sought relief from the Court; is that correct?
A. Correct. Yes.
Q. Does the Department have the power to unilaterally force these three counties to include undated ballots in their totals?
A. I don't believe so, no.
Q. In your position do you work with all 67 county boards?
A. I do, yes.
Q. Do you try to maintain cordial relationships with all of them?
A. I do, yes.
Q. At the first hint of a disagreement with a county board, is your response to immediately file a lawsuit?
A. No, it's not.
Q. What do you typically do when there's an area of disagreement with a county board?
A. You know, I'm old school so I typically if I can I pick up the phone and I try to talk through it. You know, certainly, you know, when we're sending guidance out to all the counties I'll e-mail that guidance, you know,

and deliver it that way. But, you know, typically if there's a disagreement, I usually want to talk through it and explain the Department's position before taking any other steps.

Q. And you've been asked a lot about the correspondence with some of the counties here dating roughly from the beginning of June through early July. During that time period were you also talking to certain counties over the phone?

A. I was. I wasn't the only one. You know, there were a number of counties initially. So I was having some of those conversations. Other staff for the Department was also reaching out to counties and having those conversations.

Q. What was your goal with those conversations?

A. Our goal really was to explain the Department's reasoning why we made the request; and it was our hope that, you know, all 67 counties would comply with our request.

Q. How many did in the end?

A. Sixty-four.

Q. Was that the case as of June 17th that all 64 had complied?

A. No. As of June 17th I believe there were still -- I couldn't give you the exact number but still a number

of counties who had not yet done that.

Q. Did some counties change their position with respect to including undated ballots during that time period?

A. Yes. Certainly, you know, before June 29th a number of counties changed their position.

Q. Now, you were asked about the language on the outer envelope stating that undated -- if the date is omitted, the ballot will not be counted; do you recall that?

A. I do, yes.

Q. Was that language consistent with the Department's guidance as of May, 2022?

A. As of the May primary, yes.

Q. You also were asked a lot about the Department's process with respect to certification, and I believe you testified that the Department sometimes identifies obvious errors in a county's certification; is that correct?

A. That's correct. Yes.

Q. What happens at that point when the Department identifies an obvious error in the county certification?

A. You know, typically, you know, we would contact the county to get clarification. So we would identify a potential error, ask the county to double-check their records and determine if what they submitted to us was

correct or if it was a clerical error.

Q. So do you believe it is your responsibility or --

JUDGE COHN JUBELIRER: Could you put the microphone --

MR. FISCHER: Sorry.

JUDGE COHN JUBELIRER: Thanks.

BY MR. FISCHER:

Q. Do you believe it is the Department's responsibility to certify what a county submits no matter what?

A. No. I think we do have a duty to --

MR. KING: I'm going to object. This is irrelevant. This is whether his opinion is whether they should certify it or not -- I beg your pardon -- whether it's his opinion that they can certify it or not. It's what you said to me earlier, Your Honor. It's what the law provides for.

MR. FISCHER: I was going to ask about that process. I'm not asking for his legal opinion.

JUDGE COHN JUBELIRER: Yes. I think I allowed you considerable latitude to ask him about his opinion or let me say his --

MR. KING: Knowledge.

JUDGE COHN JUBELIRER: Knowledge, right. Thank you.

-- his knowledge of the process. And so to the extent that this would call for any kind of legal conclusion, thank you for the objection; and I will clarify that whatever the witness answers is not at all a legal conclusion. Obviously questions of law, issues of law are for the Court to decide; but this is just his experience, within his experience.

MR. FISCHER: I'll rephrase the question to make that clear.

JUDGE COHN JUBELIRER: Yeah.

BY MR. FISCHER:

Q. Mr. Marks, does the Department tabulate and certify the statewide results using the certification submitted by the counties no matter what?

A. No. There are occasions when we identify an error or what we believe to be an error or an omission as the case may be, and we'll contact the county to get clarification.

Q. Thank you. You were asked about a hypothetical involving a voter who died before Election Day; do you recall those questions?

A. I do, yes.

Q. And let me just ask you about certain different scenarios. If a voter returned a mail-in ballot before the election and then subsequently died the next day before the

ballot was counted, would that ballot count?

A. Pursuant to the Election Code, no. If the voter casts a ballot and then dies before Election Day, the county Boards of Elections are directed to set that ballot aside.

Q. And if somebody else fraudulently cast that voter's ballot and back-dated it to before the voter had died, would that ballot count?

A. It would not, no.

Q. And if the voter fraudulently cast a ballot but dated it on a date after the voter had died, would it count?

A. No. Again the relevant date is the date the voter is deceased as compared to the date of the election.

Q. So is there any situation in which the date written on the envelope would be relevant to whether that vote is counted?

A. I don't believe so, no.

Q. Now, I'd like to ask you a little bit about some of the dates involved here. So do you have Joint Exhibit 6? Maybe I can hand you another copy. This involves your chronology.

(Document handed to the witness.)

THE WITNESS: I have it.

BY MR. FISCHER:

Q. Do you recall Mr. King asking you about the dates that the three counties involved in this litigation submitted their certifications to the Department?
A. I do, yes.
Q. And I believe he said they were on July 6th, 7th, and 8th; is that correct?
A. I agreed that those dates sounded correct. I believe those are the dates that Mr. King provided, but those sounded correct based on my recollection.
Q. And that was stipulated to, in fact?
A. Correct.
Q. So looking at your chronology, when did this Court issue its opinion in the McCormick case?
A. On June 2nd.
Q. June 2nd. So before those certifications were submitted.
A. Correct.
Q. And do you recall Mr. King asking you whether the McCormick case was voluntarily dismissed?
A. I don't recall. I think he just asked whether the case was dismissed.
Q. Thank you. I appreciate that clarification. Could you please look at Plaintiff's Exhibit 2 which -- I'm sorry, Petitioner's Exhibit 2 which I put in front of you. This is not Joint Exhibit 2. This is separate. Do you see

that this is an order entered by this Court?

A. It is, yes.

Q. And let me read it to you. It says, now, June 10th, 2022, upon consideration of the Application for Relief in the Nature of Voluntary Discontinuance or, Alternatively, a Dismissal for Mootness, parentheses, Application for Discontinuance, filed by Dave McCormick for U.S. Senate and David H. McCormick, and the answers thereto filed by the Leigh M. Chapman as Acting Secretary of the Commonwealth, parentheses, Secretary, Intervenors Dr. Oz for Senate and Dr. Mehmet Oz, parentheses, Oz Intervenors, and Republican National Committee and Republican Party of Pennsylvania, Republican Intervenors, the Application for Discontinuance is granted. Do you see that?

A. I do, yes.

Q. And then the next two sentences say, the Prothonotary shall mark this matter closed. In addition, upon consideration of the Application to Vacate Memorandum Opinion and Order of June 2nd, 2022, Application to Vacate filed by Oz Intervenors in which Republican Intervenors joined, and the answer filed by the Secretary, the Application to Vacate is denied. Did I read that correctly?

A. You did, yes.

Q. And again what is the date of this order?

A. This order is dated June 10th of 2022.

MR. FISCHER: Your Honor, I have no further questions.

JUDGE COHN JUBELIRER: Thank you.

Any recross?

MR. BUKOWSKI: Very briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. BUKOWSKI:

Q. During your counsel's questioning, he asked you about the 64 counties who had --

JUDGE COHN JUBELIRER: Do you want to come to a microphone?

BY MR. BUKOWSKI:

Q. -- the 64 counties who had complied and you used the word complied, they complied. What were they complying with?

A. Well, our request to certify vote totals and include undated ballots.

Q. I mean the word comply to me means they were required to, and you can't point to anything and have not pointed to anything in response to Attorney King's question that, you know, requires them to follow the Secretary's interpretation of the cases; isn't that right?

MR. FISCHER: I'll object.

THE WITNESS: Correct. I mean ultimately it

boils down to what, you know, we outlined or our counsel outlined in the June 29th letter why we believe the counties are required to certify vote totals that include undated ballots based on rulings from the Courts.

BY MR. BUKOWSKI:

Q. In the McCormick case, do you know what the Department's position was regarding the voluntary discontinuance of the case?

A. I don't recall what the Department's position was, no.

Q. Or what the Department's position was on vacating the June 2nd order or not?

A. I don't recall, no.

MR. BUKOWSKI: Nothing further, Your Honor.

RECROSS-EXAMINATION

BY MR. KING:

Q. Mr. Marks, would you tell the Court is there a difference between the term because these things are defined in the Election Code? I think we agreed to that earlier. Is there a difference between the terms canvass and certify?

A. You know, my layman's understanding, there is. You know, I believe the certification is basically the memorialization of the results of the canvass where they complete the canvass and then they certify the results of

that canvass.

Q. Two different things, right?

A. You can make an argument that they're two different things or the certification is an extension or the last step of the canvass.

Q. It either is or it isn't. So the canvass, there's a definition of canvass in the Election Code, right?

A. There is a definition in the Election Code of canvass, yes.

Q. And there is a definition of certification?

A. Correct.

Q. Those are two different things?

A. They are but one comes obviously after completion of the other.

Q. I understand the chicken and the egg story, but they're two different things?

A. They are. They're two different actions.

Q. All right. Did you see in the opinion that you were asked that Her Honor wrote, did you see anything that mentioned the word certification or certify?

A. If you're referring to the June 2nd order of the Court --

Q. Yes, sir.

A. -- the word certify was not used, correct.

Q. Did not appear?
A. Correct.

MR. KING: I believe that's all. Thank you very much.

THE WITNESS: Thank you.

MR. FISCHER: Thank you, Mr. Marks.

JUDGE COHN JUBELIRER. Thank you very much, Mr. Marks, for your testimony today.

MR. KING: Judge, could I ask one more question?

JUDGE COHN JUBELIRER: Quick. Of this witness?

MR. KING: Yes, ma'am. And the reason I say that is we were going to call him as on cross-examination; but I would be willing to say that that's not necessary, that whatever testimony he produced here he would have produced as on cross. So we'll save the Court's time and our own time with that respect, but if I could ask him I guess one more question I would appreciate it.

JUDGE COHN JUBELIRER: Okay.

Is there any objection to that?

MR. FISCHER: No objection.

JUDGE COHN JUBELIRER: Okay.

MR. KING: Now I can't remember.

BY MR. KING:

Q. So, Mr. Marks, with respect to this question of certification versus canvass, would you just tell us when the counties canvass the ballots, what is the process? What do they do?

A. Well, the counties -- I went into a little bit earlier in my testimony -- but the counties will receive the precinct-level results on election night; and when the official canvass begins on Friday, they'll review all of those results, compile those results. They also add to those the results from the precanvass and the canvass of absentee and mail-in ballots.

The canvass also includes the adjudication of provisional ballots and also a second canvass where they canvass military and overseas ballots, so that entire process where the county is reviewing and either reviewing returns submitted by precinct election officials or reviewing the tabulation that they've done centrally of absentee and mail-in ballots as well as provisional ballots.

Q And then the certification requires the calling of a public meeting and then there's a vote to certify, correct?

A. Correct. Yes.

Q. All right. So and we were talking earlier of the two separate things that occur?

A. Correct. Yes.
Q. All right.
MR. KING: I think that's all, Your Honor. Thank you very much.
JUDGE COHN JUBELIRER: Thank you.
You are free to depart. Thank you very much.
THE WITNESS: Thank you, Your Honor.
(Witness excused.)
MR. FISCHER: Your Honor, at this time we would call Scott Dunn of the Fayette Board of Commissioners, and we're calling Mr. Dunn as if on cross.
JUDGE COHN JUBELIRER: Okay.
MR. HOLLAND: Please raise your right hand.
Whereupon,
SCOTT DUNN,
having been duly sworn, testified as follows.
MR. HOLLAND: Please be seated.
DIRECT EXAMINATION (as on Cross)
BY MR. FISCHER:
Q. Good afternoon, Mr. Dunn.
A. Hi.
Q. You are a member of the Fayette Board of Commissioners; is that correct?
A. That is correct.

Q. And as a result of that position, do you have certain responsibilities with respect to the management of elections in Fayette County?
A. Yes. I serve on the Board of Elections, and we as Commissioners oversee the Election Bureau.
Q. And do you have any specific role on the Board of Elections?
A. As far as?
Q. Chair? Vice-chair?
A. I think I'm the Secretary.
Q. Okay. Thank you. And could you briefly explain the boards's role in the administration of elections in Fayette County?
A. We're an overseer of the department. We have a department head. Our Election Director, Marybeth Kuznik, and she oversees all facets of the election including the applications for mail-in ballots, sending out the mail-in ballots, receiving the mail-in ballots, training poll workers for the day-of operations.
Making sure that all of the equipment is prepared and certified to go out to our 77 precincts, making sure that all the equipment is delivered in a timely fashion, set up, ready to go, and that the ballots are prepared in such a way that they will -- there's a logic testing that they make sure all the ballots are prepared that will be

able to be read by the scanners.

Q. So is it fair to say as a result of your role, you are very familiar with how elections in Fayette County are administered?

A. Yeah. You could say, yeah, but I rely on the Election Director to make sure that all that happens.

Q. You don't have day-to-day responsibility?

A. I do not.

Q. But you understand the processes --

A. Correct.

Q. -- generally? Thank you. And does the Board of Elections ever make decisions about whether a specific vote is or is not counted?

A. We do have a meeting one week after the election to decide on provisional ballots, and I believe we've never had this under my -- this is my fifth election as Commissioner. I believe that if there were to be questionable ballots where there were challenges, then we would be in charge of that as well; but at this point I've never had that happen, just the provisional aspect.

Q. And if there is a challenge to a provisional ballot, the board resolves those in the first instance; isn't that correct?

A. If there's a challenge to a provisional ballot, then we decide that in the provisional ballot meeting.

Q. And typically you decide that by a vote of the members of the board, correct?

A. Correct.

Q. And the board's decisions with respect to inclusion of any ballots are subject to review by Courts; is that correct?

A. I'll leave that up to the Court. I'm not sure. If you can re-ask that question another way, I'm not sure exactly what you're asking.

Q. If you vote to include or not to include a particular ballot -- and I'm not asking for your legal assessment -- but is it your understanding that parties can challenge that decision?

A. Yes.

Q. And the board tries to comply with all relevant orders issued by Courts, correct?

A. Yes.

Q. So I'd like to just focus on absentee and mail-in ballots. Do you agree with Mr. Marks that the deadline to submit an absentee ballot is 8:00 p.m. on Election Day?

A. The deadline for an absentee ballot is 8:00 p.m. on Election Day. That's correct.

Q. Thank you. And just to clarify, that's the deadline that the ballot must be received by the county, correct?

A. That is correct.
Q. So if a voter drops it in the mail at 7:00 p.m. on Election Day, it's probably not going to be --
A. It's not going to be at the Election Bureau in time.
Q. Now, were you on the board in 2020?
A. Yes.
Q. And you would agree with Mr. Marks that the deadline was extended for three days in that race?
A. Yes.
Q. But that has not happened in any subsequent election?
A. Correct.
Q. And you take or Fayette County takes certain steps to verify that their ballots are received on a timely basis, correct?
A. Yes. As the ballots are received, there is a time and date stamp, and so the outer ballot envelope will be stamped with that time and date.
Q. And do you also enter information about the ballots -- I'm sorry. Let me withdraw that. Do the election administers, do they enter information about the ballot in the SURE system when they receive it?
A. Yes. Once received there is a scanning. Actually we call it binking for some reason -- I'm not

exactly sure why -- but it is scanned as received.

Q. And you don't use the date written on the outer envelope to determine when the ballot was received, correct?

A. That is correct.

Q. And you don't use that date written, assuming there is a date, to exclude ballots?

A. We do not.

Q. Now, I'd like to focus specifically on what we're referring to as undated ballots which are ballots, mail-in or absentee ballots, where the voter has omitted the date on the outer envelope but otherwise signed and otherwise complied with the Election Code as far as --

MR. FISCHER: Can I use that phrase?

MR. KING: That's fine.

BY MR. FISCHER:

Q. -- Fayette County did not include undated ballots in the totals it submitted to the Secretary as its certification, correct?

A. That is correct.

Q. And, in fact, Fayette County did not even open undated ballots, correct?

A. That is correct.

Q. And are you familiar with the litigation brought by Mr. McCormick relating to the republican primary for

senate and the counting of undated ballots?
A. I was aware there was litigation, yes.
Q. Fayette County was actually respondent in that litigation, correct?
A. I believe so. I'm not a legal. We start using words like respondent, I'm not exactly sure what you're saying. So --
Q. Well, so the McCormick campaign sued the Secretary and a number of counties.
A. I believe all the counties.
Q. It didn't sue all the counties --
A. All the counties were included as I understand it.
Q. I believe some were omitted, but Fayette County was not one that was omitted.
A. Okay.
Q. Are you aware that on June 2nd this Court entered an order ordering counties to canvass undated ballots and submit two sets of totals to the Secretary, one with the undated ballots included and one without?
A. I have to go back in my notes to actually look. Am I allowed to look at an exhibit? There was at one point the directive that we took was from the Department of State saying to count the ballots, tabulate the ballots, send the Department of State the tabulation, and then they would

decide how to proceed from there.

Q. But Fayette County did not count the ballots; is that correct?

A. That is correct.

Q. Okay. So you chose not to comply with the order entered by the Court?

A. The order as we saw it -- and again I have to go back to the May 23rd guidance from the Department of State which said to give the Courts the number of ballots that were received which we did, that were undated which we did. The May 24th guidance from the Department stated then said to go ahead and tabulate and submit the totals to the Department of State.

Again I'm going by memory here so if you're going to look up something, I'm going to be factually incorrect. At that point that was the day of our provisional ballot meeting. And at the close of the meeting after the meeting was adjourned, our Election Director said, hey, we're going to be asked to count, tabulate, send in the totals, and then the Department of State will let us know the next steps.

At that point that was where I felt this is uncomfortable, this is not the proper procedure that should be applied. And I let -- you know, I said I don't feel comfortable complying with this if that's the word, and

that's where it started. So actually it started before the June 2nd date. It started May 24th with this guidance that said, you know, submit and we will tell you the next steps.

Q. At that meeting you just discussed, did the board take a vote on this question?

A. We did not. The meeting was adjourned, and we never reconvened a meeting of the board of election to take up this matter.

Q. So even after this Court issued its order on June 2nd, you did not reconvene the board to address its implications?

A. No. Our opinion --

MR. KING: Your Honor, this is beyond the proffer. The proffer is pretty simple what the Attorney General said they were going to ask this witness about. And because I was granted great latitude, I've let this go somewhat.

But at page 2 of the proffer the county commissioner witnesses will be questioned about the Respondent board's practices for the 2022 general primary election with respect to determining the timeliness of an absentee or mail-in ballot with respect to recording the date that absentee and mail-in ballots are received and with respect to assessing the sufficiency of the declaration on a ballot return envelope.

These questions are beyond the proffer that was made in this case.

MR. FISCHER: Your Honor, I think this really goes to the sufficiency of the evidence about timeliness and particularly since we're talking about --

JUDGE COHN JUBELIRER: It's hard to hear you when you stand, so you can sit for this.

MR. FISCHER: I think this line of questioning goes directly to the sufficiency of the evidence they had to consider about timeliness. And what I understand the witness to be saying is that even after the Court entered an order, the county did not open these ballots that were timely received.

MR. KING: Well, that's not what the proffer says, Your Honor. You can read it yourself, of course, but this is beyond that. He's asking for legal opinions actually. This gentleman is a county commissioner. He's not a lawyer, and he sits on a board that are advised by a solicitor. That's not me. I wasn't representing the county at that time when I was representing the republican party in the McCormick case.

But on B it says we're going to ask him about the practices for the '22 primary election with respect to determining timeliness, with respect to recording dates, and with respect to assessing sufficiency

of the declaration. That's what this witness was prepared to come here today to testify about.

MR. FISCHER: And, Your Honor, if I may just briefly respond, the last phrase, with respect to assessing the sufficiency of the declaration on a ballot return envelope, what I understand this witness to be saying is that if a ballot did not include the date, they assessed that that declaration was insufficient and did not count it. So this is squarely within what we --

MR. KING: He's testified to that. We're now into did he intentionally violate some Court order? Well, that's not part of this.

JUDGE COHN JUBELIRER: Okay. Why don't we get the exact question that was asked because I do think that in broad terms how the board approached assessing the sufficiency of the declaration in this primary given all of the various guidances and information is within that broad scope of that particular statement.

But to the extent that you are making an objection as well about whether he's being asked for, you know, a legal opinion or an opinion on the law, that obviously is something that I would sustain.

So if we could maybe hear the question or if you want to ask the question again for the witness?

MR. FISCHER: Certainly. I'll ask the

question again.

BY MR. FISCHER:

Q. After this Court entered its injunction on June 2nd, did the board meet again to discuss whether undated ballots should be counted?

A. We did not.

Q. Did the board in any way reconsider its decision?

A. There would have been a discussion between the Election Director and the board members to say how do you want to go forward, and at this point I believe the word certification was still not in the -- was in the Court order and I could be wrong to that. And again, I still felt, you know, the law as of Election Day said that those votes should not count; and that's kind of where I was going.

As a Commissioner and as a member of the board of election since 2020, we have had all kind of lawsuits filed which make everything that we do confusing, ambiguous, uncertain. And so what happens is, you know, you add this to it. Now I have the Constitution of the state of Pennsylvania which says to do one thing. Act 77 is now saying do another thing or, you know, the Constitution doesn't even cover mail-in ballots. Act 77 says one thing.

Now I have a Court order saying, you know, forget Act 77 which was found unconstitutional in January. So the

confusion and the ambiguousness if that's a word --

THE WITNESS: Sorry if you have to type that.

So it comes into play here where, you know, you have different people telling you different things, and then you have the Department of State saying hey, just count them and we'll decide what to do. And so that's where in my mind that's where I stopped, and I said the law was the law on May 17th. That's what I'm following.

As a Commissioner I put my hand on my daddy's bible, put my hand in the air and I swore to defend the Constitution of the state of Pennsylvania and the laws of the state of Pennsylvania, and that's what I'm doing.

BY MR. FISCHER:

Q. So you chose not to follow this Court's order as a result?

A. Yes.

MR. FISCHER: Excuse me, Your Honor.

JUDGE COHN JUBELIRER: Sure.

MR. FISCHER: Just one minute to consult.

(Discussion between counsel.)

MR. FISCHER: Your Honor, I have nothing further for this witness.

MR. BUKOWSKI: I have nothing.

MR. KING: Your Honor?

JUDGE COHN JUBELIRER: Yes.

CROSS-EXAMINATION (as on Redirect)

BY MR. KING:

Q. Mr. Dunn, in beautiful Fayette County, do you understand when somebody has a reasonable disagreement with respect to something, when two people have a reasonable disagreement on what the law might be or what a question might be, do you have an understanding of what that means?

A. Absolutely.

Q. What would your understanding be?

A. You know, the question of -- it comes to a question of what's right and wrong, and a disagreement is something you have to work out between people. And, you know, at the same time you have to kind of hold your ground a little bit to say this is my understanding of, you know, this situation and this is how I'm going to go forward.

Q. You're aware that the Migliori case is on appeal to the United States Supreme Court?

A. I'll leave that to the legal people and I'm actually not.

Q. Okay.

A. I'm not aware of all the cases, and again I go back to the confusion in all the cases all along. You know, they start contradicting themselves and make it confusing for us.

Q. Do you have a legitimate disagreement with perhaps the people on the other side of the aisle from us with respect to whether undated ballots ought to be counted or not?

A. Yes.

Q. Okay. You still think they should not be counted?

A. I believe they should not be counted.

Q. All right. And if so, if you're ordered to convene a meeting of your board and you're asked to vote on that, you understand that you're going to be asked to vote on whether to certify an election counting undated ballots?

A. I know that we will more than likely be asked that, yes.

Q. All right. And I want to put on the --

MR. KING: I want to make sure this is in the record, Your Honor, from the stipulated facts.

BY MR. KING:

Q. Fayette County's election results were certified on June 7th?

A. That is correct.

Q. So I'm not sure whether -- I think Berks was 6 and Fayette was 7 and Lancaster was 8. Of course, I have them reversed.

MR. KING: Since I'm only Fayette, I know

we're in the middle, Your Honor.

BY MR. KING:

Q. So we're June 7th, correct?

A. That is correct.

Q. All right. And since that certification, have you had another meeting of the Board of Elections?

A. No.

MR. KING: Thank you.

Thank you, Your Honor.

JUDGE COHN JUBELIRER: Thank you.

MR. FISCHER: Your Honor, nothing further.

JUDGE COHN JUBELIRER: Thank you very much. We appreciate your testimony.

(Witness excused.)

MR. FISCHER: Your Honor, can I just consult with counsel for a minute? I want to try to speed things up as much as possible.

(Discussion among all counsel held off the record at 1:43 p.m.)

MR. FISCHER: I apologize, Your Honor.

JUDGE COHN JUBELIRER: That's okay.

MR. FISCHER: So, Your Honor, at this point we would call Ray D'Agostino with the Lancaster County Board of Commissioners.

JUDGE COHN JUBELIRER: Okay.

MR. HOLLAND: Please raise your right hand.

Whereupon,

RAY D'AGOSTINO,

having been duly sworn, testified as follows.

MR. HOLLAND: Please be seated.

DIRECT EXAMINATION (as on Cross)

BY MR. FISCHER:

Q. Good afternoon, Mr. D'Agostino.

A. Good afternoon. And sorry, I don't know your name.

Q. Mr. Fischer with the Attorney General's office, Michael Fischer.

A. Mr. Fischer, good afternoon.

Q. Thank you. You currently serve on the Lancaster County Board of Commissioners; is that correct?

A. That is correct.

Q. And as a result you have certain responsibilities with respect to elections in Lancaster County?

A. That is correct.

Q. And did you hear all of Mr. Dunn's testimony earlier?

A. I did.

Q. Would you agree that his description of how Fayette County administers elections at least as to your responsibilities is roughly similar to how Lancaster County

administers them?

A. I would agree we have oversight of elections. I would just say that we have oversight of elections in connection with and making sure that we abide by the Election Code and all decisions of the Courts of competent jurisdiction.

Q. And you do in that role you receive guidance from the Department of State occasionally, correct?

A. Yes, we do.

Q. But you do not treat that guidance as binding upon the Commissioners; is that correct?

A. That is correct.

Q. But you do treat judicial decisions as binding?

A. Judicial decisions, yes, as long as they're applicable.

Q. Yes, certainly. Is it your understanding that the deadline for the receipt -- I'm sorry. Let me strike that. I want to focus now on absentee and mail-in ballots. Is it your understanding that the deadline for receipt of absentee and mail-in ballots is 8:00 p.m. on Election Day?

A. Correct.

Q. And does Lancaster County time-stamp ballots when they are received?

A. We do time-stamp ballots.

Q. And do you use that time stamp to determine

whether a ballot is timely received?

A. We do use that as one method.

Q. And if a ballot is received at the Board of Elections at 8:01 on Election Day, would that ballot be counted?

A. No.

Q. Would it matter when that ballot had been filled out to the decision whether to count it?

A. Repeat the question.

Q. Certainly. If a ballot is received at 8:01, would it matter when the voter filled it out in determining whether to count it?

A. Potentially, yes.

Q. And how so?

A. Well, there is the provision that the declaration has to be dated and signed. The date which is the date that's put on there by presumably the voter could make a difference in whether that ballot is actually counted or not.

Q. So there are circumstances under which a ballot received after the 8:00 p.m. deadline would nonetheless be counted because of what that voter wrote?

A. No. That was by accident what you asked me.

Q. Okay. So just to clarify, in determining whether a ballot was received by the deadline, you use the time

stamp on the envelope, correct?

A. We time-stamp them, yes.

Q. And do you also enter information about the ballot into the SURE system?

A. Yes.

Q. Now, with respect to the date on the outer envelope, in the May, 2022 election, did Lancaster County refuse to count any ballots that had dates based on what the date was?

A. There were -- there was one occasion where the date -- we do check the date. We do believe that the date is material, that it could go to the validity and authenticity of the ballot received. And so depending on the date, it may be set aside for further research and determination whether it should go forward and count or not.

Q. So in May, I'm just asking about the May, 2022 primary --

A. Yes.

Q. -- did you decline to count any ballots based on the date that was written?

A. Based on the date, we are aware of a voter fraud case that we did not count the ballot because of the date. It was determined -- it was found out that the voter fraud occurred because of that date.

Q. Explain to me the circumstances of that voter fraud case.

A. Sure. So we received mail ballots or absentee ballots. When I say mail ballots, I mean absentee and no excuse mail ballots. We receive them. They are date-stamped and then they are scanned to go into the SURE system.

In this one case it happened to be our Chief Clerk of the Board of Elections that scanned this particular ballot that came in the outer envelope, the declaration; and the SURE system popped up and said that the person was deceased. Our Chief Clerk put that aside to then look at later; and when the Chief Clerk looked at it again, realized that the date that someone put on that declaration was a date after the person had died.

And so at that point she did more research and actually pulled up the obituary and found out that person was deceased, referred it to our District Attorney's office. Our District Attorney's office is now prosecuting that person and that person has admitted to voter fraud.

Q. So in that case it led to a criminal investigation, correct?

A. That is correct.

Q. But it did not affect whether you counted that ballot, correct?

A. Not that one but there can be instances where it could be. So, for instance, if it was a person who moved and is alive, we may not count that ballot because we've determined that the date is different than the date they may have moved out. So it is material to us, and we do treat it as such.

The plain language of the law says that obviously if -- I say obviously -- that if there's no date, you set them aside. We treat those that have dates as potentially ones that can be processed; but depending on the date that's put in there, it may not be.

Q. So just so I understand, Lancaster County election officials review every date on every mail-in ballot that you receive?

A. There's instances where it depends on whether the date looks to be something that makes sense like within the time period of the election. It might cause our staff to then take another look.

Q. But just to clarify my question was, you look at every date on every mail-in ballot; is that correct?

A. I'm not the one that does it, but I understand the staff does take it seriously. It does look at the dates, but I can't say for certain whether every single one.

Q. And with respect to a voter who moves, is it your

understanding that a vote cast by a voter who moves before Election Day can nonetheless still be counted? Moves from the Commonwealth.

A. Say that again. I'm sorry.

Q. If a voter moves before Election Day having sent in a mail-in ballot, is it your understanding that that ballot can be counted?

A. I can't say unless I look at the situation and the law itself. I can't say.

Q. Have there been any specific situations in which Lancaster has used the date written to exclude a ballot cast by a voter who moved?

A. I'm sorry. Say the question again.

Q. So you testified that a voter could move before Election Day, and you could use the date to determine whether the ballot was filled out before or after the voter had moved; do you recall that?

A. Yes.

Q. Has that ever presented itself?

A. I'm not aware. It doesn't mean it didn't happen. I'm not aware of it, though.

Q. But it is your understanding that if a voter fills out a ballot, sends it in, and then moves from the Commonwealth before Election Day, that vote should be counted?

A. Again I'm not sure.
Q. So let me just get back to my earlier question. Are you aware of any instance in the May, 2022 primary where the date written on the ballot was used to exclude that ballot from being counted? On the envelope, sorry.
A. To exclude it based on the date itself other than the case I mentioned, no.
Q. Other than the fraud case?
A. Other than the fraud case.
Q. And you would agree that ballot should not have counted regardless of the date?
A. That is correct.
Q. Because if a voter dies before Election Day, we can agree their ballot doesn't count?
A. Right. But our mantra in Lancaster County is our election should be having integrity, veracity, and transparency. And so to us that date does fit into integrity, veracity, and transparency of our elections which is of utmost importance.
Q. And this person was referred for prosecution, correct?
A. That is correct.
Q. And Lancaster County submitted a list of certified returns in early June; is that correct, to the Secretary?

A. I believe it's on June the 6th.

Q. And those certified returns did not include totals from undated ballots?

A. Certified results did not, but we did submit separately in accordance with the Court order the results of the undated ballots. We did do what the Court order said.

Q. So you complied with this Court's June 2nd order directing --

A. Yes.

Q. -- canvass of those ballots, and you counted them and submitted two sets of returns?

A. That is correct.

Q. And just so we're clear, when we're talking about undated ballots, these are all ballots cast by legal voters with no other deficiencies, correct?

A. Maybe. Again it depends on the case. I mean as I said, the person wasn't legally allowed to cast that ballot, so I can't say that.

Q. So if for instance the voter omitted the signature and date, there's no dispute that ballot wouldn't be counted?

A. That's correct.

Q. Okay. And if a voter omitted the date and also didn't use the secrecy envelope, that ballot would not be

counted, correct?

A. Correct.

Q. No dispute about that?

A. Correct.

Q. So we're not talking about those types of ballots in this case. Can we agree on that?

A. Sure.

Q. Okay. We're talking about ballots where the only deficiency identified is the omission of the date?

A. If the date is omitted, it will not count.

Q. Okay. And Lancaster was a party to the McCormick case, correct?

A. Correct.

Q. Okay. And as you testified, you complied with the Court's order and submitted two sets of returns to the Secretary?

A. Correct.

MR. FISCHER: Nothing further, Your Honor.

CROSS-EXAMINATION (as on Redirect)

BY MR. BUKOWSKI:

Q. Good afternoon, Mr. D'Agostino. The case of the voter fraud that you were referring to, is that the case that's now pending, Commonwealth of Pennsylvania versus Cheryl Mihaliak?

A. Correct.

MR. BUKOWSKI: I have the police criminal complaint, Your Honor, and the Magisterial District Judge docket. I'd like to add that and admit it as an exhibit for the record since it came up during Mr. D'Agostino's testimony. I don't need to spend time with this witness on it if they agree to its admission.

MR. FISCHER: Your Honor, this is the first we've seen this, so I haven't had time to review it. I can't say it's admissible certainly. We exchanged exhibits yesterday, and this was never mentioned.

MR. KING: I have no objections, Your Honor.

MR. BUKOWSKI: And we just learned of it actually, you know, after we had submitted our exhibits, Your Honor. We think the Court can take judicial notice of it anyway. I think for completeness of the record we ought to include this and we move to admit it.

MR. FISCHER: We would reserve the right to object just based on the fact that we haven't reviewed it and can't really assess relevance or anything.

JUDGE COHN JUBELIRER: Okay. I'll tell you what. I will wait to rule on your request to admit it and give counsel the opportunity. Do you have any objection? Were you going to ask him any questions about it?

MR. BUKOWSKI: I'm actually not, Your Honor, because I think the testimony covered it. I just wanted

the Court to have the benefit of some of the details for its record.

JUDGE COHN JUBELIRER: Sure.

MR. BUKOWSKI: And frankly --

JUDGE COHN JUBELIRER: As a judicial record I believe I could take judicial notice of it, but if you want to give me the docket number or any of the --

MR. BUKOWSKI: Sure. The docket number is it's for Magisterial District Judge 02-2-02. So the docket number is MJ-02202-CR-0000126-2022.

JUDGE COHN JUBELIRER: Thank you.

MR. BUKOWSKI: And I would just point out this came into the record. The answer that Mr. D'Agostino gave was in response to the question about the materiality of dates on the voter declaration, and I'm sure Ms. Mihaliak would agree that her putting the date on that voter declaration has become very material to her.

But I'm not going ask questions about these documents, Your Honor, and we'll let the Court take judicial notice and hopefully admit it into the record.

BY MR. BUKOWSKI:

Q. Mr. D'Agostino, getting back to the Lancaster County board's practices during the 2022, May, 2022 primary election. You were asked questions about whether incorrectly dated ballots were counted or not counted; do

you recall that?
A. Yes.
Q. And how does Lancaster County handle incorrectly dated ballots or ballots that where the date might be in question?
A. They're set aside and then there's more research done; and if it can be determined that there is more follow-up to be done, that can be done. I would also note that there's a potential of a challenge to ballots that come in. So that's something we take notice of as well.
Q. Yeah. And that was going to my next question. Are those incorrectly dated ballots or ballots that have dates that may or may not be correct, those are subject to challenge by voters and candidates; is that correct?
A. That is correct.
Q. Are you aware of any instance in which a voter or candidate in the 2022 May election did challenge the date on a ballot because it had a date that was incorrect?
A. No.
Q. Okay. And in that instance when there is no challenge, then what happens in Lancaster County?
A. If there's a date, the plain reading of the language of the Code is that we'll count that ballot.
Q. Okay. And is that consistent with guidance sent to the county Boards of Elections by the Department of

State?

A. Yes.

Q. And I think you said that the dates -- the undated ballots are not counted; is that right?

A. That is correct.

Q. And why is that?

A. Again, the plain reading of the language of the Code, the Election Code is that it should not be counted.

Q. As a member of the Lancaster --

MR. FISCHER: I have an objection. This is a legal opinion. I mean if that's his understanding, that's fine. But that's --

JUDGE COHN JUBELIRER: And thank you for the clarification.

I don't think you intended to ask him for his legal opinion.

MR. BUKOWSKI: I wasn't and although when someone says the plain language of the statute says this and it does, I'm not sure that's a legal opinion; but I wasn't trying to elicit a legal opinion. We'll save that for argument.

MR. FISCHER: Your Honor?

THE WITNESS: I would say, though, that as my role as a Board of Commissioner and Board of Elections member that I can be called upon to interpret the Code.

That's one of our jobs that we've already stipulated and so that my opinion on how that is one vote of three.

BY MR. BUKOWSKI:

Q. And you're guided by a solicitor; is that right?

A. That is correct.

Q. And in your role as a member of the Lancaster County Board of Elections, do you believe you have the discretion to ignore what you understand to be the plain language of the Election Code?

A. No.

MR. BUKOWSKI: I have nothing further, Your Honor.

MR. KING: Very briefly, Your Honor.

MR. FISCHER: I thought Mr. King had no questions.

MR. BUKOWSKI: That was me.

CROSS-EXAMINATION (as on Redirect)

BY MR. KING:

Q. Commissioner, do you know how many democratic and republican undated ballots there were in Lancaster? I can give you the numbers.

A. I don't know the breakdown. I'm pretty sure it was 82 total, but I don't remember the breakdown.

Q. I think it was 50-some and 40-some if I'm not mistaken but somewhere in that neighborhood.

A. That sounds familiar.

Q. That's not my question but my question is, do you know whether if you had to go back and recertify this election, would you have to recertify all the positions that were on the ballot?

A. All the positions on the ballot?

Q. Well, for example, state committee post, democrat, republican, local committee?

A. Well, sure.

Q. Those are all on the ballot?

A. Those are all on the ballot so we have to recertify.

Q. Do you know whether if you were ordered to recertify this election, do you know whether that would make any difference potentially in the down-ballot races, committee posts? Were some of them decided by a vote or two?

A. It could. I don't know for sure but it could.

Q. What about the House races or the Senate races or the --

A. No.

Q. -- other races?

A. No. Those were decided handily.

Q. But they might change the result, for example, in those down-ballot races?

A. It could. I'd have to look at it obviously but it could.

MR. KING: Thank you.

MR. FISCHER: Thank you. Just a few more questions, Your Honor. We do not object to the admission of the exhibits. We don't necessarily concede that they're relevant, but we don't object to their admission at this point.

JUDGE COHN JUBELIRER: Okay.

(Whereupon, the documents were marked as Berks - Lancaster Exhibit Number 6 for identification and received in evidence.)

REDIRECT EXAMINATION (as on Recross)

BY MR. FISCHER:

Q. Sir, when the board or when the county receives a mail-in or absentee ballot, do you confirm that it was submitted by a registered voter?

A. Well, I told you we do. It comes in and then it's scanned. It goes into the SURE system, and then it's processed from there.

Q. And if a voter was not on the rolls, would the SURE system reflect that fact?

A. If they were not on the rolls?

Q. Yes.

A. Well, sure. They wouldn't show up.

Q. They wouldn't show up, okay. Now, could you look at the police criminal complaint? Do you have a copy of that?

A. I do not have a copy of that.

(Documents handed to the witness.)

BY MR. FISCHER:

Q. I'll direct you to page 4 which is the Affidavit of Probable Cause. Do you see that?

A. Yes.

Q. Can you take a look at paragraph 2?

A. Yes.

Q. It says Christa Miller stated she received a mail-in ballot from Teresa J. Mihaliak signed and dated April 26th, 2022, correct?

A. Correct.

Q. And then it says the ballot for the democrat primary was received on April 28th, 2022, by her office?

A. Correct.

Q. And then it says, however, Christa Miller reported that Teresa J. Mihaliak was deceased on April 14th, 2022, correct?

A. Correct.

Q. So that's two weeks before the date the ballot was received?

A. Correct.

Q. Christa Miller said this was confirmed by an obituary and records for the Department of Health. She said Teresa J. Mihaliak was removed from the voter rolls on April 25th, 2022; is that correct?

A. That's correct.

MR. FISCHER: Nothing further, Your Honor.

MR. BUKOWSKI: I just have one brief redirect based on Mr. King's question which was Mr. D'Agostino because I wasn't sure if your answer included this.

RECROSS-EXAMINATION (as on Further Redirect)

BY MR. BUKOWSKI:

Q. As you know, the Secretary has refused to certify the statewide election results that include votes from Berks, Lancaster, and Fayette Counties. Do you have an understanding of whether any of those elections would be affected -- the outcome of any of those elections that the Secretary has to certify would be from the counting or not counting of any of the undated absentee or mail-in ballots in question?

A. I'm not aware of any of those races that would be affected.

MR. BUKOWSKI: That's all I have.

MR. FISCHER: Nothing further, Your Honor.

JUDGE COHN JUBELIRER: Thank you.

Thank you very much, Mr. D'Agostino. We appreciate your time today and your testimony.

THE WITNESS: Thank you.

(Witness excused.)

MR. BOYER: Thank you, Your Honor. We're going to call Mr. Christian Leinbach as if on cross.

JUDGE COHN JUBELIRER: Okay. Thank you.

MR. HOLLAND: Raise your right hand.

Whereupon,

CHRISTIAN LEINBACH,

having been duly sworn, testified as follows.

MR. HOLLAND: Please be seated.

DIRECT EXAMINATION (as on Cross)

BY MR. BOYER:

Q. Good afternoon, Mr. Leinbach.

A. Good afternoon.

Q. My name is Jacob Boyer. I'm an attorney with the Office of Attorney General and represent the Department of State and the Acting Secretary in this matter. Are you a member of the Berks County Commissioners?

A. Yes, I am.

Q. And what's your role on that commission?

A. I chair the Board of Commissioners.

Q. Okay. As the Chair of the Board of Commissioners, do you have certain responsibilities for the

administration of elections?
A. No more than any other Commissioner.
Q. Forgive me.
A. With the exception of the year in which we run, we serve as the Board of Elections.
Q. Actually I meant to ask as a Commissioner as opposed to as the Chair, do you have responsibilities for the administration of elections?
A. Yes, I do.
Q. Okay. And have you heard the testimony from the prior Commissioners about their roles with respect to elections?
A. I have.
Q. Okay. And is your role as Commissioner relatively the same?
A. Relatively similar.
Q. Which is to say you don't have day-to-day management responsibilities over elections, but you do have a say in the final decisions, for example, about whether certain ballots should or should not be counted?
A. We adjudicate issues as they are brought to us from our Election Director.
Q. Okay. And that includes adjudication about whether certain ballots meet the statutory requirements for canvassing for example?

A. Yes, it does.

Q. Okay. I'd like to turn to what we've been talking about which is absentee and mail-in ballots, and I may refer to undated ballots and what I mean is ballots that are returned by the 8:00 p.m. deadline that have no irregularities other than the fact that they don't have a date written on the return envelope. If I use undated ballots, that's what I'm referring to if that makes sense?

A. Yes, it does.

Q. Okay. Do you know the deadline by which absentee and mail-in ballots must be received by the county in order to be counted in an election?

A. 8:00 p.m. on Election Day with the exception of military and civilian overseas ballots which are later.

Q. Thank you for that correction, yes. I'll put those ballots aside and refer only to ballots that are not cast by military members or their families. If a ballot is received anytime after 8:00 p.m., again excluding military members and their families, will the county board receive it -- or excuse me, count it?

A. Excluding.

Q. Excluding those ballots.

A. I think you said including.

Q. Forgive me. I meant to say excluding.

A. If they are received after 8:00 p.m. on Election

Day, they will not be counted.

Q. Okay. And that's true even if the date written on the return envelope is sometime before Election Day; is that correct?

A. That is correct.

Q. Okay. Now, if the date written on the return envelope is sometime before Election Day so, for example, let's say it said May 10th for the 2022 primary, what does that date mean to you? What do you assume the voter meant by writing May 10th?

A. Let me answer that by explaining how we receive the ballots if that's appropriate.

Q. I'd rather you --

A. As it relates to the date --

Q. I'll ask a different question --

A. Okay.

Q. -- then instead. If a voter writes May 10th on the ballot for let's say a May 17th election, would you disqualify that ballot based on the date that's written?

A. Absolutely not.

Q. Okay. Would you investigate what the voter meant by May 10th meaning, for example, would you have any means to determine if the voter who wrote May 10th, in fact, signed the ballot on May 10th?

A. That would only be investigated if there were

 other circumstances that caused us to look at that date.

Q. Okay. So absent external circumstances, when you receive and review a ballot that says May 10th, for example, you're not conducting any investigation of whether the voter, for example, actually signed the ballot on May 10th?

A. When Berks County receives a properly timely presented absentee or mail-in ballot, we look to see if it is dated and signed.

Q. Okay. But you don't conduct an investigation to determine if the date that's written on the ballot --

A. We simply determine is the ballot dated and is it signed.

Q. Okay. So for all you know, if someone wrote May 10th, they could have signed the ballot on May 9th?

A. We simply determine is it dated or signed?

Q. Okay. If a voter returns a ballot that, for example, has no birth date on it, would you exclude that ballot on the basis of the date?

A. We simply determine is the ballot dated or signed.

Q. Okay. I don't believe I asked you. When Berks receives absentee or mail-in ballots, does it date-stamp the outer envelope to indicate when that ballot was received?

A. There are two ways that it can be determined relative to date. One is the outer envelope of the ballot has a unique bar code unique to the election and unique to Berks County. If someone uses some other or an older outer envelope, it will not be accepted. That is the first test of timeliness. It only relates to that election.

When it's received in the office, whether from a drop box, from the mail, or by the voters themselves, it is dated and time-stamped upon receipt.

Q. Sorry. I want to make sure I understand the first part of your answer. With respect to the scanning, is what you're saying the bar code that appears on the return envelope is scanned upon the county's receipt of the envelope?

A. It is and it is unique to that specific election and to Berks County.

Q. Okay. And what is scanning the envelope's bar code, what does that do? If you scan that into SURE, does that generate some information into the SURE system?

A. It does and it also generates information to the voter. So when it is scanned in, it notifies the system that the absentee and/or mail-in ballot has been received; and a notification goes to the voter letting them know it has been received. If it is undated, a notification goes to the voter that it's been received but it is not dated or

if it's not signed that it's not signed letting them know that that is the case.

Q. Okay. And is one of the pieces of information that appears after the envelope is scanned the date on which the ballot was received?

A. Please repeat that question.

Q. Certainly. Yes. You said that scanning the ballot or, excuse me, scanning the return envelope, the unique bar code on the return envelope generates certain information. Is one piece of information generated by --

A. It does not gener -- that is a manual process. So when the ballots are received in the election office, the first thing that happens is they're viewed. If there's a missing date or a missing signature, they are set aside. If everything is there, they are immediately scanned. The ones that are missing -- into SURE. The ones that are -- and I might add when they're scanned into SURE, they look again. So that's a second look to make sure they're signed and dated. If they are signed and dated, they go into the SURE system.

If for some reason, there's a third check and that's precanvassing that begins on 7:00 a.m. on Election Day. As part of the precanvassing process in Berks County, before they are opened they're determined again is there a missing date or signature. In the rare

case that that would happen, in that case they're set aside and the information in the SURE system would be reversed indicating that it lacked either a signature or a date.

Q. Understood. And I believe for the 2022 primary election Berks had sent to the Acting Secretary a certification of results; is that correct?

A. That is correct.

Q. Okay. And what date was that?

A. Actually I believe two dates. I'm not going to stipulate exactly, but I believe the second date which included the provisionals I believe was June 8th.

Q. Okay. But that did not include any ballot for which the voter had omitted a date on the return envelope; is that correct?

A. It did not.

Q. Okay.

MR. BOYER: Nothing further, Your Honor.

CROSS-EXAMINATION (as on Redirect)

BY MR. BUKOWSKI:

Q. Good afternoon, Mr. Leinbach.

A. Good afternoon.

Q. Why does Berks County and the Berks County Board of Elections require that absentee and mail-in ballots be both signed and dated in order to be canvassed and counted?

A. Because we believe the statute is quite clear in

requiring that the outer envelope must be or shall be signed and dated. And we act on the clear direction of the statute as well as the prior direction of the Secretary of the Commonwealth.

MR. BOYER: Objection, just to the extent as all previous objections. This is just his opinion of the law.

JUDGE COHN JUBELIRER: Thank you.

THE WITNESS: It's my clear reading of the law.

BY MR. BUKOWSKI:

Q. Okay. As of Election Day for the May, 2022 primary election, what was the guidance from the Department of State on counting undated ballots?

A. The guidance was undated ballots should not be counted.

Q. And is that what Berks County did when it processed mail-in and absentee ballots for the May, 2022 primary?

A. That is correct. We did not count undated ballots.

Q. You had mentioned information going into the SURE system and then notifications being sent to voters about how their mail-in or absentee ballot was being processed. Does a voter have an opportunity to cure a ballot if it's

missing a signature or a date?

A. A voter has the opportunity to come in to the election department and voluntarily fill in their signature or the date prior to the election.

Q. Do you know whether that happened in the May, 2022 primary election?

A. I cannot say with certainty.

Q. Okay. For ballots that had the date, for example, May 10th, I don't think there's any issue that that would look odd, a May 10th signature or a ballot dated May 10th. But if there's a ballot that had an incorrect date, you know, I think counsel pointed out you don't know whether the person signed it on May 9th and dated it May 10th or vice versa. Why are those ballots -- if there's a belief that there's an incorrect date on the ballot, how does Berks County process that?

A. If there's something that would cause us to believe there is an irregularity and it involves the date or involves the signature or both, we would set that aside. And in setting it aside initially the Director of Elections would look at it to see if she is able to make a determination, and if not that would come before the Board of Elections to adjudicate.

Q. And in the May, 2022 primary election, were any absentee or mail-in ballots submitted to the Board of

Elections of Berks County to be adjudicated where the date was -- where the question to be adjudicated was the accuracy of the date?

A. I'm not aware of any.

Q. Okay. Do you feel in your role as a member of the Berks County Board of Elections you can ignore the language of the Election Code that states that the declaration of a voter shall be signed and dated?

A. No. And I stated to that fact when the McCormick and Oz campaign came before the Board of Commissioners, one calling for us not to count undated ballots, the other calling for the board to count undated ballots; and I made it very clear that I don't have the leeway or discretion to determine what I think the law should say.

I don't have the discretion to determine whether or not a date is material or immaterial. I simply am obligated to follow the clear and plain language of the law that says undated and/or unsigned ballots shall not be counted.

Q. And did the McCormick campaign appeal any determination by the Berks County Board of Elections with respect to handling either of the issues adjudicated by the board?

A. They did.

Q. What did the McCormick campaign appeal?

A. They appealed our decision to not count the undated ballots.
Q. And was that the case that came up to the Commonwealth Court?
A. Yes, it was.
Q. Okay. And Berks County was a party, a respondent in that action?
A. Yes, we were.
Q. Okay. And as we've heard testimony, this Court issued a June 2nd, 2022 order in that case. You're familiar with that order?
A. Yes, I am.
Q. Did Berks County comply with that order?
A. Yes, we did. I will stipulate that we asked our counsel to clarify exactly what the order directed. It was clear to us that this was an interim directive that anticipated a more complete decision at a future date, and we believed it was appropriate. We were not asked to certify. We were simply asked to provide the numbers and separated dated and undated ballots which we did.
Q. And so is it your understanding that the June 2nd, 2022 order from this Court in the McCormick case did not require certification of certified returns to include votes from undated ballots?
A. There was no mention of certification at all.

Q. Okay. You're aware that the Third Circuit Court of Appeals issued a decision May 20th, 2022, in the case captioned Migliori v. Cohen?

A. I am.

Q. And are you also aware that that did not involve an election in the May, 2022 primary?

A. Yes, that is what I understood.

Q. Okay. And after that decision was issued, did Berks County receive further guidance from the Department of State regarding the processing of undated mail-in and absentee ballots?

A. We did.

Q. Okay. And what did that guidance say?

A. There were a couple of different or possibly three different pieces of communication that I'm familiar with but basically directed the county to recertify the totals including undated ballots.

Q. And are you referring to the communications that were -- that Mr. Marks had testified to earlier --

A. I am.

Q. -- in some e-mails? And, in fact, one of those e-mails that was Joint Exhibit 6 was Mr. Marks's June 17th, 2022 e-mail, and then he had also sent a June 27th, 2022 e-mail to the election officials; do you recall that?

A. Yes, I do.

Q. Do you have those over there or not?
A. I have them in front of me now.
Q. Okay. Would you refer to the June 27th, 2022 e-mail from Mr. Marks?
A. Yes.
Q. I believe it's probably part of Joint Exhibit 10 because that's the one --
A. It was.
Q. -- where you responded?
A. Yes.
Q. So just describe again for the Court what Joint Exhibit 10 is.
A. So Joint Exhibit 10 is directed to Dear County Election Official. I received it along with a number of others, and it is clearly directed to a group of counties who have either not yet certified vote totals from undated ballots or have not provided the Department with information about when we will be able to do so. It directs us to send those certified vote totals by a certain date.
And at the bottom it says, as noted in my original e-mail, please send copies of your certifications and any questions or responses to all three of the following DOS staff members, one of which is Jonathan Marks.

Q. And did you respond to that e-mail?

A. I did respond the following day, June the 28th.

Q. And your response is what's at the top of the first page of the exhibit marked Joint Exhibit 10; is that right?

A. That is correct.

Q. And as we noted earlier in my examination of Mr. Marks -- well, before we get to the last paragraph, what did you say in your response?

A. It's rather brief. Jonathan, please help me understand where the clear Court guidance is regarding certification on undated ballots. I do not see it. And then I quoted from his letter, quote, rulings in the Commonwealth Court of Pennsylvania and the U.S. Court Of Appeals for the Third Circuit makes it clear that we will have to certify vote totals that include the vote totals from undated ballots, end quote.

I then went on to say I believe the rulings are anything but clear at best. The issue is not settled. I look forward to your response.

Q. And did you receive a response to your June 28th, 2022 e-mail to Mr. Marks?

A. I received no further communication from Mr. Marks.

Q. And was the next communication from the

Department of State the letter from Attorney Gates dated June 29th, 2022, addressed to the Berks County Director of Elections Services, Paige Riegner?

A. That is correct.

Q. And that is what is marked as Joint Exhibit 11, correct?

A. That is correct.

Q. After receiving the June 29th letter from Attorney Gates and your exchange with Mr. Marks, did the Berks County Board of Elections have another meeting?

A. We did on July the 1st.

Q. What happened at that meeting?

A. Well, I did my best to get additional information prior to any vote on this important decision. I did not receive a response from Jonathan Marks. The only response was, as noted, from counsel for the Department of State. And so at that meeting I reiterated my clear reading of the current statute that ballots, outer envelopes of the ballots that are either undated or not signed shall not be counted.

And I also noted that the two decisions cited, neither one of them dealt with certification. Both of them occurred -- the one where we abided by the Commonwealth Court, this Court, we did exactly what the Court asked us to do. And based on the lack of clear judicial guidance

and the plain language of the statute, I could not in good conscience vote to certify undated ballots.

I also noted that this type of issue is what is causing a lack of trust in the system. When plain language we're being told is no longer plain, no longer means what it says it means, we damage the credibility of our elections.

Q. And when Berks County sent its certified results to the Department of State on June 8th, 2022, do you know whether or not the Third Circuit decision in Migliori v. Cohen was in effect?

A. I do not know.

Q. Okay. And was June -- did the Berks County Board of Elections view its deadline to provide certified results to the Acting Secretary of the Commonwealth as June 8th?

A. That is correct.

MR. BUKOWSKI: Nothing further, Your Honor.

JUDGE COHN JUBELIRER: Thank you.

MR. KING: May it please the Court.

CROSS-EXAMINATION (as on Redirect)

BY MR. KING:

Q. Commissioner, good afternoon.

A. Good afternoon.

Q. I'm Thomas W. King, III. We've met?

A. Yes, we have.

Q. I wanted to ask you, in Berks County according to the stipulated facts, we show 507 democratic ballots and 138 republican ballots that were undated and not counted, correct?

A. Total of 645, that is correct.

Q. And are you familiar enough with the results in Berks County to know down-ballot whether the state committee posts in either party, republican or democrat, local county committee posts, if any of those might be affected by 507 democratic ballots and 138 republicans if you're ordered to recertify this election?

A. That's a fairly substantial number of undated ballots, 645. Obviously it would change the results in any elections where votes were cast for a particular race. Based on the number of races down-ballot, committee slots in particular, that were ties or extremely close, I would not be surprised to understand that it would impact the outcome of some of those races.

Q. And do you know whether the Berks County republican party, the Berks County democratic party, the Pennsylvania republican party, or the democratic party of Pennsylvania, do you know if they've had meetings after this primary election has taken place at which people from Berks County participated because they were certified by the County of Berks as having won the elections?

A. That is correct. They have.

Q. And some of those people would have attended -- for example, I'm most familiar with the republican state committee meeting -- so that meeting of the republican state committee, were you there at the last meeting?

A. I was.

Q. It was just a week or so ago, and so the Berks County representatives were seated and voted at that meeting, correct?

A. That is correct.

Q. And that's based on the county certification that took place earlier?

A. That is correct.

Q. All right. Have you ever had to recertify an election in Berks County?

A. I'm in my 15th year and I've never been requested to recertify.

Q. Have you ever heard of the recertification of an election?

A. I didn't know there was such a term. I think if you certify an election it's certified.

Q. Now, you're familiar at least a little bit because you all were deeply involved in the McCormick and Oz election debate?

A. Yes.

Q. And so are you aware of whether the Secretary herself was, in fact, a participant in that case before Judge Cohn Jubelirer?

A. I can only speak to my experience, and the individuals that appeared before our election board were representatives of the McCormick campaign and representatives of the Oz campaign. I was not -- we had no one from the Secretary of the Commonwealth weigh in in our hearing or in the meeting where we made subsequent decisions.

Q. Now, of course, the Attorney General himself is on the ballot this year, correct?

A. He is not.

MR. BOYER: Objection to relevance.

THE WITNESS: Yes, I take it back.

JUDGE COHN JUBELIRER: He is.

THE WITNESS: Yes, not as the Attorney General.

JUDGE COHN JUBELIRER: Just --

MR. KING: I'm sorry. The sitting Attorney General is on the ballot running for Governor of Pennsylvania. I just want to know whether he filed an appeal.

MR. BOYER: And my objection is to relevance, Your Honor.

JUDGE COHN JUBELIRER: He objected to relevance. Do you want to respond?

MR. KING: Yes, Your Honor. The relevance is unclean hands. The action that's been brought here is in the nature of equity. With respect to the mandamus action, that's an equitable action. You have to come here with clean hands. And so what's happened here is that not only are these appeals untimely, but the people who are participating in these appeals had every right to file an appeal if they wanted to. They could have filed it timely. They could have filed it at all.

JUDGE COHN JUBELIRER: I'm sorry but as I'm looking at the caption, I don't see anybody having brought this action --

MR. KING: Yes, ma'am.

JUDGE COHN JUBELIRER: -- who's running for office.

MR. KING: No, not that's brought it but --

JUDGE COHN JUBELIRER: Okay.

MR. KING: -- the lawyer for the party who's brought it is a candidate.

JUDGE COHN JUBELIRER: So that's a different -- I mean I'm not sure that that --

MR. KING: I'll withdraw the question.

JUDGE COHN JUBELIRER: Yes. Thank you.

MR. KING: Yes, ma'am.

Thank you very much, Commissioner.

THE WITNESS: Thank you.

MR. BOYER: Just a few follow-ups, Mr. Leinbach.

THE WITNESS: Sure.

REDIRECT EXAMINATION (as on Recross)

BY MR. BOYER:

Q. I believe you said in your experience you've never recertified election results; is that right?

A. From my experience I have not been involved in recertifying an election.

Q. Okay. Have you ever updated incomplete certifications?

A. We may have. I don't recall right now.

Q. Well, what about in this election? Did you certify certain results on July [sic] 6th to the Department?

A. I've already testified that there were two separate reports. The second one on June the 8th included the provisional ballots.

Q. Okay. So you sent one certification on July 6th, correct?

A. Yeah. We did not recertify. We certified what we were able and certified the provisional ballots as I

understand it on June the 8th.

Q. Okay. So on June 8th you updated the certification that you sent on June 6th; is that correct?

A. I don't know what it's called. I'm simply telling you what we did. We certified everything we had on June the 6th and certified as I understand it the provisional ballots that were not yet completed on June the 8th.

Q. Okay. I believe you said you're obligated to follow your interpretation of the Election Code; is that correct?

A. I did not. I said I'm obligated to follow the plain language of this election statute.

Q. Forgive me. Thank you for that clarification. If a Court decides what the language of the election statute means, would the Berks County Commissioners follow that decision?

A. If it's a definitive decision, yes.

MR. BOYER: Nothing further, Your Honor.

JUDGE COHN JUBELIRER: And before we finish, I want to make sure, counsel, did you make an unclean hands argument in your papers? Is that before the Court? I don't recall seeing that.

MR. KING: I think we raised the -- I'm not sure about that to be honest with you. I know that we

raised equitable defenses.

JUDGE COHN JUBELIRER: I know you did. I wasn't sure if unclean hands was one of them.

MR. KING: I'm not sure either.

JUDGE COHN JUBELIRER: If you did and there are factual questions that would assist you obviously in a defense that you've raised to this action, I don't want to preclude that.

MR. KING: I appreciate that. I don't think it's necessary at this point.

JUDGE COHN JUBELIRER: Okay.

MR. KING: Thank you, Your Honor.

JUDGE COHN JUBELIRER: Thank you.

MR. BUKOWSKI: Just one last follow-up question, Commissioner Leinbach.

RECROSS-EXAMINATION (as on Further Redirect)

BY MR. BUKOWSKI:

Q. In response to the last question about following clear Court guidance, is it the -- is it your understanding that the November, 2020 Pennsylvania Supreme Court decision in In Re: Canvass is clear guidance stating that undated absentee and mail-in ballots should not be counted for all elections after November, 2020?

A. It is based on my consultation with our solicitor, our county solicitor, our election board

solicitor. Yes, we believe that is clear.

MR. BUKOWSKI: Nothing further.

MR. KING: No, thank you, Your Honor.

MR. BOYER: Nothing further, Your Honor.

JUDGE COHN JUBELIRER: Okay. Thank you very, very much. We appreciate your testimony and your time today.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

JUDGE COHN JUBELIRER: Are there any further witnesses? Let's see. You had a --

MR. BOYER: Not from the Petitioners, Your Honor.

JUDGE COHN JUBELIRER: Okay.

MR. BUKOWSKI: Not from Berks and Lancaster Respondents, Your Honor.

MR. KING: Nor from Fayette, Your Honor.

JUDGE COHN JUBELIRER: Okay. How are we with time? I mean does anybody need a break?

THE REPORTER: I'm good.

JUDGE COHN JUBELIRER: Okay.

MR. BOYER: I think we could take a five --

JUDGE COHN JUBELIRER: I was going to say maybe we should take a five-minute break before we begin with the legal arguments. We'll proceed with Petitioners

first. Well, wait. Let me just clarify.

The Respondents here do have some legal arguments that are threshold issues. Do you want to begin with those or do you want to argue about them in the normal course when you would otherwise be arguing as Respondents?

MR. KING: I think that in the interest of the Court's time and our time, that we just roll that all in one. I think your suggestion that the Petitioners go first would be fine, and we would respond in kind even though some of our arguments are going to relate to preliminary objections which otherwise would normally be heard first. So we're --

JUDGE COHN JUBELIRER: Well, the preliminary objections themselves to the PFR are not technically before the Court because the PFR isn't before the Court yet; however, you did raise many of the legal arguments that are in your preliminary objections in response to this emergency application. And so the legal issues are before the Court. They have the effect of a kind of threshold position but technically are not --

MR. KING: Per se.

JUDGE COHN JUBELIRER: Right. So I think then that will work well. If we start with the Petitioners, Respondents, you will have the opportunity to make your arguments and then if there's any rebuttal.

MR. KING: Thank you very much.

JUDGE COHN JUBELIRER: Okay. Thank you for the clarifications. And so we'll take five minutes, I think is that sufficient --

MR. BOYER: Thank you, Your Honor.

JUDGE COHN JUBELIRER: -- in order to keep everything moving?

MR. KING: Thank you, Your Honor.

MR. BUKOWSKI: Yes, Your Honor.

JUDGE COHN JUBELIRER: Thank you very much.

(A recess was taken from 2:42 p.m. to 2:50 p.m.)

MR. BOYER: Thank you, Your Honor. And again for the record, Jacob Boyer on behalf of the Department of State and the Acting Secretary.

The three counties in this case, Your Honor, are holding up final certification of the primary election because they refuse to complete their duty to certify results that reflect every lawfully cast ballot. Now, the counties don't meaningfully dispute that they have a duty to certify results that include every lawfully cast ballot. Instead they say it is they and not the Secretary that decides what constitutes a lawfully cast ballot, but that misses the issues in this case.

It's neither the Secretary nor the county boards of election that ultimately decide what constitutes

 a lawfully cast ballot. It's an order of this Court. It's Pennsylvania law and it's federal law. And all three of those in this case, Your Honor, require that the ballots at issue here be included in final certification of the 2022 primary election.

And until the counties provide the Secretary with a certification that includes the ballots at issue here, the Secretary cannot complete her own duty to finally certify the results of the primary election.

Now, I'm going to begin discussing our mandamus count, count one of the petition for relief on which we have sought an order, a peremptory judgment; and I'd like to begin that discussion with a bit of context about what is and is not at issue with this count.

The mandamus count proceeds exclusively on the basis of this Court's June 2nd order. It is not a count to enforce any guidance of the Secretary. Had there been complete silence between the Secretary following this Court's order in McCormick and now, the mandamus count would be legally indistinguishable. It is not a count to enforce any guidance by the Secretary as the briefs on the other side would suggest and as the questioning today would suggest.

And as I will get to momentarily, we readily acknowledge that the Court's order does not use the word

 certification; but as I will describe, the consequence of this Court's order that the counties must canvass and count these ballots is that their exercise of discretion was told -- they were informed or ordered by the Court how to exercise their canvassing discretion.

And after that order there is no further discussion to remove lawfully cast ballots from the certification. The Election Code simply does not permit counties that freedom.

Now, moving on to the Court's order from June 2nd and why it counts -- excuse me, why it requires that the counties here include the ballots at issue in this certification. The Court's order was quite clear the ballots -- and just for purposes of clarity of the record, the ballots we are talking about are ballots that are lacking a date on the return envelope, either an absentee or a mail-in ballot, but ballots that otherwise were timely received ballots that otherwise as the Court's order said have no deficiencies or irregularities.

So we are talking exclusively about ballots in which the only basis the county asserts for denying their inclusion and certification is that the voter failed to include a handwritten date on the ballot return envelope. So I may refer to undated ballots throughout, but that is the class of ballots that I'm talking about.

If a ballot, for example, is undated and unsigned, we're not contesting that. So I do --

JUDGE COHN JUBELIRER: Without a handwritten date?

MR. BOYER: On the outer envelope, exactly. So if there is a missing date and other errors, those ballots are not at issue. We do not believe that the law requires or permits those ballots to be counted. For example, an envelope that lacks both a date and a signature.

The Court's order on June 2nd was quite clear that the counties here must canvass. On page 14 of the Court's opinion, it was clear that by canvass it meant count the ballots at issue here. And it's clear from throughout the opinion the basis of that order was the Court's legal conclusion that both Pennsylvania law and federal law require those ballots be counted.

It was also clear at pages 6, 14, 18 of the Court's opinion that the Court understood the request to be from the petitioners there a request that the Court order the counties to count these ballots, not to merely segregate the ballots, not merely to identify how many ballots there are, but to count the ballots and report the tallies on the basis of the Court's conclusion that Pennsylvania law and federal law likely require these

ballots to be counted.

Now, under the Election Code there are clear consequences of a Court order that certain ballots must be canvassed and must be counted.

JUDGE COHN JUBELIRER: And just to clarify, when the context of the Court's opinion was in a request for preliminary injunction and so the Court was technically -- I mean, do you agree that the Court was technically examining the likelihood of success on the merits prong of the preliminary injunction test?

MR. BOYER: Yes. That is the standard the Court was applying. The order that the Court entered which is what we believe guides here was a clear order to canvass on the basis of that legal analysis. That's quite comprehensively described in Your Honor's opinion from June 2nd. And the consequences of an order to canvass and count ballots under the Election Code is that those ballots must also be reflected in the final certification.

And I will walk --

JUDGE COHN JUBELIRER: Okay. And you're going to walk me through that analysis?

MR. BOYER: And I'm going to walk through why that is. So this is for Your Honor's reference is this is pages 8 through 9 of our brief sort of walks through the Election Code and makes clear that once it's determined

that a ballot is canvassed and counted, there is no further discretion on the part of the counties, on the part of the Secretary to overrule a Court's decision that ballots must be canvassed.

So the relevant section of the Election Code here, Your Honor, is 25 P.S. 3146.8 which is the section that governs canvassing of both absentee and mail-in ballots. Paragraph (g)(3) of that section proscribes the conditions that a ballot must meet to be canvassed. One of those is that the declaration is sufficient.

Now, the consequences of the Court's reasoning in the Court's order was a determination that return envelopes lacking a date are sufficient. Once that determination is made and there's an order to canvass and count those ballots, there is no further discretion under the Election Code as to what happens under those ballots.

Under paragraph (g)(4) of that same section -- and I will read this directly, Your Honor, and this is quoted in our brief as well.

Paragraph (g)(4), all absentee ballots which have not been challenged under Section 1302.2 -- which prescribes some provisions and procedures for challenging ballots -- and all mail-in ballots which have not been challenged under Section 1302(d)(a)(2) -- which is another set of challenges -- that have been verified under

paragraph 3 -- paragraph 3 refers to the paragraph describing the conditions for canvassing -- shall be counted and included with the returns of the applicable election district as follows. And then it goes on to report that.

Section 3154 sort of picks up the process after there is computation and canvassing, and there it directs that the election districts which are actually conducting the canvassing and counting under 3146.8(g) and (4) are to report to the county board of commissioners the results that they have canvassed and that they have computed.

There is no discretion under 3154 that authorizes the county Board of Elections to decide the ballots that have already been counted and canvassed under 3146.8 are no longer going to be included in the certification, meaning there is a process. You know, you heard Mr. Marks testify about a process that begins with canvassing, counting, and ultimately concludes with certification.

Any discretion that the county boards have exists at the canvassing and counting. Of course that discretion is subject to the Election Code and subject to orders of the Court; and in this case because there was a Court order dictating how to exercise that discretion which

ballots must be canvassed and counted, there was no further discretion under the Election Code on the back end to remove ballots that this Court ordered must be counted.

For that reason, Your Honor, I think much of the case law in the present and, in fact, all of the case law in the present -- and I'll walk through some of the statutes as well -- that my colleagues cite is actually irrelevant. There is a case cited several times, In re: McCracken, that speaks about the discretion county boards have for canvassing and computing ballots.

We don't dispute that. The Court ordered them how to exercise that discretion. There is no subsequent discretion at the certification stage.

JUDGE COHN JUBELIRER: And so how do you define certification? Is there a provision in the statute?

MR. BOYER: Yes. The most relevant provision is 3154 paragraph F which speaks about the process of what election boards are supposed to do once they have received canvassed and computed results from their election districts. They're to receive them. They are to add them together.

And I can read through that paragraph if it would be helpful, Your Honor, but it is 3154(f) that describes that process that the county boards are to go through during certification. And throughout the language

is directory. The ballots that have been canvassed and computed shall be certified.

Now, there's been a couple mentions about the timing of this mandamus case and what options the Secretary or the Department should have availed themselves of. I want to make a broader point and then a more specific point about the relevant statutes.

The broader point is the Department is not an ordinary litigant. As you heard Mr. Marks testify, there are often disputes between counties and the Department about various aspects of election administration; and because the Department, you know, does not have authority to tell the counties in the main what to do, they try to resolve those disagreements.

And between the order in McCormick, the discontinuance in McCormick, and this case, the Department was in constant communication with the counties about this. And throughout that communication, they were able to prevail upon quite a few counties and convince quite a few counties to change their view based on discussions about what the law heard.

I think you heard Mr. Marks testify his June 17th e-mail went to every county. His June 27th e-mail, I think he said at that point there was a handful that had certified undated but most did not. By June 27th that

number was down to nine. By June 29th that number was down to four. By July 1 that number was down to three. If the expectation is that the Department is going to sue county boards every time there is a disagreement, there will be a flood of litigation. It is not a productive way and there is no need for it, and there is nothing that requires it.

As to the specific statutes that the counties believe required the Department to act more expeditiously, not only do they misread those statutes, but those statutes confirm exactly what I was just saying about the lack of discretion with respect to certification.

So the one that they've cited most commonly in their brief is 25 P.S. 3157 which provides two days for an aggrieved person to challenge a decision of any county board regarding the computation or canvassing of the returns. It does not permit challenges to the certification.

And the reason for that as this Court has cited and I'll get to it in a minute is quite clear. All discretion happens at the computation and the canvassing stage. There is no expectation under the Election Code that a board or that any ballot that meets the standards for computation or canvassing or even more that a Court has ordered must be canvassed and be counted can on the back end be removed at the certification stage. There is not an

existing process for that because that is not how the Election Code works.

As this Court said in In re: 2003 Election for Jackson Township Supervisor, 3157 requires immediate resolutions of disputes that prevent certification. 3157 is to have everything resolved in advance of certification. It is not a process for challenging certification because there is no expectation under the Election Code that certification is anything other than a ministerial -- there is no expectation that ballots that had been adjudged to be eligible for computation and canvassing will be removed at the certification stage.

And counsel for Fayette asked Mr. Marks are computation, canvassing, and certification different stages and they are. 3157 is clear that it applies to computation and canvassing. 3157(d) separately refers to staying certification pending certain challenges. There is no ambiguity that when we are talking about computation and canvassing, that does not include certification.

So the statute that they have pointed to saying we should have proceeded under this, you had two days, it's plainly inapplicable and it confirms our point that once you have canvassed and computed certain ballots there is no additional --

JUDGE COHN JUBELIRER: So your point is that

3157 specifies that it's an order or decision of any county board regarding the computation or canvassing of the returns or recount or recanvass thereof and that there are different things that canvassing and computation are not certification --

MR. BOYER: Correct.

JUDGE COHN JUBELIRER: -- because they're two separate things? Okay.

MR. BOYER: Absolutely. And as it applies to absentee and mail-in ballots, the decision as to what ballots are canvassed as I mentioned earlier is controlled by 3146.8 paragraph (g)(3). You count ballots that are canvassed unless there is an error on the face of the ballot.

For example, you have multiple votes or something like that. Those ballots are canvassed. The ballot meets the standards for canvassing, meets the standards for counting. There is no dispute that ballot must be reflected in the certification of election results.

So in addition to the reading of the Election Code that I walked through between 3146.8, 3154, 3157 is even further evidence that there is no expectation of discretion that will happen at the certification stage with respect to what ballots have been canvassed and counted. If they are canvassed and counted, they must be

certified.

I'd like to move now to our second count which is the count for declaratory and injunctive relief and walk through a bit more broadly what it is that the Election Code requires, not just this Court's June 2nd order but stepping back what it is that the Election Code requires with respect to ballots that a voter has failed to write a date on the return envelope but otherwise are timely and otherwise have no deficiencies or irregularities as Your Honor described in the June 2nd order.

Now, there's been a great deal of attention paid to Section 3146.6 which is the section that describes the process by which a voter completes an absentee. That one is specific to absentee ballots. There is a parallel section with substantively identical language for mail-in ballots, and that's the section that's been alluded to that says a voter shall date the return envelope. That section alone does not dictate whether a ballot that's missing or a return envelope that's missing a date meets the conditions for canvassing.

As I mentioned earlier, the process that describes canvassing or rather the section that describes canvassing is not 3146.6, but instead is 3146.8 and specifically paragraph (g)(3) and that section says that a declaration -- excuse me, a ballot may be canvassed if the

 declaration's return envelope is sufficient. The word is is sufficient. And to understand the consequences of these two statutes, they must be read together.

Under the Statutory Construction Act, we are directed to read statutes in conjunction under section 1 Pa.C.S. 1932. And I think the Supreme Court's decision in the Pennsylvania Democratic Party versus Boockvar is illuminative of how this interpretative methodology must proceed.

There was a question there as to whether ballots, absentee and mail-in ballots in particular, can be counted if a voter has failed to use the inner secrecy envelope, meaning they have omitted that and they have put their ballot directly in the return envelope. There just as here there is language saying a voter shall do that. A ballot needs to be in the inner envelope. The inner envelope shall be in the outer envelope, and that's the process for a voter to return.

That section alone did not dictate the Supreme Court's analysis of this question. Instead it read that section in tandem with the canvassing section which is again 3146.8 to determine what exactly the legislative intent was; and there because in the canvassing section there is specific language that says if when a county is precanvassing and they can determine who cast a ballot,

that ballot needs to be invalidated.

So by implication the ballot is missing a secrecy envelope even though there's nothing in the canvassing section that says, you know, toss out ballots without a secrecy envelope. The clear implication of the canvassing section's direction that if you can determine who cast a ballot that it needs to be voided informed the Court's analysis of what's to happen with ballots lacking the inner secrecy envelope.

So following the exact methodology that the Supreme Court used in PDP v. Boockvar, and the cite there for reference is 238 A.3d at 378, shall date alone does not dictate the consequences. The canvassing section that binds the counties and dictates their determination of whether a ballot meets the standards for precanvassing says the declaration must be sufficient.

Now, sufficient, of course, is not the same as complete, is not the same as a ballot must perfectly comply. What sufficient means is that the declaration must be adequate for its purpose; and the statute, the Election Code, is quite clear about what the purpose of the declaration is.

In 3146.4 for absentee ballots and 3150.14 for mail-in ballots, the statutes identify what the purpose of the declaration is; and that's for the voter to attest

that they are qualified to vote, that they have not already voted. A signature alone is sufficient for that purpose, and the Election Code itself provides that answer.

25 P.S. 3553 says that someone alone -- excuse me, someone who only signs the declaration envelope if it is false, that's sufficient for prosecution for any consequences that may follow. It is the signature, not a signature and a date that confirms the voter is everything that the declaration says the voter is.

So when we are determining sufficiency by the plain text of the Election Code, all of the answers for what the purpose is and what the Election Code and what the General Assembly deemed sufficient for that purpose are straight in the text of the Election Code. The shall date language that most of the county commissioners referred to as directing their discretion here is not by itself what dictates the answers.

You know, but even, Your Honor, if reading the shall date language and the sufficiency language together, if there's a conclusion that the language isn't clear but instead there is some sort of ambiguity. Again, following the Statutory Construction Act's directions for how we approach ambiguous statutory language, we end up in the exact same place.

For example, under 1 Pa.C.S. 1922, paragraph

1, the Statutory Construction Act directs we are to avoid statutory interpretations that produce absurd results. As you've heard from Mr. Marks, as you heard from the County Commissioners from Berks, from Lancaster, across the board or I'll say nearly across the board, counties do not review the accuracy of the date. They do not determine if the date that the voter writes is right. In fact, they don't even have a method to do that.

If a voter writes May 10th, a county board has no way of confirming that that was, in fact, the date that the voter signed the ballot if the date of the signature is the date that the statute otherwise contemplates. It is an absurd result to think that the Election Code cares deeply about the presence of a date if it cares not what that date says.

Additionally, there are other instances if we are to rely only on shall as dictating the answer here of absurd results that would follow. For example, for those who vote in person -- and this is again in our brief -- they are directed that they shall close the door behind them. If they don't, it doesn't state what the consequence is.

But under an interpretation that shall by itself dictates the answer here, if you apply that throughout the Election Code, you end up in a situation

where voters who don't fold their ballots right, voters who don't fully close the door behind them, their votes will also be invalidated.

Additionally, if there is ambiguity here, the Supreme Court has said repeatedly including in Pennsylvania Democratic Party v. Boockvar and Your Honor said this in the June 2nd Memorandum Opinion when there are ambiguities in the Election Code, we interpret them to effectuate the statute's purpose; and that means we avoid disenfranchising voters for minor irregularities. And there is no doubt that omitting a date where the content of the date does not even matter to the counties is a minor irregularity.

Now, you heard some examples of what function the date might serve. For example, you heard, well, there may be someone who died before Election Day and their daughter or someone else, you know, cast a ballot in their name and sent it in. In that instance no matter what date is on the ballot, that vote will not count. A voter who dies before Election Day cannot vote. Same with a voter who moves out of state.

Across the board voters must meet the eligibility criteria as of Election Day. So the date, you know, if we're trying to figure out, well, you voted on May 24th -- May 10th and you left on May 12th, then, you know,

how do we reconcile all this? None of that matters. The date is not in any way instructive as to whether the vote that was cast should be counted.

And no one, whether it was in Migliori, whether it was in McCormick, whether it was today, no one has come up with a function for the date that is relevant to whether the vote is valid; and, of course, that is further confirmed by the fact that counties regularly, including the Respondents here, count ballots independent of the accuracy of the date. And, as Your Honor mentioned or wrote in the June 2nd opinion, it's hard to find that the date is anything more than a minor irregularity when its accuracy is unimportant.

JUDGE COHN JUBELIRER: Do you have a position about whether a challenge could be made to ballots that, for example, include a birth date instead of a date that's a possible signing date? Is that something that could be challenged by a candidate or a voter?

MR. BOYER: I think it could be challenged. I don't think that challenge would succeed. I don't think the Election Code contemplates -- you know, it says sign and date. Of course it doesn't say what date. Counties treat that to mean any date. And I think even if there was arguments to be made that, all right, well, it means X date and so if anyone puts a different date, you know, their

vote doesn't meet the statutory criteria.

Perhaps I think it would still be the case that the date doesn't matter because it is not -- it doesn't make the declaration sufficient. The date is really beside the point when we're determining the sufficiency of the declaration which again is the language that dictates which absentee and mail-in ballots counties are to canvass.

Count two, Your Honor, we've not only sought declaratory and injunctive relief as a matter of what the Pennsylvania Election Code requires but, of course, is in addition to what federal law requires.

I don't think I need to spend too much time on this point, Your Honor, because the June 2nd opinion that Your Honor wrote, everything that was written there applies equally here because the definition of vote under 101(e) -- this is 52 U.S.C. 101(e) which is the federal statute at issue -- applies to the certification process given how that statute defines vote, and it specifically says the protections under the relevant statute apply all the way through the final certification of the election.

So I'll finish and I'll respond to other points as needed on rebuttal, but I do want to make sort of this overarching point about what this case is about.

JUDGE COHN JUBELIRER: And just before you

do that, we heard today that a recertification in some counties, I think for example Berks, could end up changing the results that have been certified by the counties for certain positions such as state committee people or other elections that didn't cover the whole county.

Is that a concern here that an order from this Court at this time would upset that and the expectations that the individuals who have been certified as winners by the county would then find themselves not?

MR. BOYER: So I'll say I have not thought about that as much. I can provide more information as the Court wants, but I'll say two points that I think are relevant.

The basis for count one, the mandamus action, is because the Secretary under Section 3158 and 3159 must receive accurate certifications of election results for the elections that she also is responsible for certifying. She has no responsibility and no statutory relationship to those elections. So I think there is not much that she can do with respect to them.

Under the statute, she must receive from counties certified results for the races that she also has responsibility for, and she doesn't have responsibility for those. And I think also generally, you know, certifications, final certifications of elections are

generally thought to moot election [inaudible].

For example, the Migliori petition that's been mentioned a number of times and there are arguments being made that no matter whether the Third Circuit decision was right or wrong and whether the Supreme Court might otherwise have granted review, the candidates have conceded the election result was certified. The case is moot.

JUDGE COHN JUBELIRER: Is the case moot? Has one of those candidates taken a position in Lehigh County Court?

MR. BOYER: One of the candidates there did concede the election, yes. And I am not saying the Department's position right now is the case is moot.

JUDGE COHN JUBELIRER: Correct.

MR. BOYER: I'm saying there is a petition from the candidate who did concede saying this petition is moot.

JUDGE COHN JUBELIRER: I see.

MR. BOYER: So I'd like to conclude for now with where I started which is what this case is about. As I mentioned at the outset, this is not a case where the Secretary believes she can order the counties to do certain things. If she had that power, we would not be before Your Honor asking for an order that the counties do certain

things.

The testimony that's been elicited, the arguments that have been made about the primacy of the counties relative to the Secretary is all beside the point. The Secretary, the county, we are all subject to the Election Code as finally interpreted by this Court and the Supreme Court of Pennsylvania and, of course, federal law ultimately as determined by the federal courts.

At the same time the Secretary, even if she has no independent authority to receive elections and say those ballots are null and void, she is not a rubber stamp. When the Secretary receives certifications, whether there's clerical errors where it's clear a county has excluded certain ballots maybe inadvertently or inadvertently, the Secretary returns to the counties and addresses that and raises that point.

Where there is clear case law saying ballots are being excluded that are lawful and, in fact, an order that says the very ballots at issue here must be canvassed and there is no further discretion under the Election Code, the Secretary simply has not received from the counties the certifications that they are required to provide to her under 3154 and the following statutes and in turn she cannot complete her own statutory duties to certify the accurate election results.

Unless there are further questions now, I'll save the rest of my points for rebuttal.

JUDGE COHN JUBELIRER: Okay.

MR. BOYER: Thank you, Your Honor.

MR. BUKOWSKI: May it please the Court, Your Honor. It's been my pleasure to represent the Berks County Board of Elections and the Lancaster County Board of Elections before Your Honor today.

We're here under circumstances where no candidate and no voter is challenging the final certified results timely submitted by the Berks County Board of Elections, the Lancaster County Board of Elections, and the Fayette County Board of Elections; and yet Petitioners are seeking a writ of mandamus and declaratory and injunctive relief from this Court to enforce what I understood until today to be the Petitioners' directive based on no statutory authority.

But now I understand that Petitioners are not trying to enforce their directives to the county Boards of Elections but trying to enforce this Court's June 2nd, 2020 [sic] order in the McCormick challenge, and I'll address that as we get into the elements of Petitioners' claim for emergency relief.

There's no dispute about the timeline, but you would have thought from counsel's argument that the In

re: Canvass decision in November, 2020, never occurred. I didn't hear him mention that one time during his argument to this Court and that case at least on the issues before the Court is binding on this Court and the county Boards of Elections.

In that case there clearly was a four-to-three majority of the Pennsylvania Supreme Court that concluded under the plain language of the Pennsylvania Election Code that undated ballots, undated absentee and mail-in ballots with no other defects shall not be counted in any election after November, 2020.

JUDGE COHN JUBELIRER: Well, would you agree that it is a plurality decision?

MR. BUKOWSKI: Not on that issue, Your Honor. There was a three -- it's three, three, one; and if you take the three Justices and the Justice Dougherty's opinion --

JUDGE COHN JUBELIRER: Well, I understand but what you're doing -- I mean, and my question let's take it in steps.

MR. BUKOWSKI: Sure.

JUDGE COHN JUBELIRER: It is a -- do you disagree that in the opinion announcing the judgment of the Court in that case it states, we conclude the dating, the declaration is a directory rather than a mandatory

instruction, and thus the inadvertent failure to comply does not require that ballots lacking a date be excluded from counting?

MR. BUKOWSKI: I agree that that opinion announcing the judgment of the Court says that.

JUDGE COHN JUBELIRER: Okay.

MR. BUKOWSKI: And that was signed on by three Justices. Justice Wecht signed on to that opinion for the limited purpose of applying --

JUDGE COHN JUBELIRER: Right.

MR. BUKOWSKI: -- it to that election.

JUDGE COHN JUBELIRER: But that doesn't change then that it was a plurality opinion that then -- I mean I think it at least is and I believe that there's been some comments that the -- it's, well, a bit confusing.

MR. BUKOWSKI: I think it's not confusing, Your Honor, if you look at -- if you look at Justice Wecht's opinion, his opinion concurring in the result where he says, I agree this election I agree but going forward -- and I'll quote from that.

JUDGE COHN JUBELIRER: Yes. And I mean that's fine and Justice Dougherty, I've read, of course, all of their opinions. But there is also case law that sort of cautions if you will against overly interpreting should I say the effect of plurality opinions that they --

to the extent that we interpret them to establish binding precedent going forward. I think we have to proceed with caution.

MR. BUKOWSKI: I don't --

JUDGE COHN JUBELIRER: That's all I would say with that, and I'm fine for you to quote the language of what is not a majority opinion but what is a concurring opinion.

MR. BUKOWSKI: And I think what -- I understand what Your Honor is saying; and I would commend Your Honor to review, although it's not binding on this Court, two of Your Honor's colleagues on this Court.

JUDGE COHN JUBELIRER: In the Ritter?

MR. BUKOWSKI: In the Ritter case.

JUDGE COHN JUBELIRER: Right.

MR. BUKOWSKI: Came to the exact result I'm urging you to come to today. And so I adopt wholesale their analysis of In Re: Canvass and urge you to do the same, and that would make three of you and who knows what the rest of the Court would do. Obviously Judge Wojcik had his own view on that and set it forth there.

But I do believe that Judge McCullough's opinion in Ritter is persuasive and that this Court should take a hard look at that analysis. And they concluded there that there's a majority as to the narrow issue, and

I'm only talking the narrow issue on whether the statute says -- whether the statute requires that an undated ballot be rejected.

There is a sliver of light certainly on the federal statute question that In Re: Canvass left open; and the opinions, you know, Justice Wecht's opinion, you know, mentioned it but said I'm not going to step into that without the benefit of full advocacy and I think that was wise. But I didn't hear really any thorough analysis or argument from opposing counsel on that point.

But so on that narrow issue I do -- and ironically I guess the opinion in Ritter, the unreported, unpublished opinion in Ritter by Judge McCullough was January of 2022. It involved the same election as Migliori which was the federal court case which reached a different result, and I will address briefly what's before the Supreme Court now because I think the timeline is pretty clear though that we established through the record today and the stipulated facts.

You know, the guidance from the Department all the way up through Election Day was don't count undated ballots. You know, the timing being what it is, May 20th was three days after Election Day, the Migliori Third Circuit opinion comes out. That mandate never takes effect. The Supreme Court stay took effect on May 31st

before the mandate became effective. The stay was lifted June 9th.

Meanwhile these county Boards of Elections are facing deadlines trying to timely certify the results of this election which Migliori really doesn't address because it's a different election, and I think the opinion makes it clear that that decision applies only to that 2021 judicial race in Lehigh County although certainly the analysis, you know, one could argue would apply.

JUDGE COHN JUBELIRER: How could you argue that it would not apply?

MR. BUKOWSKI: Well, I would argue that it's wrong.

JUDGE COHN JUBELIRER: Well, I mean but that's arisen and I'm sure that, you know, that there could be disagreement and I respect that with regard to the June 2nd order and the opinion that went with that that, you know, you thought that was incorrect, too.

MR. BUKOWSKI: Right.

JUDGE COHN JUBELIRER: So there are I don't think -- well, certainly at the time I don't want to prejudge. So there's always a question as to whether a judicial decision when you look back on it you might whatever. But otherwise what we think of in, you know, stare decisis has particularly I think if not stare decisis

let's say that certainty --

MR. BUKOWSKI: Sure.

JUDGE COHN JUBELIRER: -- that opinions that can be read, understood, and applied in the future so that all of these hardworking people who are trying to make decisions now how to apply the statutes and the law when they're counting votes and so the voters know what's required of them is really important.

And so to that end, I wonder why or if you would agree that having a decision on the merits in a case like this where probably with any decisions in our original jurisdiction here appealed as of right to our Supreme Court might provide a decision that could be then applied with more certainty in these upcoming elections?

MR. BUKOWSKI: I was hoping you didn't ask that question because thinking about coming in here today, but I knew you would. And let me answer it to say certainly, certainly if this Court issued a decision on the merits in this case which is subject obviously to appeal as of right to the Supreme Court, as the Court indicated would provide some clarity and at least a means by which Boards of Elections could, you know, hopefully sooner rather than later get clearer guidance on all the relevant issues.

What my response to your question, however, is, we're not here -- unfortunately I think probably the

best chance for that decision on the merits to have been made was the McCormick case because it was a real challenge by a real voter, a real candidate who -- there's no issue on timeliness. All the Boards of Elections were parties. The Acting Secretary was a party.

And I understand what happened and the voluntary discontinuance, but so therefore I believe this is not an actual case or controversy. It's I'll use the vernacular a ginned up case or controversy, and I don't mean that in a pejorative way. I'll assume good faith on the part of the Acting Secretary that she's trying to, you know, provide some clarity, too.

If I were bringing the action, I would have teed it up a little differently and said maybe for declaratory judgment and said, you know, 64 counties ruled one way, three ruled another way. We need clarity.

JUDGE COHN JUBELIRER: Well, then I was going to ask because there is a request for declaratory relief and one of the requirements in the Election Code -- or let me just ask how you interpret in the Section 2642, Powers and Duties of County Boards, it says, you know, to the end that primaries and elections may be honestly, efficiently, and uniformly conducted and whether you perceive there to be a concern?

I mean and the Secretary, of course, takes

the same oath or at least an oath that the county board officials take to protect, obey, and defend the Constitution and the laws. So as she's certifying her results, she has as well a duty arguably, or we can see if you disagree.

But anyway the concern about uniformity and whether there's a concern if in three counties or five counties or ten counties certain ballots are not counted and in the remaining counties those ballots are counted and does that create an issue either under the Election Code or the Constitution?

MR. BUKOWSKI: I think my answer to that is this Court should not take on and issue a declaratory judgment. This is an advisory opinion that there's no candidate challenging, there's no voter challenging.

JUDGE COHN JUBELIRER: Are candidates and voters the only parties that can challenge?

MR. BUKOWSKI: I don't believe that's -- the language in the statute says an aggrieved person. I don't know whether --

JUDGE COHN JUBELIRER: The language in which statute?

MR. BUKOWSKI: In the statute that allows for appeals from -- let me get it -- appeals from the decisions of Boards of Elections. I have it here.

JUDGE COHN JUBELIRER: I think you're looking at 3146.8 which refers to canvassing.

MR. BUKOWSKI: I think 3157 is what I was --

JUDGE COHN JUBELIRER: 3157, yes, and it was from decisions of the county board. But it still says regarding the computation or canvassing of the returns.

MR. BUKOWSKI: I agree.

JUDGE COHN JUBELIRER: How would you read that? Maybe I should ask your colleague because I think he made a very clear distinction when questioning Mr. Marks about the distinction between canvassing and certification.

MR. BUKOWSKI: I think canvassing, you know, counting votes, whether or not to count votes as part of the canvass is a decision. So the decision not to count the undated ballots in my view is a decision by the Board of Elections with respect to canvassing. That decision, you know, the statute provides there's two days for any aggrieved person to challenge that decision.

I argue that June 6, 7th, and 8th, respectively, were the dates when those decisions were made final when these county Boards of Elections submitted their certified results to the Secretary and that, within two days if somebody was going to challenge that including the Secretary -- and I'll assume without conceding that the Acting Secretary could be an aggrieved person under the

statute.

But assuming that to be true, then by June 10th then she would have had to have filed an action to this Court because this Court's May 27th administrative order said because there is a statewide recount now all appeals, even though it's original jurisdiction, all appeals will come to this Court.

I guess I alternatively argue that the appropriate date would have been the date on which the July 1st date on which -- I mean you could argue serially the first time Berks County said we're not going to do it, you know, because it didn't need to be committed to writing or the first time Lancaster or Fayette County said we're not going to recertify, that would have been a decision of the respective boards from which such an appeal would have been required to be filed within two days.

And lastly I think at least as to Lancaster and Berks they sent correspondence July 1st for Berks, July 5th each from one of -- the solicitor in Lancaster was July 5th, the first assistant deputy in Berks was July 1st. And even if you extended grace to those dates -- I think Fayette's might have been earlier -- but even if you said okay, two days from those dates, you know, we're at July 11th and it's not timely.

So even a lot of assumptions in favor of the

Acting Secretary and Department make this case untimely filed, but I think it also has the hallmarks of that we've argued a lack of an actual case or controversy. And I'll come back to the mandamus later, but because the Court is focused on the declaratory judgment --

JUDGE COHN JUBELIRER: But we can look at both. I just mentioned declaratory so --

MR. BUKOWSKI: What I'll say is that the Declaratory Judgments Act precludes, you know, relief when there's not an actual case or controversy. And I guess the Secretary's arguing that she's aggrieved somehow; but she's really not because when you look at the Code, the certified results were submitted. She has no discretion.

If anybody doesn't have discretion at this stage of the 2022 May primary it's the Acting Secretary because these three boards have sent her the certified results, and Mr. Marks did testify when the Secretary gets certified results from the county boards she has no discretion. She has the ministerial duty to certify the election.

JUDGE COHN JUBELIRER: I think that's a legal question.

MR. BUKOWSKI: No. And I'm not suggesting that that's an admission, but that's the argument is that the statute says that and provides for that. And having

received the certified results from these county Boards of Elections, the Secretary had an option at that point, certify; or if she believes what she's asserting now, appeal to this Court within two days not a month and a week or so after those results were received.

So it's not timely and it's not an actual case or controversy because there's no -- I still think there has to be a candidate or, you know, some outcome that would be hanging in the balance for this.

JUDGE COHN JUBELIRER: Did all of the counties do what Berks County did and notify the people who voted by mail or absentee that their ballot was received but without a signature or date so that they had an opportunity to cure?

MR. BUKOWSKI: I believe what Commissioner Leinbach was testifying to was that when --

JUDGE COHN JUBELIRER: Oh, was it --

MR. BUKOWSKI: It was Berks.

JUDGE COHN JUBELIRER: It was Berks, okay.

MR. BUKOWSKI: It was Berks. But when the SURE system itself puts, sends the notices when those are scanned in, then that will --

JUDGE COHN JUBELIRER: So the SURE system.

MR. BUKOWSKI: Notifies voters as to what the status -- it will send an e-mail if they included an

e-mail address.

JUDGE COHN JUBELIRER: Correct.

MR. BUKOWSKI: And then also there's a way for voters to check the status of their ballot, and then they can come in.

JUDGE COHN JUBELIRER: But that status is more than just it was received?

MR. BUKOWSKI: Correct.

JUDGE COHN JUBELIRER: It will tell them if it was -- if it did not have a date or did not have a signature?

MR. BUKOWSKI: Yeah. The answer to your question is I see Mr. King nodding no. I know it is for Berks. I believe it is for Lancaster, but I don't want to swear to it and those folks have left.

JUDGE COHN JUBELIRER: Yes. And he maybe can answer later and that wasn't put on the record, but I was not aware of that if it does exist.

MR. BUKOWSKI: And then going back to -- let me shift because I want to come back to this Court's order on June 2nd --

JUDGE COHN JUBELIRER: Yes.

MR. BUKOWSKI: -- because I was left -- my first thought and then my second thought was, wow, after hearing the way the Secretary interpreted this Court's June

2nd preliminary injunction order because I will come back to that.

But on the mandamus piece, I think, you know, the canvassing and counting of ballots is clearly an act of discretion and whether to count ballots or set aside undated ballots also is an act of discretion. And I think what their argument is, is no it's not because the Court told you to do this.

But we cited Appeal of McCracken which is a 1952 Pennsylvania Supreme Court case that says canvassing and computing necessarily embrace acts of discretion, and then it cites the older case which we also quoted Boord v. Maurer which was I think 1941 or so Pennsylvania Supreme Court.

And based on that alone and then the requirement that mandamus is improper when there's discretion, that should result in the denial/dismissal of count one of their petition.

JUDGE COHN JUBELIRER: Okay. And that's based on the idea that the canvassing and counting is included in the certification?

MR. BUKOWSKI: Correct.

JUDGE COHN JUBELIRER: Okay. So those are different --

MR. BUKOWSKI: Although I guess you only

certify once you canvass and count; and so once your canvassing and counting is done, then you certify. So the discretionary -- and what they're complaining about is the not counting these votes. So I know they're saying and then you certified votes without counting them, but you can't get around the fact that the complaint is that these counties did not count undated absentee and mail-in ballots.

JUDGE COHN JUBELIRER: Okay.

MR. BUKOWSKI: And their rationale for that and this is where I come back to this Court's June 2nd, 2020 [sic] order in McCormick. First as Your Honor pointed out in the colloquy with counsel that that was a preliminary order, and I think it's instructive to quote from parts of Your Honor's opinion in that because it sheds light on what the meaning of the order itself -- and obviously no one knows better than you do what the Court meant.

But on page 21 of your opinion, you're talking about the likelihood of success on the merits prong of the requested preliminary injunction; and you concluded that based on the review of the undisputed facts and the parties' arguments and relevant case law, the Court concludes Petitioners have established they are likely to succeed on the merits.

And I think it's helpful to read the rest of that sentence because Your Honor said, because they have, quote, demonstrated that substantial legal questions must be resolved to determine the rights of the party, end quote; and then there's the cite to the SEIU case and then going on is and their claim is, quote, more than merely viable or plausible, end quote. And so that was the Court's preliminary assessment of the arguments.

And I don't think any of the counties -- I know Berks and Lancaster had no issue with the preliminary order to say okay, let's segregate and count these and submit two tallies. I don't think but I think I understood what the Secretary is arguing now is by saying the magic words canvass, that the Court ordered these counties to certify because they were required as part of this Court's order in Canvass to count.

And once they've counted them, the genie is out of the bottle and they've got to then certify those counted votes; and they have no discretion despite the fact that this Court at the very end of Your Honor's opinion the concluding paragraph states thus when a final decision on the merits of whether the ballots that lacked a dated exterior envelope must be counted or not, the Acting Secretary will have the necessary reports from the county boards.

 And then Your Honor went on in the order to say what it says, and it does say if they're not already do so. Doing so segregate the ballots that lack a dated exterior envelope, canvass those ballots. Assuming there are no deficiencies or irregularities that would require otherwise, report the two vote tallies to the Acting Secretary, include votes with from dated and undated.

And based on all the other language and it's going to be for Your Honor to decide, I cannot imagine that that order meant what the Acting Secretary says it means and then what the results from that are that this Court concluded on the merits and made a final decision that these undated ballots must be counted and therefore included in the certified results.

And if that's their argument, it's up to the Court to decide whether that's what this Court intended. I guess I would ask on behalf of the Berks County and Lancaster County if that's what this Court ordered, the Court should reconsider that order or clarify that order. The Court denied the request to vacate it, and I'd even renew that motion to vacate the order.

JUDGE COHN JUBELIRER: Right.

MR. BUKOWSKI: As I believe, that wasn't what you intended. I think clarification probably does it.

JUDGE COHN JUBELIRER: Well, and yes, I

stand by my opinion and order of course.

MR. BUKOWSKI: Of course. And I think clarity in this case as to what that meant --

JUDGE COHN JUBELIRER: Well, every opinion and order of a Court in a sense takes on a life of its own as it is interpreted and applied in the future.

MR. BUKOWSKI: Right.

JUDGE COHN JUBELIRER: And --

MR. BUKOWSKI: And I do think it's helpful that it was a preliminary order only because --

JUDGE COHN JUBELIRER: Although it was an extensive analysis of the likelihood of success on the merits.

MR. BUKOWSKI: It was. It was. And what I would say is at that point in time, again June 2nd, the Court did not have the benefit of Justice Alito's dissenting opinion in the --

JUDGE COHN JUBELIRER: Although isn't his dissenting opinion also qualified with the fact that it was preliminary, that he was essentially relying on the request for stay that had been given which expressed what Pennsylvania law was at the time and he was relying on that interpretation?

MR. BUKOWSKI: I do think what he -- and I looked at it very closely. I read that dissenting opinion

and compared it to the Third Circuit's opinion. It's certainly -- I was shocked when I reread preparing for today how little the Third Circuit opinion breaks down the elements of the statute in question the way Justice Alito did in, you know, the elements one through five. There's no discussion like that at all in the Third Circuit opinion.

And so I do think for having it a few days even Justice Alito's preliminary analysis and I think he left some room there, but I think he's spot on when it comes to analyzing elements I think it's two and five of the federal statute in describing that you can't possibly -- that statute does not really go to the qualifications of a voter to vote.

It is the or this statute the dating requirement is the act of voting itself and doesn't affect the qualifications of the voter to vote, and therefore it's kind of a circular argument that the Appellant in Migliori and the Third Circuit adopted. And I think the concurring opinion in Migliori I think was quite candid in pointing out that Ritter conceded a couple points that he didn't argue that really left no room.

But I think the statutory analysis that Justice Alito did applies here, and this Court should take that into account and revisit its preliminary analysis of

in McCormick as it contemplates where it will come down on that because I think if it does so the analysis is such that it becomes clear that the federal statute does not apply to abrogate the dating requirement on those absentee ballots.

JUDGE COHN JUBELIRER: Well, I'm not sure that anything required the abrogation. It's an interpretation if you will of the statutory requirement and whether it's, you know -- well, we can --

MR. BUKOWSKI: That's right. It was a suggestion that that was not material to the qualification, and what Justice Alito points out and I agree and urge the Court to consider and agree as well is that that dating requirement doesn't go to the qualification to vote. It goes to whether the vote that was cast will be counted. It's not disenfranchising.

It's not saying the voter, you know, was not qualified to vote; and, therefore, it doesn't have the effect -- let me just say that -- it doesn't have the effect that the Third Circuit concluded it does. And, therefore, the result is that that statute should not result in county Boards of Elections being required to count undated ballots.

I guess I'll leave -- conclude really with and obviously we've filed extensive papers, but I think I'd

like to conclude with what I think is the key language in the In re: Canvass decision from Justice Wecht's opinion. And he goes back time and time again to the Court's decision in the PDP case.

JUDGE COHN JUBELIRER: Before you conclude just one final question and that is the difference between and we can call them, you know, wrongly dated ballots or I hate to -- let's say ballots that contain handwritten dates on the envelopes that are incorrect --

MR. BUKOWSKI: Okay.

JUDGE COHN JUBELIRER: -- or wrong --

MR. BUKOWSKI: Sure.

JUDGE COHN JUBELIRER: -- and ballots that do not contain handwritten dates on them on the outside envelope.

MR. BUKOWSKI: Understood.

JUDGE COHN JUBELIRER: Is that what you believe the Legislature intended in the dating requirement and, if so, how is that helpful?

For example, let's say the Lancaster County case and if the person there, if the daughter had put her birth date, her mother's birth date on there, that wouldn't have helped; but it wouldn't have been -- let me just say this -- it wouldn't have been found not to be counted, right? But it would not have enabled anybody to determine

whether it had been cast prior to her mother's death.

MR. BUKOWSKI: I believe that's absolutely right, and she probably would not be facing criminal charges.

JUDGE COHN JUBELIRER: Right. So how does the dating requirement assist county boards in any way if it's only those people who for whatever reason, and I'm guessing inadvertently, forget to put a date down? Because if people go to all the effort of doing everything else correctly to vote, this is inadvertent, or inadvertently write their birth date on the envelope, why should one be counted versus one not; is that the legislative intent?

MR. BUKOWSKI: Right. And that's the question that keeps coming up because time and time again the Courts come back to that question and say, you know, if you're counting incorrect dates, why aren't you -- why should we not just say, you know, the date requirement is immaterial and count them all?

Two answers I guess. One, the plain language of the statute says it shall be filled out, signed, and dated. Maybe that's not the answer the Court would like to hear, but it's clear language --

JUDGE COHN JUBELIRER: No. That's --

MR. BUKOWSKI: -- and it's mandatory language. And as you did hear uniformly I think from all

the Commissioners, you know, all those ballots that are incorrectly dated as they're processed they're subject to challenge.

And I'm going to make a prediction here I guess -- maybe that's dangerous -- but because the Courts keep saying, you know, that we, that counting the undated ballots somehow means we should count -- or counting the incorrectly dated ballots means we shouldn't, you know, enforce the date requirement that's plainly written in the statute, I suggest that's probably the next set of cases that candidates are going to start challenging ballots that have incorrect dates.

And then we're going to have hearings at county Boards of Elections on that issue because I don't think that's what the Legislature intended, and I think what it intended is that it would be the date that the ballot was signed. The instructions say that. The ballot itself says today's date trying to comply with Justice Wecht's concern or satisfy his concern that there be clear language so the voter knows what's required and what the consequences of not complying are.

And I think that ballot that's Joint Exhibit 1 does that. The instructions, we stipulated the instructions are not in dispute here, that those do that. I'm more familiar with the Berks instructions than

Lancaster, but I've seen them both. They both have detailed instructions that say when you're voting, it's got to be signed and dated or it will not count.

JUDGE COHN JUBELIRER: Okay. Well, you've answered my question. Thank you.

MR. BUKOWSKI: Yeah. Okay. And it really does come down to where I was going to conclude anyway because the language, this language from near the end of Justice Wecht's opinion -- it's on page star 1088 of the Westlaw version, so it seems to be the second from the last paragraph in his opinion before Justice Dougherty's opinion.

And it says, quote, I've returned throughout this opinion to our decision in PDP and I do so once more. I maintained in that case that the Election Code should be interpreted with unstinting fidelity to its terms and that election officials should disqualify ballots that do not comply with unambiguous statutory requirements when determining noncompliance requires no exercise of subjective judgment by election officials.

The date requirement here presents such a case, and that is really -- and to me that's where you can -- that distinguishes the undated from the incorrectly dated ballots because it does not require any subjective judgment by an election official to conclude this ballot is

missing a date and as opposed to trying to interpret whether the date is correct.

So I do believe those incorrectly dated ballots are subject to challenge, and we try and twist ourselves in knots to come up with hypotheticals. And Justice Wecht, you know, said the open-ended inquiry into instead of applying the statute as written and, you know, shall in the same sentence having two meanings, one for the signature and one for the date, you know, we're twisting ourselves in knots trying to come up with materiality, you know, immaterial, minor, you know, discrepancy and words to that effect.

JUDGE COHN JUBELIRER: So it's your position because you see it in Justice Wecht in the final sentence of his last footnote says it is inconsistent with protecting the right to vote to insert more impediments to its exercise than considerations of fraud, election security, and voter qualifications require and that in your opinion, although that may be correct under the way we've interpreted the Election Code, that is up to the General Assembly?

MR. BUKOWSKI: It is and he's calling on and has called for clarification, and I think that's a good idea. But the way it's written right now, it's got to be enforced.

And because again I come back to where these Boards of Election were by June 8th was Migliori's not in effect. They're facing a deadline to certify. This Court's opinion in my view did not intend to require certification of the undated ballots. It never reached a final decision on the merits -- and maybe Your Honor would have gotten there eventually -- but by then we would have had some other arguments to make about the statutory interpretation.

And as I said previously, that's the case that really was best teed up for this Court to make a nonadvisory declaratory judgment. This is not the case. Even though it might provide the clarity and get the issue before the Supreme Court sooner rather than later, I urge the Court to exercise restraint in not taking on that job in this case.

JUDGE COHN JUBELIRER: And so essentially you would ask us to issue an order dismissing --

MR. BUKOWSKI: Correct.

JUDGE COHN JUBELIRER: -- the action?

MR. BUKOWSKI: Correct.

JUDGE COHN JUBELIRER: Okay. Thank you very much.

MR. BUKOWSKI: And then I guess I would also clarify that in doing so I would ask that the Secretary be

ordered to, you know, certify the results of the election.

JUDGE COHN JUBELIRER: Thank you.

MR. BUKOWSKI: Thank you, Your Honor.

MR. KING: May it please the Court. I'll try not to repeat the excellent argument that my colleague just made. I will say that with respect to this action, we join in the request that this action be terminated, be dismissed.

I think it's pretty clear what this action is, Your Honor. It's simply an attempt to ask this Court to modify the order that you entered in McCormick. The order in McCormick did not and certainly Your Honor could have included an order to certify those results. Had Your Honor ordered the certification of those results, I would suggest respectfully that there would have been -- that the appeal that was taken and later discontinued and other appeals would have been taken and that that matter with respect to certification would have been in front of the Court.

I would also suggest that the Secretary has every ability -- she has done it on numerous occasions as this Court knows -- she has every ability to file a King's Bench action in front of the Supreme Court to get this issue in front of them. She could do that tomorrow if she wanted to. And I would suggest that it's likely that there

will be somebody there soon with respect to this issue.

This case is not the case, respectfully, that should go up because this case in particular has other problems with it. It has problems with respect to the fact that Your Honor entered an order that didn't say to certify. And so now what we have is we have a month and a half later, almost two months later we have an action here that is nothing more than a thinly veiled attempt to ask you to modify your order beyond the Judicial Code's provisions for the modification of an order.

So that case was discontinued. The case was no longer pending. No one came back in that case. In the McCormick Oz case, no one came back in that case and said to Your Honor, Your Honor, would you please modify this and require the certification of these results.

And so when you look at, for example, there's a recent case in the Pennsylvania Superior Court which I understand is not binding but it's illustrative and also by Judge King in that Court that talks about this 30-day requirement. It had to do -- you've probably seen it. It's a recent decision. It's published. It has to do with someone asking for counsel fees after the conclusion of a case, and it cites correctly the 30-day requirement, the 30-day provision even though counsel fees seem to be whether they're directly related to the case or not.

And that's exactly what's happening here. This is an attempt by the Secretary, and she was the named Respondent in the McCormick case. It's McCormick versus Chapman, and then we have all these other, you know, Boards of Elections. But she had every opportunity in that case to do exactly what she's trying to do here. She could have asked you to modify your order. She could have said order them to certify it. She could have done all those things. She didn't do that.

And in the absence of doing it, what she's doing is she's doing it here; and this isn't the place to do it. And this case has the great potential to expand the powers of the Secretary of the Commonwealth beyond that contemplated by the Legislature or even that addressed by the Courts. So in this Court we've addressed in the past, in the Fulton County case we've addressed the Secretary's exercising powers that are beyond those granted by the Legislature; and that's exactly what this is an attempt to do.

The Secretary's duties are -- and this is the reason why we asked that this matter be dismissed among others. The Secretary's duties are much like in my hockey analogy which didn't get too far earlier, but I'll try it again. She is much like in a hockey game. She is the scorekeeper. She is not the referee. She is not an

aggrieved party. She is the Commonwealth.

When she comes here -- and I'm telling the Court something that you know better than I. When the Secretary comes here as the Acting Secretary, she comes as the Commonwealth. She doesn't come as Leigh Chapman. She comes as the Honorable Leigh Chapman, the Secretary of the Commonwealth, which means she's invoking the Commonwealth. She's not an aggrieved person.

There is no aggrieved person in this matter. There is no case or controversy here. This is asking for an advisory opinion. It's asking even worse to seek to modify your opinion in the McCormick case which I would suggest at this point is res judicata with respect to this matter and certainly is the rule or law of the case, and no one asked in that case to modify it to include certification. It never happened.

JUDGE COHN JUBELIRER: But let me give you just a hypothetical.

MR. KING: Yes, ma'am.

JUDGE COHN JUBELIRER: Assume that one of the counties certified results that are not consistent with the law for whatever reason and nobody, you know, there was no challenge but left out a municipality. Or I mean I'm trying to think of something where it's clear to the Secretary and it would be clear that what they've done is

not consistent.

Is she still required by law then, she has no discretion, she must certify that or would she be able to in that case file a mandamus saying no, you have to certify, you have to include in your totals what is required under the law?

MR. KING: In our opinion, since you asked, in our opinion, she is already certifying results which are inconsistent from county to county. I spoke about the Ziccarelli case. Clearly the Ziccarelli case is a startling result to me that two counties can count the votes differently. That's exactly what they did in Ziccarelli, and we have a Senator Brewster sitting in the Pennsylvania Senate right now as a result of the largesse of the federal court in not invoking the Bush Gore doctrine which should have applied.

And so I would also suggest, Your Honor, since you asked me, I would also suggest that this is happening as we sit here, as we stand here because what's happening with respect -- you asked about the SURE system and the signatures and the curing. That's commonly referred to as curing. Somebody sends it in and it needs to be fixed.

And so there is a great debate in this Commonwealth about whether curing -- and the Court, the

Supreme Court addressed it only in passing. And so there is a mention in the Boockvar case that there is no provision in the Election Code for curing. There is none.

So in the 2020 election people were talking about all sorts of curing. They were talking about they might have voted for the wrong person. They wanted to come in after the mail ballot came in. They want to come in and get their mail ballot back and vote for the other guy. And so there was that sort of curing.

There is also this curing which is of great controversy over all these counties. Some counties allow curing. Some counties don't allow curing. Some counties like Montgomery put the ballots out on a card table out in the hall and allow people from political parties to come in and bring people in to try to cure the ballots. Some people --

JUDGE COHN JUBELIRER: They don't allow for opening, but you mean allow them to come in. I mean I'm asking. I wouldn't imagine they would be allowed to open them; but if somebody forgets to put a date on --

MR. KING: Yes.

JUDGE COHN JUBELIRER: -- they can come in and put a date on.

MR. KING: That's what I --

JUDGE COHN JUBELIRER: Is that what you're

talking about curing?

MR. KING: It is what I'm talking about curing. However, there are also -- what also happens is that people have been advised that it's okay to vote provisionally after they've already voted by this mail-in system. So then they vote by the mail-in system. It goes into the SURE system, and somebody shows up and votes provisionally afterwards. We have --

JUDGE COHN JUBELIRER: But they have a method of checking that, right? Everybody has their --

MR. KING: Yes.

JUDGE COHN JUBELIRER: Right.

MR. KING: But --

JUDGE COHN JUBELIRER: So and this isn't really of record. You know, we're talking about evidence --

MR. KING: You asked.

JUDGE COHN JUBELIRER: -- that wasn't presented. Yes. And thank you. I appreciate your answer but --

MR. KING: I was getting back to your question.

JUDGE COHN JUBELIRER: Yes.

MR. KING: I was getting back to your question which was, well, what would the Secretary do if

she saw that counties --

JUDGE COHN JUBELIRER: Well, I was just asking about limits of discretion, and you seem to be arguing that there are -- that she has absolutely no discretion.

MR. KING: That's what the statute says. She is a member of the executive branch. She is -- that's the executive branch's role. The Legislature set up the Election Code, set up the methods. They've set up the rules of who did what, and the statute -- I'm not going to read it again -- but it's crystal clear. It says exactly what the Secretary is to do. She is to tabulate. She is to receive. She is to tabulate, and she is to announce the results.

And here we are in Pennsylvania we're in July, almost August and to the surprise of lots of people out there, whoever's watching this on YouTube or elsewhere, that the Governor's race isn't certified yet and the United States Senate race isn't certified, Congressional races aren't certified, House races aren't certified, and Senate races aren't certified in these three counties. And across the state the Governor's race isn't certified or the U.S. Senate race.

So we do have -- she does have the -- and this is why and I'll just go through these quickly as to

why we say that this case is inappropriate. But she does have the mandatory obligation to tally these results from the counties. There's nothing that the counties have done here which is incorrect or inaccurate. And I say that because Your Honor's order did not say to certify.

And also I say this because the Migliori case which was once the Ritter case and became Migliori is pending on certiorari before the United States Supreme Court. So if this Court were to enter an order today, tomorrow, the next day, next week and all of a sudden the Supreme Court of the United States grants certiorari and will hear the argument of whether it's correct or not, then Your Honor has read Mr. Justice Alito's opinion that he says that in almost in these words that he thinks the Third Circuit likely got it wrong.

And I agree with my colleague that when you look at Justice Alito's opinion, his dissent on the grant of an emergency order -- and we know that these emergency orders are currently disfavored by the Court because they --

JUDGE COHN JUBELIRER: Well, and he also said that it's based on the review that he's been able to conduct in the time allowed and that he doesn't rule out the possibility that further briefing and argument, you know, might convince him that his current view is

unfounded. So it's a preliminary review --

MR. KING: Yes.

JUDGE COHN JUBELIRER: -- without benefit of argument. But then so we still do have a Third Circuit opinion that is in effect.

MR. KING: Yes, except it's also on appeal.

So I would also add these things because I know we've taken up a lot of your time, and we appreciate it very much. I would add these. There is no emergency in this matter. This is an emergency petition before you. The party who comes here created the emergency by not performing her duties. She didn't certify the election, and she didn't perform her --

You heard the testimony from the Deputy Secretary, and he's a real gentleman. And I want to say that we work with him all the time. He is just a terrific person to have in government, and he's a truthful witness. And he said, our duties are ministerial. That's exactly what their duties are.

They're not supposed to and this Court should not, I say respectfully, should not vest the Secretary with the power to start to investigate how these certifications took place because, for example -- I won't go off on a tangent -- for example, with respect to this thing about curing, the next Secretary of the Commonwealth

-- let's say that a republican Governor is elected this fall and the next Secretary of the Commonwealth says that curing's not permitted, will that Secretary of the Commonwealth be in here saying to you that these counties like Allegheny and Philadelphia and so forth now have to recertify their results because they allowed curing?

And I will tell you, curing is a very real issue that's likely to be before this Court and that Court soon, and the Supreme Court soon. So there is no emergency other than that created by the party that's here before you asking to get emergency relief.

There is also no case or controversy. This action is merely, this merely masquerades as a request for an advisory opinion at best. At worst it's an attempt to circumvent the system by attempting to get you, Your Honor, to modify -- and that's the exact word to modify -- your prior order which did not include the term certify. Had Your Honor wanted to say that everybody should certify, then you could have said that and I suggest you would have said it if you wanted to.

I would also say that the Petitioners here have taken opposite and contrary positions in their guidance and in their briefs and pleadings. I will also say that with respect to this issue of the undated ballots and the wrong dated ballots, part of the problem created in

this Commonwealth is from the guidance issued by the Secretary of the Commonwealth telling these county boards that they must count the wrong dated ballots.

And I would suggest to you and I agree with in the question that you posed to Mr. Bukowski I want to join in his answer. I think it's entirely correct to challenge the dates that, for example, predate the issuance of the ballots. I think that's entirely correct. I think that people who put dates on here that would perhaps go past the eight o'clock receipt date, I think that if you put dates like that that they could be challenged.

So I think that that guidance that was issued was incorrect. And so we have the Secretary who issued the incorrect guidance now suggesting that because people have counted ballots with other dates on them, that now we have to count them all. I just don't think that's right.

I would also say, of course, I've said this the Ritter case is still pending in the Supreme Court. The Petitioners come -- I did say and I'm really proud to have found this, Your Honor, because you asked me earlier and I got a little nervous. You asked me if I raised unclean hands. So I'm proud to tell you that I found it, and I did raise unclean hands.

JUDGE COHN JUBELIRER: In the papers in the

emergency --

MR. KING: In my response.

JUDGE COHN JUBELIRER: In your response.

MR. KING: Yes, Your Honor.

JUDGE COHN JUBELIRER: Okay.

MR. KING: And so what we said is the Petitioners have come before this Court with unclean hands and having failed to comply with statutory limitations and having failed to comply with statutory obligations to certify the election. We said they have unclean hands because she has this affirmative duty to do this.

And, you know, the unfortunate part about mandamus is that, as the Court well knows, you can't file a counterclaim. So it's not possible to do that in a mandamus case. Had it been possible, I would have filed; and Mr. Bukowski pointed that out to me right away the first time we spoke, you can't do that. And so I said well, that's too bad. I'd like to do it. So had I been able to do it, I would file a counterclaim here and say you need to certify this election.

And as the Court understood and heard, there are consequences to this. The consequences to this are drastic because this case would seemingly give people the opportunity to make a collateral attack on an order that's already been entered and to do so in an untimely manner in

a different case than the case in which the order arose. And so nobody did it in McCormick; and, therefore, nobody appealed it in McCormick because it wasn't there.

The parties who were in McCormick, only some of them are here today. The rest of the parties in McCormick -- which is what they're asking you to do is modify the order from that case -- all the rest of those parties aren't here. There's a whole bunch of other county boards who were parties and would be entitled to be here.

I would also suggest that as I said earlier McCormick does not require, your opinion in McCormick does not require the result that's sought here. And for all of these reasons and for the reason that expanding the Secretary's powers would not be something that we would expect the Commonwealth Court of Pennsylvania to countenance, this would expand her power to investigate as opposed to perform the ministerial function of calculating the tallies of the votes.

And it would give her the ability -- this case for the first time I think you heard the witness say, Mr. Marks, the Deputy Secretary, say he's never heard of this happening before. I've never heard of it happening before, but certainly the Court would have more experience than we would. I've not ever heard of this happening before, and I don't think it has happened before.

It's a ministerial function, and these boards -- by the way on the opposite side of that coin, these boards perform a quasi-judicial function. So it's not the question of whether the ballot is to be counted. It's whether these people make the decision of whether to count it or not, right? That's the discretion that they're exercising is whether to count the ballot that has the signature -- or the date missing on it and that's a discretionary -- and that's exactly the discretion that they exercised here or all three of them wouldn't be here.

So when people exercise discretionary functions like that, then certainly mandamus does not lie; and this is clearly a case where mandamus should not lie. If anything were to survive today's proceeding, the declaratory judgment action at best would survive. But again with respect -- and the mandamus action just simply cannot survive. With all due respect, Judge, the mandamus cannot for all the reasons we've all said, there's no way in the world this is a mandamus case.

Secondly, there's no way in the world this is a proper dec action case. It's not a proper dec action case because there is no aggrieved party, and they've failed to follow the requirements of the statutes. There's no candidate. There is no person. There is no contest. There is no election in question. This is simply an

advisory opinion that they seek.

And by the way, if they want such an opinion, when you read the King's Bench rules -- which I know Your Honor has read many times -- when you read the King's Bench rules, you can likely take that issue up with the Supreme Court and you'll likely get some decision on it. And so that would be the appropriate place for them to take this, not by using this vehicle.

There are so many -- you know, we filed preliminary objections. I'm not going to go into all those details. I think we've raised all the things I talked about. We incorporated them into our response here, but there are so many issues. This is not a great case to ultimately decide this issue, and they have other means to do it.

So thank you very much for your time, Your Honor. Glad to answer any other questions if you have any.

JUDGE COHN JUBELIRER: I don't believe I have any other. You've answered them all.

MR. KING: Thank you very much. It's my honor to be here.

JUDGE COHN JUBELIRER: Thank you.

MR. BOYER: Thank you, Your Honor. I know it's been a long day, so I will endeavor to keep this brief and just make a few what I believe to be important points.

Number one, this is exactly the right action for these circumstances. There's no statute that contemplates what the counties are doing here which is refusing to include from their certifications lawfully cast and canvassed ballots. Under 3158 and 3159 of the Election Code by refusing to do that, they are interfering with the Secretary's statutory obligation to receive those accurately completed certifications and then perform her own certifications of those results.

You heard allusions to this may not be the right time, that Mr. Marks has made clear what the Department was doing. It was communicating with the counties and was prevailing upon the counties, it was convincing the counties successfully in those back and forths; and I do not think we want the precedent to be the Department must sue a county immediately if there's a hint of disagreement.

There's been a lot of talk including from us about the significance of Your Honor's decision in McCormick. I think --

JUDGE COHN JUBELIRER: Listen, if you could just talk a little slower and louder, that would be helpful.

MR. BOYER: Forgive me. I will. I didn't want to take up any more of your time --

JUDGE COHN JUBELIRER: I know.

MR. BOYER: -- but I will slow down.

JUDGE COHN JUBELIRER: Thank you.

MR. BOYER: We have made our points on McCormick clear. I'll add a few additional ones. I recognize that it was a preliminary injunction, but the order is the order and it says what it says.

And we have laid out our belief of the consequences of what follows from that order and our understanding of, you know, the direction to separately tally ballots that -- excuse me, votes that -- separately tally a count that excludes undated ballots was to preserve the opportunity for a different decision and final judgment on appeal. Of course that never same.

JUDGE COHN JUBELIRER: So what is the effect of that? Did the order to separately tally the ballots the way it was written you think then what happened convert to a final order of certification or --

MR. BOYER: It didn't convert to a final order of certification. I think the clear consequence of the Court's legal analysis and ultimately its order was that these ballots at issue which are the same ballots we're here talking about today were lawfully cast. That order was never -- it wasn't vacated. It wasn't contravened by a final judgment by Your Honor.

JUDGE COHN JUBELIRER: So if the case hadn't been dismissed and there had been further arguments and orders, in that case what would have happened to this order?

MR. BOYER: I think it depends on what order Your Honor ultimately entered. If Your Honor entered an order saying much like the order granting preliminary injunction these are lawful ballots, they must be canvassed, they must be canvassed -- excuse me, canvassed, counted, we'd be in the exact same position.

JUDGE COHN JUBELIRER: So it really in your mind the effect of the order not vacating the opinion and order is somehow influencing your argument here?

MR. BOYER: I think it's one, the existence of the order; two, Your Honor's decision not to vacate it; and three, no other order whether from a final judgment from Your Honor or on appeal. There's only been one order. It's to canvass these ballots. It said separately exclude ballots in case there's a different decision. That theoretical possibility never arrived.

JUDGE COHN JUBELIRER: Okay.

MR. BOYER: I'd like to move quickly to In Re: Canvass and make a couple of points about that. I think Your Honor's questions got at this, but it is absolutely not precedential. I know there is one decision,

an unprecedential decision from this Court in Ritter reaching a contrary conclusion; but respectfully, the case law cited there doesn't support what the Court did. In Pennsylvania we follow the Marks rule which means the narrowest rationale in support of a judgment is precedential.

So no matter what the narrowest rationale is, the judgment was that the ballots be counted; and the only precedent that can follow is a rationale in support of counting those votes.

JUDGE COHN JUBELIRER: When you say the narrowest -- and again you're speeding up --

MR. BOYER: I'm sorry.

JUDGE COHN JUBELIRER: But the narrowest interpretation in support of the judgment in your mind, that would be the judgment of the Court which was to count the ballots?

MR. BOYER: Yes. The judgment of the Court was unequivocally to count the ballots. Under the Marks principle which Pennsylvania follows and the Supreme Court said that as recently as in 2020 in a decision called Commonwealth v. Alexander, and I'm looking for the citation.

JUDGE COHN JUBELIRER: That was in your brief?

MR. BOYER: I don't believe it was in our papers, so we weren't responding to the argument about --

JUDGE COHN JUBELIRER: Right. I think it was cited in the Ritter.

MR. BOYER: I think it was cited in Ritter as well; but it makes clear Pennsylvania follows the rule that says if there is to be precedent when there is no majority opinion, it can only be a rationale that supports the judgment. In Downington, another decision of this Court from earlier this year, all three Judges of this Court agreed that no precedent from In Re: Canvass. Your Honor, of course, reached that conclusion correctly as well.

I'd like to make a couple points about what to do with Justice Wecht and why under the circumstances it would be particularly appropriate notwithstanding that the case law doesn't support treating it as precedential. There were five days in In Re: Canvass between when the Court granted emergency jurisdiction and issued its decision. There was not extensive time for the Court to consider the issue. There was not oral argument.

So under these circumstances whereby the law of Pennsylvania it is dicta at most for Justice Wecht to say in a future election I would do so and so, number one, it's dicta; and number two, under those circumstances given

how expedited the review was and the narrowest briefing was mostly on the emergency petitions anyway, the arguments are not as fully developed as they are now as you acknowledge, as Your Honor acknowledged in McCormick.

So, number one, under Pennsylvania precedent there's nothing there that's precedential; and number two, the circumstances are particularly compelling to sort of consider this issue freshly.

I'd like to make just two final points. Number one, counsel referred to some of the inconsistencies about the Secretary's authority and the positions she has taken and made specific mention and also questioned Mr. Marks about the Ziccarelli matter but without giving any context for what the request from the plaintiffs was there.

After the In Re: Canvass decision in which the Supreme Court of Pennsylvania told Allegheny County it can count undated ballots, the plaintiffs then sued the Secretary in federal court for refusing to follow the Supreme Court's order. And in that context she said she has no authority to overrule a Court to say if a Court says these ballots may be counted, I, the Secretary, have no authority to overrule a Court.

And if you look at page 8 of Fayette County's Exhibit D, it's quite clear what the context of that brief is; and the same is true here. We're here

because the Court's order and because case law compels the counties to include in their certifications the ballots that are at issue.

Much like in Ziccarelli, we have no independent authority. We're bound by the decisions of the Court. We're bound by the Election Code; and until we receive complete certifications of all lawfully cast votes from the counties as the Courts have defined it, the Secretary cannot complete her statutory duties.

JUDGE COHN JUBELIRER: And so in your mind the Secretary has the discretion to -- well, am I correct in understanding your argument is that when she certifies the results, she must do it in a way that follows the law, and what she's here asking is essentially in some way for the Court to determine what is the law and what is required by these counties so that the certification will be accurate and her understanding is that these three counties like the other 64 counties should count the undated ballots?

MR. BOYER: Yes, but I'll add a caveat --

JUDGE COHN JUBELIRER: Yes, thank you. I want to make sure --

MR. BOYER: -- to clarify what the Secretary's --

JUDGE COHN JUBELIRER: -- I fully

understand. It's a little --

MR. BOYER: It is correct to say the Secretary cannot certify results if she receives from the counties incomplete certifications and incomplete by virtue of them excluding lawfully cast ballots. She does not have the independent authority to decide what constitutes a lawfully cast ballot or not. That's up to the Courts. And in this context the Courts have spoken as to what qualifies as a lawfully cast ballot.

JUDGE COHN JUBELIRER: So she's here trying to give effect to a Court's decision and how she understands it?

MR. BOYER: Correct. If you imagine two poles, at one a Secretary who believes she has the independent authority to review and make her own judgments of the law; another a Secretary that's purely a rubber stamp even if there are patently mistakes in the certifications whether they're clerical, whether there are whole swaths of ballots. I think the Secretary's authority clearly falls somewhere in between those.

And when there is a decision or decisions of the Court that say the certifications are excluding ballots that under state law, under federal law, under the consequences of this Court's order must be canvassed and counted, those ballots cannot be excluded from

certification. The Secretary is aware of those Court decisions and not --

JUDGE COHN JUBELIRER: And now a final question by me is, if I just assume for the sake of argument that I don't agree with your interpretation of the June 2nd order, is that the end of it or are you still relying on the Migliori case or federal law or any other opinion of the Court that would support your position?

MR. BOYER: If Your Honor disagrees with our read of the June 2nd order, I believe that's it for the mandamus count but not for the declaratory and injunctive relief count. I think the arguments we have presented make it clear as to why even in the absence of that order the law does require the counties to include these certifications under the reasoning announced and articulated in the opinion from Your Honor, in the opinion from the Third Circuit.

So yes, the mandamus count does depend on the consequence of the order. The declaratory and injunctive relief count does not.

JUDGE COHN JUBELIRER: Okay. Thank you.

MR. BOYER: I would like to make one last point about uniformity and finality. The Secretary has been pushing for uniformity and finality on this issue for quite some time now, and it's desperately needed.

I'll say and this is exactly the right case to do it, and there is a clear case in controversy. The issues are squarely presented, thoroughly briefed in Pennsylvania law, and voters generally need clarity on these issues; and I think we have presented reasons why clarity should counsel for counting these ballots and ultimately have them included in the final certifications of elections.

Thank you, Your Honor.

JUDGE COHN JUBELIRER: Thank you very much.

As we conclude this very long day, I want to thank all of you for your preparation, for your thoughtful legal arguments, and a very thorough presentation of the issues. Clearly you're all extremely knowledgeable; and while you and the parties have different interpretations of the law, you are united in appreciating the importance of your common purpose to assure that ballots are accurately counted and that the voters of Pennsylvania can exercise their right to vote for the candidates of their choice in a free and fair election.

I want to recognize all the county boards, the county boards that were here as well as all of the county boards and election workers who steadfastly and tirelessly work to meet the challenge; and we heard some of what is involved with that today.

It is now the Court's responsibility to render a decision based on the law and applying the law to the facts of this case. While it's a challenging task in this very interesting and very important case, your advocacy, both oral and written, will guide the Court's decision.

So I thank you all very much, and with that I believe we can conclude.

(Whereupon, at 4:45 p.m., the hearing was adjourned.)

***

CERTIFICATE

I hereby certify that the foregoing proceedings, docket number 355 M.D. 2022, were reported by me on July 28, 2022, and that I, Judith E. Shuller, have read this transcript and attest that this transcript is a true and accurate record of the proceedings.

By:____________________________
Judith E. Shuller

**WORD INDEX**

< 0 >
**02-2-02** 152:9

< 1 >
**1** 1:1 4:2, 19 5:6 19:24 20:1, 23 37:11 108:21, 22, 25 109:1, 2 195:2 199:5 201:25 202:1 232:23
**1:00** 108:4
**1:43** 140:19
**10** 4:16 31:12, 14 55:16 173:6, 12, 13 174:4
**10:00** 1:1
**101(e** 205:17
**1050** 1:1
**108** 4:9, 23 5:4, 6, 8, 10, 12, 13, 17, 20, 21 6:5
**1088** 233:9
**109** 4:5, 6, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 23 5:4, 6, 8, 10, 12, 13, 17, 20, 21, 23 6:5
**10th** 119:4 120:1 163:8, 10, 17, 22, 23, 24 164:3, 6, 15 169:9, 10, 11, 14 202:9 203:25 219:3
**11** 4:17 27:10, 12 52:16 56:19 97:6, 8 175:5
**11/23/20** 6:2
**111** 3:4
**11th** 41:16 42:4 97:4 219:24
**12** 4:18 32:8, 9, 11 57:18
**12:10** 105:17
**12:15** 107:22 108:3
**12:32** 55:22
**120** 3:5
**121** 3:6
**125** 3:8
**128** 2:1
**12th** 203:25
**13** 4:19 32:8 33:7, 11 57:9, 11, 12
**1302(d)(a)(2** 191:24
**1302.2** 191:21
**138** 3:9 177:3, 10
**14** 4:19 32:8 33:23, 25 41:22 108:25 189:12, 18
**140** 76:12
**141** 3:11
**14th** 158:21
**150** 3:12
**155** 3:13
**157** 3:11 5:16
**159** 3:12
**15th** 178:16
**16** 3:4
**160** 3:15
**1600** 1:1
**16001** 2:1
**167** 3:16
**176** 3:17
**17th** 25:22 26:5 28:11, 16 29:15 30:11 32:24 46:11 47:3 48:3, 8 52:16 54:10 55:21 58:12 113:22, 24 137:9 163:18 172:22 194:23
**18** 16:15 189:18
**180** 59:8
**181** 3:15
**183** 3:16
**186** 3:17
**19** 4:5
**19103** 1:1
**1922** 201:25
**1932** 199:6
**1941** 223:13
**1952** 223:10
**19610** 1:1
**1A** 63:7
**1B** 63:7
**1st** 32:18 48:12 57:2, 18 175:11 219:10, 18, 20

< 2 >
**2** 4:6 5:2, 6 41:15, 17 42:1, 3, 7 108:21 109:1 118:23, 24, 25 133:18 158:10
**2:42** 186:11
**2:50** 186:11
**20** 87:7
**20,000** 104:11
**2000s** 65:19
**2003** 16:15 196:3
**2019** 16:17
**2020** 6:5 21:16, 19 23:22 24:14 41:16 42:4, 12 46:3, 13 47:2, 15 67:13 84:25 85:1 129:6 136:17 183:20, 23 209:21 210:1, 11 224:12 241:4 255:21
**2021** 214:7
**2022** 1:1 4:9 18:14 21:10, 14 24:10, 13 26:5 27:18 29:15 32:24 34:8, 23 35:23 41:14 46:11, 16, 23 47:3 48:8, 13 49:14 51:3, 14, 15, 18, 20, 24 53:25 55:6, 9, 22 58:12 90:8 97:6, 8 114:13 119:4, 19 120:1 133:20 144:7, 17 148:3 152:23 153:17 158:14, 17, 21 159:4 163:8 167:4 168:12, 18 169:6, 24 171:10, 22 172:2, 6, 23 173:3 174:22 175:2 176:9 187:4 213:14 220:15 263:3, 4
**209** 3:17
**20-day** 87:10 88:5 95:22
**20-some** 104:6
**20th** 23:6 46:20 172:2 213:22
**21** 224:19
**22** 134:23
**236** 3:17
**238** 200:12
**23rd** 54:23 132:8
**24** 4:12 56:12
**24th** 58:13 59:3, 13 132:11 133:2 203:25
**25** 84:6 191:6 195:13 201:4
**251** 3:17
**25th** 159:4
**2621(f** 84:6
**263** 1:1
**2642** 216:20
**26th** 158:14
**27** 4:17 16:11
**27th** 29:7 31:5 48:12 55:6, 9, 11 59:17 172:23 173:3 194:23, 25 219:4
**28** 1:1 4:14 16:11 263:4
**28th** 31:21 42:12 47:2 55:22 103:13 158:17 174:2, 21
**29th** 27:18 28:12 33:4 34:18, 19 48:16, 17 56:6 96:24 103:14 114:5 121:2 175:2, 8 195:1
**2nd** 26:23 27:2 46:9, 16 53:25 118:14, 15 119:19 121:12 122:22 131:17 133:2, 10 136:4 149:8 171:10, 22 187:16 188:11 189:11 190:16 198:5, 10 203:7 204:11 205:14 209:20 214:17 222:21 223:1 224:11 227:15 260:6, 10

< 3 >
**3** 4:6 5:8 6:5 42:10, 15, 20, 25 45:4 192:1
**3/21/22** 5:6
**30** 4:15 96:4, 12 97:8
**300** 1:1
**3001** 1:1
**30-day** 237:20, 23, 24
**30th** 103:14
**31** 4:16
**3146.4** 200:23
**3146.6** 198:12, 23
**3146.8** 191:6 192:16 197:12, 21 198:23 199:22 218:2
**3146.8(g** 192:9
**3150.14** 200:23
**3154** 192:6, 13 193:17 197:21 208:23
**3154(f** 193:23
**3157** 12:3 195:13 196:4, 5, 15 197:1, 22 218:3, 4
**3157(d** 196:16
**3158** 206:15 252:5
**3159** 75:21 76:1, 6 84:7 206:16 252:5
**31st** 213:25
**32** 4:18
**33** 4:19
**355** 1:1 263:3
**3553** 201:4
**36** 3:5
**378** 200:12
**3rd** 84:24 85:1

< 4 >
**4** 4:9 5:10 108:20 158:7 192:10
**4/1/22** 5:8
**4:17** 33:15
**4:45** 262:9
**40-some** 155:24
**42** 4:6, 8
**45** 108:1
**48** 56:12

< 5 >
**5** 4:9 5:13 42:24 58:17, 18, 21 59:8 83:8 108:22 109:3
**5/24/22** 4:9
**5:00** 35:7
**507** 177:2, 10
**50-some** 155:24
**52** 205:17
**55** 4:13
**58** 4:11
**5th** 33:15 34:23 57:9, 12, 16 219:19, 20

< 6 >
**6** 4:12 5:13 24:17, 19 48:1 52:12 54:11 58:13 88:8, 10 96:15 117:21 139:22 157:11 172:22 189:18 218:19
**6/1/21** 5:17
**6/10/22** 5:2
**6/17/22** 4:12
**6/2/22** 4:19
**6/23/22** 4:13
**6/27/22** 4:14, 15
**6/28/22** 4:16
**6/29/22** 4:17
**6:31** 34:8
**601** 1:1
**61** 3:6
**64** 50:7 113:22 120:10, 14 216:15 258:18
**645** 177:5, 13
**67** 17:17 30:4 49:8 60:15 78:18, 19 79:13 84:22 94:5 112:11 113:18

**6th** 48:22 51:6, 14, 15 52:22 90:8 118:5 149:1 181:17, 22 182:3, 6

< 7 >
**7** 4:13 54:22 55:2 88:8, 10 96:15 139:23
**7/1/22** 4:18
**7/8/22** 4:19
**7:00** 18:25 129:2 166:22
**77** 126:21 136:21, 23, 25
**7th** 48:22 51:20 52:22 90:8 118:5 139:20 140:3 218:19

< 8 >
**8** 4:14 28:18, 21, 24 55:5 88:8, 10 96:15 139:23 190:24 257:23
**8:00** 21:9, 17, 18 128:20, 21 142:20 143:21 162:5, 13, 18, 25
**8:01** 143:4, 10
**82** 155:23
**83** 5:23
**8th** 34:8 48:23 51:3, 4, 18, 24 52:22 90:8 118:6 167:11 176:9, 15 181:20 182:1, 2, 8 218:19 235:2

< 9 >
**9** 4:15 30:13, 15 55:9 190:24
**9/11/20** 4:6
**9/28/20** 4:6
**9:08** 26:5 48:3
**9th** 46:23 52:6 164:15 169:13 214:2

< A >
**A.3d** 200:12
**a.m** 1:1 18:25 26:5 48:4 166:22
**abide** 87:17 142:4
**abided** 175:23
**ability** 69:17 236:21, 22 249:19
**able** 69:14 104:9 127:1 169:21 173:18 181:25 194:18 240:3 244:22 248:19
**abrogate** 229:4
**abrogation** 229:7
**absence** 238:10 260:13
**absent** 164:2
**Absentee** 4:9 6:4 17:8 18:22 19:23 21:6, 8, 23 38:3 42:21 43:11, 24 45:6, 11 47:4 48:15 59:9 60:2, 17 84:25 124:11, 18 128:18, 20, 21 130:11 133:22, 23 142:18, 20 145:3, 4 157:16 159:19 162:3, 10 164:8, 23 165:22 167:23 168:18, 24 169:25 172:11 183:22 188:16 191:7, 20 197:10 198:13, 14 199:11 200:23 205:7 210:9 221:12 224:7 229:4
**Absolutely** 14:11 91:21 138:9 163:20 197:9 231:2 243:4 254:25
**absurd** 202:2, 13, 18
**accept** 71:16 79:12 84:17 104:1
**accepted** 62:17 165:5
**accident** 143:23
**accorded** 10:23
**account** 228:25
**accuracy** 170:3 202:6 204:10, 13
**accurate** 19:20 22:24 206:16 208:25 258:17 263:6
**accurately** 252:8 261:17
**accused** 62:3 101:2, 16
**acknowledge** 187:25 257:3
**acknowledged** 257:4
**act** 19:10, 11 45:12, 18 136:21, 23, 25 168:2 195:8 199:4 202:1 220:9 223:5, 6 228:16
**Acting** 1:1 7:4 8:3 10:8 35:8 53:14 66:24 67:1 119:9 160:19 167:5 176:15 186:14 216:5, 11 218:25 220:1, 15 225:23 226:6, 10 239:4
**action** 7:22 26:25 35:9 37:6 70:22 71:5, 9 74:17 84:23 171:7 180:4, 6, 14 183:7 206:15 216:13 219:3 235:20 236:6, 7, 9, 23 237:7 246:13 250:15, 16, 21 252:1
**actions** 82:7 122:18
**acts** 223:11
**Act's** 201:22
**actual** 8:5 216:8 220:3, 10 221:6
**ad** 72:6
**add** 124:9 136:19 151:3 166:17 193:21 245:7, 9 253:5 258:20
**adding** 18:21
**addition** 8:19 119:17 197:20 205:12
**additional** 58:11 106:22 175:13 196:24 253:5
**Additionally** 202:16 203:4
**address** 8:22 9:5 133:10 209:22 213:16 214:5 222:1
**addressed** 56:18 175:2 238:14, 15, 16 241:1
**addresses** 34:25 208:15
**addressing** 9:6
**adequate** 200:20
**adjourned** 132:18 133:6 262:10
**adjudged** 196:10
**adjudicate** 161:21 169:23
**adjudicated** 170:1, 2, 22
**adjudication** 124:12 161:23
**administer** 16:23
**administered** 127:4
**administering** 16:21
**administers** 129:22 141:24 142:1
**administration** 16:19, 24 17:1 18:3 126:12 161:1, 8 194:12
**administrative** 22:8 59:17 94:22 95:7 98:13 99:25 100:4 105:10 219:4
**admissible** 151:9
**admission** 151:6 157:5, 7 220:24
**admit** 151:3, 16, 21 152:20
**admitted** 108:13, 17 145:20
**adopt** 212:17
**adopted** 228:19
**advance** 196:6
**advertise** 71:25
**advise** 34:11
**advised** 134:18 242:4
**advisory** 217:14 239:11 246:14 251:1
**advocacy** 213:8 262:5
**affect** 110:7, 11 145:24 228:16
**affiant** 85:9, 10
**Affidavit** 158:7
**affirmative** 248:11
**afternoon** 125:21 141:8, 9, 13 150:21 160:15, 16 167:20, 21 176:22, 23
**aggrieved** 87:23 195:14 217:19 218:18, 25 220:11 239:1, 8, 9 250:22
**ago** 62:14 178:7
**agree** 14:6, 9 32:4 40:22 51:1, 24 54:6 63:21 86:12 107:10 108:11 128:19 129:8 141:23 142:2 148:10, 14 150:6 151:6 152:16 190:8 210:12 211:4, 19 215:10 218:7 229:12, 13 244:16 247:4 260:5
**agreed** 118:7 121:19 256:11
**ahead** 12:21 85:21 132:12
**air** 137:11
**aisle** 139:2
**Alexander** 255:22
**Alito** 5:13 228:4, 24 229:12
**Alito's** 227:16 228:9 244:13, 17
**alive** 102:16 146:3
**allegation** 103:7
**allegedly** 101:6 102:11
**Allegheny** 67:17, 20 69:3, 11 71:13, 14 104:4, 10 246:5 257:16
**allow** 13:9 64:18 99:13 100:16 241:11, 12, 14, 17, 18
**allowed** 115:21 131:22 149:18 241:19 244:23 246:6
**allows** 217:23
**alluded** 12:8 198:16
**allusions** 252:10
**Alternative** 83:11
**Alternatively** 119:6 219:8
**ambiguities** 203:8
**ambiguity** 95:17 196:18 201:21 203:4
**ambiguous** 136:18 201:23
**ambiguousness** 137:1
**amended** 71:16 83:10
**Amicus** 5:6, 8
**amiss** 11:4
**amount** 52:19
**analogizing** 80:10

**analogy** 81:4 238:23
**analysis** 24:14 99:4 190:14, 21 199:20 200:8 212:18, 24 213:9 214:9 227:12 228:9, 23, 25 229:2 253:21
**analyzing** 228:11
**and/or** 165:22 170:18
**anecdotally** 22:17
**announce** 243:13
**announced** 260:15
**announcing** 210:23 211:5
**answer** 44:15 73:2, 5 74:19 75:1, 16 80:22 87:19 94:2 99:13 100:16 103:2 106:21 119:21 152:13 159:9 163:11 165:11 201:3 202:17, 24 215:17 217:12 222:12, 17 231:21 242:19 247:6 251:17
**answered** 233:5 251:19
**answers** 116:4 119:8 201:11, 17 231:19
**anticipated** 171:17
**anticipating** 7:12
**anybody** 63:1 88:3, 5 91:16 180:13 184:19 220:14 230:25
**anytime** 162:18
**anyway** 74:7 107:13 151:15 217:6 233:7 257:2
**apace** 108:2
**apologize** 9:13 12:17 40:1 66:18 140:20
**appeal** 87:24 138:17 170:20, 25 179:23 180:10 215:19 219:15 221:4 223:9 236:16 245:6 253:14 254:17
**appealed** 171:1 215:12 249:3
**appeals** 59:18 172:2 174:15 180:8, 9 217:24 219:6, 7 236:17
**appear** 123:1
**APPEARANCES** 1:1 2:1
**appeared** 8:11 179:5
**appearing** 85:22
**appears** 20:24 79:24 165:12 166:4
**Appellant** 228:18
**applicable** 142:15 192:3
**Application** 7:9 26:25 119:4, 7, 13, 18, 19, 22 185:18
**applications** 126:17
**applied** 132:24 215:4, 13 227:6 240:16
**applies** 196:15 197:9 205:16, 18 214:7 228:24
**apply** 12:3, 4, 19 202:24 205:20 214:9, 11 215:6 229:4
**applying** 190:12 211:9 234:7 262:2
**appreciate** 9:24 10:23 11:13 13:14 74:14 111:17 118:22 123:19 140:13 160:2 183:9 184:6 242:19 245:8
**appreciating** 261:16
**approach** 70:2 201:23
**approached** 11:9 82:21 135:15
**appropriate** 35:9 77:21 87:25 95:5 163:12 171:18 219:9 251:7 256:16
**approved** 43:11
**April** 158:14, 17, 20 159:4
**Arch** 1:1
**area** 66:17 112:20
**areas** 63:8
**arena** 65:17 67:5
**arguably** 217:4
**argue** 7:19 8:6 9:18, 22 14:9 46:19 185:4 214:9, 10, 12 218:19 219:8, 10 228:22
**argued** 102:5 220:3
**arguing** 99:17 185:5 220:11 225:13 243:4
**Argument** 3:17 10:14 11:19 12:23 45:1 52:7 90:22 104:1 122:3 154:21 182:22 209:25 210:2 213:10 220:24 223:7 226:15 228:18 236:5 244:12, 24 245:4 254:13 256:2, 21 258:12 260:5
**arguments** 9:25 13:8, 11 14:12, 14 73:17 77:13, 14 107:20 184:25 185:3, 10, 16, 25 204:24 207:3 208:3 224:23 225:8 235:8 254:2 257:2 260:12 261:13
**arisen** 214:15
**Aronchick** 68:4, 7
**arose** 249:1
**arrived** 28:9 254:20
**art** 111:1
**articulate** 53:12
**articulated** 260:16
**Ashford** 65:7
**aside** 23:23 43:17 44:5 47:10 117:5 144:14 145:12 146:9 153:6 162:16 166:14 167:1 169:19, 20 223:5
**asked** 37:11 53:19 56:23 59:25 63:11, 17 88:9 113:5 114:7, 15 116:19 118:20 120:9 122:20 132:19 135:14, 20 139:10, 11, 13 143:23 152:24 164:22 171:14, 18, 19 175:24 196:13 238:7, 21 239:15 240:7, 18, 20 242:17 247:21, 22
**asking** 47:6 71:15 74:10, 11 86:2, 13 90:1, 5 92:18, 23 93:25 115:19 118:1, 18 128:9, 11 134:16 144:17 207:25 237:22 239:10, 11 241:19 243:3 246:11 249:6 258:14
**asks** 70:19 87:11
**aspect** 127:20
**aspects** 194:11
**Assembly** 201:13 234:21
**asserting** 221:3
**asserts** 188:21
**assess** 151:19
**assessed** 135:7
**assessing** 133:24 134:25 135:4, 15
**assessment** 100:20 128:12 225:8
**assigned** 65:20
**assist** 183:6 231:6
**Assistant** 32:15, 20 57:2, 3 65:20 219:20
**assume** 96:12 163:9 216:10 218:24 239:20 260:4
**assuming** 130:6 219:2 226:4
**assumptions** 219:25
**assure** 261:17
**attaches** 34:19
**attack** 248:24
**attempt** 236:10 237:8 238:2, 18 246:14
**attempting** 246:15
**attended** 178:2
**attention** 198:11
**attest** 200:25 263:5
**attestation** 78:25
**Attorney** 1:1 10:7 23:14 44:11, 18 55:8 56:22 57:7, 17, 22 63:12 103:7 120:21 133:14 141:11 160:17, 18 175:1, 9 179:11, 17, 20
**attorney-client** 68:16
**Attorney's** 145:18, 19
**August** 243:16
**authenticity** 144:13
**authoritatively** 87:14
**authority** 17:22 45:25 64:8 73:6, 10, 12 75:12 84:17, 21, 22 86:7 111:14 194:13 208:10 209:17 257:11, 20, 22 258:5 259:6, 15, 19
**authorization** 6:23
**authorizes** 111:10 192:14
**availed** 194:5
**Avenue** 1:1
**avoid** 202:1 203:9
**aware** 22:5, 6 36:1, 4, 8 53:25 57:21 59:16 60:1, 4, 19 71:8 73:16, 22 74:2 75:1, 10, 15, 17, 21 76:1 81:24 82:3 85:5 86:22 88:2, 4, 5 91:1, 12, 13, 16 92:12, 19, 20, 23 100:19, 20, 25 101:2 109:18 110:1, 3, 4, 10 111:7, 8, 13 131:2, 17 138:17, 22 144:22 147:20, 21 148:3 153:16 159:21 170:4 172:1, 5 179:1 222:18 260:1
**awareness** 74:4

< **B** >
**back** 34:17 37:8 39:3 61:22 65:3, 19 71:24 72:6, 21 75:5 81:24 107:23 108:1, 5 131:21

132:8 138:23 148:2 152:22 156:3 179:15 193:2 195:24 198:6 214:23 220:4 222:19, 20 223:1 224:11 230:3 231:15 235:1 237:12, 13 241:8 242:21, 24 252:14
**back-dated** 117:7
**background** 65:4
**bad** 99:20 248:18
**balance** 221:9
**Ballot** 4:9 5:12 20:10, 16, 17, 18 21:8 23:19, 23 34:21 37:21 38:3, 10, 22, 23 39:10, 13, 17, 19, 20 40:2 42:21 43:4, 9, 12, 15, 18 44:3 45:18 60:18 98:20 100:21, 22 101:3, 5, 8, 16, 21, 24 102:17, 18 103:24 104:10, 15 114:9 116:24 117:1, 3, 4, 7, 8, 10 127:22, 24, 25 128:11, 20, 21, 24 129:18, 23 130:3 132:16 133:22, 25 135:5, 7 143:1, 3, 4, 7, 10, 18, 20, 25 144:4, 13, 23 145:10, 25 146:3, 14, 20 147:6, 7, 11, 16, 23 148:4, 5, 10, 14 149:19, 21, 25 153:18, 23 156:5, 6, 10, 11 157:16 158:13, 16, 23 162:17 163:18, 19, 24 164:3, 5, 8, 11, 12, 15, 17, 19, 20, 24 165:2, 22 166:5, 8 167:12 168:24, 25 169:10, 11, 15 179:12, 21 186:18, 20, 22 187:1 188:17, 23 189:1 191:1, 9 195:22 197:14, 17, 18 198:18, 25 199:14, 16, 25 200:1, 2, 7, 15, 18 202:11 203:17, 19 213:2 221:12 222:4 232:17, 22 233:25 241:7, 8 250:4, 7 259:7, 9
**balloting** 18:22 39:21 40:3
**Ballots** 6:4 19:23 21:6, 23 22:12, 13 23:3, 18, 19, 23 24:2, 4, 11, 13 26:15 28:8 29:15, 17 30:3 31:9, 25 33:20 35:15 36:1, 2, 6, 7, 9, 11 43:13, 25 45:6, 11, 15, 23, 25 47:4, 6, 10 48:15 51:16 53:7, 10, 16, 18, 22 54:1, 18 58:5 59:9, 10 60:2, 5 69:1, 2, 18 72:3 77:16 84:18, 21, 24, 25 90:20 91:3 95:12 98:8 100:3, 8 101:17 102:11 104:7, 11, 13, 25 109:19, 25 110:2, 11 112:2, 9 114:3 120:18 121:4 124:3, 11, 13, 14, 18, 19 126:17, 18, 23, 25 127:15, 18 128:5, 19 129:15, 17, 21 130:7, 10, 11, 17, 22 131:1, 18, 20, 24 132:2, 9 133:23 134:13 136:5, 23 139:3, 12 142:18, 20, 22, 24 144:8, 20 145:3, 4, 5 149:3, 6, 11, 15 150:5, 8 152:25 153:4, 9, 12 154:4 155:20 159:19 161:20, 24 162:3, 4, 8, 11, 14, 16, 22 163:12 164:23 166:12 167:23 168:14, 15, 18, 21 169:8, 14, 25 170:11, 12, 18 171:2, 20, 24 172:11, 17 173:17 174:12, 17 175:18, 19 176:2 177:2, 3, 10, 13 181:21, 25 182:7 183:22 187:3, 7 188:3, 7, 12, 14, 15, 17, 18, 20, 24, 25 189:7, 8, 14, 17, 21, 22, 23 190:1, 3, 17 191:3, 8, 15, 16, 20, 23 192:15 193:1, 3, 10 194:1 196:10, 23 197:10, 11, 12, 16, 24 198:7, 14, 16 199:11 200:4, 8, 23, 24 203:1 204:9, 15 205:7 208:11, 14, 17, 19 210:9, 10 211:2 213:22 217:8, 9 218:15 223:4, 5, 6 224:8 225:22 226:3, 4, 13 229:5, 23 230:7, 8, 13 232:1, 7, 8, 11 233:17, 24 234:4 235:5 241:13, 15 246:24, 25 247:3, 8, 15 252:5 253:11, 12, 16, 22 254:8, 18, 19 255:8, 17, 19 257:17, 21 258:2, 19 259:5, 19, 22, 25 261:6, 17
**bar** 165:3, 12, 17 166:9
**based** 24:14 30:9 53:5 58:8 74:1 79:2, 22 103:2 111:7 118:9 121:4 144:8, 20, 22 148:6 151:18 159:8 163:19 175:25 177:15 178:11 183:24 194:20 209:16 223:15, 20 224:22 226:8 244:22 262:2
**basic** 10:17 11:21
**basically** 25:25 65:5 70:19, 21 78:21 80:10 121:23 172:16
**basis** 16:21 74:16, 17 104:16 129:16 164:19 187:16 188:21 189:15, 24 190:14 206:14
**beautiful** 138:4
**beg** 115:14
**beginning** 34:17 113:7
**begins** 18:24 29:23 83:20 89:3 124:8 166:22 192:18
**behalf** 9:13 10:8 73:17 186:13 226:17
**belabor** 62:24
**belief** 26:16 169:15 253:8
**believe** 11:14 12:2 14:20 20:15 23:6, 21 25:11, 21 26:24 28:1 30:21 31:4, 19 35:3, 11, 13 45:15, 24 46:14 48:16 49:1 51:4 53:3 54:8 58:9 62:10 67:7, 8, 13 70:22 71:11, 13 72:9 75:9 85:23 87:9, 21 90:1, 2, 11 91:8 93:25 94:8 97:4 99:1, 2 100:25 102:14 104:8 106:7 112:3, 10 113:24 114:16 115:2, 8 116:16 117:18 118:5, 8 121:2, 23 123:3 127:15, 17 131:5, 10, 14 136:10 139:8 144:11 149:1 152:6 155:7 164:22 167:4, 9, 10, 11, 25 169:18 173:6 174:18 181:9 182:9 184:1 189:7 190:13 195:8 211:14 212:22 216:7 217:18 221:15 222:14 226:23 230:18 231:2 234:3 251:18, 25 256:1 260:10 262:8
**believed** 56:25 171:18
**believes** 11:16 46:12 47:14 71:5 207:23 221:3 259:14
**Bench** 236:23 251:3, 5
**benefit** 13:4 152:1 213:8 227:16 245:3
**BERKS** 1:1 5:5 7:6 9:14, 15 27:23 28:1 30:6 31:20 32:14, 15, 22, 23 33:6 37:5 48:11 50:12 51:14, 16, 22 54:12, 22 55:17 56:18 57:2, 4, 21 60:16 86:21 89:5 108:21 109:2 139:22 157:11 159:15 160:20 164:7, 22 165:4, 16 166:24 167:5, 22 168:17 169:16 170:1, 6, 21 171:6, 13 172:9 175:2, 10 176:8, 13 177:1, 7, 19, 20, 24, 25 178:7, 15 182:16 184:15 202:4 206:2 209:6, 11 219:11, 18, 20 221:11, 18, 19, 20 222:14 225:10 226:17 232:25
**best** 14:14, 15 52:3 174:19 175:13 216:1 235:11 246:14 250:15
**better** 77:13 224:17 239:3
**beyond** 15:17 63:15 65:4 80:14 97:8 133:13 134:1, 16 237:9 238:13, 17
**bible** 137:11
**big** 40:6 81:8
**binder** 37:9 47:23 58:14
**binding** 17:20, 21 41:10 92:1 142:10, 13 210:4 212:1, 11 237:18
**binds** 200:14
**binking** 129:25
**birth** 22:19 23:20, 24 164:18 204:16 230:22 231:11
**bit** 23:13 35:25 79:1 117:19 124:5

138:15 178:22 187:13 198:4 211:15
**black** 81:6
**blank** 40:11, 12
**blind** 25:11, 15
**block** 38:16 39:3 40:6
**blocks** 38:13
**blue** 38:4
**BOARD** 1:1 2:1 7:6, 7, 8, 22 8:10 9:17 18:19, 23 20:22 22:1 29:13 32:22 71:10 78:22 79:3, 10 87:24 89:14 92:10 95:18, 25 96:13 112:18, 21 125:11, 23 126:4, 6 127:11, 22 128:2, 15 129:6 133:4, 7, 10 134:18 135:15 136:4, 7, 9, 16 139:10 140:6, 24 141:15 143:3 145:9 154:24 155:7 157:15 160:23, 24 161:5 162:19 167:22 169:22, 25 170:6, 10, 12, 21, 23 175:10 176:13 179:5 183:25 192:10, 14 195:15, 22 197:2 202:4, 5, 9 203:22 209:7, 11, 12, 13 217:1 218:5, 15
**Boards** 7:23 16:22 17:3, 17 25:22 37:5, 24 41:10 44:6 45:5, 19 47:9 48:6, 10 49:8 50:17, 24 53:1 58:7 71:25 72:19 76:9 77:2, 6 84:1, 12, 16, 22 89:1 94:6, 10, 13, 16 95:11 101:23 112:12 117:4 153:25 186:25 192:21 193:9, 18, 24 195:4 209:19 210:4 214:3 215:21 216:4, 21 217:25 218:21 219:15 220:16, 18 221:1 225:25 229:22 231:6 232:14 235:2 238:4 247:2 249:9 250:2, 3 261:21, 22, 23
**board's** 128:4 133:20 152:23
**boards's** 126:12
**bodies** 81:22
**body** 81:13
**boils** 121:1
**bold** 38:7, 10 40:9, 12, 14
**Boockvar** 83:10 199:7 200:11 203:6 241:2
**Boord** 223:12
**boring** 76:21
**bottle** 225:18
**bottom** 26:4 29:23 173:21
**bound** 15:8, 11 258:5, 6
**bounds** 78:7
**box** 165:8
**BOYER** 1:1 3:15, 17 9:20 10:4, 5, 7 11:9, 12 12:15, 17 13:22 41:20 160:5, 14, 17 167:17 168:5 179:14, 24 181:4, 8 182:19 184:4, 12, 22 186:5, 12, 13 189:5 190:11, 22 193:16 197:6, 9 204:19 206:10 207:12, 16, 20 209:4 251:23 252:24 253:2, 4, 19 254:5, 14, 22 255:13, 18 256:1, 5 258:20, 23 259:2, 13 260:9, 22
**Bradford** 28:1 30:6 35:17, 18 58:2
**branch** 243:7
**branch's** 243:8
**break** 105:22, 25 107:23 184:19, 24
**breakdown** 155:22, 23
**breaks** 228:3
**BRETH** 2:1 8:11 62:13
**Brewster** 67:19 69:19 240:13
**Brief** 5:6, 8 7:13 68:24 82:11, 16, 18 83:19 85:2 86:12 94:4 99:11, 18 105:16 159:7 174:10 190:24 191:19 195:13 202:19 251:24 255:25 257:25
**briefed** 261:3
**briefing** 244:24 257:1
**briefly** 16:18 28:10 120:6 126:11 135:4 155:13 213:16
**briefs** 68:12 187:21 246:23
**bring** 241:15
**bringing** 85:12, 14 216:13
**brings** 71:5
**broad** 135:15, 17
**broader** 194:6, 8
**broadly** 17:9 198:4
**brought** 13:14 27:6 71:9 73:7 130:24 161:21 180:4, 13, 18, 21
**BUKOWSKI** 1:1 3:5, 12, 16, 17 7:15 8:13 9:12, 13 13:18, 21 14:6, 8, 17 36:19, 22, 25 37:4 41:19, 21, 22, 25 42:9, 17 44:12, 25 45:3 47:19, 21 51:12, 21 52:5, 11 55:4 58:23 60:21 67:4 88:9 106:19 120:6, 8, 13 121:5, 14 137:24 150:20 151:1, 12, 24 152:4, 8, 12, 21 154:17 155:3, 11, 16 159:7, 12, 23 167:19 168:11 176:17 183:14, 17 184:2, 15 186:9 209:5 210:14, 21 211:4, 7, 11, 16 212:4, 9, 14, 16 214:12, 19 215:2, 15 217:12, 18, 23 218:3, 7, 12 220:8, 23 221:15, 18, 20, 24 222:3, 8, 12, 19, 23 223:22, 25 224:10 226:23 227:2, 7, 9, 14, 24 229:10 230:10, 12, 16 231:2, 13, 24 233:6 234:22 235:19, 21, 24 236:3 247:5 248:16
**bullet** 38:12 43:2, 3, 5, 7, 8, 15 44:2
**bunch** 249:8
**burden** 14:22
**Bureau** 16:11, 13 29:4 61:15, 19 65:20, 23 66:1 126:5 129:4
**Bush** 240:15
**business** 69:4
**Butler** 2:1

**< C >**
**calculating** 249:17
**call** 8:16 9:1 14:24 44:10 106:17 116:2 123:14 125:11 129:25 140:23 160:6 230:7
**called** 62:9 104:3 110:16 154:25 182:4 234:23 255:21
**calling** 7:12, 20 100:12 124:20 125:12 170:11, 12 234:22
**calls** 47:18 68:14
**campaign** 89:9 131:8 170:10, 20, 25 179:6, 7
**campaigns** 59:24
**candid** 228:20
**candidate** 7:25 90:24 91:1, 9, 12 153:17 180:21 204:18 207:17 209:10 216:3 217:15 221:8 250:24
**candidates** 27:7 64:5 76:12 77:4 84:5 95:13 153:14 207:6, 10, 12 217:16 232:11 261:19
**Canvass** 6:4 18:15, 17, 19, 25 19:2, 11 26:14 28:7 43:13 45:6 46:3, 13 47:15 72:3 76:11 77:3 84:2, 13, 25 121:20, 24, 25 122:1, 5, 6, 7, 10 124:2, 3, 8, 10, 12, 13, 14 131:18 149:11 183:21 188:2 189:12, 13 190:13, 16 191:14 205:8 210:1 212:18 213:5 218:14 224:1 225:14, 16 226:4 230:2 254:18, 23 256:11, 18 257:15
**canvassed** 167:24 190:4 191:1, 4, 9 192:11, 15 193:1, 19 194:1 195:24 196:23 197:11, 13, 16, 24, 25 198:25 208:19 252:5 254:9 259:24
**canvassing** 12:6 19:4, 5 20:22 45:10 60:17 161:25 188:5 191:7 192:2, 7, 9, 19, 22 193:10 195:15, 20, 23 196:11, 14, 16, 19 197:2, 4, 17 198:20, 22, 23 199:21, 23 200:4, 6, 13 218:2, 6, 11, 12, 16 223:4, 10, 20 224:2
**caps** 38:9
**caption** 180:13
**captioned** 172:3
**card** 241:13
**cares** 202:14, 15
**carries** 29:24
**case** 8:15, 19 11:22, 23, 24 14:15, 20 23:7 26:15 27:1 28:8 45:23 51:23 53:5, 22, 24 58:25 59:5 62:9 67:10, 12, 13, 22, 24 68:1, 3, 11, 24 71:13 73:7 74:13 75:13 81:12, 18, 23, 25 82:3, 12 84:25 85:10, 12, 15

87:16 91:2, 4, 5, 7, 24, 25 92:6, 9, 17 101:9 102:5, 13 103:5, 20 104:3, 4, 22, 23 106:24 108:12 113:22 116:17 118:13, 19, 21 121:6, 8 134:2, 21 138:17 144:23 145:2, 8, 21 148:7, 8, 9 149:17 150:6, 12, 21, 22 166:2 167:1 171:3, 10, 22 172:2 179:2 186:15, 23 187:3 192:24 193:5, 8 194:4, 16 205:2, 24 207:7, 9, 14, 21, 22 208:17 210:3, 6, 24 211:23 212:14 213:15 215:10, 19 216:2, 8, 9 220:1, 3, 10 221:7 223:10, 12 224:23 225:5 227:3 230:4, 21 233:15, 22 235:10, 12, 16 237:2, 3, 11, 12, 13, 17, 23, 25 238:3, 5, 12, 16 239:10, 12, 14, 15 240:4, 10 241:2 244:1, 7 246:12 247:19 248:15, 23 249:1, 7, 20 250:13, 19, 21, 22 251:13 254:1, 3, 19 255:2 256:17 258:1 260:7 261:1, 2 262:3, 4
**cases** 17:23 44:13 62:4, 6 68:6, 10, 17 100:25 101:1, 2, 15, 18 102:21 120:23 138:22, 23 232:10
**cast** 17:7 18:16 28:7 45:15, 18 53:9, 21 76:11 77:4 80:6 84:2, 14 98:17 101:3, 8, 16, 21 102:17, 18 103:12, 13 117:6, 10 147:1, 12 149:15, 18 162:17 177:14 186:18, 20, 22 187:1 188:7 199:25 200:7 203:17 204:3 229:15 231:1 252:4 253:23 258:7 259:5, 7, 9
**casts** 117:3
**catch** 11:5
**cause** 146:17 158:8 169:17
**caused** 164:1
**causing** 176:4
**caution** 212:3
**cautions** 211:24
**caveat** 258:20
**Center** 1:1
**central** 88:25
**centrally** 18:23 124:17
**certain** 8:14 45:14 64:8 67:25 81:21 113:8 116:23 126:2 129:14 141:17 146:23 160:25 161:20, 24 166:9 173:19 181:17 190:3 196:17, 23 206:4 207:23, 25 208:14 217:8
**certainly** 15:18 28:14 29:12 44:23 45:13 47:12 56:23 67:12 68:15 69:22 88:23 95:18 96:23 97:2 101:18 103:5 109:10 110:4 112:24 114:5 135:25 142:16 143:10 151:9 166:7 213:4 214:8, 21 215:18 228:2 236:12 239:14 249:23 250:12
**certainty** 169:7 215:1, 14
**certificates** 84:4 91:10
**certification** 8:5 12:4 19:8, 10, 20 21:13 29:19 30:10 31:25 34:21 49:2, 15, 17, 19 50:6, 23 51:8, 15 53:15, 21, 23 71:16 72:9 79:20 80:1 86:24 89:12 90:3, 12, 16 91:10 110:16, 17, 19, 23 111:1, 11, 15 114:16, 18, 21 116:13 121:23 122:4, 11, 21 124:2, 20 130:19 136:11 140:5 167:6 171:23, 25 174:12 175:22 178:11 181:22 182:3 186:16 187:4, 7 188:1, 8, 13, 22 190:18 192:17, 20 193:13, 15, 25 195:11, 17, 25 196:5, 6, 7, 9, 12, 14, 17, 19 197:5, 19, 23 205:18, 21 218:11 223:21 235:5 236:14, 18 237:15 239:16 253:18, 20 258:16 260:1
**certifications** 28:13 57:24 77:7 78:17 90:16, 18, 21 96:14 97:9 118:3, 15 173:22 181:14 206:16, 25 208:12, 22 245:23 252:4, 8, 9 258:2, 7 259:4, 18, 22 260:15 261:7
**certified** 7:23 17:16 30:2 31:10 35:16 36:3 48:13, 24 49:7 50:4, 7, 9 51:7, 13, 17, 19 52:17, 21 54:1, 2 56:7 59:19 60:2 72:22 76:8 77:1 79:9 80:2 81:20, 21 84:11 88:13, 19 89:24 90:6, 8 97:13, 16, 20, 25 98:3, 5 110:5 112:2 126:21 139:19 148:24 149:2, 4 171:23 173:16, 19 176:8, 14 177:24 178:21 181:24, 25 182:5, 6 194:2, 25 198:1 206:3, 8, 22 207:7 209:10 218:22 220:12, 16, 18 221:1 224:5 226:14 239:21 243:18, 19, 20, 21, 22
**certifies** 50:1 81:19 258:12
**certify** 17:15 19:13, 14, 16 26:14, 18 28:7 35:22 49:10 50:11 51:22 53:6, 9 54:18 58:5, 10 76:14 77:9 80:8 81:10, 13 88:22 115:9, 14, 15 116:13 120:17 121:3, 21, 25 122:21, 25 124:21 139:12 159:13, 18 171:19 174:16 176:2 178:21 181:17 186:17, 20 187:9 208:24 214:4 220:19 221:3 224:1, 2 225:15, 18 235:3 236:1, 13 237:6 238:8 240:3, 5 244:5 245:12 246:17, 18 248:10, 20 259:3 263:2
**certifying** 6:24 18:13 49:19 60:10 90:4 206:18 217:3 240:8
**Certiorari** 5:20 244:8, 11
**Chain** 4:19 33:8 34:6, 22 66:2
**Chair** 31:19 126:9 160:23, 24 161:7
**Chairman** 9:15 55:17
**challenge** 7:22, 24, 25 52:20 60:15 86:24 87:3, 13 88:6 91:9 95:24 127:21, 24 128:13 153:9, 14, 17, 21 195:14 204:15, 20 209:21 216:2 217:17 218:18, 23 232:3 234:4 239:23 247:7 261:24
**challenged** 12:7 95:12 191:21, 24 204:18, 19 247:11
**challenges** 94:11, 12 127:18 191:25 195:16 196:17
**challenging** 191:22 196:7 209:10 217:15 232:11 262:3
**chance** 14:9 216:1
**change** 26:20 47:6 114:2 156:24 177:13 194:20 211:13
**changed** 24:2, 5 114:6
**changes** 24:7
**changing** 206:2
**CHAPMAN** 1:1 7:4 119:9 238:4 239:5, 6
**chapter** 54:15
**charge** 127:19
**charges** 231:4
**check** 144:11 166:21 222:4
**checking** 242:10
**checks** 40:25
**Cheryl** 150:24
**chicken** 122:16
**Chief** 27:20 33:5 56:14 65:21 66:14, 25 145:8, 12, 13
**choice** 261:19
**chose** 52:20 132:5 137:15
**Christa** 158:12, 19 159:1
**Christian** 3:14 9:15 31:17 55:17 56:20 160:6, 10
**chronology** 117:22 118:12
**circle** 95:14, 16
**Circuit** 5:6 8:4 23:6 24:9 26:23 59:4 172:1 174:15 176:10 207:4 213:24 228:3, 6, 19 229:20 244:15 245:4 260:17
**Circuit's** 46:7 47:13 51:24 100:19 228:1
**circular** 228:18
**circulated** 37:23 59:23
**circumstance** 104:2
**circumstances** 143:20 145:1 164:1, 2 209:9

252:2 256:15, 22, 25 257:7
**circumvent** 246:15
**citation** 255:23
**citations** 84:5
**cite** 193:7 200:11 225:5
**cited** 175:21 193:8 195:12, 19 223:9 255:3 256:4, 5
**cites** 84:24 223:12 237:23
**citizen** 86:23
**civil** 75:16, 17
**Civilian** 42:21 47:4 162:14
**claim** 209:23 225:6
**clarification** 25:23 56:24 114:23 116:18 118:22 154:14 182:14 226:24 234:23
**clarifications** 186:3
**clarify** 83:1 116:3 128:23 143:24 146:19 171:15 185:1 190:5 226:19 235:25 258:23
**clarifying** 57:14
**clarity** 188:14 215:21 216:12, 16 227:3 235:13 261:4, 6
**class** 188:25
**clean** 180:7
**clear** 31:24 38:21 55:25 58:9 61:22 64:15, 24 88:9 101:19 116:9 149:14 167:25 168:2, 9 170:13, 17 171:16 174:11, 15, 19 175:17, 25 183:19, 21 184:1 188:13 189:12, 13, 14, 18 190:2, 13, 25 195:19 196:15 200:5, 21 201:21 208:13, 17 213:18 214:7 218:10 229:3 231:22 232:19 236:9 239:24, 25 243:11 252:11 253:5, 20 256:6 257:24 260:13 261:2
**clearer** 215:23
**clearly** 75:16 93:3 173:15 210:6 223:4 240:10 250:13 259:20 261:14
**clerical** 80:1 115:1 208:13 259:18
**Clerk** 145:9, 12, 13
**client** 66:22, 23 68:17 73:17
**close** 11:3 132:17 177:16 202:20 203:2
**closed** 119:17
**closely** 227:25
**Code** 12:3 21:5 43:23 44:6, 13, 14, 21 50:16, 20, 21, 23 62:1, 5, 25 72:11, 17 75:10, 18, 21 76:1, 20 83:20, 24 84:17 87:3, 10 95:23 101:19 104:18 110:20, 25 111:9 117:2 121:19 122:7, 9 130:13 142:5 153:23 154:8, 25 155:9 165:3, 12, 18 166:9 170:7 182:10 188:8 190:2, 17, 25 191:5, 16 192:23 193:2 195:21 196:2, 8 197:21 198:5, 6 200:21 201:3, 11, 12, 14 202:14, 25 203:8 204:21 205:11 208:6, 20 210:9 216:19 217:10 220:12 233:15 234:20 241:3 243:9 252:6 258:6
**Code's** 237:9
**Cody** 57:3
**coffee** 61:8
**Cohen** 59:5 172:3 176:11
**COHN** 1:1 4:19 5:2 7:2 9:10, 23 10:6, 18 11:10 12:9, 13, 16, 24 13:20, 23 14:4, 7, 11, 19 15:13, 23 24:24 36:17, 20, 23 44:16 47:20 60:24 64:17, 22, 25 70:3 73:11, 15, 20, 22, 24 74:6, 24 77:12, 18 78:2, 9, 13 80:17, 20, 24 81:2 85:8, 13, 19, 21 86:1, 4, 9, 16 87:18 92:20, 25 93:3, 7, 20 99:9, 12, 15 100:15 101:13 102:6 103:1 105:11, 14, 18, 23 106:3, 13 107:5, 9, 14, 19, 22, 25 108:5, 8, 16 109:8, 11, 13 111:19, 22 115:3, 6, 20, 24 116:10 120:4, 11 123:7, 11, 20, 23 125:5, 13 134:6 135:13 137:19 138:1 140:10, 12, 21, 25 151:20 152:3, 5, 11 154:13 157:9 159:25 160:7 168:8 176:18 179:3, 16, 19 180:1, 12, 16, 19, 22, 25 182:20 183:2, 5, 11, 13 184:5, 10, 14, 18, 21, 23 185:13, 22 186:2, 6, 10 189:3 190:5, 20 193:14 196:25 197:7 204:14 205:25 207:9, 15, 19 209:3 210:12, 18, 22 211:6, 10, 12, 21 212:5, 13, 15 214:10, 14, 20 215:3 216:17 217:16, 21 218:1, 4, 8 220:6, 21 221:10, 17, 19, 23 222:2, 6, 9, 16, 22 223:19, 23 224:9 226:22, 25 227:4, 8, 11, 18 229:6 230:5, 11, 13, 17 231:5, 23 233:4 234:13 235:17, 20, 22 236:2 239:17, 20 241:17, 22, 25 242:9, 12, 14, 18, 23 243:2 244:21 245:3 247:25 248:3, 5 251:18, 22 252:21 253:1, 3, 15 254:1, 11, 21 255:11, 14, 24 256:3 258:10, 21, 25 259:10 260:3, 21 261:10
**coin** 250:2
**collateral** 248:24
**colleague** 218:9 236:5 244:16
**colleagues** 10:16 11:20 193:7 212:12
**college** 65:5, 8, 11
**colloquy** 224:13
**come** 36:21, 22 71:7 77:14 78:18 85:23 91:22 102:12 107:23 120:11 135:2 153:10 169:2, 22 180:6 204:6 212:17 219:7 220:4 222:5, 20 223:1 224:11 229:1 231:15 233:7 234:5, 10 235:1 239:5 241:6, 7, 14, 18, 22 247:20 248:7
**comes** 18:19 44:5 122:14 137:4 138:11 157:18 213:24 228:11 239:2, 4, 6 245:11
**comfort** 106:5
**comfortable** 132:25
**coming** 215:16 231:14
**commenced** 66:10
**commend** 212:10
**comment** 98:7 99:19, 20
**comments** 10:15 99:5 211:15
**commission** 160:22
**Commissioner** 8:24 9:15, 16 65:23 127:17 133:19 134:17 136:16 137:10 154:24 155:19 161:2, 6, 14 176:22 181:2 183:15 221:15
**Commissioners** 8:23 9:16, 17 30:23 31:20 55:18 64:3 71:22 72:18 125:12, 24 126:5 140:24 141:15 142:11 160:20, 23, 25 161:11 170:10 182:16 192:10 201:15 202:4 232:1
**Commissions** 16:7
**committed** 219:12
**Committee** 119:12 156:7, 8, 16 177:8, 9, 15 178:4, 5 206:4
**common** 59:21 62:13 87:25 96:2 261:17
**commonly** 195:12 240:21
**COMMONWEALTH** 1:1 5:8, 10, 15, 23 7:3, 5 15:10 17:22 19:14 46:8 59:20 61:15 62:16 63:1 65:9 66:25 72:18 76:10 77:2 82:10 83:9 106:20 111:10, 14 119:10 147:3, 24 150:23 168:4 171:4 174:14 175:23 176:15 179:8 238:13 239:1, 5, 7 240:25 245:25 246:2, 4 247:1, 2 249:15 255:22
**Commonwealth's** 94:1
**communicate** 26:10, 12, 13
**communicates** 64:3, 4, 5, 6
**communicating** 32:4 252:12
**communication** 28:12 67:8 172:15 174:23, 25 194:17, 18
**communications** 54:21 172:18
**compared**

117:14 228:1
**compel** 70:21
**compelling** 257:7
**compels** 258:1
**competent** 18:6 142:5
**compilation** 89:3
**compile** 80:4, 8 88:21, 22 124:9
**compiled** 80:9
**compiles** 19:15
**complaining** 224:3
**Complaint** 5:13 63:23, 24 70:12 73:4 74:18 83:10 85:10 97:3, 6 151:2 158:2 224:6
**complete** 19:20 53:21 72:8 79:18 90:15 105:24 111:2 121:25 171:17 186:17 187:8, 18 200:18 208:24 258:7, 9
**completed** 19:11 44:24 50:6 53:8 90:3, 12 182:7 252:8
**completely** 8:20 95:15
**completeness** 151:15
**completes** 198:13
**completion** 122:14
**complied** 35:22 58:3, 4 113:23 120:14, 15 130:13 149:8 150:14
**complies** 44:13
**comply** 8:18 35:14, 19 57:22 113:18 120:19 128:15 132:5 171:13 200:19 211:1 232:18 233:18 248:8, 9
**complying** 120:15 132:25 232:21
**comprehensively** 190:15
**computation** 12:6 192:7 195:15, 20, 23 196:11, 14, 15, 18 197:2, 4 218:6
**compute** 76:11 77:3, 9 84:2, 13
**computed** 192:12 193:19 194:2 196:23
**computing** 45:11 193:10 223:11
**concede** 46:25 157:6 207:13, 17
**conceded** 41:9 207:7 228:21
**conceding** 100:17 218:24
**concern** 206:6 216:24 217:6, 7 232:19
**Concerning** 42:21
**conclude** 207:20 210:24 229:24 230:1, 5 233:7, 25 261:11 262:8
**concluded** 210:8 212:24 224:21 226:12 229:20
**concludes** 192:19 224:24
**concluding** 225:21
**conclusion** 28:10 44:11, 18 47:18 87:12 116:3, 5 189:16, 24 201:20 237:22 255:2 256:12
**conclusions** 14:1
**concurring** 211:18 212:7 228:19
**condense** 105:22 106:1
**condensed** 107:2
**conditions** 191:9 192:2 198:19
**conduct** 94:7 164:10 244:23
**conducted** 216:23
**conducting** 164:4 192:9
**confines** 94:8
**confirm** 157:16 195:10
**confirmed** 159:1 204:8
**confirming** 202:10
**confirms** 196:22 201:8
**confused** 25:21
**confusing** 136:18 138:25 211:15, 16
**confusion** 137:1 138:23
**Congress** 98:2
**congressional** 49:23 50:3 243:19
**conjunction** 199:5
**connection** 142:4
**conscience** 176:2
**consecutive** 88:12
**consequence** 188:1 202:21 253:20 260:19
**consequences** 190:3, 16 191:11 199:2 200:13 201:7 232:21 248:22 253:9 259:24
**consider** 63:6 134:10 229:13 256:21 257:8
**considerable** 115:21
**consideration** 13:2 119:4, 18
**considerations** 234:17
**considered** 13:4
**consistent** 18:9 47:15 60:8, 11 114:12 153:24 239:21 240:1
**constant** 194:17
**constitutes** 186:22, 25 259:6
**Constitution** 136:20, 22 137:12 217:3, 11
**Construction** 199:4 201:22 202:1
**consult** 137:20 140:15
**consultation** 183:24
**consulted** 56:9 66:9, 17 67:12 82:8
**contact** 114:22 116:17
**contain** 230:8, 14
**contained** 110:18
**contains** 79:10
**contemplated** 238:14
**contemplates** 202:13 204:21 229:1 252:3
**content** 203:11
**contest** 60:14 88:7 250:24
**contesting** 87:5 189:2
**contests** 12:4
**context** 66:13 187:13 190:6 257:14, 19, 24 259:8
**continue** 10:19 43:12
**continued** 2:1
**continues** 19:1
**contradicting** 138:24
**contrary** 246:22 255:2
**contravened** 253:25
**controlled** 197:11
**controversy** 8:19 216:8, 9 220:3, 10 221:7 239:10 241:11 246:12 261:2
**convene** 139:10
**convenient** 11:11
**conversations** 28:15 113:12, 14, 15
**convert** 253:17, 19
**convince** 9:21 194:19 244:25
**convincing** 252:14
**copied** 25:11
**copies** 88:25 173:22
**copy** 25:15, 16 51:8 59:22 69:7 89:14 117:21 158:2, 4
**cordial** 112:14
**Corporation** 16:11
**correct** 19:17, 18 20:25 23:9 25:20 27:7, 8 29:5, 6, 8 30:22, 24 31:11, 21, 22 32:16, 17 33:1, 16, 21 35:12, 13 36:13 38:10, 11, 15, 19 39:1, 5, 6, 8, 9, 11, 12, 14, 18 40:5, 8, 10, 13, 16 41:8, 11, 18 42:5, 13, 22, 23 43:6, 13, 14, 21 45:7, 8 46:13, 17, 25 48:6, 7, 21 49:5, 6, 12 50:14 51:4, 5, 9 52:10, 14, 19 54:1, 2, 24, 25 55:6, 7, 9, 10, 13, 14, 23 57:6, 16, 19 58:1, 19, 25 59:1, 11, 12 60:7 61:16 62:21 65:18 66:2 67:6, 18, 20, 21 68:1, 4, 8 69:12, 13, 19 70:16, 17, 24, 25 71:3 72:7 76:18 77:4 82:4 85:3, 4 87:10 88:14, 15 90:9 91:7, 17 92:2, 3 94:7, 8, 14, 15 95:16 96:5, 15, 16 97:11, 15, 22 98:1, 6, 9, 12, 25 99:25 100:1, 5 102:18 103:25 104:17 110:14 111:5 112:5, 6 114:18, 19 115:1 118:6, 7, 9, 11, 17 120:25 122:12, 25 123:2 124:22, 23 125:1, 24, 25 127:10, 23 128:2, 3, 6, 16, 22, 25 129:1, 13, 16 130:4, 5, 19, 20, 22, 23 131:4 132:3, 4 139:21 140:3, 4 141:15, 16, 19 142:8, 11, 12, 21 144:1 145:22, 23, 25 146:20 148:12, 21, 22, 24 149:13, 16, 23 150:1, 2, 4, 12, 13, 17, 25 153:13, 14, 15 154:5 155:5 158:14, 15, 18, 21, 22, 25 159:4, 5 163:4, 5 167:6, 7, 14 168:20 174:6 175:4, 6, 7 176:16 177:4, 5 178:1, 9, 10, 13 179:12 181:23 182:3, 11 197:6 207:15 222:2, 8 223:22 234:2, 19 235:19, 21 244:12 247:6,

8 258:11
259:2, 13
**correction**
162:15
**correctly**
30:19 35:9
119:23 231:10
237:23 256:12
**correspondence**
32:25 33:2
47:22, 24
113:6 219:18
**Coulter** 2:1
**Counsel** 5:16
10:3 27:20
33:5 35:3
48:18 56:10,
14 59:25
66:14, 23 68:3,
7, 9, 15 71:4
73:17, 25
82:21 85:13
86:12 93:4
97:5 108:6, 11
111:20 121:1
137:21 140:16,
18 151:22
169:12 171:15
175:16 182:21
196:13 213:10
224:13 237:22,
24 257:10
261:6
**counsel's**
120:9 209:25
**count** 29:14
45:6, 14 54:18
59:9 69:1, 3,
15, 17 101:24
117:1, 8, 12
131:24 132:2,
19 135:8
136:14 137:7
143:8, 12
144:8, 15, 20,
23 146:3
148:14 150:10
153:23 162:20
168:20 170:11,
12 171:1
187:11, 14, 15,
17, 19, 20
188:2 189:14,
21, 23 190:16
191:15 197:12
198:2, 3
203:19 204:9
205:9 206:14
213:21 218:13,
14 223:5, 18
224:1, 7
225:11, 16
229:23 231:18
232:7 233:3
240:11 247:3,
16 250:6, 7
253:12 255:16,
19 257:17
258:18 260:11,
12, 18, 20
**counted** 24:14
29:18 38:10,
14, 22 43:18
45:23, 25
47:10 53:22
69:11, 18
84:18 100:8
110:2 114:9
117:1, 17
127:13 136:5
139:3, 7, 8
143:5, 18, 22
145:24 147:2,
7, 25 148:5, 11
149:11, 22
150:1 152:25
154:4, 8
161:20 162:12
163:1 167:24
168:16 170:19
175:20 177:3
183:22 189:8,
17 190:1, 4
191:1 192:3,
15 193:1, 3
195:24 197:25
199:12 204:3
210:10 217:8,
9 225:17, 19,
23 226:13
229:15 230:24
231:12 247:15
250:4 254:10
255:8 257:21
259:25 261:18
**countenance**
249:16
**counterclaim**
248:14, 19
**counties** 8:1
17:13, 20, 21,
25 18:21
19:16 21:7, 22,
24 22:3, 7, 18,
23 23:7, 8, 22
25:11, 12, 14
26:3, 11, 13, 21
28:1, 5, 6, 13,
15 30:2, 4, 5, 7,
10 34:20
35:12, 14, 22
36:10 43:12
48:17, 23 49:2,
16 50:3, 6, 8,
12, 18 52:21
53:5, 8, 19
54:12, 16
55:12 56:7, 11,
23 58:10 59:8,
24 60:1, 4, 15,
16 69:15 71:1
72:22 75:19
78:18, 19
79:14, 23 88:3,
10, 12, 13 89:6,
8, 10, 13, 23
90:2, 12, 17, 19
91:10 92:2
94:6 98:3, 5,
14 104:12, 13
109:20 112:1,
8, 25 113:6, 9,
11, 13, 18
114:1, 2, 6
116:14 118:2
120:10, 14
121:3 124:3, 5,
6 131:9, 10, 11,
12, 18 159:15
173:15 186:15,
19 187:6
188:2, 9, 12
189:12, 21
191:2 194:10,
13, 17, 19, 20
195:8 200:14
202:5 203:12
204:8, 22
205:7 206:2, 3,
22 207:23, 25
208:4, 15, 21
216:15 217:7,
8, 9 221:11
224:7 225:9,
14 239:21
240:11 241:11,
12 243:1, 21
244:3 246:4
252:3, 13, 14
258:2, 8, 16, 17,
18 259:4
260:14
**counting** 19:6
45:10 60:17
131:1 139:12
159:18, 19
168:14 192:9,
19, 22 197:18
211:3 215:7
218:13 223:4,
20 224:2, 4, 5
231:16 232:6,
7 255:10
261:6
**counts** 188:11
**COUNTY** 1:1
2:1 7:6, 7, 23
8:10, 23, 25
9:14, 16, 17
16:22 17:3, 6,
17 18:19, 23
19:12 20:22
21:9 22:1
25:22 27:23,
24 29:4, 14
30:23 31:4, 9,
20 32:14, 15,
21, 22, 23 33:6,
20 34:12, 15
35:4, 17 36:2,
4, 8 37:5
39:20 41:10
45:19 48:5
49:8 50:2, 17,
24 52:16 53:1
54:22 55:17
56:21 57:3, 7
58:2 62:12
71:9, 13, 14, 20
72:18 76:9
77:2, 6 79:3, 8,
21, 25 84:1, 12,
16, 22 86:21,
22, 25 89:1, 12
92:9 95:11
96:3 98:20
101:1, 23
102:14 104:5,
11 106:17, 20
109:25 111:15
112:11, 17, 21
114:21, 23, 24
115:9 116:17
117:4 124:15
126:3, 13
127:3 128:24
129:14 130:17,
21 131:3, 14
132:2 133:18
134:12, 17, 20
138:4 140:23
141:15, 18, 24,
25 142:22
144:7 146:12
148:15, 23
152:23 153:3,
21, 25 155:7
157:15 160:20
162:11, 19
164:7 165:4,
16 166:24
167:22 168:17
169:16 170:1,
6, 21 171:6, 13
172:9, 16
173:13 175:2,
10 176:8, 13
177:1, 7, 9, 19,
20, 24, 25
178:8, 11, 15
182:16 183:25
186:24 188:21
192:10, 14, 21
193:9, 24
194:23 195:3,
14 197:1
199:24 201:15
202:3, 9 206:5,
9 207:11
208:5, 13
209:6, 7, 11, 12,
13, 19 210:4
214:3, 8
216:21 217:1
218:5, 21
219:11, 13
220:18 221:1,
11 225:24
226:17, 18
229:22 230:20
231:6 232:14
238:16 240:9
247:2 249:8
252:16 257:16
261:21, 22, 23
**County's**
56:18 57:2, 4
79:2 111:11
114:18 139:19
165:13 257:24
**couple** 10:15
11:21 42:18
62:13 96:10
172:14 194:3
228:21 254:23
256:14
**course** 11:6
16:24 82:18
94:9 134:15
139:23 179:11
185:5 192:22
200:17 204:7,
22 205:11
208:7 211:22
216:25 227:1,
2 247:18
253:14 256:12
**courses** 65:11
**COURT** 1:1
5:21 6:2 7:3
8:6, 8, 14 9:7,
19, 21 10:23
11:2, 5, 24
14:8 15:7, 8
18:6, 7 21:20
23:12 24:8, 15
26:1, 23, 25
27:3 29:13
31:24 37:3
45:1 46:4, 13,
23 47:15
52:21 53:19
54:1 58:9, 24
59:20 61:1
62:6, 12, 16, 18,
19 70:18 71:7
72:20 73:13,
18 77:23, 25
78:12 80:21
81:25 82:4, 7,
12 83:12
85:16, 24 86:2,
5 87:17, 25
89:22 90:2, 5,
13 91:2 94:22
95:7, 8 96:1, 2
98:23 99:15
104:5 110:1
112:5 116:6
118:13 119:1
121:17 122:23
128:7 131:17
132:6 133:9
134:12 135:11
136:3, 11, 24
138:18 149:5,
6 151:14
152:1, 19
171:4, 9, 22
172:1 173:11
174:11, 14
175:24 176:19
182:15, 22
183:19, 20
185:15, 19
187:1 188:4
189:19, 20
190:3, 7, 8, 12
192:24, 25
193:3, 11
195:18, 23
196:3 200:11
203:5 206:7,

12 207:5, 11 208:6, 7 209:5, 15 210:3, 4, 7, 24 211:5 212:12, 20, 23 213:15, 17, 25 215:12, 18, 20 217:13 219:4, 7 220:4 221:4 223:7, 10, 14 224:17, 23 225:14, 20 226:11, 16, 18, 19, 20 227:5, 16 228:24 229:13 231:21 235:11, 14, 15 236:4, 10, 19, 22, 23 237:17, 19 238:15 239:3 240:15, 25 241:1 244:9, 11, 19 245:20 246:8, 9 247:19 248:7, 13, 21 249:15, 23 251:6 255:1, 3, 16, 18, 20 256:10, 11, 19, 20 257:16, 18, 20, 22 258:6, 15 259:22 260:1, 8
**courtesy** 11:13, 18
**Courtroom** 1:1 64:4 71:2 90:11
**Courts** 18:10 28:6 45:24 46:2 57:1 59:21 62:11, 17 64:6 67:3 69:22 121:4 128:5, 16 132:9 142:5 208:8 231:15 232:5 238:15 258:8 259:7, 8
**Court's** 7:16 46:8, 15 50:20 54:9 59:16 108:13 123:17 137:15 149:8 150:15 185:7 187:16, 19, 25 188:2, 10, 13, 18 189:11, 13, 16, 19, 24 190:6 191:3, 11, 12 198:5 199:6, 20 200:8 209:20 219:4 222:20, 25 224:11 225:8, 15 230:3 235:4 253:21 257:19 258:1 259:11, 24 262:1, 5
**cover** 106:22, 25 136:23 206:5
**covered** 93:11 107:13 151:25
**create** 78:4 217:10
**created** 245:11 246:10, 25
**credentials** 111:8
**credibility** 176:6
**criminal** 145:21 151:1 158:2 231:3
**criteria** 203:23 205:1
**critically** 102:15
**CROSS** 3:2 15:18 106:17, 22, 25 107:8 123:17 125:12, 19 141:6 160:6, 13
**cross-examination** 9:2 36:24 61:5, 11 93:18 105:8 108:9 123:14 138:2 150:19 155:17 167:18 176:20
**crux** 90:21
**crystal** 243:11
**Cunningham** 2:1
**cure** 168:25 221:14 241:15
**curing** 240:21, 22, 25 241:3, 5, 9, 10, 12 242:1, 3 245:25 246:6, 7
**curing's** 246:3
**current** 16:5, 16 66:19 175:18 244:25
**Currently** 16:6 97:13 141:14 244:19

**< D >**
**daddy's** 137:11
**D'Agostino** 3:10 9:16 30:25 140:23 141:3, 8 150:21 152:13, 22 159:9 160:1
**D'Agostino's** 151:4
**damage** 176:6
**dangerous** 232:5
**data** 89:10, 18
**database** 89:15
**date** 8:5 21:2 22:3, 7, 9, 15, 19, 20, 22, 24 23:20, 24 27:17 29:18 34:4 38:16 40:12, 18, 20, 21, 23 43:24 48:18 52:10 60:18 87:8 96:4, 14, 17, 18, 20 97:1, 9 98:18, 19 100:22 101:4, 5, 6, 8, 17, 25 102:2, 4, 15, 18 103:20 114:8 117:11, 13, 14, 15 119:25 129:18, 19 130:2, 6, 7, 11 133:2, 23 135:7 143:16 144:6, 9, 11, 14, 21, 22, 23, 25 145:14, 15 146:4, 8, 10, 13, 16, 20 147:11, 15 148:4, 6, 11, 17 149:21, 24 150:9, 10 152:16 153:4, 17, 18, 22 158:23 162:7 163:2, 6, 9, 14, 19 164:1, 11, 18, 19 165:2 166:4, 14, 25 167:3, 8, 10, 13 169:1, 4, 8, 12, 15, 18 170:1, 3, 16 171:17 173:20 188:16, 23 189:4, 6, 9 191:13 198:8, 17, 19 200:12 201:8, 14, 19 202:6, 7, 10, 11, 12, 14, 15 203:11, 12, 15, 19, 23 204:2, 6, 10, 12, 16, 17, 22, 23, 24, 25 205:3, 4 211:2 219:9, 10 221:13 222:10 230:22 231:8, 11, 17 232:9, 16, 18 233:21 234:1, 2, 9 241:20, 23 247:10 250:8
**dated** 23:3, 18, 19, 23 24:2 26:5, 15 27:18 28:8 29:7, 17 30:3 31:5 32:18 34:23 36:1, 2, 6, 7, 9 38:23, 24 42:12 43:10, 16, 22 44:4 47:9 48:3 55:21 60:11 98:11, 14 100:3, 5, 11 117:11 120:1 143:16 152:25 153:4, 12 158:13 164:9, 12, 16, 20 165:9, 25 166:19 167:24 168:2 169:10, 13 170:8 171:20 175:1 225:22 226:3, 7 230:7 231:21 232:2, 8 233:3, 24 234:3 246:25 247:3
**dates** 25:19, 21 54:21 60:3 117:20 118:1, 7, 8 134:25 144:8 146:9, 23 152:15 153:13 154:3 167:9 218:20 219:21, 23 230:8, 14 231:16 232:12 247:7, 9, 11, 15
**date-stamp** 21:24 164:23
**date-stamped** 145:6
**dating** 61:17 98:23 99:21, 23 103:24 105:10 113:6 210:24 228:15 229:4, 13 230:18 231:6
**daughter** 203:17 230:21
**Dave** 119:7
**David** 119:8
**Day** 17:7 18:25 21:9, 17, 19 46:11 47:3, 8 56:6 59:14 72:12, 14 101:21, 22 102:8, 17 116:20, 25 117:3 128:20, 22 129:3 132:16 136:13 142:20 143:4 147:2, 5, 15, 24 148:13 162:13 163:1, 3, 7 166:23 168:12 174:2 203:16, 20, 23 213:21, 23 244:10 251:24 261:11
**day-of** 126:19
**days** 52:16, 23 87:7 88:12 96:4, 12 97:8 129:9 195:13 196:22 213:23 218:17, 23 219:16, 23 221:4 228:8 256:18
**day-to-day** 16:21, 24 127:7 161:17
**deadline** 8:5 21:17, 18, 20, 23 50:22 51:1, 3 53:16 128:19, 21, 24 129:9 142:17, 19 143:21, 25 162:5, 10 176:14 235:3
**deadlines** 50:23 95:22 214:4
**deal** 198:11
**dealt** 175:22
**Dear** 173:13
**death** 231:1
**debate** 178:24 240:24
**dec** 250:21
**deceased** 101:20, 22 102:2 117:14 145:12, 18 158:20
**decide** 73:13 84:18 85:16 95:16 116:6 127:15, 25 128:1 132:1 137:7 186:25 192:14 226:9, 16 251:14 259:6
**decided** 69:1, 2, 3 92:10 156:16, 23
**decides** 182:15 186:22
**Decision** 6:4 8:4 24:14 26:22 27:2 46:4, 7, 8, 12, 15, 18, 24 47:16 54:5 59:4 73:18 95:25 96:13 128:13 136:7 143:8 171:1, 17 172:2, 8 175:14 176:10 182:17, 18 183:20 191:3 195:14 197:1, 10 199:6 207:5 210:1, 13 214:7, 23 215:10, 13, 18 216:1 218:14, 15, 16, 18 219:14 225:21 226:12 230:2,

4 233:14 235:6 237:21 250:5 251:6 252:19 253:13 254:15, 19, 25 255:1, 21 256:9, 20 257:15 259:11, 21 262:2, 6
**decisions** 18:9 46:7, 10 59:19 127:12 128:4 142:5, 13, 14 161:19 175:21 179:10 215:6, 11 217:25 218:5, 20 258:5 259:21 260:2
**decisis** 214:25
**Declaration** 4:2 20:8, 9, 11, 19 37:22 38:6, 17, 23 39:2, 4 43:10, 16 44:3, 7 133:25 135:1, 5, 8, 16 143:15 145:11, 15 152:15, 17 170:8 191:10 198:25 200:16, 19, 22, 25 201:5, 9 205:4, 6 210:25
**declarations** 15:8 43:20 60:11
**declaration's** 199:1
**declaratory** 198:3 205:10 209:14 216:15, 18 217:13 220:5, 7, 9 235:12 250:15 260:11, 19
**declare** 39:4, 10 84:21
**declared** 43:17
**declares** 39:15
**decline** 144:20
**deemed** 201:13
**deeply** 178:23 202:14
**defects** 210:10
**defend** 137:11 217:2
**defense** 183:7
**defenses** 183:1
**defer** 7:18
**deficiencies** 59:11 149:16 188:19 198:9 226:5
**deficiency** 150:9
**define** 193:15
**defined** 110:25 121:19 258:8
**defines** 205:19
**definition** 110:18, 19, 22 122:7, 9, 11 205:16
**definitive** 182:18
**deliver** 113:1
**delivered** 126:22
**democrat** 156:8 158:16 177:8
**democratic** 155:19 177:2, 10, 20, 21 199:7 203:6
**demonstrated** 225:3
**denial/dismissal** 223:17
**denied** 119:22 226:20
**denying** 26:25 188:21
**depart** 125:6
**Department** 1:1 4:6, 9 7:5 10:9 16:7, 9, 10, 25 17:10, 19 18:8 20:9 23:2, 14, 16 26:19 27:20 28:9 37:23 38:21 41:7, 13 42:4, 12 45:9 46:12 47:9, 14 53:13 56:5, 25 57:21 58:11 60:9 63:19 65:10, 12, 15, 17 66:1, 9, 13, 15, 23 71:9, 19 82:18 91:22 92:8 93:4, 13 94:5 97:10, 13 111:25 112:4, 7 113:12 114:17, 20 116:12 118:3 126:14, 15 131:23, 25 132:8, 11, 13, 20 137:6 142:8 153:25 159:2 160:18 168:13 169:3 172:9 173:17 175:1, 16 176:9 181:18 186:14 194:5, 8, 11, 12, 16 195:3, 8 213:20 220:1 252:12, 16
**Departmental** 47:2
**Department's** 23:18 24:1, 5, 11, 12 26:2, 21 28:5 32:5 35:15, 21 53:4 60:12 63:12, 13, 14, 19 113:3, 16 114:13, 15 115:8 121:7, 9, 11 207:14
**depend** 104:17 260:18
**depending** 52:16 144:13 146:10
**depends** 80:4, 5 85:10 107:7 146:15 149:17 254:5
**Deputy** 8:25 16:6 65:24 92:22 109:18 111:7 219:20 245:14 249:21
**describe** 23:4 52:25 53:2 173:11 188:1
**described** 190:15 198:10
**describes** 50:1 193:24 198:12, 22
**describing** 192:2 228:12
**description** 141:23
**desperately** 260:25
**despite** 225:19
**destroy** 43:19
**detailed** 233:2
**details** 102:21 103:5 104:8, 9 105:2 152:1 251:11
**determination** 26:3 52:4 53:4 87:23, 24 98:19 144:15 169:22 170:21 191:12, 14 200:14
**determinations** 94:20 95:8, 19
**determine** 21:22 22:4 44:7 95:14 102:16 114:25 130:3 142:25 147:15 163:23 164:11, 12, 16, 20 170:14, 15 199:22, 25 200:6 202:6 225:4 230:25 258:15
**determined** 67:15 144:24 146:4 153:7 165:1 166:24 190:25 208:8
**Determining** 45:17 98:16, 17 133:21 134:24 143:11, 24 201:10 205:5 233:19
**developed** 257:3
**dicta** 256:23, 25
**dictate** 198:18 199:19 200:13
**dictates** 200:14 201:17 202:24 205:7
**dictating** 192:25 202:17
**died** 101:4, 7 102:8 103:13 116:20, 25 117:8, 11 145:15 203:16
**dies** 117:3 148:13 203:20
**difference** 38:2, 4 110:2, 8 121:18, 20 143:18 156:15 230:6
**different** 20:13 38:2 69:12, 16, 24 79:8 86:10 96:11 104:17, 20 116:23 122:2, 4, 13, 17, 18 137:5 146:4 163:15 172:14, 15 180:22 196:14 197:4 204:25 213:15 214:6 223:24 249:1 253:13 254:19 261:15
**differently** 69:15, 23 216:14 240:12
**differs** 50:16
**difficult** 11:2 74:13
**Dillon** 2:1
**diploma** 65:15
**DIRECT** 3:2 16:1 25:17 26:4 30:12 32:8 33:7, 22 41:23 93:17 105:6, 7 106:21 125:19 141:6 158:7 160:13
**directed** 14:9 27:22 117:4 171:15 172:16 173:13, 15 199:5 202:20
**directing** 149:9 201:16
**direction** 45:22 101:22 168:2, 3 200:6 253:10
**directions** 201:22
**directive** 8:1 53:1, 3 92:5, 7 131:23 171:16 209:16
**directives** 17:23 209:19
**directly** 67:1, 11 89:11
134:9 191:18 199:14 237:25
**Director** 27:22 33:5 56:18 126:15 127:6 132:18 136:9 161:22 169:20 175:2
**Director's** 54:22
**directory** 194:1 210:25
**directs** 44:6 173:19 192:8 202:1
**disagree** 45:21 54:17 90:14 100:9 210:23 217:5
**disagreed** 57:23
**disagreement** 53:14 112:17, 21 113:2 138:5, 7, 12 139:1 195:4 214:16 252:17
**disagreements** 194:14
**disagrees** 11:16 260:9
**discern** 38:3
**Discontinuance** 119:5, 7, 14 121:8 194:16 216:7
**discontinued** 236:16 237:11
**discrepancy** 234:11
**discretion** 45:18 75:19 78:5 155:8 170:13, 15 188:3, 5 191:2, 15 192:13, 21, 23, 25 193:2, 9, 12, 13 195:11, 20 197:23 201:16 208:20 220:13, 14, 19 223:5, 6, 11, 17 225:19 240:3 243:3, 5 250:6, 9 258:11
**discretionary** 45:11, 12, 14, 15 224:3

250:9, 11
**discuss** 136:4
**discussed** 41:6 133:4
**discussing** 187:10
**discussion** 61:23 105:16 136:8 137:21 140:18 187:13 188:7 228:6
**discussions** 68:14 74:18 194:20
**disenfranchising** 203:10 229:16
**disfavored** 244:19
**Dismiss** 83:10
**Dismissal** 119:6
**dismissed** 91:7 118:19, 21 236:8 238:21 254:2
**dismissing** 235:18
**dispensing** 14:3
**dispute** 93:12, 14 149:21 150:3 186:19 193:11 197:18 209:24 232:24
**disputed** 11:17 18:3
**disputes** 194:10 196:5
**disputing** 64:13
**disqualify** 163:19 233:17
**dissent** 244:17
**Dissenting** 5:13 227:17, 19, 25
**distinction** 218:10, 11
**distinguishes** 233:23
**distribute** 104:15
**district** 62:17 83:12, 13 103:7 104:5 145:18, 19 151:2 152:9 192:4
**districts** 49:23, 24 192:8 193:20
**Division** 65:21, 22
**Docket** 5:6, 13, 21 151:3 152:7, 8, 9 263:3
**doctrine** 240:15
**document** 19:25 20:5, 7 24:18 25:18 27:11, 15 28:20 30:13, 14 31:13 32:10 33:10, 24 42:6, 14 55:1 58:20 70:4, 9 76:3 83:14 117:23
**Documents** 41:21 68:20 81:19 89:1 108:19 152:19 157:10 158:5
**doing** 60:8, 9 75:13 88:4, 23 91:12 109:12 137:13 210:19 226:3 231:9 235:25 238:10, 11 252:3, 12
**door** 202:20 203:2
**DOS** 173:24
**double-check** 114:24
**doubt** 203:11
**Dougherty** 98:22 211:22
**Dougherty's** 99:3, 5 210:16 233:11
**down-ballot** 156:15, 25 177:7, 15
**Downington** 256:9
**dozen** 104:20
**Dr** 97:24 119:10, 11
**drafted** 20:8
**drastic** 248:23
**drill** 23:13
**drop** 165:8
**dropped** 109:9
**drops** 129:2
**due** 9:8 250:17
**duly** 15:4 125:17 141:4 160:11
**Dunn** 3:7 8:24 125:11, 12, 16, 21 138:4
**Dunn's** 141:20
**duties** 17:12 83:25 208:24 216:21 238:20, 22 245:12, 18, 19 258:9
**duty** 12:5 16:23 45:16 53:5, 9 71:6 83:25 90:4 115:11 186:17, 19 187:8 217:4 220:19 248:11
**duty-bound** 70:22

< E >
**earlier** 23:1 35:11 36:1 37:3 48:11 56:24 67:4 110:15 115:16 121:20 124:6, 24 141:21 148:2 172:19 174:7 178:12 197:11 198:21 219:22 238:23 247:21 249:10 256:10
**early** 23:5 65:19 88:13 96:24 113:7 148:24
**Earth** 95:1
**easily** 12:19
**echo** 8:13
**educational** 65:4
**effect** 8:4 51:25 53:8 176:11 185:19 211:25 213:25 229:19, 20 234:12 235:3 245:5 253:15 254:12 259:11
**effective** 46:22 214:1
**effectively** 106:18
**effectuate** 203:9
**efficiently** 216:23
**effort** 18:8 231:9
**egg** 122:16
**eight** 247:10
**either** 22:18 36:21 78:7 97:25 122:6 124:15 167:3 170:22 173:16 175:19 177:8 183:4 188:16 217:10
**elected** 246:1
**Election** 6:5 12:3 16:24 17:1, 7, 14, 16 18:18, 25 19:9 20:17 21:5, 9, 17, 18, 21 27:23 29:4 32:24 33:5 37:4 39:5, 8 41:10, 14 43:23 44:6, 13, 14, 21 45:19 46:11 47:3, 8 49:2 50:16, 20, 21, 23 53:16 56:18 58:12 59:14 62:1, 5, 7, 25 66:25 68:6 71:17 72:11, 17, 22 75:10, 18 76:9, 22 77:1 78:18, 19 79:11 80:5, 6 81:10, 17, 18 83:20, 24 84:4, 12, 17 85:1 86:24 87:3, 5, 8 88:7 89:4, 9 90:4 91:11 94:9 95:23 97:12 101:19, 20, 22, 23 102:4, 8, 13, 17 104:18 110:3, 5, 20, 25 111:9, 11 116:20, 25 117:2, 3, 14 121:19 122:7, 9 124:7, 16 126:5, 15, 16 127:6, 14, 16 128:20, 22 129:3, 4, 12, 22 130:13 132:18 133:7, 21 134:23 136:9, 13, 17 139:12, 19 142:5, 20 143:4 144:7 146:13, 17 147:2, 5, 15, 24 148:13, 16 152:24 153:17 154:8 155:9 156:4, 14 159:14 161:22 162:12, 13, 25 163:3, 7, 18 165:3, 6, 15 166:12, 23 167:5 168:12, 13 169:3, 4, 6, 24 170:7 172:6, 24 173:14 177:11, 23 178:15, 19, 21, 24 179:5 181:10, 12, 16 182:10, 13, 15 183:25 186:16, 25 187:5, 9 188:8 190:2, 17, 25 191:5, 16 192:4, 8, 23 193:2, 18, 20 194:11 195:21 196:2, 3, 8 197:19, 21 198:5, 6 200:20 201:3, 11, 12, 14 202:14, 25 203:8, 16, 20, 23 204:21 205:11, 21 206:16 207:1, 7, 13 208:6, 20, 25 210:9, 11 211:11, 19 213:14, 21, 23 214:5, 6 216:19 217:10 220:20 233:15, 17, 20, 25 234:17, 20 235:2 236:1 241:3, 4 243:9 245:12 248:10, 20 250:25 252:5 256:24 258:6 261:20, 23
**ELECTIONS** 1:1 2:1 7:6, 7, 8, 23 8:2, 10 16:6, 12, 13, 14, 19, 21, 22 17:11, 14, 17 18:4, 13, 19, 23 20:22 22:2 25:22 29:13 32:22 37:24 39:22, 24 40:4 44:7 45:5 48:6 49:8, 11 50:1, 18 61:16, 19 65:17, 20, 21, 23 66:6, 11 71:10 72:1, 19 78:23 79:10 84:1, 2, 3, 23 87:24 88:13 89:2, 15, 24 92:10 94:6, 7, 10, 13, 17 95:12, 18, 25 96:13 98:5 110:5, 9 117:4 126:3, 4, 7, 12 127:3, 12 140:6 141:18, 24 142:2, 3 143:4 145:9 148:18 153:25 154:24 155:7 159:16, 17 161:1, 5, 8, 12, 18 167:23 169:20, 23 170:1, 6, 21 175:3, 10 176:7, 14 177:14, 25 183:23 192:14 206:5, 17, 19, 25 208:10 209:7, 8, 12, 13, 20 210:5 214:3 215:14, 22 216:4, 22 217:25 218:16, 21 221:2 229:22 232:14 238:5 261:8
**elector** 20:21 43:11
**electors** 76:13 98:16

**electronic** 88:24
**electronically** 89:7
**elements** 209:22 228:4, 5, 11
**elicit** 154:20
**elicited** 208:2
**elicits** 15:18
**eligibility** 203:23
**eligible** 39:16 196:11
**E-mail** 4:13, 14, 15, 16, 19 5:17 25:6, 9, 12, 21, 22 26:6, 8, 11 28:11, 16 29:1, 9, 17, 22, 25 30:8, 18 31:5, 7, 8, 17, 23 32:4 33:8, 14 34:3, 4, 5, 10, 18, 22, 25 35:5, 6 48:3 52:10, 13, 15, 25 54:10, 23 55:13, 16, 20, 21 56:1, 4, 21 57:9 112:25 172:23, 24 173:4, 22 174:1, 22 194:23 221:25 222:1
**e-mail-in** 26:5
**e-mailing** 25:14
**E-mails** 4:12 172:21, 22
**embrace** 223:11
**Emergency** 7:9 185:18 209:23 244:18 245:9, 10, 11 246:9, 11 248:1 256:19 257:2
**employed** 16:8, 10
**employee** 61:20
**enable** 75:18
**enabled** 230:25
**enclosed** 39:13
**endeavor** 251:24
**ended** 82:4
**enforce** 7:25 11:23, 24 187:17, 21 209:15, 19, 20 232:9
**enforced** 234:25
**engaging** 94:19
**enter** 89:10 129:20, 22 144:3 244:9
**entered** 89:15 119:1 131:17 132:6 134:12 136:3 190:12 236:11 237:5 248:25 254:6
**entire** 18:17 31:7 124:14
**entirely** 66:3 247:6, 8
**entities** 16:20
**entitled** 249:9
**entity** 16:20 70:22 71:6
**enumerated** 76:12
**Envelope** 4:2 20:8, 9, 10, 11, 15, 16, 17, 19, 20, 24 21:25 22:4, 7, 10 37:14, 21, 23 43:4, 9, 15 44:3, 23 101:4, 5, 25 102:15 114:8 117:16 129:18 130:3, 12 133:25 135:6 144:1, 7 145:10 148:5 149:25 162:7 163:3, 7 164:24 165:2, 5, 13, 14 166:4, 8, 9 167:13 168:1 188:16, 24 189:5, 9 198:8, 17, 19 199:1, 13, 14, 16, 17 200:3, 5, 9 201:5 225:23 226:4 230:15 231:11
**Envelopes** 5:10 20:13, 14 43:18 175:18 191:13 230:9
**envelope's** 165:17
**equally** 205:16
**equipment** 126:20, 22
**equitable** 180:6 183:1
**equity** 180:5
**error** 23:25 80:2 104:10 114:21, 24 115:1 116:16 197:13
**errors** 79:19 114:18 189:6 208:13
**Esquire** 1:1 2:1
**essence** 54:16
**essentially** 19:10 53:7 81:14 227:20 235:17 258:14
**establish** 212:1
**established** 102:20 213:18 224:24
**events** 25:24 26:1, 2, 24
**eventually** 235:7
**everybody** 11:7 242:10 246:18
**everyone's** 106:2, 4
**EVIDENCE** 4:2 5:2 6:2 103:15 108:18 109:5 134:4, 10 157:12 197:22 242:15
**evidentiary** 7:18 10:14 12:21, 22
**exact** 44:22 69:9 96:20 113:25 135:14 200:10 201:24 212:16 246:16 254:10
**exactly** 58:3 128:9 130:1 131:6 167:10 171:15 175:24 189:5 195:10 199:22 238:1, 6, 18 240:12 243:11 245:18 250:9 252:1 261:1
**EXAMINATION** 16:1 63:15, 16 93:18 109:15 111:23 125:19 141:6 157:13 160:13 174:7 181:7
**examine** 63:8
**examined** 62:13
**examining** 190:9
**example** 15:10 49:22, 24 56:17 66:19 69:16 95:10, 11 103:23 156:7, 24 161:19, 25 163:7, 22 164:4, 5, 18 169:9 178:3 189:1, 9 197:15 201:25 202:18 203:15 204:16 206:2 207:2 230:20 237:16 245:23, 24 247:7
**examples** 203:14
**excellent** 236:5
**exception** 161:4 162:13
**exchange** 175:9
**exchanged** 151:9
**exclude** 130:7 147:11 148:4, 6 164:18 254:18
**excluded** 36:2, 5, 8 60:5 208:13, 18 211:2 259:25
**excludes** 253:12
**excluding** 162:18, 21, 22, 24 259:5, 22
**exclusively** 187:15 188:20
**excuse** 11:8 15:6 137:18 145:5 162:20 166:8 188:11 198:25 201:5 253:11 254:9
**excused** 125:9 140:14 160:4 184:9
**executed** 43:20
**executive** 243:7, 8
**exercise** 188:3, 5 192:25 193:12 233:19 234:17 235:15 250:11 261:18
**exercised** 250:10
**exercising** 238:17 250:7
**Exhibit** 19:24 20:1, 23 24:17, 19 25:4 26:5 27:10, 12 28:18, 21 30:13, 15 31:12, 14 32:9, 11 33:7, 11, 23, 25 37:8, 11 41:5, 6, 15, 17 42:1, 3, 7, 10, 15, 20, 24 45:4 48:1 52:12 54:11, 22 55:2, 5, 9, 16 56:19 57:9, 11, 12, 18 58:13, 17, 18, 21 59:8 83:6, 15 108:20 117:20 118:23, 24, 25 131:22 151:3 157:11 172:22 173:6, 12, 13 174:4 175:5 232:22 257:24
**exhibits** 32:7 41:20 68:20 108:12, 17, 21, 22, 23, 25 109:1, 2, 3 151:9, 13 157:6
**exist** 222:18
**existence** 254:14
**existing** 196:1
**exists** 7:24, 25 69:21, 23 192:22
**expand** 238:12 249:16
**expanding** 249:13
**expect** 17:25 106:22 107:6 249:15
**expectation** 195:3, 21 196:8, 10 197:22
**expectations** 206:8
**expedited** 257:1
**expeditiously** 195:9
**experience** 74:1 116:6, 7 179:4 181:9, 11 249:23
**expert** 61:25 62:3, 4, 8 63:6 66:17 73:3 74:7 75:16
**expertise** 62:1
**explain** 20:12, 13 21:5 113:3, 16 126:11 145:1
**explaining** 163:11
**explanation** 103:22
**explore** 51:11
**expressed** 227:21
**expressly** 111:10
**extended** 21:21 129:9 219:21
**extension** 122:4
**extensive** 111:8 227:12 229:25 256:20
**extent** 44:10 52:1 68:14 72:2 89:18 116:2 135:19 168:5 212:1
**exterior** 225:23 226:4
**external** 164:2
**extremely** 177:16 261:14

< F >
**face** 197:*13*
**facets** 126:*16*
**facing** 214:*4* 231:*3* 235:3
**fact** 13:*6* 48:*19* 54:3 74:*3, 14, 25* 77:*19* 105:9 112:*4* 118:*10* 130:*21* 151:*18* 157:22 162:6 163:*23* 170:9 172:*21* 179:2 193:*5* 202:*7, 10* 204:*8* 208:*18* 224:6 225:*19* 227:*19* 237:*4*
**facts** 11:*17* 51:*10, 12* 52:7 77:*19* 85:*15* 88:*12* 90:*7* 91:*23* 139:*17* 177:2 213:*19* 224:22 262:3
**factual** 63:*15* 78:4 183:*6*
**factually** 132:*15*
**failed** 71:*6* 188:22 198:*7* 199:*12* 248:*8, 9* 250:*23*
**failing** 53:*7*
**failure** 8:*17* 211:*1*
**fair** 19:*5* 31:*8* 32:*3, 6* 33:*18* 44:*1* 46:*14* 47:*11* 54:*19, 20* 59:*5* 72:*4, 9* 75:*20* 90:*1* 99:*4* 127:*2* 261:*20*
**fairly** 177:*12*
**faith** 216:*10*
**fall** 246:*2*
**falls** 259:*20*
**false** 201:*6*
**familiar** 20:*5* 59:22 72:*11* 76:*16, 17* 92:9 94:*10, 12* 98:22 101:9 102:*23* 103:*4* 127:*3* 130:*24* 156:*1* 171:*11* 172:*15* 177:*6*
178:*3, 22* 232:*25*
**families** 162:*17, 19*
**fan** 81:*6, 8*
**far** 126:*8* 130:*13* 238:*23*
**fashion** 126:*22*
**favor** 219:*25*
**FAYETTE** 1:*1* 2:*1* 5:*17* 7:*7* 8:*10, 24* 28:*1* 29:*4, 14* 30:*6* 34:*12, 14* 35:*4* 48:*11* 50:*12* 51:*18* 54:*12* 55:*6* 60:*16* 83:*15* 86:*21, 22* 89:*6* 109:*25* 125:*11, 23* 126:*3, 13* 127:3 129:*14* 130:*17, 21* 131:*3, 14* 132:2 138:*4* 139:*19, 23, 25* 141:*24* 159:*15* 184:*17* 196:*13* 209:*13* 219:*13* 257:*23*
**Fayette's** 29:*19* 108:*23* 109:3 219:22
**February** 16:*17*
**federal** 11:*25* 62:*16* 82:*4, 7, 12* 104:*5* 187:2 189:*17, 25* 205:*12, 17* 208:*7, 8* 213:*5, 15* 228:*12* 229:3 240:*15* 257:*18* 259:*23* 260:*7*
**feel** 11:*10* 132:*24* 170:5
**fees** 237:*22, 24*
**felt** 132:*22* 136:*13*
**Fetterman** 97:*24*
**fidelity** 233:*16*
**fifth** 127:*16*
**figure** 203:*24*
**file** 76:*14* 87:*2* 112:*18* 180:9 236:*22*
240:*4* 248:*13, 19*
**filed** 8:*20* 15:*10* 59:*20* 66:*8* 67:*3* 68:*12* 71:*15* 82:*11, 14* 85:3 86:*23* 90:*24* 91:*9* 96:*18* 97:*1* 119:*7, 9, 20, 21* 136:*17* 179:22 180:*10, 11* 219:*3, 16* 220:*2* 229:*25* 248:*15* 251:9
**files** 88:*24*
**filing** 7:*22* 87:*4* 97:*5*
**filings** 68:*19*
**fill** 43:*24* 169:*3*
**filled** 43:*10, 16, 22* 44:4 95:*15* 101:*6* 143:*7, 11* 147:*16* 231:*20*
**fills** 147:*23*
**final** 18:*2, 5* 19:*15* 30:*1* 48:*13, 24* 54:*5* 80:*9* 161:*19* 186:*16* 187:*4* 190:*18* 205:*21* 206:*25* 209:*10* 218:*21* 225:*21* 226:*12* 230:*6* 234:*14* 235:6 253:*13, 18, 19, 25* 254:*16* 257:9 260:3 261:*7*
**finality** 260:*23, 24*
**finalize** 79:*25*
**finally** 33:*22* 187:*8* 208:6
**finance** 89:9
**find** 105:*19* 204:*11* 206:9
**fine** 13:*16* 14:2 15:*20* 53:*13* 87:*14* 130:*15* 154:*12* 185:9 211:22 212:*6*
**finish** 108:*8* 182:*20* 205:*22*
**finished** 111:*18*
**firm** 68:*4, 7*
**first** 7:*20* 8:*6* 9:*18* 14:*24* 18:*14* 23:*13* 29:*23* 30:*20* 32:*9, 15* 36:*18, 19* 38:*9, 16* 43:*7* 47:*24* 57:*3* 63:*22* 82:*16* 99:*24* 105:*19* 109:*17* 112:*17* 127:*22* 151:*7* 165:*5, 11* 166:*13* 174:*4* 185:*1, 9, 12* 219:*11, 13, 20* 222:*24* 224:*12* 248:*17* 249:*20*
**FISCHER** 1:*1* 3:*4, 8, 11* 9:*20* 14:*2, 23* 15:*15* 16:2 20:*4* 25:3 27:*14* 28:*23* 30:*17* 31:*1, 2, 16* 32:*13* 33:*13* 34:2 36:*15* 44:*9, 20* 47:*17* 52:*1* 63:*10* 64:*12, 21* 68:*13* 70:*9, 13* 72:*24* 74:*3, 21* 76:*3, 4* 77:*10* 78:*11* 80:*13* 82:*24* 83:*1* 85:*7, 14* 87:*11* 92:*15* 93:9 96:*6* 97:*2* 99:6 100:*12* 101:*10* 102:*19, 23* 105:3 106:*11, 16* 107:*6, 11, 17* 108:*15* 111:*21, 24* 115:*5, 7, 18* 116:*8, 11* 117:*25* 120:*2, 24* 123:*6, 22* 125:*10, 20* 130:*14, 16* 134:*3, 8* 135:*3, 25* 136:2 137:*14, 18, 20, 22* 140:*11, 15, 20, 22* 141:*7, 11, 12, 13* 150:*18* 151:*7, 17* 154:*10, 22* 155:*14* 157:*4, 14* 158:*6* 159:*6, 24*
**fit** 9:*4* 10:*11* 148:*17*
**five** 107:*12* 184:*22* 186:*3* 217:*7* 228:*5, 11* 256:*18*
**five-minute** 184:*24*
**fixed** 240:*23*
**flipping** 57:*15*
**flood** 195:*5*
**Flyers** 81:*6*
**focus** 128:*18* 130:9 142:*18*
**focused** 220:*5*
**fold** 203:*1*
**folks** 71:*22* 222:*15*
**follow** 12:*5, 22* 18:*1* 120:*22* 137:*15* 170:*17* 182:*10, 12, 16* 201:*7* 202:*18* 250:*23* 255:*4, 9* 257:*18*
**followed** 74:*13*
**Following** 34:*11, 17* 35:6 41:*1* 137:9 173:*24* 174:2 183:*18* 187:*18* 200:*10* 201:*22* 208:*23*
**follows** 15:*4* 125:*17* 141:*4* 160:*11* 192:*4* 253:9 255:*20* 256:6 258:*13*
**follow-up** 34:*18* 57:*13* 153:*8* 183:*14*
**follow-ups** 181:*4*
**footnote** 234:*15*
**force** 69:*14* 71:*1, 2* 112:*1, 8*
**fore** 13:*15*
**foregoing** 263:*2*
**foremost** 63:*6*
**forget** 136:*24* 231:*8*
**forgets** 241:*20*
**Forgive** 161:*3* 162:*24* 182:*14* 252:*24*
**form** 15:*9* 21:*13* 37:*12, 22* 38:*1, 20* 78:*20* 79:*6, 7, 8* 104:*14, 15*
**format** 78:*25*
**forms** 79:*13* 88:*19*
**forth** 212:*21* 246:*5*
**forths** 252:*15*
**forthwith** 76:*10* 77:*3, 7, 9* 84:*13*
**forward** 47:*22* 56:*2* 136:*10* 138:*16* 144:*15* 174:*20* 211:*19* 212:*2*
**found** 136:*25* 144:*24* 145:*17* 230:*24* 247:*21, 23*
**foundation** 102:*20*
**four** 28:*1* 34:*20* 35:*12* 40:*25* 195:2
**four-to-three** 210:*7*
**frame** 106:*6*
**frankly** 63:*13* 74:*5* 80:*14* 152:*4*
**fraud** 98:*24* 101:*3, 16, 18* 103:*8, 15, 25* 144:*22, 24* 145:*2, 20* 148:*8, 9* 150:*22* 234:*17*
**fraudulently** 117:*6, 10*
**free** 11:*10* 125:*6* 261:*20*
**freedom** 188:9
**frequently** 61:9
**freshly** 257:*8*
**Friday** 21:*21* 124:*8*
**front** 10:22 37:9 41:*17* 42:*1* 44:*22* 51:9 59:*23* 64:*11* 69:*7, 9*

74:11  96:19
118:24  173:2
236:18, 23, 24
**full**  14:9
83:19  213:8
**fully**  203:2
257:3  258:25
**Fulton**  92:9
238:16
**function**  20:13
94:17, 20
203:15  204:6
249:17  250:1,
3
**functions**
72:20  250:12
**further**  36:15
39:10, 15
78:10  94:21
120:2  121:14
137:23  140:11
144:14  150:18
155:11  159:6,
11, 24  167:17
172:9  174:23
176:17  182:19
183:16  184:2,
4, 10  188:6
191:1, 15
193:1  197:22
204:8  208:20
209:1  244:24
254:2
**future**  171:17
215:4  227:6
256:24

**< G >**
**g)(3**  191:8
197:12  198:24
**g)(4**  191:17, 20
**game**  15:22
80:11  238:24
**Gates**  4:17, 19
27:21  32:15
33:5, 9  34:3, 9,
15, 19  35:5, 12
48:20  56:6, 22
57:4, 13, 22
175:1, 9
**gener**  166:11
**General**  1:1
10:8  15:16
21:16  29:15
41:14  66:10
85:1  133:15,
20  160:18
179:11, 18, 21
201:13  234:20

**Generally**
17:2, 4  47:5
54:8  68:6
77:8  91:3
102:24  109:16,
20, 22  127:11
206:24  207:1
261:4
**General's**
141:11
**generate**
165:19
**generated**
166:10
**generates**
165:20  166:9
**genie**  225:17
**gent**  73:2
**gentleman**
85:25  134:17
245:15
**gentlemen**
82:23
**getting**  46:5
105:11  152:22
242:21, 24
**ginned**  216:9
**give**  28:18
44:19  96:19
107:3  109:8
113:25  132:9
151:22  152:7
155:21  239:17
248:23  249:19
259:11
**given**  13:6, 13,
23  16:23
17:14  75:2
97:9  135:16
205:19  227:21
256:25
**gives**  75:12
83:21, 24
84:17  111:13
**giving**  37:6
44:18  73:25
74:5  257:13
**Glad**  251:17
**go**  9:3, 19
11:11  15:17
30:4  31:12
36:18, 19  37:8
41:23  54:15
61:22  63:8
65:3  71:24
72:6, 21  78:9
81:23  85:21
96:1, 2  103:16
126:21, 23

131:21  132:7,
12  133:16
136:10  138:16,
22  144:12, 15
145:6  156:3
166:19  185:8
193:24  228:13
229:14  231:9
237:3  243:25
245:24  247:9
251:10
**goal**  107:17
113:15, 16
**goes**  39:7
77:5  134:4, 9
157:19  165:23,
24  192:4
229:15  230:3
242:6
**going**  13:1, 24
19:23  24:16
27:9  28:17
29:10  32:7
44:9  47:8, 22
54:17, 18
55:12  56:11,
14  57:22
64:17  67:16,
19  68:13, 21
69:20  80:13
82:19  90:14
99:8, 9, 12
100:15  102:7,
10  103:19
105:3  108:8
109:16, 20
110:7, 8
115:12, 18
123:14  129:3,
4  132:14, 15,
18  133:15
134:22  136:15
138:16  139:11
151:23  152:18
153:11  160:6
167:9  168:22
184:23  185:10
187:10  190:21,
22  192:16
195:3  211:19
212:2  213:7
216:18  218:23
219:11, 14
222:19  225:6
226:9  232:4,
11, 13  233:7
243:10  251:10
**Good**  7:2  8:9
10:4, 6  14:17

16:3, 4  37:1, 2
41:2  61:6
70:8  73:9
98:11  99:24
105:9  125:21
141:8, 9, 13
150:21  160:15,
16  167:20, 21
176:1, 22, 23
184:20  216:10
234:23
**Gore**  240:15
**gotten**  235:7
**government**
245:17
**governmental**
16:20
**Governor**
81:20  97:14,
17, 24  179:21
246:1
**Governor's**
243:18, 22
**governs**  191:7
**grace**  219:21
**Graham**  2:1
**Grant**  83:11
244:17
**granted**
119:14  133:16
207:6  238:17
256:19
**granting**  254:7
**grants**  244:11
**gratuitous**
99:19, 20
**great**  133:16
198:11  238:12
240:24  241:10
251:13
**ground**  93:11
138:14
**group**  173:15
**gubernatorial**
97:19
**guess**  9:5
45:4  57:20
63:8  74:1
100:6  123:19
213:12  219:8
220:10  223:25
226:17  229:24
231:19  232:5
235:24
**guessing**  231:8
**Guidance**  4:6,
8, 11  11:23
17:13, 18, 19,
21, 24, 25  18:9

23:1, 2, 7, 10,
11, 16, 18, 21
24:1, 5, 11, 12
26:21  31:24
41:6, 9, 12, 14,
15  42:3, 11, 18,
21  44:13  45:4,
5  47:2, 7, 8, 12,
14  56:1  58:9,
11  59:3, 7
60:8, 12  84:16
91:23, 24, 25
92:3  93:12
112:24, 25
114:13  132:8,
11  133:2
142:7, 10
153:24  168:13,
15  172:9, 13
174:11  175:25
183:19, 21
187:17, 21
213:20  215:23
246:23  247:1,
12, 14
**guidances**
135:17
**guide**  262:5
**guided**  155:4
**guides**  190:13
**guy**  241:8

**< H >**
**half**  25:18
104:20  107:4,
11, 16  237:7
**hall**  241:14
**hallmarks**
220:2
**hand**  15:1
19:23  24:16
27:9  28:17
32:7  75:24
90:17  117:21
125:14  137:10,
11  141:1
160:8
**handed**  41:21
117:23  158:5
**handful**  194:24
**handily**  156:23
**handle**  7:19
47:3  153:3
**handled**  91:5
**handling**
170:22
**hands**  180:4, 7
182:21  183:3

247:23, 24
248:7, 10
**handwriting**
38:17, 24
**handwritten**
188:23  189:3
230:8, 14
**hanging**  221:9
**Hangley**  68:7
**happen**  89:19
127:20  147:20
167:1  197:23
200:8
**happened**
59:2  88:16
89:16  91:13
129:11  145:8
169:5  175:12
180:7  216:6
239:16  249:25
253:17  254:3
**happening**
238:1  240:19,
20  249:22, 24
**happens**  18:7
41:1  114:20
127:6  136:19
153:21  166:13
191:16  195:20
242:3
**hard**  89:14
134:6  204:11
212:24
**hardworking**
215:5
**Harrisburg**  1:1
**hate**  230:8
**head**  126:15
**Health**  159:2
**hear**  11:3, 7
13:10  64:19
134:6  135:23
141:20  210:2
213:9  231:22,
25  244:12
**heard**  22:17
34:13  161:10
171:9  178:18
185:12  192:18
194:9, 21, 22
202:3  203:14,
15  206:1
245:14  248:21
249:20, 21, 22,
24  252:10
261:24
**hearing**  7:8,
18  8:17  10:14
12:10, 21, 22

108:16 179:9 222:25 262:9
**hearings** 232:13
**held** 16:16 48:17 66:1 105:16 140:18
**He'll** 74:19
**help** 31:23 55:25 174:10
**helped** 230:23
**helpful** 69:7 193:23 225:1 227:9 230:19 252:23
**hey** 132:18 137:6
**Hi** 125:22
**high** 65:4, 15
**hint** 112:17 252:16
**hockey** 80:11 81:4, 7 238:22, 24
**hold** 71:25 72:6 138:14
**holding** 186:16
**HOLLAND** 15:1, 5 125:14, 18 141:1, 5 160:8, 12
**home** 71:24 72:21
**HON** 1:1
**honest** 182:25
**honestly** 216:22
**Honor** 7:15, 18 9:3, 12 10:4, 11 11:12, 16 12:18, 20 13:16, 18, 22 14:2, 6, 17, 24 15:7, 15, 20 24:22 36:16, 19 44:9 47:17 51:13 52:8 60:25 62:23 63:10, 22 64:12, 23 65:1 70:2 72:5, 16, 24 73:1, 3, 5 74:10, 12 75:3, 23 78:11 80:13, 25 82:14 83:12 85:9, 18, 23 86:15 87:16 91:5 92:15 93:18 96:22 105:3, 7 106:11, 16 107:6, 18 108:10 109:6 111:18, 21 115:16 120:2, 6 121:14 122:20 125:3, 8, 10 133:13 134:3, 15 135:3 137:18, 22, 25 139:17 140:1, 9, 11, 15, 20, 22 150:18 151:2, 7, 11, 14, 24 152:19 154:22 155:12, 13 157:5 159:6, 24 160:5 167:17 176:17 179:25 180:3 182:19 183:12 184:3, 4, 8, 13, 16, 17 186:5, 8, 9, 12, 15 187:3 191:6, 18 193:4, 23 198:10 201:18 203:6 204:10 205:9, 14, 15 207:25 209:4, 6, 8 210:15 211:17 212:10, 11 224:12 225:2 226:1, 9 235:6 236:3, 10, 12, 14 237:5, 14 240:17 244:13 246:15, 18 247:21 248:4 251:4, 17, 21, 23 253:25 254:6, 17 256:12 257:4 260:9, 16 261:9
**Honorable** 239:6
**Honor's** 10:11 190:15, 23 212:12 224:15 225:20 244:5 252:19 254:15, 24
**hope** 76:21 113:17
**hopefully** 107:21 152:20 215:22
**hoping** 215:15
**hour** 107:4, 11, 15, 16
**hours** 56:12 107:16
**house** 49:24 98:4 103:12 110:12 156:19 243:20
**hundred** 109:24
**hypothetical** 103:10 116:19 239:18
**hypothetically** 96:12 103:10, 11, 14, 20
**hypotheticals** 103:16 234:5

**< I >**
**idea** 223:20 234:24
**ideal** 59:15
**identical** 198:15
**IDENTIFICATION** 4:2 5:2 6:2 20:2 24:20 27:13 28:22 30:16 31:15 32:12 33:12 34:1 42:8, 16 55:3 58:22 83:16 108:24 157:12
**identified** 150:9
**identifies** 20:16 114:17, 21
**identify** 114:23 116:15 189:22 200:24
**ignore** 155:8 170:6
**III** 2:1 8:10 61:13 176:24
**illuminative** 199:8
**illustrative** 237:18
**imagine** 226:9 241:19 259:13
**immaterial** 170:16 231:18 234:11
**immediate** 196:4
**immediately** 112:18 166:15 252:16
**impact** 177:17
**impacted** 49:20 104:11
**impediments** 234:16
**implication** 200:2, 5
**implications** 133:11
**implies** 17:25 44:23
**importance** 148:19 261:16
**important** 13:4 14:13 16:25 58:6 67:5, 7, 8 92:22 102:6, 16 175:14 215:8 251:25 262:4
**improper** 223:16
**inaccurate** 244:4
**inadvertent** 211:1 231:10
**inadvertently** 208:14 231:8, 10
**inapplicable** 196:22
**inappropriate** 244:1
**inaudible** 207:1
**include** 35:15 90:20 112:1, 8 120:18 121:3 128:10 130:17 135:7 149:2 151:16 159:14 167:12 171:23 174:16 186:20 188:12, 23 196:19 204:16 226:7 239:15 240:5 246:17 252:4 258:2 260:14
**included** 15:9 29:18 36:12 48:14 51:17 53:6 58:5 60:3, 18 131:12, 20 159:9 167:11 181:20 187:4 192:3, 16 221:25 223:21 226:14 236:13 261:7
**includes** 17:6 18:21 19:5 38:21 124:12 161:23 187:7
**including** 30:6 31:9 33:20 46:7 53:18, 20 62:11 68:20 83:25 114:3 126:16 162:23 172:17 203:5 204:9 218:23 252:18
**inclusion** 128:5 188:22
**incomplete** 53:24 90:21 110:16, 23 181:13 259:4
**inconsistencies** 257:10
**inconsistent** 234:15 240:9
**incorporated** 251:12
**incorrect** 22:16, 23 23:24 60:3, 18 79:24 132:15 153:18 169:11, 15 214:18 230:9 231:16 232:12 244:4 247:13, 14
**incorrectly** 60:10 152:25 153:3, 12 232:2, 8 233:23 234:3
**independent** 50:17 204:9 208:10 258:5 259:6, 15
**indicate** 40:17, 19 164:24
**indicated** 66:10 215:20
**indicating** 21:25 23:8 37:19 167:3
**indicia** 21:25
**indistinguishable** 187:20
**individual** 25:8 80:5 81:13 86:6 87:23
**individuals** 81:21 179:5 206:8
**influencing** 254:13
**Information** 4:9 29:16 35:7 54:6 102:1 103:6 129:20, 22 135:17 144:3 165:19, 20 166:3, 10 167:2 168:22 173:18 175:13 206:11
**informed** 188:4 200:7
**initially** 113:11 169:20
**injunction** 136:3 190:7, 10 223:1 224:21 253:6 254:8
**injunctive** 198:3 205:10 209:14 260:11, 20
**inner** 20:19 199:12, 16 200:9
**input** 89:6
**inputted** 89:17, 19
**inquiry** 64:9 234:6
**insert** 234:16
**inserted** 20:20 98:18 100:22 103:20
**inserts** 20:10, 18
**inside** 20:11
**instance** 70:16 127:22 146:2 148:3 149:20 153:16, 20 203:18

**instances** 146:1, 15 202:16
**instruct** 17:4
**instruction** 211:1
**instructions** 38:21 59:8 232:17, 23, 24, 25 233:2
**instructive** 204:2 224:14
**instrumental** 101:6
**insufficient** 44:24 135:8
**integrity** 148:16, 18
**intend** 9:18 13:2 15:17 235:4
**intended** 154:15 226:16, 24 230:18 232:15, 16
**intends** 35:8 106:20
**intent** 199:23 231:12
**intention** 106:17
**intentionally** 135:11
**interaction** 30:21
**interest** 185:6
**interesting** 262:4
**interfering** 252:6
**interim** 171:16
**interpret** 154:25 203:8 212:1 216:20 234:1
**interpretation** 8:3 45:19 46:6 50:15, 17, 19, 21 86:11 120:23 182:10 202:23 227:23 229:8 235:9 255:15 260:5
**interpretations** 202:2 261:15
**interpretative** 199:8
**interpreted** 45:24 46:2 208:6 222:25 227:6 233:16 234:20
**interpreting** 44:14 211:24
**interrupt** 66:18
**interruption** 11:8
**Intervenors** 119:10, 11, 13, 20
**intro** 43:8
**introduce** 9:13
**introduced** 37:3
**invalidated** 200:1 203:3
**investigate** 163:21 245:22 249:16
**investigated** 163:25
**investigation** 145:22 164:4, 10
**invoking** 239:7 240:15
**involve** 27:3 50:2 172:5
**involved** 64:1 66:9 67:9, 11, 25 74:18 82:6, 10 104:6 117:20 118:2 178:23 181:11 213:14 261:25
**involves** 117:21 169:18, 19
**involving** 62:5 104:23 116:20
**ironically** 213:12
**irregularities** 162:6 188:19 198:9 203:10 226:5
**irregularity** 169:18 203:13 204:12
**irrelevant** 115:13 193:8
**issuance** 59:3 247:7
**issue** 9:19 17:23 41:12 51:15, 23 63:14 77:19 80:15, 16, 18 84:4 86:5, 7 90:13 93:14 100:20 118:13 169:9 174:19 176:3 187:4, 7, 14 188:12 189:7, 14 205:18 208:19 210:14 212:25 213:1, 11 216:3 217:10, 13 225:10 232:14 235:13, 18 236:24 237:1 246:8, 24 251:5, 14 253:22 256:21 257:8 258:3 260:24
**issued** 17:18 23:1, 2, 7, 10, 11, 16 41:7, 15 42:3, 11 46:19 52:6 58:11, 12, 24 59:17 60:9 91:24 92:5, 7 93:13 128:16 133:9 171:10 172:2, 8 215:18 247:1, 13, 14 256:19
**issues** 7:16, 17 8:22 9:4, 9 10:12 11:14, 20, 22 12:2, 6, 18 13:3, 15 84:16 86:11 92:13 95:16 116:5 161:21 170:22 185:3, 18 186:23 210:3 215:23 251:13 261:3, 5, 14
**issuing** 59:3
**item** 26:24
**items** 44:24
**it'll** 107:11
**its** 18:9 31:10 33:20 36:2 51:7, 19 58:24 59:4 62:19 63:20 118:13 130:18 133:9, 10 136:3, 7 151:6 152:2 176:8, 14 200:20 204:13 227:5 228:25 233:16 234:17 253:21 256:19

**< J >**
**Jack** 35:5
**jackpurcell146@gmail** 35:1
**Jackson** 196:4
**JACOB** 1:1 10:4 160:17 186:13
**Jacquelyn** 30:18, 21
**January** 136:25 213:14
**JEFF** 1:1 9:13 37:4
**job** 235:15
**jobs** 155:1
**join** 236:7 247:6
**joined** 119:21
**Joint** 4:2 19:24 20:1, 23 24:16, 19 27:10, 12 28:17, 21, 24 30:13, 15 31:12, 14 32:8, 11 33:7, 11, 22, 25 37:11 41:15, 17 42:1, 3, 7, 10, 15, 20, 24 45:4 48:1 52:12 54:11, 22 55:2, 5, 9, 15 56:19 57:9, 11, 12, 17 58:13, 17, 18, 21 59:7 108:20, 24 117:20 118:25 172:22 173:6, 11, 13 174:4 175:5 232:22
**Jonathan** 3:3 14:24 15:3 173:24 174:10 175:15
**Jones** 103:11, 12, 13
**JUBELIRER** 1:1 4:23 5:4 7:2 9:10, 23 10:6, 18 11:10 12:9, 13, 16, 24 13:20, 23 14:4, 7, 11, 19 15:13, 23 24:24 36:17, 20, 23 44:16 47:20 60:24 64:17, 22, 25 66:20 70:3 73:11, 15, 20, 22, 24 74:6, 24 77:12, 18 78:2, 9, 13 80:17, 20, 24 81:2 85:8, 13, 19, 21 86:1, 4, 9, 16 87:18 92:20, 25 93:3, 7, 20 99:9, 12, 15 100:15 101:13 102:6 103:1 105:11, 14, 18, 23 106:3, 13 107:5, 9, 14, 19, 22, 25 108:5, 8, 16 109:8, 11, 13 111:19, 22 115:3, 6, 20, 24 116:10 120:4, 11 123:7, 11, 20, 23 125:5, 13 134:6 135:13 137:19 138:1 140:10, 12, 21, 25 151:20 152:3, 5, 11 154:13 157:9 159:25 160:7 168:8 176:18 179:3, 16, 19 180:1, 12, 16, 19, 22, 25 182:20 183:2, 5, 11, 13 184:5, 10, 14, 18, 21, 23 185:13, 22 186:2, 6, 10 189:3 190:5, 20 193:14 196:25 197:7 204:14 205:25 207:9, 15, 19 209:3 210:12, 18, 22 211:6, 10, 12, 21 212:5, 13, 15 214:10, 14, 20 215:3 216:17 217:16, 21 218:1, 4, 8 220:6, 21 221:10, 17, 19, 23 222:2, 6, 9, 16, 22 223:19, 23 224:9 226:22, 25 227:4, 8, 11, 18 229:6 230:5, 11, 13, 17 231:5, 23 233:4 234:13 235:17, 20, 22 236:2 239:17, 20 241:17, 22, 25 242:9, 12, 14, 18, 23 243:2 244:21 245:3 247:25 248:3, 5 251:18, 22 252:21 253:1, 3, 15 254:1, 11, 21 255:11, 14, 24 256:3 258:10, 21, 25 259:10 260:3, 21 261:10
**Judge** 1:1 4:19 5:2 7:2 9:10, 23 10:6, 18 11:10 12:9, 13, 16, 24 13:20, 23 14:4, 7, 11, 19 15:13, 23 24:24 36:17, 20, 23 39:22, 24 40:4 44:16 47:20 60:24 64:17, 22, 25 66:20 70:3 73:11, 15, 20, 22, 24 74:6, 24 77:12, 18 78:2, 9, 13 80:17, 20, 24 81:2 85:8, 13, 19, 21 86:1, 4, 9, 16 87:18 92:10, 20, 25 93:3, 7, 20 94:24 95:1 99:9, 12, 15 100:15 101:13 102:6 103:1 105:11, 14, 18, 23 106:3, 13 107:5, 9, 14, 19, 22, 25 108:5, 8, 16 109:8, 11, 13 111:19, 22

115:3, 6, 20, 24 116:10 120:4, 11 123:7, 9, 11, 20, 23 125:5, 13 134:6 135:13 137:19 138:1 140:10, 12, 21, 25 151:2, 20 152:3, 5, 9, 11 154:13 157:9 159:25 160:7 168:8 176:18 179:3, 16, 19 180:1, 12, 16, 19, 22, 25 182:20 183:2, 5, 11, 13 184:5, 10, 14, 18, 21, 23 185:13, 22 186:2, 6, 10 189:3 190:5, 20 193:14 196:25 197:7 204:14 205:25 207:9, 15, 19 209:3 210:12, 18, 22 211:6, 10, 12, 21 212:5, 13, 15, 20, 22 213:13 214:10, 14, 20 215:3 216:17 217:16, 21 218:1, 4, 8 220:6, 21 221:10, 17, 19, 23 222:2, 6, 9, 16, 22 223:19, 23 224:9 226:22, 25 227:4, 8, 11, 18 229:6 230:5, 11, 13, 17 231:5, 23 233:4 234:13 235:17, 20, 22 236:2 237:19 239:17, 20 241:17, 22, 25 242:9, 12, 14, 18, 23 243:2 244:21 245:3 247:25 248:3, 5 250:17 251:18, 22 252:21 253:1, 3, 15 254:1, 11, 21 255:11, 14, 24 256:3 258:10, 21, 25 259:10 260:3, 21 261:10

**Judges** 256:10

**Judgment** 7:9 83:11 187:12 210:23 211:5 216:15 217:14 220:5 233:20, 25 235:12 250:15 253:13, 25 254:16 255:5, 8, 15, 16, 18 256:9

**Judgments** 220:9 259:15

**judicata** 239:13

**Judicial** 1:1 94:21 95:19, 21 142:13, 14 151:14 152:5, 6, 20 175:25 214:8, 23 237:9

**Judith** 263:4, 8

**July** 1:1 4:19 32:18 33:15 34:8, 23 48:12 57:2, 9, 12, 15, 18 96:24 97:4, 6, 8 113:7 118:5 175:11 181:17, 22 195:2 219:9, 18, 19, 20, 23 243:16 263:3

**jump** 7:14

**June** 23:5 25:22 26:5, 23 27:2, 18 28:11, 12, 15 29:7 30:11 31:5, 21 33:4 34:18, 19 46:9, 16, 23 48:3, 8, 12, 16, 17, 22, 23 51:3, 4, 6, 14, 15, 18, 19, 24 52:6, 15, 22 53:25 54:10, 23 55:6, 9, 11, 21 56:6 88:8, 10, 13 90:8 96:15, 24 113:7, 22, 24 114:5 118:14, 15 119:3, 19 120:1 121:2, 12 122:22 131:17 133:2, 9 136:3 139:20 140:3 148:24 149:1, 8 167:11 171:10, 21 172:22, 23 173:3 174:2, 21 175:2, 8 176:9, 13, 15 181:20 182:1, 2, 3, 6, 7 187:16 188:11 189:11 190:15 194:22, 23, 25 195:1 198:5, 10 203:7 204:11 205:14 209:20 214:2, 16 218:19 219:2 222:21, 25 224:11 227:15 235:2 260:6, 10

**jurisdiction** 8:16 142:6 215:12 219:6 256:19

**jurists** 62:25

**Justice** 5:13 98:22 99:5 210:16 211:8, 17, 22 213:6 227:16 228:4, 9, 24 229:12 230:2 232:18 233:9, 11 234:6, 14 244:13, 17 256:15, 23

**Justices** 210:16 211:8

**< K >**

**Kathy** 83:9

**Kauffman** 4:18 32:20 33:2 57:3

**Kauffman's** 57:17

**keep** 186:6 232:6 251:24

**keeps** 231:14

**key** 230:1

**kind** 9:5 44:16 72:10 116:2 136:14, 17 138:14 185:9, 19 228:18

**KING** 2:1 3:6, 9, 13, 17 8:9 13:16 14:16 15:6, 18, 20, 25 60:25 61:4, 10, 12, 13 62:23 63:21 64:15, 23 65:1, 2 68:18, 22 70:2, 7, 11, 14 73:1, 14, 19, 21, 23 74:10, 21 75:3, 4, 23, 25 76:2, 5 77:17, 22, 24 78:6, 14, 16 80:15, 19, 22, 25 81:3, 7, 9 82:13, 15, 22, 25 83:1, 3, 6, 17 85:9, 18, 20, 22 86:3, 8, 14, 17, 18 87:16, 20 88:1 91:5, 6 92:18, 21 93:2, 5, 17, 21, 22 96:7, 8, 22, 25 97:4, 7 99:8, 11, 14, 18, 22 100:14, 24 101:12, 14 102:22, 25 103:9 105:5, 7, 13, 21, 25 107:10, 21, 24 108:7, 10 109:6, 10, 12, 14 111:16 115:12, 23 118:1, 8, 18 121:16 123:3, 9, 13, 24, 25 125:3 130:15 133:13 134:14 135:10 137:25 138:3 139:16, 18, 25 140:2, 8 151:11 155:13, 14, 18 157:3 176:19, 21, 24 179:20 180:3, 15, 18, 20, 24 181:1 182:24 183:4, 9, 12 184:3, 17 185:6, 21 186:1, 8 222:13 236:4 237:19 239:19 240:7 241:21, 24 242:2, 11, 13, 17, 21, 24 243:6 245:2, 6 248:2, 4, 6 251:20

**King's** 120:21 159:8 236:22 251:3, 5

**knew** 55:11 57:20 215:17

**knots** 234:5, 10

**know** 7:16 8:25 9:21 10:18 14:12 17:4, 14 18:6, 18 22:18 25:25 26:1, 16 28:19 30:20 31:18 35:1 42:25 45:22 48:12 49:25 53:2, 3, 5, 16, 22 54:21 57:1 58:8 59:13 60:14 61:14, 18, 24 63:2 64:13 66:22, 23, 24 69:8, 10, 20, 22 73:8, 21 75:8, 15, 18 79:2, 9, 16, 22, 24 80:7 81:12, 14, 16, 21 82:8, 23 86:12 87:4 88:10, 21 90:4 91:21 93:23 94:19 95:24 96:9 98:18 99:1, 16 100:6, 7 101:15, 19, 25 102:7, 10 104:9, 18, 19 105:1, 2 107:1, 3 109:19 112:22, 24, 25 113:1, 10, 18 114:5, 22 120:22 121:1, 6, 22, 23 132:20, 24 133:3 135:21 136:13, 19, 22, 24 137:4 138:11, 14, 15, 24 139:13, 25 141:9 151:13 155:19, 22 156:3, 13, 14, 18 159:13 162:10 164:14 165:23 166:1 169:5, 12 176:9, 12 177:7, 19, 22 178:20 179:22 182:4, 25 183:2 192:17 194:12 200:4 201:18 203:17, 24, 25 204:21, 25 206:24 213:6, 7, 20, 22 214:9, 15, 18, 24 215:7, 22 216:12, 15, 21 217:20 218:12, 17 219:12, 23 220:9 221:8 222:13 223:4 224:4 225:10 228:5 229:9, 17 230:7 231:15, 17 232:1, 6, 8 234:6, 7, 9, 11 236:1 238:4 239:3, 22 242:15 244:18, 25 245:8 248:12 251:4, 9, 23 253:1, 10 254:25

**knowledge** 95:22 103:3 110:17 115:23, 24 116:1

**knowledgeable** 63:5 261:14

**known** 61:8

**knows** 62:24 64:6, 7 73:3, 21 74:11 92:22 94:24 95:1 96:7 100:14 102:21 212:19 224:17 232:20 236:22 248:13

**Kuznik** 4:14 29:2, 3, 4, 9, 10 34:3 35:1 55:6 126:15

**< L >**

**L.L.P** 2:1

**lack** 175:25 176:4 195:11 220:3 226:3
**lacked** 167:3 225:22
**lacking** 188:16 191:13 200:8 211:2
**lacks** 189:9
**laid** 15:16 253:8
**LANCASTER** 1:1 5:5 7:7 9:14, 17 28:2 30:6, 23 31:4, 9 33:19 37:5 48:11 50:12 51:6, 13 54:12 55:8 57:7, 21 60:16 86:22 89:5 101:1 102:14 139:23 140:23 141:14, 18, 25 142:22 144:7 146:12 147:11 148:15, 23 150:11 152:22 153:3, 21 154:9 155:6, 20 157:11 159:15 184:15 202:4 209:7, 12 219:13, 17, 19 222:14 225:10 226:18 230:20 233:1
**Lancaster's** 57:8 108:22 109:2
**language** 43:22 44:2, 6 45:2 54:8 58:6 64:13 67:4, 5, 7 77:5 114:7, 12 146:7 153:23 154:7, 18 155:9 170:7, 17 176:1, 4 182:13, 15 193:25 198:15 199:15, 24 201:15, 19, 20, 23 205:6 210:8 212:6 217:19, 21 226:8 230:1 231:20, 22, 25 232:20 233:8
**large** 76:13
**largesse** 240:14
**lastly** 111:6 219:17
**late** 7:22 16:15
**latitude** 115:21 133:16
**Law** 5:21 11:24, 25 53:5, 15, 24 73:13 75:16 83:8 85:15, 24 87:14 94:9 95:9 101:23 115:16 116:5 135:21 136:13 137:8, 9 138:7 146:7 147:9 168:7, 10 170:14, 17 187:2 189:7, 16, 17, 25 193:5, 6 194:21 205:12 208:7, 17 211:23 215:6 224:23 227:22 239:14, 22 240:2, 6 255:3 256:17, 22 258:1, 13, 15 259:16, 23 260:7, 14 261:4, 16 262:2
**lawful** 208:18 254:8
**lawfully** 186:18, 20, 22 187:1 188:7 252:4 253:23 258:7 259:5, 7, 9
**laws** 137:12 217:3
**lawsuit** 96:17, 18 112:18
**lawsuits** 136:17
**lawyer** 61:24 63:19 134:18 180:20
**lawyers** 63:1 85:3
**layman's** 46:5 53:11 121:22
**leadership** 66:6
**leading** 24:10, 12
**learned** 18:1 151:12
**leave** 53:14 128:7 138:19 229:24
**Leavitt** 92:10
**led** 26:2 145:21
**leeway** 170:13
**left** 38:8 203:25 213:5 222:15, 23 228:10, 22 239:23
**legal** 10:12 35:9 44:10, 18 47:18 52:2 63:13, 14, 15, 20 65:20 72:25 74:8, 22, 23, 25 77:11, 13, 14 80:17 86:10, 13 87:12 92:16 107:20 115:19 116:2, 4 128:11 131:5 134:16 135:21 138:19 149:15 154:11, 16, 19, 20 184:25 185:2, 16, 18 189:16 190:14 220:22 225:3 253:21 261:13
**legality** 100:22
**legally** 45:14, 18 53:9, 21 98:17 101:21 149:18 187:20
**legislative** 199:22 231:12
**legislature** 81:20 230:18 232:15 238:14, 18 243:8
**legitimate** 79:15, 17 139:1
**Lehigh** 207:10 214:8
**LEIGH** 1:1 7:4 119:9 239:5, 6
**Leinbach** 3:14 4:16 9:15 31:18, 23 32:4 55:17 56:8 160:6, 10, 15 167:20 181:5 183:15 221:16
**Leinbach's** 56:1, 4, 20
**Letter** 4:17, 18 27:17, 18, 22, 24, 25 28:3, 4, 12 32:14, 20 33:4 34:19, 20 35:6, 12 48:18, 20 56:6, 10, 14, 16, 17, 21, 24 57:23 96:24 121:2 174:13 175:1, 8
**lettering** 38:7
**letting** 165:23 166:1
**level** 17:1
**lie** 250:12, 13
**Lieutenant** 97:17, 24
**life** 227:5
**lifted** 214:1
**light** 23:11 28:5 53:24 213:4 224:16
**likelihood** 190:9 224:20 227:12
**liken** 95:6
**likewise** 82:4
**limit** 46:10 87:2 107:3
**limitations** 14:12 248:8
**limited** 92:13, 21 106:24 211:9
**limits** 87:4, 6 94:1 243:3
**line** 21:2 25:9 38:4, 9 40:12 82:20 103:16 134:8
**list** 25:18 26:24 81:16 148:23
**listed** 25:8
**listen** 72:11 73:1 252:21
**lists** 23:20
**literally** 65:25
**litigant** 194:9
**litigation** 27:3 49:21 66:8, 10, 11, 12, 15, 20 82:10 118:2 130:24 131:2, 4 195:5
**little** 12:14 13:12 18:12 23:13 35:25 38:12 74:8 79:1 117:19 124:5 138:15 178:22 216:14 228:3 247:22 252:22 259:1
**live** 76:20, 21 95:13 103:12
**local** 91:20 156:8 177:9
**logic** 126:24
**Lohr** 8:24
**long** 16:8, 13, 16 71:11 77:8 79:8 80:4 99:3 106:7, 14 107:7 142:14 251:24 261:11
**longer** 39:15 61:21 105:19 176:5 192:16 237:12
**look** 29:22 56:2 79:14 82:11, 17, 19 83:7, 18 95:12 118:23 131:21, 22 132:15 145:13 146:18, 19, 22 147:8 157:1 158:1, 10 164:1, 8 166:17, 18 169:10, 21 174:20 211:17 212:24 214:23 220:6, 12 237:16 244:17 257:23
**looked** 70:7 145:13 227:25
**looking** 20:23 39:2 79:16, 18 86:10 103:7 118:12 180:13 218:2 255:22
**looks** 146:16
**lot** 66:4 74:12 88:23, 24 113:5 114:15 219:25 245:8 252:18
**lots** 243:16
**louder** 252:22
**lunch** 107:23
**Lycoming** 62:12

< M >
**M.D** 1:1 263:3
**ma'am** 15:25 73:14, 19, 23 77:22 80:19 86:17 93:5 99:14 107:21 108:7 123:13 180:15 181:1 239:19
**magic** 225:13
**Magisterial** 151:2 152:9
**mail** 17:8 129:2 145:3, 4, 5 165:8 221:12 241:7, 8
**mailed** 102:12
**Mail-in** 4:9 5:12 6:4 18:22 19:23 21:6, 8, 22 38:3 42:21 43:12, 24 45:6 47:4 48:15 59:10 60:2, 17 84:25 100:3 101:17 102:11 116:24 124:11, 18 126:17, 18 128:18 130:10 133:22, 23 136:23 142:18, 20 146:13, 20 147:6 157:16 158:13 159:19 162:3, 11 164:8, 23 165:22 167:23 168:18, 24 169:25 172:10 183:22 188:17 191:7, 23 197:10 198:15 199:11 200:24 205:7 210:10 224:7 242:5, 6
**main** 194:13

**maintain** 112:14
**Maintained** 5:16 233:15
**majority** 32:22 79:9 89:10 210:7 212:7, 25 256:8
**making** 77:13 94:20 95:7 98:19 126:20, 21 135:19 142:4
**man** 74:19
**management** 126:2 161:18
**mandamus** 70:19, 20 71:5, 15, 19 86:5 180:5 187:11, 15, 19 194:4 206:14 209:14 220:4 223:3, 16 240:4 248:13, 15 250:12, 13, 16, 17, 19 260:11, 18
**mandate** 57:1 70:24, 25 71:9 75:19 89:23 90:5 213:24 214:1
**mandated** 71:7
**mandatory** 92:1, 4 93:13 210:25 231:24 244:2
**manner** 7:24 43:19 76:23, 24 248:25
**mantra** 148:15
**manual** 166:11
**mark** 21:2 40:7 119:17
**marked** 19:24, 25 24:16, 18 27:9, 11 28:17, 20 30:14 31:13 32:10 33:10, 24 39:10 42:6, 14 55:1 58:20 83:6, 14 108:19 157:10 174:4 175:5
**Marks** 3:3 4:12 5:17 9:1 14:24 15:3 16:3 25:4 37:1 44:11 60:22 61:13 63:1, 6, 7, 11, 22 64:14 65:3 68:16 73:8, 15 75:5 76:16 78:17 83:4 86:19 87:12 93:23 109:15 111:16, 25 116:12 121:17 123:6, 8 124:1 128:19 129:8 172:19 173:4, 25 174:8, 22, 24 175:9, 15 192:18 194:9, 22 196:13 202:3 218:10 220:17 249:21 252:11 255:4, 19 257:13
**Marks's** 172:22
**Mary** 103:11
**Marybeth** 29:1 126:15
**masquerades** 246:13
**Mastriano** 97:20
**matches** 89:15
**material** 144:12 146:5 152:17 170:16 229:11
**materiality** 152:14 234:10
**materials** 10:22 39:22 40:3
**matter** 7:4 8:17 11:16 12:20 82:14 89:13 97:18 115:9 116:14 119:17 133:8 143:7, 11 160:19 203:12, 18 205:3, 10 207:4 236:17 238:21 239:9, 14 245:10 255:7 257:13
**matters** 8:14, 16 13:1 62:7 82:6 92:14 204:1
**Maurer** 223:13
**McCandless** 2:1
**McCormick** 4:23 5:4 11:16 27:6 46:16 58:25 91:2 102:3, 5 110:7 118:13, 19 119:7, 8 121:6 130:25 131:8 134:21 150:11 170:9, 20, 25 171:22 178:23 179:6 187:19 194:15, 16 204:5 209:21 216:2 224:12 229:1 236:11, 12 237:13 238:3 239:12 249:2, 3, 4, 6, 11 252:20 253:5 257:4
**McCracken** 193:9 223:9
**McCullough** 213:13
**McCullough's** 212:22
**mean** 18:15 53:8 64:24 66:18 69:8 77:8 78:3, 6, 10 90:10 94:19, 21 95:6 99:19 101:18 107:7, 8 120:19, 25 145:4 147:20 149:17 154:11 162:4 163:9 180:23 184:19 190:8 204:23 210:19 211:14, 21 214:14 216:10, 25 219:10 239:23 241:18
**meaning** 20:9 23:23 163:22 192:17 199:13 224:16
**meaningfully** 186:19
**meanings** 234:8
**means** 18:17 77:15 94:18 95:2 120:19 138:8 163:22 176:5, 6 182:16 200:19 203:9 204:24 215:21 226:10 232:7, 8 239:7 251:14 255:4
**meant** 161:6 162:24 163:9, 21 189:13 224:18 226:10 227:3
**mechanics** 45:13
**mechanism** 22:23
**mechanisms** 96:11
**meet** 136:4 161:24 191:9 203:22 205:1 261:24
**meeting** 26:17 71:25 72:7, 21 124:21 127:14, 25 132:17 133:4, 6, 7 139:10 140:6 175:10, 12, 17 178:4, 5, 9 179:9
**meetings** 177:22
**meets** 195:22 197:17 198:19 200:15
**Mehmet** 119:11
**member** 125:23 136:16 154:9, 25 155:6 160:20 170:5 243:7
**members** 79:10 81:22 98:4 128:2 136:9 162:17, 19 173:24
**Memorandum** 5:21 15:10 83:8 119:18 203:7
**memorialization** 121:24
**memory** 132:14
**mention** 171:25 210:2 241:2 257:12
**mentioned** 17:18 18:13 20:12 23:16 27:2 35:11 91:23 110:23 122:21 148:7 151:10 168:22 197:11 198:21 204:10 207:3, 22 213:7 220:7
**mentions** 194:3
**merely** 189:21, 22 225:6 246:13
**merit** 98:24
**merits** 54:5 190:9 215:10, 19 216:1 224:20, 25 225:22 226:12 227:13 235:6
**Met** 1:1 176:24
**method** 10:1, 20 143:2 202:8 242:10
**methodology** 199:8 200:10
**methods** 243:9
**MICHAEL** 1:1 141:12
**microphone** 11:3, 5 115:4 120:12
**middle** 43:2 140:1
**Migliori** 5:6, 8, 10, 13 23:7 27:1 46:8, 18 47:13 51:25 59:4 138:17 172:3 176:10 204:4 207:2 213:14, 23 214:5 228:18, 20 244:6, 7 260:7
**Migliori's** 235:2
**Mihaliak** 5:15 150:24 152:16 158:13, 20 159:3
**military** 124:14 162:14, 17, 18
**Miller** 158:12, 19 159:1
**mind** 75:23 137:8 254:12 255:15 258:10
**mindful** 106:4
**ministerial** 12:5 17:12 19:11 49:5 196:9 220:19 245:18 249:17 250:1
**minor** 203:10, 12 204:12 234:11
**minute** 83:4 137:20 140:16 195:19
**minutes** 13:25 107:12 108:1 186:3
**minutiae** 95:11
**misprinted** 104:6, 25
**misread** 195:9
**misses** 186:23
**missing** 166:14, 16, 25 169:1 189:6 198:18, 19 200:2 234:1 250:8
**mistaken** 102:15 155:25
**mistakes** 259:17
**misunderstand** 22:19
**misunderstandings** 11:21
**MJ-02202-CR-0000126-2022** 5:16 152:10
**modification** 237:10
**modify** 236:11 237:9, 14 238:7 239:12, 15 246:16 249:7
**moment** 65:3
**momentarily** 187:24
**Montgomery** 241:13

**month** 22:21 221:4 237:6
**months** 40:25 237:7
**moot** 207:1, 8, 9, 14, 18
**Mootness** 119:6
**morning** 7:2 8:9 10:4, 6 16:3, 4 37:1, 2, 6
**mother** 103:11
**mother's** 230:22 231:1
**Motion** 83:8 226:21
**move** 147:14 151:16 198:2 254:22
**moved** 65:16, 17 146:2, 5 147:12, 17
**moves** 146:25 147:1, 2, 5, 23 203:21
**moving** 14:21 66:2 73:4 186:7 188:10
**multiple** 25:14 93:12 197:15
**multitude** 62:6
**municipality** 239:23

< N >
**name** 17:25 37:4 61:13 141:10 160:17 203:18
**named** 238:2
**narrow** 104:2 212:25 213:1, 11
**narrowest** 255:5, 7, 12, 14 257:1
**National** 119:12
**nature** 17:12 64:9 119:5 180:5
**near** 233:8
**nearly** 202:5
**necessarily** 81:13 91:22 157:6 223:11
**necessary** 35:8 72:8 123:15 183:10 225:24
**need** 12:13 21:6 51:11 81:1 90:15 98:14 100:2, 3, 5, 10 106:23 151:5 184:19 195:6 205:13 216:16 219:12 248:20 261:4
**needed** 205:23 260:25
**needs** 12:11 85:23 199:16 200:1, 7 240:22
**neighborhood** 155:25
**neither** 97:20 175:22 186:24
**nervous** 247:22
**never** 73:7 92:5 127:15, 20 133:7 151:10 178:16 181:10 210:1 213:24 235:5 239:16 249:21, 22 253:14, 24 254:20
**new** 72:21
**news** 74:14
**nice** 38:4
**Nicole** 67:15
**night** 124:7
**nine** 25:12 30:5, 7 52:16 195:1
**nodding** 222:13
**nominees** 81:16
**nonadvisory** 235:12
**noncompliance** 233:19
**noon** 105:12
**normal** 185:4
**normally** 185:11
**note** 153:8
**noted** 173:21 174:7 175:16, 21 176:3
**notes** 38:7 131:21
**notice** 1:1 25:8 151:14 152:6, 20 153:10
**notices** 221:21
**notification** 165:23, 24
**notifications** 168:23
**notifies** 165:21 221:24
**notify** 221:11
**notwithstanding** 256:16
**November** 6:5 21:16, 19 46:13 81:16, 18 84:24 85:1 183:20, 23 210:1, 11
**null** 84:21 208:11
**NUMBER** 4:2 5:2 6:2 11:22 12:1 20:1 24:19 27:12 28:21 30:15 31:14 32:11 33:11, 25 42:7, 15 55:2 58:21 63:7 83:15 108:20 113:11, 25 114:6 131:9 132:9 152:7, 8, 10 157:11 173:14 177:12, 15 195:1, 2 207:3 252:1 256:24, 25 257:5, 6, 10 263:3
**Numbers** 108:21, 22, 23, 25 109:1, 2, 4, 21 155:21 171:19
**numerous** 94:5, 11, 12 236:21

< O >
**oath** 109:16 217:1
**obey** 217:2
**obituary** 145:17 159:2
**object** 44:10 47:18 63:9, 17 68:13 73:25 80:14 87:11 93:9, 15 105:4 115:12 120:24 151:18 157:5, 7
**objected** 80:24 180:1
**objection** 10:20 13:8 15:14, 15 52:1 63:11 64:19, 20 72:24 77:10 78:3, 10 85:7 90:24 92:15 96:6 99:6 100:12 101:10 102:19 103:19 108:13, 15 116:3 123:21, 22 135:20 151:22 154:10 168:5 179:14, 24
**objections** 108:17 151:11 168:6 185:11, 14, 17 251:10
**obligated** 170:17 182:9, 12
**obligation** 35:22 244:2 252:7
**obligations** 248:9
**observed** 61:4
**obvious** 79:19 114:17, 21
**obviously** 22:16, 23 23:10 63:15 106:18 116:5 122:14 135:22 146:7, 8 157:1 177:13 183:6 212:20 215:19 224:17 229:25
**occasion** 71:12 144:10
**occasionally** 22:9 142:8
**occasions** 79:20 94:5 116:15 236:21
**occur** 124:25
**occurred** 144:25 175:23 210:1
**occurs** 19:11
**o'clock** 108:1 247:10
**October** 103:13, 14
**odd** 169:10
**offer** 105:4 107:1
**offered** 74:9 105:5
**Office** 1:1 10:7 66:14 76:14 82:12 141:11 145:19 158:17 160:18 165:7 166:12 180:17
**offices** 49:20 79:11 80:5, 7 91:20 104:15
**official** 18:25 19:3 20:16, 17 66:25 80:9 81:15, 16 89:2 124:8 173:14 233:25
**officials** 27:24 56:21 124:16 146:13 172:24 217:2 233:17, 20
**Oh** 65:13 99:8 221:17
**okay** 11:10 12:24 13:23 14:4, 7 24:22 36:20, 23 37:17 38:1, 7, 16 39:2 42:3, 10 43:2 44:2, 25 46:10 47:1, 20 48:22 49:4, 13, 22 50:9 52:12, 15, 20, 25 56:16 57:2, 17, 20 58:2 59:7, 25 60:20 61:8 65:8 67:9 74:4 75:6 78:13 89:16 99:12 103:1 105:11, 14 106:13 107:5, 14, 19 108:2 109:11 110:12 123:20, 23 125:13 126:11 131:16 132:5 135:13 138:21 139:6 140:21, 25 143:24 149:24 150:8, 11, 14 151:20 153:20, 24 157:9 158:1 160:7, 24 161:10, 14, 23 162:2, 10 163:2, 6, 16, 21 164:2, 10, 14, 17, 22 165:17 166:3 167:8, 12, 16 168:12 169:8 170:5 171:6, 9 172:1, 8, 13 173:3 176:13 180:19 181:13, 22 182:2, 9 183:11 184:5, 14, 18, 21 186:2 190:20 197:8 209:3 211:6 219:23 221:19 223:19, 23 224:9 225:11 230:10 233:4, 6 235:22 242:4 248:5 254:21 260:21
**old** 112:22
**older** 165:4 223:12
**omission** 116:16 150:9
**omit** 22:9
**omitted** 114:9 130:11 131:14, 15 149:20, 24 150:10 167:13 199:13
**omitting** 203:11
**once** 19:11 61:4 80:3, 8 81:18 88:22 89:25 129:24 190:25 191:13 193:18 196:23 224:1 225:17 233:14 244:7
**ones** 45:25 146:10 166:16 253:5
**one's** 38:2
**open** 26:17 29:14 130:21

134:12 213:5 241:19
**opened** 43:19 166:24
**open-ended** 234:6
**opening** 7:13 13:25 14:3 241:18
**operations** 126:19
**Opinion** 5:13 26:23 44:19 74:1, 5, 25 85:16 86:13 99:2, 3, 16 115:13, 15, 19, 22 118:13 119:19 122:19 133:12 135:21 154:11, 16, 19, 20 155:2 168:6 189:13, 15, 19 190:6, 15 203:7 204:11 205:14 210:17, 23 211:4, 8, 13, 18 212:7, 8, 23 213:6, 12, 13, 24 214:6, 17 217:14 224:15, 19 225:20 227:1, 4, 17, 19, 25 228:1, 3, 7, 20 230:2 233:9, 11, 12, 14 234:19 235:4 239:11, 12 240:7, 8 244:13, 17 245:5 246:14 249:11 251:1, 3 254:12 256:8 260:8, 16
**opinions** 74:8 134:16 211:23, 25 213:6 215:3
**opportunity** 14:14 151:22 168:25 169:2 185:24 221:14 238:5 248:24 253:13
**opposed** 59:21 161:7 234:1 249:17
**opposing** 213:10
**opposite** 246:22 250:2
**option** 221:2
**options** 194:4
**Oral** 3:17 256:21 262:5
**orange** 81:5
**Order** 4:19 5:2 11:24 13:13 21:19 37:15 51:24 52:5 53:25 54:3 58:25 59:17, 24 71:21 72:5, 18 84:22 86:6, 7 88:11 119:1, 19, 25 120:1 121:12 122:22 131:18 132:5, 7 133:9 134:12 135:11 136:12, 24 137:15 149:5, 6, 8 150:15 162:11 167:24 171:10, 11, 13, 15, 22 186:6 187:1, 12, 16, 19, 25 188:2, 6, 10, 13, 18 189:11, 15, 20 190:3, 12, 13, 16 191:12, 14 192:25 194:15 197:1 198:6, 10 206:6 207:23, 25 208:18 209:21 214:17 219:5 222:20 223:1 224:12, 14, 16 225:11, 16 226:1, 10, 19, 21 227:1, 5, 10 235:18 236:11, 12, 13 237:5, 9, 10 238:7 244:5, 9, 18 246:17 248:24 249:1, 7 253:7, 9, 16, 18, 20, 21, 24 254:4, 5, 7, 12, 13, 15, 16, 17 257:19 258:1 259:24 260:6, 10, 13, 19
**ordered** 51:2 59:18 139:9 156:13 177:11 188:4 193:3, 11 195:24 225:14 226:18 236:1, 14
**ordering** 54:3 131:18
**orders** 128:16 192:24 244:19 254:3
**ordinary** 194:9
**original** 29:19 30:10 173:22 215:11 219:6
**ought** 9:5, 6 85:25 139:3 151:15
**outcome** 69:23 91:8 110:11 159:17 177:18 221:8
**outer** 20:24 21:25 22:4, 7, 10 37:14, 23 43:4, 9 114:8 129:18 130:2, 12 144:6 145:10 164:24 165:2, 4 168:1 175:18 189:5 199:17
**outlined** 121:1, 2
**outlines** 28:9
**outset** 207:22
**outside** 20:10 22:22 68:9 99:7 105:4, 5 230:14
**overarching** 205:24
**overly** 211:24
**overrule** 191:3 257:20, 22
**overseas** 124:14 162:14
**oversee** 66:12 126:5
**overseer** 126:14
**oversees** 66:15 126:16
**oversight** 142:2, 3
**overstate** 78:3
**overstep** 78:6
**overstepped** 78:5
**Oz** 97:24 110:7 119:10, 11, 20 170:10 178:24 179:7 237:13
**Oz-McCormick** 110:8

**< P >**
**p.m** 21:9, 17, 18 33:15 34:8 35:7 55:22 105:17 108:3, 4 128:20, 21 129:2 140:19 142:20 143:21 162:5, 13, 18, 25 186:11 262:9
**P.S** 84:6 191:6 195:13 201:4
**PA** 1:1 6:2 47:15
**Pa.C.S** 199:6 201:25
**Page** 3:17 25:17, 18 29:23, 24 38:8 42:20, 24 43:2 76:7 78:15 83:2, 8 133:18 158:7 174:4 189:12 224:19 233:9 257:23
**Pages** 1:1 38:1 189:18 190:24
**paid** 198:12
**Paige** 175:3
**panel** 59:4
**paper** 11:15 37:16 72:6 88:24
**papers** 8:15 68:11, 24 76:2 82:13 182:22 229:25 247:25 256:2
**paragraph** 83:18, 19, 20 84:8 158:10 174:8 191:8, 17, 20 192:1 193:17, 22 197:12 198:24 201:25 225:21 233:11
**parallel** 198:14
**paraphrasing** 69:5, 6 98:10
**pardon** 115:14
**parentheses** 40:9, 14 119:6, 10, 11
**parenthetical** 84:10, 14
**Parnell** 104:3, 4, 22
**part** 19:1 44:17 55:24 72:3 82:13 86:1 135:12 165:11 166:23 173:6 191:2 216:11 218:13 225:15 246:25 248:12
**partial** 49:15, 17, 19 51:14 110:16, 19
**participant** 179:2
**participated** 177:24
**participating** 180:9
**particular** 48:10 84:23 101:5 128:11 135:18 145:10 177:14, 16 199:11 237:3
**particularly** 134:5 214:25 256:16 257:7
**parties** 15:8 48:10 95:13 108:14 128:12 216:4 217:17 224:23 241:14 249:4, 5, 8, 9 261:15
**partner** 8:11
**parts** 224:15
**party** 14:21 73:4 91:20 119:12 134:21 150:11 171:6 177:8, 20, 21 180:20 199:7 203:6 216:5 225:4 239:1 245:11 246:10 250:22
**passing** 241:1
**patently** 259:17
**PDP** 200:11 230:4 233:14
**pejorative** 216:10
**pending** 49:16 150:23 196:17 237:12 244:8 247:19
**Penguins** 81:8
**PENNSYLVANIA** 1:1 2:1 5:8, 10, 15, 23 7:5 16:7, 9, 10, 19 18:2 21:20 24:15 46:3 62:1, 5, 18 65:9 67:1, 13 72:20 81:25 83:9 94:5 97:14 98:4, 23 104:12, 21 119:13 136:21 137:12, 13 150:23 174:14 177:21, 22 179:22 183:20 187:2 189:16, 25 199:7 203:6 205:11 208:7 210:7, 8 223:10, 13 227:22 237:17 240:14 243:15 249:15 255:4, 20 256:6, 23 257:5, 16 261:4, 18
**people** 11:1 40:24 95:1, 13 98:2 102:5 137:5 138:6, 13, 19 139:2 177:23 178:2 180:8 206:4 215:5 221:11 231:7, 9 241:4, 14, 15, 16 242:4 243:16 247:9, 15 248:23 250:5, 11
**perceive** 216:24

**Peremptory**
7:9  187:12
**perfect**  46:25
**perfectly**
200:18
**perform**  72:19
245:13  249:17
250:3  252:8
**performing**
94:17  245:12
**period**  47:7
82:9  113:8
114:4  146:17
**periods**  86:23
**permissible**
93:11
**permission**
108:13
**permit**  188:8
195:16
**permits**  189:8
**permitted**
246:3
**person**  63:2, 5,
23  69:25
70:15  71:5
74:17  85:11,
14, 22  101:7
102:2, 10, 16
145:12, 15, 17,
20  146:2
148:20  149:18
169:13  195:14
202:19  217:19
218:18, 25
230:21  239:8,
9  241:6
245:17  250:24
**personally**
56:9
**persuasive**
212:23
**Petition**  5:17
70:12, 15, 18
187:11  207:2,
16, 17  223:18
245:10
**Petitioner**  4:19
**Petitioners**  1:1
7:6, 9  59:25
184:12, 25
185:8, 24
189:20  209:13,
16, 18, 22
224:24  246:21
247:20  248:7
**Petitioner's**
108:20  109:1

118:24
**petitions**  257:2
**PFR**  185:14,
15
**Pfursich**  4:15,
19  30:19, 25
31:1, 8  33:9,
18  55:8  57:7,
11
**Pfursich's**  31:3
**Philadelphia**
1:1  68:4
246:5
**phone**  28:15
112:23  113:9
**phrase**  130:14
135:4
**phrased**  78:12
**Physically**
88:20
**pick**  112:23
**picks**  192:6
**piece**  102:1
103:6  166:10
223:3
**pieces**  41:14
166:3  172:15
**pile**  37:15
**Pittsburgh**
82:4  83:12
**place**  14:12
21:1  39:16, 21,
23, 25  40:3, 4
107:10  109:24
177:23  178:12
201:24  238:11
245:23  251:7
**places**  17:5
**plain**  20:17
146:7  153:22
154:7, 18
155:8  170:17
176:1, 4, 5
182:13  201:11
210:8  231:19
**plainly**  40:22
99:6  196:22
232:9
**plaintiffs**
257:14, 17
**Plaintiff's**
118:23
**plausible**  225:7
**play**  137:4
**played**  81:7
**plays**  16:25
**pleading**  63:4,
25  92:1

**pleadings**
246:23
**pleas**  59:21
62:13  87:25
96:2
**please**  10:18
11:8  12:14
15:1, 5, 6
31:23  34:11
55:25  61:1
71:23  76:6
83:23  118:23
125:14, 18
141:1, 5
160:12  166:6
173:22  174:10
176:19  209:5
236:4  237:14
**pleases**  29:13
**pleasure**  209:6
**plenty**  107:12
**plurality**
210:13  211:13,
25
**podium**  11:6, 9
**point**  23:8
30:2  43:7, 8
52:24  55:15
58:24  62:20
65:16  77:12
93:24  108:11
114:20  120:20
127:19  131:22
132:16, 22
136:10  140:22
145:16  152:12
157:8  183:10
194:6, 7, 8, 24
196:22, 25
205:5, 14, 24
208:4, 16
213:10  221:2
227:15  239:13
260:23
**pointed**
120:21  169:12
196:20  224:12
248:16
**pointing**
228:20
**points**  15:18
38:12  43:3, 5
205:23  206:12
209:2  228:21
229:12  251:25
253:4  254:23
256:14  257:9
**poles**  259:14

**police**  151:1
158:2
**political**
241:14
**poll**  17:5
126:18
**polling**  17:5
39:16, 21, 23,
25  40:3, 4
**popped**  145:11
**posed**  77:23
247:5
**position**  12:20
16:5, 16  28:5
31:3  32:5
44:19  50:5
53:17, 23  57:5
63:13  65:24,
25  68:25
90:19  112:11
113:3  114:2, 6
121:7, 9, 11
126:1  185:20
204:15  207:10,
14  234:13
254:10  260:8
**positions**
16:15  63:14,
20  66:4, 6
67:25  156:4, 6
206:4  246:22
257:11
**possibility**
69:21, 23
244:24  254:20
**possible**  80:8
140:17  204:17
248:14, 15
**possibly**
172:14  228:12
**post**  156:7
**posts**  156:16
177:8, 9
**potential**
86:11  114:24
153:9  238:12
**Potentially**
143:13  146:9
156:15
**pour**  61:4
**poured**  61:8
**power**  94:1
95:18  112:7
207:24  245:22
249:16
**powers**  83:25
85:6, 11  92:13,
21, 23  216:21

238:13, 17
249:14
**practical**
100:18
**practice**  25:13
**practices**
133:20  134:23
152:23
**precanvass**
18:24  43:13
124:10
**precanvassing**
166:22, 23
199:25  200:15
**precedent**
212:2  252:15
255:9  256:7,
11  257:5
**precedential**
254:25  255:6
256:17  257:6
**precedes**  19:3
**precinct**
124:16
**precinct-level**
124:7
**precincts**
18:21  126:21
**preclude**  183:8
**precludes**
220:9
**predate**  247:7
**prediction**
232:4
**prefer**  7:14
8:8  14:1
36:18
**preference**
7:16
**preferred**  9:19
**prejudge**
214:22
**preliminarily**
13:3
**preliminary**
8:14, 15, 22
9:4  13:15
185:11, 13, 17
190:7, 10
223:1  224:14,
21  225:8, 10
227:10, 20
228:9, 25
245:1  251:10
253:6  254:7
**preparation**
261:12
**prepared**  8:7
9:3  10:10, 12

126:20, 23, 25
135:1
**preparing**
228:2
**prescribes**
191:22
**presence**
202:14
**present**  14:15
52:7  106:6
193:5, 6
**presentation**
10:16  261:13
**presented**
9:25  147:19
164:8  242:19
260:12  261:3,
5
**presents**
233:21
**preserve**
253:12
**President**  1:1
**presumably**
143:17
**pretty**  40:22
70:7  95:5
133:14  155:22
213:17  236:9
**prevail**  194:19
**prevailing**
252:13
**prevent**  196:5
**preventing**
98:24
**previous**  168:6
**previously**
8:12  33:19
49:4  53:19
57:25  79:24
235:10
**primacy**  94:6
208:3
**primaries**
84:1, 3  216:22
**Primarily**
16:22  17:12,
15  66:22
**primary**  18:14
21:11, 14
23:10  24:10,
13  27:4  29:15,
19  32:24
35:23  41:2, 14
49:14  76:9
77:1  78:18, 19
81:12  84:11
87:8  97:16, 19
114:14  130:25

133:20 134:23 135:16 144:18 148:3 152:23 158:17 163:8 167:4 168:13, 19 169:6, 24 172:6 177:23 186:16 187:5, 9 220:15
**principle** 255:20
**print** 89:11 104:16
**printed** 104:13
**printing** 104:10
**prior** 23:10 41:13 42:18 47:12 48:22 57:8 65:14 161:11 168:3 169:4 175:14 231:1 246:17
**privilege** 68:16
**Probable** 158:8
**probably** 10:13 13:13 53:11 100:9 106:24 107:3 129:3 173:6 215:11, 25 226:24 231:3 232:10 237:20
**problem** 25:1 246:25
**problems** 237:4
**procedure** 75:17 132:23
**Procedures** 42:22 191:22
**proceed** 8:7 10:1, 11, 14 11:19 12:21 13:19, 24 14:21 54:6 76:10 77:3 84:13 108:2 109:13 132:1 184:25 199:9 212:2
**proceeded** 196:21
**proceeding** 10:20 250:14
**proceedings** 10:25 263:2, 6
**proceeds** 187:15
**process** 18:12, 17 49:5 80:3 87:13 114:16 115:19 116:1 124:3, 15 166:11, 23 169:16 192:6, 17, 18 193:18, 24 196:1, 7 198:13, 21 199:18 205:18
**processed** 146:10 157:20 168:18, 24 232:2
**processes** 127:9
**processing** 172:10
**proclaim** 84:3
**procure** 17:5
**produce** 202:2
**produced** 123:16, 17
**productive** 195:5
**professional** 81:7
**proffer** 15:9, 11 133:14, 18 134:1, 14
**program** 66:17
**prohibited** 6:23
**prolong** 81:1
**prompted** 24:7 26:20
**promulgated** 38:20 41:13
**prone** 80:11
**prong** 190:9 224:20
**pronunciation** 30:24
**proof** 105:5 107:1
**proper** 132:23 250:21
**properly** 164:7
**proscribes** 191:8
**prosecuting** 145:19
**prosecution** 148:20 201:6
**protect** 217:2
**protected** 68:15
**protecting** 234:16
**protections** 205:20
**Prothonotary** 119:17
**proud** 247:20, 23
**provide** 17:13 29:16 35:7 44:25 64:8 79:7 104:21 171:19 176:14 187:6 206:11 208:22 215:13, 21 216:12 235:13
**provided** 59:10 103:21 118:8 173:17
**provides** 45:22 50:23 56:24 84:5 85:24 104:18 115:17 195:13 201:3 218:17 220:25
**provision** 43:23 75:10 87:22 111:9 143:15 193:15, 17 237:24 241:3
**provisional** 39:20 40:2 51:16, 18 124:13, 18 127:15, 20, 21, 24, 25 132:16 181:21, 25 182:7
**provisionally** 242:5, 8
**provisionals** 167:11
**provisions** 191:22 237:10
**public** 64:5 124:21
**published** 237:21
**pulled** 145:17
**Purcell** 35:2, 3
**purely** 72:25 74:23 77:11 259:16
**purpose** 22:6, 8 28:3, 4 93:14 200:20, 21, 24 201:2, 12, 13 203:9 211:9 261:17
**purposes** 188:14
**pursuant** 1:1 21:19 32:21 117:2
**pursue** 35:8
**pursued** 71:19
**pushing** 260:24
**put** 21:25 22:18, 20 68:23 79:21 81:14 88:23 95:15 115:3 118:24 137:10, 11 139:15 143:17 145:12, 14 146:11 162:15 199:13 222:17 230:21 231:8 241:13, 20, 23 247:9, 11
**puts** 40:24 204:25 221:21
**putting** 8:7 37:15 152:16

< Q >
**qualification** 87:19 229:11, 14
**qualifications** 75:2 228:13, 17 234:18
**qualified** 39:5, 13 52:4 74:7 201:1 227:19 229:18
**qualifies** 259:8
**qualify** 75:16
**quasi-judicial** 72:19 94:17 95:2 250:3
**question** 8:16 18:15 40:21 44:15 45:17 47:5, 19 64:19 72:25 73:5, 11, 13 74:16, 22, 23 75:7, 9 77:11, 23, 25 78:4, 12 80:23 86:2, 14 87:19 93:10, 15, 19, 23 98:8 103:2 116:8 120:21 123:10, 19 124:1 128:8 133:5 135:14, 23, 24 136:1 138:7, 11, 12 143:9 146:19 147:13 148:2 152:14 153:5, 11 156:2 159:8, 20 163:15 166:6 170:2 180:24 183:15, 18 199:10, 20 210:19 213:5 214:22 215:16, 24 220:22 222:13 228:4 230:6 231:14, 15 233:5 242:22, 25 247:5 250:4, 25 260:4
**questionable** 74:8 127:18
**questioned** 13:9 133:19 257:12
**questioning** 64:18 77:21 120:9 134:9 187:22 218:10
**questions** 9:8 18:3 28:14 36:16 63:3, 15 64:16 76:12 77:18 101:11 105:21 109:7 116:5, 21 120:3 134:1 151:23 152:18, 24 155:15 157:5 173:23 183:6 209:1 225:3 251:17 254:24
**Quick** 123:11
**quickly** 54:6 243:25 254:22
**quite** 12:19 167:25 188:13 189:11 190:14 194:19 195:19 200:21 228:20 257:24 260:25
**quote** 30:22 68:23 69:8 84:14, 20 110:19, 20, 23, 24 174:13, 17 211:20 212:6 224:14 225:3, 5, 6, 7 233:13
**quoted** 174:13 191:19 223:12
**quotes** 83:25 84:5, 10

< R >
**race** 50:3, 10 51:3 97:14 110:10 129:9 177:14 214:8 243:18, 19, 22, 23
**races** 50:7 97:18, 23 156:15, 19, 22, 25 159:21 177:15, 18 206:22 243:19, 20, 21
**raise** 9:19 15:1 64:19 125:14 141:1 160:8 185:16 247:24
**raised** 7:17 11:21 13:3, 11 182:24 183:1, 7 247:22 251:11
**raises** 208:16
**rare** 166:25
**rationale** 50:15 224:10 255:5, 7, 9 256:8
**Ray** 3:10 9:16 140:23 141:3
**reach** 79:25
**reached** 213:15 235:5 256:12
**reaching** 113:13 255:2
**read** 29:10 31:7 34:9 35:9 43:7 55:24 68:11, 12 76:6, 17 77:5 82:16 83:22 84:8 85:2 86:11 99:2, 16 119:3, 22 127:1 134:15 191:18

193:22 199:3, 5, 20 211:22 215:4 218:8 225:1 227:25 243:11 244:13 251:3, 4 260:10 263:4
**readily** 187:24
**reading** 153:22 154:7 168:9 175:17 197:20 201:18
**ready** 28:19 126:23
**real** 216:2, 3 245:15 246:7
**realized** 145:14
**really** 18:17 35:4 53:23 90:12, 21 104:17 113:16 134:4 151:19 205:5 213:9 214:5 215:8 220:12 228:13, 22 229:24 233:6, 22 235:11 242:15 247:20 254:11
**re-ask** 128:8
**reason** 29:16 73:10 98:11, 13 99:18, 25 100:21 105:10 123:13 129:25 166:21 193:4 195:18 231:7 238:21 239:22 249:13
**reasonable** 53:14 138:5, 6
**reasoning** 113:17 191:12 260:15
**reasons** 100:2, 5, 6, 7, 10, 14, 18 249:13 250:18 261:5
**Rebuttal** 3:17 185:25 205:23 209:2
**recall** 27:23 29:24 44:22 59:23 67:11, 14 71:18 98:8 104:7, 9 105:1 114:9 116:21 118:1, 18, 20 121:9, 13 147:17 153:1 172:24 181:15 182:23
**recalled** 106:23
**recanvass** 197:3
**receipt** 17:16 21:20 84:24 142:17, 19 165:9, 13 247:10
**receive** 30:8 43:11 83:25 90:16 124:6 129:23 142:7 145:5 146:14 162:19 163:11 164:3 172:9 174:21 175:15 193:20 206:16, 21 208:10 243:13 252:7 258:7
**received** 22:1 25:12 28:14 30:9 39:19 52:17, 22 54:11 55:16 79:23 90:18 109:4 128:24 129:15, 17, 24 130:1, 3 132:10 133:23 134:13 142:23 143:1, 3, 10, 21, 25 144:13 145:3 157:12 158:12, 17, 24 162:11, 18, 25 164:25 165:7, 22, 24, 25 166:5, 12 173:14 174:23 188:18 193:19 208:21 221:1, 5, 12 222:7
**receives** 98:20 157:15 164:7, 23 208:12 259:3
**receiving** 17:6 76:8, 25 84:11 126:18 175:8
**recertification** 178:18 206:1
**recertified** 181:10
**recertify** 8:2 89:23 156:3, 4, 12, 14 172:16 177:11 178:14, 17 181:24 219:14 246:6
**recertifying** 32:23 181:12
**recess** 108:3 186:11
**recipient** 25:9
**recognize** 25:4 28:24 44:17 45:9, 10 253:6 261:21
**recollection** 27:25 49:1 68:5 82:5 87:7 118:9
**reconcile** 204:1
**reconsider** 136:7 226:19
**reconvene** 133:10
**reconvened** 133:7
**record** 13:10 55:24 61:22 83:22 86:21 105:15, 16 109:23 139:17 140:19 151:4, 15 152:2, 5, 13, 20 186:13 188:14 213:18 222:17 242:15 263:6
**recording** 133:22 134:25
**records** 114:25 159:2
**recount** 29:20, 21 51:2 59:18, 20 197:3 219:5
**recounts** 87:5
**RECROSS** 3:2 120:5 157:13 181:7
**RECROSS-EXAMINATION** 120:7 121:15 159:11 183:16
**REDIRECT** 3:2 15:19 106:9, 10, 12, 18 111:22, 23 138:2 150:19 155:17 157:13 159:8, 11 167:18 176:20 181:7 183:16
**redundant** 86:20
**refer** 12:1 19:9 22:12 162:4, 16 173:3 188:24
**referee** 80:12 238:25
**reference** 12:2 94:16 190:23 200:12
**referencing** 87:22
**referred** 91:25 145:18 148:20 201:15 240:22 257:10
**referring** 22:13 29:20 33:2, 4, 15 34:5 37:18 57:10 122:22 130:10 150:22 162:8 172:18
**refers** 34:16 192:1 196:16 218:2
**reflect** 11:21 157:22 186:18
**reflected** 190:18 197:19
**reflects** 10:17
**refuse** 84:17 144:8 186:17
**refused** 60:1 159:13
**refusing** 252:4, 6 257:18
**regard** 43:4, 8 74:8 214:16
**regarding** 27:3 31:24 34:20 47:3 51:16 62:7 77:19 91:2 100:21 121:7 172:10 174:11 195:15 197:2 218:6
**regardless** 148:11
**registered** 157:17
**Registry** 65:22
**regularly** 204:8
**regulations** 64:2
**reiterate** 28:4
**reiterated** 57:4, 8 175:17
**reiterating** 33:18
**reject** 111:11, 15
**rejected** 62:8 213:3
**relate** 185:10
**related** 66:6, 11 89:2 91:2 104:10 105:8 237:25
**relates** 17:13 163:14 165:6
**relating** 18:3, 14 23:3 130:25
**relationship** 206:19
**relationships** 112:14
**relative** 165:2 208:4
**relatively** 107:2 161:15, 16
**relevance** 101:17 151:19 179:14, 25 180:2, 3
**relevant** 11:17 18:9 26:1 28:6 46:12 77:19 85:17 92:16 98:19, 21 100:8, 23 102:1, 4 103:6, 21 104:1 117:13, 16 128:15 157:7 191:5 193:16 194:7 204:6 205:20 206:13 215:23 224:23
**Relief** 7:10 86:7 112:4 119:5 187:11 198:3 205:10 209:15, 23 216:19 220:9 246:11 260:12, 20
**rely** 51:10 127:5 202:17
**relying** 227:20, 22 260:7
**remain** 13:7
**remaining** 217:9
**remember** 67:22 104:4, 22 123:24 155:23
**reminder** 30:1
**remove** 188:7 193:3
**removed** 159:3 195:25 196:11
**render** 262:2
**RENÉE** 1:1
**renew** 226:21
**repeat** 75:7 143:9 166:6 236:5
**repeatedly** 203:5
**rephrase** 45:17 101:12 116:8
**report** 34:15 54:4 78:21 79:20 89:12 108:11 189:23 192:5, 10 226:6
**reported** 158:20 263:3
**reporter** 6:24 12:11 25:2 184:20
**reports** 79:1 181:20 225:24
**repository** 88:25
**represent** 160:18 209:6
**representatives** 178:8 179:6, 7
**representing** 37:4 134:19, 20
**reproduction** 6:23
**republican** 27:4 109:24 119:12, 13, 20 130:25 134:20 155:20 156:8 177:3, 8, 20, 21 178:3, 4 246:1
**republicans** 177:10

**request** 30:*10* 35:*15* 58:*4*, *7*, *8* 87:*5* 113:*17*, *19* 120:*17* 151:*21* 189:*19*, *20* 190:*6* 216:*18* 226:*20* 227:*20* 236:*7* 246:*13* 257:*14*
**requested** 22:*20* 29:*17* 32:*24* 34:*12* 35:*7* 55:*13* 178:*16* 224:*21*
**requesting** 86:*5*, *6*
**require** 167:*23* 171:*23* 187:*3* 189:*17*, *25* 211:*2* 226:*5* 233:*24* 234:*18* 235:*4* 237:*15* 249:*11*, *12* 260:*14*
**required** 26:*3* 28:*5*, *7* 40:*9*, *15*, *18*, *20* 50:*11* 54:*19* 58:*10* 120:*20* 121:*3* 195:*8* 208:*22* 215:*8* 219:*16* 225:*15* 229:*7*, *22* 232:*20* 240:*2*, *6* 258:*15*
**requirement** 223:*16* 228:*16* 229:*4*, *8*, *14* 230:*18* 231:*6*, *17* 232:*9* 233:*21* 237:*20*, *23*
**requirements** 8:*18* 161:*24* 216:*19* 233:*18* 250:*23*
**requires** 43:*24* 50:*16*, *20*, *21* 120:*22* 124:*20* 188:*11* 189:*8* 195:*6* 196:*4* 198:*5*, *7* 205:*11*, *12* 213:*2* 233:*19*
**requiring** 168:*1*
**reread** 228:*2*
**res** 239:*13*
**research** 13:*5* 144:*14* 145:*16* 153:*6*
**reserve** 15:*19* 151:*17*
**resolution** 12:*6* 49:*16*
**resolutions** 196:*5*
**resolve** 194:*14*
**resolved** 11:*15* 12:*19* 196:*6* 225:*4*
**resolves** 127:*22*
**respect** 8:*17* 9:*8* 10:*13*, *23* 15:*7* 17:*10* 21:*10*, *16* 24:*1*, *4*, *11* 34:*14* 35:*18* 62:*1* 81:*25* 84:*23* 92:*12*, *14* 94:*6* 98:*24* 99:*23* 101:*3*, *7*, *16* 103:*24* 114:*3*, *16* 123:*18* 124:*1* 126:*2* 128:*4* 133:*21*, *22*, *24* 134:*24*, *25* 135:*4* 138:*6* 139:*3* 141:*18* 144:*6* 146:*25* 161:*11* 165:*11* 170:*22* 180:*5* 195:*11* 197:*24* 198:*7* 206:*20* 214:*16* 218:*16* 236:*6*, *18* 237:*1*, *4* 239:*13* 240:*20* 245:*24* 246:*24* 250:*16*, *17*
**respectfully** 63:*21* 90:*10*, *14* 236:*15* 237:*2* 245:*21* 255:*2*
**respective** 219:*15*
**respectively** 48:*23* 218:*20*
**respond** 15:*19* 56:*4*, *8*, *9*, *13* 135:*4* 174:*1*, *2* 180:*2* 185:*9* 205:*22*
**responded** 55:*9* 56:*5* 57:*4* 173:*9*
**Respondent** 2:*1* 131:*3*, *6* 133:*20* 171:*6* 238:*3*
**Respondents** 1:*1* 7:*8* 184:*16* 185:*2*, *5*, *24* 204:*9*
**responding** 29:*23* 57:*14* 256:*2*
**response** 34:*12* 54:*10*, *22* 55:*16*, *20*, *21* 56:*2*, *20* 57:*8*, *9*, *17*, *23* 98:*7* 112:*18* 120:*21* 152:*14* 174:*3*, *9*, *20*, *21* 175:*15* 183:*18* 185:*17* 215:*24* 248:*2*, *3* 251:*12*
**responses** 54:*11*, *16* 56:*21* 173:*23*
**responsibilities** 17:*2*, *9* 126:*2* 141:*17*, *25* 160:*25* 161:*7*, *18*
**responsibility** 17:*15* 115:*2*, *9* 127:*7* 206:*18*, *23* 262:*1*
**responsible** 16:*20* 206:*17*
**rest** 209:*2* 212:*20* 225:*1* 249:*5*, *7*
**Restart** 60:*10*
**restraint** 235:*15*
**result** 38:*14* 50:*4* 69:*10*, *15* 81:*24* 94:*21* 126:*1* 127:*2* 137:*16* 141:*17* 156:*24* 202:*13* 207:*7* 211:*18* 212:*16* 213:*16* 223:*17* 229:*21*, *22* 240:*11*, *14* 249:*12*
**results** 7:*23* 8:*2* 17:*15* 19:*12*, *13*, *15*, *17* 32:*23* 35:*23* 48:*13*, *24* 49:*3*, *7*, *10*, *20* 50:*7* 51:*7*, *14*, *17*, *19* 52:*17*, *21* 53:*6* 54:*18* 59:*19* 71:*17* 77:*9* 79:*4*, *5*, *11* 80:*4*, *8*, *9* 81:*15* 84:*3* 88:*19*, *22* 89:*4*, *17* 97:*16* 111:*11* 116:*13* 121:*24*, *25* 124:*7*, *9*, *10* 139:*19* 149:*4*, *5* 159:*14* 167:*6* 176:*8*, *14* 177:*6*, *13* 181:*10*, *17* 186:*18*, *20* 187:*9* 192:*11* 193:*19* 197:*19* 202:*2*, *18* 206:*3*, *17*, *22* 208:*25* 209:*11* 214:*4* 217:*4* 218:*22* 220:*13*, *17*, *18* 221:*1*, *5* 226:*11*, *14* 236:*1*, *13*, *14* 237:*15* 239:*21* 240:*8* 243:*14* 244:*2* 246:*6* 252:*9* 258:*13* 259:*3*
**RETAINED** 5:*17*
**return** 43:*4*, *9*, *15*, *18* 44:*3* 133:*25* 135:*5* 162:*7* 163:*3*, *6* 165:*13* 166:*8*, *9* 167:*13* 188:*16*, *23* 191:*13* 198:*8*, *17*, *19* 199:*1*, *14*, *18*
**returned** 20:*21* 21:*6*, *8* 39:*16* 116:*24* 162:*5* 233:*13*
**returns** 17:*16* 18:*18*, *20* 76:*8* 77:*1* 79:*23* 84:*1*, *11*, *18* 89:*2* 124:*16* 148:*24* 149:*2*, *12* 150:*15* 164:*17* 171:*23* 192:*3* 195:*16* 197:*3* 208:*15* 218:*6*
**reversed** 139:*24* 167:*2*
**review** 18:*20* 79:*22* 94:*21* 95:*20*, *21* 124:*8* 128:*5* 146:*13* 151:*8* 164:*3* 202:*5* 207:*6* 212:*11* 224:*22* 244:*22* 245:*1* 257:*1* 259:*15*
**reviewed** 68:*19*, *20* 95:*8* 151:*18*
**reviewing** 124:*15*, *17*
**revisit** 228:*25*
**Riegner** 4:*13* 175:*3*
**right** 7:*14* 10:*12* 15:*1*, *19* 29:*2* 30:*12* 37:*24* 38:*18*, *25* 39:*3*, *23* 40:*7* 41:*7*, *16* 42:*19* 43:*5*, *20*, *25* 44:*8* 45:*20* 46:*15*, *16* 48:*5*, *15*, *25* 49:*8*, *25* 50:*5*, *13* 52:*18*, *23* 54:*13* 57:*25* 58:*13* 59:*14* 60:*6*, *12* 62:*22* 65:*16* 66:*5* 68:*23* 70:*19* 74:*6*, *24* 75:*20* 76:*25* 79:*4*, *13* 80:*22* 81:*23* 82:*20* 88:*2*, *8*, *18* 89:*25* 91:*4*, *19* 92:*12* 93:*7* 94:*3*, *23* 95:*3* 96:*1* 100:*3* 102:*8* 104:*13*, *16* 107:*9* 110:*9* 111:*4*, *6* 115:*24* 120:*23* 122:*2*, *8*, *19* 124:*24* 125:*2*, *14* 138:*12* 139:*9*, *15* 140:*5* 141:*1* 148:*15* 151:*17* 154:*4* 155:*4* 160:*8* 174:*5* 178:*14* 180:*9* 181:*10*, *15* 185:*22* 202:*7* 203:*1* 204:*24* 207:*5*, *14* 211:*10* 212:*15* 214:*19* 215:*12*, *20* 226:*22* 227:*7* 229:*10* 230:*25* 231:*3*, *5*, *13* 234:*16*, *24* 240:*14* 242:*10*, *12* 247:*17* 248:*16* 250:*6* 252:*1*, *11* 256:*3* 261:*1*, *19*
**rights** 225:*4*
**Ritter** 5:*20*, *21* 212:*13*, *14*, *23* 213:*12*, *13* 228:*21* 244:*7* 247:*19* 255:*1* 256:*4*, *5*
**road** 64:*10*
**role** 16:*25* 49:*5*, *7* 66:*16*, *19*, *21*, *22* 68:*17* 126:*6*, *12* 127:*2* 142:*7* 154:*24* 155:*6* 160:*22* 161:*14* 170:*5* 243:*8*
**roles** 161:*11*
**roll** 185:*7*
**rolls** 157:*21*, *23* 159:*3*
**room** 53:*14* 228:*10*, *22*
**roughly** 51:*9* 104:*11* 113:*7* 141:*25*
**rubber** 208:*11* 259:*16*
**rule** 10:*12* 12:*20* 13:*2* 151:*21* 239:*14* 244:*23* 255:*4* 256:*6*
**ruled** 23:*6* 69:*22* 216:*15*, *16*
**rules** 15:*21* 243:*10* 251:*3*, *5*
**ruling** 47:*13* 54:*9*

**rulings** 23:12 24:8 26:1 28:6 121:4 174:13, 18
**run** 72:6 161:4
**running** 38:8 98:2 179:21 180:16

< S >
**sake** 260:4
**Sally** 103:11, 12, 13
**satisfy** 232:19
**save** 28:18 123:17 154:20 209:2
**saw** 132:7 243:1
**saying** 11:5, 7 29:2, 9 30:19 50:2 56:13 131:7, 24 134:11 135:6 136:22, 24 137:6 165:12 195:10 196:21 199:15 207:13, 16, 17 208:17 212:10 224:4 225:13 229:17 232:6 240:4 246:4 254:7
**says** 31:8, 23 32:21 34:9 35:5 38:9, 10, 16 40:6, 9, 12, 14, 22 42:20 43:3, 7, 8, 15 52:13 56:1 59:9 72:17 76:25 84:15 101:5 111:12 119:3 134:15, 22 136:21, 23 146:7 154:18 158:12, 16, 19 164:3 170:18 173:21 176:6 198:17, 24 199:24 200:4, 15 201:4, 9 202:15 204:21 205:20 208:19 211:5, 19 213:2 216:21 217:19 218:5 220:25 223:10 226:2, 10 231:20 232:18 233:13 234:15 243:6, 11 244:14 246:2 253:7 256:7 257:20
**scan** 165:18
**scanned** 130:1 145:6, 9 157:19 165:13, 21 166:4, 15, 17 221:22
**scanners** 127:1
**scanning** 129:24 165:11, 17 166:7, 8
**scenarios** 116:24
**schedule** 72:21
**school** 65:4, 15 112:22
**scope** 63:16 77:21 80:14 99:7 105:4, 6 107:7 135:18
**scorekeeper** 80:12 238:25
**Scott** 3:7 125:11, 16
**se** 185:21
**seal** 78:22 81:15
**sealed** 20:20
**Sean** 104:22
**seated** 15:5 125:18 141:5 160:12 178:8
**second** 25:17 29:24 32:21 33:8 34:22 43:3 44:2 57:20 82:19 83:18 109:8 124:13 166:18 167:10 181:20 198:2 222:24 233:10
**Secondly** 64:1 250:20
**secrecy** 20:11, 15, 20 149:25 199:12 200:3, 5, 9
**secret** 39:11
**Secretary** 1:1 7:4 8:1 9:1 10:8 11:23 14:21 16:6 17:22 19:13, 14, 16, 19 35:8 38:20 48:14, 24 49:3, 13, 15, 18 50:9 52:17, 20 53:14 65:24 66:24 67:1, 24, 25 68:3, 7, 25 69:14, 16 71:15, 16 72:17 73:6 75:12, 18 76:10 77:2, 7, 16 81:14, 19 82:9 83:9, 24 84:12, 15, 20, 22 85:5, 11 92:13, 22 94:1 109:18 110:6 111:7, 10, 14 119:9, 10, 21 126:10 130:18 131:9, 19 148:25 150:16 159:13, 18 160:19 167:5 168:3 176:15 179:1, 8 186:14, 21, 24 187:6, 8, 17, 18, 21 191:3 194:5 206:15 207:23 208:4, 5, 9, 12, 15, 21 216:5, 11, 25 218:22, 24, 25 220:1, 15, 17 221:2 222:25 225:13, 24 226:7, 10 235:25 236:20 238:2, 13 239:4, 6, 25 242:25 243:12 245:15, 22, 25 246:2, 3 247:2, 13 249:21 257:18, 21 258:9, 11 259:3, 14, 16 260:1, 23
**Secretary's** 7:22 8:3 49:5 69:4 120:22 220:11 238:16, 20, 22 249:14 252:7 257:11 258:24 259:19
**Section** 12:3 72:16 73:16, 24 74:2 75:1, 21 76:1, 12, 17, 20, 25 82:19, 20 84:6, 7 87:10 111:12 191:5, 6, 8, 17, 21, 24 192:6 198:12, 15, 16, 17, 22, 24 199:5, 19, 21, 23 200:4, 13 206:15 216:20
**section's** 200:6
**security** 234:18
**see** 9:4 18:8 21:3 26:6 31:25 32:1 34:22 56:2 63:24 68:23 78:2 83:4 105:6 108:1 118:25 119:14 122:19, 20 158:8 164:8 169:21 174:12 180:13 184:11 207:19 217:4 222:13 234:14
**seeing** 182:23
**seek** 239:11 251:1
**seeking** 7:25 209:14
**seemingly** 61:25 248:23
**seen** 8:15 27:15 33:14 151:8 233:1 237:20
**sees** 10:11
**segregate** 53:19 189:22 225:11 226:3
**SEIU** 225:5
**selected** 30:7, 9
**senate** 27:4 29:21 51:3 97:17, 23 98:4 110:12 119:8, 11 131:1 156:19 240:14 243:19, 20, 23
**senator** 67:16, 19, 20 69:19 240:13
**senatorial** 49:23
**send** 25:9, 16 48:20 56:14 78:19, 20, 21 131:24 132:19 173:19, 22 221:25
**sending** 29:25 112:24 126:17
**sends** 79:8 147:23 221:21 240:22
**sense** 10:13 11:18 13:14 14:10 66:10 75:19 107:24 146:16 162:8 227:5
**sent** 25:6, 21 27:19, 20, 24, 25 29:1 30:18 31:17, 21 34:25 48:13 55:20 56:6 88:14 147:5 153:24 167:5 168:23 172:23 176:8 181:22 182:3 203:18 219:18 220:16
**sentence** 32:21 56:1 84:15 225:2 234:8, 14
**sentences** 119:16
**separate** 118:25 124:25 181:20 197:8
**separated** 171:20
**separately** 149:5 196:16 253:10, 11, 16 254:18
**September** 23:22 41:16 42:4, 12 47:2
**serially** 219:10
**seriously** 146:22
**serve** 72:18 126:4 141:14 161:5 203:15
**service** 61:14
**Services** 27:23 56:18 175:3
**set** 23:22 41:22 43:3, 17 44:5 47:10 87:2 117:4 126:23 144:14 146:8 153:6 166:14 167:1 169:19 191:25 212:21 223:5 232:10 243:8, 9
**sets** 131:19 149:12 150:15
**setting** 169:20
**settled** 174:19
**setup** 104:14
**Shapiro** 97:20
**Shapiro-Mastriano** 110:9
**sheds** 224:15
**shift** 222:20
**shirt** 61:5
**shocked** 228:2
**short** 99:3
**short-circuit** 106:4
**shorten** 109:7
**show** 157:25 158:1 177:2
**shown** 70:4, 10 76:3
**shows** 242:7
**Shuller** 263:4, 8
**sic** 181:17 209:21 224:12
**side** 10:16 38:8 39:3 139:2 187:22 250:2
**sides** 9:9
**sideways** 38:9
**sign** 20:11 21:1, 2 26:8 38:16 40:7, 23 43:25 204:21
**signature** 39:3 69:25 70:6 81:15 149:21 166:14, 25 167:3 169:1, 3, 10, 19 189:10 201:2, 7, 8 202:12 221:13 222:11 234:9 250:8
**signatures** 78:22 240:21
**signed** 20:21 38:23, 24 43:10, 17, 23

44:4  47:9
63:23  67:2
74:18  79:9
89:14  130:12
143:16  158:13
163:24  164:5,
9, 13, 15, 16, 21
166:1, 18, 19
167:24  168:2
169:13  170:8
175:19  202:11
211:7, 8
231:21  232:17
233:3
**significance**
252:19
**significant**
102:18  103:24
**signing**  204:17
**signs**  201:5
**silence**  187:18
**similar**  42:11
141:25  161:16
**Similarly**  57:7
**simple**  133:14
**simply**  85:16
92:16  164:12,
16, 20  170:16
171:19  182:4
188:8  208:21
236:10  250:16,
25
**single**  50:10
90:23  146:23
**sir**  16:5  19:22
20:5  27:9
48:1  60:22
122:24  157:15
**sit**  11:4  134:7
240:19
**sits**  134:18
**sitting**  10:21
11:3  64:4
179:20  240:13
**situation**
13:13  101:20
117:15  138:16
147:8  202:25
**situations**
22:22  147:10
**six**  101:10
109:24
**Sixty-four**
113:21
**slightly**  79:8
**sliver**  213:4
**Sloppy**  70:5
**slots**  177:15

**slow**  12:11
253:2
**slower**  12:14
252:22
**Smith**  1:1
**Solicitor**  31:4
32:15, 21  57:3
134:19  155:4
183:25  184:1
219:19
**somebody**
63:9  89:6
101:3, 15
102:8  117:6
138:5  218:23
237:1  240:22
241:20  242:7
**somebody's**
98:7
**somewhat**
86:20  133:17
**son**  81:7
**soon**  80:7
237:1  246:9
**sooner**  215:22
235:14
**sorry**  12:15
23:8  25:20
36:5  57:11, 15
58:16  61:3
71:14  74:21,
22  85:20
105:13  115:5
118:24  129:21
137:2  141:9
142:17  147:4,
13  148:5
165:10  179:20
180:12  255:13
**sort**  30:1
106:6  190:24
192:6  201:21
205:23  211:24
241:9  257:7
**sorts**  241:5
**sought**  112:4
187:12  205:9
249:12
**sounded**  118:7,
9
**sounds**  41:18
51:4, 9  52:19
156:1
**speak**  10:21,
24  11:4  12:13
63:12  179:4
**speaking**  17:2,
4, 10  63:19
76:23, 24

87:14  109:20,
22
**speaks**  193:9,
17
**specific**  45:1
126:6  127:12
147:10  165:15
194:7  195:7
198:14  199:24
257:12
**specifically**
18:14  19:22
23:17  33:8
55:15  60:15
111:9  130:9
198:24  205:19
**specificity**
103:2
**specifies**  197:1
**speculation**
100:13
**speed**  140:16
**speeding**
255:12
**spend**  13:24
106:1  151:5
205:13
**spent**  61:15, 18
**spoke**  110:15
240:9  248:17
**spoken**  259:8
**spot**  228:10
**spreadsheet**
89:7
**Spring**  1:1
**spurred**  48:20
**squarely**
135:9  261:3
**staff**  17:5
89:3, 13, 20
113:12  146:17,
22  173:24
**stage**  193:13
195:21, 25
196:12  197:23
220:15
**stages**  196:14
**stamp**  129:18
142:25  144:1
208:11  259:17
**stamped**
129:19
**stand**  11:6
97:21  134:7
227:1  240:19
**standard**
190:11

**standards**
195:22  197:17,
18  200:15
**standing**  10:24
**star**  233:9
**stare**  214:25
**start**  131:5
138:24  185:23
232:11  245:22
**started**  16:11
65:19  133:1, 2
207:21
**startling**
240:11
**starts**  57:13
**State**  1:1  4:6,
9  7:5  10:9
11:24  16:7, 9,
10, 25  17:1, 10,
19  20:9  26:19
27:21  42:12
49:24  53:15
65:10, 12, 17
66:23  76:13
78:24  79:1
82:7  91:22
110:12  131:23,
25  132:8, 13,
20  136:20
137:6, 12, 13
142:8  154:1
156:7  160:19
168:14  172:10
175:1, 16
176:9  177:7
178:3, 5
186:14  202:21
203:21  206:4
243:22  259:23
**stated**  55:12
94:3  132:11
158:12  170:9
**state-level**
79:11  110:5,
10
**statement**
7:13  13:25
78:7  105:8
135:18
**statements**
14:3
**states**  39:4
62:19  83:12
97:23  138:18
170:7  210:24
225:21  243:19
244:8, 11
**State's**  17:19

**statewide**
29:20  49:9, 10
50:10  51:2
59:18  65:22
89:9  97:18
104:16, 19
116:13  159:14
219:5
**stating**  59:17
114:8  183:21
**status**  221:25
222:4, 6
**statute**  20:16
45:22, 23
49:25  63:4
72:23  77:15,
21  84:6  111:4
154:18  167:25
168:3  175:18
176:1  182:13,
16  193:15
196:20  200:20
202:12  205:18,
19, 20  206:21
213:1, 2, 5
217:19, 22, 23
218:17  219:1
220:25  228:4,
12, 13, 15
229:3, 21
231:20  232:10
234:7  243:6,
10  252:2
**statutes**  12:8
64:2, 7, 12, 14
193:7  194:7
195:7, 9, 10
199:3, 5
200:24  208:23
215:6  250:23
**statute's**  203:9
**statutorily**
16:23
**statutory**  8:18
53:9  86:23
161:24  199:4
201:22, 23
202:1, 2  205:1
206:18  208:24
209:17  228:23
229:8  233:18
235:8  248:8, 9
252:7  258:9
**stay**  27:1
52:5  56:13
213:25  214:1
227:21
**stayed**  46:22
**staying**  196:16

**steadfastly**
261:23
**stems**  43:23
**step**  122:5
213:7
**stepping**  198:6
**steps**  113:4
129:15  132:21
133:3  210:20
**sticking**  57:24
**stipulate**
96:25  97:5
167:10  171:14
**stipulated**
51:10, 12  52:6
88:11  90:7
91:23  118:10
139:17  155:1
177:2  213:19
232:23
**stopped**  137:8
**store**  88:25
**story**  122:16
**straight**  201:14

**straightforward**
107:2
**streaming**
10:25
**Street**  1:1  2:1
**strike**  60:9
142:17
**strive**  19:19
**subject**  34:14
45:19  75:1
93:17  95:19
128:5  153:13
192:23  208:5
215:19  232:2
234:4
**subjective**
233:20, 24
**submissions**
36:10
**submit**  77:6
128:20  131:19
132:12  133:3
149:4  225:12
**submits**  115:9
**submitted**
18:20  21:23
48:24  49:2
51:7, 13, 16, 19
57:25  89:1
108:12  114:25
116:14  118:3,
16  124:16
130:18  148:23
149:12  150:15

151:13 157:17 169:25 209:11 218:21 220:13
**subsequent** 23:11 29:20 96:23 129:11 179:9 193:13
**subsequently** 19:14 26:18 116:25
**substance** 68:14
**substantial** 107:20 177:12 225:3
**substantively** 38:6 198:15
**succeed** 204:20 224:25
**success** 190:9 224:20 227:12
**successful** 84:4
**successfully** 252:14
**sudden** 244:10
**sue** 131:11 195:3 252:16
**sued** 131:8 257:17
**sufficiency** 133:24 134:4, 9, 25 135:5, 16 201:10, 19 205:6
**sufficient** 43:12, 17 44:3, 4, 5, 8 186:4 191:10, 13 199:1, 2 200:16, 17, 19 201:2, 6, 13 205:4
**suggest** 107:3 187:22, 23 232:10 236:15, 20, 25 239:13 240:17, 18 246:19 247:4 249:10
**suggesting** 98:23 220:23 247:14
**suggestion** 185:8 229:11
**suitable** 11:11
**Suite** 1:1
**suited** 77:14
**summarizes** 28:10
**Summary** 7:10 25:24, 25 56:25 83:11
**Sundays** 72:14
**Superior** 237:17
**Supervisor** 196:4
**Support** 83:8 255:3, 5, 9, 15 256:17 260:8
**supports** 256:8
**suppose** 100:6
**supposed** 12:5 193:18 245:20
**Supreme** 5:21 6:2 21:20 24:15 26:25 46:4, 13, 23 47:15 62:18, 19 72:20 81:25 98:23 138:18 183:20 199:6, 20 200:11 203:5 207:5 208:7 210:7 213:17, 25 215:12, 20 223:10, 13 235:14 236:23 241:1 244:8, 11 246:9 247:19 251:6 255:20 257:16, 19
**sure** 7:15 8:21 11:7 14:13 15:21, 23 19:19 20:15 23:9 30:22 35:4 38:2 52:3 64:14 65:22 79:14, 17, 18 80:1 83:3, 5, 24 86:10, 20 88:9 93:14 96:10 99:16 105:15 106:25 126:20, 21, 25 127:6 128:7, 8 129:23 130:1 131:6 137:19 139:16, 22 142:4 144:4 145:3, 6, 11 148:1 150:7 152:3, 8, 15 154:19 155:22 156:9, 18 157:19, 22, 25 159:9 165:10, 18, 19 166:16, 17, 18, 20 167:2 168:22 180:23 181:6 182:21, 25 183:3, 4 210:21 214:15 215:2 221:21, 23 229:6 230:12 240:20 242:7 258:22
**surprise** 243:16
**surprised** 177:17
**surrender** 39:21 40:3
**survive** 250:14, 15, 17
**suspect** 71:23 94:11
**sustain** 44:17 135:22
**swaths** 259:19
**swear** 81:22 222:15
**swore** 137:11
**sworn** 15:4 125:17 141:4 160:11
**system** 79:2, 7 89:8, 10, 11, 17, 19 104:19 129:23 144:4 145:7, 11 157:19, 22 165:19, 21 166:20 167:2 168:23 176:4 221:21, 23 240:20 242:6, 7 246:15
**systems** 104:18, 20, 21

**< T >**
**Tabas** 63:5, 7
**table** 241:13
**tables** 10:21
**tabulate** 26:14 28:7 49:8, 9 53:19, 20 54:4 76:11 77:3, 9 84:13 116:12 131:24 132:12, 19 243:12, 13
**tabulates** 50:1 77:16
**tabulating** 17:7 18:18 19:6
**tabulation** 19:2 76:14 124:17 131:25
**take** 11:4 37:17 49:7 70:1 77:8 84:23 105:25 107:7, 11, 23 129:14 133:5, 7 146:18, 22 151:14 152:6, 19 153:10 158:10 179:15 184:22, 24 186:3 210:16, 19 212:24 217:2, 13 228:24 251:5, 8 252:25
**taken** 108:3 177:23 186:11 207:10 236:16, 17 245:8 246:22 257:12
**takes** 80:4 129:14 213:24 216:25 227:5
**talk** 48:8 50:22 112:23 113:2 252:18, 22
**talked** 35:25 48:9 251:11
**talking** 17:24 46:3 69:8 97:12 102:7, 13 113:8 124:24 134:5 149:14 150:5, 8 162:3 188:15, 20, 25 196:18 213:1 224:20 241:4, 5 242:1, 2, 15 253:23
**talks** 237:19
**tallied** 19:12
**tallies** 189:24 225:12 226:6 249:18
**tally** 244:2 253:11, 12, 16
**tandem** 199:21
**tangent** 245:24
**task** 262:3
**technically** 185:14, 20 190:7, 8
**teed** 216:14 235:11
**tell** 30:23 38:13 70:18 71:12, 23 72:10, 16 82:17 89:21, 23 94:11 95:23 109:25 121:17 124:2 133:3 151:20 194:13 222:9 246:7 247:23
**telling** 85:24 137:5 182:5 239:2 247:2
**tells** 49:25 87:17
**Template** 4:5 20:8 37:21
**ten** 217:8
**tend** 86:12
**tenure** 71:18
**Teresa** 158:13, 20 159:3
**term** 17:24 54:2 70:20 92:3 111:1 121:18 178:20 246:17
**terminated** 236:7
**terms** 15:16 66:1 90:4 110:17 121:20 135:15 233:16
**terrific** 245:16
**territory** 92:16
**test** 165:5 190:10
**testified** 15:4 23:1 44:12 48:11 49:4 56:24 58:2 62:4, 6, 11, 12 68:17 114:17 125:17 135:10 141:4 147:14 150:14 160:11 172:19 181:19
**testifies** 74:3
**testify** 11:19 15:12 62:9 87:12 135:2 192:18 194:9, 22 220:17
**testifying** 107:13 221:16
**testimony** 13:9 20:24 37:7 56:20 60:4 62:17, 18 74:5, 9 123:8, 16 124:6 140:13 141:20 151:5, 25 160:2 161:10 171:9 184:6 208:2 245:14
**testing** 126:24
**text** 40:9, 12, 15 201:11, 14
**thank** 9:23 11:12 12:24 13:17, 18, 20, 21, 22 14:16, 17, 19, 23 15:5, 23, 25 16:18 18:2 19:8 20:3 24:21, 24 25:23 30:12 31:1 34:9 36:14, 15, 17 37:6 41:5, 24 44:20 45:2 47:20 60:22, 23, 24, 25 61:10, 14 64:21, 22, 23, 25 65:1 70:13 75:3 76:16 81:2 82:25 85:2 86:16 87:20 93:21 94:23 97:12 101:13 108:2 109:6 110:15 111:16, 18, 19, 21 115:25 116:3, 19 118:22 120:4 123:3, 5, 6, 7 125:4, 5, 6, 8 126:11 127:11 128:23 140:8, 9, 10, 12 141:14 152:11 154:13 157:3, 4 159:25 160:1, 3, 5, 7 162:15 168:8 176:18 180:25 181:2, 3

182:14 183:12, 13 184:3, 5, 8 186:1, 2, 5, 8, 10, 12 209:4 233:5 235:22 236:2, 3 242:19 251:16, 20, 22, 23 253:3 258:21 260:21 261:9, 10, 12 262:7
**thanking** 57:13
**Thanks** 115:6
**theoretical** 254:20
**thereof** 76:15 197:3
**thereon** 43:20
**thereto** 119:8
**thing** 25:20 41:2 59:2 61:6 77:20 109:17 136:21, 22, 23 166:13 245:25
**things** 12:7 38:13 63:18 64:8 67:3 70:19 71:22 109:16, 17 121:18 122:2, 4, 13, 17 124:25 137:5 140:16 197:4, 8 207:24 208:1 238:8 245:7 251:11
**think** 7:21 9:4, 6, 7 10:10, 12 11:17, 21 12:1, 8, 9, 21 13:4, 8, 13 14:2 18:5 22:8 24:24 32:6 44:1, 14, 23 45:13, 15, 21 47:23, 24 50:19, 20 52:6 53:17 54:20 57:18 58:6 60:3 61:20 69:5 72:4, 11 73:2, 3 74:5, 6, 25 75:20 77:13, 20 78:1 85:8 87:12, 13 88:8 89:21 90:1, 10 91:15 93:10, 11 95:5, 17, 25 98:9, 10, 11, 13 99:4, 23, 24 100:2, 10, 19 101:19 102:19, 22, 24 104:6 105:9, 25 106:14, 19 107:11, 12, 14, 20 108:10 110:25 115:11, 20 118:20 121:19 125:3 126:10 134:3, 8 135:14 139:6, 22 151:14, 15, 25 154:3, 15 155:24 162:23 169:9, 12 170:14 178:20 182:24 183:9 184:22 185:6, 8, 22 186:4 193:4 194:22, 24 199:6 202:13 204:19, 20, 23 205:2, 13 206:2, 12, 19, 24 211:14, 16 212:2, 9 213:8, 17 214:6, 21, 24, 25 215:25 217:12 218:1, 3, 9, 12 219:17, 21 220:2, 21 221:7 223:3, 6, 13 224:14 225:1, 9, 12 226:24 227:2, 9, 24 228:8, 9, 10, 11, 19, 20, 23 229:2, 25 230:1 231:25 232:15, 22 234:23 236:9 239:24 247:6, 8, 10, 12, 16 249:20, 25 251:11 252:15, 20 253:17, 20 254:5, 14, 24 256:3, 5 259:19 260:12 261:5
**thinking** 70:7 215:16
**thinks** 244:14
**thinly** 237:8
**Third** 5:6 8:3 23:6 24:9 26:22 46:7 47:13 51:24 59:4 100:19 166:21 172:1 174:15 176:10 207:4 213:23 228:1, 3, 6, 19 229:20 244:14 245:4 260:17
**THOMAS** 2:1 8:9, 11 61:13 176:24
**thorough** 213:9 261:13
**thoroughly** 261:3
**thought** 13:4 155:14 206:10 207:1 209:25 214:18 222:24
**thoughtful** 261:12
**thousand** 104:6
**thousands** 104:25
**thread** 34:18
**three** 7:23 8:1 32:7 35:18, 21 36:5, 10 43:5 48:23 49:16 50:3, 5, 12, 18 51:22 52:21 54:12, 16 55:11 60:16 71:1 88:3, 10, 11, 12, 19 89:16 90:2, 11, 18 91:10 96:14 98:3 107:15 109:7, 16, 17, 19 112:1, 8 118:2 129:9 155:2 172:15 173:23 186:15 187:2 195:2 210:15, 16 211:8 212:19 213:23 216:16 217:7 220:16 243:21 250:10 254:16 256:10 258:17
**threshold** 7:17 11:20 12:18 13:15 73:5
185:3, 19
**Thursday** 1:1
**tie** 81:6
**ties** 177:16
**Tim** 35:9
**time** 14:12 24:2, 5 28:18 30:20 37:17 47:7 57:20 60:22 61:18 71:8, 11, 16 74:12 82:9 87:2, 4, 6 99:24 102:17 106:2, 6 107:3 113:8 114:3 123:17, 18 125:10 129:5, 18, 19 134:20 138:14 142:25 143:25 146:17 151:5, 8 160:2 184:7, 19 185:7 195:4 205:13 206:7 208:9 210:2 214:21 219:11, 13 227:15, 22 230:3 231:14 244:23 245:8, 16 248:17 249:20 251:16 252:11, 25 256:20 260:25
**timeline** 23:9 41:18 51:9 52:9 209:24 213:17
**timeliness** 12:2 22:4 51:23 133:21 134:5, 10, 24 165:6 216:4
**timely** 22:1 98:18 126:22 129:15 134:13 143:1 164:7 180:10 188:17 198:9 209:11 214:4 219:24 221:6
**times** 93:12 102:12 193:8 207:3 251:4
**time-stamp** 142:22, 24 144:2
**time-stamped** 165:9
**timing** 46:25 50:22 59:15 194:4 213:22
**Timothy** 27:21
**tirelessly** 261:24
**title** 42:20
**today** 7:4 8:25 35:7 68:21 69:19 71:24 74:12, 15 90:11 97:13, 21 123:8 135:2 160:2 184:7 187:22 204:5 206:1 209:8, 16 212:17 213:18 215:16 228:3 244:9 249:5 253:23 261:25
**today's** 40:12, 23 232:18 250:14
**told** 57:22 157:18 176:5 188:3 223:8 257:16
**tomorrow** 236:24 244:10
**top** 25:18 34:6 38:5 76:6 174:3
**topic** 106:23
**toss** 200:4
**total** 33:20 36:3 79:22 155:23 177:5
**totals** 18:22 26:18 28:7 30:3 31:10 34:21 35:16 53:6, 9, 18 54:4 58:5 90:20 109:19 112:2, 9 120:17 121:3 130:18 131:19 132:12, 19 149:3 172:17 173:16, 19 174:16 240:5
**Township** 196:4
**track** 64:24
**training** 126:18
**transcript** 6:23 263:5
**transparency** 148:17, 18
**treat** 142:10, 13 146:6, 9 204:23
**treating** 256:17
**trick** 96:21
**tried** 24:22 111:25
**tries** 128:15
**trip** 8:25
**trouble** 12:10
**true** 21:10 51:6 62:20 66:3 72:1, 15 94:3 163:2 219:2 257:25 263:5
**trust** 176:4
**truthful** 74:19 245:17
**truthfully** 74:20
**try** 9:20 105:22 106:1 109:7 112:14, 23 140:16 194:14 234:4 236:5 238:23 241:15
**trying** 26:10, 12 70:21 74:22 100:18 154:20 203:24 209:19, 20 214:4 215:5 216:11 232:18 234:1, 10 238:6 239:24 259:10
**tuned** 56:13
**turn** 38:8 42:10, 24 162:2 208:23
**turning** 39:3
**twist** 234:4
**twisting** 234:9
**Two** 5:10 12:1 20:12, 14 28:18 34:25 38:1, 12, 13 41:14 51:19 52:23 61:21 65:5 69:15 70:19 78:23 84:5 107:16 110:17 119:16

122:2, 3, 13, 17, 18 124:25 131:19 138:6 149:12 150:15 156:17 158:23 165:1 167:9 175:21 181:19 195:13 196:21 197:8 199:3 205:9 206:12 212:12 218:17, 22 219:16, 23 221:4 225:12 226:6 228:11 231:19 234:8 237:7 240:11 254:15 256:25 257:6, 9 259:13
**two-day** 87:9, 21 88:2 95:22
**tying** 77:20
**type** 137:2 176:3
**types** 60:5 150:5
**typical** 25:13
**Typically** 21:24 25:15 74:9 112:20, 22 113:1 114:22 128:1

**< U >**
**U.S** 5:21 26:25 29:21 51:2 97:17 119:8 174:14 243:22
**U.S.C** 205:17
**ultimately** 35:14, 19 45:24 46:23 56:5 65:23 73:13 85:16 88:21 91:4, 7 120:25 186:25 192:19 208:8 251:14 253:21 254:6 261:7
**unable** 29:16
**unambiguous** 233:18
**uncertain** 136:19
**unclean** 180:4 182:21 183:3 247:22, 24 248:7, 10
**uncomfortable** 132:23
**unconstitutional** 136:25
**uncounted** 110:2
**undated** 22:12 23:3 24:4, 11 26:15 28:8 29:14 30:3 31:9, 25 33:20 34:21 35:15, 25 36:11 47:5 48:14 53:6, 15, 18 54:18 58:5 59:9 69:2, 18 72:3 90:20 91:3 98:8 109:19, 25 110:1 112:1, 8 114:3, 8 120:18 121:4 130:10, 17, 22 131:1, 18, 20 132:10 136:4 139:3, 12 149:3, 6, 15 154:4 155:20 159:19 162:4, 7 165:24 168:14, 15, 20 170:11, 12, 18 171:2, 20, 24 172:10, 17 173:16 174:12, 17 175:19 176:2 177:3, 12 183:21 188:24 189:1 194:25 210:9 213:2, 21 218:15 223:6 224:7 226:7, 13 229:23 232:6 233:23 235:5 246:24 253:12 257:17 258:18
**understand** 7:11 9:24 22:13 31:24 39:15, 20 40:2 41:1 55:25 56:17 70:20 75:9 94:18 103:5 122:16 127:9 131:12 134:11 135:6 138:5 139:11 146:12, 21 155:8 165:10 174:11 177:17 182:1, 6 199:2 209:18 210:18 212:10 216:6 237:18 259:1
**understanding** 34:16 36:11 44:15 56:10 63:11, 18 69:13 71:4 87:13 93:1, 10, 16 94:23, 25 95:2 106:19 121:22 128:12 138:8, 10, 15 142:16, 19 147:1, 6, 22 154:11 159:16 171:21 183:19 253:10 258:12, 17
**understands** 259:12
**understood** 32:3 56:19 86:4 167:4 172:7 189:19 209:15 215:4 225:12 230:16 248:21
**undisputed** 224:22
**unequivocally** 255:19
**unfortunate** 248:12
**unfortunately** 215:25
**unfounded** 245:1
**uniform** 78:24, 25 104:14
**uniformity** 217:6 260:23, 24
**uniformly** 216:23 231:25
**unilateral** 111:14
**unilaterally** 112:1, 8
**unimportant** 204:13
**unique** 165:3, 15 166:9
**United** 62:19 83:11 97:23 138:18 243:18 244:8, 11 261:16
**University** 65:7
**unofficial** 79:23 89:2
**unprecedential** 255:1
**unpublished** 213:13
**unreported** 213:12
**unsigned** 170:18 189:1
**unstinting** 233:16
**untimely** 7:24 8:20 180:8 220:1 248:25
**upcoming** 215:14
**updated** 51:17 181:13 182:2
**upset** 206:7
**urge** 212:18 229:12 235:14
**urging** 212:17
**use** 17:23 21:13 22:3, 7 54:2 79:17 92:3 111:1 130:2, 6, 14 142:25 143:2, 25 147:15 149:25 162:7 187:25 199:12 216:8
**uses** 165:4
**usually** 109:12 113:2
**utmost** 148:19

**< V >**
**Vacate** 119:18, 19, 22 226:20, 21 254:15
**vacated** 46:23 253:24
**vacating** 52:5 121:11 254:12
**vague** 80:14
**valid** 204:7
**validity** 100:21 144:12
**variety** 16:14 104:19
**various** 17:17 18:20 23:11 28:15 48:5 67:3 68:9 76:9 77:2 80:7 84:12 102:12 135:17 194:11
**vary** 79:1
**vast** 89:10
**vehicle** 251:8
**veiled** 237:8
**vendors** 104:21
**veracity** 148:16, 18
**verification** 70:11
**verifications** 67:2
**verified** 63:23, 24 70:15 73:4 85:15 191:25
**verify** 129:15
**verifying** 22:24 89:14
**vernacular** 111:3 216:9
**versa** 169:14
**verse** 54:15
**version** 233:10
**versus** 7:6 124:2 150:23 199:7 231:12 238:3
**vest** 245:21
**viable** 225:7
**vice** 169:14
**Vice-chair** 126:9
**view** 10:10 11:17 12:19 35:21 54:19 176:14 194:20 212:21 218:15 235:4 244:25
**viewed** 166:13
**viewing** 18:18
**violate** 135:11
**virtue** 259:4
**voice** 11:2
**void** 43:18 84:21 208:11
**voided** 39:24 40:1, 4 200:7
**volume** 11:2 24:22
**voluntarily** 118:19 169:3
**Voluntary** 119:5 121:7 216:7
**vote** 28:7 30:2 32:22 34:21 38:14, 22 39:5, 13, 16, 20 40:2 41:2 53:6, 9, 18 58:5 79:21 90:20 103:12, 13 117:17 120:17 121:3 124:21 127:12 128:1, 10 133:5 139:10, 11 147:1, 24 155:2 156:16 173:16, 19 174:16 175:14 176:2 201:1 202:19 203:19, 20 204:2, 7 205:1, 16, 19 226:6 228:14, 17 229:14, 15, 18 231:10 234:16 241:8 242:4, 6 261:19
**voted** 20:18 29:14 39:8, 17, 22 50:13 76:13 102:11 178:8 201:2 203:24 221:12 241:6 242:5
**voter** 7:24 20:10, 18 21:1 22:3 23:20, 25 37:22 38:13, 21 40:7, 18, 19 50:11 60:11 90:23 98:18, 20 100:23 101:20, 21, 22 116:20, 24 117:2, 7, 10, 11, 14 129:2 130:11 143:11, 17, 22 144:22, 24 145:1, 20 146:25 147:1, 5, 12, 14, 16, 22 148:13 149:20, 24 150:22 152:15, 17 153:16 157:17, 21 159:3 163:9, 17, 21, 23 164:5, 17 165:21, 23, 25

167:13 168:25 169:2 170:8 188:22 198:7, 13, 17 199:12, 15, 18 200:25 201:8, 9 202:7, 9, 11 203:19, 21 204:18 209:10 216:3 217:15 228:14, 17 229:17 232:20 234:18
**voters** 22:9, 15, 17, 18 43:24 95:13 149:15 153:14 165:8 168:23 203:1, 10, 22 215:7 217:17 221:24 222:4 261:4, 18
**voter's** 38:17, 23 39:2, 4 44:7 117:7
**voters's** 38:24
**votes** 17:7 18:16 19:2, 6 26:14 48:14 49:9 60:2, 5, 10 76:11 77:4 80:6 84:2, 14 136:14 159:14 171:24 177:14 197:15 203:2 215:7 218:13 224:4, 5 225:19 226:7 240:12 242:7 249:18 253:11 255:10 258:7
**voting** 79:2 104:18, 19, 20, 21 228:16 233:2

**< W >**
**wait** 14:1 61:2 93:7 151:21 185:1
**walk** 190:19, 21, 22 193:6 198:4
**walked** 197:21
**walks** 190:24
**want** 7:19 11:6 13:7, 10 14:13 23:9 25:20 32:8 55:15 61:14 62:23 64:10, 24 70:19 71:1, 2, 21, 23, 24 72:5 73:21 74:25 75:7 77:15 79:3, 5 81:23 82:11, 16 84:8 86:9, 19, 20 88:9 89:21, 22 91:21 95:10 96:25 104:3 105:15 106:3, 4, 5 107:2 109:17 111:6 113:2 120:11 135:24 136:10 139:15, 16 140:16 142:18 152:7 165:10 179:22 180:2 182:21 183:7 185:3, 4 194:6 205:23 214:21 222:14, 20 241:7 245:15 247:5 251:2 252:15, 25 258:22 261:11, 21
**wanted** 15:21 64:10 95:24 151:25 177:1 180:10 236:25 241:6 246:18, 20
**wanting** 78:4
**wants** 206:12
**watch** 11:1
**watchers** 95:14
**watching** 243:17
**water** 61:2, 5, 8
**way** 8:22 9:20 13:23 34:17 62:12, 19 69:11, 12 78:11 89:8 93:6 99:20 103:18 105:4, 5 113:1 126:24 128:8 136:7 195:5 202:10 204:2 205:21 213:21 216:10, 16 222:3, 25 228:4 231:6 234:19, 24 250:2, 18, 20 251:2 253:17 258:13, 14
**ways** 165:1
**wearing** 81:5
**Wecht** 211:8 234:6, 14 256:15, 23
**Wecht's** 211:18 213:6 230:2 232:19 233:9
**week** 35:6 54:23 59:13 127:14 178:7 221:4 244:10
**weeks** 42:18 62:13 158:23
**weigh** 179:8
**welcome** 7:3, 10
**well** 16:25 17:7 18:25 23:5, 8 24:8 26:22, 23 41:5, 12 45:13 46:5, 6, 8 56:5 58:8 59:24 66:16, 22 67:15 69:20 71:21 73:11 74:1 75:14 79:16 80:17 84:6 88:21 93:4 98:16 99:17 100:20 102:3, 25 103:1 120:17 124:5, 18 127:19 131:8 134:14 135:12, 20 143:15 153:10 156:7, 9 157:18, 25 168:3 174:8 175:13 181:16 185:1, 13, 23 191:19 193:7 203:16, 24 204:24 210:12, 18 211:15 214:12, 14, 21 216:17 217:4 226:25 227:4 229:6, 9, 13 233:4 242:25 243:2 244:21 248:13, 18 256:6, 13 258:11 261:22
**went** 30:5 35:12 95:21 124:5 174:18 194:23 214:17 226:1
**we're** 8:7 9:3, 5 10:10 13:12, 24 14:2 17:24 20:23 28:19 54:17 64:13 70:21 74:11, 12 78:14 79:16, 17 86:10 88:23 90:1, 5, 10 97:12 112:24 125:12 126:14 130:9 132:18 134:5, 22 135:10 140:1, 3 149:14 150:5, 8 160:5 176:5 185:12 189:1 203:24 205:5 209:9 215:25 219:11, 13, 23 232:13 234:9 242:15 243:15 253:23 257:25 258:5, 6
**West** 2:1
**Western** 67:13 83:13 104:5
**Westlaw** 233:10
**Westmoreland** 67:16, 20 69:1, 2, 11, 17, 18
**We've** 15:16 22:17 23:10 35:25 50:7 68:9, 21 74:13 80:3 93:11 104:12 107:12 127:15 146:3 151:8 155:1 162:2 171:9 176:24 205:9 220:2 229:25 234:19 238:15, 16 245:8 250:18 251:11
**whatsoever** 110:3
**whoever's** 243:17
**wholesale** 212:17
**willing** 123:15
**winners** 97:14, 19, 23 206:9
**wise** 213:9
**wish** 10:20
**withdraw** 47:19 78:7 80:25 81:3 86:14 129:21 180:24
**witness** 14:25 15:11, 17 20:3 24:21 41:24 44:21 52:3, 9 60:23 61:3, 4, 7 68:19 70:4, 5 74:4, 25 81:5 82:21 83:5 87:21 96:23 100:17 102:20 103:4 105:20 106:12 116:4 117:23, 24 120:25 123:5, 12 125:8, 9 133:15 134:11 135:1, 6, 24 137:2, 23 140:14 151:5 154:23 158:5 160:3, 4 168:9 179:15, 17 181:3, 6 184:8, 9 245:17 249:20
**WITNESSES** 3:2 7:12, 20 8:7, 23 10:13 11:18 13:6, 9 15:7 106:5, 7, 14, 15, 17, 21 107:4 133:19 184:11
**witness's** 105:8
**Wiygul** 83:7
**Wojcik** 212:20
**won** 177:25
**wonder** 215:9
**word** 44:5, 22 79:17 120:15, 19 122:21, 25 132:25 136:10 137:1 187:25 199:1 246:16
**wording** 20:17 69:9
**words** 131:6 225:14 234:11 244:14
**work** 65:9 67:1 89:3 112:11 138:13 185:23 245:16 261:24
**worked** 16:13, 14 66:3
**workers** 17:5 126:19 261:23
**working** 65:12, 14
**works** 89:9 196:2
**world** 73:6 250:19, 20
**worse** 239:11
**worst** 246:14
**wow** 222:24
**Writ** 5:17 209:14
**write** 22:9, 15 26:8 198:8 231:11
**write-in** 80:6
**writes** 163:17 202:7, 9
**writing** 163:10 219:12
**written** 22:3, 7 117:16 130:2, 6 144:21 147:11 148:4 162:7 163:2, 6, 19 164:11 205:15 232:9 234:7, 24 253:17 262:5
**wrong** 22:20, 21 29:18 40:25 60:3 71:14, 23 89:22 94:12 98:9 136:12 138:12 207:5 214:13 230:11 241:6 244:15 246:25 247:3
**wrongly** 23:3, 18, 19, 23 24:2 26:15 28:8 30:3 36:1, 2, 5, 7, 9 230:7
**wrote** 122:20 143:22 163:23 164:14 204:11 205:15

**Wyomissing** 1:*1*

**< Y >**
**Yeah** 56:*23* 57:*12* 58:*16* 75:*14* 95:*6*, *17* 101:*18* 116:*10* 127:*5* 153:*11* 181:*24* 222:*12* 233:*6*
**year** 22:*20* 40:*25* 41:*1* 51:*1* 61:*21* 161:*4* 178:*16* 179:*12* 256:*10*
**years** 16:*11*, *15* 61:*15* 62:*7* 65:*5* 94:*13*
**yellow** 82:*20*
**yesterday** 74:*14* 151:*10*
**YouTube** 11:*1* 243:*17*

**< Z >**
**Ziccarelli** 5:*23* 67:*9*, *12*, *15*, *16*, *24* 68:*24*, *25* 69:*18* 81:*23* 82:*3*, *12* 94:*4* 240:*10*, *13* 257:*13* 258:*4*

# <u>Exhibit B</u>

J. Marks

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------x

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, et al.,

Plaintiffs, Case No. 1:22-cv-00339-SPB

vs.

LEIGH M. CHAPMAN, In Her Official Capacity as Acting Secretary of the Commonwealth, et al.,

Defendants.

- and -

EAKIN, et al.,

Plaintiffs, Case No. 1:22-cv-00340

vs.

ADAMS COUNTY BOARD OF ELECTIONS, et al.,

Defendants.

---------------------------------------------------------x

REMOTE VIDEOTAPED DEPOSITION OF

JONATHAN M. MARKS

Jefferson Hills, Pennsylvania

Tuesday, February 14, 2023

Reported by:

THOMAS A. FERNICOLA, RPR

JOB NO. 222618

J. Marks

Tuesday, February 14, 2023

9:00 a.m.

REMOTE VIDEOTAPED DEPOSITION of JONATHAN M. MARKS, held before Thomas A. Fernicola, a Registered Professional Reporter and Notary Public of the State of New York.

J. Marks

A P P E A R A N C E S:

(All Attendees Appearing Via Videoconference and/or Telephonically)

ACLU-PA
Attorneys for the Plaintiff(s)
1800 JFK Parkway
Philadelphia, PA 19103
BY: VIC WALCZAK, ESQ.
MARIAN SCHNEIDER, ESQ.
STEPHEN LONEY, ESQ.

ELIAS LAW GROUP
Attorneys for Eakin Plaintiffs in 1:22-cv-00340
10 G Street NE
Washington, DC 20002
BY: JUSTIN BAXENBERG, ESQ.
DANIEL COHEN, ESQ.
DAN OSHER, ESQ.

J. Marks

A P P E A R A N C E S (Cont'd):

PENNSYLVANIA OFFICE OF GENERAL COUNSEL
Attorneys for the Acting Secretary of the Commonwealth
306 North Office Building
Harrisburg, PA 17120
BY: KATHLEEN MULLEN, ESQ.

ZIMOLONG LAW, LLC
Attorneys for the Lancaster County Board of Elections
353 W. Lancaster Avenue
Wayne, PA 19087
BY: JAMES FITZPATRICK, ESQ.

J. Marks

A P P E A R A N C E S (Cont'd):

DLA PIPER (US)
Attorneys for the Philadelphia County Board of Elections
1650 Market Street
Philadelphia, PA 19103
BY: M. DAVID JOSEFOVITS, ESQ.

AMERICAN CIVIL LIBERTIES UNION
Attorneys for Plaintiffs in the 00339 Case
125 Broad Street
New York, NY 10004
BY: MEGAN KEENAN, ESQ.
LUIS ROMAN, ESQ.

Case 1:22-cv-00339-SPB Document 391 Filed 05/05/23 Page 3 of 78

J. Marks

A P P E A R A N C E S (Cont'd):

PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
Attorneys for the Acting Secretary
1600 Arch Street
Philadelphia, PA 19103
BY: ELIZABETH LESTER-ABDALLA, ESQ.

DUANE MORRIS LLP
Attorneys for the Delaware County Board of Elections
30 South 17th Street
Philadelphia, PA 19103
BY: J. MANLY PARKS, ESQ.

J. Marks

A P P E A R A N C E S (Cont'd):

SMITH BUKOWSKI
Attorneys for Defendant Berks County Board of Elections
14133 Kutztown Road
Fleetwood, PA 19522
BY: JEFFREY BUKOWSKI, ESQ.

GALLAGHER GIANCOLA, LLC
Attorneys for Intervenor-Defendants, Republican National Committee, National Republican Congressional Committee, and Republican Party of Pennsylvania (both actions)
436 Seventh Avenue
Pittsburgh, PA 15219
BY: RUSSELL GIANCOLA, ESQ.

J. Marks

A P P E A R A N C E S (Cont'd):

BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.
Attorneys for Bedford, Carbon, Centre, Columbia, Dauphin, Huntingdon, Indiana, Jefferson, Lawrence, Lebanon, Montour, Monroe, Northampton, Snyder, Venango and York County Board of Elections
603 Stanwix Street
Pittsburgh, PA 15222
BY: SEAN KEEGAN, ESQ.

WESTMORELAND COUNTY
Attorneys for the Westmoreland County Board of Elections
2 N Main Street
Greensburg, PA 15601
BY: MELISSA GUIDDY, ESQ.

J. Marks

A P P E A R A N C E S (Cont'd):

BUTLER COUNTY SOLICITOR'S OFFICE
Attorneys for the Butler County Board of Elections
124 W. Diamond Street
Butler, PA 16001
BY: H. WILLIAM WHITE, III, ESQ.

BACHARACH & MICHEL
Attorneys for Allegheny County
564 Forbes Avenue
Pittsburgh, PA 15219
BY: LISA MICHEL, ESQ.

ALSO PRESENT:
JACOB BOYER, ESQ.
MARK VON LANKEN, Videographer.

Case 1:22-cv-00339-SPB Document 391 Filed 05/05/23 Page 10 of 378

J. Marks

THE VIDEOGRAPHER: Good morning. My name is Mark Von Lanken. I'm a Legal Videographer in association with TSG Reporting.

Because this is a remote deposition, I will not be in the same room as the witness. I will be recording this videotaped deposition remotely.

The reporter, Tom Fernicola, also will not be in the same room and will swear the witness remotely.

Do all parties stipulate to the validity of this video recording and remote swearing, and that it will be admissible in the courtroom following Rule 30 of the Federal Rules of Civil Procedure and the State's rules where this case is pending?

As we spoke and agreed to before we went on the record, if you do object, please state your objection now.

Thank you.

J. Marks

This is the start of media labeled No. 1 of the video-recorded deposition of Jonathan M. Marks in the matter: Pennsylvania State Conference of the NAACP, et al. versus Leigh M. Chapman, et at., in the United States District Court for the Western District of Pennsylvania, Case No. 1:22-cv-00339-SPB.

This deposition is being held on Tuesday, February 14, 2023, at approximately 9:07 a.m. Eastern time zone.

All counsel will be noted on the stenographic record.

Will the court reporter please swear in the witness.

J. Marks

JONATHAN M. MARKS,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

BY THE REPORTER:

Q. Please state your full name and address for the record.

A My name is Jonathan Marks. First name, J-o-n-a-t-h-a-n; last name, M-a-r-k-s.

BY MR. WALCZAK:

Q Good morning, Mr. Marks.

A Good morning.

Q We've done this at a time or five so we know each other, but for the record, my name is Vic Walczak. I'm one of the lawyers for the plaintiffs and NAACP versus Chapman, I believe now Schmidt.

So I know you've been deposed, that's correct, before?

A That's correct, yes.

Q I want to go over, I think, some ground rules here before we get started.

MR. WALCZAK: So I note that there are two cases involving the same

J. Marks

issue here of undated mail-in ballot envelopes.

Those cases are not consolidated, but we have counsel from the other case, the Eakin case, on.

Mr. Baxenberg, I don't know if you want to state for the record your role or involvement or the arrangements we have for today?

MR. BAXENBERG: Yes.

This is Justin Baxenberg with Elias Law Group representing the Eakin plaintiffs.

And we have separately noticed a deposition for the same date and time, and have agreed that the deposition given today will be admissible in both cases so that we don't have to go back through the same set of questions. And the time for the depositions will run concurrent.

MR. WALCZAK: Is that acceptable, Ms. Mullen?

MS. MULLEN: Yes, no objection.

J. Marks

MR. WALCZAK: So ordinarily, I would ask all counsel in the room to identify themselves, but because we are in a virtual room, and there's an awful lot of counsel, Mr. Fernicola has asked that everybody email or put in the chat their names and law firms and who they represent.

If folks could please do that.

I would like to ask counsel who expect to ask Mr. Marks questions after I'm finished and Mr. Baxenberg is finished, if you could identify yourselves on the record now.

I'm saying if you might because, of course, you may or may not want to do so after you've heard the questioning. But if you think you might, please identify yourselves now.

You're on mute.

MR. FITZPATRICK: This is James Fitzpatrick from the Lancaster County Board of Elections.

I may or may not have questions.

J. Marks

MR. WALCZAK: Thank you, Mr. Fitzpatrick.

MR. GIANCOLA: This is Russ Giancola on behalf of the intervenor defendant, and we'll probably have some questions.

MR. WALCZAK: I'm sorry, who is that?

MR. BUKOWSKI: Yes, this is Jeff Bukowski on behalf of the Berks County Board of Elections.

I may or may not have some questions.

MR. WALCZAK: So we have Lancaster, Berks, and Republican intervenors; is that correct?

MR. BUKOWSKI: Right.

BY MR. WALCZAK:

Q All right.

Mr. Marks, you're under oath here. What you testify to, everything that's said here, unless we go off the record, is going to be transcribed.

I'm going to ask you a series of

J. Marks

questions. I'm going to ask that you wait until I finish asking the question before responding, and I will try to do likewise.

I'm sure Tom is a fantastic court reporter, but if we are talking at the same time, there's just no way that he's going to be able to get that in a transcript.

Is that acceptable?

A Yes.

Q Also, if you don't hear a question or don't understand a question, please tell me, and I'm happy to rephrase it or restate it.

If you answer the question, I will assume that you both heard and understood the question.

Is that fair?

A Yes.

Q Is there anybody else in the room with you there today?

A Other than Ms. Mullen, no.

Q So it's just you and Ms. Mullen there?

A That's correct, yes.

J. Marks

Q She is your attorney today?

A She is.

Q Is there any reason that you cannot answer questions honestly and truthfully today? For instance, are you on any kind of medication?

A I am not, no.

Q If at any time you want to break, please ask me. This is not inquisition by deposition. We're here to have a friendly exchange of information.

I would just ask that if you want a break, that you not do so when I have a question outstanding. If I have a question outstanding, I'm going to ask that you complete that, and then we'll go on the break.

But, if for any reason, you need to take a few minutes, by all means, feel free to do that.

A Understood. Thank you.

Q Are you familiar with the lawsuit NAACP versus Chapman, or now Schmidt?

A I am, yes.

Q What do you know about it?
A Well, very high level, what I know about it is that this is sort of a culmination of over two years of litigation, court opinions, but on the issue of undated, and now as of last year, the term "incorrectly dated" ballots.
And this is addressing that issue, whether those ballots should be counted.
My understanding is this case is, at least, largely about whether the date on the ballot is material in determining the qualifications of the voter.
Q You said that the litigation has been going on two years. You mean the issue has been litigated for two years?
A The issue has been litigated for two years, yes.
Q And this lawsuit was filed in early November; is that correct?
A That's my recollection, yes.
Q What did you do to prepare for today's deposition, if anything?

A I reviewed previous testimony in other cases related to this issue. I also, of course, did a little bit of prep with my counsel.
Q When you say reviewed testimony, whose testimony?
A My testimony.
Q Do you recall what other case testimony you looked at?
A I can't recall the case, off the top of my head. I testified in Commonwealth Court last year on the issue of undated and incorrectly dated ballots, and I cannot recall the case at the moment.
Q Would that be Chapman versus Berks County?
A I believe that is correct, yes.
Q Have you read the complaint in this lawsuit?
A I have, yes.
Q Let's go over your background briefly here.
What is your title and position?
A Currently, I'm the Deputy

Secretary for Elections and Commissions at the Pennsylvania Department of State.
Q So in the pecking order, where does that fall?
A Well, it falls below the Executive Deputy Secretary, who answers directly to the Secretary of the Commonwealth.
Q So does that make you number 3 in the department?
A Yes. I've never really gave it deep thought. But, yes, I would expect that makes me No. 3.
Q What kind of training do you have for this job?
A Well, I actually have nearly 20 years of experience in election administration in a variety of positions at the Department of State, first as a legal assistant assigned to the Bureau of Elections, then chief of the Division of Elections.
And then I became chief of the Division of the Statewide Uniform Registry

of Electors, which is our statewide voter registration database.
After that, I became commissioner of the Bureau of Commissions, Elections, and Legislation. And then in 2019, I entered this position.
Q You're not a lawyer?
A I am not, no.
Q What year did you start at the Department?
A Well, I worked nine years in the Corporation Bureau, so I believe it was 1993. So I'm coming up on 30 years.
Q When did you start working at --
A It was late 2002 as legal assistant.
Q That's when you started working on elections?
A Correct, yes.
Q So you've worked consistently and without interruption on elections since 2002?
A I have, yes.
Q You said you became Commissioner

J. Marks

of Corrections [sic]. When was that?

A Commissioner of corrections?

Q Not corrections, sorry. I do too much prison work. Sorry, I'm not trying to change your job title here. Sorry, Commissioner of Elections.

A Yes, that was in 2011.

Q What is a commissioner responsible for?

A At that point in time, the commissioner oversaw all of the program areas including elections. So it was elections, notaries, legislation, certification -- certifications, excuse me, campaign finance, lobbying, disclosure.

Q When did you change roles at the Department of State after that?

A After that, I became Deputy Secretary in my current position in February of 2019.

Q What are your job responsibilities in that position?

A Well, I oversee, basically, that deputate, that includes elections, voter

J. Marks

registration, notaries, certifications, campaign finance, lobbying, disclosure.

Q Are you a career civil servant?

A Well, I'm not -- I don't know what -- civil service means a specific thing in State government. But I did work in private enterprise prior coming to the Department of State for a few years.

But, yes, you could probably characterize me as a career public servant.

Q I'm sorry, my question was imprecise. Let me put it a different way.

Are you a political appointee at this point?

A Yes, I do serve at the pleasure of the governor.

Q But before that, were you a civil service employee?

A I was not at any time in civil service. All of those positions I held were non-civil service jobs.

Q Now, are you familiar with the Pennsylvania Election Code?

A I am, yes.

J. Marks

Q How so?

A Well, my first experience with it was as a legal assistant assigned to the Bureau of Commissions, Elections, and Legislation.

I've dealt with it quite a bit over the years, of course, in consultation with our counsel, but I have a pretty good working knowledge of the Election Code.

You know, it's been a relevant requirement of each of the positions I've held is to have some firm understanding of Pennsylvania Election Code as well as Federal law related to elections.

Q What is your role, currently, in the making of policy by the Department of State?

A Well, I certainly have input into the making of policy. I'm usually consulted by the Secretary of the Commonwealth, you know, on policy matters certainly related to elections, and the other things I named that are within my deputate as well.

J. Marks

MR. WALCZAK: I'm going to try my technological wizardry by sharing a document on the screen, but it's not working here.

I'm going to put in the chat for counsel a link to the PDF.

MS. MULLEN: Are these what were emailed this morning?

MR. WALCZAK: Correct.

MS. MULLEN: Okay. We do have printouts of them.

THE WITNESS: Yes, we printed those out just in case.

MR. WALCZAK: Ms. Mullen, I don't know if you can see. Did it show up in the chat, just to make sure I did that correctly?

MS. MULLEN: Yes.

MR. WALCZAK: Okay.

Mr. Fernicola, do you have a copy of that exhibit?

(A Discussion was Held off the Record.)

J. Marks

(Marks' Exhibit 1, Initial Disclosures of Defendant Al Schmidt, was marked for identification, as of this date.)

BY MR. WALCZAK:

Q Mr. Marks, I'm showing you what we've labeled Marks' Exhibit 1.

Do you recognize this document?

A This the initial disclosures of the Defendant Al Schmidt?

Q Correct.

A I have it, yes.

Q If you would turn to the second page, first paragraph under the "I" heading.

Do you see that?

A I do, yes.

Q I'm going to read that.

"Individuals likely to have discoverable information that the acting secretary may use to support his claims or defenses."

And then No. 1 says:

"Jonathan Marks, Deputy Secretary

J. Marks

for Elections and Commissions, is likely to have information about the purpose, or lack thereof, served by the statutory instruction directing voters to handwrite a date on the outer envelope enclosing absentee mail-in ballots, as well as Pennsylvania's guidance concerning Pennsylvania election procedures, in particular regarding undated or incorrectly dated absentee and mail-in ballot submissions."

Did I read that correctly?

A You did, yes.

Q So you have been identified by the Department of State as a person who is knowledgeable in this area?

A Correct.

Q I would like to spend a little bit of time here discussing the responsibilities of the Department of State vis-a-vis the County Board of Elections, so how elections work in Pennsylvania.

So you are, of course, with the Department of State, correct?

J. Marks

A Correct.

Q And that is an agency of the Commonwealth of Pennsylvania, correct?

A Correct.

Q What are the responsibilities of the Department of State when it comes to elections?

A Well, so the Secretary of the Commonwealth has a variety of responsibilities outlined in the Pennsylvania Election Code related to administration of elections that includes certifying the list of State-level candidates to the Counties, certifying election returns that are submitted to the Department by the 67 County Board of Elections.

It includes maintaining the statewide voter registry for the Counties' use.

It also includes issuing directives on electronic voting systems and issuing guidance to the Counties, as necessary, on election administration

J. Marks

matters.

Q You used two terms there. One was "directives," I believe, on voting machines, and then you also used the term "guidance."

Is there a difference in those two terms?

A There is a difference. You know, based on my understanding, a directive is something -- the Election Code very explicitly gives the Secretary of the Commonwealth the authority to issue directives.

It's not quite the same as regulations, but it is something that the Secretary has explicit authority to do.

Guidance, on the other hand, is something that the Department issues to Counties on election administration matters to ensure that each County is complying with the various statutory requirements in the Election Code or in Federal law, as the case may be.

So, you know, for example, we

issue guidance on voting by military and overseas civilian citizens.

So we issue guidance on the issue of absentee and mail-in ballots, and we've issued guidance on the I.D. requirements that are outlined in the Election Code.

Q So when you issue a directive, is that something that the County Board of Elections are required to follow?

A Yes, they're obligated to follow directives issued by the Department of State.

Q And you mentioned directives related to voting means.

Is the Secretary's authority to issue directives limited to that area, or are there other areas of elections where you also have that authority?

A I don't recall that there are other sections of the Election Code that use the term directive as it relates to the Secretary's authority.

The Secretary also has authority under the Election Code to prescribe

certain forms and envelopes, envelopes, for example, for absentee and mail-in ballots. That is something that the Secretary has authority to prescribe.

But I think the term "directive," if I'm not mistaken, is used exclusively as it relates to electronic voting systems.

Q So is it fair to say that guidance is sort of an "ask and advice" kind of --

A Guidance is partly advice. You know, certainly when we issue guidance, it is, you know, firmly rooted in our interpretation of the Election Code, and, in many cases, on the very plain language of the statute.

So when we issue guidance, it's our expectation that Counties are going to follow it, but it is not a directive, it is not a regulation, so that's kind of the distinction between the two terms.

Q How is guidance developed?

A Guidance is usually developed in consultation with -- in many cases, in

consultation with Counties.

Counties are asking questions about an issue. The Department determines that it would be beneficial to issue, you know, a uniform set of guidelines for the Counties to follow in answering that question.

So we'll work with Counties. We'll work with -- you know, with our policy folks, of course, our counsel as well in developing written guidance for the Counties to ensure that it, No. 1, meets their needs; and No. 2, that the guidance we're issuing is consistent with the law.

Q Who, not by name but by role or position at the Department, is involved in developing guidance?

A So, certainly, our policy director, the chief of our bureau -- or, excuse me, the director of our Bureau of Elections, our Chief Counsel's Office.

You know, ultimately, the Secretary of the Commonwealth would review and sign off on that guidance.

So all of those individuals or program areas have input into most of our guidance, with very few exceptions.

Q As Deputy Secretary, do you play any role in --

A I do.

Q Let's try not to step on each other here. So I'll ask you to wait. So let me just repeat that.

So what, if any, role do you play in formulating guidance?

A In some cases, I do initial drafts. In a lot of cases, I reviewed initial drafts done by the program area, whoever was assigned with writing the guidance.

Then I work with our counsel and the Secretary of the Commonwealth to finalize and sign off on it.

Q You mentioned that you look at the Election Code, and sometimes the guidance flows directly from the plain language of the Election Code; is that correct?

J. Marks

A That's correct.

Q Do you also -- I mean, does the Department also consider court decisions, for instance, or any other law that may impact on the issue in formulating guidance?

A We do, yes.

Q Do you sometimes issue guidance after a court decision has issued that may have changed the, let's say, electoral -- elections law landscape?

A We do.

Q But this guidance, as opposed to a directive, is not binding on the County Board of Elections?

A That's my understanding, yes.

Q And do the Counties generally follow your guidance or the Department's guidance?

A In the overwhelming majority of cases, yes.

Q But not always?

A Not always.

Q I want to turn now to mail-in ballots.

J. Marks

Are you familiar with the undated ballot issue involved in this litigation?

A I am, yes.

Q How would you characterize the issue?

A I guess I will characterize it the way I always characterize it when asked about it. The issue is sort of a cloud that is hanging over our heads.

As I said, you know, the litigation regarding this issue has been going on for the better part of two years, and we've had some competing decisions from State and Federal courts on whether undated or incorrectly dated ballots should be counted.

And the Department has tried to -- you know, has tried to be responsive to all of those changes that have occurred over that two-year period. But it really is whether these ballots count or not.

And, you know, we've been through multiple elections now with sort of this question mark hanging out there.

J. Marks

That's kind of how I characterize it, as a cloud hanging over our heads until we get finality to this issue.

Q I want to take you through, not in great perspective, but just so we have a little bit of historical context through the history of the litigation surrounding this issue since 2020.

But before I do that, let me ask you a question.

So there are, as I understand it, three different types of ballots that can be submitted by mail. And one is an absentee ballot, one is a mail-in ballot, and the third is UOCAVA.

Is that how you say it?

A UOCAVA, Uniform Overseas Civilian and Absentee Voter Act.

That is, technically, an absentee ballot. It's a specific type of absentee ballot for the covered voters, which would be military voters, their spouses, independents, as well as overseas civilians. So I would consider that a subgroup of absentee ballots.

J. Marks

The rules are a little different. They can return their ballots a little later.

Also, the Counties are obligated to send their balloting materials out earlier than for civilian absentee voters.

Q We'll come back to UOCAVA a little bit later. Let's just focus on absentee and mail-in.

What's the difference between the two?

A The difference between the two is really based on the reason.

So an absentee ballot is being requested for a specific reason. Either the voter is going to be out of their municipality on Election Day, or the voter has an illness or disability that prevents the voter from appearing at their polling place.

A mail-in ballot, on the other hand, is, you don't need a reason to vote a

mail-in ballot; you simply have to make the request.

So that's really the main distinction between the two.

Q And so the absentee ballots where you needed an excuse or a reason to request an absent ballot, those have been in existence since the mid-20th century; is that right?

A That's correct, yes.

Q And then in 2019, the Pennsylvania General Assembly passed something called Act 77 which added mail-in ballots, correct?

A Correct.

Q And so after November of -- I think it was November of 2019, anybody could request a mail-in ballot regardless of whether they had some reason to do so, correct?

A Correct.

I believe Act 77 was signed in October. I don't recall if every provision became effective immediately.

But, yes, effectively every election after the November 2019 election, voters had the option to cast a mail-in ballot.

Q In terms of sort of how those are processed from seeking one to delivering one to accepting by the Board of Elections, is there any legal difference between the two, if you know?

I know you're not a lawyer, but, if you know.

A I'm not an attorney, so I'll answer it this way.

Process-wise, there's no difference. You know, the application process, with the exception of having to provide a reason on the absentee ballot request, the application process is the same.

The way the Counties process the request is the same. The way the voters vote the ballot is the same. And the way the voters, you know, enclose the ballot in the envelope and return it to the Counties

is the same.

Q So, let's say, I'm a person with a disability who would qualify to vote absentee. There's no reason I couldn't ask for just a mail-in ballot, correct?

A Correct.

Q And the process and my ability to vote would be the same under either avenue?

A Correct. You are qualified to do either one.

Q And both absentee and mail-in ballot processes have what I guess is colloquially now referred to as the signature and date requirement on the return envelope; is that correct?

A That's correct.

Q So the language in those two, while in separate provisions of the code, is the same?

A Correct.

Q Let's talk a bit about -- well, so would it be okay with you if we just referred to both absentee and mail-in ballots just as "mail-in ballots"?

A I have no objection to that.

Q Is there a term you would prefer to use, or is there a term of art you use at the Department?

A "Mail-in ballots" is fine.

Q I want to talk about the application process.

Can you walk us through -- I'm a voter. I can't go on Election Day to the polls, and I want to vote by mail, what do I have to do?

A So the application process, whether you're doing it online or doing it on paper, you have to provide your name, your address, I believe the length of time you've been a resident of the district.

You have to provide, I believe, your municipality of residence. And you also have to provide either a driver's license or the last four digits of your Social Security number.

And then, of course, you have to sign the application.

Q And so you can submit this either

J. Marks

online or on paper?

A That's correct, yes.

Q And is there a time when I would have to do this?

A Yes. You have the deadline to request either an absentee or mail-in ballot.

I will qualify that. There is an emergency absentee period after the normal deadline, but for most voters, they would have to make their request by the seventh day or the Tuesday before Election Day.

Q What are the reasons for the application process and the information you request?

MS. MULLEN: Objection.

You can answer.

A Well, my understanding of the reasons, you know, the County first has to know that the individual wants to avail themselves of this method of voting, whether it be absentee or mail-in.

And the County also has to determine if that individual is a qualified

J. Marks

registered voter within the County entitled to receive a ballot.

Q So the voter returns this application form.

Now, is the application form standardized?

A It is, yes. The Department issues a standardized form, both paper and electronic.

I do believe third parties like political parties and other -- you know, other campaigns, can issue absentee or mail-in ballot request forms as well, but they have to conform with the statutory requirements that are in our prescribed form.

Q By "statutory requirements," you're talking about the types of information that the voter must provide, including the I.D.?

A Correct.

Q So an application comes in, and it goes to the Department of State or the County?

J. Marks

A It goes to the individual's County Board of Elections.

Q What are the County Board's obligations, if you know?

A Well, the County has to review the application, verify that the identification provided by the voter checks out. And they do that systematically in the SURE system.

And, upon approval, then the County has to deliver a ballot along with the necessary envelopes that the voter must insert their ballot into after they're done voting for return to the County Election Office.

Q You used a phrase I want you to unpack for me. Systematically through the SURE system is how Counties verify, I guess, voter eligibility.

Explain a little bit more what that means.

A Well, so, obviously, the SURE system, Statewide Uniform Registry of Electors, houses all of the registered

J. Marks

voters within the County. So they have the voters record that they can compare the application to.

Q Wait, I'm sorry. What do you mean have their record? What's in the record that they're comparing?

A It would be the voter registration records. So the County, within the SURE system, maintain their official voter rolls.

Each County maintains its official voter rolls. The Counties then use the SURE system to verify the identification provided by the voter.

So if the voter provides their driver's license number, the system will actually send out a call to PennDOT's database to verify that that driver's license number matches the name provided by the registered voter.

Likewise, the last four of SSN goes -- it also goes through PennDOT.

They have an agreement with the Social Security Administration, so the last

four of SSN can also be verified against the Social Security Administration's database.

Q What is SSN?

A Social Security number. Excuse me.

Q So, I'm sorry --

A Sorry, we use lot of acronyms in government, and I forget sometimes.

Q Not a problem.

And so the Counties take all these steps to verify that the individual applying for a mail-in ballot is, in fact, an eligible voter; is that correct?

A That's correct.

Q I want to walk you through or have you walk me through the return process for a mail-in ballot.

I'm going to direct you to Exhibit 2.

MR. WALCZAK: I'll try to put that in the chat for folks following along.

Kathy, did that come through?

MS. MULLEN: It did.

MR. WALCZAK: Okay.

So I've never done this. Are folks able to pull that document up from the chat, Kathy or Jacob?

MR. BAXENBERG: Yes, we are.

MR. WALCZAK: Good. Thank you.

(Marks' Exhibit 2, DOS Envelope Guide, was marked for identification, as of this date.)

BY MR. WALCZAK:

Q Mr. Marks, I show you what's been marked as Marks' Exhibit 2.

Do you recognize this document?

A I do. This appears to be the absentee ability and mail-in ballot envelope templates that we provide to Counties.

So, basically, this is the prescribed form of the envelopes that Counties must uses for absentee and mail-in ballots.

Q And do you know who put this out or who developed and put this out?

A The Department of the State put these envelope templates out.

Q What is it that's on the first page of Exhibit 2? I mean, I wasn't sure this related to elections until I opened this.

A Sorry. Color palate and graphics. These are just kind of outlining the different colors and graphics that we use on the envelope templates.

Q Is there anything on that first page that would be relevant to the dating issue?

A No.

Q If you could turn to page 2 of Exhibit 2, it looks like there's two graphics: One on top and one on bottom.

Tell us what the top graphic on page 2 of Exhibit 2 shows.

A The top graphic -- so at the top of the page, it says, "Outer envelope elements."

The top graphic is the front side of the envelope that the Counties insert

the voter's balloting materials into when they send the ballot out to the voter.

Q So after the voter has applied for a mail-in ballot, and the County Board of Elections has verified their eligibility, the County sends out this kind of envelope containing certain contents; is that right?

A Correct, yes.

Q And so let's talk about what -- well, before I do that, tell us what's on the bottom.

It looks like that's the back of the envelope that the County would send out?

A It is, yes.

Q Coming back to our discussion about, you know, how much latitude Counties have, I mean, do Counties have latitude to vary the envelope and materials they send to voters?

A They can add to prescribed elements, but, generally, the envelope templates, our expectation is that they

J. Marks

will follow the prescribed form of the envelope.

Some Counties may lay it out differently. Different Counties use different envelope systems.

So the artwork may be laid out differently depending on what size envelope a County uses. And some Counties may add some helpful information in addition to that prescribed by the Department.

Q When you say Counties may add helpful information, what kind of information, for example?

A You know, information, additional contact information that may be relevant for the voters, or, you know, any other instruction that they want to add.

There is an insert that Counties provide to voters with the ballot materials that have more specific instructions on how to fill out the ballot correctly, and also how to enclose the ballot in the secrecy envelope and the declaration envelope for return to the County Election Office.

J. Marks

Q Let's talk about what Counties put into the envelope that we've just been discussing, page 2 of Exhibit 2.

Now, is there a legally prescribed set of documents or forms that Counties must send to the voter in response to having submitted a valid mail-in voter application?

MS. MULLEN: I'm just going to object. This document, I think, is a template. I'm not sure it's established whether it's a current template or not and whether all Counties use that particular envelope.

MR. WALCZAK: Yes, I think we established the second part, that they may vary those.

But I will ask the first question. Thank you for that.

BY MR. WALCZAK:

Q Mr. Marks, is this a current -- is the information contained on Exhibit 2 something that is current from the Department of State?

J. Marks

A I don't believe so. Just looking at it, I'd have to double-check to know for sure.

But just looking at the back of the return envelope, it does not appear to be the most current version.

Q We'll come back to that when we review those two pages.

So what is it that Counties send back in that envelope to the voter?

A So the Counties will send out the official ballot for the voter.

The Counties will also insert a secrecy envelope that has -- it's a plain envelope that just has the words, you know, "Official Election Ballot," I believe is the term.

Then also insert a declaration envelope that the voter is supposed to use.

After they've completed voting the ballot, the voter inserts the ballot into that secrecy envelope, and then the declaration envelope is what then contains the secrecy envelope.

J. Marks

So all of those things, in addition to an instructions insert, as I said earlier, that would explain to the voter how to complete the ballot and return it to the County Election Office.

Q What you call a "declaration envelope," is that the outer envelope that the voter mails their ballot in to the County Board of Elections?

A That's correct. That's the outer envelope within which is contained the secrecy envelope that contains the official ballot voted by the voter.

Q And the declaration envelope, and, in fact, the declaration, is where the signature and the dating requirement at issue in this litigation can be found; is that right?

A That's correct, yes.

Q So let's turn back to Exhibit 2 and look at page 3.

And I'm not trying to pull a fast one here, Mr. Marks. I had trouble finding a template. So to the extent there's

J. Marks

something not accurate on here, I would certainly ask Mr. Marks to point that out as we go through this.

So looking at pages 3 and 4 of Exhibit 2, page 3 has absentee return envelope elements, and page 4 says, "Mail-in return envelope requirement."

So the first is what we were talking about at the outset of the deposition. That relates to absentee ballots where people have an excuse, and mail-in ballots are the no-excuse, mail-in ballot, correct?

A That's correct.

Q So let's look at page 3 at the official absentee ballot.

And I believe you said that these are in all relevant respects the same?

MS. MULLEN: Objection.

A Meaning the absentee and the mail-in templates are the same?

Q Yes. I'm sorry, yes.

A Yes, they're essentially the same.

J. Marks

Q Essentially, in what way are they different?

A I mean, one says "official absentee ballot," the other says "official mail-in ballot." But, otherwise, the elements are the same.

Q To make sure I understand this, the voter gets their ballot, which is tailored to where they live, right, where they're registered, correct?

A That's correct.

Q And they fill that out, and then they put that in the secrecy envelope which they seal, correct?

A Correct.

Q And then the sealed secrecy envelope bearing the ballot goes in this declaration envelope for transmission back to the County Board of Elections, correct?

A That's correct.

Q So look at the bottom of Exhibit 2, page 3. What's the purpose of this?

A The bottom -- I'm assuming you're referring to the back of the declaration

J. Marks

envelope template?

The purpose of this, basically, this is where the voter would sign a declaration declaring that the voter is qualified to vote in the election.

That the voter is acknowledging that, by voting by absentee or mail-in ballot, they're no longer eligible to vote at their polling place.

So it's basically where the voter is affirming that they're qualified to vote in the election.

And I will point out, the one reason I don't believe this is the current template, the date area on this version, if I'm not mistaken, the Department changed in light of the litigation on the issue of the date.

I believe the current template says "today's date" instead of just "date" on that line.

We were trying to clarify which date the voter should insert there.

Q Okay.

J. Marks

I mean, I have some ballots from the most recent election, which I'll show you in just a minute, and we can compare those.

Now, I note there's a second declaration on the bottom. What's the purpose of that?

A The second declaration is to be completed if the voter is unable to sign their declaration because of an illness or a physical disability.

So this is where they would make their mark indicating that they received assistance in completing their ballot.

Q If you would turn to page 4 of Exhibit 2, and, again, looking at the back of the return envelope at the bottom of the page, this is for mail-in return envelopes, correct?

A That's correct, yes.

Q And with the exception of recognizing that the format of the date on here may have changed, otherwise, are the elements of this declaration the same as

for mail-in ballots?
A They are, yes.
Q Now, I want to just ask you about what Counties can vary in sending this out, this mail-in ballot packet out.
So they have to send the ballot, the secrecy envelope, and an outer declaration envelope, correct?
A Correct.
Q What is it that Counties can do may vary in terms of that outer envelope, just the format or layout?
A It's really the format and the layout.
Some Counties decided to put boxes or arrows next to certain fields to prompt voters to, you know, insert relevant information there, but it's really just the layout and the formatting.
The language of the declaration, our expectation is that every County is going to use that declaration language verbatim.
Q Have you had any problems with

Counties failing to comply with what you believe the requirements are for these declaration envelopes?
A I don't recall that we've had any Counties failing to comply with the requirements.
I know there have been questions in some Counties about things like font size and color.
And, you know, we've worked with individual Counties, you know, if an issue is raised to ensure that the template meets the needs of their voters while still complying with the statutory mandates.
(Marks' Exhibit 3, Dauphin MIB Envelopes, was marked for identification, as of this date.)
BY MR. WALCZAK:
Q I'm going to direct your attention to Marks' Exhibit 3, which I just circulated on the chat.
Do you have that in front of you?
A I do, yes.
Q I'm going to assert to you that

this is a production of mail-in ballots that we received from Dauphin County in the course of the NAACP versus Chapman litigation.
I've pulled it here just so we could look at the declaration layout and language.
Does what's been marked as Marks' Exhibit 3 -- does this appear to be the back of a declaration envelope from the most recent election in November of 2022?
A It does, yes. And it appears to follow the most recent template provided by the Department that says "today's date" and has "required" in parentheses where the voter must sign and date.
MR. BOYER: Vic, can I just interject a second?
I just want to note for the record if these are confidential exhibits and subject to the protective order.
MR. WALCZAK: Correct. It is redacted, Jacob, I will note.

MR. BOYER: Correct. Yes, I just wanted to put that on the record.
MR. WALCZAK: Okay, thank you.
BY MR. WALCZAK:
Q So, to your knowledge, all Pennsylvania Counties use some variation of this declaration, correct?
A That's correct.
Q So the language on the voter declaration, is that the same everywhere?
A It better be, yes.
Q Why do you say, "It better be"?
A Well, as I said, that portion of this is prescribed by the Secretary. I'm not aware of a County that has altered either of the declarations on this envelope.
Q And then, to your knowledge, are there different layouts for the signature, which is where you see that "redacted" on the left side of the page, and then the date below that?
What is your familiarity with how Counties have laid that out?

J. Marks

A I can't say that I can recall, you know, each of the 67 Counties' layouts. But, generally, there are a few different types of layout.

One is the more traditional layout, which is similar to the previous exhibit that we reviewed.

This one, the two declarations are presented side by side, and this is a slightly larger envelope size. And in other cases, it may be a larger envelope but still presented, you know, one declaration on top of the other.

So the size of the envelope really seems to determine how the County lays out the declarations more than any other factor.

Q One difference I note here between the first page of Exhibit 3 and pages 3 and 4 on Exhibit 2, which were, I think, the somewhat outdated template, you said there's no address for the voter to complete; is that correct?

A That's correct, yes.

J. Marks

Q Any other changes from the template that we reviewed at Exhibit 2?

A There do not appear to be any other changes, no.

Q Now, on that first page of Exhibit 3, there's a 10/28/2022, 4:32 p.m. It looks like a stamp there.

Do you know what this is?

A I believe I do, but I could not say with certainty.

I've been to the Dauphin Election Office, and I believe this is probably a date stamp, date and time stamp provided by the machine that they use to scan and sort ballot envelopes that are returned by voters.

Q So that would be something that's put on the envelope when it arrives at the Board of Elections, correct?

A Yes. When it's scanned through the equipment, they have to process and sort absentee and mail-in ballots.

Q Let's talk about this return process.

J. Marks

How does the voter return a mail-in ballot?

A So, as I said earlier, after the voter votes the ballot, completes the ballot, they fold it, insert the ballot into the secrecy envelope.

They insert that then into the declaration envelope and seal it, sign it, and they return it to the Board of Elections either through the mail, or if the County has a drop box available, or drop boxes available, they can drop it there, or they can return it in person directly to their County Board of Elections.

Q When it arrives at the County Board of Elections, are there any legal obligations that the Board has with respect to these mail-in ballot envelopes, if you know?

MS. MULLEN: Objection.

A My understanding, the primary legal obligation after they receive the ballot is to keep that ballot secure after

J. Marks

they process it until Election Day, until it can be canvassed or pre-canvassed, excuse me.

Q Is there a requirement that they date and time stamp the ballot when it arrives or the declaration envelope when it arrives?

A The Counties do have to determine whether a ballot has been timely received.

So the Counties -- I believe most Counties have some date stamp mechanism, but I have seen Counties use slightly different mechanisms.

One County, at least previously, used a color coding system to determine or to segregate ballots that were received by the statutory deadline versus those that were received after the statutory deadline.

But each County has some mechanism in place to identify which ballots were timely received and which ones were not.

Q Is there a uniform deadline for receipt of ballots?

J. Marks

A There is. There's a statutory deadline of 8:00 p.m. on Election Day for receipt of ballots.

Q So if a ballot is received at 7:59 on Election Day, is it timely?

A It is, yes.

Q If it's received at 8:01 or after, is that timely?

A No.

Q What happens with untimely ballots?

A Well, they're set aside and not counted, but they remain in their -- you know, unopened in their envelopes. They are set aside by the Board of Elections.

And, ultimately, they're rejected or canceled, because they were not timely received.

Q So the critical date and time, for purposes of submitting a valid mail-in ballot, is 8:00 on the night of Election Day; is that correct?

A That's correct.

Q So as long as the ballot is in

J. Marks

the hands of the County Board of Elections, it's timely?

A Correct.

Q When do voters get their mail-in ballots?

A Well, voters -- at the very latest, if a voter has applied prior to that time, at very latest, the voters will get their ballots around two weeks prior to Election Day. Counties have a deadline to send ballots out.

In most cases, Counties begin sending absentee and mail-in ballots as soon as they have them printed, and they're ready to go, which is, you know, typically several weeks prior to Election Day.

Q So when the voter gets the ballot, is that relevant at all to whether or not the ballot is going to be timely?

A By "timely," you mean?

Q Receipt --

A -- whether it's going to be timely received by the County Board of Elections after the voter votes the ballot?

J. Marks

Q Yes.

A No.

Q Does the date that the voter filled out the ballot and signs the declaration envelope, is that at all relevant to whether or not the ballot is timely?

A No.

Q So the voter could fill out the declaration, the ballot and declaration, as soon as they get the ballot two or more weeks before, or they could fill it out the day before, or the day of Election Day, and drop it off at the Board of Elections, as long as it's there by 8:00 on Election Night, it is timely received, correct?

A Correct.

Q Now, you talked about the SURE database system before.

Is there any obligation by the Counties to enter the return mail-in ballot into the SURE system?

A The Counties do record returned ballots in the SURE system. That's how

J. Marks

vote history is assigned.

So, you know, as a County receives ballots, or at least shortly after receiving ballots, the Counties will record.

There is a barcode, a unique barcode on each envelope that's returned to the County that the County uses to scan. And that unique barcode is attached to that specific voter who requested the absentee or mail-in ballots.

So, yes, the Counties record those envelopes as returned in the SURE system.

Q Does the SURE system assign a time to when they're scanned?

A It does. So it defaults to the current date and time, as I recall.

Now, the Counties do have the ability to edit that, if necessary, in a circumstance where the County is recording it at some point after the voter actually returned the ballot to the County.

Q So if all the staff are really

J. Marks

busy when the ballot comes in and couldn't enter it right away, they can change that?

A Yes, that's my recollection, yes.

Q There is a statutory obligation for the Counties to record when the ballot comes in; is that correct?

A There is, yes.

Act 77 of 2019, you know, in addition to what we talked about earlier, also added a requirement that Counties provide lists of individuals who requested absentee and mail-in ballots.

And that list has to contain the date the individual applied for the ballot, the date the County sent the ballot to the voter, the date that the ballot was returned to the County. All of those elements have to be provided in that list.

And I believe they have to provide that within 48 hours of receiving a request for production list from a candidate or a political party or a campaign.

Q Does entry by the County Board of

J. Marks

Elections of the return ballot into the SURE system trigger any kind of notice to the voter?

A It does. If the voter provided an email address at the time they applied, the voter will receive a notification via email letting them know that the County has received their absentee or mail-in ballot.

And it will also indicate the disposition, generally, the disposition of that ballot.

Q What do you mean by "disposition of the ballot"?

A So if a County cancels a ballot because there is a problem with the ballot, either the voter did not include -- you know, didn't insert it in a secrecy envelope, for example, or the voter didn't sign the declaration, and the County records that disposition in SURE, the voter would get a notification letting them know that their ballot was received, but it was canceled.

And it gives them kind of a

J. Marks

general description of the reason it was canceled.

Q So the County Board of Elections does not actually open the declaration envelope when it's received; is that correct?

A That's correct, yes. Those ballots remain sealed and secured until such time that they're able to begin pre-canvassing or canvassing those ballots.

And right now, the earliest they can do that is 7:00 a.m. on Election Day.

Q You say if the County spots a defect. So that's what they see on the declaration envelope?

A Yes, that was an example. If they noticed that there's a problem on the declaration envelope, and when they recorded it in the SURE system, they would put that disposition in there.

Q Are there certain codes that the Department of State asks Counties to use to identify the type of problem that resulted in cancellation of the ballot?

J. Marks

A There are, yes.

Q What are those codes?

A Well, now you're quizzing me. I can't recall all of them.

If it's okay with you, I will mention the relevant ones.

Q Please, yes.

A One of the codes is, "canceled, no signature," at least until very recently, within the last few weeks.

And that, actually, is inclusive of -- we didn't have separate codes for, you know, unsigned versus undated, versus incorrectly dated.

So if it was "canceled, no signature," the message the voter got if they provided an email address indicated to them that their ballot was canceled because there's a problem with their declaration envelope, meaning they either didn't sign it or didn't provide a date.

We have since, just within the last month, month and a half, added cancellation reasons specific to those

J. Marks

three things.

There's also, "canceled, no secrecy envelope," I believe is the term, if, at the point that the Counties canvas the ballot, they determine it wasn't included in the secrecy envelope.

So those are a couple of examples. I can't recall all of them.

There are also cancellation reasons if an application is rejected, for some reason.

Q So, to be clear, up through the November 2022 election putting in the cancel code would apply to missing signature and either no date or incorrect date; is that right?

A Yes. They were all kind of in the same bucket, if that makes sense.

Q But all of which should alert the voter that, unless they take some kind of action, their ballot will not be counted?

A Correct.

Q And it's now the Department's intention to be a little bit more detailed

J. Marks

with the reason that the ballot is going to be declined by specifying, starting in the May 2023 primary, that it's either a missing signature, no date, or incorrect date?

MS. MULLEN: Objection.

A We added -- I don't recall the exact date, but we -- in January of this year, we added two additional cancellation codes so that we could delineate between unsigned, undated, and incorrectly dated, so there would be three separate codes for those things.

And that was deployed live in the SURE system back in January.

Q Why did the Department do that?

A As I said, we have been sort of trying to be responsive to the changes in the law regarding, you know, undated and incorrectly dated ballots.

And, certainly, given the request that we've received for details and detailed information about how many of these there are, it made sense to us that

J. Marks

we needed to get as much detail through the SURE system as possible so that individuals who were seeking that information didn't have to go individually to each of the 67 County Board of Elections to get that.

Q So if a Board spots a defect -- strike that.

So if it goes in the SURE system, you said a voter would get a notice if they provided an email at the time of registration or they are updated thereafter; is that correct?

A Correct.

Q So if the Board of Elections has an accurate email that's entered into the SURE system, then that should -- entry of the return ballot, whether it's canceled or accepted, should trigger a notice to the voter, correct?

A Correct, yes.

Q If the email that the voter has provided is outdated or the voter has failed to provide an email, obviously, no email notification will go to them,

J. Marks

correct?

A Correct.

Q Is there any other form of notice that a County Board of Elections would give to a voter if they returned a ballot that the Board thinks is deficient and would decline?

A I don't recall. I think there may be an option within SURE for the County to generate a hard copy, a paper copy of a notification to the voter.

But, obviously, as you get closer to Election Day, that doesn't practically make a whole lot of sense. The voter is not going to find out until long after Election Day, in most cases.

I don't recall, though, whether that's -- I believe there may be that ability in SURE. I just don't recall for certain.

Q Outside of the SURE system, do the County Boards of Elections have any obligation to notify voters of a ballot that appears to be defective?

J. Marks

A    My recollection of the statute is no, they don't.

Q    Are you aware of any legal prohibition on Counties giving notice to voters of defective ballots?

A    I'm not, no.

Q    Do you know what the practice is in the 67 Pennsylvania Counties?

MS. MULLEN:  Objection.

A    Each of the 67?

Q    If you know.

A    No, I don't know the practice in each individual County.

Q    Is it fair to say that some may provide additional notice outside the SURE system, and others don't?

A    Yes, I believe that's fair to say.

Q    So when the ballot comes back, and we get to Election Day and canvassing, which means counting the ballot, right, whether you count or not, correct?

A    Correct, yes.

Q    So if there's no secrecy

J. Marks

envelope, so when the declaration envelope is opened and there's no secrecy envelope, is the ballot counted?

A    No.  That ballot is set aside.

Q    Is there a Pennsylvania Supreme Court ruling to that effect?

MS. MULLEN:  Objection.

A    I believe there is.

Q    If the voter has failed to put a signature or to sign the declaration envelope, is that ballot set aside as well and not counted?

A    It is, yes.

Q    So that leaves the date to talk about.

MR. WALCZAK:  I probably got another hour here.  I'm happy to continue, or if you want to take a 10-minute break?

MS. MULLEN:  Can we take a break, five minutes?

MR. WALCZAK:  Five minutes. Okay, let's say 10:35.

THE VIDEOGRAPHER:  We're off the

J. Marks

record the time is 10:29.

(Recess taken from 10:29 a.m. to 10:35 a.m.)

THE VIDEOGRAPHER:  We are on the record.  The time is 10:35 a.m.

BY MR. WALCZAK:

Q    I just want to follow up with a couple of questions about Counties entering return ballot information into the SURE system.

Do you know whether all Counties, in fact, enter the return ballot at or near the time it's returned into the SURE system?

A    It does vary from County to County, mostly because of operational issues, whether it's, you know, staffing, so I can't say that all 67 Counties record ballots in SURE immediately upon their return.

Q    Does how they enter that information impact, what, if anything, the voter would get?

A    Yes.  As I said previously, if

J. Marks

the voter provided an email address, the voter would receive notification that the ballot was received.

If the County cancels the ballot because there's some issue with it, they would receive notification of that as well.

So how the County records it in the SURE system would be relevant, yes.

Q    So can the County just record it as ballot received at 7:00 p.m. on Election Night, or do they have to say that it's either accepted or declined?

A    They could record it as received, and then later make a determination that the ballot should be declined.  So it somewhat depends on their own internal process.

If they're not -- you know, if they're simply, you know, doing intake and not necessarily reviewing the ballots as they come in, they're going to record them as returned.

And then at some later point during the pre-canvass, likely they will

make a determination that there's an issue with the outer envelope. And they may at that time change the disposition of the ballot in the SURE system.

Q So that determination that a ballot has a deficient declaration envelope could come after 8:00 on Election Night?

A It could, yes.

Q In which case, the SURE system itself could not trigger any kind of notice to the voter that their ballot had been declined?

A Well, the SURE system -- unless I'm mistaken and something has changed recently, the SURE system would still send the notification to the voter irrespective of when the County recorded that disposition.

Our guidance to the Counties has been consistently over the last couple of years to record ballots in SURE as quickly as possible after they're received.

Q I'm sorry. To try and clarify, so when you say "enter," is that just the

scan of the barcode that's on the declaration envelope, or is there something more that needs to be done?

A You know, I do not work in SURE myself, so, you know, my high-level understanding is that you would also -- you scan it, mark it as returned.

You also would, at some point, identify the disposition of the ballot as well. So if it were to be canceled, you would have to update that record to indicate why the ballot was canceled.

Q So the scanning indicates time of return, and that determines whether it's timely or not, correct?

A Correct.

Q And then the code would be important to denote whether or not facially, based on what you can tell from the declaration envelope, the ballot either -- the declaration envelope is either compliant or it's not?

A Correct. And that may also be used for some other reason. As I said, you

know, the secrecy envelope was not included or the ballot was not included in the secrecy envelope.

And that determination, you know, those determinations may not be made until during the pre-canvass or even the canvass after 8:00 p.m. on Election Day depending on when the ballot was returned.

Q Is there uniformity in the Counties in how and when they enter those determinations?

A There isn't. As I said, you know, each County, based on their workflow, based on their staffing level, it's going to vary from one County to another.

Q So is it fair to say that some Counties endeavor to alert voters of deficient, facially deficient, ballots prior to the return deadline?

A That's my understanding.

You know, I, obviously, cannot speak for all 67 Counties on this issue, but I am aware that some Counties record those ballots, try to notify voters as soon

as possible.

Other Counties, that comes a little bit later in the process.

Q And, conversely, are you aware of Counties that do not take steps to notify voters of deficient ballots before the deadline?

A Correct, yes.

Q So you are aware of such Counties?

A I am, yes.

Q Do you know how many of those Counties there are?

A It would be a guess, so I'm not going to make a guess.

Q Is it more than five?

A Yes, I believe so. I believe it's double digits, based on my recollection and what I know.

Q And how is it that the Department knows what the Board of Elections' practices are?

A Well, you know, we are certainly in communication with the Boards of

J. Marks

Elections, you know, prior to, during, and even after each election.

And in some cases, we survey Counties to try to obtain information that we may not be able to ascertain via the SURE system.

So we've had some communications with the Counties, and during that process, we've learned that some Counties do not notify voters and others do.

Q Do you have, as we sit here today, or does the Department of State have any kind of systematic review of how the respective Counties handled these return issues in the latest election?

A I'm not aware of us having that, no.

Q I want to turn now to sort of the history of this date issue litigation.

I'll try to go through it quickly here.

Would you agree with me that the passage of Act 77 in 2019 dramatically increased the number of mail-in ballots?

J. Marks

A Yes, that's a fair statement.

Q And it may have been a combination of Act 77 and the COVID shutdown?

A Yes. I mean, certainly, we expected that there would be an increase in voters who voted by mail.

The global pandemic certainly changed the dynamics and probably contributed to the amounts certainly in 2020.

Q But there was mail voting prior to 2019 in the form of either absentee ballots or UOCAVA ballots, correct?

A Correct, yes.

Q There were just a lot fewer of them prior to the passage of Act 77?

A Correct, yes.

Q Do you recall the date, or absence of a date, or incorrect date ever being an issue prior to 2019?

A I do not, no.

Q Are you aware of whether voters sometimes forgot to put a date on their

J. Marks

declaration envelope prior to 2019?

A I would expect that there were occasions where voters forgot to put a date.

I don't have any empirical data on that, but I can't imagine that voter behavior was a whole lot different then than it is now.

Q Are you aware of any, I'll use the term, "controversies," discussion about whether to count absentee and UOCAVA ballots without a date on them prior to 2019?

A I'm not, no.

Q Are you aware of any litigation around that prior to 2019?

A I don't recall any litigation, at least not at the State level.

Q Do you know whether or not prior to 2019 those absentee ballots without a date or an incorrect date would have been counted?

A I cannot say that they would have been counted in all 67 Counties. I don't

J. Marks

recall Counties using that as a reason or, you know.

Yes, that's probably not the best use of words there, but I don't recall Counties rejecting ballots on the basis that they were incorrectly dated, certainly, and probably did not reject them when they were undated.

And that's kind of based on the questions that we got about the issue during 2020.

Once it became a controversy, it was pretty clear that Counties traditionally had been -- you know, kind of erred on the side of the voter.

Q Did the Department have any guidance prior to 2020 about what to do with undated or incorrectly dated mail ballots?

A I don't recall that we had any guidance on that specific issue prior to 2020.

Q Is it fair to say that prior to 2020, a missing date on an absentee ballot

was not an issue?

A I think that's fair to say. Again, based on my recollection, I cannot speak for all 67 Counties and what their practices were prior to 2020 or even now, for that matter.

But based on my recollection of -- you know, from our discussions with Counties or questions we received from Counties, I believe that's true.

Q So the first election that occurred after Act 77 went into effect, right, so what I mean by that is where no-excuse, absentee mail balloting was allowed, would have been the Primary of 2020?

A Correct, yes.

Q So that was sometime in May. I don't think I have the date.

A It was actually in June. Because of the pandemic, the legislature passed -- I forget the act number now, but they pushed back the date of the Primary to give Counties more time. So I want to say it

was on June 2 or June 3.

It was early June as opposed to April.

It would have been April in 2020 because it as a presidential year. So it was pushed back from the fourth Tuesday in April to, I believe it was, the first Tuesday in June, if I'm not mistaken.

Q And do you recall there being any issues around mail-in ballot missing a date or with an incorrect date in that June 2020 Primary?

A I don't recall that being an issue in June, no.

Q Do you know whether Counties were counting undated and misdated mail-in ballots?

A I don't recall. Again, I can't speak for, you know, each individual County.

But based on my recollection, it was not a controversy, and I was not aware -- at least not aware of a significant number of Counties who weren't

counting them on that basis.

Q I'm sorry, you were not aware of a significant number of Counties that were not counting?

A Right.

Q Prior to the Primary of 2020, did the Department put out any guidance about dating mail-in ballots?

A I don't recall that we put out guidance that highlighted the dating of absentee and mail-in ballots.

Q Why is that?

A Well, you know, as I said, it wasn't a controversy at that point in time.

As I recall, our guidance was around, you know, implementation of Act 77, and, you know, what Counties needed to know to meet what, you know, certainly by March of 2020, we understood would be a very high demand for this new mail-in ballot option.

Q So the legal landscape around mail-in ballots began to change with a decision of the Pennsylvania Supreme Court in the fall of 2020; is that correct?

A That's correct, yes.

Q And I believe the name of that case was In Re: Canvass of absentee and mail-in ballots of the November 3, 2020, General Election.

Does that sound right?

A I believe that's correct, yes.

Q Yes, it just rolls off the tongue.

To move us along here, is it your understanding that the Supreme Court issued a split decision, 3-1-3 decision, where three justices held that undated ballots should be counted, three justices ruled that undated ballots should not be counted, and one justice, Justice Wecht, issued a concurring dissenting opinion in which he said that, generally or in the future, undated ballots should not be counted, but for the 2020 General Election, they should be counted?

Is that a fair understanding of what the Pennsylvania Supreme Court decided?

J. Marks

MS. MULLEN: Objection.

A Yes, I believe that's a fair summary of the Supreme Court's decision.

Q And that's your understanding of the decision?

A That's correct, yes.

Q And the Department of State conformed its guidance on whether to count or not count undated or misdated ballots based on that decision, correct?

A Yes.

Q So in the November 2020 General Election, were undated ballots counted?

A In the November 2020 Election?

Q Yes.

A Yes, that's my recollection, yes.

Q Do you recall if maybe they were not counted and segregated pursuant to U.S. Supreme Court order, if you know?

A I don't recall. What I'm recalling now is the extension and us asking Counties to segregate ballots that were received during that period of time.

The Pennsylvania Supreme Court had determined that ballots could be received up through Friday after Election Day.

J. Marks

So I do recall asking Counties to segregate ballots that were not received by the normal statutory deadline because that was still being litigated, and I think that was pursuant to a U.S. Supreme Court ruling.

I don't recall, though, us segregating ballots or directing Counties to segregate ballots based on them being undated or incorrectly dated.

My recollection is that we asked them to segregate based on when they were received.

Q So undated ballots were, in fact, counted if they were received by 8:00 p.m. on Election Night in November of 2020?

A Yes, that's my recollection.

Q Incorrectly dated envelopes are different than undated envelopes; is that right?

A Yes. I think the term is not easily understood even by me.

J. Marks

But, yes, incorrectly dated generally means it has a date, but that date is determined by the County to be incorrect, at least within the context of the election.

So maybe an example would be helpful. A birthday versus, you know, a current date.

Q So somebody next to or under their signature on the declaration page would have written their birthday instead of the date on which they filled out the ballot?

A Correct.

Q In November of 2020, were incorrectly counted ballots counted?

MS. MULLEN: Objection.

A Incorrectly dated ballots, certainly, the Department did not issue any guidance directing Counties not to count them. So I would expect that Counties counted incorrectly dated ballots just as they did undated ballots.

J. Marks

Q So now moving to the May 18, 2021, Primary.

So during that election, were undated ballots counted?

A My recollection is that they weren't with the exception of a handful of Counties that, in spite of the Department's guidance to the contrary, decided to count them.

Q So, at some point, in late 2020, early 2021, the Department put out guidance about how to handle undated and misdated mail-in ballots?

A Yes, I believe based on, you mentioned, Justice Wecht's concurring and dissenting opinion, I think it was our interpretation as well that, moving forward after the November 2020 Election, that the expectation was that those ballots would not be counted if they weren't dated.

Q And how about incorrectly dated?

A I'd have to review our guidance as it existed at the time. I don't recall when incorrectly dated -- you know, that is

a term that doesn't exist in the Election Code. It doesn't have a definition.

Our Supreme Court last year before the November election attempted to provide some guidance, but I don't recall if we directly addressed incorrectly dated, but we certainly addressed undated ballots.

Q If I could ask you to take a look at Exhibit 4 there.

(Marks' Exhibit 4, Marks' 6-1-21 Email, was marked for identification, as of this date.)

BY MR. WALCZAK:

Q Do you recognize what's marked as Marks' Exhibit 4?

A I do, yes.

Q What is it?

A This is an email that I sent out to Counties in June of 2021 as a follow-up from the May 18 Primary.

Q I'll represent to you that this was taken from an exhibit in the Migliori case, hence, the blue lettering at the top and the exhibit sticker at the bottom.

Is it fair to say that the email you sent did not bear either of those?

A Those indicia, no.

Q Now, I note at the top, it says this is from Marks Jonathan to Marks Jonathan.

Are you in the habit of just sending emails to yourself, or does this go a little bit broader?

A No, I have talked to myself on occasion. But, no, we typically -- when we blast an email out to Counties, we will blind copy everyone so that we don't have a big list of email addresses in the "to" field.

So I'll send it to myself and blind copy everyone else who receives it. But this email did go out to all of our Election Director contacts in the 67 Counties.

Q So this was not targeted just to a select number of Counties, this went to all Counties?

A Correct, yes.

Q And the subject line there says, "DOS Email Reminder Regarding Requirement to Sign and Date Declaration Envelopes."

Did I read that correctly?

A That's correct, yes.

Q So are you, in this email, conveying your view, or are you representing the Department of State?

A I'm representing the Department of State's view.

Q Was this reviewed by lawyers at the Department?

A It was, yes.

Q Why did you send this?

A Well, I think the first paragraph in the email indicates the why.

You know, we had received information, not only through news articles, but also calls and questions that some Counties were continuing to accept and count ballots that did not contain both a signature and a date. So it was sent as a reminder to Counties what the current state of the law was on the issue.

Q If you could go down to that third paragraph in Exhibit 4?

A Yes.

Q Reminder of previous clarification of 10/25/2020, it says:

"There is no basis to reject a ballot for putting the wrong date on the envelope."

Is that correct?

A Correct, yes.

Q So undated ballots should not be counted, but if there is any date on the ballot, then it should be counted.

Is that the Department's advice here?

A Yes.

Q Then it says, "Nor is the date written used to determine the eligibility of the voter."

What does that mean?

A Well, I mean, it speaks for itself. You know, it's the Department's opinion that the date that the voter inserts on that envelope, whether it's the

J. Marks

date they're assigning it or some other date, has no bearing on the voter's qualifications to vote.

Q Those qualifications are what?

A Well, they have to be, you know, of age, a citizen, and a resident of the Commonwealth for 30 days before an election.

Those are the only ones that I'm aware of.

Q And the date that the voter writes on their verification envelope does not bear on any of those qualifications?

A That's correct, yes.

Q Did this guidance carry through the November 2021 General Election?

A I believe it did. As I recall the timeline, we did not have a decision in Migliori until after the November 2021 Election.

Q So the guidance from the Department for the May Primary, or, yes, May 2021 Primary, the November 2021 Election, and then the May 2022 Primary was

J. Marks

that undated ballots should not be counted, but ballots bearing any date, even one that appears to be incorrect, should be counted; is that accurate?

A That is my recollection, yes.

Q And the May Primary in 2022 was May 17; is that right?

A That sounds right, yes.

Q And then you referenced a minute ago Migliori.

What is Migliori?

A Well, that was the case that originated in Lehigh County in the, I believe, Third Circuit Federal Court.

That decision, if I recall, became very shortly after the May Primary in 2022. It would sort of change the landscape on the question of undated ballots.

Q When you say, "change the landscape," how did it do so?

A Well, the Federal Court -- you know, I'll be succinct. I mean, the Federal Court basically determined that

J. Marks

those ballots -- that that error was immaterial for purposes of Federal law, and that those ballots should be counted.

Q When you say "that error," you mean the voters --

A The voter failing to provide a date, yes.

Q So Migliori held that a voter's failure to list the date on the declaration envelope was immaterial to their eligibility, and, therefore, it should be counted under Federal law?

MS. MULLEN: Objection.

A That's my understanding, yes, that the Court determined it was not material in determining their eligibility.

Q Do you recall that late May, early June of 2022, there were further proceedings in Migliori in the U.S. Supreme Court?

Were you aware of that?

A Yes.

Q And is it your recollection that you guys, at some point, after the Third

J. Marks

Circuit issued its decision, Justice Alito granted a stay, and then at some point thereafter, the full court lifted that stay?

A Yes, that's my recollection.

Q And this all occurred after the voting in the May 17 Primary; is that correct?

A That's correct, yes.

Q Did Migliori become an issue in any way after that for the May 2022 election?

MS. MULLEN: Objection.

Q If you know.

A I don't recall. As I said earlier, I know this is still hanging out there, that's why we're here today, but I don't recall anything specifically related to Migliori after that point in time.

Q After the Supreme Court denied a stay in Migliori, did the Department change its guidance around the undated/misdated ballot issue?

A Can you ask that again? After

J. Marks

the U.S. Supreme Court? You're referring to the Pennsylvania Supreme Court?

Q Yes, sorry.

When the Supreme Court eventually decided in June of 2022 that they were not going to stay the Third Circuit's ruling in Migliori, right, lifting any question at that time whether the Third Circuit's opinion is going forward, did the Department change its guidance?

A I don't recall that we changed our guidance in June of 2022?

Q Did you change it thereafter?

A We changed it prior to the November 2022 election based on a ruling of the Pennsylvania Supreme Court on the issue of undated ballots. And the Court also referenced incorrectly dated ballots as well, and then subsequently provided some level of guidance as to what they believed was an incorrectly dated ballot.

Q So that Pennsylvania Supreme Court decision you're referring to is known as Ball versus Chapman?

J. Marks

A Yes, I believe that's correct.

Q Let's put a pin in that and come back to that. I want to come back to Migliori.

(Marks' Exhibit 5, 2022-09-26 DOS Mail-In Ballot Procedures, was marked for identification, as of this date.)

BY MR. WALCZAK:

Q If you could look at Marks' Exhibit 5, do you recognize what's been marked as Marks' Exhibit 5?

A I do, yes.

Q So I was trying to find the actual guidance that was issued on September 26, 2022.

This is not that, correct?

A You were trying to find the guidance issued on what date?

Q September 26, 2022. It appears -- let me ask you, did the Department issue guidance around --

A Oh, the original. So, no, we basically provided the notice, this notice at the top of this guidance.

J. Marks

As you recall, that Supreme Court decision came immediately prior, within a week of the November election. So it was not practical at that time for us to update our guidance.

So we noted -- we basically struck through portions of this guidance that were inconsistent with the Supreme Court's decision, and then noted that on the cover of this guidance document, as opposed to attempting within a few days to issue brand new guidance on the issue.

Q Let me try this again.

So this is, for lack of a better term, a redline of guidance that the Department issued on September 26, 2022, correct?

A That's correct, yes.

Q And if you would turn to Exhibit 5 to page 6, and in the first full paragraph, third bullet point, you see some struck out language there that begins, "Any ballot return envelope"?

A Correct, yes.

J. Marks

Q And it reads:

"Any ballot return envelope that is undated or dated with an incorrect date, but that has been timely received by the County, shall be included in the pre-canvass and canvas."

Did I read that correctly?

A You did, yes.

Q So in the guidance issued on September 26, 2022, that language was not stricken, correct?

A That's correct, yes.

Q And that language, in fact, reflected a change in Department guidance about what to do with undated ballots, correct?

A Correct, yes, based on the Migliori decision that occurred after the May Primary.

Q Right.

So in the May Primary, undated ballot guidance was do not count, correct?

A Correct.

Q And then in September of 2022,

Case 1:22-cv-00339-SPB Document 391 Filed 05/05/23 Page 329 of 378

J. Marks

based on the Department's interpretation of Migliori, the Department changed its guidance to say count not just incorrectly dated ballots, but also undated mail-in ballots, correct?

MS. MULLEN: Objection.

A Correct, yes.

Q But that guidance was never actually implemented for any Pennsylvania election; is that correct?

MS. MULLEN: Objection.

A When you say "that guidance," you're referring to the September 26 guidance?

Q Correct.

A That's correct, yes.

Q Hence, the document that we're looking at as Exhibit 5 is updated guidance that the Department issued on November 3, or thereabouts, correct?

A Yes, that sounds -- yes, that's correct.

Q And that's the reason why the language we looked at on page 6 of Exhibit

J. Marks

5 is stricken, that was the change that was reflected in this November 3 guidance that now Counties should no longer count undated ballots, correct?

A Correct.

Q Just for completeness, if you could look on page 10 of Exhibit 5, there's language with a strike-through under pre-canvass and canvass procedures, third bullet.

Do you see that?

A I do, yes.

Q And that says also don't canvass the ballots, which means don't count them, correct?

A Correct, yes.

Q But set them aside, save them, don't destroy them, put them aside, correct?

A Correct.

Q Was the Department's change in guidance from September 26 to the November General Election based on action by the U.S. Supreme Court vacating the Third

J. Marks

Circuit's Migliori decision?

MS. MULLEN: Objection.

A That's my recollection.

Q But it also reflected a subsequent decision by the Pennsylvania Supreme Court in the case we referenced earlier, Ball versus Chapman; is that right?

A Right.

Q What's your understanding of what Ball versus Chapman ruled?

A Well, you know, the part that matters most to us in terms of administration of elections is that the Court basically held that undated and incorrectly dated ballots should also not be counted, but that the County should segregate those ballots from all other ballots.

And, as I understand it, the Court was not in agreement on the Federal question. And I would expect, at least my belief, I'm not an attorney, so take it for what it's worth, the Court expected that

J. Marks

would be follow-on litigation related to this issue. So that's why they wanted the undated and incorrectly dated ballots segregated from all other ballots that were set aside and not counted.

Q So one might say the justices were quite prescient in directing that?

A I would think so, yes.

(Marks' Exhibit 6, 2022-11-3 Guidance Re: Ball Order, was marked for identification, as of this date.)

BY MR. WALCZAK:

Q So if you could take a look at Marks' Exhibit 6 -- because of the genius of Adobe and the new court requirements, I would not disentangle this exhibit.

So we'll represent that Exhibit J -- this is just taken from an entry in the litigation that this deposition is taking place in.

But if you could turn to the second page of Marks' Exhibit 6, do you recognize this?

A Yes, page 2 of 3, it's the cover

J. Marks

page for the standalone guidance that we
issued on November 3 with detailed guidance
on how Counties should handle undated and
incorrectly dated ballots based on the Ball
decision on November 1.

Q    And, obviously, the Court marking
at the top was not part of your guidance;
is that correct?

A    That's correct, yes.

Q    So let's look at page 3 of
Exhibit 6.

Again, were you involved in
development of this guidance?

A    I was, yes.

Q    Were your lawyers involved in
this?

A    Yes.

MS. MULLEN:  Objection.

Q    I'm sorry, I don't mean your
personal lawyers.  They may have been, but
I'm really more --

A    The Department's Office of Chief
Counsel was involved in the drafting and
review of this guidance, yes.

J. Marks

Q    Was the purpose of this to
basically alert the Counties to what the
Department viewed as the impact or
requirements of the Ball decision?

A    That's correct, yes.

Q    So what this did was kind of
formally amend the Department's
September 26 guidance which we looked at as
Marks' Exhibit 5; is that right?

MS. MULLEN:  Objection.

A    Yes, that's correct.

The supplement is probably a word
I would -- we struck through the
no-longer-relevant portions, and then
supplemented the guidance with this.

Q    Would you agree with me that the
biggest change Ball instituted was that now
incorrectly dated ballots, whatever that
means, could not be counted?

MS. MULLEN:  Objection.

A    Yes.  Substantively, that was the
biggest change.  Incorrectly dated ballots
could not be counted.

And, you know, prior to that, the

J. Marks

Department's guidance on that issue was
that if there's a date on the ballot, it
should be counted, even at the point in
time where we were telling Counties not to
count undated ballots.

Q    So after Ball, the Department's
read of that decision was that neither
undated nor incorrectly dated ballots could
be counted; is that right?

A    That's correct, yes.

Q    Looking down on page 3 of
Exhibit 6, the first bullet point talks
about directing Counties to scan return
ballots into the SURE system immediately?

A    Correct, yes.

Q    And to date-stamp those; is that
correct?

A    Yes.

Q    Why did you include that in this?

A    Well, we wanted to remind
Counties that they should have a mechanism
for determining which ballots were timely
received and on what date those ballots
were received.

J. Marks

Q    So looking at the second and
third bullet points there, they essentially
ask the Counties to examine the declaration
envelopes for signature and date, and then
code them appropriately if they're missing
either of those; is that correct?

A    That's correct, yes.

Q    And why did the Department
include that?

A    Well, we wanted -- for a couple
reasons, we wanted -- to the extent that
the voter provided an email address, we
wanted to make sure the voter was alerted
to the status of their ballot.

We also wanted to make sure that
Counties were putting -- were coding these
correctly so that we would have data on
which ballots were set aside, because there
was a problem with the declaration
envelope.

Q    Do you know whether all the
Counties complied with that guidance?

A    I don't.  I can't say that every
County did everything that was outlined in

J. Marks

this guidance, including the, you know, immediately recording ballots returned in the SURE system.

Q Do you know that some Counties did not immediately record some ballots into the SURE system?

A My recollection is that that is true, yes.

Q Are you aware that some Counties may have recorded it but not have put in the cancellation code?

A That's my recollection as well, yes.

Q And do you recall how many Counties did not follow that guidance?

A I don't recall the exact number of Counties, and I don't know that we necessarily surveyed the Counties on that issue.

Q Based on what you do know, do you believe that it was more than five Counties that did not comply with that guidance?

A I believe that's true, yes.

Q Do you believe it was more than

J. Marks

ten?

A I believe there were probably more than ten, that it was in the double digits, based on what I know.

Again, I don't have any empirical data to back that up, but, anecdotally, yes.

Q Looking at the last bullet on page 3 of Exhibit 6, is it fair to term that as advice to provide notice and an opportunity to cure for voters?

A Yes. We believe that if a voter was returning their ballot by hand, and the person who was receiving the ballot should review it, and if they identified an error on the outside of the envelope, that it was appropriate to give that voter an opportunity to fix that error before submitting it to the County.

Q Do you know whether all Counties' Board of Elections complied with that guidance?

A I do not, no.

Q Do you know whether any Counties

J. Marks

did not comply with that guidance?

A I don't recall. I don't know that -- if there are any Counties who did not comply with that guidance on in-person, you know, handing the ballot over the counter, no, I don't know.

Q So that "notice and cure" applies to people who were returning their ballots in person, but there's also potentially "notice and cure" to people who submitted their ballots by mail or just dropped them off in a drop box or delivered in some fashion as well; is that right?

A That's correct, yes.

Q As I believe you said earlier, it's your understanding of the law that there's no prohibition on that, but there's also no requirement of that on the Counties to do that "notice and cure"; is that correct?

A That's correct, yes.

Q Are you aware of some Counties that did do some variation of "notice and cure" opportunity in the November 8, 2022,

J. Marks

Primary?

A Yes, that's my recollection, yes.

Q Do you know the different ways that Counties may have done "notice and cure" in that situation?

A I'm not sure exactly what you mean by "different ways."

Q Did some Counties --

A It would have involved, you know -- at the very least, it would have involved the Counties recording the ballot and generating that notification to the voter.

Some Counties may have gone beyond that and reached out directly to voters with additional contact information that they may have had for the voter.

Q Are you aware of some Counties maybe publishing lists of voters whose ballots were noncompliant?

A Yes, I'm aware of at least two Counties, actually, I think three that I'm aware, that I recall actually seeing lists on their website of individuals whose

ballots had a defect on the declaration envelope.
Q What's your understanding of why they did that?
A It was to make sure that voters could become aware that there was a problem that -- you know, that there was awareness that there was a place voters who may be worried about whether or not they correctly completed their declaration envelope, that there was a central place they could go to to find out if their ballot may have been one of those ballots that was not correctly completed.
Q On the other end of the spectrum from those Counties that were trying to alert voters to defects, I believe you testified before that there were some Counties that did not do the timely entry into the SURE system before the deadline; is that correct?
A That's my recollection, yes.
Q And are you aware whether those Counties that didn't timely enter into SURE

also did not provide any other type of notice to voters?
MS. MULLEN: Objection.
A I can't speak for each individual County, but it is my recollection that there were some Counties who did not record ballots immediately upon receipt, and also did not do any outreach to voters who notified them that their ballots were defective in some way.
Q So in those Counties, a voter would not have received any notice from the Board of Elections that their mail-in ballot was facially defective prior to the deadline?
A I think that's fair to say that they did not receive any notice from their County Board of Elections.
Q Do you know how many Counties fall into that category?
A I don't know how many Counties fall into that category.
Q More than five?
A I believe certainly more than

five, and perhaps double digits.
Again, I don't have a firm number. But anecdotally, I think it was, you know, more than a handful of Counties, let's put it that way.
Q So are you aware of any Counties that counted undated or incorrectly dated ballots in the November 2020 Election?
A I'm not aware of any Counties that counted undated or incorrectly dated ballots.
Q So that guidance from the Department of State will not change going forward as of now, in other words, the guidance will remain that Counties should not count undated or incorrectly dated ballots in the upcoming Primary election, correct?
MS. MULLEN: Objection.
A That's correct, yes.
MR. WALCZAK: Jacob, I have a little bit more to go. I don't know that I'll be done by noon.
I know Jonathan's got another

engagement that he has got to attend to at noon.
How do you want to proceed?
(A Discussion was Held off the Record.)
(Marks' Exhibit 7, SCOPA Supp Order 2022-11-5, was marked for identification, as of this date.)
BY MR. WALCZAK:
Q If I could ask you to take a look at the exhibit marked as Marks' Exhibit 7.
Do you have that?
A I do, yes.
Q Again, as with the last exhibit, I could not disentangle these exhibits through Adobe. So this is taken from a filing in the NAACP Chapman case. And, hence, the Exhibit K on the first page.
If you could take a look the second page of Marks' Exhibit 7, do you recognize this?
A I do, yes. It is a supplemental order from the Pennsylvania Supreme Court supplementing its order involving Chapman.

J. Marks

Q And this was issued on November 5, 2022?

A That's correct, yes.

Q So that's before Election Day, correct?

A It is, yes.

Q What's your understanding of the purpose of this supplemental order?

A My understanding of the purpose was to provide some standard, or some guidance, if you will, on how a County would go about determining whether a ballot is incorrectly dated or not.

Q If I'm reading this correctly, they set out a range of dates that if the date that was written on the declaration envelope fell between or fell in that range, one range for absentee, one for mail-in ballots, that the ballots should be counted, correct?

A If the date inserted by the voter fell within that range, the ballot should be counted, is that your...

Q Yes.

J. Marks

A Yes, that's correct.

Q Is there any way for the County Board of Elections to know whether the date the voter has put on the declaration form is, in fact, the date that they filled out the ballot?

A No. Unless the voter is doing it in person in front of the County Election official, no, they would not.

Q But if it's being done at home or away from an Elections Office, put in an envelope and somehow delivered by mail or dropped off, the County Election Board can't know whether the date the voter has marked is, in fact, the date that they filled out the ballot, correct?

A Correct, yes.

Q For purposes of timeliness, as we discussed earlier, the date that the voter actually fills out the ballot is irrelevant, correct?

A The date the voter fills out the ballot, no.

Q So as long as it's received prior

J. Marks

to the deadline, 8:00 on Election Night, the date the voter fills out the ballot is irrelevant?

A Correct. The date the voter fills out the ballot, the date the voter signs the declaration envelope and returns the ballot to the County is irrelevant.

What's relevant is the date that it's received by the County in determining whether the ballot should be counted or not.

Q And if a voter is filling this out in privacy, as they are supposed to do, the ballots are secret, there's no way for the Elections Board to know whether that date is, in fact, representative of when they filled out the ballot, or when they signed the declaration, or when they, in fact, put it in the mail, correct?

A Correct.

Q So this order applied to the November 8 Election, correct?

A Correct, yes.

Q Has the Department of State given

J. Marks

any kind of guidance to the County Board of Elections about how to handle, quote/unquote, incorrect dates for the May 2023 Primary?

A We have not. Our current guidance on the issue will remain unchanged barring, you know, another ruling by this court or another court on the issue.

But we did provide a reminder to the Counties who recently had special elections that this was the current status of our guidance on the issue of undated and incorrectly dated ballots, meaning the guidance that we issued shortly before the November election in response to Ball v. Chapman. So that's the current status quo right now.

Q Does the Department have any guidance on whether or not a date is incorrect for the upcoming election?

A We do not.

Q Does the Department expect to put out guidance for the upcoming election around what is an incorrect date?

A I can't say that yet whether we're going to do that. I know it's certainly a question Counties asked last November, and it's a question they continue to ask.

But I don't know. There's no standard. There's no definition in law, to my knowledge. So I'm not sure whether we will or will not. That will be a decision they make in consultation with our counsel.

MR. WALCZAK: Jacob and Kathy, you know, now might be a good time to break.

I'm guessing I only have probably about 15 minutes for folks who may want to ask questions after I'm done.

Do you want to reconvene at 1:15, I think you said earlier?

Does that work?

(A Discussion was Held off the Record.)

THE VIDEOGRAPHER: We are off the record. The time is 11:42 a.m.

A F T E R N O O N S E S S I O N

(Time noted: 11:42 a.m.)

THE VIDEOGRAPHER: We are on the record. The time is 1:17 p.m.

JONATHAN M. MARKS,

resumed and testified as follows:

CONTINUED EXAMINATION

BY MR. WALCZAK:

Q Good afternoon, Mr. Marks.

A Good afternoon.

Q Early in this deposition, I raised the concept of incorrect ballot date, incorrect date on a ballot.

And you made -- I can't remember exactly what you said, but you kind of rolled your eyes.

Is the whole concept of an incorrect date a problem for the Department of State?

A Well, I think it's certainly a problem from the perspective that there's no standard or definition for the term

"incorrect date." That's been our biggest challenge.

You know, we can't issue guidance if we don't understand the term.

Q So the Pennsylvania Supreme Court, as we talked about earlier, issued a supplemental ruling saying that as long as the voter put in a date in a certain range for either absentee or mail-in ballots, that it would count, correct?

A Yes, that's my recollection.

Q And Counties may allow their ballots on all different dates, correct?

A That's correct, yes.

Q It may depend on any number of factors, mostly around when the ballot is ready to go, and they get it back from the printer?

A Right.

Q And so, in fact, a voter may not have gotten their ballot, and likely didn't get their ballot until after the earliest of the dates specified by the Supreme Court, correct?

MS. MULLEN: Objection.

A That's a possibility, yes.

Q But if that voter put down a date before when they got it, but after the start date identified by the Supreme Court, that ballot would have been counted in November 2022, correct?

A Yes, I would expect so.

Q Even though that date clearly would not have been accurate in terms of reflecting when the voter filled out the ballot or mailed it?

A Correct.

Q But under the law as the Pennsylvania Supreme Court has announced it, that ballot would have been counted?

A Yes, based on the Court's supplemental ruling in the Ball case.

Q So, to some extent, an incorrect date or a date that doesn't accurately reflect when the voter filled it out was still allowed under Ball in that circumstance that I just described?

A Yes, if that circumstance -- it's

J. Marks

a hypothetical. I don't know whether it actually happened or not.

But, yes, hypothetically if that were the case with an individual voter, under the Supreme Court's supplemental order, that ballot would have been counted irrespective of the fact that the voter did not put the date on which they signed the declaration on the declaration.

Q So to that extent, if a voter simply made a mistake in the date, as long as that date was within that range, it would have counted?

A Correct.

Q And, you know, without a notary requirement -- and I'm not certainly urging the legislature to take that up, but some states do have that, it's impossible to tell whether or not that date accurately reflects when the voter -- discussed earlier, is that right?

MS. MULLEN: Vic, you broke up there. Could you repeat your question? The video froze.

J. Marks

MR. WALCZAK: It was brilliant. I don't know that I can repeat it. I'll do my best.

BY MR. WALCZAK:

Q So because there's no witness requirement to that date, there's no way that the Board of Elections can know whether or not the voter inserted a date that reflects the date on which they filled out the ballot or mailed the declaration envelope, correct?

A Correct. There would be no way for the County to independently verify, if that's what you're asking.

Q And, ultimately, the only date that matters here is whether or not that ballot is received by the statutory deadline of 8:00 on Election Night, correct?

A Correct.

Q And the County Board of Elections, because they received that date, are in the best position to determine that, correct?

J. Marks

A Correct.

Q I want to talk about what other possible uses the date on the declaration envelope may serve in the election process.

So it's not relevant to whether it's timely received, correct?

A Correct.

Q So correct me if I am wrong, one of the eligibility requirements is that the voter has to be 18, right?

A Correct, yes.

Q And the person's age would be ascertained at the time of registration, correct?

A That's correct, yes.

Q So if they submit an application, and the application is returned to them, they're 18 years old, correct?

A Correct, or they will at least be 18 years old by the date of the next election.

Q Same for whether they have been a citizen?

A Correct.

J. Marks

MS. MULLEN: Objection.

Q I'm sorry, so citizenship is evaluated at the time of registration, correct?

A Yes. At the time of registration, you have to have been a citizen resident of Pennsylvania for 30 days prior to the election, so that would have been part of the election process as well.

Q Right.

So what date the voter writes on the declaration envelope is irrelevant to establishing either of those two eligibility criteria, correct?

A Correct.

Q And same holds true for whether they've lived in their district for at least 30 days, right?

A Correct.

Q So the verification that the voter is eligible is really made at the time of the application for the ballot, correct?

J. Marks

A That's correct, yes.

Q So the only other factor when the voter returns the ballot that the County Board of Elections really needs to pay attention to is whether it's signed, correct, whether the declaration is signed?

A Correct.

Q There's a secrecy envelope?

A Correct.

Q And that it's timely received?

A Correct.

Q And whether the date is written on there is irrelevant to any of that, correct?

A Yes, that's correct.

Q I want to turn just briefly here to UOCAVA.

MR. WALCZAK: And, Kathy, I emailed you Exhibit 9 a little bit out of order here. I'll put it in the chat.

J. Marks

(Marks' Exhibit 9, 2022-09-26 DOS Guidance Federal Voters, was marked for identification, as of this date.)

BY MR. WALCZAK:

Q Do you have what's been marked as Marks' Exhibit 9?

A Yes, guidance concerning Federal voters under UOCAVA?

Q Correct.

A I do.

Q And do you recognize this document?

A I do, yes.

Q What is it?

A It is our guidance to Counties regarding voters who are covered under UOCAVA, specifically, Federal voters, meaning those voters who are entitled to vote in Federal elections per the Federal law.

Q So we don't have to get into the details here because I'm not sure they're relevant, but those are basically American citizens living abroad who intend to return

J. Marks

at some point; is that fair?

A Well, Federal voters are a specific subset. These are either individuals who either do not intend to return or their intention is unknown, so they fall into that Federal...

If they're simply temporarily overseas, they may also be eligible to vote in State elections. So that's why we use the term "Federal" voter.

Q And is the process for applying for a ballot, and then voting that ballot, the same for UOCAVA as it is for absentee?

I believe you said this is a subset of absentee ballots at the outset of the deposition?

A Right. The process is similar, but it's not the same. The requirements are a little different. The form they use is different.

Q I'm sorry, "form," do you mean the application form?

A Yes, the application form. We've adopted the Federal postcard application as

J. Marks

the preferred form for a military or overseas civilian voter so that the Counties are aware that they are a covered voter.

The other substantive difference is that this group of voters is exempt from the I.D. requirements of the Pennsylvania Election Code.

Q And are the deadlines different for these voters than they are for, say, absentee or mail-in ballot?

A Yes, they are. Ballots from this group of voters can be received up to seven days after Election Day with some caveats.

Q Can you recall what those caveats are?

A Yes. The voter has to affirm under penalty of perjury, and I believe there's a declaration or an affirmation, that they transmitted the ballot to the County on or before 11:59 p.m. on the day prior to Election Day.

Q And that it has to be received within one week of Election Day?

J. Marks

A Correct, yes.

MR. WALCZAK: I'm going to circulate Marks' Exhibit 8.

I will note that these are ballots -- are a sample ballot I think we got from Berks County.

I have actually redacted the name of the voter who is on here, but I do believe this is still subject to a confidentiality order.

(Marks' Exhibit 8, Berks County UOCAVA, was marked for identification, as of this date.)

BY MR. WALCZAK:

Q Mr. Marks, do you have what's been marked as Marks' Exhibit 8 in front of you?

A I do, yes.

Q So I've represented to you this was taken from documents produced by Berks County. And I wanted to use this just as an illustration of the return envelope or packet for UOCAVA.

Are you familiar generally with

J. Marks

the materials that accompany the UOCAVA ballot return?

A I am, yes.

Q So what is the first page of Exhibit 8?

A This is the instructions that are sent out with the balloting materials. So this appears, perhaps, to be a ballot -- balloting materials, part of a ballot package that was delivered electronically to the voter.

There are statutory requirements that require Counties, if a voter requests it, to deliver the ballot electronically.

And this is sort of the general instruction sheet that is part of that packet that goes out to the voters.

Q So is the first page of Exhibit 8 -- so would this be the front of the declaration envelope that County sends to the UOCAVA voter?

A No. This first page, absentee ballot instructions for military and overseas voters, is a separate page. It's

J. Marks

an instructional page that's included within the packet.

Q So I'm looking at the first page of Exhibit 8.

A Okay. The hard copy I have is the instruction sheet.

Are you looking, perhaps, at the --

Q You know what?

A The number at the bottom, Berks --

Q Sorry, yes.

The problem is on my end, not your end. I have a wrong hard copy.

A We're looking for the one that has at the bottom Berks 39?

Q Yes.

A Okay.

Q Let's go to the first page on what you've got, and I think what I circulated.

So these are instructions that are sent along with the ballot.

So after the voter has made an

J. Marks

application, this is the instructions that is sent with the ballot and the package?

A Correct. This is the general instructions that are sent with a ballot.

Q So I note that number 6 there says 6B on page 1 of Exhibit 8.

"Be sure to sign where indicated. Your ballot will not be counted without a signature."

Did I read that correctly?

A You did, yes. 6B, it's underlined and bolded.

Q Does it say anywhere on there that you have to date the declaration page?

A On this instruction page?

Q Yes.

A It does not.

Q Let's go to the second page of this exhibit which has 00039 on the bottom.

What would this be?

A This is the envelope, essentially, that the voter would -- the front of the envelope that the voter would return the ballot in.

J. Marks

Q So is this similar to the return envelope that domestic mail-in voter would get?

A It is similar, but certainly not the same. The declaration is not necessarily included in the outer envelope.

As I said, this appears to be part of a packet that went out electronically to a covered voter. But, yes, it is similar.

Q So are you saying -- because I was just looking at that second page, 00039, which appears to be the front of the return envelope.

Is that what you think it is?

A Yes.

Q Are you saying, then, that the back of this envelope would be different from the reverse side of a domestic mail-in ballot envelope?

A Yes. In this case, there would really be no back. The voter would insert this in an envelope. They would use this template that we just reviewed at Berks 39,

J. Marks

put that on the envelope.

The next page, Berks 40, is where the -- so the declaration is a separate sheet of paper that is contained inside the outward envelope when it's returned to the County but outside the secrecy envelope.

So the process is a little different for this group of voters in that respect.

There's still a secrecy envelope, there's still an outer envelope, but the declaration that the voter signs is actually a separate sheet of paper that goes inside the outer envelope -- back of the outer envelope.

Q So if I understand this correctly, instead of having the declaration page on the outward envelope, it's contained on a separate paper that goes inside the return envelope but outside the secrecy envelope?

A Yes, in this case, yes.

Q And you say, "in this case." Are there situations where the County might do

J. Marks

it differently?

A I'm not aware of any. There's a lot of text on this sheet of paper, so I'm not aware of a County that prints this all on an envelope.

Even if they send out the ballot via paper, the majority of voters have adopted the electronic delivery process, so the majority of covered voters would get exactly -- or a packet that looks very much like this.

Q So I'm not asking whether the text is the same. We'll come back to that.

Is the purpose for having the declaration on this ballot return the same as the purpose for having that declaration for domestic voters?

A It is. The purpose is similar. Again, as you noted, the requirements are different.

Voters can return the ballot up to seven days past Election Day so the affirmation is different.

But, yes, the purpose is the same

J. Marks

to determine that the voter completed the ballot and timely returned it to the County Election Office.

Q But the signing of this declaration is some assurance that the voter is who he or she says they are, and that if they are lying about that, that subjects them to potential criminal prosecution?

A Correct, yes.

Q The text of the declaration is a little bit different here, it appears to me, from domestic ballots; is that right?

A Yes.

Q And that just reflects the additional requirement that the voter has to mail the ballot by 11:59 on the day before the election.

So that would be the Monday before Election Day; is that right?

A That's correct, yes.

Q Now, you note that on this third page of Exhibit 8 that there's also a signature line here, and it says "print

J. Marks

name." There's also a date, a place to put a date.

Do you see that?

A Yes.

Q Do you see anything anywhere in this packet that indicates that the voter must sign or must put a date next to their signature?

A I do not, no.

Q Let's look at the fourth page of Exhibit 8, 00041 at the bottom.

This looks to be the same as the second page, no?

Does this appear to be the return envelope for the voter?

A It's substantially the same.

Q I'm not sure I see a difference either here.

So let's go to the last page of Exhibit 8. What is this?

A This appears to be sort of the traditional -- the old absentee elector's declaration that would have been on the back of every envelope, absentee ballot

J. Marks

envelope, return envelope that went out to voters.

I'm not sure that it's relevant in the case of a UOCAVA voter. It's redundant, I guess, for lack of a better word.

Q So I note that the text of the declaration itself still has that, "mail the ballot no later than 11:59 on the day before the election" language there.

So that wouldn't be on a regular absentee ballot declaration, would it?

A No, it would not. This would be specifically on...

So if the County -- it appears that perhaps the County was able to squeeze all of that on this declaration.

I don't know if maybe this is part of another packet, but this may be -- I can't speak for the County, but this may be if a voter -- if a covered voter requested their balloting materials to be sent out on paper and not electronically, this appears to be, perhaps, part of the

J. Marks

envelope that the County would have supplied for them to return their envelope, or for them to return their ballot.

Q So I believe we're taking a deposition of the Berks County Director at some point later this week, so we'll ask that.

So both what's on this fifth page and what's on the third page could be currently in use. I mean, you wouldn't say either one of these is outdated?

A No, I would not. Like I said, it looks like most of this maybe was part of an electronic package that went out.

The last page appears to be, perhaps, something that the County would mail if they were sending the ballot out, hard copy of the ballot.

Q And I note in the middle of that fifth page of this exhibit, it again says, "sign and date here."

There's a space for signature, putting in a name, and then the date, correct?

J. Marks

A Right, correct.

Q What is the Department's view about whether the date is required on this return envelope for the ballot to count?

MS. MULLEN: Objection.

You're talking with this particular exhibit?

MR. WALCZAK: I'm sorry. No, thank you, Ms. Mullen.

BY MR. WALCZAK:

Q So for UOCAVA voters when they return their ballots, do they have to write the date on -- in the view of the Department, do they have to include the date on the declaration order for their ballot to be counted?

A No.

Q Why not?

A Well, it's not an explicit requirement, No. 1; and No. 2, I believe -- and don't ask me to tell you chapter and verse, but I believe part of the Federal law that covers these voters indicates that their balloting materials should not be set

J. Marks

aside for immaterial reasons.

So whether it's, you know, that they use a different type of paper, whether some minor requirement is missed, again, I can't give you chapter and verse, but I understand this group of these covered voters is additional protection for them that -- directs jurisdiction is not to set their ballot aside for minor errors.

Q I don't believe in what was marked as Marks' Exhibit 9, which is the UOCAVA guidance, that there is any language in there about telling the Counties whether to count or not count ballots without a date written on the declaration; is that right?

A I believe you're correct.

If you don't mind, let me --

Q Please.

A -- peruse it one more time.

You're correct, it does not.

Q And so the Department has not taken the position that the Ball ruling applies to UOCAVA ballots -- yes, UOCAVA

J. Marks

ballots?

A That's correct, yes.

MR. WALCZAK: I have no further questions for Mr. Marks.

Jacob or Kathy, do you want to let Mr. Baxenberg have a shot first?

MR. BOYER: Yes, why doesn't Mr. Baxenberg go next. And then I may have a small number of questions to follow up. Then after he is done, if there's other defendant Counties who want to question, maybe they can go after I have.

BY MR. BAXENBERG:

Q Good afternoon, Mr. Marks. Justin Baxenberg here representing the plaintiffs in the other lawsuit, the Eakin lawsuit.

I just have maybe seven or eight questions for you we can move through pretty quick.

Other than the deadline for receiving mail ballots, is there any requirement that voters return mail ballot

J. Marks

within a certain period of time after they have dated and signed the ballot?

A No.

Q So a voter could receive and complete their mail ballot, and then wait a few weeks before submitting it as long as it's submitted it by the deadline, is that correct?

A That's correct, yes.

Q And a voter could, at least hypothetically, sign their ballot one day, put it aside for a couple weeks, and then realize, oh, I need to date it and sign it, put that day's date, send in the ballot, correct, and as long as it's received by the deadline, it will be counted?

MR. WALCZAK: Objection.

A Yes, that's correct. I've done that myself. I've completed the ballot and waited a few days afterwards because I needed a stamp.

Q It's one of those things that people used to have.

A Yes. It's not something we keep

J. Marks

handy anymore.

Q Mail ballots are only sent to voters who have timely completed and submitted an application to vote by mail, is that correct?

A That's correct, yes.

Q And mail ballots are specific to each election?

A They are, yes, they are unique to each election, yes.

Q Anyone who returns a mail ballot for a particular election, therefore, must have received that ballot at some point after the ballots for that election were distributed; is that correct?

A Correct.

Q And if a mail-in ballot is returned with a signature, the ballot must have been signed at some point between when ballots were distributed and when the ballot was returned; is that correct?

A Correct, yes.

Q If a mail-in ballot is received after the return deadline but dated before

the return deadline, will the ballot be counted?

A No, it will not.

Q Does the handwritten date on the outer envelope provide any other information or any information at all as to whether the ballot was timely received?

A It does not, no.

Q Since the Supreme Court's decision, the Pennsylvania Supreme Court's decision, which we have been speaking about earlier today, has your office provided any guidance to Counties with respect to how to determine whether the date on a ballot envelope is the correct date?

A We have not, other than to remind Counties that we've recommended that Counties should continue to segregate those ballots, but we have not given them any guidance in terms of determining what is an incorrect date.

Q Does your office intend to provide guidance of that sort?

A I don't believe so. There's no

immediate intention. Our counsel has reviewed, you know, last week's, you know, opinions by the Supreme Court.

MS. MULLEN: I just caution you not to reveal attorney-client communications.

A So I don't know that that decision has been made yet, I guess.

MR. BAXENBERG: No other questions at this time.

MR. BOYER: Good afternoon, Mr. Marks, I just have a very few number of questions.

BY MR. BOYER:

Q During your exchange with Mr. Walczak, on a number of occasions you each used the phrase "undated ballots."

Do you recall that?

A Yes.

Q Is there any place for voters to write a date on the actual ballot itself?

A No.

Q So when you used the phrase "undated ballot," do you mean ballots that

are returned in mail-in envelopes, and the mailing envelope itself is either undated or incorrectly dated?

A Yes. We have kind of gone shorthand, but, technically, it's an undated declaration envelope in which the voter has returned their ballot.

Q And the ballot and the return envelope, those are separate documents, correct?

A They are, yes.

Q And I believe during your discussion with Mr. Walczak, you also said that Counties will sometimes set aside ballot packages because of facial deficiencies such as a missing date or a missing signature on the ballot.

Do you recall that?

A I do, yes.

Q And those facial deficiencies, would they appear on the face of the ballot or on the return envelope?

A On the return envelope, the declaration envelope.

Q And if there are facial deficiencies on the return envelope, and, ultimately, they're not corrected prior to Election Day, will the County open up the return envelope, or will it never open up the return envelope and review the ballots?

A Yes, if that ballot -- you know, if that ballot is not cured in any way, the County would never open up the ballot.

Q It would never open up the return envelope?

A Correct. They set them aside. And the process is not to open them unless they need to open them and canvass the ballot.

Q And they wouldn't canvass the ballot if there was no signature on the envelope, for example?

A Correct.

MR. BOYER: I have nothing further.

MR. WALCZAK: Do any defendants' counsel wish to ask questions here?

MR. GIANCOLA: If nobody minds,

Case 1:22-cv-00339-SPB Document 391 Filed 05/05/23 Page 342 of 378

J. Marks

I'll go next.

BY MR. GIANCOLA:

Q Deputy Secretary Marks, my name is Russ Giancola. I represent the intervenor defendants in both actions, the RNC, the NRCC, and the Republican party of Pennsylvania. I've got a series of questions for you.

First, I just wanted to confirm something that my connection cut out a little earlier.

You indicated before that the Department of State issues guidance, and I believe you had said something that it was firmly rooted in the Department's interpretation of the Election Code; is that correct?

MS. MULLEN: Objection.

A I believe so. I don't recall which guidance we were referring to at the moment, but certainly our -- generally that is true of any guidance that we issue.

Q Sure.

That was early on before we were

J. Marks

talking about any specific guidance.

But just in general, the Department issues guidance, and it's based on its interpretation of the Election Code, then, correct?

A Interpretation of the Election Code and relevant case law.

Q The Department has issued guidance regarding pre-canvass procedures, correct?

A Correct, yes.

Q What is your understanding of the meaning of "pre-canvass"?

A Pre-canvass is -- basically, it's virtually identical to the canvas procedures. The main difference is when it occurs.

So pre-canvass occurs no earlier than 7:00 a.m. on Election Day, and no later than 8:00 p.m. on Election Day.

So ballots that are returned up to, you know, any time prior to 7:00 a.m. on Election Day are included in the pre-canvass procedures of the County.

J. Marks

By contrast, the canvass would be ballots that are received after that group and canvassed after 8:00 p.m. on Election Night.

Q Understood.

And what takes place during the pre-canvass?

A Well, Counties examine the outer envelope. They would open the outer envelope if they determine that the ballot should be counted.

If it's not set aside for some reason, they would open the outer envelope. They would then commingle the ballot in their secrecy envelopes, and, ultimately, they would open those ballot envelopes and proceed to tabulate the ballots.

Q Thank you.

I just want to focus on that first part. You said they examine the outer envelopes.

What during the pre-canvass are County Boards examining, in particular?

A I don't have the Election Code in

J. Marks

front of me, so I apologize if I miss something.

But, you know, they're looking at the outer envelope to verify that it's been signed, that the declaration on the outer envelope is complete, verify that the ballot was received timely.

Obviously, during the pre-canvass, all of those ballots have been received timely.

You know, they may -- if a challenge was issued by the Friday before Election Day to one of those ballots, they would, you know, check to make sure that that ballot should not be set aside for a challenge proceeding, things like that.

That's kind of the process they're going through.

And then, subsequently, there's -- you know, once they start opening those outer envelopes, assuming there are no issues with them, if they find a ballot that is not contained in the secrecy envelope, they're obligated to set

J. Marks

those ballots aside as well.

Q Apologies if I missed it, but is one of the things the Boards are required to examine during this pre-canvass whether the declaration on the outer envelope is dated?

A I don't recall if the Election Code explicitly says that. I believe -- it requires them to examine the declaration envelope.

Presumably, they would -- you know, in light of the current state of the law, they would be reviewing it not only for a signature, but also for a date.

Q You said that's all part of the pre-canvass process, correct?

A Correct.

Q That's not permitted on the Election Code to start before 7:00 a.m. on Election Day, correct?

A That's correct, yes.

Q Prior to 7:00 a.m. on Election Day, the Boards are required to keep the ballots in a sealed or locked container, correct?

J. Marks

correct?

A Correct, yes.

MR. GIANCOLA: I'd like to -- I need to upload what -- I think we're up to Exhibit 10.

MS. MULLEN: Can you speak up a little bit?

MR. GIANCOLA: I'm trying to upload an exhibit for you. It should be marked as Exhibit 10.

Let me know if you can see that.

(Marks' Exhibit 10, 2022-09-26 DOS Guidance, was marked for identification, as of this date.)

BY MR. GIANCOLA:

Q Are you able to see that?

(A Discussion was Held off the Record.)

A Guidance concerning exhibition of absentee and mail-in ballot return envelopes.

Q Correct.

And this is the version that's dated September 26, 2022, and it's version

J. Marks

3.0, correct?

A That's correct, yes.

Q I'm going to ask you, if you turn to page 3 of this document, Section 3, just the very first sentence there, and it reads:

"The County Board of Elections is responsible for approval ballots to be counted during precanvassing and canvassing," correct?

A Correct.

Q This guidance doesn't provide any indications that the Board of Elections should be doing anything about approving what ballots can or can't be counted before the precanvass, correct?

MS. MULLEN: Objection.

A That's correct, yes.

Q That's consistent with your understanding of the Election Code, correct?

MS. MULLEN: Objection.

A I don't think there's anything that prohibits them from looking at the

J. Marks

outer envelope to identify errors, if that's the question. But the determination of the Board as to whether a ballot will be counted occurs during the precanvass or canvass.

Q Correct.

And you said before that part of that precanvass process is the examination of the outer envelope, correct?

A Yes, it is part of the precanvass, as is opening the envelopes, tabulating the ballots, provided you don't release any of the results prior to 8:00 p.m.

Q Certainly.

And part of the precanvass, then, is, in fact, the examination of the outer envelope to confirm that it complies with the requirements of the Election Code?

MS. MULLEN: Objection.

A Yes. To the extent that the County has not already looked at the outer envelope, yes.

In other words, I don't think

J. Marks

there's anything that precludes them from doing that during both of those processes.

Q I'm sorry, what processes?

A Well, we're talking about intake of ballots as Counties are receiving ballots back from voters, recording them in the SURE system, I don't think there's anything that precludes them from looking at the outer envelope and determining if there's an issue with that ballot, and also doing that as part of the precanvass, and ultimately the canvass as well.

Q And that's your position knowing that the examination of the outer envelope is part of the precanvass, and that the precanvass cannot start before 7:00 a.m. on Election Day?

MS. MULLEN: Objection.

A Yes, I mean, I would argue that it's not exclusively part of the precanvass. It can be part of the precanvass and part of the County's process for doing intake of ballots.

Q Are you familiar with what part

J. Marks

of the Election Code provides for the County Board's intake of ballots that would allow for this?

A I don't know that the Election Code explicitly addresses this. I believe our Supreme Court has, though.

They've determined that actions taken by Boards -- though not required, actions taken by Boards to notify voters of minor defects is not prohibited by the Election Code. That's my understanding.

Again, I'm not an attorney, but that's -- I dealt with this quite a bit over the last two years, so I'm somewhat familiar with it.

Q Do you have a recollection as to what particular case you think made that holding?

A I don't recall the specific case. I believe it may have been the "In Re: Canvass of Absentee and Mail Ballots" that we were discussing earlier.

But I believe the current -- my understanding, anyway, is that the current

J. Marks

state of the law is that Counties can allow voters to correct minor errors, can notify them and allow them to correct minor errors, though they're not required to do so.

Q If you could pull back up Exhibit 5 which we reviewed previously?

A This is Plaintiff's Exhibit 5 that we reviewed earlier?

Q Correct.

And this is to make sure we're all on the same page.

This is guidance concerning civilian absentee and mail-in ballot procedures updated September 26, 2022, version 2.0.

And if you could, just let me know when you're on page 10 of that document.

A I'm there.

Q This section titled "Precanvass and Canvass Procedures" states:

"At the precanvass or canvass, as the case may be, the County Boards of

J. Marks

Elections should," and then if you scroll down to the third bullet point, "set aside any ballots without a signed declaration envelope."

And, previously, there was an indication about what should be done with incorrectly dated ballots.

You agree that this guidance says this is to be done at the precanvass or canvass, correct?

A Correct, yes.

Q It doesn't make any mention in this guidance as to whether County Boards are free to do so before the precanvass, correct?

MS. MULLEN: Objection.

A That's correct, yes.

Q During the precanvass, candidates and parties are permitted to have authorized representatives in attendance, correct?

MS. MULLEN: Objection.

A They are, correct.

Q If a County Board is reviewing or

J. Marks

is examining the outer envelopes of absentee and mail-in ballots before the precanvass, are candidates and parties allowed to have authorized representatives present at that time?

MS. MULLEN: Objection.

A If a County -- you're talking about the intake process when they received the ballots, no, there's no explicit requirement in the Election Code for that.

Q If we could pull up what's been previously marked as Exhibit 6.

A Guidance on undated and incorrectly dated mail-in and absentee ballot envelopes based on the Supreme Court's order in Ball v. Chapman?

Q Correct.

If we scroll to the last page of this document, that second bullet point directs the County Boards to examine all mail-in and absentee ballots received to determine if the return envelopes for those ballots are signed and dated.

Does this guidance indicate when

J. Marks

that examination should take place?

MS. MULLEN: Objection.

A Well, it indicates -- so it indicates that Counties should record the ballots in the SURE system, which is necessary to meet the transparency requirements of Act 77.

The second bullet addresses examination of the mail-in and absentee ballots received to determine if they are signed and dated.

Then it goes on, in bullet 3:

"For ballots which are administratively determined to be undated or incorrectly dated, code those ballots as cancel, no signature."

We wanted to ensure that Counties were providing the correct reason code in the system.

Q I appreciate that.

My question is just: Does this guidance indicate when, with respect to that second bullet point, that examination is supposed to occur?

J. Marks

MS. MULLEN: Objection.

I'm going to object to this whole line of questioning. You seem to be asking questions with regard to a different case. So, I mean, we have a lot of parties on this case.

A I think implicit here is -- if you read through the guidance from the beginning and throughout, I think it's implicit that the Counties would be doing this upon receipt of the ballots.

Q Is the Department's position that Counties should be examining the ballots before the precanvass?

MS. MULLEN: Objection.

A I think it's certainly our recommendation that the Counties -- because they are not precluded from notifying voters of the minor error and allowing them to correct it, that Counties can and should do that as they're doing the intake of ballots, but it's not required.

Q With respect to that third bullet point that you read a moment ago, there's a

J. Marks

phrase in there, "administratively determined."

What is an administrative determination?

A Well, I think in the context, its meaning is that as the Counties are receiving the ballots similar -- I think when I was previously questioned, we talked about an in-person interaction where somebody is returning their ballot in person to the Board of Elections, and the person who received the ballot, the County official who receives the ballot, notices that there's an error on the outside of the ballot allowing...

So this would be similar to that process where the individual during intake notices that there is an error apparent on the outer envelope, and sorts the ballot accordingly in preparation for the precanvass.

So that's what the administrative determination means in this context.

Q Has the Department ever issued

Case 1:22-cv-00339-SPB Document 391 Filed 05/05/23 Page 346 of 378

guidance regarding the procedures to be used for -- you've used different terms for it, ballot intake, or this administrative determination?

MS. MULLEN: Objection.

A Well, I think this guidance actually addresses it pretty directly.

Q Has there been any other guidance issued in that area?

A I would have to look. I'm certain we've issued other guidance on generally mail ballot procedures which may include our guidance on not only the process of issuing ballots, but also processing return ballots.

Q Just to be clear, I'm talking about, specifically, the period before the precanvass, this intake process, or this administrative determination process that you've referenced.

A I'd have to review it, but I'm certain the Department has issued guidance.

Again, we've issued guidance that covers, you know, mail-in balloting from

the moment a voter applies for a ballot all the way through the canvass of the ballot.

So I would expect that there may be other guidance similar to this.

Q The fourth bullet point in this guidance directs the County Boards to segregate undated or incorrectly dated ballots.

Is it your position that ballots can be segregated before the precanvass?

MS. MULLEN: Objection.

A I wouldn't see why not, so long as they're kept until the Board makes a decision.

Sorting them into logical groups just like sorting them by precinct makes sense. I don't know why the County would want to just have a big jumble of ballots going into the precanvass.

Q Is it your position that the Election Code does not address this?

A Yes, I don't know that the Election Code goes into this level of granularity regarding the -- you know, the

workflow of the County. And it varies from one County to another, as we discussed earlier.

Q You can put that exhibit away for the time being.

You've testified earlier today that you're familiar with the Pennsylvania Supreme Court's decision in Ball. It's called the Ball case?

A Yes.

Q That was the decision in, I believe it was, November 1 of last year regarding undated and incorrectly dated ballots?

A That's correct, yes.

MR. GIANCOLA: I'm going to upload what we'll mark as Exhibit 11.

(Marks' Exhibit 11, Email Re: Survey, Redacted, was marked for identification, as of this date.)

BY MR. GIANCOLA:

Q Let me know if you're able to access it.

A I apologize. I figured it would

be easier just to create a file and a separate folder to download all of these into.

Yes, at the top, it has "your name," there's information redacted. Then it appears to be a copy of a November 5, 2022, email from our elections resource account to the County Election Offices.

Q Were you familiar with this email when it was sent in November of 2022?

A Yes.

Q Do you know who sent it?

A I don't recall. It would have been somebody in elections, perhaps the director of elections or one of her staff.

Q It references a survey, correct?

A Correct, yes.

Q We can take that off, and I will upload Exhibit 12.

Do you have it?

A Did you post it in the chat?

MS. MULLEN: I'm not seeing it.

(A Discussion was Held off the Record.)

J. Marks

(Marks' Exhibit 12, Document Titled Survey, was marked for identification, as of this date.)

A I have it.

Q Are you able to see it now?

A Yes.

Q So what we've marked as Exhibit 12, is this a copy of the survey, the web survey, that was linked to in that email?

A Yes, it appears to be a copy of that, yes.

Q And what was the purpose of this survey?

A Well, the purpose of this survey was to collect as much information as we could about the number of undated and incorrectly dated ballots expecting that -- we had already received requests for the information. We expected that those requests were going to continue to come both from the press, the political parties. So we were trying to wrap our head around it.

J. Marks

We were fresh off our experience in the 2022 Primary where we were repeatedly asked how many outstanding ballots there were.

So we expected that we would get requests for this information. So we were trying to collect as much of it as we could.

Q So I think you just mentioned it. It requests information not just about the number of undated ballots or incorrectly dated ballots, but also a party breakdown for each category?

A Yes, it was -- basically, it was, essentially, a copy of the same survey we sent out in the Primary.

Q How would a Board -- sorry, to clarify, this email was sent to all the Boards of Elections?

A It was, yes.

Q Was it sent to anybody else?

A No, just the County Election Director contacts.

Q How would a Board, in responding

J. Marks

to this survey, determine the party affiliation of each voter?

A Well, either -- a couple of ways to determine it.

You know, relying on the list that the Counties maintain, certainly, when they record the ballots. In SURE, they would be able to determine.

At that point, some Counties may, you know, depending on their workflow, may actually -- they certainly do it in the Primary, not necessarily in the November election.

But, you know, we were asking them if they had that information to provide it.

Later in the survey, we indicated if all you have is a grand total, if you can supply that, that would be adequate.

So it would depend on the workflow, and how they maintained their internal list.

So some Counties may have them, some may not.

J. Marks

Q The party affiliation of a voter is not on the outer envelope, correct?

A Not in the November election. It is in the Primary, but it's not on that.

I believe it's on the label, actually, that goes on the return envelope.

It's there in the Primary, but it's not in the November election.

Q Thank you. I appreciate that clarification.

Is it the Department's view that this sort of data collection is permitted under the Election Code?

A Certainly, the Department -- I mean, this was a request to the Counties.

But, certainly, the Department, the Secretary of the Commonwealth, has authority to require additional reports of the Counties.

I wouldn't say a survey is a requirement, though. And I think even judging by the plain language of the survey, it was clear that it wasn't a requirement.

J. Marks

Q There is nothing in the Supreme Court's decision involved that required this information be gathered, correct?

MS. MULLEN: Objection.

A No, there was nothing in the Supreme Court's decision. It required Counties to segregate this group of ballots, but it didn't require any additional information, as I recall.

MR. GIANCOLA: I'm going to upload what was marked as Exhibit 13.

(Marks' Exhibit 13, Document Titled Lai Tweet, was marked for identification, as of this date.)

A I have it.

Q I'll represent to you, this is a tweet from Jonathan Lai.

Are you familiar with who he is?

A Jonathan Lai? Yes, I believe he's a reporter at the Philadelphia Inquirer.

Q If we scroll down to the bottom of page 2, there's a tweet indicating, the Department of State responds:

J. Marks

"The survey is perfectly appropriate under the circumstances. They're asking for a partisan breakdown because we cannot collect that data systematically, and in anticipation of the information being potentially requested in the anticipated litigation."

You can see that there's a text box that doesn't populate when we tried to convert this to PDF.

If you would scroll to the last page, I'll represent to you that this is what was embedded within that tweet.

Do you recognize the text on that last page?

A Sorry, I have to blow it up a little bit.

Yes, this appears that -- with the exception of the "Hi, Jonathan," this appears to be a response that I believe I may have sent to one of the County Election Directors.

Q So that is a message that you provided to a County Elections Director?

J. Marks

A Yes, it looks like it.

Like I said, with the exception of the "Hi, Jonathan," the rest of it appears to be the text of a response that I sent to a County Election Director.

Q Understood.

The last sentence of that first paragraph indicates that:

"The rationale for including party affiliation was the anticipation of that information being potentially requested from the departments and Counties in anticipated litigation."

Can you explain what you meant there?

A Well, I think we expected -- you know, again, this has been nearly a two-year, or I guess it's been over two years. A two-year saga.

So I think -- you know, as was the case in the Primary, I think we were expecting that we would be asked for this information, and it would potentially be relevant in additional litigation that may

J. Marks

be filed.

We didn't believe that this was going to be the last word on the issue of undated and incorrectly dated ballots. And, obviously, it wasn't, so...

Q I've heard you use the pronouns "we" a few times with this.

Who specifically made the decision to create this survey and disseminate it to the Boards?

A Well, when I say "we," I'm talking about the Department and the Department's executive staff in consultation with counsel.

So we made the decision to essentially recirculate, you know, after the Supreme Court issued its ruling.

In fact, we were certain that people were going to ask us for this data, and we were kind of caught a little behind the eight ball in the Primary.

And we were asking for it after Election Day, and, you know, obviously, the Primary was different because we had a

J. Marks

recount in one of the two Primaries, and it was extremely relevant to that.

But, you know, we kind of universally decided in the Department that it was a near certainty that we'd be asked for this information at some point in the near future. And we didn't want to be caught sort of behind the eight ball again as we were in the Primary.

Q Do you -- I believe you called it the executive committee -- consult with anyone other than counsel other than the Department's counsel with respect to whether to create the survey?

A "Executive staff" is the term I used --

Q Executive staff.

A -- and other executive office members.

But, no, I don't recall that we consulted with anybody.

We may have. It's the normal sort of chain of command, but we were all in agreement very shortly after the Supreme

J. Marks

Court issued its ruling that if we were going to be asked for the data, we should recirculate the survey, essentially the same one that we did in the Primary, and we were trying to get a head start on that and start collecting the data as quickly as possible.

Q Prior to either the lawsuit filed by the NAACP or by the Eakin plaintiffs, did anyone request the information that was in the survey?

A I'd have to check. We may have gotten requests from the press.

I don't know that we got any request from litigants prior to these two cases being filed.

But I'm fairly certain -- I'd have to review my records, but I'm fairly certain we were receiving press requests for the information.

Q How many responses did you receive to the survey?

A We only received a handful.

As I mentioned earlier, I

J. Marks

received an email from at least one of the Election Directors who was purported to be speaking on behalf of a number of Election Directors who objected to, I guess, the timing and the content of the survey. So we did not push hard on this.

Again, it was a request. We did not indicate at any point that this was a requirement.

So I think in the end, we had less than ten Counties who responded to the survey.

Q You indicated that you had less than ten Counties that responded to the survey.

How were you -- let me rephrase that.

Were there login credentials required to submit a survey response?

A I believe we used Survey Monkey, and I'm not an expert on -- it goes to specific individuals.

I think there is a way to track either via email address, like which

J. Marks

individual submitted it.

I don't recall, though, that there were login credentials to complete the survey, meaning that if you --

Q The Department --

A -- forward the email within the County, that some other individual within the County could complete the survey on the County's behalf.

Q What measures did the Department use to determine whether the responses it received were actually legitimately from Counties?

MS. MULLEN: Objection.

A I don't know that we used any additional procedure.

Again, it's a survey. It's an informal survey it was sent through Survey Monkey.

Obviously, if we were requesting mandatory information or sensitive information, we'd probably request it in a more formal way than require the Counties to submit a report to the Department.

J. Marks

This was -- you know, we do these ad hoc surveys to collect information from Counties when we believe it may be relevant or helpful for the Counties to collect it.

Q If a voter casts an absentee or a mail-in ballot that isn't dated, is it still currently the Department's position that that ballot cannot be counted, correct?

A Repeat the question. You kind of trailed off.

I think I know what you asked, but if you don't mind.

Q Certainly.

If a voter casts an absentee or mail-in ballot but fails to date the declaration on the outer envelope, that voter's absentee or mail-in ballot cannot be counted, correct?

A That's correct.

Q Is it the Department's position that the voter is able to cure that ballot?

MS. MULLEN: Objection.

A It's the Department's position

J. Marks

that if a County has a "notice and cure" procedure, that there's nothing that prohibits them from continuing to undertake those efforts.

Q Does the Department take the position whether a voter can cast a provisional ballot if they already cast an absentee or mail-in ballot that does not include a date?

MS. MULLEN: Objection.

Again, I'm going to object to this line of questioning. I think it's not relevant.

A I believe it is the Department's opinion that a voter who casts a ballot, and that ballot -- they determine that that ballot is invalid, for some reason, has the ability to cast a provisional ballot.

Q Are you familiar with the declaration that's contained within a provisional ballot?

MS. MULLEN: You're breaking up.

BY MR. GIANCOLA:

Q Are you familiar with the

J. Marks

declaration that is contained on the outer envelope for a provisional ballot?

MS. MULLEN: Objection.

A At a high level, yes. I haven't reviewed it recently.

MR. GIANCOLA: I'll upload what's been marked as Exhibit 14.

(Marks' Exhibit 14, Document Titled 25 P.S. 3050, was marked for identification, as of this date.)

BY MR. GIANCOLA:

Q Once you have it open, I'll represent to you that this is a copy of 25 P.S. Section 3550 dealing with provisional ballots.

And I'm specifically going to deal with subsection A.4, subsection 2 on page 2.

A Okay, I have that.

Q The language that's set forth in subsection A.4(2), does this refresh your recollection as to the language on the outer envelope for a provisional ballot?

MS. MULLEN: Objection.

J. Marks

Relevance.

A Yes, it is -- this would be the language that is included in the affidavit that's part of the outer envelope for the provisional ballot.

Q And a voter there needs to swear or affirm, in part, that this is the only ballots they have cast in this election, correct?

MS. MULLEN: Objection.

A Correct.

Q What is your understanding, or the Department's understanding, of the meaning of the word "cast"?

MS. MULLEN: Objection.

A Well, I don't know that the term is necessarily -- I don't recall if the term is defined in the Election Code, but usually it's what occurs after the voter has voted, they cast.

So the best example I can think of actually predates our current voting systems where a direct electronic recording system -- it would be that moment that you

J. Marks

push the button to cast your ballot after you've voted it.

Q Is there any particular document or rule or statute that informs that understanding?

MS. MULLEN: Objection.

A Again, I don't believe the term "cast" is necessarily defined in the Election Code.

It's a term of art, and it's been understood to mean the act of finalizing your ballot and submitting it to the County or the local Election Officials.

Q Earlier today, you were asked a series of questions about the relevance of the voter including the date in the declaration.

Just so I'm clear, what did you mean by "relevance"?

A Well, I think in the context of the questioning, at least I understood that relevance to whether the voter was qualified and relevant as to whether the ballot should be counted or not.

J. Marks

Q You agree, however, the absentee ballots, or for absentee ballots, the Election Code explicitly states that the voter needs to, quote, "Fill out a date and sign the declaration printed on the outer envelope"?

MS. MULLEN: Objection.

A I don't have the Election Code's provision in front of me, but I believe that's correct, that those instructions...

Q And the same for mail-in ballots?

A Yes, I believe those instructions --

Q I'm sorry, I didn't mean to interrupt.

A No, I believe those are the instructions that are outlined in the Election Code to the voter.

Q It's the same for mail-in ballots, correct, the same language, that the voter must fill out, date, and sign the declaration?

A Yes, that's correct.

Q That was what the Pennsylvania

J. Marks

Supreme Court just held this past November in Ball, correct?

MS. MULLEN: Objection.

A Again, to my laymen's understanding of it, but, yes, that's correct.

Q Would you agree that a voter could not date and sign a declaration envelope before the County Board printed absentee or mail-in ballots?

A If I understand the question you're asking, whether it would be possible for a voter to date and sign before the County has mailed the ballot, the answer would be no.

Q My specific question there was whether a voter could sign and date a declaration and vote before a County Board printed the absentee or mail-in ballot.

A I don't see how that would be possible.

Q Would you agree that a voter could not date and sign the declaration envelope before that voter applied for an

J. Marks

absentee or mail-in ballot?

A Again, I couldn't see how that would be possible.

Q Would you agree that a voter could not date and sign the declaration envelope before a County Board issues an absentee or mail-in ballot to that voter?

A I agree. I don't see how that would be possible.

Q Would you agree that a voter could not date and sign the declaration envelope after Election Day?

A Well, they could -- if they still had the ballot, they could date and sign it after Election Day, but it wouldn't be counted.

Q That's fair.

Would you agree that a voter could not date and sign the declaration envelope after that absentee or mail-in ballot was received by the County Board?

A Well, that might depend on -- so if they omitted it -- and I go back to my exchange earlier with Mr. Walczak, if they

J. Marks

hand their ballot over to an Election Official, and that Election Official looks at it and determines that it's not dated, certainly, the Election Official could give the voter the opportunity to date it at that moment in time.

But, generally, the answer would be no, but that may be -- you know, the specific facts or, you know, the specific circumstances would be relevant in the case of that question.

Q You indicated earlier that a Board needs to confirm that a voter declaration is signed, correct?

A Correct.

Q Why does the Board need to determine that a declaration is signed?

A Well, a declaration is an important component of the process. It is the voter affirming under penalty of perjury that they're qualified to vote in the election.

Q How does the Board know that it's the voter that signed it?

J. Marks

A Well, again, I think, you know, the Board would make a determination when examining.

But I think the assumption is that the voter has signed the envelope after having their I.D. verified receiving the ballot.

I'm not sure I understand the question, but I think the Board would be able to look at the outer envelope to determine whether the voter signed it or not.

Q Well, my specific question was: How would the Board know that it's the voter him or herself that signed?

A I suppose if the Board noticed the signature of another individual or an individual with a different name, I think that would indicate that perhaps there was a mixup there.

And we've seen that occur where a spouse signed. You know, they got it mixed up, and they signed on behalf of their spouse.

J. Marks

I'm not sure what your question is. I mean, if you're asking me --

Q As I understand it --

A -- analysis, the answer is no.

Q But I'm trying to understand the Department's position as to why the declaration is relevant or important but the date is not?

MS. MULLEN: Objection.

A Well, again, I think without a signature, the person who is returning the ballot is not affirming that they're qualified to vote in the election. And I think that's a relevant fact.

Whether they correctly dated that affirmation or not, I don't believe, is relevant in terms of the truthfulness of the affirmation.

Q But to your point, there's no basis for the -- you agree that the Department can't set aside a ballot based on signature analysis, correct?

A Correct. Yes, that's not a requirement.

J. Marks

And if it were to be, it would require a whole lot of training and upgrading of our infrastructure.

Q So for this important purpose that you stated of determining that they are representing that it's their vote, there's no way for the Board to determine that it's the actual voter making that determination?

MS. MULLEN: Objection.

A Absolutely determine, I suppose you're correct.

MR. GIANCOLA: I'm going to go over my notes, but I'm happy to pass to the next attorney to keep things moving.

Thanks for your time.

MS. MULLEN: Can we take just a five-minute break?

Does anybody have an objection to that?

MR. WALCZAK: Kathy, I would just ask if Mr. Giancola has additional questions, that he go ahead and ask

J. Marks

those and not come back at some future time.

So when we come back, if he's got additional questions, he should ask them at the time.

MS. MULLEN: Right. I mean, we intend to conclude this afternoon on a timely basis, so thank you.

THE VIDEOGRAPHER: We are off the record. The time is 2:54.

(Recess taken from 2:54 p.m. to 3:07 p.m.)

THE VIDEOGRAPHER: We're on the record. The time is 3:07 p.m.

BY MR. BOYER:

Q Good afternoon, Mr. Marks. I just have a few additional questions, in light of some of the things that were asked of you by counsel for the intervenors.

You were asked during your exchange with Mr. Giancola some questions about precanvassing.

Do you recall that?

A I do, yes.

J. Marks

Q As far as you're aware, is the term "pre-canvass" something that the Election Code specifically defines?

A I believe it does. I believe there's a definition of pre-canvass in the Election Code. I'd have to look, though, to confirm that.

Q You were also asked questions about canvassing.

Do you recall that?

A I do, yes.

Q Do you know, is the term "canvass" something that the Election Code specifically defines?

A Yes. I can't recall whether it's a definition of the term or if the Election Code provisions regarding each -- I think they certainly define what doesn't happen during those.

I'd have to review it to say for sure, but it certainly identifies what is pre-canvass versus what is canvass.

Q I believe Mr. Giancola showed you something marked as Marks' Exhibit 14.

J. Marks

Do you have that in front of you?

A I do, yes.

Q That's a printout of a section of the Election Code at 25 P.S. 3050; is that correct?

A That's correct, yes.

Q I believe, in the course of asking you questions about this, he asked you to define the word "cast" as it appears in this section.

Do you recall that?

A I do.

Q And the answer you gave to that question, is that your opinion of what the word "cast" means?

A It is, yes. I don't believe there's a definition for the term. It's a term of art. So, yes, that is my opinion of what it means.

Q I believe you said a number of times you are not a lawyer, correct?

A That is correct, yes.

MR. BOYER: I have nothing further.

J. Marks

MR. WALCZAK: I actually have a little bit of follow-up at this point.

It's okay, just a few questions.

BY MR. WALCZAK:

Q Mr. Marks, when the ballot comes into the elections, Bureau of Elections, right, the mail-in ballot comes into the Bureau of Elections, they can't just throw it into a bin, correct? They actually have to look at it, right?

A Correct.

Q The Election Code actually requires that the Board of Elections log in the fact that the time and date of when -- or at least, the date when the ballot has been received, correct?

A Correct.

Q And to note that a ballot was received, they've got to look and see who it came from, et cetera, correct?

A Correct, yes.

Q So there's no prohibition that you know of that prohibits the County Board of Elections from looking at the outside --

J. Marks

examining, looking at, investigating the outside of the envelope for purposes of noting its receipt?

A That's correct, yes.

Q And I believe, as you noted, if a voter chooses to vote a mail-in ballot at a Board of Elections, that's something that's provided for by Act 77, correct?

A It is, yes.

Q And it would not be improper for an elections employee, when they're handed the ballot that's been completed by the person who's there to cast that ballot, from looking at it and saying, "Oh, you forgot to sign this"; is that correct?

MS. MULLEN: Objection.

It's a double negative. Can you rephrase that? It's confusing.

MR. WALCZAK: I think I confused myself, too.

BY MR. WALCZAK:

Q So if you have a person coming in a Board of Elections to cast a mail ballot, right, that's permissible?

J. Marks

A Yes.

Q And if, in completing that ballot, they turn it into the elections employee, and that employee looks and sees that they did not complete the declaration either with a signature or a date, there's nothing improper about that employee advising the voter about how to -- that they need to, you know, sign it or date it, or whatever is missing; is that correct?

A Correct.

Q Now, when a voter comes to vote at the polls, there's various requirements to vote, correct?

A Correct, yes.

Q So you come in, and you have to sign a poll book, correct?

A Correct.

Q Now, if you sign in the wrong place, are you disenfranchised? Is that voter disenfranchised?

A No.

Q Would it be appropriate for one of the elections workers at the polls to

J. Marks

inform the voter that they signed in the wrong place and ask them to sign in the correct place?

A Yes.

Q There's no reason they couldn't do that, correct?

A Correct.

Q And do you know whether that's done on occasion at polling places?

A Yes, I believe it has happened.

MR. BUKOWSKI: Objection. Lack of foundation.

MR. WALCZAK: Go ahead.

A I am aware that voters have signed in the wrong location on a poll book. I have seen that, yes.

Q And when a voter is voting on a machine, maybe not now, but I recall times where you had to fill out the complex ballot, and then you had to push an actual vote button for the vote to take place.

Do you recall that?

A I believe so, yes.

Q And people would sometimes forget

J. Marks

to push that button; is that correct?

A Yes, that occurred, yes.

Q And if they walked away without pushing that button, their ballot wouldn't be counted, correct?

A It would not be counted. We did -- and this is kind of dated now, but we did issue guidance at one point indicating that the Board of Elections, if they noticed that, could press the vote button to finalize the ballot while trying to preserve the secrecy of that voter's ballot.

Q So not only would, in that situation, they go to the voter and say, "Hey, hey, you've got to go back and push the button," they might actually take that last ministerial step to enable that voter's ballot to count, correct?

MR. BUKOWSKI: Objection. Lacks foundation. Hypothetical.

This whole line of questioning is out of bounds.

MR. WALCZAK: I'm sorry, who is

J. Marks

objecting?

MR. BUKOWSKI: This is Jeff Bukowski.

You guys -- you know, you said you had no questions two minutes before Jacobs', you know, response, and now you've got a whole new line of questioning that is beyond the scope of Attorney Giancola's and anybody else's questions.

So I'm objecting on that basis.

MS. MULLEN: Let's proceed.

MR. WALCZAK: Thank you. I've noted your objection.

BY MR. WALCZAK:

Q So in a situation where a voter's ballot, mail ballot, was submitted without a signature on there, that vote is not going to count, correct?

A That's correct, yes.

Q And, currently, if a voter submits a mail-in ballot without a date, that vote is not going to count, correct?

A Correct.

J. Marks

Q And there's no indication that that voter is actually eligible to vote; is that correct?

A Correct.

Q So this person would be disenfranchised because of that mistake, correct?

A Yes.

Q And so any effort to interpret the law in a way that County elections officials could not assist a voter to ensure that their ballot is properly signed and dated would result in the disenfranchisement of ineligible voters; is that correct?

MR. BUKOWSKI: Objection.

Again, this is Jeffrey Bukowski.

The definition of disenfranchisement, vague and ambiguous, subject to multiple interpretations.

So we object to that basis, but the witness may answer, if he can.

MS. MULLEN: Well, he doesn't

J. Marks

take instructions from you, but proceed.

A I mean, I think that is a fair characterization. It's fair to characterize that that would result in disenfranchisement of the voter.

MR. WALCZAK: I have no further questions.

MS. MULLEN: Any other questions?

MR. GIANCOLA: I have a few follow-up based on Mr. Boyer's questions.

BY MR. GIANCOLA:

Q To scan an absentee or mail-in ballot, is it required to inspect the outer envelope?

A To scan it, you would certainly have to handle the envelope.

The Counties use handheld contact scanners, but I suppose you could scan the barcode on the outer envelope without closely examining the contents of the outer envelope.

Q I appreciate that. Let me

J. Marks

rephrase.

A worker for the County Board would not need to inspect an outer envelope for a signature or date in order to scan it into the SURE system, correct?

MS. MULLEN: Objection.

A I think that's fair, yes.

Q Would a worker working on behalf of the Board be required to inspect an outer envelope for signature or date in order to date-stamp it or time-stamp it?

MS. MULLEN: Objection.

Outside the scope.

A No, they would not have to examine the contents of the declaration envelope to time-stamp it.

Q Mr. Boyer asked you about whether pre-canvass, the term "pre-canvass," was defined in the Election Code.

MR. GIANCOLA: I'm going to upload what is marked as Exhibit 15.

Case 1:22-cv-00339-SPB Document 391 Filed 05/05/23 Page 356 of 378

(Marks' Exhibit 15, Document Titled 25 P.S. 2602, was marked for identification, as of this date.)

THE WITNESS: It's a copy of --

MS. MULLEN: Wait for the question.

THE WITNESS: I'm sorry, I was just --

BY MR. GIANCOLA:

Q Do you have the document marked as Exhibit 5?

A Yes, 25 P.S. Section 2602.

Is that what I'm supposed to be looking at?

Q Okay, yes.

And I'm going to direct you to subsection 2.1, which is the second page.

Would you agree with me that that sets forth a definition of pre-canvass in the Election Code?

MS. MULLEN: Objection.

A Subsection?

Q 2.1.

A Which page is it on?

Q It's on page 2.

A Got it. I'm sorry.

"The word 'pre-canvass' shall mean the inspection and opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelope and the counting, computing, and tallying of the votes reflected on the ballots.

"The term does not include the recording or publishing of the votes reflected on the ballots."

Q Would you agree that this is the definition set forth in the Election Code for the term "pre-canvass"?

MS. MULLEN: Objection.

A I do, yes.

Q As you just read, that definition includes -- the definition of "pre-canvass" includes the inspection of envelopes containing absentee and mail-in ballots, correct?

MS. MULLEN: Objection. It speaks for itself.

A Correct, yes.

Q You've confirmed that the Election Code prohibits the pre-canvass from starting before 7:00 a.m. on Election Day, correct?

MS. MULLEN: Objection.

A Yes, that's my understanding, that pre-canvass cannot start prior to 7:00 a.m. on Election Day.

MR. GIANCOLA: Thank you. No further questions.

MR. BUKOWSKI: This is Jeffrey Bukowski.

I have a few questions based on Attorney Walczak's last round of questions.

MS. MULLEN: Can you please put a camera on?

MR. BOYER: You really want me to?

MS. MULLEN: I'd appreciate it, yes.

MR. BUKOWSKI: I'm happy to.

BY MR. BUKOWSKI:

Q Deputy Secretary Marks, good afternoon. My name is Jeff Bukowski. I represent the Berks County Board of Elections.

We met during the hearing in the Chapman vs. Berks County, et al., matter. Good to see you again. And thanks for your time today.

A Sure.

Q Hopefully, this will be short and quick.

Attorney Walczak asked you a few questions about disenfranchisement in his last round of questioning. I just wanted to ask a few questions to clarify.

The act of not counting a voter's ballot mail-in or absentee for noncompliance with the date requirement has no effect, one way or another, on the voter's qualification to vote, is that true?

MS. MULLEN: Objection.

A If I understand the question

J. Marks

you're asking, if the decision ultimately to not count a voter's ballot, whether that has any bearing on the qualifications of the voter, is that your question?

Q It is.

A No, it does not.

Q And so when the vote is not counted for noncompliance, the voter still remains on the voter rolls as a qualified elector in that election and other elections unless and until there's some other disqualification; is that right?

MS. MULLEN: Objection. Outside the scope.

A That's correct, yes.

MR. BUKOWSKI: That's all I have, thanks.

MS. MULLEN: Any other questions?

MR. WALCZAK: Not here.

MS. MULLEN: Hearing none, we'll reserve the right to read and sign.

THE VIDEOGRAPHER: Are we ready to go off the record?

MR. WALCZAK: Yes.

J. Marks

THE VIDEOGRAPHER: We are off the record. The time is 3:24 p.m.

(Whereupon, the Deposition was Concluded at 3:24 p.m.)

(The Exhibits were not retained by the Court Reporter.)

oOo

______________________
JONATHAN M. MARKS

Subscribed and sworn to before me this day of 2023.

________________________________

J. Marks

CERTIFICATE

STATE OF NEW YORK )
: ss
COUNTY OF NEW YORK )

I, THOMAS A. FERNICOLA, a Registered Reporter and Notary Public within and for the State of New York, do hereby certify:

That JONATHAN M. MARKS, the witness whose deposition is herein before set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by such witness on Tuesday, February 14, 2023.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of February 2023.

THOMAS A. FERNICOLA, RPR

J. Marks

INDEX

| EXAMINATION OF JONATHAN M. MARKS | PAGE |
|---|---|
| By Mr. Walczak | 12 |
| By Mr. Baxenberg | 155 |
| By Mr. Boyer | 159 |
| By Mr. Giancola | 162 |
| By Mr. Walczak | 209 |
| By Mr. Giancola | 216 |
| By Mr. Bukowski | 221 |

J. Marks

EXHIBITS

| MARKS' EXHIBITS: | PAGE |
| --- | --- |
| Exhibit 1 Initial Disclosures of Defendant Al Schmidt | 26 |
| Exhibit 2 DOS Envelope Guide | 47 |
| Exhibit 3 Dauphin MIB Envelopes | 59 |
| Exhibit 4 Marks' 6-1-21 Email | 98 |
| Exhibit 5 2022-09-26 DOS Mail-In Ballot Procedures | 107 |
| Exhibit 6 2022-11-3 Guidance Re: Ball Order | 113 |
| Exhibit 7 SCOPA Supp Order 2022-11-5 | 125 |
| Exhibit 8 Berks County UOCAVA | 142 |
| Exhibit 9 2022-09-26 DOS Guidance Federal Voters | 138 |
| Exhibit 10 2022-09-26 DOS Guidance | 167 |
| Exhibit 11 Email Re: Survey, Redacted | 180 |
| Exhibit 12 Document Titled Survey | 182 |
| Exhibit 13 Document Titled Lai Tweet | 186 |
| Exhibit 14 Document Titled 25 P.S. 3050 | 196 |
| Exhibit 15 Document Titled 25 P.S. 2602 | 217 |

J. Marks

ERRATA SHEET

Case Name:

Deposition Date:

Deponent:

| Page | Line | Now Reads | Should Read | Reason |
| --- | --- | --- | --- | --- |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |
| ____ | ____ | ______________ | ________________ | ________________ |

_____________________

Signature of Deponent

SUBSCRIBED AND SWORN TO BEFORE ME

THIS ______ DAY OF __________________, 2023.

(Notary Public) MY COMMISSION EXPIRES:_________________

## 0

**00039** 145:20 146:14

**00041** 150:12

## 1

**1** 11:3 26:2,8,24 32:13 114:6 145:7 153:21 180:13

**10** 111:8 167:6,11,13 172:19

**10-minute** 79:20

**10/25/2020** 101:6

**10/28/2022** 63:7

**10:29** 80:2,3

**10:35** 79:24 80:4,6

**11** 180:18,19

**11:42** 130:24 131:3

**11:59** 141:22 149:18 151:10

**12** 181:20 182:2,9

**13** 186:12,13

**14** 11:12 196:8,9 207:25

**15** 130:16 217:22 218:2

**17** 103:8 105:8

**18** 97:2 98:21 136:11, 19,21

**1993** 21:14

**1:15** 130:18

**1:17** 131:6

**1:22-cv-00339-spb** 11:10

## 2

**2** 32:14 46:21 47:9,14 48:5,16,17,20 51:4, 23 53:21 54:6 55:23 57:17 62:21 63:3 91:2 113:25 153:21 186:24 196:18,19 219:2

**2.0** 172:17

**2.1** 218:18,24

**20** 20:17

**2002** 21:16,23

**2011** 22:8

**2019** 21:6 22:21 38:12,18 39:3 70:9 86:24 87:14,22 88:2, 14,17,21

**2020** 36:10 87:12 89:12,18,23,25 90:6, 17 91:5,12 92:7,20, 25 93:5,21 94:13,15 95:20 96:17 97:11,19 124:9

**2021** 97:3,12 98:20 102:17,20,24

**2022** 60:12 74:14 102:25 103:7,18 104:19 105:12 106:6, 13,16 107:16,20 108:17 109:11,25 120:25 126:3 133:8 167:25 172:16 181:8, 11 183:3

**2022-09-26** 107:6 139:2 167:13

**2022-11-3** 113:10

**2022-11-5** 125:8

**2023** 11:12 75:4 129:5 223:22

**25** 196:10,14 208:5 218:3,13

**26** 107:16,20 108:17 109:11 110:14 111:23 115:9 167:25 172:16

**2602** 218:3,13

**2:54** 206:11,12

## 3

**3** 20:10,14 53:22 54:5, 6,16 55:23 59:16,21 60:10 62:20,21 63:7 91:2 93:5 110:20 111:3 113:25 114:3, 11 116:12 119:10 168:5 175:13

**3-1-3** 93:13

**3.0** 168:2

**30** 10:18 21:14 102:8 137:8,20

**3050** 196:10 208:5

**3550** 196:15

**39** 144:17 146:25

**3:07** 206:13,15

**3:24** 223:3,5

## 4

**4** 54:5,7 57:16 62:21 98:10,11,16 101:3

**40** 147:3

**48** 70:21

**4:32** 63:7

## 5

**5** 107:6,11,12 108:21 110:19 111:2,8 115:10 126:3 172:8,9 181:7 218:12

## 6

**6** 108:21 110:25 113:10,15,23 114:12 116:13 119:10 145:6 174:13

**6-1-21** 98:11

**67** 28:17 62:3 76:5 78:9,11 80:19 84:23 88:25 90:5 99:20

**6B** 145:7,12

## 7

**7** 125:7,12,21

**77** 38:14,23 70:9 86:24 87:4,18 90:13 92:17 175:8 210:9

**7:00** 72:13 81:11 163:20,23 166:20,23 170:17 220:5,10

**7:59** 66:6

## 8

**8** 120:25 128:23 142:4,12,17 143:6,20 144:5 145:7 149:24 150:12,21

**8:00** 66:3,22 68:16 82:8 84:8 95:19 128:2 135:19 163:21 164:4 169:15

**8:01** 66:8

## 9

**9** 138:20 139:2,7 154:12

**9:07** 11:13

## A

**A.4** 196:18

**A.4(2)** 196:22

**a.m.** 11:13 72:13 80:3,4,6 130:24 131:3 163:20,23 166:20,23 170:17 220:5,10

**ability** 40:8 47:17 69:21 77:20 195:19

**abroad** 139:25

**absence** 87:21

**absent** 38:8

**absentee** 27:7,11 30:5 31:3 36:16,20, 21,22 37:3,9,12,17 38:6 39:18 40:5,12, 24 42:7,10,23 43:13 47:17,22 54:6,11,17, 21 55:5 56:8 63:23 67:14 69:11 70:13 71:9 87:14 88:12,21 89:25 90:15 92:12 93:4 126:19 132:10 140:14,16 141:12 143:23 150:23,25 151:13 167:21 171:22 172:15 174:3, 15,22 175:10 194:6, 16,19 195:9 199:2,3 200:11,20 201:2,8,21 216:15 219:6,22 221:19

**Absolutely** 205:12

**accept** 100:21

**acceptable** 13:23 16:9

**accepted** 76:19 81:13

**accepting** 39:8

**access** 180:24

**accompany** 143:2

**account** 181:9

**accurate** 54:2 76:16 103:5 133:11

**accurately** 133:21 134:20

**acknowledging** 56:7

**acronyms** 46:9

**act** 36:20 38:14,23 70:9 86:24 87:4,18 90:13,23 92:17 175:8 198:12 210:9 221:18

**acting** 26:21

**action** 74:22 111:24

**actions** 162:6 171:8, 10

**actual** 107:15 159:22 205:9 212:21

**ad** 194:3

**add** 49:23 50:9,12,18

**added** 38:14 70:11 73:24 75:8,10

**addition** 50:10 53:3

70:10

**additional** 50:15 75:10 78:16 121:17 149:17 154:8 185:19 186:10 188:25 193:17 205:24 206:5, 18

**address** 12:7 41:16 62:23 71:6 73:18 81:2 117:13 179:22 192:25

**addressed** 98:7,8

**addresses** 99:15 171:6 175:9 178:8

**addressing** 18:9

**adequate** 184:20

**administration** 20:19 28:13,25 29:20 45:25 112:15

**Administration's** 46:3

**administrative** 177:4,23 178:4,20

**administratively** 175:15 177:2

**admissible** 10:17 13:18

**Adobe** 113:16 125:17

**adopted** 140:25 148:9

**advice** 31:10,12 101:15 119:11

**advising** 211:9

**affidavit** 197:4

**affiliation** 184:3 185:2 188:11

**affirm** 141:18 197:8

**affirmation** 141:20 148:24 204:17,19

**affirming** 56:12 202:21 204:13

**afternoon** 131:12,13 155:16 159:12 206:8, 17 221:4

**age** 102:7 136:13

**agency** 28:3

**agree** 86:23 115:17 173:9 199:2 200:8,23 201:5,9,11,19 204:21 218:19 219:14

**agreed** 10:21 13:17

**agreement** 45:24 112:22 190:25

**ahead** 205:25 212:14

**alert** 74:20 84:18 115:3 122:18

**alerted** 117:14

**Alito** 105:2

**allowed** 90:16 133:23 174:5

**allowing** 176:20 177:16

**altered** 61:16

**ambiguous** 215:21

**amend** 115:8

**American** 139:24

**amounts** 87:11

**analysis** 204:5,23

**anecdotally** 119:7 124:4

**announced** 133:16

**answering** 32:7

**answers** 20:7

**anticipated** 187:8 188:14

**anticipation** 187:6 188:11

**anymore** 157:2

**Apologies** 166:3

**apologize** 165:2 180:25

**apparent** 177:19

**appearing** 37:22

**appears** 47:16 60:13 77:25 103:4 107:21 143:9 146:8,14 149:13 150:22 151:16,25 152:16 181:7 182:12 187:19, 21 188:5 208:10

**application** 39:16,19 41:8,13,24 42:15 43:5,6,23 44:7 45:4 51:9 74:11 136:17,18 137:24 140:23,24,25 145:2 157:5

**applied** 49:4 67:8 70:15 71:6 128:22 200:25

**applies** 120:8 154:25 179:2

**apply** 74:15

**applying** 46:14 140:12

**appointee** 23:14

**appropriately** 117:6

**approval** 44:11 168:9

**approving** 168:15

**approximately** 11:13

**April** 91:4,5,8

**area** 27:17 30:17 33:15 56:16 178:10

**areas** 22:13 30:18 33:3

**argue** 170:20

**arrangements** 13:9

**arrives** 63:19 64:17 65:7,8

**arrows** 58:17

**art** 41:4 198:11 208:19

**articles** 100:20

**artwork** 50:7

**ascertain** 86:6

**ascertained** 136:14

**asks** 72:23

**Assembly** 38:13

**assert** 59:25

**assign** 69:16

**assigned** 20:21 24:4 33:16 69:2

**assigning** 102:2

**assist** 215:12

**assistance** 57:15

**assistant** 20:21 21:17 24:4

**association** 10:4

**assume** 16:16

**assuming** 55:24 165:22

**assumption** 203:5

**assurance** 149:6

**attached** 69:10

**attempted** 98:5

**attempting** 108:12

**attend** 125:2

**attendance** 173:21

**attention** 59:21 138:6

**attorney** 17:2 39:13 112:24 171:13 205:16 214:10 220:16 221:14

**attorney-client** 159:6

**authority** 29:13,17 30:16,19,23,24 31:5 185:19

**authorized** 173:21 174:5

**avail** 42:21

**avenue** 40:9

**aware** 61:16 78:4 84:24 85:5,10 86:17 87:24 88:10,16 91:24 92:3 102:11 104:22 118:10 120:23 121:19,22,24 122:7, 24 124:7,10 141:4 148:3,5 207:2 212:15

**awareness** 122:8

**awful** 14:5

B

**back** 13:19 37:10 49:14,18 52:5,8,11 53:21 55:19,25 57:17 60:11 75:16 78:20 90:24 91:7 107:4 119:7 132:18 146:19, 23 147:15 148:14 150:25 170:7 172:7 201:24 206:2,4 213:17

**background** 19:22

**ball** 106:25 112:8,12 113:11 114:5 115:5, 18 116:7 129:16 133:19,23 154:24 174:17 180:9,10 189:22 190:9 200:3

**ballot** 13:2 18:14 27:11 35:4 36:16,22, 23 37:17,24 38:2,8, 19 39:5,18,23,24 40:6,13 42:8 43:3,14 44:12,14 46:14,19 47:17 49:3,5 50:20, 22,23 52:13,17,22 53:5,9,14 54:14,17 55:5,6,9,18 56:9 57:15 58:6,7 63:16 64:3,5,6,20,25 65:6, 10 66:5,22,25 67:19, 20,25 68:5,7,11,12, 22 69:24 70:2,6,15, 16,17 71:2,9,12,14, 15,16,23 72:25 73:19 74:6,22 75:2 76:18 77:6,24 78:20,22 79:4,5,12 80:10,13 81:4,5,11,16 82:5,7, 12 83:10,13,21 84:3, 9 89:25 91:11 92:21 96:15 101:8,14 105:24 106:22 107:7 108:24 109:3,23 116:3 117:15 119:14, 15 120:6 121:12 122:13 123:15 126:13,23 127:7,17,

21,24 128:3,6,8,11, 18 131:15,16 132:17, 22,23 133:7,13,17 134:7 135:11,18 137:24 138:4 140:13 141:12,21 142:6 143:3,9,10,15,24 144:24 145:3,5,9,25 146:21 148:7,16,22 149:3,18 150:25 151:10,13 152:4,18, 19 153:5,17 154:10 155:25 156:3,6,12, 15,20 157:12,14,18, 19,22,24 158:2,8,15 159:22,25 160:8,9, 16,18,22 161:8,9,10, 16,18 164:11,15,17 165:8,16,24 167:21 169:4 170:11 172:15 174:16 177:11,13,14, 16,20 178:4,13 179:2,3 194:7,9,17, 19,23 195:8,9,16,17, 18,19,22 196:3,24 197:6 198:2,13,25 200:15,20 201:2,8, 15,22 202:2 203:8 204:13,22 209:6,8, 16,19 210:7,13,14,24 211:4 212:21 213:5, 12,14,20 214:18,23 215:13 216:16 221:19 222:3

**balloting** 37:8 49:2 90:15 143:8,10 151:23 153:25 178:25

**ballots** 18:8,10 19:14 27:7 30:5 31:3 35:2, 17,23 36:14 37:3,5 38:6,15 40:25 41:6 47:23 54:12,13 57:2 58:2 60:2 63:23 65:17,22,25 66:4,12 67:6,10,12,14 68:25 69:4,5,12 70:13 72:9, 11 75:21 78:6 80:20 81:21 82:22 84:19,25 85:7 86:25 87:15 88:13,21 89:6,20 91:18 92:9,12,23 93:5,14,16,20 94:10, 14,23 95:2,6,12,13, 18 96:18,20,24,25 97:5,14,20 98:8 100:22 101:12 103:2, 3,20 104:2,4 106:18, 19 109:16 110:5,6 111:5,15 112:17,19, 20 113:4,5 114:5 115:19,23 116:6,9, 15,23,24 117:19 118:3,6 120:9,12 121:21 122:2,14 123:8,10 124:9,12,18 126:20 128:15 129:14 132:10,14 140:16 141:13 142:6 149:14 153:13 154:15,25 155:2,24 157:3,8,15,21 158:20 159:18,25 161:7 163:22 164:3,18 165:10,14 166:2,25 168:9,16 169:13 170:6,7,24 171:3,22 173:4,8 174:3,10,22, 24 175:6,11,14,16 176:12,14,23 177:8 178:15,16 179:9,10, 19 180:15 182:19 183:5,12,13 184:8 186:9 189:5 196:16 197:9 199:3,12,21 200:11 219:7,8,10, 13,22

**barcode** 69:7,8,10 83:2 216:22

**barring** 129:8

**based** 29:10 37:16 83:20 84:14,15 85:19 89:10 90:4,8 91:22 94:11 95:13,16 97:15 106:16 109:18 110:2 111:24 114:5 118:21 119:5 133:18 163:4 174:16 204:22 216:12 220:15

**basically** 22:24 47:20 56:3,11 103:25 107:24 108:7 112:16 115:3 139:24 163:15 183:15

**basis** 89:6 92:2 101:7 204:21 206:9 214:12 215:23

**Baxenberg** 13:7,11, 12 14:13 47:7 155:7, 9,15,17 159:10

**bear** 99:3 102:14

**bearing** 55:18 102:3 103:3 222:4

**began** 92:23

**begin** 67:13 72:10

**beginning** 176:10

**begins** 108:23

**behalf** 15:5,11 192:4 193:10 203:24 217:9

**behavior** 88:8

**belief** 112:24

**believed** 106:21

**beneficial** 32:5

**Berks** 15:11,16 19:17 142:7,12,21 144:12, 17 146:25 147:3 152:6 221:5,8

**big** 99:15 179:19

**biggest** 115:18,23 132:2

**bin** 209:10

**binding** 34:15

**birthday** 96:9,13

**bit** 19:4 24:7 27:20 36:8 37:11 40:22 44:21 74:25 85:4 99:10 124:23 138:20 149:13 167:8 171:14 187:18 209:3

**blast** 99:13

**blind** 99:14,18

**blow** 187:17

**blue** 98:24

**Board** 14:24 15:12 27:22 28:17 30:9 34:16 39:8 44:3 49:5 53:10 55:20 63:20 64:10,15,18,19 66:16 67:2,24 68:15 70:25 72:4 76:6,7,15 77:5,7 85:22 119:22 123:14, 19 127:4,14 128:16 129:2 135:8,22 138:5 168:8,14 169:4 173:25 177:12 179:14 183:18,25 200:10,19 201:7,22 202:14,17,24 203:3, 10,15,17 205:8 209:14,24 210:8,24 213:10 217:3,10 221:5

**Board's** 44:4 171:3

**Boards** 77:23 85:25 164:24 166:4,24 171:9,10 172:25 173:14 174:21 179:7 183:20 189:11

**bolded** 145:13

**book** 211:18 212:17

**bottom** 48:18 49:13 55:22,24 57:7,18 98:25 144:11,17 145:20 150:12 186:23

**bounds** 213:24

**box** 64:12 120:13 187:10

**boxes** 58:17 64:13

**Boyer** 60:18 61:2 155:8 159:12,15 161:21 206:16 208:24 217:18 220:20

**Boyer's** 216:12

**brand** 108:13

**break** 17:9,14,18 79:20,21 130:14 205:20

**breakdown** 183:13 187:4

**breaking** 195:23

**briefly** 19:23 138:17

**brilliant** 135:2

**broader** 99:10

**broke** 134:23

**bucket** 74:19

**Bukowski** 15:10,11, 18 212:12 213:21 214:3,4 215:17,18 220:13,14,24 221:2,4 222:17

**bullet** 108:22 111:11 116:13 117:3 119:9 173:3 174:20 175:9, 13,24 176:24 179:6

**bureau** 20:21 21:5, 13 24:5 32:20,21 209:7,9

**busy** 70:2

**button** 198:2 212:22 213:2,5,12,18

C

**call** 45:18 53:7

**called** 12:3 38:14 180:10 190:11

**calls** 100:20

**camera** 220:19

**campaign** 22:16 23:3 70:24

**campaigns** 43:13

**cancel** 74:15 175:17

**canceled** 66:18 71:24 72:3 73:9,16, 19 74:3 76:18 83:11, 13

**cancellation** 72:25 73:25 74:10 75:10 118:12

**cancels** 71:15 81:5

**candidate** 70:23

**candidates** 28:15 173:19 174:4

**canvas** 74:5 84:7 109:7 111:10,14 163:16

**canvass** 93:4 161:15,17 164:2 169:6 170:13 171:22 172:23,24 173:11 179:3 207:14,23

**canvassed** 65:3 164:4

**canvassing** 72:11 78:21 168:11 207:10

**career** 23:4,11

**carry** 102:16

**case** 10:20 11:9 13:6 18:12 19:9,11,15 25:14 29:24 82:10 93:4 98:24 103:13 112:7 125:18 133:19 134:5 146:22 147:23, 24 151:5 163:8 171:18,20 172:25 176:6,7 180:10 188:22 202:11

**cases** 12:25 13:4,19 19:3 31:16,25 33:13, 14 34:22 62:12 67:13 77:17 86:4 191:17

**cast** 39:4 195:7,8,19 197:9,15,21 198:2,9 208:10,16 210:14,24

**casts** 194:6,16 195:16

**category** 123:21,23 183:14

**caught** 189:21 190:9

**caution** 159:5

**caveats** 141:15,16

**central** 122:12

**century** 38:9

**certainty** 63:11 190:6

**certification** 22:15

**certifications** 22:15 23:2

**certifying** 28:14,15

**cetera** 209:21

**chain** 190:24

**challenge** 132:3 165:13,17

**change** 22:6,17 70:3 82:4 92:23 103:18,21 105:22 106:11,14 109:15 111:2,22 115:18,23 124:14

**changed** 34:11 56:17 57:24 82:15 87:10 106:12,15 110:3

**Chapman** 11:7 12:18 17:24 19:16 60:4 106:25 112:8,12 125:18,25 129:17 174:17 221:8

**chapter** 153:22 154:6

**characterization** 216:5

**characterize** 23:11 35:6,8,9 36:3 216:6

**chat** 14:7 25:6,17 46:23 47:6 59:22 138:22 181:22

**check** 165:15 191:13

**checks** 44:8

**chief** 20:22,24 32:20, 22 114:23

**chooses** 210:7

**Circuit** 103:15 105:2

**Circuit's** 106:7,9 112:2

**circulate** 142:4

**circulated** 59:22 144:22

**circumstance** 69:22 133:24,25

**circumstances** 187:3 202:11

**citizen** 102:7 136:24 137:8

**citizens** 30:3 139:25

**citizenship** 137:3

**civil** 10:18 23:4,6,18, 20

**civilian** 30:3 36:19 37:9 141:3 172:15

**civilians** 37:2

**claims** 26:22

**clarification** 101:6 185:11

**clarify** 56:23 82:24 183:19 221:17

**clear** 74:13 89:14 178:17 185:24 198:19

**closely** 216:23

**closer** 77:13

**cloud** 35:10 36:4

**code** 23:24 24:10,14 28:12 29:11,23 30:7, 21,25 31:15 33:22,24 40:19 74:15 83:18 98:3 117:6 118:12 141:9 162:17 163:5,8 164:25 166:9,20 168:21 169:20 171:2, 6,12 174:11 175:16, 19 179:22,24 185:14 197:19 198:10 199:4, 19 207:4,7,14,18 208:5 209:13 217:20 218:21 219:15 220:4

**Code's** 199:9

**codes** 72:22 73:3,9, 13 75:11,13

**coding** 65:16 117:17

**collect** 182:17 183:8 187:5 194:3,5

**collecting** 191:7

**collection** 185:13

**colloquially** 40:14

**color** 48:8 59:10 65:16

**colors** 48:10

**combination** 87:4

**command** 190:24

**commingle** 164:15

**commissioner** 21:4, 25 22:3,7,9,12

**Commissions** 20:2 21:5 24:5 27:2

**committee** 190:12

**Commonwealth** 19:13 20:9 24:22 28:4,10 29:13 32:24 33:19 102:8 185:18

**communication** 85:25

**communications** 86:8 159:7

**compare** 45:3 57:4

**comparing** 45:7

**competing** 35:15

**complaint** 19:19

**complete** 17:17 53:5 62:24 156:6 165:7 193:4,9 211:6

**completed** 52:21 57:10 122:11,15 149:2 156:20 157:4 210:13

**completeness** 111:7

**completes** 64:5

**completing** 57:15 211:3

**complex** 212:20

**compliant** 83:23

**complied** 117:23 119:22

**complies** 169:19

**comply** 59:2,6 118:23 120:2,5

**complying** 29:21 59:15

**component** 202:20

**computing** 219:9

**concept** 131:15,20

**conclude** 206:8

**Concluded** 223:5

**concurrent** 13:22

**concurring** 93:18 97:16

**Conference** 11:5

**confidential** 60:21

**confidentiality** 142:11

**confirm** 162:10 169:19 202:14 207:8

**confirmed** 220:3

**conform** 43:15

**conformed** 94:9

**confused** 210:20

**confusing** 210:19

**connection** 162:11

**consistent** 32:15 168:20

**consistently** 21:21 82:21

**consolidated** 13:4

**consult** 190:12

**consultation** 24:8 31:25 32:2 130:11 189:15

**consulted** 24:21 190:22

**contact** 50:16 121:17 216:20

**contacts** 99:20 183:24

**contained** 51:23 53:12 147:5,20 165:24 195:21 196:2

**container** 166:25

**content** 192:6

**contents** 49:8 216:23 217:16

**context** 36:8 96:6 177:6,24 198:21

**continue** 79:19 130:5 158:19 182:22

**CONTINUED** 131:10

**continuing** 100:21 195:4

**contrary** 97:9

**contrast** 164:2

**contributed** 87:11

**controversies** 88:11

**controversy** 89:13 91:23 92:15

**conversely** 85:5

**convert** 187:11

**conveying** 100:8

**copy** 25:21 77:11 99:14,18 144:6,15 152:19 181:7 182:9, 12 183:16 196:14 218:5

**Corporation** 21:13

**correct** 12:20,21 15:17 16:25 18:22 19:18 21:20 25:10 26:12 27:18,25 28:2, 4,5 33:25 34:2 38:11, 15,16,21,22 40:6,7, 10,16,17,21 42:3 43:22 46:15,16 49:10 53:11,20 54:14,15 55:11,12,15,16,20,21 57:20,21 58:9,10 60:24 61:2,8,9 62:24, 25 63:20 66:23,24 67:4 68:17,18 70:7 72:7,8 74:23 76:13, 14,20,21 77:2,3 78:23,24 83:16,17,24 85:9 87:15,16,19 90:18 92:25 93:2,8 94:7,11 96:16 99:25 100:6 101:10,11 102:15 105:9,10 107:2,17 108:18,19, 25 109:12,13,17,18, 23,24 110:6,8,11,16, 17,21,23 111:5,6,16, 17,20,21 114:9,10 115:6,12 116:11,16, 18 117:7,8 120:15, 21,22 122:22 124:19, 21 126:4,6,21 127:2, 17,18,22 128:5,20, 21,23,24 132:11,14, 15,25 133:8,14 134:15 135:12,13,20, 21,25 136:2,7,8,9,12, 15,16,19,20,25 137:5,16,17,21,25 138:2,7,8,10,12,15, 16 139:10 142:2 145:4 149:11,22 152:25 153:2 154:18, 22 155:3 156:9,10, 16,19 157:6,7,16,17, 22,23 158:16 160:11 161:13,20 162:18 163:6,11,12 166:17, 18,21,22 167:2,3,23 168:2,3,11,12,17,19, 22 169:7,10 172:3,4, 11 173:11,12,16,18, 22,24 174:18 175:19 176:21 180:16 181:17,18 185:3 186:4 194:10,20,21 197:10,12 199:11,21, 24 200:3,7 202:15,16 204:23,24 205:13 208:6,7,22,23 209:10,12,17,18,21, 22 210:5,9,16 211:11,12,15,16,18, 19 212:4,7,8 213:2,6, 20 214:20,21,24,25 215:4,5,8,16 217:6 219:23 220:2,6 222:16

**corrected** 161:4

**corrections** 22:2,3,4

**correctly** 25:18 27:13 50:22 100:5 109:8 117:18 122:10, 14 126:15 145:11 147:18 204:16

**counsel** 11:15 13:5 14:3,6,11 19:5 24:9 25:7 32:11 33:18 114:24 130:11 159:2 161:24 189:15 190:13,14 206:20

**Counsel's** 32:22

**count** 35:23 78:23 88:12 94:9,10 96:22 97:9 100:22 109:23 110:4 111:4,15 116:6 124:17 132:11 153:5 154:15 213:20 214:20,24 222:3

**counted** 18:11 35:18 66:14 74:22 79:4,13 88:23,25 93:15,16, 20,22 94:14,19 95:19 96:18,24 97:5,21 101:13,14 103:2,4 104:4,13 112:18 113:6 115:20,24 116:4,10 124:8,11 126:21,24 128:11 133:7,17 134:7,14 145:9 153:17 156:17 158:3 164:12 168:10, 16 169:5 194:9,20 198:25 201:17 213:6, 7 222:9

**counter** 120:7

**Counties** 28:15,24 29:20 31:19 32:2,3,7, 9,13 34:18 37:7 39:21,25 44:19 45:13 46:12 47:19,22 48:25 49:19,20 50:4,5,9,12, 19 51:2,7,15 52:10, 12,14 58:5,11,16 59:2,6,9,12 61:7,25 65:9,11,12,13 67:11, 13 68:22,24 69:5,13, 20 70:6,11 72:23 74:5 78:5,9 80:9,12, 19 82:20 84:11,18, 23,24 85:3,6,11,14 86:5,9,10,15 88:25 89:2,6,14 90:5,10,11, 25 91:16,25 92:4,18 94:23 95:5,12 96:22, 23 97:8 98:20 99:13, 21,23,24 100:21,24 111:4 114:4 115:3 116:5,14,22 117:4, 17,23 118:5,10,16, 18,19,22 119:25 120:4,19,23 121:5,9, 12,15,19,23 122:17, 20,25 123:7,12,20,22 124:5,7,10,16 129:11 130:4 132:13 139:16 141:4 143:14 154:14 155:12 158:14,18,19 160:15 164:9 170:6 172:2 175:5,18 176:11,14,18,21 177:7 184:7,10,24 185:16,20 186:8 188:13 192:12,15 193:14,24 194:4,5 216:20

**Counties'** 28:20 62:3 119:21

**counting** 78:22 91:17 92:2,5 219:9 221:18

**County** 14:23 15:11 19:17 27:22 28:17 29:21 30:9 34:15 42:20,24 43:2,25 44:3,4,6,12,15 45:2, 9,12 49:5,7,15 50:9, 25 53:6,10 55:20 58:22 60:3 61:16 62:16 64:12,15,17 65:15,20 67:2,24 69:3,9,22,24 70:16, 18,25 71:8,15,20 72:4,14 76:6 77:5,10, 23 78:14 80:16,17 81:5,8,10 82:18 84:14,16 91:21 96:5 103:14 109:6 112:18 117:25 119:20 123:6, 19 126:12 127:3,9,14 128:8,10 129:2 135:14,22 138:4 141:22 142:7,12,22 143:21 147:7,25 148:5 149:3 151:16, 17,21 152:2,6,17 161:5,10 163:25 164:24 168:8 169:23 171:3 172:25 173:14, 25 174:8,21 177:13 179:7,18 180:2,3 181:9 183:23 187:22, 25 188:6 193:8,9 195:2 198:13 200:10, 15,19 201:7,22 209:24 215:11 217:3 221:5,8

**County's** 170:23 193:10

**couple** 74:8 80:9 82:21 117:11 156:13 184:4

**court** 11:8,17 16:5 18:6 19:13 34:4,10 79:7 92:24 93:12,24 94:20,25 95:9 98:4 103:15,23,25 104:16, 21 105:4,21 106:2,3, 5,17,18,24 108:2 111:25 112:7,16,22, 25 113:16 114:7 125:24 129:9 132:7, 25 133:6,16 159:4 171:7 189:18 191:2 200:2 223:7

**Court's** 94:4 108:10 133:18 134:6 158:10, 11 174:17 180:9 186:3,7

**courtroom** 10:17

**courts** 35:16

**cover** 108:11 113:25

**covered** 36:23 139:17 141:4 146:10 148:10 151:22 154:7

**covers** 153:24 178:25

**COVID** 87:4

**create** 181:2 189:10 190:15

**credentials** 192:19 193:4

**criminal** 149:9

**criteria** 137:16

**critical** 66:20

**culmination** 18:5

**cure** 119:12 120:8, 11,20,25 121:6 194:23 195:2

**cured** 161:9

**current** 22:20 51:13, 22,24 52:7 56:15,20 69:19 96:10 100:24 129:6,12,17 166:13 171:24,25 197:23

**cut** 162:11

**D**

**data** 88:6 117:18 119:7 185:13 187:5 189:20 191:3,7

**database** 21:3 45:19 46:4 68:20

**date** 13:16 18:13 26:5 27:6 40:15 47:11 56:16,19,21,24 57:23 59:18 60:15,17 61:23 63:14 65:6,12 66:20 68:4 69:19 70:15,16, 17 73:22 74:16,17 75:5,6,9 79:15 86:20 87:20,21,25 88:5,13, 22 89:25 90:20,24 91:11,12 96:4,5,10, 14 98:13 100:4,23 101:8,13,18,24 102:2,3,12 103:3 104:8,10 107:8,19 109:4 113:12 116:3, 24 117:5 125:9 126:17,22 127:4,6, 15,16,20,23 128:3,5, 6,9,17 129:20,25 131:16,21 132:2,9 133:4,6,10,21 134:9, 12,13,20 135:7,9,10, 16,23 136:4,21 137:13 138:13 139:4 142:14 145:15 150:2, 3,8 152:22,24 153:4, 14,16 154:16 156:14, 15 158:5,15,16,22 159:22 160:17 166:15 167:15 180:21 182:4 186:15 194:17 195:10 196:11 198:17 199:5, 22 200:9,14,18,24 201:6,12,15,20 202:6 204:9 209:15,16 211:7,10 214:23 217:5,11 218:4 221:20

**date-stamp** 116:17 217:12

**dated** 18:8 19:14 27:11 35:17 73:15 75:12,21 89:7,19 95:14,22 96:3,20,24 97:21,22,25 98:7 106:19,22 109:4 110:5 112:17 113:4 114:5 115:19,23 116:9 124:8,11,17 126:14 129:14 156:3 157:25 160:4 166:7 167:25 173:8 174:15, 24 175:12,16 179:8 180:14 182:19 183:13 189:5 194:7 202:4 204:16 213:8 215:14

**dates** 126:16 129:4 132:14,24

**dating** 48:13 53:17 92:9,11

**Dauphin** 59:16 60:3 63:12

**day** 37:20 41:10 42:13 65:2 66:3,6,23 67:11,17 68:14 72:13 77:14,17 78:21 84:8 95:4 126:5 141:15, 22,23,25 148:23 149:18,21 151:10 156:12 161:5 163:20, 21,24 165:14 166:21, 24 170:18 189:24 201:13,16 220:6,10 223:22

**day's** 156:15

**days** 102:8 108:12 137:9,20 141:15 148:23 156:21

**deadline** 42:6,11 65:18,19,24 66:3 67:11 84:20 85:8 95:7 122:21 123:16 128:2 135:19 155:23 156:8,17 157:25 158:2

**deadlines** 141:10

**deal** 196:18

**dealing** 196:15

**dealt** 24:7 171:14

**decided** 58:16 93:25 97:9 106:6 190:5

**decision** 34:10 92:24 93:13 94:4,6,11 102:19 103:16 105:2 106:24 108:3,10 109:19 112:2,6 114:6 115:5 116:8 130:10 158:11,12 159:9 179:15 180:9,12 186:3,7 189:10,16 222:2

**decisions** 34:4 35:15

**declaration** 50:24 52:19,24 53:7,15,16 55:19,25 56:5 57:7,9, 11,25 58:9,21,23 59:4 60:7,11 61:8,11 62:14 64:9 65:7 68:6, 11 71:20 72:5,16,19 73:20 79:2,11 82:7 83:3,21,22 88:2 96:12 100:4 104:10 117:4,20 122:2,11 126:17 127:5 128:7, 19 134:10 135:11 136:4 137:14 138:7 141:20 143:21 145:15 146:6 147:4, 13,19 148:16,17 149:6,12 150:24 151:9,13,18 153:16 154:16 160:7,25 165:6 166:6,10 173:4 194:18 195:21 196:2 198:18 199:6,23 200:9,19,24 201:6, 12,20 202:15,18,19 204:8 211:6 217:16

**declarations** 61:17 62:9,17

**declaring** 56:5

**decline** 77:8

**declined** 75:3 81:13, 16 82:13

**deep** 20:13

**defaults** 69:18

**defect** 72:15 76:8 122:2

**defective** 77:25 78:6 123:11,15

**defects** 122:18 171:11

**defendant** 15:6 26:3, 11 155:12

**defendants** 162:6

**defendants'** 161:23

**defenses** 26:23

**deficiencies** 160:17, 21 161:3

**deficient** 77:7 82:7 84:19 85:7

**define** 207:19 208:10

**defined** 197:19 198:9 217:20

**defines** 207:4,15

**definition** 98:3 130:8 131:25 207:6,17 208:18 215:19 218:20 219:15,19,20

**delineate** 75:11

**deliver** 44:12 143:15

**delivered** 120:13 127:13 143:11

**delivering** 39:7

**delivery** 148:9

**demand** 92:21

**denied** 105:21

**denote** 83:19

**department** 20:3,11, 20 21:11 22:18 23:9 24:17 27:16,21,25 28:7,17 29:19 30:13 32:4,17 34:4 35:19 41:5 43:8,24 48:2 50:11 51:25 56:17 60:15 72:23 75:17 85:21 86:13 89:17 92:8 94:8 96:21 97:12 100:9,10,13 102:23 105:22 106:11 107:22 108:17 109:15 110:3, 20 115:4 117:9 124:14 128:25 129:19,23 131:22 153:15 154:23 162:14 163:4,9 177:25 178:23 185:15,17 186:25 189:13 190:5 193:6, 11,25 195:6 204:22

**Department's** 34:19 74:24 97:8 101:15,23 110:2 111:22 114:23 115:8 116:2,7 153:3 162:16 176:13 185:12 189:14 190:14 194:8,22,25 195:15 197:14 204:7

**departments** 188:13

**depend** 132:16 184:21 201:23

**depending** 50:8 84:8 184:11

**depends** 81:17

**deployed** 75:15

**deposed** 12:19

**deposition** 10:7,9 11:4,11 13:16,17 17:11 18:25 54:11 113:21 131:14 140:17 152:6 223:4

**depositions** 13:21

**deputate** 22:25 24:25

**Deputy** 19:25 20:7 22:19 26:25 33:5 162:4 221:3

**description** 72:2

**destroy** 111:19

**detail** 76:2

**detailed** 74:25 75:24 114:3

**details** 75:23 139:23

**determination** 81:15 82:2,6 84:5 169:3 177:5,24 178:5,20 203:3 205:10

**determinations** 84:6,12

**determine** 42:25 62:16 65:9,16 74:6 101:19 135:24 149:2 158:15 164:11 174:23 175:11 184:2, 5,9 193:12 195:17 202:18 203:12 205:8, 12

**determined** 95:2 96:5 103:25 104:16 171:8 175:15 177:3

**determines** 32:4 83:15 202:4

**determining** 18:14 104:17 116:23 126:13 128:10 158:21 170:10 205:6

**developed** 31:23,24 47:25

**developing** 32:12,18

**development** 114:14

**difference** 29:7,9 37:13,15 39:9,16 62:19 141:6 150:18 163:17

**differently** 50:5,8 148:2

**digits** 41:21 85:19 119:5 124:2

**direct** 46:20 59:20 197:24 218:17

**directing** 27:5 95:12 96:22 113:8 116:14

**directive** 29:10 30:8,22 31:6,20 34:15

**directives** 28:23 29:4,14 30:12,14,17

**directly** 20:8 33:23 64:15 98:7 121:16 178:8

**director** 32:20,21 99:20 152:6 181:16 183:24 187:25 188:6

**Directors** 187:23 192:3,5

**directs** 154:9 174:21 179:7

**disability** 37:21 40:4 57:12

**disclosure** 22:16 23:3

**disclosures** 26:3,10

**discoverable** 26:21

**discussed** 127:20 134:21 180:3

**discussing** 27:20 51:4 171:23

**discussion** 25:23 49:18 88:11 125:5 130:21 160:14 167:18 181:24

**discussions** 90:9

**disenfranchised** 211:21,22 215:7

**disenfranchisement** 215:15,20 216:7 221:15

**disentangle** 113:17 125:16

**disposition** 71:11,13,21 72:21 82:4,19 83:10

**disqualification** 222:13

**disseminate** 189:11

**dissenting** 93:18 97:17

**distinction** 31:22 38:5

**distributed** 157:16,21

**district** 11:8 41:17 137:19

**Division** 20:22,25

**document** 25:4 26:9 47:5,15 51:11 108:11 110:18 139:13 168:5 172:20 174:20 182:2 186:13 196:9 198:4 218:2,11

**documents** 51:6 142:21 160:10

**domestic** 146:3,20 148:18 149:14

**DOS** 47:9 100:3 107:6 139:2 167:14

**double** 85:19 119:4 124:2 210:18

**double-check** 52:3

**download** 181:3

**drafting** 114:24

**drafts** 33:14,15

**dramatically** 86:24

**driver's** 41:20 45:17,19

**drop** 64:12,13 68:15 120:13

**dropped** 120:12 127:14

**duly** 12:3

**dynamics** 87:10

E

**Eakin** 13:6,13 155:18 191:10

**earlier** 37:9 53:4 64:4 70:10 105:17 112:8 120:16 127:20 130:19 132:7 134:22 158:13 162:12 163:19 171:23 172:10 180:4,7 191:25 198:15 201:25 202:13

**earliest** 72:12 132:23

**early** 18:22 91:3 97:12 104:19 131:14 162:25

**easier** 181:2

**easily** 96:2

**Eastern** 11:13

**edit** 69:21

**effect** 79:7 90:13 221:21

**effective** 38:25

**effectively** 39:2

**effort** 215:10

**efforts** 195:5

**election** 20:18 23:24 24:10,14 27:9 28:12,16,25 29:11,20,23 30:7,21,25 31:15 33:22,24 37:20 39:3 41:10 42:13 44:15 50:25 52:17 53:6 56:6,13 57:3 60:12 63:12 65:2 66:3,6,22 67:11,17 68:14,16 72:13 74:14 77:14,17 78:21 81:11 82:8 84:8 86:3,16 90:12 93:6,21 94:14,15 95:3,20 96:7 97:4,19 98:2,5 99:20 102:9,17,21,25 105:13 106:16 108:4 110:11 111:24 124:9,18 126:5 127:9,14 128:2,23 129:16,21,24 135:19 136:5,22 137:9,10 141:9,15,23,25 148:23 149:4,19,21 151:11 157:9,11,13,15 161:5 162:17 163:5,7,20,21,24 164:4,25 165:14 166:8,20,21,23 168:21 169:20 170:18 171:2,5,12 174:11 179:22,24 181:9 183:23 184:14 185:4,9,14 187:22 188:6 189:24 192:3,4 197:9,19 198:10,14 199:4,9,19 201:13,16 202:2,3,5,23 204:14 207:4,7,14,17 208:5 209:13 217:20 218:21 219:15 220:4,5,10 222:11

**elections** 14:24 15:12 20:2,22,23 21:5,19,22 22:7,13,14,25 24:5,15,23 27:2,22,23 28:8,13,18 30:10,18 32:22 34:12,16 35:25 39:8 44:3 48:6 49:6 53:10 55:20 63:20 64:11,16,18 66:16 67:2,25 68:15 71:2 72:4 76:6,15 77:5,23 86:2 112:15 119:22 123:14,19 127:4,12 128:16 129:3,12 135:8,23 138:5 139:20 140:10 168:8,14 173:2 177:12 181:8,15,16 183:20 187:25 209:7,9,14,25 210:8,12,24 211:4,25 213:10 215:11 221:6 222:12

**Elections'** 85:22

**elector** 222:11

**elector's** 150:23

**electoral** 34:11

**Electors** 21:2 44:25

**electronic** 28:23 31:8 43:10 148:9 152:15 197:24

**electronically** 143:11,15 146:10 151:24

**elements** 48:23 49:24 54:7 55:7 57:25 70:19

**Elias** 13:13

**eligibility** 44:20 49:7 101:19 104:12,17 136:10 137:16

**eligible** 46:15 56:9 137:23 140:9 215:3

**else's** 214:10

**email** 14:7 71:6,8 73:18 76:11,16,22,24,25 81:2 98:12,19 99:2,13,15,19 100:3,7,17 117:13 180:19 181:8,10 182:11 183:19 192:2,25 193:7

**emailed** 25:9 138:20

**emails** 99:9

**embedded** 187:14

**emergency** 42:10

**empirical** 88:6 119:6

**employee** 23:19 210:12 211:5,8

**enable** 213:19

**enclose** 39:24 50:23

**enclosing** 27:6

**end** 122:16 144:14,15 192:11

**endeavor** 84:18

**engagement** 125:2

**ensure** 29:21 32:13 59:13 175:18 215:13

**enter** 68:22 70:3 80:13,22 82:25 84:11 122:25

**entered** 21:7 76:16

**entering** 80:9

**enterprise** 23:8

**entitled** 43:2 139:19

**entry** 70:25 76:17 113:20 122:20

**envelope** 27:6 39:25 40:16 47:9,18 48:3, 11,22,25 49:8,15,21, 24 50:3,6,8,24 51:3, 15 52:6,11,15,16,20, 23,24,25 53:8,12,13, 15 54:7,8 55:14,18, 19 56:2 57:18 58:8,9, 12 60:11 61:18 62:11,12,15 63:19 64:7,9 65:7 68:6 69:8 71:19 72:6,16,19 73:21 74:4,7 79:2,3, 12 82:3,7 83:3,21,22 84:2,4 88:2 101:9,25 102:13 104:11 108:24 109:3 117:21 119:17 122:3,11 126:18 127:13 128:7 135:12 136:5 137:14 138:9 142:23 143:21 145:22,24 146:3,7, 15,19,21,24 147:2,6, 7,11,12,15,16,19,21, 22 148:6 150:16,25 151:2 152:2,3 153:5 158:6,16 160:3,7,10, 23,24,25 161:3,6,7, 12,19 164:10,11,14 165:5,7,25 166:6,11 169:2,10,19,24 170:10,15 173:5 177:20 185:3,7 194:18 196:3,24 197:5 199:7 200:10, 25 201:7,13,21 203:6,11 210:3 216:17,19,22,24 217:4,11,17 219:8

**envelopes** 13:3 31:2 44:13 47:21 57:19 59:4,17 63:16 64:20 66:15 69:14 95:22,23 100:4 117:5 160:2 164:16,17,22 165:22 167:22 169:12 174:2, 16,23 219:6,21

**equipment** 63:22

**erred** 89:16

**error** 104:2,5 119:16, 19 176:20 177:15,19

**errors** 154:10 169:2 172:3,5

**essentially** 54:24 55:2 117:3 145:23 183:16 189:17 191:4

**established** 51:13, 17

**establishing** 137:15

**et al** 11:6 221:8

**evaluated** 137:4

**eventually** 106:5

**exact** 75:9 118:17

**examination** 131:10 169:9,18 170:15 175:2,10,24

**examine** 117:4 164:9,21 166:5,10 174:21 217:16

**examined** 12:4

**examining** 164:24 174:2 176:14 203:4 210:2 216:23

**examples** 74:9

**exception** 39:17 57:22 97:7 187:20 188:3

**exceptions** 33:4

**exchange** 17:12 159:16 201:25 206:22

**exclusively** 31:7 170:21

**excuse** 22:15 32:21 38:7 46:6 54:12 65:4

**executive** 20:7 189:14 190:12,16,18, 19

**exempt** 141:7

**exhibit** 25:22 26:2,8 46:21 47:9,14 48:5, 17,20 51:4,23 53:21 54:6 55:22 57:17 59:16,21 60:10 62:8, 20,21 63:3,7 98:10, 11,16,23,25 101:3 107:6,11,12 108:21 110:19,25 111:8 113:10,15,17,19,23 114:12 115:10 116:13 119:10 125:7, 12,15,19,21 138:20 139:2,7 142:4,12,17 143:6,20 144:5 145:7,20 149:24 150:12,21 152:21 153:8 154:12 167:6, 10,11,13 172:8,9 174:13 180:5,18,19 181:20 182:2,9 186:12,13 196:8,9 207:25 217:22 218:2, 12

**exhibition** 167:20

**exhibits** 60:22 125:16 223:6

**exist** 98:2

**existed** 97:24

**existence** 38:9

**expect** 14:12 20:13 88:3 96:23 112:23 129:23 133:9 179:4

**expectation** 31:19 49:25 58:22 97:20

**expected** 87:7 112:25 182:21 183:6 188:17

**expecting** 182:19 188:23

**experience** 20:18 24:3 183:2

**expert** 192:22

**explain** 44:21 53:4 188:15

**explicit** 29:17 153:20 174:10

**explicitly** 29:12 166:9 171:6 199:4

**extension** 94:22

**extent** 53:25 117:12 133:20 134:11 169:22

**extremely** 190:3

**eyes** 131:19

### F

**face** 160:22

**facial** 160:16,21 161:2

**facially** 83:20 84:19 123:15

**fact** 46:14 53:16 80:13 95:18 109:14 127:6,16 128:17,20 132:21 134:8 169:18 189:19 204:15 209:15

**factor** 62:18 138:3

**factors** 132:17

**facts** 202:10

**failed** 76:24 79:10

**failing** 59:2,6 104:7

**fails** 194:17

**failure** 104:10

**fair** 16:18 31:9 78:15, 18 84:17 87:2 89:24 90:3 93:23 94:3 99:2 119:10 123:17 140:2 201:18 216:4,5 217:8

**fairly** 191:18,19

**fall** 20:5 92:25 123:21,23 140:7

**falls** 20:6

**familiar** 17:23 23:23 35:3 142:25 170:25 171:16 180:8 181:10 186:19 195:20,25

**familiarity** 61:24

**fantastic** 16:5

**fashion** 120:14

**fast** 53:23

**February** 11:12 22:21

**Federal** 10:18 24:15 29:23 35:16 103:15, 23,25 104:3,13 112:22 139:3,8,18,20 140:3,7,11,25 153:23

**feel** 17:20

**fell** 126:18,23

**Fernicola** 10:11 14:6 25:21

**fewer** 87:17

**field** 99:16

**fields** 58:17

**figured** 180:25

**file** 181:2

**filed** 18:21 189:2 191:9,17

**filing** 125:18

**fill** 50:22 55:13 68:10, 13 199:5,22 212:20

**filled** 68:5 96:14 127:6,17 128:18 133:12,22 135:10

**filling** 128:13

**fills** 127:21,23 128:3, 6

**finality** 36:5

**finalize** 33:20 213:12

**finalizing** 198:12

**finance** 22:16 23:3

**find** 77:16 107:14,18 122:13 165:23

**finding** 53:24

**fine** 41:6
**finish** 16:3
**finished** 14:13,14
**firm** 24:13 124:3
**firmly** 31:14 162:16
**firms** 14:8
**Fitzpatrick** 14:22,23 15:3
**five-minute** 205:20
**fix** 119:19
**flows** 33:23
**focus** 37:11 164:20
**fold** 64:6
**folder** 181:3
**folks** 14:10 32:11 46:23 47:5 130:16
**follow** 30:10,11 31:20 32:7 34:19 50:2 60:14 80:8 118:16 155:11
**follow-on** 113:2
**follow-up** 98:20 209:3 216:12
**font** 59:9
**forget** 46:10 90:23 212:25
**forgot** 87:25 88:4 210:16
**form** 43:5,6,9,17 47:21 50:2 77:4 87:14 127:5 140:20, 22,23,24 141:2
**formal** 193:24
**formally** 115:8
**format** 57:23 58:13, 14
**formatting** 58:20
**forms** 31:2 43:14 51:6
**formulating** 33:12 34:6
**forward** 97:18 106:10 124:15 193:7
**found** 53:18
**foundation** 212:13 213:22
**fourth** 91:7 150:11 179:6
**free** 17:21 173:15
**fresh** 183:2
**Friday** 95:3 165:13
**friendly** 17:11
**front** 48:24 59:23 127:9 142:17 143:20 145:24 146:14 165:2 199:10 208:2
**froze** 134:25
**full** 12:6 105:4 108:21
**future** 93:19 190:8 206:2

**G**

**gathered** 186:4
**gave** 20:12 208:14
**general** 38:13 72:2 93:6,21 94:13 102:17 111:24 143:16 145:4 163:3
**generally** 34:18 49:24 62:4 71:11 93:19 96:4 142:25 162:22 178:13 202:8
**generate** 77:11
**generating** 121:13
**genius** 113:15
**Giancola** 15:4,5 161:25 162:3,5 167:4,9,16 180:17,22 186:11 195:24 196:7, 12 205:14,24 206:22 207:24 216:11,14 217:21 218:10 220:11
**Giancola's** 214:10
**give** 77:5 90:24 119:18 154:6 202:5
**giving** 78:5
**global** 87:9
**good** 10:2 12:12,13 24:9 47:8 130:13 131:12,13 155:16 159:12 206:17 221:3, 9
**government** 23:7 46:10
**governor** 23:17
**grand** 184:19
**granted** 105:3
**granularity** 179:25
**graphic** 48:19,21,24
**graphics** 48:9,10,18
**great** 36:7
**ground** 12:23
**group** 13:13 141:7, 14 147:9 154:7 164:3 186:8
**groups** 179:16
**guess** 35:8 40:13 44:20 85:15,16 151:6 159:9 188:19 192:5
**guessing** 130:15
**guidance** 27:8 28:24 29:6,18 30:2,4,6 31:10,12,13,18,23,24 32:12,14,18,25 33:4, 12,17,23 34:7,9,14, 19,20 82:20 89:18,22 92:8,11,16 94:9 96:22 97:9,12,23 98:6 102:16,22 105:23 106:11,13,21 107:15,19,22,25 108:6,8,11,13,16 109:10,15,23 110:4, 9,13,15,19 111:3,23 113:11 114:2,3,8,14, 25 115:9,16 116:2 117:23 118:2,16,23 119:23 120:2,5 124:13,16 126:12 129:2,7,13,15,20,24 132:4 139:3,8,16 154:13 158:14,21,24 162:14,21,23 163:2, 4,10 167:14,20 168:13 172:14 173:9, 14 174:14,25 175:23 176:9 178:2,7,9,12, 14,23,24 179:5,7 213:9
**Guide** 47:10
**guidelines** 32:6
**guys** 104:25 214:5

**H**

**habit** 99:8
**half** 73:24
**hand** 29:18 37:25 119:14 202:2
**handed** 210:12
**handful** 97:7 124:5 191:24
**handheld** 216:20
**handing** 120:6
**handle** 97:13 114:4 129:3 216:19
**handled** 86:15
**hands** 67:2
**handwrite** 27:5
**handwritten** 158:5
**handy** 157:2
**hanging** 35:11 36:2, 4 105:17
**happen** 207:19
**happened** 134:3 212:11
**happy** 16:13 79:18 205:15 220:24
**hard** 77:11 144:6,15 152:19 192:7
**head** 19:12 182:24 191:6
**heading** 26:16
**heads** 35:11 36:4
**hear** 16:11
**heard** 14:18 16:16 189:7
**hearing** 221:7 222:21
**held** 11:11 23:21 24:13 25:23 93:14 104:9 112:16 125:5 130:21 167:18 181:24 200:2
**helpful** 50:10,13 96:9 194:5
**hey** 213:17
**high** 18:3 92:20 196:5
**high-level** 83:6
**highlighted** 92:11
**historical** 36:8
**history** 36:9 69:2 86:20
**hoc** 194:3
**holding** 171:19
**holds** 137:18
**home** 127:11
**honestly** 17:5
**hour** 79:18
**hours** 70:21
**houses** 44:25
**hypothetical** 134:2 213:22
**hypothetically** 134:4 156:12

**I**

**I.D.** 30:6 43:21 141:8 203:7
**identical** 163:16
**identification** 26:4 44:8 45:15 47:10 59:18 98:12 107:8 113:12 125:9 139:4

142:13 167:15 180:21 182:4 186:15 196:11 218:4

**identified** 27:15 119:16 133:6

**identifies** 207:22

**identify** 14:4,14,20 65:21 72:24 83:10 169:2

**illness** 37:21 57:11

**illustration** 142:23

**imagine** 88:7

**immaterial** 104:3,11 154:2

**immediately** 38:25 80:20 108:3 116:15 118:3,6 123:8

**impact** 34:6 80:23 115:4

**implementation** 92:17

**implemented** 110:10

**implicit** 176:8,11

**important** 83:19 202:20 204:8 205:5

**impossible** 134:19

**imprecise** 23:13

**improper** 210:11 211:8

**in-person** 120:5 177:10

**include** 71:17 116:20 117:10 153:15 178:14 195:10 219:11

**included** 74:7 84:2,3 109:6 144:2 146:7 163:24 197:4

**includes** 22:25 28:13,19,22 219:20, 21

**including** 22:13 43:21 118:2 188:10 198:17

**inclusive** 73:12

**inconsistent** 108:9

**incorrect** 74:16 75:5 87:21 88:22 91:12 96:6 103:4 109:4 129:4,21,25 131:15, 16,21 132:2 133:20 158:22

**incorrectly** 18:8 19:14 27:10 35:17 73:15 75:12,21 89:7, 19 95:14,22 96:3,18, 20,24 97:22,25 98:7 106:19,22 110:4 112:17 113:4 114:5 115:19,23 116:9 124:8,11,17 126:14 129:14 160:4 173:8 174:15 175:16 179:8 180:14 182:19 183:12 189:5

**increase** 87:7

**increased** 86:25

**independently** 135:14

**independents** 36:25

**indicating** 57:14 186:24 213:10

**indication** 173:7 215:2

**indications** 168:14

**indicia** 99:4

**individual** 42:21,25 46:13 59:12 70:15 78:14 91:20 123:5 134:5 177:18 193:2,8 203:18,19

**individual's** 44:2

**individually** 76:5

**individuals** 26:20 33:2 70:12 76:3 121:25 140:5 192:23

**ineligible** 215:15

**inform** 212:2

**informal** 193:19

**information** 17:12 26:21 27:3 42:15 43:20 50:10,13,14, 15,16 51:23 58:19 75:24 76:4 80:10,23 86:5 100:19 121:17 158:7 181:6 182:17, 21 183:7,11 184:16 186:4,10 187:7 188:12,24 190:7 191:11,21 193:22,23 194:3

**informs** 198:5

**infrastructure** 205:4

**initial** 26:2,10 33:13, 15

**input** 24:19 33:3

**Inquirer** 186:22

**inquisition** 17:10

**insert** 44:14 48:25 50:19 52:14,19 53:3 56:24 58:18 64:6,8 71:18 146:23

**inserted** 126:22 135:9

**inserts** 52:22 101:25

**inside** 147:5,15,21

**inspect** 216:16 217:4,10

**inspection** 219:5,21

**instance** 17:6 34:5

**instituted** 115:18

**instruction** 27:5 50:18 143:17 144:7 145:16

**instructional** 144:2

**instructions** 50:21 53:3 143:7,24 144:23 145:2,5 199:11,14,18 216:2

**intake** 81:20 170:5, 24 171:3 174:9 176:22 177:18 178:4, 19

**intend** 139:25 140:5 158:23 206:8

**intention** 74:25 140:6 159:2

**interaction** 177:10

**interject** 60:19

**internal** 81:17 184:23

**interpret** 215:10

**interpretation** 31:15 97:18 110:2 162:17 163:5,7

**interpretations** 215:22

**interrupt** 199:16

**interruption** 21:22

**intervenor** 15:5 162:6

**intervenors** 15:17 206:20

**invalid** 195:18

**investigating** 210:2

**involved** 32:17 35:4 114:13,16,24 121:10, 12 186:3

**involvement** 13:9

**involving** 12:25 125:25

**irrelevant** 127:22 128:4,8 137:14 138:14

**irrespective** 82:17 134:8

**issue** 13:2 18:7,10, 18,19 19:3,13 29:13 30:2,4,8,17 31:13,18 32:4,5 34:6,9 35:4,7, 10,13 36:5,10 43:13 48:14 53:18 56:18 59:12 81:6 82:2 84:23 86:20 87:22 89:11,22 90:2 91:15 96:21 100:25 105:11, 24 106:17 107:22 108:13 113:3 116:2 118:20 129:7,9,13 132:4 162:23 170:11 189:4 213:9

**issued** 30:6,12 34:10 93:12,17 105:2 107:15,19 108:17 109:10 110:20 114:3 126:2 129:15 132:7 163:9 165:13 177:25 178:10,12,23,24 189:18 191:2

**issues** 29:19 43:9 80:18 86:16 91:11 162:14 163:4 165:23 201:7

**issuing** 28:22,24 32:15 178:15

**J**

**J-O-N-A-T-H-A-N** 12:9

**Jacob** 47:6 60:25 124:22 130:12 155:6

**Jacobs'** 214:7

**James** 14:22

**January** 75:9,16

**Jeff** 15:10 214:3 221:4

**Jeffrey** 215:18 220:13

**job** 20:16 22:6,22

**jobs** 23:22

**Jonathan** 11:4 12:2, 8 26:25 99:6,7 131:8 186:18,20 187:20 188:4 223:19

**Jonathan's** 124:25

**judging** 185:23

**jumble** 179:19

**June** 90:21 91:2,3,9, 12,15 98:20 104:19 106:6,13

**jurisdiction** 154:9

**justice** 93:17 97:16 105:2

**justices** 93:14,15 113:7

**Justin** 13:12 155:17

K

**Kathy** 46:25 47:6 130:12 138:19 155:6 205:23

**kind** 17:7 20:15 31:11,21 36:3 48:9 49:7 50:13 71:3,25 74:18,21 82:11 86:14 89:10,15 115:7 129:2 131:18 160:5 165:18 189:21 190:4 194:11 213:8

**knowing** 170:14

**knowledge** 24:10 61:6,19 130:9

**knowledgeable** 27:17

L

**label** 185:6

**labeled** 11:3 26:8

**lack** 27:3 108:15 151:6 212:12

**Lacks** 213:21

**Lai** 186:14,18,20

**laid** 50:7 61:25

**Lancaster** 14:23 15:16

**landscape** 34:12 92:22 103:19,22

**language** 31:16 33:24 40:18 58:21,23 60:8 61:10 108:23 109:11,14 110:25 111:9 151:11 154:13 185:23 196:21,23 197:4 199:21

**Lanken** 10:3

**largely** 18:13

**larger** 62:11,12

**late** 21:16 97:11 104:18

**latest** 67:8,9 86:16

**latitude** 49:19,20

**law** 13:13 14:8 24:15 29:23 32:15 34:5,12 75:20 100:25 104:3, 13 120:17 130:8 133:15 139:21 153:24 163:8 166:14 172:2 215:11

**lawsuit** 17:23 18:21 19:20 155:18,19 191:9

**lawyer** 21:8 39:11 208:22

**lawyers** 12:17 100:12 114:16,21

**lay** 50:4

**laymen's** 200:5

**layout** 58:13,15,20 60:7 62:5,7

**layouts** 61:20 62:3

**lays** 62:17

**learned** 86:10

**leaves** 79:15

**left** 61:22

**legal** 10:4 20:20 21:16 24:4 39:9 64:18,24 78:4 92:22

**legally** 51:5

**legislation** 21:6 22:14 24:6

**legislature** 90:22 134:18

**legitimately** 193:13

**Lehigh** 103:14

**Leigh** 11:6

**length** 41:16

**lettering** 98:24

**letting** 71:8,22

**level** 18:3 84:15 88:19 106:21 179:24 196:5

**license** 41:21 45:17, 20

**lifted** 105:4

**lifting** 106:8

**light** 56:18 166:13 206:19

**likewise** 16:4 45:22

**limited** 30:17

**link** 25:7

**linked** 182:10

**list** 28:14 70:14,19,22 99:15 104:10 184:6, 23

**lists** 70:12 121:20,24

**litigants** 191:16

**litigated** 18:18,19 95:8

**litigation** 18:6,16 35:4,13 36:9 53:18 56:18 60:5 86:20 88:16,18 113:2,20 187:8 188:14,25

**live** 55:10 75:15

**lived** 137:19

**living** 139:25

**lobbying** 22:16 23:3

**local** 198:14

**location** 212:16

**locked** 166:25

**log** 209:14

**logical** 179:16

**login** 192:19 193:4

**long** 66:25 68:16 77:16 127:25 132:8 134:12 156:7,16 179:13

**longer** 56:9 111:4

**looked** 19:10 110:25 115:9 169:23

**lot** 14:6 33:14 46:9 77:15 87:17 88:8 148:4 176:7 205:3

**lying** 149:8

M

**M-A-R-K-S** 12:10

**machine** 63:15 212:19

**machines** 29:5

**made** 75:25 84:6 131:17 134:12 137:23 144:25 159:9 171:18 189:9,16

**mail** 36:15 41:11 64:11 87:8,13 89:19 90:15 120:12 127:13 128:20 149:18 151:9 152:18 155:24,25 156:6 157:3,5,8,12 171:22 178:13 210:24 214:18

**mail-in** 13:2 27:7,11 30:5 31:3 34:25 36:16 37:12,24 38:2, 14,19 39:4 40:6,12, 24,25 41:6 42:7,23 43:14 46:14,19 47:17,22 49:5 51:8 54:8,13,22 55:6 56:8 57:19 58:2,6 60:2 63:23 64:3,20 66:21 67:5,14 68:22 69:12 70:13 71:9 86:25 91:11,17 92:9,12,21, 23 93:5 97:14 107:7 110:5 123:14 126:20 132:10 141:12 146:3, 20 157:18,24 160:2 167:21 172:15 174:3, 15,22 175:10 178:25 194:7,17,19 195:9 199:12,20 200:11,20 201:2,8,21 209:8 210:7 214:23 216:15 219:7,22 221:19

**mailed** 133:13 135:11 200:15

**mailing** 160:3

**mails** 53:9

**main** 38:4 163:17

**maintain** 45:10 184:7

**maintained** 184:22

**maintaining** 28:19

**maintains** 45:12

**majority** 34:21 148:8,10

**make** 20:10 25:17 38:2 42:12 55:8 57:13 77:15 81:15 82:2 85:16 117:14,16 122:6 130:11 165:15 172:12 173:13 203:3

**makes** 20:14 74:19 179:14,17

**making** 24:17,20 205:9

**mandates** 59:15

**mandatory** 193:22

**March** 92:19

**mark** 10:3 36:2 57:14 83:8 180:18

**marked** 26:4 47:10, 14 59:17 60:9 98:12, 15 107:7,12 113:11 125:8,12 127:16 139:3,6 142:13,17 154:12 167:11,14 174:13 180:20 182:3, 8 186:12,14 196:8,10 207:25 217:22 218:3, 11

**marking** 114:7

**Marks** 10:1 11:1,4 12:1,2,8,12 13:1 14:1,12 15:1,21 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1,7,25 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1, 13 48:1 49:1 50:1 51:1,22 52:1 53:1,24 54:1,3 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1

70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1,6 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1,8,12 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1,16 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1,5,16 156:1 157:1 158:1 159:1,13 160:1 161:1 162:1,4 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1,17 207:1 208:1 209:1,6 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1,3 222:1 223:1,19

**marks'** 26:2,8 47:9, 14 59:16,21 60:9 98:11,16 107:6,10,12 113:10,15,23 115:10 125:7,12,21 139:2,7 142:4,12,17 154:12 167:13 180:19 182:2 186:13 196:9 207:25 218:2

**matches** 45:20

**material** 18:14 104:17

**materials** 37:8 49:2, 21 50:20 143:2,8,10 151:23 153:25

**matter** 11:5 90:7 221:8

**matters** 24:22 29:2, 20 112:14 135:17

**meaning** 54:21 73:21 129:14 139:19 163:14 177:7 193:5 197:15

**means** 17:20 23:6 30:15 44:22 78:22 96:4 111:15 115:20 177:24 208:16,20

**meant** 188:15

**measures** 193:11

**mechanism** 65:12, 21 116:22

**mechanisms** 65:14

**media** 11:2

**medication** 17:7

**meet** 92:19 175:7

**meets** 32:13 59:13

**members** 190:20

**mention** 73:7 173:13

**mentioned** 30:14 33:21 97:16 183:10 191:25

**message** 73:17 187:24

**met** 221:7

**method** 42:22

**MIB** 59:16

**mid-20th** 38:9

**middle** 152:20

**Migliori** 98:23 102:20 103:11,12 104:9,20 105:11,20,22 106:8 107:5 109:19 110:3 112:2

**military** 30:2 36:24 141:2 143:24

**mind** 154:19 194:14

**minds** 161:25

**ministerial** 213:19

**minor** 154:5,10 171:11 172:3,4 176:20

**minute** 57:4 103:10

**minutes** 17:20 79:22,23 130:16 214:6

**misdated** 91:17 94:10 97:13

**missed** 154:5 166:3

**missing** 74:15 75:5 89:25 91:11 117:6 160:17,18 211:11

**mistake** 134:12 215:7

**mistaken** 31:7 56:17 82:15 91:9

**mixed** 203:23

**mixup** 203:21

**moment** 19:15 162:22 176:25 179:2 197:25 202:7

**Monday** 149:20

**Monkey** 192:21 193:20

**month** 73:24

**morning** 10:2 12:12, 13 25:9

**move** 93:11 155:21

**moving** 97:2,18 205:17

**Mullen** 13:24,25 16:22,23 25:8,11,15, 19 42:17 47:2 51:10 54:20 64:22 75:7 78:10 79:8,21 94:2 96:19 104:14 105:14 110:7,12 112:3 114:19 115:11,21 123:4 124:20 133:2 134:23 137:2 153:6, 10 159:5 162:19 167:7 168:18,23 169:21 170:19 173:17,23 174:7 175:3 176:2,16 178:6 179:12 181:23 186:5 193:15 194:24 195:11,23 196:4,25 197:11,16 198:7 199:8 200:4 204:10 205:11,19 206:7 210:17 214:13 215:25 216:10 217:7, 13 218:6,22 219:17, 24 220:7,18,22 221:24 222:14,19,21

**multiple** 35:25 215:21

**municipality** 37:20 41:19

**mute** 14:21

**N**

**NAACP** 11:6 12:17 17:24 60:4 125:18 191:10

**named** 24:24

**names** 14:8

**necessarily** 81:21 118:19 146:7 184:13 197:18 198:9

**needed** 38:7 76:2 92:18 156:22

**negative** 210:18

**news** 100:19

**night** 66:22 68:17 81:12 82:8 95:20 128:2 135:19 164:5

**no-excuse** 54:13 90:15

**no-longer-relevant** 115:15

**non-civil** 23:22

**noncompliance** 221:20 222:9

**noncompliant** 121:21

**noon** 124:24 125:3

**normal** 42:10 95:7 190:23

**notaries** 22:14 23:2

**notary** 12:4 134:16

**note** 12:24 57:6 60:20,25 62:19 99:5 142:5 145:6 149:23 151:8 152:20 209:19

**noted** 11:15 108:7,10 131:3 148:20 210:6 214:15

**notes** 205:15

**notice** 71:3 76:10,19 77:4 78:5,16 82:11 107:24 119:11 120:8, 11,20,24 121:5 123:3,13,18 195:2

**noticed** 13:15 72:18 203:17 213:11

**notices** 177:14,19

**notification** 71:7,22 76:25 77:12 81:3,7 82:17 121:13

**notified** 123:10

**notify** 77:24 84:25 85:6 86:11 171:10 172:3

**notifying** 176:19

**noting** 210:4

**November** 18:22 38:17,18 39:3 60:12 74:14 93:5 94:13,15 95:20 96:17 97:19 98:5 102:17,20,24 106:16 108:4 110:20 111:3,23 114:3,6 120:25 124:9 126:3 128:23 129:16 130:5

133:8 180:13 181:7, 11 184:13 185:4,9 200:2

**NRCC** 162:7

**number** 20:10 41:22 45:17,20 46:6 86:25 90:23 91:25 92:4 99:23 118:17 124:4 132:16 144:11 145:6 155:10 159:14,17 182:18 183:12 192:4 208:21

**O**

**oath** 15:21

**object** 10:23 51:11 176:3 195:12 215:23

**objected** 192:5

**objecting** 214:2,12

**objection** 10:23 13:25 41:2 42:17 54:20 64:22 75:7 78:10 79:8 94:2 96:19 104:14 105:14 110:7,12 112:3 114:19 115:11,21 123:4 124:20 133:2 137:2 153:6 156:18 162:19 168:18,23 169:21 170:19 173:17,23 174:7 175:3 176:2,16 178:6 179:12 186:5 193:15 194:24 195:11 196:4, 25 197:11,16 198:7 199:8 200:4 204:10 205:11,21 210:17 212:12 213:21 214:15 215:17 217:7, 13 218:22 219:17,24 220:7 221:24 222:14

**obligated** 30:11 37:7 165:25

**obligation** 64:24 68:21 70:5 77:24

**obligations** 44:5 64:19

**obtain** 86:5

**occasion** 99:12 212:10

**occasions** 88:4 159:17

**occur** 175:25 203:22

**occurred** 35:21 90:13 105:7 109:19 213:3

**occurs** 163:18,19 169:5 197:20

**October** 38:24

**office** 32:22 44:16 50:25 53:6 63:13 114:23 127:12 149:4 158:13,23 190:19

**Offices** 181:9

**official** 45:11,13 52:13,17 53:13 54:17 55:4,5 127:10 177:14 202:3,5 219:6

**officials** 198:14 215:12

**omitted** 201:24

**online** 41:14 42:2

**open** 72:5 161:5,6, 10,11,14,15 164:10, 14,17 196:13

**opened** 48:6 79:3

**opening** 165:22 169:12 219:5

**operational** 80:17

**opinion** 93:18 97:17 101:24 106:10 195:16 208:15,19

**opinions** 18:6 159:4

**opportunity** 119:12, 19 120:25 202:6

**opposed** 34:14 91:3 108:12

**option** 39:4 77:10 92:21

**order** 20:4 60:23 94:20 113:11 125:8, 24,25 126:9 128:22 134:7 138:21 142:11 153:16 174:17 217:5, 12

**ordinarily** 14:2

**original** 107:23

**originated** 103:14

**outdated** 62:22 76:23 152:12

**outer** 27:6 48:22 53:8,11 58:8,12 82:3 146:7 147:12,15,16 158:6 164:9,10,14,22 165:5,6,22 166:6 169:2,10,18,23 170:10,15 174:2 177:20 185:3 194:18 196:2,24 197:5 199:6 203:11 216:16,22,23 217:4,11

**outlined** 28:11 30:7 117:25 199:18

**outlining** 48:9

**outreach** 123:9

**outset** 54:10 140:16

**outstanding** 17:15, 16 183:4

**outward** 147:6,19

**oversaw** 22:12

**overseas** 30:3 36:19,25 140:9 141:3 143:25

**oversee** 22:24

**overwhelming** 34:21

**P**

**p.m.** 63:7 66:3 81:11 84:8 95:19 131:6 141:22 163:21 164:4 169:15 206:12,13,15 223:3,5

**P.S.** 196:10,15 208:5 218:3,13

**package** 143:11 145:3 152:15

**packages** 160:16

**packet** 58:6 142:24 143:18 144:3 146:9 148:11 150:7 151:20

**pages** 52:9 54:5 62:21

**palate** 48:8

**pandemic** 87:9 90:22

**paper** 41:15 42:2 43:9 77:11 147:5,14, 20 148:4,8 151:24 154:4

**paragraph** 26:15 100:16 101:3 108:22 188:9

**parentheses** 60:16

**part** 35:14 51:17 112:13 114:8 137:10 143:10,17 146:9 151:20,25 152:14 153:23 164:21 166:16 169:8,11,17 170:12,16,21,22,23, 25 197:5,8

**parties** 10:14 43:11, 12 173:20 174:4 176:7 182:23

**partisan** 187:4

**partly** 31:12

**party** 70:23 162:7 183:13 184:2 185:2 188:11

**pass** 205:15

**passage** 86:24 87:18

**passed** 38:13 90:22

**past** 148:23 200:2

**pay** 138:5

**PDF** 25:7 187:11

**pecking** 20:4

**penalty** 141:19 202:21

**pending** 10:20

**Penndot** 45:23

**Penndot's** 45:18

**Pennsylvania** 11:5, 9 20:3 23:24 24:14 27:9,23 28:4,12 38:13 61:7 78:9 79:6 92:24 93:24 94:25 106:3,17,23 110:10 112:6 125:24 132:6 133:16 137:8 141:8 158:11 162:8 180:8 199:25

**Pennsylvania's** 27:8

**people** 54:12 120:9, 11 156:24 189:20 212:25

**perfectly** 187:2

**period** 35:22 42:10 94:24 156:2 178:18

**perjury** 141:19 202:22

**permissible** 210:25

**permitted** 166:19 173:20 185:13

**person** 27:16 40:3 64:14 119:15 120:10 127:9 177:12,13 204:12 210:14,23 215:6

**person's** 136:13

**personal** 114:21

**perspective** 36:7 131:24

**peruse** 154:21

**Philadelphia** 186:21

**phrase** 44:17 159:18, 24 177:2

**physical** 57:12

**pin** 107:3

**place** 37:23 56:10 65:21 113:21 122:9, 12 150:2 159:21 164:7 175:2 211:21 212:3,4,22

**places** 212:10

**plain** 31:16 33:23 52:15 185:23

**Plaintiff's** 172:9

**plaintiffs** 12:17 13:14 155:18 191:10

**play** 33:5,11

**pleasure** 23:16

**point** 22:11 23:15 54:3 56:14 69:23 74:5 81:24 83:9 92:15 97:11 104:25 105:3,20 108:22 116:4,13 140:2 152:7 157:14,20 173:3 174:20 175:24 176:25 179:6 184:10 190:7 192:9 204:20 209:3 213:9

**points** 117:3

**policy** 24:17,20,22 32:11,19

**political** 23:14 43:12 70:23 182:23

**poll** 211:18 212:16

**polling** 37:22 56:10 212:10

**polls** 41:11 211:14, 25

**populate** 187:10

**portion** 61:14

**portions** 108:8 115:15

**position** 19:24 21:7 22:20,23 32:17 135:24 154:24 170:14 176:13 179:10,21 194:8,22, 25 195:7 204:7

**positions** 20:19 23:21 24:12

**possibility** 133:3

**post** 181:22

**postcard** 140:25

**potential** 149:9

**potentially** 120:10 187:7 188:12,24

**practical** 108:5

**practically** 77:14

**practice** 78:8,13

**practices** 85:23 90:6

**pre-canvass** 81:25 84:7 109:7 111:10 163:10,14,15,19,25 164:8,23 165:10 166:5,17 207:3,6,23 217:19 218:20 219:4, 16,20 220:4,9

**pre-canvassed** 65:3

**pre-canvassing** 72:11

**precanvass** 168:17 169:5,9,12,17 170:12,16,17,22,23 172:22,24 173:10,15, 19 174:4 176:15 177:22 178:19 179:11,20

**precanvassing** 168:10 206:23

**precinct** 179:17

**precluded** 176:19

**precludes** 170:2,9

**predates** 197:23

**prefer** 41:3

**preferred** 141:2

**prep** 19:4

**preparation** 177:21

**prepare** 18:24

**prescient** 113:8

**prescribe** 30:25 31:5

**prescribed** 43:16 47:21 49:23 50:2,11 51:6 61:15

**present** 174:6

**presented** 62:10,13

**preserve** 213:13

**presidential** 91:6

**press** 182:23 191:14, 20 213:11

**pretty** 24:9 89:14 155:22 178:8

**prevents** 37:21

**previous** 19:2 62:7 101:5

**previously** 65:15 80:25 172:8 173:6 174:13 177:9

**Primaries** 190:2

**primary** 64:23 75:4 90:16,24 91:13 92:7 97:3 98:21 102:23, 24,25 103:7,17 105:8 109:20,22 121:2 124:18 129:5 183:3, 17 184:13 185:5,8 188:22 189:22,25 190:10 191:5

**print** 149:25

**printed** 25:13 67:15 199:6 200:10,20

**printer** 132:19

**printout** 208:4

**printouts** 25:12

**prints** 148:5

**prior** 23:8 67:8,10,17 84:20 86:2 87:13,18, 22 88:2,13,17,20 89:18,22,24 90:6 92:7 106:15 108:3 115:25 123:15 127:25 137:9 141:23 161:4 163:23 166:23 169:14 191:9,16 220:9

**prison** 22:5

**privacy** 128:14

**private** 23:8

**problem** 46:11 71:16 72:18,24 73:20 117:20 122:7 131:21, 24 144:14

**problems** 58:25

**procedure** 10:19 193:17 195:3

**procedures** 27:9 107:7 111:10 163:10, 17,25 172:16,23 178:2,13

**proceed** 125:4 164:18 214:13 216:3

**proceeding** 165:17

**proceedings** 104:20

**process** 39:17,19,21 40:8 41:8,13 42:15 46:18 63:22,25 65:2 81:18 85:4 86:9 136:5 137:10 140:12, 18 147:8 148:9 161:14 165:18 166:17 169:9 170:23 174:9 177:18 178:15, 19,20 202:20

**Process-wise** 39:15

**processed** 39:7

**processes** 40:13 170:3,4

**processing** 178:16

**produced** 142:21

**production** 60:2 70:22

**program** 22:12 33:3, 15

**prohibited** 171:11

**prohibition** 78:5 120:18 209:23

**prohibits** 168:25 195:4 209:24 220:4

**prompt** 58:18

**pronouns** 189:7

**properly** 215:13

**prosecution** 149:10

**protection** 154:8

**protective** 60:22

**provide** 39:18 41:15, 18,20 43:20 47:18 50:20 70:12,21 73:22 76:24 78:16 98:6 104:7 119:11 123:2 126:11 129:10 158:6, 24 168:13 184:17

**provided** 44:8 45:15, 20 60:14 63:14 70:19 71:5 73:18 76:11,23 81:2 106:20 107:24 117:13 158:13 169:13 187:25 210:9

**providing** 175:19

**provision** 38:24 199:10

**provisional** 195:8, 19,22 196:3,15,24 197:6

**provisions** 40:19 207:18

**public** 12:4 23:11

**publishing** 121:20 219:12

**pull** 47:5 53:23 172:7 174:12

**pulled** 60:6

**purported** 192:3

**purpose** 27:3 55:23 56:3 57:8 115:2 126:9,10 148:15,17, 19,25 182:14,16 205:5

**purposes** 66:21 104:3 127:19 210:3

**pursuant** 94:19 95:9

**push** 192:7 198:2 212:21 213:2,17

**pushed** 90:24 91:7

**pushing** 213:5

**put** 14:7 23:13 25:6 46:22 47:24,25 48:2 51:3 55:14 58:16 61:3 63:19 72:21 79:10 87:25 88:4 92:8,10 97:12 107:3 111:19 118:11 124:6 127:5,12 128:20 129:23 132:9 133:4 134:9 138:21 147:2 150:2,8 156:13,15

180:5 220:18

**putting** 74:14 101:8 117:17 152:24

**Q**

**qualification** 221:22

**qualifications** 18:15 102:4,5,14 222:4

**qualified** 40:10 42:25 56:6,12 198:24 202:22 204:14 222:10

**qualify** 40:4 42:9

**question** 16:3,12,15, 17 17:15 23:12 32:8 36:2,12 51:20 103:19 106:8 112:23 130:4,5 134:24 155:13 169:3 175:22 194:11 200:12,17 202:12 203:10,14 204:2 208:15 218:7 221:25 222:5

**questioned** 177:9

**questioning** 14:19 176:4 195:13 198:22 213:23 214:9 221:16

**questions** 13:20 14:12,25 15:7,14 16:2 17:5 32:3 59:8 80:9 89:11 90:10 100:20 130:17 155:5, 10,21 159:11,14 161:24 162:9 176:5 198:16 205:25 206:5, 18,22 207:9 208:9 209:4 214:6,11 216:9,10,13 220:12, 15,17 221:15,17 222:19

**quick** 155:22 221:13

**quickly** 82:22 86:21 191:7

**quizzing** 73:4

**quo** 129:17

**quote** 199:5

**quote/unquote** 129:4

**R**

**raised** 59:13 131:15

**range** 126:16,19,23 132:9 134:13

**rationale** 188:10

**reached** 121:16

**read** 19:19 26:19 27:13 100:5 109:8 116:8 145:11 176:9, 25 219:19 222:22

**reading** 126:15

**reads** 109:2 168:7

**ready** 67:16 132:18 222:23

**realize** 156:14

**reason** 17:4,19 37:16,18,25 38:7,20 39:18 40:5 56:15 72:2 74:12 75:2 83:25 89:2 110:24 164:14 175:19 195:18 212:6

**reasons** 42:14,20 73:25 74:11 117:12 154:2

**recall** 19:9,11,15 30:20 38:24 59:5 62:2 69:19 73:5 74:9 75:8 77:9,18,20 87:20 88:18 89:2,5, 21 91:10,14,19 92:10,16 94:18,21 95:5,11 97:24 98:6 102:18 103:16 104:18 105:16,19 106:12 108:2 118:15, 17 120:3 121:24 141:16 159:19 160:19 162:20 166:8 171:20 181:14 186:10 190:21 193:3 197:18 206:24 207:11,16 208:12 212:19,23

**recalling** 94:22

**receipt** 65:25 66:4 67:22 123:8 176:12 210:4

**receive** 43:3 64:24 71:7 81:3,7 123:18 156:5 191:23

**received** 57:14 60:3 65:10,17,19,22 66:5, 8,19 67:24 68:17 71:9,23 72:6 75:23 81:4,11,14 82:23 90:10 94:24 95:3,6, 17,19 100:18 109:5 116:24,25 123:13 127:25 128:10 135:18,23 136:7 138:11 141:14,24 156:16 157:14,24 158:8 164:3 165:8,11 174:9,22 175:11 177:13 182:20 191:24 192:2 193:13 201:22 209:17,20

**receives** 69:4 99:18 177:14

**receiving** 69:5 70:21 119:15 155:24 170:6 177:8 191:20 203:7

**recent** 57:3 60:12,14

**recently** 73:11 82:16 129:11 196:6

**recess** 80:3 206:12

**recirculate** 189:17 191:4

**recognize** 26:9 47:15 98:15 107:11 113:24 125:22 139:12 187:15

**recognizing** 57:23

**recollection** 18:23 70:4 78:2 85:20 90:4, 8 91:22 94:17 95:15, 21 97:6 103:6 104:24 105:6 112:4 118:8,13 121:3 122:23 123:6 132:12 171:17 196:23

**recommendation** 176:18

**recommended** 158:18

**reconvene** 130:18

**record** 10:22 11:16 12:7,15 13:8 14:15 15:24 25:24 45:3,6,7 60:21 61:3 68:24 69:6,13 70:6 80:2,6, 19 81:10,14,22 82:22 83:12 84:24 118:6 123:7 125:6 130:22, 24 131:6 167:19 175:5 181:25 184:8 206:11,15 222:24 223:3

**recorded** 72:20 82:18 118:11

**recording** 10:9,15 69:22 118:3 121:12 170:7 197:24 219:12

**records** 45:9 71:21 81:8 191:19

**recount** 190:2

**redacted** 60:25 61:21 142:8 180:20 181:6

**redline** 108:16

**redundant** 151:6

**referenced** 103:10 106:19 112:7 178:21

**references** 181:17

**referred** 40:14,24

**referring** 55:25 106:2,24 110:14 162:21

**reflect** 133:22

**reflected** 109:15 111:3 112:5 219:10, 13

**reflecting** 133:12

**reflects** 134:21 135:10 149:16

**refresh** 196:22

**regard** 176:5

**registered** 43:2 44:25 45:21 55:11

**registration** 21:3 23:2 45:9 76:12 136:14 137:4,7

**registry** 20:25 28:20 44:24

**regular** 151:12

**regulation** 31:21

**regulations** 29:16

**reject** 89:8 101:7

**rejected** 66:17 74:11

**rejecting** 89:6

**related** 19:3 24:15,23 28:12 30:15 48:6 105:19 113:2

**relates** 30:22 31:8 54:11

**release** 169:14

**relevance** 197:2 198:16,20,23

**relevant** 24:11 48:13 50:16 54:19 58:18 67:19 68:7 73:7 81:9 128:9 136:6 139:24 151:4 163:8 188:25 190:3 194:4 195:14 198:24 202:11 204:8, 15,18

**relying** 184:6

**remain** 66:14 72:9 124:16 129:7

**remains** 222:10

**remember** 131:17

**remind** 116:21 158:17

**reminder** 100:3,24 101:5 129:10

**remote** 10:6,16

**remotely** 10:10,13

**removal** 219:7

**repeat** 33:10 134:24 135:3 194:11

**repeatedly** 183:4

**rephrase** 16:13 192:17 210:19 217:2

**report** 193:25

**reporter** 10:11 11:17 12:5 16:6 186:21 223:7

**Reporting** 10:5

**reports** 185:19

**represent** 14:9 98:22 113:18 162:5 186:17 187:13 196:14 221:5

**representative** 128:17

**representatives** 173:21 174:5

**represented** 142:20

**representing** 13:13 100:9,10 155:17 205:7

**Republican** 15:16 162:7

**request** 38:3,7,19 39:19,22 42:7,12,16 43:14 70:22 75:22 185:16 191:11,16 192:8 193:23

**requested** 37:18 69:11 70:12 151:23 187:7 188:13

**requesting** 193:21

**requests** 143:14 182:20,22 183:7,11 191:14,20

**require** 143:14 185:19 186:9 193:24 205:3

**required** 30:10 60:16 153:4 166:4,24 171:9 172:5 176:23 186:3,7 192:20 216:16 217:10

**requirement** 24:12 40:15 53:17 54:8 65:5 70:11 100:3 120:19 134:17 135:7 149:17 153:21 154:5 155:25 174:11 185:22,25 192:10 204:25 221:20

**requirements** 29:22 30:6 43:16,18 59:3,7 113:16 115:5 136:10 140:19 141:8 143:13 148:20 169:20 175:8 211:14

**requires** 166:10 209:14

**reserve** 222:22

**residence** 41:19

**resident** 41:17 102:7 137:8

**resource** 181:8

**respect** 64:19 147:10 158:14 175:23 176:24 190:14

**respective** 86:15

**respects** 54:19

**responded** 192:12, 15

**responding** 16:4 183:25

**responds** 186:25

**response** 51:7 129:16 187:21 188:5 192:20 214:7

**responses** 191:22 193:12

**responsibilities** 22:23 27:21 28:6,11

**responsible** 22:10 168:9

**responsive** 35:20 75:19

**rest** 188:4

**restate** 16:14

**result** 215:14 216:6

**resulted** 72:24

**results** 169:14

**resumed** 131:9

**retained** 223:6

**return** 37:5 39:25 40:16 44:15 46:18 50:25 52:6 53:5 54:6, 8 57:18,19 63:24 64:2,10,14 68:22 71:2 76:18 80:10,13, 21 83:15 84:20 86:15 108:24 109:3 116:14 139:25 140:6 142:23 143:3 145:25 146:2, 15 147:21 148:16,22 150:15 151:2 152:3,4 153:5,13 155:25 157:25 158:2 160:9, 23,24 161:3,6,7,11 167:21 174:23 178:16 185:7

**returned** 63:16 68:24 69:8,14,24 70:18 77:6 80:14 81:23 83:8 84:9 118:3 136:18 147:6 149:3 157:19,22 160:2,8 163:22

**returning** 119:14 120:9 177:11 204:12

**returns** 28:16 43:4 128:7 138:4 157:12

**reveal** 159:6

**reverse** 146:20

**review** 32:24 44:6 52:9 86:14 97:23 114:25 119:16 161:7 178:22 191:19 207:21

**reviewed** 19:2,6 33:14 62:8 63:3 100:12 146:25 159:3 172:8,10 196:6

**reviewing** 81:21 166:14 173:25

**RNC** 162:7

**role** 13:9 24:16 32:16 33:6,11

**roles** 22:17

**rolled** 131:19

**rolls** 45:11,13 93:9 222:10

**room** 10:8,12 14:3,5 16:20

**rooted** 31:14 162:16

**round** 220:16 221:16

**rule** 10:18 198:5

**ruled** 93:15 112:12

**rules** 10:18,19 12:23 37:4

**ruling** 79:7 95:10 106:7,16 129:8 132:8 133:19 154:24 189:18 191:2

**run** 13:21

**Russ** 15:4 162:5

## S

**saga** 188:20

**sample** 142:6

**save** 111:18

**scan** 63:15 69:9 83:2, 8 116:14 216:15,18, 21 217:5

**scanned** 63:21 69:17

**scanners** 216:21

**scanning** 83:14

**Schmidt** 12:18 17:24 26:3,11

**SCOPA** 125:7

**scope** 214:9 217:14 222:15

**screen** 25:4

**scroll** 173:2 174:19 186:23 187:12

**seal** 55:15 64:9

**sealed** 55:17 72:9 166:25

**secrecy** 50:23 52:15, 23,25 53:13 55:14,17 58:8 64:7 71:18 74:4, 7 78:25 79:3 84:2,4 138:9 147:7,11,22 164:16 165:25 213:13

**secret** 128:15

**secretary** 20:2,7,8 22:20 24:21 26:22,25 28:9 29:12,17 30:24 31:4 32:24 33:5,19 61:15 162:4 185:18 221:3

**Secretary's** 30:16, 23

**section** 168:5 172:22 196:15 208:4,11 218:13

**sections** 30:21

**secure** 64:25

**secured** 72:9

**Security** 41:22 45:25 46:3,6

**seeking** 39:7 76:4

**sees** 211:5

**segregate** 65:17 94:23 95:6,13,16 112:19 158:19 179:8 186:8

**segregated** 94:19 113:5 179:11

**segregating** 95:12

**select** 99:23

**send** 37:8 45:18 49:3,15,21 51:7 52:10,12 58:7 67:12 82:16 99:17 100:15 148:7 156:15

**sending** 58:5 67:14 99:9 152:18

**sends** 49:7 143:21

**sense** 74:19 75:25 77:15 179:18

**sensitive** 193:22

**sentence** 168:6 188:8

**separate** 40:19 73:13 75:13 143:25 147:4,14,20 160:10 181:3

**separately** 13:15

**September** 107:16, 20 108:17 109:11,25 110:14 111:23 115:9 167:25 172:16

**series** 15:25 162:8 198:16

**servant** 23:4,11

**serve** 23:16 136:5

**served** 27:4

**service** 23:6,19,21, 22

**set** 13:20 32:6 51:6 66:13,16 79:5,12 111:18 113:6 117:19 126:16 153:25 154:9 160:15 161:13 164:13 165:16,25 173:3 196:21 204:22 219:15

**sets** 218:20

**seventh** 42:12

**sharing** 25:3

**sheet** 143:17 144:7 147:5,14 148:4

**short** 221:12

**shorthand** 160:6

**shortly** 69:4 103:17 129:15 190:25

**shot** 155:7

**show** 25:16 47:13 57:3

**showed** 207:24

**showing** 26:7

**shows** 48:20

**shutdown** 87:5

**sic** 22:2

**side** 48:24 61:22 62:10 89:16 146:20

**sign** 32:25 33:20 41:24 56:4 57:10 60:17 64:9 71:20 73:21 79:11 100:4 145:8 150:8 152:22 156:12,14 199:6,22 200:9,14,18,24 201:6,12,15,20 210:16 211:10,18,20 212:3 222:22

**signature** 40:15 53:17 61:20 73:10,17 74:16 75:5 79:11 96:12 100:23 117:5 145:10 149:25 150:9 152:23 157:19 160:18 161:18 166:15 175:17 203:18 204:12,23 211:7 214:19 217:5, 11

**signed** 38:23 128:19 134:9 138:6,7 156:3 157:20 165:6 173:4 174:24 175:12 202:15,18,25 203:6, 12,16,23,24 212:2,16 215:13

**significant** 91:25 92:4

**signing** 149:5

**signs** 68:5 128:7 147:13

**similar** 62:7 140:18 146:2,5,11 148:19 177:8,17 179:5

**simply** 38:2 81:20 134:12 140:8

**sit** 86:12

**situation** 121:6 213:16 214:17

**situations** 147:25

**size** 50:8 59:10 62:11,15

**slightly** 62:11 65:13

**small** 155:10

**Social** 41:22 45:25 46:3,6

**sort** 18:4 31:10 35:10,25 39:6 63:15, 23 75:18 86:19 103:18 143:16 150:22 158:24 185:13 190:9,24

**sorting** 179:16,17

**sorts** 177:20

**sound** 93:7

**sounds** 103:9 110:22

**space** 152:23

**speak** 84:23 90:5 91:20 123:5 151:21 167:7

**speaking** 158:12 192:4

**speaks** 101:22 219:25

**special** 129:11

**specific** 23:6 36:22 37:18 50:21 69:11 73:25 89:22 140:4 157:8 163:2 171:20 192:23 200:17 202:10 203:14

**specifically** 105:19 139:18 151:15 178:18 189:9 196:17 207:4,15

**spectrum** 122:16

**spend** 27:19

**spite** 97:8

**split** 93:13

**spoke** 10:21

**spots** 72:14 76:7

**spouse** 203:23,25

**spouses** 36:24

**squeeze** 151:17

**SSN** 45:22 46:2,5

**staff** 69:25 181:16 189:14 190:16,18

**staffing** 80:18 84:15

**stamp** 63:8,14 65:6, 12 156:22

**standalone** 114:2

**standard** 126:11 130:8 131:25

**standardized** 43:7,9

**start** 11:2 21:10,15 133:6 165:21 166:20 170:17 191:6,7 220:9

**started** 12:23 21:18

**starting** 75:3 220:5

**state** 10:23 11:5 12:6 13:8 20:3,20 22:18 23:7,9 24:18 27:16, 21,25 28:7 30:13 35:16 43:24 48:2 51:25 72:23 86:13 88:19 94:8 100:9,24 124:14 128:25 131:22 140:10 162:14 166:13 172:2 186:25

**State's** 10:19 100:11

**State-level** 28:14

**stated** 205:6

**statement** 87:2

**states** 11:7 134:19 172:23 199:4

**statewide** 20:25 21:2 28:20 44:24

**status** 117:15 129:12,17

**statute** 31:17 78:2 198:5

**statutory** 27:4 29:22 43:15,18 59:15 65:18,19 66:2 70:5 95:7 135:18 143:13

**stay** 105:3,5,22 106:7

**stenographic** 11:16

**step** 33:8 213:19

**steps** 46:13 85:6

**sticker** 98:25

**stipulate** 10:14

**stricken** 109:12 111:2

**strike** 76:8

**strike-through** 111:9

**struck** 108:8,23

115:14

**subgroup** 37:3

**subject** 60:22 100:2 142:10 215:21

**subjects** 149:9

**submissions** 27:12

**submit** 41:25 136:17 192:20 193:25

**submits** 214:23

**submitted** 28:16 36:15 51:8 120:11 156:8 157:5 193:2 214:18

**submitting** 66:21 119:20 156:7 198:13

**Subscribed** 223:21

**subsection** 196:18, 22 218:18,23

**subsequent** 112:6

**subsequently** 106:20 165:20

**subset** 140:4,16

**substantially** 150:17

**substantive** 141:6

**Substantively** 115:22

**succinct** 103:24

**summary** 94:4

**Supp** 125:7

**supplement** 115:13

**supplemental** 125:23 126:9 132:8 133:19 134:6

**supplemented** 115:16

**supplementing** 125:25

**supplied** 152:3

**supply** 184:20

**support** 26:22

**suppose** 203:17 205:12 216:21

**supposed** 52:20 128:14 175:25 218:14

**Supreme** 79:6 92:24 93:12,24 94:4,20,25 95:9 98:4 104:20 105:21 106:2,3,5,17, 23 108:2,9 111:25 112:7 125:24 132:6, 24 133:6,16 134:6 158:10,11 159:4 171:7 174:16 180:9 186:2,7 189:18 190:25 200:2

**surrounding** 36:9

**survey** 86:4 180:20 181:17 182:3,9,10, 15,16 183:16 184:2, 18 185:21,24 187:2 189:10 190:15 191:4, 12,23 192:6,13,16, 20,21 193:5,9,18,19

**surveyed** 118:19

**surveys** 194:3

**swear** 10:13 11:18 197:7

**swearing** 10:16

**sworn** 12:3 223:21

**system** 44:10,19,24 45:10,14,17 65:16 68:20,23,25 69:15,16 71:3 72:20 75:16 76:3,9,17 77:22 78:17 80:11,15 81:9 82:5,10,14,16 86:7 116:15 118:4,7 122:21 170:8 175:6, 20 197:25 217:6

**systematic** 86:14

**systematically** 44:9,18 187:6

**systems** 28:23 31:8 50:6 197:24

**T**

**tabulate** 164:18

**tabulating** 169:13

**tailored** 55:10

**takes** 164:7

**taking** 113:21 152:5

**talk** 40:22 41:7 49:11 51:2 63:24 79:15 136:3

**talked** 68:19 70:10 99:11 132:7 177:9

**talking** 16:6 43:19 54:10 153:7 163:2 170:5 174:8 178:17 189:13

**talks** 116:13

**tallying** 219:9

**targeted** 99:22

**technically** 36:21 160:6

**technological** 25:3

**telling** 116:5 154:14

**template** 51:12,14 53:25 56:2,16,20 59:13 60:14 62:22 63:3 146:25

**templates** 47:18 48:3,11 49:25 54:22

**temporarily** 140:8

**ten** 119:2,4 192:12,15

**term** 18:8 29:5 30:22 31:6 41:3,4 52:18 74:4 88:11 95:25 98:2 108:16 119:10 131:25 132:5 140:11 190:16 197:17,19 198:8,11 207:3,13,17 208:18,19 217:19 219:11,16

**terms** 29:3,8 31:22 39:6 58:12 112:14 133:11 158:21 178:3 204:18

**testified** 12:4 19:12 122:19 131:9 180:7

**testify** 15:22

**testimony** 19:2,6,7, 8,10

**text** 148:4,14 149:12 151:8 187:9,15 188:5

**thereabouts** 110:21

**thereof** 27:4

**thing** 23:7

**things** 24:24 53:2 59:9 74:2 75:14 156:23 165:17 166:4 205:16 206:19

**thinks** 77:7

**thought** 20:13

**throw** 209:9

**time** 11:13 12:14 13:16,21 16:7 17:9 22:11 23:20 27:20 41:16 42:4 63:14 65:6 66:20 67:9 69:17,19 71:6 72:10 76:11 80:2,6,14 82:4 83:14 90:25 92:15 94:24 97:24 105:20 106:9 108:5 116:5 130:13,24 131:3,6 136:14 137:4,6,24 154:21 156:2 159:11 163:23 174:6 180:6 202:7 205:18 206:3, 6,11,15 209:15 221:10 223:3

**time-stamp** 217:12, 17

**timeline** 102:19

**timeliness** 127:19

**timely** 65:10,22 66:6, 9,18 67:3,20,21,24 68:8,17 83:16 109:5 116:23 122:20,25 136:7 138:11 149:3 157:4 158:8 165:8,11 206:9

**times** 189:8 208:22 212:19

**timing** 192:6

**title** 19:24 22:6

**titled** 172:22 182:3 186:14 196:10 218:3

**today** 13:10,18 16:21 17:2,6 86:13 105:18 158:13 180:7 198:15 221:10

**today's** 18:25 56:21 60:15

**Tom** 10:11 16:5

**tongue** 93:10

**top** 19:12 48:18,19, 21,24 62:14 98:24 99:5 107:25 114:8 181:5

**total** 184:19

**track** 192:24

**traditional** 62:6 150:23

**traditionally** 89:15

**trailed** 194:12

**training** 20:15 205:3

**transcribed** 15:24

**transcript** 16:8

**transmission** 55:19

**transmitted** 141:21

**transparency** 175:7

**trigger** 71:3 76:19 82:11

**trouble** 53:24

**true** 90:11 118:9,24 137:18 162:23 221:23

**truthfully** 17:6

**truthfulness** 204:18

**TSG** 10:5

**Tuesday** 11:12 42:13 91:7,9

**turn** 26:14 34:25 48:16 53:21 57:16 86:19 108:20 113:22 138:17 168:4 211:4

**tweet** 186:14,18,24 187:14

**two-year** 35:22 188:19,20

**type** 36:22 72:24 123:2 154:4

**types** 36:14 43:19 62:5

**typically** 67:16 99:12

**U**

**U.S.** 94:19 95:9 104:20 106:2 111:25

**ultimately** 32:23 66:17 135:16 161:4 164:16 170:13 222:2

**unable** 57:10

**unchanged** 129:7

**undated** 13:2 18:7 19:14 27:10 35:3,16 73:14 75:12,20 89:9, 19 91:17 93:14,16,20 94:10,14 95:14,18,23 96:25 97:5,13 98:8 101:12 103:2,19 106:18 109:4,16,22 110:5 111:4 112:16 113:4 114:4 116:6,9 124:8,11,17 129:13 159:18,25 160:3,7 174:14 175:15 179:8 180:14 182:18 183:12 189:5

**undated/misdated** 105:23

**underlined** 145:13

**understand** 16:12 36:13 55:8 112:21 132:5 147:17 154:7 200:12 203:9 204:4,6 221:25

**understanding** 18:12 24:13 29:10 34:17 42:19 64:23 83:7 84:21 93:12,23 94:5 104:15 112:11

120:17 122:4 126:8, 10 163:13 168:21 171:12,25 197:13,14 198:6 200:6 220:8

**understood** 16:17 17:22 92:20 96:2 164:6 188:7 198:12, 22

**undertake** 195:4

**uniform** 20:25 32:6 36:19 44:24 65:24

**uniformity** 84:10

**unique** 69:7,10 157:10

**United** 11:7

**universally** 190:5

**unknown** 140:6

**unopened** 66:15

**unpack** 44:18

**unsigned** 73:14 75:12

**untimely** 66:11

**UOCAVA** 36:17,19 37:10 87:15 88:12 138:18 139:9,18 140:14 142:13,24 143:2,22 151:5 153:12 154:13,25

**upcoming** 124:18 129:21,24

**update** 83:12 108:5

**updated** 76:12 110:19 172:16

**upgrading** 205:4

**upload** 167:5,10 180:18 181:20 186:12 196:7 217:22

**urging** 134:17

**V**

**vacating** 111:25

**vague** 215:20

**valid** 51:8 66:21

**validity** 10:15

**variation** 61:7 120:24

**varies** 180:2

**variety** 20:19 28:10

**vary** 49:21 51:18 58:5,12 80:16 84:16

**verbatim** 58:24

**verification** 102:13 137:22

**verified** 46:2 49:6 203:7

**verify** 44:7,19 45:14, 19 46:13 135:14 165:5,7

**verse** 153:23 154:6

**version** 52:7 56:16 167:24,25 172:17

**versus** 11:6 12:17 17:24 19:16 60:4 65:18 73:14 96:9 106:25 112:8,12 207:23

**Vic** 12:16 60:18 134:23

**video** 10:15 134:25

**video-recorded** 11:3

**view** 100:8,11 153:3, 14 185:12

**viewed** 115:4

**virtual** 14:5

**virtually** 163:16

**vis-a-vis** 27:22

**Von** 10:3

**vote** 37:25 39:23 40:4,9 41:11 56:6,9, 12 69:2 102:4 139:20 140:9 157:5 200:19 202:22 204:14 205:7 210:7 211:13,15 212:22 213:11 214:19,24 215:3 221:22 222:8

**voted** 53:14 87:8 197:21 198:3

**voter** 18:15 21:2 22:25 28:20 36:20 37:19,20,22 41:10 43:2,4,20 44:8,13,20 45:8,11,13,15,16,21 46:15 49:3,4 51:7,8 52:11,13,20,22 53:5, 9,14 55:9 56:4,5,7, 11,24 57:10 60:17 61:10 62:23 64:2,5 67:8,18,25 68:4,10 69:11,23 70:17 71:4, 5,7,17,19,21 73:17 74:21 76:10,20,22,23 77:6,12,15 79:10 80:24 81:2,3 82:12, 17 88:7 89:16 101:20,24 102:12 104:7 117:13,14 119:13,18 121:14,18 123:12 126:22 127:5, 8,15,20,23 128:3,5,6, 13 132:9,21 133:4, 12,22 134:5,8,11,21 135:9 136:11 137:13, 23 138:4 140:11 141:3,5,18 142:9 143:12,14,22 144:25 145:23,24 146:3,10, 23 147:13 149:2,7,17 150:7,16 151:5,22 156:5,11 160:8 179:2 184:3 185:2 194:6, 16,23 195:7,16 197:7,20 198:17,23 199:5,19,22 200:8, 14,18,23,25 201:5,8, 11,19 202:6,14,21,25 203:6,12,16 205:9 210:7 211:9,13,22 212:2,18 213:16 214:22 215:3,12 216:7 222:5,9,10

**voter's** 49:2 102:3 104:9 194:19 213:13, 20 214:17 221:18,22 222:3

**voters** 27:5 36:23,24 37:9 39:4,22,24 42:11 45:2,3 49:22 50:17,20 58:18 59:14 63:17 67:5,7,9 77:24 78:6 84:18,25 85:7 86:11 87:8,24 88:4 104:6 119:12 121:17, 20 122:6,9,18 123:3, 9 139:3,9,17,18,19 140:3 141:7,11,14 143:18,25 147:9 148:8,10,18,22 151:3 153:12,24 154:8 155:25 157:4 159:21 170:7 171:10 172:3 176:20 212:15 215:15

**votes** 64:5 67:25 219:10,12

**voting** 28:23 29:4 30:2,15 31:8 42:22 44:15 52:21 56:8 87:13 105:8 140:13 197:23 212:18

**W**

**wait** 16:2 33:9 45:5 156:6 218:6

**waited** 156:21

**Walczak** 12:11,16,24 13:23 14:2 15:2,8,15, 19 25:2,10,15,20 26:6 46:22 47:3,8,12 51:16,21 59:19 60:24 61:4,5 79:17,23 80:7 98:14 107:9 113:13 124:22 125:10 130:12 131:11 135:2, 5 138:19 139:5 142:3,15 153:9,11 155:4 156:18 159:17 160:14 161:23 201:25 205:23 209:2, 5 210:20,22 212:14 213:25 214:14,16 216:8 221:14 222:20, 25

**Walczak's** 220:16

**walk** 41:9 46:17,18

**walked** 213:4

**wanted** 61:3 113:3 116:21 117:11,12,14, 16 142:22 162:10 175:18 221:16

**ways** 121:4,8 184:4

**web** 182:10

**website** 121:25

**Wecht** 93:17

**Wecht's** 97:16

**week** 108:4 141:25 152:7

**week's** 159:3

**weeks** 67:10,17 68:13 73:11 156:7,13

**Western** 11:8

**wizardry** 25:3

**word** 115:13 151:7 189:4 197:15 208:10, 16 219:4

**words** 52:16 89:5 124:15 169:25

**work** 22:5 23:7 27:23 32:9,10 33:18 83:5 130:20

**worked** 21:12,21 59:11

**worker** 217:3,9

**workers** 211:25

**workflow** 84:14 180:2 184:11,22

**working** 21:15,18 24:10 25:5 217:9

**worried** 122:10

**worth** 112:25

**wrap** 182:24

**write** 153:13 159:22

**writes** 102:13 137:13

**writing** 33:16

**written** 32:12 96:13 101:19 126:17 138:13 154:16

**wrong** 101:8 136:9 144:15 211:20 212:3, 16

**Y**

**year** 18:7 19:13 21:10 75:10 91:6 98:4 180:13

**years** 18:5,17,18,20 20:18 21:12,14 23:9 24:8 35:14 82:22 136:19,21 171:15 188:20

**Z**

**zone** 11:14

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION**

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, ET. AL.

Plaintiffs,

v.

AL SCHMIDT, ET. AL.

Defendants.

Case No. 1:22-CV-339-SPB

**RESPONSE OF DEFENDANT, LANCASTER COUNTY BOARD OF ELECTIONS, TO PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS**

Defendant, Lancaster County Board of Elections ("LCBOE"), files this response to plaintiffs' concise statement of material facts (ECF No. 283).

1. Pennsylvania has long provided absentee-ballot options for voters who cannot attend a polling place on Election Day. APP_00954 (Marks Dep.); 25 P.S. § 3146.1–3146.9.

**Not disputed.**

2. In 2019, Pennsylvania enacted new mail-in voting provisions, which allow all registered, eligible voters to vote by mail. APP_00954 (Marks Dep.); APP_01180 (Greenburg Report); Act of Oct 31, 2019, P.L. 552, No. 77, § 8.

**Not disputed.**

3. More than 2.6 million Pennsylvanians voted by absentee or mail ballot in the November 2020 general election, and more than 1.2 million Pennsylvanians

60. The only other purported use for the voter-written date identified in discovery by any county is that considering the date written on a voter declaration might aid in prosecution of voter fraud relating to deceased voters. No county mentioned this use of the voter-written date in their interrogatory responses, but both Lancaster County and Westmoreland County addressed it when deposed. APP_00910-915 (Westmoreland Dep.); APP_00888-892 (Lancaster Dep.).

**Not disputed.**

61. If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the board of elections removes the deceased person from the voter rolls. 25 P.S. § 3146.8(d); APP_01191 (Greenburg Report); APP_01016-1019, APP_01026-1029 (Greenburg Dep.); APP_00888-892, APP_00895-896 (Lancaster Dep.).

**Not disputed.**

62. County boards of elections determine whether a voter died before 8:00 P.M. on Election Day by reviewing Department of Health records, local obituaries, and/or death certificates. APP_00895-896 (Lancaster Dep.); APP_00911-912 (Westmoreland Dep.); APP_01032 (Greenburg Dep.).

**Not disputed.**

63. If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the county board of elections will not count that person's vote, even if the vote was timely submitted before the voter's death. APP_00818 (Berks Dep.); APP_00890-891 (Lancaster Dep.); APP_00911-914 (Westmoreland

Dep.); APP_01016-1019, APP_01026-1029 (Greenburg Dep.).

**Not disputed.**

64. If a county board of elections learns that a registered voter died before 8:00 P.M. on Election Day, the county board of elections will not count that person's vote, regardless of what if any handwritten date appears on the outer return envelope of the deceased voter's ballot. 25 P.S. § 3146.8(d); APP_00819 (Berks Dep.); APP_00890-891 (Lancaster Dep.); APP_00914 (Westmoreland Dep.); APP_01016-1019, APP_01026-1029 (Greenburg Dep.).

a. For example, the Beaver County Board of Elections set aside the ballot of a deceased voter who also happened to write the date on the wrong line of their return envelope. On the return envelope, an elections official wrote "Voter passed away[,] DOH notification 11/3/22[,] moot on date." APP_01485.

**Not disputed.**

65. A voter whose mail ballot was timely received by their county board of elections could only have signed the voter declaration form in the year 2022, because the county boards of elections did not begin sending the relevant mail ballot materials to voters until August 2022 or later (*see supra* ¶ TK), and the ballots must have been received by November 8, 2022 to be considered timely. APP_00835-81 (Berks Dep.); APP_00878-879, APP_00884-885 (Lancaster Dep.); APP_00923-924, APP_00929g, APP_00929l-929q (Westmoreland Dep.).

**Not disputed.**

(Berks Dep.); APP_00930-931 (Westmoreland Dep.); APP_01183 (Greenburg Report).

**Not disputed.**

114. County boards of elections are capable of updating records of the total number of votes received by each candidate in past elections if ordered to do so by a court. APP_01183-1184 (Greenburg Report); APP_00931-932 (Westmoreland Dep.).

**Not disputed.**

Respectfully submitted,

Date: May 5, 2023

*/s/ Walter S. Zimolong*
WALTER S. ZIMOLONG III, ESQ.
wally@zimolonglaw.com
JAMES J. FITZPATRICK III, ESQ.
james@zimolonglaw.com
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
*Attorneys for Defendant Lancaster County Board of Elections*

**CERTIFICATE OF SERVICE**

I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Western District of Pennsylvania. I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.

Respectfully submitted,

Date: May 5, 2023

*/s/ Walter S. Zimolong III*

Walter S. Zimolong III, Esq.
wally@zimolonglaw.com
James J. Fitzpatrick III, Esq.
james@zimolonglaw.com
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
*Attorneys for Defendant Lancaster County Board of Elections*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>AL SCHMIDT, *et al.*,<br><br>Defendants. | Case No. 1:22-cv-00339 |

**DEFENDANTS' COUNTY BOARDS OF ELECTIONS ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS AND RESPONSES TO INTERVENOR-DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS**

Defendants Allegheny, Bucks, Chester, Montgomery, and Philadelphia County Boards of Elections ("Responding Counties") hereby submit an Additional Concise Statement of Material Facts followed by Responses to Intervenor-Defendants' Concise Statement of Material Facts (which Responses begin at page 7 below).

Responding Counties believe that enforcement of the requirement to handwrite a date on the outer return envelope of an absentee or mail-in ballot violates the materiality provision of the Civil Rights Act as a matter of law. Responding Counties, however, take no position on the merits of the separate constitutional claims raised by the Plaintiffs in this action or the merits of the "standing" arguments raised by Plaintiff's and Intervenor-Defendants.

**RESPONDING COUNTIES' ADDITIONAL STATEMENT OF MATERIAL FACTS**

**I. Philadelphia County Board of Elections ("Philadelphia County") does not use the handwritten date to determine the qualification of the voter, the timeliness of the ballot, or prevent fraud**

1. To vote by absentee or mail-in ballot in Philadelphia County, prospective voters must first send a voter application to Philadelphia County. APP-70 (Custodio Decl. ¶ 6).

2. Philadelphia County then reviews the application and determines whether the voter is registered and qualified to vote. APP-70–71 (Custodio Decl. ¶¶ 6, 12); 25 P.S §§ 3146.2b, § 3146.8(g)(4), 3150.12b.

3. If Philadelphia County approves the application, it mails an absentee or mail-in ballot package to the approved voter. APP-70 (Custodio Decl. ¶ 6).

4. This review and approval process at the application stage confirms the voter's identity and eligibility to vote. APP-70–71 (Custodio Decl. ¶¶ 6, 12).

5. Philadelphia County's determination that an individual is qualified to vote is conclusive unless the voter's eligibility is challenged before Election Day. 25 P.S. §§ 3150.12b, 3146.8(g)(3)-(4).

6. Each absentee and mail-in ballot envelope contains a correspondence ID that is unique to both the voter and election for export to the Statewide Uniform Registry of Electors (SURE) system. APP-71–72 (Custodio Decl. ¶¶ 10, 16).

7. When Philadelphia County receives absentee and mail-in ballot envelopes, it runs those envelopes through a sorting machine that scans the unique ID and records that the voter has returned an absentee or mail-in ballot. APP-70–71 (Custodio Decl. ¶¶ 8-10).

8. This system prevents a voter from using outdated ballot material because Philadelphia County will only count absentee and mail-in ballot that contain the correspondence ID unique to both the voter and the election. APP-72 (Custodio Decl. ¶¶ 15-16).

9. This process does not rely on the voter's handwritten date on the outer return envelope to determine the voter's qualifications to vote. APP-70–71 (Custodio Decl. ¶¶ 6, 12).

10. Philadelphia County also ensures that each absentee and mail-in ballot is timely received, because absentee and mail-in voter must fill out and return the ballot to Philadelphia County by 8:00 p.m. on Election Day. APP-70–71 (Custodio Decl. ¶¶ 6, 8-11) 25 P.S. §§ 3146.6, 3150.16.

11. Philadelphia County records the time it receives each returned absentee or mail-in ballot envelope. APP-70 (Custodio Decl. ¶ 9).

12. The vast majority of all ballots are run through the sorting machine, which stamps each ballot envelope with the date and time the ballot was returned to Philadelphia County. APP-70 (Custodio Decl. ¶ 9).

13. A small number of ballots are manually marked with the date and time the ballot was returned to Philadelphia County. APP-70 (Custodio Decl. ¶¶ 8-9).

14. Philadelphia County then confirms the timeliness of each absentee and mail-in ballot by referring to the date and time that it was either stamped by the sorting machine or manually marked by Philadelphia County. APP-71 (Custodio Decl. ¶ 11).

15. A voter's handwritten date is irrelevant to this process and is not used to determine whether a mail-in or absentee ballot is timely received. It serves no purpose to Philadelphia County. APP-71–72 (Custodio Decl. ¶¶ 12, 16). The Allegheny, Bucks, Chester, and Montgomery County Boards of Elections likewise do not use the handwritten date to determine whether a voter is qualified, or whether a ballot was timely. APP-79–80 (Allegheny County Response to Interrogatory No. 14); APP-85 (Bucks County Response to Interrogatory No. 14); APP-97

(Chester County Response to Interrogatory No. 14); APP-102–103 (Montgomery County Response to RFA Nos 1, 2).

16.     Philadelphia County has not identified any actual or suspected instances of voting-related fraud connected with absentee or mail-in ballots, and it has no reason to believe that non-enforcement of the handwritten date requirement would cause an increase in voter-related fraud. APP-72 (Custodio Decl. ¶¶ 15-16).

17.     Philadelphia County will need to expend significant time and labor to check for a handwritten date that is not relevant to determining that any ballots were timely received, whether the voter is qualified to vote, or any other purpose. APP-71 (Custodio Decl. ¶¶ 12, 14).

18.     Philadelphia County receives many absentee and mail-in ballots each election cycle. APP-71–72 (Custodio Decl. ¶ 14).

19.     For example, in the 2022 General Election, Philadelphia County received nearly 134,000 absentee and mail-in ballots before the Election Day deadline. APP-71–72 (Custodio Decl. ¶ 14).

20.      Given the volume, Philadelphia County does not manually review the vast majority absentee and mail-in ballots. APP-71 (Custodio Decl. ¶ 13 & n.1).

21.     Rather, automated sorting machines are configured to recognize when a ballot is returned without a handwritten signature or without the internal secrecy envelope that is required by the Pennsylvania Election Code. APP-71 (Custodio Decl. ¶ 13 & n.1).

22.     These machines cannot be configured to detect a ballot missing a "correct" handwritten date. APP-71 (Custodio Decl. ¶ 13 & n.1).

23. To enforce the dating requirement, Philadelphia County is required to devote considerable extra time and labor to manually identify ballots that have a missing or incorrect date. APP-71–72 (Custodio Decl. ¶¶ 13-14).

**II. The dating requirement disproportionately affects elderly Pennsylvania residents.**

24. In the 2022 General Election, pursuant to orders of the Pennsylvania Supreme Court, Philadelphia County was required to segregate and not count 2,617 timely ballots by otherwise qualified voters solely because the voters failed to comply with the handwritten date requirement. APP-3 (Philadelphia County Response to Interrogatory No. 2).

25. None of the voters who submitted those ballots submitted replacement ballots, but 580 of those voters submitted provisional ballots. APP-3 (Philadelphia County Response to Interrogatory No. 2).

26. Elderly voters were disproportionately overrepresented in the number of segregated and uncounted ballots:

- The median age of voters who submitted undated ballots is **64-years old.** The median jumps to **66-years old** for voters who submitted misdated ballots.
- Voters **over the age of 50** submitted **nearly 75%** of undated ballots and **77%** of misdated ballots.
- Voters **over the age of 60** submitted **more than 60%** of the undated ballots and **64% of the** misdated ballots.
- Voters **over the age of 70** submitted more **than 40%** of misdated ballots and **37.5%** of undated ballots.
- Voters **in their 80s** submitted approximately **14%** of the undated and misdated ballots.

- And **more than 70** ballots from voters **90-years old and older** were segregated and not counted as either misdated or undated.

APP-18-20 (Philadelphia County Board of Elections 11/18/2022 Meeting Transcript at 4-6, PHILA-000041-43).

27. "[T]hese percentages all are significantly higher than the percentage of Philadelphia's registered voters that these age groups represent." APP-20 (Philadelphia County Board of Elections 11/18/2022 Meeting Transcript at 6:2-5, PHILA-000043).

28. Philadelphia County's review of the data suggests that enforcement of the dating requirement in the 2022 General Election also disproportionately impacted discrete Philadelphia communities, including areas with higher poverty rates and lower rates of educational attainment. APP-20 (Philadelphia County Board of Elections 11/18/2022 Meeting Transcript at 6:13-20, PHILA-000043).

**RESPONDING COUNTIES' RESPONSES TO INTERVENOR-DEFENDANTS'
CONCISE STATEMENT OF MATERIAL FACTS**

## I.    THE PARTIES

### A.    Plaintiffs

**STATEMENT OF MATERIAL FACT**

1.    Plaintiff the Pennsylvania State Conference of the NAACP is a "non-profit, non-partisan organization" which "engages in efforts to get out the vote." **Ex. 1**, Am. Compl. ¶¶ 1112 (Dkt. No. 121).

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

2.    Plaintiff The League of Women Voters of Pennsylvania is a "nonpartisan statewide non-profit" whose "mission includes voter registration, education, and get-out-the-vote drives." *Id.* ¶¶ 14-15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

3.    Plaintiff Philadelphians Organized to Witness, Empower and Rebuild is "a Pennsylvania nonprofit" whose "civic engagement efforts include voter education programs, voter registration drives, information about applying for mail ballots, completing them properly and returning them on time, and `Souls to the Polls' efforts to encourage congregants to vote." *Id.* ¶¶ 17-18.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

4.    Plaintiff Common Cause Pennsylvania is "a non-profit political advocacy organization and a chapter of the national Common Cause organization," and "seeks to increase the level of voter registration and voter participation in Pennsylvania elections." *Id.* ¶¶ 21-22.

**RESPONSE**

Responding Counties do not dispute this fact.

5.  Plaintiff Black Political Empowerment Project is "a non-profit, non-partisan organization" whose "work includes voter registration drives, get-out-the-vote activities, education and outreach about the voting process, and election-protection work." *Id.* ¶¶ 24-25.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

6.  Plaintiff Make the Road Pennsylvania is "a not-for-profit, member-led organization" whose "work includes voter protection voter advocacy and voter education." *Id.* ¶¶ 26-27.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

7.  Plaintiffs Barry M. Seastead, Marlene G. Gutierrez, Aynne Margaret Pleban Polinski, Joel Bencan, and Laurence M. Smith plead that they are registered voters in Pennsylvania. *Id.* ¶¶ 30, 32, 34, 35, 36.

**RESPONSE**

Responding Counties do not dispute this fact.

**B.        Named Defendants**

**STATEMENT OF MATERIAL FACT**

8.  Defendant Al Schmidt is Acting Secretary of the Commonwealth. https://www.dos.pa.gov/about-us/Pages/Secretary-of-the-Commonwealth.aspx.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

9.  The Secretary of the Commonwealth has the duty "[t]o receive from county boards of elections the returns of primaries and elections, to canvass and compute the votes cast for candidates and upon questions as required by the provisions of this act." 25 P.S. § 2621(f).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

10. Defendant County Boards of Elections have "jurisdiction over the conduct of primaries and elections in [their respective] count[ies], in accordance with the provisions of this act." 25 P.S. § 2641(a).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**C. Intervenor-Defendants**

**STATEMENT OF MATERIAL FACT**

11. The Republican National Committee is the national committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

12. The National Republican Congressional Committee is the national congressional committee of the Republican Party as defined by 52 U.S.C. § 30101(14).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

13. The Republican Party of Pennsylvania is a major political party, 25 P.S. § 2831(a), and the "State committee" for the Republican Party in Pennsylvania, 25 P.S. § 2834, as well as a federally registered "State Committee" of the Republican Party as defined by 52 U.S.C. § 30101(15).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

14. Any court order purporting to change the law and direct counting of undated or incorrectly dated mail-in or absentee ballots would inflict significant harm on Intervenor-Defendants. *See* **Ex. 2,** Intervenor-Defendants' Resps. & Objs. To Plaintiffs' First Set of Interrogs. #1.

**RESPONSE**

This is an assertion of opinion, lacking non-speculative factual support. Responding Counties dispute this opinion, which is immaterial to the issue of whether the dating requirement violates the materiality provision of the Civil Rights Act.[1]

**STATEMENT OF MATERIAL FACT**

15. Unlawful counting of ballots undermines the integrity of elections, generates voter confusion, and erodes public confidence in elections. Therefore, unlawful counting of ballots can discourage voters, including Republican voters, from voting or otherwise participating in elections and, thus, change the outcome of election contests in Pennsylvania. *See id.* at 7-8; *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 197 (2008).

**RESPONSE**

Responding Counties do not dispute that unlawful counting of ballots has the potential to undermine the integrity of elections. Responding Counties do dispute the underlying legal conclusion that counting ballots with an undated or incorrectly dated outer return envelope constitutes an unlawful counting of ballots.

**STATEMENT OF MATERIAL FACT**

16. Intervenor-Defendants were the prevailing parties in the *Ball* litigation upholding the date requirement, so any court order invalidating the date requirement harms Intervenor-Defendants' rights secured in that litigation. *See* **Ex. 2** at Interrog. #1.

**RESPONSE**

This is a legal conclusion, not a fact. Responding Counties dispute this legal conclusion, which is immaterial to the issue of whether the dating requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

17. As political parties, Intervenor-Defendants expend substantial resources toward educating, mobilizing, assisting, and turning out voters in Pennsylvania and supporting Republican candidates up and down the ballot. *Id.*

---

[1] Responding Counties understand that reference in Statement of Material Fact No. 14 to "undated or incorrectly dated mail-in or absentee ballots" is a reference to the undated or incorrectly dated *outer return envelopes* of mail-in or absentee ballots. For purposes of this Response to Intervenor Defendants' Concise Statement of Material Facts, Responding Counties will treat those two phrases as synonymous.

**RESPONSE**

Responding Counties do not dispute the facts that Intervenor-Defendants expend resources toward educating, mobilizing, assisting, and turning out voters in Pennsylvania and supporting Republican candidates up and down the ballot. Responding Counties dispute the characterization of these efforts as "substantial," which is not a fact, and which is immaterial to the issue of whether the dating requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

18. These efforts include devoting time and resources toward training and education programs that ensure that Intervenor-Defendants and their voters understand the rules governing the election process, including applicable dates, deadlines, and requirements for voting by mail or absentee. *Id.*

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

19. The efforts also encompass training, education, and monitoring of the voting and vote counting process in Pennsylvania to ensure it is conducted lawfully. *Id.*

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

20. Any change in the laws governing Pennsylvania elections harms Intervenor-Defendants by rendering their training, voter education, and monitoring programs less effective, wasting the resources they have devoted to such programs, and requiring them to expend new resources to update those programs. *Id.*

**RESPONSE**

This is an assertion of opinion, lacking non-speculative factual support. Responding Counties dispute this opinion, which is immaterial to the issue of whether the dating requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

21. For instance, the Republican Party of Pennsylvania has statutory rights to appoint poll watchers to observe casting, counting, and canvassing of ballots at the polling place, 25 P.S. § 2687(a), and an "authorized representative" to "remain in the room" at the county board of elections and observe the pre-canvass and canvass of "absentee ballots and mail-in ballots," *id.* §§ 3146.8(g)(1.1)-(2). *See* **Ex. 2** at Interrog. #1.

**RESPONSE**

This is a legal conclusion, not a fact.

**STATEMENT OF MATERIAL FACT**

22.     The Republican Party of Pennsylvania has exercised these statutory rights in the past several election cycles and will do so again in future election cycles. *See Id.*

**RESPONSE**

Responding Counties do not dispute that the Republican Party of Pennsylvania has exercised its perceived statutory rights in the past several election cycles. The existence of those rights is a legal conclusion, not a fact.

**STATEMENT OF MATERIAL FACT**

23.     In conjunction with its Election Integrity Operations, the Republican Party of Pennsylvania devotes substantial time and resources toward the recruitment and training of poll workers, poll watchers, and volunteers throughout the 67 counties of the Commonwealth to assist voters on election day, to observe the casting and counting of ballots at the polling place, and to observe the pre-canvass and canvass of absentee and mail-in ballots at the county board of elections. *Id.*

**RESPONSE**

Responding Counties do not dispute that in conjunction with its Election Integrity Operations, the Republican Party of Pennsylvania devotes time and resources toward the recruitment and training of poll workers, poll watchers, and volunteers throughout the 67 counties of the Commonwealth to assist voters on election day, to observe the casting and counting of ballots at the polling place, and to observe the pre-canvass and canvass of absentee and mail-in ballots at the county board of elections. Responding Counties dispute the characterization of these efforts as "substantial," which is not a fact, and which is immaterial to the issue of whether the dating requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

24.     As part of its Election Integrity Operations, the Republican Party of Pennsylvania also devotes substantial time and resources toward the recruitment and training of a "ground team" of lawyers throughout the Commonwealth who stand ready on Election Day to assist poll workers, poll watchers, and volunteers should questions arise as to elections laws or the voting process within the Commonwealth. *Id.*

**RESPONSE**

Responding Counties do not dispute that as part of its Election Integrity Operations, the Republican Party of Pennsylvania also devotes time and resources toward the recruitment and training of a "ground team" of lawyers throughout the Commonwealth who stand ready on Election Day to

assist poll workers, poll watchers, and volunteers should questions arise as to elections laws or the voting process within the Commonwealth. Responding Counties dispute the characterization of these efforts as "substantial," which is not a fact, and which is immaterial to the issue of whether the dating requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

25. The Republican Party of Pennsylvania's Election Integrity Operations, training programs, and voter education programs include training and information regarding the requirements for voters to cast lawful and valid ballots, and the governing rules delineating unlawful and invalid ballots and preventing election officials from pre-canvassing, canvassing, or counting such ballots. *Id.*

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

26. Any change in the laws governing Pennsylvania elections harms the Republican Party of Pennsylvania by rendering its Election Day Operations, training programs, and voter education programs less effective, wasting the resources they have devoted to such programs, and requiring them to expend new resources to update those programs. *Id.*

**RESPONSE**

This is an assertion of opinion, lacking non-speculative factual support. Responding Counties dispute this opinion, which is immaterial to the issue of whether the dating requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

27. Any change in the laws governing Pennsylvania elections could affect the outcome of an election in which Intervenor-Defendants, their voters, and their supported candidates exercise their constitutional rights to vote and to participate. *Id.*

**RESPONSE**

This is an assertion of opinion, lacking non-speculative factual support. Responding Counties dispute this opinion, which is immaterial to the issue of whether the dating requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

28. The Third Circuit's failure to enforce the date requirement in *Migliori v. Cohen* actually did change the outcome of an election in which a Republican candidate had prevailed. *See* **Ex.** 3, Cert. Pet. at 7-12, *Ritter v. Migliori,* No. 22-30 (U.S. July 7, 2022), https://www.supremecourt.gov/DocketPDF/22/2230/229591/20220707140738344 Ritter%20Petition.pdf.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

## II. THE DATE REQUIREMENT

**STATEMENT OF MATERIAL FACT**

29. Pennsylvania's election laws provide a date requirement for absentee and mail-in voting. 25 P.S. § 3146.6(a); § 3150.16(a).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

30. In both provisions, the wording of the date requirement is the same: "The elector shall then fill out, date and sign the declaration printed on such envelope." 25 P.S. § 3146.6(a); § 3150.16(a).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

### A. The Date Requirement Has Been A Part Of Pennsylvania's Election Code Since 1945.

**STATEMENT OF MATERIAL FACT**

31. The first version of the Election Code permitted some active military members to vote by mail. **Ex. 4,** Act of June 3, 1937, P.L. 1333, No. 320, §§ 1327-1330, 1937 Pa. Laws 1333, 1442-44.

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

32. In 1945, the mail ballot provision was amended to require that the jurat on the ballot-return envelope be dated. **Ex.** 5, Act of Mar. 9, 1945, P.L. 29, No. 17, sec. 10, § 1306, 1945 Pa. Laws 29, 37.

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

33. Eighteen years later, the General Assembly enacted the date requirement in its current form, providing that "[t]he elector shall then fill out, date and sign the declaration printed on such envelope." **Ex. 6,** Act of Aug. 13, 1963, P.L. 707, No. 379, sec. 22, § 1304, 1963 Pa. Laws. 707, 736.

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

34. In 2019, the General Assembly passed Act 77, extending the option to vote by mail to all qualified voters, and adopting the date requirement for such ballots. **Ex. 7,** Act 77, P.L. 552, sec. 8 (Oct. 31, 2019).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

35. Act 77 also provides that section 8—containing the date requirement—is "nonseverable," and that "[i]f any provision of this act or its application to any person or circumstance is held invalid, the remaining provisions or applications of this act are void." **Ex. 8**, Act 77, P.L. 552, sec. 11 (Oct. 31, 2019).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**B. The Date Requirement Has Been A Subject Of Multiple Recent Lawsuits.**

**STATEMENT OF MATERIAL FACT**

36. After seven cases in five courts over two years, the current state of the law is that the General Assembly's date requirement is mandatory and that any noncompliant absentee or mail-in ballot may not be counted.

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

37. In 2020, a majority of the Pennsylvania Supreme Court held that the date requirement is mandatory and that election officials may not count any noncompliant ballot in any election after the 2020 general election. *See In re Canvass of Absentee and Mail-In Ballots of Nov.*

*3, 2020 Gen. Election,* 241 A.3d 1058, 1079-80 (2020) (Opinion of Justice Wecht); *id.* at 1090-91 (Opinion of Justice Dougherty, Chief Justice Saylor, and Justice Mundy).

**RESPONSE**

This is a legal conclusion, and a characterization of the Pennsylvania Supreme Court's opinion in *In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election,* 241 A.3d 1058, 1079-80 (2020). Responding Counties dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

38.     In the first two cases following that ruling, the Pennsylvania Commonwealth Court upheld mandatory application of the date requirement. *See In re Election in Region 4 for Downington Sch. Bd. Precinct Uwchlan 1,* 272 A.3d 993 (Pa. Commw. 2022) (unpublished), appeal denied, 273 A.3d 508 (Pa. 2022); *Ritter v. Lehigh Cnty. Bd. of Elections,* 272 A.3d 989 (Pa. Commw. 2022) (unpublished), appeal denied, 271 A.3d 1285 (Pa. 2022).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

39.     Four days after the Pennsylvania Supreme Court resolved *Ritter,* individual voters filed a new lawsuit in federal court claiming that the date requirement violates the federal materiality provision, 52 U.S.C. § 10101(a)(2)(B). *See* **Ex. 9,** Compl., *Migliori v. Lehigh County Bd. of Elections,* No. 5:22-cv-397 (E.D. Pa. Jan. 31, 2022), ECF No. 1.

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

40.     The Third Circuit agreed with the plaintiffs, but the U.S. Supreme Court vacated that decision. *See Migliori v. Cohen,* 36 F.4th 153 (3d Cir. 2022), *cert. granted and judgment vacated, Ritter v. Migliori,* No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (Mem.).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

41.     When addressing a request for a stay at an earlier stage in that case, three Justices opined that the Third Circuit's now-vacated holding was "very likely wrong" on the merits because it rested upon a misconstruction of the materiality provision. *Ritter,* 142 S. Ct. at 1824 (Mem.) (Alito, J., dissenting from the denial of the application for stay).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

42.     The Commonwealth Court twice invoked the Third Circuit decision to depart from the General Assembly's date requirement in unpublished, non-precedential cases arising out of the 2022 primary election. *See McCormick for U.S. Senate v. Chapman,* 2022 WL 2900112 (Pa. Commw. June 2, 2022) (unpublished); *Chapman v. Berks Cnty. Bd. of Elections,* 2022 WL 4100998 (Pa. Commw. Aug. 19, 2022) (unpublished).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

43.     Finally, in November 2022, the Pennsylvania Supreme Court exercised its original jurisdiction to reaffirm that the General Assembly's date requirement is mandatory. *Ball v. Chapman,* 284 A.3d 1189 (Pa. 2022).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

44.     In that litigation, Acting Secretary Leigh M. Chapman agreed that the signature requirement is valid and mandatory and does not violate the federal materiality provision. **Ex. 10**, Acting Sec'y Ans. 15-23, *Ball v. Chapman,* No. 102 MM 2022 (Oct. 19, 2022).

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

45.     The Acting Secretary also conceded in that litigation that the secrecy envelope does not violate the federal materiality provision. *Id.* at 39 n.15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

46.     In an opinion that followed, the Pennsylvania Supreme Court held that the date requirement refers to the "day upon which an elector signs the declaration," and noted that "[t]o

hold otherwise would be to require unnecessarily specific drafting on the part of the General Assembly." *Ball v. Chapman,* 289 A.3d 1, 23 (Pa. 2023).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

47. The Pennsylvania Supreme Court was evenly divided on whether the federal materiality provision invalidates the date requirement. *Id.* at 9.

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

***C. Commonwealth v. Mihaliak***

**STATEMENT OF MATERIAL FACT**

48. The date requirement has already been used to detect election fraud. *See* **Ex. 11**, Tr. of Hearing in *Chapman v. Berks County Bd. of Elections,* No. 355 MD 2022 (Pa. Commw. July 28, 2022), at 100-116, 141-153.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act. Moreover, the handwritten date played no role in determining the qualification of a voter or eligibility of a ballot because the records showed—without any reference to the handwritten date—that the decedent in whose name the ballot was cast had died before Primary Election Day. *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 at *21 n.14 (Pa. Commw. Ct. Aug. 19, 2022).

**STATEMENT OF MATERIAL FACT**

49. Last year, officials in Lancaster County discovered that an individual had cast a fraudulent ballot in her deceased mother's name in *Commonwealth v. Mihaliak,* No. CR-126-22 (June 3, 2022); *see* **Ex. 12,** Affidavit of Probable Cause ¶ 2, Police Criminal Complaint, *Commonwealth v. Mihaliak,* No. CR-126-22 (June 3, 2022) *("Mihaliak* Compl.").

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

50. In Lancaster County, the only information a voter is required to supply on a ballot declaration is the date and a signature. *See* **Ex. 13,** Exemplar Ballot Declaration from Lancaster County Board; *see also* **Ex. *77*,** Greenburg Dep. at 114:23-115:7.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

51. Under the Pennsylvania Supreme Court's current precedent, county boards of elections lack authority to conduct signature comparisons, so they may not check ballots for a non-matching signature, much less use any non-matching signature to detect fraud by a third party. *See In re November 3, 2020 General Election,* 240 A.3d 591 (Pa. 2020).

**RESPONSE**

Responding Counties do not dispute this legal conclusion.

**STATEMENT OF MATERIAL FACT**

52. In *Mihaliak,* the only evidence on the face of the ballot declaration indicating that someone other than the decedent had completed the ballot was the handwritten date of April 26, 2022, which was twelve days after the decedent had passed away. *See* **Ex. 12** ¶ 2.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act. Moreover, the handwritten date played no role in determining the eligibility of ballot because the records showed—without any reference to the handwritten date—that the decedent in whose name the ballot was cast had died before Primary Election Day. *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 at *21 n.14 (Pa. Commw. Ct. Aug. 19, 2022).

**STATEMENT OF MATERIAL FACT**

53. The investigation into the election fraud committed in *Mihaliak* was predicated upon the date supplied on the ballot declaration. *See id.* ¶ 2.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act. Moreover, the handwritten date played no role in determining the eligibility of ballot because the records showed—without any reference to the handwritten date—that the decedent in whose name the ballot was cast had

died before Primary Election Day. *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 at *21 n.14 (Pa. Commw. Ct. Aug. 19, 2022).

**STATEMENT OF MATERIAL FACT**

54.     Plaintiffs' putative expert agreed that the date supplied on the *Mihaliak* ballot declaration was the only piece of evidence of fraud on the face of the ballot. **Ex.** *77* at 114:15118:2.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act. Moreover, the handwritten date played no role in determining the eligibility of ballot because the records showed—without any reference to the handwritten date—that the decedent in whose name the ballot was cast had died before Primary Election Day. *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 at *21 n.14 (Pa. Commw. Ct. Aug. 19, 2022).

**STATEMENT OF MATERIAL FACT**

55.     Plaintiffs' putative expert agreed that the date on the ballot declaration helped to detect fraud in *Mihaliak. Id.* at 116:19-117:2.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act. Moreover, the handwritten date played no role in determining the eligibility of ballot because the records showed—without any reference to the handwritten date—that the decedent in whose name the ballot was cast had died before Primary Election Day. *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998 at *21 n.14 (Pa. Commw. Ct. Aug. 19, 2022).

## III. THIS LITIGATION

**STATEMENT OF MATERIAL FACT**

56.     Plaintiffs in this case filed suit on November 4, 2022, seeking to invalidate the General Assembly's date requirement. ECF No. 1.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

57.     Plaintiffs claim that the date requirement—which has been on the books in some form since 1945—violates a provision of the 1964 Civil Rights Act and the Equal Protection Clause of the U.S. Constitution. *Id.*

**RESPONSE**

Responding Counties do not dispute this fact.

**A. County Boards Of Elections' Responses To Discovery Requests Regarding The 2022 General Election.**

**STATEMENT OF MATERIAL FACT**

58. Allegheny County Board of Elections responded as follows.

a. It received 161,575 mail ballots, of which 151 were military ballots. **Ex. 14,** Allegheny Cnty. Bd.'s Am. Ans. to Interrog. #1.

b. It set aside 1,009 mail ballots with undated or misdated ballot declarations. **Ex. 15,** Allegheny Cnty. Bd.'s Ans. to Interrog. #2.

c. It did not receive any undated or misdated military ballots. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

59. Beaver County Board of Elections responded as follows.

a. It received 15,172 mail ballots, of which 48 were military-overseas ballots. **Ex. 16,** Beaver Cnty. Bd.'s Ans. to Interrog. #1.

b. It received 182 mail ballots with undated or misdated ballot declarations, of which 41 were corrected or cured. *Id.* Of the non-cured mail ballots, 9 were also missing their inner/secrecy envelopes. *Id.* "One voter who had an error on their ballot also had a naked ballot," and though that voter "corrected the ballot envelope prior to [the board's] notice being published," "the ballot was not counted as the error on the ballot was not determined until the pre-canvassing began." *Id.*

c. "No timely-received military-overseas ballots were missing a date or signature or were dated incorrectly." *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

60. Bedford County Board of Elections responded as follows.

a. It received 2,868 mail ballots and 6 military-overseas ballots. **Ex. 17**, Bedford Cnty. Bd., et al. ("BCCZ") Ans. to Interrog. #1.

b. It did not set aside any mail ballots for a date issue. *Id.* at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

61. Berks County Board of Elections responded as follows.

a. It received 28,829 mail ballots, including 146 military-overseas ballots. **Ex. 18,** Berks Cnty. Bd.'s Ans. to Interrog. #1.

b. It set aside 782 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

62. Blair County Board of Elections responded as follows.

a. It received 9,022 mail ballots, and 27 military-overseas ballots. **Ex. 19,** Blair Cnty. Bd.'s Ans. Interrogs. #1.

b. It set aside 55 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any undated or misdated military ballots for which the declaration was on the outside of the return envelope. *Id.* at Interrog. #15.

63. Bradford County Board of Elections responded as follows.

a. It received 2,787 mail ballots, and 16 military-overseas ballots. **Ex. 20**, Bradford Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 20 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. An additional 3 undated/misdated ballots lacked a secrecy envelope. *Id.*

      c. It did not receive any undated or misdated military-overseas ballots. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

64. Bucks County Board of Elections responded as follows.

a. It received 87,321 mail ballots and 466 military-overseas ballots. **Ex. 21,** Bucks Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 357 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It received 11 military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

d. It counted military-overseas ballots with undated or misdated ballot declarations. *Id.*

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

65. Butler County Board of Elections responded as follows.

a. It received 18,212 mail ballots. **Ex. 22,** Butler Cnty. Bd.'s Ans. Interrogs. #1.

b. It set aside 66 mail ballots with undated or misdated ballot declarations. *Id.*

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

66. Cambria County Board of Elections responded as follows.

a. It received 9,848 mail and military-overseas ballots. **Ex. 23**, Cambria Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 38 mail-in/absentee ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

67. Cameron County Board of Elections responded as follows.

a. It received 410 mail ballots and 2 military-overseas ballots. **Ex.** 24, Cameron Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 5 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

68. Carbon County Board of Elections responded as follows.

a. It received 4,823 mail ballots and 14 military-overseas ballots. **Ex. 17** at Interrog. #1.

b. It set aside 27 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

69.     Centre County Board of Elections responded as follows.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

70.     Chester County Board of Elections responded as follows.

    a.     It received 70,023 mail ballots and 638 military/overseas/federal absentee ballots. **Ex. 26,** Chester Cnty. Bd.'s Ans. to Interrogs. #1.

    b.     It set aside 116 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. An additional 19 mail ballots had no date and no signature. *Id.*

    c.     It set aside 12 military/overseas/federal absentee ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

71.     Clarion County Board of Elections responded as follows.

    a.     It received 12 mail ballots. **Ex. 27,** Clarion Cnty. Bd.'s Ans. to Interrogs. #1.

    b.     It set aside 12 mail ballots with undated or misdated ballot declarations. *Id.*

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

72.     Clearfield County Board of Elections responded as follows.

    a.     It received 4,564 mail ballots, including 8 military and civilian overseas ballots. **Ex. 28,** Clearfield Cnty. Bd.'s Ans. to Interrogs. #1 & **Ex.** "Clfd. 1."

      b.      It set aside 12 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

      c.      It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

73.     Clinton County Board of Elections responded as follows.

      a.      It received 2,248 mail ballots and 14 military-overseas ballots. **Ex. 29**, Clinton Cnty. Bd.'s Ans. to Interrogs. #1.

      b.      It set aside 20 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

      c.      It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

74.     Columbia County Board of Elections responded as follows.

      a.      It received 4,168 mail ballots and 11 military-overseas ballots. **Ex. 17** at Interrog. #7.

      b.      It set aside 29 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

75.     Crawford County Board of Elections responded as follows.

      a.      It received 5,917 mail ballots and 22 military-overseas ballots. **Ex. 30**, Crawford Cnty. Bd.'s Ans. to Interrogs. #1.

      b. It set aside 49 mail ballots with undated or misdated ballot declarations. Id. at Interrogs. #2, 8. It set aside an additional 2 mail ballots with undated or misdated ballot declarations that also lacked a signature. Id. at Interrog. #8.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

76. Cumberland County Board of Elections responded as follows.

a. It received 26,298 mail ballots and 113 military-overseas ballots. **Ex. 31**, Cumberland Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 100 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

77. Dauphin County Board of Elections responded as follows.

a. It received 25,839 mail ballots and 154 military-overseas ballots. **Ex. 17** at Interrog. #1.

b. It set aside 95 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

    78.    Delaware County Board of Elections responded as follows.

        a.    It received 60,154 mail ballots. **Ex. 32**, Delaware Cnty. Bd.'s Ans. to Interrogs. #1.

        b.    It set aside 114 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

        c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

    79.    Elk County Board of Elections responded as follows.

        a.    It received 2,012 absentee/mail-in ballots and 19 military-overseas ballots. **Ex. 33**, Elk Cnty. Bd.'s Ans. to Interrogs. #1.

        b.    It received 10 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. Of those, 7 voters either corrected the error or filed a provisional ballot. Id. at Interrog. #13.

        c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

    80.    Erie County Board of Elections responded as follows.

        a.    It received 26,766 mail-in ballots and 41 military-overseas ballots. **Ex. 34**, Erie Cnty. Bd.'s Ans. to Interrogs. #1.

        b.    It set aside 211 mail ballots with undated or misdated ballot declarations, including cured ballots. Id. at Interrog. #2. An additional 8 mail ballots with undated ballot declarations were also missing a signature. Id. at Interrog. #8. 113 of these ballots were cured. Id. at Interrog. #13.

        c.    It did not receive any military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

81.     Fayette County Board of Elections responded as follows.

     a.     It received 9,036 mail ballots and 33 military-overseas ballots. **Ex. 35**, Fayette Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside 137 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. Eleven of these "signed another voter's ballot return envelope. Id. at Interrog. #8. 93 "[v]oters whose timely received mail ballots were set aside and/or segregated by Fayette County because the signed outer return envelope was missing a date or showed a date the county determined to be incorrect" "came to the Fayette County Election Bureau and cured their mail ballots." Id. at Interrog. #13.

     c.     It stated that it "did not timely receive any military-overseas ballots in the 2022 General Election on which the voter failed to date their voter declaration or included a date that the county deemed to be incorrect." Id. at Interrog. #15.

     d.     "Dates were not reviewed for military/overseas ballots that were timely received." **Ex. 36**, Fayette Cnty. Bd.'s Resps. to Requests for Prod. of Docs. #3.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

82.     Forest County Board of Elections responded as follows.

     a.     It received 447 mail ballots and 0 military-overseas ballots. **Ex. 37**, Forest Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside 38 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. Of these, two mail ballots were signed by the incorrect person. Id. at Interrog. #8. Two ballots were cured. Id. at Interrog. #13.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

83. Franklin County Board of Elections responded as follows.

a. It received 10,496 mail ballots and 68 military-overseas ballots. **Ex. 38**, Franklin Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 114 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. Seven of those were also missing a signature. Id. at Interrog. #8.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

84. Greene County Board of Elections responded as follows.

a. It received 2,384 mail ballots and 7 military-overseas ballots. **Ex. 39**, Greene Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 11 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

85. Huntingdon County Board of Elections responded as follows.

a. It received 2,452 mail ballots and 8 military-overseas ballots. **Ex. 17** at Interrog. #1.

b. It set aside 34 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

86. Indiana County Board of Elections responded as follows.

a. It received 2,452 mail ballots and 8 military-overseas ballots. Id. at Interrog. #1.

b. It set aside 107 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

87. Jefferson County Board of Elections responded as follows.

a. It received 2,278 mail ballots and 12 military-overseas ballots. Id. at Interrog. #1.

b. It set aside 23 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

88. Juniata County Board of Elections responded as follows.

a. It received 1,244 mail-in ballots and 7 military-overseas ballots. **Ex. 40**, Juniata Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside five mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. Of those, two were also missing signatures. Id. at Interrog. #8. Two ballots were cured. Id.

c. In response to whether it counted "timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that [it] deemed to be incorrect," it responded: "No." Id. at Interrog. #15. It set aside one military-overseas ballot with an undated ballot declaration. *Id.* at Interrog. #16. It was also missing a signature. *Id.*

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

89. Lackawanna County Board of Elections responded as follows.

a. It received 20,759 mail ballots, including 29 military ballots and 26 civilian overseas ballots. **Ex. 41**, Lackawanna Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 160 mail ballots with undated ballot declarations. Id. at Interrog. #2.

c. It did not deem any military-overseas ballots as incorrect. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

90. Lancaster County Board of Elections responded as follows.

a. It received 34,202 mail ballots and 188 military-overseas ballots. **Ex. 42**, Lancaster Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 232 mail ballots which had undated or misdated ballot declarations. Id. at Interrog. #2. Of those, 51 had additional defects. Id. at Interrog. #8.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15; **Ex.** 43, Miller Dep. 96:15-98:4.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

91. Lawrence County Board of Elections responded as follows.

a. It received 6,888 mail ballots and 33 military-overseas ballots. **Ex. 17** at Interrog. #1.

b. It set aside 107 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

92. Lebanon County Board of Elections responded as follows.

  a. It received 10,771 mail ballots and 64 military-overseas ballots. **Ex. 17** at Interrog. #1.

  b. It set aside 24 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

93. Lehigh County Board of Elections responded as follows.

  a. It received 35,425 mail-in/absentee ballots and 101 military/overseas/civilian ballots. **Ex. 44**, Lehigh Cnty. Bd.'s Ans. to Interrogs. #1.

  b. It set aside 390 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. An additional 23 mail ballots had no date and no signature on their ballot declarations. Id.

  c. It did not review military-overseas ballots for dates. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

94. Luzerne County Board of Elections responded as follows.

  a. It received 29,002 mail ballots. **Ex. 45**, Luzerne Cnty. Bd.'s Ans. to Interrogs. #1.

  b. It set aside 166 mail ballots with undated or misdated ballot declarations. **Ex. 46**, Luzerne Cnty. Bd.'s Am. Ans. to Interrogs. 16 of these voters voted provisionally. **Ex. 45** at Interrog. #7.

  c. It "[d]o[es] not recall any" military-ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

95. Lycoming County Board of Elections responded as follows.

   a. It received 6,474 mail ballots. **Ex. 47**, Lycoming Cnty. Bd.'s Ans. to Interrogs. #1.

   b. It set aside 36 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. Six of these voters cast provisional ballots. Id. at Interrog. #12.

   c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

96. McKean County Board of Elections responded as follows.

   a. It received 1,957 mail in ballots and 5 military-overseas ballots. **Ex. 48**, McKean Cnty. Bd.'s Ans. to Interrogs. #1.

   b. It set aside 35 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

   c. It set aside 5 military-overseas ballots with undated or misdated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

97. Mercer County Board of Elections responded as follows.

   a. It received 8,220 mail ballots. **Ex. 49**, Mercer Cnty. Bd.'s Ans. to Interrogs. #1.

   b. It set aside 63 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

      c. Though it received "12 mail ballots where the Declaration was unsigned," "[a]ny ballot that was both unsigned and missing a date were categorized as `Unsigned' since this is a fatal defect outside the scope of current litigation." Id. at Interrog. #8.

d. In response to whether it counted "timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that [it] deemed to be incorrect," it responded: "This issue did not arise in 2022." *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

98. Mifflin County Board of Elections responded as follows.

a. It received 2,680 mail-in ballots and 8 military-overseas ballots. **Ex. 50**, Mifflin Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 13 mail-in/absentee ballots with undated ballot declarations, exclusive of ballots with other defects. **Ex.** 51, Mifflin Cnty. Bd.'s Resps. to Requests for Prod. of Docs. #2 & **Ex.** 1.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. **Ex. 50** at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

99. Monroe County Board of Elections responded as follows.

a. It received 15,651 mail ballots and 56 military-overseas ballots. **Ex. 17** at Interrog. #1.

b. It set aside 462 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. Of these, 191 were cured. Id. at Interrog. #13.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

    100.    Montgomery County Board of Elections responded as follows.

        a.    It received 118,224 mail-in/absentee ballots and 914 military-overseas ballots. **Ex. 52**, Montgomery Cnty. Bd.'s Ans. to Interrogs. #1.

        b.    It set aside 460 mail ballots with undated or misdated ballot declarations. Id. 44 of those ballots had other defects. *Id.* at Interrog. #2.

        c.    In Montgomery County, "[m]ilitary-overseas ballots were checked to make sure the declarations were complete. If the declarations were complete, the ballot was counted. No military-overseas ballots were set aside for having a missing or incorrect date." *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

    101.    Montour County Board of Elections responded as follows.

        a.    It received 1,718 mail ballots and 3 military-overseas ballots. **Ex. 25** at Interrog. #1.

        b.    It set aside 8 mail ballots with undated or misdated ballot declarations. **Ex. 17** at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

    102.    Northampton County Board of Elections responded as follows.

        a.    It received 36,401 mail/absentee ballots, including 91 UMOVA ballots. **Ex. 53,** Northampton Cnty. Bd.'s Ans. to Interrogs. #1.

        b.    It set aside 280 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

103. Northumberland County Board of Elections responded as follows.

a. It received 4,835 mail ballots and 30 military-overseas ballots. **Ex. 17** at Interrog. #1.

b. It set aside 14 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

104. Perry County Board of Elections responded as follows.

a. It received 2,340 mail ballots and 4 military ballots. **Ex. 54**, Perry Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 35 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

105. Philadelphia County Board of Elections responded as follows.

a. It received 133,968 absentee and mail-in ballots, including military-overseas ballots. **Ex. 55**, Philadelphia Cnty. Bd.'s Ans. to Interrogs. #1. It counted 127,934 absentee and mail-in ballots and 1,014 military-overseas ballots. Id.

b. It set aside 2,617 mail-in and absentee ballots. Id. at Interrog. #2. 580 of these voters submitted provisional ballots. Id.

c. It counted 13 military-overseas ballots with undated ballot declarations. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

106. Potter County Board of Elections responded as follows.

a. It received 888 mail-in ballots, including 2 military-overseas ballots. **Ex. 56**, Potter Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 11 mail ballots with undated or misdated ballot declarations, not including voters who submitted provisional ballots or ballots with other defects. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

107. Schuylkill County Board of Elections responded as follows.

a. It received 8,657 mail ballots and 25 military-overseas ballots. **Ex. 57**, Schuylkill Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 59 mail ballots with undated or misdated ballot declarations, including one ballot which also was missing a signature and another where the date was missing from the voter assistance declaration. **Ex. 58**, **Ex. 2** to Schuylkill Resp. to Requests for Prod. of Docs.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. **Ex. 57** at Interrog. #1.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

108. Snyder County Board of Elections responded as follows.

a. It received 2,286 mail ballots and 5 military-overseas ballots. **Ex. 17** at Interrog. #1.

b. It set aside 9 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

109. Somerset County Board of Elections responded as follows.

a. It received 4,211 mail ballots, including 47 military-overseas ballots. **Ex. 59**, Somerset Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 63 mail ballots with undated or misdated ballot declarations. Id. at Interrog. #2. Two also did not contain signatures. Id.

c. It did not receive any military-overseas ballots with an undated or misdated outer return envelope. Id. at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

110. Sullivan County Board of Elections responded as follows.

a. It received 505 mail ballots and 4 military-overseas ballots. **Ex. 60**, Sullivan Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 4 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

111. Susquehanna County Board of Elections responded as follows.

a. It received 3,247 mail-in ballots and 16 military-overseas ballots. **Ex. 61,** Susquehanna Cnty. Bd.'s Ans. to Interrogs. #1.

b. It did not set aside any mail ballots for undated or misdated ballot declarations. *Id.* at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

112. Tioga County Board of Elections responded as follows.

a. It reported that "[o]ut of 2,363 total ballots, 10 were returned." **Ex. 62,** Tioga Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside four mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. When asked if it "count[ed] timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that [it] deemed to be incorrect," it responded: "Ten such ballots were counted." *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

113. Union County Board of Elections responded as follows.

a. It received 2,997 mail ballots, including 41 military-overseas ballots. **Ex. 63**, Union Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 23 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It "believes it did not receive any military-overseas ballots that were not counted based on a missing and/or incorrect date on the elector's declaration on the return envelope." *Id.* at Interrog. #16.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

114. Venango County Board of Elections responded as follows.

a. It received 3,027 mail ballots and 35 military-overseas ballots. **Ex. 17** at Interrog. #1.

b. It set aside 42 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

115. Warren County Board of Elections responded as follows.

a. It received 2,266 mail ballots and 8 military ballots. **Ex. 64,** Warren Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 18 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2. One of these ballots also did not have a signature. *Id.* at Interrog. #8.

c. It did not receive any military-overseas ballots that were undated or misdated. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

116. Washington County Board of Elections responded as follows.

a. It received 19,569 mail ballots, including 51 military-overseas ballots. **Ex. 65**, Washington Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 66 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

c. It reported that "none of the military-overseas ballots it received in the 2022 General Election were required to be set aside." *Id.* at Interrog. #155.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

117. Wayne County Board of Elections responded as follows.

a. It received 4,692 mail ballots. **Ex. 66,** Wayne Cnty. Bd.'s Ans. to Interrogs. #1.

b. It set aside 55 mail ballots with undated or misdated ballot declarations. *Id.* at 8. Fewer than 10 of these were cured. *Id.* at Interrog. #2.

     c.     It did not receive any military-overseas ballots with undated or misdated ballot declarations. *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

118.     Westmoreland County Board of Elections responded as follows.

     a.     It received 34,599 mail ballots and 109 military-overseas ballots. **Ex. 67,** Westmoreland Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside 95 mail ballots with undated or misdated ballot declarations. *Id.* at Interrog. #2.

     c.     It "did not receive any military-overseas ballots that were not counted based on a missing and/or incorrect date on the elector's declaration on the return envelope." *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

119.     Wyoming County Board of Elections responded as follows.

     a.     It received 2,029 mail ballots and 7 military-overseas ballots. **Ex. 68**, Wyoming Cnty. Bd.'s Ans. to Interrogs. #1.

     b.     It set aside 17 mail ballots with undated ballot declarations. *Id.* One ballot also was missing a signature on the declaration. *Id.* at Interrog. #2.

     c.     It reported that "[n]o military-overseas ballot was set aside for incorrect or missing date." *Id.* at Interrog. #15.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

120.     York County Board of Elections responded as follows.

     a.     It received 37,296 mail ballots and 185 military-overseas ballots. **Ex. 25** at Interrog. #1.

b. It set aside 1,354 mail ballots with an undated or misdated ballot declaration. *Id.* at Interrog. #2.

**RESPONSE**

Responding Counties do not dispute this fact.

**B.      Ballot Envelopes**

**STATEMENT OF MATERIAL FACT**

121.    Military/overseas voters were provided with ballot declarations to fill out. See **Ex. 69**, Montgomery County Declaration for Military-Overseas Ballot at 3; **Ex. 70,** Fayette County Declaration for Military-Overseas Ballot.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

122. Those ballot declarations had date fields, and instructed voters to "SIGN AND DATE HERE." *Id.*

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

123. The Federal Write-In Absentee Ballot (FWAB) also contains a date field. https://www.fvap.gov/uploads/FVAP/Forms/fwab.pdf (specifying "Today's date"). *See* **Ex. 72,** Federal Write-In Absentee Ballot.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

124. The fvap.gov website instructs voters to "[m]ake sure to follow your state instructions when filling out your FWAB." https://www.fvap.gov/eo/overview/materials/fonns. *See* **Ex. 73**, Federal Voting Assistance Program Guide.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

125. The fvap.gov website's Pennsylvania guide in its "Hardcopy Instructions" directs voters to "sign and date the `Voter Information' page" "[o]nce your FWAB is complete." https://www.fvap.gov/guide/chapter2/pennsylvania. *See* **Ex. 74**, Federal Voting Assistance Guide Regarding Pennsylvania Elections.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**C. Mr. Jeffrey Greenburg's Putative Expert Testimony**

**STATEMENT OF MATERIAL FACT**

126. Plaintiffs designated Mr. Jeffrey Greenburg to be an expert witness. *See* **Ex. 75,** Plaintiffs' Designation of Expert Witness.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

127. Mr. Greenburg served as the director of elections for the Mercer County Bureau of Voter Registration and Elections from 2007 until July 2020. *See* **Ex. 76,** Greenburg Decl. ¶ 3.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

128. Mr. Greenburg graduated from John Carroll University in 1982 with a bachelor of arts in History. **Ex. 76 Ex. 1**.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

129.    Mr. Greenburg never took any courses in elections or election administration. **Ex. 77,** Greenburg Dep. at 18:10-13.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

130.    Mr. Greenburg has never published any articles in a peer-reviewed journal or publication, and has never submitted any written works for peer review that were not published. *Id.* at 22:18-25.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

131.    Mr. Greenburg has never authored any studies about election administration. *Id.* at 23:2-4.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

132.    Mr. Greenburg's sole experience with statistical analysis of elections was to analyze the age of poll workers and to calculate the number of average voters registered in every county. *Id.* 23:8-24:4.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

133.    Mr. Greenburg's statistical analyses were never published anywhere. *Id.* at 24:5-7.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

    134.   Mr. Greenburg has only ever administered elections in Mercer County, and has never administered a statewide election in Pennsylvania. *Id.* at 26:2-12.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

    135.   Mr. Greenburg purports to offer the opinion that "older voters" (over age 65) "were disproportionately affected by the date requirement" in the November 2022 general election compared to voters under the age of 65. **Ex. 76** ¶ 32.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

    136.   This opinion is multiply flawed. *See* **Ex. 77** at 98:8-107:7.

**RESPONSE**

This is an assertion of opinion, lacking non-speculative factual support. Responding Counties dispute this opinion, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

    137.   In the first place, Mr. Greenburg's opinion is limited to the discovery responses from 13 Pennsylvania counties and does not address any of the 54 other counties in Pennsylvania. *See* **Ex. 76** ¶ 32; **Ex. 77** at 105:25-107:7.

**RESPONSE**

Responding Counties do not dispute this fact, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

138. Moreover, in the 13 counties Mr. Greenburg examined, he found a disproportionate effect by looking only at voters whose absentee or mail-in ballots were not counted due to the date requirement. See **Ex. 76** ¶ 32; **Ex. 77** at 98:15-99:11.

**RESPONSE**

Responding Counties do not dispute this fact, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

139. Mr. Greenburg calculated the "percentage of voters" from that pool who were over the age of 65 and who were under the age of 65. **Ex. 77** at 98:18; *see also* **Ex. 76** ¶ 32.

**RESPONSE**

Responding Counties do not dispute this fact, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

140. Mr. Greenburg, however, did not know the total number of voters in each age category who submitted absentee or mail-in ballots. *See* **Ex.** 77 at 99:12-101:9.

**RESPONSE**

Responding Counties do not dispute this fact, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

141. Mr. Greenburg did not calculate the rate at which voters over 65 or voters under 65 use absentee or mail-in voting. *See* **Ex. 76** ¶ 32; **Ex. 77** at 99:12-101:21.

**RESPONSE**

Responding Counties do not dispute this fact, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

142. Mr. Greenburg also did not calculate the rate at which voters in either category fail to comply with the date requirement. *See* **Ex. 77** at 103:9-105:19.

**RESPONSE**

Responding Counties do not dispute this fact, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

143. Mr. Greenburg conceded that voters over age 65 may be less affected by the date requirement if they use absentee and mail-in voting at a higher rate—or make mistakes in completing the date field at a lower rate—than voters under age 65. *See* **Ex. 77** at 101:18105:19.

**RESPONSE**

Responding Counties do not dispute this fact, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

144. Mr. Greenburg's "disproportionately affected" opinion relied on data provided by Plaintiffs. **Ex. 76** at ¶ 28 n.4; ¶ 32 n.6.

**RESPONSE**

Responding Counties do not dispute this fact, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

145. The data provided by Plaintiffs was incomplete; they provided age data for voters in only 13 counties. **Ex. 76** at ¶ 32 n.6.

**RESPONSE**

This is an assertion of opinion, lacking any non-speculative factual support. Responding Counties dispute this opinion, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

146. The data provided by Plaintiffs was internally inconsistent.

    a.     Plaintiffs purported to exclude from their count ballots that failed some other requirement than the date requirement. **Ex. 76 Ex. 2.** But in Somerset, Franklin, Lancaster, Montgomery, Warren, Wyoming, and Crawford counties, Plaintiffs' table failed to exclude such ballots. *Id.*

    b.     Plaintiffs sometimes purported to exclude cured ballots from its count, but their table admits that those numbers are not consistently tracked. *Id.* Similarly, it does not take into account the list of ballots provided by Fayette

County that specifies which ballots were cured. *See* **Ex. 71,** Fayette Cnty. Bd.'s List of Undated Ballots.

**RESPONSE**

This is an assertion of opinion, lacking any non-speculative factual support. Responding Counties dispute this opinion, which does not undermine the conclusion that, as a matter of law, the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

147. Mr. Greenburg testified that voters "are required to affirm that they meet the qualifications" to vote "on the voter registration application." **Ex. 77** at 69:13-25.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

148. Mr. Greenburg testified that voters "provide the information necessary for the boards to verify they are qualified" on "their voter registrations." **Ex. 77** at 69:13-17.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

149. Mr. Greenburg agreed that providing a signature is not a qualification to vote. **Ex. 77,** at 76:3-5.

**RESPONSE**

Responding Counties do not dispute this fact.

**STATEMENT OF MATERIAL FACT**

150. Mr. Greenburg's "definition of `disenfranchised' was, "in [his] opinion," "an eligible voter who, for one reason or another, their ballot was not counted." **Ex. 76** at 90:8-14.

He stated in his deposition:

> If a legally eligible voter's ballot is not counted, it's disenfranchisement. When you're interpreting the law correctly or not, the ability for them to cast that ballot is not happening because of something that either they did or they omitted.

**Ex. 77** at 93:3-15.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

151. For purposes of his report, Mr. Greenburg classified such voters as "disenfranchise[d]" even if the "election official" "follow[ed] the law" in setting aside the voter's ballot. *Id.* at 93:9-19.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

152. Mr. Greenburg admitted that, in the *Mihaliak* case, the only piece of information on the face of the ballot indicating that a third party had attempted to vote someone else's ballot was the handwritten date. *Id.* at 115:8-20.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

153. Mr. Greenburg admitted that, in the *Mihaliak* case, the date requirement helped to identify fraud. *Id.* at 116:19-117:2.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

154. Mr. Greenburg agreed that fraud involving mail ballots is possible now and in the future in Pennsylvania. *Id.* at 61:3-9.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

**STATEMENT OF MATERIAL FACT**

155. Mr. Greenburg agreed that the date requirement applies to overseas voters. *Id.* at 84:2-4.

**RESPONSE**

Responding Counties do not dispute this fact, which is immaterial to the issue of whether the date requirement violates the materiality provision of the Civil Rights Act.

Dated: May 5, 2023

Respectfully submitted,

By: /s/ *George M. Janocsko*
George M. Janocsko (PA 26408)
Allan J. Opsitnick (PA 28126)
Lisa G. Michel (PA 59997)
Allegheny County Law Department
445 Fort Pitt Boulevard
Fort Pitt Commons Suite 300
Pittsburgh, PA 15129
george.janocsko@alleghenycounty.us
opsitnick@opsitnickslaw.com
lisa.michel@alleghenycounty.us
T (412) 350-1120

*Counsel for the Allegheny County Board of Elections*

By: /s/ *Amy M. Fitzpatrick*
Amy M. Fitzpatrick (pro hac vice)
(PA 324672)
Daniel D. Grieser (PA 325445)
Law Department – County of Bucks
55 E. Court St., 5th Floor
Doylestown, PA 18901
amfitzpatrick@buckscounty.org
ddgrieser@buckscounty.org

*Counsel for the Bucks County Board of Elections*

By: /s/ *Colleen M. Frens*
Colleen M. Frens (*pro hac vice*)
(PA 309604)
Faith Mattox-Baldini (PA 323868)
Chester County Solicitor's Office
313 W. Market Street, Suite 6702
West Chester, PA 19382
T 610.344.6195
cfrens@chesco.org
fmattoxbaldini@chesco.org

*Counsel for the Chester County Board of Elections*

By: /s/ *Ilana H. Eisenstein*
Ilana H. Eisenstein (*pro hac vice*)
(PA 94907)
Brian H. Benjet (*pro hac vice*)
(PA 205392)
DLA Piper LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
T (215) 656-3300
ilana.eisenstein@us.dlapiper.com
brian.benject@us.dlapiper.com

Zachary G. Strassburger
(PA 313991)
Aimee D. Thomson (*pro hac vice*)
(PA 326328)
Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
zachary.strassburger@phila.gov
aimee.thomson@phila.gov

*Counsel for Defendant Philadelphia County Board of Elections*

By: /s/ *John A. Marlatt*
John A. Marlatt
(PA 210141)
Maureen Calder (*pro hac vice*)
(PA 68055)
Montgomery County Solicitor's Office
PO Box 311
Norristown, PA 19404

*Counsel for Respondent Montgomery County Board of Elections*

**CERTIFICATE OF CONSENT**

I hereby certify that I have obtained the consent of the non-filing signatories to this Response to the Intervenor-Defendants' Concise Statement of Material Facts and Responding Counties Additional Statement of Material Facts—the above-listed counsel for Defendants the Allegheny, Bucks, Chester, and Montgomery County Boards of Elections.

Dated: May 5, 2023

By: */s/ Ilana H. Eisenstein*

*Counsel for Defendant Philadelphia County Board of Elections*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>AL SCHMIDT, in his official capacity as Acting Secretary of the Commonwealth, *et al.*,<br><br>*Defendants.* | Case No. 1:22-cv-339 |
| BETTE EAKIN, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,<br><br>*Defendants.* | Case No. 1:22-cv-340 |

**DEFENDANTS ALLEGHENY, BUCKS, CHESTER, MONTGOMERY, AND PHILADELPHIA COUNTY BOARDS OF ELECTIONS' APPENDIX**

**(APP-1—APP-105)**

Dated: May 5, 2023

Respectfully submitted,

By: /s/ *George M. Janocsko*
George M. Janocsko (PA 26408)
Allan J. Opsitnick (PA 28126)
Lisa G. Michel (PA 59997)
Allegheny County Law Department
445 Fort Pitt Boulevard
Fort Pitt Commons Suite 300
Pittsburgh, PA 15129
george.janocsko@alleghenycounty.us
opsitnick@opsitnickslaw.com
lisa.michel@alleghenycounty.us
T (412) 350-1120

*Counsel for the Allegheny County Board of Elections*

By: /s/ *Amy M. Fitzpatrick*
Amy M. Fitzpatrick (pro hac vice)
(PA 324672)
Daniel D. Grieser (PA 325445)
Law Department – County of Bucks
55 E. Court St., 5th Floor
Doylestown, PA 18901
amfitzpatrick@buckscounty.org
ddgrieser@buckscounty.org

*Counsel for the Bucks County Board of Elections*

By: /s/ *Colleen M. Frens*
Colleen M. Frens (*pro hac vice*)
(PA 309604)
Faith Mattox-Baldini (PA 323868)
Chester County Solicitor's Office
313 W. Market Street, Suite 6702
West Chester, PA 19382
T 610.344.6195
cfrens@chesco.org
fmattoxbaldini@chesco.org

*Counsel for the Chester County Board of Elections*

By: /s/ *Ilana H. Eisenstein*
Ilana H. Eisenstein (*pro hac vice*)
(PA 94907)
Brian H. Benjet (*pro hac vice*)
(PA 205392)
DLA Piper LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
T (215) 656-3300
ilana.eisenstein@us.dlapiper.com
brian.benject@us.dlapiper.com

Zachary G. Strassburger
(PA 313991)
Aimee D. Thomson (*pro hac vice*)
(PA 326328)
Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
zachary.strassburger@phila.gov
aimee.thomson@phila.gov

*Counsel for Defendant Philadelphia County Board of Elections*

By: /s/ *John A. Marlatt*
John A. Marlatt
(PA 210141)
Maureen Calder (*pro hac vice*)
(PA 68055)
Montgomery County Solicitor's Office
PO Box 311
Norristown, PA 19404

*Counsel for Respondent Montgomery County Board of Elections*

**TABLE OF CONTENTS**

| Document | Date | Appendix Page # |
|---|---|---|
| Philadelphia County Board of Elections' Responses and Objections to Plaintiffs' First Set of Interrogatories | January 25, 2023 | APP-1—APP-14 |
| Philadelphia County Board of Elections Meeting Transcript (PHILA-000038–90) | November 18, 2023 | APP-15—APP-67 |
| Declaration of Nick Custodio | May 5, 2023 | APP-68—APP-72 |
| Allegheny County Board of Elections' Responses and Objections to Plaintiffs' First Set of Interrogatories | January 25, 2023 | APP-73—APP-82 |
| Bucks County Board of Elections' Responses and Objections to Plaintiffs' First Set of Interrogatories | January 25, 2023 | APP-83—APP-87 |
| Chester County Board of Elections' Responses and Objections to Plaintiffs' First Set of Interrogatories | January 25, 2023 | APP-88—APP-101 |
| Montgomery County Board of Elections' Responses and Objections to Plaintiffs' First Set of Requests for Admissions | January 25, 2023 | APP-102—APP-105 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,

*Plaintiffs,*

v.

LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth, *et al.*,

*Defendants.*

Case No. 1:22-cv-339

**DEFENDANT PHILADELPHIA COUNTY BOARD OF ELECTIONS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO PHILADELPHIA COUNTY (NOS. 1–22)**

Pursuant to Fed. R. Civ. P. 26 and 33 and the applicable Local Rules of the United States District Court for the Western District of Pennsylvania, Defendant Philadelphia County Board of Elections ("Philadelphia County") sets forth its responses and objections (the "Responses") to Plaintiffs' First Set of Interrogatories (Nos. 1–22) (the "Requests") as follows:

**PRELIMINARY STATEMENT**

These Responses represent Philadelphia County's good faith and reasonable effort to respond to the Requests based on information and documents available at this time. Philadelphia County is conducting a reasonable investigation into the existence and location of potentially responsive information. Philadelphia County's investigation to date informs each of these Responses and Objections. Philadelphia County's investigation of this matter is ongoing. Philadelphia County thus reserves the right to amend, supplement, correct, or clarify the responses in accordance with

the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Western District of Pennsylvania

## GENERAL OBJECTIONS

1. Philadelphia County objects to any instruction to the extent that it seeks to impose a burden in excess of what it required under Rule 26 and 33 of the Federal Rules of Civil Procedure.

2. Pursuant to an agreement with Plaintiffs, Philadelphia County construes these Requests as temporally limited to the 2022 General Election.

3. Philadelphia County objects to the undefined term of "military-overseas ballots" as vague and ambiguous. For purposes of these Responses, Philadelphia County construes that term to mean all ballots returned under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) or The Uniform Military and Overseas Voter Act (UMOVA).

## SPECIFIC RESPONSES AND OBJECTIONS

The following responses are subject to and without waiver of the above General Statement and Objections here. Any specific objections to a Request are made in addition to the General Statement and Objections, not as a replacement for such objections.

**INTERROGATORY NO. 1:**

State how many mail ballots and how many military-overseas ballots voters returned to You for the 2022 General Election.

**RESPONSE TO INTERROGATORY NO. 1:**

As of 8 p.m. on Election Day, voters returned 133,968 absentee and mail-in ballots to Philadelphia County. This number includes military-overseas ballots and ballots that Philadelphia County ultimately did not count due to a deficiency. Philadelphia County counted 127,934 absentee and mail-in ballots and 1,014 military-overseas ballots.

**INTERROGATORY NO. 2:**

State how many mail ballots You received in connection with the 2022 General Election that were signed and timely received but set aside and/or segregated because they lacked a handwritten date on the outer return envelope or showed a date on the outer return envelope that You deemed to be incorrect. If you allowed voters to correct or cure the envelope-date issue, specify whether your response includes ballots that were ultimately corrected or cured.

**RESPONSE TO INTERROGATORY NO. 2:**

Pursuant to the Pennsylvania Supreme Court's November 1st and November 5th 2022 orders, Philadelphia County set aside 2,617 mail-in and absentee ballots that were timely received in signed envelopes and which had a missing or "incorrect" handwritten date on the outer return envelope. None of the voters who submitted those ballots submitted replacement ballots, but 580 of those voters submitted provisional ballots.

**INTERROGATORY NO. 3:**

Identify and describe how you determined if a date on a mail ballot outer return envelope was "incorrect."

**RESPONSE TO INTERROGATORY NO. 3:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, Philadelphia County determined whether the date on a mail ballot's outer envelope was "incorrect" in compliance with the Pennsylvania Supreme Court's November 1st and 5th, 2022 orders. Pursuant to those orders, Philadelphia County treated as "incorrect" any mail ballot in an outer return envelope with a handwritten date that fell outside the date range of September 19, 2022, through November 8, 2022.

**INTERROGATORY NO. 4:**

State the date on which you began sending the mail ballot packages to voters.

**RESPONSE TO INTERROGATORY NO. 4:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, Philadelphia County began sending mail ballot packages to voters on October 10, 2022.

**INTERROGATORY NO. 5:**

State whether you opened and/or counted mail ballots where the handwritten date on the return envelope was after September 19, 2022, but before the date on which you began sending the mail ballot package to voters.

**RESPONSE TO INTERROGATORY NO. 5:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, in compliance with the Pennsylvania Supreme Court's November 1st and 5th, 2022 orders, Philadelphia County treated as "correct" any mail ballot in an outer return envelope with a handwritten date that fell within the date range of September 19, 2022, through November 8, 2022.

**INTERROGATORY NO. 6:**

State whether you opened and/or counted absentee ballots where the handwritten date on the return envelope was after August 30, 2022, but before the date on which you began sending the mail ballot package to voters.

**RESPONSE TO INTERROGATORY NO. 6:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, because absentee and mail-in ballots envelopes are identical and because the vast majority of mail ballots requested during the 2022 General Election consisted of mail-in rather than absentee ballots, Philadelphia County treated as "correct" any absentee ballot in an outer return envelope with a handwritten date that fell within the date range of September 19, 2022, through November 8, 2022, in compliance with the Pennsylvania Supreme Court's November 1st and 5th, 2022 orders.

**INTERROGATORY NO. 7:**

Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters whose timely received mail ballots You set aside and/or segregated because they were received in signed outer return envelopes that lacked a handwritten date or showed a date on the voter declaration that You deemed to be incorrect. In responding to this Interrogatory, state the specific reason why each such ballot was set aside and, if You allowed voters to correct or cure the date issue, specify whether each voter was able to correct or cure the issue.

**RESPONSE TO INTERROGATORY NO. 7:**

Philadelphia County objects to this Request because it seeks information and data that would be disproportionately burdensome to produce or that Philadelphia County does not keep or maintain in the ordinary course—namely, full birthdate,

address, and party affiliation, and whether each voter whose ballot was set aside cast a provisional ballot after receiving notice of a potential defect in their ballot during the 2022 election. Philadelphia County also objects to the undefined term "any other demographic information available to you" as vague, unduly burdensome, disproportionate, and overbroad.

Pursuant to these objections, for the ballots that were set aside, Philadelphia County will produce documents sufficient to identify the voter—including name, precinct, birthyear, and zip code—and whether the ballot was set aside because it lacked a handwritten date on the outer envelope or because it had an "incorrect" handwritten date on the outer envelope as defined by the Pennsylvania Supreme Court's November 1st and 5th, 2022 orders.

**INTERROGATORY NO. 8:**

Did any mail ballots described in Interrogatory 2 have any other defects, besides a missing or incorrect handwritten date on the outer return envelope, that would cause You not to count them? If so, state how many such mail ballots had an additional defect, describe those defects, and identify the voters whose timely received mail ballots had such additional defect(s).

**RESPONSE TO INTERROGATORY NO. 8:**

Consistent with the Election Code and Philadelphia County's established practices, all mail ballot envelopes returned to the County are first scanned and sorted by mail sorting machines that detect whether the mail ballot envelope is missing a signature or a secrecy envelope. Consistent with the Election Code and the Pennsylvania Supreme Court's November 1st and 5th, 2022 orders, Philadelphia County then conducted a manual review of the outer envelopes of all mail ballot envelopes not identified as missing a signature or secrecy envelope. To the best of

Philadelphia County's knowledge, based on its review process, all mail ballots identified in Interrogatory 2 do not have any other defect besides a missing or "incorrect" handwritten date on the outer return envelope.

**INTERROGATORY NO. 9:**

Did You determine that any voters who sent timely mail ballots described in Interrogatory 2 were not qualified, eligible voters? If so, describe how you determined such voters to be ineligible and identify, for each such voter, the basis for ineligibility.

**RESPONSE TO INTERROGATORY NO. 9:**

Philadelphia County did not determine that any voters who sent timely mail ballots described in Interrogatory 2 were not qualified, eligible voters,

**INTERROGATORY NO. 10:**

State whether You or any of Your agents identified or raised any credible fraud concerns specifically as to any individual mail ballot described in Interrogatory 2. If so, describe the nature of such fraud concerns.

**RESPONSE TO INTERROGATORY NO. 10:**

Philadelphia County did not identify or raise any credible fraud concerns with respect to the ballots that were set aside pursuant to the Pennsylvania Supreme Court's November 1st and 5th, 2022 orders.

**INTERROGATORY NO. 11:**

Did You provide notice to voters whose timely received mail ballots were set aside and/or segregated because the signed outer return envelope was missing a date or showed a date that You determined to be incorrect? If so, identify and describe how and when you notified voters of missing or incorrect dates on the signed outer return envelope.

**RESPONSE TO INTERROGATORY NO. 11:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, on November 5, 2022, Philadelphia County published online a list of mail-in and absentee voters whose ballot envelopes were administratively determined to lack a handwritten signature on the outer mailing envelope or who wrote a date on the outer mailing envelope that may be considered to be potentially incorrect under the Pennsylvania Supreme Court's November 1st and 5th, 2022 orders.

**INTERROGATORY NO. 12:**

Did You provide mail ballot voters described in Interrogatory 11 with an opportunity to correct or cure the identified issues with dating the outer return envelope? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any missing or incorrect date issues.

**RESPONSE TO INTERROGATORY NO. 12:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, when publishing the list referred to in Response to Interrogatory 11, Philadelphia County encouraged the listed voters to request a replacement ballot at the County Board of Elections office in City Hall or, if they were unable to request a replacement ballot, to cast a provisional ballot.

**INTERROGATORY NO. 13:**

If you provided notice and an opportunity to cure as described in Interrogatories 11 and 12, how many mail ballot voters cured their envelope date issue?

**RESPONSE TO INTERROGATORY NO. 13:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case. Philadelphia County further objects to this

Request because it seeks information and data that would be disproportionately burdensome to produce or that Philadelphia County does not keep or maintain in the ordinary course—namely, whether each voter who was included in the list described in Interrogatory 11 cast a replacement ballot or a provisional ballot, and whether any voter who did cast a replacement or provisional ballot did so after receiving notice from Philadelphia County of a potential defect in their ballot.

Notwithstanding these objections, as stated in response to Interrogatory No. 2, pursuant to the Pennsylvania Supreme Court's November 1st and 5th, 2022 orders, Philadelphia County set aside 2,617 timely received mail-in and absentee ballots that were timely received in signed envelopes and which had a missing or "incorrect" handwritten date on the outer return envelope. None of the voters who submitted those ballots submitted replacement ballots, but 580 of those voters submitted provisional ballots.

**INTERROGATORY NO. 14:**

Do You contend that the handwritten date is material in determining whether a mail ballot voter is qualified to vote in the election in which they have cast a ballot? If so, what is the basis for that contention?

**RESPONSE TO INTERROGATORY NO. 14:**

Philadelphia County does not contend that the handwritten date is material in determining whether a mail ballot voter is qualified to vote in the election in which they have cast a ballot.

**INTERROGATORY NO. 15:**

Did You count timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that You deemed to be incorrect? If so, state how many such military-overseas ballots You

counted. If not, state how many such military-overseas ballots You set aside and/or segregated due to missing or purportedly-incorrect dates on the outer return envelope.

**RESPONSE TO INTERROGATORY NO. 15:**

Philadelphia County did count timely received military-overseas ballots irrespective of whether there was a handwritten date on outer return envelope or on the "Absentee Voter Declaration / Affirmation" form. Philadelphia County counted 13 timely received military-overseas ballots where the voter failed to include a handwritten date.

**INTERROGATORY NO. 16:**

Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters who timely submitted military-overseas ballots but failed to date their voter declaration or included a date that You deemed to be incorrect.

**RESPONSE TO INTERROGATORY NO. 16:**

Philadelphia County objects to disclosing this information prior to the entry of a protective order. Philadelphia County also objects to the undefined term "any other demographic information available to you" as vague, unduly burdensome, and overbroad. Philadelphia County further objects to this Request because it seeks information and data that would be disproportionately burdensome to produce or that Philadelphia County does not keep or maintain in the ordinary course—namely, full birthdate, address, and party affiliation.

Pursuant to these objections, for the ballots identified in response to Interrogatory No. 15, Philadelphia County will produce documents sufficient to identify each voter's voter identification number, name, birthyear, and Country and

will designate that information as responsive to this Interrogatory pursuant to Federal Rule of Civil Procedure 33(d).

**INTERROGATORY NO. 17:**

Did the military-overseas ballots described in Interrogatory 15 have any other defects, besides a missing or incorrect date, that would cause You not to count them? If so, state how many such military-overseas ballots had an additional defect, describe those defects, and identify the voters whose timely received military-overseas ballots had such additional defect(s).

**RESPONSE TO INTERROGATORY NO. 17:**

To the best of Philadelphia County's knowledge based its review process, all ballots identified in Interrogatory 15 do not have any other defect that would cause the County not to count them.

**INTERROGATORY NO. 18:**

Did You determine that any voters who sent timely military-overseas ballots described in Interrogatory 15 were not qualified, eligible voters? If so, describe how you determined such voters to be ineligible and identify, for each such voter, the basis for ineligibility.

**RESPONSE TO INTERROGATORY NO. 18:**

Philadelphia County did not determine that any voter who sent timely military-overseas ballots described in Interrogatory 15 were not qualified, eligible voters.

**INTERROGATORY NO. 19:**

State whether You or any of Your agents identified or raised any credible fraud concerns specifically as to any of the military-overseas ballots described in Interrogatory 15. If so, describe the nature of such fraud concerns.

**RESPONSE TO INTERROGATORY NO. 19:**

Philadelphia County did not identify or raise any credible fraud concerns with respect to any military overseas ballots.

**INTERROGATORY NO. 20:**

If You did not count the timely received military-overseas ballots described in Interrogatory 15, did you provide notice to the voters whose military-overseas ballots were set aside and/or segregated because the voter failed to date their voter declaration or included a date that You determined to be incorrect? If so, identify and describe how and when you notified those voters.

**RESPONSE TO INTERROGATORY NO. 20:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, this interrogatory does not apply to Philadelphia County. See Response to Interrogatory No. 15.

**INTERROGATORY NO. 21:**

If You did not count the timely received military-overseas ballots described in Interrogatory 15, did You provide the voters who submitted such military-overseas ballots with an opportunity to correct or cure the identified issues with the date? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any date issues.

**RESPONSE TO INTERROGATORY NO. 21:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, this interrogatory does not apply to Philadelphia County. See Response to Interrogatory No. 15.

**INTERROGATORY NO. 22:**

If you provided notice and an opportunity to cure as described in Interrogatories 20 and 21, how many military-overseas voters cured their date issue?

**RESPONSE TO INTERROGATORY NO. 22:**

Philadelphia County objects to this Request as irrelevant and not proportionate to the needs of this case.

Notwithstanding this objection, this interrogatory does not apply to Philadelphia County. See Response to Interrogatory Nos. 15, 20, and 21.

Dated: January 25, 2023

By:     /s/ Ilana H. Eisenstein

**DLA PIPER LLP (US)**
Ilana H. Eisenstein (*pro hac vice*)
(Bar No. PA-94907)
Brian Benjet (*pro hac vice*)
(Bar No. PA-205392)
1650 Market Street, Suite 5000
One Liberty Place 1650 Market Street Suite 5000
Philadelphia, Pennsylvania 19103-7300
ilana.eisenstein@us.dlapiper.com
brian.benjet@us.dlapiper.com
Telephone: 215.656.3351

**PHILADELPHIA LAW DEPARTMENT**
Zachary G. Strassburger (*pro hac vice*)
Aimee D. Thomson (*pro hac vice*)
zachary.srassburger@phila.gov
aimee.thomson@phila.gov
1515 Arch Street, 15th floor
Philadelphia, PA 19102

*Attorneys for Defendant Philadelphia County Board of Elections*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, PHILADELPHIANS ORGANIZED TO WITNESS, EMPOWER AND REBUILD, COMMON CAUSE PENNSYLVANIA, BLACK POLITICAL EMPOWERMENT PROJECT, MAKE THE ROAD PENNSYLVANIA, JEAN TERRIZZI, BARRY M. SEASTEAD, MARJORIE BOYLE, MARLENE G. GUTIERREZ, DEBORAH DIEHL, AYNNE MARGARET PLEBAN POLINSKI, JOEL BENCAN, and LAURENCE M. SMITH,

*Plaintiffs,*

v.

LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth, and ALL 67 COUNTY BOARDS OF ELECTIONS,

*Defendants.*

Civ. No. 22-339

**VERIFICATION OF DEFENDANT PHILADELPHIA COUNTY BOARD OF ELECTIONS**

I, Nick Custodio, declare under penalty of perjury, that the following statements are true:

1. I am Deputy Commissioner for Philadelphia City Commissioner Lisa Deeley, and I am authorized to make this verification for and on behalf of the Philadelphia County Board of Elections in the above-entitled action.

2. The information set forth in the foregoing interrogatory responses is true and correct to the best of my knowledge, information, and belief.

Executed this 25th day of January, 2023.

Nick Custodio

CHAIRPERSON DEELEY: Good morning. The Return Board for the 2022 General and Special Election has reconvened.

First, I will preserve the order and decorum of these meetings. Everyone in attendance should be on notice that shouting out or interrupting the proceedings will not be tolerated. Those who violate this will be asked to leave. The Sunshine Act permits anyone attending a public meeting to object to a perceived violation at any time during the meeting. If you choose to do so, please succinctly state your objection. Objecting is not an opportunity for speechmaking.

We will now move to public comment. Commenters shall state where they live or if they are not a resident of Philadelphia that they are a Philadelphia taxpayer, or since this is the Return Board, which candidate they represent.

Public comment is not an opportunity for dialogue or Q&A. It is public comment, a chance for you to tell us what you think. Each speaker shall have two

minutes. However, I may extend this time at my discretion. All public comments must be relevant or germane to board business.

Finally, it is my responsibility to preserve the order and decorum of these meetings. As such, profane, slanderous, discriminatory, or personal attacks will not be tolerated.

Anyone here representing a candidate to offer argument on a mail ballot sufficiency determination should wait until that category -- 'til the category they wish to make argument on is called later in the meeting.

Particularly, as we are considering undated and incorrectly-dated ballots today, if there are any voters here wishing to be heard on their undated or incorrectly-dated mail ballot, we ask that those voters wait until we get to that portion of the agenda and they will be given an opportunity to speak at that time. Anyone wishing to offer public comments, please step forward.

(No response).

CHAIRPERSON DEELEY: Seeing none, we will now move to Commissioner Bluestein for e-mail public comments.

COMMISSIONER BLUESTEIN: There were no e-mail public comments by 9:45 this morning.

CHAIRPERSON DEELEY: Thank you, Commissioner. Before we move on to new business, there was a mail ballot category that came up in the last 24 hours. The issue was discovered with the Department of State's script to apply permanent voters who applied in the primary to the general. This category was discovered yesterday.

For that reason, it was not included in the agenda posted to the website prior to 24 hours before the meeting. Therefore, I would like to make a motion to amend today's agenda to add the permanent mail voters whose online applications were verified in the primary to the mail ballot sufficiency determinations, that the agenda -- amended agenda may be posted on the website.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The motion to amend the agenda has passed unanimously.

Before we move on to the mail ballot sufficiency determinations, because the subject of undated and incorrectly-dated ballots are such a large problem there are some facts that I would like to enter into the record.

The Board received 2,143 undated mail-in ballots and 460 mail-in ballots that are incorrectly dated based on the Supreme Court's November 5th order. We have

conducted an analysis of those ballots which reflects the impact of the date requirement on certain groups of voters.

First, as to age, the median age of voters who submitted undated ballots is 64 years old and the median age of voters who submitted misdated ballots is 66 years old. By comparison, the median age of registered voters in Philadelphia is 43. Looked at more closely, 74.5% of undated ballots were submitted by voters age 50 or older and 77.2% of the misdated ballots were submitted by voters age 50 or older.

At age 60 or older, those numbers are 60.9% for undated ballots and 64.1% for misdated ballots. Over a third of the undated and misdated ballots were submitted by voters over 70 years of age, 37.5% for the undated, and 40.9% for the misdated. 14.1% of the undated ballots were submitted by voters 80 years or older and 13.9% of the misdated ballots were submitted by voters in this age group.

Voters age 90 or older submitted 57

undated ballots and 15 misdated ballots. Importantly, these percentages all are significantly higher than the percentage of Philadelphia's registered voters that these age groups represent. For example, nearly two-thirds of undated or misdated ballots were submitted by people age 60 or older even though people age 60 or older only represent 22% of Philadelphia's population.

The Board has prepared this information in a table providing greater detail which I will now move into the record. In addition, the Board has reviewed the distribution of these ballots across Philadelphia and that analysis suggests that this issue disproportionately impacts certain Philadelphia communities. These include areas with higher poverty rates, lower rates of educational attainment, and minority communities.

The Board is preparing maps reflecting this information which we will post on the website. Thank you. I now call on John Hansberry to present on the mail

ballot sufficiency determinations.

MR. HANSBERRY: Good morning, Commissioners.

CHAIRPERSON DEELEY: Good morning, John.

COMMISSIONER SABIR: Good morning, John.

MR. HANSBERRY: So the first category I have for you guys today is the ballots that are missing dates.

CHAIRPERSON DEELEY: Is there anyone here who would like to offer comment on their undated ballot or anyone here representing a candidate to offer argument? Please come forward.

MS. LEOPOLD: Hi.

CHAIRPERSON DEELEY: Hi. Please state your name for the record.

MS. LEOPOLD: Caroline Leopold, L-E-O-P-O-L-D. Are you writing it down?

CHAIRPERSON DEELEY: Go ahead. The stenographer has it on the record.

MS. LEOPOLD: Okay. My address -- do you need my address?

CHAIRPERSON DEELEY: Sure, and your date of birth.

MS. LEOPOLD: My date of birth is December 7, 1969 and my address is -- it wouldn't be public, right, my address?

CHAIRPERSON DEELEY: It will. So if you don't want to add it, you don't --

MS. LEOPOLD: Can I say just the neighborhood because I don't --

CHAIRPERSON DEELEY: That's fine.

MS. LEOPOLD: Okay. I'm in East Passyunk in South Philly. I wanted to testify to -- I thought it was interesting the remarks you made about age and I did notice that in the ballots, and also for people with disabilities.

When I found out I had an undated ballot, my immediate reaction was of course I did. I fucked up because I have a mental disability that causes me to be cognitively impaired. Sometimes they call it brain fog

but it's more serious than that.

This morning, I was writing a journal entry and I tried to write the date and I do that every day. I couldn't remember what the date was. So for me, I found the ballot overwhelming. And if you get -- I don't know if I'm at my two minutes but I just want to say my experience with the ballot and how I messed up. And I'm sorry I cursed earlier. Anyway, what happened?

Okay. So I was ready to vote. I had planned it in advance. First I filled out all the bubbles. I felt like that was the most important thing. And in my head, I knew that the security envelope was really important. So I knew that. So I fill it out and I put it gently in the security envelope and I then put it in the envelope and I go to sign and date it. I knew I was supposed to sign and date it.

So I signed it and I looked for the date field and for me when I sign stuff the date field has always been on the right so

it's like sign and date on the right. So I looked to the right. I didn't see the date field and instead I saw this other stuff. And it took me like five minutes to figure out that that wasn't a date field. And by then, I'd forgotten about the date.

So then what I did was I sealed the envelope. I don't remember putting a signature on the envelope at all to tell you the truth. And then I mailed it. And that's what happened to me. And as you all know, it was a process to get my vote. I was fortunate because I got on the list and I got constant phone calls and stuff. But if I was -- it was very overwhelming. But fortunately, I was cognitively in my right mind enough to go to City Hall.

And when I went to City Hall, they were very helpful. So when I -- getting to City Hall got my vote. Like I don't exactly know what happened but I just wanted to tell you my experience. I'm just one person but I just -- maybe you can take my story and also maybe look into other people with

different disabilities like physical and mental disabilities and the barriers they have to mail-in voting.

So I really appreciate -- to close, I want to say I really appreciate the mail-in ballot. It gives me a sense of safety and security so I'm not asking for that to be thrown out. I'm just asking to make it a little simpler for people like me. So thank you for letting me share.

CHAIRPERSON DEELEY: Ms. Leopold, thank you so much for taking the time to come down here to share your experience. We do appreciate it. Thank you so very much.

COMMISSIONER SABIR: Thank you.

COMMISSIONER BLUESTEIN: Thank you.

CHAIRPERSON DEELEY: Is there anyone else here who would like to offer comment on their undated ballot or anyone here representing a candidate to offer argument?

MR. GARELLA: You had said earlier to withhold comments on this whole topic until now. Is this the appropriate time?

CHAIRPERSON DEELEY: Go ahead.

MR. GARELLA: Okay. Thank you. Good morning. My name is Rich Garella and I'm here on behalf of the nonpartisan election advocacy group Protect Our Vote Philly.

After last year's primary elections, in June of '21 we urged this board to ignore the Department of State's misguided instruction to disqualify undated ballots but the board disqualified them needlessly disenfranchising over 1,300 voters. The same thing happened in last year's general election.

After this year's primaries, we were delighted to see the board reverse its position in the wake of a clarifying court decision and count those ballots. Unfortunately, a subsequent Pennsylvania

Supreme Court decision now prevents you from counting undated and what is strangely called incorrectly-dated ballots.

We believe this is a disenfranchisement of eligible voters for a technical reason that has no connection whatsoever to the validity of their votes. It's completely immaterial. However, we understand that you must abide by the court order as irrational as it may be. But if any ballots fall into a gray area, for example if the data's unclear but could possibly be within the range specified by the court, we urge you to count them and to give the voters the benefit of the doubt.

This problem of dates on ballots cannot ultimately be solved here or in the courts. It's up to the state legislature to solve it and the solution is simple. Delete the word "date" in two sections of election code so that voters are asked only to sign the envelope. Protect Our Vote Philly takes this opportunity to urge the legislature to make this simple change in hopes that

members of this board join us in that request. Thank you.

CHAIRPERSON DEELEY: Thank you. Is there anyone else here who would like to offer comment on undated ballots or anyone here representing candidates to offer argument?

(No response).

CHAIRPERSON DEELEY: John, is there any reason to believe that anyone other than the voters listed on the declaration envelopes voted those ballots?

MR. HANSBERRY: No, there's not.

CHAIRPERSON DEELEY: Has there been any fraud or irregularity being alleged?

MR. HANSBERRY: No.

CHAIRPERSON DEELEY: Are all these voters registered and eligible to vote as to any of these ballots?

MR. HANSBERRY: Yes.

CHAIRPERSON DEELEY: So the voter only failed to add the date?

MR. HANSBERRY: That is correct.

CHAIRPERSON DEELEY: Were all these ballots received by Election Day at 8:00 p.m.?

MR. HANSBERRY: Yes.

CHAIRPERSON DEELEY: When were the ballots first made available?

MR. HANSBERRY: October 10th.

CHAIRPERSON DEELEY: Are the correspondence codes for all the ballots from the general -- 2022 General Election?

MR. HANSBERRY: Yes.

CHAIRPERSON DEELEY: So there is no question that the board knows that all of these ballots were signed between when they were sent by the board and 8:00 p.m. on Election Day, correct?

MR. HANSBERRY: Yes.

CHAIRPERSON DEELEY: First, I want to thank the Philadelphia voters who have shared their efforts and experiences with the mail-in voting process with us today in person and by e-mail. I have

always maintained that whether or not the voter writes the date on the envelope is not material in determining whether or not such individual is qualified under state law to vote in such election.

We know that these voters are qualified electors. We know when the ballots were printed and mailed out. We know when we received the ballots back so we know what possible dates these could've been from. Time machines do not exist. Inside those envelopes are ballots that contain the voice of Philadelphia voters. Those voices should be heard.

I disagree with the Supreme Court of Pennsylvania's orders of November 1, 2022 and November 5, 2022 but they have preemptively ordered all Pennsylvania counties to refrain from counting these ballots which erodes the quasi judicial powers that each county Board of Elections has to weigh facts and make decisions. But it's also clear that the path to counting these ballots is not through the state

courts but through the federal.

There is already one such case that was filed and I imagine that there will be more. This board will be actively trying to assist any and all efforts to get these ballots counted. I am hopeful that we will prevail and when we do I want to make sure that our voters' votes are counted.

Therefore, I motion that in accordance with the Supreme Court of Pennsylvania's November 1, 2022 and November 5, 2022 orders we refrain from counting at this time any absentee or mail-in ballots that are contained in undated envelopes and that those envelopes remain set aside again in accordance with the Supreme Court's order.

In addition, as those ballots have been set aside, I move that the Board of Elections determines that the ballots should be counted and that going forward if a final decision of a court determines that undated ballots cast in the 2022 General Election in Pennsylvania may be counted whether under

federal law or otherwise that the Board of Elections then count such ballots and include them in the amended computation and certification of returns.

COMMISSIONER BLUESTEIN: Chairwoman, may I be recognized?

CHAIRPERSON DEELEY: Yes.

COMMISSIONER BLUESTEIN: As I've said before, I want to make very clear again a handwritten date on the declaration envelope is absolutely immaterial to whether or not that ballot should be counted.

And anybody who is happy about not counting voters' votes that were legitimately cast by eligible voters should take a serious look in the mirror and think about why they're in this to begin with. And with that, I second the motion.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The motion to refrain from counting votes allowed to by future court decision set aside has passed unanimously. The undated ballots will remain set aside until a final decision of a court determines that undated ballots cast in the 2022 General Election in Pennsylvania may be counted. Proceed.

MR. HANSBERRY: The next category I have for the commissioners is the incorrectly-dated ballots.

CHAIRPERSON DEELEY: Is there any voter here who would like to offer comment on their incorrectly-dated ballot or anyone here representing a candidate to offer comment or argument?

(No response).

CHAIRPERSON DEELEY: John, is there any reason to believe that anyone other than the voters listed on the declaration envelope voted those ballots?

MR. HANSBERRY: No.

CHAIRPERSON DEELEY: Has there been any fraud or irregularity being alleged?

MR. HANSBERRY: No.

CHAIRPERSON DEELEY: Are all these voters registered and eligible to vote as to any of these ballots?

MR. HANSBERRY: Yes.

CHAIRPERSON DEELEY: So the voter only put an incorrect date?

MR. HANSBERRY: That's correct.

CHAIRPERSON DEELEY: Were all these ballots received by Election Day at 8:00 p.m.?

MR. HANSBERRY: Yes.

CHAIRPERSON DEELEY: When were the ballots first made available?

MR. HANSBERRY: October 10th.

CHAIRPERSON DEELEY: Are the correspondence codes all for ballots from the 2022 General Election?

MR. HANSBERRY: Yes.

CHAIRPERSON DEELEY: So there is no question that the board knows that all these ballots were signed between when they were sent by the board and 8:00 p.m. on Election Day, correct?

MR. HANSBERRY: Yes.

CHAIRPERSON DEELEY: I motion that in accordance with the Supreme Court of Pennsylvania's November 1, 2022 and November 5, 2022 orders we refrain from counting at this time any absentee and mail-in ballots that are contained incorrectly-dated envelopes and that those envelopes remain set aside again in accordance with the Supreme Court's orders.

In addition, as those ballots have been set aside, I move that the Board of Elections determines that the ballots should be counted and that going forward if a final decision of a court determines that incorrectly-dated ballots cast in the 2022 General Election in Pennsylvania may be counted whether under federal law or otherwise that the Board of Elections then

count such ballots and include them in the amended computation and certification of returns.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The incorrectly-dated ballots will remain set aside until a final decision of a court determines that undated ballots cast in the 2022 General Election in Pennsylvania may be counted. John, proceed.

MR. HANSBERRY: The final category I have for the commissioners is the permanent mail-in voters whose online applications were verified in the primary

but changed to not verified during the state script for the general and there are 57 ballots in that category.

CHAIRPERSON DEELEY: I make a motion that we count these ballots.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The motion to count permanent mail voters whose active applications are verified in the primary, count those ballots has been approved. I now call -- thank you, John. I now call on Kevin Richardson to present on the provisional ballot sufficiency determinations. Good morning, Kevin.

MR. RICHARDSON: Good morning, Commissioners.

CHAIRPERSON DEELEY: Proceed.

MR. RICHARDSON: What I have right here is 19 ballots -- provisional ballots with a signature name mismatched that I have for review for the board.

CHAIRPERSON DEELEY: Thank you.

MR. RICHARDSON: The first category is not in shore.

CHAIRPERSON DEELEY: Is there anyone here representing a candidate to offer argument on this category?

(No response).

CHAIRPERSON DEELEY: Seeing none, I make a motion that we do not count the ballots that were not found in shore.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN:

Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The ballots not in shore will not be counted. Proceed.

MR. RICHARDSON: Commissioners, the next category is for canceled registrations.

CHAIRPERSON DEELEY: Is there anyone here representing a candidate to offer argument on ballots -- provisional ballots with canceled registration?

(No response).

CHAIRPERSON DEELEY: Seeing none, I make a motion that we do not count these ballots.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The ballots with canceled registration will not be counted. Please proceed.

MR. RICHARDSON: The next category is for voters who are registered in another county.

CHAIRPERSON DEELEY: Is there anyone here representing a candidate to offer argument on provisional ballots for voters registered in another county?

(No response).

CHAIRPERSON DEELEY: Seeing none, I make a motion that we do not count these ballots.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the

roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: Please proceed.

MR. RICHARDSON: The next category is provisional ballots not signed by the voter.

CHAIRPERSON DEELEY: Sorry. I went ahead of myself. The registered in another county, those ballots will not be counted. Not signed by voter. Is there anyone here representing a candidate to offer argument on ballots not signed by voter?

(No response).

CHAIRPERSON DEELEY: Seeing none, I make a motion that we do not count these ballots.

COMMISSIONER BLUESTEIN:

Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The ballots not signed by voter will not be counted. Please proceed.

MR. RICHARDSON: The next category is for the signature does not match. I have 19 of those ballots for the board to determine.

CHAIRPERSON DEELEY: Thank you. I make a motion that the ballot of Amber Glover not be counted.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the

roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Abstain.

CHAIRPERSON DEELEY: The Glover ballot will not be counted. I make a motion that the Garcia ballot be counted.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Garcia ballot will be counted. I make a motion that the Cooper ballot be counted.

COMMISSIONER BLUESTEIN:
Second.

CHAIRPERSON DEELEY:
Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN:
Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Cooper ballot will be counted by unanimous vote. I make a motion that the Claxson ballot should be counted.

COMMISSIONER BLUESTEIN:
Second.

CHAIRPERSON DEELEY:
Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN:
Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I

vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Claxson ballot will be counted by unanimous vote. I make a motion that the Luwana ballot be counted.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Luwana ballot will be counted by unanimous vote. I make a motion that the Welborn ballot be counted.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY:

Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Welborn ballot will be counted by unanimous vote. I make a motion that the Williamson ballot be counted.

COMMISSIONER SABIR: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote nay. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Williamson ballot will be counted 2-1. I make a motion that the Danzek ballot not be

counted.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Abstain.

CHAIRPERSON DEELEY: The Danzek ballot will not be counted 2-1 -- 2-0. I'm sorry. I make a motion that the Whitehead ballot not be counted.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Abstain.

CHAIRPERSON DEELEY: The Whitehead ballot will not be counted 2-0. I make a motion that the Malindon ballot be counted.

COMMISSIONER SABIR: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote nay. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: I Malindon ballot will count 2-1. I make a motion that the -- I'm sorry. I'm rushing. This is why Arizona takes so long to count their ballots. I make a motion that the Smith ballot not be counted.

COMMISSIONER BLUESTEIN:

Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Abstain.

CHAIRPERSON DEELEY: The Smith ballot will not be counted 2-0. I make a motion that the Rodriguez ballot be counted.

COMMISSIONER SABIR: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote nay. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Rodriguez ballot will be counted 2-1. I make a motion that the Nigion ballot be counted.

COMMISSIONER SABIR: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote nay. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Nigion ballot will be counted 2-1. I make a motion to count the Noco ballot.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Noco ballot will count unanimously. I make a motion to count the Merry ballot.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Merry ballot will count unanimously. I make a motion that we count the Assa ballot.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY:

Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON: The Assa ballot will count unanimously. I make a motion that the Collin Garcia ballot not count.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Abstain.

CHAIRPERSON DEELEY: The Collin Garcia ballot will not be counted

2-0. I make a motion that we count the Torres ballot.

COMMISSIONER SABIR: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote nay. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Torres ballot will count 2-1. I make a motion that we count the Holiday ballot.

COMMISSIONER SABIR: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote nay. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The Holiday ballot will count 2-1. Kevin, thank you. Please proceed.

MR. RICHARDSON: Okay. Commissioners, the next category is where the staff vote determined that the voter voted in person.

CHAIRPERSON DEELEY: Is there anyone here representing a candidate to offer argument on this category?

(No response).

CHAIRPERSON DEELEY: Seeing none, I motion that we vote to not count these ballots.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I

vote aye. Commissioner Sabir?

COMMISSIONER SABIR: To clarify, you said that the person voted on the machine?

MR. RICHARDSON: That is correct.

COMMISSIONER SABIR: Okay. I vote not to count.

CHAIRPERSON DEELEY: The voted in-person ballots will not be counted. The vote was unanimous. Please proceed.

MR. RICHARDSON: Okay. The next is where there was no ward and division on the envelopes. We don't know where the envelopes were voted at.

CHAIRPERSON DEELEY: Is there anyone here representing a candidate to offer argument on this category?

(No response).

CHAIRPERSON DEELEY: Kevin, is there any question about the chain of custody of these ballots?

MR. RICHARDSON: No.

CHAIRPERSON DEELEY: The ward

and division information is located on the section of the provisional ballot envelope that is to be filled out by the election board workers, not the voter. The voters should not be penalized for mistakes by the election board workers. I motion that we count the no ward or no division on the envelope ballots.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The ballots no ward, no division will be counted unanimously. Please proceed, Kevin.

MR. RICHARDSON: The next category is where a return mail-in or

absentee was counted and the voter voted provisionally too.

CHAIRPERSON DEELEY: Is there anyone here on behalf of a candidate?

(No response).

CHAIRPERSON DEELEY: Seeing none, I vote that we do not count these ballots.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The category of return mail-in or absentee that was counted will not be counted. The vote passed unanimously. Please proceed.

MR. RICHARDSON: Okay. The

next category is where the returned mail-in or absentee ballot was canceled for one reason or another.

CHAIRPERSON DEELEY: I motion that -- is there anybody here to offer comment on these ballots on this category?

(No response).

CHAIRPERSON DEELEY: Seeing none, I motion that we count these ballots.

COMMISSIONER BLUESTEIN: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

CHAIRPERSON DEELEY: Aye.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The category of returned mail-in or absentee ballots that were canceled will be counted. That motion passed unanimously. Please

proceed.

MR. RICHARDSON: The next category is where the ballot was not enclosed in a secrecy envelope.

CHAIRPERSON DEELEY: Kevin -- is there anybody here to offer comment on this category?

(No response).

CHAIRPERSON DEELEY: Kevin, were these voters determined to be registered voters?

MR. RICHARDSON: Yes.

CHAIRPERSON DEELEY: These voters signed the affidavit, correct?

MR. RICHARDSON: Yes.

CHAIRPERSON DEELEY: So the only thing wrong with these ballots is that they're missing a secrecy envelope, right?

MR. RICHARDSON: That is correct.

CHAIRPERSON DEELEY: Like with the mail ballots, I believe whether or not a ballot is in a secrecy envelope is not material in determining whether or not such

individual is qualified under state law to vote in such election. But unlike the mail ballots where the voters are filling them out on their kitchen table, these voters are doing this process in the polling place.

The judge of elections should be instructing them to place their ballot in the secrecy envelope so this is a poll worker error that we should not be punishing the voter for. Furthermore, the difference here is that provisional ballots are outlined in federal law, the Help America Vote Act, and this is a federal election. State law determines if someone is eligible to vote.

If we determine these voters to be registered and that they signed the affidavit and that they have not already voted in another way, then we must count them. PA law has extra hurdles and putting a ballot in a secrecy envelope has no bearing on whether or not someone is qualified to vote. I therefore think Pennsylvania law is in conflict with the

Help America Vote Act and I motion that we count the naked provisional ballots.

COMMISSIONER BLUESTEIN: I make a motion that we do not count the naked provisional ballots.

COMMISSIONER SABIR: Second.

CHAIRPERSON DEELEY: Commissioner Bluestein, please call the roll.

COMMISSIONER BLUESTEIN: Commissioner Deeley?

COMMISSIONER DEELEY: Nay.

COMMISSIONER BLUESTEIN: I vote aye. Commissioner Sabir?

COMMISSIONER SABIR: Aye.

CHAIRPERSON DEELEY: The ballots not enclosed in a secrecy envelope will not count in a vote 2-1. Thank you, Kevin. Thank your staff as well.

COMMISSIONER BLUESTEIN: Thanks, Kevin.

CHAIRPERSON DEELEY: Commissioner Bluestein, do you have any items to be added to the agenda?

COMMISSIONER BLUESTEIN: I have none.

CHAIRPERSON DEELEY: Commissioner Sabir, do you have any items to be added to the agenda?

COMMISSIONER SABIR: I have none.

CHAIRPERSON DEELEY: Thank you. There are no items remaining on today's agenda.

\- - -

(This concludes the audio file.)

\- - -

WORD INDEX

< 1 >
**1** 16:16 17:11 21:9
**1,300** 12:17
**10th** 15:9 20:20
**13.9** 5:21
**14.1** 5:20
**15** 6:1
**19** 24:5 28:16
**1969** 8:6

< 2 >
**2,143** 4:21
**2-0** 33:15 34:5 35:12 39:1
**2022** 1:2 15:12 16:16, 17 17:11, 12, 23 19:10 20:23 21:9, 10, 21 22:19
**21** 12:13
**2-1** 32:23 33:14 34:19 36:2, 16 39:14 40:3 47:18
**22** 6:9
**24** 3:10, 17

< 3 >
**37.5** 5:18

< 4 >
**40.9** 5:19
**43** 5:9
**460** 4:22

< 5 >
**5** 16:17 17:12 21:10
**50** 5:11, 13
**57** 5:24 23:2
**5th** 4:24

< 6 >
**60** 5:14 6:7, 8
**60.9** 5:15
**64** 5:5
**64.1** 5:15
**66** 5:7

< 7 >
**7** 8:6
**70** 5:18
**74.5** 5:10
**77.2** 5:12

< 8 >
**8:00** 15:5, 17 20:16 21:4
**80** 5:21

< 9 >
**9:45** 3:5
**90** 5:24

< A >
**abide** 13:9
**absentee** 17:13 21:11 43:1, 21 44:2, 22
**absolutely** 18:11
**Abstain** 29:7 33:12 34:3 35:10 38:22
**Act** 1:9 46:13 47:1
**active** 23:19
**actively** 17:4
**add** 3:19 8:9 14:24
**added** 47:24 48:5
**addition** 6:13 17:18 21:16
**address** 8:2, 6, 7
**advance** 9:13
**advocacy** 12:10
**affidavit** 45:14 46:18
**age** 5:4, 6, 8, 11, 13, 14, 18, 23, 24 6:5, 7, 8 8:17
**agenda** 2:20 3:16, 19, 22, 23 4:13 47:24 48:5, 10
**ahead** 7:23 12:6 27:14
**alleged** 14:17 20:4
**allowed** 19:6
**Amber** 28:20
**amend** 3:19 4:13
**amended** 3:23 18:3 22:2
**America** 46:12 47:1
**analysis** 5:1 6:15
**anybody** 18:13 44:5 45:6
**Anyway** 9:10
**applications** 3:20 22:24 23:19
**applied** 3:13
**apply** 3:12
**appreciate** 11:4, 5, 14
**appropriate** 12:3
**approved** 23:21
**area** 13:11
**areas** 6:18
**argument** 2:10, 13 7:14 11:24 14:7 19:19 24:14 25:14 26:15 27:18 40:11 41:18
**Arizona** 34:21
**aside** 17:15, 19 19:7, 8 21:14, 17 22:17
**asked** 1:9 13:21
**asking** 11:7, 8
**Assa** 37:21 38:9
**assist** 17:5
**attacks** 2:7
**attainment** 6:19
**attendance** 1:6
**attending** 1:10
**audio** 48:12
**available** 15:8 20:19
**Aye** 4:8, 10, 11 18:24 19:2, 3 22:11, 13, 14 23:13, 15, 16 25:2, 4, 5 26:3, 5, 6 27:4, 6, 7 28:7, 9, 10 29:4, 6, 18, 20, 21 30:8, 10, 11, 23 31:1, 2, 14, 16, 17 32:5, 7, 8, 18, 21 33:9, 11, 24 34:2, 14, 17 35:7, 9, 21, 24 36:11, 14 37:1, 3, 4, 15, 17, 18 38:5, 7, 8, 19, 21 39:9, 12, 22 40:1, 23 41:1 42:16, 18, 19 43:16, 18, 19 44:17, 19, 20 47:14, 15

< B >
**back** 16:9
**ballot** 2:10, 19 3:9, 21 4:16 7:1, 13 8:21 9:6, 9 11:6, 22 18:12 19:17 23:23 28:19 29:9, 10, 23, 24 30:13, 15 31:4, 6, 19, 21 32:10, 12, 23, 24 33:14, 16 34:5, 6, 19, 23 35:12, 13 36:2, 3, 16, 17 37:6, 7, 20, 21 38:9, 11, 24 39:2, 14, 15 40:3 42:2 44:2 45:3, 23 46:7, 21
**ballots** 2:16 4:18, 22 5:1, 5, 7, 10, 12, 15, 16, 17, 20, 22 6:1, 6, 14 7:10 8:18 12:16, 23 13:3, 11, 16 14:5, 12, 21 15:4, 8, 11, 16 16:8, 9, 12, 20, 24 17:6, 13, 18, 20, 23 18:2 19:8, 10, 14, 24 20:8, 15, 19, 22 21:3, 11, 16, 18, 21 22:1, 16, 18 23:3, 5, 20 24:5, 6, 18 25:7, 14, 15, 19 26:8, 15, 20 27:11, 15, 18, 23 28:12, 16 34:22 40:15 41:10, 22 42:8, 21 43:8 44:6, 9, 23 45:17, 22 46:3, 11 47:2, 5, 17
**barriers** 11:2
**based** 4:23
**bearing** 46:22
**behalf** 12:9 43:4
**believe** 13:4 14:10 19:22 45:22
**benefit** 13:15
**birth** 8:4, 6
**Bluestein** 3:3, 4 4:1, 4, 6, 9 11:18 18:5, 8, 20, 22 19:1 22:4, 7, 9, 12 23:6, 9, 11, 14 24:19, 22, 24 25:3, 20, 23 26:1, 4, 21, 24 27:2, 5, 24 28:3, 5, 8, 21, 24 29:2, 5, 11, 14, 16, 19 30:1, 4, 6, 9, 16, 19, 21, 24 31:7, 10, 12, 15, 22 32:1, 3, 6, 15, 16, 19 33:2, 5, 7, 10, 17, 20, 22 34:1, 10, 12, 15, 24 35:3, 5, 8, 17, 19, 22 36:7, 9, 12, 18, 21, 23 37:2, 8, 11, 13, 16, 22 38:1, 3, 6, 12, 15, 17, 20 39:5, 7, 10, 18, 20, 23 40:16, 19, 21, 24 42:9, 12, 14, 17 43:9, 12, 14, 17 44:10, 13, 15, 18 47:3, 8, 10, 13, 20, 23 48:1
**Board** 1:2, 19 2:3 4:21 6:10, 13, 21 12:14, 16, 21 14:1 15:15, 17 16:21 17:4, 19 18:1 21:2, 4, 17, 24 24:7 28:17 42:4, 6
**brain** 8:24
**bubbles** 9:14
**business** 2:3 3:9

< C >
**call** 4:4 6:23 8:24 18:20 22:7 23:9, 21, 22 24:22 25:23 26:24 28:3, 24 29:14 30:4, 19 31:10 32:1, 15 33:5, 20 34:10 35:3, 17 36:7, 21 37:11 38:1, 15 39:5, 18 40:19 42:12 43:12 44:13 47:8
**called** 2:13 13:3
**calls** 10:14
**canceled** 25:11, 15 26:8 44:2, 23
**candidate** 1:19 2:10 7:14 11:23 19:18 24:13 25:13 26:14 27:17 40:10 41:17 43:4
**candidates** 14:6
**Caroline** 7:19
**case** 17:2
**cast** 17:23 18:15 19:10 21:21 22:18
**category** 2:12 3:9, 14 7:9 19:13 22:22 23:3 24:11, 14 25:10 26:11 27:11 28:15 40:6, 11 41:18 42:24 43:21 44:1, 6, 22 45:3, 7
**causes** 8:23
**certain** 5:3 6:17
**certification** 18:4 22:2
**chain** 41:21
**CHAIRPERSON** 1:1 3:1, 7 4:3, 8, 12 7:4, 11, 17, 22 8:3, 8, 12 11:11, 20 12:5 14:3, 9,

15, 19, 23 15:3, 7, 10, 14, 20 18:7, 19, 24 19:4, 15, 21 20:2, 6, 10, 14, 18, 21 21:1, 7 22:6, 11, 15 23:4, 8, 13, 17 24:3, 8, 12, 16, 21 25:2, 6, 12, 17, 22 26:3, 7, 13, 18, 23 27:4, 8, 13, 21 28:2, 7, 11, 18, 23 29:4, 8, 13, 18, 22 30:3, 8, 12, 18, 23 31:3, 9, 14, 18, 24 32:5, 9, 14, 18, 22 33:4, 9, 13, 19, 24 34:4, 9, 14, 18 35:2, 7, 11, 16, 21 36:1, 6, 11, 15, 20 37:1, 5, 10, 15, 19, 24 38:5, 9, 14, 19, 23 39:4, 9, 13, 17, 22 40:2, 9, 13, 18, 23 41:9, 16, 20, 24 42:11, 16, 20 43:3, 6, 11, 16, 20 44:4, 8, 12, 17, 21 45:5, 9, 13, 16, 21 47:7, 16, 22 48:3, 8

**Chairwoman** 18:6
**chance** 1:23
**change** 13:24
**changed** 23:1
**choose** 1:12
**City** 10:17, 18, 20
**clarify** 41:3
**clarifying** 12:22
**Claxson** 30:14 31:4
**clear** 16:23 18:9
**close** 11:4
**closely** 5:10
**code** 13:21
**codes** 15:11 20:22
**cognitively** 8:23 10:16
**Collin** 38:11, 24
**come** 7:15 11:13
**comment** 1:15, 21, 23 7:12 11:22 14:5 19:17, 19 44:6 45:6
**Commenters** 1:16
**comments** 2:2, 23 3:3, 5 12:2
**Commissioner** 3:2, 4, 8 4:1, 4, 6, 7, 9, 10, 11 7:6 11:16, 18 18:5, 8, 20, 22, 23 19:1, 2, 3 22:4, 7, 9, 10, 12, 13, 14 23:6, 9, 11, 12, 14, 15, 16 24:19, 22, 24 25:1, 3, 4, 5, 20, 23 26:1, 2, 4, 5, 6, 21, 24 27:2, 3, 5, 6, 7, 24 28:3, 5, 6, 8, 9, 10, 21, 24 29:2, 3, 5, 6, 7, 11, 14, 16, 17, 19, 20, 21 30:1, 4, 6, 7, 9, 10, 11, 16, 19, 21, 22, 24 31:1, 2, 7, 10, 12, 13, 15, 16, 17, 22 32:1, 3, 4, 6, 7, 8, 13, 15, 16, 17, 19, 20, 21 33:2, 5, 7, 8, 10, 11, 12, 17, 20, 22, 23 34:1, 2, 3, 8, 10, 12, 13, 15, 16, 17, 24 35:3, 5, 6, 8, 9, 10, 15, 17, 19, 20, 22, 23, 24 36:5, 7, 9, 10, 12, 13, 14, 18, 21, 23, 24 37:2, 3, 4, 8, 11, 13, 14, 16, 17, 18, 22 38:1, 3, 4, 6, 7, 8, 12, 15, 17, 18, 20, 21, 22 39:3, 5, 7, 8, 10, 11, 12, 16, 18, 20, 21, 23, 24 40:1, 16, 19, 21, 22, 24 41:1, 2, 7 42:9, 12, 14, 15, 17, 18, 19 43:9, 12, 14, 15, 17, 18, 19 44:10, 13, 15, 16, 18, 19, 20 47:3, 6, 8, 10, 11, 12, 13, 14, 15, 20, 23 48:1, 4, 6
**Commissioners** 7:3 19:13 22:22 24:2 25:10 40:6
**communities** 6:17, 20
**comparison** 5:8
**completely** 13:8
**computation** 18:3 22:2
**concludes** 48:12
**conducted** 5:1
**conflict** 46:24
**connection** 13:6
**considering** 2:15
**constant** 10:14
**contain** 16:12
**contained** 17:14 21:12
**Cooper** 29:24 30:13
**correct** 15:2, 18 20:13 21:5 41:6 45:14, 20
**correspondence** 15:11 20:22
**could've** 16:10
**count** 12:23 13:14 18:2 22:1 23:5, 18, 20 24:17 25:18 26:19 27:22 34:19, 21 36:17 37:6, 7, 20, 21 38:10, 11 39:1, 14, 15 40:3, 14 41:8 42:7 43:7 44:9 46:19 47:2, 4, 18
**counted** 17:6, 8, 21, 24 18:12 19:11 21:19, 23 22:20 25:7 26:9 27:16 28:13, 20 29:9, 10, 23, 24 30:13, 15 31:4, 6, 19, 21 32:10, 12, 23 33:1, 14, 16 34:5, 7, 23 35:12, 14 36:2, 4, 16 38:24 41:10 42:21 43:1, 22 44:23
**counties** 16:19
**counting** 13:2 16:19, 23 17:12 18:14 19:5 21:10
**county** 16:21 26:12, 16 27:15
**course** 8:21
**court** 12:22 13:1, 9, 14 16:15 17:10, 22 19:6, 9 21:8, 20 22:17
**courts** 13:18 17:1
**Court's** 4:24 17:16 21:15
**cursed** 9:10
**custody** 41:22

< D >
**Danzek** 32:24 33:14
**data's** 13:12
**date** 5:2 8:4, 5 9:3, 5, 20, 21, 23, 24 10:1, 2, 5, 6 13:20 14:24 16:2 18:10 20:11
**dated** 4:23
**dates** 7:10 13:16 16:10
**day** 9:4 15:4, 18 20:15 21:5
**December** 8:6
**decision** 12:23 13:1 17:22 19:6, 9 21:20 22:17
**decisions** 16:22
**declaration** 14:12 18:10 19:24
**decorum** 1:5 2:5
**DEELEY** 1:1 3:1, 7 4:3, 7, 8, 12 7:4, 11, 17, 22 8:3, 8, 12 11:11, 20 12:5 14:3, 9, 15, 19, 23 15:3, 7, 10, 14, 20 18:7, 19, 23, 24 19:4, 15, 21 20:2, 6, 10, 14, 18, 21 21:1, 7 22:6, 10, 11, 15 23:4, 8, 12, 13, 17 24:3, 8, 12, 16, 21 25:1, 2, 6, 12, 17, 22 26:2, 3, 7, 13, 18, 23 27:3, 4, 8, 13, 21 28:2, 6, 7, 11, 18, 23 29:3, 4, 8, 13, 17, 18, 22 30:3, 7, 8, 12, 18, 22, 23 31:3, 9, 13, 14, 18, 24 32:4, 5, 9, 14, 17, 18, 22 33:4, 8, 9, 13, 19, 23, 24 34:4, 9, 13, 14, 18 35:2, 6, 7, 11, 16, 20, 21 36:1, 6, 10, 11, 15, 20, 24 37:1, 5, 10, 14, 15, 19, 24 38:4, 5, 14, 18, 19, 23 39:4, 8, 9, 13, 17, 21, 22 40:2, 9, 13, 18, 22, 23 41:9, 16, 20, 24 42:11, 15, 16, 20 43:3, 6, 11, 15, 16, 20 44:4, 8, 12, 16, 17, 21 45:5, 9, 13, 16, 21 47:7, 11, 12, 16, 22 48:3, 8
**Delete** 13:19
**delighted** 12:21
**Department** 3:11 12:14
**detail** 6:12
**determination** 2:11
**determinations** 3:22 4:16 7:1 23:24
**determine** 28:17 46:16
**determined** 40:7 45:10
**determines** 17:20, 22 19:9 21:18, 20 22:18 46:14
**determining** 16:3 45:24
**dialogue** 1:22
**difference** 46:10
**different** 11:1
**disabilities** 8:19 11:1, 2
**disability** 8:23
**disagree** 16:15
**discovered** 3:11, 14
**discretion** 2:2
**discriminatory** 2:7
**disenfranchisement** 13:5
**disenfranchising** 12:17
**disproportionately** 6:16
**disqualified** 12:16
**disqualify** 12:15
**distribution** 6:14
**division** 41:13 42:1, 7, 21
**doing** 46:5
**doubt** 13:15

< E >
**earlier** 9:10 12:2
**East** 8:15
**educational** 6:19
**efforts** 15:22 17:5
**Election** 1:3 12:10, 19 13:20 15:4, 12, 18 16:5 17:23 19:10 20:15, 23 21:5, 22 22:19 42:3, 6 46:2, 13

**elections** 12:13 16:21 17:20 18:2 21:18, 24 46:6
**electors** 16:7
**eligible** 13:5 14:20 18:15 20:7 46:14
**e-mail** 3:3, 5 15:24
**enclosed** 45:4 47:17
**enter** 4:19
**entry** 9:3
**envelope** 9:16, 19 10:8, 9 13:22 16:2 18:11 19:24 42:2, 8 45:4, 18, 23 46:8, 21 47:17
**envelopes** 14:12 16:12 17:14, 15 21:13 41:14, 15
**erodes** 16:20
**error** 46:9
**exactly** 10:20
**example** 6:5 13:12
**exist** 16:11
**experience** 9:8 10:22 11:14
**experiences** 15:22
**extend** 2:1
**extra** 46:20

< F >
**facts** 4:19 16:22
**failed** 14:24
**fall** 13:11
**federal** 17:1 18:1 21:23 46:12, 13
**felt** 9:14
**field** 9:23, 24 10:3, 5
**figure** 10:4
**file** 48:13
**filed** 17:3
**fill** 9:17
**filled** 9:13 42:3
**filling** 46:3
**final** 17:21 19:8 21:19 22:17, 21
**Finally** 2:4
**fine** 8:13
**First** 1:4 5:4 7:8 9:13 15:8, 20 20:19 24:10
**five** 10:4
**fog** 8:24
**forgotten** 10:6
**fortunate** 10:13
**fortunately** 10:16
**forward** 2:23 7:15 17:21 21:19
**found** 8:20 9:6 24:18
**fraud** 14:16 20:3
**fucked** 8:22
**Furthermore** 46:10
**future** 19:6

< G >
**Garcia** 29:10, 23 38:11, 24
**GARELLA** 12:1, 7, 8
**General** 1:3 3:13 12:19 15:12 17:23 19:10 20:23 21:22 22:19 23:2
**gently** 9:18
**germane** 2:3
**getting** 10:19
**give** 13:15
**given** 2:21
**gives** 11:6
**Glover** 28:20 29:9
**Go** 7:22 9:20 10:17 12:5
**going** 17:21 21:19
**Good** 1:1 7:2, 4, 6 12:8 23:24 24:1
**gray** 13:11
**greater** 6:11
**group** 5:23 12:10
**groups** 5:3 6:5
**guys** 7:9

< H >
**Hall** 10:17, 18, 20
**handwritten** 18:10
**Hansberry** 6:24 7:2, 8 14:13, 18, 22 15:1, 6, 9, 13, 19 19:12 20:1, 5, 9, 12, 17, 20, 24 21:6 22:21
**happened** 9:11 10:11, 21 12:18
**happy** 18:13
**head** 9:15
**heard** 2:18 16:14
**Help** 46:12 47:1
**helpful** 10:19
**Hi** 7:16, 17
**higher** 6:3, 18
**Holiday** 39:15 40:3
**hopeful** 17:6
**hopes** 13:24
**hours** 3:10, 17
**hurdles** 46:20

< I >
**ignore** 12:14
**imagine** 17:3
**immaterial** 13:8 18:11
**immediate** 8:21
**impact** 5:2
**impacts** 6:16
**impaired** 8:24
**important** 9:15, 17
**Importantly** 6:2
**include** 6:18 18:3 22:1
**included** 3:16
**incorrect** 20:11
**incorrectly** 4:23
**incorrectly-dated** 2:16, 18 4:17 13:3 19:14, 17 21:12, 21 22:16
**individual** 16:4 46:1
**information** 6:11, 22 42:1
**in-person** 41:10
**Inside** 16:11
**instructing** 46:7
**instruction** 12:15
**interesting** 8:16
**interrupting** 1:7
**irrational** 13:10
**irregularity** 14:16 20:3
**issue** 3:11 6:16
**items** 47:24 48:4, 9
**its** 12:21

< J >
**John** 6:24 7:5, 7 14:9 19:21 22:20 23:21
**join** 14:1
**journal** 9:3
**judge** 46:6
**judicial** 16:20
**June** 12:13

< K >
**Kevin** 23:22, 24 40:3 41:20 42:22 45:5, 9 47:19, 21
**kitchen** 46:4
**knew** 9:16, 17, 20
**know** 9:7 10:12, 21 16:6, 7, 9, 10 41:14
**knows** 15:15 21:2

< L >
**large** 4:18
**law** 16:4 18:1 21:23 46:1, 12, 14, 20, 24
**leave** 1:9
**legislature** 13:18, 23
**legitimately** 18:15
**LEOPOLD** 7:16, 19, 20 8:1, 5, 10, 14 11:12
**L-E-O-P-O-L-D** 7:20
**letting** 11:10
**list** 10:13
**listed** 14:11 19:23
**little** 11:9
**live** 1:16
**located** 42:1
**long** 34:21
**look** 10:24 18:16
**Looked** 5:9 9:22 10:2
**lower** 6:19
**Luwana** 31:5, 19

< M >
**machine** 41:4
**machines** 16:11
**mail** 2:10, 19 3:9, 20, 21 4:15 6:24 23:18 45:22 46:2
**mailed** 10:10 16:8
**mail-in** 4:22 11:3, 6 15:23 17:13 21:11 22:23 42:24 43:21 44:1, 22
**maintained** 16:1
**Malindon** 34:6, 19
**maps** 6:21
**match** 28:16
**material** 16:3 45:24
**median** 5:4, 6, 8
**meeting** 1:10, 12 2:14 3:17
**meetings** 1:5 2:6
**members** 14:1
**mental** 8:22 11:2
**Merry** 37:7, 20
**messed** 9:9
**mind** 10:17
**minority** 6:20
**minutes** 2:1 9:7 10:4
**mirror** 18:16
**misdated** 5:7, 12, 16, 17, 19, 22 6:1, 6
**misguided** 12:15
**mismatched** 24:6
**missing** 7:10 45:18
**mistakes** 42:5
**morning** 1:2 3:6 7:2, 5, 7 9:2 12:8 23:24 24:2
**motion** 3:18 4:13 17:9 18:18 19:5 21:7 23:5, 18 24:17 25:18 26:19 27:22 28:19 29:10, 24 30:14 31:5, 20 32:11, 24 33:15 34:6, 20, 22 35:13 36:3, 17 37:7, 21 38:10 39:1, 15 40:14 42:6 44:4, 9, 24 47:1, 4
**move** 1:15 3:2, 8 4:15 6:12 17:19 21:17

< N >
**naked** 47:2, 4
**name** 7:18 12:8 24:6
**nay** 32:20 34:16 35:23 36:13 39:11, 24 47:12
**nearly** 6:5
**need** 8:2
**needlessly** 12:17
**neighborhood** 8:11
**new** 3:8
**Nigion** 36:3, 16
**Noco** 36:17 37:5

nonpartisan 12:9
notice 1:6 8:18
November 4:24 16:16, 17 17:11 21:9
numbers 5:14

< O >
object 1:10
Objecting 1:13
objection 1:13
October 15:9 20:20
offer 2:10, 22 7:12, 14 11:21, 23 14:5, 6 19:16, 19 24:14 25:14 26:15 27:18 40:11 41:18 44:5 45:6
Okay 8:1, 14 9:12 12:7 40:5 41:7, 12 43:24
old 5:6, 7
older 5:11, 13, 14, 21, 24 6:7, 8
online 3:20 22:23
opportunity 1:14, 22 2:21 13:23
order 1:4 2:5 4:24 13:10 17:17
ordered 16:18
orders 16:16 17:12 21:10, 15
outlined 46:12
overwhelming 9:6 10:15

< P >
p.m 15:5, 17 20:16 21:4
PA 46:20
Particularly 2:15
passed 4:13 19:7 43:23 44:24
Passyunk 8:15
path 16:23
penalized 42:5
Pennsylvania 12:24 16:18 17:24 19:11 21:22 22:19 46:24
Pennsylvania's 16:16 17:11 21:9
people 6:7, 8 8:19 10:24 11:9
perceived 1:11
percentage 6:3
percentages 6:2
permanent 3:12, 19 22:23 23:18
permits 1:9
person 10:22 15:24 40:8 41:3
personal 2:7
Philadelphia 1:17, 18 5:9 6:15, 17 15:21 16:13
Philadelphia's 6:4, 9
Philly 8:15 12:11 13:22
phone 10:14
physical 11:1
place 46:5, 7
planned 9:13
please 1:12 2:23 4:4 7:15, 18 18:20 22:7 23:9 24:22 25:23 26:9, 24 27:8 28:3, 13, 24 29:14 30:4, 19 31:10 32:1 33:5, 20 34:10 35:3, 17 36:7, 21 37:11 38:1, 15 39:5, 18 40:4, 19 41:11 42:12, 22 43:12, 23 44:13, 24 47:8
poll 46:8
polling 46:5
population 6:9
portion 2:20
position 12:22
possible 16:10
possibly 13:13
post 6:23
posted 3:16, 23
poverty 6:18
powers 16:21
preemptively 16:18
prepared 6:10
preparing 6:21
present 6:24 23:22
preserve 1:4 2:5
prevail 17:7
prevents 13:1
primaries 12:20
primary 3:13, 21 12:12 22:24 23:20
printed 16:8
prior 3:17
problem 4:18 13:16
Proceed 19:11 22:20 24:3 25:8 26:9 27:9 28:13 40:4 41:11 42:22 43:23 45:1
proceedings 1:7
process 10:12 15:23 46:5
profane 2:6
Protect 12:10 13:22
providing 6:11
provisional 23:23 24:5 25:14 26:15 27:11 42:2 46:11 47:2, 5
provisionally 43:2
public 1:10, 15, 21, 23 2:2, 23 3:3, 5 8:7
punishing 46:9
put 9:18, 19 20:11
putting 10:8 46:20

< Q >
Q&A 1:22
qualified 16:4, 7 46:1, 23
quasi 16:20
question 15:15 21:2 41:21

< R >
range 13:13
rates 6:18, 19
reaction 8:21
ready 9:12
really 9:16 11:4, 5
reason 3:15 13:6 14:10 19:22 44:3
received 4:21 15:4 16:9 20:15
recognized 18:6
reconvened 1:3
record 4:20 6:13 7:18, 24
reflecting 6:22
reflects 5:2
refrain 16:19 17:12 19:5 21:10
registered 5:8 6:4 14:20 20:7 26:11, 16 27:14 45:11 46:17
registration 25:15 26:8
registrations 25:11
relevant 2:3
remain 17:15 19:8 21:13 22:16
remaining 48:9
remarks 8:17
remember 9:5 10:8
represent 1:20 6:5, 9
representing 2:9 7:14 11:23 14:6 19:18 24:13 25:13 26:14 27:17 40:10 41:17
request 14:2
requirement 5:2
resident 1:17
response 2:24 14:8 19:20 24:15 25:16 26:17 27:20 40:12 41:19 43:5 44:7 45:8
responsibility 2:4
Return 1:2, 19 42:24 43:21
returned 44:1, 22
returns 18:4 22:3
reverse 12:21
review 24:7
reviewed 6:13
Rich 12:8
Richardson 23:22 24:1, 4, 10 25:9 26:10 27:10 28:14 40:5 41:5, 12, 23 42:23 43:24 45:2, 12, 15, 19
right 8:7 9:24 10:1, 2, 16 24:5 45:18
Rodriguez 35:13 36:2
roll 4:5 18:21 22:8 23:10 24:23 25:24 27:1 28:4 29:1, 15 30:5, 20 31:11 32:2, 15 33:6, 21 34:11 35:4, 18 36:8, 22 37:12 38:2, 16 39:6, 19 40:20 42:13 43:13 44:14 47:9
rushing 34:20

< S >
Sabir 4:10, 11 7:6 11:16 19:2, 3 22:13, 14 23:15, 16 25:4, 5 26:5, 6 27:6, 7 28:9, 10 29:6, 7, 20, 21 30:10, 11 31:1, 2, 16, 17 32:7, 8, 13, 20, 21 33:11, 12 34:2, 3, 8, 16, 17 35:9, 10, 15, 23, 24 36:5, 13, 14 37:3, 4, 17, 18 38:7, 8, 21, 22 39:3, 11, 12, 16, 24 40:1 41:1, 2, 7 42:18, 19 43:18, 19 44:19, 20 47:6, 14, 15 48:4, 6
safety 11:7
saw 10:3
script 3:12 23:2
sealed 10:7
Second 4:2 18:18 22:5 23:7 24:20 25:21 26:22 28:1, 22 29:12 30:2, 17 31:8, 23 32:13 33:3, 18 34:8 35:1, 15 36:5, 19 37:9, 23 38:13 39:3, 16 40:17 42:10 43:10 44:11 47:6
secrecy 45:4, 18, 23 46:8, 21 47:17
section 42:2
sections 13:20
security 9:16, 18 11:7
see 10:2 12:21
Seeing 3:1 24:16 25:17 26:18 27:21 40:13 43:6 44:8
sense 11:6
sent 15:17 21:4
serious 9:1 18:16
set 17:15, 19 19:6, 8 21:14, 17 22:16
share 11:10, 13
shared 15:22
shore 24:11, 18 25:7
shouting 1:6
sign 9:20, 21, 23 10:1 13:21
signature 10:9 24:6 28:15
signed 9:22 15:16 21:3

27:11, 16, 18 28:12 45:14 46:17
**significantly** 6:3
**simple** 13:19, 24
**simpler** 11:9
**slanderous** 2:6
**Smith** 34:23 35:12
**solution** 13:19
**solve** 13:19
**solved** 13:17
**sorry** 9:10 27:13 33:15 34:20
**South** 8:15
**speak** 2:22
**speaker** 1:24
**Special** 1:3
**specified** 13:13
**speechmaking** 1:14
**staff** 40:7 47:19
**state** 1:13, 16 7:18 13:18 16:4, 24 23:1 46:1, 14
**State's** 3:12 12:14
**stenographer** 7:23
**step** 2:23
**story** 10:23
**strangely** 13:2
**stuff** 9:23 10:3, 14
**subject** 4:17
**submitted** 5:5, 7, 11, 12, 17, 20, 22, 24 6:7
**subsequent** 12:24
**succinctly** 1:13
**sufficiency** 2:11 3:22 4:16 7:1 23:23
**suggests** 6:15
**Sunshine** 1:9
**supposed** 9:21
**Supreme** 4:23 13:1 16:15 17:10, 16 21:8, 15
**Sure** 8:3 17:7

< T >
**table** 6:11 46:4
**take** 10:23 18:16
**takes** 13:22 34:21
**taxpayer** 1:18
**technical** 13:6
**tell** 1:23 10:9, 21
**testify** 8:16
**Thank** 3:7 6:23 11:10, 12, 14, 16, 19 12:7 14:2, 3 15:21 23:21 24:8 28:18 40:3 47:18, 19 48:8
**Thanks** 47:21
**thing** 9:15 12:18 45:17
**think** 1:24 18:16 46:23
**third** 5:16
**thought** 8:16
**thrown** 11:8
**time** 1:11 2:1, 22 11:13 12:4 16:11 17:13 21:11
**today** 2:16 7:9 15:24
**today's** 3:19 48:10
**tolerated** 1:8 2:8
**topic** 12:3
**Torres** 39:2, 14
**tried** 9:3
**truth** 10:10
**trying** 17:4
**two** 1:24 9:7 13:20
**two-thirds** 6:6

< U >
**ultimately** 13:17
**unanimous** 30:13 31:4, 19 32:10 41:11
**unanimously** 4:14 19:7 37:6, 20 38:10 42:22 43:23 44:24
**unclear** 13:12
**undated** 2:16, 18 4:17, 21 5:5, 10, 15, 17, 19, 20 6:1, 6 7:13 8:20 11:22 12:15 13:2 14:5 17:14, 22 19:7, 9 22:18
**understand** 13:9
**Unfortunately** 12:24
**urge** 13:14, 23
**urged** 12:13

< V >
**validity** 13:7
**verified** 3:21 22:24 23:1, 19
**violate** 1:8
**violation** 1:11
**voice** 16:13
**voices** 16:13
**vote** 4:10 9:12 10:12, 20 12:10 13:22 14:20 16:5 19:2 20:7 22:13 23:15 25:4 26:5 27:6 28:9 29:6, 20 30:10, 14 31:1, 5, 16, 20 32:7, 11, 20 33:11 34:2, 16 35:9, 23 36:13 37:3, 17 38:7, 21 39:11, 24 40:7, 14 41:1, 8, 11 42:18 43:7, 18, 22 44:19 46:2, 13, 15, 23 47:1, 14, 18
**voted** 14:12 19:24 40:8 41:3, 10, 15 43:1 46:19
**voter** 14:24 16:2 19:16 20:11 27:12, 16, 19 28:12 40:7 42:4 43:1 46:10
**voters** 2:17, 19 3:12, 20 5:3, 5, 6, 9, 11, 13, 18, 21, 22, 24 6:4 12:18 13:5, 15, 21 14:11, 20 15:21 16:6, 13 17:8 18:14, 15 19:23 20:7 22:23 23:18 26:11, 16 42:4 45:10, 11, 14 46:3, 4, 16
**votes** 13:7 17:8 18:14 19:5
**voting** 11:3 15:23

< W >
**wait** 2:11, 19
**wake** 12:22
**want** 8:9 9:8 11:5 15:21 17:7 18:9
**wanted** 8:15 10:21
**ward** 41:13, 24 42:7, 21
**way** 46:19
**website** 3:16, 24 6:23
**weigh** 16:22
**Welborn** 31:20 32:10
**well** 47:19
**went** 10:18 27:14
**whatsoever** 13:7
**Whitehead** 33:16 34:5
**Williamson** 32:11, 23
**wish** 2:12
**wishing** 2:17, 22
**withhold** 12:2
**word** 13:20
**worker** 46:9
**workers** 42:4, 6
**write** 9:3
**writes** 16:2
**writing** 7:20 9:2
**wrong** 45:17

< Y >
**years** 5:6, 7, 18, 21
**year's** 12:12, 19, 20
**yesterday** 3:14

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>AL SCHMIDT, Acting Secretary of the Commonwealth, *et al.*,<br><br>*Defendants.* | Case No. 1:22-cv-339 |
| BETTE EAKIN, *et al*,<br><br>*Plaintiffs,*<br><br>v.<br><br>ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,<br><br>*Defendants.* | Case No. 1:22-cv-340 |

**DECLARATION OF NICK CUSTODIO**

I, Nick Custodio, have personal knowledge of the facts contained in this affidavit and declare as follows:

1. I am of legal age and competent to provide this Declaration. All the information herein is based on my own personal knowledge. If called and sworn as a witness, I could and would competently testify to these facts.

2. Since January 29, 2018, I have served as Deputy City Commissioner for Philadelphia City Commissioner Lisa Deeley, Chairwoman. By virtue of my work as Deputy Commissioner for Chairwoman Deeley, I have a thorough knowledge of

Philadelphia's election procedures and administration. I have firsthand knowledge of the Board's handling of absentee ballots going back to January 2018 and of mail-in ballots dating back to the adoption of Act 77.

3. The Philadelphia City Commissioners are three elected officials in charge of elections and voter registration for the City of Philadelphia. Each Commissioner is elected to serve a four-year term. The Commissioners set and enforce department policies to administer voter registration and conduct elections in accordance with federal and Commonwealth voter registration and election laws.

4. Pursuant to the Pennsylvania Election Code and the Philadelphia Home Rule Charter, the Commissioners constitute the Board of Elections for Philadelphia County. Because all three Commissioners are on the ballot in the 2023 municipal election, per the Pennsylvania Election Code, the President Judge of the Court of Common Pleas has appointed three judges from the Philadelphia Court of Common Pleas to serve on the Board of Elections in their stead. Deputy Commissioners serve as deputies to members of the Board of Elections.

5. The day-to-day operations of the Board, including much of the work described below that is performed in preparation for elections, is conducted by the Board's employees, overseen by Executive Director Joseph Lynch. The Executive Director reports to the Board of the City Commissioners and is supervised day-to-day by the Chairwoman's Office. References below to "the Board" include the work of the Board staff, the offices of the City Commissioners, and the Philadelphia County

Board of Elections, and are not limited to matters on which the three-member Board has reached a formal determination.

6.    Pennsylvania allows qualified voters to vote in-person or by absentee or mail-in ballot. *See* 25 P.S. §§ 3146.1, 3150.11(a), 3050. To vote by absentee or mail-in ballot, qualified voters must apply to their county board of elections. 25 P.S. §§ 3146.2, 3146.2a, 3150.12, 3150.12a. Once the Board approves an elector's application, the Board mails them an absentee or mail-in ballot package; if the voter is applying in person, the Board hands them the ballot package. 25 P.S. §§ 3146.5, 3150.15. The voter must fill out and return the ballot package by 8:00 p.m. on Election Day. 25 P.S. §§ 3146.6, 3150.16.

7.    Since the adoption of no-excuse mail-in voting in Pennsylvania, the Board has developed procedures to efficiently process the large volume of returned absentee and mail-in ballots while complying with its obligations under the Election Code and with guidance from the Department of State.

8.    The Board records every returned absentee and mail-in ballot envelope, either by running the envelope through a mail sorting machine or by using a manual process.

9.    The vast majority of ballots are run through the sorting machine, which stamps each ballot envelope with the date and time the ballot envelope is returned to the Board. The manual process similarly marks the ballot with the date and time the ballot envelope is returned to the Board.

10. The sorting machine further scans the unique correspondence ID of each ballot envelope for export to the Statewide Uniform Registry of Electors (SURE) system. This process records that the voter has returned an absentee or mail-in ballot.

11. Because of the date stamp, the handwritten date on the ballot envelope is not necessary for the Board to determine that any ballot envelope was timely returned.

12. The Board does not use the handwritten date to determine whether a voter is qualified to vote, whether a mail-in or absentee ballot is timely received, or for any other purpose.

13. The Board has configured the sorting machine to recognize a ballot envelope returned without a handwritten signature or that is too thin to contain the internal secrecy envelope.[1] Due to technical limitations, the sorting machines are not configured to detect whether a voter has returned a ballot envelope that is missing a handwritten date. The sorting machines cannot be configured to recognize a ballot envelope with an "incorrect" date.

14. Since the adoption of no-excuse mail-in voting, the Board consistently receives a large number of mail-in ballots each election cycle. For example, in the November 2022 general election, Philadelphia voters returned nearly 134,000

[1] The Board sorts and scans returned ballot envelopes to comply with other obligations under the Election Code and to engage in enfranchising procedures that notify voters of obvious technical errors and permit the voter to cast a valid ballot. The Board's use of a sorting machine to sort and scan ballot envelopes is entirely separate from the Board's pre-canvass and canvass of the ballots themselves, which does not begin until 7:00 a.m. on Election Day. *See* 25 P.S. § 2602(a.1), (q.1). Although the sorting machines can identify ballots missing a handwritten date or signature, the Board does not make final determination about whether a ballot has been validly cast until after 7:00 a.m. on Election Day.

absentee and mail-in ballots before 8 p.m. on Election Day. As a result, identifying and segregating ballot envelopes that have a missing or "incorrect" handwritten requires significant additional time and labor by the Board.

15. The Board has not identified any actual or suspected instances of voting-related fraud, such as fraudulent backdating of ballots, connected with mail-in or absentee ballots returned in undated or misdated envelopes. The Board has no reason to believe that counting ballots returned in undated or misdated envelopes would cause an increase in incidents of voting-related fraud.

16. The Board does not use the handwritten date to detect fraud or outdated ballot materials. Each absentee or mail-in ballot envelope has a correspondence ID that is unique to that voter and that election. When the Board receives envelopes from older elections, they are out-sorted by the mail sorting machine and not counted.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: 5/5/2023

Nick Custodio

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

**PENNSYLVANIA STATE CONFERNCE OF THE NAACP, *et al.***

**Plaintiffs,**

**v.**

**LEIGH M. CHAPMAN, *et al.***

**Defendants.**

**1:22-CV-00339-SPB**

**RESPONSES OF DEFENDANT ALLEGHENY COUNTY BOARD OF ELECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 36, Defendant Allegheny County Board of Elections ("Allegheny BOE"), by and through its attorneys, George Janocsko, Allegheny County Solicitor, and Allan J. Opsitnick and Lisa G. Michel, Assistant County Solicitors, files this Response to Plaintiffs' First Set of Interrogatories, subject to Plaintiffs' counsel's clarification and amendment to the discovery stated in their January 4, 2023 1:25 P.M. email:

- In responding to the Requests for Admission, please read the questions to be limited temporally to the 2021 and 2022 elections;
- The Request for Production and Interrogatories are all intended to relate to the 2022 General Election;
- and References to "orders of November 1 and 8, 2022" in Requests for Admissions 6 and 7 should read "orders of November 1 and 5, 2022."

## GENERAL OBJECTIONS

1. Allegheny BOE objects to the definitions and instructions set forth above to these Interrogatories to the extent that they impose any obligations greater than those imposed by the Federal Rules of Civil Procedure.

2. Allegheny BOE objects to any and all Interrogatories that seek any information protected by the attorney-client privilege, work product doctrine, joint defense or any other applicable privilege.

3. Allegheny BOE objects to these Interrogatories to the extent that they seek disclosure of information not in in its possession, custody or control.

4. Allegheny BOE reserves the right to supplement, correct or revise any the responses and objections raised in the Interrogatories or assert additional objections in any subsequent supplemental response.

1. State how many mail ballots and how many military-overseas ballots

voters returned to You for the 2022 General Election.

ANSWER: Allegheny BOE received 161,575 mail ballots and 152 military ballots for the 2022 General Election.

2. State how many mail ballots You received in connection with the 2022

General Election that were signed and timely received but set aside and/or

segregated because they lacked a handwritten date on the outer return envelope or

showed a date on the outer return envelope that You deemed to be incorrect. If you

allowed voters to correct or cure the envelope-date issue, specify whether your

response includes ballots that were ultimately corrected or cured.

ANSWER: The total number of ballots that were set aside by the Allegheny BOE because the ballot either lacked a handwritten date on the outer return envelope or stated a date outside of the date ranges set forth by the Pennsylvania Supreme Court in its Orders of November 1 and 5, 2022 is approximately 1009. This total is exclusive of the any ballots

that were cured or corrected as such ballots were included in the canvass of the November 8, 2022 election and therefore were not set aside.

3. Identify and describe how you determined if a date on a mail ballot

outer return envelope was "incorrect."

ANSWER: Allegheny BOE objects to the term "incorrect" as it is not defined in the discovery request. Without waiving such objection, Allegheny BOE responds that the Pennsylvania Supreme Court in its November 1, 2022 and November 5, 2022 orders mandated date ranges for absentee and mail-in ballots and proscribed the canvassing of ballots that either had no dates or set forth dates outside of those respective time periods. Allegheny BOE, via sworn personnel, reviewed the exterior ballot envelopes and, if there was no date, then the ballot was set aside. If the date written on the envelope was not within the mandated date range under the Pennsylvania Supreme Court's orders, then the ballot was set aside.

4. State the date on which you began sending the mail ballot packages to

voters?

ANSWER: Absentee and overseas ballots were mailed out to voters commencing September 30, 2022. On October 1, 2022 the first set of mail-in ballots was mailed to voters.

5. State whether you opened and/or counted mail ballots where the

handwritten date on the return envelope was after September 19, 2022, but before

the date on which you began sending the mail ballot package to voters.

ANSWER: Yes. Allegheny BOE complied with the Pennsylvania Supreme Court's Supplemental Order dated November 5, 2022 in *Ball v. Chapman,* 102 MM 2022, which mandated the range of dates that the Boards of Elections were to apply in counting mail-in ballots and such ballots were opened and counted commencing at 7:00 A.M. on Election Day - November 8, 2022.

6. State whether you opened and/or counted absentee ballots where the handwritten date on the return envelope was after August 30, 2022, but before the date on which you began sending the mail ballot package to voters.

ANSWER: Yes. Allegheny BOE complied with the Pennsylvania Supreme Court's Supplemental Order dated November 5, 2022 in *Ball v. Chapman,* 102 MM 2022, which mandated the range of dates that the Boards of Elections were to apply in counting mail ballots and such ballots were opened and counted commencing at 7:00 A.M. on November 8, 2022.

7. Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters whose timely received mail ballots You set aside and/or segregated because they were received in signed outer return envelopes that lacked a handwritten date or showed a date on the voter declaration that You deemed to be incorrect. In responding to this Interrogatory, state the specific reason why each such ballot was set aside and, if You allowed voters to correct or cure the date issue, specify whether each voter was able to correct or cure the issue.

ANSWER: Allegheny BOE will provide a response under separate cover after the entry of the Protective Order and consistent with extensions granted by Plaintiff because Allegheny BOE is presently engaged in preparations for the three special elections to file vacant state House of Representatives seats in three Allegheny County districts scheduled for February 7, 2023.

8. Did any mail ballots described in Interrogatory 2 have any other defects, besides a missing or incorrect handwritten date on the outer return envelope, that would cause You not to count them? If so, state how many such mail ballots had an additional defect, describe those defects, and identify the voters whose timely received mail ballots had such additional defect(s).

ANSWER: No. The only reasons that these ballots were set aside were that they were undated or the date set forth on the outer envelope was outside of the date range set forth by the Pennsylvania Supreme Court in its Supplemental Order of November 5, 2022.

9. Did You determine that any voters who sent timely mail ballots described in Interrogatory 2 were not qualified, eligible voters? If so, describe how you determined such voters to be ineligible and identify, for each such voter, the basis for ineligibility.

ANSWER: No. Allegheny BOE complied with the Pennsylvania Supreme Court's Supplemental Order of November 5, 2022 and set aside mail and absentee ballots that did not comply with the Court's Order. No further inspection or inquiry was made regarding the voter's eligibility or ineligibility.

10. State whether You or any of Your agents identified or raised any credible fraud concerns specifically as to any individual mail ballot described in Interrogatory 2. If so, describe the nature of such fraud concerns.

ANSWER: None.

11. Did You provide notice to voters whose timely received mail ballots were set aside and/or segregated because the signed outer return envelope was missing a date or showed a date that You determined to be incorrect? If so, identify and describe how and when you notified voters of missing or incorrect dates on the signed outer return envelope.

ANSWER: Allegheny BOE again objects to the undefined term "incorrect date" as undefined. Without waiving that objection, Allegheny BOE responds as follows: Yes. The Elections Division made a good faith effort to review all the mail and absentee ballots that had been received by November 5, 2022 and to identify those ballots not conforming with the Pennsylvania Supreme Court's Orders of November 1 and 5, 2022. On November 6, 2022, Allegheny BOE published a list of the ballots that were either undated or did not show a date within the Pennsylvania Supreme Court's Order of November 5, 2022 mandating the date ranges for mail-in or absentee ballots. Individuals were provided notice that they could cure the defect by presenting themselves to the Office of the Elections Division at the County Office Building, 542 Forbes Avenue, Pittsburgh, PA 15219, by inserting a date in compliance with the Pennsylvania Supreme Court orders. The list was revised on November 7, 2022 to include additional ballots delivered to the Elections Division on that date. Individuals were permitted to cure the deficiency through 8:00 P.M. on November 8, 2022. For those ballots received on November 8, 2022 or

ballots that upon review at the time of canvass had no dates or dates outside of the November 5, 2022 dates ranges, there was no reasonable opportunity due to time and manpower constraints to provide notice to such voters.

12. Did You provide mail ballot voters described in Interrogatory 11 with an opportunity to correct or cure the identified issues with dating the outer return envelope? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any missing or incorrect date issues.

ANSWER: Allegheny BOE incorporates its response to Interrogatory 11 as though set forth at length herein.

13. If you provided notice and an opportunity to cure as described in Interrogatories 11 and 12, how many mail ballot voters cured their envelope date issue?

ANSWER: Allegheny BOE does not have a complete record of the number of persons who cured their ballots. As of close of its office (i.e. – The Allegheny County Elections Division) on the afternoon of November 7, 2022, Allegheny BOE tallied that 106 ballots were cured. The Elections Division did not record the number of mail ballot voters who cured their envelope date issues on November 8, 2022.

14. Do You contend that the handwritten date is material in determining whether a mail ballot voter is qualified to vote in the election in which they have cast a ballot? If so, what is the basis for that contention?

ANSWER: No. Allegheny BOE does not contend that the handwritten date is material to whether a mail ballot voter is qualified to vote in the election for which they have cast a ballot.

15. Did You count timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that You deemed to be incorrect? If so, state how many such military-overseas ballots You counted. If not, state how many such military-overseas ballots You set aside and/or segregated due to missing or purportedly-incorrect dates on the outer return envelope.

ANSWER: There were no military ballots returned to the Allegheny BOE that lacked a date or were dated outside of the range set forth in the Pennsylvania Supreme Court's Supplemental Order dated November 5, 2022. Therefore, no military ballots were set aside.

16. Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters who timely submitted military overseas ballots but failed to date their voter declaration or included a date that You deemed to be incorrect.

ANSWER: Not applicable. See response to Interrogatory 15 above.

17. Did the military-overseas ballots described in Interrogatory 15 have any other defects, besides a missing or incorrect date, that would cause You not to count them? If so, state how many such military-overseas ballots had an additional defect,

describe those defects and identify the voters who's timely received military overseas ballots had such additional defect(s).

ANSWER: Not applicable.  See response to Interrogatory 15 above.

18. Did You determine that any voters who sent timely military-overseas ballots described in Interrogatory 15 were not qualified, eligible voters? If so, describe how you determined such voters to be ineligible and identify, for each such voter, the basis for ineligibility.

ANSWER: Not applicable.  See response to Interrogatory 15 above.

19. State whether You or any of Your agents identified or raised any credible fraud concerns specifically as to any of the military-overseas ballots described in Interrogatory 15. If so, describe the nature of such fraud concerns.

ANSWER: Not applicable.  See response to Interrogatory 15 above.

20. If You did not count the timely received military-overseas ballots described in Interrogatory 15, did you provide notice to the voters whose military overseas ballots were set aside and/or segregated because the voter failed to date their voter declaration or included a date that You determined to be incorrect? If so, identify and describe how and when you notified those voters.

ANSWER: Not applicable.  See response to Interrogatory 15 above.

21. If You did not count the timely received military-overseas ballots described in Interrogatory 15, did You provide the voters who submitted such

military-overseas ballots with an opportunity to correct or cure the identified issues with the date? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any date issues.

ANSWER: Not applicable. See response to Interrogatory 15 above.


22. If you provided notice and an opportunity to cure as described in Interrogatories 20 and 21, how many military-overseas voters cured their date issue?

ANSWER: Not applicable. See response to Interrogatory 15 above.


Respectfully submitted,

Date: January 25, 2023

By: *George M. Janocsko*
George M. Janocsko (PA 26408)
Allan J. Opsitnick (PA 28126)
Lisa G. Michel (PA 59997)
Allegheny County Law Department
445 Fort Pitt Boulevard
Fort Pitt Commons Suite 300
Pittsburgh, PA 15129
george.janocsko@alleghenycounty.us
opsitnick@opsitnickslaw.com
lisa.michel@alleghenycounty.us
T (412) 350-1120
*Counsel for the Allegheny County Board of Elections*

**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth, *et al.*,<br><br>*Defendants*. | Case No. 1:22-cv-00339-SPB |

**BUCKS COUNTY BOARD OF ELECTIONS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

1. State how many mail ballots and how many military-overseas ballots voters returned to you for the 2022 General Election.

**RESPONSE: Upon reasonable investigation, unknown to the Bucks County Board of Elections ("BCBOE") at this time. By way of further response, BCBOE counted 87,321 mail-in ballots ("MIB") and absentee ballots ("AB") and 466 military-overseas ballots. However, these numbers do not include canceled MIB, AB, and military-overseas ballots that were returned. By way of additional response, BCBOE is only able to access the number of counted votes in the SURE system. The Department of State might be able to access the number of cancelled ballots in SURE.**

2. State how many mail ballots you received in connection with the 2022 General Election that were signed and timely received but set aside and/or segregated because they lacked a handwritten date on the outer return envelope or showed a date on the outer return envelope that you deemed to be incorrect. If you allowed voters to correct or cure the envelope-date issue, specify whether your response includes ballots that were ultimately corrected or cured.

**RESPONSE: For MIB and AB, BCBOE received 357 ballots that were signed and timely received but, in accordance with the orders of the Pennsylvania Supreme Court, were set aside and/or segregated because they lacked a handwritten date on the outer return envelope or showed an incorrect date on the outer return envelope. This number does not include ballots that were corrected or cured.**

3. Identify and describe how you determined if a date on a mail ballot outer return envelope was "incorrect".

**RESPONSE: BCBOE's determination was based upon the Supreme Court of Pennsylvania's ("SCOPA") order and supplemental order, guidelines provided by Johnathan Marks, Deputy Secretary for Elections and Commissions, and the advice of counsel. A poster was also created and displayed to aid election workers processing MIB/AB.**

4. State the date on which you began sending the mail ballot packages to voters.

**RESPONSE: September 22, 2022 is the earliest date that military/overseas ballots were sent. October 5, 2022 is the earliest date that MIB/AB were sent.**

5. State whether you opened and/or counted mail ballots where the handwritten date on the return envelope was after September 19, 2022, but before the date on which you began sending the mail ballot package to voters.

**RESPONSE: Upon reasonable investigation, unknown. In order for BCBOE to determine this information all mail ballots would have to be individually reviewed. By way of further response, the BCBOE complied with the SCOPA order and supplemental order.**

6. State whether you opened and/or counted absentee ballots where the handwritten date on the return envelope was after August 30, 2022, but before the date on which you began sending the mail ballot package to voters.

**RESPONSE: See response to Interrogatory No. 5, which is incorporated fully herein.**

7. Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters whose timely received mail ballots you set aside and/or segregated because they were received in signed outer return envelopes that lacked a handwritten date or showed a date on the voter declaration that you deemed to be incorrect. In responding to this Interrogatory, state the specific reason why each such ballot was set aside and, if you allowed voters to correct or cure the date issue, specify whether each voter was able to correct or cure the issue.

**RESPONSE: A spreadsheet with responsive information will be produced following entry of a Protective Order by the Court, as agreed upon by the parties.**

8. Did any mail ballots described in Interrogatory 2 have any other defects, besides a missing or incorrect handwritten date on the outer return envelope, that would cause you not to count them? If so, state how many such mail ballots had an additional defect, describe those defects, and identify the voters whose timely received mail ballots had such additional defect(s).

**RESPONSE: None. By way of a further answer, BCBOE did have 75 envelopes lacking both a date and signature. These ballots are not reflected in the response to Interrogatory No. 2.**

9. Did you determine that any voters who sent timely mail ballots described in Interrogatory 2 were not qualified, eligible voters? If so, describe how you determined such voters

to be ineligible and identify, for each such voters, the basis for ineligibility.

**RESPONSE: No.**

10.     State whether you or any of your agents identified or raised any credible fraud concerns specifically as to any individual mail ballot described in Interrogatory 2. If so, describe the nature of such fraud concerns.

**RESPONSE: No.**

11.     Did you provide notice to voters whose timely received mail ballots were set aside and/or segregated because the signed outer return envelope was missing a date or showed a date that you determined to be incorrect? If so, identify and describe how and when you notified voters of missing or incorrect dates on the signed outer return envelope.

**RESPONSE: Yes, after issuance of the SCOPA order, BCBOE sent postcards out to voters whose outer return envelope was missing a date or had an incorrect date. Prior to and on Election Day, 8 voters arrived at the BCBOE to cure their MIB/AB. Once the ballots were remedied, voter's names were documented on a log of cured ballots and the ballots were properly secured in their precinct storage bin for canvassing.**

12.     Did you provide mail ballot voters described in Interrogatory 11 with an opportunity to correct or cure the identified issues with dating the outer return envelope? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any missing or incorrect date issues.

**RESPONSE: See response Interrogatory No. 11.**

13.     If you provided notice and an opportunity to cure as described in Interrogatories 11 and 12, how many mail ballot voters cured their envelope date issue?

**RESPONSE: Eight voters cured their envelope date issue in person at the BCBOE and 4 voters cured by provisional ballot.**

14.     Do you contend that the handwritten date is material in determining whether a mail ballot voter is qualified to vote in the election in which they have cast a ballot? If so, what is the basis for that contention?

**RESPONSE: No.**

15.     Did you count timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that you deemed to be incorrect? If so, state how many such military-overseas ballots you counted. If not, state how many such military-overseas ballots you set aside and/or segregated due to missing or purportedly-incorrect dates on the outer return envelope.

**RESPONSE: Yes. We had 10 undated and one incorrectly dated for a total of 11 ballots.**

16. Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters who timely submitted military-overseas ballots but failed to date their voter declaration or included a date that you deemed to be incorrect.

**RESPONSE: A spreadsheet with responsive information will be produced following entry of a Protective Order by the Court, as agreed upon by the parties.**

17. Did the military-overseas ballots described in Interrogatory 15 have any other defects, besides a missing or incorrect date, that would cause you not to count them? If so, state how many such military-overseas ballots had an additional defect, describe those defects, and identify the voters whose timely received military-overseas ballots had such additional defect(s).

**RESPONSE: The BCBOE had two other issue categories associated with the military/civilian overseas ballots obtained during the 2022 General Election. Two ballots were considered "naked" and were not in a secrecy envelope upon canvassing. One ballot did not include any voter declaration upon canvassing.**

18. Did you determine that any voters who sent timely military-overseas ballots described in Interrogatory 15 were not qualified, eligible voters? If so, describe how you determined such voters to be ineligible and identify, for each such voter, the basis for ineligibility.

**RESPONSE: No. All Federal Postcard Applications (FPCA) are thoroughly checked and compared to the SURE voter records to determine if the voter is actively registered within the County of Bucks at their most recent residential address. When all details of the application match the voter's record, the application is then processed.**

**Upon return from voters abroad, completed ballots contain a barcode that acts as a direct link to the voter's record in SURE. Should any changes to a voter's status occur between the time their application is processed and when BCBOE receives the ballot, SURE will notify BCBOE staff once they use the barcode to record the ballot as returned on time. Any ballots belonging to voters who are ineligible due to a change in their record's status are set aside and stored.**

19. State whether you or any of your agents identified or raised any credible fraud concerns specifically as to any of the military-overseas ballots described in Interrogatory 15. If so, describe the nature of such fraud concerns.

**RESPONSE: None.**

20. If you did not count the timely received military-overseas ballots described in Interrogatory 15, did you provide notice to the voters whose military-overseas ballots were set aside and/or segregated because the voter failed to date their voter declaration or included a date that you determined to be incorrect? If so, identify and describe how and when you notified those

voters.

**RESPONSE: Not applicable.**

21. If you did not count the timely received military-overseas ballots described in Interrogatory 15, did you provide the voters who submitted such military-overseas ballots with an opportunity to correct or cure the identified issues with the date? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any date issues.

**RESPONSE: Not applicable.**

22. If you provided notice and an opportunity to cure as described in Interrogatories 20 and 21, how many military-overseas voters cured their date issue?

**RESPONSE: Not applicable.**

DATED: January 25, 2023

**BUCKS COUNTY LAW DEPARTMENT**

BY: /s/ Amy M. Fitzpatrick
Amy M. Fitzpatrick, Esquire
First Assistant County Solicitor
PA I.D. No. 324672
55 East Court Street, 5th floor
Doylestown, PA 18901

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al*.,**<br><br>Plaintiffs,<br><br>v.<br><br>**LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth, *et al*.,**<br><br>Defendants. | **Case No. 1:22-cv-00339** |

**CHESTER COUNTY BOARD OF ELECTIONS RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 33(b), the Chester County Board of Elections ("Chester County"), by and through its undersigned counsel, submits its Response to Plaintiffs' First Set of Interrogatories.[1]

## A. GENERAL OBJECTIONS

1. Chester County objects to Plaintiffs' interrogatories to the extent they purport to seek information or documents that are protected from disclosure by the attorney-client privilege. Inadvertent production of any such information or document shall not constitute a waiver of any privilege or any other grounds for objecting to discovery with respect to such information or document, nor shall such inadvertent disclosure or production waive the right of Chester County to object to the use of any such information or document in

[1] In an email dated January 4, 2023, Counsel for Plaintiffs, Stephen Loney, Esq., narrowed the scope of several Requests for Admissions as follows:

> "The Requests for Production and Interrogatories are all intended to relate to the 2022 General Election…"

any proceeding.

2. Chester County objects to Plaintiffs' interrogatories to the extent they seek information or documents that contain or constitute confidential or proprietary information.

3. Chester County objects to Plaintiffs' interrogatories to the extent they purport to seek information or documents which were prepared in anticipation of litigation or for trial, are protected from disclosure by the Federal Rules of Civil Procedure or are otherwise protected from disclosure. Inadvertent production of any such information or document shall not constitute a waiver of any privilege or any other grounds for objecting to discovery with respect to such information or document, nor shall inadvertent disclosure or production waive the right of Chester County to object to the use of any such information or document in any proceeding.

4. Chester County objects to Plaintiffs' interrogatories to the extent they seek information or documents relating to claims and defenses not raised in the pleadings.

5. Chester County objects to Plaintiffs' interrogatories, including the definitions and instruction contained therein, to the extent they seek to impose obligations upon Chester County greater than those imposed by the Federal Rules of Civil Procedure.

6. Chester County objects to Plaintiffs' interrogatories to the extent they are premature at this point in the litigation. Chester County reserves the right to amend and/or supplement their objections and responses to each interrogatory based upon subsequent rulings by the Court, as well as any facts, documents, or other evidence that may develop or come to Chester County's attention at a later time. Chester County objects to each interrogatory to the extent that it is overly broad, unduly burdensome and seeks information which is neither relevant to this case nor likely to lead to the discovery of admissible evidence, or because such seeks information unrelated to any of the claims,

allegations or defenses germane to this case.

7. Chester County objects to each interrogatory to the extent it seeks information already within the possession, control and knowledge of Plaintiffs.

8. Chester County objects to each interrogatory as overly broad and unduly burdensome, to the extent it is not limited as to time.

**B. PRESERVATION OF RIGHTS**

All responses to Plaintiffs' interrogatories are made without, in any way, waiving or intending to waive, but on the contrary, intending to preserve and preserving:

1. All questions as to competency, relevancy, materiality, and admissibility for any purpose in any subsequent proceeding, the trial of this action, or any other action.

2. The right to object on grounds of relevance, hearsay, or any other proper ground to the use of any of these responses, or the subject matter thereof, in any subsequent proceeding, the trial of this action, or any other action.

3. The right to object on any grounds at any time to a demand for further responses to these or any other interrogatory or other discovery proceedings involving or relating to the subject matter of the interrogatories herein answered.

**C. GENERAL ANSWER**

The averments contained in all pleadings, motions and/or memoranda of law filed in this case by Chester County including, without limitation, all attachments and exhibits thereto, are incorporated herein by reference in each specific answer below.

**D. RESPONSES TO SPECIFIC REQUESTS**

1. State how many mail ballots and how many military-overseas ballots voters returned to You for the 2022 General Election.

**RESPONSE:** Chester County incorporates by reference the above-stated General

Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Chester County counted 70,023 mail-in and absentee ballots (hereinafter referred to together as "mail ballots"). Chester County counted 638 military/overseas/federal absentee ballots (hereinafter referred to as "UMOVA ballots".

2. State how many mail ballots You received in connection with the 2022 General Election that were signed and timely received but set aside and/or segregated because they lacked a handwritten date on the outer return envelope or showed a date on the outer return envelope that You deemed to be incorrect. If you allowed voters to correct or cure the envelope-date issue, specify whether your response includes ballots that were ultimately corrected or cured.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Of the mail ballots that were timely received by Chester County, 19 mail ballots had no date and no signature, 48 mail ballots were missing a date entirely, and 68 mail ballots had an incorrect date.as defined by the Pennsylvania Supreme Court's supplemental order in *Ball v. Chapman*, No. 102 MM 2022, 2022 WL 16569702 (Pa. Nov. 1, 2022). These numbers do not include ballots that were ultimately corrected or cured.

3. Identify and describe how you determined if a date on a mail ballot outer return envelope was "incorrect."

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing,

Chester County responds as follows:

Chester County followed the Pennsylvania Supreme Court's order and supplemental order in *Ball v. Chapman*, No. 102 MM 2022, 2022 WL 16569702 (Pa. Nov. 1, 2022).

4. State the date on which you began sending the mail ballot packages to voters?

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Chester County began printing and sending mail ballot packages to voters on October 10, 2022.

5. State whether you opened and/or counted mail ballots where the handwritten date on the return envelope was after September 19, 2022, but before the date on which you began sending the mail ballot package to voters.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Furthermore, Chester County objects to the relevance of this Interrogatory. Notwithstanding the foregoing, Chester County responds as follows:

Chester County followed the Pennsylvania Supreme Court's Order and Supplemental Order in *Ball v. Chapman*, No. 102 MM 2022, 2022 WL 16569702 (Pa. Nov. 1, 2022).

6. State whether you opened and/or counted absentee ballots where the handwritten date on the return envelope was after August 30, 2022, but before the date

on which you began sending the mail ballot package to voters.

**RESPONSE:** Chester County incorporates the response to Interrogatory 5 as if stated fully herein.

7. Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters whose timely received mail ballots You set aside and/or segregated because they were received in signed outer return envelopes that lacked a handwritten date or showed a date on the voter declaration that You deemed to be incorrect. In responding to this Interrogatory, state the specific reason why each such ballot was set aside and, if You allowed voters to correct or cure the date issue, specify whether each voter was able to correct or cure the issue.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

See Exhibit A to Interrogatories (to be provided upon execution by the Court of a Protective Order and only provided to those other parties other than Plaintiff who agree to be bound by it by executing Exhibit A to the Protective Order). The information contained within Exhibit A is the only requested demographic information readily available to Chester County. To acquire the additional requested demographic information, Chester County would be required to manually generate such information on a voter-by-voter basis by utilizing the statewide SURE system to research each voter individually.

8. Did any mail ballots described in Interrogatory 2 have any other defects, besides a missing or incorrect handwritten date on the outer return envelope, that would cause You not to count them? If so, state how many such mail ballots had an additional

defect, describe those defects, and identify the voters whose timely received mail ballots had such additional defect(s).

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

There is no such report that exists with this information. For Chester County to determine this information, all ballots would have to be reviewed again. Additionally, since the outer envelope was not opened, Chester County would be unable to ascertain whether any deficiencies exist inside the outer envelope that would cause the ballot not to be counted (i.e., lack of secrecy envelopes, identifying marks on secrecy envelopes, etc.) However, as stated in Interrogatory No. 2, there were 19 mail ballots pre-canvassed on Election Day missing both a date and a signature.

9. Did You determine that any voters who sent timely mail ballots described in Interrogatory 2 were not qualified, eligible voters? If so, describe how you determined such voters to be ineligible and identify, for each such voter, the basis for ineligibility.

RESPONSE: Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Chester County did not determine that any voters described in Interrogatory No. 2 were not qualified, eligible voters.

10. State whether You or any of Your agents identified or raised any credible fraud concerns specifically as to any individual mail ballot described in Interrogatory 2. If so, describe the nature of such fraud concerns.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

If a returned ballot was not in compliance with the requirements set forth in *Ball v. Chapman*, No. 102 MM 2022, 2022 WL 16569702 (Pa. Nov. 1, 2022), it was set aside, segregated, and preserved, as required by the Pennsylvania Supreme Court's Orders. Chester County did not undertake a subsequent review to determine if there were "credible fraud concerns," as Chester County understands that term, nor was Chester County made aware of any issues of potential fraud related to any of these ballots.

11. Did You provide notice to voters whose timely received mail ballots were set aside and/or segregated because the signed outer return envelope was missing a date or showed a date that You determined to be incorrect? If so, identify and describe how and when you notified voters of missing or incorrect dates on the signed outer return envelope.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Furthermore, Chester County objects to the relevance of this Interrogatory. Notwithstanding the foregoing, Chester County responds as follows:

Chester County contacted voters whose mail ballots were received before Election Day and were set aside and/or segregated because the date on the return envelope was missing or showed a date outside of the date range ordered by the Pennsylvania Supreme Court's supplemental order in *Ball* by email and/or phone numbers obtained from their voter registration and mail ballot application records. Additionally, the information of voters whose mail ballots were identified as deficient on Election Day were

provided to the solicitor of the Republican Committee of Chester County and the solicitor of the Chester County Democratic Committee to afford them an opportunity to contact the affected voters and inform them that their mail ballots were deficient.

12. Did You provide mail ballot voters described in Interrogatory 11 with an opportunity to correct or cure the identified issues with dating the outer return envelope? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any missing or incorrect date issues.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Furthermore, Chester County objects to the relevance of this Interrogatory. Notwithstanding the foregoing, Chester County responds as follows:

Chester County provided the voters described in Interrogatory No. 11 with the opportunity to come in-person to the office of Chester County Voter Services located at 601 Westtown Road, West Chester, Pennsylvania, to cure their ballots if Chester County received their mail ballot before Election Day and was able to contact the voters before Election Day. These voters were also informed that they had the option of voting provisionally at their polling place on Election Day. If the voter was contacted on Election Day, they were told they had the option of voting provisionally at their polling place.

13. If you provided notice and an opportunity to cure as described in Interrogatories 11 and 12, how many mail ballot voters cured their envelope date issue?

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Furthermore, Chester County objects to the relevance of this Interrogatory. Notwithstanding the foregoing, Chester

Case 1:22-cv-00339-SPB Document 277 Filed 05/05/23 Page 10 of 24

County responds as follows:

Chester County did not specifically track that information, as cured ballots were then placed in the "general population" of ballots received that did not have deficiencies, and new ballots with a date deficiency continued to be received. The undated and incorrectly dated ballot numbers fluctuated on a daily basis and were not otherwise tracked.

14. Do You contend that the handwritten date is material in determining whether a mail ballot voter is qualified to vote in the election in which they have cast a ballot? If so, what is the basis for that contention?

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Chester County's position on this question is a matter of public record. *See* Brief of Respondents Allegheny, Bucks, Chester, Delaware, Montgomery, and Philadelphia Board of Elections at § III, filed on October 25, 2022 in *Ball v. Chapman*, No. 102 MM 2022, 2022 WL 16569702 (Pa. Nov. 1, 2022).

15. Did You count timely-received military-overseas ballots in the 2022 General Election if the voter failed to date their voter declaration or included a date that You deemed to be incorrect? If so, state how many such military-overseas ballots You counted. If not, state how many such military-overseas ballots You set aside and/or segregated due to missing or purportedly-incorrect dates on the outer return envelope.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Chester County did not count timely-received, military-overseas ballots if the voter failed to date their voter declaration or included an incorrect date as defined by the Pennsylvania Supreme Court in *Ball v. Chapman*, No. 102 MM 2022, 2022 WL 16569702 (Pa. Nov. 1, 2022). Chester County set aside and/or segregated 2 ballots that had incorrect handwritten dates and 10 ballots that lacked a handwritten date.

16. Identify, by name, birthdate, address, party affiliation and any other demographic information available to you, the voters who timely submitted military-overseas ballots but failed to date their voter declaration or included a date that You deemed to be incorrect.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

See Exhibit A to Interrogatories (to be provided upon execution by the Court of a Protective Order and only provided to those other parties other than Plaintiff who agree to be bound by it by executing Exhibit A to the Protective Order). The information contained within Exhibit A is the only requested demographic information readily available to Chester County. To acquire the additional requested demographic information, Chester County would be required to manually generate such information on a voter-by-voter basis by utilizing the statewide SURE system to research each voter individually.

17. Did the military-overseas ballots described in Interrogatory 15 have any other defects, besides a missing or incorrect date, that would cause You not to count them? If so, state how many such military-overseas ballots had an additional defect, describe those defects, and identify the voters whose timely received military- overseas ballots had

such additional defect(s).

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Chester County is not aware of any other defects of the ballots described in Interrogatory No. 15 that would cause them not to be counted.

18. Did You determine that any voters who sent timely military-overseas ballots described in Interrogatory 15 were not qualified, eligible voters? If so, describe how you determined such voters to be ineligible and identify, for each such voter, the basis for ineligibility.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Chester County did not determine that any voters described in Interrogatory No. 18 were not qualified, eligible voters.

19. State whether You or any of Your agents identified or raised any credible fraud concerns specifically as to any of the military-overseas ballots described in Interrogatory 15. If so, describe the nature of such fraud concerns.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Notwithstanding the foregoing, Chester County responds as follows:

Chester County did not undertake a subsequent review to determine if there were "credible fraud concerns," as Chester County understands that term, nor was

Chester County made aware of any issues of potential fraud related to any of ballots described in Interrogatory No. 15.

20. If You did not count the timely received military-overseas ballots described in Interrogatory 15, did you provide notice to the voters whose military- overseas ballots were set aside and/or segregated because the voter failed to date their voter declaration or included a date that You determined to be incorrect? If so, identify and describe how and when you notified those voters.

**RESPONSE:** Chester County incorporates by reference the above-stated General Objections, Preservations of Rights, and General Answer. Furthermore, Chester County objects to the relevance of this Interrogatory. Notwithstanding the foregoing, Chester County responds as follows:

Chester County was not able to provide notice or an opportunity to cure to UMOVA voters. With respect to UMOVA voters who requested that mail ballots be mailed to them, the outside of the return envelope contains the declaration with a place for the date. However, with respect to UMOVA voters who requested their ballots be emailed, the declaration page with the affirmation is printed out by the voter on a separate sheet of paper that is placed inside the regular mailing envelope used to mail the ballot to the County. This prevents Chester County from viewing the affirmation until the outer mailing envelopes are opened during computation.

21. If You did not count the timely received military-overseas ballots described in Interrogatory 15, did You provide the voters who submitted such military-overseas ballots with an opportunity to correct or cure the identified issues with the date? If so, identify and describe the cure methods offered and how you instructed notified voters to cure any date issues.

**RESPONSE:** Not Applicable.

22. If you provided notice and an opportunity to cure as described in Interrogatories 20 and 21, how many military-overseas voters cured their date issue?

**RESPONSE:** Not Applicable.

Dated: January 25, 2023

Respectfully submitted,

*Colleen M. Frens*

Colleen M. Frens
PA 309604
Faith Mattox-Baldini
PA 323868
The County of Chester
Solicitor's Office
313 W. Market Street, Suite 6702
West Chester, PA 19382
T 610.344.6195, F 610.344.5995
cfrens@chesco.org
fmattoxbaldini@chesco.org
*Attorneys for the Chester County Board of Elections*

**UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,**<br>Plaintiffs,<br>v.<br>**LEIGH M. CHAPMAN, in her official capacity as Acting Secretary of the Commonwealth, *et al.*,**<br>Defendants. | **Case No. 1:22-cv-00339** |

**OBJECTIONS AND ANSWERS OF DEFENDANT MONTGOMERY COUNTY BOARD OF ELECTIONS TO PLAINTIFFS' REQUESTS FOR ADMISSIONS**

Defendant Montgomery County Board of Elections ("Defendant"), by and through its undersigned counsel, hereby provides these objections and answers to the Requests for Admissions of Plaintiffs ("Plaintiff"), stating as follows:

1. You have never used or referred to the date handwritten on the outer return envelope containing a mail ballot for any purpose related to determining or confirming the mail ballot voter's eligibility (*i.e.*, their age, citizenship, county and duration of residence, and felony status).

ANSWER: Admitted

2.      You have never used or referred to the date handwritten on the mail ballot return envelope to establish whether you received the ballot by the applicable deadline.

Answer:  Admitted

3.      You have never used or referred to the date handwritten on the outer return envelope or on any other paperwork accompanying a returned military-overseas ballots for any purpose related to determining or confirming a voter's eligibility (*i.e.*, their age, citizenship, county and duration of residence, and felony status).

ANSWER:  Admitted

4.      You have never used or referred to the date handwritten on the outer return envelope or on any other paperwork accompanying a returned military- overseas ballots to establish whether you received the ballot by the applicable deadline.

ANSWER:  Admitted

5.      You have not counted mail ballots in connection with the 2022 General Election that were timely received and submitted in signed envelopes but without a handwritten date on the outer return envelope, and You will not count such ballots absent an order of the Court.

**ANSWER:**  Admitted

6. Pursuant to the Pennsylvania Supreme Court's orders of November 1 and 8, 2022, You have not counted mail ballots in connection with the 2022 General Election that were timely received in signed envelopes that showed a date on the outer return envelope appearing to You to pre-date September 19, 2022, or to post- date November 8, 2022, and You will not count such ballots absent an order of the Court.

**OBJECTION AND ANSWER**: Montgomery County objects to this interrogatory as it calls for privileged information within the attorney-client privilege. Montgomery County Admits that it followed the Orders of the Pennsylvania Supreme Court from November 1st, and 8th of 2022.

7. Pursuant to the Pennsylvania Supreme Court's orders of November 1 and 8, 2022, You have not counted absentee ballots in connection with the 2022 General Election that were timely received in signed envelopes that showed a date on the outer return envelope appearing to You to pre-date August 30, 2022, or to post-date November 8, 2022, and You will not count such ballots absent an order of the Court.

**OBJECTION AND ANSWER**: Montgomery County objects to this interrogatory as it calls for privileged information within the attorney-client privilege. Montgomery County Admits that it followed the Orders of the Pennsylvania Supreme Court from November 1st, and 8th of 2022.

8. In carrying out the instructions set forth in the Pennsylvania Supreme Court's order referenced in Requests 4 and 5, You determined whether the date written on the outer envelope was within the "correct" date range based on the American dating convention of writing the month, then day, then year (e.g., MM/DD/YYYY). Thus, for example, if a voter wrote 1/11/2022 as the date on a mail ballot return envelope, You set aside that envelope without counting the ballot or endeavoring to determine whether the date noted was written using a European dating convention of writing the day before the month (i.e., November 1, 2022).

**OBJECTION AND ANSWER**: Montgomery County objects to this interrogatory as it calls for privileged information within the attorney-client privilege. Montgomery County Admits that it followed the Orders of the Pennsylvania Supreme Court from November 1st, and 8th of 2022.

Respectfully submitted,
MONTGOMERY COUNTY SOLICITOR'S OFFICE

By: */s/ John A. Marlatt*
John A. Marlatt, Esquire
Attorney I.D. No. 210141
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404-0311
610-278-3033

Attorney for Defendant,
Montgomery County Board of Elections

Dated: January 25, 2023

**CERTIFICATE OF CONSENT**

I hereby certify that I have obtained the consent of the non-filing signatories to this Appendix—the above-listed counsel for Defendants the Allegheny, Bucks, Chester, and Montgomery County Boards of Elections.

Dated: May 5, 2023

By: */s/ Ilana H. Eisenstein*

*Counsel for Defendant Philadelphia County Board of Elections*

Case# 2023-26306-8 Docketed at Montgomery County Prothonotary on 12/20/2023 10:28 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PA**

**CIVIL ACTION –LAW**

| | | |
|---|---|---|
| **IN RE ELECTION CONTEST OF NOVEMBER 7, 2023** | : | **Commonwealth Court No.** |
| **ELECTION OF TOWAMENCIN** | : | |
| **TOWNHIP SUPERVISOR** | : | **Common Pleas Ct No. 2023-26306** |

**OPINION**

**SMYTH , S. J.** **DECEMBER 20, 2023**

## I. INTRODUCTION

This appeal arises from an order entered on December 7, 2023 denying a Petition for an Election Contest filed by electors of Towamencin Township who challenged the results of the election of Kofi Osei (hereinafter referred to as Osei) as township supervisor. For the reasons set forth below, this appeal should be denied.

## II. FACTS AND PROCEDURAL HISTORY

On November 7, 2023, an election took place in Towamencin Township, Pennsylvania. Among the offices at issue was the office of Towamencin Township Supervisor. In unofficial results, Richard Marino (hereinafter referred to as Marino) was initially found to have obtained four more votes than Osei. However, on November 22, 2023 in compliance with an order and opinion entered in a lawsuit brought in the United States District Court for the Western District of

Case# 2023-26306-8 Docketed at Montgomery County Prothonotary on 12/20/2023 10:28 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Pennsylvania,[1] the Montgomery County Board of Elections counted the votes of 349 ballots from voters in various counties which had incorrectly dated or missing envelopes. This included votes in Towamencin Township. These votes were included in the official results prior to their certification. No appeal was filed within the statutory time period of two days set forth in 25 P.S. 3157. On November 28, 2023, the Montgomery Board of Elections announced that both Marino and Osei had each received 3,155 votes. In accordance with P.S. 25 3168, the candidates drew lots. Having drawn the lower number, Osei was declared the winner of the election.

No recount or recanvas of the results was requested within the time period allowed. Petitioners filed the instant Petition for Election Contest on December 4, 2023, twenty two days after the election at issue took place. Osei filed a Petition to Intervene in this lawsuit, along with an application to Quash the lawsuit on December 5, 2023. By Order dated December 7, 2023, the Petition for Election Contest was denied and the case was dismissed. Petitioners filed a timely appeal of this Order.

## III. DISCUSSION

As set forth above, the Petition at issue was untimely filed. No application to appeal *nunc pro tunc* was granted. Therefore, the Petition for Election Contest at issue should be denied on that basis.

In addition, the decision to uphold the counting of the 347 ballots complies with the applicable law interpreting the right to vote and have the vote counted. Pursuant to the 1964 Civil Rights Act's Materiality Provision:

> [n]o person acting under color of law shall ... deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is

[1] *Pennsylvania State Conference of the NAACP, et al v Al Schmidt, et al* Case No. 1:22 CV-00339 (W.D. PA November 21, 2023).

Case# 2023-26306-8 Docketed at Montgomery County Prothonotary on 12/20/2023 10:28 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

qualified under State law to vote in such election. 52 U.S.C. § 10101(a)(2)(B). "[T]he word 'vote' includes all action necessary to make a vote effective." *Id.* §§ 10101(a)(2)(3)(A); 10101(e).

In an opinion dated November 21, 2023 in *Pennsylvania State Conference of the NAACP, et al v. Schmidt,* Civ. Action No. 22-CV-339 (W.D. Pa.), United States District Judge Susan Paradiso Baxter provided an exhaustive review of the history of the issues concerning the counting of mail in ballots in Pennsylvania. In so doing, Judge Paradiso Baxter reviewed and relied upon the Third Circuit Court of Appeals decision in *Migiliori v. Cohen,* 36 F.4th 153, (3d Cir (3d Cir 2022). In this case, the Third Circuit Court of Appeals had ruled that the envelope dating provision of 25 Pa. Cons. Stat. §§ 3146.6(a) and 3150.16(a) is not a material defect and could not prevent the counting of those ballots.[2]

Thus, recent Pennsylvania federal courts cases interpreting federal law have ruled that misdated or undated security envelopes are not a material defect that should prevent a ballot from being counted. The 1964 Civil Rights Law and the applicable Pennsylvania federal cases interpreting this law bar not counting votes based on a defect that is immaterial. Relying on the federal court decisions interpreting a federal law, and in keeping with the Supremacy Clause of the United States Constitution, this court found that the Montgomery Board of Elections properly counted the all the ballots at issue. Therefore, the Petition for Election Contest was properly dismissed.

[2] The decision of the Third Circuit in *Migliori* was appealed to the U.S. Supreme Court. The decision was stayed by Justice Alito. By the time the appeal was before the Supreme Court, the case was dismissed as moot.

Case# 2023-26306-8 Docketed at Montgomery County Prothonotary on 12/20/2023 10:28 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IV. CONCLUSION

For all the above stated reasons, it is respectfully submitted that the appeal of the order entered by this Court on December 7, 2023 should be **DENIED.**

**BY THE COURT:**

Joseph A. Smyth

**JOSEPH A. SMYTH, S. J.**

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: Contest of November 7, 2023 Election of Towamencin Township | : | |
| Appeal of: Shannon L. Main, Holly A. Bechtel, Nancy J. Becker, David Allen Brady, Richard D. Costlow, George H. Frisch, Earl G. Godshall, Marilyn Godshall, Alyson Horcher, Leo F. Horcher III, Kris A. Kazmar, Michael E. Main, Cynthia M. Manero, Bruce C. Marger, Bruce R. Marger III, Kathryn J. Marger, Margrit D. Marino, Joseph F. Meehan, Richard Mullen, Karen L. Nuss, Thomas A. Nuss III, Beth Pickford, Scott E. Pickford, Delyne D. Rogiani, Kevin Rossi, Nicole M. Rossi, Janella J. Santiago, Kelly L. Secoda, Michael Secoda and Kristin R. Warner | : | No. 1482 C.D. 2023<br>Heard: December 28, 2023 |

**ORDER**

NOW, December 29, 2023, following a proceeding on Appellants' "Application for Relief in the Nature of a Motion for Summary Judgment/Relief[1] or, *in the Alternative*, Application for Relief in the Nature of a Request for Emergency Preliminary Injunction" (Application), and upon consideration of the Application, the Answers in opposition thereto, the stipulated facts and the arguments presented, the Application is **DENIED**.

[1] Appellants filed a new proposed order with their December 28, 2023 memorandum of law in support of the Application, which withdrew Appellants' prior request in the Application for summary judgement or summary relief, and on that basis the Court considers the Application to be seeking only injunctive relief. To the extent the prior request for summary judgment/relief was not so withdrawn, it is DISMISSED as improvidently filed.

Opinion to follow.

**RENÉE COHN JUBELIRER,** President Judge

Order Exit
12/29/2023

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Contest of November 7, 2023 Election of Towamencin Township | : | |
| Appeal of: Shannon L. Main, Holly A. Bechtel, Nancy J. Becker, David Allen Brady, Richard D. Costlow, George H. Frisch, Earl G. Godshall, Marilyn Godshall, Alyson Horcher, Leo F. Horcher III, Kris A. Kazmar, Michael E. Main, Cynthia M. Manero, Bruce C. Marger, Bruce R. Marger III, Kathryn J. Marger, Margrit D. Marino, Joseph F. Meehan, Richard Mullen, Karen L. Nuss, Thomas A. Nuss III, Beth Pickford, Scott E. Pickford, Delyne D. Rogiani, Kevin Rossi, Nicole M. Rossi, Janella J. Santiago, Kelly L. Secoda, Michael Secoda and Kristin R. Warner | : | No. 1482 C.D. 2023<br>Heard: December 28, 2023 |

**BEFORE: HONORABLE RENÉE COHN JUBELIRER, PRESIDENT JUDGE**

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER** **FILED:** December 29, 2023

By order dated December 29, 2023, the Court disposed of Appellants'[1] "Application for Relief in the Nature of a Motion for Summary Judgment/Relief or,

[1] The appellants in this appeal include: Shannon L. Main, Holly A. Bechtel, Nancy J. Becker, David Allen Brady, Richard D. Costlow, George H. Frisch, Earl G. Godshall, Marilyn Godshall, Alyson Horcher, Leo F. Horcher III, Kris A. Kazmar, Michael E. Main, Cynthia M. Manero, Bruce C. Marger, Bruce R. Marger III, Kathryn J. Marger, Margrit D. Marino, Joseph F. Meehan, Richard Mullen, Karen L. Nuss, Thomas A. Nuss III, Beth Pickford, Scott E. Pickford, Delyne D. Rogiani, Kevin Rossi, Nicole M. Rossi, Janella J. Santiago, Kelly L. Secoda, Michael Secoda, and Kristin R. Warner (collectively, Appellants).

*In the Alternative*, Application for Relief in the Nature of a Request for an Emergency Preliminary Injunction" (Application), filed "pursuant to Pa.[]R.A.P. 123, Pa.R.A.P. 1501(a)(2), and Pa.R.C[iv.]P. 1035.1[,]"[2] and Appellees Kofi Osei's (Osei) and the Montgomery County Board of Elections' (Board or Montgomery Board) respective Answers in opposition thereto. This opinion sets forth the reasons for that disposition.

The Application was filed ancillary to an appeal from the Court of Common Pleas of Montgomery County's (Common Pleas) December 7, 2023 order (Common Pleas' Order), which denied Appellants' "Petition for Election Contest ***Or in the alternative***, Petition for Election Contest *Nunc Pro Tunc*" (Petition), relying on the reasoning set forth in the United States District Court for the Western District of Pennsylvania's (District Court) November 21, 2023 Order (District Court Order) in *Pennsylvania State Conference of the NAACP v. Schmidt*, Civil Action No. 1:22-CV-

[2] Initially, the Court notes that this is an appeal from a trial court order in a matter arising under the Pennsylvania Election Code (Code), Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591, and, as such, it is governed by Chapter 9 of the Pennsylvania Rules of Appellate Procedure (Appellate Rules). *See* Pa.R.A.P. 901 (providing that Chapter 9 "applies to all appeals from a trial court to an appellate court[,]" with certain exceptions not applicable herein), 903(c)(ii) (providing that "[a]n appeal from . . . [a]n order in any matter arising under the . . . Code" "shall be taken within ten days after the entry of the order from which the appeal is taken"). To clarify, this is not an appeal governed by Chapter 15 of the Appellate Rules, as Appellants contend. *See* Pa.R.A.P. 1501(b)(1) (providing that Chapter 15 of the Appellate Rules "does not apply to any appeal within the scope of . . . Chapter 9").

Additionally, because this is an appeal under Chapter 9 of the Appellate Rules, the Pennsylvania Rules of Civil Procedure (Civil Rules) are inapplicable. *See* Pa.R.A.P. 103 (providing that the Appellate Rules "govern practice and procedure in . . . Commonwealth Court, including procedure in appeals to such courts from lower courts . . ."); *see also* Pa.R.A.P. 106 (providing that the general rules applicable to practice and procedure in the courts of common pleas, i.e., the Civil Rules, apply to matters brought before an appellate court in its **original jurisdiction**, unless otherwise prescribed by the Appellate Rules). Therefore, to the extent Appellants' Application sought relief in the form of summary judgment in their favor, such relief is not available in this Chapter 9 proceeding, as will be discussed *infra*.

00339, 2023 WL 8091601 (W.D. Pa. 2023 Nov. 21. 2023), and dismissed the case.

The Application initially requested summary judgment/relief for Appellants directing the Board (1) to certify Richard Marino (Marino), who is not a party to this action, as the winner of the November 7, 2023 General Municipal Election (Municipal Election) for Towamencin Township Supervisor (Township Supervisor), and (2) to decertify Osei as the winner for the office of Township Supervisor. The Application sought injunctive relief in the alternative. However, as discussed *infra*, summary relief is not available in this proceeding, and Appellants later withdrew that request and modified the relief they proposed.[3]

As their requested relief is presently constituted, Appellants seek temporary emergency injunctive relief pending final determination in this matter in the form of an order enjoining Osei from assuming office as Township Supervisor. Because the Court finds that Appellants failed to satisfy the stringent requirements for a stay and/or injunction pending appeal under Pa.R.A.P. 1732(b), the Court issued an order on the morning of December 29, 2023, denying the Application with opinion to follow (Order). In the Order, the Court considered the prior request for summary judgment/relief to have been withdrawn; however, to the extent the request for summary judgment/relief was not so withdrawn, the Court dismissed it as improvidently filed.

---

[3] During the December 28, 2023 proceeding on the Application, Appellants clarified that they no longer seek relief compelling the Board to decertify Osei and certify Marino; instead, Appellants sought only injunctive relief that would prevent any candidate from taking office until their appeal is resolved. In response to the Court's inquiry as to whether the Court could enjoin the Township from administering the oath of office of Osei (as Appellants had initially requested), given that the Township is not a party to this litigation, Appellants essentially withdrew their requested relief in the nature of summary judgment/relief, and reframed the Application as seeking an injunction against Osei himself "prohibiting [him] from **taking** the oath of office." (Appellants' Br. at 5 (emphasis added)); *accord id.* (proposed order).

## I. BACKGROUND & PROCEDURAL HISTORY

This matter involves a close race between Osei and Marino for the office of Township Supervisor and the recurring issue of whether undated and/or misdated[4] declarations on the outer return envelopes of mail-in ballots that are timely received should be counted in this Commonwealth. Before explaining the background and procedural history of this matter, the Court initially observes that this case touches upon important constitutional principles that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Article I, section 5 of the Pennsylvania Constitution, PA. CONST. art. I, § 5. In considering election-related matters, the Court notes that it is "[t]he longstanding and overriding policy in this Commonwealth to protect the elective franchise[,]" and that "[o]ur goal must be to enfranchise and not to disenfranchise." *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 360-61 (Pa. 2020) (citing *Shambach v. Bickhart*, 845 A.2d 793, 798 (Pa. 2004), and *In re Luzerne Cnty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972)). Further, the courts have long held that the Pennsylvania Election Code (Code) must be construed liberally "so as not to deprive . . . voters of their right to elect a candidate of their choice." *In Re Masino*, 293 A.3d 752, 760 (Pa. Cmwlth. 2023) (single-Judge op.) (Cohn Jubelirer, P.J.). With those overarching principles in mind, and for purposes of clarity in this unique case, the Court will first explain the procedural history of the matter and the relevant facts, which are largely not in dispute, followed by the averments of the Application,

---

[4] This matter involves ballots returned in envelopes that were either "undated [or] improperly dated." (Joint Stipulation (Stip.) Ex. C at 1.). It is somewhat imprecise, however, to refer to the envelopes as "undated" because counties time-stamp the outer envelopes as they receive them, *Ball v. Chapman*, 289 A.3d 1, 16 n.77 (Pa. 2023), and the envelopes may also be postmarked if sent by postal mail. More precisely, the issue is "the lack of a **handwritten** date" *Id.* at 10 (emphasis added).

the arguments presented,[5] and the Court's reasoning for its December 29, 2023 Order.

On December 12, 2023, Appellants timely appealed Common Pleas' Order to this Court. Eleven days later, Appellants filed the instant Application. By Order dated December 26, 2023, this Court directed expedited answers to the Application, scheduled a hearing on the Application for Thursday, December 28, 2023, at 10:00 a.m. in Harrisburg, Pennsylvania, further directed the parties to consult in good faith and file any stipulations, if possible, prior to the hearing, and permitted briefs in support of and/or in opposition to the Application to be filed no later than 4:00 p.m. on the date of the hearing. On December 26, 2023, the parties filed a "Joint Application for Relief in the Nature of a Motion to Appear via Video Conference[,]" which this Court granted by Order dated December 27, 2023, given the parties' representations in that application and the time-sensitive nature of this election matter, thus permitting the December 28 proceeding to be held via WebEx. Osei and the Board filed their respective answers and briefs in opposition to the Application on December 27, 2023, as directed, as well as a "Joint Stipulation of Facts and Evidence Not in Dispute" (Joint Stipulation). Per agreement of the parties in the Joint Stipulation, and as gleaned from the record in this case, the facts are as follows.

---

[5] In addition to the arguments presented by the parties in their filings, before disposing of the Application, the Court considered the arguments presented in the "Brief for *Amicus Curiae* Secretary of the Commonwealth Al Schmidt [(Secretary)] and the Pennsylvania Department of State" (Secretary's Brief) filed on December 28, 2023. The Court notes that the Secretary did not seek leave of court before filing or within the Secretary's Brief itself, as is required. *See* Pa.R.A.P. 531(b) ("An *amicus curiae* may file a brief (i) during merits briefing; (ii) [regarding] a petition for allowance of appeal, . . . or (iii) by leave of court.") However, given the Secretary's obvious interest in election administration, which are highly salient here, the Court fully considered the Secretary's arguments.

On November 7, 2023, the Municipal Election was held for, *inter alia*, Township Supervisor, for which both Marino and Osei were candidates. (Joint Stipulation (Stip.) ¶¶ 1-2.) The unofficial results of the Municipal Election, as of November 14, 2023, initially showed Marino as the winner of the Township Supervisor race by four votes over Osei. (Stip. ¶ 3.) The Board initially completed the canvassing and computation of all ballots on November 14, 2023. (Stip. ¶ 4.) Pursuant to Section 1404(f) of the Code, 25 P.S. § 3154(f), the Board was required to submit the unofficial results to the Secretary of the Commonwealth (Secretary) no later than 5:00 p.m. on November 14, 2023. (Stip. ¶ 5.) The Board complied with Section 1404(f) and submitted the unofficial results of the Municipal Election to the Secretary. (Stip. ¶ 6.) No petitions for recount or recanvass were filed in relation to the Municipal Election. (Stip. ¶ 7.) The Board thereafter scheduled its certification vote for November 22, 2023. (Stip. ¶ 8.)

On November 21, 2023, the District Court issued the District Court Order in *Pennsylvania State Conference of the NAACP v. Schmidt*, Civil Action No. 1:22-CV-00339, 2023 WL 8091601 (W.D. Pa. 2023 Nov. 21. 2023), dismissing 55 county boards of election from the action for lack of standing, but retaining the Montgomery Board as a defendant in the action. (Stip. ¶ 9 & Exhibit (Ex.) B, at 3-4.) The District Court Order also granted in part the plaintiffs' motion for summary judgment to the extent it requested, *inter alia*, that two mail-in ballots from Montgomery County be counted for the November 2022 general election, and entered declaratory judgment in the plaintiffs' favor declaring that the rejection of timely submitted mail-in ballots based solely on the voter's failure to include a date on the outer return envelope, or a correct date thereon, violates the Materiality Provision of the Civil Rights Act of

1964, 52 U.S.C. § 10101(a)(2)(B) (Materiality Provision).[6] (Stip., Ex. B, at 4.) The District Court Order further permanently enjoined the Secretary from directing any county board of elections to segregate, reject, exclude, or in any way not count timely received mail-in ballots based on such error or omission regarding the date on the voter's declaration, dismissed the plaintiffs' equal protection claim, and granted in part and denied in part other relief requested by other parties in the case. (Stip., Ex. B, at 5.)

Pursuant to the District Court Order, on November 22, 2023, the Board issued a public statement postponing its certification to canvass six mail-in and absentee ballots it had previously determined to be defective and void for lack of a date or an incorrect date. (Stip. ¶ 10 & Ex. C.) The ballots were opened on November 27, 2023, in the presence of candidates or their designated representatives, and, as a

---

[6] Section 10101(a)(2)(B) of the Civil Rights Act of 1964 provides, in relevant part, as follows:

> **(a) Race, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers; literacy tests; agreements between Attorney General and State or local authorities; definitions**
>
> . . . .
>
> **(2)** No person acting under color of law shall--
>
> . . . .
>
> **(B)** deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B) (emphasis in the original).

result, Marino and Osei each received 3,035 votes.[7] (Stip. ¶ 11.) The Board announced these new unofficial results on November 28, 2023, and, on November 30, 2023, Marino and Osei drew lots pursuant to Section 1418 of the Code, 25 P.S. § 3168, which resulted in Osei being declared the winner of the Municipal Election for Township Supervisor. (Stip. ¶¶ 12-13.) The Board thereafter certified the results on December 4, 2023, and Appellants filed their Petition on that same date. (Stip. ¶¶ 14-15.)

On December 5, 2023, Osei filed an "Unopposed Petition to Intervene" and a "Demurrer and Application to Quash" in Common Pleas, alleging that Appellants' Petition was both time-barred and substantively deficient, and that the Board correctly complied with the District Court Order. (Stip. ¶ 16; Original Record (O.R.) at 54-56, 57-72.) By order dated December 5, 2023, Common Pleas granted Osei intervention, observed that the "Demurrer and Application to Quash" was filed of record, and noted that the court only addressed intervention and not the merits of the matter at issue. (*See* O.R. at 73.)

On December 7, 2023, Common Pleas' Order was issued, denying Appellants' Petition, dismissing the case, and adopting by reference the reasoning of the District Court Order. (Stip. ¶ 17 & Ex. D.) Appellants filed their notice of appeal to this Court on December 12, 2023. (Stip. ¶ 18.)

Common Pleas thereafter issued an Opinion on December 20, 2023, explaining its reasoning for its December 7, 2023 Order. (Stip. ¶ 17 & Ex. E.) Noting the above facts, Common Pleas opined that Appellants' appeal should be

---

[7] This matter, arising in part from a tie vote, joins a long line of cases demonstrating that "elections can be decided by a very small number of votes." *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1204 (9th Cir. 2021) (Tashima, J., dissenting) (collecting cases and examples). As may be true of any election, this is literally "an election where every vote matters." *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 356 (M.D. Pa. 2020).

denied because no appeal was filed within the two-day period set forth in Section 1407(a) of the Code, 25 P.S. § 3157(a); no recount or recanvas of the results of the election for Township Supervisor was requested within the time period allowed under the Code, *see* Sections 1701-1703 of the Code, 25 P.S. §§ 3261-3263; the Petition was untimely filed; and no application to appeal nunc pro tunc was granted. (Common Pleas' Opinion (Op.) at 1-2.) Common Pleas further observed that its decision to uphold the counting of the 349 ballots at issue complied with applicable federal law on the subject, namely, the District Court Order. (*Id.* at 2; *see also* Stip., Ex. C.) Relying on that decision and the United States Court of Appeals for the Third Circuit's (Third Circuit) recent decision in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *petition for writ of certiorari granted, judgment vacated*, *Ritter v. Migliori*, 143 S. Ct. 297 (2022),[8] both of which held that failure to comply with the dating provisions of Sections 1306(a) and 1306-D(a) of the Code, 25 P.S. §§ 3146.6(a) and 3150.16(a), is not a material defect under the Materiality Provision and thus could not prevent the counting of those ballots, and the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2, Common Pleas explained that it found the Board properly counted the mail-in ballots at issue in this case pursuant to the District Court Order. (Common Pleas' Op. at 3.) Common Pleas therefore opined that it properly dismissed Appellants' Petition. (Common Pleas' Op. at 3.)

Following Appellants' appeal to this Court, proceedings continued in the federal courts. On December 13, 2023, the Third Circuit entered an order granting

[8] In *Ritter v. Migliori*, 143 S. Ct. 297 (2022), the Supreme Court granted, *inter alia*, the petition for writ of certiorari, vacated the Third Circuit's decision, and remanded the case to the Third Circuit with instructions to dismiss the case as moot, citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).

Marino intervention and staying the District Court Order. (Stip. ¶ 19 & Ex. F.) On December 14, 2023, the Third Circuit entered another order expediting merits briefing and the appeal of the District Court Order. (Stip. ¶ 20 & Ex. G.). On December 27, 2023, the Third Circuit ordered that oral argument would be held on March 4, 2024.

## II. APPELLANTS' ARGUMENTS

In support of their request for emergency injunctive relief, Appellants argue they satisfy each of the six factors required for a preliminary injunction. *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mountain, Inc.*, 828 A.2d 995, 1001 (Pa. 2003). With respect to irreparable harm, they assert that in the absence of an injunction, the electors of the Township will be "depriv[ed] of the candidate of their choice" and "subject[] . . . to the governance [of] an unelected official." (Appellants' Memorandum of Law in Support of Their Application (Appellants' Br.) at 11.) In their view, greater harm would result from refusing to grant, than from granting, the injunction. They focus on the fact they do not ask to have a particular candidate seated, but rather to have the Township "refrain from seating anyone[,]" which would also serve to preserve the status quo. (*Id.* at 12.)

Appellants emphasize that demonstrating a clear right to relief does not require them to "prove the merits of the underlying claim," but rather requires that they "only demonstrate that substantial legal questions must be resolved to determine the rights of the parties." (Appellants' Br. at 12 (quoting *SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 590-91 (Pa. 2014)).) They support their clear right to relief arugment with two main points. First, the Board lacked authority under the Code to postpone certification of Marino; they specifically assert that the Board's failure to certify Marino as the winner ran afoul of Section 1404(f) of the Code, 25

P.S. § 3154(f). In support of this argument, they cite *Petition to Open Ballot Box of Oneida District in East Union Township*, 103 A.2d 652 (Pa. 1954). Second, they assert that it is unclear whether the District Court Order "even authorized the [Board] to canvass and count" the ballots at issue. (Appellants' Br. at 14.) Because that determination presents a "substantial legal question[,]" and because the District Court Order has been stayed, they argue their right to relief is clear. (Appellants' Br. at 12 (citing *SEIU Healthcare*, 104 A.3d at 591).) Further, they argue the District Court Order is in conflict with the Pennsylvania Supreme Court's pronouncement in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023).

Appellants also explain that they should have been allowed to proceed nunc pro tunc in Common Pleas, citing *Appeal of Koch*, 41 A.2d 657 (Pa. 1945).[9] They emphasize that they are members of the public who did not learn "that the winning candidate had now somehow lost" until November 30, 2023. (Appellants' Br. at 7.) Appellants further argue that they are not guilty of laches because there is nothing in the record to suggest that Osei was prejudiced by the delay, given that "[p]rior to the statutory deadline, [he] had no reason to believe that the election was settled in his favor." (Appellants' Br. at 8.) They argue the harm they seek to correct can be traced back to November 28, suggesting that "[t]o deny the Petition as untimely would mean that the [Board's] clear violation of the [] Code is unchallengeable merely because [it] ran out [Appellants'] clock before altering the results of an election[.]" (Appellants' Br. at 9.)

Next, they argue that a preliminary injunction is reasonably suited to abate the offending activity, as preventing "an individual who lost the [Municipal] Election"

[9] Although Appellants do not specifically place the nunc pro tunc issue under the "Injunctive Relief" section of their Brief, the Court notes that the nunc pro tunc issue falls squarely within the clear right to relief prerequisite it must consider.

from being seated avoids violations of the Code and "preserve[s] the will of the electorate." (Appellants' Br. at 14.) Finally, they assert, citing *Oliviero v. Diven*, 902 A.2d 933 (Pa. Cmwlth. 2006), that granting their requeusted relief is not contrary to the public interest, but rather consistent with the public interest, because it would "prevent an individual who lost the [Municipal] Election . . . from assuming office during the pendency of the litigation." (Appellants' Br. at 15.)

## III. DISCUSSION

### *A. Standard for Injunctive Relief Pending Appeal*

Although Appellants' Application initially requested summary judgment and injunctive relief under "Pa.[]R.A.P. 123, Pa.R.A.P. 1501(a)(2), and Pa.R.C[iv.]P. 1035.1[,]" (*see* Application at 1), there is no basis for this Court to issue the requested summary judgment in favor of Appellants under those rules in this **appeal** invoking the Court's **appellate** jurisdiction. *See* RONALD G. DARLINGTON ET AL., 20A PENNSYLVANIA APPELLATE PRACTICE § 1732:1 (2023-2024 ed.) (PA. APPELLATE PRAC.) (enumerating the four species of ancillary relief available incident to an appeal, among which is not summary relief). Therefore, after argument, Appellants essentially withdrew that request, and seek only an injunction pending appeal, which the Court considered based on the standards governing such relief under Pa.R.A.P. 1732.[10]

[10] Appellate Rule 1732(a) provides that generally, a party seeking a stay or injunction pending appeal must first seek that relief in the trial court. Pa.R.A.P. 1732(a). Applications for injunctive relief pending appeal

> may be made to the appellate court or to a judge thereof, but the application shall show that application to the trial court for the relief sought is not practicable, or that the trial court has denied an application, or has failed to afford the relief which the applicant requested, with the reasons given by the trial court for its action. The application shall also show the reasons for the relief requested and the facts relied

An injunction pending appeal is an extraordinary remedy carrying a heavy burden of proof. *Tri-State Asphalt Corp. v. Dep't of Transp.*, 582 A.2d 55, 60 (Pa. Cmwlth. 1990); *see also* 20A PA. APPELLATE PRAC. § 1732:9 (describing such relief as "[t]he most esoteric form . . . available under [Appellate] Rule 1732 and explaining "the burden of obtaining an injunction pending appeal is extremely heavy"). This Court has held

> that where a party requests relief in the nature of an injunction pending review, the applicant must satisfy not only the standard announced by our Supreme Court in [*Pennsylvania Public Utility Commission v. Process Gas*] *Consumers Group*, 467 A.2d 805 (Pa. 1983)], but **also that the party satisfy the stringent requirements for a preliminary injunction**, particularly the requirements that greater injury would result by refusing the injunction than by granting it and that the plaintiff's right to relief is clear.

*Tri-State Asphalt*, 582 A.2d at 60 (emphasis added). Under *Process Gas*, 467 A.2d 805, an applicant must make a "strong showing" on all of the following criteria to warrant the grant of a stay:

1. The petitioner makes a strong showing that he is likely to prevail on

---

> upon, and if the facts are subject to dispute the application shall be supported by sworn or verified statements or copies thereof. With the application shall be filed such parts of the record as are relevant. Where practicable, the application should be accompanied by the briefs, if any, used in the trial court. The application shall contain the certificate of compliance required by Pa.R.A.P. 127.

Pa.R.A.P. 1732(b). The Court notes that Appellants did not comply with Appellate Rule 1732(a) or (b) in filing their Application. However, given the time-sensitive nature of this election-related matter, the Court exercised its discretion under Appellate Rule 105 and disregarded Appellants' noncompliance with these requirements in disposing of the Application. *See* Pa.R.A.P. 105 (providing that the Appellate Rules "shall be liberally construed to secure the just, speedy, and inexpensive determination of every matter to which they are applicable" and that "[i]n the interest of expediting decision . . . , an appellate court may . . . disregard the requirements or provisions of any of these rules in a particular case . . . on its own motion and may order proceedings in accordance with its direction").

the merits.

2. The petitioner has shown that without the requested relief, he will suffer irreparable injury.

3. The issuance of a stay will not substantially harm other interested parties in the proceedings.

4. The issuance of a stay will not adversely affect the public interest.

*Id.* at 808-09.

To meet the standard for a preliminary injunction, the applicant must establish **each** of the following "essential prerequisites":

> (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and[] (6) the preliminary injunction will not adversely affect the public interest.

*SEIU Healthcare*, 104 A.3d at 502 (citing, *inter alia*, *Summit Towne Ctr., Inc.*, 828 A.2d at 1001). "For a preliminary injunction to issue, **every one** of these prerequisites must be established; if the petitioner fails to establish **any one** of them, there is no need to address the others." *County of Allegheny v. Commonwealth,* 544 A.2d 1305, 1307 (Pa. 1988) (emphasis added). As the Court noted during the proceeding on the Application, the *Process Gas* factors for a stay pending appeal are largely duplicative of the more stringent test for injunctive relief, and the Court principally focused on the latter.

After a proceeding during which both parties presented argument and stipulated facts, and a thorough review of the filings and the trial court record, this Court

concludes that Appellants fell short of satisfying the stringent requirements for the issuance of an injunction pending appeal.

***B. Analysis***

1. Clear Right to Relief

a. Was the Petition Timely Filed in Common Pleas?

To determine whether Appellants have demonstrated a clear right to relief, the Court first turns to whether it is clear that the underlying Petition was timely filed, and if not, whether it is clear that nunc pro tunc relief is warranted. Compliance with any mandatory appeal or filing period would be a prerequisite to Common Pleas' ability to grant any relief to Appellants. *Appeal of Orsatti*, 598 A.2d 1341, 1342 (Pa. Cmwlth. 1991). *See also Pa. Dental Ass'n v. Ins. Dep't*, 516 A.2d 647, 654 (Pa. 1986) ("Periods of time set for filing appeals are jurisdictional."). "Compliance with statutorily imposed time limitations is especially important in election cases." *Appeal of Walko*, 325 A.2d 303, 307 (Pa. 1974); *see also In re James*, 944 A.2d 69, 73 (Pa. 2008) (holding statutory period for filing objection petitions under the Code is mandatory). Thus, Common Pleas considered whether the Petition was timely filed, concluding that it could have properly dismissed Appellants' Petition on the basis of untimeliness alone. (*See* Common Pleas' Op. at 2.) This Court will ultimately be reviewing that issue on a plenary basis on appeal. *See Narberth Borough v. Lower Merion Twp.*, 915 A.2d 626, 634 (Pa. 2007) (timeliness presents a question of law; our standard of review is de novo, and our scope of review is plenary); *Brown v. Levy*, 993 A.2d 364, 365 n.1 (Pa. Cmwlth. 2010) (whether trial court erred in declining to grant nunc pro tunc relief is a question of law for which our standard of review is de novo, and our scope of review is plenary). Accordingly, whether the Petition was timely filed below significantly affects the likelihood that

Appellants will prevail on the merits of their appeal, the fourth factor.

The parties dispute the proper characterization of the Petition. Appellants styled the Petition as a "Petition for Election Contest ***Or in the alternative***, Petition for Election Contest *Nunc Pro Tunc*." (O.R., Item No. 0, at 1.) They argue it was filed pursuant to Section 1756 of the Code, which requires that any petition to commence an election contest of the fifth class[11] "shall be made and filed, as herein required, **within twenty days after the day of the primary or election**, as the case may be." 25 P.S. § 3456 (emphasis added). The parties do not dispute that the Municipal Election occurred on November 7, 2023, such that a petition under Section 1756 of the Code was required to be filed no later than November 27, 2023. Appellants filed the Petition on December 4, 2023, so it was not timely filed as a contest petition under Section 1756.

Common Pleas and Appellees take the position that the Petition did not, in substance, seek to initiate a contest of the election, but rather sought to appeal the Board's decision to recompute or recanvass returns pursuant to the District Court Order. Such a challenge is authorized by Section 1407(a) of the Code, which provides in relevant part:

> Any person aggrieved by any order or decision of any county board regarding computation or canvassing of the returns of any . . . election, or regarding any recount or recanvass thereof under [S]ections 1701, 1702 and 1703 of [the Code[12]], may appeal therefrom **within two days after such order or decision shall have been made**, whether then reduced to writing or not, to the court specified in this subsection . . . .

25 P.S. § 3157(a) (emphasis added). Appeals under this section from decisions such

[11] Under Section 1711 of the Code, the election at issue here would be subject to a Class V contest, i.e., a contest of the election of an officer "elected by the qualified voters of . . . [a] township[]." 25 P.S. § 3291.

[12] 25 P.S. §§ 3261, 3262, 3263.

as the one at issue here (i.e., decisions which do not result from a recount or recanvass ordered by the Secretary under Section 1404(g) of the Code, 25 P.S. § 3154(g)) are properly filed in the courts of common pleas. *Id.* The parties do not dispute that, on November 22, 2023, the Board issued a public statement announcing its decision that it would comply with the District Court Order by recavassing all 349 disputed ballots on November 27, 2023. (Stip. ¶ 10 & Ex. C.) The Board's decision at a public meeting, which included scheduling a specific future date for the recanvass, could be the relevant "decision of [the B]oard" for purposes of commencing the two-day appeal period under Section 1407(a), 25 P.S. § 3157(a). Alternatively, the actual recanvassing, which occured on November 27, 2023, could also be the start of the appeal period. *See Perles v. Cnty. Return Bd. of Northumberland Cnty.*, 202 A.2d 538, 539 & 540 n.5 (Pa. 1964) (holding that "[t]he **counting** of . . . absentee ballots" constituted the board of elections' "order" for purposes of the Section 1407(a) appeal period) (emphasis added). The December 4, 2023 filing of the Petition occurred 12 days after the Board's public statement that it would recanvass the disputed ballots, and 7 days after the actual counting occurred, and, thus, the Petition could be untimely under Section 1407(a), which would generally be grounds for Common Pleas to dismiss the Petition. *See Perles*, 202 A.2d at 540 n.5.

Appellants argue, alternatively, that Common Pleas should have accepted the Petition nunc pro tunc. To support the timing of their filing, Appellants argue that "the impermissible re[]canvass took place **after** the permitted statutory period for filing a timely election contest petition." (Application ¶ 31 (emphasis added).) Further, they contend that "it was not until the [Board] completed its re[]canvass that [Appellants] sustain[ed] the harm they seek to remedy." (*Id.* ¶ 32.)

Our Supreme Court has explained that "where a petitioner does not learn of a problem with the election until the filing period has expired and his ignorance is not due to any fault or dereliction on his part . . . the petitioner [may] seek relief nunc pro tunc." *Appeal of Zupsic*, 670 A.2d 629, 635-36 (Pa. 1996). Further, in determining whether nunc pro tunc relief is warranted, the court will consider whether the petitioner is guilty of laches, which requires "lack of due diligence in pursuing a cause of action and resulting prejudice to the other party." *Id.* at 636. Finally, nunc pro tunc relief is generally only warranted where a petitioner can point to fraud or a breakdown in the administrative process on the part of the court or the election board. *Appeal of Orsatti*, 598 A.2d 1341, 1342 (Pa. Cmwlth. 1991).

Appellants rely on *Appeal of Koch*, 41 A.2d 657 (Pa. 1945), to support their position that Common Pleas erred in denying nunc pro tunc relief. There, the appellant had received a majority of the votes, and the return sheets posted outside the precincts reflected that. However, a clerical error (that the board of elections declined to correct) resulted in the candidate who won fewer votes being erroneously certified as the winner; the board of elections issued a certificate of elections to that losing candidate. All appeal or contest periods under the Code had run by the time the appellant learned of the board's error. The court of common pleas denied nunc pro tunc relief, reasoning that the appellant was guilty of laches for having "made no effort to acquire knowledge of the board's action until after the expiration of the statutory period[.]" *Id.* at 658. On appeal, the appellant argued that the board's negligence rose to the level of fraud, in that "the general returns posted outside the polling places showed his election; that the election board failed to publicly announce the result of the election . . . thus prevented him from receiving notice of the discrepancy in time to correct it." *Id.*

Embracing the appellant's argument, the Supreme Court focused on the board's negligence in failing to carry out its statutory duties to compare sealed and unsealed returns with tally sheets to discover discrepancies, along with its failure to publicly announce the final result of the election. It noted that had the board complied with those statutory requirements, the appellant would have discovered the issue before the statute of limitations ran. *Id.* at 659. Noting that "those seeking . . . nunc pro tunc [relief] in an election matter must be held to a **stricter rule** than those in a controversy between individuals[,]" the Court was satisfied that the appellant was not guilty of laches where the board's failure to perform its duties completely deprived the appellant of his only means of correcting the mistake. *Id.* at 660 (emphasis added).

Appellants characterize *Koch* to say "the common pleas court erred in not allowing an appeal nunc pro tunc from the action of the election board after the Board clearly violated the [] Code." (Application ¶ 29.) It is not clear that this characterization fully captures the meaning of *Koch*, as the Court was arguably concerned about the violations of the Code **insofar as they deprived the appellant of the opportunity to learn in the first instance** that there had been a mistake. The board in *Koch* did not publicly post the results in violation of the Code, thereby depriving the appellant of the ability to file a timely challenge. It does not appear that here the Board did anything to prevent Appellants from discovering the alleged error (canvassing the ballots in accordance with the District Court Order); rather, it issued a press release publicly explaining the reason for delay of the certification, and its intent to canvass the votes in accordance with the District Court Order on November 22 following a public meeting. (Stip. ¶ 10 & Ex. C.) Arguably, *Koch* reflects the type of paradigmatic **breakdown** in a board of elections' operations that

would generally justify nunc pro tunc relief.  In *Koch*, a clerical error the board refused to correct—and of which the appellant had no notice—thwarted his ability to learn of the issue to appeal within the appropriate timeframe.  In this matter, it was not a clerical error, but an order entered by a federal court, to which the Board was a party, that caused the alleged problem with the election which Appellants raise.

Appellants also argue that nunc pro tunc relief is justified because the period to file an election contest petition expired on November 27, and the Board's announcement of the tie occurred a day later.  It is not clear that the relevant inquiry for nunc pro tunc relief is whether a breakdown thwarted Appellants' timely learning of when the "harm" was sustained or whether the focus is on their timely learning of a problem with the election.

For example, in *In re Election of Tax Collector, Horsham Township*, 51 A.2d 692 (Pa. 1947), a day after the election, the appellant heard a rumor that there was a possible issue with the count.  Instead of immediately going to court, she "awaited the ascertainment of the results of the ballot box opening, and then sought to file her appeal nunc pro tunc."  *Id.* at 693.   The Supreme Court distinguished *Koch*, emphasizing that the appellant there "who in fact was elected, and the public, were . . . deceived." *Id.* at 695.  The *Horsham Township* appellant waited for the **results** of a recount—instead of immediately bringing an election contest petition—and was found not to have timely filed the petition and was not entitled to nunc pro tunc relief.  Based on that case, there is an argument that Appellants, who awaited the recanvassing and did not file their Petition until their candidate was not successful, would also not have timely filed their Petition or be entitled to nunc pro tunc relief.

Finally, it is unclear that the Board could render any "clear violation of the []

Code . . . unchallengeable" by waiting until the day after the 20-day contest period runs, as Appellants argue. (Appellants' Br. at 9.) The Code states that "[a]ny person aggrieved by any order or decision of any county board regarding the computation or canvasing of the returns . . . may appeal therefrom within two days after such order or decision shall have been made," irrespective of whether that order or decision falls outside of the 20-day contest period. 25 P.S. § 3157(a).

Taking the record as a whole, the Court cannot say that Appellants' explanation for the time of their filing establishes that they had a clear right to nunc pro tunc relief. First, it is likely the relevant question here is not when the Board actually recanvassed the votes, but when Appellants learned of the problem. If they "learn[ed] of a problem with the election [after] the filing period ha[d] expired and [their] ignorance [wa]s not due to any 'fault or dereliction' on [their] part[,]" then an appeal nunc pro tunc is warranted. *Zupsic*, 670 A.2d at 635. Here, there is a strong argument that Appellants were on notice as soon as the Board publicly announced the delayed certification and the reasons for that delay on November 22. (Stip. ¶ 10 & Ex. C.)

In sum, it is not clear that Appellants would be found to have timely filed their Petition under either the provision Appellants themselves claim to have relied upon (a Section 1756 petition for election contest, to be filed within 20 days of the Municipal Election), or under the 2-day period for appeal to Common Pleas (under Section 1407(a)). Further, Appellants have not made a compelling showing that they were entitled to nunc pro tunc relief in Common Pleas. Given this, Appellants have not carried their heavy burden to show that they have a clear right to relief and are likely to prevail in their appeal here.

b. Clear Right to Relief as to Lawfullness of Board's Action

The merits issues raised on appeal in the Petition really involve two interrelated questions. First, as a matter of state law under the Code, Appellants argue the Board acted unlawfully in certifying the election, both because it did so after the time period prescribed by the Code, and also because the Code, as interpreted by the Pennsylvania Supreme Court's precedent, requires that the disputed ballots not be counted. Second, the Board's action implicates a question of federal law (i.e., the Materiality Provision) and its effect on how the Board is obligated to canvass ballots, and which ballots must be counted. Both of those questions bear on whether the Board acted properly, in interpreting the District Court Order and, in reliance thereon, recanvassing the disputed ballots as and when it did. Because these issues are intertwined, and given the state of the law on the federal question, Appellants cannot show a clear right to relief.

Specifically, The Pennsylvania Supreme Court has held the date requirement is unambiguous and mandatory, and that undated ballots shall not be counted. *Ball*, 289 A.3d at 20. The Court also observed that "county boards of elections retain authority to evaluate the ballots that they receive in future elections—including those that fall within the date ranges derived from statutes indicating when it is possible to send out mail-in and absentee ballots—for compliance with the Election Code." *Ball*, 289 A.3d at 23. However, the Court was evenly divided on whether the disqualification of undated or incorrectly dated ballots would offend the Materiality Provision. In addition, the District Court Order resolved the issue of the Materiality Provision and granted relief on that basis, which the Board interpreted as requring that it count the disputed ballots in this case. However, the District Court Order is currently on appeal before the Third Circuit and has now been stayed

pending that appeal. Because it is unclear how the federal courts will resolve the federal question,[13] and because that federal question underlies the merits of Appellants' appeal, the Court cannot say that Appellants have established a clear right to relief regarding whether the Board acted unlawfully. Appellants recognize that the ultimate resolution of this issue may lie before the United States Supreme Court. (*See* Appellants' Br. at 5.)

2. Balancing of Harms

In addition to a clear right to relief, injunctive relief demands a strong showing on a second, particularly important factor: that "greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings." *SEIU Healthcare*, 104 A.3d at 502. This factor requires the Court to balance potential harm to the parties, and in so doing "the harm to the public must also be considered." *Valley Forge Hist. Soc. v. Washington Mem'l Chapel*, 426 A.2d 1123, 1129 (Pa. 1981); *accord Commonwealth ex rel. Corbett v. Snyder*, 977 A.2d 28, 42 (Pa. Cmwlth. 2009), *appeal denied*, 999 A.2d 1247 (Pa. 2010).

Appellants' argument—that denial of the injunction here would undermine public confidence in the election process by effectively placing into office a candidate who lost the election—raises a profound concern. The Court is mindful that public confidence in elections, and especially the reality and public perception of fairness in elections, is of paramount importance. Relatedly, the Court takes seriously its duty to construe and apply the Code so as to maximize the franchise. *Pa. Democratic Party*, 238 A.3d at 360-61. The prospect of an unelected, or potentially unelected, person assuming public office, even temporarily, risks

[13] As noted *supra*, the Third Circuit already once resolved this issue in *Migliori*, 36 F.4th at 153, and the United States Supreme Court vacated that decision, 143 S. Ct. at 297.

upsetting these critical public interests, and an injunction preventing any candidate from taking office could abate the risk of that harm. Weighing against that important concern, however, is the harm of seating no candidate at all. This harm has at least two aspects: it deprives the candidate who has been certified and provided with a certificate of election of the opportunity to hold office, and it deprives the public of an officer to serve on their behalf.

The Court appreciates the gravity of the concerns expressed by Appellants in this case regarding the need for public confidence in this Commonwealth's free and equal elections. *See* PA. CONST. art. I, § 5. The importance of that interest cannot be overstated. But the finality of elections is also critical, and to that end, the General Assembly has structured the appeal and contest provisions of the Code to raise and resolve disputes as early as possible, so the boards of elections can perform their functions under the Code lawfully and with confidence. Despite those procedures, the Court did not receive the request for injunctive relief here until December 23, 2023. The timeframe on which the Court must consider that request, so close to the time that the certified candidate is set to take office, makes holding the seat open the only practical remedy for the harm Appellants allege. In light of the balancing of harms the Court must undertake, the harm that would be created by an **indefinite vacancy** pending this appeal[14] also constrains the Court to deny the Application. This result underscores the importance of bringing challenges pursuant to the Code as early as possible.

---

[14] Although the relief technically before the Court is an injunction pending **this** appeal, Appellants essentially request a stay pending not only this appeal but also "until the final determination of the subject appeal and the appeal of the related federal case through the United States Court of Appeals in the Third Circuit and any proceedings in the United States Supreme Court." (Appellants' Br. at 5.) Given the Third Circuit's stay of the District Court Order through potential review by the United States Supreme Court in that matter, it could be a substantial time before the federal question is finally resolved, which could further prolong any vacancy.

## IV. CONCLUSION

For the foregoing reasons, Appellants have not demonstrated a clear right to relief on the merits of their appeal, and have not shown that greater injury would result from denying the requested injunctive relief than from granting it. Because they have not satisfied all of the factors, *County of Allegheny*, 544 A.2d at 1307, the Court denied the Application.

As a final note, the Court pauses to commend all counsel of record in this matter for the impressive level of professionalism they have displayed throughout this proceeding, much of which occurred on extremely short timelines between two major holidays.

**RENÉE COHN JUBELIRER,** President Judge

Order Exit
12/29/2023

**Towamencin Township**
**Board of Supervisors**
**Reorganization Meeting**
**January 2, 2024**
**7:00 p.m.**

OATHS OF OFFICE

Elected Supervisor – Kofi Osei
Elected Auditors – Tina Rumsey and James Collins

1.  CALL TO ORDER

2.  PLEDGE OF ALLEGIANCE

3.  PUBLIC COMMENT

4.  ELECTION OF OFFICERS

5.  BOARD APPOINTMENTS

    Staff/Consultant Appointments

6.  RESOLUTION 24-01 - REAPPOINTMENT OF EMERGENCY MANAGEMENT COORDINATOR

7.  RESOLUTION 24-02 - REAPPOINTMENT OF TOWAMENCIN MUNICIPAL AUTHORITY MEMBER

8.  RESOLUTION 24-03 - REAPPOINTMENT TO ZONING HEARING BOARD

9.  RESOLUTION 24-04 - REAPPOINTMENT OF CITIZENS COMMITTEES

10. RESOLUTION 24-05 - DESIGNATING A DEPOSITORY

11. RESOLUTION 24-06 - 2024 MEETING SCHEDULE

12. RESOLUTION 24-07 - 2024 HOLIDAY SCHEDULE

13. RESOLUTION 24-08 - REAPPOINTMENT OF AUDITORS – Maillie LLP

14. DECEMBER WARRANT (2 OF 2)

15. ADJOURNMENT

## CERTIFICATE OF SERVICE

I, Jacob B. Boyer, hereby certify that a copy of this supplemental appendix has been served on all counsel of record using the Court's CM/ECF system.

January 10, 2024

/s/ *Jacob B. Boyer*
Jacob B. Boyer
*Counsel for Secretary of the Commonwealth Al Schmidt*