No. 23-3166

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,
*Plaintiffs-Appellees*,

v.

SECRETARY OF THE COMMONWEALTH, *et al.*,
*Defendants-Appellees*,

REPUBLICAN NATIONAL COMMITTEE, *et al.*,
*Intervenors-Appellants*,

DEMOCRATIC NATIONAL COMMITTEE, *et al.*,
*Intervenors-Appellees*.

———————————

Appeal from the United States District Court for the Western District of
Pennsylvania, Case No. 1:22-cv-00339 (Hon. Susan Paradise Baxter)

———————————

### PLAINTIFFS-APPELLEES' BRIEF IN OPPOSITION

———————————

Witold J. Walczak (PA 62976)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
vwalczak@aclupa.org

Ari J. Savitzky
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
asavitzky@aclu.org
slakin@aclu.org

*Counsel for Plaintiffs-Appellees Continued on Inside Cover*

Marian K. Schneider (PA 50337)
Stephen Loney (PA 202535)
Kate I. Steiker-Ginzberg (PA 332236)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
mschneider@aclupa.org
sloney@aclupa.org
ksteiker-ginzberg@aclupa.org

Megan C. Keenan
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 10004
Tel: (202) 457-0800
mkeenan@aclu.org
acepedaderieux@aclu.org

David Newmann (PA 82401)
Brittany C. Armour (PA 324455)
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4610
david.newmann@hoganlovells.com
brittany.armour@hoganlovells.com

*Counsel for the Pennsylvania State Conference of the NAACP, League of Women Voters of Pennsylvania, Philadelphians Organized to Witness, Empower and Rebuild, Common Cause Pennsylvania, Black Political Empowerment Project, Make the Road Pennsylvania, Barry M. Seastead, Marlene G. Gutierrez, Aynne Margaret Pleban Polinski, Joel Bencan, and Laurence M. Smith*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ..................................................................................... 1

BACKGROUND ....................................................................................... 4

    A.    Pennsylvania Expands Mail Ballot Voting ............................ 4

    B.    Litigation Ensues Over the Envelope-Date
            Requirement ................................................................. 6

    C.    Thousands of Pennsylvanians Are Disenfranchised in
            the 2022 General Election ..................................................... 10

    D.    Disenfranchised Voters and Non-Partisan Groups
            Prevail in the District Court.................................................. 13

    E.    Marino Loses a 2023 Election for Township Supervisor ...... 15

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT ............ 19

ARGUMENT ........................................................................................... 22

  I.    DISENFRANCHISING VOTERS BECAUSE OF THE
        ENVELOPE-DATE RULE VIOLATES FEDERAL LAW......... 22

    A.    The Materiality Provision Forbids Disenfranchising
            Voters for Trivial Mistakes on Voting-Related
            Paperwork ............................................................................. 22

    B.    The Materiality Provision Applies Here as a Matter of
            Plain Text ............................................................................. 25

    C.    GOP-Intervenors Misconstrue the Statute ........................... 33

  II.    THE MATERIALITY PROVISION IS PRIVATELY
        ENFORCEABLE........................................................................ 51

i

III.   ALL CLAIMS WITH RESPECT TO THE RESULTS OF
THE 2023 ELECTIONS ARE MOOT ........................................58

IV.   THE DISTRICT COURT'S ORDER CREATES NO
DISUNIFORMITY PROBLEM ..................................................61

CONCLUSION ........................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021) ........................................................................ 47

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ....................................................................... 57, 58

*Ali v. Fed. Bureau of Prisons,*
  552 U.S. 214 (2008) ............................................................................ 36

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ............................................................................ 45

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
  570 U.S. 1 (2013) ................................................................................ 49

*Ball v. Chapman,*
  289 A.3d 1 (Pa. 2023) ................................................................. *passim*

*Bd. of Trs. of the Univ. of Ala. v. Garrett,*
  531 U.S. 356 (2001) ............................................................................ 50

*Bognet v. Sec'y of Pa.,*
  980 F.3d 336 (3d Cir. 2020) ......................................................... 59, 63

*Bostock v. Clayton Cnty.,*
  140 S. Ct. 1731 (2020) ........................................................... 33, 34, 42

*Brnovich v. DNC,*
  141 S. Ct. 2321 (2021) ........................................................................ 45

*Bush v. Gore,*
  531 U.S. 98 (2000) ........................................................... 3, 21, 62, 63

*In re Canvass of Absentee and Mail-In Ballots,*
  241 A.3d 1058 (Pa. 2020) ............................................................. 7, 31

*Chapman v. Berks Cnty. Bd. of Elections,*
2022 WL 4100998 (Pa. Commw. Aug. 19, 2022) .................................. 8

*Chapman v. King,*
154 F.2d 460 (5th Cir. 1946) ................................................................ 54

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) .............................................................................. 38

*City of Boerne v. Flores.*
521 U.S. 507 (1997) ........................................................................ 50, 51

*City of Rancho Palos Verdes v. Abrams,*
544 U.S. 113 (2005) .............................................................................. 53

*Clingman v. Beaver,*
544 U.S. 581 (2005) .............................................................................. 45

*Common Cause v. Thomsen,*
574 F.Supp.3d 634 (W.D. Wis. 2021) .................................................. 34

*Condon v. Reno,*
913 F. Supp. 946 (D.S.C. 1995) .......................................................... 38

*DCCC v. Kosinski,*
614 F. Supp. 3d 20 (S.D.N.Y. 2022) .................................................... 45

*DIRECTV Inc. v. Seijas,*
508 F.3d 123 (3d Cir. 2007) ................................................................ 19

*DNC v. Wis. State Legis.,*
141 S. Ct. 28 (2020) .............................................................................. 45

*Fla. State Conf. of N.A.A.C.P. v. Browning,*
522 F.3d 1153 (11th Cir. 2008) ................................................ 23, 28, 40

*Fitzgerald v. Barnstable Sch. Comm.,*
555 U.S. 246 (2009) ........................................................................ 52, 57

*Ford v. Tennessee Senate*
No. 06-CV-2031, 2006 WL 8435145 (W.D. Tenn. Feb. 1,
2006) .................................................................................... 23, 24, 25

iv

*Friedman v. Snipes*,
345 F. Supp. 2d 1356 (S.D. Fla. 2004)..........................................29, 45

*In re Georgia Senate Bill 202*,
No. 21-CV-01259, 2023 WL 5334582 (N.D. Ga. Aug. 18,
2023) .............................................................................................................24

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) ..........................................20, 52, 53, 57

*Harrison v. PPG Indus., Inc.*,
446 U.S. 578 (1980) ...............................................35, 36, 37

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023) ................................................52, 53, 57

*Idahoan Fresh v. Advantage Produce, Inc.*,
157 F.3d 197 (3d Cir. 1998) ...............................................35

*Ind. Democratic Party v. Rokita*,
458 F.Supp.2d 775 (S.D. Ind. 2006) ..................................45

*Ioannidis v. Wolf*,
635 M.D. 2020 (Pa. Commw. 2021) ....................................58

*La Unión del Pueblo Entero v. Abbott*,
No. 21-CV-0844, --- F.Supp.3d ----, 2023 WL 8263348
(W.D. Tex. Nov. 29, 2023) ........................................ *passim*

*League of Women Voters of Ark. v. Thurston*,
No. 20-CV-05174, 2023 WL 6446015 (W.D. Ark. Sept. 29,
2023) ......................................................................................24, 27

*Marks v. Stinson*,
No. 93-CV-6157, 1994 WL 146113 (E.D. Pa. Apr. 26, 1994).........40-41

*Martin v. Crittenden*,
347 F.Supp.3d 1302 (N.D. Ga. 2018).................................24, 27, 28, 29

*McCormick for U.S. Senate v. Chapman*,
2022 WL 2900112 (Pa. Commw. June 2, 2022) .....................................8

*McDonald v. Bd. of Election Comm'rs of Chi.*,
  394 U.S. 802 (1969) ............................................................ 43

*McKay v. Thompson*,
  226 F.3d 752 (6th Cir. 2000) ............................................ 57

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) .................................................. 60, 61

*Migliori v. Cohen*,
  36 F.4th 153 (3d Cir. 2022) ...................................... *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ............................................................ 42

*Nev. Dep't of Human Res. v. Hibbs*,
  538 U.S. 721 (2003) .................................................. 49, 50

*Newton v. Comm'r Soc. Sec.*,
  983 F.3d 643 (3d Cir. 2020) ............................................ 33

*NFIB v. OSHA*,
  595 U.S. 109 (2022) ........................................................ 47

*Ne. Ohio Coal. for the Homeless v. Husted*,
  837 F.3d 612 (6th Cir. 2016) ............................................ 57

*Org. for Black Struggle v. Ashcroft*,
  493 F.Supp.3d 790 (W.D. Mo. 2020) ................................ 24

*Peters v. Lincoln Elec. Co.*,
  285 F.3d 456 (6th Cir. 2002) ............................................ 31

*Polychrome Int'l Corp. v. Krigger*,
  5 F.3d 1522 (3d Cir. 1993) ................................................ 8

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ...................................................... 21, 60

*Rice v. Elmore*,
  165 F.2d 387 (4th Cir. 1947) ............................................ 54

*Richardson v. Texas Sec'y of State,*
    978 F.3d 220 (5th Cir. 2020) ................................................................ 28

*Ritter v. Migliori,*
    142 S. Ct. 1824 (2022) ........................................................ 8, 34, 43

*Ritter v. Migliori,*
    143 S. Ct. 297 (2022) .................................................................. 8, 59

*RNC v. Common Cause R.I.,*
    141 S. Ct. 206 (2022) ............................................................................ 60

*Rosario v. Rockefeller,*
    410 U.S. 752 (1973) ............................................................................. 45

*Russello v. United States,*
    464 U.S. 16 (1983) ...................................................................... 40, 55

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003) ................................................. *passim*

*Schwier v. Cox,*
    412 F.Supp.2d 1266 (N.D. Ga. 2005) ................................................ 28

*Smiley v. Holm,*
    285 U.S. 355 (1932) ............................................................................ 46

*Smith v. Allwright,*
    321 U.S. 649 (1944) ............................................................................ 54

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ............................................................................ 42

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) ............................................................................ 45

*Trump v. Wis. Elections Comm'n,*
    983 F.3d 919 (7th Cir. 2020) .............................................................. 61

*Trump for President, Inc. v. Degraffenreid,*
    141 S. Ct. 1451 (2021) ......................................................................... 7

*United States v. EME Homer City Generation, L.P.*,
727 F.3d 274 (3d Cir. 2013) ...................................................... 36, 39

*United States v. Gonzales*,
520 U.S. 1 (1997) ...................................................................... 36

*Vote.Org v. Callanen*,
--- F.3d ----, 2023 WL 8664636 (5th Cir. Dec. 15, 2023) ............. *passim*

*Vote.Org v. Callanen*,
39 F.4th 297 (5th Cir. 2022) ...................................................... 28

*Wash. Ass'n of Churches v. Reed*,
492 F.Supp.2d 1264 (W.D. Wash. 2006) ................................. 24, 28, 32

**Statutes**

25 P.S. § 1301 ......................................................................... 29, 31

25 P.S. § 2602 ......................................................................... 4

25 P.S. § 2811 ......................................................................... 31

25 P.S. § 3050 ......................................................................... 16

25 P.S. § 3146 ......................................................................... *passim*

25 P.S. § 3150 ......................................................................... *passim*

25 P.S. § 3154 ......................................................................... 16, 17

25 P.S. § 3157 ......................................................................... 17

25 P.S. § 3553 ......................................................................... 31

25 Pa. C.S.A. § 1301 ................................................................. 5, 29

25 Pa. C.S.A. § 3511 ................................................................. 16

28 U.S.C. 1746 ......................................................................... 31

42 U.S.C. § 1971 ...................................................................... 54

viii

42 U.S.C. § 1983................................................................ *passim*

52 U.S.C. § 10101(a)(1)..................................................... 54

52 U.S.C. § 10101(a)(2)(A).......................................... 40, 41

52 U.S.C. § 10101(a)(2)(B)............................................ *passim*

52 U.S.C. § 10101(a)(2)(C)................................................. 40

52 U.S.C. § 10101(a)(3)(A)............................................ *passim*

52 U.S.C. § 10101(b) ........................................................ 41

52 U.S.C. § 10101(c)..................................................... 41, 55

52 U.S.C. § 10101(d) .................................................... 54, 56

52 U.S.C. § 10101(e) ...................................................... *passim*

52 U.S.C. § 10101(g) .................................................... 55, 56

Act of May 31, 1870, ch. 114, 16 Stat. 140, 140-42 (1870) ..................... 54

Pub. L. No. 85-315, § 131, 71 Stat. 637 (1957) ........................................ 55

Pub. L. No. 88-352, § 101, 78 Stat. 241 (1964) ............................ 48, 49, 55

Pub. L. No. 89-110, § 15(a), 79 Stat. 437 (1965)................................ 48, 49

## Other Authorities

110 Cong. Rec. 6530 (1964) ............................................. 37

110 Cong. Rec. 6714-6715 (1964) ...................................... 42

H.R. Rep. No. 85-291 (1957).................................... 54, 55, 57

H.R. Rep. No. 88-914 (1963)..................................... 37, 42, 48

*Civil Rights Act of 1957: Hearings on S. 83,*
    85th Cong. (1957) .......................................................... 55

*Civil Rights Act of 1964: Hearings on H.R. 7152*,
  88th Cong. (1963) ................................................................. 48

Pa. Const. art. VIII, § 1 ...................................................... 31

U.S. Const. art. I, § 4, cl. 1 .............................................. 48

U.S. Const. art VI, § 2 ...................................................... 64

**INTRODUCTION**

In November 2022, thousands of Pennsylvania voters were denied the right to vote based on a meaningless paperwork error. They filled out their mail ballots during the proper period, signed the form on the outer return envelope, and returned them by 8 p.m. on Election Day. Yet their ballots were not counted only because they omitted a handwritten date on the outer return envelope or wrote some date deemed "incorrect." The handwritten date undisputedly is not used to determine the timely receipt of a ballot, or a voter's qualifications or identity, or to prevent fraud. It is utterly irrelevant.

Discarding votes based on such immaterial paperwork errors violates federal law, which prohibits refusing to count a person's vote based on an "error or omission" on a voting-related "record or paper" that is "not material in determining" a person's qualifications to vote. 52 U.S.C. § 10101(a)(2)(B). The disenfranchisement challenged here, for failure to handwrite a date that has no substantive meaning or relevance, is a clear violation. A unanimous panel of this Court so held less than two years ago. *See Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *vacated as moot*, 143 S. Ct. 297 (Mem.) (2022).

The district court correctly applied the statute's plain text to a comprehensive and undisputed record from the 2022 election. That record showed that the content of the handwritten date is meaningless, and that the envelope-date requirement was arbitrarily enforced. Counties disenfranchised voters for dates that were "right" (for example, where a voter wrote "October 8" but omitted the year) or for obvious misprints (like "2202" instead of "2022," or a birthdate from 80 years ago), even though they conceded the ballots were timely cast. Meanwhile, some counties *counted* ballots where the handwritten date was "wrong," for example where it occurred before mail ballots had been sent to voters, or where a voter wrote "September 31"—a non-existent date.

GOP-Intervenors' merits arguments, most of which the *Migliori* panel rejected, are inconsistent with plain text. The statute is not limited to voter registration; it bars disenfranchisement for immaterial errors on "*any* record or paper relating to any application, registration, *or other act requisite to voting*," 52 U.S.C. § 10101(a)(2)(B) (emphasis added). It expressly protects a voter's right to "cast[] a ballot, and hav[e] such ballot counted." 52 U.S.C. § 10101(a)(3)(A), (e). Those terms cover all manner of irrelevant errors on voting-related paperwork, including here, where

voters' ballots were not counted due to an immaterial mistake on a "paper" (the outer-mail-ballot-envelope form) whose completion was made "requisite to voting." Nor would adhering to plain text threaten various unrelated election rules or portend major changes to election administration. Virtually every practice GOP-Intervenors cite falls outside the statute's clearly defined scope. But disenfranchising thousands for a meaningless paperwork error falls within it.

GOP-Intervenors' side arguments lack merit, too. Both *Migliori* and a Fifth Circuit panel just last month held that this statutory guarantee of federal rights is enforceable via Section 1983 as a matter of text, context, and history. GOP-Intervenors' arguments about the 2023 municipal election are moot because that the election is over. And their invocation of *Bush v. Gore* fails because the district court's declaration of federal law *protects* voters from arbitrary treatment. Most counties are already bound to follow that declaration, all counties can and should do so, and in any event this Court's merits ruling will require uniformity.

It is time to end the illegal disenfranchisement of Pennsylvania voters based on an irrelevant paperwork mistake. "[T]he right to vote is 'made of sterner stuff' than that." *Migliori*, 36 F.4th at 163.

# BACKGROUND

## A.    Pennsylvania Expands Mail Ballot Voting

Pennsylvania has long provided absentee-ballot options for certain voters. *See* 25 P.S. §§ 3146.1-3146.9. In 2019, Pennsylvania expanded mail voting significantly, allowing *all* registered, eligible voters to vote by mail. App.56.[1] In the 2022 general election, over 1.2 million Pennsylvanians voted by mail. App.60.

A voter seeking to vote by mail must complete an application to enable their county board of elections to verify their identity and qualifications. App.56. They must provide their name, address, and proof of identification, 25 P.S. §§ 3146.2, 3150.12, namely, a Pennsylvania driver's license number, the last four digits of their social security number, or, absent those, a form of photo identification. 25 P.S. § 2602(z.5)(3); Supp.App.752-755.

County boards of elections "ascertain" applicants' qualifications by verifying proof of identification and comparing the information in the

---

[1] Citations to "App." refer to the appendix submitted with Appellants' brief. Citations to "Supp.App." refer to the supplemental appendix submitted with this brief. Citations to "ECF No." refer to the district court's docket.

4

application with the voter's registration record.  25 P.S. §§ 3146.2b, 3150.12b, 3146.8(g)(4).  *See also* Supp.App.755-757.  The boards verify that voters are qualified to vote—namely, that they are 18 years old, have been a U.S. citizen for one month, have resided in the election district for 30 days, and are not incarcerated on a felony conviction.  App.56; *see also* 25 Pa. C.S.A. § 1301(a); Supp.App.637-638.  A county board's determinations as to voter qualifications are conclusive absent successful pre-election challenge.  25 P.S. §§ 3146.2b, 3150.12b, 3146.8(g)(4).

After verifying a voter's identity and eligibility, the county board sends them a package with a ballot, a "secrecy envelope," and a pre-addressed outer return envelope, on which is printed a voter declaration form.  25 P.S. §§ 3146.6(a), 3150.16(a).  Counties record who requested and returned a mail ballot.  25 P.S. §§ 3146.6(b)(1), (3), 3150.16(b)(1), (3).  Different counties send out packages at different times.  App.82.  In 2022, some counties sent the mail-ballot package in mid-September; most sent them in October, as late as October 21.  Supp.App.150-157.[2]

---

[2] All cited references to Plaintiffs' L.R.56(B)(1) Statement (Supp.App.126-220) were admitted by opposing defendants in their respective responses, included at Supp.App.221-317 (Lancaster County); Supp.App.319-424 (GOP-Intervenors); Supp.App.425-511 (Berks County).

At "any time after receiving" it, the voter marks their ballot, puts it inside the secrecy envelope, and places the secrecy envelope in the return envelope. 25 P.S. §§ 3146.6(a), 3150.16(a). The voter then delivers the ballot, in the requisite envelopes, to their county elections board. *Id.* To be timely, the board must receive ballots by 8 p.m. on Election Day. App.58, App.80; 25 P.S. §§ 3146.6(c), 3150.16(c). *See also* Supp.App.129.

Upon receipt, every county board stamps or marks the return envelope as received to confirm timeliness, and enters this information into Pennsylvania's Statewide Uniform Registry of Electors ("SURE") system. App.58, 80; Supp.App.129. Timeliness is determined by when the board receives the ballot, not based on any handwritten date. App.80 (citing 25 P.S. §§ 3146.6(c), 3150.16(c)). *See also* Supp.App.129, 189, 653-655, 660-662, 712-714, 725-726, 835, 838-839.

## B. Litigation Ensues Over the Envelope-Date Requirement

This case involves the Election Code's instruction that a voter "shall ... fill out, date and sign the declaration printed on [the return] envelope." 25 P.S. §§ 3146.6(a), 3150.16(a). Attempts to exclude mail ballots for failure to comply with the envelope-dating requirement have generated extensive litigation since 2019 to reconcile a conflict between

enforcement of this envelope-dating instruction and the Civil Rights Act's Materiality Provision, 52 U.S.C. § 10101(a)(2)(B).

First, in 2020, the Supreme Court of Pennsylvania concluded that otherwise-valid mail ballots contained in signed return envelopes missing the handwritten date would be counted in that year's November election. *In re Canvass of Absentee and Mail-In Ballots*, 241 A.3d 1058, 1062 (Pa. 2020), *cert. denied*, *Trump for President, Inc. v. Degraffenreid*, 141 S. Ct. 1451 (Mem.) (2021). While the ruling was based on state law, a majority of the seven justices suggested that invalidating votes on this basis "could lead to a violation of federal law by asking the state to deny the right to vote for immaterial reasons." *Id.* at 1074 n.5; *id.* at 1089 n.54 (Wecht, J., concurring and dissenting).

In the November 2021 municipal elections, Lehigh County set aside 257 timely-received mail ballots because voters had omitted the handwritten envelope date. *Migliori*, 36 F.4th at 157. Voters sued, and a unanimous panel ordered Lehigh County to count the votes to comply with the Materiality Provision. *See Migliori*, 36 F.4th at 162-164; *see also id.* 164-66 (Matey, J., concurring). After the Supreme Court denied a stay application, every ballot was counted. *See Ritter v. Migliori*, 142 S. Ct.

7

1824 (Mem.) (2022). The election's certification mooted the controversy and the Court subsequently vacated *Migliori* as moot in a non-merits order. *See Ritter v. Migliori*, 143 S. Ct. 297 (Mem.) (2022).[3]

The issue re-emerged in the 2022 primary. In twin decisions, the Commonwealth Court held that undated mail ballots must count because the date "does not relate to the timeliness of the ballot or the qualification of the elector." *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998, at *28 (Pa. Commw. Aug. 19, 2022); *McCormick for U.S. Senate v. Chapman*, 2022 WL 2900112, at *9-15 (Pa. Commw. June 2, 2022).

Following this authority, for the 2022 general election the Secretary of the Commonwealth advised counties to count valid and timely-received mail ballots notwithstanding any error or omission regarding the date. App.59; *see also* Supp.App.130, 645-646, 707-708, 781-784, 826-828, 887-891. But on October 16, 2022, immediately after the *Migliori* mootness vacatur, and with voting already underway, a group including GOP-Intervenors here brought a King's Bench petition in the Supreme Court of Pennsylvania, seeking an election-eve order excluding mail ballots

---

[3] *Migliori* remains "persuasive" authority. *E.g.*, *Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993).

with no handwritten date or an "incorrect" handwritten date on the return envelope. App.59; *see also* Supp.App.130.

On November 1, 2022, that court, with only six members due to the chief justice's sudden death, issued an order directing that such mail ballots be segregated and not counted. Without a trial record or argument, the court ruled based on its interpretation of the Pennsylvania state statute. But the court was "evenly divided" 3-3 on whether the Materiality Provision prohibited disenfranchising voters based on the envelope-date requirement and issued "no order" on that question. *Ball v. Chapman*, 289 A.3d 1, 28 (Pa. 2023); *Id.* at 34-35 (Dougherty, J., concurring in part) ("federal law issue" left "unresolved"). *See* App.59; *see also* Supp.App.927-928.

On November 5, the court issued a supplemental order defining "incorrectly dated outer envelopes" as mail-ballot envelopes "with dates that fall outside the date range of September 19, 2022 through November 8, 2022" and absentee-ballot envelopes "with dates that fall outside the date range of August 30, 2022 through November 8, 2022." App.60. Following *Ball*, the Secretary issued updated guidance directing counties to set aside mail ballots in envelopes without voter-written dates, or with

dates outside the "correct" range.  Supp.App.892-896.

Plaintiffs filed this federal-law action days later.

## C.    Thousands of Pennsylvanians Are Disenfranchised in the 2022 General Election

In the 2022 general election, county boards refused to count at least 10,500 timely-received mail ballots based on missing or purportedly "incorrect" handwritten dates on the outer return envelope.  App.60; *see also* Supp.App.158-170, 639-640, 705-706, 823-824, 840-845; Sealed.Supp.App.1002-1110 (lists of affected voters).  The affected voters are registered Democrats, Republicans, and Independents, ranging from ages 18 to 101.  Supp.App.174-180.  They hail from across the Commonwealth.  Supp.App.158-166.  Five are the individual voter plaintiffs-appellees in this case, who are workers and retirees in their 60s and 70s—a welder, an artist, a retired pharmacist—and all long-time Pennsylvania voters.  Supp.App.131-136, 854-871.

The county elections boards confirmed all these rejected voters' identities, registrations, and eligibility.  App.60-61; Supp.App.127-128, 172-173.  These voters filled out their ballots at the proper time, signed the envelope form, and returned their ballots by 8 p.m. on Election Day.  Supp.App.128-129, 166-170, 189.

10

The county boards undisputedly did not use the handwritten envelope date for any purpose related to determining or confirming a voter's age, citizenship, county or duration of residence, or incarceration status.[4]  App.60-61; *see also* Supp.App.180-186, 627-630, 698-701, 704, 779, 790-792, 815-817.  Nor did they use it to establish timely ballot receipt by 8 p.m. on Election Day.  App.80; *see also* Supp.App.186-187, 653-655, 712-714, 725-726, 770-772, 790, 834-839.  A voter whose mail ballot was timely received could *only* have signed the voter declaration form in between when their county board sent the mail-ballot packages and the Election-Day deadline. Supp.App.189, 200, 650-654, 656-657, 662-670, 712-720, 723-724, 797-798, 834-836, 845-846.  Ballots received by county boards *after* 8 p.m. on Election Day were not counted regardless of the handwritten envelope date.  App.80; *see also* Supp.App.190.

None of the county boards identified any fraud concerns regarding the mail ballots set aside due to a missing or "incorrect" envelope date.[5]

---

[4] Most counties admitted that they used the envelope date only to comply with *Ball*.  Supp.App.635-637, 701-703, 818, 821-822.

[5] GOP-Intervenors pointed to a single incident from the 2022 primary, in which one individual forged her deceased mother's signature on a mail-ballot envelope form.  App.79.  But an official from the county where the

Supp.App.173-174, 675. And no ballots of voters who died before Election Day were counted. Supp.App.192-193, 734-735, 819-820, 1195.

The envelope-date rule was enforced inconsistently and arbitrarily. Counties refused to count many ballots where voters wrote a correct envelope date. *E.g.*, Supp.App.207-208, 214-215, 849-850. Many refused to count ballots where the envelope date was correct but missing one term, such as "Oct. 25," App.84; Sealed.Supp.App.1161; *see also* Supp.App.198-199, 204, 205-207; Sealed.Supp.App.1146-1164, but others counted such ballots, App.84; *see also* Supp.App.199-200, 207. Counties also took varying approaches to dates that appeared to use the international format (*i.e.*, day/month/year). Supp.App.209-211, 658-659, 668-671, 716, 721-722, 846-848; Sealed.Supp.App.1118-1123.

Many counties *counted* ballots with necessarily "incorrect" envelope dates—*e.g.*, the handwritten date was before the county sent out the mail-ballot package, or after the elections board received it back from the voter—because the date written nevertheless fell within the range in

_____

incident took place admitted that the deceased voter had already been removed from the voter rolls before her ballot was received and that her vote would never have been counted regardless of the handwritten envelope date. *Id.*; *see also* Supp.App.729-731.

12

*Ball.* App.82; Supp.App.212-214, 647-649, 710-712, 830-833, 836. At least one county counted a ballot marked September 31—a date that *does not exist*. App.84; *see also* Supp.App.901-902. Counties also took inconsistent approaches to voters who mistakenly wrote their birthdates on the date line, with most refusing to do so. App.83; Supp.App.195, 674, 845-846, 900; *see also* Sealed.Supp.App.1184-1194 (birthdate examples).

Counties refused to count over 1,700 timely-received ballots with obviously unintentional slips of the pen, such as a voter writing "2021" or "2033" or "2202" instead of "2022" (Sealed.Supp.App.1177-1178, 1133-1142), or writing "10/111/2022" instead of "10/11/2022" (Sealed.Supp.App.1196), or just writing the wrong month (Sealed.Supp.App.1124-1132, 1165-1170). *See* App.83; Supp.App.193-197, 200-205. Yet county officials agreed it was a "factual impossibility" for a voter to have signed the mail-ballot envelope a year before the election, two centuries in the future, or on the day they were born. App.83; *see, e.g.*, Supp.App.193, 650-652, 671-674, 723-724, 840-846.

## D.    Disenfranchised Voters and Non-Partisan Groups Prevail in the District Court

In the days preceding the November 2022 election, Plaintiffs—individual voters and nonpartisan organizations dedicated to promoting

civic engagement—filed this lawsuit challenging the exclusion of voters'
ballots, naming the county boards and the Secretary of the
Commonwealth as defendants. Supp.App.1-20. Various Republican-
Party-affiliated entities ("GOP-Intervenors") intervened to defend the
disenfranchisement of Pennsylvania voters. ECF No. 27.

Plaintiffs successfully sought expedited discovery, although GOP-
Intervenors opposed. Supp.App.80; ECF No. 203, ECF No. 207. Forty
counties executed a stipulation whereby they "agree[d] to not contest . . .
the declaratory and injunctive relief requested by Plaintiffs in this
action." Supp.App.40-59. In the end, the discovery process, including
written discovery from virtually all 67 counties, yielded a comprehensive
factual record of the approval or rejection of mail ballots based on the
envelope-date requirement in the 2022 election. *See* Supp.App.126-220,
604-618.

Plaintiffs sought summary judgment. *See* Supp.App.94-125. On
November 21, the district court granted the motion. *See* App.13-89. On
the merits, the court concluded that the envelope date was "wholly
irrelevant." App.79. It was "irrelevant in determining when the ballot
was received" and that it was not used for "any purpose related to

determining a voter's age, citizenship, county or duration of residence, or felony status." App.80-81. The record was "replete" with "inconsistencies" in enforcement, highlighting "the irrelevance of any date written by the voter on the outer envelope." App.82-83.

The district court issued a declaration that the rejection of timely-submitted mail ballots based solely on the envelope-date requirement "violates the Materiality Provision of the Civil Rights Act." App.6; *see also* App.8-12. This declaration was not limited to any particular county.

The district court also ordered injunctive relief as to the Secretary and the three counties where the individual plaintiffs resided. App.6-7. It also dismissed 55 counties on standing grounds because the individual voter plaintiffs did not live in those counties, and the organizational plaintiffs had not established a diversion of resources in response to those counties' specific actions. App.5-6, 25-46.

### E. Marino Loses a 2023 Election for Township Supervisor

The district court's decision issued during the vote-counting process for the November 7, 2023 municipal election, which involved a few

statewide contests and many local elections.[6]  Several counties that had

not yet certified their local elections opened and counted the votes of mail-

ballot voters who had been disenfranchised based on the envelope-date

issue.  Supp.App.955.

As of November 21, Richard Marino, a Republican, was ahead by

four votes in the race for Township Supervisor in Montgomery County's

Towamencin Township, but with six mail ballots still unopened due to

the envelope-date issue.  App.143-144; Supp.App.941.  On November 22,

Montgomery County announced that, consistent with the district court's

order, it would count the affected mail ballots, including the six in

Towamencin.  Supp.App.937; *see also* App.143-144.

---

[6] Pennsylvania law contemplates that votes may take three weeks to be
computed and canvassed.  The official canvass of election results starts
at 9:00a.m. on the Friday after the election, 25 P.S. § 3154(a).  The county
must submit unofficial results by 5p.m. the following Tuesday.  25 P.S.
§ 3154(f).  But the county continues its canvass after that date.  *See* 25
Pa. C.S.A. § 3511.  Provisional ballots are adjudicated within seven days,
25 P.S. § 3050(a.4)(4), but, if any of those ballots are challenged, a hearing
must occur within seven days.  Whenever the computation and canvass
is finished, results are conditionally certified for five days.  25 P.S.
§ 3154(a).  Unless a petition for recount or an appeal of a county board
decision has been timely filed, at the expiration of five days, the results
are finally certified.  25 P.S. §3154(f).

Despite that announcement, Marino took no action in state court, where a timely-filed appeal of the board's decision would have stayed certification of the race by operation of law.  *See* 25 P.S. § 3157.  Nor did he file any motion in the district court, even though the court advised the parties (including Marino's attorneys, who also represent his political party) that it would enter judgment by November 28 "if no further motions [we]re filed."  Supp.App.588.

On November 27, the Montgomery County Board opened and counted the six ballots, resulting in a 3,035-to-3,035 tie.  Supp.App.942.  The Board scheduled the statutorily prescribed drawing of lots for November 30.  Supp.App.948.  Again, neither Marino nor his political party took action in any court.  Nor did Marino seek a recount within the five-day window following the completion of counting (or thereafter).  *See* 25 P.S. § 3154(e).

On November 30, Marino lost the drawing.  Supp.App.943-944.

On December 4, the next week, Marino filed an election contest in the Court of Common Pleas in a belated challenge to the November 22

17

decision to count the affected mail ballots.[7]  App.152.   Marino

acknowledged his tardiness, styling his motion "*nunc pro tunc.*"  *Id.*  The

court dismissed the lawsuit.  App.197.  In its written opinion, the court

concluded that Marino's petition "was untimely filed" and "should be

denied on that basis."  Supp.App.957-958.

With no stay in effect, no recount requested, and the five-day

waiting period complete, Montgomery County certified the election on

December 4 and thereafter mailed certificates of election to the winners.

Supp.App.950-951.

Marino appealed the denial of his belated state-court appeal and

eventually sought temporary relief.   On December 29, the

Commonwealth Court denied Marino's motion for relief because, among

other reasons, his challenge was untimely.  SuppApp.975-985.

On January 2, 2024, Marino's opponent was sworn into office.

---

[7] Marino sought intervention in the district court on Friday, December 1, after judgment had entered, his state-court deadlines had lapsed, and he had lost the drawing. ECF No. 351; ECF No. 361. Marino's subsequent intervention motion in this Court was granted subject to briefing regarding jurisdiction. *See infra* 58-59.

## STANDARD OF REVIEW AND SUMMARY OF ARGUMENT

**I.**     On *de novo* review, *e.g.*, *DIRECTV Inc. v. Seijas*, 508 F.3d 123, 125 (3d Cir. 2007), this Court should affirm.  The undisputed facts align perfectly with the Materiality Provision's plain text.  In 2022, thousands of Pennsylvania voters were:

•     "den[ied] the right ... to vote" (*i.e.*, their ballots were not "counted and included in the appropriate totals of votes cast");

•     "because of an error or omission" (*i.e.,* omitting or incorrectly inputting the handwritten date);

•     on a "record or paper" related to an "act requisite to voting" (*i.e.*, the paper form printed on the mail ballot return envelope, which the counties required voters to complete to have their ballots counted);

•     that was "not material" to whether the voter "is qualified under State law to vote in [the] election" or whether the mail ballot was timely received (because all parties concede that the handwritten envelope date has no bearing at all on either).

52 U.S.C. § 10101(a)(2)(B), (a)(3)(A), (e).  See *infra* 22-34.  There may be close cases in applying the Materiality Provision, but here the utter immateriality of the handwritten envelope-date is "fairly obvious." *Vote.Org v. Callanen*, --- F.3d ----, 2023 WL 8664636, at *13 (5th Cir. Dec. 15, 2023).

GOP-Intervenors cannot evade plain text and a record full of concessions.  They argue that the statute only applies to voter

registration, but the text says otherwise, and the interpretive canons on which they rely, like *ejusdem generis*, cannot create ambiguity where none exists. See *infra* 34-44. They oppose a plain-text reading on policy grounds, claiming that federalism itself is at stake, but cannot point to any commonsense election rule that the Materiality Provision would threaten, only immaterial mail-ballot paperwork requirements that needlessly disenfranchise voters. See *infra* 44-47. Their constitutional avoidance argument fails because there is nothing to avoid. See *infra* 47-51.

**II.** Plaintiffs have a right of action to contest mass disenfranchisement. The statute guarantees "the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). GOP-Intervenors do not contest that this crystal-clear guarantee of federal rights is presumptively enforceable under 42 U.S.C. § 1983. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-284 (2002). Nor can they rebut the presumption. Statutory text, context, and legislative history all confirm Congress expressly contemplated private enforcement. See *infra* 51-57.

**III.** GOP-Intervenors' arguments about the 2023 municipal election are irrelevant because that election is over, which is why local

candidate Marino should be dismissed from this appeal. The state courts rejected Marino's election lawsuit as untimely. His opponent has been sworn in. His claims are moot, just like the losing candidate in *Migliori* after the Supreme Court's stay denial. See *infra* 58-59.

Nor do GOP-Intervenors have any live argument regarding the 2023 election, despite their invocation of *Purcell*. This is a merits appeal, not a stay motion. GOP-Intervenors are not election administrators. And there is nothing remotely infeasible about counting timely-received mail ballots despite a meaningless paperwork mistake. See *infra* 59-61.

**IV.** The district court's dismissal of some counties on standing grounds bears no resemblance to *Bush v. Gore*. It does not require different counties to treat votes differently. In fact, two-thirds of counties are already either bound by the district court's order or subject to a court-ordered stipulation to follow it, and the rest should comply voluntarily going forward. They certainly aren't required to do otherwise by the Pennsylvania Supreme Court's *Ball v. Chapman* decision, which expressly left any questions federal law questions "unresolved." *E.g.*, 289 A.3d at 34-35 (Pa. 2022) (Dougherty, J.). And even if GOP-Intervenors' surmise of disuniformity had some real-world basis, this Court's decision

will bring complete uniformity for 2024, by setting precedent that will be enforceable in federal courts across the Commonwealth.  See *infra* 61-65.

## ARGUMENT

## I.    DISENFRANCHISING VOTERS BECAUSE OF THE ENVELOPE-DATE RULE VIOLATES FEDERAL LAW

### A.    The Materiality Provision Forbids Disenfranchising Voters for Trivial Mistakes on Voting-Related Paperwork

The Materiality Provision prohibits state actors from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).  The statute defines the word "vote" broadly, as "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast."  *Id.* § 10101(a)(3)(A), (e).

In plain terms, the Materiality Provision applies where a state actor refuses to count a person's ballot based on a minor mistake on

required, voting-related paperwork, if that mistake is unrelated to ascertaining a voter's qualifications to vote in the election at hand. *Id.* at (a)(2)(B); *see also, e.g.*, *Migliori*, 36 F.4th at 162, 164; *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008); *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003).

While the law's immediate aim addressed Jim-Crow disenfranchisement, *see infra* 37-38, 42, 50-51, Congress crafted the provision as a broader prophylactic against unfair disenfranchisement based on trivial paperwork mistakes, the better to protect the fundamental right to vote for all.[8]  *See Browning*, 522 F.3d at 1173 (explaining that, "in combating specific evils," Congress may "choose a broader remedy").

Accordingly, courts have repeatedly held that denying the right to vote for failure to correctly complete some irrelevant paperwork requirement violates the Materiality Provision, across various contexts. For example, in *Ford v. Tennessee Senate*, the court held that in-person voters' ballots could not be set aside because they had not met an

---

[8] *See also Vote.Org v. Callanen*, --- F.3d ---- 2023 WL 8664636, at *14 (5th Cir. Dec. 15, 2023) ("The provision was written in a somewhat over-inclusive form to capture well-disguised discrimination.").

unnecessary "technical requirement" to separately sign both a ballot application form and a poll book.  No. 06-CV-2031, 2006 WL 8435145, at *7, *10-11 (W.D. Tenn. Feb. 1, 2006).  After numerous states changed their voter registration forms following passage of the Help America Vote Act in 2002, courts resolved challenges to immaterial ID-matching and other requirements added to state voter registration forms.  *See, e.g.*, *Schwier*, 340 F.3d at 1294; *Wash. Ass'n of Churches v. Reed*, 492 F.Supp.2d 1264, 1266, 1271 (W.D. Wash. 2006).

And with the expansion of mail-ballot voting, courts have held that voters cannot be disenfranchised for immaterial mistakes on mail-ballot-related paperwork.  *See, e.g.*, *La Unión del Pueblo Entero v. Abbott*, No. 21-CV-0844, --- F.Supp.3d ----, 2023 WL 8263348, at *7 (W.D. Tex. Nov. 29, 2023) (requirement to write number that matches state database invalid); *In re Georgia Senate Bill 202*, No. 21-CV-01259, 2023 WL 5334582, at *8 (N.D. Ga. Aug. 18, 2023) (requirement to handwrite birth year likely invalid); *Martin v. Crittenden*, 347 F.Supp.3d 1302, 1308-09 (N.D. Ga. 2018) (similar); *see also League of Women Voters of Ark. v. Thurston*, No. 20-CV-05174, 2023 WL 6446015, at *16 (W.D. Ark. Sept. 29, 2023) (Materiality Provision applied to absentee ballot application

but challenged attestation requirement was material); *Org. for Black Struggle v. Ashcroft*, 493 F.Supp.3d 790, 803 (W.D. Mo. 2020) (similar).[9] This category of cases includes *Migliori*, where this Court concluded the Materiality Provision prohibits disenfranchising Pennsylvania voters based on the envelope-date requirement.  36 F.4th at 162-166.

### B.     The Materiality Provision Applies Here as a Matter of Plain Text

The undisputed facts in the record present a textbook violation of the Materiality Provision's plain terms.

### 1. Pennsylvania voters were denied the right to vote...

The Materiality Provision bars state actors from "deny[ing] the right of any individual to vote in any election."  52 U.S.C. § 10101(a)(2)(B).  Voting includes "all action necessary to make a vote effective including … casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast."  *Id.* at § 10101(a)(3)(A), (e).  So defined, the right to vote "by definition includes not only the registration and eligibility to vote, but also the right to have that vote

---

[9] Accordingly, there was no "widespread understanding" "[f]rom 1964 until 2022" that the Materiality Provision applied only to voter registration, GOP Br. 32-33; *see also id.* 1-2.

counted." *Ford*, 2006 WL 8435145, at *11; *see also, e.g.*, *Migliori*, 36 F.4th at 164 (excluding mail ballots due to omitted handwritten envelope dates is "denying [v]oters their right to vote"); *La Unión*, 2023 WL 8263348, at *22.

In 2022, county elections boards, acting under color of law, refused to "count[] and include[] in the appropriate totals of votes cast" at least ten thousand voters' ballots based on the envelope-date issue, including those of the individual voter plaintiffs. *See* Supp.App.158-170; *see also id.* 131-136. That is an actionable denial of the right to vote as the statute defines it.

### 2. … "because of an error or omission" on a "record or paper relating to … [an] act requisite to voting" …

The challenged refusal to count thousands of mail ballots was "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B).

There is no dispute that counties refused to count thousands of mail ballots in the 2022 election because the voters either did not include the handwritten date on the return envelope (an "omission") or wrote a date deemed incorrect for being outside the range in the *Ball* order (an

"error"). *See* Supp.App.158-170. Nor is there any dispute that this "error or omission" was "on" a "paper," namely the declaration form printed on the mail-ballot-return envelope. *See* Supp.App.129, 180. Indeed, the record contains numerous examples of these paper envelope forms, each stamped as timely-received but unopened and uncounted due to the handwritten date. *See* Sealed.Supp.App.1111-1201.

It is also undisputed that the handwritten date was required for voters' mail ballots to count in the 2022 election. *See* Supp.App.129, 158-166. In other words, handwriting an immaterial date on the envelope form was an "act requisite to voting" for those voters in the 2022 election. 52 U.S.C. § 10101(a)(2)(B); *see also Migliori*, 36 F.4th at 162 n.56; *La Unión*, 2023 WL 8263348, at *19; *Martin*, 347 F.Supp.3d at 1308-1309; *Thurston*, 2023 WL 6446015, at *16. The envelope form is a required piece of voting-related paperwork, covered by the statute.

### 3. ... that is "not material in determining whether such individual is qualified under State law to vote in such election."

The handwritten envelope date's immateriality is indisputable. Indeed, as the Fifth Circuit recently noted, the envelope date's

immateriality is "fairly obvious." *Vote.Org*, 2023 WL 8664636, at *13.[10]

In considering whether a particular error or omission is "material in determining whether such individual is qualified under State law to vote in such election," 52 U.S.C. § 10101(a)(2)(B), courts generally look to the qualifications to vote set forth in state law. *See Migliori*, 36 F.4th at 162-164; *La Unión*, 2023 WL 8263348, at *15; *Martin*, 347 F.Supp.3d at 1308-1309; *Reed*, 492 F.Supp.2d at 1270; *Schwier v. Cox*, 412 F.Supp.2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285; *see also Browning*, 522 F.3d at 1175 (issue is "whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant") (emphasis omitted).

In Pennsylvania, the "qualifications" to vote are age, U.S. citizenship, duration of residence in the district, and felony-incarceration

---

[10] GOP-Intervenors misplace reliance (at 18-19) on the non-precedential stay opinion in *Vote.Org*, 39 F.4th 297 (5th Cir. 2022), which was eclipsed by the subsequent merits panel opinion. The merits panel rejected the stay panel's views on multiple legal issues. *See* 2023 WL 8664636, at *6-10 (private right of action); *id.* at *18-19 (racial discrimination requirement). That stay opinion, and the one in *U.S. v. Paxton* on which GOP-Intervenors also rely (at 6, 26, 32, 40), should be disregarded; as *Vote.Org* shows, they are "essentially written in sand with no precedential value." *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 244 (5th Cir. 2020) (Higginbotham, J., concurring).

status.  Supp.App.127; *see* 25 Pa. C.S.A. § 1301(a); *Migliori*, 36 F.4th at 163-164.  All parties conceded below that the handwritten envelope date bears no relationship to any of these.  Supp.App.70-71, 180-186, 627-631, 699-701, 704, 814-817.  A voter's qualifications are confirmed by their county board of elections when they register and when they apply for a mail ballot.  Supp.App.127-128; *see Migliori*, 36 F.4th at 163-164; *La Unión*, 2023 WL 8263348, at *25; *Martin*, 347 F.Supp.3d at 1309.

The handwritten envelope date also has nothing to do with "ensuring ballots are timely cast."  GOP Br. 39.[11]  Again, all parties conceded this point.  The thousands of voters whose ballots were excluded necessarily completed their mail ballots during the proper period, which is "any time" prior to 8 p.m. on Election Day.  Supp.App.128-129, 200; 25 P.S. §§ 3146.6(a), 3150.16(a).  Their ballots were all received by then, and were thus timely, *regardless of any date written on the return envelope.* Supp.App.129, 186-189; 25 P.S. §§ 3146.6(c), 3150.16(c).  Elections boards

---

[11] Refusal to count a voter's mail ballot because it was not timely remitted does not violate the Materiality Provision because that is not an error or omission "on any record or paper."  GOP-Intervenors' repeated reliance on *Friedman v. Snipes* (at 8, 18, 32) is thus misplaced; that case involved the *deadline* to submit absentee ballots, not any paperwork error on voting-related paperwork.  345 F.Supp.2d 1356, 1371-72 (S.D. Fla. 2004).

independently time-stamped the mail-ballot envelopes to confirm their timeliness. Supp.App.129. These concessions demonstrate that "backdating" the envelope could *never* render an untimely-received ballot timely. Supp.App.189, 200, 654-655. *Accord Migliori*, 36 F.4th at 164 (stamping envelopes renders handwritten date "superfluous and meaningless.").

Nor does the handwritten envelope date perform any other function that might render it "material" under some more limited construction of that term. GOP-Intervenors' attempts to suggest one (at 46-47) are waived, wholly unsupported, and contrary to Pennsylvania law.

For instance, there was neither argument nor evidence adduced below that a handwritten envelope date plays some "ritual function." GOP Br. 46. Nor was there any evidence or even suggestion that the handwritten date has any bearing on whether a voter is "actually who they say they are." *Vote.Org*, 2023 WL 8664636, at *19 (cited in GOP Br. 46-47). The law and the undisputed record are conclusively to the contrary. County elections boards "ascertain[ed]" voters' qualifications when they applied for a mail ballot. 25 P.S. §§ 3146.2b, 3150.12b; Supp.App.127-128. The thousands of voters who were disenfranchised in

2022 were required to sign, and did sign, the declaration form attesting to their identities and stating, "I am qualified" to vote. *See, e.g.*, Supp.App.167-170; 25 P.S. § 3150.14 (envelope form contains "a statement of the elector's qualifications"); *see also, e.g.*, Sealed.Supp.App.1111-1201. Potential criminal penalties for any false attestation attached when the voters "sign[ed]" the form, regardless of the date. 25 P.S. § 3553.[12]

Nor does the handwritten envelope date "establish[] a point in time against which to measure the elector's eligibility to cast the ballot," GOP Br. 46 (quoting *In re Canvass*, 241 A.3d at 1090 (opinion of Dougherty, J.)). There was (again) neither evidence nor argument below that any county used the envelope date in that way. Nor could there be, because the relevant date for determining a voter's eligibility is Election Day, *not* whatever date they signed the envelope. *See* Pa. Const. art. VIII, § 1; 25 P.S. §§ 1301(a), 2811.

---

[12] A missing or incorrect date commonly does not deprive a document of its legal effect. For example, "the absence of a date [on declarations under 28 U.S.C. 1746] does not render them invalid if extrinsic evidence could demonstrate the period when the document was signed." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475-76 (6th Cir. 2002).

GOP-Intervenors' repeated allusions to vague "fraud" prevention purposes (at 2, 31-32, 39, 45, 46) are baseless. It was conceded below that there were no fraud concerns with any of the ballots set aside in 2022. Supp.App.173-174. Voters who die before Election Day are automatically removed from the voter rolls and their ballots are not counted, *regardless of any handwritten envelope date*. Supp.App.192-193, 727-731. Even if the Materiality Provision included some "fraud prevention" exception—and none appears in the statutory text, *Migliori*, 36 F.4th at 163; *accord La Unión*, 2023 WL 8263348, at *9; *Reed*, 492 F.Supp.2d at 1266, 1270—GOP-Intervenors offer no concrete explanation for how the handwritten date at issue in *this* case might advance such purposes. *Cf. Vote.Org*, 2023 WL 8664636, at *13, *19-21 (wet-ink signature on registration form was material, but immateriality of Pennsylvania envelope-date rule was "fairly obvious").[13]

The counties' arbitrary and inconsistent application of the envelope-date requirement underscores the point.

---

[13] Relatedly, GOP-Intervenors' suggestion (at 48) that the envelope-date rule deserves deference as a legislative judgment is undercut by their complete failure to articulate any policy goal served by disenfranchising voters for failure to comply with it.

If the date mattered, county boards should not disenfranchise voters who wrote *correct* dates on the envelope form—yet numerous counties did just that. See *supra* 12. If the date mattered, county boards also should *not* count ballots where the date was necessarily *wrong*. Yet some counties did that too, accepting envelope dates from before the county began sending ballots to voters, Supp.App.169-170, 212-213, 830-833; dates later than the board of elections' own time-stamp, Supp.App.213, 903-904; and non-existent dates, like September 31, Supp.App.205, 901-902. See *supra* 12-13.

The date does not matter. The undisputed record instead supports the district court's conclusion that it is "wholly irrelevant," App.79.

## C.   GOP-Intervenors Misconstrue the Statute

Because the Materiality Provision's plain terms apply, the Court's job "is at an end." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020); *accord Newton v. Comm'r Soc. Sec.*, 983 F.3d 643, 649 (3d Cir. 2020). To evade applying plain statutory language to undisputed facts, GOP-Intervenors offer a hodge-podge of misapplied interpretive canons, a contorted rendition of congressional intent, and straw-man policy

33

arguments.  None of that can justify the violence that they would do to the text as Congress wrote it.  *Bostock*, 140 S. Ct. at 1749.

### 1. The Materiality Provision Is Not Limited to Voter Registration

GOP-Intervenors' argument that the Materiality Provision "refers only to voter registration." GOP Br. 20-21, is refuted by unambiguous statutory text.  *See Migliori*, 36 F.4th at 162 n.56;[14] *accord Common Cause v. Thomsen*, 574 F.Supp.3d 634, 636 (W.D. Wis. 2021) ("[T]he text of § 10101(a)(2)(B) isn't limited to race discrimination or voter registration.").[15]

---

[14] Contrary to GOP-Intervenors claim (at 44), their argument that the Materiality Provision only applies to voter registration was squarely presented in *Migliori*.  Appellees' Br., *Migliori v. Cohen*, No. 22-1449, Dkt. 49 at 46-49.  The fact that it was rejected in a footnote speaks to its inconsistency with the statute's text.  GOP-Intervenors also mischaracterize Judge Matey's concurrence (at 43-44).  Judge Matey did not fault Ritter's counsel for overlooking important arguments; he noted that the record contained fatal concessions *that are in this record, too*. *See*, *Migliori*, 36 F.4th at 165-166.

[15] In terms of case law, GOP-Intervenors rely (at 19-20) on (1) the non-precedential, superseded *Vote.Org* stay opinion, *see supra* n.10; (2) Justice Alito's non-precedential *dissent* in *Ritter*, 142 S. Ct. 1824; and (3) *Vote.Org* merits panel's acknowledgement, in a footnote and without endorsement, of the *Ritter* stay dissent, 2023 WL 8664636 at *12 n.7. They do not point to any precedential opinion adopting their misreading.

The statute prohibits denial of the right to vote based on immaterial errors or omissions "on any record or paper relating to any application, registration, *or other act requisite to voting*." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Limiting the statute's scope to records or papers relating to "registration" would render the broader phrase "or other act requisite to voting" nugatory. *See, e.g.*, *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998). GOP-Intervenors' reading also ignores the express definition of voting as including "all action necessary to make a vote effective including, but not limited to, registration …, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(a)(2)(B), (a)(3)(A), (e). That definition encompasses a paper form whose completion is required for a person to have their vote "counted and included in the appropriate totals of votes cast." *See supra* 26-27.

GOP-Intervenors' resort to the interpretive canon of *ejusdem generis* (at 20) is unavailing. This only helps to "ascertain[] the correct meaning of words when there is uncertainty." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588-589 (1980) (citation and quotation omitted). Where (as here) Congress has used general terms of clear application to

35

the subject at issue, *ejusdem generis* cannot limit the statute as written. *Id.*; *see also, e.g., Ali v. Fed. Bureau of Prisons,* 552 U.S. 214, 226-227 (2008) (courts should not "create ambiguity where the statute's text and structure suggest none"); *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 292-293 (3d Cir. 2013) ("[S]ometimes a catch-all is just a catch-all.").

This reading makes sense given Congress's repeated use of the term "any" (as in, "*any* record or paper relating to *any* application, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B) (emphasis added)). "Any" is "expansive" and "naturally" reads as "referring to all" acts requisite to voting. *United States v. Gonzales*, 520 U.S. 1, 5 (1997). Here, Congress twice deployed that word to describe the range of paper forms covered by the prohibition against disenfranchisement for immaterial errors. *See, e.g., Ali*, 552 U.S. at 219, 225 (rejecting application of *ejusdem generis* to phrase "or any other law enforcement officer").[16]

---

[16] Especially given GOP-Intervenors' insistence (at 20) that "registration" and "application" have the same meaning, the statute reads more like the "disjunctive" structure at issue in *Ali*, "with one specific and one general category," rather than a list of specific terms as in the typical application of *ejusdem generis*. 552 U.S. at 225.

Nor does legislative history demonstrate that Congress's language "means anything other than what it says." *Harrison*, 446 U.S. at 589. To be sure, voter registration was top of mind for Congress in enacting the Materiality Provision because registration was a key chokepoint used to prevent Black Americans from entering the political process. *E.g.*, H. Rep. No. 88-914 (1963), *reprinted* 1964 U.S.C.C.A.N. 2391, 2394, 2485-2487, 2491. But contrary to GOP-Intervenors' suggestion (at 22), Congress's "statutory aim" was not limited to voter registration.

Congress sought to protect not merely registrants, but "all persons *seeking to vote*" and did so "by prohibiting the disqualification of an individual because of immaterial errors or omissions in papers or acts relating *to such voting*." *Id.* at 2394, 2491 (emphasis added).[17] Crafting the Materiality Provision as a broader rule that protects "the right of any individual to vote in any election," 52 U.S.C. § 10101(a)(2)(B), served that goal. A rule protecting voter registration but allowing registered voters to be denied an effective vote, however, would *not* have accomplished

---

[17] *See also, e.g.*, 110 Cong. Rec. 6530 (1964) (Sen. Humphrey) (noting noting "technique[s] for denying . . . *the right to vote*," such as "ask[ing] questions that have nothing to do with the applicant's qualifications to vote." (emphasis added)).

"Congress' broader, well-documented aim of eradicating all manner of arbitrary and discriminatory denials of the right to vote," since new paperwork-based chokepoints would have quickly emerged. *La Unión*, 2023 WL 8263348, at *21.

The record in this case reflects that danger. One defending county official testified that, under the view GOP-Intervenors advance, a voter's mail ballot could permissibly be excluded for failure to comply with a requirement to list their exact age in days on the mail-ballot envelope. *See* Supp.App.642-643. Such "exact-age" paperwork requirements were widely used in the Jim Crow South, and Congress sought to eradicate them with the Materiality Provision. *E.g.*, *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995); *accord Schwier*, 340 F.3d at 1294. GOP-Intervenors ask this Court to hold that they can be revived and imposed on the mail-ballot envelope to disenfranchise voters.

In light of Congress's purpose to protect access to the ballot and not merely registration, statutory references to "registration" and "application" forms provide a "paradigmatic" example of the *type* of paperwork might that be used to disenfranchise voters based on trivial mistakes. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142,

38

164 (2012). That is not unusual: "Congress sometimes inserts 'technically unnecessary' examples along with a general description of those examples … to ensure the general term will be interpreted as capturing those examples." *EME Homer City*, 727 F.3d at 292-293 (citation omitted).[18]

GOP-Intervenors' attempts to twist the meaning of other statutory phrases are even less convincing. They claim (at 23-25) that the Materiality Provision *only* applies to a record or paper "used 'in determining' whether an individual is 'qualified' to vote."[19] But the statute says the opposite: The Materiality Provision prohibits vote denial based on trivial paperwork errors when those errors are "*not* material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see also,*

---

[18] Giving the catch-all phrase its full meaning would not render the words "registration" and "application" superfluous. GOP Br. 21. Those terms help clarify that the type of "act requisite to voting" to which the "record or paper" must relate is the completion of officially-required, voting-related paperwork.

[19] GOP-Intervenors wrongly suggest (at 25) that voter qualifications are determined exclusively during the initial voter registration process. But counties "ascertain" a voter's "qualifications" when they apply for a mail ballot. 25 P.S. § 3146.2b.

*e.g.*, *Browning*, 522 F.3d at 1173.  GOP-Intervenors' contrary reading would greenlight disenfranchisement for all manner of irrelevant mistakes on ancillary forms under the guise of "determin[ing] a ballot's validity," GOP Br. 25 (emphasis omitted).  *See La Unión*, 2023 WL 8263348, at *26.

Nor do neighboring statutory subsections support GOP-Intervenors' "qualification-determinations-only" construction (at 24-25).  Even if those separate provisions dealt exclusively with voter qualification determinations, that would only highlight the Materiality Provision's comparatively broader scope.  For instance, subsection 10101(a)(2)(A) prohibits the use of non-uniform practices to "determin[e] whether any individual is qualified under State law or laws to vote in any election."  By contrast, the Materiality Provision contains no such limitation; it prohibits "deny[ing] the right of any individual to vote in any election."  With such "differing language" come differences in meaning. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983).  And in any case, GOP-Intervenors' premise is wrong because subsections 10101(a)(2)(A) and (a)(2)(C) *have* been applied outside of the voter registration context.  *E.g.*, *Marks v. Stinson*, No. 93-CV-6157, 1994 WL

40

146113, at *34 (E.D. Pa. Apr. 26, 1994) (applying Section 10101(a)(2)(A) to "the delivery of Absentee Ballot Packages").

GOP-Intervenors misrepresent the text in claiming (at 24-25) that remedies available in suits brought under subsections 10101(c) and (e) of the statute somehow "reinforce[]" the supposed "qualification-and-registration focus of § 10101(a)." Those provisions allow the Attorney General to sue to prevent the deprivation of "any right or privilege secured by subsection (a) *or (b)*." 52 U.S.C. § 10101(c) (emphasis added for language omitted from GOP Br.). GOP-Intervenors agree (at 25) that subsection 10101(b) encompasses rights related to the "*act* of voting," and *not* just qualification determinations. The actual scope of the Attorney General's remit under Section 10101 refutes rather than advances GOP-Intervenors' argument.

Nor does the statutory term "right to vote" help GOP-Intervenors. They argue (at 26-27) that, because mail-ballot voting was uncommon in 1964, the term "right to vote" must be construed to exclude voting by mail. But that is not an argument about the meaning of the statutory *language*, which Congress expressly defined as including "all action necessary to make a vote effective," 52 U.S.C. § 10101(a)(3)(A), (e).

41

Rather, it proceeds from the supposition that, "because few in 1964 expected today's *result*, we should not dare to admit that it follows ineluctably from the statutory text." *Bostock*, 140 S. Ct. at 1750.

Statutory interpretation does not work that way.[20] With the Civil Rights Act and the Voting Rights Act, Congress enacted "major piece[s] of federal civil rights legislation," *id.* at 1753, designed to succeed where prior legislation had failed, and to stymie even not-yet-invented, "ingenious" forms of vote denial. *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966); *see, e.g.*, H.R. Rep. 88-914, 1964 U.S.C.C.A.N. 2391, 2489 (Rep. McCulloch) (prior civil rights laws were not "sufficient to end wholesale voter discrimination in many areas."); 110 Cong. Rec. 6714-6715 (1964) (Sen. Keating) (immaterial errors used to "circumvent the 1957 and 1960 acts"). Congress's decision to broadly define the right to vote in response to this problem "virtually guaranteed that unexpected applications would emerge over time." *Bostock*, 140 S. Ct. at 1753.

---

[20] GOP-Intervenors' reliance (at 26) on *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) for the proposition that the term "right to vote" should be interpreted "with reference to 'history'" conflates ordinary statutory interpretation with the legal test for determining a Second Amendment violation. They are different.

GOP-Intervenors are similarly wrong in their categorical argument (at 27-30, 41-43) that "mandatory ballot-casting rules do not deny anyone 'the right to vote' under the Materiality Provision." To be sure, the vast majority of "rules that regulate how eligible individuals receive and cast their ballots," GOP Br. 29, *are* outside the Materiality Provision's well-defined ambit. *See infra* 45-47. But practices that require a voter's ballot to be set aside and not counted based solely on a meaningless paperwork mistake come within it.[21] *See* 52 U.S.C. § 10101(a)(2)(B).

GOP-Intervenors' reliance (at 28-29) on cases holding that there is no constitutional right to vote by mail[22] ignores the *statutory* right at issue, which extends to having a ballot "counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(a)(2)(B), (a)(3)(A), (e).

---

[21] It is no response to say that such a voter has been subject to a "forfeiture of the right to vote, not the denial of that right." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting) (cited in GOP Br. 28-29). That logic would contravene the statute's protection for having a ballot "counted and included in the appropriate totals of votes cast," 52 U.S.C. § 10101(a)(2)(B), (a)(3)(A), (e) and would allow voters to be disenfranchised for trivial paperwork mistakes like failing to write their age in months and days on the mail-ballot envelope. *See supra* 38.

[22] For example, *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802 (1969) involved prisoners claiming constitutional right "right to receive absentee ballots" where, unlike here, state law provided none. *Id.* at 807.

Where mail voting is made available, state actors cannot violate federal law in its administration. *E.g.*, *La Unión*, 2023 WL 8263348, at *22-23.

Nor does it matter whether voters are wholesale disqualified or merely denied the right to vote in a single election. GOP Br. 29-30. Both are impermissible under the statute's plain terms. *See Migliori*, 36 F.4th at 163-164. Indeed, the statutory text reinforces this point by repeatedly referring to the right to vote "in any election" and "in such election." 52 U.S.C. § 10101(a)(2)(B). It is irrelevant whether a voter whose ballot has been discarded remains "qualified and eligible" to vote in some *future* election, GOP Br. 30. That voter, like the thousands of Pennsylvanians whose ballots were discarded in 2022, has been unlawfully disenfranchised.

### 2. The Materiality Provision's Scope Is Clear and Modest

GOP-Intervenors' "federalism canon" argument is built on the false premise that reading the Materiality Provision according to its plain meaning will somehow "jeopardize many longstanding ballot-casting rules nationwide long assumed to be legitimate." GOP Br. 30; *see id.* 33-34. This argument ignores the Materiality Provision's self-limiting scope,

which extends only and specifically to denials of the right to vote due to immaterial errors on voting-related paperwork.

Applying the Materiality Provision as written will not affect States' capacity to write and enforce "reasonable," "commonsense" election rules (GOP Br. 17, 33). Regulations involving the time and place of voting are categorically not covered.[23] Similarly, *none* of the rules from the inapposite cases GOP-Intervenors cite—like party registration requirements, candidate filing deadlines, the availability of "fusion voting," or mail-ballot-collection practices—involves immaterial *paperwork* errors.[24]

---

[23] *E.g., DCCC v. Kosinski*, 614 F.Supp.3d 20, 55 (S.D.N.Y. 2022) (Materiality Provision inapplicable to failure to vote at the right polling place); *Snipes*, 345 F.Supp.2d at 1371-72; *see also Ind. Democratic Party v. Rokita*, 458 F.Supp.2d 775, 841 (S.D. Ind. 2006) (failure to present identification "is by definition not an 'error or omission on any record or paper'"), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

[24] *See* GOP Br. 28-29 (citing *Rosario v. Rockefeller*, 410 U.S. 752, 754, *reh'g denied*, 411 U.S. 959 (1973) (party registration deadline); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997) (fusion voting); *Brnovich v. DNC*, 141 S. Ct. 2321, 2330 (2021) (in-precinct voting requirement and mail ballot collection); *DNC v. Wis. State Legis.*, 141 S. Ct. 28 (Mem.) (2020) (absentee ballot deadlines)) and 30-31 (citing *Clingman v. Beaver*, 544 U.S. 581, 587-588 (2005) (semi-closed primary law); *Anderson v. Celebrezze*, 460 U.S. 780, 790-792 (1983) (early

Even the few "paper-based" rules GOP-Intervenors cobble together (at 32-24, citing *Ball*, 289 A.3d at 38-39 (Brobson, J., dissenting)) fall outside the plain statutory language.  The Materiality Provision would not apply to a requirement that a mail ballot be placed in a secrecy envelope (GOP Br. 34), because that is not "an error or omission *on* any record or paper," 52 U.S.C. § 10101(a)(2)(B) (emphasis added).  It would not apply to prohibitions on overvoting (*i.e.*, "voting for more candidates than there are offices," GOP Br. 34), because that error is not on some "paper" that is made "requisite to voting," but on the ballot itself.[25]  And it would not apply to the failure to *sign* the form on the mail ballot return envelope or some other similar form (GOP Br. 33-34) because unlike the date, the voter's signature—at least if it is on a form affirming their qualifications or identity—*is* material to determining that they are qualified to vote.  *Cf. Vote.Org*, 2023 WL 8664636, at *21 ("Signing an application is related to voting qualifications.").  GOP-Intervenors'

_____

candidate filing deadline); *Smiley v. Holm*, 285 U.S. 355, 364-366 (1932) (congressional districting)).

[25] The ballot is different from an ancillary required form like the mail-ballot-envelope form declaration, as Pennsylvania law illustrates by calling the ballot a "ballot," and the declaration a "declaration." 25 P.S. §§ 3146.6(a), 3150.16(a).

suggestion (at 2) that "*all* paper-based requirements for voting by mail" are at stake is simply false.

Nor does the Materiality Provision "prohibit[]" states from *requesting* even immaterial information on election-related paperwork, contrary to GOP-Intervenors' claim (at 17-18). Merely requesting such information does not "deny the right of any individual to vote." 52 U.S.C. § 10101(a)(2)(B). The Materiality Provision prohibits *discarding voters' ballots* because of minor mistakes in responding to such requests.

The statute as written thus presents a precise and limited intervention by Congress into the States' administration of elections to prohibit a defined set of disenfranchising practices by state actors—not any significant or unheralded alteration of the federal-state balance.[26]

### 3. Congress's Authority to Enact the Materiality Provision Is Beyond Doubt

GOP-Intervenors' invocation (at 35-40) of constitutional avoidance is meritless. There is nothing to avoid.

---

[26] GOP-Intervenors' "clear statement" cases—stay opinions involving emergency extensions of federal agency authority in response to the COVID-19 pandemic—are inapposite. GOP Br. 34-35 (citing *NFIB v. OSHA*, 595 U.S. 109 (2022) and *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021)).

To start, GOP-Intervenors wrongly suggest (at 37) that the Reconstruction Amendments were the only source of authority for the Materiality Provision. When Congress enacted the Materiality Provision in 1964, it relied largely (although not exclusively) on the Elections Clause's delegation of "broad authority to Congress to control the substantive and not merely the mechanical aspects of elections." *See, e.g.*, H.R. Rep. No. 88-914 (1963), *reprinted* 1964 U.S.C.C.A.N. 2391, 2492 (Rep. McCulloch). Indeed, as enacted in 1964, the Materiality Provision applied *only* to federal elections; Congress then expanded it with the 1965 Voting Rights Act to encompass state elections as well. *See* Pub. L. No. 88-352, § 101, 78 Stat. 241, 241 (1964); Pub. L. 89-110, § 15(a), 79 Stat. 437, 444 (1965).[27]

The Elections Clause provides that "[t]he Times, Places and Manner of holding" federal elections "shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. Congress's

---

[27] *See also, e.g.*, *Civil Rights Act of 1964: Hearings on H.R. 7152*, 88th Cong. 2653-2654 (1963) (Oct. 15, 1963 Stmt. of AG Kennedy) (discussing limitation of the 1964 Act to federal elections).

"comprehensive" power to regulate federal elections pursuant to the Elections Clause "'is paramount, and may be exercised at any time, and to any extent which it deems expedient.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).

The Elections Clause on its own supplies sufficient authority for Congress to prohibit disenfranchisement of voters for immaterial paperwork mistakes in elections where federal candidates are on the ballot. *Id.* at 8-9. That includes the 2022 election which gave rise to this lawsuit, and the upcoming 2024 election on which GOP-Intervenors premise their continued standing on appeal. *See* GOP Br. 60, 61. For present purposes, that ends the discussion on the avoidance canon.

And Congress also had authority to enact the Materiality Provision under the Reconstruction Amendments. Those Amendments authorize Congress specifically to enact prophylactic legislation to protect the right to vote. *E.g.*, *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727-28 (2003). Indeed, the voting rights measures in the 1964 Civil Rights Act and 1965 Voting Rights Act, which include the Materiality Provision, are paradigmatic examples of valid remedial legislation, as the Supreme

49

Court explained in *City of Boerne v. Flores*. 521 U.S. 507, 518 (1997) (noting the validity of Congress's "suspension of literacy tests and similar voting requirements" as well as "other measures protecting voting rights" and collecting cases); *see also, e.g.*, *Hibbs*, 538 U.S. at 738 (VRA was a "valid exercise[] of Congress' § 5 power"); *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 (2001) (similar).

GOP-Intervenors' crabbed rendition of a *City of Boerne* "congruence and proportionality" analysis (at 36-38) is not what the law requires. 521 U.S. at 519. And their suggestion (at 38) that Congress was unconcerned with ensuring the franchise for Black Americans "outside the registration process" (GOP Br. 38) is nonsensical. Congress in 1964 and 1965 sought to ensure the right to *vote*, not just to register—and it had a massive record before it that States and localities persistently used facially neutral rules like immaterial paperwork requirements to exclude Black Americans. *E.g.*, *supra* 37-38. Congress's remedy accordingly targeted that mechanism. "[P]rohibit[ing] those acting under color of law from using immaterial omissions, which were historically used to prevent racial minorities from voting, from blocking any individual's ability to

vote … is a congruent and proportional exercise of congressional power." *Vote.Org*, 2023 WL 8664636, at *19; *see Boerne*, 521 U.S. at 519-520.[28]

GOP-Intervenors do not really contest this.  Rather, they again attack (at 38-39) a fictitious statute that they claim would prohibit all manner of state laws aimed at "preventing fraud or ensuring ballots are timely cast."  The Materiality Provision is much more modest in its sweep.  But it does apply here—and it flatly prohibits the disenfranchisement of thousands of Pennsylvania voters for a "wholly irrelevant" paperwork error.  App.79.

## II. THE MATERIALITY PROVISION IS PRIVATELY ENFORCEABLE

GOP-Intervenors' private-right-of-action argument (at 49-53) fails here just as it did in *Migliori* and in the Fifth Circuit.  *See Vote.Org.*, 2023 WL 8664636, at *6-10; *Migliori*, 36 F.4th at 159-162; *accord Schwier*, 340 F.3d at 1294-1297.

---

[28] GOP-Intervenors' suggestion that the Materiality Provision might be limited only to racially-motivated disenfranchisement (at 39-40) rests primarily on the superseded *Vote.Org* stay opinion, whose views on this point the merits panel rejected.  *Vote.Org*, 2023 WL 8664636, at *19. *Migliori* correctly rejected it too, as inconsistent with the race-neutral statutory text.  36 F.4th at 162 n.56.

Plaintiffs brought this action pursuant to 42 U.S.C. § 1983, which provides an enforceable remedy for the deprivation of any right "secured by the Constitution and laws." *Id.*; *see* Supp.App.3, 5, 33. Where a plaintiff demonstrates that Congress "intended to create a federal right," "the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 283-284 (emphasis omitted); *accord Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183-184 (2023).

Once established, this presumption is rarely overcome. *E.g., Migliori*, 36 F.4th at 159-160 n.31 (citing *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994)). To do so, a defendant must show that Congress implicitly foreclosed Section 1983 relief by creating an incompatible private remedy scheme. *E.g., Gonzaga*, 536 U.S. at 284-285 n.4. The presence of a parallel *public* remedy (*i.e.*, government enforcement) is insufficient. Rather, "a more restrictive *private* remedy" is required because restrictions on *private* remedies (such as special filing or exhaustion requirements, or limits on damages) are inconsistent with the relief available under Section 1983. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254, 256 (2009) (emphasis added). "'The crucial consideration' is whether 'Congress intended a statute's remedial scheme

to be *the exclusive avenue* through which a plaintiff may assert [his] claims.'" *Talevski*, 599 U.S. at 187 (citation omitted).

GOP-Intervenors do not contest that Congress intended to create a federal right. Nor could they, given the Materiality Provision's crystal-clear language guaranteeing "the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). Indeed, the Materiality Provision's mandatory language (*i.e.*, "No person ... shall deny"), and clear focus on individual rights (*i.e.*, "the right of any individual to vote") is "clearly analogous to the right-creating language cited ... in *Gonzaga*." *Schwier*, 340 F.3d at 1296; *see Gonzaga*, 536 U.S. at 284 & n.3.

Nor can they rebut the resulting presumption of enforceability. There is no narrower private remedy scheme in the statute. *See, e.g.*, *Vote.Org.*, 2023 WL 8664636, at *6-10. *Compare City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005).[29] To the contrary, subsection 10101(d) specifically contemplates federal court "proceedings pursuant to

---

[29] Thus, in *Rancho Palos Verdes*, and, unlike here, Congress expressly provided for a narrow set of *private* remedies in the Telecommunications Act—including injunctive relief but not damages as with Section 1983. 544 U.S. at 122-124. By expressly providing for a narrower *private* remedy, Congress had indicated it "did not intend to leave open a more expansive remedy under §1983." *Id.* at 121.

this section" brought by a "party aggrieved" (*e.g.*, a disenfranchised voter) and specifically precludes the imposition of exhaustion requirements that might otherwise constrain full-fledged Section 1983 actions.  52 U.S.C. § 10101(d); *see Migliori*, 36 F.4th at 160.  The statutory history makes Congress's intentions plain: The provisions in Section 10101(d) were added in 1957 specifically to *preserve* a longstanding right to enforce Section 10101's predecessor statute via Section 1983, notwithstanding the addition of parallel Attorney General enforcement power, and to abrogate exhaustion requirements that had been recently imposed on private litigants by federal courts.[30]  *See* H.R. Rep. No. 85-291 (1957),

---

[30] Section 10101 (formerly 42 U.S.C. § 1971) was originally part of the Reconstruction-Era civil rights laws, which included a provision virtually identical to current Section 10101(a)(1).  *See* Act of May 31, 1870, ch. 114, 16 Stat. 140, 140-42 (1870).  Those laws were always enforced by private parties under Section 1983.  *See Schwier*, 340 F.3d at 1295.  Such private actions included, for example, *Smith v. Allwright*, 321 U.S. 649 (1944), in which the Supreme Court struck down white primary laws.  *Id.* at 658; *see also, e.g.*, *Chapman v. King*, 154 F.2d 460, 464 (5th Cir. 1946); *Rice v. Elmore*, 165 F.2d 387, 392 (4th Cir. 1947).

   In 1957, present-day Section 10101 took shape. Congress codified the original statute from the 1870 Act in what is now subsection 10101(a), added new voting protections and new public enforcement authority, and confirmed federal jurisdiction over actions "pursuant to this section" by a "party aggrieved."  *See* 52 U.S.C. § 10101(c), (d); Pub. L. No. 85-315, § 131, 71 Stat. 637 (1957).  In 1964, it added the Materiality Provision,

*reprinted* 1957 U.S.C.C.A.N. 1966, 1975-1977. The Attorney General, whose office drafted the 1957 Act, expressly assured Congress that, notwithstanding new governmental enforcement, "private people will retain the right they have now to sue in their own name" to enforce the rights contained in Section 10101. *See Civil Rights Act of 1957: Hearings on S. 83*, 85th Cong. 67-73 (1957) (Feb. 15 Stmt. of AG Brownell).

GOP-Intervenors' reliance (at 51-52) on the Attorney General's parallel public remedy scheme is misplaced. In particular, subsection 10101(c), added as part of the 1957 Act, provided the Attorney General with new enforcement power, and subsections 10101(e) and 10101(g) then set forth special remedies and procedures available in Attorney General actions. Under this parallel public remedy scheme, the Attorney General may bring a specialized pattern-or-practice claim, and if it succeeds, federal courts and voting referees working with them then supplant recalcitrant local election officials, essentially taking over the

---

alongside the original provision from the 1870 Act. Pub. L. No. 88-352, § 101, 78 Stat. 241 (1964). Congress thus constructed Section 10101 with a longstanding, privately-enforced voting rights guarantee as its keystone. *E.g.*, *Russello*, 464 U.S. at 23 (statutory "evolution" informs meaning).

workings of the election system. 52 U.S.C. § 10101(e). GOP-Intervenors wrongly characterize this as a private remedy scheme because voters may make an "application" for a summary determination of their qualification once federal superintendents have been put in place (basically, re-registering to vote under the new system). *Id.* But that is not a private remedy scheme; it is just one aspect of a systemic *public* remedy, available only to the Attorney General. *Id.*

The text confirms the point. The takeover remedy scheme to which GOP-Intervenors allude is available only in a "proceeding instituted pursuant to subsection (c)," *i.e.*, one brought by the Attorney General. 52 U.S.C. § 10101(e); *see also id.* § 10101(g) (setting forth procedures for "proceeding[s] instituted by the United States," including pattern-or-practice cases). If Congress had intended such proceedings to be the only means of enforcing the statute, it could have referred simply to proceedings "pursuant to this section." It did not. Instead, it used *that* broader language in subsection 10101(d), to describe the "proceedings pursuant to this section" (*i.e.*, including pursuant to the Materiality Provision in subsection 10101(a)) that can be brought by a private "party aggrieved." *Id.*

This textual distinction was intentional and consistent with Congress's stated aim of preserving longstanding private enforcement via Section 1983 while "supplementing existing law" with powerful new public remedies.    H.R. Rep. No. 85-291 (1957), *reprinted* 1957 U.S.C.C.A.N. 1966, 1976-1977.[31]    Congress plainly meant the systemic remedies available in Attorney General actions "to coexist with an alternative remedy available in a § 1983 action." *Fitzgerald*, 555 U.S. at 252 (citation and quotations omitted); *accord Talevski*, 599 U.S. at 187.[32]

---

[31] *Schweier*, *Migliori*, and *Vote.Org* each applied *Gonzaga* and arrived at the same conclusion regarding the Materiality Provision's enforceability. In contrast, the Sixth Circuit reached a contrary conclusion in a case decided prior to *Gonzaga*, *McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000).    The court reasoned in a single sentence that the Materiality Provision "is enforceable by the Attorney General, not by private citizens." *Id.* at 756. Another Sixth Circuit opinion, on which GOP-Intervenors now rely (at 50, 53) reaffirmed that conclusion only because the earlier *McKay* decision "binds this panel." *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 629-30 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2265 (2017).

[32] GOP-Intervenors separately argue (at 49-51) that plaintiffs do not have an *implied* private right of action under *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).    But *Sandoval* is irrelevant; whether a statutory violation may be enforced *via Section 1983* "is a different inquiry." *Gonzaga*, 536 U.S. at 283-284; *see also Migliori*, 36 F.4th at 159, 161.  Nor would it matter if *Sandoval*'s implied-right-of-action test did apply because, as discussed, the statutory text and the legislative history demonstrate that Congress expressly contemplated private enforcement of the rights guaranteed in Section 10101.  *See supra* 53-57.

## III.   ALL CLAIMS WITH RESPECT TO THE RESULTS OF THE 2023 ELECTIONS ARE MOOT

GOP-Intervenors' various arguments regarding the 2023 election all fail for the simple reason that the 2023 election is over.

For Intervenor Marino, that means dismissal for lack of jurisdiction.  Nothing this Court is asked to decide here could result in "Marino properly being certified as the winner."  GOP Br. 67.  Marino's own strategic decision not to timely challenge Montgomery County's counting of the excluded Towamencin mail ballots fatally undermined his prospects in state court, as multiple written state court opinions held.  Supp.App.957-960, 961-985.  Any controversy surrounding his election certainly died by January 2, when his opponent was sworn into office.

Because the election is over, Marino no longer has any path to relief, no matter what happens in this appeal.  *See Ioannidis v. Wolf*, 635 M.D. 2020 (Pa. Commw. 2021) (candidate appeal became moot upon opponent's taking office) (unpublished), *aff'd,* 270 A.3d 1110 (Pa. 2022).  Marino is just like the losing candidate in *Migliori* whose claims became moot after the ballots were opened and counted and the election concluded.  *See Ritter*, 143 S. Ct. at 298 (granting vacatur on mootness grounds); *see also* Pet. for Writ of Cert., *Ritter v. Migliori*, No. 22-30, 2022 WL 2704768, at

*14 (U.S. July 7, 2022) ("The case became moot when the new election results were certified over Ritter's rigorous defense of the original results."). At this point, Marino's protectable interest in this appeal is no different than that of any other Pennsylvania voter—which is to say, he has none. *See Bognet v. Sec'y of Pa.*, 980 F.3d 336, 354-357 (3d Cir. 2020) (individual voters' complaints about "counting ballots in violation of state election law" are not concrete, cognizable harms), *vacated as moot*, 141 S. Ct. 2508 (Mem.) (2021). Marino should be dismissed.[33]

While Plaintiffs do not accept GOP-Intervenors' various purported injuries (at 60-66), Plaintiffs do not dispute that GOP-Intervenors have standing to prosecute an appeal challenging the district court's order, which grants prospective relief that would apply in 2024 and beyond. But for the same reason as Marino, GOP-Intervenors do not have any redressable injury or claim stemming from the certified-and-done 2023

---

[33] GOP-Intervenors claim (at 64) that the envelope-date issue has "flipped" three elections since 2020. "Flipped" is odd way to describe the candidate who receives more timely votes from qualified voters winning an election. Nor is it clear what this third election is beyond the Towamencin contest and the one in *Migliori*. Either way, the number is miniscule compared to the thousands of offices on the ballot since 2020.

municipal election.   Their invocation of *Purcell* (at 57-59) changes

nothing.

For one, *Purcell* applies where an appellate court has been asked to

stay a "lower federal court injunction[]" due it its proximity to an election,

*Merrill v. Milligan*, 142 S. Ct. 879, 880-881 (2022) (Kavanaugh, J.,

concurring); it provides no basis to collaterally attack an election result

or seek substantive relief in a merits appeal.   For another, *Purcell*

protects the "*State's* extraordinarily strong interest in avoiding ...

changes to its election laws and procedures."   *Id.* at 881 (emphasis

added).   But private, partisan actors like GOP-Intervenors are not

election administrators, and "lack a cognizable interest in the State's

ability to 'enforce its duly enacted' laws."   *RNC v. Common Cause R.I.*,

141 S. Ct. 206, 206 (Mem.) (2022) (quoting *Abbott v. Perez*, 138 S. Ct.

2305, 2324 n.17 (2018)).   For a third, *Purcell*-type considerations would

not help GOP-Intervenors here.   For instance, the "feasib[ility]" of

counting timely-received mail ballots notwithstanding the immaterial

envelope-date issue "without significant cost, confusion, or hardship,"

*Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring), is self-

evident:  Counties have *already* opened and counted the ballots, and the elections have *already* been certified.

At this point, GOP-Intervenors, who threw the law into disarray on the eve of the 2022 election by initiating the *Ball* litigation, are unironically invoking a supposed maxim against federal judges issuing rulings "on the back end of elections" in order to—wait for it—press for a federal judicial ruling on the back end of an election.  *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 925-926 (7th Cir. 2020) (rejecting challenges raised after "election results ha[d] been certified as final").  Whatever equitable criticisms GOP-Intervenors might have once had about the timing of the district court's decision, they are now moot because the 2023 election is over.  This appeal must be resolved, and GOP-Intervenors' arguments must be rejected, on the merits.

## IV.  THE DISTRICT COURT'S ORDER CREATES NO DISUNIFORMITY PROBLEM

GOP-Intervenors' Equal Protection arguments (at 54-57) fundamentally misunderstand both the effect of the district court's order and the teachings of *Bush v. Gore*.  The district court's order does not require that any county afford differential treatment to anyone.  Rather, it provides a clear statement of federal law that all counties can and

should follow, whether or not they were dismissed below on standing grounds.

*Bush v. Gore* held that "the absence of specific standards" in the "recount mechanisms implemented in response to the decisions of the Florida Supreme Court" failed to "satisfy the minimum requirement for nonarbitrary treatment of voters" under the Equal Protection Clause. 531 U.S. 98, 105-106 (2000).  The district court's decision does not suffer from any absence of specific standards that would lead to arbitrary treatment.   Rather, it declares that disenfranchising voters for a meaningless paperwork error with respect to the mail-ballot-envelope date violates federal law.  Implementing that decision is straightforward: Count voters' mail ballots notwithstanding the meaningless paperwork mistake.

The invocation of *Bush v. Gore* is especially misguided on this record, which demonstrates that thousands of voters were subjected to arbitrary treatment due to the counties' inconsistent enforcement of the envelope-date requirement.  *See supra* 12-13.  Returning to the disarray that prevailed in 2022 would not promote the "nonarbitrary treatment of voters." *Bush*, 531 U.S. at 105-106.  Affirming the district court would.

GOP-Intervenors are left arguing that the district court did something "even worse" than (read: entirely different from) *Bush v. Gore*. They argue that the district court's decision "gives specific guidance that compels application of different standards to similarly situated ballots in different counties." GOP Br. 56 (emphasis omitted). That mischaracterizes reality.[34]

The district court entered a declaration that the practice of disenfranchising voters based on the envelope-date rule violated federal law. App.6. Even if the judgment in this case formally binds only 12 counties, all counties *can and should comply* with it because it is a federal court's reasoned and correct statement of what federal law requires.

Dismissed counties are in no way prohibited from such compliance by the Pennsylvania Supreme Court's order in *Ball v. Chapman*, which holds only that *state law* requires voters to be disenfranchised for immaterial errors or omissions regarding the handwritten envelope date.

---

[34] Unrelatedly but wrongly, GOP-Intervenors also suggest (at 64-65) that counting the votes of qualified voters of all parties notwithstanding immaterial envelope-date errors somehow harms "their voters." But voters whose ballots have been counted have no cognizable interest in preventing the counting of other peoples' votes. *See, e.g.*, *Bognet*, 980 F.3d at 354-57.

63

289 A.3d at 28 (opinion announcing the judgment). The court, ruling on GOP-Intervenors' election-eve King's Bench petition, and with no lower court decision to affirm or reverse, expressly *declined* to address the application of the Materiality Provision, leaving it "unresolved." *Id.* at 34-35 (Dougherty, J., concurring in part); *id.* at 36 (Brobson, J., dissenting) (court left federal law question "unanswered"). The district court's decision here is thus the *only* operative statement of federal law in Pennsylvania on the question whether voters can be disenfranchised on this basis. Counties should follow it. *See* U.S. Const. art VI, § 2.

Indeed, we know that the *Ball* order has not mandated a different result for the 55 dismissed counties because many of them have *already complied* with the district court's declaration. *See, e.g.*, Supp.App.952-956. Dozens more will be bound to do so in future elections by the stipulation they executed "agree[ing] to not contest . . . the declaratory and injunctive relief requested by Plaintiffs in this action." Supp.App.40; Supp.App.54. In all, two-thirds of Pennsylvania's counties are already either formally bound, or subject to the stipulation. The speculation that a few of the remaining group might voluntarily choose to ignore federal

law (and risk winding up right back in court) does not create an Equal Protection problem.

In all events, this Court's decision will conclusively resolve any possible concern about disuniformity. After the Court affirms on the merits, any county that continues to illegally deny the right to vote by discarding timely-submitted mail ballots due to the immaterial handwritten envelope date will have the Materiality Provision enforced against them in federal court with the backing of binding circuit precedent. This Court should do so now and ensure, once and for all, that Pennsylvania voters are no longer arbitrarily and unlawfully disenfranchised for a meaningless paperwork error.

## CONCLUSION

This Court should affirm the judgment of the district court.

Dated: January 10, 2024

Respectfully submitted,

*/s/ Ari J. Savitzky*

Witold J. Walczak (PA 62976)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
vwalczak@aclupa.org

Ari J. Savitzky
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
slakin@aclu.org

Marian K. Schneider (PA 50337)
Stephen Loney (PA 202535)
Kate I. Steiker-Ginzberg
(PA 332236)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
mschneider@aclupa.org
sloney@aclupa.org
ksteiker-ginzberg@aclupa.org

Megan C. Keenan
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 10004
Tel: (202) 457-0800
mkeenan@aclu.org
acepedaderieux@aclu.org

David Newmann (PA 82401)
Brittany C. Armour (PA 324455)
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4610
david.newmann@hoganlovells.com
brittany.armour@hoganlovells.com

*Counsel for the Pennsylvania
State Conference of the NAACP,
League of Women Voters of
Pennsylvania, Philadelphians
Organized to Witness, Empower
and Rebuild, Common Cause
Pennsylvania, Black Political
Empowerment Project, Make the
Road Pennsylvania, Barry M.
Seastead, Marlene G. Gutierrez,
Aynne Margaret Pleban Polinski,
Joel Bencan, and Laurence M.
Smith*

## COMBINED CERTIFICATIONS

At least one of the attorneys whose name appears on this brief is a member of the bar of this Court, or has filed an application for admission pursuant to L.A.R. 46.1.

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,000 words.

The text of this electronic brief is identical to the text in paper copies that will be filed with the Court.

A virus detection program, Microsoft Word from the Microsoft Office Professional Plus 2010 suite, has been run on this electronic brief and no virus was detected.

Dated: January 10, 2024   Respectfully submitted,

       */s/ Ari J. Savitzky*
       Ari J. Savitzky

# CERTIFICATE OF SERVICE

I herby certify that on January 10, 2024, I caused a true and correct copy of the foregoing Brief in Opposition, together with all documents in support thereof, via the Court's ECF/CMF system.

Dated: January 10, 2024              Respectfully submitted,

                                     _/s/ Ari J. Savitzky_____
                                     Ari J. Savitzky