Case No. 23-3166

# United States Court of Appeals

*for the*

# Third Circuit

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,

*Plaintiffs-Appellees,*

– v. –

SECRETARY OF THE COMMONWEALTH, *et al.*,

*Defendants-Appellees,*

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

*Intervenors-Appellants,*

DEMOCRATIC NATIONAL COMMITTEE, *et al.*,

*Intervenors-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA,
CASE NO. 1:22-CV-00339 (BAXTER, J.)

**BRIEF FOR *AMICUS CURIAE* THE PROTECT DEMOCRACY PROJECT
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

AARON CROWELL
ALEXANDER D. BERNSTEIN
DAVID KIMBALL-STANLEY
CLARICK GUERON REISBAUM LLP
*Attorneys for Amicus Curiae*
220 Fifth Avenue, 14th Floor
New York, New York 10001
(212) 633-4310

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u>
## <u>CORPORATE DISCLOSURE STATEMENT</u>

The Protect Democracy Project certifies that The Protect Democracy Project has no parent corporation and no publicly held corporation owns 10% or more of its stock.   The Protect Democracy Project is not aware of any publicly held corporation not a party to the proceeding before this Court that has a financial interest in the outcome of the proceeding.  The Protect Democracy Project is not affiliated with any publicly owned corporation not named in the appeal.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ....................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF AMICUS CURIAE ....................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................... 3

ARGUMENT ....................................................................................... 5

I.   Congress Enacted the Materiality Provision to Secure Voting Rights for All in the Face of Intractable and Ever-Evolving Resistance ............................ 5

    A. 1865-1957: Reconstruction and Retreat ................................. 6

    B. Initial Modern Reform Efforts: Civil Rights Acts of 1957 and 1960 ...... 7

    C. The 1957 and 1960 Acts Fall Short ......................................... 9

    D. The Civil Rights Act of 1964 ................................................. 11

    E. The Voting Rights Act of 1965 ............................................... 14

II.  Congress Had Constitutional Authority to Enact a Materiality Provision Reaching All Stages of the Voting Process ................................... 17

    A. Congress's Findings Were Not Limited to "Discrimination During In-Person Voter Registration" ................................................ 17

    B. Congress Had At Least Three Sources of Constitutional Authority to Enact the Materiality Provision ............................... 20

        i.   The Elections Clause ................................................. 20

        ii.  The Fifteenth Amendment .......................................... 22

        iii. The Fourteenth Amendment ....................................... 25

CONCLUSION ................................................................................... 29

# TABLE OF AUTHORITIES

*Cases*

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
 570 U.S. 1 (2013) .................................................................. 20, 21, 22

*Baker v. Carr*,
 369 U.S. 186 (1962) ..................................................................... 26, 27

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
 531 U.S. 356 (2001) ..................................................................... 26, 29

*Bond v. United States*,
 572 U.S. 844 (2014) ............................................................................21

*Burroughs v. United States*,
 290 U.S. 534 (1934) ............................................................................21

*Bush v. Gore*,
 531 U.S. 98 (2000) ....................................................................... 26, 28

*Chan v. Korean Air Lines, Ltd.*,
 490 U.S. 122 (1989) ...........................................................................12

*City of Boerne v. Flores*,
 521 U.S. 507 (1997) ........................................................ 22, 23, 24, 26

*City of Rome v. United States*,
 446 U.S. 156 (1980) ...........................................................................25

*Fla. State Conference of N.A.A.C.P. v. Browning*,
 522 F.3d 1153 (11th Cir. 2008) .........................................................24

*Hunter v. Underwood*,
 471 U.S. 222 (1985) ...........................................................................27

*Moskal v. United States*,
 498 U.S. 103 (1990) ...........................................................................24

*Nev. Dep't of Human Res. v. Hibbs*,
 538 U.S. 721 (2003) ..................................................................... 23, 26

*Nixon v. Herndon*,
   273 U.S. 536 (1927) ...................................................................27

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) ...................................................................21

*Shelby County v. Holder*,
   570 U.S. 529 (2013) ...................................................................23

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ............................................................ *passim*

*United States v. Original Knights of Ku Klux Klan*,
   250 F. Supp. 330 (E.D. La. 1965) .............................................21

*Vote.Org v. Callanen*,
   No. 22-50536, -- F.4th --, 2023 WL 8664636 (5th Cir. Dec. 15, 2023) .............25

**Statutes**

52 U.S.C. § 10101(a)(2)(B) ................................................... *passim*

52 U.S.C. § 10101(e) ...................................................................12

Pub. L. No. 85-315, 71 Stat. 634 (1957)..............................................7, 8

Pub. L. No. 86-449, 74 Stat. 86 (1960).................................................9

Pub. L. No. 88-352, 78 Stat. 241 (1964)........................... 5, 12, 14, 19

Pub. L. No. 89-110, 79 Stat. 437 (1965)................................ 5, 15, 19

**Legislative History**

110 Cong. Rec. 1,593 (1964) ........................................... 12, 28

110 Cong. Rec. 1,610 (1964) ...................................................13

110 Cong. Rec. 1,642 (1964) ...................................................13

110 Cong. Rec. 1,693-94 (1964).................................................12

110 Cong. Rec. 6,530 (1964) ...................................................12

110 Cong. Rec. 6,530-31 (1964)................................................13

110 Cong. Rec. 6,531 (1964) ......................................................................28

110 Cong. Rec. 6,646 (1964) ......................................................................13

110 Cong. Rec. 6,650 (1964) ............................................................... 13, 28

110 Cong. Rec. 6,715 (1964) ......................................................................12

110 Cong. Rec. 6,741 (1964) ............................................................... 12, 13

110 Cong. Rec. 12,837 (1964) ....................................................................13

111 Cong. Rec. 2,156 (1965) ......................................................................16

111 Cong. Rec. 15,645 (1965) ....................................................................14

111 Cong. Rec. 15,652 (1965) ....................................................................27

111 Cong. Rec. 15,653 (1965) ....................................................................18

111 Cong. Rec. 15,660 (1965) ....................................................................16

H.R. Rep. No. 88-914, title I (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391…11, 13, 14, 25

H.R. Rep. No. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437......... 14, 15

Pres. Lyndon B. Johnson, Special Message to the Congress: The American Promise (Mar. 15, 1965)..................................................... 4, 16, 18, 19

Statement by Att'y Gen. Robert F. Kennedy on H.R. 7152 before H. Jud. Comm. (Oct. 15, 1963).........................................................................14

U.S. Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights 1959 (1959)....................................................................... *passim*

U.S. Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights 1961, vol. 1 (1961) ................................................... 7, 9, 10, 11, 18

U.S. Comm'n on Civil Rights, Civil Rights '63 (1963) ................................. *passim*

U.S. Comm'n on Civil Rights, Voting in Mississippi (1965) .................................15

***Other Authorities***

Eric Foner, *Freedom's Lawmakers: A Directory of Black Officeholders during Reconstruction* (1996) ............................................................................6

Kevin Coleman, Cong. Research Serv., R43626, *The Voting Rights Act of 1965: Background and Overview* (2015) ..................................................................6, 7

U.S. Const. amend. XIV ................................................................... *passim*

U.S. Const. amend. XV .................................................................... *passim*

U.S. Const. art. I, § 4, cl. 1 ............................................................. *passim*

## **INTEREST OF AMICUS CURIAE**[1]

The Protect Democracy Project files this brief to assist the Court in evaluating the Appellants' assertion—echoed by their *amici*—that, prior to enacting 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision"), Congress made findings regarding problems with voting registration only, and thus interpreting the statute to apply to later stages of the voting process would raise "serious doubt" about its constitutionality.  A review of the voluminous record compiled by Congress during an eight-year struggle to protect voting rights demonstrates that Appellants are mistaken, and that there should be no "doubt," much less a "serious" one, that Congress had the authority and justification to enact the Materiality Provision to ensure that voters would not lose their rights, at any stage of the voting process, due to immaterial paperwork errors.

Protect Democracy is a nonpartisan, nonprofit organization dedicated to preventing our democracy from declining into a more authoritarian form of government.  As part of that mission, Protect Democracy works to ensure that American elections are free and fair.  In connection with that objective, Protect Democracy has an interest in ensuring that the Materiality Provision is not

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.  No such monetary contributions were made by anyone other than *amicus* and its counsel.

artificially narrowed so that it cannot prohibit unreasonable, unlawful, and/or

discriminatory disenfranchisements.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"The constitutional propriety of the Voting Rights Act of 1965 must be judged with reference to the historical experience which it reflects." *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966).  Contravening this basic principle, Appellants and their *amici* offer an inaccurate and incomplete account of the history of federal voting rights legislation in an attempt to cast "serious doubt" on the constitutionality of the Materiality Provision.  ECF 97-1 ("App. Br.") at 35 (quotation marks omitted).[2]  A review of the origins, intent, and legislative history of the Materiality Provision dispels this "doubt."

Appellants try to tell a simple story.  Citing a single House Report issued before the passage of the Civil Rights Act of 1964, Appellants maintain that the "enacting Congress" was focused on remedying just one problem, namely, "unscrupulous officials discriminating during in-person voter registration."  App. Br. at 37; *see also id.* at 6-9.  In this account, the 1964 Congress invoked its power under the Fifteenth Amendment to enact a correspondingly discrete "remedy" to "fit[] the violation," specifically, "forbidding registrars to deny applications based on immaterial mistakes."  *Id.* at 37.  Appellants thus conclude that the Materiality Provision cannot apply to any act "beyond qualification determinations during

---

[2] "ECF" citations are to the docket in this matter.

voter registration," *id.* at 39, because the Materiality Provision would then no longer be a congruent and proportional remedy to the specific injury targeted by Congress, *id.* at 36, leaving it constitutionality infirm, *id.* at 35.

Appellants are wrong.  To begin, there was not just one enacting Congress: the 1964 Act included a narrower version of the Materiality Provision, limited to federal elections; the Voting Rights Act of 1965 expanded the provision to all elections.  But even more important, between 1957 and 1965, Congress engaged in an eight-year cycle of factfinding and lawmaking regarding discrimination in elections.  Congress cataloged myriad techniques used to keep Black Americans off the voter rolls, and it compiled a factual record demonstrating that certain localities were prepared to use, as President Lyndon Johnson put it, "[e]very device of which human ingenuity is capable to deny [the] right [to vote]."[3]  After years of frustration and failure, Congress did not adopt a remedy limited to a narrow problem, as Appellants suggest, but rather appropriately acted to ensure that no person would be "den[ied] the right . . . to vote" in "any election" because of, among other things, an immaterial "error or omission on *any* record or paper

---

[3] Pres. Lyndon B. Johnson, Special Message to the Congress: The American Promise (Mar. 15, 1965) ("The American Promise"), *available at* https://www.presidency.ucsb.edu/documents/special-message-the-congress-the-american-promise.

relating to *any* application, registration, *or other act requisite to voting*." 52 U.S.C.

§ 10101(a)(2)(B) (emphasis added).

Given Congress's voluminous record demonstrating a pattern of disenfranchisement and evasion, Congress's enactment and expansion of the Materiality Provision was a proper exercise of its powers under the Elections Clause, the Fourteenth Amendment, and the Fifteenth Amendment. Thus, affirming the District Court's application of the Materiality Provision to mail-in ballots raises no constitutional issue for this Court to avoid.

## ARGUMENT

I.  **Congress Enacted the Materiality Provision to Secure Voting Rights for All in the Face of Intractable and Ever-Evolving Resistance**

In the Civil Rights Act of 1964, Congress, *inter alia*, barred disenfranchisement because of immaterial errors in voting paperwork in "any Federal election." Pub. L. No. 88-352, § 101(a), 78 Stat. 241, 241 (1964). A year later, in the Voting Rights Act, Congress struck the word "Federal," thereby extending the provision's reach to state and local elections. Pub. L. No. 89-110, § 15, 79 Stat. 437, 445 (1965). A review of Congress's detailed factual findings confirms that it had good reason to enact a Materiality Provision that reached every stage of the voting process. Hard-won lessons confirmed that anything less—

leaving open any loophole for continued discriminatory action—would lead to yet more disenfranchisement.

### A. <u>1865-1957: Reconstruction and Retreat</u>

After the ratification of the Thirteenth, Fourteenth, and Fifteenth Amendments, equal voting rights briefly became a reality in the United States. Hundreds of Black officials were elected to local, state, and federal offices, and registered Black voters outnumbered registered white voters in parts of the South. *See generally* Eric Foner, *Freedom's Lawmakers: A Directory of Black Officeholders during Reconstruction* (1996).

But this achievement was short-lived. Ex-Confederates retook control of many state and local governments, and "the years passed and fervor for racial equality waned." *Katzenbach*, 383 U.S. at 310. Southern states then unleashed a tidal wave of constitutional and statutory reforms "to deprive [Black Americans] of the right to vote." *Id.* at 311. The hallmark of these efforts was their "variety and persistence." *Id.* Poll taxes, literacy tests, "grandfather," "old soldier," and "good character" clauses, "white primaries," and new property requirements were accompanied by renewed violence and voter intimidation, including an estimated 2,500 lynchings between 1884 and 1900. *See* Kevin Coleman, Cong. Research Serv., R43626, *The Voting Rights Act of 1965: Background and Overview* 8-10 (2015).

These efforts had their intended effect: Black voter registration and participation plummeted, falling in many Southern counties from Reconstruction highs to near zero, where they languished for decades.  *See id.* at 9-10 & n.47; U.S. Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights 1961, vol. 1, at 40-41 (1961) ("1961 CRC Report") (describing decline of Black voting rights in Louisiana from 1877—when Black voters were a "substantial[]" majority state-wide—to 1910-1944, when less than one percent of registered voters were Black).[4]

### B. <u>Initial Modern Reform Efforts: Civil Rights Acts of 1957 and 1960</u>

Congress did not return to the issue of voting rights until 1957.  At that time, Congress "was disturbed by allegations that some American citizens were being denied the right to vote . . . because of their race, color, creed, or national origin." U.S. Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights 1959, at ix (1959) ("1959 CRC Report").[5]  In response, Congress passed the Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634.  The 1957 Act banned intentional voter intimidation in federal elections, *id.* § 131(b), 71 Stat. at 637; empowered the Attorney General to enforce both this ban and existing laws barring disenfranchisement based on race, color, or previous condition of servitude, *id.*

---

[4] Available at: https://www.crmvet.org/docs/ccr_61_voting.pdf.

[5] Available at: https://www2.law.umaryland.edu/marshall/usccr/documents/cr11959.pdf.

§ 131(c), 71 Stat. at 637; created the Civil Rights Division within the Department of Justice, *id.* § 131(c), 71 Stat. at 637; and established the U.S. Commission on Civil Rights, which was directed to "investigate" the issue of discrimination in voting rights and report to Congress and the President, *id.* §§ 101-06, 71 Stat. at 634-36.

The Commission issued its initial report in 1959. The report detailed the history of voting rights since the dawn of the Republic—with particular attention paid to "ingenious and sometimes violent methods" to limit the franchise since the end of the Civil War, 1959 CRC Report at 30; *see id.* at 19-106—and surveyed Congress's constitutional authority to protect voting rights, *id.* at 107-27, 135.

The Report's conclusion was clear: "Many Americans, even today, are denied the franchise because of race." *Id.* at 134. Although such discrimination was barred by the U.S. Constitution and existing federal law, racial disenfranchisement was "accomplished through the creation of legal impediments, administrative obstacles, and positive discouragement engendered by fears of economic reprisal and physical harm." *Id.* As the Commission informed Congress and the President: "The history of voting in the United States shows . . . that where there is will and opportunity to discriminate against certain potential voters, ways to discriminate will be found." *Id.* at 133.

Congress responded with the Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86, which closed some of the loopholes in the 1957 Act.  The 1960 Act required that federal election records be preserved and produced in response to a demand from the Attorney General, *id.* §§ 301-06, 74 Stat. at 88-89; extended the term and expanded the powers of the Commission on Civil Rights, *id.* § 401, 74 Stat. at 89; and created alternative federal mechanisms for registering to vote, *id.* § 601, 74 Stat. at 90-92.  In addition, the 1960 Act gave the word "vote" a broad definition to ensure that voting rights laws protected each step in the voting process:

> [T]he word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast . . . .

*Id.* § 601, 74 Stat. at 91.

## C. <u>The 1957 and 1960 Acts Fall Short</u>

Although the 1957 and 1960 Acts provided some "effective tools to deal with discrimination in voting," they remained "limited in scope."  *See* 1961 CRC Report at 73-78, 100.  Meanwhile, "[e]fforts to deny the right to vote" continued to "take many forms," including "economic reprisals," "discriminatory purges . . . from the registration rolls," "restrictive voter qualification laws," and, "[t]he most prevalent form of discrimination[,] . . . arbitrary registration procedures."  *Id.*

9

at 133.  The Commission concluded that there was still "no widespread remedy to meet what is still widespread discrimination," *id.* at 100, and reiterated its earlier recommendation that federal law be amended "to prohibit any arbitrary action or . . . inaction, which deprives or threatens to deprive any person of the right to register, vote, and have that vote counted in any Federal election," *id.* at 141; *see also* 1959 CRC Report at 138-39 (similar proposal).

Matters had still not meaningfully improved by 1963, when the Commission again found "that present legal remedies for voter discrimination are inadequate," and that "the promise of the 14th and the 15th amendments to the Constitution remains unfulfilled."  U.S. Comm'n on Civil Rights, Civil Rights '63, at 13, 26 (1963) ("1963 CRC Report").[6]  Between 1956 and 1963, despite "two civil rights acts, the institution of 36 voting rights suits by the Department of Justice, and the operation of several private registration drives," the Commission found that Black voter registration in the 100 counties in which voting discrimination was most prevalent had increased from 5 percent "only to 8.3 percent."  *Id.* at 14–15.

The 1963 Report observed that the "techniques of discrimination" used to "subvert the constitution of the United States" remained "diverse."  *Id.* at 15, 22-23.  Among the most "common" and effective tactics remained the "use of plainly arbitrary procedures" by certain officials, such as (1) the "requirement of vouchers

---

[6] Available at: https://www.crmvet.org/docs/ccr_63_civil_rights.pdf.

or some other unduly technical method of identification," (2) the "rejection for insignificant errors in filling out forms," (3) "the failure to notify applicants of rejection," (4) the "imposition of delaying tactics," and (5) the "discrimination in giving assistance to applicants." *Id.* at 22-23; *see also* 1961 CRC Report at 137 (arbitrary application of legal requirements, such as having "to calculate [one's] age to the day," is "[a] common technique of discriminating against would-be voters on racial grounds").

### D. <u>The Civil Rights Act of 1964</u>

Congress responded yet again in the Civil Rights Act of 1964, which was intended to remedy "problems encountered in the operation and enforcement of the Civil Rights Acts of 1957 and 1960." H.R. Rep. No. 88-914, title I (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2394. The legislation included the initial version of the Materiality Provision, which was limited to federal elections:

> No person acting under color of law shall . . . deny the right of any individual to vote in any Federal election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

11

Pub. L. No. 88-352, § 101(a), 78 Stat. 241, 241 (1964).  The 1964 Act also re-

incorporated the broad definition of "vote" from the 1960 Act.  *See id.*

§ 101(a)(3)(a), 78 Stat. at 241.[7]

Supporters of the 1964 Act pointed to the "ample evidence" of "rank

discrimination" collected by Civil Rights Commission in its prior reports,[8]

including the abuse of "trivial,"[9] "immaterial,"[10] or "highly technical"[11] errors to

deny the right to vote.[12]  And for constitutional authority, supporters noted that the

---

[7] The broad definition of "vote" from the 1960 Act distinguishes between "registration or other action . . . *prerequisite* to voting," and "casting a ballot, and having such ballot counted."  52 U.S.C. § 10101(e) (emphasis added).  The Materiality Provision, in turn, states that it applies to "any application, registration, or other act *requisite* to voting."  *Id.* § 10101(a)(2)(B).  Appellants nevertheless assert that both terms—"prerequisite to voting" and "requisite to voting"—refer to voter registration.  App. Br. at 21.  But an interpretation giving two distinct terms from the same statute the same meaning should be avoided.  *Cf. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 133 (1989) (cautioning that when "an interpretation" ignoring statutory variation is allowed, "the art of draftsmanship will have become obsolete").

[8] 110 Cong. Rec. 1,693-94 (1964) (statement of Rep. Celler).

[9] *Id.* at 1,593 (statement of Rep. Farbstein).

[10] *Id.* at 6,715 (statement of Sen. Keating) (identifying "rejection of [Black] applicants for totally immaterial errors and omissions on their application forms" as among "obstructive and discriminatory tactics which have been used to circumvent the 1957 and 1960 acts").

[11] *Id.* at 6,741 (statement of Sen. Hart) (observing pattern of rejecting applicants for "highly technical and immaterial errors. . . such as failing to sign the application form").

[12] *See also id.* at 6,530 (statement of Sen. Humphrey) (noting "technique for denying . . . the right to vote is to ask questions that have nothing to do with the

Act was supported not only by (1) the Elections Clause, which grants Congress "broad authority" to regulate both the "substantive" and "mechanical aspects" of federal elections; but also by (2) the Fifteenth Amendment, given the "wide-ranging evidence . . . produced before Congress . . . that literacy tests and other State voter-qualification standards and procedures have been regularly used by some States to deny people the right to vote because of their race or color"; and by (3) the Fourteenth Amendment, given the well-documented unequal and arbitrary application of voting "tests and standards" by State officials.  H.R. Rep. No. 88-914, *as reprinted in* 1964 U.S.C.C.A.N. at 2492-93.[13]

The Department of Justice agreed that these constitutional provisions authorized Congress to enact the Materiality Provision and apply it to all elections. *See* Statement by Att'y Gen. Robert F. Kennedy on H.R. 7152 before H. Jud.

---

applicant's qualifications to vote, or to apply irrelevantly strict standards to answers").

[13] Numerous members of Congress also invoked these three constitutional provisions in support of the 1964 Act.  *See* 110 Cong. Rec. 1,610 (1964) (statement of Rep. Shriver) (locating constitutional authority in "any one of several sources: The 14th amendment to the U.S. Constitution; the 15th amendment; article I, section 4, and the implied power of Congress to protect the purity of Federal elections"); *id.* at 6,646 (statement of Sen. McIntyre) (same); *id.* at 6,530-31 (statement of Sen. Humphrey) (same); *id.* at 6,741 (statement of Sen. Hart) (same); *id.* at 1,642 (statement of Rep. Ryan) (citing Fifteenth and Fourteenth Amendments); *id*. at 12,837 (statement of Sen. Williams (N.J.)) (citing Fifteenth Amendment); *id*. at 6,650 (statement of Sen. Javits) (same); *id.* at 1,593 (statement of Rep. Farbstein) (citing Fourteenth Amendment).

Comm., at 5-6 (Oct. 15, 1963) ("1963 Kennedy Statement").[14]  Nevertheless, to

minimize potential opposition, *see id.*, the final version of the 1964 Act limited the

voting rights provisions to "Federal elections" only, *see* Pub. L. No. 88-352,

§ 101(a), 78 Stat. at 241.  As the ranking member of the House Judiciary

Committee noted, however, "[t]he fact that . . . Congress is limiting its action to

Federal elections can only be interpreted to mean that it has not chosen to exercise

its full authority in the field of voting at this time."  *See* H.R. Rep. No. 88-914, *as*

*reprinted in* 1964 U.S.C.C.A.N. at 2492 (additional views of Rep. McCulloch et

al.); *see also id.* at 2410 (additional views of Rep. Kastenmeier) ("No serious

constitutional difficulty is presented by applying the [voting rights] provisions . . .

to State and local elections . . . .").

### E. **The Voting Rights Act of 1965**

Congress was soon required to act again.  "[T]he provisions of the 1957,

1960, and 1964 Civil Rights Acts to eliminate discriminatory voting practices

[were] shown to be clearly inadequate," 111 Cong. Rec. 15,645 (1965) (statement

of Rep. Celler), and "[p]rogress" remained "painfully slow," H.R. Rep. No. 89-439

(1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2441.  In its 1965 Report, the

Civil Rights Commission found that Congress's prior efforts had, in fact, "failed to

---

[14] *Available at* https://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/10-15-1963.pdf.

produce any significant increase in [Black] registration and voting." U.S. Comm'n on Civil Rights, Voting in Mississippi, at 49 (1965) ("Voting in Mississippi").[15]

Among other issues, potential voters were still disenfranchised due to immaterial errors in their applications. *See id.* at 14-15, 60; *Katzenbach*, 383 U.S. at 312. And when specific discriminatory practices were banned, "some of the States affected . . . merely switched to discriminatory devices not covered by the federal decrees," "enacted difficult new tests," "defied and evaded court orders," or "simply closed their registration offices to freeze the voting rolls." *Id.* at 314.

Thus, a year after passing the 1964 Civil Rights Act, Congress passed the Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437, seeking "to banish the blight of racial discrimination in voting," *Katzenbach*, 383 U.S. at 308, with a bill "designed primarily to enforce the 15th amendment to the Constitution," but "also designed to enforce the 14th amendment and article I, section 4 [the Elections Clause]," H.R. Rep. No. 89-439, *as reprinted in* 1965 U.S.C.C.A.N. at 2437.

The 1965 Act "marshalled an array of potent weapons against the evil" of voting discrimination, *Katzenbach*, 383 U.S. at 337, but among the first proposals—ultimately reflected in Section 15 of the Act, *see* 79 Stat. at 445—was

---

[15] Available at:
https://www2.law.umaryland.edu/marshall/usccr/documents/cr12v94.pdf.

to strike the word "Federal" from the Materiality Provision, thereby expanding the 1964 Act's ban on "deny[ing] the right of any individual to vote" due to an immaterial "error or omission" in "any record or paper relating to any . . . act requisite to voting" in "any election," *see* 111 Cong. Rec. 2,156 (1965) (statement of Rep. Lindsay).  This "ma[d]e up for the deficiency in the 1964 civil rights bill," which had "omitted . . . any embracement of non-Federal elections—local and State elections—where the chief agony has been in this country for so long."  111 Cong. Rec. 15,660 (1965) (statement of Rep. Lindsay).

Throwing his support behind the proposed legislation, President Johnson declared that "[e]very American citizen must have an equal right to vote," but lamented that "[e]very device of which human ingenuity is capable has been used to deny this right" to Black Americans.[16]  The purpose of this legislation, he stated, was nothing less than "to eliminate illegal barriers to the right to vote," including by "establish[ing] a simple, uniform standard which cannot be used, however ingenious the effort, to flout our Constitution," and "ensur[ing] that properly registered individuals are not prohibited from voting."[17]

On August 6, 1965, the president signed the Voting Rights Act into law.

---

[16] The American Promise, *available at* https://www.presidency.ucsb.edu/documents/special-message-the-congress-the-american-promise.

[17] *Id.*

## II.    Congress Had Constitutional Authority to Enact a Materiality Provision Reaching All Stages of the Voting Process

Appellants assert that (1) "Congress enacted the Materiality Provision pursuant to its Fifteenth Amendment enforcement authority," App. Br. at 37; but (2) only made findings about "discriminati[on] during in-person voter registration," *id.*; and thus, (3) the only way to keep the "Provision . . . properly rooted in the enacting Congress's findings" is by "limiting its reach to qualification determinations during the voter-registration process," *id.* at 40.   The Court should reject this argument because both (A) the factual premise of the argument is false, and (B) Appellants' constitutional analysis is incomplete and incorrect.

### A. Congress's Findings Were Not Limited to "Discrimination During In-Person Voter Registration"

Citing a single 1963 House Report, Appellants contend that, in the legislative history of the 1964 Civil Rights Act, there was "not even [a] hint at any findings to support a reach for [the Materiality Provision] beyond qualification determinations during voter registration." *Id.* at 39.  That is wrong.

Congress did, of course, compile a detailed record of the abuse of "immaterial" errors and omissions during voter registration, *see supra* at 8–16, and it did target that problem in its remedial legislation, as Appellants note, *see* App. Br. at 6-8.  But, by 1964 and 1965, Congress had also been repeatedly informed that voting discrimination was persistent because the "ingenious," 1959 CRC

Report at 30, and "diverse," 1963 CRC Report at 15, methods used to disenfranchise Black Americans had "take[n] many forms," 1961 CRC Report at 133. As President Johnson put it, hard experience had shown that "[e]very device of which human ingenuity is capable has been used to deny" Black Americans the right to vote.[18] *See also Katzenbach*, 383 U.S. at 309, 311 (noting "variety and persistence" of disenfranchisement methods and "voluminous legislative history" of "unremitting and ingenious defiance of the Constitution").

Thus, Congress was not presented merely with evidence of discrete "techniques of discrimination" during voter registration, *see* 1963 CRC Report at 22, requiring one-by-one elimination. Rather, the totality of the evidence also compelled a broader conclusion: "that where there is will and opportunity to discriminate against certain potential voters, ways to discriminate will be found." 1959 CRC Report at 133. And, given that Congress's goal was not simply to reform voting registration procedures, but rather to protect Black Americans' voting rights "regardless of the manner by which any attempt is made to deny or abridge [it] on account of race or color," 111 Cong. Rec. 15,653 (1965) (statement of Rep. McCulloch), Congress had every reason to draw the logical conclusion

---

[18] The American Promise, *available at* https://www.presidency.ucsb.edu/ documents/special-message-the-congress-the-american-promise.

from the factual record: establishing "a simple, uniform standard which cannot be used, however ingenious the effort, to flout our Constitution"[19] was required.[20]

To that end, the Civil Rights Commission had repeatedly recommended that Congress pass a law to "prohibit *any* arbitrary action or . . . inaction which deprives or threatens to deprive any person of the right to *register, vote, and have that vote counted in any Federal election*." 1963 CRC Report at 248 (emphasis added); *see also* 1959 CRC Report at 138-39.  And, in 1964, Congress did just that by enacting the Materiality Provision, barring disenfranchisement based on immaterial errors in voting paperwork in "any Federal election," Pub. L. No. 88-352, § 101(a), 78 Stat. 241, 241 (1964)—and, in 1965, in the face of unstinting resistance, Congress expanded that ban to "any election," Pub. L. No. 89-110, § 15, 79 Stat. 437, 445 (1965).

In sum, to the extent Appellant's "constitutional avoidance" argument is based on the supposed lack of factual support in the congressional record for

---

[19] The American Promise, *available at* https://www.presidency.ucsb.edu/documents/special-message-the-congress-the-american-promise.

[20] Appellants' *amici* compile a larger selection from the indisputably extensive evidence Congress collected.  *See* ECF 114 at 3-6.  But not only do *amici* overlook the wider breadth of Congress's evidence and purpose, *see supra* at 8-16, their compilation proves too little: nothing in the statutory language or legislative history suggests that Congress sought to limit arbitrary disenfranchisement during voting registration, but permit it later in the voting process.  In fact, Congress had every reason and every intention to close all such loopholes, as the history described above shows.

ascribing to the Materiality Provision its plain meaning—which reaches every stage of the voting process—that argument should be rejected. Doing otherwise would needlessly reopen precisely the kind of loophole Congress deliberately closed.

## B. **Congress Had At Least Three Sources of Constitutional Authority to Enact the Materiality Provision**

Appellants' argument is also based on an incomplete account of the sources of constitutional authority for the Materiality Provision. As the Provision's proponents made clear, *see supra* at 12–15, there were at least three: the Elections Clause, the Fifteenth Amendment, and the Fourteenth Amendment.

### i. **The Elections Clause**

Appellants ignore the Elections Clause. *See* U.S. Const. art. I, § 4, cl. 1. The initial version of the Materiality Provision in the 1964 Civil Rights Act was limited to "Federal elections," in part to take advantage of Congress's undisputed powers under the Elections Clause, *see supra* at 12-14, and supporters of the 1965 Voting Rights Act, extending the Materiality Provision to all elections, likewise invoked this this authority, *see supra* at 15.

The Elections Clause gives Congress "broad" substantive authority to "provide a complete code for congressional elections." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) (quotation marks omitted). This

power "is paramount, and may be exercised at any time, and to any extent which [Congress] deems expedient," *id.* at 9 (quotation marks omitted).  Congress's Article I powers reach beyond congressional elections, too: it is "the prerogative of Congress to oversee the conduct of presidential and vice-presidential elections," *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970) (opinion of Black, J.); *see, e.g.*, *Burroughs v. United States*, 290 U.S. 534, 544-48 (1934), as well as state and local elections, to the extent such laws are necessary and proper to prevent interference with federal elections, *see United States v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 353 (E.D. La. 1965) (Wisdom, J.).

Thus, Congress's power to set standards for processing voting paperwork, at any stage of the voting process, should be indisputable with respect to the vast majority of elections—including the joint federal/state election at issue in this appeal.  As the Supreme Court has held, given Congress's broad authority, "there is no compelling reason not to read Elections Clause legislation simply to mean what it says," *Inter Tribal Council*, 570 U.S. at 15, and thus, because the Materiality Provision was enacted pursuant to Congress's authority under that Clause (among others), the Materiality Provision passes constitutional muster.[21]

---

[21] Certain of Appellants' *amici* contend that this Court should interpret the Materiality Provision with a presumption against "alter[ing] sensitive federal-state relationships" in "areas of traditional state responsibility."  ECF 124 at 22 (quoting *Bond v. United States*, 572 U.S. 844, 858 (2014)).  The Supreme Court expressly

### ii.  The Fifteenth Amendment

Appellants concede that the Materiality Provision is a proper exercise of

Congress's authority under the Fifteenth Amendment.  App. Br. at 37.  However,

the Provision need not be "limited to registration" to remain within the scope of

Congress's authority, as Appellants argue, *id.*, nor need it be limited to racially

discriminatory conduct, as Appellants imply and their *amici* contend, *see id.* at 39-

40; ECF 114 at 18-20.

Appellants maintain that laws enforcing the Fifteenth Amendment must

demonstrate "a congruence and proportionality between the injury to be prevented

or remedied and the means adopted to that end," *City of Boerne v. Flores*, 521 U.S.

507, 520 (1997) (quoted at App. Br. 36).  The Supreme Court has previously

recognized, however, that "Congress may use any rational means to effectuate the

constitutional prohibition of racial discrimination in voting."  *Katzenbach*, 383

---

rejected this proposition in *Inter Tribal Council*, 570 U.S. at 15, stating that "[t]he assumption that Congress is reluctant to pre-empt does not hold when Congress acts under [the Elections Clause], which empowers Congress to 'make or alter' state election regulations."  And, in any case, Alabama's suggestion that Congress meant to defer to state management of elections in the Voting Rights Act of 1965, *see* ECF 124 at 22, 40, cannot withstand any historical scrutiny, *cf. Katzenbach*, 383 U.S. at 309 (Voting Rights Act aimed at confronting "an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance").  Indeed, the entire purpose of extending the Materiality Provision to state and local elections in the Voting Rights Act of 1965 was to limit the ability of states to disenfranchise.

U.S. at 324.[22]  Regardless, this Court need not decide which test applies, as the Materiality Provision is constitutional under either standard.

*First*, as the "voluminous legislative history" compiled by Congress shows, *Katzenbach*, 383 U.S. at 309, *see supra* at 8–16, the "injury to be prevented" was not merely the misuse of a particular form or process, but rather the relentless disenfranchisement by officials who were determined to take advantage of any available technicality to deny Black Americans' right to vote.  Thus, the "means" adopted by Congress to prevent that injury, *i.e.*, a rule outlawing the use of immaterial paperwork errors to deny voting rights at any stage, was not just "congruen[t] and proportional[]," *City of Boerne*, 521 U.S. at 520, it was urgently necessary.

*Second*, even if Congress's findings *were* limited to a narrow problem with registration paperwork (which they were not), the statute is not rendered constitutionally infirm because it reaches later steps in the voting process. Congress indisputably has power to enact "prophylactic legislation . . . to prevent and deter unconstitutional conduct," *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728-29 (2003), including when "protecting voting rights," *City of Boerne*, 521 U.S. at 518.  Having found overwhelming evidence of discrimination in voter

---

[22] *Shelby County v. Holder* does not resolve the question; it invalidated the re-enactment of the Voting Rights Act's coverage formula only after determining that Congress's justification was "irrational."  570 U.S. 529, 556 (2013).

registration, Congress could permissibly enact "prophylactic legislation" to prevent that discrimination *as well as* foreclose the opportunity for functionally identical discrimination later in the voting process.  *See Moskal v. United States*, 498 U.S. 103, 111 (1990) ("This Court has never required that every permissible application of a statute be expressly referred to in its legislative history.").[23]  Given Congress's detailed findings regarding the relentless, multi-faceted efforts to deny the right to vote, it strains credulity to conclude that, despite Congress's "broad" enforcement powers, *City of Boerne*, 521 U.S. at 517-18, it was required to leave obvious loopholes open to allow officials to discriminate in precisely the same manner later in the voting process.[24]

 *Third*, contrary to *amici*'s suggestions, ECF 114 at 18-20, the Materiality Provision remains well within the scope of Congress's Fifteenth Amendment enforcement powers without any "suggestion of a requirement of racial

---

[23] *See also Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) ("[W]e recognize that Congress in combating specific evils might choose a broader remedy.").

[24] Appellants and their *amici* also ignore the all-too-obvious reason Congress was able to obtain a comparative plethora of evidence of discrimination during registration: officials were so effective at stopping Black Americans from registering that there were far fewer opportunities to discriminate against them when casting ballots.  But it defies both common sense and constitutional law to suggest that Congress—having obtained so much evidence that officials would use any technical excuse to stop Black voters from exercising their rights—had to wait for these odious schemes to continue into the ballot-casting process before acting.

24

discrimination"—as a Fifth Circuit merits panel held just last month.  *Vote.Org v. Callanen*, No. 22-50536, -- F.4th --, 2023 WL 8664636, at \*18-19 (5th Cir. Dec. 15, 2023).  Just as "Congress may prohibit all literacy tests under the Fifteenth Amendment because they unduly lend themselves to discriminatory application," Congress may likewise take note of the fact that "immaterial omissions . . . were historically used to prevent racial minorities from voting," and forbid that practice "irrespective of racial animus."  *Id.* (quotation marks omitted). Congress's decision to prevent racial discrimination by "requiring the application of uniform standards, practices, and procedures to all persons," regardless of race, H.R. Rep. No. 88-914, 1964 U.S.C.C.A.N. at 2394, was both an appropriate means to "reduce discriminatory application of voting standards," *id.*, and a "congruent and proportional exercise of congressional power." *Vote.Org*, 2023 WL 8664636, at \*19.

### iii.  <u>The Fourteenth Amendment</u>

Finally, Appellants and their *amici* make no mention of the fact that—as many members of Congress emphasized, *see supra* at 12-13 & n.13—Congress's authority to enact the Materiality Provision also emanates from the Fourteenth Amendment.

Like the Fifteenth Amendment, Congress's authority under the Fourteenth Amendment is "broad," *City of Rome v. United States*, 446 U.S. 156, 176-77

(1980), and Congress may act pursuant to this font of authority to prohibit even practices that are not themselves unconstitutional, provided there is "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," *City of Boerne*, 521 U.S. at 520; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365, 368-74 (2001) (determining scope of constitutional right and "examin[ing] whether Congress identified a history and pattern of unconstitutional" actions by states). The Voting Rights Act is a paradigmatic, valid exercise of Congress's powers under the Fourteenth Amendment. *See Hibbs*, 538 U.S. at 737-38.

Both the due process and equal protection clauses of the Fourteenth Amendment support the Materiality Provision:

*First*, arbitrary disenfranchisement violates the Due Process Clause and gives rise to a cognizable constitutional injury against which Congress may protect. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000) ("Having once granted the right to vote on equal terms, the State may not, *by later arbitrary and disparate treatment*, value one person's vote over that of another." (emphasis added)). Such arbitrary action is unconstitutional even absent racial motivation. *See Baker v. Carr*, 369 U.S. 186, 208 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution . . . .").

Congress compiled a detailed record of the many arbitrary factors—

misspellings, missed signatures, and erroneous dates—used as purported bases for

denying citizens' rights to vote.  *See supra* at 8-16.  And members of Congress

expressly invoked the Due Process Clause during the debate surrounding the

Materiality Provision, drawing on this extensive record.  As Representative

Emanuel Celler, a manager of the Voting Rights Act in the House, explained:

> [I]t is a plain violation of due process to [disenfranchise] a person for making an immaterial error on an application form, and this, too, is as true with respect to local and State [as] well as Federal elections.  Hence the due process clause and section 5 of the 14th amendment . . . sustain this extension.

111 Cong. Rec. 15,652 (1965).

In sum, it is difficult to imagine an enactment better tailored to enforce

citizens' undisputed "right to a vote free of arbitrary impairment by state action,"

*Baker*, 369 U.S. at 208, than the Materiality Provision.[25]

*Second*, election laws that racially discriminate, or that are applied

discriminatorily, violate the Equal Protection Clause.  *See Hunter v. Underwood*,

471 U.S. 222, 231-33 (1985); *Nixon v. Herndon*, 273 U.S. 536, 541 (1927).

---

[25] *Amicus* RITE is thus wrong to suggest that "[c]onstruing the statute to require racial discrimination as an element" helps avoid a "constitutional problem." ECF 114 at 19.  No such "problem" exists, as racial discrimination is not required to establish a violation of the Due Process Clause—nor, as noted above, is Congress limited to prohibiting racially discriminatory conduct under the Fifteenth Amendment.

Further, "[e]qual protection applies" not only to the "initial allocation of the franchise," but also "to the manner of its exercise." *Bush*, 531 U.S. at 104-05.

With respect to the Materiality Provision, Congress amply satisfied any requirements to identify a constitutional wrong and to remedy it via a "congruent and proportional" response. The congressional record is replete with findings about racially discriminatory voting laws and/or racially discriminatory application of facially neutral voting laws.[26] And, again, members of Congress invoked the equal protection clause as a constitutional basis for voting rights legislation. *E.g.*, 110 Cong. Rec. 1,593 (1964) (statement of Rep. Farbstein) (referencing need to "implement[]" "[t]he clear mandate of the 14th amendment which secures to all Americans equal protection of the laws"); *id.* at 6,531 (statement of Sen. Humphrey) (highlighting constitutional authority "to legislate with respect to . . . denial[s] of equal protection of the laws guaranteed by the 14th amendment").

Thus, after "Congress documented a marked pattern of unconstitutional action by the States" and had first tried more limited legislation that made insufficient progress, the Materiality Provision represented a "limited remedial

---

[26] *E.g.*, 110 Cong. Rec. 6,650 (1964) (statement of Sen. Javits) ("[W]here . . . if a white voter misspells a word in his application . . . or if he makes some other minor error, his application is approved, but in the case of a [Black American], it would be thrown out; . . . Congress, in implementing the constitutional guarantee, may properly require that the State's qualifications be applied to all voters equally.").

scheme designed" to alleviate—*finally*—the systematic, discriminatory denial of

Black Americans' voting rights.  *See Bd. of Trs. of Univ. of Ala.*, 531 U.S. at 373.

## CONCLUSION

The Materiality Provision was a congruent and proportional response to

decades of voting officials' relentless, ingenious, and opportunistic discrimination.

This Court need not harbor any "doubt" that the Materiality Provision is

constitutional under the Elections Clause, and under the Fourteenth and Fifteenth

Amendments, or that the decision below can be affirmed in full.

Respectfully submitted,

Dated:  New York, New York       CLARICK GUERON REISBAUM LLP
        January 12, 2024

By: /s/  Aaron Crowell
    Aaron Crowell
    Alexander D. Bernstein
    David Kimball-Stanley
    220 Fifth Avenue, 14th Floor
    New York, NY 10001
    Tel.:  (212) 633-4310
    acrowell@cgr-law.com
    abernstein@cgr-law.com
    dkimballstanley@cgr-law.com

    *Attorneys for Amicus Curiae The
    Protect Democracy Project*

## <u>COMBINED CERTIFICATIONS</u>

In accordance with applicable Federal and Local Rules, I certify as follows:

1. I am a member in good standing of the Bar of this Court.

2. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,472 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

3. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

4. The text of the electronic brief is identical to the text in the paper copies.

5. The electronic file containing the brief was scanned for viruses using Vipre Virus Protection, version 3.1, and no virus was detected.

Dated:  New York, New York
          January 12, 2024

Respectfully submitted,

CLARICK GUERON REISBAUM LLP


By: /s/  Aaron Crowell
     Aaron Crowell
     Alexander D. Bernstein
     David Kimball-Stanley
     220 Fifth Avenue, 14th Floor
     New York, NY 10001
     Tel.:  (212) 633-4310
     acrowell@cgr-law.com
     abernstein@cgr-law.com
     dkimballstanley@cgr-law.com

*Attorneys for Amicus Curiae The*
*Protect Democracy Project*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this brief was electronically filed with the Court using the CM/ECF system, which will provide notice to and service on all counsel of record.

Dated:  New York, New York
         January 12, 2024

Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By: /s/  Aaron Crowell
    Aaron Crowell
    Alexander D. Bernstein
    David Kimball-Stanley
    220 Fifth Avenue, 14th Floor
    New York, NY 10001
    Tel.:  (212) 633-4310
    acrowell@cgr-law.com
    abernstein@cgr-law.com
    dkimballstanley@cgr-law.com

*Attorneys for Amicus Curiae The Protect Democracy Project*