No. 23-3166

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

PENNSYLVANIA STATE CONFERENCE OF NAACP BRANCHES, *et al.*,

Plaintiffs-Appellees

v.

SECRETARY COMMONWEALTH OF PENNSYLVANIA, *et al.*,

Defendants-Appellants

REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL
COMMITTEE, THE REPUBLICAN PARTY OF PENNSYLVANIA,

Intervenors-Defendants-Appellants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING PLAINTIFFS-
APPELLEES AND URGING AFFIRMANCE ON THE ISSUES ADDRESSED HEREIN

———————————

KRISTEN CLARKE
  Assistant Attorney General

TOVAH R. CALDERON
JASON LEE
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-1317

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................................1

STATEMENT OF THE ISSUES ........................................................................1

STATEMENT OF THE CASE.............................................................................2

     A.    Statutory Background...........................................................................2

     B.    Factual Background..............................................................................3

SUMMARY OF ARGUMENT............................................................................6

ARGUMENT

     I.     Private plaintiffs may enforce the Materiality Provision. .....................7

     II.    The Materiality Provision extends beyond voter
           registration. ......................................................................................10

          A.    The Provision's plain text applies to acts at any
                stage in the voting process that are necessary for
                having one's vote counted........................................................10

          B.    Intervenors' arguments about the Provision's
                purpose, history, and impact are unpersuasive. .......................18

          C.    The Provision is a constitutional exercise of
                Congress's Fifteenth Amendment authority..............................22

     III.   Pennsylvania's date requirement must be analyzed
           separately from the State's signature requirement, and no
           deference is warranted to the state legislature's supposed
           view of the date requirement's importance. .......................................25

**TABLE OF CONTENTS (continued):**                                    **PAGE**

IV.   The district court appropriately ordered officials to count
the individual plaintiffs' ballots...........................................................26

CONCLUSION ...................................................................................29

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                          **PAGE**

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008) ................................... 11, 13

*Allen v. Milligan*, 599 U.S. 1 (2023)..................................................................23

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).................... 21, 23

*Ball v. Chapman*, 289 A.3d 1 (Pa. 2023) ....................................... 4, 22, 25

*Bostock v. Clayton Cnty.*, 140 S.Ct. 1731 (2020) ............................. 18-19

*Bush v. Gore*, 531 U.S. 98 (2000) (per curiam)............................ 7, 26-27

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ....................................22

*Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021) ............................. 13, 17

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ....................................21

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) .................................... 7-8

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980) .................................12

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023)................9

*Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219 (6th Cir. 2011)..............28

*Johnson v. Arteaga-Martinez*, 596 U.S. 573 (2022)....................................22

*La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR,
    2023 WL 8263348 (W.D. Tex. Nov. 29, 2023),
    *appeal pending*, No. 23-50885 (5th Cir.) ......................................22

*League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174,
    2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) ............................................11

**CASES (continued):**                                                   **PAGE**

*League of Women Voters of Wis. v. Wisconsin Elections Comm'n*,
   No. 2022CV2472 (Wis. Cir. Ct. Dane Cnty. Jan. 2, 2024). ...........................11

*Lewis v. Alexander*, 685 F.3d 325 (3d Cir. 2012)......................................................7

*Martin v. Crittenden*, 347 F.Supp.3d 1302 (N.D. Ga. 2018)........................... 11, 29

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ......................................23

*McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000) ..................................................8

*McLinko v. Department of State*, 279 A.3d 539 (Pa. 2022)......................................3

*Merrill v. Milligan*, 142 S.Ct. 879 (2022)...............................................................28

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir.),
   *vacated as moot sub nom. Ritter v. Migliori*,
   143 S.Ct. 297 (2022)................................................................................... *passim*

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) ................................... 7, 27-28

*Quarles v. United States*, 139 S.Ct. 1872 (2019)....................................................18

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   140 S.Ct. 1205 (2020) (per curiam).........................................................................28

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ................................................ 8-10

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) .........................................................23

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ............................................23

*United States v. Cunningham*, No. 3:08-cv-709,
   2009 WL 3350028 (E.D. Va. Oct. 15, 2009) ................................................29

*United States v. New York*, No. 1:10-cv-1214,
   2012 WL 254263 (N.D.N.Y. Jan. 27, 2012) ................................................29

**CASES (continued):**                                                 **PAGE**

*United States v. West Virginia*, No. 2:14-27456,
2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014) ...........................................29

*Vote.Org v. Callanen*, No. 22-50536,
2023 WL 8664636 (5th Cir. Dec. 15, 2023)......................................... *passim*

*Wisniewski v. Rodale, Inc.*, 510 F.3d 294 (3d Cir. 2007) .........................................8

**CONSTITUTIONS:**

U.S. Const. Art. I, § 4, Cl. 1 ...................................................................21

U.S. Const. Art. VI, Cl. 2 .......................................................................27

Pa. Const. Art. VII, § 1 ...........................................................................3

**STATUTES:**

Civil Rights Act of 1957
Pub. L. No. 85-315, § 131(c), 71 Stat. 637.................................................2, 10
Pub. L. No. 85-315, § 131(d), 71 Stat. 637 .................................................10

Civil Rights Act of 1960
Pub. L. No. 86-449, § 601, 74 Stat. 90-92....................................................2

Civil Rights Act of 1964
52 U.S.C. 10101 .................................................................................2, 15
52 U.S.C. 10101(a)(1)........................................................................ 16-17
52 U.S.C. 10101(a)(2)(A) .......................................................................16
52 U.S.C. 10101(a)(2)(B) ................................................................*passim*
52 U.S.C. 10101(a)(2)(C) .......................................................................16
52 U.S.C. 10101(a)(3)(A) .........................................................................3
52 U.S.C. 10101(c) .................................................................................1
52 U.S.C. 10101(d) ...............................................................................10
52 U.S.C. 10101(e)........................................................................*passim*
52 U.S.C. 10101(g) ...............................................................................10
Pub. L. No. 88-352, § 101, 78 Stat. 241-242 .................................................3

**STATUTES (continued):** **PAGE**

Enforcement Act of 1870
    Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140................................................2

Uniformed and Overseas Citizens Absentee Voting Act
    52 U.S.C. 20301-11 ...........................................................................29

42 U.S.C. 1983 ...................................................................................... 2, 5-6

52 U.S.C. 10508 ...........................................................................................20

52 U.S.C. 20301 ...........................................................................................29

Ala. Code §§ 17-11-7(b) (2019) ...................................................................20

Ala. Code §§ 17-11-10(b)(2) (2019)..............................................................20

Ariz. Rev. Stat. Ann. § 16-611 (2023)..........................................................21

Cal. Elec. Code § 3011(c) (West 2022) .........................................................21

Colo. Rev. Stat. Ann. § 31-10-1002(1) (2014) .............................................20

Fla. Stat. Ann. § 101.657(4)(a) (West 2020) ................................................19

Ky. Rev. Stat. Ann. § 117.085(7) (West 2022) .............................................20

Ky. Rev. Stat. Ann. § 117.255 (West 2021) ..................................................20

La. Stat. Ann. § 18:562(C) (2023) ................................................................19

Mont. Code Ann. § 13-19-301(1)(b) (2024)..................................................20

25 Pa. Cons. Stat. § 1301(a) (2002) ................................................................3

25 Pa. Cons. Stat. § 1301(b) (2002)......................................................... 14-15

25 Pa. Stat. and Cons. Stat. Ann.
    § 2811 (West 2023) .......................................................................3

**STATUTES (continued):**                                          **PAGE**

§ 3048(c) (West 2020) ...............................................16
§ 3050(a.3) (West 2020) ...........................................15
§ 3050(a.3)(3) (West 2020) ......................................16
§ 3050(a.4) (West 2020) ...........................................15
§ 3054(a) (West 2020) ..............................................16
§ 3058(b) (West 2020) ..............................................20
§ 3146.6(a) (West 2020) ..............................................4
§ 3150.11(a) (West 2020) ........................................ 3-4
§ 3150.12(b) (West 2020) .........................................19
§ 3150.12(c) (West 2020) .........................................19
§ 3150.12b(a) (West 2020) ......................................15
§ 3150.16(a) (West 2020) ......................................4, 19

Va. Code Ann. § 24.2-643(B) (2022) ........................20

**RULE:**

Fed. R. App. P. 29(a) .................................................1

**LEGISLATIVE HISTORY:**                                          **PAGE**

H.R. Rep. No. 291, 85th Cong., 1st Sess. (1957) ......................2

H.R. Rep. No. 914, 88th Cong., 1st Sess. (1963) ............ 2-3, 24

H.R. Rep. No. 914, Pt. 2, 88th Cong., 1st Sess. (1963)........................24

**MISCELLANEOUS:**

*Webster's New International Dictionary of the English Language*
  (2d ed. unabridged 1960) ..............................................12

## INTEREST OF THE UNITED STATES

This case involves the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. 10101(a)(2)(B).  The United States, through the Attorney General, has a direct role in enforcing the Provision, 52 U.S.C. 10101(c), and therefore, a significant interest in its proper interpretation, as well.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES

1.  Whether private plaintiffs have a right of action to enforce the Materiality Provision.

2.  Whether the Materiality Provision applies outside of voter registration.

3.  Whether a voter's signature and a date written on a mail ballot return envelope serve different functions.

4.  Whether it would be inappropriate for a court to defer to the view of the state legislature when assessing materiality under the Provision.

5.  Whether the district court's remedy for a Materiality Provision violation was lawful.[1]

---

[1]  The United States takes no position on any other issue.

## STATEMENT OF THE CASE

### A.    Statutory Background

What is now 52 U.S.C. 10101 traces its lineage to the Enforcement Act of 1870.  The legislation provided that any person otherwise qualified to vote "shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State . . . to the contrary notwithstanding."  Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140 (52 U.S.C. 10101(a)(1)).  Until 1957, the United States could enforce this law only via criminal prosecutions.  H.R. Rep. No. 291, 85th Cong., 1st Sess. 12, 15 (1957).  Private parties alone civilly enforced the statute, typically under 42 U.S.C. 1983.  *Ibid.*; *see also Vote.Org v. Callanen*, No. 22-50536, 2023 WL 8664636, at *7-8 (5th Cir. Dec. 15, 2023).

The Civil Rights Act of 1957 added four Subsections to Section 10101 and, for the first time, granted the Attorney General power to enforce it through civil suits.  Pub. L. No. 85-315, § 131(c), 71 Stat. 637 (52 U.S.C. 10101(b)-(d) and (f)).  Further amendment in 1960 authorized the Attorney General to bring pattern-or-practice claims for racial discrimination in voting.  Civil Rights Act of 1960, Pub. L. No. 86-449, § 601, 74 Stat. 90-92 (52 U.S.C. 10101(e)).

The Civil Rights Act of 1964 amended the statute again to "provide specific protections to the right to vote."  H.R. Rep. No. 914, 88th Cong., 1st Sess. 19

(1963) (1963 House Report); *see also* Pub. L. No. 88-352, § 101, 78 Stat. 241-242.

Among the amendments is the Materiality Provision, which today states:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. 10101(a)(2)(B). The statute defines "vote" to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes." 52 U.S.C. 10101(a)(3)(A) and (e).

### B.    Factual Background

1. In Pennsylvania, an individual is qualified to vote if, on the day of the election, they (1) are at least 18 years of age, (2) have been a United States citizen for at least one month, (3) have resided in Pennsylvania for at least 90 days, (4) have resided in their voting district for at least 30 days, and (5) have not been incarcerated for a felony conviction within the last five years. *See* Pa. Const. Art. VII, § 1; 25 Pa. Cons. Stat. § 1301(a) (2002); 25 Pa. Stat. and Cons. Stat. Ann. § 2811 (West 2023).

The State permits "all qualified voters to cast their vote by mail." *McLinko v. Department of State*, 279 A.3d 539, 544 (Pa. 2022); *see also* 25 Pa. Stat. and

- 3 -

Cons. Stat. Ann. § 3150.11(a) (West 2020).  To do so, a voter submits an application to their county board of elections, which verifies whether the person is qualified under state law to vote.  App.56 (district court opinion).[2]  If they are, the board sends the voter a "ballot package" containing a mail ballot, a "Secrecy Envelope," and a "Return Envelope."  App.57 (district court opinion).  Printed on the return envelope is a "declaration that contains 'a statement of the [elector's] qualifications, together with a statement that such elector has not already voted in such primary or election.'"  *Ball v. Chapman*, 289 A.3d 1, 9 (Pa. 2023) (alteration in original; citation omitted).

After marking the ballot, the voter seals it in the secrecy envelope, places the the secrecy envelope inside the return envelope, "date[s] and sign[s] the declaration," and seals the return envelope.  25 Pa. Stat. and Cons. Stat. Ann. § 3150.16(a) (West 2020); *see also* 25 Pa. Stat. and Cons. Stat. Ann. § 3146.6(a) (West 2020) (absentee ballots).

2.  In *Migliori v. Cohen*, 36 F.4th 153 (3d Cir.), *vacated as moot sub nom. Ritter v. Migliori*, 143 S.Ct. 297 (2022), this Court considered a challenge under the Materiality Provision to the requirement that Pennsylvania voters date their

---

[2] "App.__" refers to the page of intervenors' appendix.  "Doc. _, at _" refers to the docket and page number of documents filed in the district court.  "Br.__" refers to the page of intervenors' opening brief.

return envelopes. *Id.* at 159-164. As relevant here, the Court held that private parties may enforce the Provision under 42 U.S.C. 1983 and the Provision applies outside the voter-registration context. *Id.* at 162 & n.56. The Court further concluded that the date requirement is "immaterial to determining [voters'] qualifications" under Pennsylvania law and remanded with directions for the district court to "order that the undated ballots [in the election at issue] be counted." *Id.* at 164.

The Supreme Court later granted certiorari and vacated the opinion as moot. *See Ritter*, 143 S.Ct. at 298.

3. A group of individuals and private organizations sued Pennsylvania's Acting Secretary of the Commonwealth and its 67 county boards of elections, arguing that rejection of mail ballots because return envelopes are undated or bear purportedly "incorrect" dates violates the Materiality Provision. Doc. 1, at 5-13, 22-25. A set of Republican Party committees later intervened as defendants. Doc. 167, at 11-12.

The parties cross-filed for summary judgment (Docs. 270-271, 274-275), and the district court granted in part and denied in part plaintiffs' motion and denied in whole intervenors' motion (App.6-7). As relevant here, the court held that plaintiffs could enforce the Materiality Provision through 42 U.S.C. 1983 and an implied right of action. App.63-67. The court further concluded that the

Provision applies to mail voting, and that officials' rejection of ballots where return envelopes are undated or "incorrectly dated" violates the Materiality Provision. App.76-85.  As a remedy, the court issued declaratory relief against the 12 county boards of elections for which the plaintiffs had established standing and required three boards to count the individual plaintiffs' ballots.  App.5-7.

Intervenors appealed (App.1) and petitioned for a stay pending appeal (Appellants' & Proposed Intervenor's Emergency Mot. for a Stay (Dec. 7, 2023)). A motions panel of this Court granted the request, though cautioning that such action was not based on any finding that intervenors' "likelihood of winning on appeal [wa]s more likely than not."  Order 3 (Dec. 13, 2023).

## SUMMARY OF ARGUMENT

This Court should reject intervenors' arguments about the private enforceability, scope, and application of the Materiality Provision.  As this Court previously recognized, the Materiality Provision creates a personal right that is presumptively enforceable under 42 U.S.C. 1983, and intervenors fail to identify any comprehensive enforcement scheme that would be incompatible with a private remedy.  Nor do their arguments about the Provision's text, structure, purpose, history, impact, or enactment reveal any error in the district court's determination (like this Court's before it) that the Provision applies beyond voter registration. Intervenors' arguments applying the Provision conflate voters' signatures and the

- 6 -

dates on return envelopes despite the different functions they serve, and also

wrongly call for deference to the Pennsylvania legislature's supposed view that the

date requirement is "important."  Br.47.  Finally, neither *Bush v. Gore*, 531 U.S. 98

(2000) (per curiam), nor *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam),

precluded the district court from ordering officials to count validly cast votes as a

remedy for the Materiality Provision violations it found.

## ARGUMENT

## I.    Private plaintiffs may enforce the Materiality Provision.

A.  The district court correctly held that private plaintiffs may enforce the

Materiality Provision under 42 U.S.C. 1983.  App.66-67.  Section 1983 "supplies a

remedy for the vindication of rights secured by federal statutes."  *Gonzaga Univ. v.

Doe*, 536 U.S. 273, 284 (2002).  To determine whether statutory text contains

"rights-creating language," this Court considers whether (1) the statute "benefits

[prospective] plaintiffs with a right unambiguously conferred by Congress," (2) the

right is not so "vague and amorphous" that "enforcement would strain judicial

competence," and (3) the statute "impose[s] a binding obligation on the States."

*Lewis v. Alexander*, 685 F.3d 325, 344-345 (3d Cir. 2012) (citations omitted).  The

Materiality Provision meets these standards.  It expressly prohibits the denial of a

person's right to vote in an election by a "person acting under color of law" based

on "an error or omission on any record or paper relating to any . . . act requisite to

- 7 -

voting." 52 U.S.C. 10101(a)(2)(B). "With an explicit reference to a right and a focus on the individual protected, this language suffices to demonstrate Congress's intent to create a personal right." *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 302 (3d Cir. 2007).

Indeed, this Court has already determined that the Materiality Provision creates such a right. *See Migliori v. Cohen*, 36 F.4th 153, 159 (3d Cir.), *vacated as moot sub nom. Ritter v. Migliori*, 143 S.Ct. 297 (2022).[3] The Fifth and Eleventh Circuits agree. *See Vote.Org*, *supra* note 3, 2023 WL 8664636, at *7-8; *Schwier v. Cox*, 340 F.3d 1284, 1296-1297 (11th Cir. 2003).[4]

B. Where "a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284. It therefore falls to intervenors here to "rebut th[at] presumption." *Id.* at 284 n.4. Their effort to do so (Br.52-53) relies on Section 10101(e), in which, after the Attorney General has

---

[3] As the district court explained, although *Migliori* was vacated as moot, the case was "fully briefed (including submission from several *amici curiae*)," considered at oral argument, and circulated to the full Court for consideration of further review. App.71. The opinion was thus "forged and tested in the same crucible as all opinions," and its "reasoning was unaffected by the case['s] subsequent mootness." *Ibid.* (citation omitted); *see also Vote.Org*, No. 22-50536, 2023 WL 8664636, at *10, *12-13 (5th Cir. Dec. 15, 2023) (relying on *Migliori*).

[4] The only other circuit to address this issue never discussed Section 1983, merely stating without elaboration that the Provision "is enforceable by the Attorney General, not by private citizens." *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000).

alleged and a court has found a pattern or practice that denies individuals "on

account of race or color" the rights protected by Section 10101(a), an individual

"of such race or color resident within the affected area" may be able to obtain a

court order "declaring him qualified to vote," 52 U.S.C. 10101(e).

However, Subsection (e) does not contain "a private judicial right of action,

a private federal administrative remedy, or any carefu[l] congressional tailor[ing]

that § 1983 actions would distort." *Health & Hosp. Corp. of Marion Cnty. v.

Talevski*, 599 U.S. 166, 190 (2023) (alterations in original; internal citations and

quotation marks omitted).  Merely creating a *public* right of action and a new type

of claim for the Attorney General, as the Materiality Provision does, does not

suffice.  *See Schwier*, 340 F.3d at 1294-1296; *see also Migliori*, 36 F.4th at 162

(rejecting reliance on "the mere existence of a public remedy by the Attorney

General").  Indeed, the Fifth Circuit specifically rejected the proposition that

Subsection (e) creates the type of "comprehensive enforcement scheme" that,

under *Talevski*, is "incompatible" with Section 1983 enforcement.  *Vote.Org*, 2023

WL 8664636, at *8 (citation omitted).

Other congressional action confirms this understanding.  Litigation under

Section 10101(e) must be "instituted pursuant to subsection (c)."  And the

legislation that authorized the Attorney General to enforce the Provision through

civil suits under Subsection (c) simultaneously authorized district courts to hear

other Section 10101 claims "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies."  Civil Rights Act of 1957, Pub. L. No. 85-315, § 131(c)-(d), 71 Stat. 637 (1957).  This reference to "the party aggrieved," 52 U.S.C. 10101(d), clearly contemplates private enforcement, and the elimination of exhaustion requirements makes it *easier* for such parties to bring suit, *see Vote.Org*, 2023 WL 8664636, at *8; *Migliori*, 36 F.4th at 160; *Schwier*, 340 F.3d at 1296.[5]

## II.    The Materiality Provision extends beyond voter registration.

### A.    The Provision's plain text applies to acts at any stage in the voting process that are necessary for having one's vote counted.

1.  As this Court previously recognized, the plain text of the Materiality Provision refutes intervenors' claim that it extends only to voter registration materials.  *See Migliori*, 36 F.4th at 162 n.56 ("[W]e cannot find that Congress intended to limit this statute to . . . registration.").  The Provision applies to "an

---

[5]  Text, history, and precedent establish that private plaintiffs also have an implied right of action under the Provision itself.  For instance, when Congress intended to withhold Section 10101's enforcement procedures from private parties, it did so expressly.  *Compare* 52 U.S.C. 10101(d) (providing jurisdiction over all "proceedings instituted pursuant to this section," without exhaustion requirements for any "party aggrieved"), *with* 52 U.S.C. 10101(e) (limiting pattern-or-practice claims in cases "instituted pursuant to subsection (c)"); 52 U.S.C. 10101(g) (permitting three-judge courts in certain "proceeding[s] instituted by the United States").  Likewise, when Congress added federal enforcement authority for Section 10101, it recognized—and did nothing to alter—a three-quarter-century long history of private enforcement.  *See* p.2, *supra*.

error or omission on *any* record or paper relating to *any* application, registration, or other act requisite to voting."  52 U.S.C. 10101(a)(2)(B) (emphases added). Congress's intentional repetition of the word "any" belies intervenors' cramped interpretation.  The first use requires a "broad" reading that reaches documents "of whatever kind."  *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) (citation omitted).  The second use requires a similarly "broad" reading of the occasions when an immaterial error might occur, *ibid.*:  during the processes of applying, registering, or undertaking whatever kind of act is "requisite to voting."

Construing "record[s] or paper[s]" as merely voter registration materials, and "other act[s] requisite to voting" as only those required by voter registration laws, would ignore these indicators.  The Materiality Provision *already* expressly includes registration materials.  And its text extends beyond that subset of documents, as evidenced by lower court decisions applying the Provision to, among other things, absentee ballot applications, *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021), and absentee ballot materials, *Martin v. Crittenden*, 347 F.Supp.3d 1302, 1308-1309 (N.D. Ga. 2018); *League of Women Voters of Wis. v. Wisconsin Elections Comm'n*, No. 2022CV2472 (Wis. Cir. Ct. Dane Cnty. Jan. 2, 2024), slip op. 4-5.

The statutory definition of "vote" buttresses this reading. As discussed, the Provision applies to "*any . . . other act requisite to voting.*" 52 U.S.C. 10101(a)(2)(B) (emphasis added). "Requisite" means "[r]equired by the nature of things, by circumstances, or by the end in view; necessary." *Webster's New International Dictionary of the English Language* 2117 (2d ed. unabridged 1960). The Provision thus applies to any action that a voter must take to vote. Section 10101 then defines "vote" to "include[] all action necessary to make a vote effective including, but not limited to, registration or *other* action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. 10101(e) (emphasis added). Congress could not have chosen language better crafted to apply the Provision, not just to registration, but all acts necessary at any stage of the voting process to cast and count one's vote.

2. Intervenors cite the canon of *ejusdem generis* in arguing that "other act[s] requisite to voting" refers only "to voter registration." Br.21 (citation omitted). But *ejusdem generis* does not apply where the specifically listed items—here, "application" and "registration"—do not all fall within a single category. *See, e.g.*, *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980). The word "application" reaches beyond voter registration applications to include any applications requisite for casting a ballot, such as mail-in ballot applications—indeed, it must do so to avoid surplusage concerns. Accordingly, "application" and "registration" cannot

jointly define a single category that restricts "other act requisite to voting," let alone constrain that phrase exclusively to voter registration.

Moreover, Congress *already* dictated the relevant category by using the phrase "requisite to voting."  This final phrase modifies each of its three antecedents:  "application," "registration," and "other act."  *See Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021) (explaining that "a modifier at the end of the list 'normally applies to the entire series'" (citation omitted)).  It therefore indicates that the Provision applies only to those "acts"—as well as those "application[s]" and "registration[s]"—that are essential preconditions *to voting*.  52 U.S.C. 10101(a)(2)(B).

Additionally, as discussed, the Materiality Provision uses the expansive word "any" to modify the series that includes the phrase "other act requisite to voting."  In *Ali v. Federal Bureau of Prisons*, the Supreme Court rejected the argument that including the specific examples "officer of customs or excise" before the general phrase "or any other law enforcement officer" limited that general phrase to "officers acting in a customs or excise capacity."  552 U.S. at 218 (citation omitted).  The Court determined that "Congress' use of 'any' to modify 'other law enforcement officer' is most naturally read to mean law enforcement officers of whatever kind."  *Id.* at 220.  Likewise, here, Congress's use of "any" to modify "other act requisite to voting" is most naturally read to mean acts of

- 13 -

*whatever* kind that are necessary to cast a ballot and have it counted.  52 U.S.C.

10101(a)(2)(B).

Intervenors' other textual argument—that the Provision only applies to voter

registration because that is when papers or records are used "'in determining'

whether an individual is 'qualified' to vote" (Br.23 (citation omitted))—

contravenes the statutory text.  Because the statute broadly defines "vote" to

"include[] all action necessary to make a vote effective," 52 U.S.C. 10101(e), a

person's qualifications to "vote" include qualifications needed to take such action.

Those actions, moreover, are expressly "*not* limited to[] registration."  52 U.S.C.

10101(e) (emphasis added).

Intervenors' argument also misreads the Materiality Provision itself.  The

Provision does not use the phrase "in determining" to cabin the Provision to

registration.  Rather, it functions to set the standard for assessing materiality—

namely, whether a requirement is necessary "in determining whether such

individual is qualified under State law."  52 U.S.C. 10101(a)(2)(B).

Finally, the argument lacks support in state law.  The Pennsylvania provision

intervenors cite (Br.25) does not say that qualifications to cast a ballot are

determined *solely* when a voter registers; rather, it simply states that, subject to

certain exceptions, "[n]o individual shall be permitted to vote at any election unless

the individual is registered" to vote under state law.  25 Pa. Cons. Stat. § 1301(b)

(2002); *see also* Br.25 (citing this Subsection). Intervenors' lack of state-law

support is unsurprising because determinations of a person's eligibility to cast a

ballot can also occur elsewhere in the voting process. *See, e.g.*, 25 Pa. Stat. and

Cons. Stat. Ann. § 3150.12b(a) (West 2020) ("The county board of elections, upon

receipt of any application of a qualified elector [for a mail ballot] . . . shall

determine the qualifications of the applicant."); *see also* 25 Pa. Stat. and Cons.

Stat. Ann. § 3050(a.3) and (a.4) (West 2020).

3.  Intervenors claim that the Provision must be limited to voter registration

because other parts of Section 10101 are, too. Br.23-25. But again, these

arguments are atextual.

For example, intervenors assert that Section 10101(a)(2)(A) and (C) are

"limited to voter-qualification determinations," which they locate exclusively in

the registration process. Br.23-24. But as discussed, a person's qualifications to

"vote" under the Provision are "not limited to[] registration" qualifications;

instead, they include any qualifications needed to take "action necessary to make a

vote effective." 52 U.S.C. 10101(e). Intervenors' argument also reads a limitation

into the text where none exists because neither subparagraph says *anything* about

registration. Rather, Subsections (a)(2)(A) and (C) restrict the ways officials may

determine a person's qualifications "to vote"—requiring that the same

"standard[s], practice[s], [and] procedure[s]" be used for all persons, and barring

the use of literacy tests except in limited circumstances, *see* 52 U.S.C.

10101(a)(2)(A) and (C)—*regardless* of when those determinations occur. *See*

p.15, *supra*; pp.16-17, *infra*.

Nor is intervenors' reliance on Section 10101(e) reconcilable with the text.

Under Subsection (e), the Attorney General may ask a court to find that "a[] person

has been deprived on account of race or color of any right or privilege secured by

subsection (a) . . . pursuant to a pattern or practice." 52 U.S.C. 10101(e). If the

court makes such a finding, an individual "of such race or color resident within the

affected area" may obtain a judicial order "declaring him qualified to vote" if he

(1) is indeed "qualified under State law to vote," and (2) has been denied the

opportunity to register to vote or "found not qualified to vote by any person acting

under color of law." *Ibid.*

Contrary to intervenors' suggestion, this relief does not merely redress

discriminatory denials of the right to "register to vote." Br.24-25. Rather, a person

can be "found not qualified to vote" at multiple points in the voting process. *See*

25 Pa. Stat. and Cons. Stat. Ann. § 3050(a.3)(3) (requiring that voters at polling

places be "found entitled to vote"); *see also id.* §§ 3048(c), 3054(a); p.15, *supra*.

That is why the "right[s] . . . secured by subsection (a)," which Subsection (e)

seeks to vindicate, extend beyond registration and ensure that individuals "who are

otherwise qualified by law to vote" actually are "allowed to vote." 52 U.S.C.

10101(a)(1).  Subsection (e) makes this goal explicit, stating that a recipient of a judicial order "shall be permitted to vote in any such election."  52 U.S.C. 10101(e).  In short, the whole point of Subsection (e) is to help ensure that qualified individuals can vote, and not just register to do so.

4.  Intervenors' arguments about denial of the right to vote under the Materiality Provision fare no better.  They contend that the constitutional right to vote tolerates the rejection of ballots based on voters' failure to comply with "mandatory ballot-casting rules."  Br.27-28.  But even if that were true, the Provision protects a distinct *statutory* right to "vote," which includes the right to "cast[] a ballot" without fear of it being excluded due to immaterial paperwork errors or omissions relating to an "act requisite to voting."  52 U.S.C. 10101(a)(2)(B) and (e).

Intervenors further suggest that, when the Provision was enacted, the "right to vote . . . was not understood to entail a right to vote by mail."  Br.27 (internal quotation marks omitted).  But even assuming intervenors accurately capture past understanding, Congress enacted statutory language that reaches mail voting by defining "vote" to "include[] all action necessary to make a vote effective" and "hav[e] [one's] ballot counted."  52 U.S.C. 10101(e).  "This Court must interpret what Congress wrote," *Facebook*, 592 U.S. at 409, and nothing in the statutory text

turns on how a voter returns their ballot, *see Migliori*, 36 F.4th at 162 n.56 (finding

that a "mail-in ballot squarely constitutes a paper relating to an act for voting").

**B.    Intervenors' arguments about the Provision's purpose, history, and impact are unpersuasive.**

1.  Lacking support in its text, intervenors resort to arguments about the

Materiality Provision's purpose, history, and impact.  First, they argue that

straightforward application of the language Congress selected would exceed

Congress's purpose in ensuring "nondiscriminatory practices in the registration of

voters."  Br.20 (citation omitted).  To the contrary, it is intervenors' reading that

would frustrate the Provision's goals.  Under their interpretation, the Materiality

Provision would bar rejection of a voter's registration form for omission of

immaterial information, but permit rejection of their ballot for the same omission.

"We should not lightly conclude that Congress enacted a self-defeating statute."

*Quarles v. United States*, 139 S.Ct. 1872, 1879 (2019).

2.  Second, in intervenors' view, the existence of longstanding "paper-based

ballot-casting rules," coupled with recent increases in litigation involving the

Provision, reflect a historical "understanding" that the Provision only applies to

voter registration.  Br.32-33.  "Congress did not," they say, "'hide [this] elephant[]'

in the Materiality Provision's obscure 'mousehole.'"  Br.35 (alterations in original;

citation omitted).  But even if applicability beyond registration were "an

elephant[,] . . . where's the mousehole?"  *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731,

1753 (2020).  Where, as here, a civil rights statute "is written in starkly broad terms," courts are obliged to "recognize" the "consequence[s] of that legislative choice," including where new "applications [have] emerge[d] over time."  *Id.* at 1753-1754.

3.  Third, intervenors exaggerate (Br.33-34) the implications of applying the Provision as written.  Doing so will not suddenly "invalidate a host of state ballot-casting rules."  Br.15.  Rather, for any challenge, the analysis will depend on the contested requirement's substance and purpose within the State's election laws and practices, and the extent to which the requirement is necessary for determining a voter's qualifications.

Under such an analysis, signature requirements for mail ballots, mail-ballot applications, early-voting certificates, and poll lists may be material where they establish a person's eligibility to vote and that the person is who they say they are.  *See, e.g.*, 25 Pa. Stat. and Cons. Stat. Ann. § 3150.12(b) and (c) (West 2020) (mail-ballot application); *id.* § 3150.16(a) (declaration on return envelope); Fla. Stat. Ann. § 101.657(4)(a) (West 2020) (early voting voter certificate); La. Stat. Ann. § 18:562(C) (2023) (precinct register).  Mandating witness signatures on ballots, ballot applications, and voter certificates may also serve to establish a voter's identity, including where, due to a disability, the voter needs to fulfill the types of signature requirements discussed above in some other way—for example, by using

a non-signature mark.  *See, e.g.*, Ala. Code §§ 17-11-7(b), 17-11-10(b)(2) (2019);

Colo. Rev. Stat. Ann. § 31-10-1002(1) (2014); Ky. Rev. Stat. Ann. § 117.085(7)

(West 2022).

Voter assistance forms may also pass muster under the Materiality

Provision.  Some States "entitle[]" voters who have a disability "to receive

assistance in voting."  25 Pa. Stat. and Cons. Stat. Ann. § 3058(b) (West 2020);

*see, e.g.*, Ky. Rev. Stat. Ann. § 117.255 (West 2021); *see also* 52 U.S.C. 10508

(similar provision in the Voting Rights Act (VRA)).  If such a State uses the

information in a voter assistance form to determine a person's qualifications for

voting with such assistance, it may be material.

Intervenors' remaining examples (Br.33-34) do not implicate the Materiality

Provision at all.  Requiring voters to place ballots inside secrecy envelopes, *see,*

*e.g.*, Mont. Code Ann. § 13-19-301(1)(b) (2024), does not involve "error[s] or

omission[s] *on* a[] record or paper," 52 U.S.C. 10101(a)(2)(B) (emphasis added).

Recordkeeping obligations to document in pollbooks the names and sequence of

voters, *see, e.g.*, Va. Code Ann. § 24.2-643(B) (2022), are unlikely to result in

retroactive denials of the right to vote.  Nor do state prohibitions on over-marked

ballots, or signature requirements for individuals returning mail ballots for others,

involve denials of the right to vote.  The former addresses a situation where

officials cannot discern the individual's preferred candidate, and therefore, cannot

"include[]" any vote from the individual "in the appropriate total[]" for that candidate.  52 U.S.C. 10101(e); *see also* Ariz. Rev. Stat. Ann. § 16-611 (2023).  And none of intervenors' examples of the latter (Br.34) requires rejection of a ballot as a penalty—indeed, California forbids it, *see* Cal. Elec. Code § 3011(c) (West 2022).

4.  Nor does the federalism canon aid intervenors.  Br.30-35.  As originally enacted and applied to federal elections, the Materiality Provision is lawful Elections Clause legislation.  That Clause grants Congress the power to "make or alter" laws related to "[t]he Times, Places and Manner of holding Elections for Senators and Representatives."  U.S. Const. Art. I, § 4, Cl. 1.  The Materiality Provision does so by regulating the way States conduct registration and voting activities.  The federalism canon thus "has no work to do in th[is] Elections Clause setting" because "Congress's regulation of congressional elections *necessarily* displaces state regulations," meaning there is no "alter[ation] [of] the traditional state-federal balance."  *Fish v. Kobach*, 840 F.3d 710, 731 (10th Cir. 2016); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12-13 (2013).

The same is true of the Provision's application to state and local elections.  As noted by three Justices on the Pennsylvania Supreme Court, the "narrow nature" of the Provision neither "threaten[s] the states' broad authority to institute and operate election systems of their own design," nor "in any way compel[s] the

- 21 -

rewriting of regulations by federal courts." *Ball v. Chapman*, 289 A.3d 1, 12 (Pa.

2023).[6]

### C.    The Provision is a constitutional exercise of Congress's Fifteenth Amendment authority.

Finally, intervenors' invocation of the canon of constitutional avoidance

finds no purchase.  They warn that the Materiality Provision would be

unconstitutional if applied outside the registration process because it would not be

a congruent and proportional response to the Fifteenth Amendment violations

Congress identified when enacting it.  Br.35-40.  This argument fails on multiple

grounds.

The canon is inapplicable because intervenors' proposed reading is not a

"plausible construction of the text." *Johnson v. Arteaga-Martinez*, 596 U.S. 573,

581 (2022); *see also* pp.11-14, *supra*.  Even if the canon were relevant, intervenors

use the wrong standard for assessing constitutionality.  The "congruence and

proportionality" standard applicable to Fourteenth Amendment legislation, *see City*

*of Boerne v. Flores*, 521 U.S. 507, 520 (1997), does not apply to the Fifteenth

---

[6]  For these reasons, the federalism canon's requirement of "exceedingly clear language" is inapplicable.  Br.34 (citation omitted).  But even if it applied, the requirement would be satisfied because the Provision "unambiguous[ly]" applies beyond the voter-registration context. *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, at *20 (W.D. Tex. Nov. 29, 2023), *appeal pending*, No. 23-50885 (5th Cir. filed Dec. 5, 2023); *see also* pp.11-14, *supra*.

Amendment. Rather, Fifteenth Amendment legislation remains subject to the rationality standard articulated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). *See Allen v. Milligan*, 599 U.S. 1, 41 (2023) (upholding Section 2 of the VRA as "appropriate" legislation based on cases applying *McCulloch* standard); *Shelby Cnty. v. Holder*, 570 U.S. 529, 556 (2013) (invalidating the VRA's coverage formula only after finding that Congress's justification was "irrational"). Under this deferential test, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966), and ensuring ballots are not rejected for immaterial errors and omissions on voting-related paperwork is surely one such means.[7]

But regardless, the Materiality Provision satisfies both the *McCulloch* and *City of Boerne* tests. *See Vote.Org*, 2023 WL 8664636, at *18 n.11. Congress's goal in enacting the Materiality Provision was to "reduce discriminatory obstacles to the *exercise* of the right to vote." 1963 House Report at 18 (emphasis added). One "commonly employed" tactic was to apply "more rigid standards of accuracy"

---

[7] Nor is *City of Boerne*'s "congruence and proportionality" standard applicable to legislation enacted via the Elections Clause, under which Congress's authority is plenary. *See Arizona*, 570 U.S. at 9 (noting that Congress may exercise this authority "at any time, and to any extent which [Congress] deems expedient"); *see also* p.21, *supra*.

to paperwork submitted by Black voters, "thereby rejecting [Black] applications for minor errors or omissions."  H.R. Rep. No. 914, Pt. 2, 88th Cong., 1st Sess. 5 (1963) (1963 House Report Pt. 2) (additional views of Rep. McCulloch et al.).

Congress properly determined that the evidence before it necessitated a general prohibition on denying the right to vote for immaterial errors or omissions at any stage of the voting process.  Rather than try to "capture the hard-to-predict variations" in curtailments of access to voting, Congress "broadly 'prohibit[ed] the disqualification of an individual because of immaterial errors or omissions." *Vote.Org*, 2023 WL 8664636, at \*18 (quoting 1963 House Report at 19).  Doing so, Congress explained, would bar "'onerous procedural requirements' which handicap *the exercise* of the franchise."  1963 House Report Pt. 2 at 6 (emphasis added; citation omitted) (additional views of Rep. McCulloch et al.).  Taking this more expansive approach was "a congruent and proportional exercise of congressional power."  *Vote.Org*, 2023 WL 8664636, at \*19; *see also id.* at \*18-19 (concluding the same regarding the Provision's application beyond racially discriminatory voting practices).

- 24 -

**III. Pennsylvania's date requirement must be analyzed separately from the State's signature requirement, and no deference is warranted to the state legislature's supposed view of the date requirement's importance.**

This Court should reject intervenors' pleas to analyze the date requirement in conjunction with the State's return ballot signature requirement and to defer to the state legislature's supposed view of the date requirement's importance.

Intervenors argue that the date requirement must be material because it "appear[s] in the same" provision of state law as the signature requirement for return envelopes (which all parties agree is material), and because dating and signing together comprise a "formalit[y]" applicable to "[i]mportant documents." Br.46-47 (emphasis omitted). The Materiality Provision does not, however, permit such bootstrapping: intervenors must show that the date requirement, separate from the signature requirement, is "material in determining whether" an individual is qualified under state law to vote. 52 U.S.C. 10101(a)(2)(b).

Here, it is clear the signature on a return envelope serves functions the date does not. A signature establishes the substance of the voter's declaration on the envelope and their qualifications. *See* p.4, *supra*; *see also Ball*, 289 A.3d at 28. A date plays no such role. Additionally, voters returning a mail ballot must attest that they "have not already voted in th[e] election." App.73 n.36 (citation omitted) (district court opinion). "[I]t is the signature which holds the voter accountable, not the date." *Ibid.*; *see also Vote.Org*, 2023 WL 8664636, at *13 (commenting on

- 25 -

*Migliori* and describing the date requirement's "immateriality" as "fairly obvious").

Intervenors also ask this Court to "defer[]" to the state legislature's supposed view that the date requirement is "important." Br.47-48. The Materiality Provision's text, however, provides no basis for such deference. Rather, it "expressly limits states' purported 'considerable discretion,'" *Vote.Org*, 2023 WL 8664636, at *23 (Higginson, J., dissenting), leaving room for neither inquiry into the strength of a State's interest nor means-ends scrutiny, *see, e.g.*, *Migliori*, 36 F.4th at 163. Moreover, the *Vote.Org* panel's statements about deference derived from constitutional right-to-vote cases, 2023 WL 8664636, at *13, even though the right-to-vote doctrine "involves a different analytical framework than what we use for [statutory] claims," *id.* at *23 (Higginson, J., dissenting) (alteration in original; citation omitted).

## IV. The district court appropriately ordered officials to count the individual plaintiffs' ballots.

Intervenors' remaining arguments challenging the district court's relief are meritless.

First, they contend that, under *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), the district court violated the Equal Protection Clause by enjoining only the 12 county boards of elections against which plaintiffs established standing to seek relief. Br.54-57. This was not, however, a constitutional denial of equal

treatment, but rather, a product of the district court's limited Article III authority. Intervenors' argument would mean that a court could not ensure the proper counting of an individual's vote under the Materiality Provision unless it has some grounds for extending the remedy statewide. *Bush v. Gore* does not stand for that astonishing proposition.

Indeed, this case in no way resembles *Bush v. Gore*, where the Supreme Court held, in an opinion "limited to th[ose] [particular] circumstances," that the processes ordered by the Florida Supreme Court for a statewide recount violated the Equal Protection Clause. 531 U.S. at 104-109. Here, all county election boards must comply with the Materiality Provision. Thus, for boards not bound by the district court's order, they must decide whether they concur with and will abide by its analysis, even if state law would require otherwise. *See* U.S. Const. Art. VI, Cl. 2. Those that choose not to do so may be subject to suit by affected voters or the United States. This situation, where not all county boards are covered by a single injunction, is easily distinguishable from the statewide disuniformity that produced a constitutional violation in *Bush v. Gore*, where court-ordered procedures were "standardless" and threatened "arbitrary and disparate treatment" of votes. 531 U.S. at 103-104.

Lastly, intervenors argue that, under *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), the district court erred in issuing relief affecting the 2023 elections

after they concluded.  Br.57-59.  However, the principal rationale underlying *Purcell* seeks to avoid potential voter confusion and administrative disruption preceding an election.  *See Purcell*, 549 U.S. at 4-5; *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020) (per curiam) (instructing that "lower federal courts should ordinarily not alter the election rules on the eve of an election").  *Purcell* can therefore operate as a "refinement of ordinary stay principles for the election context." *Merrill v. Milligan*, 142 S.Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

Such concerns carry significantly less force in the post-election period. After an "election has already occurred, [a court] need not worry that conflicting court orders will generate 'voter confusion and consequent incentive[s] to remain away from the polls.'" *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011) (second alteration in original) (quoting *Purcell*, 549 U.S. at 4-5).  "To the contrary, counting the ballots of qualified voters," consistent with federal law, "may enhance '[c]onfidence in the integrity of our electoral processes[, which] is essential to the functioning of our participatory democracy.'" *Id.* at 244-245 (alterations in original) (quoting *Purcell*, 549 U.S. at 4).  Such was the case here, where the district court vindicated the individual plaintiffs' right to vote and ensured the counting of their ballots, just as other courts have done in the post-election context under the Materiality Provision and the Uniformed and

Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301-11 *et seq.  See, e.g.*, *Martin*, 347 F.Supp.3d at 1311; *United States v. West Virginia*, No. 2:14-27456, 2014 WL 7338867, at *8 (S.D. W. Va. Dec. 22, 2014); *United States v. New York*, No. 1:10-cv-1214, 2012 WL 254263, at *4 (N.D.N.Y. Jan. 27, 2012); *United States v. Cunningham*, No. 3:08-cv-709, 2009 WL 3350028, at *9-10 (E.D. Va. Oct. 15, 2009).

## CONCLUSION

This Court should affirm on the issues discussed above.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Jason Lee
TOVAH R. CALDERON
JASON LEE
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-1317

# CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rules 28.3(d) and 46.1(a), I certify that I am exempt from

the Third Circuit's bar admission requirement as counsel representing the United

States.

s/ Jason Lee
JASON LEE
  Attorney

Date:  January 12, 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6500 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365. Additionally, it complies with the requirements of Local Rule 31.1(c) because the text of the electronic brief is identical to the text in any paper copies of this brief that are submitted to the Court, and the electronic version of this brief, prepared for submission via ECF, has been scanned with the most recent version of Crowdstrike Endpoint Detection and Response (Version 7.1.1713.0) and is virus-free according to that program.

s/ Jason Lee_____
JASON LEE
 Attorney

Date: January 12, 2024

## CERTIFICATE OF SERVICE

On January 12, 2024, I filed this brief with the Clerk of the Court by using the CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.  I also certify that seven (7) paper copies, identical to the brief filed electronically, will be sent to the Clerk of the Court by Federal Express.

s/ Jason Lee
JASON LEE
  Attorney