No. 23-3166

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

———————————

PENNSYLVANIA STATE CONFERENCE OF THE NAACP, *et al.*,
*Plaintiffs-Appellees*,

v.

SECRETARY OF THE COMMONWEALTH, *et al.*,
*Defendants-Appellees*,

REPUBLICAN NATIONAL COMMITTEE, *et al.*,
*Intervenors-Appellants*,

DEMOCRATIC NATIONAL COMMITTEE, *et al.*,
*Intervenors-Appellees*.

———————————

Appeal from the United States District Court for the Western District of
Pennsylvania, Case No. 1:22-cv-00339 (Hon. Susan Paradise Baxter)

———————————

**PETITION FOR REHEARING OR REHEARING EN BANC**

———————————

Witold J. Walczak (PA 62976)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
vwalczak@aclupa.org

Ari J. Savitzky
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
asavitzky@aclu.org
slakin@aclu.org

*Counsel for Plaintiffs-Appellees Continued on Inside Cover*

Marian K. Schneider (PA 50337)
Stephen Loney (PA 202535)
Kate I. Steiker-Ginzberg
(PA 332236)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
mschneider@aclupa.org
sloney@aclupa.org
ksteiker-ginzberg@aclupa.org

Megan C. Keenan
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 10004
Tel: (202) 457-0800
mkeenan@aclu.org
acepedaderieux@aclu.org

David Newmann (PA 82401)
Brittany C. Armour (PA 324455)
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4610
david.newmann@hoganlovells.com
brittany.armour@hoganlovells.com

*Counsel for the Pennsylvania State
Conference of the NAACP, League
of Women Voters of Pennsylvania,
Philadelphians Organized to
Witness, Empower and Rebuild,
Common Cause Pennsylvania,
Black Political Empowerment
Project, Make the Road
Pennsylvania, Barry M. Seastead,
Marlene G. Gutierrez, Aynne
Margaret Pleban Polinski, Joel
Bencan, and Laurence M. Smith*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................i

FRAP 35 STATEMENT ........................................................................1

INTRODUCTION ..............................................................................1

BACKGROUND ...............................................................................3

    A. Statutory Background ............................................................3

    B. Pennsylvania's Mail Ballot Rules .............................................6

    C. Procedural Background ..........................................................7

ARGUMENT ................................................................................10

    I. THE PANEL MAJORITY DRASTICALLY MISINTERPRETED A FEDERAL STATUTE ....................................................................10

    II. THE QUESTION IS EXCEPTIONALLY IMPORTANT ...............19

CONCLUSION ..............................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Babbitt v. Sweet Home Chapter,*
515 U.S. 687 (1995) ................................................................ 14

*Ball v. Chapman,*
289 A.3d 1 (Pa. 2023) ............................................................... 8

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ....................................................... 15, 16

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ................................................................ 13

*Circuit City Stores, Inc. v. Adams,*
532 U.S. 105 (2001) .......................................................... 17, 18

*Flora v. United States,*
362 U.S. 145 (1960) ................................................................ 11

*Ford v. Tennessee Senate,*
No. 06-CV-2031, 2006 WL 8435145
(W.D. Tenn. Feb. 1, 2006) ................................................... 5, 18

*In re Georgia Senate Bill 202,*
No. 1:21-cv-1259-JPB, 2023 WL 5334582
(N.D. Ga. Aug. 18, 2023) ........................................................ 20

*La Unión del Pueblo Entero v. Abbott,*
--- F.Supp.3d ----, 2023 WL 8263348
(W.D. Tex. Nov. 29, 2023) ................................................... 5, 20

*League of Women Voters of Ark. v. Thurston,*
No. 20-CV-05174, 2023 WL 6446015
(W.D. Ark. Sept. 29, 2023) ....................................................... 5

*Martin v. Crittenden,*
347 F.Supp.3d 1302 (N.D. Ga. 2018) ......................................... 5

*Migliori v. Cohen,*
  36 F.4th 153 (3d Cir. 2022) .......................................... *passim*

*Pa. State Conf. of NAACP v. Schmidt,*
  No. 1:22-CV-00339, 2023 WL 8091601
  (W.D. Pa. Nov. 21, 2023) ................................................. 9, 19

*Polychrome Int'l Corp. v. Krigger,*
  5 F.3d 1522 (3d Cir. 1993) ..................................................... 20

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012) ............................................................. 13

*Ratzlaf v. United States,*
  510 U.S. 135 (1994) ............................................................. 16

*Ritter v. Migliori,*
  142 S. Ct. 1824 (2022) ........................................................... 7

*Ritter v. Migliori,*
  143 S. Ct. 297 (2022) ............................................................. 7

*Schwier v. Cox,*
  340 F.3d 1284 (11th Cir. 2003) ............................................... 5

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966) ............................................................... 4

*Travers v. Fed. Express Corp.,*
  8 F.4th 198 (3d Cir. 2021) ................................................. 14, 6

*United States v. Safehouse,*
  985 F.3d 225 (3d Cir. 2021) ................................................. 13

**Statutes**

25 P.S. § 2602 ........................................................................ 6

25 P.S. § 3146.2 ..................................................................... 6

25 P.S. § 3146.2b ................................................................... 6

iii

25 P.S. § 3150.12 .................................................................. 6

25 P.S. § 3150.12b ................................................................ 6

25 P.S. § 3146.4 ............................................................... 6, 18

25 P.S. § 3146.6 ............................................................... 6, 18

25 P.S. § 3146.8 .................................................................. 6

25 P.S. § 3150.14 ............................................................. 6, 18

25 P.S. § 3150.16 ............................................................. 6, 18

52 U.S.C. § 10101(a)(2)(B) ....................................... *passim*

52 U.S.C. § 10101(a)(3)(A), (e) ............................... 2, 3, 4, 10, 14

Pub. L. 89-110, § 15(a), 79 Stat. 437 (1965) ............................ 4

Pub. L. No. 88-352, § 101, 78 Stat. 241 (1964) ....................... 4

**Other Authorities**

110 Cong. Rec. 6714-15 (1964) .................................................. 5

A. Scalia & B. Garner, *Reading Law: The Interpretation of
    Legal Texts* (2012) ................................................................. 13

H.R. Rep. 88-914 (1963), *reprinted* in 1964 U.S.C.C.A.N.
    2391 ........................................................................................ 4

## FRAP 35 STATEMENT

I express a belief, based on reasoned and studied professional judgment, that this appeal involves a question of exceptional importance, *i.e.*, whether a venerable federal civil rights law excludes mail-ballot voters from its protection and allows them to be disenfranchised for irrelevant paperwork errors.

## INTRODUCTION

The panel majority's novel and restrictive interpretation of a sixty-year-old voting rights statute misapplies rules of statutory construction, directly contradicts a 2022 decision of this Court, and will disenfranchise thousands of eligible Pennsylvania voters, especially seniors of all political stripes.

In 2022, a panel of this Court unanimously concluded that the Materiality Provision of the Civil Rights Act of 1964 protects voters from disenfranchisement when they forget to write an undisputedly irrelevant date on a form that is printed on the back of the mail ballot return envelope. *See Migliori v. Cohen*, 36 F.4th 153 (3d Cir.), *stay denied*, *Ritter v. Migliori*, 142 S. Ct. 1824, *vacated as moot*, 143 S. Ct. 297 (Mem.) (2022). This case is factually indistinguishable from *Migliori*: If anything, it proceeds on a more robust evidentiary record conclusively demonstrating

that the handwritten date on this form plays no role in establishing a voter's qualifications or whether their ballot was timely received. The district court held that disenfranchising voters for irrelevant mistakes regarding the handwritten date violates the Materiality Provision, as in *Migliori*. A fractured panel of this Court reversed in a 2-1 vote.

The Materiality Provision protects against denial of the right to "cast a ballot and have it counted" based on any immaterial "error or omission on any record or paper relating to any application, registration, or other act requisite to voting," *i.e.*, an immaterial mistake on a paper form that voters must complete to vote and make their vote effective. 52 U.S.C. § 10101(a)(2)(B); *see also id.* § 10101(a)(3)(A), (e).

The panel majority gave this text an unnatural construction, rendering key language superfluous and ignoring statutory definitions. The panel majority's reading drastically limits the statute to errors on voter registration forms only and not (as plain text commands) to errors on other forms as well, *i.e.*, errors on "*any* record or paper relating to *any* application, registration, *or other act requisite to voting.*" 52 U.S.C. § 101010(a)(2)(B) (emphasis added). It ignores the definition of "voting" provided by Congress, which includes not just registration, but "all action

2

necessary to make a vote effective including … casting a ballot, and having such ballot counted." *Id.* § 10101(a)(3)(A), (e).

The panel majority's construction is not just wrong; it will needlessly disenfranchise thousands of eligible voters in the upcoming elections. In the 2022 mid-term election, more than 10,000 voters' ballots were discarded for the form-dating error. That number could rise in the higher-turnout quadrennial election this year.

The question presented would be exceptionally important and worthy of review under any circumstance. It is especially so now, with sister circuits set to examine similar issues under the same statute, and with the 2024 election on the horizon. Panel rehearing or rehearing en banc should be granted.

## BACKGROUND

### A. Statutory Background

The Materiality Provision prohibits state actors from

"deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]"

52 U.S.C. § 10101(a)(2)(B).  The statute defines the word "vote" broadly, as "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast."  *Id.* § 10101(a)(3)(A), (e).

The Materiality Provision was enacted as part of the Civil Rights Act of 1964; in the 1965 Voting Rights Act, it was expanded to cover state and federal elections.  *See* Pub. L. No. 88-352, § 101, 78 Stat. 241, 241 (1964); Pub. L. 89-110, § 15(a), 79 Stat. 437, 444 (1965).  The statute was designed to eradicate the use of irrelevant errors on paper forms as a barrier to the franchise; one well-known example from the Jim Crow South required prospective voters to state their exact age in days to register to vote.  *E.g.*, Op.16.  It was meant to succeed where narrower voting protections enacted in 1957 and 1960 had failed, due to persistent, "ingenious" efforts to circumvent them.  *E.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966); *see, e.g.*, H.R. Rep. 88-914 (1963), *reprinted* in 1964 U.S.C.C.A.N. 2391, 2489 (Rep. McCulloch) (prior civil rights laws not sufficient); 110 Cong. Rec. 6714-7615 (1964) (Sen.

Keating) (immaterial errors used to "circumvent the 1957 and 1960 acts").

The statute has been applied in various contexts. It has been applied to errors on required paper forms at the polls. *See Ford v. Tennessee Senate*, No. 06-CV-2031, 2006 WL 8435145, at *7, *10-11 (W.D. Tenn. Feb. 1, 2006) (requirement to separately sign both application form and poll book). It has been applied to errors on voter-registration forms, including ID-matching or other requirements. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). And with the expansion of mail-ballot voting, it has been applied to immaterial mistakes on mail-ballot-related forms. *See, e.g.*, *Migliori*, 36 F.4th at 162-166; *La Unión del Pueblo Entero v. Abbott*, --- F.Supp.3d ----, 2023 WL 8263348, at *7 (W.D. Tex. Nov. 29, 2023) (requirement to write ID number on mail ballot application and return form); *Martin v. Crittenden*, 347 F.Supp.3d 1302, 1308-09 (N.D. Ga. 2018) (requirement to handwrite birth year on return form); *see also League of Women Voters of Ark. v. Thurston*, No. 20-CV-05174, 2023 WL 6446015, at *16 (W.D. Ark. Sept. 29, 2023) (statute applied to absentee ballot application but challenged requirement material).

### B.    Pennsylvania's Mail Ballot Rules

Millions of Pennsylvanians vote by mail.  *E.g.*, Dissent 1.  To vote by mail, a voter must first complete an application.  25 P.S. § 2602(z.5)(3), 3146.2, 3150.12.  County boards of elections review the application and proof of identification submitted and "ascertain" the applicants' qualifications.  *Id.* §§ 3146.2b, 3150.12b, 3146.8(g)(4).  The county board then sends the voter a package with a ballot, a "secrecy envelope," and a pre-addressed outer return envelope, on which a voter declaration form is printed.  *Id.* §§ 3146.6(a), 3150.16(a).

At "any time after receiving" it, the voter marks their ballot, puts it inside the secrecy envelope, and places the secrecy envelope in the return envelope.  25 P.S. §§ 3146.6(a), 3150.16(a).  The voter must also "fill out, date and sign" the declaration form on the envelope, which states, among other things, that the voter is "qualified to vote in this election."  Op.41; 25 P.S. §§ 3146.6(a), 3150.16(a); *see also id.* §§ 3146.4, 3150.14 (specifying the "form of declaration" which "shall contain a statement of the elector's qualifications").  To be timely, the county board must receive ballots by 8 p.m. on Election Day.  *Id.* §§ 3146.6(c), 3150.16(c).  Upon receipt, county boards stamp or mark the return envelope to confirm timeliness and scan

6

a barcode to update Pennsylvania's Statewide Uniform Registry of Electors ("SURE") system.  Op.18.

## C.    Procedural Background

This case involves the handwritten date on the declaration form that voters must complete and return with their mail ballot.  For purposes of this case it is undisputed that this handwritten date on the declaration form "is immaterial."  Op.27.  It is not used "'for any purpose related to determining a voter's qualification' under Pennsylvania law," and it "plays no role in determining a ballot's timeliness."  Op.18, 21.

In 2022, a unanimous panel of this Court ordered the votes of hundreds of Lehigh County mail-ballot voters who had omitted the handwritten date from the declaration form to be counted pursuant to the Materiality Provision.  *See Migliori*, 36 F.4th at 162-164; *see also id.* 164-66 (Matey, J., concurring).  The panel published that decision as precedential.  The Supreme Court denied a stay of that order, and the Lehigh ballots were counted.  *See* 142 S. Ct. 1824.  *Migliori* subsequently lost precedential effect because it was vacated in a non-merits order:  The certification of the election, following this Court's order and the Supreme Court's denial of a stay, had mooted the controversy.  *See* 143 S. Ct. 297.

7

In October 2022, immediately after the *Migliori* mootness vacatur, appellants here brought a petition in the Supreme Court of Pennsylvania, seeking an election-eve order excluding mail ballots based on errors or omissions with the handwritten declaration-form date. *Ball v. Chapman*, 289 A.3d 1, 12 (Pa. 2023). The court, with only six members due to the chief justice's sudden death, issued an order directing that such mail ballots be segregated and not counted. The court held that the instruction in state law that voters "shall … date" the form was mandatory as a matter of state statutory interpretation. *Id.* at 28. But it expressly issued "no order" on whether federal law nevertheless required those ballots to be counted. *Id.*; *id.* at 34-35 (Dougherty, J., concurring in part) ("federal law issue" left "unresolved").

In the 2022 election, over 10,000 voters' timely-received mail ballots were set aside due to an error or omission with respect to the handwritten date on the declaration form. Op.19; Dissent 1, 14. Those ballots are still sitting, uncounted and unopened, in sealed secrecy envelopes. Included among the disenfranchised are voters who wrote a date that was correct but missing one term, such as "Oct. 25," wrote the date in the international format (*i.e.*, day/month/year), or who made obvious typos,

like writing their birthdate or the wrong year. *Pa. State Conf. of NAACP v. Schmidt*, No. 1:22-CV-00339, 2023 WL 8091601, at *32-34 (W.D. Pa. Nov. 21, 2023).

Plaintiffs (good government groups and disenfranchised voters) filed this suit within days, obtained discovery from all 67 counties, and sought summary judgment. Based on undisputed facts, the district court concluded that the handwritten declaration-form date was "wholly irrelevant" and held that discarding voters' ballots on this basis violated the Materiality Provision. *Schmidt*, 2023 WL 8091601, at *31, *34.

A divided 2-1 panel of this Court reversed. While acknowledging that the handwritten date on the declaration form was irrelevant, the panel majority concluded that the Materiality Provision "is concerned only with the process of determining a voter's eligibility to cast a ballot" and therefore allows voters to be disenfranchised for irrelevant paperwork errors on any required, voting-related forms other than their initial registration form. Op.34. Judge Schwartz dissented, concluding that the statute "applies to mistakes on paperwork including, but not limited to, voter registration forms." Dissent 27, 34.

9

**ARGUMENT**

## I.   THE PANEL MAJORITY DRASTICALLY MISINTERPRETED A FEDERAL STATUTE

The panel majority's conclusion that the Materiality Provision only applies to voter registration forms is irreconcilable with the statutory text and ignores this Court's prior decision in *Migliori*.  *E.g.*, Op.31, 34.

By its plain terms, the Materiality Provision applies to the dating mistake on the declaration form.  Pennsylvania voters were "den[ied] the right ... to vote" as the statute defines it because their ballots were not "counted and included in the appropriate totals of votes cast[.]"  52 U.S.C. § 10101(a)(2)(B), (a)(3)(A), (e).  That denial was "because of an error or omission," *i.e.,* omitting or incorrectly inputting the handwritten date. *Id.* § 10101(a)(2)(B).  The error was on a "record or paper relating to any application, registration, or other act requisite to voting," *i.e.*, the paper declaration form on the envelope that voters were required to complete to have their mail ballots opened and counted.  *Id.*  And it is completely undisputed that this error is unrelated to whether a voter "is qualified under State law to vote in [the] election[,]" or the mail ballot's timely receipt.  *Id.*; *see supra* 7.

10

Putting it together, the Materiality Provision applies where the right to register, vote, or have a ballot counted is denied due to a minor mistake on some required, voting-related paper form, if the mistake is unrelated to ascertaining a voter's qualifications to vote in that election. *See, e.g.*, *Migliori*, 36 F.4th at 162-164; Dissent 34.  That reading gives all terms in the statute their natural meaning and follows normal syntactic rules.  It does not render any language in the statute superfluous.  It respects statutorily-provided definitions.  And it results in a voter-protection rule that is not easily circumvented, but is also properly limited to immaterial paperwork errors on required forms.

The panel majority reached its restrictive, registration-forms-only interpretation by overlooking or countermanding numerous principles of statutory interpretation and relying on incorrect, unsourced assumptions about Pennsylvania election law.

Principles of statutory interpretation direct that normal rules of syntax and usage—"ordinary principles of English prose"—apply.  *E.g.*, *Flora v. United States*, 362 U.S. 145, 150 (1960).  But the panel majority applied an unnatural, backwards reading to the text—one where, in its own words, "the tail … wags the dog."  Op.37.

11

The Materiality Provision is comprised of two parts. Its main clause sets forth the general prohibition on disenfranchisement based on paperwork errors and specifies the nature of the paper forms on which such errors may occur: "any record or paper relating to any application, registration, or other act requisite to voting[.]" 52 U.S.C. § 10101(a)(2)(B). A subordinate "if" clause then specifies which errors or omissions on such forms cannot serve as a basis for disenfranchisement: "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]" *Id.*

The main clause is where the statute sets forth the breadth of the paperwork that it covers. But for its registration-forms-only limitation, the panel majority looked elsewhere—specifically, to the subordinate "if" clause, which relates to the types of errors to which the statute applies, not the covered types of paperwork. Op.27. The panel majority concluded that the language in the subordinate clause ("material in determining whether such individual is qualified to vote") refers to the process for determining voter qualifications, which it further assumed meant voter registration. Op.27-28; *see also infra* 15. It then took the registration-only limitation it had contrived based on that phrase in the subordinate

12

clause and imported it into the main clause's description of the type of *paperwork* that the statute covers, overriding the main clause's express language to the contrary.  Op.29.

That is not a natural or permissible way to read text.  The language about being "material in determining" qualifications refers to "error or omission," which is the "nearest reasonable referent" and is in the same subordinate clause.  *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012); *see also, e.g.*, *United States v. Safehouse*, 985 F.3d 225, 236 (3d Cir. 2021).  It does not refer to (and thus does not limit) the scope of "record or paper" in the main clause.  *Compare Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994) (specification in dependent clause of statute could not "swallow" the broader meaning of the main clause).

The panel majority's reading is not just unnatural, it renders key portions of statutory text entirely superfluous—violating a "cardinal rule" of construction.  *E.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  The panel majority admitted its reading creates "redundancies."  Op.41 (citation omitted).  But that undersells the damage:  It negates the phrase "or other act requisite to voting" from the

statute's main clause entirely, collapsing it with "registration." *Compare Migliori*, 36 F.4th at 162 n.56 ("[T]he text of the provision … includes "other act[s] requisite to voting" in a list alongside registration.  Thus, we cannot find that Congress intended to limit this statute to … registration.").  The "or other act requisite to voting" language ensures that mistakes on *all* paper forms ("any record or paper") whose completion is required ("requisite") for a person to be able to register, cast a ballot, or have it counted (as the statute defines "voting") are potentially covered by the statute's protections—not merely those relating to registration.  The panel majority's reading treats this text as though it does not exist.

And the panel majority's reading also ignores statutorily defined terms, which it was required to accept.  *E.g.*, *Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 697 n.10 (1995); *accord Travers v. Fed. Express Corp.*, 8 F.4th 198, 202 (3d Cir. 2021).  Congress expressly defined voting as including not just registration but "all action necessary to make a vote effective including … casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(a)(3)(A), (e).  Under that definition, completing the

declaration form, including the handwritten date, is an "act requisite to voting."

In addition to misreading statutory text, the panel majority misconstrued (or overlooked) Pennsylvania law. A critical and repeated premise of its reasoning—indeed, the very first words in its substantive analysis—is the idea that there are distinct "stages of the voting process," namely a "qualification stage" when a person first registers to vote, and a post-registration "vote-casting stage." *E.g.*, Op.24, 31, 37. This "two-stages" premise, for which the panel majority cited no authority, is not part of Pennsylvania law.[1] Rather, in Pennsylvania, voter qualifications are continually assessed and attested to, including when a voter applies for a mail ballot, and indeed, when they fill out *the very declaration form at issue in this case*. *See supra* 6; *see also* Dissent 34-36 n.26.

When interpreting a federal statute, the analysis must begin with text—and where the text is unambiguous, it ends there. *E.g.*, *Bostock v.*

---

[1] Nor is it in the Materiality Provision. To the contrary, the statute protects "the right to vote *in any election*," and speaks of errors immaterial "in determining whether [a voter] is qualified under State law to vote *in such election*." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Restricting the statute to initial voter registration renders this "in such election" language superfluous.

15

*Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020); *Travers*, 8 F.4th at 200.  Yet text was not the primary driver of the panel majority's reasoning.  Its decision relies heavily on legislative history (*e.g.*, Op.29-31) without any determination that the text was ambiguous, *e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 147-148 (1994).  Congress's concern with registration in the legislative history cannot override its clear textual command that the statute's protection extend to immaterial errors on *all* required paper forms.  *Bostock*, 140 S. Ct. at 1750.  Indeed, Congress drafted the statute broadly to overcome creative resistance by state and local governments.  By design, that decision to cover not just registration forms but all forms that might be required of potential voters "guaranteed that unexpected applications would emerge over time." *Id.* at 1753.

In the end, policy concerns seemingly drove the panel majority's opinion.  It viewed a registration-forms-only construction as necessary because "[u]nless we cabin the Materiality Provision's reach to rules governing voter qualification, we tie state legislatures' hands in setting voting rules unrelated to voter eligibility." Op.34.  It sought to avoid some conflict between the Materiality Provision and what it called "ballot-counting" or "vote-casting" rules, like rules around secrecy envelopes.

*E.g.*, Op.31-38.  Such policy rationales are no basis to ignore the plain text of federal law.

And in any event, the panel majority's proposed dichotomy, between voter-qualification and vote-counting, created these hypothetical policy problems in the first place.  Reading the Materiality Provision consistent with its text, as limited to forms voters are required to fill out, such as the declaration form here, eliminates these issues.  The term "any record or paper relating to any registration, qualification, or other act requisite to voting" does not include the secrecy envelope, because the secrecy envelope is not a required paper form that is "similar in nature" to an "application" or "registration," *i.e.*, a paper form that voters are made to fill out.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).  To the contrary, *any* writing on secrecy envelopes is *prohibited*.  They cannot result in immaterial paperwork errors on required forms.[2]

---

[2] Moreover, if a voter's ballot is not counted because they have improperly marked the secrecy envelope, then their vote will not be counted for failure to vote in secret, and not "because of an error or omission" on a covered form.  52 U.S.C. § 10101(a)(2)(B).

17

And it does not cover the ballot itself (or any ballot defects caused by overvoting and the like), because the ballot also is not a piece of required paperwork. *See Circuit City*, 532 U.S. at 115. The ballot *is the vote*. Voters are not required to complete their ballot at all (they can leave it blank) or to input any individualized information as with a required form, and indeed, voted ballots are not even necessarily paper. The panel majority repeatedly referred to "defective" ballots, overlooking the fact that the declaration form and the ballot are different. Op.32, 33, 35. But state law makes this distinction clear, referring to the ballot as a "ballot," and to the declaration form as a "declaration." 25 P.S. §§ 3146.6(a), 3150.16(a); *see also id.* §§ 3146.4, 3150.14.

The declaration form is no different from an attestation or ballot application form that might be required of an in-person voter at the polls. *Cf. Ford*, 2006 WL 8435145, at *7, *10-11. Under the panel majority's rule, voters could be required to complete such polling place questionnaires, asking them to state their age in days or other irrelevant, error-generating questions, with no protection from the Materiality Provision. This is the type of glaring loophole that Congress sought to avoid with the text it chose.

18

## II.  THE QUESTION IS EXCEPTIONALLY IMPORTANT

The panel majority's restrictive new interpretation of the Materiality Provision will needlessly disenfranchise thousands of Pennsylvania voters.  If adopted more broadly, it could deny the protection of federal law to literally millions.  It could greenlight new immaterial paperwork requirements for mail-ballot and in-person voters alike, both of whom are excluded from the statute's protection under the panel majority's rule.  Whether the panel majority's registration-forms-only construction of the Materiality Provision is correct is an exceptionally important question that merits consideration.

In 2022 alone, a midterm election in which approximately 1.2 million mail ballots were cast, over 10,000 voters' timely-received mail ballots were discarded due to this irrelevant mistake on the declaration form.  *Schmidt*, 2023 WL 8091601, at *22.  Untold numbers of eligible voters will be similarly disenfranchised due to meaningless typos in the high-turnout 2024 presidential election on the horizon.

The panel majority's opinion is utterly novel, and contrary to recent federal court decisions in Texas, Georgia, and Arkansas holding that the Materiality Provision's protections apply to forms associated with the

19

mail ballot process. *E.g.*, *La Unión*, 2023 WL 8263348, *appeal docketed* No. 23-50885 (5th Cir.); *In re Georgia Senate Bill 202*, No. 1:21-cv-1259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023), *appeal docketed* No. 23-13245 (11th Cir.).

And the panel's fractured ruling is directly contrary to the unanimous conclusion of the *Migliori* panel, which remained "persuasive" authority. *E.g.*, *Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993). *Migliori* was based on an indistinguishable set of undisputed facts establishing the utter purposelessness of the handwritten date on the declaration form. 36 F.4th at 163-164; *id.* at 164-165 (Matey, J., concurring). Indeed, the facts here are even stronger, because they are based on discovery from all 67 counties conclusively establishing that the handwritten date has no function in the voting process.

## CONCLUSION

Rehearing or rehearing en banc should be granted.

Dated: April 10, 2024

Respectfully submitted,

*/s/ Ari J. Savitzky*

Witold J. Walczak (PA 62976)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
vwalczak@aclupa.org

Ari J. Savitzky
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
slakin@aclu.org

Marian K. Schneider (PA 50337)
Stephen Loney (PA 202535)
Kate I. Steiker-Ginzberg
(PA 332236)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
mschneider@aclupa.org
sloney@aclupa.org
ksteiker-ginzberg@aclupa.org

Megan C. Keenan
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 10004
Tel: (202) 457-0800
mkeenan@aclu.org
acepedaderieux@aclu.org

David Newmann (PA 82401)
Brittany C. Armour (PA 324455)
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4610
david.newmann@hoganlovells.com
brittany.armour@hoganlovells.com

*Counsel for the Pennsylvania
State Conference of the NAACP,
League of Women Voters of
Pennsylvania, Philadelphians
Organized to Witness, Empower
and Rebuild, Common Cause
Pennsylvania, Black Political
Empowerment Project, Make the
Road Pennsylvania, Barry M.
Seastead, Marlene G. Gutierrez,
Aynne Margaret Pleban Polinski,
Joel Bencan, and Laurence M.
Smith*

## COMBINED CERTIFICATIONS

I am a member of the bar of this Court.

This brief complies with the word limit of Fed. R. App. P. 35(b)(2) because this document contains 3,899 words.

A virus detection program, Microsoft Word from the Microsoft Office Professional Plus 2010 suite, has been run on this electronic brief and no virus was detected.

Dated: April 10, 2024                Respectfully submitted,

　　　　　　　　　　　　　　　　 _/s/ Ari J. Savitzky_
　　　　　　　　　　　　　　　　 Ari J. Savitzky

# CERTIFICATE OF SERVICE

I herby certify that on April 10, 2024, I caused a true and correct copy of the foregoing Petition for Rehearing or Rehearing En Banc, together with all documents in support thereof, via the Court's ECF/CMF system.

Dated: April 10, 2024           Respectfully submitted,

                                  */s/ Ari J. Savitzky*
                                  Ari J. Savitzky

**ADDENDUM**

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3166
_____

PENNSYLVANIA STATE CONFERENCE OF NAACP
BRANCHES; LEAGUE OF WOMAN VOTERS OF
PENNSYLVANIA; PHILADELPHIANS ORGANIZED TO
WITNESS EMPOWER AND REBUILD; COMMON
CAUSE PENNSYLVANIA; BLACK POLITICAL
EMPOWERMENT PROJECT; MAKE THE ROAD
PENNSYLVANIA; BARRY M. SEASTEAD; MARLENE
G. GUTIERREZ; AYNNE MARGARET PLEBAN
POLINSKI; JOEL BENCAN; LAURENCE M. SMITH

v.

SECRETARY COMMONWEALTH OF PENNSYLVANIA;
ADAMS COUNTY BOARD OF ELECTIONS;
ALLEGHENY COUNTY BOARD OF ELECTIONS;
ARMSTRONG COUNTY BOARD OF ELECTIONS;
BEAVER COUNTY BOARD OF ELECTIONS; BEDFORD
COUNTY BOARD OF ELECTIONS; BERKS COUNTY
BOARD OF ELECTIONS; BLAIR COUNTY BOARD OF
ELECTIONS; BRADFORD COUNTY BOARD OF
ELECTIONS; BUCKS COUNTY BOARD OF
ELECTIONS; BUTLER COUNTY BOARD OF
ELECTIONS; CAMBRIA COUNTY BOARD OF
ELECTIONS; CAMERON COUNTY BOARD OF

ELECTIONS; CARBON COUNTY BOARD OF
ELECTIONS; CENTRE COUNTY BOARD OF
ELECTIONS; CHESTER COUNTY BOARD OF
ELECTIONS; CLARION COUNTY BOARD OF
ELECTIONS; CLEARFIELD COUNTY BOARD OF
ELECTIONS; CLINTON COUNTY BOARD OF
ELECTIONS; COLUMBIA COUNTY BOARD OF
ELECTIONS; CRAWFORD COUNTY BOARD OF
ELECTIONS; CUMBERLAND COUNTY BOARD OF
ELECTIONS; DAUPHIN COUNTY BOARD OF
ELECTIONS; DELAWARE COUNTY BOARD OF
ELECTIONS; ELK COUNTY BOARD OF ELECTIONS;
ERIE COUNTY BOARD OF ELECTIONS; FAYETTE
COUNTY BOARD OF ELECTIONS; FOREST COUNTY
BOARD OF ELECTIONS; FRANKLIN COUNTY BOARD
OF ELECTIONS; FULTON COUNTY BOARD OF
ELECTIONS; GREENE COUNTY BOARD OF
ELECTIONS;  HUNTINGDON COUNTY BOARD OF
ELECTIONS; INDIANA COUNTY BOARD OF
ELECTIONS; JEFFERSON COUNTY BOARD OF
ELECTIONS; JUNIATA COUNTY BOARD OF
ELECTIONS; LACKAWANNA COUNTY BOARD OF
ELECTIONS; LANCASTER COUNTY BOARD OF
ELECTIONS; LAWRENCE COUNTY BOARD OF
ELECTIONS; LEBANON COUNTY BOARD OF
ELECTIONS; LEHIGH COUNTY BOARD OF
ELECTIONS; LUZERNE COUNTY BOARD OF
ELECTIONS; LYCOMING COUNTY BOARD OF
ELECTIONS; MCKEAN COUNTY BOARD OF
ELECTIONS; MERCER COUNTY BOARD OF
ELECTIONS; MIFFLIN COUNTY BOARD OF
ELECTIONS; MONROE COUNTY BOARD OF
ELECTIONS; MONTGOMERY COUNTY BOARD OF

ELECTIONS; MONTOUR COUNTY BOARD OF
ELECTIONS; NORTHAMPTON COUNTY BOARD OF
ELECTIONS; NORTHUMBERLAND COUNTY BOARD
OF ELECTIONS; PERRY COUNTY BOARD OF
ELECTIONS; PHILADELPHIA COUNTY BOARD OF
ELECTIONS; PIKE COUNTY BOARD OF ELECTIONS;
POTTER COUNTY BOARD OF ELECTIONS;
SCHUYLKILL COUNTY BOARD OF ELECTIONS;
SNYDER COUNTY BOARD OF ELECTIONS;
SOMERSET COUNTY BOARD OF ELECTIONS;
SULLIVAN COUNTY BOARD OF ELECTIONS;
SUSQUEHANNA COUNTY BOARD OF ELECTIONS;
TIOGA COUNTY BOARD OF ELECTIONS; UNION
COUNTY BOARD OF ELECTIONS; VENANGO
COUNTY BOARD OF ELECTIONS; WARREN COUNTY
BOARD OF ELECTIONS; WASHINGTON COUNTY
BOARD OF ELECTIONS; WAYNE COUNTY BOARD OF
ELECTIONS; WESTMORELAND COUNTY BOARD OF
ELECTIONS; WYOMING COUNTY BOARD OF
ELECTIONS; YORK COUNTY BOARD OF ELECTIONS

REPUBLICAN NATIONAL COMMITTEE; NATIONAL
REPUBLICAN CONGRESSIONAL COMMITTEE;
THE REPUBLICAN PARTY OF PENNSYLVANIA,

Appellants

(Intervenors in D.C.)

3

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No. 1-22-cv-00339)
District Judge:  Honorable Susan Paradise Baxter

_____


Argued February 20, 2024


Before:  SHWARTZ, CHUNG, and AMBRO, <u>Circuit Judges</u>


(Opinion filed March 27, 2024)


John M. Gore **[ARGUED]**
E. Stewart Crosland
Ryan M. Proctor
Louis J. Capozzi, III
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001

       Counsel for Appellants Republican National
       Committee, National Republican Congressional
       Committee and The Republican Party of Pennsylvania
       and Intervenor Appellant Richard Marino

Steve Marshall
Edmund G. Lacour Jr.
Soren Geiger
Office of Attorney General of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36104

      Counsel for Amicus Appellant State of Alabama

Zachary M. Wallen
Chalmers Adams Backer & Kaufman
301 S Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241

      Counsel for Amicus Appellants Brian Cutler, Kim
      Ward and Joe Pittman

Gilbert Dickey
Conor D. Woodfin
Consovoy McCarthy
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

      Counsel for Amicus Appellant Restoring Integrity and
      Trust in Elections Inc

Brittany C. Armour
David Newmann
Hogan Lovells US
1735 Market Street
23rd Floor
Philadelphia, PA 19103

Adriel I. Cepeda Derieux
Sophia Lin Lakin
Ari J. Savitzky **[ARGUED]**
American Civil Liberties Union
125 Borad Street
18th Floor
New York, NY 10004
Stephen A. Loney, Jr.
Marian K. Schneider
Kate Steiker-Ginzberg
American Civil Liberties Union of Pennsylvania Legal
P.O. Box 60173
Philadelphia, PA 19102

Witwold J. Walczak
American Civil Liberties Union
P.O. Box 23058
Pittsburgh, PA 15222

Counsel for Plaintiff Appellees

Richard E. Santee
Northampton County office of the Solicitor
669 Washington Street
Easton, PA 18042

      Counsel for Defendant Appellee Northampton County
      Board of Elections

Jacob B. Boyer **[ARGUED]**
Michael J. Fischer
Office of Attorney General of Pennsylvania
Office of General Counsel
333 Market Street
17th Floor
Harrisburg, PA 17108

Sean A. Kirkpatrick
Lisa Eisenberg
Office of Attorney General of Pennsylvania
1600 Arch Street
Suite 300
Philadelphia, PA 19103

Robert A. Wiygul
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103

      Counsel for Defendant Appellee Secretary
      Commonwealth of Pennsylvania

Molly R. Mudd
Adams County Office of Solicitor
117 Baltimore Street
Gettysburg, PA 17325

       Counsel for Defendant Appellee Adams County
       Board of Elections

Lisa G. Michel
Allegheny County Law Department
300 Fort Pitt Commons
445 For Pitt Boulevard
Suite LL 500
Pittsburgh, PA 15219

       Counsel for Defendant Appellee Allegheny County
       Board of Elections

Casey A. Coyle
Babst Calland
409 N 2nd Street
Suite 201
Harrisburg, PA 17101

Elizabeth A. Dupuis
Babst Calland
330 Innovation Boulevard
Suite 302
State College, PA 16803

     Counsel for Defendant Appellees Bedford County
     Board of Elections, Carbon County Board of Elections,
     Centre County Board of Elections Columbia County
     Board of Elections, Dauphin County Board of
     Elections Huntingdon County Board of Elections,
     Indiana County Board of Elections, Jefferson County
     Board of Elections, Lawrence County Board of
     Elections, Lebanon County Board of Elections,
     Monroe County Board of Elections, Montour County
     Board of Elections, Northumberland County Board of
     Elections, Snyder County Board of Elections, Venango
     County Board of Elections, and York County
     Board of Elections

Tyler B. Burns
Bucks County Law Department
55 E Court Street
5th Floor
Doylestown, PA 18901

     Counsel for Defendant Appellee Bucks County Board
     of Elections

Timothy J. Ford
Christian M. Velez-Vargas
Dilworth Paxson
1500 Market Street
Suite 3500E
Philadelphia, PA 19102

    Counsel for Defendant Appellee Chester County
    Board of Elections

James M. Parks
Duane Morris
30 S. 17th Street
Philadelphia, PA 19103

    Counsel for Defendant Appellee Delaware County
    Board of Elections

Robert E. Grimm
Grimm Layers
P.O. Box 430
Smithfield, PA 15478

    Counsel for Defendant Appellee Greene County Board
    of Elections

John Marlatt
Philip W. Newcomer
Montgomery County Office of Solicitor
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404

> Counsel for Defendant Appellee Montgomery County
> Board of Elections

Thomas A. Burkhart
McNerney Page Vanderlin & Hall
433 Market Street
P.O. Box 7
Williamsport, PA 17701

> Counsel for Defendant Appellee Union County Board
> of Elections

Melissa A. Guiddy
Suite 103
2 N Main Street
Greensburg, PA 15601

> Counsel for Defendant Appellee Westmoreland
> County Board of Elections

Brian H. Benjet
Ilana H. Eisenstein
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Alison L. Stohr
City of Philadelphia
Law Department
15th Floor
1515 Arch Street
Philadelphia, PA 19102

    Counsel for Defendant Appellee Philadelphia County
    Board of Election

Jason Lee **[ARGUED]**
Tovah R. Calderon
United States Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, DC 20044

    Counsel for Amicus Appellee United States of
    America

Alexander D. Bernstein
Aaron H. Crowell
David C. Kimball-Stanley
Clarick Gueron Reisbaum
220 5th Avenue
14th Floor
New York, NY 100001

    Counsel for Amicus Appellee The Protect Democracy
    Project

Omeed Alerasool
Justin Baxenberg
Daniel J. Cohen
Uzoma N. Nkwonta
Elias Law Group
250 Massachusetts Avenue NW
Suite 400
Washington, DC 200001

     Counsel for Intervenor Appellees Democratic
     Senatorial Campaign Committee and Democratic
     Congressional Campaign Committee

Seth P. Waxman
Wilmer Cutler Pickering Hale & Dorr
2100 Pennsylvania Avenue NW
Washington, DC 20037

     Counsel for Intervenor Appellee Democratic National
     Committee

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>,

Pennsylvania, like all other States, has devised a web of rules that qualified voters must follow to cast a ballot that will be counted. Mail-in and absentee voters, for their part, must sign and date the declaration printed on the return envelope containing their mail ballot. The date requirement, it turns out, serves little apparent purpose. It is not used to confirm timely receipt of the ballot or to determine when the voter completed it. But the Supreme Court of Pennsylvania ruled that dating the envelope is mandatory, and undated or misdated ballots are invalid under its state law and must be set aside.

We must decide whether federal law nonetheless requires those non-compliant ballots be counted. Section 10101(a)(2)(B) of the Civil Rights Act of 1964, called the Materiality Provision, prohibits denial of the right to vote because of an "error or omission" on paperwork "related to any application, registration, or other act requisite to voting," if the mistake is "not material in determining whether [an] individual is qualified" to vote. Because the date requirement is irrelevant to whether a vote is received timely, the blink response is to believe a voter's failure to date a return envelope should not cause his ballot to be disqualified. But our role restricts to interpreting a statute, and there we hold that the Materiality Provision only applies when the State is determining *who* may vote. In other words, its role stops at the door of the voting place. The Provision does not apply to rules, like the date

requirement, that govern *how* a qualified voter must cast his ballot for it to be counted.  We reach this conclusion because a contrary approach cannot be reconciled with the text and historic backdrop of the statute, nor cabined to the date requirement while leaving intact other vote-casting rules that serve valid state interests.  Accordingly, we reverse the District Court's decision and remand for further consideration of the pending equal protection claim.

## I. Background

### A

The federal law at the heart of this case—the Materiality Provision of the Civil Rights Act of 1964—today reads as follows:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).  It was part of Congress' effort to "outlaw[] some of the tactics" used by States "to disqualify [African Americans] from voting in federal elections." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966).  Despite the promises of the Fifteenth Amendment that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude," U.S. Const. amend. XV, § 1, discriminatory laws like poll taxes, literacy tests, property qualifications, and "good

morals" requirements abounded after its ratification, *Katzenbach*, 383 U.S. at 313. African American voter registration in many Southern States thus languished at "appallingly low" levels for decades. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. __, 141 S. Ct. 2321, 2330 (2021).

One of the many techniques used to keep Black voters from the polls was to reject would-be registrants for insignificant, hyper-technical errors in filling out application forms. Report of U.S. Comm'n on Civil Rights ("CRC Report") 1963, at 22. For instance, registrars rejected applicants for failing "to calculate [their] age to the day," misspelling "Louisiana," underlining "Mr." when it should have been circled, or the Catch 22 of identifying their skin color as "Negro" instead of "brown," or "brown" instead of "Negro."[1] Voter registration thus was the principal means to suppress Black voter participation.

Congress, in 1957 and 1960, passed two civil rights acts to rein in some of these practices, but "[e]fforts to deny the right to vote" continued to "take many forms," most often through "arbitrary registration procedures" individuals had to follow to qualify to vote. CRC Report of 1961, at 133, 137. A few years later, Congress again took aim at these entrenched

---

[1] CRC Report of 1961, at 137; Hearings on S. 1731 and S. 1750 Before the S. Comm. on the Judiciary, 88th Cong. 101 (1963) (statement of Robert F. Kennedy, U.S. Att'y Gen.); *see also* 110 Cong. Rec. 6715-16 (1964) (statement of Sen. Kenneth B. Keating) (recounting similar rejections); 110 Cong. Rec. 6733 (1964) (statement of Sen. Philip A. Hart); *id.* at 6530 (statement of Sen. Hubert Humphrey); *id.* at 1693-94 (statement of Rep. Emanuel Celler).

problems.  In Title I of the Civil Rights Act of 1964, it prohibited the arbitrary application of voter qualification standards and procedures and barred literacy tests as a qualification for voting in federal elections.  Pub. L. No. 88-352, § 101(a)(2)(A), (C).  Surrounded by these provisions, the Materiality Provision of the 1964 Act applied only to federal elections, *id.* § 101(a)(2)(B), but the Voting Rights Act of 1965 expanded its reach to state elections as well.  Pub. L. 89-11, § 15(a), 79 Stat. 437, 444 (1965).

Fast forward to today.  Voter registration now is a streamlined process often requiring little more than a few clicks on a website or a trip to a driver's license center.  In Pennsylvania, an individual is qualified to vote if that person (1) is at least eighteen years old on the day of the election, (2) has been a U.S. citizen for at least one month before that day, (3) has resided in Pennsylvania and the election district for at least thirty days, and (4) has not been imprisoned for a felony conviction within the last five years.  Pa. Const. art. VII, § 1; 25 P.S. § 2811, 25 Pa.C.S. § 1301(a).  Each county board of elections assesses compliance with these requirements when the individual seeks to register to vote.  25 Pa.C.S. § 1328.  Approved applicants receive a unique identification number in the Statewide Uniform Registry of Electors ("SURE") system—Pennsylvania's database of all registered voters—and an identification card.  *Id.* §§ 1328.1, 1222.

In 2019, Pennsylvania also made voting more convenient by adopting universal mail-in voting.  Act of Oct. 31, 2019, P.L. 552, No. 77, § 8; *see* 25 P.S. § 3150.11(a).  Registered voters now can cast their vote by submitting a mail-in ballot without having to show cause why they cannot make it to the polls on Election Day.  To do so, a registered voter

must apply to his county election board and provide, among other things, his name, address, date of birth, proof of identification, and length of residency in the voting district. *Id.* § 3150.12. The county board reviews the application, verifies the proof of identification, and compares the information with that on the applicant's registration card housed in county-specific voter rolls within the SURE system. *Id.* § 3150.12b(a). Once approved, the voter receives a package containing the ballot, a secrecy envelope, and a pre-addressed return envelope. *Id.* § 3150.14; App. 57. The return envelope is specific to each voter and features a declaration as well as a unique barcode that allows the county board to track each ballot. 25 P.S. § 3150.14; *see also* App. 58, 80. After completing the ballot, the voter places it into the secrecy envelope, and places that envelope into the return envelope. 25 P.S. § 3150.16(a).

Among the rules a mail-in voter must follow for his mail ballot to be valid—central to the dispute here—is Pennsylvania's requirement to "fill out, date and sign the declaration printed on [the] envelope" before returning the completed ballot. *Id.* § 3150.16(a). But, it may surprise, the date on the declaration plays no role in determining a ballot's timeliness. That is established both by a receipt stamp placed on the envelope by the county board and separately through scanning of the unique barcode on the envelope. App. 58, 80; *see* 25 P.S. §§ 3150.17(b)(5), 3146.9(b)(5).

## B

Until recently, the Materiality Provision received little attention from federal appellate courts. When it did, the challenged state law prescribed rules governing voter

registration.  *See Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (affirming District Court determination that Georgia statute requiring applicants to disclose Social Security Number on registration form violated Materiality Provision); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) (reversing grant of preliminary injunction and holding Florida voter registration statute imposing a new verification process as a precondition of registration for first-time registrants did not violate Materiality Provision); *Vote.Org v. Callanen*, 89 F.4th 459, 485-91 (5th Cir. 2023) (holding Texas law requiring an original signature on a voter registration form did not violate Materiality Provision).

But in the November 2020 and November 2022 elections, thousands of Pennsylvania mail-in voters did not comply with the date requirement.  Some voters omitted the date altogether, others put shortened or obviously incorrect dates.  As county boards took different approaches to enforcing the date requirement, litigation began, and the Materiality Provision took center stage.  A panel of this Court ruled this federal law does apply outside the voter registration context and was violated by the date requirement now (again) before us.  *See Migliori v. Cohen*, 36 F.4th 153, 157 (3d Cir. 2022).  But that decision has since been vacated as moot by the Supreme Court.  *Ritter v. Migliori*, 143 S. Ct. 297 (2022).

The validity of enforcing the date requirement thus remained uncertain as a matter of federal law.  But the Supreme Court of Pennsylvania soon settled the issue for state law purposes.  *See Ball v. Chapman*, 289 A.3d 1, 20-23 (Pa. 2023).  It unanimously agreed the command in Pennsylvania's Election Code that mail-in voters "shall . . . date" the declaration was "unambiguous and mandatory" as a matter of

statutory interpretation; so omitting the date, or incorrectly dating the return envelope, "render[s] a ballot invalid" under Pennsylvania law. *Id.* at 20-22. The Court also rejected the argument that a declaration with an incorrect date was "sufficient," reasoning that "[i]mplicit in the Election Code's textual command . . . is the understanding that 'date' refers to the day upon which an elector signs the declaration." *Id.* at 22. So, under Pennsylvania law, non-compliant ballots are invalid. The Court evenly divided, however, on whether failing to count non-compliant ballots violated the Materiality Provision. *Id.* at 9. That question thus was bound to return to us.

Shortly after the *Ball* order, five individuals whose ballots were not counted during the November 2022 election, along with the Pennsylvania State Conference of the NAACP ("NAACP") and other voting organizations,[2] brought this suit under 42 U.S.C. § 1983 against all 67 Pennsylvania county boards of elections and the Secretary of the Commonwealth of Pennsylvania ("Secretary"), claiming enforcement of the date requirement violated the Materiality Provision and the equal protection clause of the Fourteenth Amendment. The Republican National Committee and other entities affiliated with it ("RNC") intervened as Defendants.

---

[2] The NAACP joined efforts with the League of Women Voters of Pennsylvania, Philadelphians Organized to Witness, Empower and Rebuild, Common Cause Pennsylvania, Black Political Empowerment Project, and Make the Road Pennsylvania. For convenience, they are collectively referred to as "NAACP," and with the individual plaintiffs as "Plaintiffs."

On cross-motions for summary judgment,[3] the District Court determined the Plaintiffs lacked standing to bring their equal protection claim against all county boards of election and their Materiality Provision claim against 55 of them. It thus dismissed those counties on standing grounds. But the Court ruled the Plaintiffs had standing to sue the remaining 12 county boards and the Secretary, and granted summary judgment for the Plaintiffs on their Materiality Provision claim. It declared that rejecting timely received mail ballots because of missing or incorrect dates violated the Materiality Provision and permanently enjoined the Secretary from directing counties to exclude ballots on that basis. The Court also dismissed the equal protection claim against the Secretary on constitutional avoidance grounds, explaining "there [wa]s no need to reach" that issue given the Court's resolution of the statutory question. App. 7, 88. (The NAACP did not appeal the District Court's rulings on that claim or on standing.).

The District Court framed the Materiality Provision issue as "whether Pennsylvania's Date Requirement is material to the act of voting": "[I]f the error is not material to voting, the requirement of placing a date on the Return Envelope violates the Materiality Provision." App. 74. The date requirement, it reasoned, is immaterial by any measure. No party disputed that election officials "did not use the handwritten date . . . for any purpose related to determining" a voter's qualification under Pennsylvania law. App. 74-75, 81. Moreover, it is "irrelevant in determining when the voter

---

[3] The Secretary did not move for summary judgment, instead filing a brief stating he did not oppose the Plaintiffs' motion as to the Materiality Provision but opposed it as to the equal protection claim.

signed their declaration" or filled out the ballot. App. 79. Nor is it used to determine the ballot's timeliness because a ballot is timely if received before 8:00 p.m. on Election Day, and counties' timestamping and scanning procedures serve to verify that. Indeed, not one county board used the date on the return envelope to determine whether a ballot was timely received in the November 2022 election.

The District Court also disagreed with the RNC's argument that enforcement of the date requirement "does not impinge on the right to vote" because the Materiality Provision "only prohibits immaterial requirements affecting the qualification and registration of a voter," not additional requirements for casting a ballot. App. 76. That interpretation, in the Court's view, was incompatible with the statute's expansive definition of "vote" to include "casting a ballot and having [it] counted." App. 77.

The RNC timely appealed. Richard Marino, who lost his 2023 bid for reelection to the Towamencin Township Board of Supervisors after the District Court ordered the counting of non-compliant ballots, intervened.[4] The RNC and Marino

---

[4] Appellees argue Mr. Marino's challenge regarding the application of the District Court's order to his 2023 race is moot because the results have been certified and his opponent sworn into office. *E.g.*, DNC Br. 50-53. Thus, they say, we cannot "grant any effectual relief" if he prevailed here. *Id.* at 50 (citing *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). Under Pennsylvania law, however, the results of an election may be changed even after certification based on a "timely filed election contest petition." *In re Contest of 2003 Gen. Election for the Off. of Prothonotary*, 849 A.2d 230, 235 (Pa. 2004);

obtained a stay of that order, and we expedited the appeal. The Democratic National Committee and other entities affiliated with it ("DNC") intervened in support of the Plaintiffs-Appellees. The Secretary, though a Defendant below, joins Plaintiffs and the DNC in defending the District Court's decision on the Materiality Provision claim ("Appellees").

With that important background in mind, we turn to the merits.

---

RNC Br. 66. Mr. Marino filed such a petition, but the Court of Common Pleas rejected his challenge as untimely (and thus moot) and noted the ballots were counted consistent with the District Court's order. *In re: Contest of Nov. 7, 2023 Election of Towamencin Twp.*, No. 1482 C.D. 2023, slip op. at *8-9 (Pa. Commw. Ct. Dec. 29, 2023). Mr. Marino appealed, and the Commonwealth Court scheduled a hearing on both mootness *and* the merits of his certification challenge for April 3, 2024. *See* ECF No. 219. It thus is not "impossible" that he could prevail, *Chafin*, 568 U.S. at 172, so his claim before us is not moot.

## II. Discussion[5]

States have separate bodies of rules for separate stages of the voting process.  One stage, voter qualification, deals with *who* votes.  To register and thus be authorized to vote, applicants must follow prescribed steps and meet certain requirements.  It's like obtaining a license to drive.  Another stage deals with *how* ballots are cast by those previously authorized to vote, which is governed by a different set of rules.  To cast a ballot that is valid and will be counted, all qualified voters must abide by certain requirements, just like those authorized to drive must obey the State's traffic laws like everyone else.

The Materiality Provision is an important federal overlay on state election requirements during the "who" stage: voter qualification.  It prohibits States from denying an applicant the right to vote based on an error or omission in paperwork involving his application if that mistake is immaterial in determining whether he is qualified to vote.  That is, it is triggered when conduct or laws restrict *who* may vote.  But it leaves it to the States to decide *how* qualified voters must cast

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1331.  28 U.S.C. § 1291 gives us appellate jurisdiction.  We review the District Court's order granting summary judgment and questions of statutory interpretation *de novo*.  *Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231, 236 (3d Cir. 2023).

While Appellants provide several grounds for reversal, we need consider only one: that Pennsylvania's date requirement does not violate the Materiality Provision.  We assume private plaintiffs can sue to enforce that federal law.  *Migliori*, 36 F.4th at 159-62; *Vote.Org*, 89 F.4th at 475-478.

a valid ballot. Pennsylvania has made one such rule—the date requirement—mandatory. The federal Materiality Provision, in our view, does not interfere.

It has five elements: (1) the proscribed conduct must be engaged in by a person "acting under color of law"; (2) it must have the effect of "deny[ing]" an individual "the right . . . to vote"; (3) that denial must be attributable to "an error or omission on [a] record or paper"; (4) the "record or paper" must be "related to an[] application, registration, or other act requisite to voting"; and (5) the error or omission must not be "material in determining whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B); *see also Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting from denial of application for stay).

The first and third elements are not disputed here. Pennsylvania's county boards of elections are state actors, and neither party argues that a missing or incorrectly dated mail-in envelope is not an "error or omission on [a] record or paper."[6]

---

[6] Judge Chung notes the possibility that the phrase "because of an error or omission" does more work than the parties argue. 52 U.S.C. § 10101(a)(2)(B). For instance, facially non-compliant mistakes that render a ballot defective under state law might be "defects." Accordingly, one might say these facially non-compliant ballots are not counted "because of" a defect rather than "because of an error or omission." Undated envelopes may fall into this category since the statute imposes a duty on the voter to date the declaration, 25 P.S. § 3146.6(a), and the Supreme Court of Pennsylvania has concluded the requirement is mandatory, *Ball*, 289 A.3d at 20-21. In comparison, improperly dated envelopes might be considered

But does the declaration on the envelope in which the ballot travels "relat[e] to an[] application, registration, or other act requisite to voting"?  And what of the requirement that "such error or omission" must not be "material in determining whether such individual is qualified under State law to vote"?  Also, is a voter "den[ied] the right . . . to vote" if his ballot is not counted for failing to abide by state ballot-casting rules?

Read as a whole and in context, the text tells us the Materiality Provision targets laws that restrict who may vote. It does not preempt state requirements on how qualified voters may cast a valid ballot, regardless what (if any) purpose those rules serve.

---

imperfectly compliant ballots where electors have facially met statutory requirements but have done so imperfectly, either by error (*e.g.*, using the previous year) or by omission (*e.g.*, providing no year). Although the Court found that these misdated envelopes were not "sufficient," it analyzed the effect of these mistakes separately from its consideration of undated envelopes and pursuant to a different statute, 25 P.S. § 3146.8(g)(3) (providing election officials discretion to determine sufficiency). *See Ball*, 289 A.3d at 20-23, Section III(B)(1) (undated envelopes) and III(B)(2) (incorrectly dated envelopes). Thus, not counting imperfectly compliant ballots might be considered "because of an error or omission" rather than a defect. This interpretation would not affect the discounting of undated ballots, but it might result in requiring incorrectly dated ballots to be counted if the dissent's view of paperwork were adopted.  52 U.S.C. § 10101(a)(2)(B).

**A**

To make sense of the Materiality Provision, we begin with the part we think drives the interpretation of the rest of the statute.  For the statute to apply, the "error or omission" must not be "material *in determining* whether such individual is qualified under State law to vote . . . ."  52 U.S.C. § 10101(a)(2)(B) (emphasis added).  At first glance, one might think the date requirement fits neatly because the date on the declaration bears no relation—it is immaterial—to whether a voter is qualified under Pennsylvania law to vote, *i.e.*, age, citizenship, duration of residence, and so forth.  And that is what Appellees argue to us.  *See* NAACP Br. 28-29; DNC Br. 24; Sec'y Br. 25-26.

But the text does not say the error must be immaterial "to" whether an individual is qualified to vote.  It uses the words "in determining," and that choice must mean something. *See Polselli v. IRS*, 598 U.S. 432, 441 (2023) ("We ordinarily aim to 'give effect to every clause and word of a statute.'" (quoting *Microsoft Corp. v. i4i L.P.*, 564 U.S. 91, 106 (2011)). Read naturally, we believe they describe a process—namely, determining whether an individual is qualified to vote.  So the information containing an error or omission, material or not, must itself relate to ascertaining a person's qualification to vote (like paperwork submitted during voter registration), and it is only in that context that "officials are prohibited from using" a mistake to deny ballot access unless it is "material 'in determining' whether" the applicant indeed is qualified to vote. *See Ball*, 289 A.3d at 38 (Brobson, J., concurring in part, dissenting in part).

Words also take color from context. Other provisions in subsection 10101(a)(2) that sandwich the Materiality Provision give it meaning. The first—(a)(2)(A)—targets the application of discriminatory standards, practices, or procedures "in determining whether any individual is qualified . . . to vote." The second—(a)(2)(C)—bars literacy tests "as a qualification for voting," subject to some exceptions not relevant here. The thrust of subsection (a)(2) in which the Materiality Provision lives thus appears clear: it governs voter qualification determinations.

And once that much is settled, we can readily make sense of the phrase "record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). Everyone agrees dating the return envelope does not relate to applying or registering to vote. Indeed, it is far afield. But is it an "act requisite to voting"?

If those words take meaning from the words that precede it—application or registration—the answer is no. But Appellees claim the statutory definition of "vote" supplies an unequivocal answer to the contrary. *See* NAACP Br. 35; DNC Br. 19; Sec'y Br. 35. It includes "all action necessary to make a vote effective[,] including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast[.]" 52 U.S.C. § 10101(e). So, the argument goes, because "requisite" means "necessary," and the statutory definition of "vote" includes "having [a] ballot counted," the Materiality Provision unambiguously applies here: dating the declaration on the return envelope is "necessary" to having one's ballot counted, and the envelope is a paper related to that act.

But the words of a statute are not read in isolation; statutory construction is a "holistic endeavor." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). The phrase "act requisite to voting" also draws its import from the context in which it appears. Because the "in determining" phrase, as explained, makes clear the Materiality Provision applies to determinations that affect a voter's eligibility to cast a ballot, its application necessarily is limited to "record[s] or paper[s]" used in that process. And Congress further signaled its focus on qualification determinations by referring to acts like "application" and "registration." Those specific words limit the scope of the relevant paperwork in a way that coheres with the statute's voter qualification focus. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) ("Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (internal quotation marks omitted)).

Although we need not rely on legislative history, it too supports confining the statute's scope to paperwork used for voter qualification determinations. Title I of the Civil Rights Act of 1964, as we have detailed above, was one in a series of federal efforts seeking to put an end to Southern States' diverse techniques "used to disqualify" African Americans from voting. *Katzenbach*, 383 U.S. at 811; *see also Browning*, 522 F.3d at 1173 (describing enactment as a means to "sweep away such tactics as disqualifying an *applicant*" by "inducing voter generated errors that could be used to justify rejecting *applicants*" (emphases added)).

Several statements in the Report issued by the House Judiciary Committee that considered the legislation buttress the Materiality Provision's focus on "address[ing] the practice of requiring unnecessary information for voter *registration* with the intent that such requirements would increase the number of errors or omissions on the *application* forms, thus providing an excuse to *disqualify* potential voters." *Schwier*, 340 F.3d 1284, 1294 (11th Cir. 2003) (emphases added); *see* Robert A. Katzmann, JUDGING STATUTES 75 (2014) ("Committee reports are among 'the most authoritative and reliable materials of legislative history.'" (citation omitted)); Anita S. Kirshnakumar, *Dueling Canons*, 65 Duke L.J. 909, 991-92 (2016). In the Report, the Committee declares that "discriminatory use of literacy tests and other *devices by registration officials* is dealt with … by the *prohibition against their disqualifying an applicant* for immaterial errors or omissions in papers requisite to voting in Federal elections." H.R. Rep. 88-914, title I (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2394 (emphases added).

And references to "registration" and its many permutations abound. *See id.* ("[Section 10101(a) is designed to [e]nsure nondiscriminatory practices in the *registration* of voters …. (emphasis added)); *id.* at 2445-46 (noting Title I would "provide for Federal determinations as to whether errors or omissions in an *application to register* are material" (emphasis added)); *id.* at 2490 (reporting the "disproportionately low [African American] *registration* in some counties" (emphasis added)). Supporters praised Section 10101(a) for countering "the intricate methods employed by some … officials to defeat [African American] *registration*," like the "dilatory handling of [their] *applications* and failure to notify *applicants* of results," and "applying more rigid

30

standards of accuracy to [them] than white[s], thereby rejecting [African Americans'] *applications* for minor errors or omissions." *Id.* at 2491 (emphases added). They noted "*registrars* will overlook minor misspelling errors or mistakes … by white *applicants*, while rejecting an [African American's] *application* for the same," and explained the amendment would require "*registration officials*," among other things, to "disregard minor errors or omissions if they are not material *in determining whether an individual is qualified* to vote." *Id.* (emphases added). And testimony at the House and Senate Judiciary Committee hearings detailed the myriad discriminatory techniques local registrars used to reject applications like, as noted, misspelling "Louisiana." *See* n.1, *supra*.

The legislative history shows the enacting Congress was concerned with discriminatory practices during voter registration, thus in line with what the text reflects. So, in our view, the phrase "record or paper relating to application, registration, or other act requisite to voting" is best read to refer to paperwork used in the voter qualification process. It does not cover records or papers provided during the vote-casting stage.

Yet a separate reason leads us to conclude that a vote-casting rule cannot violate the Materiality Provision: a voter who fails to abide by state rules prescribing how to make a vote effective is not "den[ied] the right . . . to vote" when his ballot is not counted. "Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich*, 141 S. Ct. at 2338. States have legitimate interests in regulating the voting process and in imposing restrictions on voters to

preserve "the integrity and reliability of the electoral process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-90 (2008).  If state law provides that ballots completed in different colored inks, or secrecy envelopes containing improper markings, or envelopes missing a date, must be discounted, that is a legislative choice that federal courts might review if there is unequal application, but they have no power to review under the Materiality Provision.  And we know no authority that the "right to vote" encompasses the right to have a ballot counted that is defective under state law.

One may argue, as Appellees do, that the statutory definition of "vote" as "having [a] ballot counted" means that not counting a timely received mail ballot denies "the right to vote."  Sec'y Br. 47; NAACP Br. 43.  But the definition does not get us far.  Is that right "denied" when a ballot is not counted because the voter failed to follow the rules, neutrally applied, for casting a valid ballot?  We doubt it is.

Consider that the enacting Congress in 1964 merely cross-referenced the definition of "vote" from Title VI of the Civil Rights Act of 1960, where Congress sought to protect minorities' access to the polls in States with "a pattern or practice" of denying the right to vote on racial grounds.  *See* Pub. L. 86-449, 74 Stat. 86, 91-92, Title VI, § 601(a), codified at 52 U.S.C. § 10101(e).  It "authorized courts to *register voters* in areas of systematic discrimination," *Katzenbach*, 383 U.S. at 313 (emphasis added), upon proof they were "denied" that "opportunity," 52 U.S.C. § 10101(e).  That focus on denying (and remedying denials of) the opportunity to register strengthens our view that the phrase "deny the right . . . to vote" in the Materiality Provision must be understood as denying an individual the opportunity to access the ballot in the first

instance—not as denying the right to cast a defective ballot. *See Schwier*, 340 F.3d at 1294 ("[The Materiality Provision] forbids the practice of *disqualifying potential voters* for their failure to provide information irrelevant to determining their eligibility to vote." (emphasis added)).

Returning to the 1960s, we think, illustrates that is what Congress had in mind. It targeted States' systematic campaigns to subvert minorities' access to the polls. Rejecting applications to register for irrelevant mistakes was one of many devices, like poll taxes or literacy tests, that resulted in outright *vote denial*—many Black citizens never had a chance to cast their ballot. *See Shelby County v. Holder*, 570 U.S. 529, 547 (2013). In enacting the Materiality Provision and other prohibitions, Congress put an end to that. No longer could States block ballot box access to an applicant who misspelled a State's name or failed to calculate correctly his birthday to the day. But the Materiality Provision's prohibitions end there. States must still control the mechanics of the vote-casting process. Once inside the voting place (where, in the 1960s, nearly all voting took place), all voters must follow the same rules for casting a valid ballot.

In our view, it makes no sense to read the Materiality Provision to prohibit enforcement of vote-casting rules that are divorced from the process of ascertaining whether an individual is qualified to vote. "Indeed, they were not intended for that purpose," *Ball*, 289 A.3d at 38 (Brobson, J., concurring in part, dissenting in part), and "[t]here is no reason why the requirements that must be met in order to register (and thus be 'qualified') to vote should be the same as the requirements that must be met in order to cast a ballot that will be counted," *Ritter*, 142 S. Ct. at 1825 (Alito, J.). Unless we cabin the

Materiality Provision's reach to rules governing voter qualification, we tie state legislatures' hands in setting voting rules unrelated to voter eligibility.

A few examples illustrate the point. Pennsylvania's Election Code requires that secrecy envelopes containing "any text, mark or symbol which reveals the identity" of the voter "be set aside and declared void." 25 P.S. § 3146.8. An improper mark on that envelope is a paperwork "error." But the error is not relevant (*i.e.*, material) when a State ascertains whether the voter is qualified to vote. On Appellees' account, the error thus must be disregarded, and the ballot counted. Pennsylvania's Election Code also requires that voters mark their ballot using "the same pen or pencil," or else it will be voided and not counted. *Id.* § 3063(a). Filling out the ballot with two different pens would likewise be a paperwork "error," and one that is not relevant to a voter's eligibility. Under Appellees' approach, that rule too would be unenforceable. The same goes for the rule against overvoting, which requires excluding a ballot from the vote tally if a voter casts more votes than permissible, *id.*, the rule that a ballot must not be counted if it is "impossible to determine [a voter's] choice," *id.*, or the requirement that mail-in voters "fill out" and "sign the declaration" printed on the return envelope, *id.* § 3150.16.

There is no need to belabor this point further. The upshot of Appellees' theory is that the Materiality Provision would preempt many such ballot-casting rules because none are related to a voter's qualification to vote. We thus think the correct conclusion is that the Materiality Provision is concerned only with the process of determining a voter's *eligibility* to cast a ballot.

It follows that individuals are not "denied" the "right to vote" if non-compliant ballots are not counted.  Suppose a county board of elections excludes a voter's ballot from the vote tally because he cast more than the permissible number of votes.  Or it sets aside a ballot because the voter revealed his identity by improperly marking the secrecy envelope containing the ballot.  Is that person denied the right to vote?  In both instances, the voter failed to follow a rule—like the date requirement—that renders his ballot defective under state law.  We find it implausible that federal law bars a State from enforcing vote-casting rules that it has deemed necessary to administer its elections.  *See Ritter*, 142 S. Ct. at 1824 (Alito, J.) ("Even the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right.").

## B

The Materiality Provision's textually apparent focus on voter qualification determinations is Appellees' Achilles' heel.  Why?  Because vote-casting rules like the date requirement have nothing to do with determining who may vote.  A voter whose ballot is set aside because of a missing or incorrect date on the return envelope, we know, "ha[s] previously been determined to be eligible and qualified to vote in the election." App. 81.

In our view, the Materiality Provision does not reach something as distinct from "registration" as the casting of a mail ballot at the end of the voting process.  The text does not allow it.  Even the statute's definition of "vote" distinguishes "casting a ballot" from what precedes it in time: "registration or other action required by State law prerequisite to voting."

52 U.S.C. § 10101(e). The date requirement is embedded in the act of casting a ballot. Indeed, the provisions of Pennsylvania's Election Code where the date requirement appears are captioned "Voting by mail-in electors" and "Voting by absentee electors," 25 P.S. §§ 3150.16, 3146.6, and "set forth . . . requirements for *how* a qualified elector may cast a valid absentee or mail-in ballot," *In re Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 Gen. Elec.*, 241 A.3d 1058 (Pa. 2020) (emphasis added). "It is therefore awkward to describe the act of voting as 'requisite to the act of voting.'" *Ritter*, 142 S. Ct. at 1826 n.2 (Alito, J.). And so an outer ballot envelope falls outside the Materiality Provision's scope.

The Pennsylvania General Assembly has decided that mail-in voters must date the declaration on the return envelope of their ballot to make their vote effective. The Supreme Court of Pennsylvania unanimously held this ballot-casting rule is mandatory; thus, failure to comply renders a ballot invalid under Pennsylvania law. *Ball*, 289 A.3d at 20-23. We do not read the Materiality Provision as overriding that pronouncement by requiring that non-compliant ballots nonetheless be counted.

### III. The Dissent's Position

Our colleague takes a different approach. Her dissent reads each of the elements in isolation—consulting more than half a dozen dictionary definitions—and then reassembles them to conclude the Materiality Provision "covers mistakes on any paperwork necessary for one's ballot to count" and requires those mistakes be ignored whenever they are "not relevant to the State's ability to ascertain whether he is qualified under state law to vote." Dissent Op. 19, 30-31, 34.

We part from that theory because what results is a statutory provision Congress did not write with implications it did not intend.

## A

The dissent's approach separates the Materiality Provision into two and treats these parts as though one does not inform the other. The phrase "if such error or omission is not material in determining whether such voter is qualified under State law to vote," it says, identifies what types of errors cannot be used to deny a voter the right to vote: any mistakes that are not "relevant to the State's ability to ascertain whether [an individual] is qualified" to vote. Dissent Op. 15-16, 34. So far, we're onboard. But the dissent then divorces that phrase from everything that comes before it. It does not read the "in determining" phrase as necessarily referring to the process of voter qualification, so it believes the types of "record[s] or paper[s]" covered by the Materiality Provision extend far beyond the paperwork submitted during voter registration. Thus, an "error or omission" can occur on *any* "paperwork necessary for one's ballot to count" (echoing Appellees' theory), and whether that mistake must be ignored depends on whether it is relevant to ascertaining whether the voter is qualified to vote.

But the "in determining" phrase that makes explicit the Materiality Provision's voter qualification focus is the tail that wags the dog. It must confine the scope of "record[s] or paper[s]" to those used at the qualification stage because the dissent's approach runs into the issue that our reading avoids: "judg[ing] the validity of vot[e-casting] rules based on whether

they are material to eligibility." *Ritter*, 142 S. Ct. at 1825 (Alito, J.). Think back to our driver's license example. Could you dispute a ticket for running a red light in Pennsylvania on the ground that you have a valid driver's license, and observing this traffic law is not relevant to whether you are a resident of the State, passed all licensing exams, are over eighteen years old, and so forth? If that sounds confusing, that's because it is.

Likewise, when a registered voter submits his mail-in ballot, all that is left for election officials to do is to verify whether it is valid, *i.e.*, whether it complies with the State's vote-casting rules. Put differently, the dissent's reading ignores that vote-casting rules, as we have explained, serve entirely different purposes than voter-qualification rules. It makes little sense to block enforcement of laws meant to protect the integrity of the voting process due to their inescapable irrelevance in determining whether an individual meets registration requirements.

The dissent appears to believe its approach would not result in stymying enforcement of important vote-casting rules. We have already provided a list of examples to illustrate the practical consequences of adopting the dissent's view, *see supra* Part II.A, and its attempt to distinguish the date requirement from those rules does not persuade us.

Our colleague tackles low-hanging fruit like state laws about voting deadlines, polling locations, and the use of secrecy envelopes, *see* Dissent Op. 21-22 n.17, explaining none are covered by its reading of the Materiality Provision because they do not involve "record[s] or paper[s]." We don't disagree. What troubles us is the dissent's treatment of rules about the ballot. Consider that Appellees, recognizing the

potentially sweeping implications of their position in this case, have argued that the ballot is not a paper "requisite to voting," and so does not come within the Materiality Provision's sweep. *See* NAACP Br. 46; Sec'y Br. 55-56.  But by elsewhere urging that Congress was "concerned with protecting voters' rights at *every* step of the voting process," and that the Materiality Provision covers an outer ballot envelope because it is "paperwork necessary for one's ballot to count," Dissent Op. 19, 30 (emphasis added), the dissent would have difficulty explaining why that same logic does not apply to the ballot itself.  Of all the "paperwork required to vote," the ballot seems to us to be the most necessary to have one's vote counted. Moreover, excluding the ballot from the Materiality Provision's reach while including the envelope in which the completed ballot travels—on the ground that one is "requisite to voting" and one is not—counters commonsense.  The dissent thus concedes, as it must, that "good reason" exists to conclude its interpretation brings into play state rules concerning the ballot itself.  Dissent Op. 36 n.27.  But there is nothing wrong with that, says our colleague, for no matter Pennsylvania's interest in its election laws, it simply was "Congress's goal" in 1964 "to restrain a State's ability to discard ballots cast by qualified voters."  *Id.*  Legislative history does not support that.  To assert otherwise without any indication from a Committee Report is judicially to rewrite Congress' stated intent.

To downplay the implications of its position, the dissent briefly mentions the rule against overvoting, claiming it still would be enforceable under its reading because "the State could not determine the candidate for whom the voter intended to vote."  Op. 36 n.27.  In other words, there is a legitimate reason for prohibiting overvotes.  The dissent also claims its

interpretation would not "give license to bad actors who attempt to exploit certain State election laws for improper purposes," such as "by having voters make errant marks on ballots to signal the vote where such marks are prohibited by State law." *Id.* Why that is so it does not say. Presumably, the dissent again believes these rules serve a legitimate purpose while the date requirement does not. But the Materiality Provision simply does not care whether a rule furthers important state interests. It targets rules that require unnecessary information during voter *qualification* processes and prohibits disqualifying individuals making immaterial errors or omissions in paperwork related to registration. It does not prevent enforcement of neutral state requirements on how voters may cast a valid ballot, no matter the purpose those rules may serve.

Perhaps the dissent recognizes as much, as it argues the declaration on the return envelope does in fact "play[] a role in helping the State to determine that all mail-in voters [are] qualified to vote," and the signature "provides the name of the voter" and thus a means "to determine whether the name is associated with a qualified voter"—*i.e.*, to ascertain his identity. Dissent Op. 34-35 n.26, 38 & n.30. We do not see it that way. Even if verifying a voter's identity, in theory, is a necessary step in determining an individual's qualification to vote, Pennsylvania does not, in practice, use the signature on the declaration to do that. *See In re Nov. 3, 2020 Gen. Election*, 662 Pa. 718, 741-43 (Pa. 2020). Moreover, the declaration is printed on an envelope a voter uses to submit—*i.e.*, cast—his mail ballot. It (the declaration) is not even remotely a form used in Pennsylvania's voter qualification process. The voter who submits his mail-in package has already been deemed qualified to vote—first, when his application to register is

approved and again when his application for a mail ballot is accepted.  *See* App. 81; NAACP Br. 30; 25 P.S. §§ 3150.12b(a), 2811; 25 Pa.C.S. § 1301(a).  Moreover, in signing and dating the declaration, the voter merely attests that he is "qualified to vote in this election," "ha[s] not already voted," "marked [his] ballot in secret," and "understand[s] [he is] no longer eligible to vote at [his] polling place after" returning the voted ballot.  App. 58.  That signed and dated attestation is used to determine whether the ballot is validly cast, not whether the individual is qualified under state law to vote.

## B

Our dissenting colleague grounds her rationale for reading the Materiality Provision to extend to all "paperwork required to vote"—and thus to ensnare a ballot return envelope—in Congress' use of "act requisite to voting" and the statute's broad definition of "vote."  We address a few points here.

To be sure, there is an argument that limiting the phrase "record or paper relating to any application, registration, or other act requisite to voting" to paperwork submitted during registration or similar processes renders "other act requisite to voting" superfluous.  Dissent Op. 21.  Sometimes, "no matter how" we read a statute, "there will be redundancies."  *Bobb v. Att'y Gen.*, 458 F.3d 213, 223 (3d Cir. 2006) (citation omitted).  And reading the Materiality Provision as the dissent does—*i.e.*, it simply refers to "paperwork required to vote"—would also render language superfluous; namely, the deliberate references to "registration" and "application."  Why did Congress list these specific procedures when it just as easily could have said

the Materiality Provision applies to "any record or paper relating to an act requisite to voting"?  The dissent's reading ignores not just the limiting effect of "application" and "registration" but also the import of the voter qualification focus in the "in determining" phrase that follows.

The dissent claims support in legislative history for interpreting the phrase to cover "more than registration-related papers."  Dissent Op. 21, 23-27 & n.19.  It accepts that the enacting Congress was concerned with "the threshold problem" of "discriminatory practices in voter registration." *Id.* at 25 n.19, 27.  But rather than limiting the statute's reach accordingly, the dissent believes it can expand it because "Congress's concerns about voter discrimination did not vanish after registration." *Id.* at 27.  No doubt those concerns existed after Congress passed the Civil Right Act of 1964.  They led the following year to enactment of the landmark Voting Rights Act of 1965.  But before us today is the statutory interpretation of the Materiality Provision.   Even our colleague's own account of that law's historic record consists of nothing but instances of discriminatory and arbitrary practices *during registration*.  *See id.* at 24-26 n.19.  That is what Congress meant to address and what the text reflects.

We close this segment by commenting on the dissent's conclusion that a voter whose ballot is not counted for omitting or incorrectly dating the return envelope is "denied the right . . . to vote."   Citing the statute's definition of "vote" as including "having [a] ballot counted," the dissent believes setting aside non-compliant ballots deprives affected voters of their right to vote. Dissent Op. 16-17, 37-38. We have already explained why, in our view, the definition does not help much, as voters must still follow certain rules to make their vote

effective.  *See supra* Part II.A.   The dissent's response is circular.  It acknowledges that "States have the authority to set neutral requirements for voting." *Id.* at 17 n.13.  But, it claims, if "a state requirement denies an individual the right to vote in an election due to an inconsequential paperwork error or omission of the type captured by the Materiality Provision, then the state rule cannot be used to disqualify a vote." *Id.* That just begs the question at the heart of this case:  Does the Materiality Provision (a federal override for determining voter qualification) cover the date requirement (a Pennsylvania vote-casting rule)?

* * * * *

Confining the role of the Materiality Provision to qualification determinations places its parts into a whole that can be squared with the statute's text, context, and historic backdrop.  It prohibits turning away otherwise eligible individuals based on errors or omissions in supplying information that is not material in determining whether they are qualified to vote.  This removes unnecessary barriers blocking access to the voting place.  But it lets States decide the rules that must be followed to cast a valid ballot. Pennsylvania's date requirement, regardless what we may think of it, does not cross over to a determination of *who* is qualified to vote, and the Materiality Provision likewise does not cross over to *how* a State regulates its vote-casting process.

Because we hold the date requirement for casting a mail-in ballot is not covered by, and thus does not violate, the Materiality Provision, we reverse the District Court's order and remand for it to consider the merits of the Plaintiffs' equal protection challenge.

SHWARTZ, <u>Circuit Judge</u> dissenting.

In the 1950s and 1960s, Congress set out to guarantee all eligible Americans the right to vote.  It investigated, legislated, and, when its efforts fell short, enacted "sterner and more elaborate measures" to eliminate barriers to voting. <u>South Carolina v. Katzenbach</u>, 383 U.S. 301, 309 (1966).  One such measure was to ensure that States' immaterial voting requirements did not prevent otherwise qualified voters from registering to vote, casting ballots, and having their votes counted.  Congress did so, in part, through the Civil Rights Act of 1964 as amended by the Voting Rights Act of 1965, in which it enacted what is now codified as 52 U.S.C. §10101(a)(2)(B) (the "Materiality Provision").  This law forbids State actors from denying voters the right to vote in any election due to errors or omissions on required paperwork when such mistakes do not affect the State's ability to determine the voters' qualifications to vote.[1]

More than one million Pennsylvania voters mailed in their ballots in the November 2022 election.  Of them, 10,000 timely-received ballots were not counted because they did not comply with the State law requirement that the voters' declarations ('the declarations') on the mailing envelopes include a date below the voter's signature,[2] <u>Ball v. Chapman</u>,

---

[1] The words "paperwork" and "document" refer to any record or paper covered by the Materiality Provision.  The word "mistake" refers to the errors and omissions covered by the Materiality Provision.

[2] These voters either omitted the date, wrote an incomplete date, or recorded an incorrect date below their signatures.  Examples of erroneous dates include dates that

284 A.3d 1189, 1192 (Pa. 2022) (per curiam), even though the date on the envelope is not used to (1) evaluate a voter's statutory qualifications to vote, (2) determine the ballot's timeliness, or (3) confirm that the voter did not die before Election Day or to otherwise detect fraud.

Some of those voters, and organizations representing similar interests ("Plaintiffs"), sued the Secretary of the Commonwealth of Pennsylvania and county boards of elections to have their ballots counted, contending that the exclusion of those ballots denied those voters their right to vote

---

only had the month and day but no year, or with a month and year but no day, dates that listed a year in the past or in the future, dates that were likely the voter's birth date, and dates written using the European style of day/month/year.

under federal law.[3, 4]   The District Court agreed, granted Plaintiffs' motion for summary judgment,[5] and ordered that

_____

[3] Plaintiffs are correct that 42 U.S.C. § 1983 provides them a private right of action to enforce the Materiality Provision. Vote.Org v. Callanen, 89 F.4th 459, 478 (5th Cir. 2003) (holding that "a remedy for [§] 10101 violations [may be sought] by way of [§] 1983"); Schwier v. Cox, 340 F.3d 1284, 1297 (11th Cir. 2003) (concluding that § 10101 "may be enforced by a private right of action under § 1983"); but see Ne. Ohio Coal. for the Homeless v. Husted, 837 F.3d 612, 630 (6th Cir. 2016) (stating that § 10101 could not be enforced under § 1983 based on cases relying on a district court opinion that had no allegation of state action and did not discuss § 1983).

Applying the test announced in Gonzaga University v. Doe, 536 U.S. 273 (2002), despite having some doubt that it applies to civil rights claims, see id. at 279-83 (justifying the test based on "confusion" stemming from noncivil rights cases), Plaintiffs may use § 1983 seek relief.  Under Gonzaga, a plaintiff must show that the law he claims has been violated creates a personal right.  Three Rivers Ctr. for Indep. Living v. Hous. Auth. of Pittsburgh, 382 F.3d 412, 421-22 (3d Cir. 2004).  To determine whether a statute gives rise to a personal right, we consider whether: (1) Congress intended that the statute benefit the plaintiff; (2) the plaintiff has shown that the right is "not so vague and amorphous that its enforcement would strain judicial competence"; and (3) the statute imposes a binding obligation on the State, which may be shown by its couching of the right "in mandatory, rather than precatory, terms."  Blessing v. Freestone, 520 U.S. 329, 340-41 (1997) (internal quotation marks and citations omitted).  Once the plaintiff establishes such a right, then there is a rebuttable

presumption that the plaintiff may enforce that right via § 1983. Id. at 341; see also Health and Hosp. Corp. of Marion Cnty. v. Talevski, 599 U.S. 166, 186 (2023) (same). Plaintiffs have established there is a personal right in § 10101, and the presumption has not been rebutted.

First, § 10101 embodies a right, which the parties do not dispute, as the first subsection of the statute provides that all qualified citizens "shall be entitled and allowed to vote." 52 U.S.C. 10101(a)(1). This subsection, and the Materiality Provision itself, benefit a voter. Moreover, the right embodied in the statute is not "vague and amorphous," and the statute "is couched in mandatory terms," Blessing, 520 U.S. at 340, in that it provides that no State actor "shall . . . deny the right of any individual to vote[.]" 52 U.S.C. § 10101(a)(2)(B); cf. Wisniewski v. Rodale, Inc., 510 F.3d 294, 302 (3d Cir. 2007) ("[A]n explicit reference to a right and a focus on the individual protected . . . suffices to demonstrate Congress's intent to create a personal right."). Therefore, § 10101 creates a personal right.

Second, Appellants have not rebutted the presumption that the right is enforceable and that a remedy can be secured via § 1983 because Congress did not (1) expressly foreclose the use of § 1983, or (2) create a comprehensive enforcement scheme incompatible with individual enforcement. Gonzaga, 536 U.S. at 284 n.4. Here, Appellants argue that § 10101(c) contains an "elaborate enforcement scheme," as it permits private individuals to seek a declaration that they are entitled to vote only after the Attorney General prevails in a lawsuit showing that a State actor engaged in a pattern or practice of discrimination. 52 U.S.C. § 10101(c), (e). This, however, is not the only remedy available to private plaintiffs. Congress specifically provided federal courts with jurisdiction over §

10101 claims and gave the "party aggrieved," i.e., the aggrieved voter, the right to bring suit without exhausting other remedies.  <u>See</u> 52 U.S.C. § 10101(d).  This means that an individual need not await any action by the Attorney General, or a finding of a pattern or practice of discrimination, before seeking to enforce his rights under the statute.  As a result, the statute does not embody a comprehensive scheme for relief incompatible with individual enforcement.

Furthermore, the 1957 Civil Rights Act specifically added the aggrieved person/no exhaustion provision at the same time it gave the Attorney General civil enforcement authority.  Civil Rights Act of 1957, Pub. L. No. 85-315, § 131, 71 Stat. 634, 637 (1957).  It would be inconsistent to read the statute to remove one roadblock to private suits (exhaustion requirements) and simultaneously erect another by allowing private persons to obtain relief only when the Attorney General chooses to bring (and wins) a pattern and practice suit.  <u>See</u> <u>Schwier</u>, 340 F.3d at 1295-96; <u>see</u> <u>also</u> <u>Morse v. Republican Party of Virginia</u>, 517 U.S. 186, 213, 230-34 (1996) (holding the Voting Rights Act "only authorizes enforcement proceedings brought by the Attorney General and does not expressly mention private actions," but nevertheless "Congress must have intended [] to provide private remedies"); <u>United States v. Mississippi</u>, 380 U.S. 128, 137 (1965) (acknowledging "private persons might file suits under § [10101]").  Thus, because § 10101 does not provide a comprehensive enforcement scheme that is inconsistent with a plaintiff's ability to seek relief under § 1983, Plaintiffs have a private of right action and can sue under § 1983.

Although Plaintiffs asserted in their complaint that § 10101 contains an implied right of action, they did not do so before us.  Nonetheless, there is textual support for concluding

such an implied right of action exists.  To determine whether an implied right of action exists, courts consider whether (1) plaintiff was the beneficiary of the statute, (2) the text indicates that the statute created a remedy, (3) implying the remedy is consistent with the legislative scheme, and (4) the implied cause of action is in an area not traditionally relegated to state law such that it would be inappropriate to infer a federal cause of action.  See S. Camden Citizens in Action v. N.J. Dep't of Env't Prot., 274 F.3d 771, 777 n.4 (3d Cir. 2001) (quoting West Virginia Univ. Hosps., Inc. v. Casey, 885 F.2d 11, 18 n.1 (3d Cir. 1989) (citing Cort v. Ash, 422 U.S. 66, 78 (1975))).  Each of these considerations support concluding that § 10101 contains an implied private right of action.  First, because the statute directs State actors not to deny an individual the right to vote, the beneficiary of the statute is the voter.  The statute also instructs federal district courts to accept suits from a "party aggrieved" regardless of whether that party has exhausted administrative remedies.  52 U.S.C. § 10101(d).  This conveys that Congress intended that voters whose rights were denied be permitted to immediately come to court.  Second, following a finding that a wrongdoer engaged in a pattern or practice of voter discrimination, the statute provides an avenue for a voter to obtain declaratory relief.  Although Congress identified this declaratory relief in a particular circumstance, the text's reference to allowing courts to consider suits by aggrieved persons without satisfying administrative or other prerequisites shows that the statute does not limit aggrieved parties to seeking only such relief.  Third, allowing a voter to bring suit for violations of the statute is consistent with the text and legislative scheme.  Fourth, although the statute covers election activity, including State elections subject to state law, it serves the purpose of ensuring that State actors do not misuse state

_____

law to deny a voter the right to have their vote counted, a right Congress explicitly extended to voters in State elections in the Voting Rights Act of 1965. Therefore, there are reasons to conclude that § 10101 has an implied right of action.

⁴ Amicus curiae Alabama and sixteen other States (the "Seventeen States") contend that § 1983 cannot apply here. No party made such an argument and amici are generally not permitted to inject new issues into an appeal, "at least in cases where the parties are competently represented by counsel." New Jersey Retail Merchs. Ass'n v. Sidamon-Eristoff, 669 F.3d 374, 382 n.2 (3d Cir. 2012) (quoting Universal City Studios, Inc. v. Corley, 273 F.3d 429, 445 (2d Cir. 2001) (citation omitted)). Nevertheless, I will address it. The Seventeen States argue that Plaintiffs may not rely on § 1983 to enforce § 10101 because Gonzaga requires that § 1983 can only be used to enforce new rights that Congress creates and that statutes promulgated under § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment can only create remedies. This is incorrect for at least three reasons.

First, the Gonzaga Court itself approvingly noted that the Supreme Court had previously "recognized, for example, that Title VI of the Civil Rights Act of 1964" (which prohibits discrimination in federally assisted programs, Pub. L. No. 88-352, 78 Stat. 241, 252-53 (1964)) "creat[ed] individual rights." 536 U.S. at 284 (citation omitted). Thus, it cannot be that the Court was ruling that legislation enacted pursuant to the Fourteenth Amendment cannot satisfy the Gonzaga test as the Court used the Civil Rights Act of 1964, which was promulgated in part based on the Fourteenth Amendment, as an example of a statute that can create rights.

Second, the implications of the Seventeen States's
position illustrate why it is wrong.  Under their theory, (1) all
§ 1983 actions for statutory violations require the underlying
statute to confer a new right, (2) statutes enacted pursuant to
the Fourteenth and Fifteenth Amendments cannot establish
new rights, and (3) together this means that no federal civil
rights law enacted pursuant to those Constitutional
Amendments are enforceable by private action unless the
statute includes an express cause of action.  Adopting the
Seventeen States's theory would: (1) eliminate almost all
avenues to enforce the civil rights laws promulgated pursuant
to the enforcement clauses of the Fourteenth and Fifteenth
Amendments; (2) ignore that Congress enacted many civil
rights laws without including an express private right of action
"against a backdrop of decisions in which implied causes of
action were regularly found[,]" Morse, 517 U.S. at 213, 231
(internal quotation marks and citation omitted); and (3) be
inconsistent with the purpose of § 1983, which Congress
enacted to enforce the civil rights laws against State actors, see,
e.g., Talevski, 599 U.S. at 176-77;  Lugar v. Edmondson Oil
Co., 457 U.S. 922, 934 (1982) (noting Congress viewed § 1983
as a mechanism for private plaintiffs to enforce the rights
embodied in the Reconstruction Amendments); Lynch v.
Household Fin. Corp., 405 U.S. 538, 545 (1972) ("The broad
concept of civil rights embodied . . . in the Fourteenth
Amendment is unmistakably evident in the legislative history
of § 1 of the Civil Rights Act of 1871, 17 Stat. 13, the direct
lineal ancestor of §[] 1983[.]").

Third, Gonzaga developed the rights-creation test to
clarify "confusion" that the Court thought had resulted from
several of its earlier ruling.  Gonzaga, 536 U.S. at 279-83.
However, the cases it cited as giving rise to "confusion" all

such ballots be counted in the twelve counties over which the Court had Article III jurisdiction.[6] Pennsylvania State Conf. of

_____

arose outside of the civil rights context. See id. Therefore, it follows that Gonzaga's test was crafted to examine cases where plaintiffs seek to use § 1983 to enforce a right arising outside of the civil rights context.

[5] The Purcell doctrine, which disfavors courts providing election-related relief in the weeks before an election, does not counsel against deciding this dispute. First, the doctrine is often invoked to ensure that courts avoid deciding matters that could result in "voter confusion" and cause voters to "remain away from the polls." Purcell v. Gonzalez, 549 U.S. 1, 4-5 (2006) (per curiam); see also Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020) (per curiam) ("[W]hen a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this Court, as appropriate, should correct that error."). Here, the District Court's ruling occurred after the polls closed. Second, the District Court's ruling occurred well before any upcoming election, providing ample time for voters to plan how they would like to vote. Third, the District Court's order affected election officials, not voters, and provided clear guidance about whether to count certain mail-in ballots. Thus, ruling in this case did not present any risk voter confusion.

[6] The District Court's remedy, which was limited to twelve counties based on its Article III jurisdiction, Pennsylvania State Conf. of NAACP v. Schmidt, No. 1:22-cv-00399, 2023 WL 8091601, at *35-36 (W.D. Pa. Nov. 21, 2023), did not violate the Equal Protection Clause. Two Supreme Court cases tell us why. In Katzenbach v. Morgan, the Supreme Court held that a federal law that required the States to grant voting rights to non-English speakers who

attended schools in Puerto Rico that taught predominantly in a non-English language, but not to non-English speakers who attended schools beyond the territorial limits of the United States, did not violate the Equal Protection Clause.  384 U.S. 641, 654-58 (1966).  The Court upheld the law because it "d[id] not restrict or deny the franchise but in effect extend[ed] the franchise to persons who otherwise would be denied it by state law."  Id. at 657.  Likewise, in McDonald v. Board of Election Commissioners, the Court considered an Illinois law that allowed for absentee voting in certain circumstances, including where a voter would be absent from his resident county on Election Day.  394 U.S. 802, 803 (1969).  Plaintiffs, who were pre-trial detainees in their county of residence, alleged that the law violated the Equal Protection Clause because it permitted pre-trial inmates at jails located outside of their counties of residence to vote absentee, while the plaintiffs were excluded from doing so.  Id. at 803, 806.  The Court concluded that the "different treatment" afforded to similarly situated voters in different counties did not give rise to an Equal Protection Clause violation, in part because expanding voting to people who otherwise would not be entitled to it "should not render void [the] remedial legislation, which need not . . . 'strike at all evils at the same time.'"  Id. at 810-11 (quoting Semler v. Dental Exam'rs, 294 U.S. 608, 610 (1935)).  Thus, under Morgan and McDonald, remedies that fall short of extending voting rights to all similarly situated individuals do not violate the Equal Protection Clause, as making voting more accessible often comes in stages and need not be an all-or-nothing proposition.

Appellants' reliance on Bush v. Gore, 531 U.S. 98 (2000), to support their view that the District Court's order violated the Equal Protection Clause is misplaced.  First, Bush

NAACP v. Schmidt, No. 1:22-cv-00399, 2023 WL 8091601, at *28-34 (W.D. Pa. Nov. 21, 2023).

The Republican National Committee intervenors appeal but, notably, the county boards of election and the Secretary do not. My colleagues agree with the intervenors' view that the Materiality Provision applies only to paperwork used to register to vote and not to the declarations on the envelopes used to mail ballots. For the reasons set forth below, the

---

expressly stated that its "consideration is limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities." Id. at 109. Second, the present case does not involve a lack of a uniform standards for determining whether a ballot expressed the voter's choice. Finally, reported cases involving Equal Protection challenges to a remedy citing Bush, see, e.g., Ne. Ohio Coal. For the Homeless v. Husted, 696 F.3d 580, 583-84 (6th Cir. 2012); Democratic Party of Georgia, Inc. v. Crittenden, 347 F. Supp. 1324, 1339-41 (N.D. Ga. 2018); Friedman v. Snipes, 345 F. Supp. 2d 1356, 1381-82 (S.D. Fla. 2004), are factually distinguishable and ignore Bush's statement about the limits of its ruling. 531 U.S. at 109. Furthermore, Bush itself did not cite Morgan, and only Justice Ginsburg cited McDonald in her dissent. Id. at 143 (Ginsburg, J., dissenting). Likewise, Husted, Crittenden, and Friedman do not cite Morgan, and the singular references to McDonald in Crittenden and Friedman were for unrelated purposes. Accordingly, these cases do not show that the District Court's remedy violated Equal Protection.

Materiality Provision, in my view, is not limited to that narrow group of documents and, therefore, I respectfully dissent.[7]

## I

I begin with a review of the relevant Pennsylvania law. To be qualified to register and to vote in Pennsylvania, an individual must (1) be at least eighteen years old on the date of the election, (2) be a citizen of the United States for at least one month before the election, (3) reside in the election district for at least thirty days before the election, and (4) not have been confined for a felony in the preceding five years. 25 Pa. Cons. Stat. § 1301; 25 Pa. Stat. and Cons. Stat. § 2811.

Qualified voters can vote in person, absentee, or by mail-in ballot. See 25 Pa. Stat. and Cons. Stat. §§ 3146.6(a), 3150.16(a). To vote by mail-in ballot,[8] the voter must complete an application that contains the voter's date of birth, length of residency in the district, and proof of identification. 25 Pa. Stat. and Cons. Stat. § 3150.12. If the voter's county board of elections verifies the voter's identity and qualifications, then it sends him a mail-ballot package, which

---

[7] A prior panel reached the same conclusion when it held that the Materiality Provision required that officials count ballots contained in envelopes where the declaration lacked a date, and I agree with their conclusion. Migliori v. Cohen, 36 F.4th 153 (3d Cir. 2022), vacated as moot sub nom., Ritter v. Migliori, 143 S. Ct. 297, 298 (2022).

[8] I focus on only documents that mail-in voters submit because that is the group of voters at issue in this case. See United States v. Meyers, 484 F.2d 113, 114 (3d Cir. 1973) ("[W]e will limit our review to the pertinent facts.").

contains a ballot, a secrecy envelope, and a pre-addressed return envelope, on which a voter declaration is printed. 25 Pa. Stat. and Cons. Stat. § 3150.12-.15.[9]  The law instructs the voter to mark the ballot in secret, place the ballot in the secrecy envelope, place the secrecy envelope in the return envelope, and "fill out, date and sign the declaration."  25 Pa Stat. and Cons. Stat. §§ 3146.6(a), 3150.16(a) (the "date requirement"). Although the formatting of the declaration varies by county, each declaration contains the following language above the signature and date lines:

> I hereby declare that I am qualified to vote in this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret.  I am qualified to vote the enclosed ballot.  I understand I am no longer eligible to vote at my polling place after I return my voted ballot.  However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

Pa. Supp. App. at 284; see also 25 Pa. Stat. and Cons. Stat. § 3146.6(b)(3) (setting forth required language for mail-in and absentee declarations).  Of import here, the first line of the declaration requires the voter to declare that he is qualified to vote.

---

[9] In the November 2022 election, the boards of elections did not begin sending the relevant mail-in ballot materials to voters until August 2022.

After the voter completes these steps, he is required to mail or deliver the packet to the designated county location so it is received by 8:00 P.M. on Election Day. 25 Pa. Stat. and Cons. Stat. §§ 3146.6(a), 3150.16(a). When the county board of elections receives the packet, it scans the bar code on the return envelope. The bar code corresponds to the voter who requested the ballot and records when election officials receive the ballot package.

As stated previously, more than 10,000 eligible voters had their timely-ballots disqualified because the dates that appeared below their signatures had no date, an incomplete date, or an incorrect date and thus did not satisfy the State law's date requirement.

## II

### A

The question in this case is whether the disqualification of those votes violates the Materiality Provision. To answer this question, I consider the full text of the Materiality Provision and the entire statutory section of which it is a part.

"As in any statutory construction case," courts must begin "with the statutory text and proceed from the understanding that [u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." Sebelius v. Cloer, 569 U.S. 369, 376 (2013) (internal quotation marks and citation omitted) (alterations in the original); see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon, 515 U.S. 687, 697 n.10

(1995) (observing that Congress's choice to "explicitly define[]" a statutory term "obviat[es] the need for us to probe its meaning as we must probe the meaning of [] undefined [] term[s]").  When a statutory term is undefined, we may consider dictionary definitions to ascertain the term's ordinary meaning.  Pa., Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs., 647 F.3d 506, 511 (3d Cir. 2011) (citation omitted).  "[W]hen the meaning of the statute's terms is plain, our job is at an end[,]" as "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."  Bostock v. Clayton Cnty., 590 U.S. 644, 673-74 (2020) (citations omitted).

The Materiality Provision provides that:

> [n]o person acting under the color of law shall[] . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).  This is a conditional statement consisting of two parts.  I will refer to the part the Materiality Provision that precedes "if such error or omission" as the first clause, and the language that follows this phrase as the second clause.  As explained herein, the first clause identifies the types of papers covered by the Materiality Provision, and the second clause informs the first clause by identifying the types of errors

15

or omissions that cannot be used to deny a voter the right to vote.

1

The first clause begins with "[n]o person acting under color of law shall[] . . . deny the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). To understand the meaning of the phrase "deny the right of any individual to vote," it is necessary to consider the meaning of "right." Black's Law Dictionary defines "right" as "a capacity residing in one man of controlling, with the assent and assistance of the state, the actions of others," or "that which a man is entitled to have, or to do, or to receive from others within the limits prescribed by law." Right, Black's Law Dictionary (4th ed. 1951) (internal quotation marks and citation omitted).[10] To "deny" means, as relevant here, to "refuse to grant," Deny, Black's Law Dictionary (4th ed. 1951).[11] Finally, the statute's definition of "vote" provides that

> the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to

---

[10] See also Right, Black's Law Dictionary (4th ed. 1968) (same); accord Obergefell v. Hodges, 576 U.S. 644, 664 (2015) (describing "rights" as "interests of the person so fundamental that the State must accord them its respect") (citation omitted).

[11] See also Deny, Webster's Third New Int'l Dictionary of the English Language Unabr. (1963) ("to refuse to grant").

> candidates for public office and propositions for
> which votes are received in an election[.]

52 U.S.C. § 10101(e); <u>see also</u> <u>id.</u> § 10101(a)(3)(A) (providing that "the term 'vote' shall have the same meaning as in subsection (e) of this section"); <u>see</u> <u>Babbitt</u>, 515 U.S. at 697 n.10 (deferring to a statute's definition of a term). This definition demonstrates that the Materiality Provision applies to a variety of actions connected with the voting process. Accordingly, this part of the first clause unambiguously provides that the State may not refuse to grant voters their entitlement to have their ballots counted so long as the remaining conditions of the Materiality Provision are satisfied.[12, 13]

---

[12] Appellants' contention that we should interpret the phrase "right . . . to vote" as the common law understood it in 1964, i.e., to not encompass mail-in voting fails because Congress provided the strongest possible indication that the common law definition was not applicable: its own definition. <u>United States v. Shabani</u>, 513 U.S. 10, 13 (1994) (citations omitted). Its definition governs. <u>Babbitt</u>, 515 U.S. at 697 n.10. Mail-in voting falls squarely within that definition, as the definition does not limit the act of voting to casting ballots in person.

[13] States have the authority to set neutral requirements for voting. If, however, a state requirement denies an individual the right to vote in an election due to an inconsequential paperwork error or omission of the type captured by the Materiality Provision, then the state rule cannot be used to disqualify a vote because the Materiality Provision supersedes state law. <u>See</u> <u>Armstrong v. Exceptional Child Ctr., Inc.</u>, 575 U.S. 320, 324 (2015) (explaining that under the

The next portion of the first clause provides "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting."  52

---

Supremacy Clause of the Constitution, see U.S. Const. art. VI, cl. 2, "[c]ourts . . . must not give effect to state laws that conflict with federal laws" (citation omitted)).  The Majority chooses to adopt a narrow interpretation of the Materiality Provision due, at least in part, to a concern that a plain reading may prevent States from enforcing election laws that, albeit reasonable, have nothing to do with determining whether someone is qualified to vote.  It is not a judge's job to curtail the scope of a constitutional law, see infra at 28-30, even if the judge thinks its application could go too far.  See Bob Jones Univ. v. United States, 461 U.S. 574, 612 (1983) (Powell, J., concurring) ("The contours of public policy should be determined by Congress, not by judges[.]").  The text makes clear the types of mistakes Congress sought to regulate (i.e., those on mandatory paperwork other than registration forms).  The history shows that Congress extended the Materiality Provision to the States and broadly defined the term "vote" to combat the evil of voter disenfranchisement.  Accordingly, Congress's choice to judge States' voting laws against the benchmark of whether a mistake is material to determining a voter's qualifications is not "confusing."  Majority Op. at 38.  Rather, the Materiality Provision's plain text and history demonstrate that Congress endeavored to legislate expansively, and it determined that the interest in preventing neutral-looking laws from disenfranchising qualified voters outweighed the potential consequence of voiding a limited number of state voting laws.  Congress has the authority to do so, and we are required to apply the law as written.

U.S.C. § 10101(a)(2)(B).  The Majority holds that this portion of the Materiality Provision shows that it applies to only registration paperwork.  I part company with them, as I view the language as written: to capture errors or omissions on any records or papers that relate to any application, registration, or "other act requisite to voting."  Id.

　　To determine what constitutes any "other act requisite to voting," I am guided by the statute's definition of "vote," see Babbitt, 515 U.S. at 697 n.10, as well as the ordinary meaning of "requisite" and "other."  As previously noted, the statute defines "vote" to include "all action necessary to make a vote effective including, but not limited to, action required by State law prerequisite to voting, casting a ballot, and having such ballot counted[.]"  52 U.S.C. § 10101(e).  "Requisite" ordinarily means "required," Requisite, Webster's Third New Int'l Dictionary of the English Language Unabr. (1963) ("required by the nature of things or by circumstances or by the end in view: essential, indispensable, necessary"),[14] and "other" means "[d]ifferent or distinct from that already mentioned," Other, Black's Law Dictionary (4th ed. 1951), or "not being the one (as of two or more) first mentioned," Other, Webster's Third New Int'l Dictionary of the English Language Unabr. (1963).  Therefore, by its terms, the first clause of the Materiality Provision covers mistakes on paperwork necessary for one's ballot to count, including on papers distinct from application or registration forms.  To conclude that the Materiality Provision limits "other act[s] requisite to voting" to

---

　　[14] See also Requisite, Webster's New Twentieth Century Dictionary (2d ed. 1969) ("required by the nature of things or by circumstances; necessary for some purpose; so needful that it cannot be dispensed with").

only registration-related conduct would place limits on the text that simply are not there.[15]  52 U.S.C. § 10101(a)(2)(B).  Had Congress wished to limit "any . . . other act requisite to voting,"

---

[15] Because the phrase "requisite to voting" is not ambiguous, the ejusdem generis canon of statutory interpretation does not apply.  See Harrison v. PPG Indus., Inc., 446 U.S. 578, 588-89 (1980).  However, applying that canon would not lead to a different outcome in this case.  This canon instructs that "where general words follow an enumeration of specific items, [they] are read as applying only to other items akin to those specifically enumerated."  Id. at 588; see also Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 224-25, 227-28 (2008) (declining to apply the rule to the phrase "'any officer of customs or excise or any other law enforcement officer'" so as to limit "'any other law enforcement officer'" because Congress "easily could have written 'any other law enforcement officer acting in a customs or excise capacity'" but instead "used [an] unmodified, all-encompassing phrase" (emphasis omitted)).  If we applied the canon, as well as the canon noscitur a sociis, a related canon that provides that "a word is known by the company it keeps," Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961), "it would not significantly narrow the ambit of" "requisite to voting" to preclude inclusion of the declaration, Harrison, 466 U.S. at 588; see also Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-15 (2001) (noting that a catch-all phrase can be construed "to embrace only objects similar in nature to those objects enumerated by the preceding specific words").  The declaration is of the same species as a voter application or registration form, as all three types of documents exist to enable someone to exercise the right to vote and provide information concerning the voter's qualifications to vote.

<u>id.</u>, to registration-related conduct alone, it could have written "any . . . other act requisite to registering to vote," or defined "vote" more narrowly, but it did not.

Interpreting the first clause to cover more than registration-related papers makes sense for additional reasons. First, doing so ensures that no words in the statute are rendered superfluous. "It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word." <u>Washington Mkt. Co. v. Hoffman</u>, 101 U.S. 112, 115 (1879). Limiting the Materiality Provision to papers relating to the initial registration would render the phrase "or other act requisite to voting" meaningless, <u>see</u> <u>United States v. EME Homer City Generation, L.P.</u>, 727 F.3d 274, 293 (3d Cir. 2013) (cautioning that "general phrases cannot be so narrowly construed that they become meaningless"),[16] because the Materiality Provision already applies to "any record or paper relating to any . . . registration,"[17] 52 U.S.C. 10101(a)(2)(B).

---

[16] Conversely, this interpretation of "requisite to voting" does not render "application or registration" superfluous, as "Congress may have simply intended to remove any doubt that" applying and registering to vote count as acts requisite to voting. <u>Fort Stewart Schs. v. FLRA</u>, 495 U.S. 641, 646 (1990) (noting that Congress may insert "technically unnecessary" examples "out of an abundance of caution—a drafting imprecision venerable enough to have left its mark on legal Latin (ex abundanti cautela)" (italics omitted)).

[17] This interpretation of "any . . . other act requisite to voting" also does not violate the canon against federalism. Concluding that the phrase covers paperwork other than registration forms does not infringe upon a State's right to enact neutral and uniform legislation to regulate elections,

Second, this interpretation gives effect to the Materiality Provision's repeated use of the word "any." See 52 U.S.C. § 10101(a)(2)(B). "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." United States v. Gonzales, 520 U.S. 1, 5 (1997) (internal quotation marks and citation omitted). Accordingly, this construction aligns with Congress's use of "any" to emphasize the variety of papers the Materiality Provision covers.[18]

---

subject to the Materiality Provision, which itself is limited to mistakes on paperwork requisite to voting that are irrelevant to determining a voter's qualifications. State laws that set voting deadlines, identify polling locations, permit mail-in voting, and require the use of a secrecy envelope for mail-in ballots, for example, all lie outside the sphere of the Materiality Provision, as such requirements cannot result in errors on papers requisite to voting. See, e.g., Democratic Cong. Campaign Comm. v. Kosinski, 614 F. Supp. 3d 20, 55 (S.D.N.Y. 2022) (distinguishing between errors regarding a voter's assigned polling place and errors "on any record or paper"); Friedman, 345 F. Supp. 2d at 1372-73 (declining to issue an injunction under the Materiality Provision that would require counting absentee ballots received after a deadline, as this was not an error or omission "on any record or paper"); see also Indiana Democratic Party v. Rokita, 458 F. Supp. 2d 775, 841 (S.D. Ind. 2006) (failure to present identification "is by definition not an error or omission on any record or paper" (internal quotation marks and citation omitted)), aff'd sub nom. Crawford v. Marion Cnty. Election Bd., 472 F.3d 949 (7th Cir. 2007), aff'd, 553 U.S. 181 (2008).

[18] The Majority relies on the fact that the statutory subsections neighboring the Materiality Provision may more

Third, this interpretation is consistent with the historical context in which the Materiality Provision was enacted.[19]  As

_____

obviously apply to only registration and voter qualifications to support the view that the Materiality Provision only applies to initial registration paperwork.  <u>See</u> 52 U.S.C. § 10101(a)(2)(A), (C) (prohibiting State actors from using (1) non-uniform practices to "determin[e] whether any individual is qualified under State law or laws to vote in any election," and (2) "literacy test[s] as a qualification for voting . . . unless" certain requirements are met).  These neighboring provisions, however, do not alter the scope of the Materiality Provision.  First, they are not phrased as conditional statements and thus are not structured in the same way as the Materiality Provision.  Secon, the Materiality Provision reaches errors or omissions any paperwork "requisite to voting."  Neither § 10101(a)(2)(A) nor (C) contain such "requisite to voting" language.  Therefore, the subsections differ, and with "differing language" comes differing meanings.  <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) (observing that when "Congress includes particular language in one section of a statute but omits it in another section of the same [a]ct, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotation marks and citations omitted)).

[19] Between 1957 and 1965, Congress engaged in an eight-year effort to research and combat discrimination in elections.  In 1957, Congress, "disturbed by allegations that some American citizens were being denied the right to vote . . . because of their race, color, creed, or national origin[,]" U.S. Comm'n on Civil Rights, <u>Report of the U.S. Comm'n on Civil Rights 1959</u>, at ix (1959) ("1959 CCR Report"), passed the Civil Rights Act of 1957, which, among other things, outlawed

---

intentional acts of voter intimidation in federal elections and established the U.S. Commission on Civil Rights ("CCR") to "investigate" discrimination in voting, see 71 Stat. at 634-36 (§§ 101-06).

The CCR's initial report detailed the history of persistent, "ingenious and sometimes violent methods" State actors employed to disenfranchise Black voters since the end of the Civil War. 1959 CCR Report at 30. This report advised Congress that the "[t]he history of voting in the United States shows . . . that where there is will and opportunity to discriminate against certain potential voters, ways to discriminate will be found." Id. at 133. Congress responded by passing the Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 (1960). Relevant in that legislation, Congress defined the term "vote" using the identical, broad definition now codified at 52 U.S.C. § 10101(e). See 74 Stat. at 91-92.

By 1963, the CCR advised Congress that: (1) voter discrimination endured, (2) "present legal remedies . . . [were] inadequate[,]" and (3) "the promise of the 14th and the 15th amendments to the Constitution remain[ed] unfulfilled." U.S. Comm'n on Civil Rights, Civil Rights '63, at 13, 26 (1963) ("1963 CCR Report"). The report further catalogued that the "techniques of discrimination" used to "subvert the Constitution of the United States" remained "diverse." Id. at 15, 22. Among the most "common" included the "use of plainly arbitrary procedures" by certain officials, such as (1) the "requirement of vouchers or some other unduly technical method of identification," (2) the "rejection for insignificant errors in filling out forms," (3) the "failure to notify applicants of rejection," (4) the "imposition of delaying tactics," and (5) the "discrimination in giving assistance to applicants." Id. at 22; see also U.S. Comm'n on Civil Rights, 1961 U.S. Comm'n

24

on Civil Rights Report: Voting, at 137 (1961) ("1961 CCR Report") (describing the arbitrary requirement "to calculate [one's] age to the day" as a "common technique of discriminating against would-be voters on racial grounds"). As a result of this report, Congress passed the Civil Rights Act of 1964 to remedy "problems encountered in the operation and enforcement of the Civil Rights Acts of 1957 and 1960[.]" H.R. Rep. No. 88-914, title I (1963), as reprinted in 1964 U.S.C.C.A.N. 2391, 2394 ("1963 House Report"); see also id. at 2448 (explaining further that Congress sought rectify the failure of prior legislation "to end wholesale voter discrimination in many areas").

The 1964 legislation included an initial version of the Materiality Provision that applied only to federal elections, which the House Report described as "prohibiting the disqualification of an individual because of immaterial errors or omissions in papers or acts relating to [] voting." Id. at 2394. The House Report reflects that Congress largely envisioned the Materiality Provision to address discriminatory practices in voter registration. Id. at 2391, 2491 (Congressmen expressing their views that the Materiality Provision required registration officials to disregard minor errors or omissions if they are not material in determining whether an individual is qualified to vote). However, in framing the problem, Congress understood from the CCR's initial report that "where there is will and opportunity to discriminate against certain potential voters, ways to discriminate will be found." 1959 CCR Report at 133. Accordingly, the initial focus on registration merely reflects that, at the time the legislation was enacted, registration was the threshold problem that needed to be addressed, but it was not the only problem that Congress did, in fact, address. Indeed, the definition of vote that is in § 10101 demonstrates

that it is illogical to conclude that Congress, who was seeking to ensure that Black Americans could vote, intended to enact legislation that only allowed Black Americans to register to vote but gave no regard to whether those same individuals could actually have their votes counted once registered. See, e.g., 1963 House Report at 2393 (explaining "H.R. 7152, as amended, . . . would reduce discriminatory obstacles to the exercise of the right to vote[,]" not just the right to register to vote).

Ultimately, "the provisions of the 1957, 1960, and 1964 Civil Rights Acts to eliminate discriminatory voting practices [proved] to be clearly inadequate," 111 Cong. Rec. 15,645 (1965) (statement of Rep. Emanuel Celler), and "[p]rogress" remained "painfully slow," H.R. Rep. No. 89-439 (1965), as reprinted in 1965 U.S.C.C.A.N. 2437, 2441. The CCR expressed concerns that Congress's prior efforts had "failed to produce any significant increase in [Black] registration and voting." U.S. Comm'n on Civil Rights, Voting in Mississippi, at 49 (1965). Even the Supreme Court observed that when Congress banned specific discriminatory practices, "some of the States affected . . . merely switched to discriminatory devices not covered by the federal decrees," "enacted difficult new tests," "defied and evaded court orders," or "simply closed their registration offices to freeze the voting rolls." Katzenbach, 383 U.S. at 314. Consequently, Congress passed the Voting Rights Act of 1965, which expanded the Materiality Provision to cover all elections, Pub. L. No. 89-110, 79 Stat. 437, 445 (1965), thereby ensuring that, even in State and local elections, voters were not denied the right to cast a ballot based on inconsequential paperwork mistakes that had no impact on determining whether the voter was qualified to vote. A fulsome consideration of the legislative history surrounding the

explained in more detail in note 19, history shows that Congress investigated the problem of voter discrimination and learned that it was pervasive, adaptable, and destructive. Although Congress sought to address what, at the time, was the threshold problem for Black Americans trying to vote, Congress's concerns about voter discrimination did not vanish after registration. Congress's underlying concern was wrongful disenfranchisement. In light of the important problem Congress sought to address, and its adoption of broad statutory language, it follows that the Materiality Provision applies to mistakes on paperwork including, but not limited to, voter registration forms. See Katzenbach, 383 U.S. at 309 (describing 'voluminous legislative history' addressing 'unremitting and ingenious defiance of the Constitution'").[20]

---

Voting Rights Act demonstrates that Congress clearly understood that it was acting in an area normally reserved to the States and did so because of the extraordinary need to protect the franchise. Congress regarded the Voting Rights of Act of 1965 as "essential to prevent any last minute nullification of the enfranchisement of qualified citizens." 111 Cong. Rec. 10958, 11021-22 (May 19, 1965) (statement of Sen. Fong).

[20] The Materiality Provision does not require proof that the State law under review was motivated by discriminatory animus as the plain language of the Materiality Provision contains no such requirement. See Bostock, 590 U.S. at 674 (identifying no constitutional problem when legislation "reaches beyond the principal evil legislators may have intended or expected to address," as "it is ultimately the provisions of . . . legislative commands rather than the principal concerns of our legislators by which we are governed" (internal quotation marks and citations omitted)). Additionally,

Reading the statute to cover paperwork that is created after a voter is registered also does not render the Materiality Provision unconstitutional. First, with respect to federal elections, the Elections Clause provides that "[t]he Times, Places and Manner of holding" federal elections "shall be prescribed in each State by the Legislature thereof; but Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Elections

---

Congress's choice for the Materiality Provision to cover facially neutral, but nonetheless immaterial, post-registration requirements is an appropriate and necessary approach to remedy voter discrimination, particularly because States used what appeared to be facially neutral voting requirements to disenfranchise certain voters. See Condon v. Reno, 913 F. Supp. 946, 950 (D.S.C. 1995) (describing the requirement for a voter to calculate his age in exact months, which disparately affected Black voters in the Jim Crow South, and which Congress sought to eradicate by way of the Materiality Provision); cf. Nev. Dep't of Hum. Res. v. Hibbs, 538 U.S. 721, 721-22 (2003) (observing in the analogous Fourteenth Amendment context that "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct in order to prevent and deter unconstitutional conduct"). In any event, an amicus has cited a report finding that the types of errors and omissions that occurred in this case disproportionately disenfranchised minority voters. See SeniorLAW Center Amicus Br. at 11-12 (citing Carter Walker & Laura Benshoff, Philadelphia's Communities of Color Disproportionately Affected When Mail Ballots Are Rejected Over Small Errors, SpotlightPA (June 27, 2023), https://www.spotlightpa.org/news/2023/06/pa-philadelphia-mail-ballot-rejection-black-latino/).

Clause on its own thus supplies authority for Congress to prohibit the disenfranchisement of voters for immaterial paperwork mistakes in elections where federal candidates are on the ballot.

Second, both the Fourteenth and Fifteenth Amendments empowered Congress to promulgate legislation such as the Civil Rights Acts of 1957, 1960, and 1964 and the Voting Rights Act of 1965.  U.S. Const. amends. XIV, § 5, XV, § 2.  Although the Supreme Court has stated that such legislation need only be reviewed for a rational basis, Katzenbach, 383 U.S. at 324, it also has indicated that legislation enacted under the Fourteenth Amendment must be congruent and proportional to the injury Congress sought to prevent, City of Boerne v. Flores, 521 U.S. 507, 520 (1997).  See Vote.Org v. Callanen, 89 F.4th 459, 486 n.11 (5th Cir. 2003) ("The Supreme Court has not decided whether legislation enacted under the Fifteenth Amendment on voting rights must be congruent and proportional or simply a rational means of executing a constitutional prohibition" (internal quotation marks, citations, and alterations omitted)).

The interpretation of the Materiality Provision set forth herein survives constitutional muster under either standard.  See id. ("The Materiality Provision satisfies either test.").  As already noted, the historical record shows that Congress sought to eliminate a variety of evils plaguing the voting process when it passed the Civil Rights Acts and the Voting Rights Act.  See supra n.19; accord Shelby Cnty. v. Holder, 570 U.S. 529, 534 (2013) (noting that "Congress determined [that the Voting Rights Act of 1965] was needed to address entrenched racial discrimination in voting," not merely in registering to vote); id. at 545 (quoting favorably Katzenbach, 383 U.S. at 308, for the

proposition that in 1966 "'[t]he 'blight of racial discrimination in voting' had 'infected the electoral process in parts of our country for nearly a century'"); id. at 548 (observing that the Voting Rights Act of 1965 "has proved immensely successful at redressing racial discrimination and integrating the voting process"—not registration, alone). This history demonstrates that Congress was concerned with protecting voters' rights at every step of the voting process, not just during registration. "[P]rohibit[ing] those acting under color of law from using immaterial omissions, which were historically used to prevent racial minorities from voting, [and] from blocking any individual's ability to vote[,]" is a rational, congruent, and proportional remedy to address a State actor's effort to interfere with the franchise. Vote.Org, 89 F.4th at 487; see Florida State Conf. of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1173 (11th Cir. 2008) ("[W]e recognize that Congress in combating specific evils might choose a broader remedy."); accord La Unión del Pueblo Entero v. Abbott, No. 5:21-cv-0844, 2023 WL 8263348, at *21 (W.D. Tex. Nov. 29, 2023) ("Congress's enactment of a broader rule is entirely rational: after identifying a record of a problem at the registration stage, Congress was not limited to crafting a solution with an obvious loophole allowing officials to use forms at later stages in the same way, and for the same purpose.").

For these reasons, the first clause of the Materiality Provision covers mistakes on paperwork submitted both in

connection with a voter's initial registration to vote and those
required to ensure that the voter's vote is counted.[21, 22]

---

[21] Other courts have reached similar conclusions.  See,
e.g., La Unión del Pueblo Entero, 2023 WL 8263348, at *19
(concluding that the Materiality Provision applies because the
"preparation of a carrier envelope is an 'act requisite to voting'
for individuals who cast a mail ballot"); League of Women
Voters of Arkansas v. Thurston, No. 5:20-cv-05174, 2023 WL
6446015, at *16 (W.D. Ark. Sept. 29, 2023) (applying the
Materiality Provision to absentee ballot applications); In re
Georgia Senate Bill 202, No. 1:21-mi-55555, 2023 WL
5334582, at *10 (N.D. Ga. Aug. 18, 2023), appeal docketed,
No. 23-13245 (11th Cir.) (holding that returning an absentee
ballot and completing the outer envelope is an act requisite to
voting); Common Cause v. Thomsen, 574 F. Supp. 3d 634, 636
(W.D. Wis. 2021) (observing that the Materiality Provision
"isn't limited to . . . voter registration"); Ford v. Tenn. Senate,
No. 06-2031, 2006 WL 8435145, at *7, 10-11 (W.D. Tenn.
Feb. 1, 2006) (holding that under the Materiality Provision,
State officials could not set aside in-person voters' ballots
because they had not met the requirement to separately sign
both a ballot application form and a poll book).

Appellants have identified only one district court that
has ruled differently.  In Friedman, the court declined to enjoin
the counting of absentee ballots received after a deadline,
principally because this was not an error or omission on a
record or paper.  345 F. Supp. 2d at 1373.  Thus, that case
differs from this case, which involves paperwork.  Relatedly,
although the Friedman court viewed the Materiality Provision
as being "designed to eliminate practices that could encumber
an individual's ability to register to vote[,]" id. at 1370-71
(emphasis and citation omitted), and stated that it found no

2

The Materiality Provision's second clause limits the Provision to cover errors or omissions only "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

_____

authority to hold that the Materiality Provision was intended to apply after a voter was deemed qualified, id. at 1371, it made these observations in a case where the alleged errors were (1) not on paperwork, and (2) did not affect state officials' ability to determine voter qualifications. Thus, these comments are dicta from an out-of-circuit district court.

22 The Majority speaks of a category of state election laws it calls "ballot-casting" or "vote-casting" measures, which it views as distinct from registration rules. This categorization is not grounded in the text of the statute, which draws no such distinction. In fact, its definition of "vote" demonstrates that the statute covers actions beyond registration. Cf. United States v. Mosley, 238 U.S. 383, 386 (1915) (stating "the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box"). Moreover, this distinction does not account for situations where same-day voter registration is permitted. See, e.g., Va. Code § 24.2-420.1. More specifically, in a same-day registration jurisdiction, a voter could make a paperwork mistake on the registration form that the Materiality Provision would forgive. If, however, moments later the voter made the identical mistake on another document requisite to voting, then, under the Majority's view, the Materiality Provision would not apply and the ballot could be discarded. Such an outcome would be inconsistent with the plain meaning of the Materiality Provision and Congress's goals in enacting it.

52 U.S.C. § 10101(a)(2)(B). Thus, mistakes on paperwork related to any act requisite to voting cannot provide a basis to discard someone's vote "if" the voter's mistake is immaterial "in determining whether" the voter is "qualified under State law to vote in such election." Id.

The statute defines the phrase "qualified under State law" to "mean qualified according to the laws, customs, or usages of the State[.]" Id. at § 10101(e).[23] "Material" means "having influence" or is "relevant." See Material, Black's Law Dictionary (4th ed. 1951) ("having influence or effect; going to the merits"); Material, Webster's Third New Int'l Dictionary of the English Language Unabr. (1963) ("of, relating to, or consisting of matter," "relevant, pertinent").[24] "Determine"

---

[23] As is the case in Pennsylvania, see 25 Pa. Cons. Stat. § 1301(b), States generally define voter qualifications to consist of substantive personal attributes. See, e.g., La Unión del Pueblo Entero, 2023 WL 8263348, at *22 (citing Lassiter v. Northampton Cnty. Bd. of Elections, 360 U.S. 45, 51 (1959) (residence, age, criminal record)). Such qualifying attributes are "distinct from rules governing the conduct of elections, including the manner of determining qualifications." Id. at *22 (citing Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1, 13-17 (2013); Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 666 (1966) (distinguishing qualifications and compliance with poll tax)).

[24] See also Wearry v. Cain, 577 U.S. 385, 392 (2016) (explaining that in the context of the Brady rule, "[e]vidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury") (internal quotation marks and citations omitted)); Anderson v. Liberty

means "to reach a decision about after thought and investigation," "decide upon," "find out exactly," "ascertain," or "resolve." Determine, Webster's New World Dictionary, College Ed. (1960). In this context, "in" means "used as a function word to indicate means or instrumentality." In, Webster's Seventh New Collegiate Dictionary (7th ed. 1963); see also In, Webster's New World Dictionary, College Ed. (1960) ("during the course of").[25] Thus, the phrase "in determining" within the Materiality Provision addresses whether the error or omission is used to ascertain or decide the voter's qualifications.

Therefore, read together, the Materiality Provision means that State actors cannot deprive a voter of the right to vote due to an error or omission he makes on papers that he must complete to have his ballot counted, including on papers distinct from application or registration forms, if the mistake is not relevant to the State's ability to ascertain whether he is qualified under state law to vote in the election.[26] Inversely, if

---

Lobby, 477 U.S. 242, 248 (1986) (describing materiality in the context of summary judgment as "facts that might affect the outcome of the suit under the governing law").

[25] See also Webster's Third New Int'l Dictionary of the English Language Unabr. (1963) ("to settle a question or controversy about"; "to come to a decision concerning as the result of investigation or reasoning").

[26] Contrary to the Majority's suggestion, determining whether an individual is qualified to vote does not end after the individual registers. On Election Day, States continue to verify voter qualifications up until the time they count voters' ballots, such as by requiring voters to sign-in or present identification immediately prior to voting at a polling location or by ensuring

that the voter had not died, moved from the district or the Commonwealth, or been incarcerated for a felony. <u>Cf.</u> <u>Vote.Org</u>, 89 F.4th at 489 (observing, as a broad principle, that States' "interest in voter integrity is substantial," and "that interest relates to the qualifications to vote").

It is worthwhile to note that the declaration here played a role in helping the State to determine that all mail-in voters were qualified to vote. As noted, the declaration contained the language "I hereby declare that I am qualified to vote in this election" above the date and signature line. <u>See, e.g.</u>, Pa. Supp. App. 284. Thus, the declaration provides additional assurance to election officials that the mail-in voter is qualified to vote. <u>See</u> 25 Pa. Stat. and Cons. Stat. § 3146.8(g)(3) ("When the county board meets to pre-canvass or canvass . . . mail-in ballots . . . the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d)[,]" which addresses deceased voters, 25 Pa. Stat. and Cons. Stat. § 3146.8(d),"and shall compare the information thereon with that contained in the . . . Mail-in Voters File . . . . If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the . . . Mail-in Voters File . . . verifies his right to vote . . ., the county board shall provide a list of the names of electors whose . . . mail-in ballots are to be pre-canvassed or canvassed." (internal quotation marks omitted)).

Accordingly, even assuming the Materiality Provision only covers documents States use to determine voter qualifications, the declaration and signature themselves—but not the date—fit the bill. They aid election officials in verifying the name of the voter and that he was qualified to vote on the date of the election. Therefore, the signed

someone makes an error or omission on paperwork required to vote and that mistake is relevant to the State actor in ascertaining whether the voter is qualified to vote, then the State actor can deny him the right to vote for making that mistake.[27]

---

declaration was material to determining voter qualifications but, as explained herein, the date was not.

[27] As explained herein, Congress wrote broadly when it enacted the Materiality Provision to include a host of paperwork beginning with "registration" through "having a ballot counted." 52 U. S. C. § 10101(e). Although it is unnecessary to decide here, there is good reason to conclude the Materiality Provision covers ballots. This, however, does not mean that State officials are, for example, required to count a ballot that contains votes for multiple candidates for a single position. This is because it would be impossible to "have such ballot counted and included in the appropriate totals of votes cast," 52 U.S.C. § 10101(e), because the State could not determine the candidate for whom the voter chose to vote.

Conversely, where a voter's choice is discernable, the Materiality Provision may require States to count those votes, say where the ballot is marked in black ink despite a state law requiring the ballots to be marked in blue ink. This is consistent with Congress's goal to restrain a State's ability to discard ballots cast by qualified voters.

Furthermore, as stated previously, see supra n.17, the interpretation herein also does not invalidate the broad array of State election laws that do not relate to paperwork required to vote or give license to bad actors who may attempt to exploit certain State election laws for improper purposes, such as those individuals who might implement a pay-to-vote scheme by having voters make errant marks on ballots to signal their vote,

3

Applying this interpretation of the Materiality Provision, the declaration here is squarely covered by the Provision's first clause.  First, the declaration appears on the mailing envelope and thus is a paper.  Second, although the declaration is not itself a registration or application, it is another paper required for a voter to have his vote counted.  See 25 Pa. Stat. and Cons. Stat. §§ 3146.6(a), 3150.16(a).  Third, qualified voters who failed to date their declarations or who wrote an incorrect or incomplete date had their ballots discarded for noncompliance with the date requirement.[28]  As

_____

where such marks are prohibited by State law.  See, e.g., 18 U.S.C. § 597; 52 U.S.C. § 20511.

Contrary to the Majority's characterization, these observations are not based upon whether there are legitimate interests being furthered, but rather are based upon what the law says.  Moreover, they are consistent with Congress's goal of safeguarding the right of all qualified voters to participate in the democratic process—an interest shared by federal and state actors alike.

[28] One member of the Majority asserts that even if the view espoused herein governed, an argument could be made that declarations that contain no date or incomplete dates should not be counted, but declarations that have an erroneous date, such as the wrong year, should be counted.  No party has advocated such view.  To the contrary, the parties agreed at oral argument that, for the purposes of the date requirement, there is no difference between a declaration that omits a date and a declaration that has an erroneous date.  This is consistent with the conclusion of the Pennsylvania Supreme Court, which held that both "undated or incorrectly dated" return envelops

a result of the disqualification of those ballots, affected voters were deprived of their right to have their votes counted.[29]

The components of the second clause are also satisfied. The record shows that the date errors and omissions were not relevant to a voting official's determination that the voter was qualified to vote. Although the declaration embodies the voter's representation that he was qualified to vote, and the signature provides the name of the voter,[30] the evidence shows that election officials did not use the date or absence thereof to determine a voter's qualifications (i.e., a voter's age, citizenship, county and duration of residence, or incarceration status). See 25 Pa. Cons. Stat. § 1301(b).[31]

---

could not be counted because they failed to comply with State law. Ball v. Chapman, 289 A.3d 1, 22-23 (Pa. 2023). The Ball court split as to whether such ballots should nonetheless be counted under the Materiality Provision.

[29] Elections officials confirmed that all rejected ballots were signed and timely received and came from voters who were otherwise registered and qualified to vote.

[30] The signature is being used for the sole purpose of providing a name and the name is needed to determine whether the name is associated with a qualified voter. Pennsylvania specifically prohibits election officials "from rejecting absentee or mail-in ballots based on signature comparison[.]" In re: Nov. 3, 2020 General Election, 240 A.3d 591, 611 (Pa. 2020).

[31] Election officials did not use the handwritten date to establish whether the ballot was timely received, and a voter whose mail-in ballot was timely received could have only signed the declaration at some point between the time that he received the mail-ballot from election officials and the time

Election officials denied qualified voters the right to vote by declining to count timely-received ballots contained in return envelopes with signed declarations that were missing or had incorrect dates, even though such errors or omissions were immaterial to ascertaining whether those individuals were qualified to vote. Accordingly, enforcement of the State's date requirement violates the Materiality Provision. Thus, timely received ballots cast by qualified voters that were contained in envelopes with signed declarations that have omitted or mistaken dates should have been (and should be) counted.

My colleagues disagree with this conclusion. They hold the majority, and their view prevails. From a practical perspective, this means that the State may toss a ballot cast by a qualified voter based upon mistakes on required paperwork immaterial to determining voter qualifications.

Today's ruling is a clear reminder that all voters must carefully review and comply with every instruction and requirement imposed upon them. If they do not, they risk having their otherwise valid votes discounted based on even the most inconsequential mistake. One can only hope that election officials do not capitalize on the Majority's narrow interpretation of the Materiality Provision by enacting unduly technical and immaterial post-registration paperwork requirements that could silence the voices of qualified voters.

---

election officials received it back. Election officials discarded ballots received after the Election Day deadline and did not count the ballots of voters who died before Election Day. In addition, no county board of elections identified any fraud concern due to a declaration missing or having an incorrect date.

I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-3166

_____

PENNSYLVANIA STATE CONFERENCE OF NAACP BRANCHES; LEAGUE OF
WOMAN VOTERS OF PENNSYLVANIA; PHILADELPHIANS ORGANIZED TO
WITNESS EMPOWER AND REBUILD; COMMON CAUSE PENNSYLVANIA;
BLACK POLITICAL EMPOWERMENT PROJECT; MAKE THE ROAD
PENNSYLVANIA; BARRY M. SEASTEAD; MARLENE G. GUTIERREZ; AYNNE
MARGARET PLEBAN POLINSKI; JOEL BENCAN; LAURENCE M. SMITH

v.

SECRETARY COMMONWEALTH OF PENNSYLVANIA; ADAMS COUNTY
BOARD OF ELECTIONS; ALLEGHENY COUNTY BOARD OF ELECTIONS;
ARMSTRONG COUNTY BOARD OF ELECTIONS; BEAVER COUNTY BOARD OF
ELECTIONS; BEDFORD COUNTY BOARD OF ELECTIONS; BERKS COUNTY
BOARD OF ELECTIONS; BLAIR COUNTY BOARD OF ELECTIONS; BRADFORD
COUNTY BOARD OF ELECTIONS; BUCKS COUNTY BOARD OF ELECTIONS;
BUTLER COUNTY BOARD OF ELECTIONS; CAMBRIA COUNTY BOARD OF
ELECTIONS; CAMERON COUNTY BOARD OF ELECTIONS; CARBON COUNTY
BOARD OF ELECTIONS; CENTRE COUNTY BOARD OF ELECTIONS; CHESTER
COUNTY BOARD OF ELECTIONS; CLARION COUNTY BOARD OF ELECTIONS;
CLEARFIELD COUNTY BOARD OF ELECTIONS; CLINTON COUNTY BOARD
OF ELECTIONS; COLUMBIA COUNTY BOARD OF ELECTIONS; CRAWFORD
COUNTY BOARD OF ELECTIONS; CUMBERLAND COUNTY BOARD OF
ELECTIONS; DAUPHIN COUNTY BOARD OF ELECTIONS; DELAWARE
COUNTY BOARD OF ELECTIONS; ELK COUNTY BOARD OF ELECTIONS; ERIE
COUNTY BOARD OF ELECTIONS; FAYETTE COUNTY BOARD OF ELECTIONS;
FOREST COUNTY BOARD OF ELECTIONS; FRANKLIN COUNTY BOARD OF
ELECTIONS; FULTON COUNTY BOARD OF ELECTIONS; GREENE COUNTY
BOARD OF ELECTIONS;  HUNTINGDON COUNTY BOARD OF ELECTIONS;
INDIANA COUNTY BOARD OF ELECTIONS; JEFFERSON COUNTY BOARD OF
ELECTIONS; JUNIATA COUNTY BOARD OF ELECTIONS; LACKAWANNA
COUNTY BOARD OF ELECTIONS; LANCASTER COUNTY BOARD OF
ELECTIONS; LAWRENCE COUNTY BOARD OF ELECTIONS; LEBANON
COUNTY BOARD OF ELECTIONS; LEHIGH COUNTY BOARD OF ELECTIONS;
LUZERNE COUNTY BOARD OF ELECTIONS; LYCOMING COUNTY BOARD OF
ELECTIONS; MCKEAN COUNTY BOARD OF ELECTIONS; MERCER COUNTY

BOARD OF ELECTIONS; MIFFLIN COUNTY BOARD OF ELECTIONS; MONROE
COUNTY BOARD OF ELECTIONS; MONTGOMERY COUNTY BOARD OF
ELECTIONS; MONTOUR COUNTY BOARD OF ELECTIONS; NORTHAMPTON
COUNTY BOARD OF ELECTIONS; NORTHUMBERLAND COUNTY BOARD OF
ELECTIONS; PERRY COUNTY BOARD OF ELECTIONS; PHILADELPHIA
COUNTY BOARD OF ELECTIONS; PIKE COUNTY BOARD OF ELECTIONS;
POTTER COUNTY BOARD OF ELECTIONS; SCHUYLKILL COUNTY BOARD OF
ELECTIONS; SNYDER COUNTY BOARD OF ELECTIONS; SOMERSET COUNTY
BOARD OF ELECTIONS; SULLIVAN COUNTY BOARD OF ELECTIONS;
SUSQUEHANNA COUNTY BOARD OF ELECTIONS; TIOGA COUNTY BOARD
OF ELECTIONS; UNION COUNTY BOARD OF ELECTIONS; VENANGO COUNTY
BOARD OF ELECTIONS; WARREN COUNTY BOARD OF ELECTIONS;
WASHINGTON COUNTY BOARD OF
ELECTIONS; WAYNE COUNTY BOARD OF ELECTIONS; WESTMORELAND
COUNTY BOARD OF ELECTIONS; WYOMING COUNTY BOARD OF
ELECTIONS; YORK COUNTY BOARD OF ELECTIONS

REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN
CONGRESSIONAL COMMITTEE; THE REPUBLICAN PARTY OF
PENNSYLVANIA,

Appellants (Intervenors in D.C.)

---

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No. 1-22-cv-00339)
District Judge: Honorable Susan Paradise Baxter

---

Argued on February 20, 2024

Before: SHWARTZ, CHUNG, and AMBRO, <u>Circuit Judges</u>

## **JUDGMENT**

This cause came to be considered on appeal from the United States District Court

for the Western District of Pennsylvania and was argued on February 20, 2024.

On consideration whereof, it is now hereby ORDERED that the order of the

2

District Court entered on November 21, 2023, is hereby REVERSED with respect to the

Materiality Provision claim and the matter is REMANDED for further proceedings on the

equal protection claim.

Costs are not taxed.

All of the above in accordance with the Opinion of this Court.


ATTEST:


s/ Patricia S. Dodszuweit
 Clerk

Dated: March 27, 2024