

April 16, 2024

Patricia S. Dodszuweit
Clerk of Court
United States Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

re: *Pennsylvania State Conference of the NAACP v. Schmidt*, No. 23-3166

Ms. Dodszuweit:

I represent Plaintiffs-Appellees in the above-captioned appeal. I write to alert the Court to supplemental authority that further supports the pending petition for rehearing, namely, the Supreme Court's decision in *Bissonette v. LePage Bakeries*, No. 23-51, a copy of which is attached.

*Bissonette* involved a federal statutory exception to mandatory arbitration applicable to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Bissonette* Op. 3. The Court rejected a bakery company's argument that construing the statute to cover *all* transportation workers and not just those in the transportation industry would "render 'seamen' and 'railroad employees' superfluous." *Id.* 8.

*Bissonette* rejected the panel majority's exact reasoning. The panel majority suggested that applying the Materiality Provision to the declaration form would render "the deliberate references to "registration" and "application" "superfluous." Op. 41. *Bissonette* held that this reasoning "gets *ejusdem generis* exactly backwards." *Bissonette* Op. 8.

Like the losing party in *Bissonette*, the panel majority suggested its reading was necessary because otherwise the Materiality Provision's residual "or other act requisite to voting" language might swallow up the terms "application" and "registration," allowing the statute to extend to errors on secrecy envelopes or even on the ballot itself. Op. 31-35, 41-42. And *Bissonette* rejected that suggestion, in reasoning that is directly applicable here: "It is the specific terms "[application]" and "[registration]" that limit the residual clause, not the residual clause that swallows up these narrower terms." *Bissonette* Op. 8. "Only by deleting

1

"[application]" and "[registration]" from the statute could [the Materiality Provision] reach as far as the [panel majority] imagine[d]." *Id.*

As Plaintiffs explained, relying on *Circuit City v. Adams*, 532 U.S. 105 (2001), which involved the same underlying statutory language as *Bissonette*, the Materiality Provision applies to required paper forms, like application forms, registration forms, or the declaration form at issue in this case. Rhrg Pet. 11, 17-18; Dissent 20 n.15. *Bissonette* strongly supports Plaintiffs' natural construction of the statute, in accordance with the *ejusdem generis* canon, and further demonstrates that the panel majority's unnatural one was incorrect.

Sincerely,

/s/ Ari J. Savitzky

Ari Savitzky
Senior Staff Attorney
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Plaintiffs Appellees*

Cc: all counsel via ECF

## CERTIFICATION

       I hereby certify that the body of the foregoing letter pursuant to Fed. R. App. P. 28(j) contains 346 words according to the word-processing software used to prepare this Letter.

       I certify that on April 16, 2024, I served a copy of the foregoing on all counsel of record by CM/ECF.

<u>Dated</u>: April 16, 2024

                                        <u>/s/ Ari J. Savitzky</u>
                                        Ari J. Savitzky

(Slip Opinion) OCTOBER TERM, 2023 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BISSONNETTE ET AL. *v.* LePAGE BAKERIES PARK ST., LLC, ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 23–51. Argued February 20, 2024—Decided April 12, 2024

Respondent Flowers Foods, Inc. produces and markets baked goods that are distributed nationwide. Petitioners Neal Bissonnette and Tyler Wojnarowski owned the rights to distribute Flowers products in certain parts of Connecticut. To purchase those rights, they entered into contracts with Flowers that require any disputes to be arbitrated under the Federal Arbitration Act, 9 U. S. C. §1 *et seq.* After petitioners sued Flowers and two of its subsidiaries for violating state and federal wage laws, Flowers moved to compel arbitration. Petitioners responded that they are exempt from coverage under the FAA because they fall within an exception in §1 of the Act for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." The District Court dismissed the case in favor of arbitration, concluding that petitioners were not "transportation workers" exempt from the Act under §1. The Second Circuit ultimately affirmed on the ground that the §1 exemption was available only to workers in the transportation industry, but that petitioners were in the bakery industry. 49 F. 4th 655, 661–662.

*Held*: A transportation worker need not work in the transportation industry to be exempt from coverage under §1 of the FAA. Pp. 4–9.

(a) The Court has long recognized that the exemption in §1 is limited to transportation workers. See *Circuit City Stores*, *Inc.* v. *Adams*, 532 U. S. 105. Applying the *ejusdem generis* canon of statutory interpretation to §1, the Court in *Circuit City* read the general phrase "class of workers engaged in . . . commerce" to be "controlled and defined by reference to" the specific categories "seamen" and "railroad employees" that precede it. *Id.*, at 115. The Court concluded that the "linkage" between "seamen" and "railroad employees" is that they are both

transportation workers, *id.*, at 118–119, 121, and the Court thus interpreted the class of workers in the residual clause of §1 to be limited in the same way.

The Court again considered the scope of the residual clause in *Southwest Airlines Co.* v. *Saxon* and declined to adopt an industrywide approach to §1, rejecting the employee's claim that she was a member of a "class of workers engaged in foreign or interstate commerce" simply because she worked for an airline and carried out its customary work. See 596 U. S. 450, 460. Instead, the language of §1—referring to "'workers'" who are "engaged" in commerce—focuses on the performance of work rather than the industry of the employer. *Id.*, at 456 (quoting *New Prime Inc.* v. *Oliveira*, 586 U. S. 105, 116). The relevant question was what the employee does at the airline, not what the airline does generally. *Saxon*, 596 U. S., at 456.

Here the Second Circuit fashioned its transportation-industry requirement without any guide in the text of §1 or this Court's precedents. The Second Circuit decided that an entity would be considered within the transportation industry if it "pegs its charges chiefly to the movement of goods or passengers" and its "predominant source of commercial revenue is generated by that movement." 49 F.4th, at 661. But that test would often turn on arcane riddles about the nature of a company's services. For example, does a pizza delivery company derive its revenue mainly from pizza or delivery? Extensive discovery might be necessary before deciding a motion to compel arbitration, adding expense and delay to every FAA case. That "complexity and uncertainty" would "'breed[] litigation from a statute that seeks to avoid it.'" *Circuit City*, 532 U. S., at 123 (quoting *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U. S. 265, 275). Pp. 4–7.

(b) Flowers argues that the §1 exemption would sweep too broadly without an implied transportation-industry requirement. Because "virtually all products move in interstate commerce," Flowers warns that nearly all workers who load or unload goods would be exempt from arbitration. But §1 does not define the class of exempt workers in such limitless terms. Instead, as the Court held in *Saxon*, a transportation worker is one who is "actively" "'engaged in transportation' of . . . goods across borders via the channels of foreign or interstate commerce." 596 U. S., at 458 (quoting *Circuit City*, 532 U. S., at 121). In other words, a transportation worker "must at least play a direct and 'necessary role in the free flow of goods' across borders." 596 U. S., at 458 (quoting *Circuit City*, 532 U. S., at 121). These requirements "undermine[] any attempt to give the provision a sweeping, open-ended construction," instead limiting §1 to its appropriately "narrow" scope. *Id.*, at 118. Pp. 7–9.

49 F. 4th 655, vacated and remanded.

ROBERTS, C. J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 23–51

NEAL BISSONNETTE, ET AL., PETITIONERS *v.* LEPAGE BAKERIES PARK ST., LLC, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[April 12, 2024]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Neal Bissonnette and Tyler Wojnarowski worked as distributors for Flowers Foods, Inc., a multibillion-dollar producer and marketer of baked goods. After they sued Flowers for violating state and federal wage laws, Flowers moved to compel arbitration under the Federal Arbitration Act. The question presented is whether the exemption from coverage under that Act for any "class of workers engaged in foreign or interstate commerce" is limited to workers whose employers are in the transportation industry. 9 U. S. C. §1.

I

Flowers Foods, Inc. is "the second-largest producer and marketer of packaged bakery foods" in the United States.[1] Flowers Foods, www.flowersfoods.com (Mar. 14, 2024). One of its flagship products is Wonder Bread, which it promotes with a 95-foot-tall hot air balloon and a parade float called

———
[1] In addition to Flowers, two of its subsidiaries, C. K. Sales Co., LLC, and LePage Bakeries Park St., LLC, are defendants below and respondents here. We refer to respondents collectively as "Flowers."

The Wondership.  Flowers also makes and markets other baked goods such as tortillas, bagels, Butterscotch Krimpets, and Jumbo Honey Buns in more than 40 bakeries located in 19 States.  *Ibid*.  From there, these products are distributed across the country.

But Flowers is not solely responsible for getting its baked goods to customers.  Some of its subsidiaries use a "direct-store-delivery" system in which franchisees buy the rights to distribute Flowers products in particular geographic territories.  Those distributors purchase the baked goods from Flowers and then market, sell, and deliver them to retailers.  App. 2; 49 F. 4th 655, 658 (CA2 2022).

Bissonnette and Wojnarowski were franchisees who owned the rights to distribute Flowers products in certain parts of Connecticut.  Flowers baked the bread and buns and sent them to a warehouse in Waterbury.  Bissonnette and Wojnarowski picked them up and distributed them to local shops.  They allegedly spent at least forty hours a week delivering Flowers products in their territories.  But their jobs extended beyond carrying the products from Point A to Point B.  They also found new retail outlets, advertised, set up promotional displays, and maintained their customers' inventories by ordering baked goods from Flowers, stocking shelves, and replacing expired products.  App. 1–3, 5; 49 F. 4th, at 658; 460 F. Supp. 3d 191, 194, 200 (Conn. 2020).

To purchase the rights to their territories, Bissonnette and Wojnarowski signed Distributor Agreements with Flowers.  Those contracts incorporate separate Arbitration Agreements that require "any claim, dispute, and/or controversy" to be arbitrated under the Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq*.; App. 64, 133; see also *id.,* at 37, 104–105.

In 2019, Bissonnette and Wojnarowski brought a putative class action claiming that Flowers had underpaid them in violation of state and federal law.  They alleged that

Flowers had taken unlawful deductions from their wages, failed to pay them overtime, and unjustly enriched itself by requiring them to pay for distribution rights and operating expenses. Flowers moved to dismiss or to compel arbitration under the FAA, arguing that the contracts required the distributors to arbitrate their claims individually.

The FAA provides generally that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. §2. It contains, however, an exception specifying that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." §1. Bissonnette and Wojnarowski contend that they fall within this exception, and therefore cannot be compelled to arbitrate under the FAA.

The District Court dismissed the case in favor of arbitration. It explained that for Bissonnette and Wojnarowski to be exempt from the FAA, they must be "transportation workers." 460 F. Supp. 3d, at 197. And it concluded that their "much broader scope of responsibility" under the Distributor Agreements "belie[d] the claim that they are only or even principally truck drivers." *Id.*, at 199.

Without addressing the District Court's analysis, the Second Circuit affirmed on the alternative ground that Bissonnette and Wojnarowski "are in the bakery industry." 33 F. 4th 650, 652 (2021). And under Circuit law, the panel explained, §1 of the FAA exempts only "'workers involved in the transportation industries.'" *Id.*, at 655 (quoting *Adams* v. *Suozzi*, 433 F. 3d 220, 226, n. 5 (CA2 2005)). Judge Pooler dissented because, in her view, §1 asks whether a person is a "transportation worker[]," not "*for whom* the worker undertakes her transportation work." 33 F. 4th, at 662, 666 (emphasis added).

A month after the Second Circuit decided the appeal, we decided *Southwest Airlines Co.* v. *Saxon*, 596 U. S. 450

(2022). In that case, we determined that a ramp supervisor who "frequently load[ed] and unload[ed] cargo" from airplanes belonged to a "class of workers engaged in foreign or interstate commerce." *Id.*, at 463. We held that a "class of workers" is properly defined based on what a worker does for an employer, "not what [the employer] does generally." *Id.*, at 456.

The Second Circuit granted panel rehearing in light of *Saxon* but adhered to its prior decision. The court held that an individual works in a transportation industry and may therefore be exempt under §1 only "if the industry . . . pegs its charges chiefly to the movement of goods or passengers, and the industry's predominant source of commercial revenue is generated by that movement." 49 F. 4th, at 661. Applying that test, the court concluded that the distributors' "commerce is in breads, buns, rolls, and snack cakes—not transportation services." *Id.*, at 662. Judge Pooler again dissented, reiterating her position that the majority erred in "focusing on the nature of [Flowers's] business, and not on the nature of [the distributors'] work"—"the sort of industrywide approach *Saxon* proscribes." *Id.*, at 671.

The Second Circuit denied rehearing en banc. 59 F. 4th 594 (2023). Judge Pooler, having assumed senior status, filed a statement opposing the denial. Judge Nathan dissented, joined by two other judges.

The Second Circuit's decision conflicted with decisions from the First Circuit. *Canales* v. *CK Sales Co.*, 67 F. 4th 38 (2023) (also involving Flowers Foods distributors); *Fraga* v. *Premium Retail Servs., Inc.*, 61 F. 4th 228 (2023).

We granted certiorari to resolve that conflict. 600 U. S. ___ (2023)

## II

The only question before us is whether a transportation

worker must work for a company in the transportation industry to be exempt under §1 of the FAA.[2] We conclude that there is no such requirement.

More than twenty years ago, in *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105 (2001), we recognized that §1 is limited to transportation workers. Adams, a sales counselor at an electronics store, claimed that §1 exempts *all* contracts of employment, regardless of what a worker does. *Id.*, at 109–111, 114. But he failed to account for *ejusdem generis*, the familiar canon of statutory interpretation that courts "interpret a 'general or collective term' at the end of a list of specific items in light of any 'common attribute[s]' shared by the specific items." *Saxon*, 596 U. S., at 458 (quoting *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 225 (2008); alteration in original). Applying that canon to §1, we explained that the general phrase "class of workers engaged in . . . commerce" is "controlled and defined by reference to" the specific categories "seamen" and "railroad employees" that precede it. *Circuit City*, 532 U. S., at 115. And we concluded that the "linkage" between "seamen" and "railroad employees" is that they are both transportation workers. *Id.*, at 118–119, 121. The class of workers in the residual clause was therefore limited in the same way.

That reading of §1 harmonized the FAA with other statutes designed to protect the movement of goods in commerce. *Id.*, at 121. Congress enacted the FAA in 1925 to override the longstanding refusal of courts to enforce arbitration agreements. See *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U. S. 265, 270–271 (1995). At that time, though, specific statutory dispute resolution regimes already covered seamen and railroad employees—"transportation

―――――――
[2]The Second Circuit did not address whether Bissonnette and Wojnarowski qualify as transportation workers based on the work that they perform, or whether they are "engaged in . . . interstate commerce" even though they do not drive across state lines. We do not decide those issues.

workers" who played a "necessary role in the free flow of goods." *Circuit City*, 532 U. S., at 121 (citing Shipping Commissioners Act of 1872, ch. 322, 17 Stat. 262; Transportation Act of 1920, §300 *et seq.*, 41 Stat. 469). An exemption from the FAA for those workers was thus required to avoid "unsettl[ing]" those schemes. *Circuit City*, 532 U. S., at 121. The residual clause similarly reserves for Congress the decision whether to enact additional "specific legislation for those engaged in transportation," while "ensur[ing] that workers in general would be covered by" the FAA. *Ibid.*; see also *New Prime Inc.* v. *Oliveira*, 586 U. S. 105, 110–111 (2019).

We again considered the scope of the residual clause in *Saxon*, where we expressly declined to adopt an "industry-wide" approach of the sort Flowers advances here. The respondent in *Saxon* argued that she was a member of a "class of workers engaged in foreign or interstate commerce" simply because she worked for an airline and carried out its customary work. See 596 U. S., at 460. But §1 refers to "'workers'" who are "engaged" in commerce. *Id.*, at 456 (quoting *New Prime*, 586 U. S., at 116). That language focuses on "'the *performance* of work'" rather than the industry of the employer. *Saxon*, 596 U. S., at 456 (quoting *New Prime*, 586 U. S., at 116; emphasis as altered by *Saxon*). And §1 says nothing to direct courts to consider the industry of a worker's employer. The relevant question was "what [Saxon] does at Southwest, not what Southwest does generally." *Saxon*, 596 U. S., at 456.

Because the Second Circuit in this case fashioned its transportation-industry requirement without any guide in the text of §1 or our precedents, it had to figure out for itself what constituted a "transportation industry." The court decided that an entity would be considered within that industry if it "pegs its charges chiefly to the movement of goods or passengers" and its "predominant source of commercial revenue is generated by that movement." 49 F. 4th, at 661.

The application of such a test, however, would often turn on arcane riddles about the nature of a company's services. Does a pizza delivery company derive its revenue mainly from pizza or delivery? Do companies like Amazon and Walmart—which both sell products of their own and transport products sold by third parties—derive their revenue mainly from retail or shipping?[3] Extensive discovery might be necessary to explore the internal structure and revenue models of a company before deciding a simple motion to compel arbitration. Mini-trials on the transportation-industry issue could become a regular, slow, and expensive practice in FAA cases. All this "complexity and uncertainty" would "'breed[] litigation from a statute that seeks to avoid it.'" *Circuit City*, 532 U. S., at 123 (quoting *Allied-Bruce*, 513 U. S., at 275).

### III

At the end of its brief, Flowers argues that our analysis in *Saxon* actually "suggests" that working in the transportation industry is a necessary but not sufficient condition for §1 to apply. Brief for Respondents 43–44. Flowers also emphasizes a single passing description in our opinion of "seamen" as "a subset of workers engaged in the maritime shipping industry." *Saxon*, 596 U. S., at 460. But this reading of *Saxon* misses the basis for our holding in that case. *Saxon* rejected the proposition that there is an industry-wide link between "seamen" and "railroad employees"—a "flawed premise" that is essential to Flowers's position here. *Ibid*. Those classes of workers, as we read the statute then and now, are connected by what they do, not for whom they do it.

Flowers also points to historical statutes regulating certain seamen and railroad employees to show that those

---

[3] See Fulfillment by Amazon, https://sell.amazon.com/fulfillment-by-amazon; Walmart Fulfillment Services, https://marketplace.walmart.com/walmart-fulfillment-services/.

terms were limited to transportation-industry workers in 1925. Brief for Respondents 15–27. But those statutes only prove that where Congress wanted to regulate seamen or railroad employees in a particular industry, it said so explicitly—for example, by specifying that a law covered seamen *aboard merchant vessels*, or that a law covered employees of railroad carriers *subject to the Interstate Commerce Act*. See, *e.g.*, The Seamen's Act of 1915, §2, 38 Stat. 1164; Transportation Act of 1920, §§300(1), 301–302, 41 Stat. 469.

Unlike those industry-specific statutes, §1 refers to "seamen" and "railroad employees" without specifying any industry to which they must belong. It would be strange to read the conspicuous absence of similar industry-specific language in §1 as a sign that Congress defined the exemption on an industrywide basis. The far more natural inference, which we embraced in *Circuit City* and *Saxon*, is that "seamen" and "railroad employees" share the employment characteristic of being transportation workers.

Nor does construing §1 to cover transportation workers render "seamen" and "railroad employees" superfluous, as Flowers contends. See Brief for Respondents 35. That argument gets *ejusdem generis* exactly backwards. It is the specific terms "seamen" and "railroad employees" that limit the residual clause, not the residual clause that swallows up these narrower terms. Only by deleting "seamen" and "railroad employees" from the statute could §1 reach as far as Flowers imagines.

Having lost on text and precedent, Flowers turns to policy, arguing that the §1 exemption would sweep too broadly without an implied transportation-industry requirement. Because "virtually all products move in interstate commerce," Flowers warns that virtually all workers who load or unload goods—from pet shop employees to grocery store clerks—will be exempt from arbitration. *Id.,* at 46–47.

We have never understood §1 to define the class of exempt workers in such limitless terms. To the contrary, as

we held in *Saxon*, a transportation worker is one who is "actively" "'engaged in transportation' of . . . goods across borders via the channels of foreign or interstate commerce." 596 U. S., at 458 (quoting *Circuit City*, 532 U. S., at 121). In other words, any exempt worker "must at least play a direct and 'necessary role in the free flow of goods' across borders." 596 U. S., at 458 (quoting *Circuit City*, 532 U. S., at 121). These requirements "undermine[] any attempt to give the provision a sweeping, open-ended construction," instead limiting §1 to its appropriately "narrow" scope. *Id.,* at 118.

\* \* \*

A transportation worker need not work in the transportation industry to fall within the exemption from the FAA provided by §1 of the Act. The Second Circuit accordingly erred in compelling arbitration on the basis that petitioners work in the bakery industry. We express no opinion on any alternative grounds in favor of arbitration raised below, including that petitioners are not transportation workers and that petitioners are not "engaged in foreign or interstate commerce" within the meaning of §1 because they deliver baked goods only in Connecticut.

The judgment of the Second Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*